Exhibit  1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:** | MDL No. 2492<br><br>Judge John Z. Lee<br><br>Magistrate Judge Brown |
| **Walker,** *et al*.<br><br>       **v.**<br><br>**National College Athletic Assoc.,** | No. 1:13-cv-00293 (E.D. Tenn.) |
| **Morgan,** *et al*.<br><br>       **v.**<br><br>**National Collegiate  Athletic Assoc.,** | No. 1:13-cv-03174 (D. Minn) |

**MEMORANDUM IN SUPPORT OF *WALKER* AND *MORGAN* PLAINTIFFS' MOTION
TO TEMPORARILY ENJOIN THE ONGOING *ARRINGTON* MEDICAL
MONITORING CLASS SETTLEMENT NEGOTIATIONS WITH DEFENDANT NCAA**

## TABLE ON CONTENTS

A.  INTRODUCTION ................................................................................................................ 1

B.  FACTS ................................................................................................................................ 3

    1. Procedural History .......................................................................................................... 3

    2. Facts Related to Concussions ......................................................................................... 8

C.  ARGUMENT ................................................................................................................... 12

    1. A Settlement Negotiation for a Class Must Fairly and Adequately Represent Divergent Interests of the Class on Fundamental Issues ................................................. 12

        a.  The Settlement Process Itself Must Protect Divergent Interests of the Class .......... 12

        b.  Concern for Representation of the Divergent Interests of All Class Members is Heightened When Counsel is Negotiating for an Uncertified Class ...................... 13

        c.  Intra-Class Conflicts and Conflicts Between Class Counsel and Absent Class Members are Fundamental Conflicts ....................................................... 14

    2. This Court Possesses Explicit Authority Presiding Over a Class Action, as well as an MDL, to Oversee the Settlement Negotiations to Protect the Fundamental Interests of Absent Class Members. ................................................................................ 17

    3. Because the Arrington NCAA Medical Monitoring Class Settlement Negotiation Lacks Structural Protection of Former Players Before 2004 and Former Players From 32 States, the Negotiations Should be Enjoined to Allow for Adequate Representation of These Class Members. ....................................................................... 18

D.  CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Prods., Inc., v. Windsor*,
521 U.S. 591 (1997)................................................................................................. *passim*

*Chmieleski v. City Prods. Corp.*,
71 F.R.D. 118 (W.D. Mo. 1976).....................................................................................15, 18

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012)......................................................................................14, 15, 18

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975)..........................................................................................13

*Grider v. Keystone Health Plan Cent., Inc.*,
500 F.3d 322 (3d Cir. 2007)..........................................................................................17

*Hawkins v. Securitas Sec. Servs. USA, Inc.*,
280 F.R.D. 388 (N.D. Ill. 2011).....................................................................................14

*In re Bank of America Wage and Hour Emp't Litig.*,
No. 10-MD-2138-JWC .............................................................................................17, 18, 19

*In re Imprelis Herbicide Mktg., Sales Practices and Prods. Liab. Litig.*,
MDL No. 2284, 2013 WL 504857 (E.D. Pa. Feb. 12, 2013)...............................................17

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)......................................................................................12, 15, 18

*In re National Football League Players' Concussion Injury Litig.*,
MDL No. 2323.......................................................................................................13

*In re Relafen Antitrust Litig.*,
221 F.R.D. 260 (D. Mass 2004)......................................................................................16

*In re Teflon Prods. Liab. Litig.*,
254 F.R.D. 354 (S.D. Iowa 2008)...............................................................................15, 18

*Kohen v. Pacific Inv. Mgmt. Co. LLC*,
571 F.3d 672 (7th Cir. 2009) ......................................................................................14, 18

*Mars Steel Corp. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*,
834 F.2d 677 (7th Cir. 1987) ........................................................................................14

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*,
247 F.R.D. 253 (D. Mass. 2008)....................................................................................16

*Pearl v. Allied Corp.*,
102 F.R.D. 921 (E.D. Pa. 1984)......................................................................................15, 18

*Reynolds v. Beneficial Nat'l Bank*,
288 F.3d 277 (7th Cir. 2002) ..................................................................................................13

*Smith v. Sprint Commc'ns, Co., L.P.*,
387 F.3d 612 (7th Cir. 2004) ..................................................................................................13

*Wahl v. Midland Credit Mgmt., Inc.*,
243 F.R.D. 291 (N.D. Ill. 2007)..............................................................................................14

**STATUTES**

Fed. R. Civ. P. 23 ............................................................................................................................15

**OTHER AUTHORITIES**

Manual for Complex Litigation (Fourth) § 21.612......................................................12, 14, 18, 19

1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.31 (4th ed. 2002) .............15

### A. INTRODUCTION

This motion is brought by the *Walker* and *Morgan* plaintiffs to temporarily enjoin, and modify the court-approved medical monitoring class settlement negotiations in the case of *Arrington v. NCAA*. The *Walker* and *Morgan* plaintiffs contend that the ongoing settlement negotiations between *Arrington* and the NCAA violate basic tenets of Rule 23 in that they utterly lack structural assurance of fair and adequate representation of the diverse individuals within the medical monitoring class – specifically: (a) former NCAA football players who played before 2004 (hereinafter "Former Players Before 2004"), and (b) former NCAA football players who played in 32 states excluded from the *Arrington* medical monitoring class (hereinafter "Former Players From 32 States"). These two groups of class members, making up considerably more than half of all former NCAA football players, and numbering in the hundreds of thousands, have been excluded from the medical monitoring class defined in *Arrington's* motion for class certification; and *Arrington* counsel has taken the position in numerous subsequent federal court pleadings that the medical monitoring claims of Former Players Before 2004 and Former Players From 32 States lack merit. Thus, *Arrington* counsel has a manifest intra-class conflict with these class members and cannot vigorously and independently represent their interests, as is required by Rule 23. Therefore, neither *Arrington* counsel nor the *Arrington* class representatives can act as adequate representatives under Rule 23(a)(4) for these groups of former players.

