Ex. A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | **MDL NO. 2492**<br>**Case No. 13-cv-09116**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Brown** |

**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF**
**APPLICATION FOR APPOINTMENT OF STEVE W. BERMAN OF**
**HAGENS BERMAN SOBOL SHAPIRO LLP AS PLAINTIFFS' LEAD COUNSEL**

I, Steve W. Berman, declare as follows:

1. I am an attorney with Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), an attorney for plaintiffs in the above captioned case. I have full knowledge of the matters stated herein and could and would testify hereto.

2. I am the managing partner of Hagens Berman, and one of its founding members. Attached to my declaration as Exhibit 1 is a true and correct copy of Hagens Berman's firm profile, which describes some of HBSS's experience, significant cases and victories, and contains profiles of the attorneys who are or are expected to be assigned to work on this case should we be appointed lead counsel. Those attorneys include myself, my partner Elizabeth A. Fegan, and associates Daniel J. Kurowski and Thomas E. Ahlering.

**A.      Hagens Berman Has Demonstrated Its Commitment to Success in this Matter.**

3. This MDL proceeding arises from claims surrounding the National Collegiate Athletic Association's negligence and failure to implement regulations that would properly protect student-athletes from the risks associated with concussions and/or manage those risks to properly respond to the medically proven fact that repetitive concussions would lead to neurocognitive injuries in many players. My firm filed a complaint against the National

1

Collegiate Athletic Association on November 21, 2011 (*Arrington, et al. v. National Collegiate Athletic Ass'n*, No. 11-cv-06356 (N.D. Ill.) ("*Arrington*").

4.       From 2011 through January 31, 2014, Hagens Berman has invested more than 8,000 hours and invested more than $400,000 in out-of-pocket costs on a wholly contingent basis.  A brief breakdown of our work includes:

- More than two dozen oral meet and confers with defense counsel and third parties regarding discovery requests;

- The negotiation of 97 search terms for NCAA electronically-stored information;

- Nine lawyers spent at least 2,314 hours reviewing the 29,502 documents (176,849 pages) produced by the NCAA from 14 NCAA custodians and central libraries;

- Three lawyers spent more than 209 hours reviewing the plaintiffs' emails and documents, and produced 3,842 documents (10,144 pages) in response to NCAA requests;

- 43 third parties produced 8,124 documents (28,485 pages), which were reviewed over a period of 400 hours by seven lawyers;

- Hagens Berman took 10 depositions of the NCAA's fact witnesses, including two experts on NCAA committees, expending more than 200 hours;

- The NCAA deposed the four Lead Plaintiffs and one absent class member;

- Hagens Berman spent more than 375 hours drafting the Proffer of Facts in Support of Class Certification, and more than 700 hours researching and drafting Plaintiffs' Motion for Class Certification;

- Excluding mediation-related work, Hagens Berman spent 110+ hours working with their expert, Dr. Cantu, and Dr. Cantu has spent approximately 85 hours working on his report or consulting with us related to his report.

Hagens Berman's work thus weighs heavily in support of reappointment as lead counsel.

5.       Likewise, Hagens Berman has engaged in 10 months of settlement negotiations with the NCAA, resulting in a Term Sheet dated February 7, 2014 that will provide a medical monitoring program to all current and former student-athletes.

2

6.     Moreover, Hagens Berman has spent the last three months consulting with the newly-filed medical monitoring Plaintiffs' counsel to address any concerns that they may have with respect to the settlement.  Accordingly, it is in the best interests of the Class to continue to be represented by Hagens Berman.

**B.     Hagens Berman's Professionalism and Professional Experience**

7.     I believe that Hagens Berman is supremely well qualified, and has the ability and experience necessary to prosecute a case of this magnitude and complexity both effectively and efficiently.  As detailed further in the firm résumé (Exhibit 1 to my declaration), Hagens Berman was founded 20 years ago, and has been recognized as a premier plaintiffs' class action firm in the country by *National Law Journal* for four consecutive years.  Hagens Berman has 59 lawyers in nine offices across the country, including an office in Chicago, which will enable Hagens Berman to employ its resources effectively for the Class.

8.     Hagens Berman's qualifications and proven track record have prompted courts to appoint the firm as lead class counsel in a string of high-profile contests.  Hagens Berman was selected as lead class counsel among competing firms in *Toyota Unintended Acceleration Litigation* and *Optical Disk Drive Antitrust Litigation* in 2010, *E-Books Antitrust Litigation* in 2011, and *Hotels Antitrust Litigation* and *Lithium Ion Antitrust Litigation* in 2013.  True and correct copies of the orders appointing Hagens Berman as lead counsel in each of these cases are attached to my declaration as Exhibits 2-6, respectively:

| | |
|---|---|
| Exhibit 2 | Order No. 2: Adoption of Organization Plan and Appointment of Counsel, *In re: Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, No. 8:10ML2151 JVS (FMOx) (C.D. Cal. May 14, 2010), Dkt. # 169, at 6; |
| Exhibit 3 | Memorandum Opinion, *In re: Optical Disk Drive Prods. Antitrust Litig.*, No. M:10-2143 VRW (N.D. Cal. June 4, 2010), Dkt. # 96, at 1, 7-9; |

010270-12  672317 V1

Exhibit 4    Case Management Order, *In re: Electronic Books Antitrust Litig.*, No. 11 MD 2293 (DLC) (S.D.N.Y. Dec. 21, 2011), Dkt. # 23, at 1;

Exhibit 5    Order Appointing Plaintiffs' Interim Lead and Liaison Counsel, *In re: Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, No. 3:13-cv-3515-B (N.D. Tex. March 1, 2013), Dkt. # 47, at 1; and

Exhibit 6    Order Appointing Interim Co-Lead Counsel and Liaison Counsel for Direct Purchaser Plaintiffs and Appointing Interim Co-Lead Counsel and Liaison Counsel for Indirect Purchaser Plaintiffs, *In re: Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420- YGR (N.D. Cal. May 17, 2013), Dkt. # 194, at 2.

9.    Moreover, courts nationwide recognize Hagens Berman as "truly extraordinary in terms of professional competence, perseverance, and diligence."  Ex. 7 (Transcript of Proceedings, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL-10-2151-JVS (FMOx) (C.D. Cal. July 19, 2013), at 39) (emphasis added).  Hagens Berman, as lead class counsel, achieved a settlement valued at $1.6 billion in the *Toyota Unintended Acceleration Litigation*, deemed by Judge Selna to be "extraordinary in that every single dollar of the cash funds will go to class members."  Ex. 7, at 38.

10.    Similarly, Judge Milton Shadur recently called Hagens Berman "a clear choice" to be appointed sole lead counsel in an MDL, and Judge Andersen has praised Hagens Berman as being "great lawyers and I actually even think you are better people…."  *See* Ex. 8 (Memorandum Order, *In re: Stericycle, Inc., Sterisafe Contract Litig.*, No. 13 C 5795 (N.D. Ill. Oct. 11, 2013), Dkt. # 56, at 6); Ex. 9 (Transcript of Proceedings, *Wiginton et al. v. CB Richard Ellis, Inc.*, No. 02 C 6832 (N.D. Ill. Jan. 9, 2008), at 15).

11.    Among Hagens Berman's recent notable class action successes are:

- *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, No. 8:10ML2151 JVS (FMOx) (C.D. Cal.), in which Judge Selna sua sponte identified me as a presumptive co-lead counsel without application by Hagens Berman when Judge Selna was assigned the Toyota MDL, in which I negotiated a settlement returning Class members 100% of the value of their claims;

4

- *In re Charles Schwab Corp. Secs. Litig.*, No. 08-cv-1510 (N.D. Cal.), a recent securities class action that settled during the course of argument on *in limine* motions on the eve of trial for approximately $235 million or a 42.5% recovery for the federal class and an 80% recovery for the California class;

- *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, No. 01-12257-PBS (D. Mass.) ("*AWP Litig.*"), where I tried the class case against four manufacturers and successfully argued the appeal of the verdict before the First Circuit; and

- *New England Carpenters v. First DataBank, et al.*, No. 05-11148-PBS (D. Mass.), where Hagens Berman achieved a $350 million settlement 11 days before trial was scheduled to start on behalf of a nationwide class of private payors that purchased prescription brand name-drugs.

12.    Illustrative of the firm's excellence is the landmark settlement valued at $1.6 billion in the *Toyota Unintended Acceleration Litig.*  In granting final approval to that settlement, Judge Selna stated:

> Well, let me make a few concluding remarks.  I reaffirm my conclusion that this settlement is fair, adequate, and reasonable. Moreover, it's extraordinary.  *** ***It's extraordinary that every single dollar allocated for distribution is going to a class member***.
>
> *          *          *
>
> It's also been extraordinary in the way this case has been presented to me.  I have been in many large cases on both sides of the bench. ***I know extraordinary counsel when I see extraordinary counsel, and the efforts here on both sides have been truly extraordinary in terms of professional competence, perseverance, and diligence***.

Ex. 7, at 38-39 (emphasis added).

13.    I was also appointed as a special assistant attorney general for the states of Washington, Arizona, Illinois, Indiana, New York, Alaska, Idaho, Ohio, Oregon, Nevada, Montana, Vermont and Rhode Island in the landmark *Tobacco Litigation*.  That case resulted in the largest settlement in history, which occurred while I was in trial in *State of Washington, et al. v. Philip Morris, et al.*  As the State of Illinois' national counsel, I helped Illinois reach a settlement of approximately $9 billion, the largest in the State's history.

14.     Hagens Berman has had numerous other successes in large-scale class action cases – too many to list exhaustively.  Those successes include:  *In re Visa-MasterCard Antitrust Litigation*, where Hagens Berman served as co-lead counsel and recovered the largest antitrust settlement in history – valued at $27 billion; *Enron ERISA Litigation*, where Hagens Berman is co-lead counsel in the ERISA litigation that has recovered in excess of $350 million; *Tenet Healthcare Litigation*, where Hagens Berman obtained a settlement – the first of its kind – on behalf of a class of 2 million uninsured patients in 19 different states.

15.     Hagens Berman's success comes not only from settlements, but also from taking cases to trial.  Hagens Berman is one of the few plaintiffs' firms in the United States that often has taken complex civil litigation, including class actions, to trial.  Class action cases that Hagens Berman has tried include *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 1629 (D. Mass.); *Williams v. The Boeing Co.*, No. C98-761 P (W.D. Wash.); *In re Burlington N. & Santa Fe Railway Co. Emp. Settlement Agreements Litig.* (W.D. Wash.); *AWP Litig.*, No. 01-12257-PBS (D. Mass.), and *Kucera, et al. v. The State of Washington Dep't of Transp. & Washington State Ferries*, No. 99-2-01161-1 (King Cty. Sup. Ct.).

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.  Executed this 9th day of May, 2014 at Seattle, Washington.


By:     */s/ Steve W. Berman*
        Steve W. Berman

010270-12  672317 V1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 9, 2014, a true and correct copy of the foregoing Declaration of Steve W. Berman in Support of Application for Appointment of Steve W. Berman of Hagens Berman Sobol Shapiro LLP as Plaintiffs' Lead Counsel and all exhibits thereto were filed via CM/ECF, which caused notice to be sent to all counsel of record.

By:    */s/ Steve W. Berman*  _____
Steve W. Berman

010270-12  672317 V1

# Ex. 1



**SEATTLE**
1918 EIGHTH AVENUE – SUITE 3300
SEATTLE, WA 98101
TELEPHONE 206.623.7292
FACSIMILE 206.623.0594

**BOSTON**
55 CAMBRIDGE PARKWAY – SUITE 301
CAMBRIDGE, MA 02142
TELEPHONE 617.482.3700
FACSIMILE 617.482.3003

**CHICAGO**
1144 W. LAKE STREET – SUITE 400
OAK PARK, IL 60301
TELEPHONE 708.628.4949
FACSIMILE 708.628.4950

**COLORADO SPRINGS**
2301 E. PIKES PEAK AVENUE
COLORADO SPRINGS, CO 80909
TELEPHONE 719.635.0377
FACSIMILE 719.635.2920

**LOS ANGELES**
301 NORTH LAKE AVENUE – SUITE 203
PASADENA, CA 91101
TELEPHONE 213.330.7150
FACSIMILE 213.330.7152

**NEW YORK**
555 FIFTH AVENUE – SUITE 1700
NEW YORK, NY 10017
TELEPHONE 212.752.5455
FACSIMILE 917.210.3980

**PHOENIX**
11 WEST JEFFERSON STREET – SUITE 1000
PHOENIX, AZ 85003
TELEPHONE 602.840.5900
FACSIMILE 602.840.3012

**SAN FRANCISCO**
715 HEARST AVENUE – SUITE 202
BERKELEY, CA 94710
TELEPHONE 510.725.3000
FACSIMILE 510.725.3001

**WASHINGTON, D.C.**
1629 K STREET, NW – SUITE 300
WASHINGTON, D.C. 20006
TELEPHONE 202.355.6435
FACSIMILE 202.355.6455

www.hbsslaw.com

## INTRODUCTION

**3**   **The Firm**

**4**   **Major Successes**

## PRACTICE AREAS

Hagens Berman has a diverse practice and regularly represents plaintiffs in a wide variety of cases that do not neatly fit into specific practice groups. However, most of our work can be categorized into the following practice areas:

**5**   **Investor Fraud** – Individual and Class Action Litigation

**7**   **ERISA/Retirement Plan Protection**

**8**   **Antitrust**

**10**   **Consumer Protection** – General Class Litigation

**12**   **Consumer Protection** – Defective Product Litigation

**13**   **Consumer Protection** – Drugs and Supplement Litigation

**15**   **Employment Litigation**

**17**   **Civil and Human Rights**

**19**   **Whistleblower Litigation**

**21**   **Governmental Representation**

**23**   **Personal Injury and Abuse**

**24**   **Intellectual Property**

**25**   **Lending and Mortgage Fraud**



## INTRODUCTION | **The Firm**

Hagens Berman Sobol Shapiro LLP was founded in 1993 with one purpose: to help victims with claims of fraud and negligence that adversely impact a broad group of people. We represent plaintiffs in complex class-action and multi-party litigation protecting investors, inventors, whistleblowers, consumers, workers, and the environment.

We are one of the nation's leading firms in these fields, and have earned an international reputation for excellence and innovation.

**Our Focus.** Our main focus is to represent plaintiffs in securities and investment fraud, product liability, tort, antitrust, consumer fraud, employment, whistleblower, intellectual property, environmental, and employee pension protection cases. Our firm is particularly skilled at managing multi-state and nationwide class actions through an organized, coordinated approach that implements an efficient and aggressive prosecutorial strategy in order to place maximum pressure on the defendant.

**We Win.** We believe excellence stems from a commitment to try each case, vigorously represent the best interests of our clients, and obtain maximum recovery. We believe we have tried a higher percentage of cases than our competition. Our opponents know this, respect our skills and recognize our track record of achieving top results.

**Incentivized to Succeed.** Winning is especially important to Hagens Berman because our compensation depends so much on our performance. We devote approximately 95 percent of our time to litigation under fee agreements that tie our pay to the results we achieve, not to the hours we bill. We have developed innovative contingent- and flatfee arrangements with many clients, including partial contingent fees that reduce our hourly rates for a stake in the outcome. We are willing to use reverse contingent fee arrangements for defending cases where the amount we save our clients determines our compensation.

