**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| | MDL NO. 2492 |
| | Master Docket No. 13-cv-09116 |
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | Judge John Z. Lee |
| | Magistrate Judge Geraldine Soat Brown |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND
<u>CERTIFICATION OF SETTLEMENT CLASS</u>**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................1

II.    BACKGROUND OF THE LAWSUIT AND THE  SETTLEMENT
     NEGOTIATIONS ...........................................................................5

     A.    Procedural History of *Arrington v. NCAA* .............................5

     B.    Fact and Expert Discovery in *Arrington* ...............................7

            1.    Student-Athletes are at risk for long-term effects from concussions
               and subconcussive hits...............................................7

            2.    Plaintiffs allege the NCAA breached its duty to protect
               student-athletes. ..................................................10

     C.    Formation of the NCAA Student-Athlete Concussion Litigation
          Multidistrict Litigation.........................................11

     D.    The History of the Settlement Negotiations.........................13

III.    DESCRIPTION OF THE SETTLEMENT TERMS.......................14

     A.    The Proposed Settlement Class and Settlement Class Representatives.................14

     B.    The Settlement Benefits .........................................17

            1.    The Medical Monitoring Fund..................................17

            2.    The Medical Monitoring Program. ............................18

            3.    Appointment of the Medical Science Committee....................21

            4.    NCAA changes to concussion-management and return-to-
               play policies. ....................................................22

                    a.    Baseline testing. ....................................22

                   b.    No same day return to play. ...........................23

                   c.    Medical personnel at contact sports games and available
                      for contact sport practices. ..........................23

                   d.    Concussion tracking......................................24

                   e.    Concussion education. .................................25

f.  Academic accommodation.............................................................25

5. Concussion-related research funds. ...........................................26

C. Release and Waiver...........................................................................26

D. Attorneys' Fees and Costs, and Plaintiff Service Awards .....................................27

E. Class Notice ....................................................................................28

IV. THE SETTLEMENT MEETS THE CRITERIA NECESSARY FOR PRELIMINARY APPROVAL AND FOR THIS COURT TO CERTIFY THE SETTLEMENT CLASS............................................................28

 A. The Court Should Certify the Proposed "Hybrid" Settlement Class Pursuant to Rules 23(b)(2) and 23(d)(1)...............................................28

  1. Rule 23(a) requirements are satisfied. .......................................29

   a. Rule 23(a)(1): Joining all members of the Class is impracticable............................................................29

   b. Rule 23(a)(2): There are questions of law and fact common to the Class.....................................................30

   c. Rule 23(a)(3): Plaintiffs' claims are typical of those of the proposed Class. ..............................................31

   d. Rule 23(a)(4): Plaintiffs and Class Counsel will fairly and adequately protect the interests of the proposed Class. ..................31

  2. The Settlement Class satisfies Rule 23(b)(2)..............................34

 B. Preliminary Approval of the Settlement Should Be Granted................................36

  1. Weighing the strength of Plaintiffs' case compared to the terms of the proposed settlement supports preliminary approval. ...........................37

  2. The risk, expense, complexity, and likely duration of further litigation weigh in favor of preliminary approval.....................................41

  3. Opposition to the settlement is *de minimus*. ...............................43

  4. The terms of the proposed Settlement were only reached following discovery by attorneys familiar with the legal and factual issues of the case. ...............................................................43

V.      WITHIN 14 DAYS OF PRELIMINARY APPROVAL, THE PARTIES WILL
        SUBMIT A NOTICE PLAN TO THE COURT AND REQUEST THAT
        THE COURT SCHEDULE A FAIRNESS HEARING....................................................44

        A.      The Court Should Approve the Contents of the Notice to be Provided
                to the Class Now ....................................................................................................44

        B.      The Court Should Set Settlement Deadlines for Preliminary Approval and
                for Consideration of the Notice Plan and Proposal for Administration of
                the Medical Monitoring Program..........................................................................45

VI.     CONCLUSION...............................................................................................................46

010270-12  705997 V2

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Lines Stewards & Stewardesses Ass'n v. American Airlines, Inc.*,
455 F.2d 101 (7th Cir. 1972) ...................................................................................................44

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...............................................................................................28, 29, 32

*Armstrong v. Board of Sch. Dir.*,
616 F.2d 305 (7th Cir. 1980) ...................................................................................4, 36, 37

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
270 F.R.D. 330 (N.D. Ill. 2010)..........................................................................29, 32, 34, 38

*Boring v. Medusa Portland Cement Co.*,
63 F.R.D. 78 (M.D. Pa. 1974)...................................................................................................39

*Caronia v. Philip Morris USA, Inc.*,
5 N.E. 3d 11 (N.Y. App. Ct. 2013) ...................................................................................38

*Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*,
296 F.3d 624 (7th Cir. 2002) ...................................................................................................33

*In re Cincinnati Radiation Litig.*,
187 F.R.D. 549 (S.D. Ohio 1999) .........................................................................................4

*Crowder v. Lash*,
687 F.2d 996 (7th Cir. 1982) ...................................................................................................33

*Durrett v. Housing Auth. of Providence*,
896 F.2d 600 (1st Cir. 1990)...................................................................................................44

*EEOC v. Hiram Walker & Sons, Inc.*,
768 F.2d 884 (7th Cir. 1985) ...................................................................................................37

*Gabriel v. Standard Fruit & S.S. Co.*,
448 F.2d 724 (5th Cir. 1971) ...................................................................................................40

*Gates v. Rohm & Haas Co.*,
248 F.R.D. 434 (E.D. Pa. 2008)...............................................................................30, 31, 35

*In re General Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*,
MDL 1192, 2000 WL 45534 (N.D. Ill. Mar. 13, 2000)...........................................................32

*Hawaii-Pacific Venture Capital Corp. v. Rothbard*,
564 F.2d 1343 (9th Cir. 1977) ...................................................................................................40

*Hiser v. Franklin*,
  94 F.3d 1287 (9th Cir. 1996) ...................................................................................33

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
  204 F.R.D. 330 (N.D. Ohio 2001) ............................................................................40

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) ..............................................................................36, 37

*Jahn v. ORCR, Inc.*,
  92 P.3d 984 (Colo. 2004) .........................................................................................33

*Jamie S. v. Milwaukee Pub. Schs.*,
  668 F.3d 481 (7th Cir. 2012) ..............................................................................30, 36

*Jenkins v. Missouri*,
  78 F.3d 1270 (8th Cir. 1996) ....................................................................................40

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
  634 F.3d 883 (7th Cir. 2011) .........................................................................4, 34, 35

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) ....................................................................................31

*Leib v. Rex Energy Operating Corp.*,
  No. 06-cv-802-JPG-CJP, 2008 WL 5377792 (S.D. Ill. Dec. 19, 2008) ...................33

*Lemon v. International Union of Operating Eng'rs, Local No. 139*,
  216 F.3d 577 (7th Cir. 2000) ..............................................................................34, 35

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  256 F.R.D. 586 (N.D. Ill. 2009) ...............................................................................33

*Markham v. White*,
  171 F.R.D. 217 (N.D. Ill. 1997) ...............................................................................30

*Marshall v. H&R Block Tax Servs.*,
  270 F.R.D. 400 (S.D. Ill. 2010) ...............................................................................31

*Martin v. Kalvar Corp.*,
  411 F.2d 552 (5th Cir. 1969) ....................................................................................40

*In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*,
  693 F.2d 847 (9th Cir. 1982) ....................................................................................39

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ............................................................................................31, 39

010270-12 705997 V2

*Payton v. Abbott Labs.*,
    100 F.R.D. 336 (D. Mass. 1983)........................................................39

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)......................................45

*Reynolds v. Benefit Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ...........................................................36

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ...........................................................39

*Smith v. Sprint Commcn's Co., L.P.*,
    387 F.3d 612 (7th Cir. 2004) ...........................................................29

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011)...........................................................38

*Sutton v. Bernard*,
    No. 00C 6676, 2002 WL 1794048 (N.D. Ill. Aug. 5, 2002)....................................37

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ........................................................5, 37

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
    309 F.3d 978 (7th Cir. 2002) ...........................................................37

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012).........................................................33

*Wal-Mart Stores, Inc. v. Dukes*,
    ___ U.S. ___, 131 S. Ct. 2541 (2011)...................................................30

*Yandle v. PPG Indus., Inc.*,
    65 F.R.D. 566 (E.D. Tex. 1974)........................................................39

*Yslava v. Hughes Aircraft Co.*,
    845 F. Supp. 705 (D. Ariz. 1993) ......................................................30

## Other Authorities

Grabill, "The Pesky Persistence of Class Action Tolling In Mass Tort
    Multidistrict Litigation," 74 LA. L. REV. 433 (Winter 2014)..................................40

MANUAL FOR COMPLEX LITIGATION § 22.74 (4th ed. 2004) .......................................36

MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004) ..................................44, 45

Plaintiffs Adrian Arrington, Derek Owens, Kyle Solomon, Angela Palacios, Abram

Robert Wolf, Sean Sweeney, Jim O'Conner, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John

DuRocher, and Sharron Washington (collectively, the "Class Representatives"), on behalf of

themselves and as representatives of the Settlement Class, through Class Counsel[1] and pursuant

to Rules 23(b)(2) and 23(d)(1), respectfully submit this Memorandum in Support of Plaintiffs'

Motion for Preliminary Approval of Class Action Settlement and Certification of Settlement

Class (the "Motion").

## I.      INTRODUCTION

By agreement with the National Collegiate Athletic Association ("NCAA"), the Class

Representatives present a historic 50-year Medical Monitoring Program, which will make

medical screening and Medical Evaluations available to all current and former NCAA student-

athletes – regardless of when they played, what sport they played, for how long they played, in

which state they played or reside, or their age.  This Medical Monitoring Program provides

comprehensive, diagnostic relief in response to the Class Representatives' allegations that, for

years, the NCAA put the health and safety of its student-athletes at risk by failing to implement

or enforce standard concussion-management policies or return-to-play guidelines.  As a result,

current and former student-athletes are at both short- and long-term risk from concussions and

from the accumulation of subconcussive hits received while playing NCAA-sanctioned sports at

NCAA member institutions.  The purpose of the Medical Monitoring Program is to ensure that

all NCAA athletes will have the opportunity to be seen by medical experts trained in the

---

[1] Capitalized terms have the same meaning as defined in the Settlement Agreement ("SA"), attached as Exhibit 1 to the Motion for Preliminary Approval. "Class Counsel" means Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC as Lead Class Counsel ("Lead Counsel"), Richard Lewis of Hausfeld LLP as Special Class Counsel for Medical Monitoring Relief ("Special Class Counsel"), and Charles Zimmerman of Zimmerman Reed, James Dugan of the Dugan Law Firm, and Mark Zamora of The Orlando Law Firm as the Executive Committee.  SA, ¶ II(E).

diagnosis of conditions resulting from concussions or the accumulation of subconcussive hits, including early onset conditions, such as persistent post-concussion syndrome, or mid- to late-life onset problems, such as dementia, Parksonism, or other indicators of Chronic Traumatic Encepholopathy ("CTE").

