## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL NO. 2492<br>Case No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Brown |

## DECLARATION OF MEDIATOR AND FORMER
## UNITED STATES DISTRICT COURT JUDGE WAYNE R. ANDERSEN
## IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT

I, WAYNE R. ANDERSEN, declares as follows:

1.      I am the one of the mediators in this action and a former United States District Court Judge. I submit this declaration in support of Plaintiffs' motion for preliminary approval of the proposed class action settlement between the proposed Settlement Class and the National Collegiate Athletic Association ("NCAA").

2.      At the request of the parties, I conducted a mediation that, when combined with the prior efforts of Hon. Layn R. Phillips (Ret.), produced the proposed settlement that I understand is being submitted to the Court for preliminary approval. The parties negotiated this settlement partly under my supervision. The talks before me were vigorous, at arm's length, and in good faith. Based on my experience as a mediator and former judge, my detailed discussions with the parties, and the information made available to me during the mediation, I believe that the proposed settlement (plus attorneys' fees and reasonable costs) was the result of a fair, vigorous, and arm's length mediated negotiation process. Without waiver of the mediation privilege, I describe below the reasons for my view.

**Qualifications and Experience**

3.     I am a mediator with JAMS, Inc. based in JAMS' Chicago office.  I am a former United States District Court Judge for the Northern District of Illinois.

4.     I have successfully mediated complex commercial cases, including dozens of class actions.  Before that, as a federal judge, I presided over hundreds of settlement conferences in complex business disputes and class actions.  It is my understanding that I was selected by the parties to mediate this matter in part because of my extensive experience resolving complex, high-visibility disputes of this kind.

**The Mediation Process**

5.     Under my supervision, the parties engaged in arm's length, hard-fought negotiations over the course of approximately two months.  I conducted a face-to-face mediation session in May of this year, which included meetings with both sides present and sessions where I met only with one side or the other.  I held follow-up conversations with both parties after the in-person mediation, and counsel for the parties conducted negotiations outside my presence pursuant to requests and directions that I gave to them.

6.     Plaintiffs and the NCAA each were represented by preeminent attorneys.  It was quickly apparent to me that counsel for both parties had thoroughly investigated the relevant facts and law, and I was satisfied throughout the negotiations that the parties' positions were diligently explored and advanced.  These counsel presented an impressive array of legal experience, talent, and expertise.

7.     The mediation process benefitted substantially from the prominent medical and economic experts that Plaintiffs and the NCAA retained.  The medical experts advised the parties on potential medical issues related to concussion management and a potential medical

monitoring program. In addition, the parties each retained economic experts who modeled the sufficiency of the proposed medical monitoring fund. I spoke with several of the parties' experts during the mediation to satisfy myself that the parties were being expertly advised and were considering all relevant issues. It was clear to me that both sides had hired experts who were extremely well-versed in the medical literature, as well experts well-versed in the economic and actuarial considerations relevant to a medical monitoring settlement, and the issues relevant to arriving at a fair settlement that would function efficiently over the course of the settlement period. I also believe based on the information provided to me that the proposed common fund will be more than adequate to provide medical monitoring to qualified individuals.

8. Several of the proposed terms of the settlement changed during the mediation. Although the parties shared a common goal, at times they proposed very different visions of how to achieve that goal. I worked constructively with counsel to offer possible compromises and solutions.

9. At all times, Plaintiffs' counsel vigorously represented the proposed class. They repeatedly emphasized their commitment to protecting the interests of current and former NCAA student-athletes and fought hard to obtain the greatest possible benefits in a settlement that the NCAA could accept. I had no doubt that Plaintiffs' counsel were prepared to litigate and try this case should mediation fail.

10. At the same time, Plaintiffs' counsel weighed and recognized the significant legal and factual hurdles Plaintiffs faced if they proceeded with the litigation. First and foremost, a litigation of this size and complexity can take many years to litigate. By resolving the litigation at this time, Plaintiffs' counsel, in part, sought to have return-to-play and concussion management rules implemented as soon as possible to help prevent concussion-related injuries.

