**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Documents Relates To:**<br>**All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

**NICHOLS' RESPONSE TO PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

**Respectfully submitted by**:

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Robert A. Clifford
Shannon M. McNulty
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
Tel: 312.899.909

Brian W. Coffman
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614
Tel: 773.348.1295

Richard R. Gordon
GORDON LAW OFFICES, Ltd.
211 West Wacker Drive, Suite
Chicago, Illinois 60606
Tel: 312.332.5200

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067
Tel: 248.548.1009

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115
Tel: 415.994.9930

John J. Driscoll
THE DRISCOLL FIRM, P.C.
211 N. Broadway
St. Louis, Missouri 63102
Tel: 314.932.3232

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   ARGUMENT ............................................................................................. 2

   A. Nearly 9 out of 10 Class Members receive absolutely no benefit from the Settlement at all but are forced to forfeit valuable rights and claims that will never be vindicated absent a class action. ........................................................................ 3

      1. 89% of the Class Members get nothing from the Settlement. .............................. 3

      2. Of the handful of Class Members slated to receive any benefit under the deal, most get injunctive relief (that the NCAA had already put in place) while a tiny fraction has their insurance co-pays covered. ........................................................ 4

      3. Despite the fact they receive nothing, in derogation of Seventh Circuit precedent Class Members are forced to forfeit certifiable personal injury and other class claims that will never be asserted individually. ................................... 8

   B. The Settlement is truly unprecedented: No authority (cited by Class Counsel and the NCAA or otherwise) authorizes the release of billions of dollars worth of valuable claims in exchange for nothing. .......................................................................... 17

      1. Class Counsel and the NCAA's reliance on *Trans Union* is misplaced. ............. 17

      2. Class Counsel and the NCAA's reliance on cases allowing Rule 23(b)(2) certification of incidental damages claims demonstrates they fundamentally misunderstand the harm this class waiver inflicts on the Class. ....................... 19

   C. Additional Provisions of the Settlement Demonstrate That the Deal is Unfair, Unreasonable, and Inadequate, and Cannot be Approved. ....................................... 21

      1. The Settlement appears marred by actual conflicts of interest. .......................... 21

      2. The Settlement prematurely terminates the tolling of claims. ............................ 23

      3. The Settlement improperly discourages objections. ......................................... 24

      4. The Settlement Notice shouldn't be approved separately. ................................. 25

III.  CONCLUSION ........................................................................................ 26

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................ 6, 12

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ........................................... 25

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) ........................................................ 25

*General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982) ..................................... 22

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996) ........................................ 22

*Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999) ...................................................................... 6

*See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974) .......................................................... 26

*Vieth v. Jubelirer,* 541 U.S. 267 (2004) ................................................................................... 13

## UNITED STATES CIRCUIT COURT OF APPEALS CASES

*Adams Public School Dist. v. Asbestos Corp., Ltd.*, 7 F.3d 717 (8th Cir. 1993) ...................... 25

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ............................................... 14

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ............................................. 13

*Crawford v. Equifax*, 201 F.3d 877 (7th Cir. 2000) ............................................................... 9, 21

*Edwards v. Boeing Vertol Co.*, 717 F.2d 761 (3d Cir. 1983) ................................................... 25

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) ...................................................... 3, 25, 26

*Grispino v. New England Mut. Life Ins. Co.*, 358 F.3d 16 (1st Cir. 2004) ............................... 25

*In re Trans Union Corp. Privacy Litig.,* 741 F.3d 811 (7th Cir. 2014) ........................... 18, 19, 25

*Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999) ................................................. 19

*Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364 (7th Cir. 2012) ............... 20

*Juris v. Inamed Corp.* 685 F.3d 1294 (11th Cir. 2012) ........................................................... 6

*Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012) .......................................................... 14

i

*Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011) .................................. 20

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009)................................................ 23

*Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577 (7th Cir. 2000).................................................................................................... 20

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012) ........................................................................................................................ 13

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) ................................................. 13

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ................................ 23

*Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781 (7th Cir. 2004).................................................. 3

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999) ........................................ 13

*Olden v. LaFarge Corp.*, 383 F.3d  495 (6th Cir. 2004)............................................................... 14

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ................................................... 23

## UNITED STATES DISTRICT COURT CASES

*Brewton v. City of Harvey*, 285 F. Supp. 2d 1121 (N.D. Ill. 2003) .............................................. 24

*Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397 (W.D.N.Y. 2013) ........................ 10, 11

*Fresco v. Automotive Directions, Inc,*. No. 03-CIV-61063, 2009 WL 9054828 (S.D. Fla. Jan. 20, 2009) ............................................................................................... 18, 19

*Gomez v. PNC Bank, Nat'l Assn*, -- F. Supp. 2d. --, 2014 WL 3640798 (N.D. Ill.

July 24, 2014) .......................................................................................................................... 23

*In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330 (N.D. Ohio 2001) ............................ 15

*In Re National Football League Players' Concussion Injury Litigation,* 2:12-MD-02323-AB (E.D. Pa. July 7, 2014).......................................................................................... 11

*In re Oil Spill by Oil Rig Deepwater Horizon*, 2013 WL 144042 (E.D. La. Jan. 11, 2013)......... 15

*In re Phenylpropanolamine (PPA) Products Liab. Litig.*, 227 F.R.D. 553 (W.D. Wash. 2004).. 15

*In re Serzone Products Liab. Litig.*, 231 F.R.D. 221 (S.D.W. Va. 2005)..................................... 15

*Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013) ............................. 9, 12, 16

*Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) ............................................. 13

## STATE COURT CASES

*Marr v. WMX Technologies, Inc.*, 244 Conn. 676 (1998) ........................................... 14

*Marshall ex rel. minor children v. Air Liquide-Big Three, Inc.*, 2008-0668 (La.
   App. 4 Cir. Dec. 17, 2008) ................................................................................. 14

*R.J. Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39 (Fla. Dist. Ct. App. 1996) .......................... 15

*Rivera v. Veterans Mem'l Med. Ctr.*, 262 Conn. 730 (2003) ......................................... 14

*Rudolph v. Dep't of Corr.*, 67-02-CA-178, 2002 WL 32182165 (Fla. Cir. Ct. Dec.
   30, 2002) ........................................................................................................... 14

## STATUTES

Fed R. Civ. P. 23(c)(4) ................................................................................................ 13

Mass. Gen. Laws Ann. Ch. 93A, § 9 ......................................................................... 16

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq* ..... 16

## OTHER AUTHORITIES

Allan Erbsen, From "Predominance" to "Resolvability": A New Approach to

Regulating Class Actions, 58 Vand. L. Rev. 995 (2005) ............................................... 23

Manual for Complex Litigation, Fourth ....................................................................... 25

Thomas E. Willging, Emery G. Lee III, From Class Actions to Multidistrict Consolidations:
   Aggregate Mass-Tort Litigation After Ortiz, 58 U. Kan. L. Rev. 775 (2010) ............................. 15

## I.      INTRODUCTION

"If you think about the amount of money that will be necessary to pay for personal injuries of every single college athlete, it would be billions and billions of dollars. That's not what we're doing with this settlement."

