UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**SETTLEMENT CLASS REPRESENTATIVES' MOTION
<u>FOR APPROVAL OF NOTICE PLAN</u>**

010270-12 715515 V1

**TABLE OF CONTENTS**

<u>Page</u>

I. OVERVIEW OF PROPOSED NOTICE PLAN ................................................................1

    A. The Notice Administrator ........................................................................................1

    B. A Unique Approach To Notice That Will Exceed Due Process Requirements While Protecting the Corpus of the Medical Monitoring Fund ...............................1

    C. The Nuts and Bolts of the Proposed Notice Plan......................................................4

        1. Direct Notice................................................................................................4

        2. First Phase of Publication Notice................................................................5

            a. Print Publication..............................................................................5

            b. Settlement Website. .........................................................................6

            c. Internet Publication. ........................................................................6

            d. Press release.....................................................................................7

            e. Earned Media. ..................................................................................7

        3. Second Phase of Publication Notice ............................................................8

II. THE PROPOSED NOTICE PLAN SATISIFES DUE PROCESS .....................................8

III. THE SETTLEMENT CLASS IS ASCERTAINABLE ......................................................10

IV. CONCLUSION..................................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013)..................................................................................................10, 11

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
  No. 3:08-MD-01998, 2010 U.S. Dist. LEXIS 87409 (W.D. Ky. Aug. 20, 2010) ......................9

*DeHoyos v. Allstate Corp.*,
  240 F.R.D. 269 (W.D. Tex. 2007) .............................................................................................9

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)...................................................................................................................9

*Herkert v. MRC Receivables Corp.*,
  254 F.R.D. 344 (N.D. Ill. 2008)...............................................................................................11

*Herrera v. LCS Fin. Servs. Corp.*,
  274 F.R.D. 666 (N.D. Cal. 2011).......................................................................................11, 12

*Hinman v. M&M Rental Ctr.*,
  545 F. Supp. 2d 802 (N.D. Ill. 2008) .......................................................................................10

*Lemon v. Int'l Union of Operating Eng'rs, Local 139*,
  216 F.3d 577 (7th Cir. 2000) .....................................................................................................8

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)...................................................................................................................8

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)...................................................................................................................9

*Saf-T-Gard Int'l, Inc., v. Wagener Equities, Inc.*,
  251 F.R.D. 312 (N.D. Ill. 2008)...............................................................................................10

*Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*,
  271 F.R.D. 139 (N.D. Ill. 2010)...............................................................................................10

*Spillman v. RPM Pizza, LLC*,
  No. 10-349-BAJ-SCR, 2013 U.S. Dist. LEXIS 72947 (M.D. La. May 23, 2013) ....................9

*Tchoboian v. Parking Concepts*,
  No. SACV 09-422 JVS (ANx), 2009 U.S. Dist. LEXIS 62122 (C.D. Cal. July 16,
  2009) ........................................................................................................................................10

*In re TFT-LCD Antitrust Litig.*,
    267 F.R.D. 291 (N.D. Cal. 2010) ........................................................................................... 10

*Zeisel v. Diamond Foods, Inc.*,
    No. C 10-01192 JSW, 2011 U.S. Dist. LEXIS 60608 (N.D. Cal. Jun. 7, 2011) ...................... 10

010270-12  715515 V1

Pursuant to Case Management Order No. 2, the Settlement Class Representatives submit the following memorandum "regarding the ascertainability of the settlement class and the reasonableness of the proposed notice and related procedures under Fed. R. Civ. P. 23(e)(1)."

