**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL No. 2492<br><br>Master Docket No. 1:13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**DECLARATION OF ALAN VASQUEZ**
**RE: DISSEMINATION OF NOTICE TO CLASS MEMBERS**

I, Alan Vasquez, hereby declare and state as follows:

**INTRODUCTION**

1.      I am the Director of the Larkspur Design Group ("LDG"), which is located at 3301 Kerner Blvd., San Rafael, California. LDG was retained to design and administer the Notice Program in this matter. I have personal knowledge of the matters set forth in this declaration and, if called as a witness, can and will testify competently thereto.

2.      LDG is Gilardi & Co. LLC's ("Gilardi") in-house advertising agency specializing in notice plan design and implementation. Gilardi was established in 1984 and is one of the largest full-service class action notice and claims administrators in the United States. In this matter, Gilardi will provide notice administration services, including the printing and mailing services outlined in the notice program, and LDG will handle the implementation of the notice program's publication efforts.

3.      LDG has specialized in designing, developing, and implementing legal notification plans for more than 25 years. As such, LDG is familiar with, and guided by, constitutional due process provisions, rules of states and local jurisdictions, and the relevant case law relating to legal notification. Media plans designed and implemented by LDG include publication in both domestic and international newspapers and magazines, internet-based banners, notices, and websites, and notice by wire service, radio, television, point-of-

-1-

CH\1918999.3

purchase displays, and direct mail. In my role as the Director of LDG, I oversee all of LDG's activities as they relate to these notice services.

4.    I have been involved in the development and implementation of media plans for class action notification for more than ten years. Prior to my engagement with Gilardi, I spent five years with another nationally recognized claims administrator serving in a similar capacity. I have also spoken as faculty on CLE panels related to trends in class action notice.

5.    For several years, courts have accepted my expert testimony regarding our firm's quantitative and qualitative evaluation of judicially approved notice plans. I have testified in person and was acknowledged as an expert in *Larson v. Sprint Nextel Corporation*, No. 07-cv-5325 (D. N.J.). Media campaigns for which I have been directly responsible include but are not limited to *Pappas v. Naked Juice, No LA CV 11-08276-JAK (C.D. Cal.)*, *Mattel, Inc., Toy Lead Paint Products Liability Litigation*, No. 07-ML-01897 (S.D. Cal.), *Pecover et al. v. Electronic Arts Inc*., No. 08-cv-02820 (N.D. Cal.), *New Motor Vehicles Canadian Export Antitrust Litigation*, No. MDL 03-1532 (D. Me.), and *SRAM Antitrust Litigation*, No. 07-MD-01819 (N.D. Cal) A more comprehensive list of notable matters for which I have been personally responsible for the notice planning and implementation services is attached as Exhibit A.

6.    This declaration is based upon my personal knowledge, information provided by counsel, and my independent research regarding the litigation and the defined class, including information obtained by LDG's staff and reliable industry sources.

### CASE BACKGROUND

7.    LDG is informed the proposed Settlement Class is defined as follows:

> All current or former student-athletes who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date.

Excluded from the Settlement Class are the NCAA and the NCAA's officers and directors; Class Counsel; and the judges who have presided over this Litigation. Individuals who otherwise meet the criteria of the class definition do not need to have been diagnosed with a concussion to be a member of the Settlement Class.

8. On information provided by the parties, LDG understands the class size is estimated to be approximately 4.2 million individuals.

9. The nature of the proposed settlement calls for a tailored approach to providing notice to the Settlement Class. A description of some of the factors involved are as follows:

a. **Long class period**. The class definition includes anyone who formerly played or currently plays an NCAA-sanctioned sport at the collegiate level. The NCAA was established more than one hundred years ago; thus, the age range for potential class members is broad and must be taken into consideration.

b. **Long Medical Monitoring Period**. LDG understands that the Medical Monitoring Period is a 50 year period, with the potential for additional notice to Class Members.

c. **Wide range of sports involved**. While contact sports may be most often thought of when concussions come to mind, there are many sports where participants are at risk for concussion. Many people who play sports at the college level are fans of sports in general, but the individuals who play sports other than football, basketball and baseball may principally follow different sports, requiring a different approach for providing notice.

d. **Extensive news coverage of concussions**. Concussions have received extensive coverage both generally and in sports news. News stories have covered the issue from many angles, including changes to equipment, changes to protocol for treatment, and changes to the rules of different sports in an effort to reduce the number of concussions. In order to capitalize on such news coverage, the Notice program must ensure that news outlets reporting on the issue are aware of this particular case and encourage these outlets to pass the website URL on to their audiences.

10. Indeed, the wide coverage of concussions in the media creates both an opportunity and a challenge for the notice campaign in this matter. The opportunity presented is the potential for a great deal of news coverage (a form of earned media) prior to and upon

preliminary approval of the settlement. The accompanying challenge is the need to clearly distinguish the case from other concussion coverage and direct appropriate traffic to the case website. In order to leverage earned media and take advantage of the unique aspects of the case, LDG suggests an approach that involves multiple phases of notice, depending on the availability of class member contact information for direct notice and the amount of earned media generated at the onset of the Notice campaign. LDG has been informed that the NCAA will work with its member institutions to obtain all reasonably available names and addresses of both current and former student athletes and believes the list could include millions of records, but the number is necessarily unknown at this time.

11. LDG understands the notice period will be approximately 6 months and recommends a phased approach: spending a portion of the notice budget at the onset of the Notice period and then monitoring both the paid and earned media over a 120 day period to evaluate the campaign's effectiveness before determining whether to spend the balance of the total notice plan budget. Articles published on major news outlets that contain a link to the case website will be evaluated to determine whether impressions generated could be used in place of paid advertising impressions. After assessing the amount of direct notice, website traffic, major news outlet coverage and publication efforts, LDG will work with the parties to determine whether to spend the balance of the budget. At the conclusion of the program, statistics generated will be evaluated against other notice program statistics for similar cases that received court approval.

## NOTICE DOCUMENTS

12. LDG has reviewed the Notice to ensure compliance with the following guidelines outlined on the Federal Judicial Center's Class Action Notice website:[1]

    a.    The nature of the action

    b.    The definition of the Settlement Class

    c.    The class claims, issues, and defenses

    d.    The method by which one may exclude oneself

---

[1] http://www.fjc.gov/public/home.nsf/pages/376

      e.      The timing and manner for requesting exclusion

      f.      The timing and manner for objection

      g.      The binding effect of the class judgment on the class members

      h.      The manner by which to contact class counsel

      i.      The manner by which to obtain copies of relevant documents

13. Attached as Exhibits D and E to this Declaration are the draft Long Form Notice and the Summary Notice. These notices effectively communicate information about the Settlement.

## NOTICE PLAN

<u>Overview</u>

14. The objective of the proposed notice plan is to provide the best notice practicable, consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure, to reach a large percentage of the class while meeting or exceeding the requirements of due process and all applicable state laws and court rules.

15. The proposed approach to notice is built on two principles: (1) leveraging direct notice, earned media (where quantifiable), and targeted internet advertising; and (2) measuring the effectiveness of the initial campaign to determine the appropriate level of publication notice for the rest of the notice period.

16. Precise tactics and publication budget will be determined by the amount of direct notice provided, which in turn is directly related to the amount of reliable contact information available for class members.

17. The proposed plan, when implemented to its fullest degree, is designed to reach at least 80% of the Settlement Class. As mentioned in paragraph 10, LDG recommends a phased approach: In the first phase, implementing the initial campaign of direct notice, print publication, and targeted internet advertising. Analysis of the first phase will direct the volume of internet advertising in the second. In the likely case that the first campaign phase results exceed projections, there is the opportunity to scale the budget accordingly for the second phase and make the campaign more cost-effective for the class and Fund.

