# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**SETTLEMENT CLASS REPRESENTATIVES' REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT
(RESPONSE TO THE NICHOLS' OPPOSITION)**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.    ARGUMENT .....................................................................................................2

      A.    Nichols Ignores the Procedural Posture of the Case, Because Analysis of the Factors to be Considered for Preliminary Approval Favor the Settlement ........2

            1.    The Settlement achieves 50 state medical monitoring benefits, while Nichols concedes that the "billions" of dollars of personal injury claims would have to find some "solution" that is less than a 100% victory..........3

            2.    Nichols' opposition demonstrates that the second factor – complexity, length, and expense of trial – is satisfied. ....................................................6

            3.    The fact that there is just one objection supports preliminary approval. .....6

            4.    This Court has observed first hand Class Counsel's dedication to Student-Athletes.................................................................................................7

            5.    Analysis of the fifth factor demonstrates that Class Counsel has the benefit of full merits discovery, while Nichols' counsel is proceeding with blinders on..........................................................................................8

      B.    100% of the Settlement Class is Entitled to Participate in the Medical Monitoring Program and thus Receive a Benefit...................................................8

            1.    100% of the Settlement Class Members may complete the screening questionnaire up to five times over 50 years. .............................8

            2.    The projected number of Medical Evaluations is grounded in epidemiology, actuarial science, and medical science...............................11

      C.    Nichols' Claim That There are "Billions and Billions" of Dollars of Personal Injury Claims is Unsupported by the Current Landscape ......................13

            1.    5,000 individual NFL players have filed concussion-related personal injury claims.................................................................................................14

            2.    The scope of pending concussion-related personal injury claims against the NCAA pales in comparison to the NFL. ...............................15

                a.    From 2002 to September 2013, just 11 lawsuits were filed by NCAA student-athletes against the NCAA for negligence or personal injury. ..........................................................................15

010270-12  715509 V1

b.      As of September 2, 2014, 19 Plaintiffs have asserted individual concussion-related personal injury claims against the NCAA – 44 percent of which are not before this Court. ...............16

3.      Nichols' claim that a class action is superior for resolving individual negligence claims has no basis in fact. ......................................................17

4.      A class waiver does not prevent the MDL Panel from centralizing or coordinating individual personal injury claims if they were common in fact – as it did with the NFL claims. ...........................................................20

5.      Why, then, does Nichols want to proceed as part of a personal injury Class? .....................................................................................................20

D.      The Procedural Protections of Rule 23(b)(3) Together With the Class Waiver Can be Approved as Fair, Adequate and Reasonable .............................................22

1.      Class action waivers are not per se unfair................................................22

2.      The Class action waiver is only applicable to concussion-related bodily injury claims. ................................................................................23

E.      The Changes to the Concussion-Management and Return-to-Play Guidelines Will Protect All Current Student-Athletes ...........................................24

1.      "Merely" receiving a baseline test in advance of every season provides a meaningful benefit to 100% of all current student-athletes. ....24

2.      Nichols conflates NCAA PR with evidence as to the current state of mandated return-to-play guidelines. .........................................................25

F.      The Tolling of Personal Injury Claims of Settlement Class Members .................25

G.      Nichols' Remaining Contentions Do Not Preclude a Finding that the Settlement is Within the Range of Possible Approval...........................................25

III.      CONCLUSION...................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*American Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   No. 07 C 2898, 2011 U.S. Dist. LEXIS 84219 (N.D. Ill. July 26, 2011) .........................3, 5, 6

*Armstrong v. Board Of Sch. Dir.*,
   616 F.2d 305 (7th Cir. 1980) .................................................................................................2

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
   MDL No. 1967, 2011 WL 1790603 (W.D. Mo. May 10, 2011) .............................................3

*Bower v. Westinghouse Elec. Corp.*,
   206 W. Va. 133, 522 S.E.2d 424 (1999).......................................................................12, 13

*Crawford v. Equifax*,
   201 F.3d 877 (7th Cir. 2000) .........................................................................................22, 23

*Donovan v. Philip Morris USA, Inc.*,
   455 Mass. 215, 914 N.E.2d 891 (2009) ...............................................................................12

*EEOC v. Hiram Walker & Sons, Inc.*,
   768 F.2d 884 (7th Cir.1985) ..................................................................................................5

*Freeman v. Berge*,
   68 Fed. Appx. 738 (7th Cir. 2003)........................................................................................7

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ..............................................................................................5

*Hansen v. Mountain Fuel Supply Co.*,
   858 P.2d 970 (Utah 1993) ...................................................................................................12

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ............................................................................................2, 7

*Kelly v. Phiten USA, Inc.*,
   277 F.R.D. 564 (S.D. Iowa 2011) .........................................................................................3

*Kohen v. Pac. Inv. Mgmt. Co. LLC & Pimco Funds*,
   571 F.3d 672 (7th Cir. 2009) ..............................................................................................26

*In re Mercedes-Benz Tele Aid Contract Litig.*,
   Civ. No. 07-2720 (DRD), 2011 WL 4020862 (D.N.J. Sept. 9, 2011) .......................................3

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ..............................................................................................26

*Meyer v. Fluor Corp.*,
    220 S.W.3d 712 (Mo. 2007) .................................................................................12

*Mullen v. Treasure Chest Casino, L.L.C.*,
    186 F.3d 620 (5th Cir. 1999) ...............................................................................4

*Petino v. A.H. Robins Co.*,
    750 So. 2d 103 (Fla. Dist. Ct. App. 1999) ...........................................................12

*Redland Soccer Club, Inc. v. Dept. of the Army*,
    55 F.3d 827 (3d Cir. 1995).................................................................................12

*Sugarman v. Ducati N. Am., Inc.*,
    No. 5:10-CV-05246-JF, 2012 WL 113361 (N.D. Cal. Jan. 12, 2012).....................3

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011).............................................................................3, 26

*Sutton v. St. Jude Medical S.C., Inc.*,
    419 F.3d 568 (6th Cir. 2005) ...............................................................................5

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ...............................................................................2

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods.*
*Liab. Litig.*,
    No. 8:10-ML 02151 JVS, 2013 WL 3224585 (C.D. Cal. June 17, 2013) ...............5

*Turner v. Murphy Oil USA, Inc.*,
    234 F.R.D. 597 (E.D. La. 2006).............................................................................4

### STATUTES

28 U.S.C. § 1407.................................................................................................20

### OTHER AUTHORITIES

25 Am. Jur. 3d Proof of Facts 313 § 8...................................................................11

25 Am. Jur. 3d Proof of Facts 313 § 11.................................................................12

010270-12 715509 V1

## I.     INTRODUCTION

The centerpiece of Nichols' opposition to preliminary approval is the assertion, unfounded by any fact, that the Settlement allows the NCAA to avoid "billons and billons" of dollars of concussion-related liability. He also contends that the Settlement deprives Class Members of any day in court as no lawyer would take an $8,000 to $20,000 concussion case. Such declarations sound awful, and were they even remotely true we should be terminated as Lead Counsel.

**_The Facts._** Nichols might have a case worth just $8,000 to $20,000, because he is currently asymptomatic. The medical expert in this case has identified debilitating post-concussion syndrome ("PCS") or mid-to-late-life neurodegenerative diseases, such as chronic traumatic encephalopathy ("CTE"), that cause early-onset dementia and other disabling symptoms as the types of injuries one could expect as a result of mishandled concussion management and being forced to return to play while symptomatic. These are not $8,000 injuries.

