1                    IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3  IN RE:  NATIONAL COLLEGIATE     )  Docket No. 13 C 9116
    ATHLETIC ASSOCIATION STUDENT-  )
4  ATHLETE CONCUSSION INJURY       )  Chicago, Illinois
    LITIGATION,                 )  October 23, 2014
5                          )  10:00 o'clock a.m.

6             TRANSCRIPT OF PROCEEDINGS - MOTION
            BEFORE THE HONORABLE JOHN Z. LEE
7

APPEARANCES:

8

For Plaintiffs:              HAGENS BERMAN SOBOL SHAPIRO, by
9                        MR. STEVE W. BERMAN
                        1918 8th Avenue
10                      Suite 3300
                        Seattle, Washington 98101
11

                        HAGENS BERMAN SOBOL SHAPIRO, by
12                      MS. ELIZABETH A. FEGAN
                        1144 West Lake Street
13                      Suite 400
                        Oak Park, Illinois 60301
14

                        SIPRUT PC, by
15                      MR. GREGG MICHAEL BARBAKOFF
                      MR. JOSEPH J. SIPRUT
16                        (appearing telephonically)
                      MR. GREG JONES
17                        (appearing telephonically)
                      17 North State Street
18                      Suite 1600
                      Chicago, Illinois 60602
19

                        HAUSFELD LLP, by
20                      MR. RICHARD S. LEWIS
                      1700 K Street NW
21                      Suite 650
                      Washington, DC 20006
22

             ALEXANDRA ROTH, CSR, RPR
23             Official Court Reporter
            219 South Dearborn Street
24               Room 1224
            Chicago, Illinois 60604
25              (312) 408-5038

1   APPEARANCES: (Continued)

2                                  ZIMMERMAN REED PLLC, by
                                   MR. BRIAN C. GUDMUNDSON
3                                  651 Nicollet Mall
                                   Minneapolis, Minnesota 55402
4
                                   JAMES C. SELMER & ASSOCIATES, by
5                                  MR. MARC M. BERG
                                      (appearing telephonically)
6                                  500 Washington Avenue S
                                   Suite 2010
7                                  Minneapolis, Minnesota 55415

8                                  CORBOY & DEMETRIO, by
                                   MR. WILLIAM T. GIBBS
9                                     (appearing telephonically)
                                   33 North Dearborn Street
10                                 Suite 2100
                                   Chicago, Illinois 60602
11
                                   COHEN & MALAD, by
12                                 MR. VESS A. MILLER
                                      (appearing telephonically)
13                                 One Indiana Square
                                   Suite 1400
14                                 Indianapolis, Indiana 46204

15                                 ZELLE HOFMANN VOELBEL &
                                   MASON, by
16                                 MR. SHAWN D. STUCKEY
                                      (appearing telephonically)
17                                 500 Washington Avenue
                                   Suite 400
18                                 Minneapolis, Minnesota 55415

19                                 HAUSFELD LLP, by
                                   MS. MINDY B. PAVA
20                                    (appearing telephonically
                                   1700 K Street NW
21                                 Suite 650
                                   Washington, DC 20006
22
                                   THE LANIER LAW FIRM, by
23                                 MR. RYAN D. ELLIS
                                      (appearing telephonically
24                                 6810 FM 1960 West
                                   Houston Texas 77069
25

1    APPEARANCES: (Continued)

2    For Proposed Intervenors          EDELSON PC, by
     Moore and Nichols:                MR. JAY EDELSON
3                                      350 North LaSalle Street
                                       Suite 1300
4                                      Chicago, Illinois 60654

5    For Defendant NCAA:               LATHAM & WATKINS, by
                                       MR. MARK STEVEN MESTER
6                                      MS. JOHANNA MARGARET SPELLMAN
                                       330 North Wabash Avenue
7                                      Suite 2800
                                       Chicago, Illinois 60611
8
     ALSO PRESENT:                     COATS ROSE YALE RYMAN & LEE, by
9                                      MR. DWIGHT E. JEFFERSON
                                       Nine Greenway Plaza
10                                     Suite 1100
                                       Houston, Texas 77046
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       THE CLERK:  13 CV 9116, NCAA Student Athlete

2  Concussion Injury Litigation, for motion hearing.

3       MR. BERMAN:  Good morning, your Honor.  Steve Berman

4  on behalf of the plaintiffs.

5       MR. MESTER:  Mark Mester and Johanna Spellman on

6  behalf of the NCAA.

7       MR. EDELSON:  Good morning, your Honor.  Jay Edelson

8  on behalf of the proposed objectors.

9       MR. BARBAKOFF:  Good morning, your Honor.  Gregg

10  Barbakoff on behalf of plaintiffs, from Siprut PC.

11       THE COURT:  Good morning, counsel.  We have people on

12  the phone.  Will the people on the phone introduce themselves

13  for the record please.

14       MR. SIPRUT:  Good morning, your Honor.  This is Joe

15  Siprut for plaintiffs.  And thank you for allowing some of us

16  to appear telephonically this morning.

17       MR. BERG:  Marc Berg on behalf of Paul Morgan and

18  others from the district of Minnesota, calling from

19  Minneapolis.  Thank you, your Honor.

20       MR. GIBBS:  Bill Gibbs on behalf of the Wolf

21  plaintiffs.

22       THE COURT:  Anyone else on the phone?

23       MR. JONES:  -- from Siprut PC also on behalf of Mr.

24  Arrington.

25       THE COURT:  Who is that please?  Can you repeat your

1   name?

2        MR. JONES:  Greg Jones also from Siprut PC on behalf

3   of the plaintiffs.

4        MR. MILLER:  Vess Miller from Cohen and Malad on

5   behalf of the Durocher plaintiffs.

6        MR. STUCKEY:  Shawn Stuckey from Zelle Hofmann on

7   behalf of the plaintiffs.

8        MR. ELLIS:  Ryan Ellis, Lanier Law, here for the

9   plaintiffs.

10        MS. PAVA:  Mindy Pava, Hausfeld, on behalf of the

11   plaintiffs.

12        THE COURT:  Anyone else?  All right.  Very well.

13        I understand that there is a PowerPoint presentation

14   at some point today that the attorneys want to present.  But I

15   have had a chance to now review the rather voluminous

16   submissions by the parties, the settling parties, the NCAA, as

17   well as Mr. Edelson on behalf of the Nichols, his client the

18   Nichols, and the putative class.

19        The purpose of today's hearing is, I had some

20   questions regarding the scope of the settlement, some of the

21   terms of the settlement.  And I want to discuss those concerns

22   with counsel today.  With regard to the -- so that was kind of

23   the main thing on my agenda as I continue to evaluate the

24   preliminary approval motion that is currently pending before

25   the Court.

1      I understand that plaintiffs' counsel, Hagens Berman,

2   has a presentation they would like to make at some point.  Is

3   that correct?

4      MR. BERMAN:  It's -- no, up to you, your Honor.

5   You're directing.

6      THE COURT:  What is the presentation intended to

7   address?

8      MR. BERMAN:  It's intended to address the objections.

9   I can go through the following things.  One, to review the

10  terms of settlement again, in case you have questions.  You

11  probably studied it and you might not.  To address the

12  objections, to talk about Rule 23 and to walk you through the

13  notice plan and the schedule.

14     THE COURT:  Okay.  I think I have covered a lot of

15  those in my questions.  So let's do this:  I will hear from

16  counsel in response to the questions that I have.  And if, Mr.

17  Berman, you think that parts of your presentation might provide

18  some additional illumination on those points you are more than

19  welcome to use it.  But these are pretty focused.

20     So first of all, I wanted to talk about the concerns I

21  have regarding the scope of the proposed putative class, both

22  in terms of scope of activity as well as temporal scope.  So

23  first, with regard to the scope of activity or the sports, as

24  counsel knows, Rule 23(a) requires, among other things,

25  typicality and that the named class representatives adequately

1    represent the interests of the putative class members.

2           The class definition as it currently is proposed

3    includes current and former student athletes who played an

4    NCAA-sanctioned sport at an NCAA member institution.  It does

5    not provide any limitation on what type of sport, so long as it

6    is NCAA-affiliated or sanctioned.  And it certainly doesn't

7    provide any limitation as to scope in time.  And both those

8    things raise different types of concerns with regard to

9    preliminary approval of the settlement.

10          So first of all, with regard to the type of sport, the

11   proposed class definition does not differentiate between those

12   student athletes who played what is defined to be contact

13   sports; that is, football, lacrosse, wrestling, ice hockey,

14   soccer and basketball, and those who played non-contact sports

15   such as baseball, water polo, skiing, as well as the numerous

16   other NCAA-sanctioned sports that are in various schools.

17          This distinction does manifest itself in parts of the

18   proposed settlement agreement.  For example, the return-to-play

19   guidelines as well as some of the provisions that provide for

20   additional medical staff and training provide additional

21   protections for contact sports that is not provided in

22   non-contact sports.

23          Now, perhaps in some respects that might make a lot of

24   sense.  Perhaps if you play -- if you have a student athlete in

25   a rifling event, for example, which I understand is an NCAA-

1  sanctioned sport in some instances, perhaps you don't

2  necessarily have a lot of risks of concussions.  But perhaps

3  you do.  Certainly one can envision a scenario where someone

4  playing baseball, water polo, skiing, gymnastics, might have

5  concussion concerns.

6  Now, I am not saying that they will or not.  But what

7  I am saying is that the Court is cognizant of the fact that

8  those non-contact sports are not represented by any class

9  representative in any of the classes.  In fact, all the named

10  representatives have played a contact sport.

11  And so whether or not those are legitimate concerns at

12  this point I am not sure whether or not the Court, or frankly

13  anyone else here, knows, given the fact that we do not have a

14  class representative in any of the class actions that has

15  played a non-contact sport, as that term is defined in the

16  settlement agreement.

17  The differences also manifest themselves in some of

18  the assumptions that is used by Analysis Group and Bruce Deal,

19  when he concludes that the amount of the settlement is adequate

20  for the medical monitoring program.  For example, one of the

21  assumptions that he uses -- or not assumptions -- figures that

22  he uses to calculate the anticipated number of people that

23  would participate in the medical monitoring program is based

24  upon the number of concussions reported per every thousand

25  student athletes who played a contact sport.

1      There is no discussion of the rate of concussions in
2 any other sport.  If there are such data, and I don't know
3 whether or not there is and that's one of the questions I have,
4 presumably that number would increase the participation rate
5 that forms the basis of Analysis Group's conclusion that the
6 funds that are currently allocated for the medical monitoring
7 project are sufficient.

8      So those are some ways in which the distinction
9 between contact sports and non-contact sports again manifests
10 itself throughout the settlement agreement and the procedure
11 that the parties contemplate.  And I also note that according
12 to Bruce Deal's estimates, approximately 2.4 million of the
13 4.2 million putative class members were athletes who played
14 non-contact sports.

15      So you have more than 50 percent the class, of the
16 putative class, who, No. 1, did not play contact sports; No. 2,
17 are not represented by any named class member in any of the
18 class actions that are currently before the Court.

19      Given that, my question to counsel -- and we will
20 start with Mr. Berman, and then I will hear from the NCAA and
21 anyone else, any other counsel, that would like to speak up --
22 can the current class representatives adequately represent the
23 interests of those who played non-contact sports when it comes
24 to the terms that are set forth in this settlement?

25      Mr. Berman?

1          MR. BERMAN:  Thank you, your Honor.

2          With respect to why we included the non-contact

3    sports, there are probably instances that we don't know about

4    where a non-contact person has been concussed.  The NCAA data

5    that we had as far as --

6       (Brief interruption.)

7          MR. BERMAN:  Sorry.

8          The data as far as I know that the NCAA gave us in

9    discovery that tracks concussions only tracks the contact

10   sports.  But we are aware of examples, for example a baseball

11   player.  I'm assuming this because Major League baseball has

12   focused on the fact that catchers are getting concussed when

13   there is collisions at home plate.

14         So even though we don't have the data, we figure that

15   there are probably some athletes out there who have been

16   concussed in baseball.  I think there are -- in the settlement

17   negotiations the NCAA give us some other examples of sports

18   that we wouldn't think, like a steeplechase runner falling off

19   the steeple and hitting his head.  So there is isolated

20   examples out there.

21         So we figured that we wanted to offer the benefits of

22   medical monitoring as broadly as possible so that health issues

23   could be addressed.  I think the Sullivan case from the Third

24   Circuit, so called De Beers case, talks about the fact that the

25   settlement can be broader than some of the underlying aspects

of the litigation. So we felt that we were fairly safe with respect to covering a broader group, and it was the right thing to do.

We don't think as a practical matter that covering that many athletes will dilute the medical monitoring fund because we just don't think that there are that many. There has to be two things. There has to be a concussion, and there has to be long-standing injury, which we know is not that frequent. So it's probably not a large number of people.

As to your second question, why we did not implement the return-to-practice or return-to-play guidelines more broadly than contact sports, the answer was, that was a hotly contested issue because what we're imposing on particularly Division Two and Three schools has financial consequences and has significant financial consequences.

So, for example, let's take baseline testing. Although Mr. Edelson belittles that, the scientific evidence from the only scientist in this case, Dr. Cantu, says that that's probably the most critical thing. If you don't have a baseline for an athlete, then it's much harder to tell what happened to them. In fact, baseline testing -- my daughter is getting baseline tested at Youth 13 soccer. It's like a fundamental part of concussion management.

