UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

SETTLEMENT CLASS REPRESENTATIVES' MEMORANDUM IN SUPPORT
OF RENEWED MOTION TO ADD NON-CONTACT SPORTS
PLAINTIFFS AND CLASS REPRESENTATIVES

[REDACTED VERSION]

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ..................................................................................................1

II.  PROCEDURAL HISTORY.....................................................................................2

III. BACKGROUND FACTS .......................................................................................4

    A.    The Proposed Class Representatives Unanimously Support the Settlement ..........4

        1.    Ms. Shelby Williams is a sophomore and member of an NCAA women's golf team..................................................................................5

        2.    Mr. Brice Sheeder is a junior and member of NCAA men's cross country and track and field teams......................................................6

        3.    Ms. Shavaughne Desecki is a former NCAA women's softball player and current assistant coach of an NCAA women's softball team..............8

        4.    Mr. Spencer Trautmann is a senior and a pitcher for an NCAA men's baseball team...................................................................................9

        5.    Mr. Ryan Parks is a former NCAA men's baseball player.......................11

        6.    Ms. Ursula Kunhardt is a former NCAA women's volleyball player. ......12

        7.    Ms. Jessica Miller is a senior and a current member of an NCAA women's volleyball team............................................................14

    B.    The Proposed Class Representatives Had a Meaningful Opportunity to Review and Discuss the Settlement with Judge Andersen ....................................16

    C.    The Proposed Class Representatives Represent Non-Contact Sports on the Continuum of Concussion Incidences.............................................................18

    D.    The Analysis Group Confirms that the Medical Monitoring Fund Is Adequate When Concussion Rates for Non-Contact Sports Are Included...........22

IV.  ARGUMENT ........................................................................................................23

    A.    The Proposed Class Representatives Adequately Represent the Settlement Class........................................................................................23

    B.    The Proposed Class Representatives Claims Are Typical of the Settlement Class........................................................................................25

010270-12 737782 V1

C.      The Addition of the Proposed Class Representatives May Be Necessary to Protect Settlement Class Members Who Played Non-Contact Sports...............26

D.      The NCAA Athletes Who Played Non-Contact Sports May Otherwise Suffer Prejudice if the Court Deems the Current Plaintiffs Inadequate to Represent Them *and* Denies the Addition of the Proposed Class Representatives as Plaintiffs ...............................................................................28

V.      CONCLUSION.................................................................................................................29

010270-12 737782 V1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amchem Prods. v. Windsor,*
 521 U.S. 591 ..............................................................................................................23, 24

*American Pipe & Constr. Co. v. Utah,*
 414 U.S. 538 (1974) ...................................................................................................26, 27

*Anderson v. Cornejo,*
 199 F.R.D. 228 (N.D. Ill. 2000) ......................................................................................24

*Blackie v. Barrack,*
 524 F.2d 891 (9th Cir. 1975) ...........................................................................................25

*Brider v. Nationwide CR Inc.,*
 1999 U.S. Dist. LEXIS 2681 (N.D. Ill. Mar. 5, 1999) ....................................................27

*In re Discovery Zone Secs. Litig.,*
 181 F.R.D. 582 (N.D. Ill. 1998) ......................................................................................28

*Espenscheid v. DirectSat USA, LLC,*
 688 F.3d 872 (7th Cir. 2012) ...........................................................................................24

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
 574 F.3d 29 (2d Cir. 2009) ..............................................................................................24

*Foster v. Gueory,*
 655 F.2d 1319 (D.C. Cir. 1981) .......................................................................................27

*Gates v. Rohm & Haas Co.,*
 248 F.R.D. 434 (E.D. Pa. 2008) .......................................................................................25

*In re Gen. Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.,*
 2000 WL 45534 (N.D. Ill. Mar. 13, 2000) .......................................................................24

*Gooch v. Life Investors Ins. Co. of Am.,*
 672 F.3d 402 (6th Cir. 2012) ...........................................................................................24

*Hill v. Western Elec. Co.,*
 672 F.2d 381 (4th Cir. 1982) ...........................................................................................27

*Jordan v. Commonwealth Fin. Sys., Inc.,*
 237 F.R.D. 132 (E.D. Pa. 2006) .......................................................................................25

010270-12 737782 V1

*Keele v. Wexler,*
    149 F.3d 589 (7th Cir. 1998) ............................................................................25

*Kohen v. Pacific Inv. Mgmt.,*
    571 F.3d 672 (7th Cir. 2009) ............................................................................25

*Marshall v. H&R Block Tax Servs.,*
    270 F.R.D. 400 (S.D. Ill. 2010) .......................................................................25

*Nelson v. IPALCO Enters.,*
    2003 U.S. Dist. LEXIS 26392 (S.D. Ind. Sept. 30, 2003) ......................................27

*Searcy v. eFunds Corp.,*
    2010 U.S. Dist. LEXIS 73881 (N.D. Ill. July 22, 2010) ........................................27

*South v. Rowe,*
    759 F.2d 610 (7th Cir. 1985) ............................................................................26

*Srail v. Village of Lisle,*
    249 F.R.D. 544 (N.D. Ill. 2008)........................................................................24

*Stallworth v. Monsanto Co.,*
    558 F.2d 257 (5th Cir. 1977) ............................................................................27

*United Airlines, Inc. v. McDonald,*
    432 U.S. 385 (1977)...............................................................................26, 27

*United States v. Union Elec. Co.,*
    64 F.3d 1152 (8th Cir. 1995) ............................................................................28

*Valley Drug Co. v. Geneva Pharms., Inc.,*
    350 F.3d 1181 (11th Cir. 2003) ........................................................................24

### Other Authorities

6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 18:14
    (4th ed. 2002) ................................................................................................24

010270-12 737782 V1

Plaintiffs Adrian Arrington, Derek Owens, Kyle Solomon, Angela Palacios, Abram Robert Wolf, Sean Sweeney, Jim O'Conner, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John DuRocher, and Sharron Washington (collectively, the "Settlement Class Representatives"), on behalf of themselves and as representatives of the Settlement Class, for their Memorandum In Support of Renewed Motion to Add Non-Contact Sports Plaintiffs And Class Representatives Shelby Williams, Bruce Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, and Jessica Miller (collectively, the "Proposed Class Representatives") state as follows:

## I. INTRODUCTION

The Proposed Class Representatives are current and former NCAA student-athletes who play or played non-contact sports which generally have a lower incidence of concussion than Contact Sports.[1] The Proposed Class Representatives have reviewed, understand, and support the Amended Settlement Agreement ("Settlement") from the perspective of student-athletes who play or played a sport that is not defined as a Contact Sport in the Settlement.[2] The unanimous support of the Settlement demonstrates that there is no conflict between Settlement Class members who participated in Contact Sports and those who participated in non-contact sports. Rather, the Settlement Class shares a single goal regardless of sport – to obtain access to the Medical Monitoring Program in the Settlement and to obtain necessary changes to the NCAA's concussion-management and return-to-play guidelines to further protect student-athletes in the future.

