# EXHIBIT 1

1

1                 IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  IN RE:  NATIONAL COLLEGIATE     )  Docket No. 13 C 9116
    ATHLETIC ASSOCIATION STUDENT-   )
4  ATHLETE CONCUSSION INJURY       )  Chicago, Illinois
    LITIGATION,                 )  July 29, 2014
5                          )  2:00 o'clock p.m.

6        TRANSCRIPT OF PROCEEDINGS - STATUS, MOTION
          BEFORE THE HONORABLE JOHN Z. LEE
7

APPEARANCES:

8

ALSO PRESENT:              HONORABLE GERALDINE SOAT BROWN

9

For the Plaintiffs:        HAGENS BERMAN SOBOL SHAPIRO, by
10                    MR. STEVE W. BERMAN
                      1918 8th Avenue
11                    Suite 3300
                      Seattle, Washington 98101
12

                      SIPRUT PC, by
13                    MR. JOSEPH J. SIPRUT
                      17 North State Street
14                    Suite 1600
                      Chicago, Illinois 60602
15

                      ZIMMERMAN REED, by
16                    MR. CHARLES S. ZIMMERMAN
                      MR. BRIAN C. GUDMUNDSON
17                     (appearing telephonically)
                      1100 IDS Center
18                    80 South 8th Street
                      Minneapolis, Minnesota 55402
19

20

21

22             ALEXANDRA ROTH, CSR, RPR
             Official Court Reporter
23           219 South Dearborn Street
                Room 1224
24            Chicago, Illinois 60604
               (312) 408-5038

25

```
 1   APPEARANCES:   (Continued)

 2                                 HAUSFELD LLP, by
                                   MR. RICHARD S. LEWIS
 3                                 MS. MINDY B. PAVA
                                       (appearing telephonically)
 4                                 1700 K Street NW
                                   Suite 650
 5                                 Washington, DC 20006

 6                                 LIEFF CABRASER HEIMANN &
                                   BERNSTEIN, by
 7                                 MR. JEREMY J. TROXEL
                                       (appearing telephonically)
 8                                 250 Hudson Street
                                   8th Floor
 9                                 New York, New York 10013

10                                 JAMES C. SELMER & ASSOCIATES, by
                                   MR. JAMES C. SELMER
11                                     (appearing telephonically)
                                   500 Washington Avenue
12                                 Suite 2010
                                   Minneapolis, Minnesota 55415
13
                                   DUGAN LAW FIRM, by
14                                 MR. JAMES R. DUGAN, II
                                       (appearing telephonically)
15                                 MR. DAVID B. FRANCO
                                       (appearing telephonically)
16                                 One Canal Place
                                   365 Canal Street
17                                 Suite 1000
                                   New Orleans, Louisiana 70130
18
                                   BLUESTEIN NICHOLS THOMPSON
19                                 AND DELGADO, by
                                   MR. JOHN CLARKE NEWTON
20                                     (appearing telephonically)
                                   P. O. Box 7965
21                                 Columbia, South Carolina 29202

22                                 THE LANIER LAW FIRM, by
                                   MR. RYAN D. ELLIS
23                                     (appearing telephonically)
                                   6810 FM 1960 West
24                                 Houston, Texas 77069

25
```

```
 1   APPEARANCES:   (Continued)

 2                              McCALLUM METHVIN & TERRELL, by
                               MR. RODNEY MILLER
 3                                  (appearing telephonically)
                               2201 Arlington Ave S
 4                             Birmingham Alabama 35205

 5                             COHEN & MALAD, by
                               MS. LYNN A. TOOPS
 6                                  (appearing telephonically)
                               One Indiana Square
 7                             Suite 1400
                               Indianapolis, Indiana 46037
 8
     For plaintiff Nichols and   EDELSON PC, by
 9   Proposed Personal Injury    MR. JAY EDELSON
     Class:                       MR. ARI JONATHAN SCHARG
10                               350 North LaSalle Street
                               Suite 1300
11                             Chicago, Illinois 60654

12   For Defendant NCAA:         LATHAM & WATKINS, by
                               MR. MARK STEVEN MESTER
13                               MS. JOHANNA MARGARET SPELLMAN
                               233 South Wacker Drive
14                             Suite 5800
                               Chicago, Illinois 60606
15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings had in open court:)

2          THE CLERK:  13 C 9116, NCAA Student-Athlete Concussion

3   Injury Litigation, for status and motion hearing.

4          MR. BERMAN:  Good afternoon, your Honor.  Steve Berman

5   on behalf of plaintiffs.

6          MR. SIPRUT:  Good afternoon, your Honor.  Joe Siprut

7   on behalf of plaintiffs.

8          MR. EDELSON:  Good afternoon, your Honor.  Jay Edelson

9   and Ari Scharg on behalf of plaintiff Nichols and the proposed

10  personal injury class.

11         MR. ZIMMERMAN:  Charles Zimmerman, your Honor, on

12  behalf of the plaintiffs.

13         MR. LEWIS:  Richard Lewis on behalf of the plaintiffs,

14  your Honor.

15         MR. MESTER:  Good afternoon, your Honor.  Mark Mester

16  and Johanna Spellman on behalf of the NCAA.

17         THE COURT:  Do we have people on the phone?

18         MR. TROXEL:  Good afternoon, your Honor.  Jeremy

19  Troxel on behalf of plaintiffs.

20         THE COURT:  Can you talk more slowly and more clearly

21  into the receiver, please.

22         MR. TROXEL:  Jeremy Troxel on behalf of the

23  plaintiffs.

24         MR. SELMER:  James Selmer on behalf of the plaintiffs.

25         MR. GUDMUNDSON:  Brian Gudmundson on behalf of the

1  plaintiffs.

2          MR. DUGAN:  Good afternoon, your Honor.  James Dugan,

3  with the Dugan Law Firm in New Orleans, on behalf of the

4  plaintiffs.

5          MR. NEWTON:  Clark --

6          MS. PAVA:  Good afternoon --

7          MR. NEWTON:  Clarke Newton on behalf of the

8  plaintiffs.

9          MS. PAVA:  Mindy Pava on behalf of the plaintiffs.

10          THE COURT:  How do you spell that last name, please?

11          MS. PAVA:  Pava, P-a-v-a.

12          THE COURT:  Anyone else on the phone?

13          MR. ELLIS:  Yes, Ryan Ellis at the Lanier Law Firm on

14  behalf of plaintiffs.

15          MR. MILLER:  And Rodney Miller on behalf of the

16  plaintiffs.

17          MR. FRANCO:  David Franco on behalf of the plaintiffs.

18          MS. TOOPS:  Lynn Toops on behalf of the plaintiffs.

19          THE COURT:  Anyone else?  All right.  Good afternoon,

20  everyone.

21          We are here on status in this case as well as the

22  motion that was filed this morning, of which I got a copy of

23  late yesterday, with regard to seeking the Court's preliminary

24  approval of the settlement.

25          Before we proceed to the motion for preliminary

1    approval of the settlement, I did want to address a couple of

2    procedural matters.  First of all, with regard to the

3    appointment of lead counsel in this case, the last time we were

4    all together, I told you I'd take a look at all the motions,

5    and if I thought it was appropriate go ahead and issue an order

6    while the parties were pursuing the settlement discussions.

7            The papers that the parties filed raised some

8    questions in my mind with regard to the motion filed by the

9    Hagens Berman firm on behalf of what Hagens Berman termed the

10   medical monitoring plaintiffs.  And I just wanted to get some

11   more clarification with regard to Hagens Berman's position and

12   what exactly it's seeking in its motion for appointment of lead

13   counsel.