The *Walker* and *Morgan* plaintiffs, who played before 2004 and who played in one of the 32 states excluded by the *Arrington* motion for class certification, seek to represent a class of all former NCAA football players, including these two groups of former players excluded by the *Arrington* medical monitoring class definition. Any settlement negotiation that does not provide independent and adequate representation for Former Players Before 2004 and Former Players

From 32 States would jeopardize urgently-needed and fair medical monitoring relief for hundreds of thousands of class members.[1]

Given *Arrington* counsel's past filings, it is now impossible for them to adequately and fairly represent these hundreds of thousands of former players in the ongoing settlement negotiations. Whether the *Arrington* medical monitoring class definition is technically controlled by the one put forth in their class certification motion on July 19, 2013 (*Arrington, et al. v. NCAA*, 1:11-cv-06356 (N.D. Ill.) (Dkt. #175 at p. 2 ), which excludes these former players, or the broader medical monitoring class definition put forth in their Second Amended Complaint on February 12, 2013 (*Arrington*, Dkt. #121 at ¶ 227), is immaterial to the obvious fact that once *Arrington* abandoned the claims of hundreds of thousands of class members and argued that they were correct to abandon these claims, *Arrington* can no longer independently and vigorously represent these class members.

This Court first authorized these settlement negotiations to proceed on August 15, 2013 (*Arrington*, Dkt. #186 ) prior to the Judicial Panel on Multidistrict Litigation finding that all NCAA concussion cases should be consolidated before this Court on December 18, 2013 (JPML Transfer Order, MDL No. 2492) (Dkt. #53). Since that time, the *Walker* and *Morgan* cases, and several other similar cases, have been consolidated before this Court. Settlement negotiations are routinely identified as a responsibility of the MDL transferee court. Therefore under the authority of this Court's initial settlement negotiation order in *Arrington*, as well as its authority under 28 U.S.C. §1407(a), the *Walker* and *Morgan* plaintiffs respectfully request that this Court

---

[1] *See* NCAA Student-Athlete Participation Hits 450,000, September 2012, available at www.ncaa.org (finding that Year 1981-1982 accounted for 40,733 NCAA football players, an average of slightly more than 10,000 football players per class; while Year 2001-2002 accounted for 58,090 NCAA football players, an average of more than 14,520 football players per class).

temporarily enjoin the ongoing *Arrington* class medical monitoring settlement negotiations; and modify the negotiation to provide structural assurance of fair and adequate representation on behalf of: (a) the Former Players Before 2004, and (b) the Former Players From 32 States.

**B. FACTS**

### *1. Procedural History*

The *Arrington* Complaint was filed on September 12, 2011. *Arrington, et al. v. NCAA*, 1:11-cv-06356 (N.D. Ill.) (Dkt. #1). This Court appointed Hagens Berman Sobol Shapiro LLP and Siprut PC as Plaintiffs' Interim Lead Counsel on October 19, 2011 (Dkt. #22). A Corrected Amended Complaint was filed on November 21, 2011 (*Arrington*, Dkt. #25). The Corrected Amended Complaint identified three class representatives. The first class representative was Adrian Arrington, who played NCAA football from 2006 to 2009 (i.e., *after* 2004), and played at Eastern Illinois University in Charleston, Illinois. (*Arrington*, Dkt. #25 at ¶¶ 9, 11). The second class representative was Derek Owens, who played NCAA football in 2010 (i.e., *after* 2004) at University of Central Arkansas in Conway, Arkansas. (*Arrington*, Dkt. #25 at ¶¶ 21, 24, 27). The third class representative was Mark Turner who played NCAA football from 1988-1989 (i.e., *before* 2004) at Fordham University in Bronx, New York. (*Arrington*, Dkt. #25 at ¶¶ 38, 39).

Mark Turner, the only *Arrington* class representative who played NCAA football *before* 2004, was dropped as a class representative by *Arrington* counsel when the Second Amended Complaint was filed in *Arrington* on February 12, 2013 (*Arrington*, Dkt. #121, Ex. 1 and Dkt. #124 (filed under seal)). *Arrington* added new class representative Kyle Solomon[2] to replace

---

[2] Kyle Solomon, who played NCAA men's ice hockey in 2010 (i.e., after 2004) at the University of Maine in Orono, Maine, was added as a class representative for the *proposed core issues* class under 23(c)(4). This motion only addresses the *Arrington* medical monitoring class, medical monitoring settlement negotiations, and the issues of the scope of medical monitoring

Mark Turner, but that new class representative played hockey, not football, and played hockey after 2004.  The fourth class representative was Angela Palacios who played NCAA women's soccer from 2010-2011 (i.e., *after* 2004) at the Ouachita Baptist University in Arkadelphia, Arkansas.  (*Arrington*, Dkt. #25 at ¶¶ 48, 50, 51).  At the time of the *Arrington* Corrected Amended Complaint, *Arrington* sought a medical monitoring class, defined as follows:

> All former and current NCAA student-athletes who have suffered a concussion or concussion-like symptoms while playing sports at an NCAA school (the "Medical Monitoring Class").