**A Nationwide Reach.** The scope of our practice is truly nationwide. We have flourished through our network of offices in Seattle, Boston, Chicago, Colorado Springs, Los Angeles, New York, Phoenix, San Francisco and Washington, D.C. Our reach is not limited to the cities where we maintain offices. We have cases pending in courts across the country, with substantial activity in California, New York, Washington, Arizona, Illinois and Idaho.

**Visa-MasterCard Antitrust Litigation –**
The firm served as co-lead counsel in the largest antitrust settlement in history – valued at **$27 billion**.

**McKesson Drug Litigation –**
Hagens Berman was lead counsel in these racketeering cases against McKesson for drug pricing fraud that settled for more than **$444 million** on the eve of trials.

**State of Washington, et al. v. Philip Morris, et al. –**

Hagens Berman represented 13 states in the largest recovery in litigation history – **$206 billion**.

**DRAM Antitrust Litigation –**
The firm was co-lead counsel, and the case settled for **$345 million** in favor of purchasers of dynamic random access memory chips (DRAM).

**Average Wholesale Price Drug Litigation –**
Hagens Berman is co-lead counsel in this ground-breaking drug pricing case against the world's largest pharmaceutical companies, resulting in a victory at trial. The court approved a total of **$338 million** in settlements.

**Enron ERISA Litigation –**
Hagens Berman was co-lead counsel in this ERISA litigation, which recovered in excess of **$250 million**, the largest ERISA settlement in history.

**Lupron Consumer Litigation –**
A **$150 million** settlement on behalf of patients using Lupron for prostate cancer.

**Charles Schwab Securities Litigation –**
The firm was lead counsel in this action alleging fraud in the management of the Schwab YieldPlus mutual fund; a **$235 million** class settlement was approved by the court.

**Expedia Hotel Taxes and Fees Litigation –**
Hagens Berman obtained summary judgment in this class action to recover deceptive service fees and settled the case for **$123.4 million**.

**HAGENS BERMAN**

PRACTICE AREAS | **Investor Fraud**
Individual and Class Action Litigation

5

Investing is a speculative business involving a wide variety of risks, and sound investment decisions can only be made when you have full disclosure of accurate information. No money manager, retirement fund or individual investor should suffer undue risk or incur losses due to misrepresentations related to the investment at issue.

Our attorneys work for institutional and individual investors defrauded by unscrupulous corporate insiders and mutual funds. The firm vigorously pursues fraud recovery litigation, forcing corporations and mutual funds to answer to deceived investors.

Hagens Berman is one of the country's leading securities litigation firms and advises clients in both individual and class-action cases. The firm has the experience, dedication, and a team with the horsepower required to drive complex cases to exemplary outcomes. Our attorneys are authorities in a wide array of issues unique to federal and state securities statutes and related laws. We also use a variety of highly experienced experts as an integral part of our prosecution team.

Some of the firm's more noteworthy successes on behalf of our investor clients include:

▶ **Charles Schwab Securities Litigation** – The firm was lead counsel in this action alleging fraud in the management of the Schwab YieldPlus mutual fund. The firm secured a $235 million class settlement for investors, a nearly unheard of recovery as a percentage of total losses.

▶ **Oppenheimer** – The firm was additional counsel for the lead plaintiffs in this class-action litigation alleging Oppenheimer misled investors regarding its Champion and Core Bond Funds, which resulted in the recovery of $100 million for the classes.

▶ **Tremont** – The firm was co-lead counsel in a case alleging Tremont Group Holdings breached its fiduciary duties by turning over $3.1 billion to Bernard Maddoff. A federal judge gave final approval to a $100 million settlement between investors, Tremont and its affiliates.

▶ **Enron** – Hagens Berman was co-lead counsel in this ERISA litigation, which recovered more than $250 million, the largest ERISA settlement in history.

▶ **Boeing** – The subject of a BusinessWeek feature article, this case uncovered critical production problems with the 777 airliner documented internally by Boeing, but swept under the rug until a pending merger with McDonnell Douglas was completed. Hagens Berman worked to uncover evidence demonstrating that the company knew of the concealed problems, eventually pressing Boeing into a record-breaking settlement of more than $92.5 million.

- **Morrison Knudsen** – After the company took a significant write off, Hagens Berman filed a shareholder class action, alleging that MK's senior officers had concealed hundreds-of-millions in losses. After bitterly fighting the suit, MK ousted the CEO and admitted the true extent of the losses. The firm recovered more than $63 million for investors.

- **Raytheon/Washington Group** – This suit charged Raytheon with deliberately misrepresenting the true financial condition of its Raytheon Engineers & Constructors (RE&C) division in order to sell this division to the Washington Group at an artificially inflated price. The case resulted in a $39 million settlement.

- **U.S. West** – The firm represented shareholders of U.S. West New Vector in a challenge to the proposed buyout of minority shareholders by U.S. West. As a result of this litigation, the proposed buyout was stayed, and a settlement was achieved that resulted in a $63 million increase in the price of the buyout.

### Mortgage-backed Securities

In the wake of the "subprime" mortgage meltdown, Hagens Berman has actively prosecuted fraud in the sale of mortgage-related securities. Fraud cases against mortgage lenders, investment banks, and other financial institutions that misrepresented mortgage-related securities have proliferated. Investors now understand that portfolio losses on these instruments were not simply due to a "down" market, but to the defendants' unlawful manipulations.

### Whistleblowers

In an effort to curb Wall Street excesses, Congress recently passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. Recognizing that corporate insiders play a critical role in rooting out securities law violations, the Dodd-Frank bill built vigorous whistleblower protections into the legislation known as the "Wall Street Tip-Off Law."

The law empowers the U.S. Securities and Exchange Commission to award between 10 percent and 30 percent of any monetary sanctions recovered in excess of $1 million to whistleblowers who provide information leading to a successful SEC enforcement. Hagens Berman, already a leading qui tam litigation firm, is fully equipped to handle any and all cases and investigations related to the Wall Street Tip-Off Law.

The firm's past whistleblower successes include a suit against an ambulance company that resulted in the second-largest settlement ever in the ambulance industry; representation of a healthcare finance consultant who blew the whistle on Medicare Outlier fraud and helped recover millions for the federal treasury; representation of a former consultant at a Big Four accounting firm whose office perpetrated a fraudulent billing scheme on the U.S. Justice Department; and representation of a defense industry employee whose company provided substandard gyroscopes for Air Force fighter jets. The synergies that result from marrying our securities talent with our qui tam successes make Hagens Berman an ideal choice for whistleblowers contemplating actions under the Wall Street Tip-Off Law.

 HAGENS BERMAN

## PRACTICE AREAS | **ERISA/Retirement Plan Protection**

7

Tightly related to our work in protecting defrauded investors, Hagens Berman has long been a leader in protecting the rights of working men, women and their families through its ERISA and retirement plan protection practice and has represented them in some of the largest cases in the history of ERISA law.

The federal Employee Retirement Income Security Act of 1974 (ERISA) spells out the duties that plan administrators, trustees and other fiduciaries owe to participants and beneficiaries in retirement programs including Employee Stock Ownership Plans (ESOPs), 401(k) plans, healthcare and pension plans.

Our firm has substantial experience in recovering retirement funds lost by employees as the result of imprudent and disloyal conduct by plan fiduciaries, and in otherwise safeguarding the rights of ERISA plan participants.

Courts have recognized our aptitude in handling large ERISA cases and appointed our firm as co-lead counsel in a number of such cases, including the groundbreaking Enron ERISA litigation. Enron produced $220 million in settlements for the benefit of former Enron employees, making it the largest ERISA settlement to date. Hagens Berman served as co-lead in the GM ERISA litigation, which resulted in a proposed settlement for $37.5 million and substantial injunctive relief for the benefit of a class of 401(k) plan participants. The firm was counsel to former Washington Mutual employees who lost hundreds of millions of dollars in retirement savings invested in company stock and the Washington Mutual 401(k) plan. The court granted final approval to a $49 million settlement in the case. We also served in ERISA cases on behalf of employees of IPALCO, the Montana Power Company and United Airlines.

In addition to using ERISA to protect retirement plans, the firm's ERISA practice also seeks to protect other employee benefit plans such as health insurance. For example, Hagens Berman pioneered the discovery of fraud in "discounts" provided to employee health plans, and led a case that broke new ground in the coverage of contraceptives.

Because ERISA litigation often involves negotiations in a bankruptcy or similar financial situation, our firm often pursues alternative legal approaches to increase the chances of recovery, including filing RICO charges or naming as defendants key outsiders who played a role in the company's failure.

 HAGENS BERMAN

## PRACTICE AREAS | **Antitrust**

Hagens Berman works to preserve healthy competition and fair trade in the marketplace by protecting consumers and businesses that purchase goods and services from price-fixing, market allocation agreements, monopolistic schemes, and other restraints of trade. The firm has earned an enviable reputation as experts in this often-confusing and combative area of commercial litigation. Our attorneys have a deep understanding of the legal and economic issues within the marketplace, allowing us to employ ground breaking market theories that shed light on monopolistic, restrictive and anti-competitive practices.

Hagens Berman currently represents millions of consumers in several high-profile class-action lawsuits, and takes on major antitrust litigation that has the potential to improve market conditions for consumers, businesses and investors. We have represented plaintiffs in markets as diverse as debit and credit cards services, personal computer components, television screens, electric and gas power, airlines, personal computer software, computer games, and Internet services.

We have prevailed against some of the world's largest corporations. Representative successes on behalf of our clients include:

▸ **Visa/MasterCard** – Hagens Berman helped lead this record-breaking antitrust case against credit card giants Visa and MasterCard, which resulted in a $3.05 billion cash settlement and injunctive relief valued at more than $20 billion. The suit challenged charges imposed in connection with debit cards. As co-lead counsel in this matter, the firm assisted in setting strategy and providing oversight on all aspects of the case.

▸ **DRAM** – The firm played a key role in this class-action suit against the leading DRAM (Dynamic Random Access Memory) manufacturers, claiming the companies secretly agreed to reduce the supply of DRAM which artificially raised prices. DRAM is a necessary component in a wide variety of electronics including personal computers, cellular telephones, digital cameras and many other devices, and the class included equipment manufacturers, franchise distributors, and smaller-volume customers who purchased DRAM. The case settled for $345 million. The firm also represented purchasers of SRAM (Static Random Access Memory) in another class action that resulted in settlements totaling more than $75 million.

▸ **Disposable Contact Lens** – The firm represented hundreds of thousands of consumers against a number of disposable contact lens manufacturers, claiming that the manufacturers conspired with the American Optometric Association to keep low-priced retailers such as pharmacies and mail order companies from selling their lenses. The case settled in 2001 during trial.

▸ **AC Nielson** – Hagens Berman represented Information Resources, Inc. ("IRI") in a suit claiming that AC Nielsen's anti-competitive practices caused IRI to suffer significant losses. The case settled for $55 million.

The firm has also generated substantial recoveries on behalf of health plans and consumers in antitrust cases involving pharmaceutical companies abusing their patent rights to block generic drugs from coming to market. Certain brand name manufacturers have employed unlawful tactics such as perpetuating the brand name drug's monopoly by filing "sham litigation" against generic entrants and fraudulently extending an existing patent. Hagens Berman has served as lead or co-lead counsel in landmark litigation challenging these anti-competitive practices, achieving substantial settlements for clients in, among other cases, the **Paxil Direct Purchaser Litigation ($100 million), Relafen Antitrust Litigation ($75 million), Tricor Indirect Purchaser Antitrust Litigation ($65.7 million),** and **Augmentin Antitrust Litigation ($29 million).**

Some of the firm's current cases include:

- **Optical Disc Drives** – Hagens Berman represents optical disc drive (ODD) owners in this suit alleging that many of the largest ODD manufacturers, including Toshiba, Sony, LG Technology and Philips fixed prices and conducted anticompetitive business practices.

- **EA Madden** – This class-action lawsuit claims that video game giant Electronic Arts used exclusive licensing agreements with various football organizations to nearly double the price of several of its games.

- **E-books** – Hagens Berman was recently named lead counsel in this class action against Apple, Inc. and several of the nation's largest publishers. The firm contends that the defendants conspired to artificially raise the price of e-books by simultaneously transitioning to an agency sales model. The price of e-books rose as much as 50 percent, according to the suit.

**9**

## PRACTICE AREAS | **Consumer Protection**
General Class Litigation

**10**

Hagens Berman is a leader in protecting consumers, representing millions in large-scale cases that challenge unfair, deceptive, and fraudulent practices.

We realize that often-voiceless consumers suffer the brunt of corporate wrongdoing, and have little power to hold companies responsible or change those tactics. Unscrupulous companies often overcharge each customer only a small amount, avoiding serious complaints but adding up to tremendous amounts of undeserved money.

In response, Hagens Berman pursues class litigation on behalf of clients to confront fraudulent practices that consumers alone cannot effectively dispute. We make consumers' concerns a priority, collecting consumer complaints against suspected companies and exploring all avenues for prosecution. The firm has been an innovator in organizing and prosecuting individual class cases across many states involving the same defendants and similar factual and legal issues.

Consumer rip-offs have many faces. As one court has said, "It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field." Hagens Berman's legacy of protecting consumer rights reflects the wide spectrum of scams that occur in the marketplace. The cases that we have led have challenged a wide variety of practices such as:

– False and deceptive advertising of consumer products and services

– False billing and over-charging by credit card companies, banks, telecommunications providers, power companies, hospitals, insurance plans, shipping companies, airlines, and Internet companies

– Deceptive practices in selling insurance and other financial products and services such as life insurance, annuities, and auto insurance

– Predatory and other unfair lending practices, and fraudulent activities related to home purchases

A few case examples are:

▸ **Toyota Sudden, Unintended Acceleration** – Hagens Berman serves as co-lead counsel for the economic loss class in this class-action lawsuit filed on behalf of Toyota owners who allege a defect causes their vehicles to undergo sudden, unintended acceleration. Consumers allege that in addition to the safety risks associated with driving the vehicles, they suffered economic losses because the value of Toyota vehicles plummeted following media coverage of the alleged defect. A federal judge has denied Toyota's motion to dismiss the case, which will proceed toward trial.

▸ **Expedia Hotel Taxes and Service Fees Litigation** – The firm led this nationwide class-action suit arising out of bundled "taxes and service fees" that Expedia collects when its consumers book hotel reservations. Plaintiffs alleged that by collecting exorbitant fees as a flat percentage of the room rates, Expedia violated both the Washington Consumer Protection Act and its contractual commitment to charge as service fees only "costs incurred in servicing" a given reservation. After plaintiffs obtained summary judgment in the amount of $184 million, the case settled for cash and consumer credits totaling $123.4 million.

▸ **Blue Rhino** – Hagens Berman participated in this case which alleged that Ferrellgas, wanting to avoid a price increase and a negative impact on sales, reduced the amount of propane in its tanks from 17 to 15 pounds without informing consumers. The firm negotiated a $25 million settlement which has been given preliminary approval by the court.