Funded by a $70 million Medical Monitoring Fund to be paid by the NCAA and its insurers, the Medical Monitoring Program includes a written screening process to determine whether and when a Settlement Class Member qualifies for a Medical Examination. If qualified through the written screening process, the Medical Monitoring Program provides for eligible Settlement Class Members to receive at least two Medical Examinations during the 50-year Medical Monitoring Period. Overseen by a Medical Science Committee to be appointed by the Court, the Medical Examinations will include both neurological and neurocognitive assessments designed to assess cognitive, behavioral and mood disorders that may result from concussions and the accumulation of subconcussive hits.[2]

The Settlement also provides for significant changes to and enforcement of the NCAA's concussion-management policies and return-to-play guidelines, including the requirement of baseline testing before each season for every player; the prohibition of same-day return-to-play for athletes diagnosed with a concussion; the requirement that a concussed athlete be seen by a physician before being cleared to return to play; the presence of medical personnel trained in the diagnosis and management of concussions at all Contact Sports games; the implementation of reporting mandates for all concussions and their resolution; and education regarding concussions, as well as academic accommodations, for students, coaches, trainers, physicians and teachers.

---

[2] As discussed *infra*, the Medical Examinations are funded by the Medical Monitoring Fund and thus are free of cost to Settlement Class Members. Moreover, the Settlement does not release individual personal or bodily injury claims.

In addition to the $70 million Medical Monitoring Fund, the NCAA and its members will separately contribute $5 million to research the prevention, treatment and/or effects of concussions.

As more fully described below, the Settlement is the product of extensive arm's-length negotiations, including three in-person mediation sessions overseen by the Hon. Layn Phillips (Ret.), a fourth in-person mediation session overseen by the Hon. Wayne Andersen (Ret.), and extensive additional negotiations over the course of one year.[3]

The following hybrid Settlement Class, stipulated to by the Parties, should be certified pursuant to Rules 23(b)(2) and 23(d)(1):

> All persons who played an NCAA-sanctioned sport at an NCAA member institution at any time through the date of Preliminary Approval.

The Settlement Class meets the requirements of Rule 23(a) because: (1) the thousands of members are too numerous to be joined; (2) class members share a common interest in establishing the NCAA's duty to protect the health and welfare of student-athletes, the NCAA's breach of its duty with respect to concussion management, the establishment of a medical monitoring remedy, and changes to the NCAA's return-to-play and concussion-management guidelines; (3) the Class Representatives' claims for medical monitoring are typical of the Settlement Class's interests in establishing medical monitoring in the form of neurological and neuropsychological testing to identify cognitive, mood, and behavioral disorders resulting from concussions and the accumulation of subconcussive hits, as well as in establishing changes in how the NCAA manages concussions and return-to-play decisions; and (4) the Class

---

[3] In addition, the NCAA separately conducted multiple mediation sessions with its insurers over the course of months.

Representatives are adequate because they have no interests antagonistic to the Class's interests and are represented by experienced counsel.

The Settlement Class also meets the requirements of Rule 23(b)(2), because "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[4] Here, the Parties have agreed to final relief generally applicable to the Settlement Class in the form of the Medical Monitoring Program. Even though not required by Rule 23(b)(2), the Parties have also agreed to provide the Settlement Class with Notice of the Settlement as well as the right to exclude themselves from the Settlement. Thus, the Parties are requesting that the Court exercise its power, pursuant to Rule 23(d)(1), to order notice and a right to opt out in conjunction with certification of the Rule 23(b)(2) Settlement Class in order to ensure procedural fairness.[5] Because this "hybrid"[6] Settlement Class meets the requirements of Rule 23, the Settlement Class should be certified.

Next, this Court should find that the Settlement is within the range of possible approval, direct that Notice be provided to the Settlement Class,[7] and schedule a Fairness Hearing to determine whether the Settlement is fair, adequate, and reasonable.[8] The Settlement is within the range of possible approval because: (1) the Medical Monitoring Program provides relief that

---

[4] FED. R. CIV. P. 23(b)(2); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

[5] *In re Cincinnati Radiation Litig.*, 187 F.R.D. 549, 555 (S.D. Ohio 1999) ("Courts that have exercised that power to require notice and a right to opt out [under Rule 23(d)] in conjunction with the certification of a Rule 23(b)(2) class have recognized that failure to do so 'may deny many members of the class procedural fairness.'") (quoting *Fuller*, 168 F.R.D. at 604 (citing Rosen, *Title VII Classes and Due Process: To (b)(2) or not to (b)(3)*, 26 WAYNE L. REV. 919, 952 (1980))).

[6] *Id.*

[7] The Parties will submit a proposed Notice Plan to the Court within 14 days of Preliminary Approval.

[8] *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 314 (7th Cir. 1980) (internal citation and footnote omitted).

Plaintiffs could achieve only after a win on the merits on all claims; (2) the likely complexity,

length, and expense of continued litigation outweighs any benefits to the Settlement Class;

(3) the Settlement Class Representatives support the Settlement, and just one plaintiff with

personal injury claims has voiced opposition to the Settlement due to his counsel's interests in

pursuing a dubious personal injury class; (4) Proposed Lead Counsel has conducted full merits

discovery and extensive investigation and believes that the Settlement is in the best interests of

the Settlement Class; and (5) the fact that the *Arrington* Plaintiffs, and Lead Counsel, have the

benefit of full merits discovery and filed a Motion For Class Certification in July 2013

demonstrates that they have the benefit of making a fully-informed assessment of the risks and

benefits of continued litigation versus Settlement.[9]

Accordingly, as more fully described below, Plaintiffs respectfully request that the Court

grant the Motion for Preliminary Approval, conditionally certify the Settlement Class, find that

the Settlement is within the range of possible approval, direct that Notice be given to the

Settlement Class, and schedule a final Fairness Hearing to determine whether the Settlement is

fair, adequate, and reasonable.

## II.     BACKGROUND OF THE LAWSUIT AND THE SETTLEMENT NEGOTIATIONS

### A.     Procedural History of *Arrington v. NCAA*

Football player Adrian Arrington filed the first class action against the NCAA on behalf

of a putative class of student-athletes on September 12, 2011.[10]   Subsequently, Derek Owens

---

[9] *See Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

[10] Class Action Complaint, *Arrington, et al. v. National Collegiate Athletic Ass'n*, No. 11-cv-06356 (N.D. Ill.) (*Arrington* Dkt. No. 1).

filed a separate class action suit, which was consolidated with *Arrington*.[11]  Several NCAA football, ice hockey, and soccer players then joined the suit on behalf of NCAA student-athletes. The student-athletes sought medical monitoring for all current and former student-athletes, as well as changes to the NCAA's return-to-play guidelines for students who had suffered concussions or concussion symptoms.

On October 19, 2011, the Hon. Sharon Coleman appointed Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC as Interim Co-Lead Counsel on behalf of the putative class.[12]  On November 18, 2011, the *Arrington* Plaintiffs filed a Consolidated Class Action Complaint.[13]

Between October 2011 and June 2013, Interim Co-Lead Counsel conducted a thorough investigation into the facts and law and conducted full merits discovery, including the NCAA's production of 29,502 documents (176,849 pages), the production of 8,124 documents by 43 third-parties (28,485 pages), and the *Arrington* Plaintiffs' production of 3,842 documents (10,144 pages).  Interim Co-Lead Counsel spent more than 3,300 hours reviewing and analyzing documents produced in this matter.  Interim Co-Lead Counsel took 10 depositions of the NCAA's fact witnesses, and the NCAA deposed the four *Arrington* Plaintiffs and one absent class member.[14]

---

[11] Class Action Complaint, *Owens v. National Collegiate Athletic Ass'n*, No. 11-cv-6816 (N.D. Ill.) (*Owens* Dkt. No. 1); Notification of Docket Entry dated October 5, 2011 (*Arrington* Dkt. No. 18).

[12] Order (*Arrington* Dkt. No. 22).

[13] Consolidated Class Action Complaint (*Arrington* Dkt. No. 24).

[14] Declaration of Steve W. Berman ("Berman Decl."), ¶ 3.

On March 11, 2013, the *Arrington* Plaintiffs filed their Second Amended Class Action Complaint.[15] Then, on July 19, 2013, the *Arrington* Plaintiffs filed their Motion for Class Certification and Memorandum in Support,[16] together with a detailed Proffer of Facts In Support of Class Certification ("Fact Proffer")[17] and an expert analysis of the NCAA's concussion policies from one of the nation's leading sport concussion experts, Dr. Robert Cantu.[18]

**B.    Fact and Expert Discovery in *Arrington***

**1.    Student-Athletes are at risk for long-term effects from concussions and subconcussive hits.**

Concussion or mild traumatic brain injury (mTBI) has been defined as "a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces." Although concussions most commonly occur after a direct blow to the head, they also can occur after a blow elsewhere that is transmitted to the head. Sometimes, athletes refer to hits that result in concussions as getting "dinged" or having their "bell rung."[19]

According the Class's expert, when a concussion occurs, there is a traumatically induced alteration of brain function that may include a rapid onset of cognitive impairment (impairment to the mental processes of perception, memory, judgment, and reasoning). Many times, the short-term effects of the concussion spontaneously resolve.[20] Other concussion symptoms include: amnesia, confusion, nausea, loss of consciousness, balance problems or dizziness,

---

[15] Second Amended Class Action Complaint (*Arrington* Dkt. No. 135).

[16] Plaintiffs' Motion for Class Certification (*Arrington* Dkt. No. 174); Plaintiffs' Memorandum in Support of Motion for Class Certification (*Arrington* Dkt. No. 175).

[17] Proffer of Common Facts in Support of Motion for Class Certification ("Fact Proffer") (*Arrington* Dkt. No. 176).

[18] Report of Robert C. Cantu, M.A., M.D., F.A.C.S., F.A.C.S.M. in Support of Plaintiffs' Motion For Class Certification (*Arrington* Dkt. No. 180).

[19] Report of Robert C. Cantu, M.A., M.D., F.A.C.S., F.A.C.S.M. in Support of Plaintiffs' Motion for Preliminary Approval of Settlement ("Cantu Rep.").