They also sought to ensure that medical monitoring will be available for current and former NCAA student-athletes as soon as possible, and for both persistent post-concussion syndrome as well as mid- to late-life onset problems, such as Chronic Traumatic Encephalopathy and related disorders.

11.     Moreover, it was clear that Plaintiffs weighed the continued, enormous costs of litigation versus the ability to achieve significant medical monitoring and equitable relief for the Settlement Class now, and for their part, the NCAA and its counsel clearly recognized the significant diversion of resources that continued litigation would cause. Thus, by settling this important litigation with a medical monitoring remedy at this point in time, Plaintiffs have ensured that the NCAA's resources will be used to ensure a half-century of medical monitoring relief for its student athletes, rather than being used to pay lawyers in federal and multi-state litigation.

12.     Plaintiffs faced additional significant hurdles to their medical monitoring claim. For example, there was a real chance the Court would rule that many states do not recognize a claim for medical monitoring or that class certification of such claims would not be appropriate. Thus, a settlement that provides medical monitoring for current and former NCAA student-athletes, regardless of the state in which they reside, is a significant achievement.  In addition, some members of the proposed class may have been concussed many decades ago at a time when concussion science was different.

13.     Plaintiffs faced other legal hurdles as well, including, but not limited to, various statute of limitations arguments and the assertion of the "assumption of risk" defense based on the NCAA's argument that the student-athletes knew at the time they played NCAA sports that their sport could be a dangerous activity and that they assumed that risk when they chose to play.

14.     For its part, the NCAA also faced risks if it continued to defend this litigation. For example, the Court may have rejected the NCAA's statute of limitations and assumption of risk defenses. If the NCAA did not succeed on dismissing all of the cases consolidated in this multidistrict litigation proceeding, it would inevitably face years of very expensive discovery and potentially dozens of trials in state and federal courts around the country. Each potential lawsuit carried with it the risk of a significant damage verdict and a negative precedent that could affect subsequent cases.

15.     In short, both sides faced substantial risks if they chose to litigate these matters and tremendous benefits if they could fairly resolve their differences.

**The Negotiation Process**

16.     The negotiated settlement produced by the mediation process, as reflected in the parties' proposed settlement agreement, represents a thoughtful, deliberative, and comprehensive settlement that will benefit thousands of NCAA current and former student-athletes. If the settlement is approved, current and former NCAA student-athletes will be immediately eligible to participate in a diagnostic screening program and, depending on the outcome of that screening, may be entitled to receive a free in-person medical evaluation. The benefits will be made available promptly after the Effective Date of the settlement and will remain available for 50 years, ensuring that class members who appear healthy today but subsequently develop medical issues that may be related to concussions or subconcussive hits sustained during college can obtain medical monitoring at no cost to them through the settlement fund.

17.     Based upon my extensive experience in this case and other complex actions, the settlement benefits provided to the class members as described above were negotiated at arms-length and were weighed against the parties' claims and defenses, and the expense, uncertainty

and time inherent in litigating the student-athletes' claims to judgment. In particular, it is my considered judgment that Plaintiffs would be unlikely to have obtained more money and benefits without going through years of discovery and trial, because they would face substantial risks of loss if they could not prove negligence or fraud on the part of the NCAA. In addition, costs and uncertainty of litigation would not end with a trial court judgment, as the losing party likely would appeal, resulting in years of appellate proceedings before any judgment would be finalized.

## Conclusion

For all the reasons set forth above, the proposed settlement of this litigation was the result of a fair, vigorous, and arm's length mediated negotiation process. I am submitting this Declaration in support of Plaintiffs' motion for preliminary approval of the proposed settlement.

I declare that the foregoing is true and correct.

Executed this 28th day of July, 2014.

WAYNE R. ANDERSEN

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on July 28, 2014, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: */s/ Steve W. Berman*_____