- Joseph Siprut, Lead Counsel for the Class.[1]

Class Counsel has been remarkably honest that their focus in the negotiations leading to the instant Settlement has been limited: deliver (i) injunctive relief to a select group of student-athletes and (ii) medical monitoring to those who are concerned they may be suffering from concussion-related trauma. The NCAA has been even more honest: it would not sign off on a deal unless it got "global peace."[2]

The result is a mess of a settlement. Of the 4.2 million Class Members, only about 3,500 (*i.e.*, less than .08 percent) are expected to receive medical monitoring tests over the 50-year lifespan of the Settlement. Those tests are expected to deliver—in total—perhaps $140,000 of actual value to the Class. And fewer than 200,000 (*i.e.*, 1 in 20) Class Members currently play a Settlement-defined "Contact Sport" and therefore stand to benefit from the Settlement's core injunctive relief.

Let's put aside for a moment the fact that the small minority of Class Members getting *any* benefit from the Settlement are getting thin relief at best.[3] What makes the instant Settlement so unique—and so dangerous—is that nearly 90% of the class will get *absolutely nothing* from

---

[1] Jon Solomon, CBS Sports *NCAA reaches concussion settlement for $70 million in testing*, available at http://www.cbssports.com/collegefootball/writer/jon-solomon/24641342/ncaa-reaches-concussion-settlement-for-70-million-in-testing (last accessed August 22, 2014).

[2] *See* February 5, 2014 Hearing Trans. 10:6, 20:16 (Dkt. No. 26).

[3] As will be explained in this brief, it makes little sense for virtually all involved to (a) wait months and months, (b) to fill out a questionnaire, (c) and then hope that a secret algorithm makes them eligible to take a test, (d) for which they must travel upwards of 200 miles, and (e) see a new doctor, all to save a $40 co-pay. Similarly, the injunctive relief is not binding, it merely requires the NCAA to make certain recommendations to its sub-organizations; recommendations that it had for the most part already made years ago. And the *cy pres* components are completely illusory.

this Settlement yet will give up valuable rights. Thus, Class Members who need real medical monitoring (as opposed to winning a lottery ticket that might entitle them to a test) get nothing. And, worst of all, the Class Members who this litigation was supposed to be about—those suffering from concussion-related personal injuries—will be left without the only mechanism that might redress their harms: class-wide adjudication.

And make no mistake about it. If the NCAA gets away with this and forces millions of people to forego the right to participate in a class action without getting a single benefit in return, it will, in one fell swoop, eliminate the vast majority of the personal injury liability that it is most fearful of. As Class Counsel itself recognized at the prior hearing, individual personal injury cases are expensive and difficult to bring. They require expert testimony, significant discovery, and attorneys willing to fight the machinery of the NCAA—which will be looking to make an example of each litigant. Given the relatively small stakes involved (likely tens of thousands of dollars for most Class Members), injured student-athletes will be unable to find lawyers and will be left in the dust.

Mr. Siprut was indeed correct when he spoke to CBS Sports. The Settlement does nothing to redress the billions of dollars in injuries suffered by the Class. Instead, it wipes that liability off the NCAA's (and its member institutions') corporate ledgers as a "throw in" to the medical monitoring deal Lead Counsel so desperately wants.

This Settlement should not be approved.

## II.    ARGUMENT

"[B]ecause class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements…." *Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (citing *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004)).

2

Applied here, approval must be denied. Almost 90% of the Class gets absolutely nothing—but gives up valuable claims—while the NCAA achieves "global peace" and Class Counsel nets a fortune.

   A.   **Nearly 9 out of 10 Class Members receive absolutely no benefit from the Settlement at all but are forced to forfeit valuable rights and claims that will never be vindicated absent a class action.**

         1.   **89% of the Class Members get nothing from the Settlement.**

As an initial matter, the Settlement provides nothing whatsoever to 3.74 million Class Members, simply ignoring 89% of the entire Class. Indeed, Class Counsel's expert, Bruce Deal, projects that only 3,500 medical tests will be provided over the 50-year Monitoring Period.[4] Even assuming that each tested athlete receives only a single examination—which even Deal concedes isn't likely (*i.e.*, qualifying athletes will likely receive multiple tests such that fewer than 3,500 Class Members are actually tested)—this makes up only .089% of the Class.

The rest of the Class Members who purportedly get a benefit under the Settlement are the approximately 460,000 current NCAA student-athletes[5] who, as explained below in Section III.A.2, *infra*, get nothing other than the NCAA's promise to recommend to its member schools that they update certain concussion guidelines. And over half of those current student-athletes don't even get the core purported injunctive relief—approximately 262,000 play sports outside the Settlement's narrow definition of "Contact Sports" and merely receive a pre-season baseline test. Of course, former students don't benefit from these supposed changes at all. Subtracting the current students and the tested Class Members from the total, the Settlement is truly remarkable: it releases the claims of 3.74 million Class Members without providing them a *single* benefit in

---

[4] Deal projects 2,623 CTE tests and 903 PCE tests (3,526 total). (Deal Rpt. at 21, Dkt. 70.)
[5] *See* NCAA participation rates going up, http://www.ncaa.com/news/ncaa/article/2011-11-02/ncaa-participation-rates-going (last accessed August 22, 2014). Of those, approximately 43%, or 198,000, play "Contact Sports" (*See* Deal Rpt. at 6.)

return. *See* Figures 1 & 2, below.



**Figure 1**



**Figure 2**

As discussed next, even the relief for Class Members who get medical tests and for current students who get concussion guidelines is markedly thin.

> **2.    Of the handful of Class Members slated to receive any benefit under the deal, most get injunctive relief (that the NCAA had already put in place) while a tiny fraction has their insurance co-pays covered.**

Although 460,000 current student-athletes purportedly will receive injunctive relief, that

"relief" confers no real benefit. First, the return-to-play guidelines will be implemented "subject to the proper NCAA rulemaking process," which merely states that the "NCAA Executive Committee will *recommend* that the governing bodies of Divisions I, II, and III pass legislation requiring" the return-to-play guidelines. (Settlement § VIII) (emphasis added.) Such a recommendation is non-binding and thus illusory.[6] Moreover, the NCAA has already promulgated the return-to-play guidelines this Settlement purports to secure. As NCAA attorney Mester has made clear, "in terms of the return-to-play guidelines, that would really be a reaffirmation of guidelines that were put into place a couple of years ago … I just want to make clear, those are guidelines that have been in place a couple years." *See* April 14, 2014 Hearing Trans. 13:1-7 (Dkt. No 39.) Indeed, the NCAA's website confirms that the NCAA has already implemented return to play guidelines, an academic accommodations policy, and a concussion education policy.[7] The NCAA even claims such policies were put in place *not* as a result of this litigation.[8]

Further, the return to play rules do nothing for current student-athletes who play sports outside the Settlement's narrow definition of "Contact Sports" but nevertheless face a risk of concussion—sports like baseball, volleyball, horseback riding, water polo, etc.[9] The approximately 262,000 "non-contact-sport" athletes had *no* representation during the negotiations—the Class Representatives each played or currently play sports that fall under the

---

[6] *See Michalski v. Circuit City Stores, Inc.*, 177 F.3d 634, 639 (7th Cir. 1999) (noting that a non-binding agreement constitutes "wholly illusory" consideration).