## I. OVERVIEW OF PROPOSED NOTICE PLAN

### A. The Notice Administrator

The Parties sent requests for proposals to five respected notice experts nationwide to provide the Initial Notice to the Settlement Class in this matter. Based on cost as well as substantive approach, the Parties agreed to propose Gilardi & Co. LLC ("Gilardi") as the Notice Administrator, together with Alan Vasquez, the Director of the Larkspur Design Group ("LDG"), which is Gilardi's in-house advertising agency specializing in notice plan design and implementation.[1]

Gilardi is one of the largest full-service class action notice and claims administrators in the United States. Mr. Vasquez is an expert in designing class notice programs.[2] The Parties are proposing that Gilardi provide notice administration services, including printing and mailing services, and LDG will handle the implementation of the notice program's publication efforts.[3]

### B. A Unique Approach To Notice That Will Exceed Due Process Requirements While Protecting the Corpus of the Medical Monitoring Fund

According to Mr. Vasquez, "[t]he nature of the proposed settlement calls for a tailored approach to providing notice to the Settlement Class."[4] Some of the factors involved include:

---

[1] *See* Declaration of Alan Vasquez ("Vasquez Decl."), ¶ 2, attached as Ex. A.
[2] *Id.*
[3] *Id.*
[4] *Id.* at ¶ 9.

- The age range of Class Members;

- The 50-year Medical Monitoring Period, with the potential for additional notice to Class Members;

- The wide range of sports involved; and

- The extensive news coverage of concussions.[5]

In particular, Mr. Vasquez explains that "the wide coverage of concussions in the media creates both an opportunity and a challenge for the notice campaign in this matter. The opportunity presented is the potential for a great deal of news coverage (a form of earned media) upon preliminary approval of the settlement. The accompanying challenge is the need to clearly distinguish the case from other concussion coverage and direct appropriate traffic to the case website."[6]

Accordingly, in order to leverage earned media, take advantage of the unique aspects of the case, as well as to ensure that the Medical Monitoring Fund is used wisely, LDG proposes a phased, or incremental, approach to reach 80% of the Settlement Class Members. LDG proposes to spend a portion of the notice budget at the onset of the Notice period and then monitor both the paid and earned media to evaluate the campaign's effectiveness. Depending on the reach achieved as of 120 days after Preliminary Approval, 2014, LDG would then spend the balance of the total notice plan budget to ensure that 80% of the Settlement Class received notice.[7]

During the initial phase, LDG will evaluate articles on major news outlets that contain a link to the case website to determine whether impressions generated could be used in place of paid advertising impressions. After assessing the amount of direct notice, website traffic, major news outlet coverage and publication efforts, LDG will ensure that additional notice is placed to

---

[5] Vasquez Decl., ¶ 9(a)-(d).
[6] *Id.* at ¶ 10.
[7] *Id.* at ¶ 11.

reach 80% of the Settlement Class.[8] At final approval, LDG will provide a declaration to the Court confirming that the 80% of the Settlement Class received notice.

Mr. Vasquez opines that LDG believes an incremental approach is appropriate for this matter for the following reasons:

a. **Better Targeting**. In the initial phase of the program, LDG will be able to evaluate audience feedback (information) using server log data for the case website, information from our online vendor partners, and data that may be obtained from third-party websites that have carried a news story related to the matter. This evaluation allows LDG to focus advertising where it will be most successful, minimizing budget waste.

b. **Cost Effective**. By breaking the program into two phases and utilizing online media vehicles, costs can be managed more efficiently by displacing paid media with earned media that has been statistically evaluated to be a valid replacement for the paid media impressions. Since Notice costs come out of the fund, which is to last 50 years, it is critical to manage the funds available for notice efficiently. LDG understands the Court may also order additional direct notice in the future; judicious spending of the initial Notice budget will facilitate these efforts.

c. **Credibility**. Articles and stories about the issue that include the case website boost credibility of the case and specifically the case website.

---

[8] Vasquez Decl., ¶ 17.

Individuals who see these stories will either search other resources to determine validity or they will go directly to the case website.[9]

### C. The Nuts and Bolts of the Proposed Notice Plan

Mr. Vasquez explains that the Notice Plan relies on the following elements:

 a. Direct Notice;

 b. Print Publication in *USA Today*, *Sports Illustrated*, and E*SPN the Magazine*;

 c. Case Dedicated Settlement Website;

 d. Internet Publication, including Sponsored Search advertising on the Google and Yahoo!/Bing networks, text link and banners on the Google Display Network, targeted banner advertising on the Xaxis and Steel Media networks, and banner advertising through Xaxis on Facebook;

 e. Press Release; and

 f. Other Earned Media.[10]

### 1. Direct Notice

First, for any class member for whom contact information is available, direct notice will be provided via email or USPS. The NCAA has agreed to send a letter via email or United States Postal Service ("USPS"), within 14 days of Preliminary Approval, to all NCAA member schools, request all address data for all current and former participants in NCAA sanctioned sports at the schools. The number of records that will be obtained from this effort is unknown at this time. The deadline for schools to respond (for purposes of assessing the reach of direct notice) will be 45 days from the date the letter is sent.