18.     LDG believes an incremental approach is appropriate for this matter for the following reasons:

a.     **Better targeting**.  In the initial phase of the program, LDG will be able to evaluate audience feedback (information) using server log data for the case website, information from our online vendor partners, and data that may be obtained from third party websites that have carried a news story related to the matter.  This evaluation allows LDG to focus advertising where it will be most successful, minimizing budget waste.

b.     **Cost effective**.  By structuring the program in two phases and utilizing online media vehicles, costs can be managed more efficiently by displacing paid media with earned media that has been statistically evaluated to be a valid replacement for the paid media impressions. Since Notice costs come out of the fund, which is to last 50 years, it is critical to manage the funds available for notice efficiently. LDG understands the Court may also order additional direct notice in the future; judicious spending of the initial Notice budget will facilitate these efforts.

b.     **Credibility**.  Articles and stories about the settlement that include the case website boost the credibility of the case website.  Individuals who see these stories will either search other resources to determine validity or they will go directly to the case website.

19.     Although each case is unique, the methods and tools used in developing the Notice Plan described below for this Settlement have been employed in many other court-approved notice plans.  To effectively reach Class Members LDG has chosen efficient media vehicles that will ensure comprehensive reach and therefore ensure a large percentage of Class members receive legal notice of their due process rights in the settlement.  Specifically, the Notice Plan relies on the following elements:

a.     Direct Notice;

b.      Print Publication in *USA Today*, *Sports Illustrated*, and *ESPN the Magazine*;

c.      Case-Dedicated Settlement Website;

d.      Internet Publication, including Sponsored Search advertising on the Google and Yahoo!/Bing networks, text link and banners on the Google Display Network, targeted banner advertising on the Xaxis and Steel Media networks, and banner advertising through Xaxis on Facebook;

e.      Press Release; and

f.      Other Earned Media

Direct Notice

20.   When practicable and possible, direct first-class mailed notice is the preferred form of legal notification.  For any class member for whom contact information is available, direct notice will be provided via email or United States Postal Service ("USPS").  LDG understands a letter will be sent via email or USPS or to all NCAA member schools, notifying them of the settlement and the relevance of medical and training records of student athletes to the medical monitoring process.  The letter will request any address data for all current and former participants in NCAA sanctioned sports at the school.  The number of records that will be obtained from this effort is, however, unknown at this time.

21.   LDG has also been informed that counsel is in possession of address data for football and basketball players at certain NCAA colleges and universities.   Any potential class member for whom contact information is available will be provided direct notice via email or USPS.

22.   Because the amount of direct notice in unknown at this time, the notice plan described in this declaration is based on the assumption that little to no direct notice will be available.  A summary of the vehicles is attached as Exhibit B.  If a more significant level of direct notice is available, less publication notice may be required to supplement the direct notice efforts.  Attached as Exhibit C is a chart that projects the amount of indirect notice necessary to supplement direct notice at various percentages of the total estimated class size.

The chart assumes that direct notice will reach somewhere between 0% and 75% of the total class member population.

23.    As the Notice Date approaches and more information is available regarding the number of records, the budgets for various publication media vehicles will be adjusted accordingly.  While the amount of direct notice will impact how much budget is allocated to the paid advertising efforts, the suggested media vehicles and approach to the program would not materially change.

24.    The case website, discussed in further detail below, will include a form for individuals who wish to stay apprised of the settlement to submit their information.  Any records obtained through the website will be used to continue building on a contact database for use in any subsequent mailings.

25.    Current and former athletes tend to be sports fans in general, and there are many platforms for them to share information about the case.  LDG believes a great deal of conversation will take place on social media which will further enhance reach of the notice program.  Our team will monitor websites with discussions about the topic and direct online advertising accordingly.

Publication Notice:  Phase One

26.    **Print Publication**.  LDG utilized Simmons National Consumer Survey Data (the "Simmons data")[2] to evaluate the most effective national magazines to reach the class members.  *ESPN the Magazine* and *Sports Illustrated* were chosen because they were the highest ranked magazines with substantial circulation dedicated to sports.  *USA Today* was included because it is a national newspaper with a readership that includes non-sports fans as well as many individuals who buy it solely for national sports content that they cannot get in their local papers.   All three print publications will run in the first phase of the notice program. According to the Simmons data, these three publications will reach 17.8% of US Adults who have attended college and have interest in college sports.

[2] Simmons Winter 2014 12-Month National Consumer Survey

27. **Settlement Website**. LDG and Gilardi will establish a case-dedicated settlement website, which will be a source of reliable and accurate information for the class members, the media, and the general public. In addition to being a primary source of information about the case, the case website will also serve as an important means of measuring audience engagement with the campaign. Both the direct notice and paid media will direct individuals to the case website.

28. Once preliminary approval is granted, the full settlement website will go live at the selected URL. Analytics installed on the website and the data gathered will be a key basis for our assessment of the notice plan's performance and allow for optimization of the efforts during the campaign. Analytics can provide total visits, unique visits, time spent on website, time spent on specific pages, which ads are directing the most traffic and which URLs are generating high traffic. Analytics is further discussed in the Earned Media section, below.

29. **Internet Publication**. LDG firmly believes that the best notice practicable should include a substantial online campaign.

30. LDG will implement a comprehensive Internet notice campaign that will offer many advantages to the Class, including flexibility to adjust message during the campaign, tracking capabilities that allow optimization of the plan during the campaign, and cost efficiency due to the ability to shut down the efforts if the parties' goals are met early in the notice period. If the campaign is not generating the anticipated reach, as well, there is the ability to scale up the campaign.

31. Specifically, to ensure an effective online campaign, LDG will utilize:

    i.   Sponsored Links (search) advertising on the Google and Yahoo!/Bing networks

    ii.  Text link and banner advertising through Google Display Network

    iii. Targeted banner advertising through the Xaxis and Steel Media networks

    iv.  Banner advertising through Xaxis on Facebook

32. **Press release**. LDG will release a party-neutral Press Release about the settlement through PR Newswire that is pre-approved by the Parties. A press release is still one of the most cost effective ways to supplement notice efforts and provide an opportunity for media outlets to pick up the story and post it both to print publications as well as websites. PR Newswire is one of largest wire release distributors with the ability to reach more than 200,000 media points and 10,000 Websites. The reporting options for PR Newswire offer substantial data, including where the release appeared, online links to it, how many people read it, where they are located, and how your coverage ranks against others. LDG will review the reports, determine sites that have picked up the release, and visit those sites to evaluate the content and whether it can be helpful for optimizing the performance of the campaign.

33. LDG assumes a press release will be issued shortly after preliminary approval with two additional releases to follow within the Notice Period. Once live, each press release is available to media outlets for up to 30 days.

34. **Earned Media.** As mentioned in the plan overview, earned media will be evaluated by analyzing traffic volume to various news stories and to the settlement website, as well as referrals to the case website. The case website, which will include analytics code to track this activity, will be launched in advance of the campaign. We will also employ our server log query software, which may provide more accurate statistical information about who is visiting the website.

35. Websites with page content directing high volumes of traffic will be contacted for statistical information if we have a partnership or if possible, we will utilize third party traffic analysis tools to evaluate whether the page's share of the total site traffic can be used to replace paid advertising impressions. After evaluation of the sites' number of daily unique visitors, LDG will estimate the share of page views for the content where our link is located and estimate the number of impressions generated to those likely to be class members.

36. LDG will also perform general searching online for sites that include content related to the settlement in addition to having a link to our site.

37.    To determine if earned media impressions should be considered valid in reaching the target audience, LDG's team will evaluate the site content and demographics of its users.

38.    Gilardi and LDG will work with the parties to set specific goals for the determination of whether additional budget is needed or whether we can pause the paid advertising so that it could be utilized at a time when the concussion issue is less prominent in the news cycle.

Assessment of Phase One Campaign

39.    As mentioned in paragraph 11, 120 days after the start of the Notice program or at an interval to be approved by the Court, LDG will collect all data available related to the matter and measure the impact of direct notice, paid advertising, and earned media.   A decision regarding implementation of the Notice efforts outlined in Phase 2 of the plan will be made, in consultation with the Parties, based on the following measurable performance indicators:

40.    Website interaction

     i.       Unique visitors

     ii.      Source of data: Analytics

     iii.     Referral URLs

     iv.      Bonus data:  number of visitors who sign up to learn more

     v.       Traffic to major news stories

41.    Sites with stories related to the NCAA case will be contacted directly or analyzed through online traffic estimation sites to determine daily unique visitors and potentially, the article page's share of the overall traffic to the site.  From that analysis, an estimation of the number of impressions will generated.