For those players truly injured, PCS- and CTE-related injuries are compensable in significant amounts, and are regularly handled by lawyers on an individual basis – as with 18 of 19 personal injury cases currently pending against the NCAA. Thus, real clients with real long-term concussion injuries will benefit from diagnosis of their symptoms in the Medical Monitoring Program. Further, the 19 individual personal injury cases currently pending against the NCAA, in comparison to the 5,000+ individual NFL players with pending lawsuits, deflates Nichols' bold claim that billions of dollars owed to NCAA players has been left on the table.

Nichols' claim that hardly anyone will benefit from the Program has no basis in fact. 100% of the Settlement Class can complete the Screening Questionnaire up to five times over the 50-year Medical Monitoring Period, as symptoms may not arise until mid- to late-life. Moreover,

- 1 -

those whose symptoms demonstrate a need for a Medical Evaluation will be seen by a neurologist or neuropsychologist to undergo specialized types of testing that general practitioners are not trained to do.

Thus, as reflected below, because Plaintiffs meet the five factors required by the Seventh Circuit to demonstrate that the Settlement is within the range of possible approval, this Court should grant preliminary approval and order that Notice be provided to the Settlement Class.

## II.    ARGUMENT

### A.    Nichols Ignores the Procedural Posture of the Case, Because Analysis of the Factors to be Considered for Preliminary Approval Favor the Settlement

At preliminary approval, this Court is charged with determining whether the proposed settlement is "within the range of possible approval," and "whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing."[1] While this Court considers five factors in deciding whether to grant preliminary approval – (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length, and expense of continued litigation; (3) the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed[2] – Nichols has not applied any of these factors in his opposition. As reflected below, all five factors are satisfied here.

---

[1] *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 314 (7th Cir. 1980) (internal citation and footnote omitted).

[2] *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

1.     **The Settlement achieves 50 state medical monitoring benefits, while Nichols concedes that the "billions" of dollars of personal injury claims would have to find some "solution" that is less than a 100% victory.**

Under the first factor, this Court must compare the strength of the case to the value of the settlement figure to determine whether it is within the range of possible approval.[3] With respect to the medical monitoring claims, the value of the Settlement exceeds the strength of Plaintiffs' claims. In sum, despite the fact that 33 states do not recognize medical monitoring as an independent cause of action or as a remedy for negligence, this Settlement provides medical monitoring in all 50 states.[4] Moreover, while international consensus on concussion-management standards was not achieved until 2002,[5] this Settlement provides medical monitoring benefits to all current and former NCAA student-athletes, regardless of age and sport.[6] Even Nichols cannot dispute that the Settlement soundly overcomes the weaknesses of the medical monitoring claims.

---

[3] *See American Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, 2011 U.S. Dist. LEXIS 84219, at *36-39 (N.D. Ill. July 26, 2011) (citations omitted).

[4] The fact that Nichols would never be happy, but for finding reasons to object, is demonstrated by his complaint that Plaintiffs achieved more than they could at trial on medical monitoring, claiming the Settlement should not include student-athletes from 33 states. *See* Nichols' Response to Plaintiffs' Motion for Preliminary Approval of Class Settlement ("Nichols Opp."), at 22-34. *But see* Plaintiffs Chris Walker, Ben Martin, and Dan Ahern's Opposition to Plaintiff *Arrington's* Motion to Transfer for Coordinated or Consolidated Pre-Trial Proceedings, MDL No. 2492 (Dkt. No. 27), at 2-3 (Sept. 30, 2013) (criticizing *Arrington* Plaintiffs for not seeking medical monitoring in all 50 states).

The argument that any allocation among class members must account for the strengths and weaknesses of each state's laws has been considered and rejected as antithetical to the very purpose of Rule 23 and the strong judicial policy favoring global settlements. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011). Nationwide class settlements that treat class members uniformly are sensible and regularly approved. *See, e.g., Sugarman v. Ducati N. Am., Inc.*, No. 5:10-CV-05246-JF, 2012 WL 113361 (N.D. Cal. Jan. 12, 2012); *Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564 (S.D. Iowa 2011); *In re Mercedes-Benz Tele Aid Contract Litig.*, Civ. No. 07-2720 (DRD), 2011 WL 4020862 (D.N.J. Sept. 9, 2011); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, MDL No. 1967, 2011 WL 1790603 (W.D. Mo. May 10, 2011).

[5] *Arrington* Plaintiffs' Proffer of Common Facts in Support of Class Certification ("Proffer"), (*Arrington* Dkt. No. 176), ¶ 60.

[6] Nichols argues that the subrogation provision negates any purported value. However, Class Counsel has been informed by several experts that it is unlikely that any subrogation can occur given standard insurer contracts. Accordingly, Class Counsel has been working with the understanding that no subrogation will occur. *See, e.g.*, Expert Report of Bruce Deal Regarding the Medical Monitoring Fund

- 3 -

Nichols' attempt to skew this inquiry to compare the Settlement to non-existent personal injury claims worth "billions and billions" on a class basis is flawed in several respects. First, although Nichols claims that a personal injury class is strong, but that individual personal injury claims are not, the evidence reflects that 18 of the 19 currently-pending personal injury claims against the NCAA are being individually litigated.[7] Only Nichols is seeking to proceed by way of a class action. The record suggests that he is doing so because his individual claim is low-value at best. He is currently asymptomatic,[8] and is outside the statute of limitations.[9]

Moreover, whether or not a personal injury class could be certified,[10] Nichols concedes that a personal injury class may need to seek less than a full victory, such that the Court could just certify specific issues, reserve damages for mini-trials, or create subclasses.[11] He describes what he calls "solutions" to his concession that a personal injury class could not be certified on all issues.[12] These are the actual weaknesses Class Counsel considered in (1) seeking to certify a

---

(July 28, 2014) (Dkt. No. 70) ("Deal Report"), at 3-4 ("…all model results assume that the Fund bears the entire cost of all tests (and administration) without any inflows from subrogation").

[7] *See* Section II.C, *infra*.

[8] *Nichols* Complaint, ¶ 38.

[9] *Id*.

[10] The cases cited by Nichols at page 13 of his Opposition do not support his proposition that a personal injury class could be certified against the NCAA. *See, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 (E.D. La. 2006) ("The Court also believes that the personal injury and mental anguish damages will not form a significant portion of the Plaintiffs' claims, which further supports a finding of predominance here."); *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 626 (5th Cir. 1999) (holding "that the issues to be tried commonly – seamen status, vessel status, negligence, and seaworthiness – were significant in relation to the individual issues of causation, damages, and contributory negligence," and "finding that causation is a unique issue that will be resolved in the trial plan's second-phase individual trials."), *abrogated in part by M.D. v. Perry*, 675 F.3d 832, 839 (5th Cir. 2012), citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

[11] *See* Nichols Opp. at 13-14.

[12] Nichols Opp. at 14.

010270-12 715509 V1

50-state Core Issues Class in *Arrington*;[13] and (2) weighing the likelihood of class certification with the achievement of this Settlement.

The essence of Nichols' objection is that Class Counsel should have held out for liability certification or settlement of personal injury claims.[14] Such objections are routinely overruled.[15] Settlements, by their very nature, are the product of compromise and therefore offer less than a full recovery.[16] Yet, even though the Settlement does not encompass personal injury claims, Class Counsel took steps to preserve those claims.[17]

After years of litigation and full merits discovery, Class Counsel achieved a Settlement that creates a 50-year Medical Monitoring Program for all current and former NCAA student-athletes and is supported by the top experts in concussion in sport.[18] Moreover, the Settlement includes significant changes to the NCAA's concussion-management and return-to-play guidelines that will benefit all current student-athletes.[19] "No more detail is required for the court to find at this stage that, compared to the strength of the case, the settlement figure is fair, adequate, and reasonable."[20]

---

[13] *Arrington* Motion for Class Certification (Dkt. No. 174), at 2.