But it has an expense. So we are imposing that expense on Division Two and Three schools, not happily from

1  what I can tell. We're also imposing the expense of having

2  qualified medical personnel at all games. That's a lot of

3  games when you think of all the different contact sports.

4  That's expensive. And the Division Two and Three schools also

5  have to have available during practices qualified medical

6  personnel.

7  So if we went further, if we went to golf and we went

8  to, you know, swimming, we probably -- first of all we'd never

9  have had a settlement package. But we wouldn't really be doing

10  good. We would be doing more harm, because to get the schools

11  to agree to what we did, they have to see that it was

12  necessary. And going beyond that I don't think is necessary.

13  THE COURT: Mr. Berman, I guess there is two questions

14  I have with regard to that, follow-up questions. One is that

15  if the issue was hotly contested, and I have no reason to take

16  issue with what you tell me, the concern I have is then

17  shouldn't there be someone who played a non-contact sport be

18  part of this lawsuit? Because the current class

19  representatives who play contact sports, it's completely within

20  their -- it's to their benefit to agree that those additional

21  procedures be applied to contact sports, because frankly they

22  may or may not care about the other sports.

23  Now, I am not saying that it should be applied to all

24  sports. It probably doesn't make sense for it to be applied to

25  all sports, particularly in the fashion that's currently

contemplated. But my concern is that the interests of people who play non-contact sports be formally represented in this case, so that those representatives can themselves make the decision of whether or not they think that that is a critical, material part of the settlement or not.

So, for example, I could see a rifleman or golfer, if there is a class representative who played golf or those actions, saying, look, I am happy with the attempts that were made. I am happy with the compromises that were made to get to this settlement. And, you know, because I don't think that the risks for concussions in golf really are that pressing an issue or that material, I am willing to give up that right so that we can have all those other rights. And I understand that. And practically speaking I also understand the practical implications of that as well.

My concern with regard to adequacy is that there isn't anyone representing non-contact sports that are part of the actions that were consolidated into this action. That was my No. 1 concern.

The other concern I have is, I understand the intent, and I believe it's well meaning, that the parties want to provide medical monitoring to as inclusive a population as possible. But on the flip side, one of the rights of a class representative, putative class representatives, is the right not to bring the lawsuit.

So, for example, if someone who plays a non-contact sport -- and I don't know what exactly, by the way, the sport of rifling entails. But I am going to assume for purposes of this hearing there is not a lot of risk of concussions in rifling. I could be completely off about that.

But assuming that there is, I could see someone who is playing that sport saying, you know what? I don't even want to be a plaintiff in this case. I don't want to be part of this class, because I don't want to give up my rights in any respect. And I don't even want to have to opt out. I just don't want to be a part of it at all from the get-go. And that is a right, I think, that needs to be recognized and represented in this class. So with regard to the breadth of the class, that's kind of another concern.

Tangentially, and we'll talk about this a little bit more later, here the parties, the settlement parties, are asking for hybrid class, so a Rule (b)(2) class, with notice and opt-out. Right? And so the parties have stressed how critical, and I believe it is critical, whether proceeding under (b)(2) or (b)(3), that notice and opportunity for opt-out be provided to putative class members.

But the larger and more not to say -- amorphous isn't the right word, but the larger and broader the class is, the more difficult it's going to be to ensure as a practical matter that the individuals whose rights are affected get notice of

1  this lawsuit and are provided meaningful opportunity to opt

2  out.  And so they are kind of balancing concerns and

3  considerations there that may limit the intention to provide

4  the benefit to as broad a population as possible.

5         And, Mr. Berman, you say that as a practical matter it

6  might be that people who play non-contact sports will not

7  participate in the settlement.  And that's probably true.  I

8  would anticipate that student athletes who played football and

9  hockey and sports of that sort, you probably see greater

10  participation rate certainly than in non-contact sports.

11         But again, if that's the case, I think the question

12  becomes, should the people that played those other sports be

13  included in the class in the first instance if, No. 1, they

14  don't want to be a part of the class; No. 2, they don't think

15  they have any claims in the class; No. 3, practically speaking

16  they are probably not going to participate in the relief that

17  is granted by the settlement.  And if that's the case -- and

18  again, we don't know.  And the reason we don't know is because

19  those interests are not represented here.

20         I don't know if you want to respond.

21         MR. BERMAN:  So there is two ways we can respond to

22  that.  Your Honor, I think you are making good points.  And we

23  wrestled with this exactly the way you did.

24         One thing we could do in response is, we could modify

25  the class definition to be only contact sports.  I think that's

1   a solution that is easily done, because we are talking about a

2   marginal reach, if I can use that term, for the few athletes

3   out there that might have had a concussion in one of these

4   other sports.

5          To go down the path that you're suggesting I think

6   would be problematic because I hear what you're saying, that

7   the riflemen might say, wow, I wasn't included.  I should have

8   been.  But then we have to go to every sport, I think.  And

9   then we would have a never-ending -- we couldn't get that kind

10  of representation, I don't believe.  We'd have to have an

11  athlete from every sport.  They all may have different views.

12  You're correct.

13         So if you felt we had to go down that path, we had to

14  have non-contact sport representation, my view would be that we

15  should modify the class definition.  Because we -- we did not

16  bring the case for those people, if you look at our complaint

17  and the way the case was fashioned.

18         THE COURT:  Just as a side note, I would also think it

19  would be going down that path -- and again I wasn't suggesting

20  one or the other.  I am just raising concerns.  It would also

21  be difficult because I believe -- and again NCAA can correct me

22  if I am wrong -- but that different sports became recognized by

23  the NCAA at different times throughout history.  And so then

24  you have the issue of the temporal issue to deal with.

25         MR. BERMAN:  Correct.

1          THE COURT:  So let me then segue into the concern with
2    regard to the time frame of the class.  And again, the concerns
3    with regard to the time frame deal with the difficulties of
4    notice.  The class as currently constituted, which includes
5    every athlete for all time, you know, raises concerns with
6    regard to the feasibility and practicalities of providing
7    notice, particularly because -- and I believe Bruce Deal noted
8    this as well -- two thirds of the putative class members
9    graduated ten or more years ago.  And so I understand that as
10   part of the notice plan the NCAA proposed that it will obtain
11   records from the schools themselves.

12         But obviously the continuing accuracy of records of
13   people that went to school decades ago is quite questionable.
14   People undoubtedly moved.  I know I have on numerous times
15   since I graduated from college.  Students may have gotten
16   married, changed their name.  I mean, there is a host of
17   reasons why the information, to the extent that schools still
18   have them, would be old and dated.

19         And so if notice is such a critical issue to ensure
20   due process rights of putative class members, Mr. Berman,
21   doesn't it make sense to have some limitation with regard to
22   class period to a more manageable period so we have the best
23   chance of obtaining accurate information, so we can provide as
24   effective notice as possible?  I know that in the Arrington
25   complaint that you first brought, that the class definition as

1  far as temporal timing was from 2004 onward.

2        Wouldn't it make sense to do that, to have some sort

3  of temporal limitation to this class?

4        MR. BERMAN:  Well, here is how we got to the time

5  limit, and then I'll talk about notice.  With respect to time

6  limit, the issue of when to start the class, whether it's 2004

7  or 2002 or 2007 or even 2010, that was going to be a hotly

8  litigated issue, the issue being when did -- was there a

9  consensus about what proper concussion management was, which is

10 the first leg of our case against the NCAA.  And when did the

11 NCAA breach that duty was hotly contested.

12       So while we are negotiating a settlement, other cases

13 were filed, as you know, when word got out.  And those lawyers

14 were taking the position that it should be 1995.  And there is

15 a gentleman in the room -- courtroom today who's got an athlete

16 who was injured in 1969.

17       So we felt that if we picked 2002 or 2004, a new case

18 would be filed, say, okay, now we want to do it from 1998.  And

19 then another.  It would never end.  So we decided the best

20 thing to do, since this is a contested issue, is to be broad.

21       Now, with respect to notice, we're not really going to

22 -- we don't know how good the direct mail plan will be, because

23 that's going to be dependent on the participation rate of the

24 schools.  And we've never done this before with the schools.

25 So I have no idea what's going to happen.

1          I think some of the larger schools will be

2   cooperative.  I think some of the smaller schools are going to

3   be wow, what do I do with this?  I don't have the staff to send

4   this to the notice administrator.

5          But the notice administrator here -- and I have the

6   notice administrator here in court, Mr. Vasquez, if you want to

7   ask him any questions.  And he's going to tell you and he's

8   going to opine, he has in his declaration, that we're going to

9   be able to get to these older players.  The internet is an

10  amazing tool for notice.

11         And so when there is a story that's run on Yahoo and

12  someone clicks on it, we'll be sending a banner ad to those

13  people.  So to the extent ten- or 12-year-old athletes are out

14  there and they're on the internet, which they probably are,

15  we're going to be able to get them notice in a way that ten

16  years ago we couldn't do that.

17         So I'm fairly confident, if you take a look at Mr.

18  Vasquez's plan, that notice is going to be given here so that

19  your concern, although it's a good point, I think it should be

20  satisfied by the notice plan.

21         THE COURT:  Okay.  And the costs for the notice plan,

22  I know that the notice plan has two phases, phase one and phase

23  two.  Are the costs of the notice plan for both phases subsumed

24  in the administrative costs that were calculated by Mr. Deal?

25  He set forth $6.7 million anticipated costs for administrative

1    costs.  And I think some of the notice costs are in there, but
2    I am not sure whether that's an all-in figure.

3         MR. BERMAN:  No, it's not an all-in figure.  So there
4    are additional notice costs.  What -- Mr. Deal is opining on
5    the cost.  So, for example, yesterday we met with a firm called
6    Garretson Resolutions, the NCAA and -- and Ms. Fegan and
7    myself.  They're setting up, if preliminary approval is
8    granted, how the medical centers will be established.  So right
9    now we think there will be at least 33 locations, so that we're
10   covering 90 percent of the population that will be within 200
11   miles of one of those centers.

12        The costs of administering the tests and administering
13   all those centers, that's what Mr. Deal was opining on.  So we
14   have to have staff.  We're going to have to have all kinds of
15   stuff.  And the first round of notice costs are in Mr. Deal's.
16   It's the second round that's not.

17        THE COURT:  Do we have an estimate at this point as to
18   what the costs for the second round would be?

19        MR. VASQUEZ:  I believe we contemplated if there were
20   no direct notice, both phases together would still be under a
21   million dollars.

22        Alan Vasquez, your Honor.

23        THE COURT:  So without the -- so without direct
24   notice --

25        MR. VASQUEZ:  Yes, without direct notice.  We provided

1  a chart and -- or I provided a chart in the declaration

2  dependent on how much direct notice contact information was

3  available.  We would still be -- the program would meet the

4  rules.

5          THE COURT:  Okay.  What was the upper ceiling for

6  those costs for phase two?

7          MR. VASQUEZ:  You know, I don't -- I don't have the

8  exact figure in my head right now.  I can leave it with -- if

9  we had zero direct notice, I want to say our program was close

10  to 800,000 including phase one and phase two.

11          THE COURT:  Okay.  And it would decrease depending on

12  how much direct --

13          MR. VASQUEZ:  Correct, correct.

14          THE COURT:  All right.  And, Mr. Berman, the 6.7

15  figure, does that include efforts for direct notice if the

16  parties thought direct notice was practicable?

17          MR. VASQUEZ:  If -- no, my costs do not include cost

18  of direct notice until we know how many records there are.  The

19  cost of printing and mailing, the number of e-mail addresses,

20  are all going to affect the cost.

21          THE COURT:  And as you say, Mr. Berman, you haven't

22  done something like this before where you are reaching out to

23  all the schools, or the NCAA reaching out to all the schools.

24  But has anyone done a range analysis or sensitivity analysis on

25  the expected direct mailing costs, depending upon how extensive

1   the response was based upon the class as currently defined?

2        MR. BERMAN:  We have not.  We can do that for you.

3   You know, we get very excellent bulk mail rates and so forth.

4   And we can do a chart just like Mr. Vasquez did in his

5   declaration on mail cost.

6        THE COURT:  I take it that those costs will come out

7   of the overall all-in amount, right?

8        MR. BERMAN:  That's correct.  It's an unknown, to be

9   frank.  We've never done this before.  We've done it in other

10  cases where we subpoenaed people and they give us information.

11  This is not a subpoena.  It's voluntary.  The -- having to

12  subpoena all these schools would have been very time-consuming

13  task.

14       THE COURT:  Before I go to my other questions with

15  regard to the settlement itself and the interplay between Rule

16  23(b)(2) and 23(b)(3), I thought at this point, Mr. Berman, I

17  will give you an opportunity to sit down, and I will hear from

18  some other people with regard to the issues that I raised.

19       MR. BERMAN:  Yes, thank you.

20       THE COURT:  Thank you.

21       MR. MESTER:  Good morning, your Honor.  I'll try to be

22  brief.  Mark Mester on behalf of the NCAA.

23       In terms of the scope of sports, I thought perhaps I

24  could shed a little more light on that.  What we actually do

25  have, what was provided during discovery, was focused on by

experts on both sides during the mediation, is both anecdotal

data as well as the database maintained by the NCAA of reported

instances of all injuries, including concussions.  And while

the distinction between contact and non-contact sports is

certainly recognized, it's obviously reflected to a degree in

the documents, I think one perhaps misconception that should be

correct is, it's not the case.  It's really a continuum.