---

[1] "Contact Sports" is defined in the Amended Settlement Agreement to include football, lacrosse, wrestling, ice hockey, field hockey, soccer, and basketball, whether a men's or women's team. Amended Settlement Agreement, ¶ II(G) (Dkt. No. 92).

[2] *See* Declaration of Judge Wayne R. Andersen (ret.) ("Andersen Decl."), Ex. A. "Ex." Refers to Exhibits to the Renewed Motion to Add Non-Contact Sports Plaintiffs And Class Representatives Shelby Williams, Bruce Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, and Jessica Miller.

- 1 -

Therefore, the request should be granted for three reasons: (1) the Proposed Class Representatives are typical and they will fairly and adequately protect the Settlement Class including current and former student-athletes who played non-contact sports; (2) the rights of and benefits for Settlement Class Members who participated in non-contact sports would otherwise at risk; and (3) the denial of the right to add the Proposed Class Representatives would prejudice non-contact sports Settlement Class Members. Accordingly, the motion should be granted.

## II.    PROCEDURAL HISTORY

On July 29, 2014, the Settlement Class Representatives filed their Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class ("Motion for Preliminary Approval") seeking preliminary approval of the Settlement Agreement on behalf of a Settlement Class defined as: "All persons who played an NCAA-sanctioned sport at an NCAA member institution at any time through the date of Preliminary Approval."[3] On October 10, 2014, Plaintiffs filed their Amended Motion ("Amended Motion") for Preliminary Approval of Amended Class Settlement and Certification of Settlement Class seeking approval of the Amended Settlement Agreement ("Amended Settlement Agreement").[4]

During the October 23, 2014 hearing on the Motion for Preliminary Approval of the Amended Settlement Agreement, the Court inquired: "[C]an the current class representatives adequately represent the interests of those who played non-contact sports when it comes to the terms that are set forth in this settlement?"[5] In an attempt to address the Court's "concern that the

---

[3] *See* Motion for Preliminary Approval (Dkt. No. 64), at 1.

[4] *See* Amended Motion for Preliminary Approval (Dkt. No. 91).

[5] *See* Transcript of Proceedings – Motion Before the Honorable John Z. Lee, Oct. 23, 2014 ("Oct. 23, 2014 Transcript of Proceedings"), Ex. B, at 9.

- 2 -

interests of people who play non-contact sports be formally represented in this case,"[6] the Settlement Class Representatives filed their Motion to Add Non-Contact Sports Plaintiffs and Class Representatives ("Motion to Add Non-Contact Sports Plaintiffs") requesting to add two *current* participants in non-contact NCAA sports as Class Representatives.[7]

During the November 18, 2014 hearing on the Motion to Add Non-Contact Sports Plaintiffs, the Court requested Plaintiffs: (1) to obtain "the thoughts of various class representatives along the spectrum of both sports and time period to some extent, and whether or not they would approve of the overall settlement …";[8] (2) "to make sure that whoever the additional class members are, that they have a meaningful opportunity to sit down with Judge Andersen and the parties and ask whatever questions they have";[9] (3) "to the extent there is a continuum [of concussions among non-contact sports] … to make sure that whoever the additional class representatives are adequately represent that continuum";[10] and (4) to have the expert "team take another look at their work to make sure that they have the most relevant data to adequately calculate participation rate."[11]

We have taken these steps requested by the Court. As reflected below, we (1) obtained the thoughts of current and former student athletes in the non-contact sports of baseball, softball, volleyball, golf, and track and field;[12] (2) each of the Proposed Class Representatives had a meaningful opportunity to review the Amended Settlement and to engage in conversations with

---

[6] *Id.* at 13.

[7] *See* Settlement Class Representatives' Motion to Add Non-Contact Sports Plaintiffs and Class Representatives (Dkt. No. 96).

[8] *See* Transcript of Proceedings – Motion Before the Honorable John Z. Lee, Nov. 18, 2014 ("Nov. 18, 2014 Transcript of Proceedings"), Ex. C, at 10-11.

[9] *Id.*, at 13.

[10] *Id.*, at 8.

[11] *Id.*, at 11.

[12] List of NCAA-sanctioned sports included in the Settlement, Ex. K.

Judge Andersen; (3) the Proposed Class Representatives represent both the three non-contact sports (*i.e.*, baseball, softball, and volleyball) that have the "highest" rate of concussions among the non-contact sports, as well as two non-contact sports (*i.e.*, golf and track and field) that represent the majority of non-contact sports because they generally reflect fewer incidences of concussions; and (4) Mr. Deal has analyzed the data and concluded that, even by including the concussion rates for non-contact Sports, the Medical Monitoring Fund is fully adequate. Therefore, the motion should be granted.

### III.    BACKGROUND FACTS

**A.    The Proposed Class Representatives Unanimously Support the Settlement**

The Court requested that we provide the "thoughts of various class representatives along the spectrum of both sports and time period ... and whether or not they would approve of the overall settlement ...."[13]

Each Proposed Class Representative reviewed the Amended Settlement Agreement on behalf of current and former NCAA student-athletes who have played non-contact sports to determine if the Settlement is fair, adequate, and reasonable as it applies to student-athletes who play or played non-contact sports.[14] Unanimously, the Proposed Class Representatives approve of the Settlement and believe that the Settlement should apply to all sports. The Proposed Class Representatives believe that the Settlement is important because it provides both medical monitoring to all current and former student-athletes and significant changes to the NCAA's concussion management and return-to-play rules.

---

[13] Nov. 18, 2014 Transcript of Proceedings, Ex. C, at 10-11.