14           And so, Mr. Berman, I am glad you are here.

15           With regard to the request by Hagens Berman to be

16   appointed as lead counsel, the medical monitoring class,

17   so-called medical monitoring class, is defined by Hagens Berman

18   to include the various plaintiffs of the various cases,

19   including obviously the Arrington case which is the first-filed

20   case that was filed in this court originally.  But I just want

21   to be clear.

22           To the extent that the medical monitoring class as

23   defined by the Hagens Berman firm includes or is defined to

24   include the class or the proposed class that is defined in the

25   Arrington case, that class as defined in the second amended

1  complaint includes not only a class seeking relief under

2  23(b)(2), that is medical monitoring, but also a putative class

3  that seeks damages as a result of the alleged negligence on the

4  part of NCAA under 23(b)(3).

5       And I wanted to be clear because this was an issue

6  that has been discussed in prior statuses between the Hagens

7  Berman firm and Mr. Edelson on behalf of the Nichols

8  plaintiffs, that, Mr. Berman, medical monitoring plaintiffs as

9  defined would include at this point both putative classes, is

10 that correct?  That is, the plaintiffs who are asking for

11 injunctive relief as well as plaintiffs at this point in time,

12 as stated in the second amended complaint, that are also

13 seeking damages as a result of the alleged actions or inactions

14 by the NCAA.

15      MR. BERMAN:  Let me see if I can answer to your

16 satisfaction, your Honor.

17      There -- there are individual plaintiffs who are class

18 representatives, who are seeking damages not as class relief

19 but separate -- their lawsuits will continue to seek damages.

20 We are not seeking in the medical monitoring class or in the

21 injunctive relief class any actual damages for personal

22 injuries.

23      THE COURT:  No, I understand that.  But I'm just

24 trying to assess whether you believe that if I were to grant

25 your motion, that it would be part of your responsibilities to

1    protect and oversee the best interests of the putative class

2    members who are also seeking damages, as alleged in your

3    complaint.

4         MR. BERMAN:  Well, that's an interesting question.

5         THE COURT:  That's why I am asking it.

6         MR. BERMAN:  Because there is a difference of opinion.

7    So right now I am representing and seek to represent in the

8    settlement all NCAA athletes who have ever played.  The claims

9    we're seeking to have you approve are medical monitoring and

10   injunctive relief, not damages.

11        So we think we're acting in their best interest by

12   proposing that settlement and providing in the settlement that

13   they are free to pursue personal injury claims on their own,

14   not on a class basis.  And the reason that we came around that

15   way is very simple.  We think case law is quite clear, you

16   cannot certify personal injury claims.

17        I'll give you an example.  I have --

18        THE COURT:  Well, I mean, I guess, you know -- I am

19   sure we will get into that later on in this hearing.  But my

20   question is really much more of a threshold question, right?

21   I'm trying to ensure that lead counsel in this case are going

22   to act in the best interest of all putative class members with

23   regard to all their claims, right?  Maybe it's in their best

24   interest, as you say, to waive the right to proceed, to waive

25   their basically 23(b)(3) rights, to preserve their personal

1    injury rights individually. And maybe that's in the interest

2    of the entire class, you believe, to do that.

3          Some people might disagree. But I just want to make

4    sure that when you are proceeding, if you are going to be

5    proceeding as lead counsel, that you are pursuing the best

6    interests of all putative class members with regard to all

7    their claims, and making your decisions in the best interests

8    of that whole -- of the entire putative class.

9          MR. BERMAN: And I think I have. I think when you

10    look at the settlement -- the settlement, by the way, is -- you

11    see you got a lot of papers, and you haven't had a chance to go

12    through them, I am sure. But we have hired the leading

13    scientist in the country. We have hired the leading

14    statistician in the country. We have gone through this with

15    two retired federal judges who are overseeing this and watched

16    everything I've done and my co-lead counsel have done.

17          And I think they have concluded that we have acted in

18    the best interest of the class. And I submit to the Court we

19    have.

20          THE COURT: By the class, you --

21          MR. BERMAN: I mean everyone, everyone who's got a

22    claim, even if they have a personal injury claim.

23          THE COURT: All right. Mr. Edelson, I'll provide you

24    with, if you want, a brief response or reaction.

25          MR. EDELSON: I was actually really interested to hear

1    what the position was today.  I am still not sure I understand.

2         But from our point of view the class as currently

3    defined is actually -- we -- we were very concerned about what

4    the deal would look like, and it's far worse than what we

5    thought.  The class as defined is anyone who's ever been an

6    NCAA athlete.  You got bowlers and archerers in there, who I

7    don't know why they have any similar interest.

8         Also you've got the people who are really injured, the

9    people who this -- when they brought the class action, they

10   told the press in their court papers, the Court, what they

11   really cared about, which was getting and address the people

12   who had suffered injury as a result of concussion.  Those

13   people are getting absolutely no benefit at all.  The only

14   thing they get is this basically post-lawsuit class action

15   waiver.

16        THE COURT:  No, I mean, I understand that is your

17   position.  And it has been consistent throughout.  And I

18   appreciate the consistency.

19        I guess my question, what I am trying to decide on the

20   applications for lead counsel, which is what I am doing now,

21   is, I want to make sure that whoever is leading the charge is

22   keeping everyone's interest in mind.

23        Now, the decisions that they make on behalf of

24   everyone may or may not be disagreed with or agreed with with

25   the rest of the world.  But I want to make sure that that

1  person or that law firm is considering and considers themselves

2  to be responsible for the entire class.  And what I

3  understand -- because it wasn't quite clear in the papers.

4       So what I understand from Mr. Berman today is that is

5  Hagens Berman's position.  Is that right?

6       MR. BERMAN:  It is, your Honor.

7       And can I just say one more thing in that regard?  I'm

8  probably one of the few lawyers in the room that is actually

9  litigating individual concussion cases, filed cases, not just

10 talking about it but litigating.  And I can tell you that in

11 each case I have to -- first of all, I have to see who was

12 responsible.  Lot of times it's the school, not the NCAA.  I

13 have to hire vocational experts.  I have to hire concussion

14 experts.  I have to hire neuropsychologists.  I have to have

15 IMEs done for my clients.

16      So when I look at what's in the best interest of those

17 clients, based on that experience, in my view it's -- the best

18 thing for them to do is to have a chance at medical monitoring.

19 And if you actually have concussion injury, then you can find a

20 lawyer who's going to do your case on an individual basis and

21 do what needs to be done for that client, rather than try to

22 shoehorn them into some class action which we think would not

23 be certified.

24      THE COURT:  Okay.

25      MR. SIPRUT:  Judge, if I may also put on the record,

1   the motion seeks the appointment of the Hagens Berman firm and

2   my firm, Siprut P.C., as co-lead counsel, consistent with the

3   original appointment of lead counsel three years ago when this

4   case was first filed and litigated.  Our two firms have done

5   all the work to get to this point.  And the motion seeks the

6   appointment of those two firms as lead counsel along with the

7   structure that we put together happily by agreement.  So

8   sometimes miracles can happen.  We worked out something here.

9            What I want to emphasize to the Court, if I might, is

10  that I take the obligations that your Honor has alluded to and

11  identified incredibly seriously.  And I'm extremely cognizant

12  of them and have been throughout this process.  And I think my

13  colleague Mr. Berman speaks eloquently about how we have

14  managed those obligations and have achieved what we think is a

15  great result, consistent with those obligations.