Dkt. #25 at ¶ 114.  The Second Amended Complaint also sought a medical monitoring class definition comprising "all current and former NCAA student-athletes who experienced one or more head impacts while playing sports at an NCAA school . . .".  (*Arrington*, Dkt. #121, Ex. 1 at ¶ 227).[3]

The *Arrington* Plaintiffs moved for certification of the medical monitoring class on July 19, 2013 (*Arrington*, Dkt. #175).  At that time, *Arrington* counsel *changed and limited* the medical monitoring class definition as follows:

> [A]ll male and female players listed on a team roster in the contact sports of football, wrestling, basketball, field hockey, ice hockey, lacrosse, or soccer, at any NCAA institution "*in any of the 18 listed jurisdictions during the period from 2004 to the present.*"[4]

*Arrington*, Dkt. #175 at p. 2 (emphasis added); *see also* p. 28.  (The 18 included jurisdictions are Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Illinois, Indiana,

---

relief.  This motion does not address the *Arrington* Rule 23(c)(4) issues class.  Papers filed by *Arrington* indicate that the settlement negotiations only encompass the medical monitoring claim and medical monitoring relief.  (*Arrington*, Dkt. #199 at p. 8 n.30, 12).

[3]  The Second Amended Complaint also sought a 23(c)(4) issues class to litigate the issue of negligence.  *Arrington*, Dkt. #121, Ex. 1.

[4]  *Arrington* also set forth a class definition for the 23(c)(4) issues class which included NCAA athletes from all 50 states and excluded players who played before 2004.  *See* Dkt. #175 at p. 3.

Maryland, Massachusetts, Missouri, Montana, New Jersey, New York, Ohio, Pennsylvania, Utah, and West Virginia (*Arrington*, Dkt. #175 at p. 20 & n.76)). On August 15, 2013, this Court entered a Minute entry indicating that the case is stayed pending settlement discussions and mediation. (*Arrington,* Dkt. #186).

On September 3, 2013 the *Walker* plaintiffs filed their medical monitoring class complaint in the Eastern District of Tennessee, and filed an Amended Complaint on September 6, 2013 (*Walker, et al. v. NCAA*, 1:13-cv-00293, (E.D. Tenn.), Dkt. #4). In *Walker*, two class representatives (Chris Walker and Ben Martin) played NCAA football at the University of Tennessee in Knoxville, Tennessee. (*Walker,* Dkt. #4 at ¶ 5, 6). Tennessee is one of the 32 states excluded from the *Arrington* medical monitoring class. The third class representative in *Walker*, Dan Ahern, played NCAA football at North Carolina State University from 1972 to 1976. (*Walker,* Dkt. #4 at ¶ 7). North Carolina is also one of the 32 states excluded from the *Arrington* medical monitoring class. Given the pre-2004 time period in which he played collegiate football, Dan Ahern would be excluded from the medical monitoring class as defined in the *Arrington* plaintiffs' class certification motion based on the dates during which he played. In addition all three *Walker* class representatives would be excluded from the *Arrington* medical monitoring class based on the states in which they played.

On November 19, 2013, the *Morgan* plaintiffs filed their medical monitoring class complaint in *Morgan v. NCAA*, 13-cv-03174 (D. Minn.), Dkt. #1. The first *Morgan* class representative is Paul Morgan who played NCAA football from 1994-1997 (i.e., *before* 2004) at Vanderbilt University in Nashville, Tennessee. *Morgan*, Dkt. #1 at ¶ 5. The second *Morgan* class representative is Cliff Deese who played NCAA football from 1992-1995 (i.e., *before*

2004) at Vanderbilt University in Nashville, Tennessee. *Morgan*, Dkt. #1 at ¶ 6.[5] Given the pre-2004 time period in which Paul Morgan and Cliff Deese played collegiate football, both would be excluded from the medical monitoring class as defined in the *Arrington* plaintiffs' class certification motion. *See Arrington*, Dkt. #175 at p. 2; *see also* p. 28. Because both Paul Morgan and Cliff Deese played NCAA football at Vanderbilt University in Nashville, and because Tennessee is one of the 32 states excluded from the *Arrington* medical monitoring class, these *Morgan* class representatives also would be excluded from the medical monitoring as defined in the *Arrington* plaintiffs' class certification motion as they fall into the excluded category of Former Players From 32 States.

In addition to the medical monitoring class certification motion, *Arrington* counsel has filed federal court pleadings on multiple occasions asserting that NCAA football players who played *before* 2004 should *not* be included in the medical monitoring. For example, on September 23, 2013, *Arrington* counsel filed a Proposed Intervenors' Reply in Support of Motion to Intervene and to Dismiss, Transfer and Stay Action in the *Walker* case (Dkt. #19). In that pleading *Arrington* counsel stated the following:

> Additionally, although *Walker* plaintiffs claim a longer class period, it is clear that 2004 was the year by which international consensus had been reached regarding best practices for concussion management in amateur sports. While the Walker complaint cites studies regarding the dangers of concussions dating back to 1928, it does not cite any consensus best practices for the management of concussions until approximately 2004. Therefore, the Intervenors' proposed classes are properly limited in both time and scope.

Dkt. #19 at p. 2 & n.8. *Arrington* counsel repeated the same language in support of its position that Former Players Before 2004 do not belong in the medical monitoring class on October 2,

---

[5] The third *Morgan* class representative is Joseph Balthazor, Jr. who played NCAA football from 2009-2012 (i.e., *after* 2004) at the University of Minnesota in Minneapolis, Minnesota. *Morgan*, Dkt. #1 at ¶ 7.

2013, this time in a pleading filed before the JPML. (MDL No. 2492, Dkt. #14, at p. 4-5 & nn.13-14).

*Arrington* counsel has also repeatedly taken the position in federal filed pleadings that NCAA football players who played in 32 states should be excluded from the medical monitoring class. *Arrington* counsel stated in their September 23, 2013 Intervenor Reply in *Walker* that:

> Counsel for Intervenors completed extensive research regarding the medical monitoring laws of all 50 states and narrowed the Negligence/Medical-Monitoring Class to the 18 states that recognize medical monitoring as an independent cause of action or a remedy for negligence in the absence of present physical injury.