▸ **Tenet Healthcare** – In a pioneering suit filed by Hagens Berman, plaintiffs alleged that Tenet Healthcare charged excessive prices to uninsured patients at 114 hospitals owned and operated by Tenet subsidiaries in 16 different states. Tenet settled the case and agreed to refund to class members amounts paid in excess of certain thresholds over a four-and-a-half year period.

▸ **Consumer Insurance Litigation** – Hagens Berman has pioneered theories to ensure that in first- and third-party contexts consumers and health plans always receive the treatment and benefits to which they are entitled. Many of our cases in this area have succeeded in expanding coverage owed and, thereby, providing more benefits; recovering underpayments of benefits; and returning uninsured/underinsured premiums received because of the misleading tactics of the insurer. In addition, on individual cases, we have taken insurers to trial and recovered millions of dollars for our clients by way of verdict for bad faith, punitive damages, wage losses, and medical and rehabilitative care.

**11**

HAGENS BERMAN

**PRACTICE AREAS** | **Consumer Protection**
Defective Product Litigation

**12**

When a product fails to meet accepted or advertised standards, the results can be costly, hazardous or even deadly. In such cases, consumers deserve relief.

State and federal laws provide consumers with remedies for products that do not perform as warranted or advertised. Hagens Berman is nationally recognized for our successful prosecution of lawsuits involving a wide range of such defective products, from faulty building and home products to defective cars, computers, software, electronic products, medical devices, and toys.

Indicative of the firm's achievements for its consumer clients, the Federal court overseeing the massive multi-district litigation against Toyota appointed the firm to co-lead one of the largest consolidations of class-action cases in U.S. history. The litigation combines more than 300 state and federal suits concerning acceleration defects tainting Toyota vehicles. Hagens Berman and its two co-lead firms were selected from among more than 70 law firms applying for the role.

Select firm successes representing consumers in defective product class litigation are profiled below:

▸ **Louisiana-Pacific Siding Litigation** – Hagens Berman attorneys served as co-lead counsel in a nationwide settlement class involving defective siding installed on 800,000 homes that soaked up moisture, resulting in swelling and cracking. More than 130,000 claims have been paid exceeding $500 million in total.

▸ **Polybutylene Pipe Litigation** – This litigation charged Shell Oil Company, E. I. du Pont de Nemours, and Hoescht Celanese with manufacturing and marketing defective polybutylene pipes and plumbing systems used in homes. Hagens Berman served as co-lead counsel for the class and secured a settlement providing a minimum of $950 million in relief, which, at the time, was the largest class-action settlement of its kind.

▸ **Nissan Quest Accelerator Litigation** – Hagens Berman represented Nissan Quest minivan owners who alleged that their vehicles developed deposits in a part of the engine called the throttle-body assembly, and that these deposits caused drivers to apply increased pressure to push the accelerator down. A favorable settlement provided the class with reimbursement for throttle-body cleanings or replacements and applicable warranty coverage for qualified class members.

▸ **Hyundai Horsepower Litigation** – Hagens Berman was co-lead counsel in a class-action lawsuit against Hyundai that claimed the company overstated the horsepower of 1.3 million vehicles and inflated the value of certain Hyundai models. In the resulting nationwide settlement, owners of each vehicle will receive up to $225 in cash or up to $325 in credit with Hyundai dealers. The cost of the settlement to Hyundai ranges from $76 million to $127 million, depending on whether owners seeking compensation take the cash or dealer credit. The settlement replaced a previous agreement under which Hyundai offered coupons on future purchases.

PRACTICE AREAS | **Consumer Protection**
**Drugs and Supplement Litigation**

**13**

Hagens Berman aggressively pursues pharmaceutical industry litigation, and fights for more affordable prescription drugs and a more responsible pharmaceutical and medical device industry.

For decades, brand-name prescription drug makers have been among the most profitable companies in America. While pharmaceutical companies become richer, consumers, health plans and insurers pay higher costs for prescription drugs. Representing individuals, third-party payors and the nation's most forward-thinking public-interest groups, we shine the light of public scrutiny on this industry's practices.

Our drug litigation focuses on drug makers' unlawful price inflation, filing of false secondary patents that block competitive generic drugs, and drug promotion for uses not approved by the Food and Drug Administration, commonly known as "off-label" uses. We also litigate cases against "dietary supplement" manufacturers for making false claims about their products. Examples include cases alleging that "Cellasene" did not fight cellulite as promised, and that "Enzyte" was marketed with false male-enhancement claims.

We believe the firm's pharmaceutical and dietary supplement litigation practice is second-to-none in the nation in terms of expertise, commitment and landmark results. The firm's attorneys have argued suits against dozens of major drug companies, giving them extensive litigation and courtroom experience. In recent years, Hagens Berman's aggressive prosecution of pharmaceutical industry litigation has recovered more than $500 million dollars in gross settlement funds for consumers and third-party payors.

Here are some examples of our approach:

▸ **McKesson and First DataBank Drug Litigation** – Hagens Berman was lead counsel in this RICO case against McKesson and First DataBank alleging the companies fraudulently inflated the prices of more than 400 prescription drugs by manipulating drug-pricing benchmarks. The class action against McKesson settled for $350 million on the eve of trial. The First DataBank settlement will result in a four percent rollback on the prices of 95 percent of the nation's retail branded drugs, the net impact of which could be in the billions of dollars. Similar cases on behalf of government entities have resulted in recoveries exceeding $94 million.

▸ **Average Wholesale Price Drug Litigation** – This sprawling litigation against most of the nation's largest pharmaceutical companies alleges that defendants artificially inflated the Average Wholesale Price used as a benchmark for almost all prescription drug sales in the United States. Hagens Berman is co-lead counsel to several certified classes and was lead trial counsel in a consolidated trial resulting in verdicts against AstraZeneca and BMS, marking one of the first trial defeats for the pharmaceutical industry on pricing issues. Class settlements approximating $338 million in the aggregate were approved in favor of consumers and health plans.

▸ **Vioxx Third Party Payor Marketing and Sales Practices Litigation** – The firm served as lead counsel for third-party payors in the Vioxx MDL, alleging that Merck & Co. misled physicians, consumers and health benefit providers when it touted Vioxx as a superior product to other non-steroidal anti-inflammatory drugs. In reality, the drug had no appreciable benefits from less expensive medications, but carried increased risk of causing cardiovascular events. A $65 million settlement resulted.

▸ **Serono Drug Litigation** – Hagens Berman negotiated a $24 million settlement to reimburse a class of consumers and third-party payors, including self-insured employers, health and welfare plans, and insurance companies, for part or all of their purchases of the AIDS drug Serostim. The suit alleged that global biotechnology company Serono, Inc., schemed to substantially increase Serostim sales by duping patients diagnosed with HIV into believing they suffered from AIDS-wasting and needed the drug to treat that condition.

▸ **Neurontin Third-Party Payor Litigation** – Hagens Berman served as co-lead trial counsel in this case alleging that Pfizer fraudulently and unlawfully promoted the drug Neurontin for uses unapproved by the FDA. A jury returned a $47 million verdict in favor of plaintiffs.

**HAGENS BERMAN**

**15**

PRACTICE AREAS | **Employment Litigation**

Hagens Berman takes a special interest in protecting workers from exploitation or abuse. We take on race and gender discrimination, immigrant worker issues, hour and wage issues, on-the-job injury settlements, and other crucial workplace issues.

We understand the sensitive position that many employees find themselves in. Often, employees accept labor abuses or a curbing of their rights because they don't know the law, respect their superiors or fear for their jobs. We act on behalf of employees who may lack the individual power to bring about meaningful change in the workplace.

Hagens Berman takes a comprehensive approach to rooting out systemic employee abuses through in-depth investigation, knowledgeable experts and fervent exploration of prosecution strategies. Our attorneys excel at seeking out and finding employees with an inside view and crucial knowledge and using that information to bring success in the courtroom.

Hagens Berman is a firm well-versed in taking on complicated employee policies and bringing about significant results. Our representative cases include:

▸ **CB Richard Ellis Sexual Harassment Litigation** – Hagens Berman filed a class-action lawsuit against CB Richard Ellis, Inc. on behalf of 16,000 current and former female employees who alleged that the company fostered a climate of severe sexual harassment and discriminated against female employees by subjecting them to a hostile, intimidating and offensive work environment. Emotional distress and other physical and economic injuries to the class were the result. The firm negotiated an innovative and unprecedented settlement requiring changes to human resources policies and procedures. Class members participated in a stream-lined claims process providing the potential for individual awards of up to $150,000 per class member. The company agreed to tighten existing harassment policies and implement enhanced training for all employees. It also agreed to increase supervisor accountability to address sexually inappropriate conduct in the workplace, enhance record-keeping practices, and conduct two annual reviews of settlement compliance by a court appointed monitor.

▸ **Costco Wholesale Corporation Wage & Hour Litigation** – Hagens Berman filed a class-action lawsuit against Costco Wholesale Corporation on behalf of 2,000 current and former ancillary department employees (such as food court managers) who alleged that the company misclassified them as "exempt" executives. According to the complaint, Costco improperly denied these employees overtime compensation, meal breaks, and other employment benefits. After years of hard-fought litigation, the court certified eight employee groups for class-action treatment. Hagens Berman then negotiated a $15 million cash settlement on behalf of the class.

▸ **Washington State Ferry Workers Wage Litigation** – The firm represented a class of "on-call" seamen who alleged that they were not paid for being "on call" in violation of federal and state law. The case resulted in a rearrangement in work assignments and of the "on-call" system, resulting in better working conditions for the employees.

▸ **SunDance Rehabilitation Corporation** – The firm filed a class-action lawsuit against SunDance, a subsidiary of Sun Healthcare Group, challenging illegal wage manipulation, inconsistent contracts, and other compensation tricks used to force caregivers to work unpaid overtime. The caregivers included physical, speech and rehabilitation therapists. The suit resulted in a $3 million settlement of stock to be distributed out of the company's bankruptcy estate.

HAGENS BERMAN

PRACTICE AREAS | **Civil and Human Rights**

Hagens Berman has represented individuals and organizations in some of the more difficult civil rights challenges that have arisen in the past two decades. In doing so, we have managed cases presenting very complex legal and factual issues that are often related to highly charged political and historical events. Our clients have included such diverse communities as World War II prisoners of war, conscripted civilians, and entire villages.

In this cutting-edge practice area, the firm vigilantly keeps abreast of new state and national legislation and case-law developments. We achieve positive precedents by zealously prosecuting in our clients' interests. Some examples of our work in this area include:

▸ **World Trade Organization Protests** – During the 1999 World Trade Organization (WTO) protests in Seattle, tens of thousands of Seattle citizens became targets after Seattle officials banned all forms of peaceful protest. Seattle police attacked anyone found in the designated "no protest" zones with rubber bullets and tear gas. City residents were arrested and incarcerated for up to four days. In conjunction with Trial Lawyers for Public Justice, the firm won a settlement from Seattle city officials after filing a class-action alleging violations of the First and Fourth Amendments to the United States Constitution and after a jury returned a verdict in favor of the plaintiffs.

▸ **Hungarian Gold Train** – Following the firm's representation of former forced and enslaved laborers for German companies in the Nazi Slave Labor Litigation, Hagens Berman led a team of lawyers that brought suit against the United States on behalf of Hungarian Holocaust survivors in the Hungarian Gold Train case. The suit claimed that, during the waning days of World War II, the Hungarian Nazi government loaded the plaintiffs' valuable personal property onto a train, and the U.S. Army later seized the train and its contents and never returned the property to its owners and heirs.

▸ **Rio Tinto** – In a landmark case, the firm represents victims of Rio Tinto's mining operation on the island of Bougainville. To build the mine, Rio chemically defoliated, bulldozed and sliced off an entire mountainside of rain forest, and mine operations dumped billions of tons of toxic mine waste onto the land and into pristine waters, filling major rivers with tailings, and polluting a major bay dozens of miles away. Rio's flagrant disregard for the environment dispossessed the people of Bougainville from their land, destroyed their culture, and exposed members of the class to numerous toxic chemicals. In certain villages, chemicals remain and have caused death and illness.

Rio's actions on Bougainville were so egregious that they sparked an uprising designed to close the mine. When the uprising succeeded, the Papua New Guinea government sent troops, transported by Rio, to reopen the mine. After initial efforts were unsuccessful, the PNG government, as the agent and co-venturer of Rio and with the support and encouragement of Rio, instituted a military blockade of the island that lasted for almost 10 years. The blockade's purpose was to coerce the Bougainville people into surrender so that the mine could be reopened and both Rio and PNG could continue to reap enormous profits from the mine. The blockade

prevented medicine, clothing and other essential items from reaching Bougainville. Hospitals were forced to close, women died needlessly in childbirth, and young children died from easily preventable diseases. According to the Red Cross, the blockade killed more than 2,000 children in just its first two years of operation. By the time the war ended in 1999, 10 percent of the population of Bougainville, approximately 15,000 civilians, were killed.

The action alleges that Rio's conduct amounted to war crimes and violated customary international law, including prohibitions against destruction of the right to life and health and prohibitions against racial discrimination. Plaintiffs seek redress under the federal Alien Tort Claims Act (28 U.S.C. § 1350). An appeals court recently ruled that the case may proceed in U.S. courts and Rio has appealed to the Supreme Court.

HAGENS BERMAN

## PRACTICE AREAS | **Whistleblower Litigation**

19

Hagens Berman pursues whistleblower litigation under various programs, including the federal False Claims Act, various state laws and the more recently enacted Securities and Exchange Commission (SEC), Commodity Futures Trading Commission (CFTC), and Internal Revenue Service programs.

All of these whistleblower programs reward private citizens who blow the whistle on fraud. In many cases, the whistleblower reports fraud committed against the government, and may sue those individuals or companies responsible, thereby helping the government recover its losses. The programs under which Hagens Berman pursues cases include:

**False Claims Act**

Under the federal False Claims Act, and more than 30 similar state laws, the whistleblower reports fraud committed against the government, and under the law's qui tam provision, may file suit on its behalf to recover lost funds.

The whistleblower initially files the case under seal, giving it only to the government and not to the defendant, which permits the government to investigate. After the investigation, the government may take over the whistleblower's suit, or it may decline. If the government declines, the whistleblower can proceed alone on his or her behalf. In successful suits, the whistleblower normally receives between 15 and 30 percent of the government's recovery as a reward.

False claims acts are one of the most effective tools in fighting Medicare and Medicaid fraud, defense contractor fraud, financial fraud, under-payment of royalties, fraud in general services contracts and other types of fraud perpetrated against governments. Since 1986, federal and state false claims act recoveries have totaled more than $22 billion. Whistleblowers themselves have now received more than $2 billion.

In recent years, instances of fraud relating to financial services have exploded, as billions of dollars have flowed through federal programs such as the Troubled Asset Recovery Program (TARP), the Term-Asset-Backed Securities Loan Program (TALF), and the Federal Home Administration. Bid-rigging and kickback schemes in the municipal bond arena have flourished, as have mispricing and deception associated with securities bought by public pension funds.

The government cannot keep up with the high volume of filed cases, making it important that a whistleblower retain the services of a firm like Hagens Berman. We have a proven track record of winning and the resources and knowledge to take on a powerful defendant and prosecute the case through trial. When the government is unwilling to act, we are.