[20] *Id.* at 19.

double or fuzzy vision, sensitivity to light or noise, headache, feeling sluggish, foggy or groggy, feeling unusually irritable, concentration or memory problems, or slowed reaction time. Settlement Class Members may have suffered a concussion if they experienced any of these symptoms while playing a NCAA sport, even if they were not formally diagnosed with a concussion. Athletes do **not** need to have lost consciousness to have suffered a concussion.[21]

Subconcussive hits, or impacts, do not produce any clinical concussion symptoms, but may adversely affect brain function in the same way symptomatic concussions do. Evidence that subconcussive hits may adversely affect brain function has been reflected in documented changes in brain function in high school and college football athletes in the absence of clinical signs of concussion. In the last year, for example, studies in high school and college football players found that players who received normal football brain trauma and did not report any concussion symptoms still had physiological and structural changes of the brain as well as cognitive changes that mimicked concussed players.[22]

Concussions occur when linear and rotational accelerations are imparted to the brain from either direct impacts to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown athletes receiving more than 1,000 impacts greater than 10 G force which is slightly more than a fighter pilot receives doing maximal maneuvers. The majority of football related hits to the head exceed 20 G force.[23]

Although helmets are effective in virtually eliminating skull fractures and dramatically reducing linear forces, they are relatively ineffective in reducing the rotational forces that result

---

[21] *Id.* at 20.

[22] *Id.* at 28.

[23] *Id.* at 21.

in a concussion.[24]  Many people associate concussion with football.  However, concussions can occur in any sport, including most often in a range of contact sports, including, but not limited to, men's and women's soccer, ice hockey, basketball, field hockey, lacrosse, and wrestling.[25]

Although the symptoms of most concussions go away after a relatively short period of time, especially if the individual receives adequate rest (both physical and cognitive), some concussions in some people result in symptoms that may last for months or even longer.  This long-term persistence of concussion symptoms is referred to as Post-Concussion Syndrome or PCS.  PCS symptoms can include headaches, fatigue, memory problems, feeling in a fog, depression, impulsivity, and other physical, cognitive, mood, and behavioral problems.  There may be treatments that can alleviate some or all of these symptoms and in almost all cases they resolve eventually.[26]

Repetitive impacts to the head from participation in sports can lead to a later-life, usually-progressive neurodegenerative disease called Chronic Traumatic Encephalopathy (CTE), which may manifest in cognitive, mood, behavioral, and motor disorders. CTE is a unique disease, similar to Alzheimer's disease, which has been referred to as "punch drunk" or dementia pugilistica when it is seen in boxers.  It appears to begin earlier in life and, once enough brain tissue is hurt or destroyed by the disease, symptoms then begin.  Sometimes there can be a delay of years or even decades between the end of the repetitive head impacts (*i.e.*, the end of playing the contact sport) and the beginning of the symptoms.  CTE often presents with recent memory

---

[24] *Id.* at 22.

[25] *Id.* at 75.

[26] *Id.* at 37.

loss and other cognitive impairments similar to those experienced by people with Alzheimer's disease.[27]

People with CTE can also have changes in behavior (*e.g.*, impulsivity, rage, aggression, having a short fuse) and mood (*e.g.*, depression, hopelessness, feeling suicidal). Less commonly there can be movement disorders such as Parkinsonism (*e.g.*, tremor, difficulty walking or speaking, stiffness). Some people with CTE may first have behavior or mood problems. Others may first have cognitive difficulties, with the changes in mood and behavior later. In many people, the symptoms of the disease progress to the point where there is difficulty in daily functioning, requiring assistance or being unable to live alone. In these cases, CTE may be clinically mistaken for Alzheimer's disease or dementia. A smaller subset of people with CTE may develop a motor neuron disease (MND) that could be diagnosed clinically as Amyotrophic Lateral Sclerosis (ALS) or "Lou Gehrig's Disease."[28]

**2.      Plaintiffs allege the NCAA breached its duty to protect student-athletes.**

The *Arrington* Plaintiffs' extensive investigation and analysis during discovery resulted in Plaintiffs' filing of their Motion For Class Certification and Proffer of Facts in Support of their Motion for Class Certification ("Fact Proffer," reflecting evidence that Plaintiffs believe demonstrates that the NCAA breached its duty to "provide a safe environment" for its student-athletes in contact sports.[29]/[30] After the *Arrington* Plaintiffs' Motion for Class Certification was

---

[27] *Id.* at 41.

[28] *Id.* at 41-42.

[29] With respect to the underlying facts of the case, Plaintiffs incorporate the Proffer of Facts in Support of the Motion for Class Certification (*Arrington* Dkt. No. 176) as if fully set forth herein.

[30] The NCAA has denied and continues to deny Plaintiffs' allegations.

filed with their findings, on August 15, 2013, this Court agreed to the Parties' request for a stay

pending settlement negotiations between the NCAA and the *Arrington* Plaintiffs.[31]

**C.  Formation of the NCAA Student-Athlete Concussion Litigation Multidistrict Litigation**

After the Court stayed the *Arrington* litigation pending settlement discussions, multiple

other actions were filed nationwide, including the following actions:  (i) *Walker, et al. v. NCAA*,

No. 1:13-cv-00293 (E.D. Tenn., filed Sept. 3, 2013); (ii) *DuRocher, et al. v. NCAA*, No. 1:13-cv-

01570 (S.D. Ind., filed Oct. 1, 2012); (iii) *Doughty v. NCAA*, No. 3:13-cv-02894 (D.S.C., filed

Oct. 22, 2013); (iv) *Caldwell, et al. v. NCAA*, No. 1:13-cv-03820 (N.D. Ga., filed Oct. 18, 2013);

(v) *Powell, et al. v. NCAA*, No. 4:13-cv-01106 (W.D. Mo., filed Nov. 11, 2013); (vi) *Morgan, et

al. v. NCAA*, No. 0:13-cv-03174 (D. Minn., filed Nov. 19, 2013); (vii) *Walton, et al. v. NCAA*,

No. 2:13-cv-02904 (W.D. Tenn., filed Nov. 20, 2013); (viii) *Washington, et al. v. NCAA*, No.

4:13-cv-02434 (E.D. Mo., filed Dec. 3, 2013); (ix) *Hudson v. NCAA*, No. 5:13-cv-00398 (N.D.

Fla., filed Dec. 3, 2013); (x)  *Nichols v. NCAA*, No. 1:14-cv-00962 (N.D. Ill., filed Feb. 11,

2014); (xi) *Wolf v. NCAA*, No. 1:13-cv-09116 (N.D. Ill., filed Feb. 20, 2014) (collectively, the

"Related Actions").[32]  All of the Related Actions seek medical monitoring relief on behalf of

student-athletes who played football at NCAA member institutions and some were filed for the

stated purpose of ensuring that any class definition included all former NCAA football players

---

[31] Order (*Arrington* Dkt. No. 186).

[32] Since the time of consolidation, one additional action seeking medical monitoring on behalf of former student-athletes, *Jackson v. NCAA*, No. 1:14-cv-02103 (E.D.N.Y., filed April 2, 2014), has been transferred to the MDL Action, and is also included in the definition of Related Actions.

(no matter what age or in what state), and that any monitoring relief included appropriate tests for mid- to late-life cognitive, mood, behavioral, and movement disorders.[33]

On December 18, 2013, at the request of Interim Co-Lead Counsel in *Arrington*, the Judicial Panel on Multidistrict Litigation ("Panel") transferred *Arrington* and all of the Related Actions for coordinated and consolidated pre-trial proceedings to the United States District Court for the Northern District of Illinois (the "Court" or "MDL Court") before the Honorable John Z. Lee. The Panel found that "all actions share common factual questions concerning the NCAA's knowledge of the risks of concussions in football players and its policies governing the protection of players from such injuries … Plaintiffs in all actions seek medical monitoring for putative class members" and "centralization in the Northern District of Illinois will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."[34] The resulting multidistrict litigation was captioned *In re National Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492, Master Dkt. No. 1:13-cv-09116 (N.D. Ill.) (the "MDL Action").

After consolidation, Interim Co-Lead Counsel in *Arrington* and Plaintiffs' Counsel in the Related Actions engaged in multiple written and oral communications to reach consensus on the scope of the medical monitoring relief and the leadership of the medical monitoring claims in the MDL Action, and, with the exception of the *Nichols* Plaintiffs, agreed to support (i) the reappointment of Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC as Lead Class Counsel ("Lead Counsel"), (ii) the appointment of Richard Lewis of

---

[33] These claims were supported by the expert Affidavit of Robert Stern Ph.D., a neuropsychologist at the Boston University Sports Legacy Institute. Some of the Plaintiffs in the Related Actions also include claims for personal injury. Individual claims for personal injury are expressly reserved and not released by the Settlement. SA, ¶ XIV(A)(7).

[34] *See* Transfer Order, *In re National Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492 (Dkt. No. 53).

Hausfeld LLP as Special Class Counsel for Medical Monitoring Relief, and (iii) the appointment

of Charles Zimmerman of Zimmerman Reed, James Dugan of the Dugan Law Firm, and Mark

Zamora of The Orlando Law Firm to the Executive Committee (collectively, "Class Counsel").[35]

**D.      The History of the Settlement Negotiations**

After the filing of the *Arrington* Plaintiffs' Motion For Class Certification and before the

MDL Action, on August 7, 2013, Defendant's counsel suggested that the NCAA would be

interested in mediation.  On August 15, 2013, the *Arrington* Parties requested that the Court enter

a stay pending mediation.  The *Arrington* Parties initially retained the Honorable Layn R.

Phillips (Ret.) to conduct the settlement negotiations.

The Parties engaged in in-person mediation sessions with Judge Phillips on November 1,

2013 in New York, New York; December 13, 2013 in Houston, Texas; and February 6-7, 2014

in New York, New York.[36]/[37]  The NCAA's insurers participated in two of these sessions.

Moreover, the NCAA and its insurers engaged in multiple additional sessions, including a

separate mediation overseen by an independent mediator.

Following the creation of the MDL Action, Class Counsel conferred extensively together

and with medical experts regarding the scope of an appropriate medical monitoring program for

the Settlement Class, and Lead Counsel, in consultation with Class Counsel, continued

negotiations with the NCAA.[38]  On May 12, 2014, the NCAA together with Plaintiffs' Proposed

Lead Counsel, Special Class Counsel for Medical Monitoring Relief and one member of the

Executive Committee participated in a fourth and final mediation before the Honorable

---

[35] Berman Decl., ¶ 2.

[36] Berman Decl., ¶ 6.

[37] *See* Declaration of Hon. Layn R. Phillips (Ret.) ("Phillips Decl.").

[38] Berman Decl., ¶ 7.

Wayne R. Andersen (Ret.) regarding the consensus reached by Class Counsel, in consultation with their experts, regarding the medical monitoring claims, requests for equitable relief in the form of changes to the NCAA's concussion-management and return-to-play policies, and the scope of an appropriate medical monitoring program.[39]

The Parties also engaged in multiple written and oral communications to consummate the Settlement spanning months of vigorous, arm's-length negotiations, and have conditionally agreed to (1) a comprehensive Medical Monitoring Program to benefit all persons who played an NCAA-sanctioned sport at an NCAA member institution through the date of preliminary approval; and (2) significant changes to the NCAA's concussion-management and return-to-play guidelines.[40]  All of the negotiations between Class Counsel and the NCAA were conducted at arm's-length and were facilitated by Judge Phillips or Judge Andersen.  Notably, Judge Phillips and Judge Andersen both opine that the Settlement was the result of vigorous, arms-length negotiations.[41]

## III.    DESCRIPTION OF THE SETTLEMENT TERMS

The Class Settlement Agreement and Release (the "Settlement Agreement") and the exhibits thereto provide all of the material details of the Settlement terms.  Below is a summary of the benefits and releases provided in the Settlement Agreement.