[7] *See* "Concussion Guidelines," http://www.ncaa.org/health-and-safety/concussion-guidelines (last accessed August 22, 2014).

[8] *See* "New guidelines aim to improve student-athlete safety," http://www.ncaa.org/about/resources/media-center/news/new-guidelines-aim-improve-student-athlete-safety (last accessed August 22, 2014).

[9] *See 2013-2014 NCAA Sports Medicine Handbook* – Guideline 21(Sports-Related Concussion), pp. 56-58, available at http://www.ncaapublications.com/p-4328-2013-14-ncaa-sports-medicine-handbook.aspx (last accessed August 22, 2014).

Settlement's limited definition of "Contact Sports." (Settlement § II.G.) As such, the Class

Representatives could not have properly negotiated away the claims of other athletes. *See Juris v.*

*Inamed Corp.* 685 F.3d 1294, 1323 (11th Cir. 2012) *cert. denied*, 133 S. Ct. 940 (2013)

(explaining that settlements must contain "structural assurances of adequate representation …

[to] ensure that class representatives understand that their role is representing solely members of

their respective constituency, not the whole class.") (citing *Amchem Products Inc. v. Windsor*,

521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999)); *see also infra*,

III.A.3.c.

Hence, the majority of student-athletes are having their rights traded away for basically

nothing, while the select student-athletes who play sports within the Settlement's narrow

definition of "Contact Sports" receive a promise from the NCAA to recommend to its member

institutions that they pass guidelines already in effect. This "relief" is essentially worthless.

Incredibly, the medical monitoring program delivers even less value. Approximately

3,500 (of the 4.2 million) Class Members are projected to actually receive tests.[10] Class

Counsel's own expert has explained that because most Class Members are insured, the real value

of the medical monitoring program to those who receive tests is merely the value of a co-pay

reimbursement.[11] At an average co-pay cost of $40,[12] the 3,500 tests will therefore confer only

**$140,000** in value to the Class. Class Counsel's focus on the point-of-transaction cost of the test

---

[10] *See supra*, note 4.

[11] Deal Rpt. 16 ("Furthermore, even for symptomatic class members, these tests may well be similar or identical to tests their commercial or government insurance would cover, even without the Fund's existence. For those members, the utility of receiving the testing via the Fund is limited to the out-of pocket cost they would incur under their insurance coverage.") Hence, where insurance would cover the cost of the test, the test's value is limited to the Class Member's insurance co-pays.

[12] *See* http://www.debt.org/medical/doctor-visit-costs/ (last visited Aug. 11, 2014.) (co-pays typically run $30 - $50.)

is not only deceptive,[13] but also irrelevant: the inquiry should focus on the value delivered to the

class, not the *retail cost* of certain tests. And just to get their $40 co-pay, Class Members must:

- Wait months until the Settlement is approved, the Medical Science Committee is finalized, the questionnaire is drafted and the computer algorithm formulated and programmed, the RFP period is closed, and the test locations and medical practitioners are selected among the competing bids;

- Complete the questionnaire, of which almost nothing is presently known;

- Be selected by the secret algorithm, about which little has been disclosed apart from the Deal Report's indication that the "screening tool" needs to be "highly sensitive" so that "very few who do qualify will be screened out." (Deal Rpt. at 19);

- Drive up to 200 miles to the nearest (and as-of-yet undetermined)[14] testing center (or, and only for those athletes who live more than 200 miles away from a testing site, go see their own doctor and submit a reimbursement for mileage and the costs of their co-pays); and

- Be examined by strangers.[15]

Unsurprisingly, the Deal Report concedes that the relatively low value of the medical monitoring

program, combined with the "relatively high level of effort" required to go through with the

---

[13] While the Deal Report calculates that the test costs will equal $15,757,936 for 3,526 tests (Deal Rpt. at 21) the Report critically omits the subrogation rate (of 70%) from the projection. (Deal Rpt. at 3.) A calculation inclusive of subrogation shows that the testing will actually cost the NCAA approximately $4,727,388.90 for 3,526 tests over 50 years. (Deal Rpt. at 21.) As explained below in Section C.2, *infra*, the Deal Report projects a reverter to the NCAA of at least $30 million (which is likely exceeds $40 million if subrogation is included).

[14] Class Counsel's agreement to such an arduous procedure represents an about-face from their public objections to the NFL Settlement. *See* URL http://www.hbsslaw.com/cases/cases-investigations/cases/NFLSettlement-details-long (last visited August 22, 2014.) ("We are very concerned that the settlement has requirements that many former players are going to need to travel to totally undefined locations for medical testing…We are further concerned that it appears that the former players will be responsible for all expenses to get to/from the testing.")

[15] Although Plaintiff's expert claims that this process meets the standard of care, that is simply nonsense. There are absolutely no studies—peer-reviewed or otherwise—supporting this screening process. Indeed, how could there be, as the algorithm has not even been developed? In the end, no reasonable medical professional would tell her patients to go through this lengthy and hidden process as opposed to seeing their doctor immediately. To the extent there is any doubt about this, the Court should hear live testimony on this point and Plaintiff's expert should be subject to cross-examination.

testing, means that relatively few Class Members will actually make a claim for medical monitoring. (*See* Deal Rpt. at 17.)

Finally, no Class Members actually benefit from the $5 million research fund. (Settlement § IX.) This is because the Settlement provides that "research undertaken by NCAA member institutions with respect to the prevention, treatment and/or effects of concussions will be credited (as appropriate) toward the foregoing monetary requirement." (*Id*.) As NCAA schools are already spending millions annually on concussion related research[16] these monies—and potentially vast other sums[17]—can be credited against the $5 million. No value is added.

Thus, in reality, even the few members of the Class who receive anything under the Settlement end up with close to nothing—concussion guidelines and co-pays. As shown next, even though the vast majority of the Class receives next to nothing, all Class Members are forced to give up valuable rights and claims that can't be asserted absent a class action.

       3.     **Despite the fact they receive nothing, in derogation of Seventh Circuit precedent Class Members are forced to forfeit certifiable personal injury and other class claims that will never be asserted individually.**

In exchange for a Settlement that provides them no value, Class Members must sacrifice their ability to bring or participate in any class action even amorphously related to concussions. The practical effect is devastating: the Class loses personal injury and other claims worth

---

[16] *See e.g.* http://www.uofmhealth.org/medical-services/brain-neurological-conditions/concussion (describing the University of Michigan's NeroSport Program) (last visited Aug. 22, 2014); see also http://www.upmc.com/services/sports-medicine/services/concussion/program/pages/default.aspx (University of Pittsburgh Medical Center) (last visited Aug. 22, 2014); http://www.knowconcussion.org/about-us/ (Sports Concussion Center at Idaho State University (last visited Aug. 22, 2014); http://www.utulsa.edu/about-TU/news-events-publications/UniversityNews/2014/May/brain-study.aspx (University of Tulsa) (last visited Aug. 22, 2014).