---

[9] Vasquez Decl., ¶ 18.
[10] *Id.* at ¶ 19.

- 4 -

Because the amount of direct notice is unknown at this time, the notice plan designed by LDG is based on the assumption that little to no direct notice will be available. If a more significant level of direct notice is available, less publication notice may be required to supplement the direct notice efforts. Attached as Exhibit C to the Vasquez Declaration is a chart that projects the amount of indirect notice necessary to supplement direct notice at various percentages of the total estimated class size. The chart assumes that direct notice will reach somewhere between 0% and 75% of the total class member population.[11]

While the amount of direct notice will impact how much budget is allocated to the paid advertising efforts, the suggested media vehicles and approach to the program would not materially change.

### 2. First Phase of Publication Notice

#### a. Print Publication

LDG utilized Simmons National Consumer Survey Data (the "Simmons data") to evaluate the most effective national magazines to reach the class members. *ESPN the Magazine* and *Sports Illustrated* were chosen because they were the highest ranked magazines with substantial circulation dedicated to sports. *USA Today* was included because it is a national newspaper with a readership that includes many individuals who buy it solely for national sports content that they cannot get in their local papers. All three print publications will run in the first phase of the notice program. According to the Simmons data, these three publications will reach 17.8% of U.S. Adults who have attended college and have interest in college sports.[12]

---

[11] Vasquez Decl., ¶ 22.
[12] *Id*. at ¶ 26.

### b. Settlement Website

LDG and Gilardi will establish a case-dedicated settlement website, which will be a source of reliable and accurate information for the media, the class members and the general public. In addition to being a primary source of information about the case, the case website will also serve as an important means of measuring audience engagement with the campaign. Both the direct notice and paid media will direct individuals to the case website.[13]

Once preliminary approval is granted, the full settlement website will go live. Analytics installed on the website and the data gathered will be a key basis for LDG's assessment of the notice plan's performance and allow for optimization of the efforts during the campaign. Analytics can provide total visits, unique visits, time spent on website, time spent on specific pages, which ads are directing the most traffic and which URLs are generating high traffic. Analytics is further discussed in the Earned Media section, below.[14]

### c. Internet Publication

Opining that the best notice practicable should include a substantial online campaign, LDG will implement a comprehensive Internet notice campaign that will offer many advantages to the Class, including flexibility to adjust message during the campaign, tracking capabilities that allow optimization of the plan during the campaign, and cost efficiency due to the ability to shut down the efforts if the parties' goals are met early in the notice period. If the campaign is not generating the anticipated reach, as well, there is the ability to scale up the campaign.[15]

Specifically, to ensure an effective online campaign, LDG will utilize: (i) Sponsored Links (search) advertising on the Google and Yahoo!/Bing networks; (ii) text link and banner

---

[13] Vasquez Decl., ¶¶ 27-28.
[14] *Id*. at ¶ 30.
[15] *Id*.

advertising through Google Display Network; (iii) targeted banner advertising through the Xaxis and Steel Media networks; and (iv) banner advertising through Xaxis on Facebook.[16]

### d. Press release

LDG will release a party-neutral Press Release about the settlement through PR Newswire shortly after preliminary approval with two additional releases to follow within the Notice Period. Once live, each press release is available to media outlets for up to 30 days.