Publication Notice:  Phase Two

42.    The results of Phase One will direct the volume of publication notice in the second phase of the campaign.  LDG has outlined levels of effort to be applied depending on

the volume of direct contact information and results of Phase One, in the chart attached as Exhibit C.

43.    By examining the amount of traffic from unique users and the number of signups for more information, and then relating those statistics against similarly situated cases which received court approval, a decision will be made whether to implement the vehicles for Phase Two outlined in the chart attached as Exhibit C.

### REACH

44.    LDG will utilize Random Combination Theory ("RCT") to determine the reach of the Notice campaign.  Random probability has been found to be an adequate statistical assessment tool for the purpose of calculating reach across multiple mediums.   Because the number of records that will be available for direct notice is unknown at this time, Exhibit B outlines the implementation of the Notice campaign assuming that there are no records available for direct notice.  As we receive information regarding how many records will be available, the direct notice will be included in the calculation.

45.    RCT is based on the premise that when the probability of two unrelated phenomena occurring is known, then the probability of both occurring is calculated by the product of the two probabilities. The combined reach of one media schedule and another media schedule is calculated based on the probability that neither reached the target.  Reach is determined by subtracting the calculated probability from 1.

46.    In a multimedia application, Phenomenon A may be an individual's chance of seeing an advertisement in the newspaper (30%, or 0.30), and Phenomenon B may be that individual's chance of hearing an advertisement for the same product on the radio (60%, or 0.60). The probabilities that the newspaper and radio advertisement not reaching their target would be 0.70 and 0.40, respectively. Applying RCT, the probability of this individual seeing the newspaper ad and hearing the radio ad would be the product of the probability of each phenomenon, or 0.28.  The calculated reach would be 1-0.28 or 0.72 (72%).

**CONCLUSION**

47.   It is LDG's opinion that the notice plan attached as Exhibit B will reach at least 80% of the class.  While the measurement for audience duplication[3] is not certain, the reach of the print publication combined with the online media is expected to reach well in excess of 4.2 million unique individuals who are likely to fit within the profile of someone likely to have played college sports.

48.   Many courts have held that notice plans estimated to reach a minimum of 70% of the settlement class are adequate and sufficient and thus comply with Fed. R. Civ. P. 23. When implemented, the Notice Plan will exceed this standard of reach using reach calculation methodology consistent with other national class action notice programs.  LDG believes that the plan results in a campaign that will reach large percentage of the class members and comport in all respects with Fed. R. Civ. P. 23.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 5th day of September 2014, at San Rafael, California.

_____

Alan Vasquez

---

[3] The number of class members who may have the opportunity to view the notice in print and also see the notice in other media

# EXHIBIT – A



**EXHIBIT - A**

**Notice Plans Designed and Implemented by Alan Vasquez**

**Automotive**

Automobile Antitrust Cases I and II , No. JCCP 4298 and 4303 (San Francisco Sup. Ct., CA)

New Motor Vehicles Canadian Export Antitrust Litigation , No. MDL 03-1532 (Dist. Court of Maine) & New Motor

Vehicles Canadian Export Antitrust Litigation , No. 2:03-MD-1532-DBH (Dist. Court of Maine)

**Entertainment**

Herbert et al. v. Endemol USA, Inc. et al. , Case No. 2:07-cv-03537-JHN-VBKx (C.D. Cal.)

Couch v. Telescope Inc., et al, Case No. 2:07-cv-03916-JHN-VBKx

McDonald v. RealNetworks, Inc. , No. 816666 (Orange County Sup. Ct., CA)

Pecover et al. v. Electronic Arts Inc. , No. 08-cv-02820 CW (N.D. Cal.)

**Environment**

Koepf et al. v. Hanjin Shipping, Co. et al. , No. CGC-07-469379 (San Francisco County Sup. Ct., CA)

Loretz et al. v. Regal Stone Limited et al. , No. 07-5800-SC (N.D. Cal.)

Tarantino et al. v. Regal Stone et al. , No. CGC-07-469379 (San Francisco County Sup. Ct., CA)

**Government**

McKesson Governmental Entities Average Wholesale Price Litigation , No. 1:08-cv-10843-PBS (D. Mass.)

**Technology**

SRAM Antitrust Litigation, No. 4:07-MD-01819-CW (N.D. Cal) & SRAM Antitrust Litigation, No. 4:07-md-1819 CW, MDL No. 1819 (N.D. Cal)

**Telecommunications**

White v. Cellco Partnership , No. RG04-137699 (Alameda County Sup. Ct., CA)

In re Universal Service Fund Telephone Billing Practices Litig., MDL No. 1468 (D. Kan.)

**Consumer Products**

Natalie Pappas v. Naked Juice Co. of Glendora, Inc. CASE NO. LA CV 11-08276-JAK (C.D. Cal)

Barbara Marciano v. Schell & Kampeter, Inc. et al Civil Action No. 12-cv-02708-SJF-AKT (E.D. NY)

Mattel, Inc., Toy Lead Paint Products Liability Litigation , No. 2:07-ML-01897-DSF-AJW (S.D. Cal.)

Gallucci v. Boiron, Inc. et al., No. 11-cv-2039-JAH (NLSx)

Nigh v. Humphreys Pharmacal, Incorporated et al., Case No. 3:12-cv-02714-MMA-DHB

In re: Bayer Corp. Combination Aspirin Products Marketing and Sales Practices Litigation, No. 09-MD-2023

In Re: Aurora Dairy Corp. Organic Milk Marketing and Sales Practices Litigation, Civil Litigation No. 4:08-md-01907-ERW

Eliason v. Gentek Building Products, Inc., and Associated Materials, Inc. , No. 1:10-cv-02093 (N.D. Ohio)

Hart v. Louisiana-Pacific Corporation , No. 2:08-cv-00047 (E.D.N.C.)

**Debt Collection Practices**

Adams, et al., v. AllianceOne Receivables Management, Inc. (Case No. 08-CV-0248)

Pepper v. Midland Credit Management, Inc. and Encore Capital Group, Inc., No. 37-2011-00088752 (Cal. Super. Ct. San Diego County)

# EXHIBIT – B

**EXHIBIT - B**

## NCAA STUDENT ATHLETE CONCUSSION INJURY LITIGATION
## CLASS NOTICE GAME-PLAN
## PHASE - 1 (ASSUMING NO DIRECT NOTICE)

## PRINT PUBLICATION

**1x - USA Today, National Edition, 1/6 page Insertion**

**1x - ESPN The Magazine, 1/3 page B/W Insertion**

**1x - Sports Illustrated, 1/3 page B/W Insertion**

## INTERNET

**Sponsored Links**
  Google, Yahoo/Bing, AOL and others

**Contextual Text Link Advertising (Google Display Network)**
  Utilize Google Managed Placements as well as the General Google Display network

  Website partners will be selected based on sports content as well as video game content

  *Approximately 4 million impressions*

Staff Time Managing Google Campaigns

**Content and Behavioral Targeted Advertising (Xaxis Network)**
  Targeting

  Audience Targeting: Audience Segments - NCAA Athletes, College Athletes, Athletic Enthusiasts, Sports Enthusiasts

  Keyword targeting: Contextual / Keyword Targeting - Athletes, College Sports,Sports Injury NCAA (Specific Keywords TBD)

  Facebook Exchange: NCAA Class Action ads to run across the Facebook Exchange.

  *Minimum of 25 million Impressions, frequency capped to ensure a significant number of unique individuals will be reached*

**Content and Behavioral Targeted Advertising (Steel Media)**
  *Content: Custom - Division 1, 2 and 3 Athletes Channel: Sports, News, Mens Interest

  Online Display Sports Channel: Custom Channel & Run of Network (RON)
  Precision Profiles Behavioral Targeting (BT): NCAA athlete (all sports, DI, DII, DIII).