[14] *But see Sutton v. St. Jude Medical S.C., Inc.,* 419 F.3d 568, 575 (6th Cir. 2005) ("We also note that there is something to be said for disease *prevention,* as opposed to *disease treatment*. Waiting for a plaintiff to suffer physical injury before allowing any redress whatsoever is both overly harsh and economically inefficient.").

[15] *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1998).

[16] *EEOC v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir. 1985). *See also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 8:10-ML 02151 JVS (FMOx), 2013 WL 3224585, at *14 (C.D. Cal. June 17, 2013) (emphasis in original) ("Settlement is born of compromise, and settling plaintiffs trade the risk of recovering nothing for a reward that is necessarily less than their full *potential* recovery.").

[17] *See, e.g.*, Settlement Agreement, § II.NN (excluding claims for personal injury and bodily injury from the definition of "Released Claims").

[18] *See* Expert Report of Robert C. Cantu In Support of Preliminary Approval of Settlement (Dkt. No. 69) ("Cantu Report"), at § I (listing extensive qualifications).

[19] *See* Appendix A.

[20] *American Int'l Grp., Inc.*, 2011 U.S. Dist. LEXIS 84219, at *37.

- 5 -

**2. Nichols' opposition demonstrates that the second factor – complexity, length, and expense of trial – is satisfied.**

The second factor, the likely complexity, length, and expense of trial, weighs heavily in favor of the settlement's fairness, reasonableness, and adequacy. This Court has witnessed first-hand the types of issues and opposition that would encompass continued litigation.[21] "No one disputes that a trial on these claims[] will be complex. The length and expense of litigation also supports preliminary approval. Continuing to litigate this case will require vast expense and a great deal of time, on top of that already expended."[22]

**3. The fact that there is just one objection supports preliminary approval.**

Third, the fact that Nichols has objected is not dispositive. "[I]nsofar as it is proper to consider at preliminary approval the amount of opposition to settlement among affected parties, this third factor weighs in favor of approving the proposed settlement."[23] For example, in *AIG*, Judge Gettleman found that the fact that there were just two objections to preliminary approval supported the settlement.[24] "At this point, the only way to gauge any additional opposition is to solicit it by sending notice of the settlement to the class and inviting its members to voice their opinions."[25] Accordingly, this factor supports preliminary approval.

---

[21] *See generally* Nichols Opp. *See also Arrington* Plaintiffs' Motion for Class Certification and Memorandum and Proffer in Support (*Arrington* Dkt. Nos. 174, 175, 176); *Walker and Morgan* Plaintiffs' Motion to Temporarily Enjoin the Ongoing *Arrington* Medical Monitoring Class Settlement Negotiations with the NCAA (Dkt. No. 5).

[22] *American Int'l Grp., Inc.*, 2011 U.S. Dist. LEXIS 84219, at *37-38.

[23] *Id.* (citing *AT&T Mobility*, 270 F.R.D. at 350 ("Because the parties have not yet sent the notice, it is premature to fully assess this factor.")).

[24] *American Int'l Grp., Inc.*, 2011 U.S. Dist. LEXIS 84219, at *38-39.

[25] *Id.* at 39 (citing *In re M3 Power Razor Sys. Mktg. & Sales Practice Litig.*, 270 F.R.D. 45, 63 (D. Mass. 2010) ("[T]he only practical way to ascertain the overall level of objection to the proposed settlement is for notice to go forward, and to see how many potential class members choose to opt out of the settlement class or object to its terms at the Final Fairness Hearing.")).

**4.      This Court has observed first hand Class Counsel's dedication to Student-Athletes.**

Fourth, the Seventh Circuit has held that the district court may "properly rel[y] on the opinion of class counsel, a team of experienced and well-respected [] attorneys, who reached this agreement only after exhaustive negotiations and extensive discovery,"[26] "and perhaps more importantly upon its own observations over the course of the litigation as to the quality of the representation provided to the class."[27] Here, in recently appointing Hagens Berman and Siprut PC as Lead Class Counsel in the MDL, this Court explained: "…the Court notes that Hagens Berman and Siprut have served as Co-Lead Counsel for the Arrington Plaintiffs since the inception of this case in 2011, have expended numerous hours in service of their clients, and have moved the case along at a commendable pace."[28] Moreover, Class Counsel submitted declarations from two nationally-renowned mediators, both of whom are former federal judges, in support of the Settlement.[29] Nichols has provided no opinion, other than that of his counsel Mr. Edelson, who as far as we can ascertain has no experience in concussion-related or medical monitoring cases and never certified a personal injury class.[30] The fourth factor weighs in favor of preliminary approval.

---

[26] *Freeman v. Berge*, 68 Fed. Appx. 738, 743 (7th Cir. 2003).

[27] *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996).

[28] Case Management Order No. 3 (Dkt. No. 76), at 4.

[29] *See* Declaration of Hon. Layn Phillips (Ret.) in Support of Plaintiffs' Motion for Preliminary Approval (Dkt No. 67); Declaration of Hon. Wayne R. Andersen (Ret.) (Dkt. No. 68).

[30] Searches of Westlaw, LexisNexis, and dockets.justia.com (nationwide federal docket search) confirm that, prior to and since filing the *Nichols* complaint nearly three years after *Arrington* was filed, Mr. Edelson has never filed or had a decision published in any case involving concussions or medical monitoring in any context. *See also* http://www.edelson.com/lawyers/#Jay_Edelson (last accessed Aug. 29, 2014) (Mr. Edelson's biography indicates that he focuses primarily on "the areas of privacy, technology, and consumer advocacy.").

- 7 -

**5.    Analysis of the fifth factor demonstrates that Class Counsel has the benefit of full merits discovery, while Nichols' counsel is proceeding with blinders on.**

The fifth factor – the stage of the proceedings and the amount of discovery completed – highlights that Nichols' counsel is looking for a pulpit, and not a courtroom. In *Arrington*, full merits discovery was completed.[31] Because Mr. Edelson claimed to seek access to the *Arrington* discovery, Class Counsel arranged to copy 68 disks and two hard drives for him.[32] Yet, Mr. Edelson has never paid for nor picked up the discovery. Actions speak louder than words.

Where Class Counsel has been in the trenches since 2011 conducting full merits discovery and working with the top experts in the field of concussions in sport, Mr. Edelson has sat on the sidelines, has a client that does not-suffer from medically-recognized symptoms of PCS or CTE, and has zero evidence, zero experts,[33] zero experience in the field of concussions or medical monitoring, and zero basis on which to support his client's objection.[34] Thus, this Court should find that the factors support preliminary approval of the Settlement.

**B.    100% of the Settlement Class is Entitled to Participate in the Medical Monitoring Program and thus Receive a Benefit**

**1.    100% of the Settlement Class Members may complete the screening questionnaire up to five times over 50 years.**

Contrary to Nichols' claim that 89% of the Settlement Class Members "get nothing from the Settlement,"[35] *100% of the Settlement Class Members* are entitled to participate in the written screening "designed to assess, *inter alia*, self-reported symptoms and cognitive, mood, behavioral, and motor problems that may be associated with persistent post-concussion

---

[31] *Arrington* Dkt. No. 134 (indicating a fact discovery cut-off date of April 26, 2013).