Of course, the incidence of concussion is much lower

in the non-contact sports, probably lowest of all rifling.

That's a guess but I'd say it's probably correct.  But that's

not to say that it never happens.  It does happen.  It doesn't

happen very often.

But likewise on the far end of the other side of the

continuum, it's not to say that a hundred percent of football

players are concussed.  So it is a continuum.  And one of the

driving forces behind the settlement and the negotiation of the

settlement was to provide this benefit to all persons who

have -- were student athletes who may believe that they

suffered concussion and have long-lasting effects or may have

long-lasting effects.

So from our perspective, it was critically important

that we provide that to even the people who participate in

rifling, because there are a few that may feel that they need

that benefit, the benefit of filling out a questionnaire, being

eligible for medical monitoring.  And that was a driving force

behind the inclusion of those individuals in -- in the settlement class.

We were certainly mindful of the need to provide everyone with the opportunity to opt out. So if someone doesn't like the settlement, they can opt out, and they will receive notice, which means they can also object. I don't have any idea how many people are going to do either. But they're going to have -- if it's approved as proposed, they're going to have both rights.

But from the perspective of the NCAA and though I don't represent them the NCAA's insurers, it was critically and it is critically important that the class definition be as broad as it is because we want to capture all the people who can potentially have this issue and provide that benefit.

We are also mindful, of course, that if we don't have that broad scope, that whatever we leave left, whatever we don't include within the settlement class, will inevitably be the -- the basis for some claim and it likely will be a class claim. I don't think it will be a particularly meritorious class claim, but that doesn't mean it wouldn't be brought. And there is no question at all, another driving force is to avoid the relatively high transaction costs of -- of class claims seriatim being filed, virtually ad nauseam.

So that was the driving force as well. But first and foremost, we want to provide this medical monitoring to every

student athlete who needs it.  And the fact that there may only be three participants in rifling who need it doesn't mean they shouldn't get it.  I think they should get it.  But it should be provided to everybody.

The same logic applies in terms of the temporal issue. We don't think for a moment that the -- the claims of someone who participated in college football in the '60s are as strong as they would be of somebody who participated -- participates now or participated last year.  But that doesn't mean we want to deprive those individuals of the benefit of the settlement, which is the medical monitoring.

And so it was again critically important that we provide it to all student athletes without distinction, without discrimination, without making any -- any types of differentiation, which was also designed, we thought, in part to address the adequacy question, the adequacy of representation, as long as we're not distinguishing between people, we are not saying that non-contact sport participants have to meet a higher standard before they get medical monitoring, which I've seen in some settlements.

But we are not doing that here.  Everybody has an equal, fair shot.  They fill out the questionnaire.  The criteria is the same.  And that determines whether they do or they do not get medical monitoring.  But again, we thought it was critically important that we provide to all student

1   athletes without distinction.

2         THE COURT:  The concern I have, of course, is the

3   concern I raised earlier, which is, I understand the intent to

4   provide the benefit as widely as possible.  But in a settlement

5   like this one, where you're trying to resolve disputes,

6   benefits come at a cost, right?  And the cost is preclusion of

7   bringing claims.

8         Now, I know that the opt-out notice provides some

9   protections for that and sufficient to satisfy due process,

10  perhaps, more than likely.  But as I noted there is also the

11  right to not participate at all from the get-go, right?  And I

12  think that that's a right that also needs to be considered as

13  we look at this case.

14        The NCAA, I understand, and it's reasonable for the

15  NCAA to want peace and to want to, you know, use this

16  settlement and this vehicle, this MDL, as a way of getting that

17  with regard to medical monitoring claims.

18        But at this point I am not sure frankly whether this

19  is the right case for the NCAA to be able to get that universal

20  peace that it seeks with regard to medical monitoring because

21  of the limitations that I described, because of the concerns

22  about effective and reasonable notice, about the concerns about

23  giving people an opportunity, effective opportunity, to opt

24  out, and because of the lack of representation that people who

25  participated in non-contact sports have had thus far in the

1    case.

2         So that's some of the -- you know, I am not saying I

3    made up my mind.  I haven't.  But those are some of the

4    concerns I am raising with the parties.  I want to get the

5    parties' views on them.

6         MR. MESTER:  Your Honor, if I may, I apologize.

7         On the notice issue, as Mr. Berman said, we don't know

8    at this point how effective direct notice is going to be.  What

9    we did agree as part of the settlement to do what I think under

10   the legal standard, which is the best notice practicable under

11   the circumstances.  We agree to do far more than that.  But

12   that is after all the legal standard.

13        I mean, our ability to reach that -- that student

14   athlete who participated in the '50s, who's not particularly

15   cognizant, I don't -- I don't know how well we can do that.

16   But I think we can only do what we can do.  And I am supremely

17   confident we're doing much more than what we typically do in

18   class cases, deliberately, and I think for good reason.

19        I also think we've hired a very capable notice

20   administrator, who's designed a program that I think for want

21   of a better term is very much a belt and suspenders.  But we

22   have among other things agreed that we are going to send a

23   letter out to all of our member institutions and get from them

24   all the names and addresses we can.

25        Those names and addresses then will be bounced against

1  the national database for change of address, which from my

2  experience in class cases is quite effective.  We will I think

3  get for those names -- for those names we get an A address, we

4  will get a current address for a very high percentage.  And for

5  all those people we'll send out direct notice.

6          If you add this together with all the other things

7  we're going to do in terms of notice and you couple that with

8  the so-called free media, the fact that this -- this litigation

9  has gotten a great deal of press, for better or for worse, I

10 think we're going to reach a -- reach a number in terms of

11 the -- the amount of the class that's quite high.

12          But in terms of those people that don't want to

13 participate, I think in some sense, your Honor, that's endemic

14 to the class vehicle.  Every class settlement I've ever done,

15 we end up with a small stack of letters from class members who

16 you don't even know what to categorize them as.  Just a bunch

17 of people saying, I don't like class actions.  I don't like

18 class action lawyers.  If you're an absent class member, I

19 think you're always at risk for being, quote, part of an

20 endeavor you may not agree with.

21          But I am -- I am very confident, having lived through

22 the extensive mediation process, that the interests of all

23 student athletes were taken into account and that we made a

24 sincere effort to provide benefit to everyone, which is I think

25 to the benefit of everyone.  That certainly was our intent.

1          THE COURT:  Thank you.

2          MR. BERMAN:  Your Honor, I misspoke.  Can I correct

3    my -- because -- one of the questions.  I apologize.  It's a

4    complicated settlement, and I didn't have something right.

5          With respect to your question about the difference

6    between contact sports and non-contact sports and your concern

7    that the return-to-play guidelines discriminated, let me

8    clarify.  It's on page 32 of the settlement agreement.

9          Certain aspects of concussion management apply to all

10   sports.  So the baseline testing applies to all sports.  The

11   return-to-practice applies to all sports.  And clearance by a

12   physician applies to all sports.  So non-contact sports are

13   covered.  It's only the physician being in attendance that

14   distinguishes between contact sports.

15         So we were looking out for the interests of those

16   folks, and we made that distinction that you really don't need

17   a doctor there for a golf game.  I'm sorry for that.

18         THE COURT:  Thank you.

19         At this point I will hear from other counsel here.

20   Mr. Edelson, since you filed your -- I'm sorry.  Since you

21   filed your objection, why don't you go ahead and go next and

22   address the issues that I have raised.

23         MR. EDELSON:  I feel like I owe an apology for Mr.

24   Mester.  Probably half of those letters slamming plaintiffs

25   class action came from my wife.  So I apologize on her behalf.

1          The -- you know, I am not a theoretical guy.  So I'd

2     like to answer your question very concrete way.  What does it

3     matter that there wasn't an attorney in the room who is

4     representing, let's say, volleyball players?  I think we

5     actually demonstrated that.

6          Mr. Mester is a very skilled advocate.  He made his

7     arguments, this continuum.  He clearly understands the facts.

8     Then we heard from Mr. Berman who said, well, the NCAA doesn't

9     track the number of concussions.  If someone was in the room

10    representing volleyball players, they would have said, well,

11    Mr. Berman, you're wrong.  You're wrong.  They do.

12         We actually cite that, page 5 of our brief.  We cite

13    NCAA Sport Medicine Handbook, where they have a chart, where

14    they list the -- the -- their broader definition of contact

15    sports.  And because football, lacrosse, wresting were the ones

16    they mentioned, basketball which is included, about .5 people

17    per thousand get concussions.  Softball is the next one, which

18    is just under .5 per thousand.  Then comes women's volleyball

19    and then baseball.  And there they track that, and there are

20    real concussion risks there.

21         Now, Mr. Berman, you know, as he said, he wasn't

22    really suing on behalf of those people.  So he wasn't concerned

23    with them, wasn't aware of the facts.  That's why you need

24    someone in the room who would say, Mr. Berman, why don't we

25    have for those people the possibility of doctors being on the

1  court or on the field there as well?

2  Mr. Berman says, well, you know, they can opt out

3  obviously.  Well, it would be very hard to opt out and then

4  still bring an injunctive -- injunctive action after the Court

5  already said, this is the injunction.  That will be --

6  essentially have to undo the Court's order.

7  So in the end, I think the Court's question where it's

8  leading is the correct one, which is either you limit the

9  class, or you make sure there are people in the room who are

10  representing the class members.

11  When it comes to truly non-contact sports, archery or

12  riflery, I think that the only answer is that those people

13  should not be part of the class.  Unless -- unless there are

14  data that I'm not aware of, where that really is an issue at

15  all, you are putting an incredible burden on class members.

16  Class members have to read the notice, figure out what their

17  rights are, decide whether these claims stay in the claim, or

18  doesn't pertain to them at all.

19  And there is no benefit for one bit.  So I think that

20  the class should be limited at the least to non-contact sports.

21  And then with regard to the broader category of contact sports,

22  either it should be the same relief for the softball and

23  women's volleyball and baseball of the world, or it should be

24  limited in scope just to the -- the self-defined contact

25  sports.

1        I am happy to address notice as well.

2        THE COURT:  Go ahead.

3        MR. EDELSON:  Mr. Mester said that this notice plan is

4   belts and suspenders.  It's not.  It's -- what the notice plan

5   says is, we're going to do publication notice.  Then we're

6   going to ask our member institutions for lists of class

7   members.  Then we might do direct notice.

8        It's all dependent on what the member institutions

9   decide to do.  They have no -- no obligation.  They're getting

10  very valuable releases under the settlement.  They have no

11  obligation at all to actually comply with the request.

12       So they can just say, you know what?  Forget it.  We

13  don't want to give any contact information.  That's why when

14  the claims administrator stood up, the only information he had

15  was for publication notice.  They made no projections at all

16  that there will be any real direct notice going out.

17       I think that in the affidavit it says that.  They say,

18  we are going to assume that there is no direct notice.  And

19  having a case of this magnitude, we are giving away valuable

20  rights like this and not directly notifying people, especially

21  when we've got e-mails available.  Most of the class or a good

22  portion of the class at least are current students.  The idea

23  that University of Texas is going to get a release and they

24  don't have to give the e-mail addresses so that the current

25  students can know that they're giving up injunctive claims, and

1  personal injury -- class personal injury waivers is certainly

2  not belts and suspenders.  It is not good notice.

3        THE COURT:  Mr. Edelson, what about with regard to the

4  temporal scope of the proposed class?

5        MR. EDELSON:  That's a tougher question.  That was not

6  something that we focused on in our brief.  Truly, I have less

7  concerns about that.  If -- if you're talking about people who

8  have been -- who are really true members of the class and have

9  been injured, I think that -- that the argument is that the

10  statute of limitations started running when all this

11  information really came out.  And so I think that going back

12  that far is fine.  The remedy that -- for the problem that you

13  suggested, or the question suggested, of how do you notify

14  those people is, do good notice.  Don't rely on just

15  publication notice.

16        But I don't have that concern.  At least, you know, as

17  the objector.

18        THE COURT:  Okay.  Thank you.

19        MR. EDELSON:  Thank you.

20        THE COURT:  Is there anyone else?  Yes.

21        MR. LEWIS:  Thank you, your Honor.  Richard Lewis for

22  the plaintiffs.

23        Your Honor, you raised the question about the temporal

24  scope in relation to the notice program.  But I also believe

25  that the temporal issue is really fundamental here.  The whole

1   reason that our clients got into this litigation was to protect

2   the older players, older former players, who are at the most

3   immediate risk to the mid- and long-term dementia-like problems

4   that come from chronic head impacts in concussions sports.

5   That was the fundamental reason we got into this case.  And the

6   Court suggested that we sit down with Mr. Berman and talk about

7   that issue, which we did do.  And we were invited to join in

8   the negotiations to protect that issue.

9           And as a group, Mr. Berman and the other firms were

10   successful in making sure that the most at-risk persons --

11   remember, the medical monitoring doctrine, the fundamental

12   element of the legal doctrine, is risk.  And the most at-risk

13   people, the most immediate at-risk people to the long-term CTE

14   type problems are the older players.

15          So it was really central to us that all living former

16   athletes be entitled to participate in the medical monitoring

17   program because -- because the older people are the ones who

18   need it the most and need it the soonest, which is not to

19   diminish the importance of PSC, post concussion syndrome.  But

20   that's a more immediate, acute situation as compared to the

21   long-term, latent dementia-type problems associated with CTE,

22   which is fundamental to the doctrine and was fundamental to

23   many of the lawyers and clients who join this case, sat down

24   with Mr. Berman, worked out unified approach and joined in the

25   negotiations.