[14] *See* Declaration of Shelby Williams ("Williams Decl.), Ex. D, ¶¶ 2-3; Declaration of Brice Sheeder ("Sheeder Decl."), Ex. E, ¶¶ 2-3; Declaration of Shavaugne Desecki ("Desecki Decl."), Ex. F, ¶ 2; Declaration of Spencer Trautmann ("Trautmann Decl."), Ex. G, ¶¶ 2-3; Declaration of Ryan Parks ("Parks Decl."), Ex. H, ¶ 2; Declaration of Ursula Kunhardt ("Kunhardt Decl."), Ex. I, ¶ 2; Declaration of Jessica Miller ("Miller Decl."), Ex. J, ¶ 2.

010270-12 737782 V1

1.     **Ms. Shelby Williams is a sophomore and member of an NCAA women's golf team.**

Ms. Williams is a current student-athlete at Northwest Missouri State University in Maryville, Missouri. She is a sophomore and a member of the women's golf team.[15]

Ms. Williams believes that the concussion issues raised in this litigation are very important to NCAA student-athletes. Many NCAA student-athletes are impacted on a daily basis by concussion-management practices. While non-contact sport athletes may not be affected on a daily basis, concussions can and do still occur.[16]

Ms. Williams further explains that, for those student-athletes who suffer effects from concussions, she believes that all current or former student-athletes should have access to the Medical Monitoring Program – regardless of the sport they played. She states that each player has dedicated time to play their sport, and should have access to the diagnostic program provided under the Settlement.[17]

During her review of the Settlement, Ms. Williams realized that it provided for trained personnel to be present at contact sports events but not at non-contact sports events. She does not believe that this difference means that the Settlement is unfair to non-contact sports athletes due to the relative rarity of concussions at non-contact sports events.[18] However, in the event that a concussion occurs at a non-contact sports event, she states that it is important that all athletes will have a baseline test against which to test their recovery from the injury, as well as a rule that

---

[15] Williams Decl., Ex. D, ¶ 1.

[16] *Id.*, ¶ 5.

[17] *Id.*, ¶ 6.

[18] *Id.*, ¶ 7.

- 5 -

prevents athletes from being returned to play too early. These are important benefits that will protect all student-athletes, regardless of sport, in the future.[19]

Ms. Williams also supports the Settlement because she has friends who have suffered concussions. She believes it is important for her to step forward and ensure that all student-athletes in all sports are protected in the future. She also believes it is important for her to ensure that non-contact sports athletes receive the medical benefits provided under the Settlement.[20]

Ms. Williams states that she is willing to be a class representative in this litigation if the Court grants this motion, and will stay abreast of developments in the litigation.[21]

> **2. Mr. Brice Sheeder is a junior and member of NCAA men's cross country and track and field teams.**

Mr. Sheeder is a current student-athlete at Simpson College in Indianola, Iowa, where he is a junior and member of the men's track and field and cross country teams.[22]

Mr. Sheeder believes that the concussion issues raised in this litigation are very important to NCAA student-athletes. He has roommates that have received concussions and were returned to play on the same day. He has never received any baseline testing. His school only requires athletes to watch a short video regarding concussions at the beginning of each season, which is less than the Settlement provides based on his review.[23]

Mr. Sheeder concluded that the Settlement was not only fair but important for all student-athletes to have access to the Medical Monitoring Program, receive baseline testing before each season, and be protected by a prohibition against same-day return-to-play guidelines.[24]

---

[19] *Id.,* ¶ 7.
[20] *Id.,* ¶ 8.
[21] *Id.,* ¶ 9.
[22] *See* Sheeder Decl., Ex. E, ¶¶ 1-2.
[23] *Id.,* ¶ 4.
[24] *Id.,* ¶ 5.

- 6 -

Mr. Sheeder focused, in part, on the Settlement's paragraphs that provided for trained personnel to be present at contact sports events but not at non-contact sports events. He does not believe that this difference means that the Settlement is unfair to non-contact sports athletes, because they do not receive hits or concussions as frequently as in other sports. In fact, he found it important that the Settlement provides that trainers will receive annual concussion-management training. He explains that at many non-contact sporting events, trainers – who are sometimes just college students themselves – are the only medical personnel present. Knowing that they will receive annual training in concussion management is thus important to him.[25]

Mr. Sheeder also thinks it is important that non-contact sports athletes will receive baseline testing before each season,[26] and that the NCAA will provide training to teachers regarding the need for academic accommodations to protect all student-athletes and provide adequate time for recovery from head injuries without being penalized.[27]

Mr. Sheeder fully supports the Settlement on behalf non-contact sport athletes, and wants to make sure that non-contact sports athletes receive the medical benefits provided under the Settlement.[28] He is willing to be a class representative in this lawsuit if the Court grants this motion, and will stay current with any developments in the lawsuit.[29]

---

[25] *Id.*, ¶ 7.
[26] *Id.*, ¶ 6.
[27] *Id.*, ¶ 8.
[28] *Id.*, ¶ 9.
[29] *Id.*, ¶ 10.

- 7 -

### 3. Ms. Shavaughne Desecki is a former NCAA women's softball player and current assistant coach of an NCAA women's softball team.

Ms. Desecki is a former student-athlete, who graduated from DePaul University in Chicago, Illinois in 2003. Ms. Desecki played softball at DePaul and is currently a volunteer assistant softball coach at Concordia University in River Forest, Illinois.[30]

Ms. Desecki that the NCAA and its member institutions it should be responsible to provide medical screening to athletes who think that they may be suffering from concussion symptoms. She also thinks it is important that the Settlement extends to all sports, and not just football.[31]

During the time she played softball at DePaul, Ms. Desecki witnessed others sustain concussions as a result of accidents during the course of play on the softball field.[32] At DePaul, she never received baseline testing and, to her knowledge, there were no concussion management rules in place despite the fact that concussions did occur. Therefore, as a current coach, it is important to Ms. Desecki that modernized guidelines are in effect for players in all sports.[33]

Ms. Desecki also thinks it is important for former student athletes who suffered effects from concussions to have access to the Medical Monitoring Program – regardless of the sport they played.[34] It is important to Ms. Desecki that she will be eligible to obtain medical monitoring despite the fact that her playing career ended more than 10 years ago.[35]

---

[30] Desecki Decl., Ex. F, ¶ 1.

[31] *Id.*, ¶¶ 3-4.

[32] *Id.*, ¶ 4.

[33] *Id.*, ¶ 5.

[34] *Id.*, ¶ 6.