16           So I just want to echo and reiterate that.  And

17  hopefully the Court will see fit to accept our application so

18  we can continue on this path.

19           MR. MESTER:  Your Honor, if I may?

20           THE COURT:  Hold on for a second.

21           So, Mr. Siprut, I am glad you brought it up because I

22  just wanted to make sure that I get this on the record as well.

23           So you too agree that your obligations to represent

24  your clients in this case, should you be appointed as lead

25  counsel, would include the entire class as defined by the

1  second amended complaint in Arrington as well as all of the

2  other complaints that were filed as part of this MDL, is that

3  correct?

4            MR. SIPRUT:  That's correct.  And furthermore, the

5  settlement that we have proposed to your Honor that we're here

6  for today is, we believe, consistent with the discharge of

7  those duties and obligations.

8            THE COURT:  Yes.

9            MR. MESTER:  Your Honor, there is one provision of the

10 settlement agreement I want to call your attention to that I

11 think may give you some comfort with regard to this issue.

12 Mindful of the issues that Mr. Edelson raised, the settlement

13 agreement, the proposed settlement agreement, specifies that

14 the statute of limitations with respect to those bodily injury

15 claims has been tolled since they were first brought and will

16 be continued to be tolled through the preliminary approval.

17           So there will be no question with respect to any

18 prejudice for these individuals that -- that you're addressing

19 and the types of claims you're addressing.  So that -- that's a

20 portion -- that's an element of the settlement.

21           THE COURT:  Okay.  Very well.  I will issue a written

22 order to this effect.  But with regard to the -- with those

23 clarifications and affirmations, with regard to the motion for

24 appointment as lead counsel in this case, on April 14 I ordered

25 the parties to submit applications to serve as lead and liaison

1    counsel in connection with this MDL action.  The NCAA, the

2    defendant, submitted an unopposed application for designation

3    of lead and liaison counsel requesting Latham & Watkins be

4    appointed as its lead and liaison counsel.

5         Jay Edelson, counsel for plaintiff Anthony Nichols and

6    those similarly situated, filed a motion to appoint Jay Edelson

7    as lead counsel of the class personal injury claims.

8         Steve Berman of Hagens Berman submitted a joint agreed

9    application for appointment of lead counsel special class

10   counsel for monitoring relief and executive committee for the

11   medical monitoring plaintiffs on behalf of his firm as well as

12   other firms, including Mr. Siprut's firm.  The applications

13   were submitted pursuant to Rule 23(g)(3), which provides the

14   Court may in its discretion designate interim counsel to act on

15   behalf of the putative class before determining whether to

16   certify the action as class action.

17        All class counsel appointed pursuant to Rule 23(g)

18   have the duty to fairly and adequately represent the interests

19   of the class under Rule 23(g)(4).  Where, as here, more than

20   one adequate applicant seeks appointment as counsel, the Court

21   must appoint the applicant best able to represent the interests

22   of the class under Rule 23(g)(2).

23        First, with regard to the NCAA, it requests that the

24   Court appoint Latham & Watkins.  Not only is there no objection

25   to this request, but Latham & Watkins has been representing the

1   NCAA from the inception of the Arrington case in 2011 and is

2   intimately familiar with the issues involved in this case.

3          Additionally Latham & Watkins has substantial

4   experience serving as lead and liaison counsel in numerous

5   other class actions of this magnitude.  Accordingly the Court

6   grants the NCAA's application and designates Mark Mester of

7   Latham & Watkins as lead counsel for the NCAA, and Johanna

8   Spellman also of Latham & Watkins as its liaison counsel.

9          Second, the Court notes as a preliminary matter as

10  discussed here today that the term medical monitoring

11  plaintiffs, quote unquote, coined by Hagens Berman in its

12  application is a bit of a misnomer.  Hagens' application

13  defines medical monitoring plaintiffs in fact to include all of

14  the plaintiffs in the Arrington case, Caldwell, Doughty,

15  Durocher, Hudson, Morgan, Power, Walton, Johnson and Wolf case.

16         The second amended complaint in Arrington in turn

17  seeks to certify class pursuant to Rule 23(b)(2) and 23(b)(3)

18  comprised of, and I quote, all current and former NCAA student

19  athletes who experienced one or more head impacts while playing

20  sports in an NCAA school resulting in concussion or concussion-

21  like symptoms, end quote.  And that's in the second amended

22  complaint in Arrington, Docket No. 227.

23         In so doing the Arrington plaintiffs seek not only

24  injunctive relief under Rule 23(b)(2) in the form of medical

25  monitoring, but also monetary damages under Rule 23(b)(3) to

1  compensate plaintiffs for injuries they have suffered or will

2  suffer in the future.

3        Similarly, I note that the plaintiffs in the Durocher,

4  Powell and Wolf case also seek certification in the complaint

5  of Rule 23(b)(2) classes and 23(b)(3) classes.  As a result the

6  term, medical monitoring plaintiffs, encompasses putative class

7  members who seek both, monetary damages related to alleged

8  injuries as well as injunctive relief.

9        Realizing the scope of the term, Mr. Edelson does not

10  oppose Hagens Berman's appointment as lead counsel, so long as

11  it is, in his words, limited to medical monitoring claims only,

12  but objects to the extent that Hagens Berman seeks to serve as

13  lead counsel for, quote, class personal injury issues which,

14  according to Mr. Edelson, Hagens Berman has, quote unquote,

15  consistently repudiated.

16        But in light of the statements here today as well as

17  Hagens Berman's actions in the Arrington case and prior

18  proceedings in this court, the Court disagrees with Mr. Edelson

19  and disagrees that Hagens Berman has, quote unquote, repudiated

20  the personal injury claims at this stage.  They certainly have

21  not disclaimed or affirmatively waived the personal injury

22  claims during this proceeding.  And for the purposes of the

23  current posture of the case, that is for the Court's

24  appointment of lead class counsel prior to the Court's decision

25  on approval of any settlement or certification of any class if

1    appropriate, I believe that in light of the fact that the

2    Arrington, Durocher, Powell and Wolf actions all seek classwide

3    relief under both 23(b)(2) and 23(b)(3), and the statements by

4    counsel, I will grant the application by Hagens Berman and

5    appoint Hagens Berman and Mr. Siprut as lead counsel for the

6    class in this case.

7          I want to be clear, that is not to say that I have

8    approved in any way the settlement the parties have proposed

9    today.  But rather until such time the Court does resolve class

10   certification issues in this case, which the Court has not done

11   so to this point, counsel in these actions continue to owe a

12   duty to the entire putative class.  And indeed I would note the

13   scope of the putative class in Arrington is substantially

14   identical to the putative class in the Nichols case, who Mr.

15   Edelson represents.

16         Like Arrington, the Nichols suit seeks to certify

17   Rule 23(b)(2) and (b)(3) classes for medical monitoring and

18   damages and similarly defined putative class as, quote, all

19   current and former NCAA student athletes who sustained a

20   concussion or suffered concussion-like symptoms while playing

21   NCAA-related sports, who incurred medical expenses as a result.

22         Given this overlap, the Court sees no reason at this

23   time to conclude, as Mr. Edelson argues, that counsel for the

24   Arrington plaintiffs will not be able to represent the

25   interests of an entire class as required by Rule 23(g)(2).  To

1   the extent, of course, that the Nichols plaintiffs have any

2   objections to the settlement that is being proposed, the

3   Nichols plaintiffs may file an objection or be heard by this

4   Court.

5           Therefore, the Court will designate the firms of

6   Hagens Berman Sobol Shapiro LLP and Siprut PC as co-lead

7   counsel for the proposed class.  In so doing the Court notes

8   that Hagens Berman and Siprut have served as co-lead counsel

9   for the Arrington plaintiffs since, as I said inception of this

10  case in 2011, have expended numerous hours in service of the

11  clients, and have moved the case along in a commendable pace.