*Walker*, Dkt. #19 at p. 2 & n.5; *see also* MDL No. 2492, Dkt. #14 at p. 3 & n.6.

Therefore, a simple comparison of the medical monitoring class definitions in *Arrington* compared to that in *Walker* and *Morgan* shows that the above-described two groups of former NCAA football players are excluded from the *Arrington* medical monitoring class and included in the *Walker* and *Morgan* class medical monitoring claims.[6]

|  | Age of College Football Players Covered | States Where Football Players Covered | Class Representatives Who Played Before 2004 | Class Representatives Who Played in 32 States Excluded in *Arrington* |
|---|---|---|---|---|
| *Arrington* | Those that played 2004 to present | 18 states | None | None |
| *Walker* | All former living players | 50 states | Dan Ahern | Chris Walker Ben Martin Dan Ahern |
| *Morgan* | All former living players | 50 states | Paul Morgan Cliff Deese | Paul Morgan Cliff Deese Joseph Balthazor, Jr. |

---

[6] The *Arrington* medical monitoring class definition is put forth *infra* at p. 6 (Dkt. #175 at p. 3). The *Walker* and *Morgan* medical monitoring class definition is: "All former NCAA football players in the United States, who did not go on to play professional football in the National Football League." *See Walker* (Dkt. #4 at ¶ 10); *See Morgan* (Dkt. #1 at ¶10).

On November 4, 2013, the *Walker* plaintiffs (a non-party in *Arrington* at the time, prior to MDL consolidation) served a letter on the *Arrington* Court to notify the Court that it was their position that the anticipated November 2013 mediation between *Arrington* plaintiffs and the NCAA, scheduled pursuant to the Court's Minute Order (*Arrington,* Dkt. #156), suffered from a fundamental Rule 23 adequacy and intra-class conflict defect in that the *Arrington* counsel and *Arrington* class representatives could not adequately represent Former Players Before 2004 and Former Players From 32 States. (*See* Ex. 2 hereto). On December 18, 2013, this Court struck the *Arrington* status hearing scheduled for December 19, 2013, and no further docket entries have occurred in *Arrington* due to the JPML activities.

On December 18, 2013, the JPML ruled that the NCAA concussion cases would be consolidated before this Court. (MDL No. 2492, Dkt. #53.) Following the consolidation of the *Walker* case with the *Arrington* case, transfer of the other various cases to this Court commenced on December 24, 2013. (MDL No. 2492, Dkt. #55 (Conditional Transfer Order)).

### 2. *Facts Related to Concussions*

Former NCAA football players are at increased risk to latent brain injury as a result of suffering repeated head impacts. These risks, and interventions to reduce these risks, have been known to the NCAA and have been the subject of peer reviewed and published medical articles for decades. *See* Jeffrey T. Barth, *et al.*, *Mild Head Injury in Sports: Neuropsychological Sequelae and Recovery of Function*, Oxford Press 257, 271-72 (1989) ("[O]ur study suggests that single mild head injury in football players often causes cognitive/information processing deficits which can be documented on neuropsychological assessment within 24 hours of the insult, and that rapid; although perhaps incomplete recovery may take place over the next 5-10 days … Questions still remain regarding the full extent of recovery and compensation, the short and long-term effects of multiple head trauma …") (*See* Ex. 4 Appendix of Articles (App.) Ex.

A); *Id.* at 272 (recommending a "conservative" approach to return to play be employed in college football); Randall W. Dick, *A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System*, American Society for Testing and Materials Int'l 13, 18 (1994) ("Concussions made up the bulk of reported head injuries. Medical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced.") (*See* Ex. 4 App. Ex. B); David M. Erlanger *et al.*, *Neuropsychology of Sports-Related Head Injury: Dementia Pugilistica to Post Concussion Syndrome*, 13 The Clinical Neuropsychologist 193, 200 (1999) (describing the Barth, University of Virginia college football study as revealing that concussed players' test data demonstrated evidence of cognitive impairment) (*See* Ex. 4 App. Ex. C); Kevin M. Guskiewicz, *et al.*, *Epidemiology of Concussion in Collegiate and High School Football Players*, 28 The Am. J. of Sports Med. 643, 649 (2000) ("[H]igh school and collegiate football players who sustain a concussion are nearly three times more likely to sustain a second concussion in the same season …") (*See* Ex. 4 App. Ex. D); *Id.* at 649 (finding that "30.8% of the injured players in the current study returned to competition on the same day" and describing this data as "alarming"); *Id.* at 649 ("Many authors have warned of the dangers involved with returning athletes to competition too early, yet according to our findings these warnings are most often ignored."); Kevin M. Guskiewicz, *et al., Cumulative Effects Associated with Recurrent Concussion in Collegiate Football Players*, 290 JAMA 2549, 2553 (2003) ("Given our finding of a 3-fold greater risk of future concussions following 3 concussions vs. no concussions, athletes with a high cumulative history should be more informed about the increased risk of repeat concussions when continuing to play contact sports such as football.") (*See* Ex. 4 App. Ex. E).