Our expertise in the qui tam arena includes close working relationships with attorneys at the United States Department of Justice and numerous state Attorney General's Offices; specialized understanding of federal and state false claims statutes and other related areas of law; and extensive experience in cultivating close, productive attorney-client relationships with whistleblower clients.

Hagens Berman's past whistleblower successes include a suit against an ambulance company that resulted in the second-largest settlement ever in the ambulance industry; alleged kickbacks demanded by a major hospital procurement agent in exchange for the award of contracts to supply products for hospitals reimbursed by federal health programs; a health care finance consultant who blew the whistle on Medicare "outlier" fraud and helped recover millions for the federal treasury; a former consultant at a "Big Four" accounting firm whose office perpetrated a fraudulent billing scheme on the U.S. Justice Department; and a defense industry employee whose company provided substandard gyroscopes for Air Force fighter jets.

### Securities and Exchange Commission / Commodity Futures Trading Commission

Hagens Berman also provides counsel for whistleblowers under the new Securities and Exchange Commission (SEC) and Commodity Futures Trading Commission (CFTC) whistleblower programs.

Unlike the False Claims Act, whistleblowers under these new programs do not initially file a sealed lawsuit. Instead, they provide information directly to the SEC or the CFTC regarding violations of the federal securities or commodities laws. If the whistleblower's information leads to an enforcement action, they may be entitled to between 10 and 30 percent of the recovery.

Many traditional False Claim Act firms are beginning to take on these cases, but those firms lack real experience in prosecuting financial fraud and securities violations. Hagens Berman has extensive experience in these areas and has represented large institutions as well as led class-action litigation against some of the largest financial institutions in the world.

Hagens Berman has also worked alongside government officials and regulators, establishing the credibility necessary to bring a case to the SEC. When Hagens Berman brings a claim, regulators pay attention.

### Internal Revenue Service

Hagens Berman also represents whistleblowers under the IRS whistleblower program enacted with the Tax Relief and Health Care Act of 2006.

The IRS program offers rewards to those who come forward with information about persons, corporations, or any other entity that cheats on its taxes. In the event of a successful recovery of government funds, a whistleblower can be rewarded with up to 30 percent of the overall amount collected in taxes, penalties and legal fees.

Hagens Berman helps IRS whistleblowers to present specific and credible information to the IRS regarding tax fraud. Unlike some traditional False Claims Act firms, Hagens Berman has experience representing governments who have lost tax revenue due to fraud.

HAGENS BERMAN

21

## PRACTICE AREAS | **Governmental Representation**

Hagens Berman represents government agencies and public officials in civil law enforcement and damage recoupment actions designed to protect citizens and the treasury. We understand the needs of elected officials and the obligation to impartially and zealously represent the interests of the public, are often chosen after competitive bidding, and have been hired by officials from across the political spectrum.

Hagens Berman has assisted governments in recovering billions of dollars in damages from corporate wrongdoers and, in the process, helped alter the manner in which some industries do business. In serving government, we are often able to leverage the firm's expertise and success in related private class litigation.

Successes on behalf of government clients include:

▸ **Big Tobacco** – Hagens Berman represented 13 states in their landmark Medicaid-recoupment litigations against the country's major tobacco companies. Only two states actually took their cases to trial – Washington and Minnesota. The firm served as trial counsel for the State of Washington, becoming only one of two private firms in the entire country to take a state case to trial.

Hagens Berman was instrumental in developing what came to be accepted as the predominant legal tactic to use against the tobacco industry: emphasizing traditional law enforcement claims such as state consumer protection, antitrust and racketeering laws. Before the firm's involvement in the state cases, the predominant claims being pursued by most of the states were traditional tort theories, which were sometimes unsuccessful. In contrast, the law enforcement approach proved to be nearly universally successful at the pleading stage, leaving the industry vulnerable to a profits disgorgement remedy, penalties and double damages. The firm also focused state legal claims on the industry's deplorable practice of luring children to tobacco use.

A national settlement of the state tobacco litigation resulted in recouping $206 billion for state programs, the largest settlement in the history of civil litigation in the United States. The firm played a key role in the national settlement negotiations.

Hagens Berman is particularly proud of the important role that the firm's lawyers played in these pioneering actions against an industry that has caused so much illness and financial harm.

▸ **Average Wholesale Price Drug Litigation** – The drug manufacturers' artificial inflation of the Average Wholesale Price that is used as a benchmark for almost all prescription drug sales in the United States hurt consumers and private third-party payors whose interests the firm represents in class litigation, and it also caused damage to state Medicaid and other public health programs. Hagens Berman is special counsel to the states of Arizona, Montana and Nevada in their AWP suits, which have settled on terms favorable to the states.

‣ **McKesson Drug Price Inflation Litigation** – This litigation is yet another example of fraudulent drug price inflation impacting not just consumers and private health plans, but public health programs such as Medicaid and local government-sponsored plans as well. Hagens Berman, building on the firm's experience in leading the $350 class-action recovery against McKesson, represents six states, including Oregon, Virginia, Utah, Montana, Mississippi, and Connecticut, the City and County of San Francisco, and other local government agencies in their efforts to recover the damages caused to their health plans by McKesson's scheme. The County public payor case settled for $82 million, and the City and County of San Francisco settled its claims for $12.5 million.

‣ **Zyprexa Marketing and Sales Practices Litigation - Connecticut** – Hagens Berman served as outside counsel to Attorney General Richard Blumenthal in litigation alleging that Lilly engaged in unlawful off-label promotion of the atypical antipsychotic Zyprexa. The litigation also alleged that Lilly made significant misrepresentations about Zyprexa's safety and efficacy, resulting in millions of dollars in excess pharmaceutical costs borne by the State and its taxpayers. The State's Zyprexa litigation concluded with a $25 million settlement that Hagens Berman negotiated.

HAGENS BERMAN

## PRACTICE AREAS | **Personal Injury and Abuse**

Hagens Berman's blend of professional expertise, education and commitment to our clients has made us some of the most well-respected and successful mass tort and personal injury lawyers.

Not all personal injury cases are the same. To successfully litigate personal injury cases, attorneys must have a deep understanding of the medical and legal issues of that particular case and the practice area it falls within. The attorneys at Hagens Berman have extensive knowledge and experience across the spectrum of personal injury practice areas, assuring that our clients will receive the highest level of legal counsel. We have delivered in catastrophic injury cases involving wrongful death, brain injury, auto accidents, defective products, construction accidents, and police and emergency vehicle collisions.

Hagens Berman has a long record of accomplishment in personal injury litigation. Experience is the number one factor in reaching successful outcomes.

We also have unparalleled experience in very specific areas of abuse law, recovering damages on behalf of some of the most vulnerable people in our society, as profiled below.

**Sexual Abuse Litigation** – Hagens Berman has represented a wide spectrum of individuals who have been the victims of sexual abuse, including children and developmentally disabled adults. We treat each case individually, with compassion and attention to detail and have the expertise, resources and track record to stand up to the toughest opponents. In the area of sexual abuse, our attorneys have obtained record-breaking verdicts, including the largest personal injury verdict ever upheld by an appellate court in the State of Washington.

**Nursing Home Negligence** – Nursing home negligence is a growing problem throughout the nation. As our population ages, reports of elder abuse and nursing home negligence continue to rise. Today, elder abuse is one of the most rapidly escalating social problems in our society. Hagens Berman is uniquely qualified to represent the victims of elder abuse and nursing home negligence. Our attorneys have secured record-breaking settlements in this area of the law and have committed to holding nursing homes accountable.

**Social Work Negligence** – Social workers play a critical role in the daily lives of our nation's most vulnerable citizens. Social workers, assigned to protect children, developmentally disabled and elderly adults, are responsible for critical aspects in the lives of tens of thousands of citizens who are unable to protect themselves. Many social workers do a fine job. Tragically, many do not. The results are often catastrophic when a social worker fails to monitor and protect his or her vulnerable client. All too often, the failure to protect a child or disabled citizen leads to injury or sexual victimization by predators. With over $40 million in recoveries on behalf of vulnerable citizens who were neglected by social workers, Hagens Berman is the most experienced, successful and knowledgeable group of attorneys in this dynamic area of the law.

HAGENS BERMAN

PRACTICE AREAS | **Intellectual Property**

Hagens Berman launched a new intellectual property practice in early 2011. Managing Partner Steve Berman leads the effort and the firm has hired top-notch attorneys to pursue cases.

Unlike other intellectual property firms, Hagens Berman only represents plaintiffs. This reduces the risk of potential conflicts of interest which at larger firms often create delays in deciding whether or not to take a case. With no conflicts, we are able to act quickly in deciding to take a case and move the process forward.

The firm is primarily interested in patent law, and seeks to represent patent holders including inventors, non-practicing entities and other groups whose patent portfolio represents a significant capital investment.

A number of patent cases are currently in various phases of litigation. Some examples include:

▸ **Nintendo Wii** – Hagens Berman represents Shinsedai Company, Limited, a small video game company which alleges that Nintendo's Wii Sports games infringe on several of Shinsedai's patents.

▸ **Mission Abstract Data** – The firm has filed a lawsuit against more than 900 radio stations across the United States alleging that they have infringed on patents covering the use of hard disk drive systems to store and retrieve music.

▸ **Green Dot and NetSpend** – Hagens Berman filed this patent infringement suit on behalf of Nevada-based Integrated Technological Systems, Inc. (ITS) which claims that two prepaid debit card providers infringe on an ITS patent covering a method for transfers between prepaid debit cards.

▸ **Apple** – Hagens Berman is currently preparing new patent cases involving infringement by Apple's iPad, Mac and iPhone devices and infringement of patents formerly belonging to Polaroid.

Hagens Berman also specializes in other aspects of intellectual property law, including trade secret, copyright and trademark litigation.


HAGENS BERMAN

## PRACTICE AREAS | **Lending and Mortgage Fraud**

The financial crisis of 2008, triggered by the burst of a massive bubble in housing, led to waves of foreclosures that are still ongoing. The crisis has revealed a number of fraudulent tactics used by lenders, appraisers and others.

Hagens Berman has responded to these tactics by prosecuting financial institutions and real estate companies who break the law.

The firm has filed several lawsuits against some of the largest banks and mortgage owners, including Bank of America, Aurora Loan Services and Wells Fargo.

Some of the areas the firm focuses on include:

**Appraisals** – Hagens Berman has investigated appraisers and financial institutions that inflated fees or coordinated to produce false appraisals.

**Bait and Switch Charges** – The firm has prosecuted large mortgage holders that unfairly charged excessive and illegal fees.

**False Modification Schemes** – Some banks, the firm believes, have offered a false promise of a mortgage modification to homeowners, only to foreclose after the homeowner follows a prescribed payment plan.

One of the firm's cases has already led to a settlement that returned money to homeowners. In early 2011, a $7.1 million settlement was reached between homeowners and home building giant KB Homes. The case alleged that KB Homes improperly required customers to use its escrow subsidiary and extracted $275 for a "contract coordination" fee. The settlement will allow homeowners to recover at least $225 and perhaps more than $275.

**25**



## STEVE W. BERMAN | Managing Partner

1918 Eighth Ave., Suite 3300
Seattle, WA 98101
206.623.7292
steve@hbsslaw.com

Steve W. Berman founded Hagens Berman in 1993 after his prior firm refused to represent several young children who consumed fast food contaminated with E. coli. Steve went on to prove that the poisoning was the result of Jack in the Box's cost cutting and gross negligence. He is the managing partner of Hagens Berman and is considered one of the most successful class-action attorneys in the nation.

Mr. Berman played a key role in winning record settlements in consolidated cases against Wall Street, Big Oil, Big Pharma and Big Tobacco. He has served as lead counsel for the largest settlement in world history, largest U.S. antitrust settlement, largest U.S. ERISA settlement, and largest U.S. securities settlement at the time of settlement. His trial experience has earned him significant recognition, and led The National Law Journal to name him one of the 100 most powerful lawyers and rate Hagens Berman one of the top ten plaintiffs' firms in the country.



# ELIZABETH A. FEGAN │ Partner

1144 W. Lake St., Suite 400
Oak Park, IL 60301
708.628.4960
beth@hbsslaw.com

Elizabeth A. Fegan is a partner in Hagens Berman's Chicago office, where she has worked since 2004. Her practice includes a variety of complex commercial class-action cases in the areas of antitrust, consumer protection and product liability.

Her recent successes include a $35 million settlement in a nationwide antitrust class action on behalf of consumers against Babies 'R Us and manufacturers of high-end strollers, high chairs, carriers and car seats, as well as a settlement that provides up to $25 million in refunds to purchasers of Blue Rhino propane tanks in a nationwide antitrust class action.

Ms. Fegan has successfully tailored creative results for the benefit of nationwide classes. For example, Ms. Fegan settled a nationwide class action alleging sexual harassment on behalf of 16,000 current and former female employees of a commercial property brokerage firm. In addition to requiring changes to human resources policies and procedures, the innovative settlement afforded class members the opportunity to participate in a stream-lined claims process that provides the potential for individual awards up to $150,000 per class member.



## THOMAS E. AHLERING │ Associate

1144 W. Lake St., Suite 400
Oak Park, IL 60301
708.628.4961
toma@hbsslaw.com

Thomas Ahlering joined Hagens Berman's Chicago office as an associate in 2012. Prior to joining Hagens Berman, Thomas was an associate at a Chicago law firm where he was a member of the firm's White-Collar Crime and Internal Investigations and Litigation practice groups. While there, Thomas gained a broad and eclectic mix of litigation experience in both state and federal court in actions ranging from fraud, breach of contract, theft, RICO, ERISA, civil rights violations and criminal conspiracy.



## DANIEL J. KUROWSKI | Associate

1144 W. Lake St., Suite 400
Oak Park, IL 60301
708.628.4963
dank@hbsslaw.com

Daniel J. Kurowski is an associate at Hagens Berman's Chicago office, where he has worked since 2006. His current work with the firm includes a number of large class actions, including:  (1) litigating against the National Collegiate Athletic Association to improve its concussion policies for student-athletes; (2) contesting North American Company for Life and Health Insurance Company's deferred annuity sales practices, particularly as those practices impact senior citizens; (3) suing on behalf of a putative class of third-party payors of the prescription cancer pain drug Actiq, allegedly marketed and sold by Cephalon, Inc. for non-cancer uses; and (4) challenging Family Video Movie Club, Inc.'s alleged violations of the Fair Labor Standards Act and similar state laws for failing to pay hourly employees for "off-the-clock" work and miscalculating overtime pay.

While in law school, Mr. Kurowski received various academic scholarships, served as a staff member and Lead Articles Editor for The John Marshall Law Review, and received an award for an appellate brief he submitted in connection with a national moot court competition. Along with his studies, Mr. Kurowski worked in the private and governmental legal sectors, including interning with the U.S. Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity, the U.S. Attorney's Office for the Northern District of Illinois, and working with Hon. Ronald A. Guzman and his staff, a judge sitting with the U.S. District Court for the Northern District of Illinois.