## A.    The Proposed Settlement Class and Settlement Class Representatives

The proposed Settlement Class is defined as:

>     All persons who played an NCAA-sanctioned sport at an NCAA

---

[39] Berman Decl., ¶ 8.

[40] Berman Decl., ¶ 9.

[41] *See* Declaration of Hon. Layn Phillips (Ret.); Declaration of Hon. Wayne R. Andersen (Ret.).

member institution through the date of preliminary approval.[42]

The proposed Settlement Class Representatives are:

1.      Adrian Arrington, who played football at Eastern Illinois University from 2006 to 2009.  Mr. Arrington suffered concussions and numerous subconcussive hits while playing NCAA football.  Mr. Arrington participated in discovery and was deposed by the NCAA on March 14, 2013.  To this day, Mr. Arrington continues to suffer from seizures, chronic severe headaches, depression, nausea and vomiting, photophobia, confusion, short-term memory loss/cognitive impairment, insomnia, and spells of unresponsiveness.

2.      Derek Owens, who played football at University of Central Arkansas from 2008 to 2011.  Mr. Owens suffered concussions and numerous subconcussive hits while playing NCAA football.  Mr. Owens participated in discovery and was deposed by the NCAA on April 23, 2013.  To this day, Mr. Owens continues to suffer from migraines, moodiness, anxiety, feeling "shortfused," depression, trouble concentrating, and short-term memory problems.

3.      Angelica Palacios, who played soccer at Ouachita Baptist University from 2010 to 2011.  Ms. Palacios suffered a concussion and the accumulation of subconcussive hits while playing NCAA soccer.  Ms. Palacios participated in discovery and was deposed by the NCAA on April 9, 2013, in the *Arrington* matter.

4.      Kyle Solomon, who played hockey at the University of Maine from 2008 to 2010.  Mr. Solomon suffered concussions and numerous subconcussive hits while playing NCAA hockey.  He participated in discovery and was deposed by the NCAA on April 16, 2013, in the *Arrington* matter.  To this day, Mr. Solomon continues to suffer from headaches (including

---

[42] SA, ¶ II(D).

migraines caused by sensitivity to light, working on a computer, or stress), short term memory loss, intense psychological distress, anxiety, and seizures.

5.     Abram Robert Wolf, who currently plays football at Simpson College in Indianola, Iowa.  He has played football since the fall of 2012 and is expected to graduate in 2016.  Mr. Wolf has been exposed to concussions and the accumulation of subconcussive hits.

6.     Sean Sweeney, who wrestled at Buena Vista College from 1991 to 1993.  He received concussions and numerous subconcussive hits while participating in NCAA wrestling.

7.     Jim O'Conner, who played football at Drake University from 1971 to 1974.  He suffered concussions and numerous subconcussive hits while playing NCAA football.

8.     Dan Ahern, who played football at North Carolina State University from 1972 to 1976.  He suffered concussions and numerous subconcussive hits while playing NCAA football.

9.     Paul Morgan, who played football at Vanderbilt University from 1994 to 1997.  He suffered concussions and numerous subconcussive hits while playing NCAA football.

10.     Jerry Caldwell, who played football at Georgia Tech University from 1995 to 1998.  He suffered concussions and numerous subconcussive hits while playing NCAA football.

11.     John DuRocher, who played football at the University of Oregon and the University of Washington from 2003 to 2006.  He suffered concussions and numerous subconcussive hits while playing NCAA football.

12.     Sharron Washington, who played football at the University of Missouri from 1987 to 1991.  He suffered concussions and numerous subconcussive hits while playing NCAA football.

As reflected above, each of the Settlement Class Representatives plays or played football, soccer, wrestling, or hockey for an NCAA school.  Each of them suffered concussions or was

exposed to the accumulation of subconcussive hits, and is in need of medical monitoring over the Medical Monitoring Period.[43]

## B.     The Settlement Benefits

In consideration for the Settlement Class's release of claims against the NCAA for medical monitoring arising from participation in NCAA-sanctioned sports, the NCAA has agreed to provide the following Settlement benefits:

### 1.     The Medical Monitoring Fund.

The NCAA and its insurers have agreed to pay $70 million to create the Medical Monitoring Fund, which will be used to pay the costs of the Medical Monitoring Program, including all payments for Screening Questionnaires, Medical Evaluations, Notice and Administrative Costs, the costs of the Medical Science Committee, Attorneys' Fees and Costs, and the Class Representatives' Service Awards.[44]   The NCAA has also agreed to separately dedicate $5 million to concussion-related research.

Plaintiffs retained The Analysis Group, a well-respected consulting firm, to analyze the adequacy of the Medical Monitoring Fund to fund the Settlement benefits for all eligible Settlement Class Members.[45]   The Analysis Group formed an expert committee composed of physicians, epidemiologists, economists, actuaries, and consultants to conduct its analysis ("Expert Committee").   Based on the analysis of and input from the Expert Committee, the Analysis Group ultimately concluded that the Medical Monitoring Fund is adequate for the purposes for which it was formed.[46]   Its opinion is based on modeling an appropriately

---

[43] *See* Cantu Report, ¶ 89.

[44] SA, ¶ IV(A)(1)(b).

[45] *See* Expert Report of Bruce Deal ("Deal Rep.").

[46] *Id*. at 2-3.

conservative range of values for the main drivers of Fund economics: incidence and prevalence of the conditions that testing aims to detect; anticipated participation rates for those who have the conditions; the number of tests each tested individual receives; and the cost of each test.[47]

Although unexpected, if the Medical Monitoring Fund is depleted before the expiration of the fifty (50) year Medical Monitoring Period, Settlement Class Members may pursue individual claims for medical monitoring. The statute of limitations for medical monitoring will be tolled during the Medical Monitoring Period.[48]

In addition, if it appears that the Fund is going to be depleted before the expiration of the Medical Monitoring Period, Class Counsel may serve written notice on the NCAA, requiring that the NCAA meet and confer within thirty (30) days regarding additional funding of the Medical Monitoring Fund. In such event, the NCAA and/or its insurers may elect to deposit or cause to be deposited additional funds into the Settlement Account for the Medical Monitoring Fund but are not required to do so.[49] If they choose not to deposit additional funds, Notice will be provided to the Class that the statute of limitations will begin to run on tolled claims.[50]

### 2. The Medical Monitoring Program.

The Medical Monitoring Program is designed to screen those members of the Settlement Class who choose to participate in the Program at any time during the 50-year Medical Monitoring Period.[51] The Medical Monitoring Program consists of two phases: the first phase is designed to assess self-reported symptoms and cognitive, mood, behavioral, and motor problems that may be associated with persistent post-concussion syndrome and/or mid-to late-life onset

---

[47] *Id*. at 2-3.

[48] SA, ¶ IV(A)(5).

[49] SA, ¶ IV(A)(7).

[50] SA, ¶ IV(A)(8).

[51] SA, ¶ IV(B)(3). *See also* Cantu Report, ¶ 76.

problems, such as Chronic Traumatic Encephalopathy ("CTE") and related disorders; and the second phase provides in-person Medical Evaluations for those who are eligible as a result of the self-reported responses.[52]

First, all Settlement Class Members are eligible to complete a Screening Questionnaire, at least five times during the Medical Monitoring Period,[53] to determine whether or when they qualify for a Medical Examination.[54] The Medical Science Committee (described below) will agree on the substance and scoring of the Screening Questionnaire.[55] During the course of deliberations, the Medical Science Committee will consider the inclusion of a number of areas of inquiry and screening tools related to concussion history, sports participation, work and social functioning, cognitive functioning, behavioral functioning, mood functioning, functional independence, motor functioning, neurological diagnoses and treatment, psychiatric diagnoses and treatment, and substance use/abuse diagnoses and treatment.[56]

---

[52] SA, ¶ IV(B)(4).

[53] Class Members may complete the Screening Questionnaire not more than once every five (5) years until the age of fifty (50) and then not more than once every two (2) years after the age of fifty (50) until the end of the fifty (50) year Medical Monitoring Period. A Class Member may complete no more than five (5) Screening Questionnaires during the Medical Monitoring Period. After a Class Member has submitted three (3) Screening Questionnaires without qualifying for an examination, any further Screening Questionnaires completed by that Class Member will be sent to the Medical Science Committee for review and decision as to the appropriateness of further Medical Evaluation. SA, ¶ IV(B)(4)(g).

[54] SA, ¶ IV(B)(4).

[55] SA, ¶ IV(B)(4)(c).

[56] SA, Ex. F. Throughout the Medical Monitoring Period, the Medical Science Committee can make changes to the Screening Questionnaire that are consistent with changes to the standard of care for the diagnosis and treatment of concussions and subconcussive impacts and their sequelae. The Medical Science Committee will promptly report any changes to the Screening Questionnaire to Class Counsel, the NCAA and Counsel for the NCAA and will report any such changes to the Court on an annual basis. SA, ¶ IV(B)(4)(b).

Settlement Class Members can complete the Screening Questionnaires in hard copy or online at the Settlement Website.[57] Completed Screening Questionnaires will be scored electronically, based on the algorithm and score developed by the Medical Science Committee.[58] Class Members will be notified if they qualify for a Medical Evaluation and be provided with instructions regarding how and where to schedule a Medical Evaluation.[59] Class Members may qualify for at least two Medical Evaluations during the Medical Monitoring Period.[60]

Medical Evaluations will take place at Program Locations, of which there will be at least ten (10) nationwide.[61] The Program Administrator will work with the Qualifying Class Members to find the most convenient location.[62]

The Medical Science Committee will also agree on the scope of the Medical Evaluations.[63] During the course of its deliberations, the Medical Science Committee will consider the inclusion of the following types of testing: (i) a neurological examination; (ii) a neuropsychological examination; (iii) mood, behavioral, and movement evaluation; and (iv) ancillary testing necessary to complete the evaluation of the Class Member as determined by the neurologist.[64]

---

[57] SA, ¶ IV(B)(4)(a).

[58] SA, ¶ IV(B)(4)(c).

[59] SA, ¶ IV(B)(4)(i).

[60] SA, ¶ IV(B)(4)(h).

[61] SA, ¶ IV(B)(5)(a). The Parties will present a proposed plan for administration of the Medical Monitoring Program within 14 days of Preliminary Approval.

[62] SA, ¶ IV(B)(5)(a). If a qualifying Class Member lives more than 200 miles from the nearest location, the qualifying Class Member may seek either reimbursement from the Medical Monitoring Fund for the cost of driving to the nearest Program Location or obtain a Medical Evaluation from a local healthcare provider and request reimbursement from the Medical Monitoring Fund for the lesser of the average cost of a Medical Evaluation provided in the Program or the Qualifying Member's actual out-of-pocket costs.