[17] For example, in May 2014 the NCAA announced $30 million in concussion-related research. http://www.ncaa.org/health-and-safety/medical-conditions/concussion. It is not at all clear whether this $30 million, or other amounts, count against the $5 million.

billions, and the NCAA effectively obtains immunity from suit.

> **a.** **The class action waiver is improper under Seventh Circuit precedent because it shields the NCAA while cutting the Class Members "off at the knees."**

To begin, the Seventh Circuit has recognized that class action waivers should not simply be thrown into a settlement. *See Crawford v. Equifax*, 201 F.3d 877 (7th Cir. 2000). As Judge Easterbrook explained:

> All questions of notice and opt-out aside, the settlement is substantively troubling … the other class members received nothing (not even any value from the $5,500 "donation") and lost the right to pursue class relief...For persons who stay out of financial trouble, only damages matter, yet all the settlement does for (to?) them is cut them off at the knees. They gain nothing, yet lose the right to the benefits of aggregation in a class.

*Id.* at 882. In addition to *Crawford*, two other cases indicate that the instant class release is improper because it deprives Class Members of the ability to pursue their claims. In *Richardson v. L'Oreal*, the court explained that, "Preserving individual damages claims here does not help plaintiffs" because "most of the plaintiffs would have no realistic day in court if a class action were not available." *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 199 (D.D.C. 2013). Similarly, the court in *Felix* v. *Northstar* court rejected the inclusion of a class waiver, emphasizing its substantive unfairness. *Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013) ("And what do the absent class members receive? If not nothing, then close to it. They receive no money whatsoever [and limited injunctive relief] … In return for this ethereal benefit, the absent Settlement Class Members are required to release Northstar and its affiliates from, *inter alia,* 'all *class* claims for damages or injunctive relief.'"). The *Felix* court also found the scope of the waiver problematic. *See id.* (noting that "the class claims being

released … are potentially far broader than the limited claims asserted by plaintiffs").[18]

Hence, the law is straightforward: broad class waivers that strip Class Members of the ability to assert their claims are substantively troubling where they are traded away in a class settlement for little or no value. Such releases should be rejected, irrespective of whether individual claims are preserved and regardless of any notice and opt out rights provided. As established above, the class waiver here forecloses individual suits and is egregious given the paltry relief secured in relation to the multi-billion dollar value of the Released Claims.

**b.    The personal injury claims are worth "billions and billions."**

Applying *Crawford* here, though the vast majority of the Class fails to realize any benefit whatsoever from the Settlement, as all are required to relinquish class claims that Lead Class Counsel admits are worth billions. Attorney Siprut made this point unmistakably at a press conference following the presentment hearing by stating, "If you think about the amount of money that will be necessary to pay for personal injuries of every single college athlete, it would be billions and billions of dollars … That's not what we're doing with this settlement."[19]

Of course, that class personal injury claims (and others) have value is evidenced by their inclusion in the Settlement in the first place. (*See* July 29, 2014 Hearing Trans. 31:8-10) ("Because if the parties are so sure that a 23(b) class will not be certified, why is it part of the settlement at all, right?"); *see also Felix,* 290 F.R.D. at 408-09 (W.D.N.Y. 2013) (holding that

---

[18] Class Counsel and the NCAA assert that *Crawford, Richardson,* and *Felix* are supposedly inapposite because notice and opt out rights weren't provided in those cases. (Class Counsel Br. at 6; NCAA Br. at 7.) But that isn't accurate. *Crawford* and *Felix* "rejected the settlements based on fairness grounds and [did] not reach[] the due process issue." *Richardson*, 991 F. Supp. 2d 181, 200 (D.D.C. 2013). Likewise, the *Richardson* court unmistakably doubted the fairness of the putative deal in addition to the lack of notice and opt out rights. *Id.* at 187 ("If redefinition of the class could result in a viable (b)(3) class, then plaintiffs have achieved a poor result by bargaining away valuable monetary claims….")

[19] http://www.cbssports.com/collegefootball/writer/jon-solomon/24641342/ncaa-reaches-concussion-settlement-for-70-million-in-testing (last visited August 22, 2014.)

although "class members are not releasing any *individual* claims against Northstar, the fact remains that the *class* claims which they are releasing must have some value—for why else would Northstar agree to the settlement?") (emphasis in original). Class Counsel and the NCAA offer no reasonable answer to the Court's question.[20]

A multi-billion dollar valuation is further supported by the settlement reached in *In Re National Football League Players' Concussion Injury Litigation*—priced at more than $675 million.[21] While the NFL case is inevitably distinguishable, its core allegations are substantively identical to those here, that the defendants: (1) "breached their duties to the players by failing to take reasonable actions to protect players from the chronic risks created by concussive and sub-concussive head injuries" and (2) "concealed those risks from the players."[22] That court readily certified a 23(b)(3) class for those claims, finding that common questions predominated.[23] And the $675 million NFL settlement covers only approximately 20,000 class members while the instant Settlement seeks to extinguish more than 4.2 million Class Members' claims for nothing.[24] Any extrapolation from the NFL deal—even discounting the value of individual personal injury releases—suggests the class damages claims are worth billions.

---

[20] At the presentment hearing, NCAA attorney Mester characterized the 23(b)(3) release as an effort to combat "the cost of the defense, disruption of litigation. We know if we don't resolve the class claims, that there will be an incentive for other class action lawyers to file other class actions." (July 29, 2014 Hearing Trans. 31:12-15.) This explanation is dubious. If true, the NCAA could have fought certification of the issues class or moved to strike the class damages allegations early on. It is far more likely that the release is present because it is exceptionally valuable.

[21] *See In re Nat'l Football League Players' Concussion Injury Litig.*, 2:12-MD-02323-AB, 2014 WL 3054250, at *1 (E.D. Pa. July 7, 2014).

[22] *Id.*

[23] *See id. *07-10.*

[24] Although the fact that the NFL settlement releases individual personal injury cases is relevant to its valuation, considering the scale of the classes and the number of Class Members here who have claims worth less than the cost of litigation, the NFL case serves as a valuable guidepost.

c.    **Class Counsel's assertion that no damages class can be certified misunderstands the law post-*Amchem* and ignores the waiver of other class claims.**

Although the class injury claims, issues claims, state-law claims, and innumerable other claims are worth billions, Class Counsel[25] asserts they "know of no case, and we get into the briefing, that allows under *Amchem* [*Products Inc. v. Windsor*, 521 U.S. 591 (1997)] or other Supreme Court precedent a personal injury class action." (July 29, 2014 Hearing Trans. 30:24-25 – 31:1-2.)[26] Thus, according to Class Counsel, because the personal injury claims are not certifiable, there is no harm in including the class waiver. This argument should be rejected.

First, as an initial matter it is inappropriate for Class Counsel to request an advisory opinion from the Court that no other class actions could be certified. The *Richardson* court rejected a similar argument, 991 F. Supp. 2d 181 ("The parties counter that the Court should not be concerned about certifying the class because, in their view, there are no viable class-wide damages claims … The parties cite no authority for this novel proposition"), and went on to explain:

> On the record before the Court, it is impossible to determine with any level of certainty that the class damages claims to be surrendered by class members are valueless…it is not the role of this Court to speculate as to whether a hypothetical class can be certified.