A press release is still one of the most cost effective ways to supplement notice efforts and provide an opportunity for media outlets to pick up the story and post it both to print publications as well as websites. PR Newswire is one of largest wire release distributors with the ability to reach more than 200,000 media points and 10,000 Websites. The reporting options for PR Newswire offer substantial data, including where the release appeared, online links to it, how many people read it, where they are located, and how your coverage ranks against others. LDG will review the reports, determine sites that have picked up the release, and visit those sites to evaluate the content and whether it can be helpful for optimizing the performance of the campaign.[17]

### e. Earned Media

Earned media will be evaluated by analyzing traffic volume to various news stories and to the settlement website, as well as referrals to the case website. The case website, which will include analytics code to track this activity, will be launched in advance of the campaign.[18]

LDG will analyze statistical information from websites directing high volumes of traffic. After evaluation of the sites' number of daily unique visitors, LDG will estimate the share of

---

[16] Vasquez Decl., ¶ 31.
[17] *Id.* at ¶¶ 31-32.
[18] *Id.* at ¶¶ 34-38.

page views for the content where our link is located and estimate the number of impressions generated to those likely to be class members.

LDG will also perform general searching online for sites that include content related to the settlement in addition to having a link to our site. To determine if earned media impressions should be considered valid in reaching the target audience, LDG's team will evaluate the site content and demographics of its users.

As of 60 days after the start of the Notice Program, LDG will measure the impact of direct notice, paid advertising, and earned media. Based on that measure, LDG will then implement phase two.[19]

### 3. Second Phase of Publication Notice

The results of Phase One will direct the volume of publication notice in the second phase of the campaign. LDG has outlined levels of effort to be applied depending on the volume of direct contact information and results of Phase One, in the chart attached as Exhibit C to the Vasquez Declaration.[20]

## II. THE PROPOSED NOTICE PLAN SATISIFES DUE PROCESS

Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs." According to Federal Rule of Civil Procedure 23(c)(2)(B), members of a class must receive "the best notice that is practicable under the circumstances." Class members are entitled to the best practicable notice, not just because the Rules require it, but "as a matter of due process."[21]

---

[19] Vasquez Decl., ¶¶ 34-38.

[20] *Id*. at ¶¶ 42-43.

[21] *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

What comprises the best notice possible depends on various elements, including the size of the class, whether the class members can be easily identified, and the probability notice will reach the intended audience.[22] Individual notice should be provided where lists of class members and their addresses are readily available.[23]

Experts can calculate the percentage of the class that will be exposed to a notice based on a proposed notice plan. "A high percentage (e.g., between 70-95%) can often reasonably be reached by a notice campaign."[24] Thus, courts regularly approve notice plans designed by experts to reach a percentage of class members within the recommended range.[25]

Here, LDG has designed a notice plan that will reach at least 80% of the Settlement Class, which is within the Federal Judicial Center's range.[26] Moreover, the Notice Plan incorporates a phased approach that calculates reach through a combination of direct notice, publication notice, and earned media at set periods, and then adds additional publication, if necessary, to ensure that Notice is provided to Settlement Class Members. This approach is sensible given the unique factors in this case that make it likely that earned media publications will provide the reach necessary to meet due process, while balancing the desire to ensure that

---

[22] *See, e.g.*, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 166-67 (1974) (considering the size, ease of identifying the class, and probability of receiving notice); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).

[23] *Eisen*, 417 U.S. at 173.

[24] Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, at 1 (Federal Judicial Center 2010).

[25] *See Spillman v. RPM Pizza, LLC*, No. 10-349-BAJ-SCR, 2013 U.S. Dist. LEXIS 72947, at *7 (M.D. La. May 23, 2013) (approving notice plan where "the percentage effectiveness of the reach of the notice plan in the three-state area was 80% and for the overall class was 74-76%, which shows that the notice complied with Federal Judicial Center ("FJC") checklist/requirements"); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 U.S. Dist. LEXIS 87409 (W.D. Ky. Aug. 20, 2010) (approving notice plan that reached 80% of settlement class members); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 293 (W.D. Tex. 2007) (granting final approval of settlement where "publication notice plan in this case reached 80% of all adults age eighteen and over").

[26] *See* notes 24, 25, *supra*.