  *Minimum of 15 million Impressions, frequency capped to ensure a significant number of unique individuals will be reached*

## NEWSWIRE

1x Press Release through Businesswire and/or PR Newswire

*Steel Media Traffic will optimize to the best performing placement Behavioral Custom Channel vs. RON

**EXHIBIT - B**

## NCAA STUDENT ATHLETE CONCUSSION INJURY LITIGATION
## CLASS NOTICE GAME-PLAN
## PHASE - 2 (ASSUMING NO DIRECT NOTICE)

## INTERNET

**Sponsored Links**

Google, Yahoo/Bing, AOL and others

*Approximately 5 million impressions*

**Contextual Text Link Advertising (Google Display Network)**

Utilize Google Managed Placements as well as the General Google Display network

Website partners will be selected based on sports content as well as video game content

*Approximately 15 million impressions*

Staff Time Managing Google Campaigns

**Content and Behavioral Targeted Advertising (Xaxis Network)**

Targeting

Audience Targeting: Audience Segments - NCAA Athletes, College Athletes, Athletic Enthusiasts, Sports Enthusiasts

Keyword targeting: Contextual / Keyword Targeting - Athletes, College Sports, Sports Injury NCAA (Specific Keywords TBD)

Facebook Exchange: NCAA Class Action ads to run across the Facebook Exchange.

*Minimum of 53 million Impressions, frequency capped to ensure a significant number of unique individuals will be reached*

**Content and Behavioral Targeted Advertising (Steel Media)**

*Content: Custom - Division 1, 2 and 3 Athletes Channel: Sports, News, Mens Interest

Online Display Sports Channel: Custom Channel & Run of Network (RON)

Precision Profiles Behavioral Targeting (BT): NCAA athlete (all sports, DI, DII, DIII).

*Minimum of 33 million Impressions, frequency capped to ensure a significant number of unique individuals will be reached*

## NEWSWIRE

2x Press Release through Businesswire and/or PR Newswire

*Steel Media Traffic will optimize to the best performing placement Behavioral Custom Channel vs. RON

# EXHIBIT – C



**EXHIBIT - C**

**Notice Plans Dependent on Direct Mail Volume**

| Direct Notice | Notice Plans Dependent on Direct Mail Volume |
|---|---|
| 75% | **PHASE I: 0-120 days from Preliminary Approval**<br>Direct Notice<br>　Email/USPS<br>Print Publication<br>　*Sports Illustrated*<br>　*ESPN the Magazine*<br>　*USA Today*<br>Online Advertising and Press Release<br>　(minimum 24 million impressions)<br><br>**PHASE II**<br>Online Advertising and Press Release<br>　(38 million impressions)<br>**TOTAL COST:**<br>**ESTIMATED REACH WITH 5-10X FREQUENCY:**　　　**84.66%** |
| 50% | **PHASE I: 0-120 days from Preliminary Approval**<br>Direct Notice<br>　Email/USPS<br>Print Publication<br>　*Sports Illustrated*<br>　*ESPN the Magazine*<br>　*USA Today*<br>Online Advertising and Press Release<br>　(minimum 35 million impressions)<br><br>**PHASE II**<br>Online Advertising and Press Release<br>　(44 million impressions)<br>**TOTAL COST:**<br>**ESTIMATED REACH WITH 5-10X FREQUENCY:**　　　**81.60%** |
| 25% | **PHASE I: 0-120 days from Preliminary Approval**<br>Direct Notice<br>　Email/USPS<br>Print Publication<br>　*Sports Illustrated*<br>　*ESPN the Magazine*<br>　*USA Today*<br>Online Advertising and Press Release<br>　(minimum 35 million impressions)<br><br>**PHASE II**<br>Online Advertising and Press Release<br>　(54 million impressions)<br>**TOTAL COST:**<br>**ESTIMATED REACH WITH 5-10X FREQUENCY:**　　　**80.98%** |
| 0% | **PHASE I: 0-120 days from Preliminary Approval**<br>Print Publication<br>　*Sports Illustrated*<br>　*ESPN the Magazine*<br>　*USA Today*<br>Online Advertising and Press Release<br>　(minimum 44 million impressions)<br><br>**PHASE II**<br>Online Advertising and Press Release<br>　(100 million impressions)<br>**TOTAL COST:**<br>**ESTIMATED REACH WITH 5-10X FREQUENCY:**　　　**80.37%** |

# EXHIBIT – D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | ) ) ) ) ) ) ) ) ) ) | **MDL No. 2492** |
| | | **Case No. 1:13-cv-09116** |
| | | **This Document Relates To: All Cases** |
| | | **Judge John Z. Lee** |
| | | **Magistrate Judge Geraldine Soat Brown** |

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

If you played a National Collegiate Athletic Association ("NCAA")-sanctioned sport at an NCAA member school, you may be entitled to **free medical screening and may receive free medical testing, known as "medical monitoring," up to two times over the next 50 years.**

In addition, the NCAA and its schools have committed to follow concussion management and return-to-play guidelines.

*The United States District Court for the Northern District of Illinois authorized this Notice. This is not a solicitation from a lawyer.*

On _____, 2014, the Court issued an Order preliminarily approving a Settlement that provides benefits for all persons who played a sport for an NCAA-sanctioned team.[1] The Settlement establishes a Medical Monitoring Program and Fund that provides eligible members of the Settlement Class with medical monitoring to screen, assess and diagnose effects from concussions or the cumulative effects of subconcussive hits. You may be entitled to receive the medical screening even if you were not diagnosed with a concussion.

The Settlement also requires the NCAA and its member institutions to implement concussion management and return-to-play guidelines, having trained medical personnel in attendance or available for contact sport play, and step-wise return to play guidelines for injured athletes and further requires the NCAA to contribute or cause to be contributed $5,000,000 to research the prevention, treatment, and/or effects of concussions.

If this Settlement receives final approval from the Court, all Settlement Class Members will have the opportunity to participate in, object to, or exclude themselves from the Settlement. All Settlement Class Members who decide to participate in the Settlement or who do nothing will release the NCAA for all medical monitoring claims. All Settlement Class Members who

---

[1] Definitions for capitalized terms in this Notice can be found in the Settlement Agreement available at www.XXXXXX.com. To the extent any statement in this notice conflicts with the terms of the Settlement Agreement, the terms of the Settlement Agreement control.

decide to participate in the Settlement or who do nothing will preserve and have the right to bring any personal injury claims on an individual, non-class basis.

The Court still has to decide whether to grant final approval of the Settlement. The Medical Monitoring Program will only be provided if the Court finally approves the Settlement and any appeals are resolved.

Your legal rights are affected whether or not you act. These rights and options, **and the deadlines to exercise them**, are explained in this Class Notice. Please read it carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS MEDICAL MONITORING SETTLEMENT | |
|---|---|
| **PROVIDE YOUR CONTACT INFORMATION TO THE PROGRAM ADMINISTRATOR TO RECEIVE INFORMATION REGARDING THE FREE MEDICAL MONITORING PROGRAM** | If you think you might want to participate in the Medical Monitoring Program, you should send the Program Administrator your contact information to be sure you receive further notice. If you do not do so, however, you will still have the right to participate later. The commencement of the Medical Monitoring Period will be announced on the Settlement Website and inquiries regarding the Medical Monitoring Program can be directed to the Program Administrator at XXX-XXX-XXXX. |
| **COMMENT ON THE PROPOSED SETTLEMENT** | Write to the Court about why you do, or do not, like the Settlement. Your comments or objections must be in writing and postmarked no later than XXXXX, 2014. |
| **ATTEND THE FAIRNESS HEARING** | Ask to speak in Court about the fairness of the Settlement. You may not speak unless have asked to do so in writing before XXXXX, 2014. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT CLASS** | If you are a member of the Settlement Class but do not want to be bound by the proposed settlement, you must exclude yourself ("opt-out") from the Settlement Class. If you exclude yourself, you will get no benefits. To ask to be excluded, you mail a written request stating that you want to be excluded. (*See* Paragraph 24 of this Notice for further information about your right to exclude yourself from the Settlement Class.) |
| **DO NOTHING** | Participation in the Medical Monitoring Program is completely voluntary. Final approval by the Court of the Settlement simply means that those eligible Settlement Class Members who wish to participate will have the opportunity to do so. If you do nothing now, you will have the right to participate in the Medical Monitoring Program in the future. |