[32] *See* Email dated May 21, 2014, attached as Ex. 1.

[33] *See generally* Nichols Opp.

[34] *Id*.

[35] Nichols Opp. at 3.

syndrome and/or mid- to late-life onset problems, such as Chronic Traumatic Encephalopathy ("CTE") and related disorders."[36]

While Nichols plays games with numbers and pie charts, the fact is clear that no Settlement Class Member – regardless of age, gender, sport, or current eligibility status – is precluded from completing the Screening Questionnaire up to five times over 50 years:[37]



The ability to complete the Screening Questionnaire multiple times is an important component of the Settlement. Just because an asymptomatic Settlement Class Member who completes the Questionnaire on day one does not qualify for a Medical Evaluation does not mean that the Class Member did not receive a benefit. Nichols' assessment of benefits is too narrow.[38]

Rather, Settlement Class Members will obtain valuable medical insight into their current cognitive functionality and will be able to track their current state of health against symptoms that may develop later and trigger a future desire (and right) to participate in the Program. For example, a Settlement Class Member who is asymptomatic today may later develop, *e.g.*, early-onset dementia, Parkonsonism or other CTE-related disorders, and may again complete the Screening Questionnaire. At that time, a Medical Evaluation would likely be deemed necessary

---

[36] Settlement Agreement, § IV.B.4.

[37] *Id.* at § IV.B.4(g).

[38] Nichols Opp. at 3 (Nichols completely ignores the written screening in purporting to evaluate the Settlement's benefits).

"to assess, detect and/or diagnose any conditions, symptoms, or injuries from concussions or the accumulation of subconcussive hits."[39] Thus, the Program provides Class Members the valuable benefit of tracking when and if they develop debilitating symptoms and determines whether those symptoms are related to their participation in and head trauma from NCAA-sanctioned sports. But Class Counsel is not asking that this Court take our word for it, as Nichols is doing.

Rather, Class Counsel has submitted an expert report from the leading expert on concussions in sport, Dr. Robert Cantu, who was the very first medical expert to propose concussion-management guidelines. He explained:

> Here, the purpose of a medical monitoring program of current and former student-athletes that have played NCAA sports is to determine whether they are suffering from post-concussion syndrome or other mid- to late-life cognitive impairments or mental disturbances. Student-athletes may not have any idea that the debilitating symptoms that they are experiencing were caused by their head injuries – and thus are not seeking the available treatments that they need to ease their symptoms associated with their head injuries.[40]

Dr. Cantu opines: "that the proposed Medical Monitoring Program provides an appropriate diagnostic remedy for current or former NCAA student-athletes at risk for PCS or mid- to late-life onset problems associated with CTE."[41]

Contrastingly, Nichols presents no expert testimony in the medical or scientific realms to support his wild accusations that the Medical Monitoring Program provides "thin relief at best,"[42] and that "Class Members who need real medical monitoring (as opposed to winning a

---

[39] Settlement Agreement, § II.S.
[40] Cantu Report, ¶ 76.
[41] Cantu Report, ¶ 46.
[42] Nichols Opp. at 1-2.

lottery ticket that might entitle them to a test) get nothing."[43] At this stage then, the weight of the evidence supports a finding that the Settlement is within the range of possible approval.

> ### 2. The projected number of Medical Evaluations is grounded in epidemiology, actuarial science, and medical science.

Nichols twists the projected number of Settlement Class Members who have persistent PCS or will develop mid- to late-life degenerative diseases, such as CTE and related disorders, to argue that the Medical Monitoring Program is failing the rest of the Class. He argues that the Program has little value because "[a]pproximately 3,500 (of the 4.2 million) Class Members are projected to actually receive tests."[44]

Here, 100% of the Settlement Class Members can complete a Screening Questionnaire. Yet, 100% of the Settlement Class Members are not suffering from PCS nor will develop a neurodegenerative disease. However, there is no medically-accurate or scientific way to know which members of the at-risk population will face the nightmares of concussion-caused early-onset dementia, Parkonsonism, or other disorders. So, when Nichols laments that just 3,500 will have a Medical Evaluation, he is lamenting that more Settlement Class Members will not develop functionally life-ending diseases. Such discontent is at direct odds with the Class' interests.

"The purpose of medical monitoring compensation is to enable the plaintiff to obtain information about his or her future diseases as early as possible. That information, in turn, enables the plaintiff to seek early treatment, so that the injuries will be minimized."[45] "Medical

---

[43] Nichols Opp. at 1-2.
[44] Nichols Opp. at 6.
[45] 25 AM. JUR. 3D PROOF OF FACTS 313 § 8.

monitoring does not include treatment if a disease is diagnosed."[46] While neither Plaintiffs nor

Nichols can accurately pinpoint which Settlement Class Members will be among those who

develop mid- to late-life neurodegenerative disorders, Plaintiffs have ensured that all Settlement

Class Members have access to the neurological and neuropsychological testing they will need

when or if they become symptomatic.[47] Such access is in the direct interests of the Class as a

result of the NCAA's alleged failure to implement or enforce concussion-management or return-

to-play guidelines that met the standard of care since 2002.[48]

---

[46] *Id.* at § 11. *See also Meyer v. Fluor Corp.*, 220 S.W.3d 712, 718 (Mo. 2007) ("[a] physical injury requirement is inconsistent with the reality of latent injury and with the fact that the purpose of medical monitoring is to facilitate the early diagnosis and treatment of latent injuries caused by exposure to toxins"; reversing lower court's denial of certification of a medical monitoring class).

[47] *Nichols* argues that the Screening Questionnaire is unknown, that scoring of the Questionnaire will be based on a secret algorithm, and that the screening will not select qualified class members. Nichols Opp. at 7. These assertions are incorrect.

First, the Court-appointed Medical Science Committee will use its medical expertise to design a Questionnaire based on the ten topic areas set forth in Ex. E to the Settlement Agreement, as well as to define the in-depth neuropsychological and/or neurological evaluations as set forth in Ex. F. Second, while the elements in Ex. E will be the basis of the content of the Questionnaire, the algorithm will be based on specialized neuropsychological methodologies in assessing these elements.

Third, the Medical Science Committee will not design the Program to be underinclusive. Consistent with the typical conservative approach to favor false positives, not false negatives, to be sure to include qualified persons, the Deal Report factors in a 25% false positive rate. Deal Report, at 5.

Finally, Nichols' contention that Class Members should just be reimbursed to be seen by their local doctors would merely perpetuate the problem. Nichols Opp. at 2, 7. The point of medical monitoring is to provide specialized diagnostic evaluations beyond normal medical care. *See, e.g.*, *Redland Soccer Club, Inc. v. Dept. of the Army*, 55 F.3d 827, 850-51 (3d Cir. 1995) (plaintiffs "demonstrate an immediate need for medical monitoring beyond that which is recommended for the general population"); *Petino v. A.H. Robins Co.*, 750 So. 2d 103, 106-07 (Fla. Dist. Ct. App. 1999) (medical monitoring is appropriate where "the prescribed monitoring regime is different from that normally recommended in the absence of exposure"); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 980 (Utah 1993) (same). Local doctors are not necessarily trained in neurocognitive assessment, or in the assessment of neuropsychological and neurological degenerative diseases. Seeing one's family doctor is the *status quo* and, in the area of neurocognitive disease and head impacts, there is a widespread consensus that the *status quo* is not working.