1       THE COURT:  Mr. Lewis, do you have any concerns about

2   the ability of the parties to provide effective notice to a

3   class that doesn't have a temporal scope limitation?

4       MR. LEWIS:  Your Honor, I don't think -- I think

5   reasonable and adequate notice -- I don't see why the fact that

6   we're trying to reach back for the older players, who are at

7   the greatest risk, is any harder than reaching any other part

8   of this class.  There is a lot of interest in this country now

9   in head injuries, latent head injuries.  Some of the famous NFL

10  players who have committed suicide.  People are tuned into this

11  issue.

12       And I don't see why it would be any harder, using

13  publication notice and whatever available direct mail there is,

14  to reach these older players.  I think their level of interest

15  is actually greater than the younger players, who aren't

16  necessarily as worried about it, given where they are in their

17  life.

18       So I think reasonable and adequate notice that

19  includes the older players is -- makes sense here and would be

20  adequate under Rule 23.

21       THE COURT:  Thank you.

22       MR. LEWIS:  Thank you.

23       MR. JEFFERSON:  Good morning, your Honor.

24       THE COURT:  Good morning.  Can you identify yourself

25  for the record, please?  Can you please state your name for the

1    record.

2            MR. JEFFERSON:  Yes, Judge.  I am Dwight Jefferson.  I

3    am here on behalf of one of the putative class members.  I was

4    referenced a little bit earlier.  I represent a gentleman who

5    played football at the University of Texas, who in fact suffers

6    from early onside -- onset Alzheimer's.

7            I think that the Court has really zoomed in on two

8    issues that are very relevant and significant to whether or not

9    this class should be certified.  And that is, I think the Court

10   is right in questioning the scope of the -- of the class.  And

11   I believe that the scope of the class may be too great.

12           In addition I think that the Court has identified a

13   significant issue related to this settlement; and that is,

14   there being no class representatives for those persons who were

15   included in the settlement from non-contact sports.  This

16   litigation, in fact, was driven by the contact sports and the

17   revelations most recently of medical data that has been

18   available for some time to the NCAA that in fact was not made

19   known to their member institutions and to the participating

20   athletes.

21           Having played football myself and seen how, being

22   familiar with, that particular contact sport, which is my

23   understanding is really the driving edge of this, is that with

24   the advent of the hard-shelled helmet and the face mask, that

25   football changed significantly.  And the use of a head became

1   an integral part of football.

2          And so I would think that the scope of the class, the

3   temporal scope, should be limited to a period of time

4   associated with the development of the helmet and the use of

5   the helmet.  And I believe that that period roughly would have

6   been around 1960, between 1960 and 1965.  And so I think I

7   would believe that a scope of cutoff period of 1960 would be

8   much more reasonable.

9          In addition, as was raised by the previous counsel in

10  his objection -- and I have submitted something today that I

11  intend to file with the Court joining in those objections -- is

12  the effect of the waiver that's contained in the settlement,

13  that if the Court were to approve it would waive any future

14  class action claims for any of those class members who in fact

15  are suffering today from the consequences of having

16  participated in these contact sports prior to the time that the

17  NCAA decided to develop protocol of things -- of things of that

18  nature.

19         THE COURT:  Mr. Jefferson, are you representing a

20  putative class in this case?  You said you are representing a

21  client, an individual claim?

22         MR. JEFFERSON:  Right, Judge.  I just got into this.

23  I have drafted a complaint that I was planning to file in the

24  Western District tomorrow as a matter of fact for those class

25  members who in fact have been diagnosed with brain injuries

1   proximately caused by the participation in athletics.  Today

2   since this matter was going to be before the Court, I wanted to

3   at least have the opportunity to present my objections on

4   behalf of that individual to the Court here today.

5        I will also say, Judge, with regard to the question

6   about notice that in order for notice to be effective to the

7   class of this size, it would really have to be some form of

8   direct notice in order to be effective enough in order to meet

9   the standards.  But I think that the inclusion of non-contact

10  sports, although favorable to the NCAA, is in fact unfavorable

11  to the class representatives in the class who are members of

12  contact sports.

13       THE COURT:  Thank you.

14       MR. JEFFERSON:  Thank you, your Honor.

15       THE COURT:  Mr. Mester, one question with regard to

16  the NCAA and the notice.  So when the NCAA sends out a request

17  to its affiliated schools requesting information about class

18  members, what requirement -- first of all, I guess two

19  questions.  One, what level of requirement, if any, is there

20  with regard to that request?  And secondly, do you have any

21  sense of what the level of compliance will be?

22       MR. MESTER:  We are relatively new at this.  So we

23  don't have a great deal of experience.  Generally our members

24  cooperate.  So we fully expect them to cooperate.

25       We don't have, though -- I think to a portion of your

1 question, we don't have the means to compel them to do so,

2 though we do in the sense of this Court. I mean, we've

3 discussed with counsel. We hope we don't need to do this. But

4 if there is wide-spread noncompliance and the Court believes --

5 and I don't necessarily -- I think we should try to do direct

6 notice. I've been of that view for quite some time.

7 But if there is -- if there is wide-spread

8 noncompliance by members, it's entirely within Mr. Berman's

9 power to request the issuance of subpoenas to member

10 institutions and ask them to provide the requested information.

11 And no one has foreclosed that possibility.

12 I certainly hope we won't need to do that, but that's

13 certainly a possibility.

14 THE COURT: Okay. While you are there, the next issue

15 I want to talk about is the interplay between 23(b)(2) and

16 23(b)(3), which is the subject of the NCAA's submissions. So

17 here in the Seventh Circuit we have In Re Allstate, and then we

18 have Johnson, right? We have Judge Posner's opinion in In Re

19 Allstate. We have Judge Easterbrook's opinion in Johnson.

20 How do you reconcile those two opinions?

21 MR. MESTER: Without being flip, your Honor, I was

22 going to say, if you are asking me to harmonize, I can't.

23 I don't know that you can. I am not exactly sure you

24 can. But I think at some sense we don't need to because we

25 now -- we're at a point where we agreed the proposed settlement

1   contemplates certainly would be (b)(3) -- the critical (b)(3)

2   elements of opt-out rights and notice on the one hand.

3        But on the second hand, in -- in counsel --

4   plaintiffs' amended motion, they offered in lieu of that to

5   have a settlement class certified under (b)(3), which I think

6   would be -- would be certainly appropriate as well.  My

7   personal view is that because the nature of the relief is such

8   that the hybrid suggestion in Allstate, and I think it dates

9   back actually to Lemmon and those earlier cases, that that's

10  probably the right answer.  But I understand there are other

11  people above us who think otherwise.

12       But since -- since there -- a showing has been made I

13  believe by Mr. Berman that the (b)(3) requirements would also

14  be met, the settlement class could be easily I think certified

15  under (b)(3).  And I think it would easily meet that test.

16       So I don't know that -- you know, I don't know at the

17  end of the day it makes a huge difference.  But what does make

18  a difference, and I think what differentiates this case from

19  virtually every --

20       THE COURT:  Hold on.  I don't think that Mr. Berman --

21  and I guess he can correct me if I'm wrong.

22       I don't think that, Mr. Berman, your position goes so

23  far as to say that the entire case can be certified under

24  23(b)(3).  Or is that your position?

25       MR. BERMAN:  Under (b)(3)?

1          THE COURT:  Right.

2          MR. BERMAN:  Yes, it --

3          THE COURT:  In other words, including the damages

4     phase and everything that would be cognizable under (b)(3).

5          MR. BERMAN:  I believe so.

6          MR. MESTER:  In the settlement context.  I mean,

7     obviously we would fight tooth and nail for certification of a

8     damages claim.

9          THE COURT:  Unfortunately, whether or not it's in the

10    settlement context or not doesn't provide the Court with much

11    difference, right, because, in fact, if anything we are to look

12    at it more vigorously in the settlement context than in

13    non-settlement context.

14         MR. MESTER:  But it does provide one important

15    difference.  Under Amchem you don't need to look at

16    manageability.  And I think manageability at the end of the

17    day, were a class as broad as this to be certified on a

18    contested basis tried, I think manageability would in fact be

19    the ultimate stumbling block, because you would be looking at

20    literally hundreds of thousands of individualized

21    determinations with regard to damages, and a series of mini

22    trials that, as I understand other decisions from the Seventh

23    Circuit would require the same finder of fact.  That would span

24    decades.

25         So I think -- I think that critical difference, which

1   is certainly the thrust of Amchem, is in fact what matters here

2   and why the distinction between (b)(2) and (b)(3) in the

3   settlement context for this case is not all that pertinent

4   because I think that this settlement class does meet -- does

5   meet (b)(3).

6          But -- I'm sorry, your Honor.

7          THE COURT:  That's okay.  I'm just writing.

8          So assuming that we proceed or analyze this case

9   under, as you suggest, 23(b)(2) with the additional protection

10  of 23(d)(1), notice to the class and opportunity for class

11  members to opt out, one of the considerations that runs through

12  these cases that have addressed this issue is whether the

13  individual damages claims are sufficiently large, of sufficient

14  size, so that foreclosing class actions would not preclude

15  those individual claims altogether, right?  And because the

16  Courts have reasoned, if that's what you are doing, you are

17  basically effectively shutting off all personal damages claims

18  altogether, and that's not really what is intended under a

19  hybrid class.

20         The parties have talked about this a little bit.  And

21  by the parties, I think Mr. Berman and the Nichols plaintiffs

22  have talked about this a little bit.  NCAA has not.

23         But I wonder whether counsel could provide me with

24  your thoughts on how a Court, how I, should go about making

25  this determination as to whether or not the individual damages

1　claims are sufficiently large so that foreclosing future class

2　actions on those claims would not preclude individuals from

3　bringing those claims.

4　　　　So what should I look at?  Where can it be found?  And

5　what should that analysis consider?

6　　　　MR. MESTER:  Let me, if I can, your Honor, answer in

7　two parts.  First of all, I think -- I am not entirely sure

8　that the cases that predate the Supreme Court's recent

9　decisions, most notably Italian Colors, are consistent with

10　Italian Colors.

11　　　　To the extent that -- that the extinguishment of the

12　right to pursuit on a class basis might extinguish as an

13　effective matter the rights, the claims, substantive claims, of

14　a party, as I read Italian Colors, was not of much concern to

15　the Supreme Court.  That was a risk that they accepted,

16　recognized, and said that isn't going to change our -- our

17　decision.

18　　　　But this is a very different case than Italian Colors.

19　It's certainly a very different case than Crawford, the Seventh

20　Circuit decision that Mr. Edelson relies so heavily on.  In

21　that case the claims were valued at the low end two dollars and

22　I think 34 cents.  Even by Mr. Edelson's analysis, we're

23　looking here instead at claims that are in the range of 8,000

24　to $10,000 at the low end.

25　　　　I think, for the record, I think that is very low.

1  For someone who's truly injured, who actually has a claim, I
2  don't know that $8,000 is a realistic assessment in any way,
3  shape or form.  I think instead, looking at the cases that have
4  been litigated, the cases that are being litigated, what the ad
5  damnums are, what the claimed damages are, as you would expect
6  for someone who actually has a claim who's litigating it,
7  you're looking at claims that are, you know, six figures and
8  seven figures.

9        These are substantial claims.  They are not really
10  different than typical personal injury claims.  Although they
11  may be more acute than some personal injury claims.  But
12  they're substantial claims that are certainly of a sufficient
13  magnitude that someone who has such a claim and has a valid
14  claim will be able to find a lawyer to take the case, likely on
15  a contingency fee, and pursue it.  I think that's the way those
16  claims should be handled.

17        But even at 8,000, Mr. Edelson's number, there is a
18  big difference between 8,000 and $2.34.  And that assumes that
19  that rationale is appropriate, which I'm not sure in light of
20  Italian Colors it is.

21        THE COURT:  Okay.  Thank you.

22        Mr. Berman, can you address this issue?

23        MR. BERMAN:  First of all, the (b)(2), (b)(3) issue

24  that you raise, I think the case to look at is really the

25  Johnson case.  And the reason I say that is because it post-

1    dates Wal-Mart.  So it's the most recent analysis.

2         And what the Johnson case said is, you look to see if
3    it -- what is the nature of the damages?  And the Court said,
4    are these individualized money damages?  In other words, would
5    you have to make a specific damage determination different for
6    each class member?  If they are, it's (b)(3).  But it's -- if
7    it's the same relief to each class member, then it's (b)(2).

8         And the medical monitoring relief here is the same
9    relief to each class member.  So I think it's not
10   individualized.  And, therefore, I think the better analysis in
11   this case is it's a (b)(2) class.

12        To answer your question, where in the record would you
13   find -- you know, what's the nature of the remedy or the
14   damages that are being waived here?  If I can hand up?  I would
15   turn in my illustrations very briefly.

16        I am going to start at page 25.  So Mr. Edelson says,
17   you know, there is all these claims out there that are 8,000 to
18   $20,000.  And, therefore, it's a valuable right, this class
19   action for personal injuries.

20        So you can look in the record to rebuke that very
21   easily.  First of all, Mr. Nichols is not suffering from a
22   long-term concussion.  He is asymptomatic.  It's -- all his
23   complaint says, he has calcification.  Doesn't say he is
24   suffering from PCS or CTE.  And it doesn't say it was caused by
25   a concussion.