[35] *Id.*

- 8 -

Ms. Desecki also understands that the Settlement provides for trained personnel to be present at contact sports events but not at non-contact sports events. However, she believes this is appropriate given the expense and sheer volume of NCAA sporting events and the lower risk of concussions in non-contact sports than in contact sports.[36]

As a current volunteer assistant NCAA softball coach, it is important to Ms. Desecki that the Settlement requires that coaches, athletic trainers, and student-athletes receive mandatory concussion education prior to the start of the season.[37] Because coaches are with the student-athletes most often, it is important that they be able to recognize symptoms of concussions, refer the student-athlete to medical personnel after a head injury, and require the student-athletes to be cleared by a physician before returning to play.[38]

Ms. Desecki is willing to be a class representative in this lawsuit if the Court grants this motion, and will stay current with any developments in the lawsuit.

### 4. Mr. Spencer Trautmann is a senior and a pitcher for an NCAA men's baseball team.

Mr. Trautmann is a current student-athlete at Western Oregon University. He is a senior and a pitcher for the baseball team.[39]

After reviewing the Settlement, it was obvious to Mr. Trautmann that the Settlement should apply to players in all sports. He believes that the NCAA is doing the right thing by funding a Medical Monitoring Program for the benefit of athletes who are either currently struggling with concussion symptoms or may in the future.[40] Although Mr. Trautmann has never

---

[36] *Id.*, ¶ 7.

[37] *Id.*, ¶ 8.

[38] *Id.*

[39] Trautmann Decl., Ex. G, ¶ 1.

[40] *Id.*, ¶ 4.

- 9 -

to his knowledge personally suffered a concussion while playing baseball, he has witnessed other players suffer head injuries as a result of accidents or being hit in the head by a ball.[41] The injuries he has witnessed on the baseball diamond are serious because of the pure force behind the hit of a baseball – especially since the NCAA allows the use of metal bats.[42]

Mr. Trautmann notes that one important benefit of the Medical Monitoring Program is that it is easily accessible to current and former student-athletes across the country. Therefore, student-athletes can obtain medical monitoring either where their school is located or near where they permanently reside.[43] Mr. Trautmann also notes that another important benefit of the Settlement is that it requires that all student-athletes be baseline tested, which his school currently offers.[44]

Finally, it is important to Mr. Trautmann that, if a concussion occurs at a non-contact sports event, the Settlement requires that a student-athlete obtain medical clearance prior to returning to play regardless of sport.[45] Due to the rarity of concussions in baseball, he realizes that it may not be practical for a physician to be present at every game. However, if a concussion does occur, it is important to him that the student-athlete must see and be cleared by a physician before returning to play.[46] In addition, it is important to him that all student-athletes, coaches, and athletic trainers receive concussion education before each season.[47]

---

[41] *Id.*, ¶ 5.
[42] *Id.*
[43] *Id.*, ¶ 7.
[44] *Id.*, ¶ 8.
[45] *Id.*, ¶ 9.
[46] *Id.*
[47] *Id.*

- 10 -

Overall, Mr. Trautmann supports the Settlement and believes it should apply to all sports.[48] Mr. Trautmann is willing to be a class representative in this lawsuit if the Court grants this motion, and will stay current with any developments in the lawsuit.[49]

**5.    Mr. Ryan Parks is a former NCAA men's baseball player.**

Mr. Ryan Parks is a former student-athlete, who graduated from the University of Illinois in Champaign, Illinois in 2002. He was a pitcher for the baseball team.[50]

During his baseball career, his school did not conduct baseline testing.[51] However, concussions did occur in baseball; he witnessed other players (including fellow pitchers) sustain injuries as a result of being hit in the head by a ball.[52] To his knowledge, there were no rules regarding return to play following a concussion during the time he played.[53]

Although Mr. Parks to his knowledge never personally suffered a concussion, he thinks it is important that all current and former student-athletes have access to the Medical Monitoring Program.[54] He also thinks it is important that all student-athletes be baseline tested.[55]

Mr. Parks is surprised that the concussion rates for baseball are lower than those for the "contact sports" defined in the Settlement, but thinks that the rule changes are sufficient to

---

[48] *Id.*, ¶ 10.
[49] *Id.*
[50] Parks Decl., Ex. H, ¶ 1.
[51] *Id.*, ¶ 3.
[52] *Id.*
[53] *Id.*
[54] *Id.*, ¶ 4.
[55] *Id.*, ¶ 5.

010270-12 737782 V1

ensure that baseball players are protected going forward.[56] Specifically, it is important that the coaches and athletic trainers are properly trained in concussion management and recognition.[57]

Finally, Mr. Parks thinks that the Settlement is important because it both provides medical monitoring to former athletes like him and also makes significant changes going forward to protect current players. Therefore, he supports the Settlement on behalf of a former player in a "non-contact" sport, and is willing to participate as a class representative.[58]

**6.     Ms. Ursula Kunhardt is a former NCAA women's volleyball player.**

Ms. Kunhardt is a former student-athlete who played volleyball at Montana State University in Bozeman, Montana from 2011 to 2012. She played outside hitter for the volleyball team until suffering a concussion in practice which forced her to quit the team.[59]

Ms. Kunhardt can attest from personal experience that concussions can and do occur in sports other than traditional "contact sports."[60] When concussions do occur in these sports, they can be just as devastating and have just as much of an effect on a student-athlete's health. Therefore, Ms. Kunhardt believes that the Settlement should cover players in all sports.[61]

During her career, Ms. Kunhardt hit her head on the floor during a drill in practice and sustained a concussion.[62] Despite remaining symptomatic, she was rushed back to play by the training staff even though she did not feel ready to return to play.[63] Ms. Kunhardt was not subject to medical screening and did not see a physician until she requested a neuropsychological

---

[56] *Id.*, ¶ 6.
[57] *Id.*
[58] *Id.*, ¶ 7.
[59] Kunhardt Decl., Ex. I, ¶ 1.
[60] *Id.*, ¶ 3.
[61] *Id.*
[62] *Id.*, ¶ 4.
[63] *Id.*

- 12 -

evaluation well after the injury occurred.[64] For her own safety, she decided to quit the team rather than participate in the same drills that caused her concussion.[65] Ms. Kunhardt's performance in certain classes also suffered as a result of the concussion.[66]

Therefore, Ms. Kunhardt believes that all former student-athletes should have access to the Medical Monitoring Program – regardless of the sport they played.[67] The ability to obtain access to the diagnostic program provided under the Settlement is a valuable benefit for former student-athletes.[68]