12          Furthermore, these firms have substantial class action

13  experience and in serving as lead counsel in other class

14  actions, and have served as counsel in other comparable cases.

15          Finally the Court notes that there are economies to be

16  gained due to the fact that firms have offices in Chicago,

17  eliminating the necessity of appointing additional local or

18  liaison counsel.

19          The Arrington plaintiffs' joint application is,

20  therefore, granted as to Hagens Berman and Siprut.

21          Accordingly, the Court also designates Richard S.

22  Lewis of Hausfeld LLP as special class counsel of monitoring

23  relief.  I do so because the Hausfeld firm and Mr. Lewis also

24  have substantial experience in serving as lead counsel in class

25  actions, and he has worked diligently on behalf of his clients

1    in proceeding before the MDL panel in this court.

2           Finally the plaintiffs asked the Court to appoint

3    Charles S. Zimmerman of Zimmerman Reed, Mark Zamora of the

4    Orlando Firm PC and James Dugan II of Dugan's Law Firm as

5    members of the executive committee.  And the Court notes that

6    Zimmerman, Zamora and Dugan like Lewis have substantial

7    experience as class counsel and have diligently represented

8    clients in the course of this action.  Thus, that application

9    is approved as well.

10          Finally, in so doing, the Court denies the motion by

11   Mr. Edelson, counsel in the Nichols case, to be appointed lead

12   counsel for putative personal injury class at this stage.  As

13   set forth above, the Court has already determined that the

14   Hagens Berman, Siprut firms are best situated at this point to

15   represent the interests of the class, class as a whole.

16   Therefore, that motion is denied.  But it's denied without

17   prejudice because, as all the parties know, the interaction and

18   the intersection between the 23(b)(2) class and 23(b)(3) class

19   is an issue that is going to be in some ways the heart of the

20   settlement to ensure that the rights of the absent class

21   members are protected.

22          So that's my ruling with regard to the application.

23          MR. SIPRUT:  Thank you very much, your Honor.

24          MR. MESTER:  Thank you, your Honor.

25          THE COURT:  So having done that, let's move to the

1   motion for preliminary approval of settlement.  Mr. Berman, Mr.

2   Mester, is there a particular agenda that the parties propose

3   for this?

4             MR. BERMAN:  Yes, your Honor.  If -- if it's okay with

5   the Court, I though I would just -- since you got a lot of

6   paper, I might go through the settlement for just a few

7   moments, explaining the highlights.  And then our agenda is to

8   ask you to preliminarily approve the settlement.  We know

9   you're not going to do that today.  And that you might either

10  do it without or with a hearing later, that we are at your

11  convenience.

12            There is a second step to this that we haven't

13  finished.  And what we're proposing to do, we think it will

14  take us about 45 days to come up with a notice plan.  So we've

15  agreed on the terms.  And now we're trying to figure out the

16  notice.  And it's a little trickier than normal because what we

17  have to do is to engage a claims administration firm that's

18  actually going to go hire the doctors and come up with

19  protocols to administer the tests if you approve the

20  settlement.

21            We've been working on that, but we're not just there

22  yet because it's not -- hasn't been done that often.

23            THE COURT:  How are you going to go about -- I am sure

24  that the parties have given this some thought.  How are you

25  going to go about trying to identify all the members in the

1    class and what notice would be reasonable?

2         MR. BERMAN:  That's the other thing we're working on.

3    And we've been working on that.  And let me give you -- there

4    is a lot of parts to this answer.

5         First we've been talking with Jim Messina, President

6    Obama's former campaign manager.  And he is very in tune with

7    social networking and using social media.  So we are developing

8    a social media plan because a lot of these student athletes are

9    on Facebook and Twitter and all the other things that people my

10   age don't necessarily use.

11        We're going to combine that with mailed notice.  And

12   what we're doing now, and it's going to take a little time --

13   and Mr. Mester and my group has been working on it for a

14   while -- is, we're actually going to ask the NCAA to send a

15   letter out to its member institutions, asking them for the

16   names and addresses, to the extent they have them, of their

17   student athletes.  We think they have them because they keep in

18   touch with them for alumni reasons and fundraising reasons.

19        We're also -- it turns out there is another case in

20   California that just settled called Keller versus NCAA.  I'm

21   lead counsel in that case.  It involves student athletes'

22   publicity rights.  And they're about to get paid for misuse of

23   their rights.  And we're -- we're collecting the names for that

24   settlement.  So we actually have a combined effort to -- to

25   reach out to these schools because these schools now have to

1    respond in two cases.

2           The letter we're going to send from the NCAA says, if

3    you don't give us the names and addresses, we are going to

4    subpoena you.  We're hoping not to have to do that.  There is a

5    thousand schools.  But if we have to go down that road, we have

6    to go down that road.

7           So in the next 45 days we're going to be working.  And

8    then we're going to come back to you with a proposed notice and

9    distribution plan.

10          Did I missay anything?

11          MR. MESTER:  No, that's right.

12          THE COURT:  Okay.  I would note, by the way, Mr.

13   Berman, as you mentioned, I did just receive this rather

14   impressive stack of papers.  And I will say that I did have a

15   chance to read the memorandum.  I have reviewed the memorandum

16   in support.  But I have not had a chance to review the various

17   attachments and the documents that were provided by the parties

18   as part of this motion.

19          So I just want to let you know that that's where my

20   review of the motion stands.

21          MR. BERMAN:  Okay.

22          THE COURT:  I also wanted to make sure that I put on

23   the record that I am joined here today by Judge Brown, who has

24   been helping the parties in the discovery that is proceeding in

25   this case and the discovery that took place in the Arrington

1    case.

2              So you may proceed.

3              MR. BERMAN:  So I'll be very brief, your Honor, just

4    to go through the highlights so you have them in mind from our

5    perspective.  And also, frankly, there is a lot of press people

6    here.  And I want to make sure that if the word goes out, which

7    it is, that it goes out correctly.

8              The settlement really has two aspects.  And if you --

9    I have it on the monitor.  But I have a hard copy if I can

10   approach.

11             THE COURT:  You may.

12             While Mr. Berman goes through the presentation, there

13   is no need for counsel to remain standing here at the podium,

14   if you want to sit down.  And then I will see if there is any

15   additional comments people want to add.  At that point I will

16   invite you up to the podium.

17             So please take a seat.

18             MR. BERMAN:  So the injunctive part under Rule

19   23(b)(3), one of our concerns, and frankly a very serious

20   concern, was that the NCAA was not living up to best practices

21   with respect to concussion management.  So the injunctive

22   relief that we sought was to change those practices and require

23   every school to conform to what our experts, Dr. Cantu, says is

24   best practices.