9

The brain injury associated with football and other contact sports is described as "late-life cognitive impairment" including mild cognitive impairment (MCI) and Alzheimer's disease (AD), and as a "midlife" injury. Christopher Randolph, *et al.*, *Prevalence and Characterization of Mild Cognitive Impairment in Retired National Football League Players*, 19 J. of the Int'l Neuropsychological Soc'y 1*,* 1 (2013) (*See* Ex. 4 App. Ex. F); Brandon E. Gavett, *et al.*, *Chronic Traumatic Encephalopathy: A Potential Late Effect of Sport-Related Concussive and Subconcussive Head Trauma*, 30 Clinical J. of Sports Med. 179, 180 (2011) (*See* Ex. 4 App. Ex. G). The disease, referred to as Chronic Traumatic Encephalopathy (CTE) or Traumatic Encephalopathy (TE) "results from the progressive decline in neuron functioning occurring years or decades after exposure to repetitive concussive injuries and presents clinically as progressive neurologic dysfunction affecting mental status, balance, and movement." Everett J. Lehman, *et al.*, *Neurodegenerative causes of death among retired National Football League players*, 79 Neurology 1*,* 1-2 (2012) (*See* Ex. 4 App. Ex. H). A study of former NFL players' causes of death showed that neurodegenerative mortality was 2-3 times higher in former NFL players as compared to the U.S. population of comparable age and gender. *Id.* at 1 (The study reported increased rates of death due to dementia/Alzheimer's disease, Amyotrophic lateral sclerosis (ALS), and Parkinson's disease in retired NFL football players). The latency period (or delay after exposure) associated with these brain injuries and diseases has been reported as 8-10 years, and 15 years. Jeff Victoroff (2013), *Traumatic encephalopathy: Review and provisional research diagnostic criteria*, 32 NeuroRehabilitation 211*,* 217 (2013) ("On average, the delay from symptom onset to diagnosis exceeded 15 years.") (*See* Ex. 4 App. Ex. I); Gavett (2011), at 183 ("Based on a recent review of neuropathologically confirmed CTE in athletes, the mean age of onset is 42.8 years …") (*See* Ex. 4 App. Ex. G).

Thus, it is clear from the medical literature that former NCAA college football players who played before 2004 have an urgent and compelling need for neurocognitive injury evaluation and treatment where indicated. As summarized in the expert affidavit of Robert Stern Ph.D., of the Boston University Center for the Study of Chronic Traumatic Encephalopathy, (1) former NCAA college football players are an increased risk to post-concussive injuries and latent brain injury, (2) the older players (i.e., those who played before 2004) face this risk now and are in urgent need of diagnostic evaluation and treatment where indicated, and (3) the NCAA has known for decades of the risks of post-concussive injuries, and latent brain injury, and that medical intervention and other measures, reduces the risks of these injuries. *See* Stern Affidavit (Ex. 3).

The *Arrington* class definition excludes NCAA football players who played before 2004 and none of the *Arrington* class representatives played NCAA sports before 2004. (*Arrington*, Dkt. #25 at ¶¶ 11, 22, 48; Dkt. #175 at p. 2). The *Arrington* Corrected Amended Complaint included a former NCAA football player who played before 2004 (Mark Turner) but he was dropped in the Second Amended Complaint and as a class representative when *Arrington* moved for certification of the medical monitoring class. (*Arrington*, Dkt. #25 at ¶¶ 38-47; Dkt. #175 at p. 35). In addition, none of the *Arrington* class representatives identified in the *Arrington* medical monitoring class motion played NCAA sports in any of the 32 states excluded from the *Arrington* medical monitoring class definition. *Id.*

To the contrary, the *Morgan* plaintiffs and the *Walker* plaintiffs include class representatives who played NCAA football before 2004 (*Walker* class representative Dan Ahern and *Morgan* class representatives Paul Morgan and Cliff Deese) and include class representatives from the 32 states excluded by the *Arrington* medical monitoring class definition

11

(*Walker* class representatives Chris Walker, Ben Martin, and Dan Ahern and *Morgan* class representatives Paul Morgan, Cliff Deese, and Joseph Balthazor, Jr.).  The *Walker* class representatives and *Morgan* class representatives, as well as hundreds of thousands of former NCAA football players that they seek to represent, are in urgent need of medical monitoring for brain injury, yet remain excluded from the *Arrington* medical monitoring class.

## C. ARGUMENT

### 1. A Settlement Negotiation for a Class Must Fairly and Adequately Represent Divergent Interests of the Class on Fundamental Issues

#### a. The Settlement Process Itself Must Protect Divergent Interests of the Class

Rule 23 jurisprudence makes clear that the settlement negotiation process itself must have built in "structural assurance" for the divergent interests of the class on fundamental issues.  As stated in the *Manual for Complex Litigation (Fourth)*:

> Settlement will also effectively terminate other pending individual and class actions subsumed in the certified settlement class. Divergent interests must be taken into account and fairly accommodated *before* the parties negotiate a final settlement.

*Manual* § 21.612 (emphasis added).

In the *In re Literary Works* case, the Second Circuit reversed the certification of a settlement class, after focusing on the negotiation itself and finding that the "structural assurance of fair and adequate representation" was lacking because a part of the purchaser class (Category C) lacked "independent representation" to advance their unique arguments.  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 253 (2d Cir. 2011).

In *Amchem*, where the court also reversed the certification of a settlement class, the Supreme Court found that a subgroup of plaintiffs (persons exposed to asbestos, not yet injured, but at increased risk to future injuries) were found to lack adequate representation because their

12

interests were not independently represented and were at odds with class members who were currently injured. *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 627 (1997) ("The settling parties, in sum, achieved a global compromise with no structural assurance of a fair and adequate representation for the diverse groups and individuals affected."); *see also Smith v. Sprint Commc'ns, Co., L.P.*, 387 F.3d 612, 614-15 (7th Cir. 2004) (a settlement agreement is not a "cure-all" when it does not adequately represent the interests of subgroups; finding that landowners from certain states were inadequately represented by settling plaintiffs).