# Ex. 2

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9

10   In Re: Toyota Motor Corp. Unintended          CASE NO: 8:10ML02151 JVS(FMOx)
     Acceleration Marketing, Sales
11   Practices, and Products Liability
     Litigation                                    ORDER NO. 2:  ADOPTION OF
12                                                 ORGANIZATION PLAN AND
     This document relates to:                     APPOINTMENT OF COUNSEL
13   ALL CASES

14

15

16

17

18          At the outset, the Court thanks the authors of the Joint Preliminary Report

19   (Docket No. 8) and all counsel for their thoughtful and extensive submissions on

20   the structure of this litigation.  The filings represent a thorough consideration of the

21   complexity which these pretrial proceedings face.

22

23   I.    Adoption of Structure.

24

25          The Court finds that plaintiffs' counsel should be structured as

26   follows:

27

28                                          1

• A liaison committee for personal injury/wrongful death cases, consisting of two co-lead counsel and a total of nine members, including the co-leads.  The committee will have the duties outlined in the Manual for Complex Litigation (Fourth) § 22.62, but tailored to reflect retention by individual counsel of the unique aspects of each personal injury/wrongful death case.

• A lead counsel committee for the economic loss cases, consisting of two co-leads who represent consumer plaintiffs and one co-lead who represents non-consumer plaintiffs, and six additional members consisting of five counsel who represent consumer plaintiffs and one counsel who represents non-consumer plaintiffs.  The committee will have the duties outlined in the Manual for Complex Litigation (Fourth) § 22.62.

• A core discovery committee consisting of the co-lead liaison counsel for the personal injury/wrongful death cases and the co-lead counsel for the economic loss plaintiffs.  There shall be two co-leads of the core discovery committee, one designated by the liaison committee and one designated by the lead counsel committee.  The co-leads may add by agreement a total of four additional members from the liaison committee and/or the lead committee.   Thus, the core discovery committee shall be no larger than nine.

• Three liaison counsel to the state cases and other types of federal cases to coordinate between the core discovery committee and the state and federal litigation.  The duties of plaintiffs' state and federal liaison counsel shall be limited to liaison.

• One or more counsel who shall have specific duties limited to a particular factual or legal area.

This structure is somewhat larger than the Court initially envisioned. However, the Court became convinced at the initial hearing that a larger group of counsel is needed to meet the needs of this case.

The Court declines to appoint a series of specialized committees. (<u>See</u> Joint Preliminary Report, pp. 3-4.) The Court believes these tasks can best be addressed by the committees which the Court has appointed in a centralized framework. In this regard, the Court notes the depth of the firms of many of the appointees.

II.   <u>Core Discovery.</u>

In its April 13, 2010 Order, the Court suggested a definition of core discovery: "By core discovery, the Court means discovery of the development, marketing, sales, manufacture, and administration of the Toyota products and product programs at issue in this case." (Docket No. 3, p. 2.) The scope likely includes all the issues outlined in the Joint Preliminary Report (pp. 9-20), but the Court agrees with the Toyota parties that it would be more productive to allow the parties to negotiate a joint definition, which the Court believes should occur as part of adopting a discovery program. (<u>See</u> Section IV.B, <u>infra</u>.) It is premature for the Court to attempt to define the scope of discovery at this time.

III.   <u>Appointments.</u>

The Court makes the appointments listed below, but first deals with

3

1  the issue of conflicts of interests.

2

3        A.  Conflicts of Interest.

4

5        On May 3, 2010, the Court invited comments on whether a conflict

6  exists if counsel represent both personal injury/wrongful death plaintiffs and

7  economic loss plaintiffs and whether a conflict exists if counsel represent both

8  consumer economic loss plaintiffs and non-consumer economic loss plaintiffs.

9  (Docket No. 92.)  The Court has concluded that neither combination of

10  representations constitutes a disqualifying conflict which bars the appointment of

11  counsel to a leadership position.

12

13        First, the supposed conflict between personal injury/wrongful death

14  plaintiffs and economic loss plaintiffs is premised on the theory that these

15  categories of plaintiffs are competing for a limited pool of resources to fund any

16  judgment.[1]  (E.g., Docket No. 53, pp. 5-6; Docket No. 149, p. 1.)  However, such

17  concerns appear speculative at this time in view of the representations that Toyota

18  had revenues of  more than $200 billion in 2009.  See Blackie v. Barrack, 524 F.2d

19  891, 909 (9th Cir. 1975); In re First American Corp. Erisa Litigation, 258 F.R.D.

20  610, 619 (C.D. Cal. 2009).  Moreover, the Court notes that Toyota announced on

21  May 11, 2010 an annual profit of approximately $2.2 billion for the fiscal year

22  ending March 31, 2010.[2]

23  _____

24        [1]Arguably, the same contention could be made with respect to representation of consumer

25  and non-consumer economic loss plaintiffs, but it would suffer from the same flaw.

26        [2] See, e.g., Hiroko Tabuchi, Toyota Posts $2.2 Billion Annual Profit, N.Y. Times, May

27  11, 2010, http://www.nytimes.com/2010/05/12/business/global/12toyota.html.

28                                          4

1           Second, the differences between consumer and non-consumer

2 economic loss plaintiffs may require representation of both types of plaintiffs in

3 the leadership, but dual representation does not create a conflict.  Courts have

4 regularly permitted counsel to represent different types of claimants within a class

5 or subclasses.  See, e.g., In re Medtronic, Inc., 2008 WL 3895933 at *3 (D. Minn.

6 Aug. 15, 2008) (MDL 1726); Moreno v. Autozone, Inc., 251 F.R.D. 417, 425

7 (N.D. Cal. 2008); In re Serzone Products Liability Litigation, 231 F.R.D. 221, 238

8 (S.D. W.Va. 2005) (MDL 1477).   There is no basis for reaching a different

9 conclusion here.

10

11           Part of the concern regarding potential conflicts is addressed by the

12 Court's determination not to appoint the same counsel to a leadership position

13 involving more than one type of claimant.  Each group of claimants will have

14 adequate representation in the leadership.

15

16           At best, the issue of whether such dual representations require

17 disqualification is premature.  There will be other, more appropriate opportunities

18 to revisit the issue, such as the Court's consideration of the adequacy of counsel on

19 motions for class certification.  Fed. R. Civ. P. 23(a)(4).

20         B.  Appointments.

21

22           The Court makes the appointments listed below.  The appointments

23 are personal in nature, and although the Court anticipates that appointees will draw

24 on the resources of their firms or their existing co-counsel, the appointee is the

25 member of the committee and responsible for the duties which he or she assumes.

26 At a coming hearing, the Court will discuss a process for evaluating appointees'

27 performance and commitment to the tasks assigned.

28

Plaintiffs' Liaison Committee for Personal Injury/Wrongful Death Cases:

    *Co-Lead Counsel:* Elizabeth J. Cabraser, Mark P. Robinson, Jr.

    *Members:* Lewis S. Eidson, W. Mark Lanier, Richard D. McCune, W. Daniel "Dee" Miles, Brian Panish, Hunter J. Shkolnik, Donald H. Slavik

Plaintiffs' Lead Counsel Committee for Economic Loss Class Actions:

    *Co-Lead Counsel:* Steven W. Berman (consumer), Frank M. Pitre (non-consumer), Marc M. Seltzer (consumer)

    *Members:* Richard J. Arsenault (non-consumer), Benjamin L. Bailey (consumer), Stanley M. Chesley (consumer), Jayne Conroy (consumer), Michael Louis Kelly (consumer), Jerome L. Ringler (non-consumer)

Core Discovery Committee: To be staffed as discussed in Section I.

Plaintiffs' Liaison Counsel to State and Other Types of Federal Cases: Wylie A. Aitken, Dawn M. Barrios, Gretchen M. Nelson

Specialized Appointment: Monica R. Kelly, consultant to the Liaison Committee for Personal Injury/Wrongful Death Cases and the Lead

6

Counsel Committee for Economic Loss Class Actions on foreign law issues, including motions practice involving foreign law issues.

The Court defers to the Toyota parties' suggestion for organizing their defense, and adopts their proposal below.  (See Joint Preliminary Report, pp. 8-9.) Accordingly, the Court appoints:

Lead Defense Counsel for Personal Injury/Wrongful Death Cases: Vince Galvin, Joel Smith.  Counsel will have the duties outlined in the Manual for Complex Litigation (Fourth) § 22.62.  They shall also serve as liaison counsel for technical issues.

Lead Defense Counsel for Economic Loss Cases:  Cari K. Dawson, Lisa Gilford.  Counsel will have the duties outlined in the Manual for Complex Litigation (Fourth) § 22.62.

Defendants' Liaison Counsel to State Cases and Other Types of Federal Cases: Vince Galvin, Lisa Gilford

IV.    Further Hearings.

A.  May 28, 2010, 9:00 a.m.

This hearing will address the following issues:

• Entry of a scheduling order for pleadings, including:

• Date for filing a consolidated class action complaint(s) for

7

economic loss.

• A briefing schedule for Rule 12 or other pleadings motions directed to the consolidated complaint(s) for economic loss.

• A briefing schedule for Rule 12 or other pleadings motions directed to the personal injury/complaints.  The number of such motions shall be limited to two motions raising any common issues affecting all or a substantial number of personal injury/wrongful death complaints.  The Court intends for such motions to serve as bellwethers which will provide the parties guidance with respect to the same issues in other cases before further motions practice proceeds.  Pleadings motions raising issues unique to a particular plaintiff may be tendered without limitation.

The parties shall submit a proposed order no later than May 26, 2010.  The proposed order shall reflect alternative provisions where there is a dispute.   The Liaison and Lead Counsel Committees may each supplement the proposed order with a brief of no more than ten pages.  The Toyota parties may supplement the proposed order with a brief of no more than fifteen pages.

• Entry of an evidence preservation order.  The parties shall submit a proposed order no later than May 26, 2010.  The proposed order shall reflect alternative provisions where there is a dispute.  The Liaison and Lead Counsel Committees may each supplement the proposed order with a brief of no more than ten pages.  The Toyota parties may

supplement the proposed order with a brief of no more than fifteen pages.

• The timing and scope of Rule 26 initial disclosures.

• Such other matters as the parties jointly request the Court to take up by filing a joint request no later than May 24, 2010.

B.   June 25, 2010, 9:00 a.m.

The hearing will address the following issues:

• Entry of an order establishing a comprehensive plan for all forms of discovery and the entry of a protective order.  The parties shall submit proposed orders no later than June 21, 2010.  The proposed orders shall reflect alternative provisions where there is a dispute.  The Liaison and Lead Counsel Committees may each supplement the proposed orders with one  brief of no more than ten pages.  The Toyota parties may supplement the  proposed orders with one brief of no more than fifteen pages.

• To the extent not covered in the comprehensive plan, discussion of the establishment of an electronic document depository and the establishment of databases.

• Appointment of one or more discovery masters, including special masters for attendance at foreign depositions.  No later than June 23, 2010, the parties shall submit a proposed joint list of discovery

masters, which at a minimum shall include a resume and indication that the candidate will accept appointment.  Where there is no agreement, plaintiffs collectively may propose up to five candidates, and the Toyota parties may propose up to five candidates.

• Coordination with state cases and other types of federal cases.  No later than June 23, 2010, Plaintiffs' Liaison Counsel for State and other Types of Federal Cases and Defendants' Liaison Counsel for State and other Types of Federal Cases  shall submit a joint report with suggested procedures for coordination.  The report shall also address the status of the state cases, similar to Exhibit B to the Joint Preliminary Report, and shall also address the status of any state coordination proceedings.

• Discussion of the timing, content and format of a technical tutorial for the Court.

• Such other matters as the parties jointly request the Court to take up by filing a joint request no later than June 18, 2010.

C.  <u>Regular Hearings.</u>

The Court believes that it would helpful to set aside one day each month for a status conference, with the possible exception for the summer vacation period and year-end holidays.  The Court would invite a joint status report a week in advance.

V.    <u>Attorney's Fees and Time Records.</u>

There appears to be a consensus that plaintiffs' counsel should maintain time records.  (<u>E.g.</u>, Joint Preliminary Report, pp. 6-7; Docket No. 42, p. 11.)  Accordingly, the Court orders any counsel who intend to apply for fees in a class action to maintain records sufficient to make and support a lodestar showing. <u>Perdue v. Kenny A.</u>, __ U.S. __, Slip Op. at pp. 7-8 (Apr. 21, 2010); <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1029 (9th Cir. 1998).  Similarly, the Court orders all counsel in the personal injury/wrongful death cases whose fees are subject to Court approval for any reason to maintain records sufficient to make and support a lodestar showing.

IT IS SO ORDERED.

Dated: May 14, 2010

_____
James V. Selna
United States District Judge

11

# Ex. 3



**United States District Court**
**For the Northern District of California**

1
2
3
4
5
6
7
8
9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  **IN RE: OPTICAL DISK DRIVE**            **MDL DOCKET NO M:10-2143 VRW**
    **PRODUCTS ANTITRUST LITIGATION**
13
                                            **ALL CASES**
14  _____/

15

16          Three sets of attorneys have applied for appointment as

17  interim class counsel to represent a class of indirect purchaser

18  plaintiffs in the above litigation in accordance with FRCP

19  23(g)(3):  the Larson and Zelle groups and the Hagens Berman firm.

20  Because their applications contain attorney work product, all three

21  groups requested that the precise terms of their applications

22  remain confidential during the pendency of this litigation, a

23  request the court honors by GRANTING counsel's administrative

24  motions to seal these proposals.  Docs #47, 51 & 54.

25  *//*

26  *//*

27  *//*

28

I

Pursuant to FRCP 23(g)(3), a "court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."  When making such an appointment, a court must find that the applicant is adequate under FRCP 23(g)(1), which requires that the court consider:  (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.  Additionally, the court may consider any other matter pertinent to counsel's ability fairly and adequately to represent the interests of the class and, as the court has done here, may direct potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney fees and costs in representing a prospective class.  FRCP 23(g)(1)(B) & (C).

With respect to attorney fees and costs, it appears that some of the statutes pursuant to which indirect purchasers seek recovery provide for shifting fees and costs in favor of a prevailing plaintiff.  To the extent that a class of indirect purchaser plaintiffs obtains a recovery pursuant to a statute entitling them to fee shifting, the court will award fees and costs pursuant to that statute using the now almost universally accepted lodestar methodology.  This approach makes sense in a fee shifting regime because the party against whom the award is made has an

2

incentive to challenge any unreasonable fee or cost award,
affording the court the benefit of adversary presentations.

Not every recovery on behalf of a class of indirect
purchasers may be subject to a fee shifting regime for at least two
possible reasons:  either the statute in question does not provide
for fee shifting or the recovery is obtained in a settlement that
creates a common fund.  There is, of course, a third possibility:
the recovery may be obtained pursuant to two or more claims, one or
more of which provides for fee shifting while others do not.  Where
possible, the court will attempt to determine fees based on truly
adversarial presentations.  Because that is not always possible, it
is appropriate to consider the matter of fees and costs at the
outset.  This is particularly appropriate here in which competing
applications have been presented by able counsel to assist the
court in discharging its responsibility to protect the interests of
the putative class.  See, e g, <u>Gulf Oil Co v Bernard</u>, 452 US 89,
100 (1981) ("Because of the potential for abuse, a district court
has both the duty and the broad authority to exercise control over
a class action and to enter appropriate orders governing the
conduct of counsel and parties.").