[63] SA, ¶ IV(B)(5)(b).

[64] SA, Ex. G.

The information gathered from the Medical Evaluation will be evaluated by a physician. The physician will send the results and/or diagnosis and report to the Qualifying Class Member or the Qualifying Class Member's physician at the direction of the Class Member.[65]

### 3. Appointment of the Medical Science Committee.

By agreement, the Parties request that this Court appoint a Medical Science Committee, comprised of four (4) medical experts with expertise in diagnosis, care, and management of concussions in sport and mid- to late-life neurodegenerative disease.[66] Throughout the Medical Monitoring Period, the membership of the Medical Science Committee will include four (4) experts with representation from among the following specialties: Behavioral Neurology; Neuropsychiatry; Neuropsychology; Neurosurgery; and Athletic Training. The Parties request that the Court appoint the following experts to the initial Medical Science Committee: (i) Dr. Brian Hainline; (ii) Dr. Robert Cantu; (iii) Dr. Ruben Echemendia; and (iv) a fourth expert to be chosen by the Chair of the Medical Science Committee based on input from the Parties.[67]

The membership of the Medical Science Committee will also include a person who will serve as Chair of the Medical Science Committee and who will provide the tie-breaking vote in the event that the medical experts are unable to reach consensus after a reasonable period of time

---

[65] SA, ¶ IV(B)(5)(c).

[66] SA, ¶ V(A)(1).

[67] Dr. Hainline and Dr. Cantu will be appointed for an initial five (5) year term with the potential to be reappointed by the Parties for a second five (5) year term. Dr. Echemendia and the fourth member will be appointed for an initial three (3) year term with the potential to be reappointed by the Parties for a second, five (5) year term. All subsequent appointments for all members will be for five (5) year terms. SA, ¶ V(A)(2).

and opportunity for conferral.[68]  The Parties request that the Court appoint the Hon. Wayne R.

Andersen (Ret.) as Chair of the Medical Science Committee for an initial term of five (5) years.

The Medical Science Committee will:  (i) prepare, annually review and amend, if

necessary, the Medical Monitoring Program Screening Questionnaire to ensure it meets the then-

current standard of care and fits the purposes of the Medical Monitoring Program; (ii) prepare,

annually review, and, if necessary, amend the scope of the Medical Evaluations to ensure they

meet the then-current standard of care and fit the purposes of the Medical Monitoring Program;

(iii) oversee the performance of the Program Locations to ensure that the Program Locations are

providing Medical Evaluations to Qualifying Class Members in accordance with the terms of the

Settlement; and (iv) provide a written report to the Parties on an annual basis regarding their

fulfillment of their responsibilities under the Settlement for submission to the Court.[69]  Finally,

the Committee will recommend how the research funds should be expended referred to below.

The members of the Medical Science Committee will be compensated at a reasonable hourly rate

from the Medical Monitoring Fund by the Program Administrator.[70]

4.      **NCAA changes to concussion-management and return-to-play policies.**

Under the Settlement, the NCAA will implement the following policies:

a.      **Baseline testing.**

During the course of discovery, Plaintiffs learned that baseline testing was not mandated

by the NCAA and was inconsistently conducted at member institutions at best.  Thus, as part of

the Settlement, the NCAA has agreed that:  "Every student-athlete will undergo pre-season

baseline testing, for each sport in which they participate, prior to participating in practice or

---

[68] SA, ¶ V(A)(3).

[69] SA, ¶ V(C)(6).

[70] SA, ¶ V(F).

competition."[71] Dr. Cantu opines that the Settlement's mandated baseline testing "is a significant step that will provide appropriate clinical data to the clinician after a student has been concussed that may be used to determine, among other things, whether or when the student-athlete has recovered and may return to play."[72]

### b. No same day return to play.

During the course of discovery, Plaintiffs learned that many NCAA member institutions did not have established return-to-play guidelines,[73] and many were following old guidelines.[74] Thus, as part of the Settlement, the NCAA has agreed that: "Students with a diagnosed concussion will be prohibited from returning to play or participation in any practice or game on that same day and must be cleared by a physician before being permitted to return to play in practice or competition."[75] Dr. Cantu opines that the NCAA's agreement to implement and enforcement consensus standards that have been recognized since 2004 "is another important achievement in the Settlement."[76]

### c. Medical personnel at contact sports games and available for contact sport practices.

During the course of discovery, Plaintiffs learned that many NCAA schools left discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to its medical staff without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management is

---

[71] SA, ¶ VIII(A)(1).

[72] Cantu Report, ¶ 50.

[73] NCAA 10068879-922 at 907.

[74] NCAA10101405-09, at 06.

[75] SA, ¶ VIII(A)(3).

[76] Cantu Report, ¶ 57.

against consensus best practices. Thus, as part of the Settlement, the NCAA has agreed that, for football, lacrosse, wrestling, ice hockey, field hockey, soccer, and basketball, which are sometimes referred to as "Contact Sports," all schools will be required to have medical personnel with training in the diagnosis, treatment, and management of concussion present at games and available during practices.[77] Dr. Cantu opines that this Agreement will provide "immediate benefit to concussed athletes and to athletes who display symptoms on the field but may not otherwise receive medical attention absent the presence of medical personnel with training in the diagnosis, treatment and management of concussion."[78]

### d. Concussion tracking.

During the course of discovery, Plaintiffs learned that NCAA data on concussions is incomplete and that the NCAA does not mandate reporting of diagnosed concussions. Dr. Cantu explains that: "[w]ithout complete data, injury prevention initiatives have not gone far enough and have not had sufficient support within the NCAA as an organization."[79] Thus, as part of this Settlement, the NCAA will put a reporting process in place for schools to report diagnosed concussions and their resolution, as well as a reporting mechanism from concerned persons to the NCAA.[80] Dr. Cantu opines that this agreement will enable the NCAA to receive complete information on both a systemic and individual basis to identify problems in the way sports are played, as well as the way concussions are handled, and ensure consensus best practices in concussion management are followed.[81]

---

[77] SA, ¶ VIII(4),(5).

[78] Cantu Report, ¶ 61.

[79] Cantu Report, ¶ 64.

[80] SA, ¶ VIII(D).

[81] Cantu Report, ¶ 66.

- 24 -

### e.    Concussion education.

Plaintiffs learned during discovery that the NCAA's Sports Medicine Handbooks made no mention of concussion education techniques for coaches, trainers, students or parents, and that many NCAA coaches and athletic trainers were "not up to date when it comes to concussion."[82] Thus, as part of the Settlement, the NCAA will require that its schools provide NCAA-approved concussion education and training approved by the NCAA to student-athletes, coaches and athletic trainers before each season.[83]  Dr. Cantu opines that "this is a significant change that will bring the NCAA's practices in line with consensus best practices and aid in the detection of concussion and its proper management."[84]

### f.    Academic accommodation.

Physical and cognitive rest is the hallmark of initial concussion management.[85]  Yet, Plaintiffs learned during discovery that many teachers are unaware of the need or extent of academic accommodations for concussed students.  Thus, the NCAA has agreed that it will provide education for faculty regarding academic accommodations for students with concussions.  Dr. Cantu opines that this "is an important step that will help provide concussed athletes with the cognitive rest necessary for recovery, as well as reduce the punitive consequences of missed schoolwork, short-term memory deficits that impact test-taking, and other obstacles to success in the classroom as a result of concussions."[86]

---

[82] NCAA10140278.

[83] SA, ¶ VIII(F).

[84] Cantu Report, ¶ 74.

[85] Cantu Report, ¶ 27.

[86] Cantu Report, ¶ 70.

5.      **Concussion-related research funds.**

Separate from the Medical Monitoring Fund, the NCAA will contribute, or cause to be contributed, five million dollars ($5,000,000), over a period not to exceed ten (10) years, to research the prevention, treatment, and/or effects of concussions.[87]  The Medical Science Committee can make annual recommendations for the NCAA's consideration regarding the expenditure of research funds.[88]  The NCAA and its member institutions will provide an annual report to the Court regarding the expenditure of the research funds.[89]

C.      **Release and Waiver**

In consideration for the Settlement, Plaintiffs and the Settlement Class have agreed to release (i) any and all claims seeking damages or other legal or equitable relief for medical monitoring related to concussions or subconcussive hits sustained during participation in collegiate sports as an NCAA student-athlete; and (ii) any and all claims seeking relief for personal injury on a class-wide basis related to concussions or subconcussive hits sustained during participation in collegiate sports as an NCAA student-athlete.  Plaintiffs are not releasing, and have expressly reserved, individual personal injury claims, as well as any other claims unrelated to medical monitoring relief for concussions or subconcussive hits.[90]  Further, as requested in the *Arrington* Plaintiffs' Motion For Class Certification, the NCAA has agreed that the statute of limitations has been tolled for all personal injury claims since September 12, 2011,

---

[87] SA, ¶ IX(A).

[88] SA, ¶ IX(B).

[89] SA, ¶ IX(C).

[90] SA, ¶ XIV(A)(7).

the date that *Arrington* was filed, and will be tolled through the date of preliminary approval of the Settlement.[91]

## D.     Attorneys' Fees and Costs, and Plaintiff Service Awards

The Parties did not discuss the issue of attorneys' fees at any point during the mediation sessions, except to defer the issue until after an agreement in principal was reached on all material terms providing benefits to the Settlement Class.[92]  The NCAA agrees not to oppose an application for the award of Attorneys' Fees and Expenses not to exceed a total of fifteen million U.S. dollars ($15,000,000.00) in attorneys' fees and up to $750,000 in out-of-pocket expenses.[93]

Class Counsel will have a continuing obligation to implement the terms of the Settlement throughout the Medical Monitoring Period.  Thus, the NCAA has also agreed not to object to applications from Lead Counsel and one (1) member of the Executive Committee for additional attorneys' fees, at a rate not to exceed $400 per hour from the Fund for work performed after the first year from the Effective Date, and up to $500,000.  The Chair of the Medical Science Committee shall approve any such fee requests in the first two (2) years.[94]

Plaintiffs will apply to the Court for reasonable Service Awards for the time and service spent by the Class Representatives in this matter to be paid from the Medical Monitoring Fund. The NCAA has agreed not to object to Service Awards in the amount of $5,000 for each Class Representative deposed in *Arrington*, namely Adrian Arrington, Derek Owens, Angelica Palacios, and Kyle Solomon.  The NCAA has agreed not to object to Service Awards in the amount of $2,500 for each Settlement Class Representative who was not deposed, namely

---

[91] SA, ¶ XX(5).
[92] Berman Decl., ¶ 10.
[93] SA, ¶ XVI(B).
[94] SA, ¶ XVI(C).

Abram Robert Wolf, Sean Sweeney, Jim O'Connor, Dan Ahern, Paul Morgan, Jeffrey Caldwell,

John DuRocher, and Sharron Washington.[95]

**E.      Class Notice**

The Parties are currently working with notice administrators to develop a plan for

providing Notice of the Settlement to the Class.  The Parties will submit a Notice plan to the

Court for approval within 14 days of Preliminary Approval.