*Id.* at 187 (citing *Vieth v. Jubelirer,* 541 U.S. 267, 311 (2004)). As such, it would be improvident for the Court to conclude at this juncture, as self-servingly urged by Class Counsel, that none of the to-be-waived class claims can be certified.

---

[25] For its part, the NCAA concedes in its brief that the certifiability of personal injury claims is "open to question." (NCAA Br. at 4, n. 5) (Dkt. 81.)

[26] This echoed attorney Beth Fegan's statements at the hearing on Nichols's Petition to Intervene. (*See* Nov. 5, 2013 Hearing Trans. 10:8-13)("First, I think it's black letter law that typically – and perhaps what Mr. Edelson is confused about is typically what mass torts are not certified as class actions. They might be MDL'd and grouped together and proceed along some type of group basis. But it is not under, for example, Rule 23(b)(3).")

Second, Class Counsel misinterprets both the law and the propriety of injury classes post-*Amchem*. *See* Ann. Manual Complex Lit. § 22.72 (4th ed.) ("*Amchem* does not categorically preclude certification of a mass tort personal injury or property damage settlement class action."); *see also Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. 2006) (finding common issues predominated resulting from oil-spill following Hurricane Katrina and granting certification in light of potential for "bifurcation of the issues of liability and damages"); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-27 (5th Cir. 1999) (distinguishing *Amchem* and certifying class of casino workers who "claim injury from the same defective ventilation system over the same general period of time"). As Nichols and his counsel would explain more fully in any motion for class certification, numerous other solutions may be employed, even post-*Amchem*:

- Certification may be sought with respect to specific issues. Indeed, Class Counsel's own Motion for Class Certification sought to certify an issues class that would have, according to Class Counsel, protected injured athletes by allowing them to sue individually for damages without having to prove liability. (*Arrington* Dkt. 175 30-35, citing *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012), cert. denied, 133 S. Ct. 338 (2012); *see also* Fed R. Civ. P. 23(c)(4) advisory committee's note ("[t]his provision recognizes that an action may be maintained as to particular issues only"). Class Counsel cannot now claim this would be impossible here;

- Relatedly, the Court could certify the class with respect to liability, reserving damages for mini-trials or a special master. *See Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004) (the court "can bifurcate the issue of liability from the issue of damages, and if liability is found, the issue of damages can be decided by a special master or by another method.");

- Subclasses may be created. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013) *cert. denied*, 134 S. Ct. 1277 (2014) (suggesting use of subclasses in products liability suit over defective washers with varying degrees of alleged injury and damages), or the Court could otherwise ensure that each identifiable subgroup is adequately represented in the litigation and negotiations. *See, e.g., Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) *cert. denied*, 133 S. Ct. 940 (U.S. 2013) (approving of breast implant class settlement finding that designation of specific

representatives to advocate for *de facto* subgroups satisfied *Amchem*'s requirement of structural assurances of adequate representation);[27] and

- The Court could certify state-specific classes, particularly states that have certified injury classes including **Connecticut:** *Marr v. WMX Technologies, Inc.*, 244 Conn. 676, 682 (1998) (upholding certification in landfill exposure case explaining that "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible"); *Rivera v. Veterans Mem'l Med. Ctr.*, 262 Conn. 730 (2003); **Louisiana**: *Marshall ex rel. minor children v. Air Liquide-Big Three, Inc.*, 2008-0668 (La. App. 4 Cir. Dec. 17, 2008), 2 So. 3d 541, 550 *writ denied sub nom. Marshall v. Air Liquide--Big Three Inc.*, 2009-0105 (La. Mar. 13, 2009), 5 So. 3d 125 and *writ denied sub nom. Marshall v. Air Liquide—Big Three Inc.*, 2009-0111 (La. Mar. 13, 2009), 5 So. 3d 125 (finding exposure to toxins common when class alleged a common source of contamination); and **Florida:** *Rudolph v. Dep't of Corr.*, 67-02-CA-178, 2002 WL 32182165 (Fla. Cir. Ct. Dec. 30, 2002) (upholding certification of class challenging Department of Correction's policies for handling harassment of female guards by inmates, explaining that "The finding of commonality is bolstered by the common, if not identical defenses to the Plaintiffs' claims, including such matters as whether it took appropriate remedial measures in response to the harassment") *aff'd sub nom. Dep't of Corr., State of Fla. v. Rudolph*, 855 So. 2d 59 (Fla. Dist. Ct. App. 2003); *R.J. Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39, 40 (Fla. Dist. Ct. App. 1996) (Affirming certification of class of cigarette smokers and finding that "Although certain individual issues will have to be tried as to each class member, principally the issue of damages, the basic issues of liability common to all members of the class will clearly predominate over the individual issues.").[28]

These are just some of the solutions available—sampling, phased litigation, bell-weather trials and other potential trial plans could be devised to ensure predominance of common issues in a manageable setting. The point is that Class Counsel's blanket assertion that class tort claims can't be certified and thus have no value is simply false. Courts have regularly, post-*Amchem*,

---

[27] Applied here, as explained in Section III.A.2, current students who play non-"Contact Sports" were not adequately represented—and are predictably shortchanged—by the Class Representatives (each of whom played "Contact Sports").

[28] Class Counsel's supplemental brief makes clear that certification is possible under Rule 23(b)(3) based on the NCAA's common course of conduct. *See, e.g.*, Class Counsel Supp. Br. at 8 (focus of monitoring claim is "on the conduct of the NCAA, rather than the conduct of individual Class Members") (Dkt. 77.)

certified such classes in both settlement[29] and adversarial settings. The Court should therefore refuse to find the waiver acceptable on the grounds that none of the class claims are certifiable.

### d. The Class Waiver extinguishes other valuable class claims.

The release also bars other certifiable classes. For example, the Settlement releases Rule 23(c)(4) issues-only classes, (Settlement § II.NN), despite the fact that Class Counsel's Motion for Class Certification had sought to certify one.[30] (*Arrington* Dkt. 175.) Likewise, as the release extends to any class action in any way "related to" concussions, (Settlement § II.NN), the Settlement threatens to waive countless other causes that future plaintiffs might advance.[31] The release waives the claims of former student-athletes who have donated to their school's athletic programs under false pretenses, believing the schools were protecting student-athletes when in reality they were not. Similarly, the Settlement bars the potential claims of former-athlete ticketholders who may allege that they paid for events that were excessively violent. The release even waives the Class's ability to file class actions under state-specific theories, including state