010270-12 715515 V1

the corpus of the Medical Monitoring Fund is preserved for screening and evaluations. Accordingly, Plaintiffs request that the Notice Plan be approved.

### III.   THE SETTLEMENT CLASS IS ASCERTAINABLE

Courts in this district have observed: "a class is sufficiently definite if its members can be ascertained by reference to objective criteria and may be defined by reference to defendants' conduct."[27] The parties are not required "to identify specific class members."[28] Rather, it is sufficient that membership in the class can be "ascertained by reference to objective criteria...."[29]

Courts nationwide also routinely find that "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria."[30]  As long as a class definition is not "subjective or imprecise," but instead "includes objective characteristics that would permit a consumer to identify themself [sic] as a member of the proposed class," the class is ascertainable.[31]  Ultimately, "[i]t is not fatal for a class definition to require some inquiry into individual records, as long as the inquiry is not 'so daunting as to make the class definition insufficient.'"[32]

---

[27] *Hinman v. M&M Rental Ctr.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008) (citations omitted). *See also Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 146-147 (N.D. Ill. 2010) (same).

[28] *Saf-T-Gard Int'l, Inc., v. Wagener Equities, Inc*., 251 F.R.D. 312, 315 (N.D. Ill. 2008).

[29] *Hinman*, 545 F. Supp. 2d at 806.

[30] *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 299 (N.D. Cal. 2010) (citation omitted); *see also Tchoboian v. Parking Concepts*, No. SACV 09-422 JVS (ANx), 2009 U.S. Dist. LEXIS 62122, at *14 (C.D. Cal. July 16, 2009) ("[T]he Court finds that, although the class members are not currently known, they are objectively ascertainable, certainly by themselves on notice of the pendency of a certified class…. However, the Court can imagine methods of identifying the class members, including publishing a notice of the action and allowing class members to come forward.").  But *see Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("A plaintiff does not satisfy the ascertainability requirement if individualized fact-finding or mini-trials will be required to prove class membership.").

[31] *Zeisel v. Diamond Foods, Inc.*, No. C 10-01192 JSW, 2011 U.S. Dist. LEXIS 60608, at *20-21 (N.D. Cal. Jun. 7, 2011).

[32] *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008) (quoting *Lau v. Arrow Fin. Servs., L.L.C.*, 245 F.R.D. 620, 624 (N.D. Ill. 2007)).  *See also Herrera v. LCS Fin.*

Here, the Settlement Class is defined as "[a]ll current or former student-athletes who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date."[33] The definition clearly relies on objective criteria only: (1) current or former student; (2) NCAA-sanctioned sports; (3) NCAA member institution; and (4) a time period that will end on the date of Preliminary Approval.

The purpose of the ascertainability requirement is to provide due process to the defendant by permitting the defendant to test the reliability of the evidence submitted to prove class membership.[34] Here, the NCAA has agreed to permit Settlement Class Members to self-identify to participate in the Medical Monitoring Program, subject to verification by the NCAA and/or the Program Administrator, as appropriate. Information will be solicited from persons submitting Screening Questionnaires to allow the Program Administrator to verify the right to participate, including but not limited to, the sport, school, and time period during which the Class Member played an NCAA-sanctioned sport. Accordingly, because the Class is defined by reference to objective criteria, and the NCAA has agreed to the process for self-identification, the ascertainability requirement is satisfied.

## IV. CONCLUSION

WHEREFORE, the Settlement Class Representatives respectfully request that the Court grant preliminary approval of the Settlement, direct that Notice be provided to the Class, approve the Notice Plan reflected in the Declaration of Alan Vasquez, approve a Notice Period of six months, and grant such other and further relief as this Court deems appropriate.

---

*Servs. Corp.*, 274 F.R.D. 666, 673 (N.D. Cal. 2011) (fashioning an administrative questionnaire process to identify class members).

[33] Settlement Agreement, § II.D.

[34] *Carrera*, 727 F.3d at 307.

- 12 -

Date: September 5, 2014          Respectfully submitted,

By:   */s/ Steve W. Berman*
    Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342

*Co-Lead and Settlement Class Counsel*