**Questions? Call the Program Administrator at [1-800-__-____]**

| BASIC INFORMATION |
| --- |

**1.  What is this Notice and why should I read it?**

This Notice is to inform you of the settlement of a class action lawsuit titled *In re National Collegiate Athletic Association Student-Athlete Concussion Litigation*, Case No. 1:13-cv-09116, brought on behalf of current and former NCAA student-athletes and pending before Judge John Z. Lee of the United States District Court for the Northern District of Illinois.  You need not live in Illinois to get a benefit under the Settlement.  The Court has granted preliminary approval of the Settlement and has set a final hearing to take place on _____ at _____ in the Everett McKinley Dirksen U.S. Courthouse, 219 South Dearborn Street, Chicago, Illinois to determine if the Settlement is fair, reasonable and adequate, and to consider the request by Class Counsel for Attorneys' Fees and Expenses and Service Awards for the Class Representatives.  This Notice describes the Settlement.

Your rights and options – and the deadlines to exercise them – are explained in this Notice.  This Notice and the Settlement Agreement in its entirety are posted on the Settlement Website, www.XXXX.com, and are also available from the Program Administrator.  Other documents available on the Settlement Website include the complaints filed in the Litigation and the papers that are or will be filed with the Court requesting preliminary and final approval of the Settlement described in this Notice.  If you are a Settlement Class Member, your legal rights are affected regardless of whether you act.

**2.  What is the Litigation about?**

In 2011, three former student-athletes who played football and soccer at NCAA member schools filed class action lawsuits on behalf of themselves and current and former student-athletes against the NCAA.  They claimed that the NCAA was negligent and had breached its duty to protect all current and former student-athletes by failing to adopt appropriate rules regarding concussions and/or manage the risks from concussions.  The named plaintiffs sought medical monitoring for all current and former student-athletes, as well as changes to the NCAA's return-to-play guidelines for student-athletes who had suffered concussions or concussion symptoms.  Subsequently, twelve (12) additional class action lawsuits were filed on behalf of current and former NCAA football players, seeking medical monitoring, and the establishment of guidelines regarding how NCAA schools handle concussions.

The NCAA denied and continues to deny all allegations of liability and wrongdoing.  Nonetheless, the Parties to the Litigation have reached a preliminary Settlement. As part of that Settlement, the Parties are required to notify certain affected persons (i.e., the Settlement Class) of the Settlement, their right to participate in the Medical Monitoring Program established under the Settlement, if it is finally approved by the Court, and their right to object to or exclude themselves from the Settlement.

The Settlement has already been preliminarily approved by the Court.  Because the settlement of a class action determines the rights of all members of the proposed class, the Court must give final approval to the Settlement before the Settlement can take effect.

The Court has conditionally certified the Settlement Class for settlement purposes only, so that members of the Settlement Class can be given this notice and the opportunity to exclude themselves from the Settlement Class, voice their support or opposition to final approval of the

**Questions?  Call the Program Administrator at [1-800-__-____]**

3

Settlement, and explain how those who do not exclude themselves from the Settlement Class may obtain the relief offered by the Settlement. If the Settlement is not granted final approval by the Court or the Parties terminate it, the Settlement will be void and the Litigation will continue as if there had been no Settlement and no certification of the Settlement Class.

**3.      Does this Notice pertain to me? What if I was never diagnosed with a concussion?**

This Notice pertains to you if you are or were an NCAA student athlete:

- You are a member of the Settlement Class if you played an NCAA-sanctioned sport at an NCAA school at any time prior to [insert date of preliminary approval].

- You do **not** need to have been diagnosed with a concussion to be a member of the Medical Monitoring Class.

If you have any questions about whether you are a member of the Medical Monitoring Class, please contact the Program Administrator at XXXX@XXXX.com or XXX-XXX-XXXX.

**4.      What is a class action?**

In a class action, one or more people called "Class Representatives" sue on behalf of a group of people with similar claims. All of these people together are called the "Class" or "Settlement Class Members." When a class action is settled, one court resolves the issues for all Settlement Class Members, except for those who exclude themselves from the settlement. Excluding yourself means that you will not receive any benefits from the Settlement. The process for excluding yourself is described in Paragraph 24 of this Notice.

**5.      Why is there a settlement?**

Although the Court has not yet resolved the merits of the lawsuit, or determined whether the Class Representatives' or the NCAA's contentions are true, the Parties have agreed to settle the Litigation. The NCAA denies all allegations of wrongdoing and liability and believes that its conduct was lawful. The NCAA, however, is settling to avoid the substantial cost, inconvenience and disruption of litigation. The Class Representatives and their attorneys believe that the Settlement is in the best interests of the Settlement Class because it provides an appropriate remedy for Settlement Class Members now, while avoiding the substantial risk, expense and delay of pursuing the case through trial and any appeals.

---

**BACKGROUND ON CONCUSSIONS AND SUBCONCUSSIVE HITS**

---

**6.      What is a concussion?**

Concussion or mild traumatic brain injury (mTBI) has been defined as "a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces." Although concussions most commonly occur after a direct blow to the head, they can occur after a blow elsewhere in the body that transmits forces to the head. Sometimes, athletes refer to hits that result in concussions as getting "dinged" or having their "bell rung."

According to the experts retained by Class Counsel and the Class Representatives, when a concussion occurs, there is a traumatically induced alteration of brain function that may include a rapid onset of cognitive impairment (e.g., impairment to the mental processes of perception,

**Questions?  Call the Program Administrator at [1-800-__-____]**

4

learning, memory, judgment, and reasoning). Most times, the short-term effects of the concussion spontaneously resolve.

Other concussion symptoms include: amnesia, confusion, nausea, loss of consciousness, balance problems or dizziness, double or fuzzy vision, sensitivity to light or noise, headache, feeling sluggish, foggy or groggy, feeling unusually irritable, concentration or memory problems, or slowed reaction time.

You may have suffered a concussion if you experienced any of these symptoms while playing an NCAA sport, even if you were not formally diagnosed with a concussion. You do **not** need to have lost consciousness to have suffered a concussion.

**7.      What is a subconcussive hit?**

Subconcussive hits, or impacts, do not produce any clinical concussion symptoms, but may adversely affect brain function in the same way symptomatic concussions do. Some published data reflecting high school and college football players who did not exhibit clinical signs of concussion and did not report symptoms of concussion but nonetheless had physiological and structural changes to the brain suggest the possibility that subconcussive hits can lead to changes in the brain that are similar to those observed in concussed players.

**8.      Do concussions only occur in football?**

Many people associate concussion with football. However, concussions can occur in any sport, including most often in a range of contact sports, including but not limited to men's and women's soccer, ice hockey, basketball, field hockey, lacrosse and wrestling.

**9.      What is post-concussion syndrome?**

Although the symptoms of most concussions go away after a relatively short period of time, especially if the individual receives adequate rest (both physical and cognitive), some concussions in some people result in symptoms that may last for months or even longer. This long-term persistence of concussion symptoms is referred to as Post-Concussion Syndrome or PCS. PCS symptoms can include headaches, fatigue, memory problems, feeling in a fog, depression, impulsivity, and other physical, cognitive, mood, and behavioral problems. There may be treatments that can alleviate some or all of these symptoms and in almost all cases they resolve eventually.