[48] *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 225-26, 914 N.E.2d 891, 901 (2009) ("When competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease due to physiological changes indicating a substantial increase in risk of harm from exposure to a known hazardous substance, the element of injury and damage will have been satisfied and the cost of that monitoring is recoverable in tort."); *Bower v. Westinghouse Elec. Corp.*, 206

- 12 -

Finally, Nichols' argument that the Program has a value of $140,000 is baseless.[49] As set forth in the Deal Report, the estimated cost of the tests for PCS is $1,645 and for CTE ranges from $2,528 to $5,253. Using a participation rate of 25% based on other medical monitoring programs, there could be as many as 8,814 persons who will receive testing, with an economic value up to $54 million.[50]

In sum, Nichols conflates physical injury with the need for screening for all Settlement Class Members. Accordingly, his desire to ascribe zero benefit to the Medical Monitoring Program – unless a Settlement Class Member suffers from a life-ending neurodegenerative disease – should be rejected.

## C. Nichols' Claim That There are "Billions and Billions" of Dollars of Personal Injury Claims is Unsupported by the Current Landscape

With personal venom, Nichols begins his brief purporting to quote Mr. Siprut as contending that there are "billions and billions" of dollars-worth of NCAA personal injury claims.[51] Yet, from the same article, he leaves out the immediately preceding statement:

> If there was billions of dollars available in an NCAA settlement, "why wouldn't I have gone for it?" [Mr.]Berman told [Judge] Lee during Tuesday's hearing. "I like big-ticket cases. I've done a lot of big-ticket cases. If I could have expanded this into the

---

W. Va. 133, 139, 522 S.E.2d 424, 430 (1999) (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 826, 241 U.S. App. D.C. 83 (D.C. Cir. 1984) (emphasis added) (footnote omitted) ("It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations.")).

[49] Nichols Opp. at 6.

[50] *See* Deal Report, at 21, 24, 25. Nichols' argument that the economic value of the medical testing should be reduced by subrogation and calculated solely on the basis of co-pays should be rejected. Government health insurance plans (*i.e.*, Medicare) make clear that they are the secondary payer, not the primary payer (which would be the Settlement). Private health insurance plans also have coordination of benefits provisions, which would most likely not allow for subrogation. For these reasons, the Deal Report did not consider subrogation in evaluating medical costs.

[51] Nichols Opp. at 1.

> billion-dollar NFL case, I would have. The NFL has 45[00][sic] on
> personal injury claims so there's a mass of people you could work
> with. ... The NFL could buy peace for PR purposes. In this case,
> there are very few individual cases out there. There's not a
> groundswell suggesting even a need for a class action like in the
> NFL."[52]

Yet, this Court should not rely on purported quotations from the press, or heated arguments among counsel. Instead, this Court should weigh the evidence presented by the parties. As reflected below, the evidence is clear that (1) meritorious individual personal injury claims are worth an average of $1,374,907.41, according to evidence in the NFL MDL; (2) there are just 19 concussion-related personal injury claims currently pending against the NCAA; and (3) all but Nichols prefer to or have chosen to proceed individually on those claims. Thus, there is no evidence that there are billions and billions of dollars' worth of claims.

### 1. 5,000 individual NFL players have filed concussion-related personal injury claims.

In July 2011, the first lawsuit was filed by retired NFL football players related to concussion-related injuries.[53] On July 19, 2011, seventy-three (73) former NFL players filed a California state court complaint against the NFL, alleging that the NFL breached its duty by

---

[52] *See* http://www.cbssports.com/collegefootball/writer/jon-solomon/24641342/ncaa-reaches-concussion-settlement-for-70-million-in-testing (last accessed Aug. 30, 2014).

[53] *See* Memorandum Of Law In Support Of Motion Of Proposed Class Counsel For An Order: (1) Granting Preliminary Approval Of The Class Action Settlement Agreement; (2) Conditionally Certifying A Settlement Class And Subclasses; (3) Appointing Co-Lead Class Counsel, Class Counsel And Subclass Counsel; (4) Approving The Dissemination Of Class Notice; (5) Scheduling A Fairness Hearing; And (6) Staying Matters As To The Released Parties And Enjoining Proposed Settlement Class Members From Pursuing Related Lawsuits (Dkt. No. 5652) ("NFL Motion"), at 4, *In Re: National Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa. June 25, 2014) ("NFL MDL").

failing to warn and protect them against the long-term risks associated with concussions.[54] Since

then, more than 5,000 former players have filed substantially similar lawsuits.[55]

> ### 2. The scope of pending concussion-related personal injury claims against the NCAA pales in comparison to the NFL.
>
> #### a. From 2002 to September 2013, just 11 lawsuits were filed by NCAA student-athletes against the NCAA for negligence or personal injury.

From 2002 to September 2013, 97 lawsuits were filed against the NCAA.[56] Of those 97

lawsuits, 44 were brought by student-athletes.[57] However, just 11 of the student-athlete lawsuits

alleged personal injury or negligence.[58] A September, 2013 presentation prepared by the NCAA

provided:[59]



---

[54] *Id.* at 7 (citing Complaint, *Maxwell v. National Football League*, BC465842 (Super. Ct. Cal. July 19, 2011)).

[55] NFL Motion at 4.

[56] Donald Remy, "Litigation Trends: An analysis of NCAA court activity" (September 2013) ("NCAA Lit. Trends"), at 7, available at https://law.marquette.edu/assets/sports-law/pdf/SEPTEMBER%202013%20Donald%20Remy%20Presentation%20Litigation%20Updates.pdf (last accessed Aug. 27, 2014).

[57] *Id.* at 7.

[58] *Id.* at 8.

[59] *Id.*

Moreover, the NCAA reported that *just three* of the negligence lawsuits focused on traumatic brain injuries, including *Arrington*,[60] *Walker*,[61] and *Sheely v. NCAA*.[62]

> **b.     As of September 2, 2014, 19 Plaintiffs have asserted individual concussion-related personal injury claims against the NCAA – 44 percent of which are not before this Court.**

In this MDL, there are currently 73 Plaintiffs.[63] Of those Plaintiffs, *just 10 have asserted individual personal injury claims against the NCAA*.[64] Thus, in this MDL alone, just 13.6% of the Plaintiffs have pending personal injury claims. Moreover, of the 10 individuals with personal injury claims in this MDL, just one – Nichols – is contesting the class waiver.

Also, outside the MDL, there are nine pending cases brought by individual student-athletes against the NCAA related to concussions.[65] None of those cases was brought by counsel for the Nichols' Plaintiffs, nor have those plaintiffs sought to participate in this MDL. Thus, of

---

[60] *See generally* Second Amended Class Action Complaint (*Arrington* Dkt. No. 135).

[61] *See generally* Amended Complaint (*Walker, et. al. v. NCAA*, Case No. 13-CV-09117) (N.D. Ill.) (Dkt. No. 4)).

[62] NCAA Lit. Trends, at 14-16. *Sheely* was filed in Montgomery County (Md.) Circuit Court on behalf of the family of a Frostburg State University football player who died in 2011 after suffering a head injury during practice. *Id.* at 16.