1    Therefore, in the record before you, there is no --

2 nothing to suggest that a concussion claim is that small.  And

3 in fact, what we put in the record before you, illustrated on

4 the next slide, is we went and we looked at the NFL grid, which

5 is in the record, where the minimum payout is $1.2 million.  We

6 looked at jury verdicts in Cook County, which is in our brief.

7 And there are -- some of these are represented here on this

8 page.

9    Concussion cases where you have long-term concussive

10 problems, those kids have life-long problems.  They lose --

11 they can't continue through college.  They have career

12 problems.  They have lower occupational status.  They are

13 serious damage claims that lawyers would take.

14    Let me give you another example of why waiver of the

15 class action really doesn't -- it's not a valuable right.  This

16 is -- what would a class action get you in a personal injury

17 context?  Very little.  This is taken from one of my cases.

18 This -- the first part, all the examinations my clients had to

19 undergo -- my client had to undergo.

20    And then there is a list of all the depositions that

21 had to be taken, some 15 depositions, none of which, by the

22 way, are NCAA witnesses.  So how would a class against the NCAA

23 for personal injuries answer the real liability questions?  It

24 would not.  So it's not a real waiver.

25    And on the next page I list all the questions that you

have to answer in a concussion case, none of which would be answered in this supposed personal injury class.

This is exactly what the Amchem case said you can't do. Amchem says, you have different exposures. You have different pathways. You have different injuries. Everyone in Amchem had a different history. Every athlete here has a different history. So a class is not a valuable right. It's not going to get them anything.

And the last point I make on how there is no value to this supposed PI class is, the proposed PI class filed by Nichols, an asymptomatic plaintiff, was just against the NCAA. You can't claim split. You have to bring all defendants into your case in a case that rises out of occurrence.

The actual class would harm class members because the best defendant in almost every case is the school. In almost every case the school, if there is a serious injury, would have failed to file its own concussion management plan. It's doctors would have failed to do something. They would have returned the kid earlier.

So having these plaintiffs proceed on a class action against the NCAA rather than have them focus on the real defendant, that's harmful to those folks. So what we actually think would happen here is, and what the NCAA is actually worried about is, the medical monitoring program is --
according to Dr. Cantu, is going to allow students to realize

1    that their headaches, whatever they have, was actually caused

2    by a concussion.

3            And it may cause them to look at, how did that come

4    about?  And they're going to go to a specialist, and they may

5    most likely generate litigation because the -- now they know

6    how they've been harmed.  So it's a real valuable right to

7    proceed on an individual basis.  It's not a valuable right that

8    is -- that should stand in a way of this medical monitoring

9    relief.

10           THE COURT:  Thank you.

11           Does anyone have anything to add to that?  Mr.

12   Edelson, briefly.

13           MR. EDELSON:  Thank you, your Honor.

14           This is obviously the big issue for our client and the

15   putative class.  Counsel are saying a couple of different

16   things.  I want to try to focus on what I understood your

17   question to be specifically, which is, how can your Honor sit

18   there and make a determination about whether claims are really

19   going to be effectually extinguished or whether people are

20   going to be able to bring those claims.

21           And the answer was, well, if you look at Mr. Berman's

22   client, Mr. Berman's client has real injuries.  They keep

23   talking about the ones that are actually being litigated.  They

24   are long-term health problems.  People can afford a lawyer.

25   And that's probably the case.

1    But then there is a huge chunk of people, like my
2    client, who Mr. Berman says, oh, those aren't real injuries.
3    Well, my client had thousands of dollars of medical bills,
4    certainly entitled to sue for that.  The idea that -- that he
5    will be able to get an attorney represent him individually on a
6    contingent basis is not really plausible.  And there are,
7    according to Mr. Mester, hundreds of thousands of class members
8    who fall into the category of having personal injury claims.

9    Now, one way the Court can look at it is, how many
10   claims have actually been filed?  And there has only been a
11   handful.  Mr. Berman said, compare that to the NFL, somehow
12   said that that showed that there wasn't a groundswell of
13   support for class actions.  I think it works the opposite way.

14   But the reason there were so many claims in the NFL
15   case and not in this case is because in the NFL the damages are
16   so much more significant.  NFL players are professional players
17   who are getting paid huge amounts of money.  And if they have
18   injuries that take them out of games that hurt their career,
19   they can be hundreds of thousands of dollars, millions of
20   dollars.  That's why you look at the NFL settlement, and it
21   would be so vastly different than any NCAA personal injury
22   settlement.

23   The way -- the way to figure this out is, my belief is
24   that it really is the parties' burden to demonstrate that all
25   of the different elements have been met in order to approve a

1 class. And my other view, strongly, I think that Mr.

2 Jefferson's appearance kind of makes this point. We have had

3 no coordination. I met him right before court today -- is,

4 it's very dangerous for the Court to start ruling on what may

5 happen in other suits.

6 Mr. Jefferson, just in me speak to him briefly in the

7 hall, clearly has much different theory of how he can recover

8 for a smaller class of plaintiffs than I do. And the idea that

9 this Court is going to say, no -- no lawyer is going to be able

10 to come up with the class action in state court or in federal

11 court against the NCAA or against the member institutions who

12 are getting the release is really dangerous.

13 But if the Court wants to go down that road, then

14 let's hear testimony. Let's get -- let's get personal injury

15 attorneys to take the stand and say, here is what we would do.

16 We've got -- Mr. Bob Clifford is with us in the objection. And

17 I think that he would be an appropriate person to talk about

18 how he makes decisions about who to represent, and whether he

19 will be interested representing people who have smaller claims

20 and how he values them.

21 Certainly his opinion would be a lot more valuable

22 than mine in this context. And if they got their own

23 witnesses, they should put those on.

24 I want to make one other point. Mr. Berman said that

25 one of the benefits of the settlement is that the 3,000 people

who are eventually going to get tested may end up finding that they have claims and will bring litigation. Well, I think if that really was his plan, he wasn't paying attention to settlement agreement because Mr. Mester was very clever and made sure that was not going to happen.

Let's look at the statute of limitations, which they claim to have fixed but they haven't. The statute of limitations in most -- I'm sorry. I don't mean to be flip. But I've never seen this in a settlement.

The statute of limitations ought to start running after the settlement has been effectuated. And what they do is they say, it will start running at final approval. If your Honor says, I grant final approval, the statute of limitations will run right then.

Now, it's hard to imagine if the Court does give final approval there won't be someone who appeals it. And then we're off to a two-year process. And at the end of the two years assuming that it is affirmed, then the whole medical monitoring process -- program will be instituted, and it will take however many months or years for people to get tested.

And the idea that their statute of limitations will still be -- be kept in tact is really very unlikely, which is why they said, let's stop it not at the effective date but at final approval.

The other thing, which I hope was just casual

1    language, and maybe Mr. Mester could address this if your Honor

2    wants him to, there is some odd language about what is actually

3    tolled.  It says, the claims that Arrington brought are being

4    tolled.

5          Well, there is a lot of confusion in the record about

6    what claims were brought.  Our belief was, there were class

7    personal injury claims brought.  I think NCAA acknowledged that

8    at certain points -- more recently Mr. Berman has said, no, we

9    absolutely didn't.

10         If that's true that NCAA is saying, what we're willing

11   to do is toll the Arrington claims, maybe only Arrington gets

12   -- gets this limited tolling.  I can't believe that's what they

13   mean, but it was -- it was scary language for us.

14         THE COURT:  Thank you.

15         MR. EDELSON:  Thank you.

16         THE COURT:  You want to make a comment, Mr. Jefferson?

17   I will give you a couple minutes.

18         MR. JEFFERSON:  Yes, Judge, I want to speak very

19   briefly on -- on this point; and that is, for example, the

20   putative class member who I represent, unlike the NFL players,

21   I mean, many of these men are of, you know, normal and average

22   income.

23         In addition, for example, my client who's at the age

24   of 64 now, as I point out in my motion -- rather in the

25   objection that I filed, that in many ways I think that the

1    damages would be more in line with the 8,000 and 20,000,

2    because much of the relief would be in the form of damages to

3    cover, let's say, palliative care or supplemental care, to

4    other either public or private benefits that these individuals

5    receive.

6         And then from the standpoint of taking these cases on,

7    maybe if you have -- if you have a guy who's 27 years old, who

8    just finished playing two or three years ago, there may be a

9    plaintiffs' attorney out there who would be willing to take on

10   that case and spend 200, $250,000, to try to get it to the

11   point where he will -- he can recover damages of a million

12   dollars.

13        But if you're representing someone who is 62 years of

14   age, 65 years of age, you aren't going to get a plaintiffs'

15   attorney who's going to be willing to take that case on,

16   because you're going to have other additional factors that are

17   going to be involved from the standpoint of the proof.

18        And so basically as far as -- and then, you know,

19   counsel had pointed out, the reason they made the temporal

20   period so large was, their greatest concern was for older

21   players.  But the simple fact of the matter is that this

22   settlement does nothing for the older players, those who in

23   fact have been diagnosed and in fact are suffering from brain

24   injuries.

25        Thank you, your Honor.

1          THE COURT:  Thank you.

2          I now want to turn to some questions I had with regard

3     to the settlement agreement itself, for the proposed settlement

4     agreement.

5          Mr. Berman, if you would step up?

6          First of all, with regard to the limitations on the

7     number of both the opportunities for an individual to fill out

8     a questionnaire, as well as the limitation on a number of

9     personal evaluations, which is I believe two during the medical

10    monitoring period.  One of the questions I had is, from the

11    medical information that was provided by Dr. Cantu as well as

12    the information provided by Bruce Deal, it appears that

13    individuals that suffer from CTE are largely asymptomatic for

14    many years.

15         And given that, one can easily envision a situation

16    where a person who is asymptomatic may max out over the course

17    of the first ten or 15 years on these tests, only to have

18    symptoms develop later, say in year 20 or 25.

19         Is there a procedure in the -- I know there isn't one

20    in the settlement agreement.  But is there a procedure by which

21    such an individual can request additional evaluations at that

22    point in time?  In other words, is there a formal either

23    petitioning process or request process?

24         MR. BERMAN:  There is, your Honor.  First of all, to

25    address your question, if someone is asymptomatic for the first

1    ten or 15 years, they probably would not have scored to get a

2    medical exam.

3            THE COURT:  That's the next question I am going to

4    have.

5            MR. BERMAN:  So it's unlikely that they are going to

6    use up their medical evaluations.

7            There is -- and maybe Ms. Fegan can find it for me

8    while I am answering questions.  But there is one provision

9    that says, if you have had two exams and you think you want a

10   third, the medical science committee will take a look at it and

11   evaluate whether it's warranted.

12           I'll find the citation for you.

13           THE COURT:  So how would an individual make that

14   request?

15           MR. BERMAN:  It will be on the website, you know,

16   saying if you've already done two, you can go for a third one.

17   It's at page 23 of the settlement agreement, Section G:  Any

18   further screening questionnaires completed by that class member

19   will be sent to the medical science committee for review.  So

20   anyone who goes over five or over two and it comes in, the

21   medical science committee will take a look at it.

22           The reason we put limits is, we didn't want any repeat

23   customers kind of eating up the dollars available.  And the

24   doctors felt there must be something driving that person that

25   we need to -- to address as the science committee.

1    THE COURT:  Okay.  Turning to the question or the

2  issue that you raised with regard to how it is that these

3  individual questionnaires will be evaluated and scored.  I know

4  that there is -- I reviewed information as to what types of

5  information the questionnaires are going to request.

6    But I am wondering.  There wasn't much detail with

7  regard to what factors the medical committee was going to use

8  to screen those questionnaires to further provide evaluations

9  for those personnel.  And I was wondering if you can give me

10  further information about that.

11    MR. BERMAN:  Okay.  The -- once preliminary approval,

12  if it is granted in some form or another, then we will convene

13  a meeting of the medical science committee.  And that committee

14  will then agree on the questionnaire.  We drafted a

15  questionnaire.  We exchanged it with the NCAA.  So we made

16  some -- there's been a lot of work and thought into it.  But

17  now -- it was the lawyers.  And now it's time for the experts

18  to take a look at it.

19    Then they will have to agree on the criteria.  I think

20  the Court will see the criteria.  I need to talk to the experts

21  whether we will actually publish the criteria, because that may

22  influence the way people fill out the score, fill out the

23  questionnaire.

24    So there is a balancing.  And I haven't had a chance

25  to meet with the experts and talk about that.  But when we do,

1    we'll present you, you know, what our thoughts were and take it

2    from there.

3           But a class member obviously will be able to see the

4    screening and the questionnaire.  And we may be able to have

5    some kind of general criteria.  But I sense there would be a

6    concern that people might rig their questionnaires if they knew

7    precisely what they had to do.

8           THE COURT:  I guess, I mean, I haven't thought about

9    that particular concern.  But my concern really dealt with

10   participation rates.  All right?  And so participation rates

11   are again based upon certain assumptions made by Bruce Deal in

12   his analysis.

13          But much of it bears upon what the criteria is going

14   to be in deciding whether or not a particular person who fills

15   out a questionnaire qualifies for an evaluation.  Obviously the

16   more -- to use the vernacular, the broader the criteria are, or

17   the more lenient they are, for lack of a better word, then the

18   greater the participation rate is going to be, and you are

19   going to have more and more tests, according to what Bruce Deal

20   predicted, versus if there are more stringent requirements.

21          And so do you believe that it is, No. 1, a material

22   term in the settlement?  No. 2, something that needs to be

23   provided or provided so that putative class members can review

24   and object to if they think appropriate before either

25   preliminary approval or final approval of settlement?