Ms. Kunhardt understands that it is not practical for medical personnel to be present at all non-contact sports games.[69] However, it is important to her that, if a concussion occurs at a non-contact sports event, the Settlement requires that a student-athlete obtain medical clearance prior to returning to play. It is also important to her that student-athletes, coaches, and athletic trainers receive concussion education before each season,[70] decreasing the likelihood that injured athletes are returned to play too soon.[71]

In addition, it is also extremely important to Ms. Kunhardt that the Settlement requires that all concussed student-athletes, regardless of sport, obtain medical clearance prior to

---

[64] *Id.*, ¶ 4.
[65] *Id.*
[66] *Id.*
[67] *Id.*, ¶ 5.
[68] *Id.*
[69] *Id.*, ¶ 6.
[70] *Id.*, ¶ 7.
[71] *Id.*

010270-12 737782 V1

returning to play.[72] She is convinced her symptoms could have been alleviated if she had promptly been evaluated by a physician and withheld from play until she fully recovered.[73]

The requirement that the NCAA provide education for faculty regarding academic accommodations for student-athletes suffering from concussions is also very important.[74] Following her injury, it was extremely difficult to focus and study which caused her to struggle with classes and school work.[75]

Overall, based on Ms. Kunhardt's personal experiences and struggles with concussions in volleyball, she thinks the Settlement is important because it covers all sports.[76] She is willing to and wants to be a class representative to help prevent her situation from happening to other student-athletes and to ensure that Medical Monitoring is available to all current and former student-athletes.[77]

7. **Ms. Jessica Miller is a senior and a current member of an NCAA women's volleyball team.**

Ms. Miller is a current student-athlete at Seattle Pacific University. She is a senior and a member of the women's volleyball team.[78]

Ms. Miller is extremely grateful for this Settlement primarily because it requires all schools to live up to the same standards.[79] Her school has started to implement some positive changes in concussion management, such as baseline testing.[80] Requiring all schools to be on the

---

[72] *Id.*, ¶ 8.

[73] *Id.*

[74] *Id.*, ¶ 9.

[75] *Id.*

[76] *Id.*, ¶ 10.

[77] *Id.*

[78] Miller Decl., Ex. J, ¶ 1.

[79] *Id.*, ¶ 4.

[80] *Id.*

- 14 -

same page and to implement the same concussion management policies and rules is important to her.[81]

During her career, Ms. Miller suffered a mild concussion while playing volleyball and also witnessed a teammate suffer a concussion as a result of being hit in the head with a ball. Therefore she thinks that all current or former student-athletes should have access to the Medical Monitoring Program.[82]

In her review of the Settlement, Ms. Miller acknowledged that the Settlement provides for trained personnel to be present at contact sports events but not at non-contact sports events but does not believe that this difference means that the Settlement is unfair to non-contact sports athletes.[83] Concussions happen much less frequently in sports like volleyball. However, if concussions do happen in non-contact sports, it is important that a student-athlete will have to obtain medical clearance before returning to play.[84]

As a player who has suffered a concussion and witnessed teammates get concussions, Ms. Miller knows how serious these injuries can be.[85] Therefore, she is willing to be a class representative to ensure that non-contact sport student athletes, such as volleyball players, obtain the benefits of this Settlement.[86]

---

[81] *Id.*, ¶ 4.
[82] *Id.*, ¶ 6.
[83] *Id.*, ¶ 7.
[84] *Id.*
[85] *Id.*, ¶ 9.
[86] *Id.*

**B.    The Proposed Class Representatives Had a Meaningful Opportunity to Review and Discuss the Settlement with Judge Andersen**

At the November 18, 2014 hearing, the Court instructed the parties to ensure that the additional class members have "a meaningful opportunity to sit down with Judge Andersen and the parties and ask whatever questions they have."[87]

During the week of December 1, 2014, Judge Andersen conducted interviews of the Proposed Class Representatives.[88] The interviews were detailed, at arm's length, and in good faith.[89] During each individual phone call, Judge Andersen explored whether the proposed Class Representative had reviewed and understood the Settlement and each Proposed Class Representative was given the opportunity to ask, and did ask, questions about the Settlement.[90] In addition, Judge Andersen explored whether they understood the scope (and limitations) of the benefits provided for in the Settlement, as well as the Release (including the waiver to proceed on a class-wide basis with regard to personal injuries).[91] During the discussions, if the Proposed Class Representative did not raise the issues, Judge Andersen ensured that the Proposed Class Representative discussed their opinion of the Release (including the waiver to proceed on a class-wide basis with regard to personal injuries) and the prospective injunctive relief, including the requirement that qualified medical personnel be present at all Contact Sports games but not at non-Contact Sports games.[92]

Based on Judge Andersen's discussions with the Proposed Class Representatives, he opined the Proposed Class Representatives have reviewed, understand, and support the proposed

---

[87] Nov. 18, 2014 Transcript of Proceedings, Ex. C, at 13.
[88] Andersen Decl., Ex. A, ¶ 3.
[89] *Id.*
[90] *Id.*, ¶ 4.
[91] *Id.*
[92] *Id.*, ¶ 5.

- 16 -

Settlement including the limitations and releases contained in the Settlement.[93] Judge Andersen also concluded that the Proposed Class Representatives unanimously supported the Settlement. Each of the Proposed Class Representatives believes that the Settlement will provide extraordinary benefits to thousands of current and former NCAA athletes that would not otherwise exist in the absence of the Settlement.[94]

The Proposed Class Representatives unanimously concluded that it was not only fair but important for all student-athletes, regardless of which sport they participate in, or when they participated, to have access to the Medical Monitoring Program in the Settlement in exchange for the release and waiver of the right to bring a future personal injury class action.[95] The Proposed Class Representatives also expressed that the prospective injunctive relief is appropriate to provide certain benefits, such as baseline testing, to all NCAA student-athletes in all sports, while balancing the likelihood of concussions with costs with respect to the required presence of medical personnel at games and practices.[96]

In sum, the Proposed Class Representatives fully support the Settlement and the important benefits provided by the Settlement that would not exist in the absence of this litigation.[97] Moreover, each of the Proposed Class Representatives understands the role of a class representative and expressed their desire to participate as a class representative.[98]

---

[93] *Id.*, ¶ 6.
[94] *Id.*, ¶¶ 8-9.
[95] *Id.*, ¶ 10.
[96] *Id.*, ¶ 11.
[97] *Id.*, ¶ 12.
[98] *Id.*