25             So very briefly, you can see that we identify here

1  what the problem was and how the settlement changes that

2  problem.  And it starts with the very basic that baseline

3  testing, it's imperative that every student athlete before they

4  begin their career has a test to see what their skill level is

5  at a cognitive level, so that if they then are injured, you can

6  measure that and see if they are off their cognitive test.  So

7  we start with that.

8          We also start with probably the second most important

9  idea, your Honor, and that is, you can't return to play in the

10 same day that you've had a concussion.  And you have to be

11 cleared by a physician.  And what we saw through discovery and

12 what I see in my individual cases for the case I am

13 representing is that they were returned to practice, and they

14 weren't cleared by a physician.  And that's really where the

15 danger is.  If you're out there before you're healed, too soon,

16 that's how these kids are getting lifetime injuries.  So we've

17 taken care of that.

18         We've also made sure that there are adequate medical

19 personnel at contact sports.  And let me pause for a second

20 before I go to the second page.

21         There has been a lot of emphasis in America on

22 football.  This is not a football-only problem.  So the

23 settlement covers all contact sports.  In fact, it covers all

24 sports, in the event someone was swimming in a pool and they

25 hit their head and want to get tested.

1          So we want to make sure everyone gets tested.  But

2    it's important to note that it's an all-sport event because,

3    for example, I learned through this case that the second

4    leading concussion issue is female soccer, because the female

5    neck is a little different, and concussion is basically a

6    twisting of the head that jiggles the spine and the brain.  So

7    when a female soccer player goes up, they tend to twist more.

8    So it's protective of the people who need protection.

9          We're also making sure that there is a reporting

10   process in place.  So the schools have to report concussions in

11   a specified manner.  So we have a data set so that the medical

12   science committee can be studying this as it goes forward and

13   monitoring what needs to be done next.

14         We've amped up concussion education, both of coaches

15   and students, because it's important for students to understand

16   when they may have been concussed so they can go and say, here

17   is what I am experiencing.  And that's the injunctive relief

18   which we think is significant.  And we think it will have a

19   very protective effect of student athletes going forward.

20         Medical monitoring.  And I'm glad -- you're right we

21   used that word overbroad.  And I will not do so in the future.

22         The medical monitoring program will work this way:

23   First there is a medical science committee that's been

24   established, two nominated by us; two nominated by the NCAA.

25   They cover a wide variety of medical fields.  Judge Andersen

1    will be the chair, if you approve the settlement, of the

2    medical science committee, to make sure that it's working

3    properly and that if there is any impasses he can use his

4    well-known mediation skills to get through those.

5            They will develop a questionnaire.  And the

6    questionnaire will be designed to test.  There is all kinds of

7    tests that you can get on paper to figure out if people may be

8    having injuries caused by concussions.  That questionnaire will

9    be put on a website.  Any class member can fill it out.  It

10   will be screened and judged by criteria to be developed by the

11   medical science committee.  And if they qualify, they then will

12   be available for two types of testing, either a post-concussion

13   syndrome testing or a testing for CTE, a more severe form of

14   brain injury.

15           So if they qualify, they go to a test center.  They

16   get -- the test results will come out, will tell them whether

17   they have a concussion-related injury and what treatment

18   options are available going forward.  Because if you find out

19   the cause of your injury, you can do something about it.  And

20   so hopefully that will happen.

21           It will cover any athlete who's ever played can make

22   an application for medical monitoring.  And it will go forward

23   for 50 years, so that the kids playing now or the kids who

24   are -- you know, just got done playing will be covered by this,

25   because the later-life diseases tend to happen around age 35 to

1    50.   And then they tail off after that.

2           The final aspect of the settlement is a $5 million

3    research fund.  And the research is going to be focused on how

4    to prevent concussions.  When we've talked about it, I think in

5    a few years, maybe three or four years, through research that

6    we're funding here and is being studied elsewhere, that

7    plaintiffs will actually have devices on their heads in all

8    sports.  And we will measure the g-forces.  And when they reach

9    a certain level, a light will go off in the box and they have

10   to come out.

11          So that's the kind of thing we hope this research fund

12   will develop to prevent future concussions.  And that is kind

13   of the summary of the settlement.  And I'm able to take any

14   questions that you have, your Honor, at this point.

15          HONORABLE JUDGE BROWN:  I presume you have some kind

16   of succession plan for medical monitoring committee?

17          MR. BERMAN:  Yes, it's a -- it's a five-year

18   appointment.  There are staggered appointments for the members.

19   Judge Anderson is willing to do the first five years, and then

20   we have to reexamine it after that.  There will have to be a

21   succession appointment for me too because I won't be around

22   when this program ends.  So we have a deal with someone else.

23          THE COURT:  With regard to the settlement contemplates

24   I believe it's $70 million --

25          MR. BERMAN:  That's correct.

1          THE COURT:  -- set aside for that.  And again, this

2     may be in your supporting materials.  I believe there is a

3     declaration by a physician in here.  But how was that amount

4     arrived at?

5          MR. BERMAN:  It was through our analysis of how much

6     may be necessary, how many tests might be out there, how much

7     those tests costs.  So you'll see in the report of Mr. Bruce

8     Deal, it's Exhibit 8, I think, to the papers we gave you -- is

9     that the right number?  Exhibit 8.

10         What we did, your Honor, was something we think very

11    thorough.  We hired Dr. Cantu, Mr. Deal who is an economist

12    with a well-known statistician background.  We hired an expert,

13    a Ph.D. in healthcare matters.  We hired an epidemiologist and

14    a health economist.  And we hired an actuary.  So we had five

15    different disciplines look at how many people will even be

16    alive who are within the class of 30 years.  What is the

17    incident of concussion rates in various sports.  How many class

18    members there are.

19         So basically we know there is roughly 4.2 million

20    class members.  700,000 of them played football.  1.1 million

21    were in other contact sports.  And 2 million were in

22    non-contact sports.

23         We then can take the concussion rates in the football

24    and other sports and multiply them out over time.  And then we

25    know the medical literature on how many unresolved PCS cases

1    there are over time, and how many CT cases there might be.  And

2    we're able to have a range of a high-low of how many tests are

3    going to be done and what they cost.

4            We've actually gone out and got very thorough cost

5    estimates from a firm that's doing similar testing in the BP,

6    British Petroleum, settlement and in the NFL settlement.  So we

7    think we came up with this estimate, got some real hard number.

8    Lot of homework went into this, was kind of -- kind of fun

9    actually.

10            THE COURT:  Okay.  And so assuming that the settlement

11    is eventually approved, this is what the class is receiving.

12    As part of the settlement, what is the class giving up?

13            MR. BERMAN:  The class is only giving up one thing,

14    and that's the right to sue for medical monitoring relief.

15    That's it.

16            THE COURT:  What about there is some mention in the

17    papers about the class waiving their right to proceed under

18    23(b)(3) to pursue their individual class claims on a classwide

19    basis?  Is that part of the settlement as well?

20            MR. BERMAN:  I'm sorry, can you say that --

21            THE COURT:  Is that part of the settlement as well;

22    that is, is the class agreeing to waive it's rights to proceed

23    under 23(b)(3) or at least try to proceed under 23(b)(3) with

24    regard to their personal injury claims?

25            MR. BERMAN:  That's correct.  And the reason for that

1    was, we've already gone on to that a little bit. But the other

2    reason was, we couldn't get funding because the insurance

3    companies in the NCAA are not going to put up $70 million and

4    then turn around the next day and have a new class action on

5    personal injuries. So that was a tradeoff that we thought was

6    in the best interest of the class.