> **b. Concern for Representation of the Divergent Interests of All Class Members is Heightened When Counsel is Negotiating for an Uncertified Class**

In a class action, the Court has a special duty described as a "fiduciary responsibility, as the guardian of the rights of the absentee class members." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002) (referring to the district judge in the settlement phase of a class action suit as "a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries"). This special duty and responsibility of the Court to absentee class members is heightened in the case of an uncertified class that has not undergone the judicial review and the adversary process necessary to certify a litigation class. *In re National Football League Players' Concussion Injury Litig.*, MDL No. 2323, 12-md-2323, Dkt. #5657 at p. 9 (January 14, 2014) ("In cases such as this, where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, we require the district court to be 'even more scrupulous than usual' when examining the fairness of a proposed settlement.") (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995) ("General Motors")); *see*

*also Amchem*, 521 U.S. at 620 (When a court is asked to certify a class and approve a settlement in one proceeding, the Rule 23(a) requirements designed to protect absent class members "demand undiluted, even heightened, attention."); *Mars Steel Corp. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 834 F.2d 677, 680-81 (7th Cir. 1987) (the danger of a premature settlement is increased when "status of the action as a class action is not determined until a settlement has been negotiated," which results in requiring a "more careful scrutiny of the fairness of the settlement"); *Manual for Complex Litigation (Fourth)* §21.612 ("Courts have held that approval of settlement class actions under Rule 23(e) requires closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process.")**.**

### c. Intra-Class Conflicts and Conflicts Between Class Counsel and Absent Class Members are Fundamental Conflicts

The Rule 23(a)(4) adequacy requirement has two components:

(1) concerning the experience and performance of class counsel; and

(2) concerning the interests and incentives of the representative plaintiffs.

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012); *Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 394 (N.D. Ill. 2011); *Wahl v. Midland Credit Mgmt., Inc.*, 243 F.R.D. 291, 299 (N.D. Ill. 2007) ("In addition to having an adequate named plaintiff, the proposed class must have counsel that is 'experienced, competent, qualified and able to conduct the litigation vigorously.'") (citation omitted).

Not all intra-class conflicts defeat the adequacy requirement; the conflicts must be fundamental and real. *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679-80 (7th Cir. 2009).

In *Dewey*, the Third Circuit characterized a fundamental intra-class conflict as follows:

14

> A conflict is fundamental where it touches the specific issues in
> controversy. A conflict concerning the allocation of remedies
> amongst class members with competing interests can be
> fundamental and can thus render a representative plaintiff
> inadequate.

*Dewey*, 681 F.3d at 184 (omitting quotations and citations).

Expressed differently, it is impermissible for class counsel or class representatives to

"abandon[] some of the claims of their fellow class members." *Pearl v. Allied Corp.*, 102 F.R.D.

921, 923 (E.D. Pa. 1984); *In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 366-68 (S.D. Iowa

2008). Indeed one district court found that a temporal limitation on a class claim, as was done

here by *Arrington* class counsel for the medical monitoring class (i.e., limiting medical

monitoring claim to players 2004-present), was wholly improper where the claims were viable;

"[A]bandonment of substantive damage claims of persons who are included in the class of

persons which plaintiffs seek to represent under Rule 23, coupled with the plaintiff's allegations

in support of the injunctive claims, raises fundamental questions concerning the ability and

desire of the Plaintiffs to protect the interests of the potential class members." *Chmieleski v. City

Prods. Corp.*, 71 F.R.D. 118, 147 (W.D. Mo. 1976). As determined by the *In re Literary* Court,

"Adequacy is twofold: the proposed class representative must have an interest in vigorously

pursuing the claims of the class, and must have no interests antagonistic to the interests of class

members." *In re Literary*, 654 F.3d at 249 (citations omitted).

One means of providing structural protection for the divergent interests of some class

members is to establish separate subclasses, with independent legal representation. Fed. R. Civ.

P. 23(c)(5) provides that "[w]hen appropriate, a class may be divided into subclasses that are

each treated as a class" under the rule. The existence of subclasses can provide structural

guarantees that a proposed settlement is fair. *See* 1 Herbert B. Newberg & Alba Conte, Newberg

on Class Actions § 3.31 (4th ed. 2002) ("When the class members are united in interest on the

15

liability issues but have potential conflicts regarding the nature of the relief or the division of a monetary award, the court may avoid the potential conflict by creating subclasses"); *cf. In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 270 n.8 (D. Mass 2004) ("With respect to settlement . . . an uninjured end payor might be willing to accept a far lesser sum than would an injured end payor with an entirely different economic situation."); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*, 247 F.R.D. 253, 269 (D. Mass. 2008) (finding that when Smith Drug was added as a class representative, leading to the emergence of a conflict in how to allocate a settlement fund between end users and distributors, it was appropriate to appoint separate counsel for each subclass).

Here, *Arrington* counsel decided to abandon Former Players Before 2004 (and their only class representative (Turner) who played before 2004) and Former Players From 32 States, when it filed its medical monitoring class certification motion on July 19, 2013 (Dkt. #175), first by excluding them from the medical monitoring class, and second by not seeking subclass certification and independent representation for these hundreds of thousands of class members. Thus for these former players, *Arrington* counsel did not seek medical monitoring class certification and disavowed their medical monitoring claims. Subclassing and independent representation of such subclasses, would potentially provide the structural protections to these former player class members that Rule 23, and *Amchem* and its progeny, require, as recognized in the proposed NFL concussions settlement. *In re NFL*, Dkt. #5657 at p. 3. By failing to seek this representation for the Former Players Before 2004 and Former Players From 32 States, *Arrington* counsel failed to mitigate its intra-class conflict with these class members and failed to vigorously represent the interests of these class members in a manner that these class members are entitled to under Rule 23

16

**2.** **This Court Possesses Explicit Authority Presiding Over a Class Action, as well as an MDL, to Oversee the Settlement Negotiations to Protect the Fundamental Interests of Absent Class Members.**