A

Having reviewed the parties' submissions, the court finds
that all applicants meet the baseline requirements set forth in
FRCP 23(g)(1)(A)(ii) and (iii).  All three parties appear to have
prepared their proposals independently and are experienced in
prosecuting complex litigation in antitrust and other areas of law;

some of the lawyers in each group have appeared before the
undersigned in other litigation and have consistently displayed
high levels of skill and professionalism.  The law firms
represented in each of the three applications, by virtue of their
collective experience and resources, easily satisfy the remaining
requirements of FRCP 23(g)(1)(A).  The undersigned has previously
noted a number of qualitative criteria by which to evaluate the
quality of bids by counsel seeking to represent a class.  See, e g,
<u>In re Oracle Sec Litig</u>, 136 FRD 639 (N D Cal 1991) ("<u>Oracle III</u>").
The Zelle application claims one other such criterion when it
proposes to keep any settlement obtained in an escrow account
"until the end of the case."  While this would presumably serve as
an incentive to conclude the entire litigation, escrowing any
interim settlement might discourage counsel from activities to
maximize recovery from other defendants.  The benefit to the class
of escrowing interim settlements is thus difficult to predict and
the court gives this little weight in a qualitative evaluation of
the competing applications.

Before assessing the three applications, the court
briefly summarizes each proposal in general terms.  All three
proposals describe the background of each of the firms seeking
designation as interim counsel.  As noted, each brings impressive
skills and experience to the proposed task.  It is difficult to
distinguish among the three applications on this basis.  No doubt
realizing that their backgrounds would not point to a clear choice,
the three applicants devote most of their attention to their
respective fee and cost proposals and an analysis of the prospects
for a recovery.  From these criteria, particularly the latter, a

**4**

clear choice emerges.  That choice is the Hagens Berman firm.


**B**

The Larson Group proposes a fee structure at the lessor of a multiplier of its lodestar or a percentage fee keyed to two factors:  (i) the stage of the litigation at which recovery is obtained, with increases in the percentage fee with each succeeding stage of the litigation; and (ii) the amount of the recovery, with decreases in the percentage fee as the amount of the recovery increases.  In addition, the Larson Group proposes a cap on expenses at each of the stages of the litigation set forth in its proposal.  The Larson Group also requests that all parties be required to sign a single protective order and electronic discovery protocol, utilize a single document depository and unified document identification system and adopt translation procedures——proposals which the court adopts below——but it is not clear that the Larson Group's application is contingent on the implementation of these processes.

The Zelle Group also proposes a percentage fee, but one that is less keyed to litigation stages than that of either the Larson or Hagens Berman proposals.  The disadvantage of not tailoring a percentage to the stage of the litigation at which a recovery is obtained is the risk of a relatively higher percentage fee charged to the class for a recovery obtained at an early stage in the litigation.  To be sure, the stage of litigation is not precisely keyed to the amount of work entailed in obtaining a recovery, but is probably a fairly good proxy.  Thus, it would seem

5

United States District Court
For the Northern District of California

appropriate that as the stages of the litigation advance, the percentage devoted to fees should reflect the likely greater amount of attorney work involved.[1]  It is possible that the undersigned's reference to Judge Kaplan's decision in <u>In re Auction Houses Antitrust Litig</u>, 197 FRD 71 (SDNY 2000), may have influenced the Zelle Group to structure its fee proposal as it did.  Due to the relatively low recovery at which no fee would be charged under the Zelle Group proposal, the amount of the Zelle Group's fee at substantial levels of recovery would vastly exceed the fees in the Larson and Hagens Berman proposals.

The Hagens Berman proposal, like that of the Larson Group, sets forth a fee percentage which increases with the stages of litigation and declines as the amount of the recovery rises. The stages of litigation set forth in the Hagens Berman proposal are very similar to those in the Larson Group proposal, all being logical steps in the litigation at which a recovery, if there is to be one, is likely to be obtained.  These proposals thus afford enhanced compensation to the lawyers as the likely amount of work involved in securing a recovery increases (and provides for a lower fee for early stage recoveries).  In this regard, the Larson and

---

[1]While others have argued for an increasing fee award as amount of the award increases, see, e g, Jill E Fisch, *Lawyers on the Auction Block: Evaluating the Selection of Class Counsel by Auction*, 102 Colum L Rev 650, 679 (2002) ("The increasing percentage bid structure better addresses the moral hazard problem. By increasing the reward to counsel, increasing percentage bids reduce the incentive for cheap settlements and motivate counsel to pursue high levels of recovery."), this court is not convinced that an increasing award structure would inure to the benefit of the class. In such cases, the class, which would be shouldering more risk in passing up an early settlement offer, would ultimately receive less reward.  Even increasing fee advocates, however, recognize that "[i]ncreasing fees are particularly problematic in cases[, such as this,] in which the court cannot readily predict the recovery at the time it selects counsel."  Id.

Hagens Berman proposals are superior to the Zelle proposal.

The Zelle and Larson groups also propose a monetary cap on deduction from the class's recovery for out-of-pocket expenses. The Hagens Berman proposal entails one fee that covers both compensation of attorneys and reimbursement of attorneys' out-of-pocket expenses. The court notes that expense caps of the Larson and Zelle proposals may be more problematic for the class than simply folding expense recovery into the fee as Hagens Berman proposes. As expenses approach the expense cap, the existence of a cap might serve as a determent to incur the expense even if to do so might be in the class's interest. The overall fee and expense pool approach, on the other hand, avoids or, at least, militates against this potential conflict. Furthermore, to the extent that services paid for by out-of-pocket expenditures and attorney inputs are substitutes one for the other, a reimbursement regime which promises one hundred cents on the dollar (full recovery) tends to encourage those expenditures relative to compensation keyed to a percentage of recovery. The Hagens Berman proposal thus tends to put class counsel's evaluation of attorney and non-attorney inputs on the same plane and affords an incentive to seek the optimal mix of the two.

The court, in requesting bids from prospective counsel seeking recovery on behalf of indirect purchaser plaintiffs, understood fully that counsel, at this early stage of litigation, have limited information concerning the probability of a recovery and the amount or range of such recovery. By contrast, plaintiffs' counsel in a fraud-on-the-market securities class action typically

7

United States District Court
For the Northern District of California

have more readily available information to size up potential recovery than do counsel here.  The price movement of the security in question is known and the alleged unlawfully undisclosed or misstated information that distorted the price of the stock has come into the market when the typical fraud-on-the-market case commences.  While the amount of the price distortion and the period of distortion may not be completely apparent at the onset of a fraud-on-the-market class action, experienced counsel are nevertheless able to make reasonably astute estimates of the value of such litigation.  By contrast, potential recovery by indirect purchaser plaintiffs in this litigation is subject to a greater variety of imponderables. Nonetheless, Hagens Berman has presented a very impressive array of possible recovery scenarios that suggest a high level of analysis of potential recoveries.  This feature is what most distinguishes the Hagens Berman application from the others.

The fee proposals likewise favor Hagens Berman.  As noted above, the expense caps proposed by the Zelle and Larson Groups give the court some hesitation.  The approach taken by Hagens Berman, which seeks to fold expenses into a total fee and expense deduction, is preferable.  Although Hagens Berman's declining percentage fees at the larger recovery amounts may be less than the Larson or Zelle Groups' proposal, as a practical matter the Larson Group's lodestar multiplier cap may make it the lowest cost proposal—at least for some recovery amounts.  But this slight advantage is outweighed by the overall quality and relative sophistication of Hagen Berman's analysis of the potential recovery that indirect purchaser plaintiffs may achieve.

**II**

        For these reasons, after reviewing all three high-quality proposals, the court finds that Hagens Berman will best be able to represent the interests of the indirect purchaser plaintiffs as interim class counsel in the above-captioned matter.  The court therefore APPOINTS the Hagens Berman firm as interim class counsel for indirect purchaser plaintiffs pursuant to FRCP 23(g)(3). Appointment of class counsel pursuant to FRCP 23(g)(1) will be made when and if a class of indirect purchaser plaintiffs is certified. As interim counsel, the Hagens Berman firm may coordinate its efforts with additional counsel pursuant to its proposal and shall identify, in a letter to the court submitted on or before June 18, 2010, a discovery coordinator.

        Additionally, the court ADOPTS the administrative procedures put forth by the Larson Group.  Absent further order of court, on or before August 1, 2010, the parties are ORDERED to meet and confer in order to execute a single protective order and electronic discovery protocol, to establish a single document depository and unified document identification system and to adopt translation procedures.


        IT IS SO ORDERED

        _____

        VAUGHN R WALKER
        United States District Chief Judge

**United States District Court**
For the Northern District of California

**9**

# Ex. 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X     12/21/2011
                                        :           11 MD 2293 (DLC)
                                        :
IN RE: ELECTRONIC BOOKS ANTITRUST       :        Related to all
LITIGATION                              :           matters
                                        :
                                        :        CASE MANAGEMENT
                                        :             ORDER
--------------------------------------- X

DENISE COTE, District Judge:

    The Court having conducted a pretrial conference on

December 20, 2011 to address the motion for appointment of lead

counsel in the class actions brought against defendants

MacMillan, Inc., Harpercollins Publishers, Penguin Group USA,

Inc., Random House Inc., Apple Inc., Hachette Book Group, Simon

& Schuster, Amazon.com, Inc., and Barnes & Noble Inc., it is

hereby

    ORDERED as follows:

I. LEAD PLAINTIFFS' COUNSEL

    Hagens Berman LLP and Cohen Milstein Sellers & Toll PLLC

shall serve as Co-Lead Counsel for all plaintiffs in this action

and the class.

II.  CAPTION

    Every pleading filed in this action, and in any separate

action subsequently included therein, shall bear the following

caption:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: ELECTRONIC BOOKS                11 MD 2293 (DLC)
ANTITRUST LITIGATION

III. <u>NEWLY FILED OR TRANSFERRED ACTIONS</u>

    1. When a class action that relates to the same subject
matter as this action is hereafter filed in or
transferred to this Court and assigned to the
undersigned, it shall be consolidated with this action
(provided that any case transferred to this Court solely
for pretrial proceedings shall be consolidated only to
that extent absent further order of this Court), and the
Clerk of Court shall:

        a. File a copy of this Order in the separate file for
such action.

        b. Mail a copy of the Order of assignment of counsel
for plaintiffs and counsel for each defendant in the
consolidated actions.

        c. Make an appropriate entry in the Docket.

        d. Mail to the attorneys for the plaintiff(s) in the
newly filed or transferred case a copy of this
Order.

        e. Upon the first appearance of any new defendant(s),
mail to the attorneys for such defendant(s) in such
newly filed or transferred case a copy of this
Order.

    2. The Clerk shall maintain a separate file for each of the
consolidated actions and filings shall be made therein in
accordance with the regular procedures of the Clerk of
this Court except as modified by this Order.

    3. The Court requests the assistance of counsel in calling
to the attention of the Clerk the filing or transfer of
any case which might properly be consolidated with this
Action.

IV.  APPLICATION OF THIS ORDER TO SUBSEQUENT CASES

   1. This Order shall apply to each class action assigned to the undersigned alleging claims similar to those set forth in this action against defendants MacMillan, Inc., Harpercollins Publishers, Penguin Group USA, Inc., Random House Inc., Apple Inc., Hachette Book Group, Simon & Schuster, Amazon.com, Inc., Barnes & Noble Inc. and others.

   2. This Order shall apply to each such case which is subsequently filed in or transferred to this Court, and which is assigned to the undersigned unless a party objecting to the consolidation of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten (10) days after the date on which the Clerk mails a copy of this Order to counsel for that party.

   3. The provisions of this Order shall apply to such action pending the Court's ruling on the application.

   4. Unless a plaintiff in a subsequently filed or transferred case is permitted by the Court to use a separate complaint, defendants shall not be required to answer, plead or otherwise move with respect to that complaint in any such case.

   5. If a plaintiff in any such case is permitted to use a separate complaint, each defendant shall have thirty (30) days from the date the Court grants such permission within which to answer, plead or otherwise move with respect to any such complaint.

V.  SCHEDULE

   1. Lead Plaintiff(s) shall file a consolidated amended complaint for this action and any actions subsequently consolidated with it on or before **January 20, 2012**.

   2. Pending filing and service of the consolidated amended complaint, defendants shall have no obligation to move, answer, or otherwise respond to any complaints in any actions subsequently consolidated with this action.

   3. Defendants shall file their motion(s) to dismiss the amended complaint, if any, on or before **March 2, 2012**.

4. Lead Plaintiff(s) shall file any second consolidated
   amended complaint by **March 16, 2012.**  Lead plaintiff will
   have no further opportunity to amend.

5. If no second consolidated amended complaint is filed,
   Lead Plaintiff(s) shall file opposition(s) to the
   motion(s) to dismiss on or before **March 30, 2012.**
   Defendants shall file their reply to the opposition(s) to
   the motion(s) to dismiss on or before **April 13, 2012.**

6. Defendants shall file their motion(s) to dismiss the
   second consolidated amended complaint, if any, on or
   before **April 13, 2012.**  Lead Plaintiff(s) shall file
   opposition(s) to any such motion(s) to dismiss on or
   before **May 11, 2012.**  Defendants shall file their reply
   on or before **May 25, 2012.**

7. The parties shall supply the Court with two courtesy
   copies of the motion papers at the time they are served.

SO ORDERED:

Dated:     New York, New York
           December 21, 2011


                         _____
                              DENISE COTE
                    United States District Judge

# Ex. 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **ONLINE TRAVEL COMPANY (OTC)** | § | Consol. Civil Action No. 3:12-cv-3515-B |
| **HOTEL BOOKING ANTITRUST** | § | |
| **LITIGATION** | § | |
| | § | |

<u>**ORDER APPOINTING PLAINTIFFS' INTERIM LEAD AND LIAISON COUNSEL**</u>

Before the Court are two competing proposals for appointment of Plaintiffs' Interim Lead Counsel and Liaison Counsel. Upon consideration of the parties' submissions, the proceedings at the status conference held February 25, 2013, and the relevant factors listed in Federal Rule of Civil Procedure 23(g) and the Manual for Complex Litigation (Fourth) § 10.22, the Court hereby **APPOINTS** the law firm of **Hagens Berman Sobol Shapiro LLP** as Plaintiffs' Interim Lead Counsel and the law firm of **Stanley Iola LLP** as Plaintiffs' Liaison Counsel. In doing so, the Court notes the considerable experience and qualifications of both of the groups of attorneys seeking appointment.

It is further **ORDERED**:

1.  Plaintiffs' Interim Lead Counsel shall be generally responsible for coordinating the activities of Plaintiffs during pretrial proceedings and shall:

    a.  determine (after such consultation with co-counsel as may be appropriate) and present (in briefs, oral argument, or such other fashion as may be appropriate, personally or by a designee) to the Court and opposing parties the position of the Plaintiffs on all matters arising during pretrial proceedings;

    b.  coordinate the initiation and conduct of discovery on behalf of Plaintiffs consistent with the requirements of Federal Rule of Civil Procedure 26, including the

  preparation of joint interrogatories and requests for production of documents and the examination of witnesses in depositions;

c.   conduct settlement negotiations on behalf of Plaintiffs, but not enter binding agreements except to the extent expressly authorized;

d.   delegate specific tasks to other counsel or committees of counsel,[1] as authorized by the Court, in a manner to ensure that pretrial preparation for the Plaintiffs is conducted efficiently and effectively;

e.   enter into stipulations with opposing counsel as necessary for the conduct of the litigation;

f.   prepare and distribute periodic status reports to the parties;

g.   maintain adequate time and disbursement records covering services as Lead Counsel;

h.   monitor the activities of co-counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided; and

i.   perform such other duties as may be incidental to proper coordination of Plaintiffs' pretrial activities or authorized by further order of the Court.