> **IV.      THE SETTLEMENT MEETS THE CRITERIA NECESSARY**
> **FOR PRELIMINARY APPROVAL AND FOR THIS**
> **COURT TO CERTIFY THE SETTLEMENT CLASS**

**A.      The Court Should Certify the Proposed "Hybrid" Settlement Class Pursuant to**
**Rules 23(b)(2) and 23(d)(1)**

Before granting the Motion, the Court must determine whether the Settlement Class

agreed to by the Parties may be certified under Fed. R. Civ. P 23(b)(2).[96]  The Parties have

stipulated to certification, for settlement purposes only, of the following Settlement Class:

> All persons who played an NCAA-sanctioned sport for an NCAA
> member institution at any time through the date of Preliminary
> Approval.

The Parties have also agreed to provide Notice to the Settlement Class as well as provide

Settlement Class Members the right to exclude themselves from the Settlement, which rights the

Court has the authority to order pursuant to Rule 23(d)(1).

To obtain certification of the Class, Plaintiffs must demonstrate that all four threshold

requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation)

and Rule 23(b)(2) are satisfied.[97]  The fact that the parties have reached a settlement is a relevant

---

[95] SA, ¶ XVI(A).

[96] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

[97] FED. R. CIV. P. 23.

consideration in the class-certification analysis.[98]  "'Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.'"[99]

After conducting the necessary analysis, the Court should find that the Settlement Class satisfies the requirements of Rule 23(a) and Rule 23(b)(2), making certification appropriate.  The Court should also find that it has the authority to order Notice to the Settlement, as well as provide the right to Settlement Class Members to exclude themselves from the Settlement, pursuant to Rule 23(d)(1).

### 1.    Rule 23(a) requirements are satisfied.

The proposed Class and Class Representatives satisfy all of Rule 23(a)'s requirements: (i) the size of the proposed Class makes joinder impracticable; (ii) the proposed Class's members share common questions of law and fact; (iii) Plaintiffs' requests for medical monitoring relief and changes to the NCAA's concussion-management policies are typical of the relief needed by the proposed Class; and (iv) Plaintiffs and their counsel will vigorously protect the proposed Class's interests.

### a.    Rule 23(a)(1): Joining all members of the Class is impracticable.

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable."[100]  Generally, classes numbering greater than 40 individuals satisfy this requirement.[101]  This case easily satisfies the numerosity requirement.  As reflected in the

---

[98] *See Smith v. Sprint Commcn's Co., L.P.*, 387 F.3d 612, 614 (7th Cir. 2004); *Amchem Prods.*, 521 U.S. at 619.

[99] *Smith*, 387 F.3d at 614 (quoting *Amchem Prods.*, 521 U.S. at 620, 117 S. Ct. 2231, 138 L. Ed. 2d 689).  *See also In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 340-41 (N.D. Ill. 2010) (same).

[100] FED. R. CIV. P. 23(a)(1).

[101] *E.g.*, *id.*

- 29 -

Analysis Group's Expert Report, the Settlement Class is comprised of several million living persons.[102]  Accordingly, joinder is impracticable.

### b.  Rule 23(a)(2):  There are questions of law and fact common to the Class.

Rule 23(a)(2) requires that there be questions of law *or* fact common to the class.  This requires that class members' claims "must depend upon a common contention."[103]  And that common contention "must be of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[104]

Commonality is easily met.[105]  Here, the fundamental issues of the NCAA's duty to protect student-athletes' safety, health and welfare, and its alleged breach of that duty is common to all Settlement Class Members.[106]  These are the same questions – duty and breach – that form the core common issues in many medical monitoring settlements nationwide.[107]  Plaintiffs' claims arise out of the same course of conduct, and are based on the same legal theories as those of the absent Settlement Class Members.  Accordingly, Rule 23(a)(2) is satisfied.

---

[102] Deal Rep. at 6.

[103] *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011).

[104] *Id*.  *See also Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (citing *Wal-Mart*, 131 S. Ct. at 2556) (while a "superficial" common question is not enough, "[e]ven a single [common] question" can suffice for commonality) (alteration in original).

[105] *Markham v. White*, 171 F.R.D. 217, 222 (N.D. Ill. 1997) (court give commonality requirement a "highly permissive reading," citing 7A Charles Alan Wright, *et al.*, FEDERAL PRACTICE AND PROCEDURE - CIVIL § 1763, at 196-98 (3d ed. 2011)).

[106] *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 440 (E.D. Pa. 2008) ("Here, the fundamental factual issue of exposure to the alleged pollutants is common to all class members in the Medical Monitoring Settlement Class, as are the legal issues of duty and breach."); *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993) ("The core issues of liability and exposure [in the medical monitoring claim before the court] are common to all class members. Commonality among the members exists notwithstanding certain factual variations.").

[107] *Id.*

### c. Rule 23(a)(3): Plaintiffs' claims are typical of those of the proposed Class.

Rule 23(a)(3) requires that the "claims … of the representative parties [be] typical of the claims … of the class." A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."[108] This requirement ensures that the class representative's interests align with those of the class as a whole.[109]

Plaintiffs satisfy this requirement. They played NCAA-sanctioned sports at NCAA schools. Each of them suffered from concussions or from the accumulation of subconcussive hits and are in need of medical monitoring. Their requests for medical monitoring do not differ by sport, age, symptoms, or injury.[110] All of the Settlement Class Members will have access to the same type of testing as the Plaintiffs, and their claims arise from the same conduct of the NCAA that caused the need for medical monitoring and for changes to the NCAA's concussion-management guidelines. Therefore, Plaintiffs are typical.

### d. Rule 23(a)(4): Plaintiffs and Class Counsel will fairly and adequately protect the interests of the proposed Class.

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." The adequacy-of-representation requirement is "concerned with the 'competency and conflicts of class counsel.'"[111]

---

[108] *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

[109] *E.g.*, *Marshall v. H&R Block Tax Servs.*, 270 F.R.D. 400, 405 (S.D. Ill. 2010).

[110] *Gates v. Rohm & Haas Co.*, 248 F.R.D. at 441 (finding medical monitoring class representatives typical where they "do not allege that they were singled out; instead, they allege that they suffered harm as a result of the same conduct that allegedly injured the absentee class members").

[111] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 n.31 (1999) (quoting *Amchem Prods.*, 521 U.S. at 626 n.20, 117 S. Ct. at 2251).

- 31 -

Plaintiffs have satisfied the adequacy-of-representation requirement. First, Plaintiffs have claims for medical monitoring and equitable relief that are typical of those brought by other Class Members,[112] and their interests appear to be entirely consistent with those of the other Class Members because they – like the other Class Members – seek relief from the NCAA's breach of its duties to protect their health, safety and welfare.[113] Moreover, Plaintiffs and absent Class Members seek the same goal arising out of the same factual allegations: the establishment of a medical monitoring program to identify whether and the extent to which they suffer from post-concussion syndrome, mid- to late-life neuropsychological disease, or any other form of post-concussion injury from their participation in NCAA sports, as well as changes to the NCAA's deficient concussion-management and return-to-play guidelines.[114]

Furthermore, the Settlement does not release individual personal injury claims, which obviates any conflict between Plaintiffs and Class Members that wish to pursue individual claims for bodily injury. Also, courts do not impose on Rule 23(b)(2) absent class members the choice to either withdraw from the litigation or forfeit their damages claims. The Seventh Circuit has joined with other circuits to rule that an earlier class action in which only declaratory and injunctive

---

[112] The *Amchem* Court explained that Rule 23(a)(4)'s adequacy-of-representation requirement "tends to merge" with Rule 23(a)'s commonality and typicality criteria, which "serve as guideposts for determining whether … maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Amchem*, 521 U.S. at 626 n.20 (quoting *General Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

[113] *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 343-44 (citing *Amchem Prods.*, 521 U.S. at 615, 117 S. Ct. at 2245).

[114] *See, e.g.*, *In re General Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*, MDL 1192, 2000 WL 45534, at *7 (N.D. Ill. Mar. 13, 2000) ("[T]he named plaintiffs suffered the exact same injury and advanced the exact same interest as the Stastny Plaintiffs … The Stastny Plaintiffs' interests were no doubt properly represented in this Settlement Agreement. Unlike in *Amchem*, their interests and injuries are perfectly aligned with those of the name plaintiffs.").

relief were sought does not preclude an absent class member from seeking damages for the same alleged misconduct.[115] Other courts have ruled similarly.[116]

To eliminate any claim-preclusion threat, however, the Settlement Agreement specifically reserves the right of Class Members to pursue their individual personal injury claims.[117] Plaintiffs also request that the Court, in its Final Approval Order, expressly state that the Settlement only encompasses a negligence claim for medical monitoring and excludes all individual damage claims, which are expressly reversed for subsequent individual litigation. An express reservation of this sort disposes of any later assertion of claim preclusion.[118] The Seventh Circuit has ruled that "under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action."[119]

Second, Lead Counsel have invested substantial time and resources in this case by investigating the underlying facts, conducting full merits discovery, researching the applicable law, working with experts, filing their Motion for Class Certification, and negotiating a detailed

---

[115] *Crowder v. Lash*, 687 F.2d 996, 1009 (7th Cir. 1982) (holding that an absent class member should not be barred from pursuing a damage action on the basis of his limited participation in a prior declaratory and injunctive action.

[116] *See, e.g.*, *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 597 (N.D. Ill. 2009); *Leib v. Rex Energy Operating Corp.*, No. 06-cv-802-JPG-CJP, 2008 WL 5377792 (S.D. Ill. Dec. 19, 2008); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 114-15 (E.D.N.Y. 2012); *Jahn v. ORCR, Inc.*, 92 P.3d 984, 990-91 (Colo. 2004).

[117] SA, ¶ XIV(A)(7).

[118] *Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 629 (7th Cir. 2002) (ruling that "under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action").

[119] *Central States*, 296 F.3d at 629.

settlement.[120]  In addition, Proposed Class Counsel has consulted regarding the scope and

content of the medical monitoring relief set forth herein.  Finally, Lead Counsel has substantial

experience pursuing national class-action cases, including medical monitoring, and do not have

interests that conflict with those of the Class.[121]  Accordingly, Rule 23(a)(4) is satisfied.

### 2. The Settlement Class satisfies Rule 23(b)(2).

The Settlement Class also satisfies Rule 23(b)(2), which provides for class treatment

where defendant has "acted or refused to act on grounds that apply generally to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole."[122] Rule 23(b)(2) requires plaintiffs to (i) allege grounds for liability generally applicable

to the class and (ii) seek relief that is predominantly injunctive or declaratory, as opposed to

monetary.[123]

Here, Plaintiffs' claims for medical monitoring relief and changes to the way the NCAA

handles concussion management are based on NCAA conduct that is "generally applicable to the

class."  The NCAA breached its duty to protect the safety, health and welfare of its student-

athletes.  Plaintiffs allege that the NCAA owed a uniform duty to every Class Member to

promulgate and enforce concussion-management best practices, which the NCAA failed to do

putting Class Members at risk for short and long-term effects from concussions and the

accumulation of subconcussive hits.