---

[29] *See also* Thomas E. Willging, Emery G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation After Ortiz*, 58 U. KAN. L. REV. 775, 793 (2010) (empirical data "suggests ... that class settlement is not necessarily a less likely outcome of class actions raising personal-injury claims, compared with other diversity class actions…."); *see also In re Oil Spill by Oil Rig Deepwater Horizon*, 2013 WL 144042 (E.D. La. Jan. 11, 2013) (certifying for settlement a class relating to the Deepwater Horizon disaster); *In re Serzone Products Liab. Litig.*, 231 F.R.D. 221, 241 (S.D.W. Va. 2005) (granting final settlement approval and class certification in an action involving personal injury claims arising from an antidepressant); *In re Phenylpropanolamine (PPA) Products Liab. Litig.*, 227 F.R.D. 553, 567 (W.D. Wash. 2004) (granting final settlement approval and class certification of a class of "[a]ll Dexatrim Product Users who sustained bodily injury on or after December 21, 1998 allegedly as a result of his or her ingestion of a Dexatrim Product."); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330 (N.D. Ohio 2001) (certifying a products liability class for settlement purposes relating to defective hip implants).
[30] Class Counsel never explains how these claims now have no value, or how forcing injured athletes to litigate liability against the NCAA serves to adequately protect such Class Members.
[31] *See, e.g.*, *Richardson*, 991 F. Supp. 2d at 187 ("Hypothesizing about every possible set of potential class members and engaging in the complex analysis of class certification, all without the aid of adversarial briefing, is not an appropriate task for the Court").

consumer fraud laws that impose statutory penalties for unfair or deceptive conduct in lieu of needing to prove actual damages.[32] *See, e.g.*, Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*; Mass. Gen. Laws Ann. ch. 93A, § 9. In sum, the Released Claims go well-beyond personal injury claims, are worth billions and, are being gifted away for nothing.

> **e.   None of the Released Claims can be pursued individually, granting the NCAA a shield not only from "billions" in class claims but from essentially all individual actions as well.**

To be sure, while in the aggregate the class claims are worth billions, as was the case in *Crawford*, individually they are too small to allow vindication. As explained at the presentment hearing on the Motion for Preliminary Approval, for "[m]ost of the class, the personal injury claims are worth five figures, not -- not six figures, not seven figures. And so taking the client who has a claim where they might be able to get $20,000, $10,000, $8,000, and saying, go find a personal injury attorney who's going to bring this, they can't." (July 29, 2014 Hearing Tran. 37:6-10). Class Counsel hasn't refuted this valuation of the individual claims; rather, Class Counsel admits that pursuing the claims individually is expensive and requires significant expert testimony.[33]

Further, Class Counsel acknowledges that unlike the NFL case where "you have 4500 personal injury cases pending before Judge Brody in the MDL" (July 29, 2014 Hearing Trans. 39:20-21), with the NCAA claims, "there are very few cases out there. There were how many out

---

[32] Magistrate Judge Brown observed this result at the presentment hearing. *See* July 29, 2014 Hearing Trans. 30:21-24 ("HONORABLE JUDGE BROWN: So they will be giving up that right under not just Federal Rules of Civil Procedure but any state comparable…But under any state class action mechanism as well[?] MR. BERMAN: That's correct, your Honor.")

[33] *See* July 29, 2014 Hearing Trans. 11:7-15, statement of Class Counsel Berman ("I'm probably one of the few lawyers in the room that is actually litigating individual concussion cases, filed cases, not just talking about it but litigating…I have to hire vocational experts. I have to hire concussion experts. I have to hire neuropsychologists. I have to have IMEs done for my clients").

there? Maybe a dozen in the whole country? Maybe two dozen individual cases." (*Id*. 40:2-3.)

The alternative to a class action therefore isn't a groundswell of individual claims—it's essentially no claims—which is the entire point of the class waiver. As such, by handing over a total release of all class claims, Class Counsel allows the NCAA to extinguish billions in class damages claims and other aggregate claims, absolving the NCAA from billions in liability for individual claims that can't feasibly be brought absent a class proceeding.

Thus, the Settlement is grossly inadequate. Millions of Class Members get nothing, those that receive *anything* get a handful of tests and concussion guidelines, and in exchange, the Class is required to give up claims worth billions. As explained next, no authority supports such a result.

**B.     The Settlement is truly unprecedented: No authority (cited by Class Counsel and the NCAA or otherwise) authorizes the release of billions of dollars worth of valuable claims in exchange for nothing.**

Try as they may, neither Class Counsel nor the NCAA directs this Court to any authority—and Nichols' counsel was unable to locate any either—where a release of class claims was approved where the vast majority of class members received no consideration for the waiver and, as a practical matter, the waiver prevented the assertion of such claims.

**1.     Class Counsel and the NCAA's reliance on *Trans Union* is misplaced.**

Brushing off *Crawford*, Class Counsel and the NCAA combine to cite two cases they claim have upheld class waivers—*In re Trans Union Corp. Privacy Litig.,* 741 F.3d 811 (7th Cir. 2014) and *Fresco v. Automotive Directions, Inc.*, No. 03-CIV-61063, 2009 WL 9054828 (S.D. Fla. Jan. 20, 2009).[34] Neither supports the release here. First, *Trans Union* merely noted that,

---

[34] The NCAA ignores *Fresco* and instead cites inapposite decisions that explain there is no substantive right to bring a class action and to cases upholding class waivers in arbitration agreements. (NCAA Br. at 4-7.) Such class waivers (which notably are only approvable when

"Class settlements that limit 'only' class members' procedural options could extinguish their substantive rights as a practical matter." *Trans Union* at 814, n.1. This was a factual observation, not a legal holding. Further, the relief there was both monetary and substantial:

> Trans Union agreed to give all class members 'basic' in-kind relief in the form of credit monitoring services. In addition, class members could either claim cash from a $75 million settlement fund established by Trans Union or claim 'enhanced' in-kind relief consisting of additional financial services. Trans Union agreed to provide roughly $35 million worth of enhanced relief… In short, "the deal gave significant relief to class members….

*Id.* at 813. This ability to claim cash relief is a far cry from the monitoring being offered in the instant case where (not to belabor the point) most Class Members won't receive anything, let alone the right to claim money against a "$75 million" fund. Additionally, whereas in the instant case the limitations periods may expire before Final Approval, *see* Section III.B.7, Trans Union agreed to waive limitations defenses.

And most critically, although the *Trans Union* court "set aside for a moment whether it would make economic sense for" settlement class members to pursue individual claims, (NCAA Br. at 7, n. 6) over *100,000* individual claims had been filed by "enterprising lawyers"—all of which Trans Union paid without hesitation from the $75 million fund. *Trans Union*, 741 F.3d at 814. By contrast, as explained above individual personal injury cases are prohibitively expensive, and the NCAA has every reason to fight each filing as aggressively as possible.

*Fresco* provides even less support. The totality of that court's analysis was to state, "All of the cases cited by objectors dealt with waivers of the right to pursue collective action in arbitration agreements and were analyzed under state law on unconscionability. This Court is not aware of any binding authority holding that parties may not waive such rights in a settlement

---

the consumer is provided with at least constructive notice of the provision prior to contract formation) are not at issue here.

agreement." *Fresco*, 2009 WL 9054828 at *6. The standard isn't unconscionability—it is

whether the release is fair, reasonable, or adequate. And the Settlement here clearly is not. The

NCAA is using this Settlement as a vehicle to insulate itself from all future class actions (and

individual cases) worth billions while providing no real relief to millions of Class Members.

Thus, there is no reason for the Court to extend *Trans Union* or *Fresco* to the instant case.

Following *Crawford*, the release cuts the Class "off at the knees" and should not be approved.