**10.      What is Chronic Traumatic Encephalopathy (CTE)?**

Repetitive impacts to the head from participation in sports can lead to a later-life, progressive neurodegenerative disease called Chronic Traumatic Encephalopathy (CTE), which may manifest in cognitive, mood, behavioral, and motor disorders. The Parties in this Litigation and their experts disagree regarding the nature, extent and causes of CTE. The Class Representatives and their experts, however, believe that concussive and sub-concussive hits play a significant role in most if not all cases of CTE. In light of a limited understanding of CTE, CTE is thought to be a unique disease, similar to Alzheimer's disease, which has been referred to as "punch drunk" or dementia pugilistica when it is seen in boxers. It appears that the process may begin earlier in life and, once enough brain tissue is affected by the disease, symptoms become apparent. It is thought that in some cases there may be a delay of years or even decades between the end of the repetitive head impacts (i.e., the end of playing the contact sport) and the beginning of the symptoms.

**Questions?  Call the Program Administrator at [1-800-__-____]**

CTE can present with recent memory loss and other cognitive impairments similar to those experienced by people with Alzheimer's disease. People with CTE can also have changes in behavior (e.g., impulsivity, rage, aggression, having a short fuse) and mood (e.g., depression, hopelessness, feeling suicidal). Less commonly there can be movement disorders such as parkinsonism (e.g., tremor, difficulty walking or speaking, stiffness). Some people with CTE may first have behavior or mood problems. Others may first have cognitive difficulties, with the changes in mood and behavior later. In some people, the symptoms of the disease progress to the point where there is difficulty in daily functioning, requiring assistance or being unable to live alone. In these cases, CTE may be clinically mistaken for Alzheimer's disease or dementia. In other cases, CTE may be mistakenly diagnosed as Amyotrophic Lateral Sclerosis (ALS) or "Lou Gehrig's Disease."

**11. What symptoms may signal that I should participate in the Medical Monitoring Program?**

Any current athlete should speak to their team physician, private physician, and/or athletic trainer immediately if they experience any of the following symptoms after receiving a blow to head (or the body that may have jolted the head suddenly). If you continue to experience any of the following symptoms, you may also decide to complete a Screening Questionnaire to determine whether you qualify for a Medical Evaluation in the Medical Monitoring Program.

These symptoms include but may not be limited to: balance issues, confusion, difficulty concentrating, difficulty remembering, dizziness, don't feel right, drowsiness/fatigue/low energy, feeling in a fog, feeling more emotional, feeling slowed down, headache/head pressure, irritability, loss of consciousness, nausea/vomiting, neck pain, nervous/anxious, numbness/tingling, ringing in the ears, sadness, sensitivity to light, sensitivity to noise, sleeping less than usual, sleeping more than usual, trouble falling asleep, visual problems/blurred vision. These symptoms may not occur immediately following the trauma, but may begin to be noticeable the following day or two. If you are a current student-athlete, the decision regarding when you may return to play will be determined by the team physician and medical team. It is important to remember that the symptoms listed above could also be due to causes other than concussion. It is important to inform your medical staff if the symptoms exist and they can help determine whether or not they may be related to concussion.

A former athlete should speak to their personal physician or other appropriate health care provider if they experience a new onset of any of the following symptoms: poor memory for recent events; difficulty learning new information; problems with organization, planning, judgment, or multi-tasking; difficulties with speech, gait, or strength; language or spatial difficulties; problems with attention, concentration, or orientation; mood changes, including depression, hopelessness, or thoughts of suicide; or changes in behavior, including having a "short fuse," irritability, rage, aggression, or problems with impulse control.

If you have any of these symptoms, you may also decide to complete an online or paper-and-pencil Screening Questionnaire to determine whether you qualify for an in-person Medical Evaluation as part of the Medical Monitoring Program.

**Questions?  Call the Program Administrator at [1-800-__-____]**

6

| THE MEDICAL MONITORING PROGRAM |
|---|

**12.      What Is The Medical Monitoring Program?**

The Medical Monitoring Program will screen Settlement Class Members and provide Qualifying Class Members with a Medical Evaluation designed to assess symptoms related to persistent post-concussion syndrome, as well as cognitive, mood, behavioral, and motor problems that may be associated with mid- to late-life onset diseases resulting from concussions and/or subconcussive hits, such as Chronic Traumatic Encephalopathy and related disorders. The Medical Monitoring Program will last 50 years from the Settlement's Effective Date.

Settlement Class Members who wish to participate in the Medical Monitoring Program must complete a Screening Questionnaire prepared by a Court-appointed Medical Science Committee to determine whether they qualify for an in-person Medical Evaluation.

Settlement Class Members may complete a Screening Questionnaire online or download a Screening Questionnaire by going to www.XXXXX.com and following the instructions provided on the website.  Settlement Class Members can also obtain a Settlement Questionnaire by writing to the Program Administrator at _____.

A Settlement Class Member may complete five (5) Screening Questionnaires during the Medical Monitoring Period, but not more than one every five (5) years until the age of 50 and then not more than one every two (2) years after the age of 50.

If you are a member of the Settlement Class and the Settlement becomes Final, you should complete a Screening Questionnaire if you wish to qualify for a Medical Evaluation or are concerned that you may be at risk for long-term effects from any concussions or the accumulation of subconcussive hits you experienced while playing in NCAA-sanctioned sports at member institutions.

The Program Administrator will send notice to those Settlement Class Members whose responses to the Screening Questionnaire indicate they are eligible for a Medical Evaluation, and explain how to arrange for a Medical Evaluation.  The Medical Evaluations will be administered at numerous regional locations across the United States.  If you qualify for a Medical Evaluation but live more than 200 miles from the nearest location, you have the option to be reimbursed based on the then-prevailing rate for reimbursement of mileage to travel to a designated regional institution or the average cost of the examination in the Medical Monitoring Program if done locally.

The NCAA and its insurers will pay $70 million into the Medical Monitoring Fund to pay the costs of the Medical Monitoring Program, as well other costs including payments to the Medical Science Committee, Notice costs, administrative costs, Attorneys' Fees and Expenses, and Class Representative Service Awards.

**13.      What are the responsibilities of the Medical Science Committee?**

The Parties have agreed to create a Medical Science Committee to determine the scope of the Medical Evaluations provided under the Medical Monitoring Program.  The Medical Science Committee will also create the Screening Questionnaire and Screening Criteria used to determine if a Settlement Class Member qualifies for a Medical Evaluation.  The Medical Science Committee will be composed of four (4) medical experts with expertise in the diagnosis, care and

**Questions?  Call the Program Administrator at [1-800-__-____]**

7

management of concussions in sport and mid- to late-life neurodegenerative disease, and the Honorable Wayne R. Andersen (Ret.) as Chair of the Medical Science Committee.

**14.    What is the scope of the Medical Evaluation if I qualify after completing the Screening Questionnaire?**

The scope of the Medical Evaluation for Qualifying Class Members will be determined by the Medical Science Committee. The Medical Science Committee will update the scope of the Medical Evaluations annually to ensure that the examinations meet the current standard of care for assessment of and diagnoses related to persistent post-concusssion syndrome, Chronic Traumatic Encephalopathy and related disorders. The results of the Medical Evaluation will be evaluated by a physician skilled in the diagnosis, treatment and management of concussions, persistent post-concussion syndrome, and mid- to late- life cognitive, mood, behavior, or motor disorders associated with concussive and subconcussive head impacts. The physician will send the results and/or diagnosis to the Qualifying Class Member or the Qualifying Class Member's physician at the direction of the Qualifying Class Member.

**The results of the Medical Evaluations will not be shared with the NCAA or anyone else.**

**15.    When will the Medical Monitoring Program begin?**

Settlement Class Members may complete Screening Questionnaires after the Settlement is approved by the Court and after the time for any appeals has expired or any appeals have been dismissed.  Medical Evaluations may take place at any time during the Medical Monitoring Period after Settlement Class Members have been notified that they qualify.