[63] *Arrington, et al. v. NCAA* (4); *Walker, et al. v. NCAA*, No. 1:13-cv-09117 (N.D. Ill., filed Jan. 2, 2014) (3); *Durocher, et al. v. NCAA*, No. 1:14-cv-00035 (N.D. Ill., filed Jan. 8, 2014) (3); *Doughty v. NCAA*, No. 1:14-cv-00199 (N.D. Ill., filed Jan. 13, 2014) (1); *Caldwell, et al. v. NCAA*, No. 1:14-cv-00195 (N.D. Ill., filed Jan. 14, 2014) (43); *Powell, et al. v. NCAA*, No. 1:14-cv-00198 (N.D. Ill., filed Jan. 28, 2014) (1); *Morgan, et al. v. NCAA*, No. 1:14-cv-00196 (N.D. Ill., filed Jan. 14, 2014) (3); *Walton, et al. v. NCAA*, No. 1:14-cv-00200 (N.D. Ill., filed Jan. 13, 2014) (2); *Washington, et al. v. NCAA*, No. 1:14-cv-00197 (N.D. Ill., filed Jan. 14, 2014) (2); *Hudson v. NCAA*, No. 1:14-cv-00194 (N.D. Ill., filed Jan. 14, 2014) (1); *Nichols v. NCAA*, No. 1:14-cv-00962 (N.D. Ill., filed Feb. 11, 2014) (1); *Wolf v. NCAA*, No. 1:13-cv-09116 (N.D. Ill., filed Feb. 20, 2014) (7); *Jackson v. NCAA*, No. 1:14-cv-04387 (N.D. Ill., filed April 2, 2014) (1).

[64] *Arrington* (4), *Doughty* (1), *Durocher* (3), *Hudson* (1), *Nichols* (1).

[65] *Sheely v. NCAA*, Case No. 380569V (Montgomery Cnty., MD); *Wells v. NCAA*, Case No. 02-cv-2013-902657.00 (Mobile Cnty., AL); *Anderson v. NCAA*, Case No. 631093 (East Baton Rouge, LA); *Flasher v. NCAA*, Case No. CACE14009698 (Broward Cnty., FL); *Cunningham v. NCAA*, Case No. 3:14-cv-02256 (N.D. Tex.); *Schmitz v. NCAA*, Case No. 1:14-cv-01399 (N.D. Ohio); *Onyshko v. NCAA*, Case No. C-63-CV-201403620 (Wash. Cnty., PA); *Bradley v. NCAA*, Case No. 2014 CA 004932 B (D.C. Sup. Ct.); *Walen v. NCAA et al.,* No. 14cv12218 (Multnomah Cnty., Or.).

the pending concussion-related personal injury claims against the NCAA nationwide, 94% prefer to go it alone.[66]

### 3. Nichols' claim that a class action is superior for resolving individual negligence claims has no basis in fact.

Nichols argues that most individual lawsuits for concussion-related injury are worth just $8,000 to $20,000, citing to his lawyer's own arguments as evidence.[67] Based on his unsupported valuation, he claims that no lawyer would ever take an individual case or advance costs.

These contentions are belied by the public record and common sense. Fortunately most concussions resolve. For those whose concussions do not spontaneously resolve, the injuries can be life-altering and are not worth just $8,000 to $20,000. For example, the case of 19-year-old Preston Plevretes, a linebacker at Division I La Salle University in 2005, is set out in detail in the *Arrington* record.[68] After being head butted during a practice and receiving subsequent hits during a game, Plevretes complained to the school's trainer and student health center that he was having headaches, but continued to play while symptomatic. Then, during a game: "he was blocked, lost consciousness, regained consciousness, attempted to stand up, and then lapsed into a coma." As a result of playing while suffering from a concussion, Plevretes suffered "Second Impact Syndrome." On November 2, 2006, Plevretes filed an individual personal injury lawsuit

---

[66] Plaintiffs in *Sheely* have relied, in part, on the *Arrington* Plaintiffs' Proffer of Facts, which is exactly what we intended in ensuring that the NCAA agreed to designate certain documents as confidential thus permitting an unredacted version of the Proffer to be filed. *See* Fenno, "Death of Frostburg State player Derek Sheely due to 'egregious misconduct,' law says." THE WASHINGTON TIMES (Aug. 22, 2013), available at http://www.washingtontimes.com/news/2013/aug/22/death-frostburg-state-player-derek-sheely-due-egre/ (last accessed September 4, 2014) ("Several emails unearthed in that [*Arrington*] case, however, are cited in the laundry list of allegations against the NCAA in the *Sheely* lawsuit.").

[67] Nichols Opp. at 16 (citing July 29, 2014 Hearing Tran. 37:6-10 (Edelson's own arguments)).

[68] *See* Plaintiffs' Proffer of Facts In Support of Class Certification (*Arrington* Dkt. No. 176), ¶¶ 63-73.

against La Salle.[69] Multiple world-renowned experts testified on Plevretes' behalf.[70] In late

2009, La Salle agreed to settle the lawsuit for $7.5 million "to provide care" for Plevretes.

Similarly, in the NFL MDL, the 5,000 individual plaintiffs allege significant personal

injuries, and found well-respected lawyers to take their cases. There, the 5,000 individual

plaintiffs and the NFL negotiated a Monetary Award Grid for settling individual claims:[71]

| MONETARY AWARD GRID (BY AGE AT TIME OF QUALIFYING DIAGNOSIS) | | | | | | |
|---|---|---|---|---|---|---|
| Age Group | ALS | Death w/CTE | Parkinson's | Alzheimer's | Level 2 | Level 1.5 |
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45-49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50-54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55-59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60-64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65-69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70-74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75-79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

The above Monetary Award levels are the average base Monetary Awards for each of the Qualifying Diagnoses for particular age groups, except for the "Under 45" and "80+" rows, which list the maximum and minimum base Monetary Awards, respectively, for those age groups. A Settlement Class Member's actual base Monetary Award for ages 45-79 may be higher or lower than the average base Monetary Award listed for the Retired NFL Football Player's age group, depending on the Retired NFL Football Player's actual age at the time of Qualifying Diagnosis.

Thus, the average base award for symptomatic NFL football players is $1,374,907.41. This grid

underscores the fact that individual concussion cases are: (1) valuable; (2) will be litigated; and

(3) are not the $8,000 to $20,000-type of cases no one will litigate.

As further evidence that Nichols' valuations have no basis in fact, this Court need look no

further than the actual medical expenses incurred by the *Arrington* plaintiffs.[72] By way of

---

[69] *Plevretes v. La Salle Univ.*, Civil No. 071004973 (Ct. Com. Pl. Pa.) (Nov. 2, 2007).

[70] Proffer, ¶ 67.

[71] Ex. B-3 to the Class Action Settlement Agreement as of June 25, 2014, in the *NFL MDL*, *available at* https://www.nflconcussionsettlement.com/CourtDocs.aspx (last accessed Aug. 27, 2014).

[72] Plaintiffs' Supplemental Response To Certain Interrogatories And Plaintiffs' Rule 26(a)(1)(A)(iii) Disclosures, Ex. 2.

010270-12 715509 V1

example, as of on or about April 29, 2013, Plaintiff Adrian Arrington had incurred medical expenses of at least $76,567.69, as well as $19,023.09 in costs incurred as a result of the revocation of his scholarships.[73] Mr. Arrington would hardly agree that his costs plus continued symptoms, including seizures, amount to a personal injury claim that is worthless.

Finally, this Court could look to jury verdicts regarding concussions generally in the Chicago-area,[74] nationwide verdicts and settlements on behalf of middle school or high school football players that suffered brain injuries,[75] or NFL players outside the current MDL.[76] In sum, there is no truth to the argument that lawyers will not take individual concussion-injury lawsuits or that the value of an individual personal injury claim is so small as to discourage all claims.[77]

---

[73] *Id.* at _.