MR. BERMAN: Well, if I were a class member and I saw that four experts, two on each side, and a chair, a judge, were deciding the criteria, I think I would have confidence that those medical professionals did the right thing. And I'm not sure telling me how they were scoring things would be all that useful. That's one thought I had.

Again, it's kind of a chicken -- we are a chicken and an egg. We -- we're not going to engage these folks and do all the work until we get preliminary approval. And maybe what we do is, we come back to you with a report saying, here is where we are. The notice process has started. But we can now recommend to you that we put the criteria up, scoring criteria, or we come up with a hybrid, or we just put the questionnaire up.

We thought that the way that notice is drafted, if it's drafted properly, and it talks about, you may if you're suffering these symptoms, that that would be enough of an enticement for someone to fill out the questionnaire, without knowing the -- how the doctors are going to arrive at their decision.

In terms of your other question, whether the criteria should be broader or specific, actually the medical science committee is interested in tailoring the questionnaire carefully enough so that they weed out normal dementia, for example. So we're not spending money on people who clearly are

1  suffering from normal dementia, because the doctors can tell

2  from their other symptoms if it's likely -- more likely than

3  not.

4         So they're more interested in making it kind of a

5  precision instrument rather than a very wide one, because we

6  would just waste lot of money if it was too broad.  And if you

7  want to hear from any of those folks, we spent a lot of time on

8  this.  It's a very complicated question.  It's an interesting

9  one.  We'd be glad to bring them in so you can hear further

10  about that.

11         THE COURT:  All right.  With regard to the evaluation

12  locations, I was heartened to hear that at this point the

13  thinking is to have 33 locations --

14         MR. BERMAN:  At least.

15         THE COURT:  -- at least 33, as opposed to the ten.

16  And that also goes to my question, which is, what are the

17  factors that are being considered in trying to come up with

18  these locations and the number of these locations?  And the

19  related question is, how do you come up with the 200-mile

20  parameter?

21         MR. BERMAN:  Okay.  So in terms of how we are choosing

22  the locations, it's somewhat in flux at the moment because

23  we -- again we're waiting to go forward.

24         THE COURT:  And the reason, I mean, in case there is

25  any confusion or to provide clarity, I mean, the reason why

1  obviously the locations are important is, again, this is all
2  about participation rates, right?  And what the participation
3  rate will be, whether or not there are particular requirements
4  that are going to artificially deflate participation rate,
5  artificially inflate participation rates.

6         And it all goes down to also where the rubber meets
7  the road is, how reliable is Analysis Groups' analysis as to
8  whether or not the funds that the parties have earmarked for
9  this are going to be sufficient.

10         MR. BERMAN:  Right.  So what we did is, the Garretson
11  Resolution outfit, they've done the medical monitoring for the
12  Deep Water Horizon case, the World Trade Center case, and the
13  NFL concussion case.  So they have an entrenched knowledge that
14  would be hard to replicate on how to do this.  And they've
15  identified, you know, qualified physicians in various cities.
16  And they are in the process of doing it.  So actually -- for
17  the NFL.  So we're actually working in tandem and accomplishing
18  a lot of deficiency that way.

19         So what we're looking for in each city is, cost
20  effective provider.  And we think we're going to have some
21  negotiation power because we think that institutions will be
22  interested in getting this book of business because they're
23  going to get a block of business.  We're looking at
24  institutions that have well-qualified, if not exceptionally
25  qualified, people who specialize in neuropsychology and

1  neuroscience behind concussions and recognizing concussion

2  injuries.

3        So what's important picking people is, if you go to

4  your normal doctor and complain about this, you may come out

5  with nothing.  If you go into one of the specialists we're

6  trying to gear the tests to in all these cities, you're going

7  to find someone who'll know what they're doing with respect to

8  these injuries.

9        So we haven't settled on exact number.  We know it's

10 at least 33, and it may be more.  And we take your Honor's

11 comments back to them when we meet again.

12       In terms of the 200, we had to come up with some --

13 how far will people drive?  So we figured, you know, four, five

14 hours is probably the most.  So we wanted to have -- we think

15 we're going to have 90 percent of the population of America

16 covered in those 33.  The number is 200 people -- 90 percent of

17 America will be within 200 miles of a testing center.

18       THE COURT:  With regard to Bruce Deal's analysis, in

19 the sensitivity analysis he concludes that the monies allotted,

20 that is 70 million minus all the things that come out of it

21 before the medical monitoring program takes effect, will be

22 sufficient even if the participation rate was 25 percent.  I

23 think 25 percent was kind of the ceiling.

24       But he doesn't in his report at least or his chart

25 note particular what that amount would be.  He doesn't put a

1  dollar figure.  If you assume that you are going to have 25

2  participating rate, how much is that going to be?

3          I think that the plaintiffs in their briefs, in your

4  briefs, indicated that the anticipated testing cost at that

5  level would be about $54 million.  Is that correct?

6          MR. BERMAN:  Yes, and that's in his report.

7          THE COURT:  Can you point me to it?

8          MR. LEWIS:  Page 21 has the data.

9          MR. BERMAN:  Page 21 of his report.  I don't think

10  that's the right --

11      (Brief pause.)

12          MR. BERMAN:  So on page 21, I have the page I can hand

13  up to you if you don't have it.

14          THE COURT:  I have it right here.

15          MR. BERMAN:  Okay.  If you add up the 46 and the

16  seven, it comes up to 54 million.

17          THE COURT:  As he said, the conservative estimates.

18          MR. BERMAN:  Right.  And can I make a comment, just

19  so -- what we were worried about and why we hired Mr. Deal.

20  Mr. Edelson's paper says, a hundred thousand dollars is going

21  to be spent on medical monitoring.  We're worried we don't have

22  enough money.  Okay?  So this whole thing was to try to

23  analyze, do we have enough?  So we think it's going to be on

24  the high end, rather than the low end.  But we think we have

25  enough.

1      THE COURT: Okay. Thank you. That's all the
2  questions I had for you.

3      Mr. Mester, step up please.

4      So there is a provision in the settlement agreement.
5  Mr. Berman just talked about the concerns that plaintiffs have
6  that they don't have enough money there. And that's obviously
7  what Bruce Deal's report goes to, and that's something that is
8  obviously material to the Court's consideration of preliminary
9  approval of a settlement.

10     But with regard to the NCAA, this settlement agreement
11  also has a reversion clause, right? So if there is money left
12  after this 50-year monitoring program, whatever is left goes
13  back to the NCAA. And given the fact that there is still a lot
14  to be fleshed out about this program that goes to participation
15  rate, right, in the number of locations for evaluation centers.
16  The greater the number, one would reasonably assume that the
17  higher the participation rate. The criteria that the medical
18  community is going to use to evaluate whether or not a person
19  receives an evaluation. So those are all things that still are
20  in flux.

21     I'm concerned that provisions, reversion provisions,
22  like this may influence or at least give the appearance of
23  influencing the ways that parties administer the programs,
24  right? And so just being hypothetically, and again, I do not
25  believe that's happening here, but let's say that the

1   participation rate is much lower than anticipated.  Instead of
2   ten percent that is anticipated you have three percent, for
3   whatever reason.

4          Perhaps it's because of the criteria that the medical
5   committee determined was appropriate in screening the
6   questionnaires.  Perhaps it's because we don't have enough
7   locations.  But in any event, say there is a nice amount of
8   money left after the program is over that goes to the NCAA.

9          And given that, it raises some concerns about whether
10  that reversion clause would have any influence in the way the
11  program is administered.  And I am wondering what your thinking
12  is in this regard, why the provision was there.  I am assuming
13  that the NCAA is the one that wanted it there.  And secondly,
14  whether the NCAA would consider any modifications to the
15  provision, so that to the extent any funds remained that it
16  would be earmarked either for further research or other similar
17  uses.

18         MR. MESTER:  Your Honor, I can speak to that.  It's
19  there because there was a substantial and there is a
20  substantial difference of opinion on the two sides of the case
21  in terms of the extent of this problem.  We don't think the
22  problem is -- is -- and I use the word problem guardedly -- but
23  the alleged problem is as large as Mr. Berman does.

24         Having said that, reasonable minds differ.  So we came
25  up with a number after retaining actuary and other experts on

both sides to look at the data and make reasonable estimates as to what the participation rate would be.

But I think most importantly, your Honor, the safeguards that we have in this settlement are the solution to this problem. While the parties will certainly be involved in the program, by no means will we be controlling it. We will hire a third-party administrator that will be approved by your Honor. It most likely will be -- as Mr. Berman said, will be Garretson, which has a great deal of experience in this area.

We have a medical science committee that is composed of two members from both sides that will be appointed by your Honor. They will be overseen by Judge Andersen. To the extent there are disagreements, those four members, all very well distinguished -- very distinguished physicians in their own rights and experts in this field. And they will be making, along with Judge Andersen and with Garretson, the critical determinations, again subject to approval by your Honor, that will drive the participation rate.

But needless to say, I think it's in our papers, it doesn't end at final approval. If there are issues or problems that arise and what we hope to not be back to see you every day, but I certainly had settlements where we've been back occasionally. If there are differences that can't be resolved or class members who believe that they are not being treated fairly or they are being denied an opportunity, everyone will

1  have an opportunity to come back to your Honor to raise that

2  question with your Honor.

3         So I think there is a number of checks in place that

4  would -- that would ensure that the participation rate is what

5  it should be.  We, of course, had the opposite concern, which

6  is that it will be larger than it should be, that people will

7  get through that there is no reason to get through.  And then

8  it becomes a waste of money.  Or that the cost of the medical

9  monitoring will be greater than it needs to be.

10         So those are all competing concerns.  But I think we

11  have a process in place that is very, very robust, overseen by

12  very notable individuals, whose I think credentials speak for

13  themselves.  And ultimately there is always the courts.  We

14  won't abuse the privilege, but there is of course your Honor.

15         THE COURT:  I guess I am not sure whether you answered

16  my last question, which is whether the NCAA would consider

17  modifications to the provision so that they would earmark any

18  remaining funds to go to research or other similar purposes.

19         MR. MESTER:  Your Honor, we're always willing to

20  consider any provision of proposed settlement.  I will say

21  though, and I -- and we've alluded this in prior hearings as

22  early as February, that there are -- there are moving parts

23  here that aren't always being represented.  It's not just the

24  NCAA that has interest in that.  But it's obviously the NCAA's

25  insurers who are funding this.

1    So I really honestly can't speak for everybody at this

2  point.

3    THE COURT: And I don't intend to bind you to what you

4  would say today anyway. But I was just curious as to the

5  current thinking.

6    Along similar lines, the settlement agreement also

7  provides the NCAA with the right to unilaterally terminate the

8  agreement after the opt-out period and prior to a fairness

9  hearing. And in the briefs there was some talk about certain

10  submissions that the parties may make prior to the fairness

11  hearing or what have you.

12    But what if any constraints are there, if any, on the

13  NCAA's right to do this during that period? And what's the

14  concern that the NCAA is trying to address?

15    MR. MESTER: That one I can answer directly, your

16  Honor. That is directly related to the finalization of the

17  agreements with the NCAA's insurance carriers, which we were

18  never certain were going to be perfectly and parallel and in

19  sync with your Honor's schedule. So we obviously didn't want

20  to and don't want to get ahead of ourselves. I can report that

21  we made considerable progress.

22    I certainly do not foresee any set of circumstances at

23  this point which we'd have to exercise that right. But when we

24  drafted the agreement, that -- that's what was motivating us.

25    THE COURT: Okay. So it wasn't a motivation as to

1   kind of wait and see what these protocols might be, wait to see
2   how many people would opt out.  It wasn't driven by any of the
3   substantive issues that are raised in the settlement agreement
4   itself.

5           MR. MESTER:  Well, of those three issues you
6   identified, opt-out is a separate situation.  If -- obviously
7   if the entire class opts out, then we have a different issue.
8   And there is an opt-out limit.

9           But the focus was certainly not at all with regard to
10  the MSC or the screening question or anything of that sort.
11  It's really just getting inked so that they're binding the
12  commitments from the insurance carriers.

13          THE COURT:  So explain to me, just so we have it on
14  the record, the concerns about the opt-out.

15          MR. MESTER:  Well, I mean, we have an opt-out limit.
16  And if -- if it's exceeded, then we have processes in the
17  settlement agreement.  But as any defense lawyer on this side,
18  I am always worried about too many opt-outs making the relief
19  to my client elusory.  So that if, you know, ten percent of the
20  class opted out, then we wouldn't -- we wouldn't be buying the
21  relief.  We wouldn't be in a position that we anticipated that
22  goes into our -- our thinking.

23          So that's really what it is.  We have in our minds
24  what we hope to achieve.  We certainly can't control and don't
25  control the number of opt-outs.  We have a projection what we

1  think is a reasonable limit.  We think our limit is more than

2  reasonable.  But if -- if it's exceeded, then that change is

3  certainly dynamic.

4           THE COURT:  Okay.  I know, Ms. Fegan, you look like

5  you were looking through the settlement agreement.  Is that

6  provided in the settlement agreement at some point?

7           MS. FEGAN:  It is.  It was filed under seal, your

8  Honor, because so it wouldn't become a target for people to

9  meet that number to cause the settlement to fail.