- 17 -

**C.      The Proposed Class Representatives Represent Non-Contact Sports on the Continuum of Concussion Incidences**

NCAA documents confirm that the sports played by the Proposed Class Representatives have lower concussion injury rates than Contact Sports. Lead Counsel have, in turn, conducted a thorough investigation into the facts of the case including the review of the NCAA's production of 29,502 documents (176,849 pages) and data. The review of the NCAA documents revealed that, starting in 1988, the NCAA used voluntarily reported injury data from member schools to track the incidences of concussions at member institutions. The data from the NCAA Injury Surveillance System reflected an estimated 29,225 total concussions in NCAA Sports from 2004-2009.[99] The statistics showed that approximately 16,277 of these occurred in football.[100]

While the majority of the NCAA documents and analysis focus on football and other Contact Sports, the documents also reveal that concussions can and do occur – albeit with less frequency – in  non-contact sports. In fact, the NCAA's Director of Health and Safety noted in 2010, "[t]oo many people think concussion is just a football injury, but from the NCAA's perspective, it's a condition that is a concern across all the sports."[101]

Internal NCAA reports generally reflect the incidence of concussions in the non-Contact Sports of softball, baseball, women's volleyball, and women's gymnastics. The NCAA tracks those particular non-Contact Sports because the data tends to reflect concussion rates above zero (but obviously below the Contact Sports' rates).

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[99] *See* Exhibit 1 attached to the Declaration of Steve W. Berman, (NCAA00007964-66, at NCAA00007964).

[100] *Id.*

[101] *See* Exhibit 2 attached to the Declaration of Steve W. Berman, (NCAA00014606-09).

- 18 -



Mr. Dick published a similar article in 2007 which summarized injury and exposure data for 16 sports from 1988-89 through 2003-2004.[106] A table in the article summarized the "frequency, distribution, and rates" of concussions for games and practices combined for 15 sports for the years 1988-89 through 2003-2004:[107]

---

[102] *See* Exhibit 4 attached to the Declaration of Steve W. Berman, (NCAA00001639-45).
[103] *Id.*, at NCAA00001639.
[104] *Id.* at NCAA00001643.
[105] *Id.*, at NCAA00001643.
[106] *See* Exhibit 3 attached to the Declaration of Steve W. Berman, (NCAA00003483-91).
[107] *Id.*, at NCAA00003488.

010270-12 737782 V1

Table 2. Frequency, Distribution, and Rates of Select Injuries (Ankle Ligament Sprains, Anterior Cruciate Ligament Injuries, and Concussions) for Games and Practices Combined for 15 Sports, 1988–1989 to 2003–2004

| Injuries | Frequency | Percentage of All Injuries | Injury Rate per 1000 Athlete-Exposures | 95% Confidence Interval |
|---|---|---|---|---|
| **Concussions** | | | | |
| Men's baseball | 210 | 2.5 | 0.07 | 0.06, 0.08 |
| Men's basketball | 387 | 3.2 | 0.16 | 0.14, 0.17 |
| Women's basketball | 475 | 4.7 | 0.22 | 0.20, 0.24 |
| Women's field hockey | 129 | 3.9 | 0.18 | 0.15, 0.21 |
| Men's football | 4404 | 6.0 | 0.37 | 0.36, 0.38 |
| Women's gymnastics | 64 | 2.3 | 0.16 | 0.12, 0.20 |
| Men's ice hockey | 527 | 7.9 | 0.41 | 0.37, 0.44 |
| Women's ice hockey* | 79 | 18.3 | 0.91 | 0.71, 1.11 |
| Men's lacrosse | 271 | 5.6 | 0.26 | 0.23, 0.29 |
| Women's lacrosse | 213 | 6.3 | 0.25 | 0.22, 0.28 |
| Men's soccer | 500 | 3.9 | 0.28 | 0.25, 0.30 |
| Women's soccer | 593 | 5.3 | 0.41 | 0.38, 0.44 |
| Women's softball | 228 | 4.3 | 0.14 | 0.12, 0.16 |
| Women's volleyball | 141 | 2.0 | 0.09 | 0.07, 0.10 |
| Men's wrestling | 317 | 3.3 | 0.25 | 0.22, 0.27 |
| Men's spring football | 612 | 5.6 | 0.54 | 0.50, 0.58 |
| Total concussions | 9150 | 5.0 | 0.28 | 0.27, 0.28 |

*Data collection for women's ice hockey began in 2000–2001.

As demonstrated in this chart, concussions occur in all sports but are more prevalent in Contact Sports. █████████████████████████

█████████████████████████████████████████

███████████████

---

108 ████████████████████████████████████████

██████████████████████████████ *See* Exhibit 5 attached to the Declaration of Steve W. Berman, (NCAA00013786-98, at NCAA00013786-87).



     In another example, also dated April 25, 2011, the NCAA similarly summarizes the national annual estimate of concussions in practice and competition by sport:[109]



---

    [109] *See* Exhibit 5 attached to the Declaration of Steve W. Berman, (NCAA00013786-98, at NCAA00013788).

- 21 -

Accordingly, for purposes of consulting with putative Class Members who played non-contact sports, Plaintiffs identified baseball, softball, and women's volleyball as having the highest concussion rates among the non-contact sports. Given that Plaintiffs already had Proposed Class Representatives that represented those sports with the lowest rates of concussions, Plaintiffs took steps to ensure that current and former players of baseball, softball, and women's volleyball had the opportunity to review and opine on the Settlement. Each of them fully supports the Settlement and seeks to be added as a Class Representative.

**D.      The Analysis Group Confirms that the Medical Monitoring Fund Is Adequate When Concussion Rates for Non-Contact Sports Are Included**

The Court has also requested that "Mr. Deal and his team take another look at their work to make sure that they have the most relevant data to adequately calculate participation rate."[110] The Analysis Group has evaluated the available data to determine whether it is likely that the Fund will be adequate to provide benefits to all qualifying athletes who complete the required steps and request testing.[111] The Analysis Group's supplemental report incorporates athletes participating in non-contact sports and estimated concussion rates in non-contact sports based on the NCAA's Injury Surveillance System.[112]

The Analysis Group model computed annual concussions, and the proportion of those which are unresolved, to estimate the Post-Concussive Syndrome (PCS) test volumes by year.[113] With respect to Chronic Traumatic Encephalopathy (CTE), the expert team determined that it is not a relevant risk among athletes participating in non-contact sports because CTE is clinically

---

[110] Nov. 18, 2014 Transcript of Proceedings," Ex. C, at 11.

[111] *See* Expert Report of Bruce Deal Regarding the Medical Monitoring Fund, Supplementary Report: Non-Contact Sports ("Deal Rep."), Ex. L.