7                THE COURT: But each individual class member has the

8    right and retains the right to pursue their full extent of

9    their individual injury claims, is that correct?

10                MR. BERMAN: That's correct. In fact, I am pursuing

11   them for some clients. I have new clients who are going to

12   stay in the settlement. But they are also going to bring their

13   personal injury claims. And I think there will be more

14   personal injury claims when the news of this gets out, frankly.

15                HONORABLE JUDGE BROWN: So they will be giving up that

16   right under not just Federal Rules of Civil Procedure but any

17   state comparable --

18                MR. BERMAN: That's right.

19                HONORABLE JUDGE BROWN: -- action proceeding?

20                MR. BERMAN: That's right. Just the right to bring

21   personal injury class action, not the right to bring a case.

22                HONORABLE JUDGE BROWN: But under any state class

23   action mechanism as well.

24                MR. BERMAN: That's correct, your Honor. But again, I

25   know of no case, and we get into the briefing, that allows

1    under Amchem or other Supreme Court precedent a personal injury

2    class action.

3           THE COURT:  Well, I mean --

4           MR. BERMAN:  That's just not done.

5           THE COURT:  I understand that's your position.  I am

6    sure that there is people out there, Mr. Edelson being one,

7    that may disagree with that position.  And that kind of cuts

8    both ways, right?  Because if the parties are so sure that a

9    23(b) class will not be certified, why is it part of the

10   settlement at all, right?

11          Mr. Mester I see is waiting to get up.  Please.

12          MR. MESTER:  Your Honor, quite simply, it's the cost

13   of the defense, disruption of litigation.  We know if we don't

14   resolve the class claims, that there will be an incentive for

15   other class action lawyers to file other class actions.

16          And so a substantial benefit to this settlement is

17   that we eliminate that risk once and for all.  But Mr. Berman

18   is exactly right.  Individual class members retain the right to

19   pursue individual claims.  As I mentioned earlier, not only

20   that, but we made clear in the settlement that the tolling --

21   the statute of limitations are all tolled.  So there will be no

22   prejudice whatsoever based upon the pendency of this class

23   case.

24          But in terms of limiting class exposure, it's really a

25   cost of defense because it's enormously expensive to litigate

1    these cases.

2         MR. BERMAN:  There is -- in terms of what class

3    members are receiving who may want to bring personal injury

4    claims, they are receiving the play book.  What I mean by that

5    is, one of the things we wanted to do if we kept going was, we

6    were going to ask you to issue certify the issues of whether

7    the NCAA breached their duty and whether they had a duty.  Two

8    big legal issues.

9         In our class certification paper and our proffer,

10   we've given any person who wants to bring a personal injury

11   claim against NCAA the play book.  They don't need to do any

12   further work.  All the documents are identified.  All the hot

13   stuff that we gathered over three years is right there.  And,

14   in fact, I know that there are lawyers in the country who have

15   taken that work product, put it in their complaints, and are

16   proceeding with individual personal injury claims.  That was

17   one of our objectives in representing the class.  Everyone's

18   interest was to make that play book available to facilitate

19   future personal injury claims.

20        THE COURT:  Okay.  At this point in time I will allow

21   any of the other plaintiffs' counsel to make statements or

22   present any arguments or reactions to the class.

23        MR. LEWIS:  Thank you, your Honor.  Richard Lewis.

24        I just wanted to reference an earlier appearance that

25   I made before this Court on behalf of the Walker plaintiffs,

1  regarding our concerns with the medical monitoring

2  negotiations.  Our two basic concerns at the time were to make

3  sure that the older football players were fully covered in the

4  medical monitoring program.  And the particular types of

5  cognitive and behavioral problems they're experiencing in mid

6  to late life were covered by the monitoring program.  And our

7  second concern was that it reach all 50 states.

8          You asked that I on behalf of the Walker plaintiffs

9  confer with Hagens Berman in trying to find a way to work

10  together, and we have done that.  And I've been able to work

11  with them and with the NCAA in the mediation, and with the

12  assistance of our experts who were focused on the long-term

13  hazards to the mid to late life hazards of subconcussive

14  impacts.

15          So I appreciate the Court encouraging us to do that.

16  And we were able to do that and in the settlement provisions

17  reflect that cooperative work.  Thank you, your Honor.

18          THE COURT:  Anyone else?  Mr. Edelson?

19          MR. EDELSON:  Thank you, your Honor.

20          Your Honor, along with I am sure members of the press,

21  perhaps the Court, we're still digesting the settlement.  We

22  didn't get the normal three-day notice period.  We've gotten a

23  bunch of briefs and papers this morning.  I've been looking at

24  it.

25          I'd like to make a couple brief comments.  But we

34

1    really would think that the Court might benefit from a written

2    brief by us where we can lay out our objections.  And I think

3    if we have a chance to study some of the issues, we're seeing a

4    little bit more closely, either they'll be cleared up or we can

5    make the points perhaps a bit more eloquently.  So we ask that

6    we can submit a brief.

7           That being said, as we understand the settlement, it

8    is going to benefit no one here in any real way other than the

9    NCAA and the plaintiffs' attorneys.  We've got a procedure.

10   First the idea that it's a $70 million settlement is not true.

11   It's not.  This is a $70 million price tag around what is --

12   you couldn't even call it a claims-made settlement.

13          Under the deal the NCAA puts $25 million in a pot.

14   That amount is going to be paid to the attorneys, 15 million.

15   I think if I understood it correctly, 5 million for notice, and

16   then $5 million more for basically the reimbursement of

17   co-pays, as I understand it, for the testing.  We'll get there

18   in a minute.

19          Then if by any chance the $5 million is eaten up, that

20   money might go back in at some later point.  But the idea that

21   there really is $70 million going out, we have no basis for

22   that at all.  This is exactly what the Seventh Circuit just

23   looked at in a recent case, saying, you know, we got to be

24   really careful when we got claims-made deals in saying what the

25   ceiling is and pretending that that's what's actually going to

1  be paid out.

2       Now let's look at what -- what actual members of the

3  class are going to -- if they are going to care about the

4  settlement.  We've got 4 million people.  Most of the people

5  weren't involved in -- in high impact sports at all.  You got

6  the archerers, you got the bowlers, you got the runners.

7  Somehow they are mixed up in the settlement.  They're going to

8  get nothing from it at all.

9       Then you got people who actually were involved in high

10  impact sports.  And people we care the most about ought to be

11  the people who were injured.  Those people have already got a

12  test.  All the clients that Mr. Berman was talking about have

13  undergone tests and have medical treatment.  And that's what

14  they are suing about.

15       So the fact -- I don't know how he goes to his clients

16  and says, this is a good deal.  What you've won in this deal is

17  a chance to get another test.  No benefit at all.

18       The injunctive relief, we've heard that the NCAA had

19  to correct Mr. Berman last time when they took credit for a lot

20  of what the NCAA apparently was doing on its own.  But whether

21  that's a good social good or not, and I believe it is, that

22  doesn't actually benefit people who are no longer NCAA student

23  athletes, which is most of the class.  So we might think that's

24  a good thing, but there's no direct benefit.

25       So how about -- how about the people who were injured,

1   who suffer real damages?  They get -- they get this kind of

2   fake relief of you can -- you can fill out a questionnaire, and

3   then there is a secret algorithm.  And if the panel decides

4   that you fit, you can get a test that you don't want.