The recent Order of Judge Brody in the NFL concussion litigation makes explicitly clear that a district court judge presiding over a class case that is consolidated as a MDL has robust authority to oversee a class settlement negotiation process. In that case, Judge Brody emphasized the heightened standards for review of potential settlements involving uncertified classes, appointed a special master to assist with Court, ordered the parties to produce data supporting the settlement to the court, and denied preliminary approval pending her review of these and other issues. *In re NFL*, Dkt. #5657 at p. 9-12 ("As a transferee judge, I exercise authority over any coordinated or consolidated proceedings including settlement proceedings."). Such oversight by the district court is necessary to ensure the structural protections required by *Amchem* and its progeny. *Id.; see also In re Imprelis Herbicide Mktg., Sales Practices and Prods. Liab. Litig.*, MDL No. 2284, 2013 WL 504857, at *1 n.2 (E.D. Pa. Feb. 12, 2013) ("Settlement proceedings, in particular, are commonly conducted before MDL Courts, and the Third Circuit Court of Appeals has held that such proceedings are squarely under the umbrella of pretrial proceedings over which transferee courts have jurisdiction.") (*See* Ex. 5 hereto); *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 333 (3d Cir. 2007) (The MDL court is charged with conserving "judicial resources by resolving as many claims as possible," and if appropriate, to "achieve a global settlement that appropriately and fairly deals with a range of claims.") (cited and quoted in *In re Bank of America Wage and Hour Employment Litigation*, No. 10-MD-2138-JWC, Dkt. #92 at 14 (September 10, 2010)) .

**3. Because the Arrington NCAA Medical Monitoring Class Settlement Negotiation Lacks Structural Protection of Former Players Before 2004 and Former Players From 32 States, the Negotiations Should be Enjoined to Allow for Adequate Representation of These Class Members.**

*Arrington* class counsel and *Arrington* class representatives have acted to exclude Former Players Before 2004 and Former Players From 32 States from its Medical Monitoring Class. Thus, they have deprived these class members of their fair opportunity to obtain urgently needed medical monitoring, and placed their interests behind the *Arrington* class representatives who played after 2004 in only 18 states. An intra-class conflict could not be more fundamental than this – depriving class members of relief, and subjugating their interests to other class members; (*Kohen,* 571 F.3d at 679-80; *Dewey,* 681 F.3d at 188-89, *Amchem,* 521 U.S. at 626-27), and leads to irreparable harm, *In re Bank of America Wage and Hour Emp't Litig.*, No. 10-MD-2138-JWC, Dkt. #92 at 20 ("But the court is persuaded that plaintiffs will suffer irreparable harm in the absence of an injunction . . .").

The act of excluding these two groups from the *Arrington* medical monitoring class manifests a lack of "interest in vigorously pursuing" their claims, and demonstrates that *Arrington* class counsel have interests "antagonistic to the interest" of these former players. *In re Literary*, 654 F.3d at 249. As the cases explain, this type of abandonment of some class members' interests is impermissible. *Pearl*, 102 F.R.D. at 923; *Teflon*, 254 F.R.D. at 366-68; *Chmieleski*, 71 F.R.D. at 147. Thus, any settlement negotiations that would allow *Arrington* class counsel to be authorized to represent the interests of Players Before 2004 and Players From 32 States runs afoul of the most basic teachings of *Amchem* and its progeny. *Amchem*, 521 U.S. at 627; *Dewey*, 681 F.3d at 189; *Manual for Complex Litigation (Fourth)* §21.612.

It is no answer to suggest that if the *Walker* and *Morgan* Plaintiffs believe their interests are not being fairly and adequately represented, that they should wait for the Court to grant

preliminary approval of an *Arrington* medical monitoring class settlement, and then become objectors to the settlement,[7] because as made explicitly clear by the *Manual* and *Amchem* and its progeny, the structural protections of the divergent interests of the class must be instituted "*before* the parties negotiate a final settlement", *not after*. *Amchem*, 521 U.S. at 627 (emphasis added); *Manual for Complex Litigation (Fourth)* §21.612; *see also In re Bank of America,* MDL 92 at p. 20 ("But the court is persuaded that plaintiffs will suffer irreparable harm in the absence of an injunction as soon as the notice of the proposed settlement in *Lopez* is issued – before the opportunity even arises to opt-out of the settlement or raise an objection to the settlement."). Nor is it of any moment at this stage of the *Arrington* negotiation of settlement for an *uncertified* medical monitoring class, for *Arrington* counsel to defend the exclusion of Former Players Before 2004 and Former Players From 32 States on the merits. Those defenses[8] [9] [10] will likely

---

[7] *Arrington* counsel has previously suggested this – that plaintiffs not covered by any potential *Arrington* medical monitoring settlement have the remedy of objecting to a settlement with the NCAA following preliminary approval. *See Walker*, Dkt. #18 at p. 3 ("If a settlement is reached in *Arrington*, the *Walker* plaintiffs will be provided notice of the settlement, and the *Arrington* court will provide all class members ample opportunity to review and analyze the proposed terms. The *Arrington* court will then schedule a date by which all comments in support of or objections to the settlement must be filed. The *Walker* plaintiffs will have the opportunity to have their voices be heard at that juncture.").

[8]*Arrington* counsel's purported justification for excluding Former Players Before 2004 from the medical monitoring class based on the theory that "no international consensus on sport concussion management existed before 2004" (*see Walker*, Dkt. #19 at p.2) lacks merit because no requirement exists under the law of medical monitoring or contract that plaintiffs must prove an "international consensus" on concussion management – rather, the law requires evidence of a duty (or promise), a breach, and a feasible remedy, all of which can be established against the NCAA for time periods extending back into the 1980s and 1990s .