2.   Plaintiffs' Liaison Counsel shall:

a.   maintain and distribute to co-counsel and to Defendants' Liaison Counsel[2] an up-to-date service list;

b.   receive and, as appropriate, distribute to co-counsel orders from the Court and documents from opposing parties and counsel;

---

[1]The Court may consider proposals for committees of counsel in the future but does not appoint any committees at this time.

[2]The Court will address the issue of liaison counsel for the Defendants in a separate order.

Case 3:12-cv-03515-B   Document 47   Filed 03/01/13   Page 3 of 3   PageID 572

      c.      maintain and make available to co-counsel at reasonable hours a complete file of all documents served by or upon each party except such documents as may be available at a document depository; and

      d.      establish and maintain a document depository if necessary.

3.      No communication among Plaintiffs' counsel or among Defendants' counsel shall be taken as a waiver of any privilege or protection to which they would otherwise be entitled.

4.      This Order appointing Plaintiffs' Interim Lead and Liaison Counsel in no way lifts the stay of discovery imposed by the Court at the February 25, 2013 status conference and memorialized in the Court's February 26, 2013 Order.

**SO ORDERED.**

**DATED: March 1, 2013**.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

# Ex. 6



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET SUITE 2450
SAN FRANCISCO CALIFORNIA 94104

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE LITHIUM ION BATTERIES
ANTITRUST LITIGATION

_____

This Document Relates to:

ALL ACTIONS

CASE NO. 13-MD-2420-YGR

MDL No. 2420

**The Honorable Yvonne Gonzalez Rogers**

[~~PROPOSED~~] **ORDER APPOINTING INTERIM CO-LEAD COUNSEL AND LIAISON COUNSEL FOR DIRECT PURCHASER PLAINTIFFS AND APPOINTING INTERIM CO-LEAD COUNSEL AND LIAISON COUNSEL FOR INDIRECT PURCHASER PLAINTIFFS**

854439.1

[~~PROPOSED~~] ORDER APPOINTING INTERIM CO LEAD COUNSEL AND LIAISON COUNSEL FOR DIRECT PURCHASER PLAINTIFFS AND APPOINTING INTERIM CO LEAD COUNSEL AND LIAISON COUNSEL FOR INDIRECT PURCHASER PLAINTIFFS

13 MD 2420 YGR

1    WHEREAS, the Court has received and considered applications for appointment as

2  Interim Co-Lead Counsel and Liaison Counsel;

3    WHEREAS, on April 3, 2013, at the Initial Case Management Conference, the

4  Court considered the arguments and comments of counsel with respect to such

5  appointments;

6    WHEREAS, in the interest of securing the just, speedy, and inexpensive

7  determination of these proceedings, pursuant to Federal Rules of Civil Procedure 1 and

8  23(g)(3) and Local Civil Rules 1-2(b) and 16-10(b)(15), it is hereby ORDERED:

9    1.    *Interim Lead Class Counsel for Direct Purchaser Plaintiffs*.

10        a.    Bruce L. Simon of PEARSON, SIMON & WARSHAW, LLP;

11        b.    R. Alexander Saveri of SAVERI & SAVERI, INC.; and

12        c.    Joseph J. Tabacco, Jr. of BERMAN DEVALERIO

13        are appointed as Interim Co-Lead Counsel ("Co-Lead Counsel") for

14        all Direct Purchaser Plaintiffs.

15    2.    *Interim Liaison Class Counsel for Direct Purchaser Plaintiffs*.  Judith A.

16      Zahid of ZELLE HOFMANN VOELBEL & MASON LLP is appointed as

17      Interim Liaison Class Counsel ("Liaison Counsel") for all Direct Purchaser

18      Plaintiffs.

19    3.    *Interim Lead Class Counsel for Indirect Purchaser Plaintiffs*.

20        a.    COTCHETT, PITRE & McCARTHY, LLP;

21        b.    HAGENS BERMAN SOBOL SHAPIRO LLP; and

22        c.    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

23        are appointed as Interim Co-Lead Counsel ("Co-Lead Counsel") for

24        all Indirect Purchaser Plaintiffs.

25    4.    *Interim Liaison Class Counsel for Indirect Purchaser Plaintiffs*.  Jennie Lee

26      Anderson of ANDRUS ANDERSON LLP is appointed Interim Liaison

27      Counsel ("Liaison Counsel") for all Indirect Purchaser Plaintiffs.

28

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET SUITE 2450
SAN FRANCISCO CALIFORNIA 94104

5. *Steering Committees for the Proposed Class*. The constitution of the Plaintiffs' Steering Committees ("PSC") for the proposed Direct Purchaser and Indirect Purchaser classes shall be the subject of a separate Order. By May 3, 2013, Co-Lead Counsel for the Direct Purchasers and for the Indirect Purchasers shall make recommendations to the Court as to the firms who should be appointed to their respective PSCs.

6. *Duties and Powers of Co-Lead Counsel*. Co-Lead Counsel shall be responsible for the overall conduct of the litigation on behalf of their respective proposed Plaintiff classes as follows:

a. To promote the orderly and efficient conduct of this litigation and to avoid unnecessary duplication and unproductive efforts;

b. To conduct all pretrial, trial, and post-trial proceedings on behalf of their respective proposed Plaintiff classes;

c. To sign any pleadings, motions, briefs, discovery requests or objections, subpoenas or notices on behalf of their respective proposed Plaintiff classes, but, in any event, no motion may be filed nor discovery served by any Plaintiff without the approval of their respective Co-Lead Counsel, absent leave of Court;

d. To determine and present (either personally or by designee) in motions, briefs, oral argument or such other fashion as may be appropriate, the position of their respective proposed Plaintiff classes as to all matters arising during pretrial, trial, and post-trial proceedings;

e. To act as spokesperson (either personally or by designee) for their respective proposed Plaintiff classes at pretrial conferences;

f. To conduct and coordinate discovery (either personally or by designee) on behalf of their respective proposed Plaintiff classes

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET  SUITE 2450
SAN FRANCISCO  CALIFORNIA 94104

1  consistent with the requirements of the Federal Rules of Civil

2  Procedure, including the preparation of interrogatories, requests for

3  production of documents, requests for admissions, and the

4  examination of witnesses in depositions, as well as any motion

5  practice related thereto;

6    g.   To enter into stipulations (either personally or by designee) necessary

7  for the conduct of the litigation with opposing counsel;

8    h.   To make and supervise all work assignments;

9    i.   To monitor the activities of their respective proposed Plaintiff classes'

10  counsel and to implement procedures to ensure that schedules are met

11  and unnecessary expenditures of time and costs are avoided;

12    j.   To collect time and expense reports from each firm (either personally

13  or by designee), including paralegals and any other staff members

14  whose time is expected to be included in any fee petition, and to

15  review such time and expense reports;

16    i.   To this end, all Plaintiffs' counsel shall contemporaneously

17  keep a daily record of their time spent and expenses incurred in

18  connection with this litigation, indicating with specificity the

19  hours and particular activities performed;

20    ii.   By the tenth day of each month, each firm that may seek an

21  award (or approval) of a fee or reimbursement of expenses by

22  the Court shall provide its corresponding Liaison Counsel (or

23  other designee established by Co-Lead Counsel), a report

24  summarizing, according to each separate activity, the time and

25  expenses spent by its attorneys, paralegals or staff during the

26  preceding month (and the ordinary billing rates of such

27  personnel in effect during the month) and the accumulated total

28

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET  SUITE 2450
SAN FRANCISCO CALIFORNIA 94104

[PROPOSED] ORDER APPOINTING INTERIM CO LEAD COUNSEL AND LIAISON COUNSEL FOR DIRECT
PURCHASER PLAINTIFFS AND APPOINTING INTERIM CO LEAD COUNSEL AND LIAISON COUNSEL
FOR INDIRECT PURCHASER PLAINTIFFS

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET SUITE 2450
SAN FRANCISCO CALIFORNIA 94104

of the firm's time, hourly rates, and expenses to date;

    iii.    All Plaintiffs' counsel shall endeavor to keep fees reasonable and to choose the most appropriate level of staffing for the tasks required in this litigation; and

    iv.    Co-Lead Counsel shall be responsible for preparing any application for an award (or approval) of fees and reimbursement of expenses by their respective proposed Plaintiff classes, consistent with the Rules and Orders of this Court.  The provisions of this subparagraph do not limit the discretion of Co-Lead Counsel in basing an allocation of a fee award among Plaintiffs' counsel based on hours, a percentage-based allocation, a combination of the two, or any other reasonable method of allocation, consistent with the Rules and Orders of this Court.

k.    To make and collect assessments (either personally or by designee) from some or all of their respective Plaintiffs' counsel for the purpose of paying the costs necessary to prosecute the case;

l.    To ensure that work assignments are not given to any firm that has not promptly submitted its time and expense records or paid its assessments;

m.    To employ and consult with experts;

n.    To call meetings of their respective Plaintiffs' counsel when deemed appropriate;

o.    To conduct settlement negotiations with defendants on behalf of their respective proposed Plaintiff classes;

p.    To ensure that all of their respective Plaintiffs' counsel are kept informed of the progress of this litigation as necessary; and

q. To otherwise coordinate the work of their respective Plaintiffs'
counsel, and perform such other duties as Co-Lead Counsel deems
necessary and appropriate based upon their judgment and
consideration or as authorized by further Order of the Court.

7. *Duties of Liaison Counsel.* Each Liaison Counsel may be the contact
between its respective Plaintiffs' counsel and the Court for administrative
and scheduling purposes. Each Liaison Counsel shall (a) report upon any
communications from the Court to its corresponding Co-Lead Counsel; (b)
maintain and provide to plaintiffs' counsel and to defendants' liaison
counsel, if requested, an up-to-date service list; (c) be responsible for
collecting and reviewing the monthly time reports of all counsel in her case,
and reporting to Co-Lead Counsel concerning the reasonableness of the time
and expense reported by counsel; (d) as requested by Co-Lead Counsel,
monitor the activities of Plaintiffs' counsel to ensure that schedules are met
and unnecessary expenditures of time and funds are avoided, including the
collection of time records on a monthly basis; and (e) as requested by Co-
Lead Counsel, perform such other duties as may be incidental to proper
coordination of Plaintiffs' pretrial activities or authorized by further order of
the Court. Co-Lead Counsel and Liaison Counsel may delegate certain time
collecting and reporting functions to an outside vendor to further the efficient
prosecution of this litigation.

8. *Duties and Powers of PSCs.* The duties and powers of the PSCs shall be the
subject of a separate Order. As set forth above, Co-Lead Counsel shall
recommend to the Court the attorneys who shall serve on the Steering
Committees in their respective cases. Upon appointment by the Court,
members of the Steering Committees shall operate under the supervision of
their respective Co-Lead Counsel and only do work that is assigned and

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET SUITE 2450
SAN FRANCISCO CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET   SUITE 2450
SAN FRANCISCO CALIFORNIA 94104

approved by their respective Co-Lead Counsel.  The PSCs will not have the
independent authority to assign work to other firms, and cannot do so
without the approval and consent of the Co-Lead Counsel in their respective
cases, nor shall the PSCs be authorized to convene meetings of counsel
without the prior approval and consent of said Co-Lead Counsel.

9.    *Service*.   Co-Lead Counsel and Liaison Counsel are hereby designated as
counsel for all of their respective Plaintiffs upon whom all notices, orders,
pleadings, motions, discovery, and memoranda which are not otherwise
served via the Court's ECF system shall be served, and Defendants shall
serve papers on all Direct Purchaser Plaintiffs and Indirect Purchaser
Plaintiffs by serving the corresponding Co-Lead Counsel and Liaison
Counsel.  Liaison Counsel shall be responsible for maintaining a master
service list of all their respective parties and their respective counsel.

10.   *Binding Effect*.   Any agreement reached between Defendant(s) and Co-Lead
Counsel or their designee(s) in the Direct Purchaser litigation, shall be
binding on all other respective Plaintiffs' counsel in that action.  Any
agreement reached between Defendant(s) and Co-Lead Counsel or their
designee(s) in the Indirect Purchaser litigation, shall be binding on all other
respective Plaintiffs' counsel in that action.

11.   *Privileges Preserved*.  No communication between or among any of
Plaintiffs' counsel shall be taken as a waiver of any privilege or protection to
which Plaintiffs would otherwise be entitled.

12.   This Order Terminates Dkt. Nos. 72, 74, 76, 85, 90, 91, 92, 94, 96, 98, 100,
101, 103, 104, 105, 106, 108, 118, 122 & 134.

**IT IS SO ORDERED.**

Dated:  May 17, 2013

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

[~~PROPOSED~~] ORDER APPOINTING INTERIM CO LEAD COUNSEL AND LIAISON COUNSEL FOR DIRECT
PURCHASER PLAINTIFFS AND APPOINTING INTERIM CO LEAD COUNSEL AND LIAISON COUNSEL
FOR INDIRECT PURCHASER PLAINTIFFS

# Ex. 7

1

2

3

4              UNITED STATES DISTRICT COURT

5             CENTRAL DISTRICT OF CALIFORNIA

6                    SOUTHERN DIVISION

7                        – – –

8     THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

10      IN RE:  TOYOTA MOTOR
        CORPORATION UNINTENDED
        ACCELERATION MARKETING,
11      SALES PRACTICES, AND
        PRODUCTS LIABILITY
12      LITIGATION.              MDL–10–2151–JVS(FMOx)

13      – – – – – – – – – – – – – – – – – – – – – – – – –

14

15

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              Santa Ana, California

18                July 19, 2013

19

20              SHARON A. SEFFENS, RPR
                United States Courthouse
21              411 West 4th Street, Suite 1–1053
                Santa Ana, CA  92701
22              (714) 543–0870

23

24

25

 1    Mr. Berman's comments in that regard.  It has been a

 2    privilege to appear before Your Honor, and we very much

 3    appreciate the attention and time the Court has given to

 4    this matter.  And I also join in Mr. Hooper's comments about

 5    Mr. Juneau.  Thank you.

 6            THE COURT:  Thank you.

 7            Well, let me make a few concluding remarks.  I

 8    reaffirm my conclusion that this settlement is fair,

 9    adequate, and reasonable.  Moreover, it's extraordinary.

10    It's extraordinary in terms of the value that is being

11    conferred on class members.  It's extraordinary that every

12    single dollar allocated for distribution is going to a class

13    member.

14            So many class settlements I see come up with a

15    number that looks inviting in terms of potential liability

16    only to find that a relatively small portion of that number

17    actually goes to class members.  This settlement is

18    extraordinary in that every single dollar of the cash funds

19    will go to class members.  It is extraordinary in that the

20    claimants will receive 100 percent of the value of their

21    claims, not as measured by the Court, not as measured on a

22    litigated basis, but as measured by plaintiffs' own experts.