---

[120] *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 343-44 (citing *Rand*, 926 F.2d at 598-99).

[121] *See id*. at 343-44 (citing *Amchem Prods.*, 521 U.S. at 615, 117 S. Ct. at 2245).

[122] FED. R. CIV. P. 23(b)(2); *Kartman*, 634 F.3d at 892.

[123] *See, e.g.*, *Lemon v. International Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000).

The second (b)(2) requirement is based on the notion that class cohesiveness breaks down when the class seeks to recover damages from individual injuries.[124]  The predominantly "injunctive or declaratory" requirement hence protects the legitimate interests of potential class members who might wish to pursue their monetary claims individually.[125]  This concern is absent here because the Settlement Agreement is for relief in the form of a Court-ordered Medial Monitoring Program and equitable relief in the form of changes to the NCAA's concussion management directives.

Thus, courts generally find that settlement classes providing medical monitoring and equitable relief are appropriate for certification under Rule 23(b)(2).  As one court approving a medical monitoring settlement and certifying a Rule 23(b)(2) settlement class explained:

> Because the class members exclusively seek some form of medical monitoring, they have nothing to gain from monetary relief beyond funding for the costs of any such monitoring.  The value of any "medical monitoring" is the medical screening itself, not any monetary sum.[126]

There can also be no doubt that the Medical Monitoring Program sought here is relief appropriate for Rule 23(b)(2) certification.  The Seventh Circuit has specifically held that relief in which a court establishes a medical-monitoring program managed by court-appointed trustees – which is precisely the relief reflected in the Settlement Agreement – is properly "characterized as injunctive even if the defendants are required to pay for the program."[127]  The Settlement Agreement provides final relief to the entire Class and does not "require[] thousands

---

[124] *Id.*

[125] *Id.* (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)).

[126] *Gates v. Rohm & Haas Co.*, 248 F.R.D. at 442.

[127] *Kartman*, 634 F.3d at 894 n.9.

of individual determinations of class membership, liability, and appropriate remedies."[128]

Rather, the relief is purely for injunctive, non-monetary medical monitoring relief which

expressly reserves the right of Class Members to pursue any and all claims other than medical

monitoring and accordingly should be certified under Rule 23(b)(2),[129] with Notice to the Class

and the right for Settlement Class Members to exclude themselves pursuant to Rule 23(d)(1).

## B.    Preliminary Approval of the Settlement Should Be Granted

"Federal courts naturally favor the settlement of class action litigation."[130]  However,

Rule 23(e) "requires court approval of any settlement that effects the dismissal of a class action.

Before such a settlement may be approved, the district court must determine that a class action

settlement is fair, adequate, and reasonable, and not a product of collusion."[131]

The Seventh Circuit has explained:

> District court review of a class action settlement proposal is a two-
> step process.  The first step is a preliminary, pre-notification
> hearing to determine whether the proposed settlement is 'within
> the range of possible approval.'  This hearing is not a fairness
> hearing; its purpose, rather, is to ascertain whether there is any
> reason to notify the class members of the proposed settlement and
> to proceed with a fairness hearing.  If the district court finds a
> settlement proposal 'within the range of possible approval,' it then
> proceeds to the second step in the review process, the fairness
> hearing.  Class members are notified of the proposed settlement
> and of the fairness hearing at which they and all interested parties
> have an opportunity to be heard.[132]

In deciding whether to preliminarily approve the Settlement, this Court must consider:  (1) the

---

[128] *Cf.*, *Jamie S.*, 668 F.3d at 499.

[129] MANUAL FOR COMPLEX LITIGATION § 22.74, at 427 (4th ed. 2004) (footnote omitted) (advising that "Rule 23(b)(2) generally applies" to a mass tort class for medical monitoring "when the relief sought is a court-supervised program for periodic medical examination and research to detect diseases attributable to the product in question.") ("MANUAL").

[130] *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

[131] *Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (quotation omitted).

[132] *Armstrong*, 616 F.2d at 314 (internal citation and footnote omitted).

strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed.[133]  Courts "'do not focus on individual components of the settlement[ ], but rather view them in their entirety in evaluating their fairness.'"[134]

When analyzing whether a proposed settlement is fair, reasonable, and adequate, courts "should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights."[135]  Additionally, a court "must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case,"[136] keeping in mind that the presence of different or more creative alternatives does not preclude settlement approval.[137]

### 1.    Weighing the strength of Plaintiffs' case compared to the terms of the proposed settlement supports preliminary approval.

One of the principal factors which a district court should consider in determining the reasonableness of the settlement is the strength of the plaintiff's case on the merits balanced against the settlement offer.[138]  In doing so, however, "[b]ecause the essence of settlement is

---

[133] *Synfuel Techs.*, 463 F.3d at 653 (quoting *Isby*, 75 F.3d at 1199).

[134] *Isby*, 75 F.3d at 1199.

[135] *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

[136] *Armstrong*, 616 F.2d at 314-15.

[137] *See Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 987 (7th Cir. 2002).

[138] *Armstrong*, 616 F.2d at 314.  *See also Synfuel Techs.*, 463 F.3d at 653 (the "most important factor relevant to the fairness of a class action settlement" is the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement.") (quotations omitted); *Sutton v. Bernard*, No. 00C 6676, 2002 WL 1794048, at *1 (N.D. Ill. Aug. 5, 2002) ("The primary question is whether the proposed settlement amount is reasonable, given the risk and likely return to the class of continued litigation.").

compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs."[139]

Here, after full merits discovery and thousands of hours of research, Plaintiffs moved for certification of liability classes comprised of an 18-state Medical Monitoring Class and a 50-State Core Issues Class. Yet, despite the fact that 33 states do not recognize medical monitoring as an independent cause of action or as a remedy for negligence,[140] this Settlement provides medical monitoring to all current and former student-athletes in all 50 states.[141]

Moreover, in their Motion for Class Certification, the *Arrington* Plaintiffs sought certification of a liability Class comprised of student-athletes in Contact Sports from 2004 to the present date, based on the date international consensus on concussion management standards was achieved.[142] However, this Settlement provides medical monitoring benefits to all current and former NCAA student-athletes, regardless of age and sport.[143]

By providing all current and former NCAA student-athletes access to the Screening Questionnaire and, if they qualify, to the Medical Evaluations, the Settlement is unprecedented. Plaintiffs have achieved the right for all Settlement Class Members to have neurological, neuropsychological, and mood and behavior evaluations to determine whether their symptoms or

---

[139] *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 347 (internal quotation marks and citations omitted).

[140] Since the filing of Plaintiffs' Motion for Class Certification, the New York Court of Appeals has ruled that it does not recognize medical monitoring as an independent cause of action. *Caronia v. Philip Morris USA, Inc.*, 5 N.E. 3d 11 (N.Y. App. Ct. 2013). Accordingly, Plaintiffs may have to remove New York from its Motion for Class Certification for liability purposes if the MDL Action were litigated on a contested basis.

[141] *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 308 (3d Cir. 2011) ("Rule 23 does not require a district court to determine whether class members individually have a colorable claim – one that 'appears to be true, valid, or right.'").

[142] The Second Amended Complaint in *Arrington* defined the class as all student athletes without restriction on sport or time; the Related Actions included a class definition comprised of all former NCAA football players without a time restriction.

[143] SA, ¶ II(D).

- 38 -

conditions are related to the concussions or accumulation of subconcussive hits they sustained while playing NCAA sports.  And Plaintiffs have ensured that the rights of Settlement Class Members to pursue individual personal injury claims are protected, through tolling during the pendency of these proceedings.

The Nichols Plaintiffs have previously complained that the opt-out rights provided here are a sham, because the Settlement waives class personal injury claims, but preserves individual personal injury claims. However, such an objection should be overruled.

First, the contention that a personal injury class could be certified here is unsupportable. To the extent Nichols' counsel is attempting to certify a personal injury class, the case is more akin to a mass tort claim, which is generally not suited for class treatment.[144]  Most courts have denied certification in those circumstances.[145]

For example, in *In the Matter of Rhone–Poulenc Rorer, Inc.*,[146] the Seventh Circuit issued a writ of mandamus decertifying a class action on behalf of hemophiliacs exposed to the HIV virus as a consequence of using the defendants' blood solids.  The Seventh Circuit recognized that "[m]ost federal courts … refuse to permit the use of the class-action device in mass tort cases, even asbestos cases. Those courts that have permitted it have been criticized…."[147]  One commentator recently explained:  "Although mass tort litigation continues

---

[144] *Ortiz v. Fibreboard Corp.*, 527 U.S. at 845 (quoting FED. R. CIV. P. 23(b)(3) advisory committee notes, "a mass accident resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions not only of damages, but of liability and defenses of liability would be present, affecting the individuals in different ways.").

[145] *See, e.g.*, *In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847 (9th Cir. 1982); *Payton v. Abbott Labs.*, 100 F.R.D. 336 (D. Mass. 1983); *Yandle v. PPG Indus., Inc.*, 65 F.R.D. 566 (E.D. Tex. 1974); *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 83-85 (M.D. Pa. 1974).

[146] *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995).

[147] *Id.* at 1304.

to be occasionally resolved via class action settlements, it is essentially unquestionable that personal injury claims can no longer be certified as litigation classes."[148]

Thus, Lead Plaintiffs have not "abandoned" Class Members' right to obtain personal injury damages but rather have vigorously sought to protect and advance that very right by expressly seeking to ensure those individual claims are protected and not subject to claim preclusion.[149] The fact that Nichols' counsel wants to pursue a class action, which is now precluded by the Settlement, does not render the Settlement unfair.[150]

Ultimately, Lead Plaintiffs' Counsel recognized that individual causation issues were not amenable to a class action; such a recognition does not render counsel inadequate.[151/152] Rather, after weighing the benefits that could be provided under the Medical Monitoring Settlement against the unlikely certification of a personal injury class, Lead Plaintiffs made the strategic decision to support a $70 million Medical Monitoring Program with meaningful changes to the

---

[148] Grabill, "The Pesky Persistence of Class Action Tolling In Mass Tort Multidistrict Litigation," 74 LA. L. REV. 433, 435 n.3 (Winter 2014) (citing *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1089 (6th Cir. 1996) (identifying "a national trend to deny class certification in drug or medical product liability/personal injury cases")).

[149] *See* SA, ¶ XIV(A)(7). *See also* Plaintiffs' Memorandum in Support of Motion for Class Certification (Dkt. No. 175), at 24-27 (requesting that the Court immunize Plaintiffs and absent class members from assertions of claim preclusion for damages claims in subsequent individual litigation).