> **2.    Class Counsel and the NCAA's reliance on cases allowing Rule
> 23(b)(2) certification of incidental damages claims demonstrates they
> fundamentally misunderstand the harm this class waiver inflicts on
> the Class.**

In a final effort to give the class waiver legal cover, Class Counsel and the NCAA direct

the Court to a series of cases certifying damages classes under Rule 23(b)(2) when notice and opt

out rights are provided. *See Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999),

*Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 582 (7th

Cir. 2000), and *Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364, 366 (7th

Cir. 2012). (Class Counsel Br. at 3-4; NCAA Br. at 10-12.) These authorities are red herrings:

they say nothing about allowing class damages releases—under Rule 23(b)(3), under Rule

23(b)(2) with added protections, or under any other rule—in exchange for no relief.

Rather, those courts merely explain that in cases where both damages and injunctive

relief are sought, the district court might certify the class under Rule 23(b)(2) for both monetary

and equitable remedies but exercise its plenary authority under Rules 23(d)(2) and 23(d)(5) to

provide all class members with personal notice and opportunity to opt out, as though the class

was certified under Rule 23(b)(3). But that is not in dispute here. The Settlement offers only

injunctive relief and a court-supervised medical monitoring program—both of which are

properly certified under Rule 23(b)(2)[35] —and any "monetary relief" is incidental.[36] In short, these cases speak to which Rule 23(b) subsection is appropriate to use for certification when the court is confronted with a combination of injunctive relief and damages, not to the validity of class waivers exchanged for inadequate relief. That some forms of incidental monetary damages may be certified under Rule 23(b)(2) where notice and the right to opt out are provided doesn't cure the "substantively troubling" nature of the waiver. To conclude otherwise would deem the mere provision of a notice that informs class members that they can opt out of a settlement— where millions of them get nothing of value—as a fair trade for the release of their billion-dollar class claims.

In the same vein, Class Counsel's eleventh-hour request to certify the medical monitoring claims under Rule 23(b)(3) (and the NCAA's suspect concession that Rule 23(b)(3) certification is allowable)[37] doesn't magically make the release less substantively troubling. Such reasoning presumes that the substantive unfairness of the waiver hinges on which subsection under Rule 23(b) the Settlement Class is certified. It doesn't. The waiver is improper under any Rule 23(b) subsection. *See Crawford*, 201 F.3d at 882 ("***All questions of notice and opt-out aside***, the [class waiver] is substantively troubling....") (emphasis added). It is irrelevant that the Class may also

---

[35] *See, e.g., Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 894, n.9 (7th Cir. 2011) (medical monitoring programs overseen by court are appropriately certified under Rule 23(b)(2)). The NCAA's argument that *Dukes* undercut this rule is incorrect, and the only case it cites involves an unsupervised monitoring plan. (NCAA Br. at 10.)

[36] The NCAA's assertion that "the relief to be provided by the Settlement is most akin to money damages" (NCAA Br. at 12) falls flat. Though counsel for the NCAA previously stated that the Settlement contained "elements of (b)(3), including but not limited to enhanced notice rights … And equally, if not more important, opt-out rights," (Hearing Trans 43:1-3) this is circular and does not explain what *relief* under the Settlement would warrant such (b)(3) protections. For that, the NCAA cites—via a footnote buried on the final page of its brief—the Settlement's provision for "reimbursement to members of the Settlement Class of out-of-pocket costs." (NCAA Br. at 12, n.10.) This is plainly incidental to the monitoring.

[37] NCAA Br. at 12, n. 10. The Settlement, however, stipulates only to Rule 23(b)(2) certification. (Settlement § III.A.)

be certified under Rule 23(b)(3)—under Seventh Circuit precedent, the Settlement's release of valuable class claims in exchange for nothing cuts the class off at the knees regardless of which Rue 23(b) subsection Class Counsel asserts may be used to certify the Class.

Finally, it makes no difference that Class Members may opt out of this Settlement. The value of most Class Members' claims are likely less than the cost of individual personal injury litigation. Because such individual claims are economically untenable and therefore unlikely to be pursued, the right to opt out does nothing to save this Settlement's fundamental unfairness.[38]

### C. Additional Provisions of the Settlement Demonstrate That the Deal is Unfair, Unreasonable, and Inadequate, and Cannot be Approved.

The Settlement suffers from a host of additional improprieties, described below.[39]

### 1. The Settlement appears marred by actual conflicts of interest.

An unfair settlement like the present one isn't altogether surprising where conflicts of interest abound. *See e.g. Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 396 n.5 (1996) (citing *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157–158, n. 13 (1982) (noting that Federal Rule of Civil Procedure 23(a)(4)'s adequate representation requirement "raises concerns about the competency of class counsel and conflicts of interest.") The most significant conflict has been discussed thoroughly—including personal injury class members who get no benefit but give up valuable rights. But the conflicts abound.

First, the Settlement *amazingly* requires that everyone release all of the lawyers and program administrators from any future liability related to the Medical Monitoring Program.[40]

---

[38] *See e.g. Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (Posner, J.) (emphasis in original).

[39] The issues described herein are by no means an exhaustive list of the objectionable portions of the Settlement. Nichols expressly reserves all rights and arguments.

[40] Indeed, located apart from the definition of "Released Claims," tucked away on page 58 (of

Requiring class members to prospectively waive claims that have not yet manifested—including potential malpractice claims—is improper and unethical: both Washington State and Illinois, for example, have adopted versions of Model Rule of Professional Conduct 1.8(h)(1), barring lawyers from entering into an agreement to limit prospective malpractice claims unless the client is independently represented.[41] And the fact that Class Counsel insisted these provisions be included in the Settlement—which benefit them, and hurt the Class—calls into question what the Class traded away in exchange.

Further conflicts arise due to the over breadth of the Class Definition. The Seventh Circuit has admonished that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) (same); *Gomez v. PNC Bank, Nat'l Ass'n*, -- F. Supp. 2d. --, 2014 WL 3640798, at *11 (N.D. Ill. July 24, 2014) ("a class is overbroad if it necessarily includes many members who cannot satisfy the elements of the legal claim.").

Class Counsel further created problems by treating all medical monitoring plaintiffs the same, regardless of whether they reside in a state that *even allows* such claims. Although they have heralded this as a victory, patting themselves on the back for getting people with no claims

---

61) of the Settlement, under the heading "Miscellaneous Provisions," it states "No Person shall have any claim against the Class Representatives, Settlement Class Counsel, the NCAA, the NCAA's counsel, Program Administrator, Notice Administrator, or the Released Persons or their agents based on administration of the Settlement…." (Settlement § F.) Such loose language leaves open the possibility that Dr. Cantu and the selected doctors claim to be agents shielded from liability.

[41] *See* WA. R. RPC. 1.8(h)(1) (a lawyer shall not "make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement."); IL. R. S. CT. RPC. Rule 1.8 (a lawyer shall not "make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement.")

the same relief as the real litigants, they misunderstand the point. By doing this, they necessarily water down the good claims with the bad. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 353 n.22 (3d Cir. 2011) (Jordan, J. dissenting) ("The problem is that some class members who deserve nothing are included in the settlement and hence are diluting the recovery of those who are entitled to make claims."); Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 VAND. L. REV. 995, 1088 n.201 (2005) (noting that, with overbroad classes, class members with strong claims effectively subsidize those with weak claims). Thus, if Plaintiffs had focused on only those with viable medical monitoring claims, perhaps in addition to the $40 co-pay, they could have gotten the NCAA to pay their travel costs as well.