**16.    If I qualify, do I need to pay for a Medical Evaluation?**

Settlement Class Members who qualify for the Medical Evaluation will not have to pay out-of-pocket for any of the costs of a Medical Evaluation.  The Program Administrator may seek subrogation or reimbursement from your health insurance for the Medical Evaluation, as long as it does not prejudice your ability to qualify for at least one more wellness examination under your health insurance plan in the two (2) year period following your Medical Evaluation. In no event, however, will you be responsible for making a claim on your insurance policy to receive or qualify for the benefits of the Settlement, nor will you be responsible for any co-pays or deductibles associated with any Medical Evaluation received pursuant to the Settlement.

**CONCUSSION MANAGEMENT PROTOCOLS**

The Parties have agreed that the NCAA and/or its member institutions will implement certain concussion education and concussion management protocols.

**17.    What changes to its concussion management policies has the NCAA agreed to make?**

Subject to the NCAA rulemaking process, the NCAA and/or its member institutions will implement the following policies:

- Baseline Testing:  Every student-athlete will undergo pre-season baseline testing for each sport in which they participate prior to participating in practice or competition.

**Questions?  Call the Program Administrator at [1-800-__-____]**

- <u>No Same Day Return to Play</u>:  A student-athlete who has been diagnosed with a concussion will be prohibited from returning to play or participating in any practice or game on that same day and must be cleared by a physician before being permitted to return to play in practice or competition.

- <u>Medical Personnel at Contact Sports[2] Games and Available for Practices</u>: NCAA member schools will be required to have medical personnel with training in the diagnosis, treatment and management of concussions present at Contact Sports games and available during Contact Sports practices.

- <u>Reporting Process</u>:  The NCAA will create a reporting process through which member schools will report diagnosed concussions in student-athletes and their resolution, as well as a reporting mechanism through which anyone can report concerns about concussion management issues to the NCAA.

- <u>Education:</u>  The NCAA will also provide education for faculty regarding academic accommodations for student-athletes with concussions, and will require that member schools provide NCAA-approved concussion education and training to student-athletes, coaches and athletic trainers before each season.

## CONCUSSION RESEARCH

**18.  What type of research is supported by the Settlement?**

The NCAA has agreed to contribute or cause to be contributed $5,000,000, over a period not to exceed 10 years, to research the prevention, treatment, and/or effects of concussions.

## RELEASED CLAIMS

**19.  What claims will be released against the NCAA?**

Unless you exclude yourself from the Settlement, you cannot sue the NCAA or its member institutions for medical monitoring related to concussions or subconcussive hits.  In addition, unless you exclude yourself from the Settlement, you cannot file a class action lawsuit against the NCAA or its member institutions relating to concussions or subconcussive hits or their effects.

If you do not exclude yourself from the Settlement, you will still have the right to file a personal injury lawsuit against the NCAA, but you will be required to do so on an individual, non-class basis.

Section XIV of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves from the Settlement, so please read it carefully.  The Settlement Agreement is available at www.XXXXX.com.

---

[2] "Contact Sports" are football, lacrosse, wrestling, ice hockey, field hockey, soccer, and basketball.

**Questions?  Call the Program Administrator at [1-800-__-____]**

9

## CLASS REPRESENTATIVES AND CLASS COUNSEL

**20.   Who represents the Settlement Class?**

For purposes of the Settlement, the Court has appointed Adrian Arrington, Derek Owens, Kyle Solomon, Angelica Palacios, Abram Robert Wolf, Sean Sweeney, Jim O'Connor, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John Durocher, and Sharon Washington to serve as the Class Representatives.

For purposes of the Settlement, the Court has appointed Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut P.C. as Lead Counsel to represent the Settlement Class Members. The Court has also appointed Richard Lewis of Hausfeld LLP as Special Class Counsel for Medical Monitoring Relief, and Charles Zimmerman of Zimmerman Reed, James Dugan of the Dugan Law Firm, and Mark Zamora of The Orlando Law Firm to the Executive Committee for the Class. These lawyers and law firms are called "Class Counsel." Lead Counsel can be contacted at the following addresses:

Steve W. Berman, Esq.             Joseph J. Siprut, Esq.
HAGENS BERMAN SOBOL               SIPRUT PC
SHAPIRO LLP                       17 North State Street
1918 Eighth Avenue               Suite 1600
Suite 3300                       Chicago, Illinois  60602
Seattle, Washington  98101

If you want to be represented by your own lawyer, you may hire one at your own expense.

**21.   How will Class Counsel and the Class Representatives be paid?**

To date, Class Counsel has not been paid any attorneys' fees. Class Counsel will ask the Court for an award of attorneys' fees and reimbursement of actual out-of-pocket expenses. The NCAA has agreed not to oppose or object to the request for attorneys' fees and expenses if the request does not exceed $15,000,000 in attorneys' fees and $750,000 in out-of-pocket expenses. Class Counsel will also ask the Court to approve Service Awards of $5,000 for each Class Representative deposed in the Litigation, and $2,500 for each Class Representative who was not deposed in the Litigation. The payment for the Attorneys' Fees and Expenses and the Service Awards will come from the Medical Monitoring Fund. Any Attorneys' Fees and Expenses and Service Awards will be awarded only as approved by the Court in amounts to be determined to be fair and reasonable.

Class Counsel's petition for fees and costs and the justifications supporting the request will be available at www.XXXXX.com after they are filed with the Court.

## YOUR OPTIONS DURING THE SETTLEMENT APPROVAL PROCESS

**22.   How do I support the Settlement?**

If the Court finally approves the Settlement, you will automatically become eligible to receive the benefits described above. If you wish to comment in favor of the proposed Settlement, you may mail your comment to the Program Administrator at _____,

**Questions?  Call the Program Administrator at [1-800-___-____]**

10

who will forward your comments to Class Counsel, the NCAA and the Court. Alternatively, you may send your comments directly to Class Counsel.

**23.    How do I object to the Settlement?**

If you do not exclude yourself from the Settlement Class, you may object to the Settlement or the award of Attorneys' Fees and Costs. The Court will consider your views. To object, you or your attorney must submit your written objection to the Court. The objection must include the following:

- The name of the case and multi-district litigation, *In re National Collegiate Athletic Association Student-Athlete Concussion Litigation*, Case No. 1:13-cv-09116;

- Your name, address, telephone number, and, if you are represented by counsel, the name, address and telephone number of your counsel;

- The name of the NCAA member school(s) at which you participated in NCAA-sponsored sport(s), the NCAA-sponsored sport(s) in which you participated and the years during which you participated;

- A written statement of your objections, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection;

- A statement of whether you intend to appear at the Fairness Hearing; and

- If you intend to appear at the Fairness Hearing through counsel, the identity of the attorney(s) representing you who will appear at the Fairness Hearing.

You must send via U.S. Mail copies of the objection to each of the following addresses, postmarked no later than XXXXXX:

| Clerk of Court United States District Court for the Northern District of Illinois 219 South Dearborn Street Chicago, IL 60604 | Steve W. Berman, Esq. HAGENS BERMAN SOBOL SHAPIRO LLP 1918 Eighth Avenue, Suite 3300 Seattle, Washington 98101 | Mark S. Mester, Esq. LATHAM & WATKINS LLP 330 North Wabash Avenue Suite 2800 Chicago, Illinois 60611 |
|---|---|---|
| | *Settlement Class Counsel* | *Counsel for the NCAA* |

The requirements to object to the Settlement are described in detail in the Settlement Agreement in Section XII(C).

**24.    How do I ask the Court to exclude me from the Settlement?**

To exclude yourself from the Settlement (or "opt out" of the Settlement), you must mail a letter or other written document to the Notice Administrator. Your request for exclusion must include:

- Your name, address, and telephone number;

**Questions? Call the Program Administrator at [1-800-__-____]**

- The name of the NCAA member school(s) at which you participated in NCAA-sponsored sport(s), the NCAA-sponsored sport(s) in which you participated and the years during which you participated;

- A statement that "I wish to exclude myself from the Settlement Class in *In re National Collegiate Athletic Association Student-Athlete Concussion Litigation*, Case No. 1:13-cv-09116" (or substantially similar clear and unambiguous language); and,

- Your signature by hand (not any form of electronic signature), and the date on which you signed it (even if you are represented by an attorney).