[74] *See generally* combined Ex. 3 (Cook County Jury Verdict Reporter reports showing that, for concussion-related cases, settlements and verdicts for non-sport concussion-related injuries range from $30,245-$790,860).

[75] *See, e.g.*, Bermes, Whitney, "Judge enforces settlement in Three Forks School District brain injury lawsuit," BOZEMAN DAILY CHRONICLE (July 10, 2014) (high school football player settled individual action against school district for **$300,000**, after the player suffered a second, same-day concussion in football practice and was knocked unconscious); Draper, Heather, "Frank Azar wins lawsuit against helmet maker Riddell," DENVER BUS. JOURNAL (April 14, 2013) **($11.5 million** verdict in favor of high school football player that suffered a head injury and was paralyzed on one side); "Cash Awards In Death Suits Are Often Lower," HERALD NEWS (Passaic Cnty., NJ, Sept. 29, 2012) (the family of a 17-year-old football player who died as a result of Second Impact Syndrome settled with the school district for **$125,000** plus an undisclosed sum with the helmet manufacturer); Clarridge, Christine, "Tahoma schools settle football-injury claim for $14.6 million," THE DAILY NEWS (Longview, Washington) (Sept. 18, 2009) **($14.6 million** settlement for middle school football player who suffered a concussion in a game, was twice returned to play and, after the game was over, collapsed).

[76] *See, e.g.*, A.P., "Former Bears players wins lawsuit against former team doctor" (July 22, 2000) **($1.55 million** jury verdict for former Bears fullback who contended he was cleared to play by the team doctor too soon after suffering a concussion, forcing his retirement from the NFL in October 1994).

[77] *See, e.g.*, Complaint, *Cunningham*, No. 3:14-cv-2256 (N.D. Tex.), ¶ 37 (as a result of concussions, NCAA basketball player "suffers from constant headaches, memory loss, dizziness, severe depression, speech impediments, panic disorder, anxiety, mobility issues, irritability, chronic traumatic encephalopathy, and panic disorder"); Complaint, *Schmitz*, No. 1:14-cv-1399 (N.D. Ohio), ¶ 18 (former Notre Dame football player "has been diagnosed with severe memory loss, cognitive decline, Alzheimer's, chronic traumatic encephalopathy, and dementia"). *Compare with* Complaint, *Nichols*, No. 14-cv-00962, ¶ 44 ("Nichols is at an increased risk of developing latent brain injuries or future neurological disorders").

- 19 -

**4.    A class waiver does not prevent the MDL Panel from centralizing or coordinating individual personal injury claims if they were common in fact – as it did with the NFL claims.**

Nichols argues that the lack of "a groundswell of individual claims" to date is the effect that a class waiver will have, which is a circular argument.[78] The lack of individual claims has nothing to do with a class waiver, but instead with a lack of manifested injuries in the Class.

Moreover, a class waiver will not prevent the Judicial Panel on Multi-District Litigation from centralizing and coordinating individual personal injury claims when the requirements of 28 U.S.C. § 1407 are met.[79] For example, the Panel explains on its website that it has historically centralized "mass torts, such as those involving asbestos, drugs and other product liability cases,"[80] and in fact had more than 67 pending MDLs that included mass torts as of December 31, 2013.[81] Accordingly, if the Panel determines in the future that there are efficiencies for personal injury claims to proceed in one court, it will centralize those claims.

**5.    Why, then, does Nichols want to proceed as part of a personal injury Class?**

We could wax poetic regarding his lawyers' need to be heard in the press, where he does not need to support his claims with evidence or experts. But the simple fact is the value of Nichols' individual claim is too low to proceed individually. Nichols, a football player from 1989-92, alleges in his Complaint that *he is currently asymptomatic*:

---

[78] Nichols Opp. at 17.

[79] *See* 28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated….").

[80] *See* http://www.jpml.uscourts.gov/panel-info/overview-panel (last accessed Aug. 27, 2014).

[81] Calendar Year Statistics of the United States Judicial Panel On Multidistrict Litigation (2013), *available at* http://www.jpml.uscourts.gov/statistics-info (last accessed Aug. 27, 2014).

- 20 -

The neurologist explained that Nichols' brain calcifications *may have been* caused by the brain trauma he sustained during his playing time in football, and informed him that he needed to be alert to any signs of headaches or pressure, as those could indicate that the calcifications had turned into tumors.[82]

To the extent that the calcifications without symptoms or tumors are enough to state a claim without a clear causal link,[83] his personal injury claim must overcome the statute of limitations.[84] Thus, while the other 95% of the individuals with personal injury claims pending against the NCAA are not seeking to prosecute their individual claims as part of a class action, just one plaintiff – Nichols – does not have a claim that his lawyer is willing to prosecute on his behalf alone absent a national platform.[85]

---

[82] *Nichols* Complaint, ¶ 38 (emphasis added). *Compare with* Expert Report of Robert C. Cantu, *Arrington v. NCAA*, ¶ 237 (Arrington "continues to suffer seizures, chronic severe headaches, depression, nausea and vomiting, photophobia, confusion, short-term memory loss/cognitive impairment, insomnia, and spells of unresponsiveness. These conditions in my opinion stem from concussions.); ¶ 270 ("…Owens has struggled academically and has been unable to finish a semester of classes. Owens continues to report migraines, moodiness, anxiety, feeling "shortfused," depression, trouble concentrating and short-term memory problems."); ¶ 302 ("…Solomon continues to suffer from headaches (including migraines caused by sensitivity to light, working on a computer, or stress), short term memory loss, intense psychological distress, anxiety, seizures, struggles with schoolwork….").

[83] For the five reported jury verdicts involving calcification in Cook County, Illinois during the period 1988 to the present, just three involved calcifications in the brain, *none* involved a plaintiff who was asymptomatic, and *none* involved a personal injury solely related to the existence of a calcification in the brain. *See* Ex. 3 (Jury Verdict Reporter case details reports for *Kunz v. Dr. Neil Levie, et al*., No. 02 L-1954 (Cook Cnty., IL) (jury verdict in favor of the defense); *Samudio v. Dr. Maureen O'Loughlin et al*., No. 98 L-2927 (Cook Cnty., IL) (same); *Minor v. Dr. Charles James*, No. 95 L 5066 (Cook Cnty., IL) (settlement of $3,000,000 after minor lapsed into a coma and died following a biopsy procedure).

[84] *See* http://www.courts.ca.gov/9618.htm (The statute of limitations in California for personal injury is "[t]wo years from the injury. If the injury was not discovered right away, then it is 1 year from the date the injury was discovered.").

[85] For that reason, Mr. Edelson is already worried about how he will get paid. *See* Nichols Opp. at 24-25 (complaining that the Settlement requires that individual class members who hire their own lawyers have to pay their own lawyers).

**D.**     **The Procedural Protections of Rule 23(b)(3) Together With the Class Waiver Can be Approved as Fair, Adequate and Reasonable**

Plaintiffs will not repeat the arguments from their Supplemental Submission In Support of Preliminary Approval here, but instead reply narrowly to the arguments raised by Nichols.[86]

**1.**     **Class action waivers are not per se unfair.**

Nichols asserts that class action waivers "should be rejected, irrespective of whether individual claims are preserved and regardless of any notice and opt out rights provided."[87] Not a single case makes such a sweeping finding. Each of the cases cited by Plaintiffs and Nichols turns on specific facts regarding relief afforded to the class, the scope of the waiver, the value of individual claims preserved, and whether due process protections were afforded.