10          THE COURT:  Do you have a docket number for me?

11          MS. FEGAN:  It was Exhibit G to the settlement

12  agreement.  So it would be attached to the motion for

13  preliminary approval, the settlement agreement would be.  And

14  then it was Exhibit G to the settlement agreement.  And that's

15  docket 64.

16          MR. LEWIS:  64-1.

17          MS. FEGAN:  64-1, your Honor.

18          THE COURT:  Okay.  Also, Mr. Mester, what authority --

19  perhaps you can enlighten me as to what authority the NCAA has

20  to require its affiliated schools to comply with the proposed

21  return-to-play provisions and other provisions in the

22  injunctive relief section.

23          MR. MESTER:  That was obviously an issue Mr. Edelson

24  addressed in his submission.  And I think there is simply just

25  a misunderstanding.

1          What we did was, we -- we provided in the settlement

2     agreement that the executive committee will recommend to the

3     divisions, and the divisions will enact legislation to enact or

4     implement the provisions of the settlement agreement.

5          That's precisely the process that the NCAA has used

6     for the existing guidelines.  Those recommendations are taken

7     very seriously.  They are not ignored by any -- in any way,

8     shape or form, by the divisions.

9          But the concern again, your Honor, was one of timing.

10    If we said that the legislation had to be enacted by the time

11    of preliminary approval or final approval, I would have had to

12    come in here and give you very bad news, which I know you

13    wouldn't want to have heard, which is, that could take a year,

14    because we don't control all of that.  It's a process that

15    needs to be done and respected.

16         But -- but I have absolutely no concern whatsoever

17    that it will be done.  And again, what we did was, we enacted

18    or we implemented the process that the NCAA has already used

19    for the implementation of the existing guidelines.  So we have

20    some history there to -- to look back on.  That's what we did

21    here.  But it was -- the reason was timing.

22         THE COURT:  Okay.  But the divisions then have to

23    agree to implement the recommendations, is that correct?

24         MR. MESTER:  They do.  But they will.

25         THE COURT:  Have there been any instances where you

1  are aware of where they have not agreed to the recommendations
2  made by the executive committee?

3      MR. MESTER:  I don't know of a single instance, your
4  Honor.  And that was a question I asked as well.

5      THE COURT:  And what recourse is there in the event,
6  the unique event, unprecedented event, that division or school
7  simply says, you know what?  This is going to cost too much
8  money.  We just don't want to do this.

9      MR. MESTER:  Well, I mean, the bylaws, the
10  constitution, the rules of the NCAA have all sorts of
11  consequences.  How those would be implemented, I guess, because
12  I don't think it's ever happened, I don't -- I don't have a
13  ready answer.  But at some point if an institution refused to
14  comply, there are consequences.

15      It doesn't happen because no one wants to face those
16  consequences.  But it -- there is just not a history of rogue
17  institutions saying, you know what?  I am -- we're not
18  interested in -- in doing this or that.

19      THE COURT:  And I certainly appreciate that.

20      Mr. Berman, would that be a material term?  So in
21  other words, if Division Three schools just decided, because I
22  understand the history of NCAA, but you never know.  And so if
23  the Division Three schools just say, look, to have a trained
24  medical personnel at all of our practices and all of our games,
25  it's just too cost prohibitive.  NCAA, you can try to make us

1    do it, but we're just not going to do it.

2              What does that mean for the class?

3              MR. BERMAN:  Well, for --

4              THE COURT:  Let me ask you this:  At that point would

5    the Court have the authority to say, you know what?  I think

6    that's a material term, and this settlement isn't going

7    forward?

8              MR. BERMAN:  Well, first of all, having sat down with

9    executives from the NCAA, I do have a great deal of confidence

10   that this is going to happen, because I asked the same

11   questions you did.  And they have such a laborious decision-

12   making process.  This was the only way we could figure it out.

13             In the event that Division Three did not comply -- I

14   just picked them.  I don't mean to pick on them.

15             THE COURT:  I don't mean to pick on them either, just

16   for the record.

17             MR. BERMAN:  I know what I would do, and that is,

18   there would be a new class action filed.  So I thought about

19   this.  What if someone doesn't do that?

20             I really set up whatever division doesn't comply,

21   because the body, the NCAA, has agreed that this should be

22   done.  Division One has agreed it should be done.  And now you

23   haven't.  So I have a new class action seeking injunctive

24   relief against the recalcitrant division.

25             THE COURT:  So the release would not flow to the

1    benefit of any, as you term them for purpose of this hearing,

2    recalcitrant schools or divisions?

3         MR. BERMAN:  That's right.  The really -- yes, that's

4    correct.

5         THE COURT:  Mr. Mester, is that your understanding of

6    how this would work as well?

7         MR. MESTER:  Well, I haven't honestly thought about

8    what the impact would be on the release.  What I can tell your

9    Honor is that it certainly is not the case that the NCAA has

10   done this without conferring with the divisions and

11   representing member schools.  So it's why it strikes me as a

12   very hypothetical question.

13        There is -- there is a comfort level.  And certainly

14   even disclosures.  This settlement is not being kept quiet, not

15   hidden from the members.  I am not aware of any -- any

16   suggestions along those lines.  How it would impact the

17   release, I haven't honestly thought about it.

18        THE COURT:  That certainly seems like a fair

19   consequence, that if a particular school or particular division

20   says, you know what?  We don't want to participate in this

21   procedure.  You know, we are effectively opting out of this

22   settlement.  Then it seems only fair that they wouldn't have

23   the benefit of the release that comes as part of this class

24   action.  And whether or not the parties have kind of thought

25   about that -- and again, I have no reason to believe at this

1    point to disagree with Mr. Mester or to think that the NCAA

2    would not be able to ensure the compliance of or the agreement

3    of its affiliated schools.

4          However, that is part of my job is to try to figure

5    out, to the extent we can, to look into this crystal ball, to

6    look at the different consequences that might flow from

7    different events.

8          MR. BERMAN:  And we're going to be able to address

9    that, because under the schedule we're proposing, you know,

10   final hearing six months out.  Within that period we're going

11   to know whether they agreed.  And if they haven't, we can

12   certainly -- we would address it at the final approval hearing.

13         MR. MESTER:  I think the trigger -- we have to check

14   the agreement.

15         THE COURT:  All right.  While I have you both up here,

16   a couple of questions to ask both of you.  One is that the

17   settlement agreement specifies that attorneys' fees incurred by

18   any objectors must be borne by the objector and not come out of

19   any sort of common funds.

20         MR. BERMAN:  I think that objectors' fees,

21   applications, are subject to your Honor's discretion.

22         THE COURT:  And that was my question, because

23   notwithstanding what the agreement says, I take it that I can

24   certainly have the discretion to award fees of any objectors to

25   the extent I think that they provide value and represent the

1  interests of either subclasses or the class as a whole, is that

2  correct?

3  MR. MESTER:  Yes, your Honor.

4  THE COURT:  Okay.  And the last question I had is with

5  regard to the -- or couple -- as a lawyer I'd say, one final

6  question, and I never did.  So I won't say the last question.

7  But the nature and extent of continuing Court

8  supervision that's going to be required in this settlement.

9  You are talking about a 50-year plan.  You know, I may or may

10 not be here 50 years from now, most likely not.  But it

11 envisions at a minimum a yearly report, continuing approval of

12 any administrative costs, attorneys' fees are expended in the

13 program.

14 Have the parties thought about I guess the

15 institutional administrative realities of having a settlement

16 agreement where you are looking for court, this court

17 particular, to supervise the settlement agreement over the next

18 50 years?

19 MR. BERMAN:  Well, we know the court is going to be

20 here.  You may not.

21 THE COURT:  Clearly the court will be here.

22 MR. BERMAN:  So we didn't think it would be too much

23 of a burden to have status conference once a year where we come

24 in and tell the Court what's happened.  Yes, we were worried

25 about it.  We were worried about -- obviously I won't be here,

1  you know, at the conclusion of this thing.

2       THE COURT:  For example, in other cases like this, one

3  can imagine a District Court appointing a special master that

4  would answer specifically to the court, not either party.  The

5  special master would obviously have some limited

6  responsibilities, as you say, going forward.  There is not

7  going to be all that much time.

8       But still someone with institutional knowledge that

9  can deal with issues that come up and who he or she would be

10 paid from the fund, from the parties themselves, as opposed to

11 coming from the court, that I know has worked in other

12 instances.  And I was wondering whether that's something that

13 the parties have thought about.

14      MR. MESTER:  Well, your Honor, I think we have done it

15 to a degree with Judge Andersen because he is the chairman of

16 the medical science committee where most of the conflicts and

17 issues are going to get to.  He is the referee.

18      There is a process, as specified in the settlement

19 agreement.  Those go to him.  He resolves them if we have an

20 issue, and we'll certainly try to work it out.  We ultimately

21 bring it to you.

22      Again, I've had that sort of structure, admittedly and

23 typically in employment class cases.  But we work our hardest

24 to not come to the court very often because usually we get a

25 chilly reception.  They don't want to hear from us.

1      So -- but I think Judge Andersen really by and large

2   serves that function under our proposed settlement.

3      MR. BERMAN:  We would be willing to modify.  If you

4   wanted to have Judge Andersen serve that function rather than

5   the court.  Or what we could do, Judge Andersen's term is for

6   two years to start.  We could report to you for just the first

7   two years, and then when you are satisfied that we are --

8      THE COURT:  Well, the difference between -- I mean, I

9   have all the respect in the world for Judge Andersen obviously.

10  The benefit of a special master, though, is that the special

11  master reports directly to me and is basically my arm in

12  overseeing the duties that the Court has over the settlement.

13  So that's something that I just wanted to raise with the

14  parties.

15      That might be something that would not only minimize

16  the administrative burdens of this court for the next 50 years.

17  But also to have someone that has some institutional knowledge

18  over time with regards to the ins and outs of the settlement

19  agreement might be helpful.

20      MR. BERMAN:  The special master doesn't necessarily

21  need to be a lawyer.

22      THE COURT:  No, I understand that.

23      The other thing is that I noticed that if the medical

24  monitoring fund runs out of money, there are various kind of

25  contingencies.  And the plaintiffs can bring it to NCAA's

1    attention.  The NCAA can then figure out what it wants to do.

2    But one of the things is that if the fund runs out of

3    money, then the individuals can bring their individual claims

4    for medical monitoring on an individual basis, right?

5    And I am wondering why at that point in time, if the

6    fund runs out of money, why it wouldn't be reasonable to allow

7    individuals to pursue their claims either on an individual

8    basis or a class basis, given the fact that for medical

9    monitoring individual claims are kind of difficult to bring.

10   As we're often seeing, they're more apt to class resolution.

11   MR. MESTER:  It goes, your Honor, I think in part to

12   one of our goals in the settlement.  First of all, we don't

13   think it's likely that it's going to run out of money.  We

14   spent a lot of time and effort and a fair amount of money doing

15   analysis to make sure the common fund is more than adequate,

16   and we believe it is.

17   In the unlikely event, however, it isn't, we didn't

18   want to have incentives built into the settlement that would

19   cause certain people to do things that might cause the fund to

20   be exhausted prematurely, such -- so that a new fresh class

21   claim could be brought.

22   Having said that, we thought the symmetry was

23   appropriate because what we would be -- we would be giving back

24   to class members in the event of exhaustion would be precisely

25   the only substantive right that we are taking away in the

1  release, which I think is an important factor.  Sometimes gets

2  lost in some of the rhetoric.

3       The only substantive claims the class members are

4  releasing is their medical monitoring claim.  And that's the

5  case notwithstanding the fact, as reflected in the papers, a

6  lot of them probably don't have a medical monitoring claim,

7  depending on where they live, what their symptoms are, et

8  cetera, et cetera.  But that's the only substantive claim they

9  are giving away in the release.  They are preserving all other

10 substantive claims.

11      And we give that back to them if in fact the medical

12 monitoring that we provided to them -- the fund is exhausted.

13 So we give them back what we took away.

14      THE COURT:  But as part of that bundle of right that

15 they're giving away as part of the medical monitoring claim is

16 the right to bring medical monitoring claims as class actions,

17 right?  Whether or not you call it substantive right, it's a

18 right.  It has value.  I mean, the Seventh Circuit has talked

19 about that.

20      So I was just curious as to whether or not the parties

21 have thought about if in the unlikely event that the fund runs

22 out of money, whether the individuals would be able to pursue

23 the medical monitoring claims on a class-wide basis to the

24 extent it's not extinguished by everything that's happened in

25 the last 49 years, say.

1           MR. BERMAN:  Your Honor, this was the hottest -- one

2     of the hottest points in the negotiation.  I demanded that.  It

3     has been something that I used in other class cases.  And I

4     couldn't get them to do it.

5           So the question is whether giving up that right that

6     may or may not exist 30 years from now is worth, you know,

7     tossing the rest of the settlement out.  And that's what I was

8     told would happen.

9           Now let me say what I did do.  Sorry.  There is a

10    provision in there where we have an obligation to meet and

11    confer a certain period of time before the fund runs out of

12    money.  And my thinking was the following:  If I couldn't get

13    them to allow a class action to be brought and we ran out of

14    money, that means that there is a huge medical problem out

15    there that would be front-page news.  Fund out of money, so

16    many concussions.

17          The political pressure and the pressure that the NCAA

18    would be under to continue doing something would be enormous.

19    So I figured if this really is going to happen and they're

20    going to walk away over this class action provision, I'm going

21    to have a heck of a public relations club on these guys at this

22    point in time.