[112] Ex. L, at 4.

[113] *Id.*

- 22 -

isolated to people who have suffered repeated head trauma over a prolonged period of time.[114] Guided by the existing literature on CTE was well as the clinical experience of Dr. Cantu, the Analysis Group only considered four non-contact sports to present a risk of CTE-like symptoms: gymnastics, pole-vaulting, softball, and baseball.[115]

Based on this information, the Analysis Group ultimately concluded that, based on an appropriately conservative range of values, the Medical Monitoring Fund is extremely likely to be adequate for its purpose of sustaining a medical monitoring program for 50 years for NCAA student-athletes with either PCS or CTE.[116]

## IV. ARGUMENT

### A. The Proposed Class Representatives Adequately Represent the Settlement Class

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." The Supreme Court has held that to meet this requirement, "[a] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."[117] The *Amchem* Court also explained that Rule 23(a)(4)'s adequacy-of-representation requirement "tends to merge" with Rule 23(a)'s commonality and typicality criteria, "which 'serve as guideposts for determining whether … maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"[118] The class representative's interests cannot conflict with the interests of the absent class

---

[114] Ex. L, at 5.

[115] *Id.*

[116] *Id.* at 9.

[117] *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (quoting *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

[118] *Id.* at 626 n.20 (quoting *General Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 157 n.13 (1992)).

- 23 -

members.[119] The existence of minor conflicts, however, between plaintiffs and the class alone will not defeat a party's claim to class certification; a conflict must be fundamental to the specific issues in controversy.[120] Such a conflict exists where the class representatives' economic interests and objectives "differ significantly from the economic interests and objectives of unnamed class members," such as when other members of the class actually benefitted from the conduct challenged by the plaintiffs.[121] No such conflict exists amongst the Proposed Class Representatives and the Settlement Class.

Here, the Proposed Class Representatives do not have interests antagonistic to or in conflict with the Settlement Class. The Proposed Class Representatives are current and former NCAA student-athletes who played non-contact sports including baseball, softball, volleyball, golf, and track and field and seek the same goal as other Class Members arising out of the same factual allegations: the establishment of a medical monitoring program to provide diagnostic testing for post-concussion syndrome, mid- to late-life neuropsychological disease, or any other form of post-concussion injury from participation in NCAA sports, as well as changes to the NCAA's concussion-management and return-to-play guidelines.[122]

---

[119] *Id.*

[120] 6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 18:14 (4th ed. 2002); *Srail v. Village of Lisle*, 249 F.R.D. 544, 555 (N.D. Ill. 2008) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)); *Anderson v. Cornejo*, 199 F.R.D. 228, 240 (N.D. Ill. 2000). *See also Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876 (7th Cir. 2012) ("[a] settling plaintiff would be an adequate class representative if there were no significant conflict of interest"); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citing 7A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROC. § 1768, at 326 (2d ed. 1986)).

[121] *Valley Drug*, 350 F.3d at 1189-90.

[122] *See, e.g., In re Gen. Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*, 2000 WL 45534, at *7 (N.D. Ill. Mar. 13, 2000) ("[T]he named plaintiffs suffered the exact same injury and advanced the exact same interest as the Stastny Plaintiffs.... The Stastny Plaintiffs' interests were no doubt properly represented in this Settlement Agreement. Unlike in *Amchem*, their interests and injuries are perfectly aligned with those of the named plaintiffs.").

- 24 -

The Proposed Class Representatives' unanimous support of the Settlement is further proof that there is not a conflict between Settlement Class members who participated in Contact Sports and those who participated in non-contact sports that "is apparent imminent, and on an issue at the very heart of the suit" sufficient to defeat the class action.[123]

## B. The Proposed Class Representatives Claims Are Typical of the Settlement Class

Rule 23(a)(3) requires that the "claims ... of the representative parties [be] typical of the claims ... of the class." "A 'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'"[124] This requirement ensures that the class representative's interests align with those of the class as a whole.[125] The Proposed Class Representatives satisfy this element and are "typical" for purposes of Rule 23 because they are current and former NCAA athletes that played NCAA-sanctioned sports at NCAA schools.[126]

The existing Settlement Class Representatives are typical of the Settlement Class Members.[127] However, the Proposed Class Representatives, as participants in men's baseball, women's volleyball, and women's softball, are submitted here to ensure that Settlement Class

---

[123] *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975). *See also Kohen v. Pacific Inv. Mgmt.*, 571 F.3d 672, 678 (7th Cir. 2009) (holding that a class action cannot be defeated based on the existence of potential and hypothetical conflicts which have not become real); *Jordan v. Commonwealth Fin. Sys., Inc.*, 237 F.R.D. 132, 139 (E.D. Pa. 2006) ("[P]ossible factual variations between plaintiff's claims and those of the classes simply do not establish an antagonism between plaintiff's objectives and the objectives of the various classes.").

[124] *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

[125] *E.g., Marshall v. H&R Block Tax Servs.*, 270 F.R.D. 400, 405 (S.D. Ill. 2010).

[126] *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 441 (E.D. Pa. 2008) (finding medical monitoring class representatives typical where they "do not allege that they were singled out; instead, they allege that they suffered harm as a result of the same conduct that allegedly injured the absentee class members").

[127] *See, e.g., See* Exhibit 1 attached to the Declaration of Steve W. Berman, (NCAA00007964-66, at NCAA00007964) (estimating that 16,277 of 29,225 concussions from 2004-2009, approximately 55%, occurred in football).

- 25 -

Members who played those non-contact sports with the highest relative rates of concussion are represented and their opinions heard. The Proposed Class Representatives, including those who played golf and track and field, also are typical of and adequately represent current and former student-athletes who participated in sports *without* documented concussion injury rates. Therefore, the Proposed Class Representatives are typical of and adequately represent the entire spectrum of Settlement Class members who participated in either: (1) sports with concussion rates lower than Contact Sports (*e.g.*, men's baseball, women's volleyball, and women's softball) or (2) sports where the risk of concussion is sufficiently low that a concussion rate has not been documented by the NCAA (*e.g.*, golf and track and field).

Accordingly, Plaintiffs' motion should be granted.

## C.  The Addition of the Proposed Class Representatives May Be Necessary to Protect Settlement Class Members Who Played Non-Contact Sports

The interests of the Settlement Class Representatives and the Proposed Class Representatives are aligned in desiring to ensure that the interests of non-contact sports Class Members continue to be protected.[128] The Proposed Class Representatives are thus taking steps to ensure that non-contact Class Members have access to the substantial benefits provided by the Settlement Agreement.