5        And what do they lose?  They lose the right to

6   participate in a class action.  Mr. Berman should talk to Mr.

7   Siprut about what the chances are of getting a personal injury

8   class certified.  At the beginning of this case, what they said

9   to the press was, of course you can get a class action

10  certified.  Even when they moved for certification on a more

11  limited basis, Mr. Siprut said to the press, don't worry, we're

12  going to move for the damage class later on.

13       Now when the NCAA cleverly makes them trade, he says,

14  which clients do you care more about?  The few people who maybe

15  haven't been tested yet or the people who are really injured?

16  You've got -- you've got a choice to make.

17       They say, well, it's in the best interest of the class

18  to now pretend you can ever get a personal injury class

19  certified.  It's not true.  We cited cases post Amchem.  You

20  look at the NFL deal.  That NFL deal, the NFL wasn't simply

21  worried about the litigation costs when they put up three

22  quarters of a billion dollars.  Personal injury class action

23  has a significant amount of value.

24       Now, what's going to -- what's the harm?  As Mr.

25  Berman says, these people can bring their own individual cases.

1    And he actually went for, I think, he, hidden understanding, is

2    arguing against his own interest to explain how hard it is.

3    You've got to get experts.  You've got to find attorneys, all

4    that.

5             And the big problem, your Honor, is that most of the

6    class, the personal injury claims are worth five figures,

7    not -- not six figures, not seven figures.  And so taking the

8    client who has a claim where they might be able to get $20,000,

9    $10,000, $8,000, and saying, go find a personal injury attorney

10   who's going to bring this, they can't.

11            What the -- what the NCAA will get out of this deal is

12   the elimination of billions of dollars of liability.  There

13   will not be personal injury claims brought by 95 percent of the

14   class.  They will never pay them.  They will be gone like that.

15   And they are doing it for $15 million in fees and some secret

16   algorithm.

17            That's our argument.

18            THE COURT:  So let me just cut to the chase then,

19   Mr. Edelson.  Would you have objections to the settlement if

20   the plaintiffs were not waiving their 23(b)(3) rights to

21   proceed on a classwide basis as to personal injury claims?

22            MR. EDELSON:  I would have an objection as a human but

23   not as an attorney.  I wouldn't care.  I mean, I think it's

24   still a bad settlement and silly.  But -- but it really isn't

25   my concern.

1    THE COURT:  Well, I mean, it would be your concern to

2  the extent that you are representing the Nichols class.  And as

3  part of the Nichols class, some of the things they are seeking

4  include medical monitoring, right?  Would you file an objection

5  on behalf of your clients, the Nichols and the putative class

6  members in that class, with regard to the current form of the

7  settlement if they were not waiving or releasing their right to

8  proceed under 23(b)(3)?

9    MR. EDELSON:  My view would be that they -- they gain

10  nothing from settlement but they lose nothing from the

11  settlement.  So it's still a bad settlement.  But we would not

12  be objecting, which we told the Court from the beginning.

13    THE COURT:  Thank you.

14    Mr. Berman, Mr. Mester, I'll provide you with an

15  opportunity to respond, if you like.  One or both.

16    MR. BERMAN:  Just briefly, on this last point that

17  there is small claims out there that aren't going to be brought

18  because of the elimination of the ability to bring a class

19  action.  He says they're -- they're small claims, five figures.

20  All of a sudden he says, billions of dollars are lost.  That

21  doesn't add up.  You can't have billions of dollars if there is

22  these tiny claims that are out there.

23    But what he doesn't answer is, let's say that you have

24  a claim again of someone who's got five or $10,000.  How would

25  you prove on a classwide basis that the NCAA breached a duty to

1    each of those people and caused the injury? Because in any of

2    these concussion cases, you've got to examine on an individual

3    basis the sequence of events for each kid.

4          Did a doctor see that kid? Was he then returned to

5    practice without the doctor's approval? Did a doctor not see

6    the kid? Did the kid report the concussion? Did he in fact

7    have a concussion? How do you prove any of those things on a

8    classwide basis? It can't be done.

9          So the notion that we're giving up a right that's

10   valuable is just a fiction. It doesn't stand up if you really

11   analyze how you prove a case. I don't think he has a case on

12   file. I don't think he's litigating an individual concussion

13   case. I am. I know that you can't just do it a recipe for

14   everyone.

15         If you could, let me ask you this: Why wouldn't I

16   have gone for it? I like big-ticket cases. I've done a lot of

17   big-ticket cases. If I could have expanded this into a billion

18   dollar NFL case, I would have.

19         And the NFL analogy is really not apt for two reasons.

20   In the NFL case, you have 4500 personal injury cases pending

21   before Judge Brody in the MDL. So obviously there was a mass

22   of people that you can work with. And maybe it made sense for

23   the NCAA in that kind of case to forget about all the issues

24   that I just raised for you that a plaintiff would have to

25   prove, just to buy peace for public relations purposes.

1        In this case -- there are very few cases out there.

2   There were how many out there?  Maybe a dozen in the whole

3   country?  Maybe two dozen individual cases.  There is not a

4   groundswell to suggest that there is even a need for a class

5   action like there is in the NFL case.

6        So those two, the NFL analogy really doesn't help us

7   here.  He says the injunctive relief is of no value.  Well,

8   some of our class representatives are current players.  Why

9   would it not be valuable for them to have the NCAA implement

10  the best practices that we think this settlement is

11  implementing?

12       We just put up the chart of all the changes.  Mr.

13  Mester didn't get up and say I'm wrong.  These changes aren't

14  being made.  They are being made.

15       And finally, the law recognizes the value of medical

16  monitoring.  Mr. Edelson seems to think that doesn't mean

17  anything.  But in the NFL case there is medical monitoring.  In

18  the BP case there is medical monitoring.  The law recognizes a

19  value in people going and finding out from a qualified

20  physician, from a test that's on point, that most people don't

21  even know exist until they get this notice.

22       The law has found value in that.  And that's what this

23  settlement accomplishes, your Honor.

24       THE COURT:  Thank you.

25       MR. MESTER:  Just briefly, your Honor.  In terms of

1   Mr. Berman's PowerPoint and some of the things Mr. Edelson
2   said, and as probably expected, we do disagree with some of the
3   characterizations of the discovery.  We disagree with some of
4   the characterization what the NCAA -- NCAA did or did not do.
5   But the point of the settlement is to get past those
6   disagreements and to get this litigation resolved.
7           We certainly don't oppose preliminary approval, and we
8   firmly believe that this settlement agreement and the relief
9   that's provided to the class is a very positive step forward
10  for the class and for -- as a whole and for the NCAA.
11          THE COURT:  Okay.  You may be seated.
12          Mr. Berman, Mr. Mester, one of the issues that I
13  raised at a prior hearing was whether or not a class that is
14  certified under 23(b)(2) can waive a right in a bundle of
15  rights that a class may have under 23(b)(3).  Put it that way,
16  it does present a bit of a metaphysical question.  But in fact
17  it's a real one here in that in order for a settlement to be
18  approved at the final stage, the Court needs to find a class
19  certification is appropriate under one of the provisions under
20  Rule 23.
21          Here the parties are asking the Court to certify a
22  settlement class under 23(b)(2).  As part of that settlement
23  the parties are asking the Court to define the settlement so
24  that the class would, unless they opt out, waive the rights to
25  proceed to seek their damages for personal injury under

1    23(b)(3) on a classwide basis.