[9] *Arrington* counsel's purported justification for excluding Former Players From 32 States from the medical monitoring class based on the theory that only 18 states allow medical monitoring claims in the *absence* of "present physical injury" (*see Walker*, Dkt. #19 at 2, 4 & n.5) fails both because contract law has no such limitation, and because the 32 excluded states recognize medical monitoring in the *presence* of physical injury, and it could be a disputed fact question whether the concussions suffered by class members are physical injuries.

eventually fail on the merits, but more importantly and central to this motion, have no bearing on the intra-class conflict and lack of vigorous representation manifested by the *Arrington* counsel's medical monitoring class certification motion and abandonment of class members' medical monitoring claims.[11] It is not for counsel of an uncertified medical monitoring class to unilaterally decide that most of its class members have no claim and then proceed to hold itself out as a representative of those same abandoned class members. That is not the structural protection required by *Amchem* and its progeny.

Thus, the *Walker* and *Morgan* plaintiffs request that this Court temporarily enjoin the ongoing *Arrington-NCAA* settlement negotiations and authorize *Walker* and *Morgan* counsel and class representatives to represent the medical monitoring interests of Former Players Before 2004 and Former Players From 32 States in any future medical monitoring class settlement negotiations before this Court.[12]

---

[10] *Arrington* counsel's claim that Former Players From 32 States can be adequately represented by *Arrington* counsel as part of the 23(c)(4) negligence class, even after counsel has stated that their medical monitoring claims lack merit, fails because: (1) the 23(c)(4) issues class seeks no relief whatsoever and therefore cannot provide the medical monitoring relief the older players urgently need and seek in this case, and (2) the 23(c)(4) issues class also excludes Former Players Before 2004 (*see Arrington*, Dkt. #175 at p.3.)

[11] Another *Arrington* counsel claim – *i.e.*, that among the ten (10) NCAA concussion complaints filed and now consolidated before this Court, only *Arrington* counsel has done a year of discovery and filed lengthy expert reports and declarations; and thus other counsel have only filed "numerous copycat actions" and have nothing to offer to the class, (*see* MDL No. 2492, Dkt. #14 at p. 3, Dkt. #40 at p.5), also is both incorrect and irrelevant to the issue of *Arrington* counsel's intra-class conflict and lack of vigorous representation of former players documented herein.

[12] Counsel for *Walker* and *Morgan* are conferring with all other counsel who seek to represent the medical monitoring interests of Former Players Before 2004, and Former Players From 32 states (counsel for *DuRocher, et al. v. NCAA, et al.*; *Hudson v. NCAA*; *Caldwell, et al. v. NCAA*; *Washington, et al. v. NCAA*; *Powell v. NCAA*; *Doughty v. NCAA*; and *Walton, et al. v. NCAA*) and will submit a Petition to Be Appointed Interim Class or Subclass Counsel for these former players.

**D. CONCLUSION**

For all of the foregoing reasons, the *Walker* and *Morgan* plaintiffs respectfully request that this Court temporarily enjoin the *Arrington* medical monitoring class settlement negotiations, and provide structural assurances of fair representation for Former Players Before 2004 and Former Players From 32 States. A proposed order has been e-mailed to this Court.

Dated: January 31, 2014                                    Respectfully Submitted:

                                                            __/s/ Richard S. Lewis_____

Renae Steiner                                               Michael D. Hausfeld
Heins Mills & Olson, P.L.C.                                 Richard S. Lewis
310 Clifton Avenue                                          Mindy B. Pava
Minneapolis, MN 55403                                       Hausfeld LLP
Phone: 612-338-4605                                         1700 K Street, N.W.
Fax: 612-338-4605                                           Suite 650
                                                            Washington, DC 20006
                                                            Phone: 202-540-7200
                                                            Fax: 202-540-7201


Mark J. Feinberg (Trial Bar Number 28654)                  Gordon Ball
Shawn D. Stuckey                                           Law Offices of Gordon Ball
Zelle Hofmann Voelbel & Mason LLP                          7001 Old Kent Drive
500 Washington Avenue, South                               Knoxville, TN 37919
Suite 4000                                                 Phone: 865-525-7028
Minneapolis, MN 55415                                      Fax: 865-525-4679
Telephone: 612-339-2020
Facsimile: 612-336-9100

Daniel S. Mason                                            W. Mark Lanier
Zelle Hofmann Voelbel & Mason LLP                          Eugene R. Egdorf
44 Montgomery Street                                       The Lanier Law Firm
Suite 3400                                                 6810 FM 1960 West
San Francisco, CA 94104                                    Houston, Texas 77069
Phone: 415- 633-0700                                       Phone: 713-659-5200
Fax: 415-693-0770                                          Fax: 713-659-2204

Timothy J. McIlwain
Timothy J. McIlwain, Attorney at Law, LLC
89 River Street #1538
Hoboken, NJ 07030
Phone: 877-375-9599
Fax: 609-450-7017

Edgar D. Gankendorff,
Provosty & Gankendorff, L.L.C.
650 Poydras Street
Suite 2700
New Orleans, LA 70130
Phone: 504-410-2795
Fax: 504-410-2796

Joseph J. DePalma
Steven J. Greenfogel
Lite DePalma Greenberg, LLC
Two Gateway Center
Suite 1201
Newark, NJ 07102
Phone: 973-623-3000
Fax: 973-623-0858

Charles S. Zimmerman
J. Gordon Rudd, Jr.
Brian C. Gudmundson
Zimmerman Reed, PLLP
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Phone: 612-341-0400
Fax: 612-341-0844

*Counsel for Walker Plaintiffs*

James C. Selmer
Marc Berg
J. Selmer Law, P.A.
500 Washington Avenue South
Suite 2010
Minneaposlis, MN 55415
Phone: 612-338-6005
Fax: 612-338-4120

*Counsel for Morgan Plaintiffs*