23            I believe that the plaintiffs own experts were in

24    the best position to value the worth of the economic loss

25    claims and other claims.  This settlement is extraordinary

39

1    in terms of its complexity and its continued complexity.

2    The settlement with all of its moving parties when presented

3    to me in the settlement is a complex undertaking that

4    reflected a year of negotiation and thought on the part of

5    the parties, but the parties also exhibited flexibility of

6    getting the changing facts, dealing with the reduced number

7    of claimants, to ensure that as the settlement evolved that

8    it continued to be fair, adequate, and reasonable.  So I

9    think it's been extraordinary in many different respects.

10            It's also been extraordinary in the way this case

11   has been presented to me.  I have been in many large cases

12   on both sides of the bench.  I know extraordinary counsel

13   when I see extraordinary counsel, and the efforts here on

14   both sides have been truly extraordinary in terms of

15   professional competence, perseverance, and diligence.

16            Finally, I join all of you in thanking Pat Juneau.

17   He really was part of my assessment that this case has been

18   extraordinary.  His efforts to bring the parties together to

19   work through the problems and do all of that with good grace

20   I think has in itself has been an extraordinary undertaking.

21   He activities have been a true service to the Court and to

22   the parties.

23            So I thank you each of you for your courtesies

24   throughout.  Thank you.

25            One housekeeping matter, I would like to hold a

# Ex. 8

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION

                              )
                              )
IN RE:  STERICYCLE, INC.,     )    Case No. 13 C 5795
STERISAFE CONTRACT LITIGATION )    MDL No. 2455
                              )
                              )
```

<u>MEMORANDUM ORDER</u>

This Court has been designated by the Panel on Multidistrict Litigation to preside over this MDL proceeding.  As the first substantive step in that proceeding, the appointment of interim class counsel to represent the putative plaintiff class is called for.  This memorandum order is issued to confirm this Court's choice of one from among the four well-qualified applicants for that appointment:  in alphabetical order, Audet & Partners, LLP (linked with other firms), Gordon & Rees, LLP, Grant & Eisenhofer P.A. (linked with other firms) and Hagens Berman Sobol Shapiro LLP.

As indicated in the preceding paragraph, two of the four applicants have tendered proposals in which the law firms named in that paragraph would share the load with other firms, while each of Gordon & Rees and Hagens Berman proposes to take on and discharge the responsibility within the resources of its own firm.  On September 18, in the course of an extended in court proceeding--a proceeding that culminated in this Court's ordering the applicant firms to supplement their earlier submissions by September 23 (as all four applicants have done since)--this

Court's oral articulation of its own views had expressed a strong preference for the single firm model, so long as that firm possessed the essential ingredients of high quality lawyering, extensive experience, a track record of significant successes, a lawyer complement adequate to the task--and the list of necessary ingredients could go on.[1]

This Court is of course well aware that Section 10.22 of the Federal Judicial Center's 2004 <u>Manual for Complex Litigation: Fourth</u> ("Manual") looks to a different pattern, with the form suggested in Manual §40.21.2 providing for the designation of lead counsel, liaison counsel and a Plaintiffs' Steering Committee. But with all due respect, that multilayered format is not one that fosters efficiency--instead it tends to promote a duplication of effort via conferencing, as well as overlapping work assignments and other inefficiencies too often attendant on such a structure. And that of course inevitably tends to increase the lodestar figure without any corresponding increase

---

[1] This should not at all be mistaken as a negative reflection on the quality of the two applicants that have sought to join with other firms. Although this Court has had no personal experience with any of the law firms sought to be yoked in the submission on behalf of the "Brucker Plaintiffs" (firms whose curriculum vitae are quite impressive), it has in the past dealt with Adam Levitt, the lead in-court presenter of the proposal on behalf of the "Midgley Plaintiffs," and attorney Levitt and his law firm have acquitted themselves most admirably in earlier litigation over which this Court presided. In sum, what the decision has come down to is a choice from among four well-qualified applicants (as this order has already said in its first paragraph).

in meaningful lawyer output.[2]

In any event, the choice between the two firms that do propose to act on a self-contained basis has been a difficult one. Each of them has impressive credentials to satisfy each of the factors identified in Fed. R. Civ. P. ("Rule") 23(g)(1)(A):[3]

> (i) the work counsel has done in identifying or investigating potential claims in the action;

> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

> (iii) counsel's knowledge of the applicable law; and

> (iv) the resources that counsel will commit to representing the class.

And of course 23(g)(1)(B) understandably goes on to provide that the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."

Both law firm finalists have tendered thorough and

---

[2] It is recognized that others may have different views, but it was not this Court that coined the aphorism that "A camel is a horse designed by a committee." What has been said in the text reflects a sense forged during this Court's many years in the practice of law (including class action participation on both sides of the "v." sign) and more years of evaluating applications for fee awards in class actions (a task that too often reveals an excess of lawyers seeking to share the wealth).

[3] Although those criteria reflect what a court "must consider" in the ultimate appointment of class counsel, they obviously have equal force in the designation of interim class counsel.

informative submissions as to each of the four criteria set out
in Rule 23(g)(1)(A). Although this Court has vetted those
presentations with equal thoroughness in reaching its decision,
it sees no useful purpose to be served in detailing them here.
Instead what follows will pick and choose some highlights simply
to illustrate both candidates' first-rate credentials for
potential appointment.

As for the first criterion, the Gordon & Rees team devoted
nearly a year (since October 2012) to the investigation of
Stericycle's assertedly questionable activities in California, an
investigation that began after a Stericycle customer had come to
the law firm complaining about the fees and charges the customer
had been paying. As for Hagens Berman, it hit the ground running
because counsel for a Stericycle insider (a former government
specialist for that company)--having earlier filed a 2008 qui tam
complaint under the False Claims Act--came to Hagens Berman to
ask it to bring what ultimately became the Lyndon Veterinary
Clinic action before this Court (13 C 2499). Because of its
access to that whistleblower's perspective and the sharing of
information with her qui tam counsel, Hagens Berman's Complaint
provided more information than any other as to Stericycle's
methodology and organizational structure. And Hagens Berman has
since engaged in more active pursuit of the prosecution of the
putative class' claims than Gordon & Rees (or the other two

4

candidates and their associated firms as well).

In terms of the second criterion under Rule 23(g)(1)(B), both competing firms (and especially their lead litigators) have sterling credentials. Gordon & Rees' Miles Clancy has a wealth of trial experience (incidentally including the defense as well as the prosecution of class actions). But it must be said that the track record of Hagens Berman and its lead partner Steve Berman is even more impressive, having racked up such accomplishments as a $1.6 billion settlement in the <u>Toyota Unintended Acceleration Litigation</u>[4] and a substantial number of really outstanding big-ticket results.

It may be worth mentioning that to this Court's recollection it has had no first-hand judicial experience with either of the two finalist firms--and it has been on the bench far too long to have had litigation contact with either or their respective lead partners while it was in the active practice of law. But that is not true of its colleagues in this District of more recent vintage, an email inquiry to whom[5] brought in return some high praise of attorney Berman's skills.

---

[4]  In that respect District Judges James Selna went out of his way, at the windup of the case, in describing the settlement as truly extraordinary--indeed unique--in terms of the benefits conferred on the plaintiff class.

[5]  Under the Code of Conduct for United States Judges, judge-to-judge communications are not of course subject to the limitations applicable to other ex parte communications.

Little need be said as to the third factor mentioned in the Rule ("counsel's knowledge of the applicable law"), for lawyers of the quality demonstrated by the curriculum vitae that each of the two firms has supplied unquestionably have the tickets to bring their broad legal knowledge to bear on any particularized problems that may be posed by the current litigation. That is certainly true as to issues regarding class actions as such (knowledge that counsel already have in abundance), and there is no reason to believe that it will not also prove true as to whatever substantive issues the current litigation will pose.

Lastly, each firm has pledged itself to commit all required resources to the litigation. This Court's only initial pause in reaching what had otherwise appeared to be a clear choice of Hagens Berman[6] stemmed from the Gordon & Rees emphasis on that firm's much larger size and, more specifically, its Chicago presence (numbering 26 lawyers, in contrast to the Hagens Berman three-lawyer office here). But Hagens Berman's supplemental submission of September 23 has graphically demonstrated the

---

[6] That choice was not made in terms of the <u>primus inter pares</u> ("first among equals") phrase often used to describe, for example, the relationship between the Chief Judge of a District or Circuit Court and his or her colleagues. Instead, obviously with no offense intended, such a choice really echoes George Orwell's classic line from <u>Animal Farm</u>:

Some animals are more equal than others.

fallacy inherent in simply looking at those numbers.[7]

For one thing, Elizabeth Fagan (the managing partner of Hagens Berman's Chicago office) has outstanding credentials on her own, and the Hagens Berman September 23 supplement confirms the strength of support provided by the others in the Chicago office as well. But even more importantly in overall terms, that September 23 response (emphasis in original) more than convincingly refutes any claimed significance of the sheer numerical comparison:

> According to Gordon & Rees' website, **_just 3 of the 26_** lawyers in its Chicago office have class action experience, in comparison to the three lawyers in Hagens Berman's Chicago office who are devoted **_exclusively_** to prosecuting large scale class actions. Moreover, according to the website, 49 lawyers at Gordon & Rees nationwide reflect that they have class action experience in comparison to the 53 lawyers at Hagens Berman whose **_primary focus_** is prosecuting class actions. Accordingly, Hagens Berman's class action dedication for plaintiffs--and demonstrated results--overshadows Gordon & Rees' traditional defense firm size.

<u>Conclusion</u>

In sum, this Court is pleased to designate the Hagens Berman firm as the interim lead counsel, and it looks forward to that

---

[7] This Court does not of course question the good faith of Gordon & Rees in advancing a numerical contrast as part of its own sales pitch. But again in terms of the raw numbers rather than Gordon & Rees' bona fides in advancing them, this Court has been put in mind of Mark Twain's quotation, in his <u>Autobiography</u>, of a statement attributed to Disraeli:

> There are three kinds of lies: lies, damned lies and statistics.

firm's prompt pursuit of the matter in the manner outlined in its
submissions.  With that appointment having taken place, this
Court next poses a question to the Hagens Berman people.

As part of the firm's original application for appointment
as interim lead class counsel, Appendix A to that application set
out a proposed case schedule.  But that proposed schedule
specified its successive steps in terms of time frames such as
"Within -- days of appointment of Lead Class Counsel," and it is
not clear from that designation whether the stated timetable was
intended to speak in relation to the current interim designation
rather than to the final appointment of class counsel.
Accordingly this Court orders a submission from the Hagens Berman
firm, on or before the scheduled October 17 status hearing,
expressly framed as a timetable in terms of the present posture
of the litigation.

One final item.  As part of the supplemental submissions
requested by this Court on September 18, all of which were timely
responded to by the designated September 23 date, counsel were
asked to submit in camera their respective views on an
appropriate fee structure.  This Court's views on that subject
have always conformed to our Court of Appeals concept "that
attorneys' fees in class actions should approximate the market
rate that prevails between willing buyers and willing sellers of
legal services" (Silverman v. Motorola Solutions, Inc., Nos. 12-

2339 and 12-2354, 2013 WL 4082893, at *1 (7th Cir. Aug. 14), citing to In re Continental Ill. Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992) and In re Synthroid Mktg. Litig., 264 F.3d 712, 718 (7th Cir. 2001) and 325 F.3d 974, 975 (7th Cir 2003)). And this Court has always agreed with the Synthroid cases establishing fee schedules ex ante represents the preferred path to take.[8]

But because interim counsel do not invariably become the ultimate class counsel (even though that is most frequently the case), this opinion will not disclose the proposed terms that have been submitted in camera by Hagens Berman. Instead any announcement of the ex ante determination as to fees will await the occasion of the ultimate choice of lead class counsel.

Milton I. Shadur
Senior United States District Judge
Date: October 11, 2013

---

[8] Indeed, that premise seems to this Court to support a procedure of inviting bidding up front--not in terms of an "auction," an unfortunate and inaccurate label that connotes competition based on price alone, but rather a procedure that also takes into account an evaluation of the quality of class representation (much as this opinion has done). In fact, in these days, when the old notion of long-term fixed relationships between clients and law firms has been overtaken by market concepts (the so-called "beauty contest" is an example of that), private litigants frequently make their selections of counsel in much the same manner that this Court has employed in what are pejoratively and misleadingly characterized as "auctions."

# Ex. 9

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3     AMY WIGINTON, et al.,        )  No. 02 C 6832
                                    )
 4                  Plaintiffs,     )  Chicago, Illinois
                                    )  January 9, 2008
 5                                  )  9:30 o'clock a.m.
                                    )
 6     -vs-                         )
                                    )
 7     CB RICHARD ELLIS,            )
                                    )
 8                  Defendant.      )

 9
                TRANSCRIPT OF PROCEEDINGS - MOTION
10           BEFORE THE HONORABLE WAYNE R. ANDERSEN

11     APPEARANCES:

12     For the Plaintiffs:      WEXLER TORISEVA WALLACE LLP
                                55 West Monroe Street
13                              Suite 3300
                                Chicago, Illinois 60603
14                              BY:  MR. KENNETH A. WEXLER
                                       and
15                              HAGENS BERMAN SOBOL SHAPIRO LLP
                                820 North Boulevard
16                              Suite B
                                Oak Park, Illinois 60301
17                              BY:  MS. ELIZABETH A. FEGAN

18     For the Defendant:       SEYFARTH SHAW, LLC
                                131 South Dearborn Street
19                              Suite 2400
                                Chicago, Illinois 60603
20                              BY:  MS. BRENDA H. FEIS
                                     MS. ANNE E. DUPREY
21                                   MR. CHRISTOPHER J. DEGROFF

22

23     Court Reporter:          ROSEMARY SCARPELLI
                                219 South Dearborn Street
24                              Room 1412
                                Chicago, Illinois  60604
25                              (312) 435-5815
```

```
 1              MS. FEGAN:  Sure.
 2              THE COURT:  So I would suggest that we set April
 3     10th.
 4              MR. WEXLER:  What time?
 5              THE COURT:  At 9:00 o'clock.
 6              MR. WEXLER:  Okay.
 7              THE COURT:  Now, I do want to say -- you know, I
 8     got a long chance to work with the three of you in this case.
 9     And, obviously, I had known each of you in other contexts
10     separately beforehand.  I think you are great lawyers and I
11     actually even think you are better people.  And despite the
12     stress that you place on me and Judge Ashman by making us
13     make decisions and do our job, I really -- I have really -- I
14     have found -- I have found working with you on this case one
15     of the more interesting, challenging and, at some level,
16     uplifting things that I have been able to do in the 15 years
17     or so that I have been here.  And maybe that will all unravel
18     because of future disputes that I don't foresee, but I -- I
19     really appreciate your intelligence and your intensity here
20     and the reasonableness overall with which you approached all
21     of this.  So I don't know what else to say.  But I will -- I
22     will move forward with a sense of affection for each one of
23     you individually, growing out of this really difficult but
24     important dispute.
25              MR. WEXLER:  Thank you.
```