[150] *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 357 (N.D. Ohio 2001) (finding class action settlement fair and rejecting objections where "a large number of the comments were submitted by counsel seeking to pursue their own class action cases. To the extent these comments objected to class certification, they expressed dissatisfaction with the *sub-classification* scheme, or with the *nationwide* scope of the proposed class, or with the concept of a "settlement class," not the idea of class treatment. Primarily, the commenters attacked the fairness of the proposed settlement agreement, tending to focus on the argument that the opt-out provisions of the agreement were a 'sham.'").

[151] *Hawaii-Pacific Venture Capital Corp. v. Rothbard*, 564 F.2d 1343, 1346 (9th Cir. 1977); *Martin v. Kalvar Corp.*, 411 F.2d 552, 553 (5th Cir. 1969); *Gabriel v. Standard Fruit & S.S. Co.*, 448 F.2d 724, 725 (5th Cir. 1971).

[152] Notably, "[a] difference of opinion concerning litigation strategy or individual aspects of a remedy does not overcome the presumption of adequate representation." *See, e.g.*, *Jenkins v. Missouri*, 78 F.3d 1270, 1275 (8th Cir. 1996).

- 40 -

NCAA's return to play practices in return for waiving a virtually non-existent right to class personal injury claims.

In sum, Plaintiffs likely could not have achieved this same victory – a comprehensive Medical Monitoring Program for all living NCAA athletes under 50 states' laws and significant changes to the NCAA's concussion-management and return-to-play guidelines – on a contested basis. Accordingly, this Court should find that the benefits of the Settlement are substantial and encompass or exceed the relief that could be obtained through a jury verdict in favor of a class on a contested basis.

      **2.**     **The risk, expense, complexity, and likely duration of further litigation weigh in favor of preliminary approval.**

This factor also weighs heavily in favor of preliminary (and, ultimately, final) approval of the Settlement. The risk, expense, complexity, and likely duration of further litigation can only be characterized as monumental.

From 2011 through January 31, 2014, Hagens Berman and Siprut PC, as Court-appointed Lead Counsel, invested more than 11,000 hours and more than $500,000 in out-of-pocket costs on a wholly contingent basis. A brief breakdown of this work includes:

- More than two dozen oral meet-and-confers with defense counsel and third parties regarding discovery requests;

- The negotiation of 97 search terms for NCAA electronically-stored information;

- Ten lawyers spent at least 2,500 hours reviewing the 29,502 documents (176,849 pages) produced by the NCAA from 14 NCAA custodians and central libraries;

- Four lawyers spent more than 220 hours reviewing the *Arrington* Plaintiffs' emails and documents, and produced 3,842 documents (10,144 pages) in response to NCAA requests;

- 43 third parties produced 8,124 documents (28,485 pages), which were reviewed over a period of 400 hours by seven lawyers;

- Lead Counsel took 10 depositions of the NCAA's fact witnesses, including two experts on NCAA committees, expending more than 200 hours;

- The NCAA deposed the four Lead Plaintiffs and one absent class member;

- Lead Counsel spent more than 375 hours drafting the Proffer of Facts in Support of Class Certification, and more than 700 hours researching and drafting Plaintiffs' Motion for Class Certification;

- Excluding mediation-related work, Lead Counsel spent 110+ hours working with their expert, Dr. Cantu, and Dr. Cantu spent approximately 85 hours working on his report or consulting with counsel related to his report.[153]

If this matter were to revert to a contested basis, this Court has already stated that the new parties to the MDL Action – all of the Plaintiffs – would have the right to open discovery on a Class-wide basis. The Plaintiffs would be required to file a third consolidated amended complaint, as well as revise the Motion For Class Certification to incorporate a consensus-based approach. There is no reason to believe that this process would be any less contentious or lengthy than the tracks on which both the *Arrington* Action and the MDL Action have proceeded.

Moreover, if this matter went to verdict, a lengthy appeal period would certainly result. The litigation road has been arduous and promises to be even more difficult absent settlement. Plaintiffs' counsel have already collectively incurred and advanced more than $500,000 in out-of-pocket expenses pursuing Plaintiffs' claims. Settlement will conserve the resources of the Parties and the Court. The proposed Settlement guarantees a substantial recovery for the Class now while obviating the need for a lengthy, complex, and uncertain trial. Additionally, the Settlement expressly reserves the right of individuals to pursue personal injury damages separately of this class action while also obtaining the benefits of the Medical Monitoring Program. Accordingly, this factor favors preliminary approval of the Settlement.

---

[153] Berman Decl., ¶ 4.

3.     **Opposition to the settlement is *de minimus*.**

Because Class Members have not yet received notice of the Settlement and been provided an opportunity to comment, this factor cannot yet be fully evaluated.  However, it is important to note that the Class Representatives in the MDL Action support the Settlement.

While the four original *Arrington* Plaintiffs support the Settlement, counsel for the Medical Monitoring Plaintiffs in the MDL Action have since worked cooperatively with the *Arrington* Plaintiffs to analyze and understand both the risks of continued litigation and the benefits of the Settlement.[154]  Accordingly, this factor favors preliminary approval.

4.     **The terms of the proposed Settlement were only reached following discovery by attorneys familiar with the legal and factual issues of the case.**

This matter has been intensely litigated for three years and this Settlement was reached only following the close of discovery.  Plaintiffs conducted an extensive investigation, including two years of discovery, to uncover and allege class-wide negligence and the need for medical monitoring relief from the NCAA.  Between October 2011 and June 2013, the parties conducted full merits discovery, including the production and review of more than 200,000 pages by Plaintiffs, the NCAA, conferences and schools; the depositions of 14 witnesses; and extensive expert analysis.  As a result, on July 19, 2013, Plaintiffs filed their extensive Motion for Class Certification accompanied by a detailed Proffer of Facts and expert report.

Given the advanced stage of these proceedings, there can be no question that Lead and Class Counsel have a clear view of the strengths and weaknesses of the Class's claims.  Full merits discovery has been completed, which has informed Lead and Class Counsel as to the pertinent legal and factual issues and resulted in the recommendation of this Settlement.

---

[154] The only potential objector of which Lead Counsel is aware is the singular Nichols Plaintiff, whose lawyers make no complaints regarding the medical monitoring relief described herein.

Because Plaintiffs satisfy the requirements for demonstrating that the Settlement is fair, adequate and reasonable for purposes of preliminary approval, the Court should grant Plaintiffs' motion.

**V.     WITHIN 14 DAYS OF PRELIMINARY APPROVAL, THE PARTIES WILL SUBMIT A NOTICE PLAN TO THE COURT AND REQUEST THAT THE COURT SCHEDULE A FAIRNESS HEARING**

**A.     The Court Should Approve the Contents of the Notice to be Provided to the Class Now**

Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement.[155]  Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs."

The MANUAL sets forth several elements of the "proper" content of notice.  If these requirements are met, a notice satisfies Fed. R. Civ. P. 23(c)(2), Fed. R. Civ. P. 23(e) and due process, and binds all members of the Class.  The Notice must:

1.      Describe the essential terms of the Settlement;

2.      Disclose any special benefits or incentives to the Class Representatives;

3.      Provide information regarding attorneys' fees;

4.      Indicate the time and place of the hearing to consider approval of the Settlement, and the method for objection to and/or opting out of the Settlement;

5.      Explain the procedures for allocating and distributing Settlement funds; and

6.      Prominently display the address of Class counsel and the procedure for making inquiries.[156]

The proposed Long Form Notice, attached as Exhibit 4 to the Agreement, is clear,

---

[155] *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).

[156] MANUAL, ¶ 30.212 (3d ed. 1995); *see also, e.g., Air Lines Stewards & Stewardesses Ass'n v. American Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process).

- 44 -

precise, informative, and meets the foregoing standards.[157]

The Parties will submit a proposed plan for how Notice will be distributed to the

Settlement Class within 14 days of Preliminary Approval.

**B.**   **The Court Should Set Settlement Deadlines for Preliminary Approval and for Consideration of the Notice Plan and Proposal for Administration of the Medical Monitoring Program**

In connection with preliminary approval of the Settlement, the Parties recommend that

the Court schedule the following dates:

| Date | Event |
|------|-------|
| Within two Days of Preliminary Approval | Settlement website established and basic Settlement documents posted. |
| Within 14 Days of Preliminary Approval | The Parties to submit a proposed Notice Plan and proposed plan for administration of the Medical Monitoring Program for the Court's approval. |
| Within 10 Days of the Court's Approval of the Notice Plan | Mailing of Short Form Notices begins, Publication Notice published, call center established, notice via social media begins, XXX-day Claim Period begins. |
| Within 75 days after the Notice Date | Due date for Plaintiffs' Class Counsel's papers in support of final approval of the Settlement, including a declaration of proof of mailing and publishing notice, and papers in support of the request for an award of attorneys' fees and expenses. |

---

[157] The Notice is also written in plain English and is easy to read and includes other information such as the case caption; a description of the Class; a description of the claims; a description of the Settlement; the names of counsel for the Class; a statement of the maximum amount of attorneys' fees that may be sought by Plaintiffs' Class Counsel; the Fairness Hearing date; a description of Class Members' opportunity to appear at the hearing; a statement of the procedures and deadlines for requesting exclusion and filing objections to the Settlement; and the manner in which to obtain further information. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998). *See also* MANUAL, § 30.212 (Rule 23(e) notice designed to be only a summary of the litigation and settlement to apprise Class members of the right and opportunity to inspect the complete settlement documents, papers and pleadings filed in the litigation).

| Within 90 days after the Notice Date | Due date for postmark or delivery of requests for exclusion.<br><br>Due date for delivery and filing of objections and intents to appear at the Fairness Hearing. |
|---|---|
| Within 100 days after the Notice Date | Due date to file reply papers, if any, in support of final approval of the Settlement and request for an award of attorneys' fees and expenses. |
| Within seven days before the Fairness Hearing | Due date for filing of declarations of Class Action Settlement Administrator and Settlement Notice Administrator. |
| On or after 120 days after the Preliminary Approval date or the Court's approval of the Notice Plan | Fairness Hearing |

## VI.    CONCLUSION

For all the above-stated reasons, Plaintiffs respectfully request that the Motion be granted and the Court enter an order:  (i) conditionally certifying the Settlement Class; (ii) granting Preliminary Approval of the Settlement; (iii)  establishing the deadlines reflected above; and (iv) directing that Notice be provided to the Class, subject to the Court's approval of a Notice Plan.

Date:  July 28, 2014

Respectfully submitted,

By:   _/s/ Steve W. Berman_
     Steve W. Berman
_steve@hbsslaw.com_
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594

- 46 -

Elizabeth A. Fegan
*beth@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

By:    */s/ Joseph J. Siprut*       
     Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342

*Co-Lead and Settlement Class Counsel*

010270-12 705997 V2

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on July 28, 2014 a true and correct copy of the foregoing document was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

By:   /s/ Steve W. Berman
                   Steve W. Berman