Further, by seeking a class action waiver while acting as one of the only attorneys to bring individual concussion-related personal injury lawsuits on behalf of former student-athletes,[42] Class Counsel Berman is simply creating more individual clients for his law firm. Finally, as indicated above, the Class Representatives each played "Contact Sports" including football, soccer, wrestling, and ice hockey. As all of the Class Representatives played in Settlement-defined "Contact Sports," they make poor advocates for athletes who played sports outside that narrow definition. It is therefore not surprising that "non-contact sport" student-athletes do not stand to receive the main part of the Settlement's purported injunctive relief, even though many of them are at risk for concussions due to the sports they play.

### 2. The Settlement prematurely terminates the tolling of claims.

Another improper provision cuts short the tolling of all claims asserted in *Arrington*, including individual personal injury claims. (Settlement at 60 ¶ S.) Although counsel claimed

---

[42] *See* Notes 1 and 35, *supra.*

during the hearing that "we made clear in the settlement that the tolling -- the statute of limitations are all tolled. So there will be no prejudice whatsoever based upon the pendency of this class case," (July 29, 2014 Hearing Trans. 31:19-23), that isn't accurate. Rather, under the Settlement, tolling ceases for all claims upon preliminary approval, and, in the event of Final Approval, tolling will resume only with respect to the medical monitoring claims. This leaves open the likelihood that claims will become stale in between the time preliminary approval is granted and the Settlement is finally approved—a period that depending upon objections and appeals could last months or longer.  (It is perhaps not surprising that the NCAA insisted on a lengthy testing process; by the time class members find out they have suffered injury, their claims will be gone.)

Without this provision, the claims would remain tolled until final adjudication. *See Brewton v. City of Harvey*, 285 F. Supp. 2d 1121, 1126 (N.D. Ill. 2003) ("Although a class was certified and defendants successfully defeated the [class claims], the limitations periods for class members' individual claims … were tolled *until the final adverse determination of the class claims*.") (emphasis added). This rule, an extension of the class action tolling doctrine laid down in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and then *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) has been accepted almost unanimously.[43] Yet, Class Counsel has given up the Class's rights to have their claims tolled until the Settlement is final, forcing them to file their individual cases without knowing whether the deal will be approved.

### 3.    The Settlement improperly discourages objections.

Another problem for the settlement is that it purports to require counsel for an objector to

---

[43] *See Grispino v. New England Mut. Life Ins. Co.*, 358 F.3d 16, 20 (1st Cir. 2004); *Edwards v. Boeing Vertol Co.*, 717 F.2d 761 (3d Cir. 1983) (cert. granted, judgment vacated on other grounds, 468 U.S. 1201 (1984)); *Adams Public School Dist. v. Asbestos Corp., Ltd.*, 7 F.3d 717 (8th Cir. 1993).

the settlement to be compensated solely by the objecting class member. (*See* Settlement at 40 ¶ p.) This provision ignores settled law. Objectors who effect beneficial modifications to class action settlements are entitled to compensation either from the common fund or directly from Defendants (or, when appropriate, through statutory fee-shifting). *See Eubank*, 753 F.3d at 720 (citing *In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741 (7th Cir.2011)); Manual for Complex Litigation, Fourth, § 21.643. The Settlement's attempt to disincentivize Class Members from raising objections is improper.

**4.     The Settlement Notice shouldn't be approved separately.**

Finally, the Notice Plan appears deficient. As Rule 23 requires the Court to consider notice when approving a settlement, *see* Rule 23(e)(1) (requiring the Court, when approving a class action settlement, to approve the notice to the Class), the type of notice to be provided would bear directly on that question and shouldn't be considered piecemeal as Class Counsel has requested.

Also, although the NCAA promises to "work with its member institutions to obtain all reasonably-available names and addresses of NCAA student-athletes … so that Notice and Medical Evaluation Reports can be mailed directly to Settlement Class Members," no sample direct mail notice has been provided to the Court for approval.[44] And as explained above, it is unclear whether Class Counsel or the NCAA has requested proposals related to any direct mailing when soliciting bids. It is therefore questionable whether any form of direct notice will be mailed to Class Members, which is mandatory since the addresses are plainly known. *See*

---

[44] Although Mr. Berman suggested at the presentment hearing that he is "going to ask the NCAA to send a letter out to its member institutions, asking them for the names and addresses, to the extent they have them, of their student-athletes" it remains impossible to determine whether the proposed notice plans will actually include notice by direct mail because the solicitations to proposed notice administrators haven't been disclosed.

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 175–76 (1974) (noting that Rule 23(c)(2) includes an "unambiguous requirement" that "individual notice must be provided to those class members who are identified through reasonable effort.")[45]

Finally, the notice doesn't apprise Class Members of the significant objections that have clearly been lodged to the Settlement. *See Pella*, 753 F.3d at 728.

## III.    CONCLUSION

The proposed Settlement is truly a rarity: a settlement where the Class Members get nothing but are forced to give up everything. Everyone—that is, everyone apart from the NCAA, Class Counsel, and a handful of administrators and doctors—would be better off without the deal. Approval should be denied.

Respectfully submitted,

**ANTHONY NICHOLS**

By: /s/ Jay Edelson
          One of his Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Steven L. Woodrow
swoodrow@edelson.com

---

[45] Because Class Counsel and the NCAA are relying on the sufficiency of the notice (and the right to opt-out that it supposedly describes) to justify their inclusion of the release of class damages claims in the Settlement under the auspices of Rule 23(b)(2), Rule 23(b)(3)'s requirements that the notice be "the best notice practicable under the circumstances" should be enforced here.

EDELSON PC
999 18th Street, Suite 1300
Denver, CO 80202
Tel: 303.357.4878
Fax: 303.446.9111

Robert A. Clifford
rclifford@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
Tel: 312.899.9090
Fax: 312.251.1160

Richard R. Gordon
richard.gordon@gordonlawchicago.com
GORDON LAW OFFICES, Ltd.
211 West Wacker Drive, Suite 500
Chicago, Illinois 60606
Tel: 312.332.5200
Fax: 312.236.7727

Brian W. Coffman
bcoffmanlaw@gmail.com
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614
Tel: 773.348.1295
Fax: 773.248.6013

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067
Tel: 248.548.1009
Fax: 248.548.1012

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

27

John J. Driscoll
THE DRISCOLL FIRM, P.C.
211 N. Broadway
St. Louis, Missouri 63102
Tel: 314.932.3232

## <u>CERTIFICATE OF SERVICE</u>

I, Ari J. Scharg, an attorney, hereby certify that on August 22, 2014, I served the above and foregoing ***Nichols' Response to Plaintiffs' Motion for Preliminary Approval of Settlement***, on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF system on this, the 22th day of August 2014.

/s/ Ari J. Scharg