You must mail your exclusion request, postmarked no later than _____, to:

[Notice Administrator Address]

Exclusions, or opt-outs, shall be allowed on an individual basis only, and "mass" or "class" opt-outs are not allowed. If you do not timely submit an exclusion request including all of the above information, you will be bound by the Settlement and all of your claims for any of the Released Claims will be released. If you validly and timely request exclusion from the Settlement Class, you will not be bound by the Final Order and Judgment entered in this Litigation. Excluding yourself means you cannot receive any of the Settlement benefits or comment upon the Settlement, but you will be able to file a lawsuit on your own behalf.

If you opt out of the Settlement but you later complete a Screening Questionnaire and confirm in writing that you intend to rescind your request for exclusion, you will be treated as a member of the Settlement Class on a going-forward basis.

If you have any questions concerning these procedures, please contact the Program Administrator or Class Counsel.

**25. What happens if I do nothing at all?**

If you are a member of the Settlement Class and you do nothing, you will be bound by the terms of the Settlement. You may voluntarily participate in the Medical Monitoring Program at any time during the Medical Monitoring Period, and may complete up to five (5) Screening Questionnaires and may qualify for up to two (2) Medical Evaluations. You will release your right to sue the NCAA for medical monitoring in the future, but the Settlement reserves your right to pursue any individual personal injury claims you may have on a non-class basis.

You may contact your college or university to obtain copies of your medical and training records.

| FAIRNESS HEARING |
| --- |

The Court will hold a hearing to decide whether to finally approve the Settlement. You may attend and you may ask to speak, but you do not have to. The Court will determine if you are allowed to speak if you request to do so.

**Questions? Call the Program Administrator at [1-800-__-____]**

**26.     When is the Fairness Hearing?**

A hearing will be held before Judge John Z. Lee on _____, 2014 at _____ (a.m./p.m.) at the United States District Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois.  At the hearing, the Court will hear evidence about whether the proposed Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing.  After the hearing, the Court will decide whether to approve the Settlement.  If the Court approves the Settlement, it will decide whether to approve the Attorneys' Fees and Expenses and Service Awards.  The time, date and location of the Fairness Hearing may be changed by the Court without further notice to you.  If you plan to attend the hearing, you should confirm its time, date and location.  Any updates or changes on the time, date or location of this hearing will be posted on the Settlement Website, www.XXXXXXX.com.

**27.     Do I have to attend the Fairness Hearing?**

You do not have to attend the Fairness Hearing to remain a Settlement Class Member or to file an objection to or comment on the Settlement.  Class Counsel will respond to any questions the Court may have.  You or your own counsel, however, may attend the Fairness Hearing at your own expense.  If you timely submit a written objection, you do not have to attend the Fairness Hearing to discuss it.  As long as you mailed your written objection on time, following the instructions in Paragraph 23 of this Notice, the Court will consider it.

You may ask the Court for permission to speak at the Fairness Hearing only if you have submitted your objection as provided in Paragraph 23 of this Notice and have stated in your objection letter that you wish to be heard at the Fairness Hearing.

**28.     How can I get more information?**

This Notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  You may obtain a copy of the Settlement Agreement by visiting www.XXXXX.com, or writing:

[PROGRAM ADMINISTRATOR]

The Settlement Agreement is also on file with the Clerk of the Court for the Northern District of Illinois (*see* Paragraph 26 for the address).

**Please do not contact the Clerk of the Court or the Judge regarding this Notice.
Instead, please direct any inquiries to any of the Class Counsel listed above.**

**Questions?  Call the Program Administrator at [1-800-__-____]**

13

# EXHIBIT - E

## LEGAL NOTICE

*In re National Collegiate Athletic Association Student-*
*Athlete Concussion Injury Litigation,*

Case No. 1:13-cv-09116

(United States District Court for the Northern District of Illinois)

**NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION AND FAIRNESS HEARING FOR MEDICAL MONITORING AND RELEASE OF CLAIMS**

**If You Are a Current or Former Student-Athlete Who Played An NCAA-Sanctioned Sport at an NCAA School At Any Time Through _____, 2014,**

**Your Rights May Be Affected by a Class Action Lawsuit**

A Settlement, subject to court approval, has been reached in a class action lawsuit called In re *National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*, Case No. 1:13-cv-09116 (N.D. Ill.). It is pending in the U.S. District Court for the Northern District of Illinois.

### WHAT IS THE LAWSUIT ABOUT?

The lawsuit claims that the NCAA was negligent and breached its duty to protect all current and former student-athletes by failing to adopt appropriate rules regarding concussions. The lawsuit seeks medical monitoring relief to diagnose possible long-term effects of concussions or the accumulation of sub-concussive hits for all current and former student-athletes. The lawsuit also seeks changes to the NCAA's concussion management and return-to-play guidelines.

The NCAA denies these allegations and denies it did anything wrong. If the Court does not approve the Settlement, the NCAA will argue, among other things, that the case should not be a class action. The Court has not decided whether or not Defendant did anything wrong.

### WHO IS INCLUDED?

You are a Class Member and included in the Settlement if you played an NCAA-sanctioned sport at an NCAA school at any time up to _____, 2014.

### WHAT DOES THE SETTLEMENT PROVIDE?

The NCAA has agreed to a Medical Monitoring Fund of $70,000,000, which, after deducting administrative costs, and attorneys' fees and expenses, will fund the screening of Class Members as well as medical evaluations for those Class Members who qualify as a result of the screening during the 50-year Medical Monitoring Program. The medical evaluations will be designed to assess symptoms related to persistent post-concussion syndrome, as well as cognitive, mood, behavioral, and motor problems that may be associated with mid- to late-life onset diseases that may be linked to concussions and/or subconcussive hits, such as Chronic Traumatic Encephalopathy and related disorders. In addition, the NCAA has committed $5,000,000 to fund research regarding the prevention, diagnosis, care, and management of concussions and mid- to late-life neurodegenerative disease. The NCAA has also agreed to change its policies and procedures for concussion management and return to play. You can download the Settlement Agreement from www._____.com or call the toll-free number listed below and request one.

### WHO REPRESENTS YOU?

The Court appointed the law firms Hagens Berman Sobol Shapiro LLP and Siprut PC to represent you. You do not have to pay these attorneys or anyone else to participate. They will ask the Court for attorneys' fees and costs, which would be paid from the Medical Monitoring Fund. You may hire your own lawyer to appear in Court for you; if you do, you have to pay that lawyer.

### WHAT ARE YOUR OPTIONS?

- **Do Nothing and Remain in the Settlement.** If you do nothing, you are considered a participant in the Settlement. You will be bound by all Court orders. If the Settlement is approved, certain potential legal claims you may have against the NCAA will be resolved and forever released. Also, if the Settlement is approved, you will have the opportunity to complete a screening questionnaire to determine whether you qualify for up to two medical evaluations during the 50-year medical monitoring period.

- **Opt Out ("Exclude Yourself") from the Settlement.** You must submit a written request to Opt Out of the Class and the Settlement to the Settlement Administrator. The complete, signed Opt-Out request must be mailed to the Settlement Administrator **postmarked no later than _____, 2014.**

- **Object or Comment on the Settlement.** Written objections must be filed and served no later than _____, 2014. You give up your right to sue and are bound by Court orders even if your objection is rejected. If you file an objection, you may appear at the Fairness Hearing to explain your objection, but you are not required to attend.

The Court will determine whether to approve the Settlement and attorneys' fees and expenses at a **Fairness Hearing to be held on _____, 2014, at _____ a.m.**, at the Everett M. Dirksen United States Courthouse for the United States District Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois. You may attend this hearing if you wish, but you do not have to attend in order to participate in the proposed Settlement.

### HOW CAN I GET MORE INFORMATION?

**If you have questions or want to complete a Screening Questionnaire:**
Visit: www._____.com; Call: 1-8XX-XXX-XXXX;
Write: In re: National Collegiate Athletic Association Student-Athlete
Concussion Injury Litigation, c/o [CLAIMS ADMINISTRATOR]