For example, citing *Crawford v. Equifax*,[88] Nichols contends that the Seventh Circuit would find the release of class personal injury claims improper. However, while *Crawford* involved claims brought pursuant to the Fair Debt Collection Practices Act, the plaintiffs settled for $0 in damages, prospective injunctive relief, and a waiver of class damages claims even though individual damages claims were worth a maximum of $2.34 each.[89] Under those circumstances, the Seventh Circuit was correct: the class "gain[ed] nothing…."[90] Plus, plaintiffs sought to certify the settlement class under Rule 23(b)(2), without notice to the class or the right to opt out.[91] *Crawford* thus has no application here.

---

[86] Nichols Opp. at 9-17.

[87] Nichols Opp. at 10.

[88] 201 F.3d 877 (7th Cir. 2000).

[89] *Id.* at 879, 882.

[90] *Id.* at 882.

[91] *Id.* at 879-80.

The Settlement in this case provides meaningful benefits under a 50-year Medical Monitoring Program to all Settlement Class Members.[92] Meritorious individual personal injury claims are worth far more than the $2.34 in *Crawford* – based on reported jury verdicts, the NFL MDL monetary award grid, and actual medical and out-of-pocket expenses incurred by the *Arrington* class representatives, among others.[93] Thus, 95% of the current personal injury plaintiffs are willing to or have chosen to proceed individually. Moreover, Plaintiffs have expressly sought to ensure that Settlement Class Members receive notice and an opportunity to exclude themselves from the Settlement.[94] Under these circumstances and as more fully set forth in Plaintiffs' Supplemental Submission,[95] the class waiver was a bargained-for concession to achievement of meaningful medical monitoring benefits.

### 2. The Class action waiver is only applicable to concussion-related bodily injury claims.

Nichols fabricates case ideas to contend that the class action waiver extends beyond bodily injury claims, claiming that it will bar, *inter alia*: (i) alumni's claims that they donated to schools under false pretenses, "believing the schools were protecting student-athletes…"[96]; and (ii) ticketholder's claims "who may allege that they paid for events that were excessively violent." [97] On the contrary, the waiver was narrowly drafted to ensure that it applies only to claims of Settlement Class Members "arising from or relating to concussions or sub-concussive hits or contact sustained during participation in collegiate sports as an NCAA student-athlete," and does not apply to "class claims that do not relate in any way to medical monitoring or

---

[92] Settlement Agreement, § IV.

[93] *See* notes 75, 76, *supra.*

[94] Settlement Agreement, §§ X, XI.

[95] *See* Settlement Class Representatives' Supplemental Submission In Support Of Plaintiffs' Motion For Preliminary Approval Of Settlement (Dkt. No. 77).

[96] Nichols Opp. at 15.

[97] *Id.*

medical treatment or concussions or sub-concussive hits or contact."[98] Accordingly, Nichols' objections should be overruled.

## E. The Changes to the Concussion-Management and Return-to-Play Guidelines Will Protect All Current Student-Athletes

### 1. "Merely" receiving a baseline test in advance of every season provides a meaningful benefit to 100% of all current student-athletes.

Nichols contends that current student-athletes "merely receive a pre-season baseline test," without any expert or evidentiary analysis that disputes the enormous medical value of such testing.[99] With just one reference in the text of his brief to baseline testing, he provides a misleading pie chart that makes it appear all current student-athletes will not receive the baseline testing.[100] However, all current student-athletes will receive baseline testing before the start of each season:



Dr. Cantu has opined that the Settlement's mandated baseline testing "is a significant step that will provide appropriate clinical data to the clinician after a student has been concussed that may be used to determine, among other things, whether or when the student-athlete has recovered and may return to play."[101] Nichols has provided no expert testimony contradicting the

---

[98] Settlement Agreement, § II.N.

[99] Nichols Opp. at 3.

[100] *See* Nichols Opp. at 4.

[101] Cantu Report, ¶ 50.

importance of baseline testing. Accordingly, while Class Counsel has not sought to place a monetary value on the inclusion of mandated baseline testing for 100% of current student-athletes, the baseline testing is not an after-thought, but instead a significant benefit.

> **2.      Nichols conflates NCAA PR with evidence as to the current state of mandated return-to-play guidelines.**

Nichols contends that the guidelines adopted under this Settlement were put into place a couple of years ago.[102] However, it is clear that this Settlement goes much further than any current NCAA guidelines or requirements.[103] Thus, a review of the facts reflected in Appendix A – without rhetoric or embellishment – belies Nichols' criticisms.

**F.      The Tolling of Personal Injury Claims of Settlement Class Members**

Class Counsel caught the fact that tolling should not end until the Court rules on the Motion For Final Approval, raised this issue with NCAA's counsel on July 29, 2014 just before the last hearing, and the NCAA has agreed to an amendment.[104]

**G.      Nichols' Remaining Contentions Do Not Preclude a Finding that the Settlement is Within the Range of Possible Approval**

Nichols raises four issues, namely that Section XX.F of the Settlement Agreement violates ethical rules, the Class Definition is overbroad, the Settlement includes medical monitoring relief even where not recognized by state law, and a class action waiver speculatively creates clients for Hagens Berman.

First, Class Counsel agrees that they should be deleted from Section XX.F, and the NCAA has consented to this amendment.

---

[102] Nichols Opp. at 5.

[103] *See* Appendix A. In fact, other than in the areas of same day return-to-play and academic accommodations, the NCAA has not yet instituted changes in any area that meets the level of required changes to concussion-management and return-to-play guidelines mandated by this lawsuit.

[104] Settlement Agreement, § XX.S.

- 25 -

Second, the Class Definition is not overbroad. It is medically impossible to know today which members of the Settlement Class will develop mid- to late-life neurodegenerative diseases. But all Settlement Class Members played NCAA sports during a time when the NCAA failed to comply with consensus best practices, and thus could have been harmed. The Seventh Circuit has held that all persons who could have been harmed may be included in the class.[105]

Third, the fact that medical monitoring relief is provided for Settlement Class Members in 50 states is consistent with the very purpose of Rule 23 and the strong judicial policy favoring global settlements.[106] There is zero evidence that providing 50 state relief watered down any relief provided to class members in the 18 states that recognize medical monitoring.

Finally, Nichols' speculation that this Settlement creates clients for Hagens Berman has no basis in fact. As reflected above in Section I, *supra*, there are currently 19 personal injury claims pending against the NCAA. Hagens Berman represents just three of those plaintiffs.

### III.    CONCLUSION

WHEREFORE, the Settlement Class Representatives respectfully request that the Court grant their Motion For Preliminary Approval.

---

[105] If "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012); *Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677 (7th Cir. 2009). But a distinction exists "between class members who were not harmed and those who could not have been harmed." *Messner*, 669 F.3d at 825. For example, in *Messner*, the Seventh Circuit held that an antitrust plaintiff class could not be defined to include persons who purchased a product before the defendant possessed market power, for those persons could not have been injured by the defendant's alleged abuse of market power. *Id.* at 824-25. Here, however, all NCAA student-athletes (Settlement Class Members) played sports without the benefit of concussion-management or return-to-play guidelines that were uniformly enforced or met consensus best practices.

[106] *See Sullivan*, 667 F.3d at 305.

Date:  September 5, 2014

Respectfully submitted,


By:   /s/ Steve W. Berman
    Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594


Elizabeth A. Fegan
*beth@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950


Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
gbarbakoff@siprut.com
Siprut PC
17 North State Street
Suite 1600
Chicago, IL  60602
312.236.0000
Fax: 312.878.1342


*Co-Lead and Settlement Class Counsel*

010270-12  715509 V1