23          That's where I came out.

24          MR. MESTER:  Your Honor, if I could, this goes to one

25    of your earlier questions.  Precisely because we ceded so much

1 control away over the process and the fund, administration of
2 fund and how this all works, it's for that reason, because we
3 ceded so much control and put in the hands of others, including
4 the design of the questionnaire and the criteria, et cetera, et
5 cetera, it's those reasons that we were particularly concerned
6 that while we don't think it will happen, there is the
7 potential for it to get out of hand.

8      Perhaps -- and again, I'm not in any way, shape or
9 form, impugning the representatives that they proposed and your
10 Honor will approve.  But maybe their replacements of the
11 replacements of the replacements suddenly think that the
12 appropriate questionnaire or criteria should be changed, or
13 that the testing should be changed, become much, much more
14 expensive.

15      These are all eventualities, very hard to get your
16 arms around, but they are possibilities.  And those would
17 change the dynamic and increase the risk of exhaustion.  And
18 it's certainly conceivable that someone would do that with the
19 idea of exhaustion to facilitate then or to make possible a
20 class claim.  And we think that sets the incentives the wrong
21 way, so that what we do instead is, we give you back the
22 substantive right that -- that was released, and you can go
23 pursue medical monitoring.

24      THE COURT:  Okay.  Thank you very much.

25      Now, at this time I am going to need to take a five-

1   minute recess.  And after that, I'd like to hear from anyone

2   else, Mr. Edelson or Mr. Jefferson, with regard to the issues

3   that we raised.  And Mr. Edelson, I'll give you about five

4   minutes or so to address them.

5           Mr. Jefferson, I'll give you about that much time too.

6           And then we will bring this to a close because those

7   are all of my questions at this point in time.  Then also if

8   there is anything else the parties want to bring to my

9   attention, you can do that afterwards.

10          So let's take a five-minute recess.

11      (Brief recess.)

12          THE COURT:  Mr. Edelson.

13          MR. EDELSON:  Thank you, your Honor.  Thank you for

14  giving us all so much time this morning.  I will not even use

15  my full five minutes.  I'll speak quickly.

16          Three points I want to make.  One is, your Honor

17  zeroed in on a point I think we made in our brief, which is

18  what happens if the NCAA institutions decide, we don't want to

19  be involved in actually implementing this.  And the answer was,

20  well, we think maybe they don't get benefit of release.  That's

21  not how the settlement is structured.

22          We think that to the extent your Honor was throwing

23  out a suggestion or -- or at least the question, have a

24  suggestion, where there would be a carrot and a stick in the

25  settlement agreement, which is, if you -- if you follow through

1  this, you get the release.  And if you don't, you don't.

2          That would make perfect sense.  In fact, it occurred

3  to me, that could apply as well to the notice issues too.  You

4  can say, we're going to ask for your records so we can contact

5  the class.  And if you want the benefit of this release, which

6  is very valuable, you will comply.  If you don't want to,

7  that's okay too.  And then -- then you won't get the benefit of

8  the release.

9          No. 2, you mentioned there are two provisions where

10 NCAA can get out of the case, one is if there are too many opt-

11 outs and it's a mystery number.  We don't have any objections

12 to that.  We agree with counsel that that's standard.

13         The other issue, which is if the insurance doesn't

14 pay, is very concerning to us because there has been plenty

15 months.  And I thought the whole point of negotiation was to

16 see if the insurance was on board.  And it allows them

17 whether -- I don't have any issue with Mr. Mester, NCAA's

18 integrity.  But the insurance company can certainly take a

19 wait-and-see approach to see how much this might cost.  So that

20 is an issue.

21         THE COURT:  Presumably any agreement with the

22 insurance companies would have to be finalized before final

23 approval.

24         MR. EDELSON:  That is true.  That is true.

25         The last part where you asked about -- about the

questionnaire and how that will all be done, you asked whether that's where the rubber meets the road. That is the relief that people are getting under the settlement. And the idea that -- that the class member should just kind of take everyone's word that experts are looking at it and they're making the right determination doesn't feel right, especially since I never understood this before. It seems like the questionnaire was written by the attorneys.

At the end of the day, if you are using a questionnaire and you're coming up with some algorithm to screen out people, that has to be based on scientific literature. Doctors can't just make their own determinations and say, if they say yes to this and no to this, they should get tested.

They have to study that, done tests, and they should put that forward so we can evaluate that. And in fact, they haven't even decided that at this point when that's the key relief is obviously troubling to us.

Last point -- and I said three and this is the fourth, I apologize. With the idea of people -- Mr. Berman said that he was comfortable sending people four, five hours each way to get tested. Remember, this is our view -- I shouldn't say remember because this is contested.

But our view is that the benefit to class members is that they don't have to -- to incur the cost of a co-pay, which

1    is $40.   The idea someone is going to drive ten hours and go

2    through a tank of gas to save a $40 co-pay is not reasonable.

3         Now, Mr. Berman says, but, you know, there is all this

4    talk about the fund being eaten up.  How can it be eaten up if

5    only a hundred thousand dollars is going to the class?  That's

6    because they're doing different types of counting.  They're

7    looking at what the cost is to the defendant, but not really

8    the actual cost, because what hasn't been brought up is, if

9    they pay out that money, they -- the class members are forced

10   to assign the subrogation claims that they have with the

11   insurance companies, which means that NCAA can say to the

12   insurance company, we would like all of that money back, except

13   for the $40 co-pay.

14        So under this -- this -- you know, this cap of $70

15   million, if $50 million goes out, they are able to get $45

16   million or $49 million back from the insurance company.

17        That's all I have.  And again, thank you for your

18   time.

19        THE COURT:  Mr. Edelson, let me ask you this:  How

20   would you address the concerns raised by Mr. Berman that if we

21   disclose the parameters and the protocol that the medical

22   committee will be using to screen these questionnaires,

23   basically the responses will basically ensure that everyone

24   passes because everyone will know how to respond to these

25   questions?

1    MR. EDELSON:  Why would -- why would someone want to
2  manipulate the system so that they got the opportunity to be
3  seen by a doctor?  It's not as though they are getting money at
4  the end of the day where then there might be incentives.  It's
5  like if you say, here is the test for a mammogram.  Are people
6  going to change the results so they get -- actually get the
7  mammogram?  That -- that is counter-intuitive to me.

8    But if there was a big concern about it, they could at
9  least share that information, you know, with concerned people.
10  We think we should see that.  We're happy to have a protective
11  order and do it under seal.  But that -- or at the very least
12  give it to the Court.

13    THE COURT:  All right.  Thank you.

14    MR. EDELSON:  Thank you, your Honor.

15    THE COURT:  Anything further, Mr. Jefferson?

16    MR. JEFFERSON:  Yes, briefly, Judge.

17    First of all, Judge, thank you for giving me the
18  opportunity to speak before the Court today.

19    Just one last thing, Judge.  I would like to join with
20  Mr. Edelson.  I think that in order for the Court to have a
21  complete picture, I think that the formulation of the
22  questionnaire and the Court have an opportunity to approve the
23  questionnaire, something that's very fundamental to the
24  fairness of this entire process.

25    For that to be allowed to occur outside the purview of

1   the Court would really beg the question as to what extent the

2   settlement meets the fairness.

3       THE COURT:  But do you think that's necessary at the

4   preliminary approval stage?  I mean, certainly I think that

5   prior to final approval, that there has to be some way for the

6   protocols and parameters, whether it's the actual protocol and

7   parameters or whether it's some sort of summary of the process,

8   there must be -- I believe that it's reasonable to expect some

9   way that the putative class members can review and comment on

10  those parameters.

11      I am not really sure at this point how detailed or

12  specific that disclosure has to be.  But at the preliminary

13  approval stage, do you think that such a detailed analysis is

14  necessary now?

15      MR. JEFFERSON:  Well, Judge, I think that at the least

16  the Court should be provided with some kind of outline or some

17  idea of -- of what form the questionnaire is going to take.

18  Even if it doesn't include all of the specifics or details as

19  to the waiting criteria, there should be some outline of what

20  that questionnaire is going to be and how it's going to be

21  approached, Judge.

22      And then also, too, your Honor, with regard to the

23  point that you raised as to the length of this settlement at 50

24  years, I mean, that is an extremely long period of time.  I do

25  know, Judge, from following sports in the NCAA and what's going

1   on with its member institutions, that there has been much
2   conversation with regard to where the NCAA is going to be in 50
3   years, where a lot of the Division One schools actually --
4   there is conversation about them starting with a different
5   organization.

6           And so to what extent would the NCAA still be in a
7   position to fulfill any settlement that it might enter into
8   today that stretches out for some -- for some 50 years.

9           And then just in closing, Judge, I will say that I
10  have been involved in class settlements, and mass torts and
11  things of that nature, and seen how those have worked out.  And
12  I actually had a brief period of time to serve on the bench at
13  the -- at the state level where I had the opportunity to review
14  class actions and mass torts as well.

15          I think as far as this settlement is concerned, just
16  in closing, to include people and as the Court pointed out more
17  than 50 percent of the people within the class that we are
18  talking about here being involved in non-contact sports, and
19  allocating funds that can be made available to those people who
20  aren't even in the case, whereas not making any allocations of
21  funds for people who actually played and are suffering today,
22  to me makes this settlement really, your Honor, fundamentally
23  unfair.  And we would submit that to the Court and ask the
24  Court to consider that.

25          Thank you.

1          THE COURT:  Thank you very much.

2          Yes, Mr. Lewis.

3          MR. LEWIS:  Your Honor, very briefly.  Richard Lewis

4     for the plaintiff.

5          On your question about the screening protocol,

6     Exhibits E and F to settlement agreement do indicate the

7     factors, and they were not written by lawyers.  They were

8     written by medical experts.  Dr. Stern for one from Boston

9     University had input into those.

10         And we're not really writing on a clean slate here.

11    There are principles for medical screening.  There are public

12    health principles that routinely prefer false positives over

13    false negatives.  It's a concept of screening to throw a

14    broader net and not a narrower net, to make sure that you

15    capture the people who are truly at risk.

16         All four of the medical professionals on the committee

17    are familiar with these principles.  At Boston University Dr.

18    Cantu and Dr. Stern are implementing protocols right now that

19    utilize these principles.  And I think the Court should be

20    highly confident that their work product will reflect this.

21         Of course, if the Court wants to see more detail from

22    them, that wouldn't be a problem.  But it's not something they

23    are going to sit down and make up.  There are established

24    screening protocols and principles which they are using in

25    their research and clinical care today, which will be utilized

1  in this program.

2        Thank you, your Honor.

3        THE COURT:  Thank you.

4        Mr. Berman, Mr. Mester, any concluding remarks?

5        MR. BERMAN:  Yes, your Honor.  First of all, I am

6  going back to your questions about notice.  I don't know if you

7  want more information.  You got plenty of information.  But

8  there is a case called In Re Student Likeness Litigation about

9  using students.  And we have sent out notice there.  It's been

10 approved by Judge Wilken and we can show you the notice plan.

11 I think Gilardi was also involved in that.

12       And there is a request going out to the universities I

13 think next week in that case very similarly to what's being

14 done here.

15       THE COURT:  And I can find that on the docket, can't

16 I?

17       MR. BERMAN:  I think it will be easier if we did it

18 for you.  But if you want to try, but I will be glad to have

19 it -- write you a letter identifying on the docket.  The docket

20 is enormous.

21       THE COURT:  Why don't you go ahead and file that.

22 Thank you.

23       MR. BERMAN:  To the extent that you have concerns that

24 we didn't have a non-contact representative, we do have clients

25 who are non-contact clients.  We had a runner, for example,

1  who's about to file a case but was afraid publicity and the
2  coach.  But we have others.
3          We could if you wanted make a motion to have them
4  added as plaintiffs.  We can sit down with Judge Andersen.  We
5  can -- the NCAA, they agreed to do this.  And we could have
6  them go through the settlement process from their eyes.
7  Something for you to consider while you are pondering your
8  decision.
9          Unless you have any further questions for me, I am
10  done.  I appreciate your time.
11          THE COURT:  Thank you.
12          MR. MESTER:  Your Honor, nothing further.  We are
13  perfectly willing to do that with a non-contact sport person if
14  that remains a concern of the Court.
15          THE COURT:  I mean, I think that with regard to that,
16  it does raise kind of some interesting issues as to how much is
17  enough, right?  And I don't know whether -- well, I guess at
18  this point I don't know the answer to that.  And probably the
19  parties are better suited to really kind of think about that as
20  we go forward.  Thank you.
21          MR. MESTER:  Thank you, your Honor.
22          THE COURT:  So at this point in time, I want to thank
23  the counsel for the comments today.  It was very helpful to me
24  in trying to digest the proposed settlement.  And I thought the
25  responses to my questions were very useful and productive.  So

1  I appreciate everyone's participation today at the hearing.

2          At this point in time, the motion for preliminary

3  approval will remain under advisement, and we will issue a

4  ruling.

5          Thank you.

6      (Which were all the proceedings had at the hearing of the

7          within cause on the day and date hereof.)

8                          CERTIFICATE

9          I HEREBY CERTIFY that the foregoing is a true, correct

10 and complete transcript of the proceedings had at the hearing

11 of the aforementioned cause on the day and date hereof.

12

13   /s/Alexandra Roth                          10/24/2014
     _____    _____
14   Official Court Reporter                      Date
     U.S. District Court
15   Northern District of Illinois
     Eastern Division
16

17

18

19

20

21

22

23

24

25