The Supreme Court has explained that the addition of class representatives is permissible and necessary when it is apparent that the current class representatives may no longer be adequate to represent the Class's interests.[129] As reflected in *American Pipe* and *United Airlines*,

---

[128] *South v. Rowe*, 759 F.2d 610, 612 (7th Cir. 1985) (addition of new party nearly two years after entry of consent decree and one day before its expiration was timely because the motion was filed one month after intervener discovered detriment to his interests; court found "no indication in the record" that defendant was prejudiced by the delay).

[129] *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974); *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 387 (1977).

- 26 -

additional class representatives may be added even after class certification is denied or judgment

is entered in order to ensure that the interests of unnamed class members are protected.[130]

Courts in the Seventh Circuit thus permit the addition of class representatives when the

court determines that the current representatives are not adequate to represent the class.[131] This is

consistent with courts nationwide which follow the Supreme Court's rule that the addition of a

class representative is timely at the time class certification is denied.[132]

Accordingly, in the event that the Court believes that Settlement Class Members who

played non-contact sports are not adequately represented by the current Settlement Class

Representatives, this motion should be granted. The Proposed Class Representatives are fully

informed regarding the Settlement, and are willing to serve as class representatives.

---

[130] *Id.*

[131] *Searcy v. eFunds Corp.*, 2010 U.S. Dist. LEXIS 73881 (N.D. Ill. July 22, 2010) (granting limited discovery of new class representative added after original class representative found inadequate); *Nelson v. IPALCO Enters.*, 2003 U.S. Dist. LEXIS 26392, at *18 n.2 (S.D. Ind. Sept. 30, 2003) ("If the problem of [individual defenses] arises later in a case, it is more likely to affect the issue of adequate representation, which could be solved by merely having a new class representative step forward rather than decertifying an otherwise proper plaintiff class."); *Brider v. Nationwide CR Inc.*, 1999 U.S. Dist. LEXIS 2681 (N.D. Ill. Mar. 5, 1999) (granting leave to add a new plaintiff after class certification was denied because the original plaintiff was found to not be adequate).

[132] *See, e.g., Hill v. Western Elec. Co.*, 672 F.2d 381, 386 (4th Cir. 1982) ("In a class action the critical issue with respect to timeliness is whether the proposed intervenor moved to intervene 'as soon as it became clear … that the interests of the unnamed class members would no longer be protected by the named class representatives.'") (quoting *United Airlines*, 432 U.S. 385); *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("In the present case appellants satisfied the timeliness requirement when their motion was made little more than one month after the district court denied the original plaintiffs' motion for class certification. Until that denial, appellants might have reasonably believed they could secure relief as members of a plaintiff class."); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 265 (5th Cir. 1977) (explaining that, for a class action, "the time that the would-be intervenor first became aware of the pendency of the case is not relevant to the issue of whether his application was timely").

- 27 -

**D.**     **The NCAA Athletes Who Played Non-Contact Sports May Otherwise Suffer Prejudice if the Court Deems the Current Plaintiffs Inadequate to Represent Them *and* Denies the Addition of the Proposed Class Representatives as Plaintiffs**

If the Court deems the current Plaintiffs inadequate to represent non-contact sports athletes, those Settlement Class Members will no longer be protected in this litigation.[133] Moreover, if the Settlement Class Members that played non-contact sports must resort to filing a separate action, the chances of obtaining a recovery comparable to that contained in the Settlement Agreement is slim.[134]

During the October 23, 2014 hearing on the Motion for Preliminary Approval, the NCAA's counsel argued that a stand-alone class consisting solely of non-contact athletes would not be successful, but that it was important to provide the Settlement's benefits to all student-athletes:

> We are also mindful, of course, that if we don't have that broad scope, that whatever we leave left, whatever we don't include within the settlement class, will inevitably be the – the basis for some claim and it likely will be a class claim. *I don't think it will be a particularly meritorious class claim, but that doesn't mean it wouldn't be brought.* And there is no question at all, another driving force is to avoid the relatively high transaction costs of – of class claims seriatim being filed, virtually ad nauseam.
>
> So that was the driving force as well. But first and foremost, we want to provide this medical monitoring to every student athlete who needs it. And the fact that there may only be three participants in rifling who need it doesn't mean they shouldn't get it. I think they should get it. But it should be provided to everybody.[135]

---

[133] *See United States v. Union Elec. Co.*, 64 F.3d 1152, 1159 (8th Cir. 1995) (finding that the question in determining whether to allow additional parties is focused on whether the existing parties will be prejudiced).

[134] *See In re Discovery Zone Secs. Litig.*, 181 F.R.D. 582, 597 (N.D. Ill. 1998) (finding that if forced to file its own action, the additional party would be prejudiced because of the unlikelihood of recovery).

[135] Oct. 23, 2014 Transcript of Proceedings, Ex. B, at 24-25 (emphasis added).

- 28 -

Accordingly, in the event that this motion is denied, the prejudice to Settlement Class

Members who played non-contact sports is clear. If the Court denies preliminary approval of the

Settlement based on adequacy, the non-contact sports athletes will have little chance of success

in an independent class lawsuit, and will lose the right to substantial diagnostic testing if needed

and meaningful changes to the NCAA's current concussion-management practices under the

Settlement.

## V.    CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court grant the motion to add

Shelby Williams, Bruce Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula

Kunhardt, and Jessica Miller as additional class representatives, and grant such other and further

relief as this Court deems appropriate.

Date:  December 15, 2014                          Respectfully submitted,


                                                 By:   _/s/ Steve W. Berman_
                                                       Steve W. Berman
                                                 steve@hbsslaw.com
                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 1918 Eighth Avenue, Suite 3300
                                                 Seattle, WA 98101
                                                 206.623.7292
                                                 Fax: 206.623.0594

                                                 Elizabeth A. Fegan
                                                 beth@hbsslaw.com
                                                 Thomas E. Ahlering
                                                 toma@hbsslaw.com
                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 1144 W. Lake Street, Suite 400
                                                 Oak Park, IL 60301
                                                 708.628.4949
                                                 Fax: 708.628.4950

010270-12 737782 V1

Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342

*Co-Lead and Settlement Class Counsel*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on December 15, 2014, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: */s/ Steve W. Berman* _____

010270-12 737782 V1