2           To be frank, one of the first things I did when I got

3    this memo was to go through to see if I can find some cases

4    that would help me in that analysis.  And I recognize that you

5    got a lot to put into this memorandum.  And under the local

6    rules you had 15 pages to do it.  You asked for 25 pages.  That

7    motion is granted.  But still I recognize that 25 pages is not

8    all that much space to address all the issues that you wanted

9    to address.

10          But I am particularly interested in this issue because

11   I do think that it's something that I am going to have to

12   address in my deliberations as I consider whether or not I am

13   going to approve this settlement.

14          Yes, you wanted to say something?

15          MR. MESTER:  Your Honor, I think there are a couple

16   decisions.  One that comes to mind, which modestly post-dates

17   the 1991 amendments of Title VII, was a Seventh Circuit

18   decision Lemon.  And I -- I attempted to refer to it earlier at

19   the earlier hearing when I think I referred to this issue as

20   being somewhat thorny.

21          But as I understand it, your Honor, there is good

22   press, Lemon being one, and I think there are other subsequent

23   decisions, that allow for a hybrid settlement that has elements

24   of (b)(2) and elements of (b)(3).  I think it was certainly

25   always our intention -- I don't want to speak for Mr. Berman,

1    but I believe it was his as well -- that this would be in that

2    sense a hybrid settlement.  It would have elements of (b)(2)

3    but also elements of (b)(3), including but not limited to

4    enhanced notice rights, which would otherwise not be provided

5    under (b)(2).  And equally, if not more important, opt-out

6    rights, which would not be provided under (b)(2) but available

7    under (b)(3).

8          So I think my belief and my understanding is that this

9    settlement combines elements of both.

10          THE COURT:  Okay.

11          MR. BERMAN:  That's correct, your Honor.  We are

12    moving under (b)(2) and (d)(1), which we believe allows you

13    discretion to make this a hybrid settlement, and to send notice

14    and opt-out rights.  And because of the waiver issues and the

15    opt-out issues, it's exactly why we want you to do that.

16          THE COURT:  No, I understand.  And again, I didn't

17    have much time to digest all of the memorandum.  And so I

18    didn't have a chance to go back and look at all the cases that

19    were cited.  But I did look at a couple of those cases.  And it

20    seems that in some of those cases, you had a 23(b)(2) class.

21    And for a variety of reasons the Court decided that additional

22    protections would be appropriate.

23          But in those cases, at least in my cursory review of

24    them, I did not see the class giving up any additional rights

25    other than what they would give up under 23(b)(2); that is,

1   they weren't giving up anything that would implicate 23(b)(3).

2   And so that's really the issue that I want the parties to

3   address.  And I feel that I am going to give you a chance to do

4   that.

5          So I'd like the parties -- I would like the parties

6   who are proposing the preliminary approval of this settlement

7   to file a supplemental memorandum addressing the issue; that

8   is, addressing basically whether under 23(b)(2) class with or

9   without -- with or without additional protections, whether such

10  a class can waive the right to proceed under 23(b)(3).

11         I will give you up to the 15 pages to do so, if you

12  need them all.  How much time would you like to submit that

13  memorandum?

14         MR. BERMAN:  Would seven days be okay?

15         THE COURT:  That would be more than adequate.  So why

16  don't I give you until August 8, that is next Friday, to file

17  the memorandum.  Again, it will be limited to 15 pages,

18  addressing that issue.

19         Now, Mr. Edelson you had requested some time to file a

20  formal written response and/or objections to the settlement

21  that's proposed in the motion.  How much time would you like to

22  file that?

23         MR. EDELSON:  Can we have 28 days?

24         THE COURT:  That will be fine, because I also want you

25  to respond to, if you wish to do so and think appropriate, to

45

1  their memorandum they are going to file on the 8th with regard

2  to the 23(b)(3), 23(b)(3) issue.

3          MR. EDELSON:  Of course, your Honor.

4          THE COURT:  So I will give you until August 22 to file

5  your response.  In light of the fact that you will be

6  addressing that issue as well as the other aspects of the

7  settlement, I will give you up to 30 pages.  You need not use

8  them all.  But I anticipate you might need more than 15.  So I

9  will give you up to 30.

10          MR. EDELSON:  I appreciate that, your Honor.

11          THE COURT:  So what I would like to do at this point

12  is, I am not going to rule on the motion today.  As Mr. Berman

13  alluded, I just received it.  I found the hearing today to be

14  quite illuminating.  I look forward to the supplemental

15  memorandum that will be submitted in support.

16          I am also reluctant, I must say, to preliminarily

17  approve a class settlement without knowing what the notice

18  efforts are going to be like.  And I understand that the

19  parties need about 45 days to put together a notice plan.

20          As the parties know, ascertainability, the Seventh

21  Circuit has found, is a requirement.  Whether one thinks it's

22  in the statute or implied, either way it's a requirement.  And

23  so whether or not you can readily ascertain the identity of all

24  the putative class members in some objective manner is

25  something that I want to consider prior to providing

1    preliminary approval of the settlement, to make sure that the

2    requirements under 23(b)(2) and/or (3) or (d)(1), depending are

3    all satisfied.  Okay?

4            So with regard to that, Mr. Berman, you said that the

5    parties need about 45 days to get that together.  Do you

6    anticipate being able to file a memorandum that addresses the

7    issue of ascertainability and reasonable notice in about 45

8    days?

9            MR. BERMAN:  Yes, I think, your Honor.

10           MR. MESTER:  Yes.

11           THE COURT:  Okay.  Why don't you go ahead and file

12   that by September 5.  So that would be with regard to

13   ascertainability with regard to the protocol that the parties

14   intend to use to provide reasonable notice under 23(d).

15           Since I have everyone here, what I'd like to do is,

16   I'd like to set another -- continue the motion to another

17   hearing date.  Once we have had a chance to look at all of the

18   exhibits to the motion, if I find that I require additional

19   either testimony or elaboration with regard to some of these

20   issues, I will issue a minute order asking the parties to

21   address them.  Okay?

22           So let's set this case for further status and the

23   continuation with regard to the motion.  Let's set that for

24   September 12.  Does that --

25           MR. BERMAN:  We have my firm retreat that day, your

1    Honor.  I am sure everyone will be thrilled if I was not at the

2    conference.

3             THE COURT:  I am sure you will be missed.

4             So let's set this then for how about the 19th, the

5    following Friday?  Does that work for everyone?

6             MR. MESTER:  That's fine.

7             THE COURT:  Okay.  Let's set it for 10:00 o'clock that

8    morning.  And the motion for preliminary approval of class

9    settlement and certification of settlement class will be

10   entered and continued to that date.

11            Is there anything else we need to address today?

12            MR. BERMAN:  Not from the plaintiffs.

13            MR. MESTER:  No, your Honor.

14            THE COURT:  Very well.  We are adjourned.

15       (Which were all the proceedings had at the hearing of the

16        within cause on the day and date hereof.)

17                              CERTIFICATE

18            I HEREBY CERTIFY that the foregoing is a true, correct

19   and complete transcript of the proceedings had at the hearing

20   of the aforementioned cause on the day and date hereof.

21

22    /s/Alexandra Roth                        7/30/2014
     _____    _____
23    Official Court Reporter                      Date
      U.S. District Court
24    Northern District of Illinois
      Eastern Division

25