**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | ) ) ) ) ) ) ) ) | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |
| **ADRIAN ARRINGTON, DEREK OWENS, ANGELA PALACIOS, KYLE SOLOMON, SHELBY WILLIAMS, BRICE SHEEDER, SHAVAUGHNE DESECKI, SPENCER TRAUTMANN, RYAN PARKS, URSULA KUNHARDT, and JESSICA MILLER, individually and on behalf of all others similarly situated,** | ) ) ) ) ) ) ) ) ) ) ) | **Case No 1:11-cv-06356**<br><br>**JURY DEMAND** |
| **Plaintiffs,**<br>**v.**<br><br>**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**<br>**Defendant.** | ) ) ) ) ) ) ) ) | |

**ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT**
**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION TO**
**PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Adrian Arrington ("Arrington"), Derek Owens ("Owens"), Angela Palacios

("Palacios"), Kyle Solomon ("Solomon"), Shelby Williams ("Williams"), Brice Sheeder

("Sheeder"), Shavaughne Desecki ("Desecki"), Spencer Trautmann ("Trautmann"), Ryan Parks

("Parks"), Ursula Kunhardt ("Kunhardt"), and Jessica Miller ("Miller") (collectively, the

"Plaintiffs")[1] bring this class action complaint against Defendant National Collegiate Athletic

Association ("NCAA"), individually and on behalf of all others similarly situated, and complain

---

[1] Plaintiffs reserve the right to add or propose additional class representatives.

and allege upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I.    NATURE OF THE ACTION

1.      President Obama January 2013:

I'm a big football fan, but I have to tell you if I had a son, I'd have to think long and hard before I let him play football.  And I think that those of us who love the sport are going to have to wrestle with the fact that it will probably change gradually to try to reduce some of the violence.  In some cases, that may make it a little bit less exciting, but it will be a whole lot better for the players, and those of us who are fans maybe won't have to examine our consciences quite as much.

I tend to be more worried about college players than NFL players in the sense that the NFL players have a union, they're grown men, they can make some of these decisions on their own, and most of them are well-compensated for the violence they do to their bodies. You read some of these stories about college players who undergo some of these same problems with concussions and so forth and then have nothing to fall back on.  That's something that I'd like to see the NCAA think about.

**<u>ANSWER</u>:**

The attributed statement referenced in Paragraph 1 speaks for itself, and to the extent that the allegations in Paragraph 1 vary therewith, the NCAA denies those allegations.

2.      The NCAA controls and regulates every aspect of the game of football and other college sports including rules regarding player safety and health.  The NCAA has used this authority to compel all players and participants to follow the policies, rules, and regulations the NCAA has enacted and imposed.  As the governing body of college athletics, the NCAA has held itself out as the guardian and authority on the issue of player safety and has unilaterally shouldered for itself a common law duty to provide players with rules, information, and best practices that protect them as much as possible from short-term and long-term health risks.

**<u>ANSWER</u>:**

The NCAA denies the allegations in Paragraph 2 and affirmatively states that the mission and priorities of the NCAA speak for themselves.

3.     The NCAA was founded "to protect young people from the dangerous and exploitive athletics practices of the time."[2] According to the NCAA, "[t]he rugged nature of early-day football, typified by mass formations and gang tackling, resulted in numerous injuries and deaths," prompting President Theodore Roosevelt to convene two White House conferences with college athletics leaders to encourage safety reforms.  As a result of several subsequent meetings of colleges and universities to initiate changes in football playing rules to protect the safety of student-athletes, 62 higher-education institutions became charter members of the original NCAA, then called the Intercollegiate Athletic Association of the United States (IAAUS).[3]

**ANSWER:**

The material referenced in Paragraph 3 speaks for itself, and to the extent that the

allegations in Paragraph 3 vary therewith, the NCAA denies those allegations.  The NCAA

denies any and all remaining allegations in Paragraph 3.

4.     The NCAA's founding purpose to protect student-athletes has been repeated often, and as far back as 1909 at the annual convention of member institutions.  There, Chancellor James Roscoe Day of Syracuse University stated:

> The lives of the students must not be sacrificed to a sport.  Athletic sports must be selected with strict regard to the safety of those practicing them.  It must be remembered that the sport is not the end. It is incidental to another end far more important.  We lose sight of both the purpose and the proportion when we sacrifice the student to the sport.[4]

**ANSWER:**

The material referenced in Paragraph 4 speaks for itself, and to the extent that the

allegations in Paragraph 4 vary therewith, the NCAA denies those allegations.  The NCAA

denies any and all remaining allegations in Paragraph 4.

---

[2]    http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/history (last updated Aug. 13, 2012).  The Intercollegiate Athletic Association of the United States changed its name to the National Collegiate Athletic Association in 1910.  *Id.*

[3]    *Id.*

[4]    James Roscoe Day, Chancellor, Syracuse University, The Function of College Athletics, in PROCEEDINGS OF THE FOURTH ANNUAL CONVENTION OF THE INTERCOLLEGIATE ATHLETIC ASSOCIATION OF THE UNITED STATES (Dec. 28, 1909), 34-43, at 38, available at http://google.com/books?id=dh0LAAAAIAAJ.

5.      The NCAA's role as the guardian of player health and safety has continued throughout the last century, and continues up through the present day.  The NCAA has exercised that role through its unilateral decisions to issue rules to regulate the way in which games are played, to make a profit, and to address issues of player safety.  During these decades, the NCAA voluntarily provided teams and players with information and extensive regulations that directly affected the short and long-term health of NCAA players, including the Plaintiffs.

**ANSWER:**

The NCAA admits that it has published rules, guidelines and other information relating to student-athlete health and safety, including the health and safety of football players at NCAA member institutions.  The remaining allegations in Paragraph 5 state legal conclusions to which no response is required, but to the extent a response is required, the NCAA denies those allegations.  The NCAA denies any and all remaining allegations in Paragraph 5.

6.      Over the years the NCAA has assumed a duty to make sure that athletic programs are conducted in a manner "designed to protect and enhance the physical and educational well-being of the student athlete."  The NCAA's website provides that "its core mission is to provide student athletes with a competitive environment that is safe" and that the NCAA itself takes "protective steps" with respect to student-athletes' health and safety."

**ANSWER:**

The material referenced in Paragraph 6 speaks for itself, and to the extent that the allegations in Paragraph 6 vary therewith, the NCAA denies those allegations.  The NCAA affirmatively states that it strives to enhance player safety but the remaining allegations in Paragraph 6 state legal conclusions to which no response is required.  To the extent a response is required, the NCAA denies that as an organizer of sports, it is legally obligated to eliminate the inherent risk of injury to voluntary participants in sports.  The NCAA denies any and all remaining allegations in Paragraph 6.

7.      Despite the NCAA's assumption of this responsibility, the NCAA was negligent and failed to carry out this duty in that it failed to implement regulations that would properly protect student-athletes from the risks associated with concussions and/or manage those risks to properly respond to the medically proven fact that repetitive concussions would lead to neuro-cognitive injuries in many players, including the Plaintiffs.

- 4 -

**ANSWER:**

The NCAA denies the allegations in Paragraph 7.

8.      The NCAA was aware that the number of concussions was increasing and occurring over a broad range of sports.  Its five year estimates of the number of concussions in NCAA sports:  (1) 16,000 for football; (2) 5,751 for women's soccer; (3) 3,374 for men's soccer; and (4) 1,209 for women's volleyball.[5]  Although public attention focused on concussions in football, large numbers of female athletes in particular were being concussed in sports such as soccer, basketball, lacrosse and volleyball.  Further, the NCAA suppressed and kept secret from student-athletes, information about the extent of concussion injuries in NCAA sports and their long-term consequences.

**ANSWER:**

The material referenced in Paragraph 8 speaks for itself, and to the extent that the

allegations in Paragraph 8 vary therewith, the NCAA denies those allegations.  The NCAA

denies that it suppressed and kept secret from student-athletes information about the extent of

concussion injuries in NCAA sports and their long-term consequences.  The NCAA denies any

and all remaining allegations in Paragraph 8.

9.      The NCAA was aware of the health risks associated with repetitive blows producing sub-concussive and concussive results and the fact that some members of the NCAA athlete population were at significant risk of developing brain damage and cognitive decline as a result.  Despite its knowledge and controlling role in governing player conduct on and off the field, the NCAA turned a blind eye to the risk and failed to timely and adequately impose safety regulations governing this health and safety problem.

**ANSWER:**

The NCAA denies the allegations in Paragraph 9.

10.      While the NCAA has assumed voluntarily its role as the unilateral guardian of player safety, college athletes and their families, including the Plaintiffs, have looked to the NCAA for guidance on player-safety issues.  Student-athletes are 18 when they begin their athletic careers and are not on equal footing with the NCAA when it comes to understanding the importance of brain injury prevention and treatment.

---

[5]      NCAA10091830.

**ANSWER:**

The NCAA denies the allegations in Paragraph 10.

11.    In its supervisory role, as well as in its position as arbiter of all aspects of college athletics, the NCAA has, since its inception, unilaterally and voluntarily chosen how to spend its funds to investigate and regulate many different circumstances affecting player health and safety, including, but not limited to, requiring players to wear certain equipment, designating some player gear as illegal, deciding what helmet brands should be recognized as the official equipment of the NCAA.

**ANSWER:**

The NCAA admits that it has funded studies related to student-athlete health and safety. The NCAA further admits that NCAA committees have enacted playing rules with the purpose of improving student-athlete health and safety. The NCAA denies any and all remaining allegations in Paragraph 11.

12.    As early as the 1980s the NCAA was aware of publications in the medical-science community establishing that concussive and sub-concussive injuries to athletes and the general population were a significant risk factor for short-term and long-term neuro-cognitive health complications, both as single incidents and particularly as repetitive impacts. By the year 2004 the NCAA was aware of over 20 scientific studies documenting the relationship between concussions and brain injury. These studies recommended prevention and treatment regimens the NCAA ignored.

**ANSWER:**

The NCAA admits that over the past several decades, various publications have discussed and debated the possible effects of concussive and sub-concussive injuries. The NCAA further admits that at various times, certain of its employees and certain members of NCAA committees have reviewed such publications. The NCAA denies that it has ignored recommended prevention and treatment regimens for concussions. The NCAA denies any and all remaining allegations in Paragraph 12.

13.     The NCAA has failed to meet its contractual and legal responsibility to safeguard student-athletes, despite being aware that its members have a "legal obligation to use reasonable care to protect athletes from foreseeable harm in any formal school sponsored activity."[6] The NCAA has engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by its student-athletes, all the while profiting immensely from those same student-athletes.

**ANSWER:**

The materials referenced in Paragraph 13 speak for themselves, and to the extent that the allegations in Paragraph 13 vary therewith, the NCAA denies those allegations.  The remaining allegations in Paragraph 13 state legal conclusions to which no response is required, but to the extent a response is required, the NCAA denies those allegations.  The NCAA denies that it has engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by its student-athletes.  The NCAA denies any and all remaining allegations in Paragraph 13.

14.     Specifically, the NCAA has failed to timely address and/or correct the coaching of tackling, checking or playing methodologies that cause head injuries; the NCAA has failed to timely educate coaches, trainers and student-athletes as to the symptoms indicating possible concussions; the NCAA has failed to timely implement system-wide "return to play" guidelines for student-athletes who have sustained concussions; the NCAA has failed to implement system-wide guidelines for the screening and detection of head injuries; the NCAA has failed to implement legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play; and the NCAA has failed to implement a financial support system for student-athletes who, after sustaining concussions, are left unable to either – play their sport or even lead a normal life and who have continuing medical costs arising from participation in NCAA athletics.

**ANSWER:**

The NCAA denies the allegations in Paragraph 14.

15.     On average, the NCAA makes over $750 million in revenue each year and recently signed multi-billion-dollar television contracts for football games.  Unlike professional sports organizations, however, the NCAA does not use revenues to pay its athletes, nor does the money go towards pension or medical benefits for post-collegiate athletes.  Unlike professional

---

[6]     NCAA10023685

athletes, student-athletes have no collective bargaining power to negotiate for such benefits. The NCAA gives no medical or financial support to collegiate student-athletes who sustained concussions while playing an NCAA sport and who are then left to cope with the necessary costs and care resulting from their injuries. The NCAA, however, retains the economic benefits resulting from the student-athletes' labors.

**ANSWER:**

The NCAA admits that in 2009-2010, it earned approximately $749.8 million in revenue. The NCAA further admits that it does not pay a salary to student-athletes, who are not professional athletes and many of whom are receiving some type of financial assistance (including full tuition scholarships) to attend NCAA member institutions. The NCAA further admits that it does not pay a pension to former student-athletes. The NCAA affirmatively states that currently over 96% of its revenue is distributed to NCAA conferences and member institutions. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 15.

16.     The NCAA's conduct is particularly egregious in light of the fact that its policies and procedures – or lack thereof – leave student-athletes like Plaintiffs and members of the Class inadequately protected from sustaining, monitoring and recovering from brain injuries at a particularly early and vulnerable point in their lives. Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, collegiate players typically range in age from 18-23 and are just beginning their adult lives. For such NCAA student-athletes, including Plaintiffs and the putative Class, these injuries can or may in the future have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, to depression, and early-onset dementia.

**ANSWER:**

The NCAA denies the allegations in Paragraph 16.

17.     The NCAA was in a superior position to know of student-athletes' concussion-injury rates and the long-term medical consequences. The NCAA and its members breached its duty to provide a "safe environment" and by failing to provide long-term and/or complete medical coverage for student-athletes who suffered concussion(s) while playing NCAA sports.

**ANSWER:**

The allegations in Paragraph 17 state legal conclusions to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 17.

18.     Accordingly, this nation-wide class action seeks injunctive relief, and equitable relief in the form of medical monitoring for the purpose of diagnosis of long-term injury and disease resulting from concussions, as a result of the NCAA's carelessness, negligence, and concealment of information.

**ANSWER:**

The NCAA admits that Plaintiffs purport to seek injunctive relief and medical monitoring on behalf of a nationwide class. The NCAA expressly denies that Plaintiffs are entitled to any relief in this lawsuit. The NCAA denies any and all remaining allegations in Paragraph 18.

## II.     JURISDICTION AND VENUE

19.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, Plaintiffs' claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous Class members who are citizens of states other than the NCAA's states of citizenship.

**ANSWER:**

The allegations in Paragraph 19 state legal conclusions to which no response is required, but to the extent a response is required, the NCAA denies those allegations. To the extent an answer is required, the NCAA admits that Plaintiffs purport to assert jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 19.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) and 1391(c) as:  the NCAA is deemed to reside in this judicial district because it is subject to personal jurisdiction here; and a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the Defendant conducts substantial business in this jurisdiction.

**ANSWER:**

The allegations in Paragraph 20 state legal conclusions to which no response is required, but to the extent a response is required, the NCAA denies those allegations. To the extent an answer is required, the NCAA admits that Plaintiffs purport to assert that venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), (2) and 1391(c). Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 20.

### III.      PARTIES

**A.      Plaintiff Arrington**

21.      Adrian Arrington is a natural person and a citizen of the State of Illinois. Arrington is 25 years old. Arrington currently attends Eastern Illinois University ("EIU"), an NCAA member school, where he formerly competed on the EIU football team.

**ANSWER:**

The NCAA admits that EIU is a member of the NCAA. The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 21 and, on that basis, denies them and demands strict proof thereof. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 21.

22.      Before attending EIU, Arrington was named All-State for the Illinois Football Coaches Association Class 6 A ; he received a special All-State mention by the *Chicago Tribune* and *Champaign News-Gazette*; he was a three-time Illinois 6A State runner-up; he was named the WJBC Player of the Year; he was Big 12 Conference Defensive MVP and team MVP; and he competed in the summer Shrine All-Star game.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 22 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 22.

23.     Arrington continued to shine as a member of the EIU football team. From 2006-2009, he was a Strong Safety and was the captain of the EIU football team during the 2009 season. In 2007, he earned a starting position and led the team with 48 solo tackles. Arrington finished his career with an impressive 154 total tackles.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 23 and, on that basis, denies them and demands strict

proof thereof. The NCAA denies any and all remaining allegations in Paragraph 23.

24.     During his time on the team, however, Arrington suffered numerous and repeated concussions during football games. In each instance after he sustained his first three concussions, the EIU team doctor told Arrington he could return to play the very next day.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 24 and, on that basis, denies them and demands strict

proof thereof. The NCAA denies any and all remaining allegations in Paragraph 24.

25.     After his third concussion, Arrington started experiencing memory loss unrelated to a specific traumatic event. Around the same time, Arrington also began experiencing seizures. Only after these symptoms started to manifest did EIU finally send Arrington to a neurologist for testing.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 25 and, on that basis, denies them and demands strict

proof thereof. The NCAA denies any and all remaining allegations in Paragraph 25.

26.     At no time was Arrington coached on how to make safer tackles. In fact, at all times the message from EIU was to "play hard and play fast" without regard to safety, and that those who did not play in that manner would be summarily cut. Arrington was also never given literature or lectures about concussion or other head-injury prevention.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 26 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 26.

27.     Arrington sustained two more concussions before finally leaving the football team to focus on matriculating from EIU. That has proved difficult, however, as Arrington had to drop out of a number of his classes due to the memory loss, depression and the almost-daily migraines he continues to experience as a result of his head injuries.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 27 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 27.

28.     Recently, as a result of his symptoms, Arrington's doctors suggested he receive an MRI. The MRI showed that he has scarring on the frontal lobe of his brain.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 28 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 28.

29.     Specifically, with respect to Arrington, *inter alia*, the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions. As a result, Arrington was returned to play football while still recovering from prior concussion injuries. The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes about the symptoms and dangers of concussions. Moreover, the NCAA failed to implement system-wide guidelines for screening and detecting head injuries that would have detected the numerous concussions Arrington received and prevented him from playing until he had fully recovered. The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Arrington, who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 29 regarding Plaintiff Arrington and, on that

basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining

allegations in Paragraph 29.

30.     The NCAA did not require its members to properly educate its student-athletes as
to the true symptoms of when a concussion can occur. Without such knowledge, requiring
student-athletes to report symptoms is meaningless.

**ANSWER:**

The NCAA denies the allegations in Paragraph 30.

31.     Further, the NCAA has utterly failed Arrington because he has had to take time
off from school due to his injuries. Neither the NCAA nor EIU have provided Arrington with
any support system; in fact, neither the NCAA nor EIU have any support system in place for
student-athletes who, after sustaining concussions, are left unable to either play football or even
lead a normal life.

**ANSWER:**

The NCAA incorporates its answer to Paragraph 30 as and for its answer to Paragraph 31.

The NCAA is without knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 31 regarding Arrington and EIU and, on that

basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining

allegations in Paragraph 31.

32.     Finally, Arrington has incurred out-of-pocket costs and continues to pay for
ongoing medical treatment directly related to the post-concussion syndrome with which he has
been diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 32 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 32.

**B.    Plaintiff Owens**

33.    Derek K. Owens is a natural person and a citizen of the State of Arkansas.  Owens is 22 years old.  Owens was a student at the University of Central Arkansas ("UCA"), was on an academic scholarship and was a member of the football team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 33 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 33.

34.    Before attending UCA in the fall of 2008, Owens played football at Russellville High School in Russellville, Arkansas.  He was the only person to attend that school who lettered in three varsity sports in three consecutive years.  He was the first chair in trumpet in the school band for three years.  He scored a 32 on his ACT.  And he was a star football player.  As a wide receiver, he was named the Top Offensive Player in the State of Arkansas, he was chosen to play at his position in the state All-Star Game, and he was named one of the top Scholar-Athletes in the State.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 34 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 34.

35.    UCA recruited Owens, and offered Owens the choice between an academic scholarship or a football scholarship.  He chose the academic scholarship.  But he could not wait to play football for UCA.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 35 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 35.

36.     In the summer of 2008, UCA offered incoming freshman football players the chance to attend "voluntary practices" with certain other members of the team, but without coaches, to get acquainted with the school. No baseline concussion assessment was conducted for Owens. Prior to the "voluntary practice," Owens did not receive any information from or on behalf of the NCAA on how to recognize or report head injuries. Owens did not receive any information from or on behalf of the NCAA concerning proper tackling and blocking techniques that could avoid head injuries. Owens attended and excelled as a receiver. During one practice without pads or helmets, however, Owens was hit in the head from behind. No one from the team provided him any treatment. After practice, Owens called his parents, telling them he was dizzy, he was having difficulty seeing, and he did not think he could drive. He stayed that evening locally with his cousin because he could not drive and went home the next day. He did not return to the summer practices. No one at UCA followed up with him. No one at UCA provided concussion education prior to his attendance at this practice.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 36 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 36.

37.     Owens returned to school for the fall semester and the fall football season. Before the start of the season Owens did not receive any training on how to recognize a potential concussion, nor the steps to take to report any potential symptoms that may signify a concussion has occurred. Owens believed that a concussion only occurred if he "blacked out" or was "knocked out." Again, no baseline assessment was performed. During a practice in the second week of the season, however, Owens was hit by a linebacker and was knocked unconscious. No one from UCA called Owens' family. In fact, the UCA trainers returned Owens to his dorm room, told his roommates that Owens had a "severe concussion," and asked his roommates to wake him up every couple of hours to make sure he was okay. The UCA staff did not administer any of the widely recommended concussion tests. His mother learned what had happened after receiving several strange texts from her son, which prompted her to call his cell phone to see if he was okay. One of Owens' roommates answered his cell phone and said that Owens was unable to talk as a result of the concussion. Owens' mother called the UCA trainers and stated

that this was Owens' second concussion of the season. UCA red-shirted Derek for the 2007-2008 Season; he sat out for three to four weeks until the team doctor cleared him to return to the practice team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 37 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 37.

38.     During his time as a player, the NCAA did not pass regulations requiring its members to educate student-athletes on what symptoms may be signs of a concussion. Owens suffered numerous and repeated concussions while playing football at UCA. Some of those he did not recognize as concussions, as he did not "black out" or was not "knocked out" but instead would get headaches, hear ringing in his ears, feel pressure in his head, feel as if his head was swollen, or would vomit.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 38 regarding Plaintiff Owens and, on that

basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 38.

39.     In the fall of 2010, Owens was playing in a game against University of Tulsa as the punt returner and was hit just as he caught the ball. Owens' mother saw that he hit his head. The Tulsa player even bragged about how hard he hit Owens to the newspaper *The Tulsa World*. *The Tulsa World* wrote after the game:

> TU deep snapper Bo Abbott said racing down to drill Central Arkansas punt returner Derek Owens last Saturday night was the highlight of his career. "The only problem was, his helmet didn't fly off," Abbott said with a chuckle.

Mike Brown, "TU notebook: Headhunter," THE TULSA WORLD (Oklahoma) (September 30, 2010). The Tulsa player had not been properly coached on helmet to helmet contact. No one from the team checked on Owens when he returned to the sidelines. It was obvious, however, from watching the play that Owens had a possible head injury. No one at UCA graded his concussion; utilized standard concussion tests or monitored Owens in any meaningful fashion.

**ANSWER:**

      The alleged newspaper article referenced in Paragraph 39 speaks for itself, and to the

extent that the allegations in Paragraph 39 vary therewith, the NCAA denies those allegations.

The NCAA is without knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations contained in Paragraph 39 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 39.

      40.     By the fall of 2010, Owens had been and was experiencing memory loss, headaches, an inability to concentrate or focus, anxiety and depression.  He complained that he was not feeling well and was having trouble sleeping.  He would study for tests, but if he went to sleep he would forget what he had studied, so he started making himself stay up all night out of fear of failing.  His grades plummeted even though academics had been his priority.  As a result, he lost his regular academic scholarship.  Thus, for the fall semester 2010, Owens obtained a school loan and a partial state lottery scholarship to make up for the lost academic scholarship.

**ANSWER:**

      The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 40 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 40.

      41.     During the spring semester 2011, Owens was paying for school through a small football scholarship, the state lottery scholarship and his school loan.  But Owens' grade in one of his core science classes was a low C/high D.  Owens therefore either had to drop the class and lose his state lottery scholarship (because he would not meet the minimum hours required to maintain it), or take the grade.  He dropped the class and sacrificed his lottery scholarship in an attempt to keep his grade-point average up.

**ANSWER:**

      The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 41 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 41.

42.     In May 2011, Owens asked to go to his family doctor because he feared he had ADHD. After hearing Owens' story, however, Owens' doctor diagnosed the problems as being related to his concussions. This was the first time he learned that the symptoms he had been experiencing and the steady decline in his academics were directly related to the multiple concussions he had suffered. At no time did the NCAA require UCA to provide Owens with adequate information about (a) how to tackle and block so as to avoid as much as possible a head injury, (b) the symptoms of a head injury, and (c) the possible long-term consequences of concussions. The NCAA did not conduct baseline testing prior to his participation in NCAA sports.

**ANSWER:**

The NCAA affirmatively states that under the NCAA Constitution, each member

institution is responsible for protecting the health of its student-athletes. The NCAA is without

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations

contained in Paragraph 42 regarding Plaintiff Owens and, on that basis, denies them and

demands strict proof thereof. The NCAA affirmatively states that for decades, it has published

rules, guidelines and other information (i) recommending tackling and blocking techniques to

avoid head injury, (ii) describing the symptoms of a head injury, and (iii) discussing the possible

adverse effects of concussions. Except as expressly admitted, the NCAA denies any and all

remaining allegations in Paragraph 42.

43.     Owens attempted to take classes during the first period of the summer of 2011 but was forced to drop out of school and football as a result of his symptoms. Owens told his mother: "I feel like a 22 year old with Alzheimer's." Owens lost his lottery scholarship because he did not maintain the required hours.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 43 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 43.

44.     When Owens informed his coach that he could not play due to medical issues, the coach inquired "so what's your plan?," informing Owens that as soon as he walked out the door all of the benefits Owens had from football would cease. At no time did his coach offer to take responsibility for the consequences of Owens' injury. Owens felt like he had been "kicked to the gutter." Subsequently, after Owens' mother went directly to the Athletic Director to fight for Owens' right to retain his athletic scholarship because Owens was injured while playing football, UCA agreed Owens would maintain his athletic scholarship (approximately $2,000) since he had to quit as a result of his medical condition.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 44 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 44.

45.     Since then, Owens has seen both a neurologist as well as a specialist in football-related concussions, has been diagnosed with post-concussion syndrome, and was told the front part of his brain had been injured. The symptoms of post-concussion syndrome, each of which Owens has suffered, include migraine headaches, dizziness, fatigue, irritability, anxiety, insomnia, loss of concentration and memory, and noise and light sensitivity.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 45 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 45.

46.     Specifically, with respect to Owens, *inter alia*, the NCAA failed to implement system-wide "return-to-play" guidelines for student-athletes who have sustained concussions. As a result, Owens was returned to play football while still recovering from prior concussion injuries, even despite his mother's intervention. The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff, and athletes about the symptoms and long-term consequences of concussions if not properly treated, as well as the proper treatment protocol for head injuries. Moreover, the NCAA failed to implement system-wide guidelines for screening and detecting head injuries that would have detected the numerous concussions Owens

- 19 -

received and thus prevented him from playing until he had fully recovered. The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Owens, who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 46 regarding Plaintiff Owens and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 46.

47. Owens did not learn that concussions could occur without a "blackout" or "knockout experience" until he saw his doctor. The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur without a "blackout" or "knockout." Without such knowledge, requiring athletes to report symptoms is meaningless.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 regarding Plaintiff Owens and, on that basis, denies them and demands strict proof thereof. The NCAA incorporates its answer to Paragraph 30 as and for its answer to Paragraph 47. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 47.

48. Further, the NCAA has utterly failed Owens since he has had to take time off from school due to his injuries. Neither the NCAA nor UCA have provided Owens with any support system; in fact, neither the NCAA nor UCA have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 48 regarding Plaintiff Owens or UCA and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 48.

49.     Finally, Owens has incurred out-of-pocket costs as a result of the loss of his academic scholarship, and has incurred and continues to incur out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which Owens has been diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 49 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 49.

**C.     Plaintiff Palacios**

50.     Plaintiff Angela Palacios is a natural person and a citizen of the State of Texas. Palacios is 19 years old.  Palacios currently attends Ouachita Baptist University ("OBU"), an NCAA member school located in Arkadelphia, Arkansas, where she formerly competed on the OBU women's soccer team.

**ANSWER:**

The NCAA admits that OBU is a member of the NCAA.  The NCAA is without

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations contained in Paragraph 50 and, on that basis, denies them and demands strict proof

thereof.  Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 50.

51.     Before attending OBU, Palacios sustained two concussions playing soccer in high school.  Her parents alerted the school about Palacios' concussions and provided protective head gear for her to wear while playing on OBU women's soccer team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 51 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 51.

52.     Prior to starting her career, the NCAA did not provide Palacios with concussion education or conduct baseline testing.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 52 and, on that basis, denies them and demands strict proof thereof.

53.     As a freshman at OBU, Palacios started in 14 of 18 games and played in 17 games overall.  Palacios is listed among the 2010 team leaders in points, assists, shots on goal, and game winning goals.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 53 and, on that basis, denies them and demands strict proof thereof.

54.     At a team practice held on September 13, 2011 – just before OBU's fourth game of the season – Palacios' face collided with another team member's head during a practice drill. Immediately after the incident, the athletic trainer asked Palacios if she was dizzy, nauseated, or had a headache.  Palacios answered yes to all three.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 54 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 54.

55.     Despite her responses and despite Palacios' eye swelling shut almost instantly, no further concussion-related tests were administered on the day of her injuries and she was not sent to the emergency room.  Instead, the team trainer directed Palacios to go to her dorm room to rest, never once checking in on her or arranging for Palacios to have any type of monitoring.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 55 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 55.

56.     The following day, Palacios was given an online test to determine whether she had any lingering neurological deficiencies.  Based on that test, Palacios did not participate in practices until September 17th.  That morning, after consistently suffering from headaches every day since her injury, Palacios vomited.  When she arrived at practice she alerted her coach that she was still not feeling well.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 56 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 56.

57.     Without any clearance from the training staff and despite Palacios' lingering side effects, the coach made her participate in running drills.  After being ordered to run, Palacios asked a trainer for help.  The trainer simply said: "you don't want to make the coach mad."

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 57 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 57.

58.     Palacios was finally excused from practice after her mother contacted the coach. After that call, Palacios' coach told her that she was allowed to sit out – and should expect to sit out for a long time, insinuating that Palacios would no longer be allowed to play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 58 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 58.

59.     Realizing that OBU was ignoring her medical needs, Palacios sought medical attention at a hospital emergency room.  There, the doctor found that Palacios had diminished sensation on her left side, that her memory was sluggish, and that she had sustained a serious concussion.  The ER doctor told Palacios that she should not participate in any activities for two more weeks.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 59 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 59.

60.     Specifically, with respect to Palacios, *inter alia*, the NCAA failed to implement system-wide "return-to-play" guidelines for student-athletes who have sustained concussions. As a result, Palacios was returned to play soccer while still recovering from prior concussion injuries.  The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and dangers of concussions.  Moreover, the NCAA failed to implement system-wide guidelines for screening and detecting head injuries that would have prevented Palacios from playing until she had fully recovered.  The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Palacios, who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 60 regarding Plaintiff Palacios and, on that

basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining

allegations in Paragraph 60.

61.     The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur.  Without such knowledge, requiring athletes to report symptoms is meaningless.

**ANSWER:**

The NCAA incorporates its answer to Paragraph 30 as and for its answer to Paragraph 61.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 61.

62.     Finally, Palacios has incurred out-of-pocket costs directly related to the concussion with which she has been diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 62 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 62.

**D.     Plaintiff Solomon**

63.     Kyle Solomon is a student at the University of Maine and formerly was a member of the university's hockey team.  Before attending Maine in the fall of 2008, he shined as a prep high school hockey player.  At age 17, he led the Cedar Rapids RoughRiders team to a United States Hockey League national championship, and subsequently played for the Boston Junior Bruins in the Eastern Junior Hockey League.  As a result, he received numerous offers to play collegiate hockey.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 63 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 63.

64.     Prior to starting at Maine in the fall of 2008, he disclosed that he had sustained three previous concussions during his time in prep hockey.  While he was given a baseline test upon starting at Maine, neither the coaching or training staff ever addressed or discussed concussions or concussion symptoms with him.  He also did not receive any information from or on behalf of the NCAA on how to recognize or report head injuries.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 64 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 64.

65.     In October 2009, while playing for Maine, Solomon suffered a concussion in a nationally-televised game on ESPN against Boston College.  Midway through the second period, Solomon was blindsided by an opposing player and hit his head above the right ear on the ledge of the boards.  Solomon completely blacked out on the ice.  When he awoke, he was seeing "stars" and experienced double vision for approximately 10 minutes.  The trainer examined Solomon in the locker room by asking him to follow a flashlight and his finger.  Solomon was not officially diagnosed with a concussion by the trainer nor did the trainer administer a baseline test.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the remaining allegations contained in Paragraph 65 and, on that basis, denies them

and demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 65.

66.     While the trainer told Solomon that his eyes were dilated, Solomon was given seven stiches and returned to the game during the third period despite exhibiting concussive symptoms.  After the game, Solomon was told to "go back to his dorm room and rest," despite the fact that he lived alone and no one was present to monitor his condition.  Solomon was symptomatic for approximately one week, experiencing headaches and sensitivity to light.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 66 and, on that basis, denies them

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 66.

67.     In March 2009, Solomon sustained another concussion at Maine as a result of an elbow to the head during a practice.  When he tried to get up after the hit, his legs collapsed and he experienced dizziness, sleepiness and felt "foggy."  These symptoms lasted for several few days and he was diagnosed with a Grade 2 concussion.  The team cleared him to return to practice within a week of the hit.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 67 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 67.

68.     In a January 2010 game against Merrimack, as a sophomore, Solomon received another concussion. He received an elbow to his face mask, which jammed his face mask against his throat, rupturing one of his vocal cords. He was told he had also received a "slight" concussion. He was taken by ambulance from the game to the hospital, and was out for approximately two weeks.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 68 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 68.

69.     Just two months later, in a March 2010 practice, Solomon was elbowed softly in the side of the head by a teammate. As a result, he was diagnosed with a Grade 3 concussion. Yet, two weeks after the injury, Maine cleared him to return to the ice despite the fact that Solomon felt something was wrong with him. He felt like a different person. He noticed a change in his personality, felt depressed, and was disconnected from reality.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 69 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 69.

70.     Solomon subsequently visited Dr. Robert Cantu, a neurologist, who concluded that Solomon's brain had sustained severe trauma and who diagnosed Solomon with post-concussion syndrome. Dr. Cantu advised Solomon of the risks of continuing to play hockey and advised that another concussion could kill him. Solomon made the decision at that time to retire from hockey fearing that further concussions could be fatal.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 70 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 70.

71.     Yet, at the same time of Dr. Cantu's diagnosis of post-concussion syndrome and recommendation that Solomon retire from hockey, the Maine trainers cleared Solomon to play. The Maine coaches thus actively tried to get Solomon back on the ice, even assuring him that he could wear a "no-contact" red jersey during practices. Solomon nonetheless retired.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 71 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 71.

72.     Solomon has continued his studies at Maine in an attempt to obtain a degree but the effects of the concussions have been debilitating. He has had to drop classes and cannot read or study for long stretches of time. In addition, Solomon suffers from migraine headaches that last as long as 72 hours, vomiting, intense seizures that trigger unconsciousness and an inability to breathe, depression, irritability, anxiety, insomnia, loss of concentration and memory, noise and light sensitivity, and an inability to cope with anxiety or stress. Solomon continues to incur out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which he was diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 72 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 72.

**E.     Plaintiff Williams**

73.     Shelby Williams is a current student-athlete at Northwest Missouri State University in Maryville, Missouri. She is a sophomore and a member of the women's golf team.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 73 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 73.

74. Williams believes that the concussion issues are very important to NCAA student-athletes. Many NCAA student-athletes are impacted on a daily basis by concussion-management practices. While non-contact sport athletes may not be affected on a daily basis, concussions can and do still occur.

**ANSWER**:

The NCAA admits that concussions can occur in non-contact sports. The NCAA is

without knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations contained in Paragraph 74 and, on that basis, denies them and demands

strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 74.

75. Williams believes that all current or former student-athletes should have access to a medical monitoring program – regardless of the sport they played – and that non-contact sports athletes should receive medical monitoring.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 75 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 75.

76. Like other current student-athletes, Plaintiff Williams has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for future injury.

**ANSWER**:

The NCAA denies the allegations in Paragraph 76.

**F.    Plaintiff Sheeder**

77.    Brice Sheeder is a current student-athlete at Simpson College in Indianola, Iowa, where he is a junior and member of the men's track and field and cross country teams.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 77 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 77.

78.    Sheeder believes that concussion issues are very important to student-athletes regardless of sport.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 78 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 78.

79.    Sheeder has roommates that have received concussions and were returned to play on the same day and he has never received any baseline testing.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 79 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 79.

80.    Sheeder believes that all student-athletes should have access to a medical monitoring program, receive baseline testing before each season, and be protected by a prohibition against same-day return-to-play guidelines.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 80 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 80.

81.    Sheeder also believes that the NCAA should provide training to teachers regarding the need for academic accommodations to protect all student-athletes and provide adequate time for recovery from head injuries without being penalized.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 81 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 81.

82.    At many non-contact sporting events attended by Sheeder, athletic trainers - who are often just college students - are the only medical personnel present.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 82 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 82.

83.    Like other current student-athletes, Plaintiff Sheeder has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore he is at risk for future injury.

**ANSWER:**

The NCAA denies the allegations in Paragraph 83.

G.    **Plaintiff Desecki**

84.    Shavaughne Desecki is a former student-athlete, who graduated from DePaul University in Chicago, Illinois, in 2003.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 84 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 84.

85.    Desecki played softball at DePaul and is currently a volunteer assistant softball coach at Concordia University in River Forest, Illinois.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 85 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 85.

86.    Desecki believes that the NCAA and its member institutions should be responsible to provide medical monitoring to athletes who think that they may be suffering from concussion symptoms and that the monitoring should extend to all sports.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 86 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 86.

87.    During the time she played softball at DePaul, Desecki witnessed others sustain concussions as a result of accidents during the course of play on the softball field.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 87 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 87.

88.    Desecki never received baseline testing and, to her knowledge, there were no concussion management rules in place despite the fact that concussions did occur.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 88 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 88.

89.    It is important to Desecki that she be eligible to obtain medical monitoring if symptoms of concussion-related injuries arise in the future.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 89 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 89.

90.    As a current volunteer assistant NCAA softball coach, it is important to Desecki that coaches, athletic trainers, and student-athletes receive mandatory concussion education prior to the start of the season. Because coaches are with the student-athletes most often, it is important that they be able to recognize symptoms of concussions, refer the student-athlete to medical personnel after a head injury, and require the student-athletes to be cleared by a physician before returning to play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 90 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 90.

91. Like other former student-athletes, Plaintiff Desecki played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**ANSWER:**

The NCAA denies the allegations in Paragraph 91.

**H.    Plaintiff Trautmann**

92. Spencer Trautmann is a current student-athlete at Western Oregon University. He is a senior and a pitcher for the baseball team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 92 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 92.

93. Trautmann believes that all student-athletes should be eligible for medical monitoring regardless of sport.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 93 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 93.

94.     Trautmann believes that a medical monitoring program would benefit athletes who are either currently struggling with concussion symptoms or may in the future.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 94 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 94.

95.     Trautmann has witnessed other players suffer head injuries as a result of accidents or being hit in the head by a ball. The injuries he has witnessed on the baseball diamond are serious because of the pure force behind the hit of a baseball - especially since the NCAA allows the use of metal bats.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 95 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 95.

96.     Trautmann believes that all student-athletes should be baseline tested.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 96 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 96.

97.     It is important to Trautmann that, if a concussion occurs at a non-contact sports event, that a student-athlete obtain medical clearance prior to returning to play regardless of sport.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 97 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 97.

98.    Due to the rarity of concussions in baseball, Trautmann realizes that it may not be
practical for a physician to be present at every game. However, if a concussion does occur, it is
important to him that the student-athlete must see and be cleared by a physician before returning
to play. In addition, it is important to him that all student-athletes, coaches, and athletic trainers
receive concussion education before each season.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 98 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 98.

99.    Like other current student-athletes, Plaintiff Trautmann has played an NCAA
sport during a time when the NCAA's concussion-management and return-to-play guidelines did
not meet the consensus standards, and therefore he is at risk for future injury.

**ANSWER**:

The NCAA denies the allegations in Paragraph 99.

**I.    Plaintiff Parks**

100.    Ryan Parks is a former student-athlete, who graduated from the University of
Illinois in Champaign, Illinois in 2002. He was a pitcher for the baseball team.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 100 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 100.

101.     During Parks' baseball career, his school did not conduct baseline testing. However, concussions did occur in baseball; he witnessed other players (including fellow pitchers) sustain injuries as a result of being hit in the head by a ball.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 101 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 101.

102.     To his knowledge, there were no rules regarding return to play following a concussion during the time he played.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 102 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 102.

103.     Parks thinks it is important that all current and former student-athletes have access to medical monitoring.  He also thinks it is important that all student-athletes be baseline tested.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 103 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 103.

104.     Parks believes that it is important that coaches and athletic trainers are properly trained in concussion management and recognition and return-to-play guidelines are necessary to protect baseball players going forward.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 104 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 104.

105.    Parks believes that medical monitoring should extend to former athletes and significant changes should be made going forward to protect current players.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 105 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 105.

106.    Like other former student-athletes, Plaintiff Parks played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore he is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**ANSWER:**

The NCAA denies the allegations in Paragraph 106.

**J.    Plaintiff Kunhardt**

107.    Ursula Kunhardt is a former student-athlete who played volleyball at Montana State University in Bozeman, Montana from 2011 to 2012. She played outside hitter for the volleyball team until suffering a concussion in practice which forced her to quit the team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 107 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 107.

108.    During her career, Kunhardt hit her head on the floor during a drill in practice and sustained a concussion.  Despite remaining symptomatic, she was rushed back to play by the training staff even though she did not feel ready to return to play.  Kunhardt was not subject to medical screening and did not see a physician until she requested a neuropsychological evaluation well after the injury occurred.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 108 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 108.

109.    For her own safety, she decided to quit the team rather than participate in the same drills that caused her concussion.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 109 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 109.

110.    Kunhardt's performance in certain classes also suffered as a result of the concussion.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 110 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 110.

111.    Kunhardt believes that all former student-athletes should have access to medical monitoring - regardless of the sport they played.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 111 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 111.

112. Kunhardt understands that it is not practical for medical personnel to be present at
all non-contact sports games. However, it is important to her that, if a concussion occurs at a
non-contact sports event, that a student-athlete obtain medical clearance prior to returning to
play. It is also important to her that student-athletes, coaches, and athletic trainers receive
concussion education before each season, decreasing the likelihood that injured athletes are
returned to play too soon.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 112 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 112.

113. Kunhardt believes that all concussed student-athletes, regardless of sport, obtain
medical clearance prior to returning to play. She is convinced her symptoms could have been
alleviated if she had promptly been evaluated by a physician and withheld from play until she
fully recovered. Kunhardt also believes that the NCAA should provide education for faculty
regarding academic accommodations for student-athletes suffering from concussions is also very
important [sic]. Following her injury, it was extremely difficult to focus and study which caused
her to struggle with classes and school work.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 113 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 113.

114. Like other former student-athletes, Plaintiff Kunhardt played an NCAA sport
during a time when the NCAA's concussion-management and return-to-play guidelines did not

meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**ANSWER:**

The NCAA denies the allegations in Paragraph 114.

**K.    Plaintiff Miller**

115.    Jessica Miller is a current student-athlete at Seattle Pacific University.  She is a senior and a member of the women's volleyball team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 115 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 115.

116.    Miller believes that all schools should have the same return-to-play standards, and implement baseline testing.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 116 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 116.

117.    During her career, Miller suffered a concussion while playing volleyball and also witnessed a teammate suffer a concussion as a result of being hit in the head with a ball. Therefore, she thinks that all current or former student-athletes should have access to medical monitoring.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 117 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 117.

118.     Like other current student-athletes, Plaintiff Miller has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**ANSWER:**

The NCAA denies the allegations in Paragraph 118.

119.     In sum, while playing NCAA sports, the NCAA did not encourage Plaintiffs or other student-athletes to report or complain about their physical well-being, did not thoroughly educate or warn Plaintiffs or other student-athletes of the long-term effects of concussions, and did not thoroughly educate Plaintiffs, or other student-athletes about head-injury prevention. Moreover, the NCAA did not provide baseline testing before each season to identify and manage a concussion once it occurred and failed to conduct any follow up with players forced to stop playing as a result of concussions.  As a result, Plaintiffs and the members of the Class have or may have suffered physical injury, including post-concussion syndrome or Chronic Traumatic Encephalopathy, symptoms of which may not manifest until the future.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 119 regarding Plaintiffs' alleged injuries and,

on that basis, denies them and demands strict proof thereof.  The NCAA affirmatively states that

it encourages student-athletes to report suspected injuries to their schools' athletic and/or medical

personnel.  The NCAA further states that under the NCAA Constitution, each member institution

is responsible for protecting the health of its student-athletes.  Except as expressly admitted, the

NCAA denies any and all remaining allegations in Paragraph 119.

**L.     Defendant**

120.     Defendant National Collegiate Athletic Association is an unincorporated association that acts as the governing body of college sports.  Its principal office is located in Indianapolis, Indiana.  According to its website, the NCAA oversees 88 championships in 23 sports.  There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities within the NCAA.  Through various licensing programs, the NCAA takes in, on average, over $750 million in revenues each year.

**ANSWER:**

The statements on the NCAA's website speak for themselves, and to the extent that the allegations in Paragraph 120 vary therewith, the NCAA denies those allegations. The NCAA admits that it is an unincorporated association. The NCAA further admits that its principal office is in Indianapolis, Indiana. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 120.

**M.      Reported Concussion Injuries of Other Student-Athletes**

121.      The Plaintiffs are just examples of thousands of athletes that suffer concussions and are returned to play symptomatic or are returned to play before they have fully recovered from their concussion. Some additional examples follow, and their stories are typical of the NCAA's concussion problem and:

(a)      the NCAA's failure to conduct baseline testing prior to a student-athlete's participation;

(b)      the NCAA's failure to educate athletic departments and trainers;

(c)      the NCAA's failure to educate athletes;

(d)      the NCAA's failure to warn of long-term risks;

(e)      the NCAA's failure to guarantee a safe playing environment;

(f)      the NCAA's failure to have proper return-to-play guidelines;

(g)      the NCAA's failure to provide adequate post-concussion care; and

(h)      the NCAA's failure to provide adequate insurance coverage.

**ANSWER:**

The NCAA incorporates its answers to Paragraphs 21-119 regarding Plaintiffs as and for its answer to Paragraph 121. The NCAA denies any remaining allegations in Paragraph 121.

**1.      Preston Plevretes**

122.      In 2005, Preston Plevretes was a 19-year-old sophomore starting linebacker at Division I La Salle University in Philadelphia, Pennsylvania.[7] In October 2005, Plevretes sustained a concussion during a football practice. Subsequently, he reported to the coaching staff that he had been having headaches since the practice. Plevretes went to the Student Health

---

[7]      Andrew B. Carrabis, *Head Hunters: The Rise of Neurological Concussions in American Football and Its Legal Implications*, J. SPORTS & ENTM'T LAW (2011) 2:371-386, 381-383, *available at* harvardjsel.com/wp-content/uploads/2011/06/Carrabis.pdf. *See also The NCAA Takes Stronger Action* in *Concussion in Athletes: Where We Are and What to Do Now?*, Jackson Lewis (Jan. 2010), *available at* http://www.jacksonlewis.com/resources.php?NewsID=3869.

Center at La Salle after the game and was examined by a nurse who explained that he had, in fact, sustained a Grade 1 concussion. Plevretes was cleared to play on October 16, 2005.

**ANSWER:**

The NCAA admits that La Salle University is a member of the NCAA's Division I. The materials referenced Paragraph 122 speak for themselves, and to the extent that the allegations in Paragraph 122 vary therewith, the NCAA denies those allegations. The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 122 and, on that basis, denies them and demands strict proof thereof.

123. On November 5, 2005, Plevretes suffered a second helmet-to-helmet collision at a game at Duquesne University. During a play, Plevretes was momentarily knocked unconscious. After regaining consciousness, Plevretes collapsed and then lapsed into a coma due to swelling of the brain. Upon arrival at the hospital, Plevretes's brain was so swollen that part of his skull had to be removed. Plevretes now needs constant treatment and has difficulty walking and speaking.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 123 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 123.

124. On November 2, 2006, Plevretes filed a personal injury lawsuit against La Salle, Duquesne, and their respective physicians, athletic trainers, and football staff and players "alleging that the severity of [Preston's] injury was caused, or at least aggravated, by an earlier concussion he suffered during a prior game [rendering Preston] more vulnerable to the second, catastrophic blow."[8] Dr. Robert Cantu served as Plevretes's medical expert and testified that Plevretes's erratic on-field behavior, combined with the excessive bleeding, point to second-impact syndrome: "'[h]e enters the game symptomatic (for concussion). That sets him up for

---

[8] *Id.* at n.1.

another injury causing this malignant brain swelling,' he [Cantu] said."[9]  The case ultimately settled for $7.5 million.

**ANSWER:**

The material referenced in Paragraph 124 speaks for itself, and to the extent that the allegations in Paragraph 124 vary therewith, the NCAA denies those allegations.  The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 124 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 124.

### 2.    James Hilaire

125.    James Hilaire is a resident of the state of Connecticut and was formerly a student at the University of New Haven ("UNH") where he was a member of the soccer team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 125 and, on that basis, denies them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 125.

126.    Before attending UNH in the fall of 2006, Hilaire played high school soccer at Stamford High School in Connecticut where he shined as a goalie for his high school team. Following high school and obtaining his associates degree at a local community college, Hilaire was recruited to play as a goalie for the University of New Haven Men's soccer team on a partial athletic scholarship.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 126 and, on that basis, denies them and

---

[9]    *Id*. at n.2.

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 126.

127. On October 26, 2006, Hilaire sustained his first concussion during a conference final game for UNH. While attempting to make a save, he dove for a ball in the manner that he had been trained. During this save attempt, he was kneed in the head by an opposing player and was knocked unconscious. Upon regaining consciousness, Hilaire was asked a series of questions such as "Where are you?" and "What day is it?" by the trainer. Despite the fact that he had been knocked unconscious, Hilaire was allowed to continue participating in the game and played the remainder of the game in its entirety. Following this concussion, Hilaire did not receive any other tests or assessments nor any follow-up treatment despite the fact that Hilaire experienced painful headaches during the remainder of the game as well as following the game.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 127 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 127.

128. During a September 24, 2008 game, an opposing player's knee hit Hilaire in the face causing him to bounce along the turf, breaking Hilaire's jaw and knocking him unconscious. This injury put Hilaire in a life-threatening coma for eight days during which doctors struggled to save his life and even told his coaches that he "might not make it." Hilaire spent the remainder of the school year in treatment and rehabilitation. Shortly after the 2008 injury however, UNH revoked Hilaire's athletic scholarship and, as a result, the remainder of his tuition was subsidized by student loans.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 128 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 128.

129. Hilaire is still recovering from this injury today. He has limited movement of his right hand and still experiences numbness on the right side of his body. Hilaire is responsible for the cost of his ongoing treatment related to the injury and continues to incur out-of-pocket costs.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 129 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 129.

130.    Despite his injuries, Hilaire returned to UNH and obtained a degree in criminal
justice and graduated with a 3.4 overall grade point average.  The injuries he suffered while
playing soccer at UNH made it extremely difficult to concentrate and hard to focus and therefore,
Hilaire consistently had to ask for extra and special help in his studies.  He could not read or
study for long stretches of time.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 130 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 130.

 **3.    Catherine Varner**

131.    In the spring of 2010, Catherine Varner, a lacrosse midfielder, suffered a stick
check to the head.[10] After the hit, she rose to her feet slowly, stunned and visibly shaking.[11]
Varner was a student-athlete at Agnes Scott College,[12] a NCAA Division-III institution.  Checks
to the head are illegal in NCAA women's lacrosse, but because this hit was not especially
egregious, Varner simply took possession of the ball and play resumed.[13]  She finished the rest of

---

[10]    Catherine Varner, *Letting Go of Lacrosse:  Catherine Varner's Story*, THE CONCUSSION BLOG
(May 3, 2011), http://theconcussionblog.com/2011/05/03/letting-go-of-lacrosse-catherine- varners-story/
(recounting details of the game in which the student-athlete suffered the concussion).  Unlike in men's
lacrosse, women's lacrosse players wear goggles, which protect against eye injury, but they do not wear
helmets.  *See About the Sport*, USLACROSSE.ORG,
http://www.uslacrosse.org/UtilityNav/AboutTheSport/SportsScienceandSafety/Approved
EyewearList.aspx (last updated June 29, 2011).

[11]    *See* Varner, *supra* n.10 (characterizing player's recollection of post-hit impressions).

[12]    Agnes Scott College is a Division III NCAA member institution.  *See* AGNES SCOTT
ATHLETICS, http://www.agnesscott.edu/athletics (last visited June 16, 2012).

[13]    *See* Varner, *supra* n.10 (explaining how the head check appeared to be a "normal" foul, requiring
only that the offending player be removed from the field).

the first half, and played the entire second half, though she continued to experience nausea and sensitivity to light.[14]

**ANSWER:**

The NCAA admits that Agnes Scott College is a member of the NCAA's Division III and that checks to the head are illegal in NCAA women's lacrosse. The material referenced in Paragraph 131 speaks for itself, and to the extent that the allegations in Paragraph 131 vary therewith, the NCAA denies those allegations. The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 131 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 131.

132. The lacrosse player had suffered a Grade 2 concussion, which is characterized by transient confusion and mental-status abnormalities that last for more than 15 seconds.[15] Varner's coach was concerned, but, like many student-athletes, Varner brushed herself off and readied herself to return to the game, dazed, with slower processing speed and susceptibility to additional head trauma.[16] Following the game, Varner continued to experience nausea and moodiness.[17] The next day, she went to her school's Health Center and described her symptoms. She complained of a splitting headache, nausea, and tremors, but no one considered the possibility that she had a concussion.[18] Varner even played in the last game of the season the following day, though she had no recollection of playing after the fact.[19]

---

[14]    *See* Varner, *supra* n.10 (describing player's symptoms).

[15]    *See* AM. ACAD. OF NEUROLOGY QUALITY STANDARD SUBCOMM., *Practice Parameter: The Management of Concussion in Sports (Summary Statement)*, 48 NEUROLOGY 581, 582 (1997), *available at* http://www.neurology.org/content/48/3/581.full.html (last updated Sept. 16, 2011) (describing Grade 2 concussion) (hereinafter *AAN Statement*).

[16]    *See* Varner, *supra* n. 10 (recalling player's criticism of herself for shaking, brushing off coach's concerns:  "I just wanted to be left alone and to be able to block out what I was feeling so that we could finish the game and go home.").

[17]    *See id.* (reciting player's strange behaviors, such as crying to her mother, snapping at her teammates and trainers).

[18]    *See id.* (noting Health Center's suggestion that player might have been experiencing an allergic reaction to medication).

[19]    *Id.*

**ANSWER**:

The material referenced in Footnotes 15 through 19 and Paragraph 132 speaks for itself, and to the extent that the allegations in Paragraph 132 vary therewith, the NCAA denies those allegations. The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 132 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 132.

133.    In the weeks following the hit, Varner struggled to complete her remaining coursework for the semester.[20] She experienced difficulty in retaining information, focusing, reasoning, following directions, balancing, exercising, and recognizing her surroundings.[21] In the months that followed, as her symptoms worsened, she spent her time searching for ways to relax and lift her mood, and let her body heal.[22] Finally, three months after her symptoms started, Varner's mother suggested that she might have suffered a concussion from the hit.[23]

Varner saw a concussion specialist and took an ImPACT test, which confirmed and officially diagnosed the concussion.[24]

**ANSWER**:

The material referenced in Footnotes 20 through 24 and Paragraph 133 speaks for itself, and to the extent that the allegations in Paragraph 133 vary therewith, the NCAA denies those allegations. The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 133 and, on that basis, denies

---

[20]    *See id*. (describing how papers took "much longer than usual" and "all had a slightly incoherent element").

[21]    *See id*. (indicating student-athlete's difficulty expressing herself coherently in papers, following sequences of driving directions, and exiting a three-story parking garage).

[22]    *See id*. (listing Varner's attempts to improve her "foul mood").

[23]    *Id*.

[24]    *See id*. (relaying doctor's diagnosis and prediction that Varner should feel better "sometime after three to six months" with rest).

them and demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 133.

### 4. Additional examples of improper steps to make players safe regarding concussions in eleven NCAA sports and statistics evidencing a class-wide problem.

134.    Examples of the concussion problem in the NCAA student-athlete body continued throughout 2012.  According to a report by the National College Players Association ("NCPA"), the 2012 season was "studded with examples of questionable treatment of players with potential head injuries, stating:

> Two weeks ago, Florida State quarterback E.J. Manuel needed to be helped off the field after taking a vicious hit to the head against Florida.  Manuel returned to the game after an abbreviated medical examination, and FSU coach Jimbo Fisher later claimed farcically that Manuel had suffered an abdominal injury.  In a game against Utah earlier this year, USC wide receiver Robert Woods stumbled and fell while trying to run to the sidelines after taking a helmet-to-helmet hit.  Woods missed just one play.  In another Pac-12 game, Arizona quarterback Matt Scott puked on the field after getting hit in the head, leading ESPN announcers Matt Millen and Joe Tessitore to plead on the air for him to be taken out.  But Scott stayed in, getting pulled only after that series was complete.  In the Wildcats' next game, Scott suffered another concussion.  After taking a week off, the quarterback returned to action and was shown barfing on the sidelines against Utah.[25]

**ANSWER:**

The material referenced in Footnote 25 and Paragraph 134 speaks for itself, and to the

extent that the allegations in Paragraph 134 vary therewith, the NCAA denies those allegations.

The NCAA is without knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations contained in Paragraph 134 and, on that basis, denies them

and demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 134.

135.    The examples provided above do not scratch the surface of the problem, but are merely illustrative.  In fact, the NCAA reports:

---

[25]    http://www.ncpanow.org/news_articles?id=0048.

- Data from the NCAA Injury Surveillance System (ISS) for the period 1994-96 estimated that more than 1,500 concussions occur annually in college football. Nine of every 10 head injuries in the sport are reported as concussions;

- "In the years 2000 to 2002, the rate of concussion during games per 1,000 athlete exposures for football was 3.1, for men's ice hockey 2.4, for men's wrestling 1.6, for men's lacrosse, 1.4, for women's ice hockey 2.4, for women's soccer 2.1, for men's soccer 1.7, for field hockey 0.8, for women's lacrosse 0.8, for women's basketball 0.7, and for men's basketball 0.5, accounting for between 6.4 and 18.3 percent of the injuries for these sports as reported by the NCAA Injury Surveillance System (ISS)."[26]

- "In the years 2004 to 2009, the rate of concussion during games per 1,000 athlete exposures for football was 3.1, for men's lacrosse 2.6, for men's ice hockey 2.4, for women's ice hockey 2.2, for women's soccer 2.2, for wrestling 1.4, for men's soccer 1.4, for women's lacrosse 1.2, for field hockey 1.2, for women's basketball 1.2, and for men's basketball 0.6, accounting for between 4 and 16.2 percent of the injuries for these sports as reported by the NCAA Injury Surveillance Program by the Datalys Center."[27]

- "Our data reports record concussion injury rates in football since 1986."[28]

**ANSWER:**

The material referenced in Footnotes 26 through 28 and Paragraph 135 speaks for itself, and to the extent that the allegations in Paragraph 134 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 135.

136.    Thus, the NCAA has express knowledge that the examples provided above are just a miniscule portion of the number of student-athletes that have suffered concussions while playing intercollegiate sports.

**ANSWER:**

The NCAA denies the allegations in Paragraph 136.

---

[26]    2007-08 Handbook, at NCAA00012928.

[27]    2010-11 Handbook, at 52.

[28]    Email from David Klossner (NCAA) dated June 19, 2007, NCAA10022589.

# IV.    FACTUAL BACKGROUND

## A.    The NCAA Had a Duty to Protect and Safeguard Student-Athletes

137.    College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which comprise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

**ANSWER:**

The NCAA Constitution, Operating Bylaws and Administrative Bylaws referenced in

Paragraph 137 speak for themselves, and to the extent the allegations in Paragraph 137 vary

therewith, the NCAA denies those allegations.  The NCAA denies any and all remaining

allegations in Paragraph 137.

138.    The NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for member schools.[29]  The NCAA promulgates sport-specific standards through its Playing-Rules Committees, which write the rules for 15 of the 23-three men's and women's sports that it regulates.[30]  The playing-rules committees are comprised primarily of coaches, who act as consultants to the Association in the event that any "major changes" to the rules are considered. However, the primary responsibility for developing and interpreting the rules falls to the secretary-rules editor.

**ANSWER:**

The material referenced in Footnotes 29 and 30 and Paragraph 138 speaks for itself, and

to the extent the allegations in Paragraph 138 vary therewith, the NCAA denies those allegations.

The NCAA denies any and all remaining allegations in Paragraph 138.

139.    The NCAA also publishes a Sports Medicine Handbook (the "*Handbook*"), which includes policies and guidelines for the treatment and prevention of injury, as well as return-to-play instruction.  The Handbook is also produced annually and sent directly to head athletic

---

[29]    *See Bowers v. NCAA*, 974 F. Supp. 459, 461 (D.N.J. 1997) (explaining NCAA Governing legislation).

[30]    *See* NCAA, *Playing Rules*, http://www.ncaa.org/wps/wcm/connect/public/Test/lssues/ Issues+Landing+Page (last visited June 17, 2012) (defining "playing rules" as "regulations governing recruiting, eligibility, financial aid, amateurism, and other such categories").

trainers, as well as various individuals at NCAA member institutions. It is not sent directly to the entire athletic trainer staff or to student-athletes, but it is made available online to athletics directors, senior administrators, faculty athletics representatives, other athletic trainers, student-athlete advisory committees at each member institution, and conference commissioners.[31]

**ANSWER:**

The material referenced in Footnote 31 and Paragraph 139 speaks for itself, and to the

extent the allegations in Paragraph 139 vary therewith, the NCAA denies those allegations. The

NCAA denies any and all remaining allegations in Paragraph 139.

> **1.    The NCAA Constitution declares that the NCAA will control intercollegiate sports to protect the physical and educational well-being of student-athletes.**

140.    The NCAA Constitution clearly defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:

> (a)   To initiate, stimulate and improve intercollegiate athletics programs for student athletes….;

> (b)   to uphold the principal [sic] of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;….

NCAA Const., Art.1, § 1.2(a),(b). The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation."[32]

**ANSWER:**

The material referenced in Footnote 32 and Paragraph 140 speaks for itself, and to the

extent the allegations in Paragraph 140 vary therewith, the NCAA denies those allegations. The

NCAA denies any and all remaining allegations in Paragraph 140.

---

[31]    *Id.*

[32]    NCAA Const., Art. 1, § 1.3.2.

141.    Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides in pertinent part:

**2.2     THE PRINCIPLE OF STUDENT-ATHLETE WELL- BEING**

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well- being of student-athletes. *(Revised: 11/21/05.)*

\*        \*        \*

**2.2.3  Health and Safety.**  It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes.  *(Adopted:  1/10/95.)*

**ANSWER:**

The material referenced in Paragraph 141 speaks for itself, and to the extent the

allegations in Paragraph 141 vary therewith, the NCAA denies those allegations.  The NCAA

denies any and all remaining allegations in Paragraph 141.

142.    In fact, the NCAA Constitution mandates that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience."  NCAA Const., Art. 2, § 2.2.1 *(Adopted:  1/10/95).*

**ANSWER:**

The material referenced in Paragraph 142 speaks for itself, and to the extent the

allegations in Paragraph 142 vary therewith, the NCAA denies those allegations.  The NCAA

denies any and all remaining allegations in Paragraph 142.

143.    To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations...."[33]

---

[33]    NCAA Const., Art. 2, § 2.8.2.

**ANSWER:**

The material referenced in Footnote 33 and Paragraph 143 speaks for itself, and to the

extent the allegations in Paragraph 143 vary therewith, the NCAA denies those allegations.  The

NCAA denies any and all remaining allegations in Paragraph 143.

> **2.      The NCAA has publicly acknowledged its duty to protect the health
> and safety of student-athletes.**

144.      The NCAA has consistently recognized its duty to provide a safe environment for
student-athletes.  For example, the NCAA's website states:  "Part of the NCAA's core mission is
to provide student-athletes with a competitive environment that is safe and ensures fair play.
While each school is responsible for the welfare of its student-athletes, the NCAA provides
leadership by establishing safety guidelines, playing rules, equipment standards, drug testing
procedures and research into the cause of injuries to assist decision making.  By taking proactive
steps to student-athletes' health and safety, we can help them enjoy a vibrant and fulfilling
career."[34]

**ANSWER:**

The material referenced in Footnote 34 and Paragraph 144 speaks for itself, and to the

extent the allegations in Paragraph 144 vary therewith, the NCAA denies those allegations.  The

NCAA affirmatively states that it strives to enhance player safety but the remaining allegations

in Paragraph 144 state a legal conclusion to which no response is required.  To the extent a

response is required, the NCAA denies that as an organizer of sports, it is legally obligated to

eliminate the inherent risk of injury to voluntary participants in sports.  The NCAA denies any

and all remaining allegations in Paragraph 144.

145.      Thus, the NCAA maintains The Committee on Safeguards and Medical Aspects
of Sports, which is publicly touted by the NCAA as "serv[ing] to provide expertise and
leadership to the NCAA in order to provide a healthy and safe environment for student-athletes
through research, education, collaboration and policy development."[35]

---

[34]      http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/index.html (last visited
Jan. 31, 2013).

[35]      http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/.

**ANSWER**:

The NCAA admits that it maintains a Committee on Safeguards and Medical Aspects of Sports. The material referenced in Footnote 35 and Paragraph 145 speaks for itself, and to the extent the allegations in Paragraph 145 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 145.

146.    The NCAA promises its athletes a safe environment as recently as August 27, 2012, where its website states:

> The NCAA takes appropriate steps to modify safety guidelines, playing rules and standards to minimize those risks and provide student athletes with the best opportunity to enjoy a healthy career. The injury surveillance program collects, analyzes, interprets and disseminates data on injuries in each sport, providing a wealth of information through which we can provide athletes with a safe competitive environment.

**ANSWER**:

The material referenced in Paragraph 146 speaks for itself, and to the extent the allegations in Paragraph 146 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 146.

147.    One of the NCAA's "core concepts and priorities" was to use its knowledge to promote health and safety:

> The NCAA has been conducting injury surveillance for more than 20 years. Over time, the underlying principle of the program has remained unchanged -- to promote and support student athlete health and safety.[36]

**ANSWER**:

The material referenced in Footnote 36 and Paragraph 147 speaks for itself, and to the extent the allegations in Paragraph 147 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 147.

---

[36]    NCAA10107716

148.    In fact, the NCAA explains on its website how it promises to use the injury surveillance data it collects:

How does [the injury surveillance data] help prevent sports injuries?

Once we know how they occur we can take the necessary steps to reduce student-athletes' exposure to situations that cause injuries. For instance, we can make adjustments to rules – such as eliminating tackling techniques in football or high-sticking in ice hockey – to reduce situations that expose student-athletes to high risks of injury. Or we can adjust equipment requirements and standards to increase safety.[37]

**ANSWER:**

The material referenced in Footnote 37 and Paragraph 148 speaks for itself, and to the

extent the allegations in Paragraph 148 vary therewith, the NCAA denies those allegations. The

NCAA denies any and all remaining allegations in Paragraph 148.

### 3.    The NCAA promulgates annual guidelines for the protection of student- athletes' health and well-being.

149.    On an annual basis, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports publishes ("Medical Committee") the NCAA Sports Medicine Handbook ("Handbook") "to formulate guidelines for sports medicine care and protection of student-athletes' health and safety" and "to assist member schools in developing a safe intercollegiate athletic program"[38] The Medical Committee recognizes that the Handbook "may constitute some evidence of the legal standard of care." The Handbook expressly recognizes that "student-athletes *rightfully assume* that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."[39]

**ANSWER:**

The material referenced in Footnotes 38 and 39 and Paragraph 149 speaks for itself, and

to the extent the allegations in Paragraph 149 vary therewith, the NCAA denies those allegations.

The NCAA denies any and all remaining allegations in Paragraph 149.

150.    In discussing the "Shared Responsibility for Intercollegiate Sports Safety," the NCAA states that:

---

[37]    http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/.

[38]    The 2010-11 NCAA Sports Medicine Handbook, at 2.

[39]    *Handbook*, at 4 (emphasis added).

- 57 -

In an effort to do so [i.e. take reasonable precautions to minimize the risks of injury from athletics participation], the NCAA collects injury data in intercollegiate sports. When appropriate, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports makes recommendations to modify safety guidelines, equipment standards, or a sport's rules of play.[40]

**ANSWER:**

The material referenced in Footnote 40 and Paragraph 150 speaks for itself, and to the extent the allegations in Paragraph 150 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 150.

151. Thus, the NCAA has described, time and again, its responsibility for the health and well-being of student-athletes.

**ANSWER:**

The allegations in Paragraph 151 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA affirmatively states that that under the NCAA Constitution, each member institution is responsible for protecting the health of its student-athletes. The NCAA denies any and all remaining allegations in Paragraph 151.

**B.      A Primer on Concussions**

**1.      Concussions and what they cause.**

152. The brain is made of soft tissue and is cushioned by spinal fluid. It is encased in the hard, protective skull. When a person gets a head injury, the brain can slosh around inside the skull and even bang against it. This can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves. When this happens, a person can get a concussion – a temporary loss of normal brain function.

**ANSWER:**

The NCAA admits the allegations in Paragraph 152.

---

[40]     *Handbook*, at 4.

153.    Concussions and other brain injuries are fairly common.  One of the most common reasons people get concussions is through a sports injury.  High-contact sports such as football, boxing, soccer, and hockey pose a higher risk of head injury, even with the use of protective headgear:



**ANSWER:**

The material referenced in Paragraph 153 speaks for itself, and to the extent that the allegations in Paragraph 153 vary therewith, the NCAA denies those allegations.  The NCAA denies any and all remaining allegations in Paragraph 153.

154.    Men are more likely to get concussions than women.  However, in certain sports, like soccer, girls have a higher potential for concussion.  Below is a depiction of how a concussion occurs in athletics:

- 59 -



**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 154 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 154.

155.    The Brain Injury Association of America and the Centers for Disease Control and
Prevention estimate that up to 3.8 million sports- and recreation-related concussions occur in the
United States each year. That makes concussions the most common type of brain injury.[41]  The
reason for the frequency is due to the brain's somewhat precarious placement within the skull.
Surrounded by fluid, it is normally suspended within the skull's bony structure. In everyday
activity, this fluid is sufficient to protect the brain from crashing against the skull, but there is a
low threshold of impact necessary to cause damage, and athletes, in particular, frequently induce
this threshold.[42]  For example, when an athlete sustains a sudden blow to the head, or if the head

---

[41]     Interview:  Concussions, An Overlooked Epidemic, Interview by Diane Rehm with Dr. Gerard
Gioia, Children's National Medical Center, in Washington, DC (Sept. 12, 2011), transcript *available at*
http://thedianerehrnshow.orglshows/2011-09-12/concussions-overlooked- epidemic/transcript.

[42]     *See id.* (describing how the brain is "floating around in fluid and it's not anchored" in the skull).

whips around too quickly, the brain is jolted within the surrounding fluid, and knocked against the inside of the skull.

**ANSWER:**

The material referenced in Footnotes 41 and 42 and Paragraph 155 speaks for itself, and to the extent that the allegations in Paragraph 155 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 155.

156. Some experts have described the impact of a concussion with more vivid analogies. Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100 gs: in effect, the player [who sustained two hits above 80-gs,] had two car accidents that morning."

**ANSWER:**

The material referenced in Paragraph 156 speaks for itself, and to the extent the allegations in Paragraph 156 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 156.

157. The Institute for Preventative Sports Medicine likens the effect to mashing up Jell-O:

Put a piece of saran wrap over a bowl of jello [*sic*] …. That jello [*sic*] is your brain. Now shake the bowl pretty vigorously. You see the bits of jello [*sic*] stuck to the sides of the bowl and the saran wrap? That's the bruising that occurs, the tearing of the nerve tissue. That's how folks get injured.[43]

**ANSWER:**

The material referenced in Footnote 43 and Paragraph 157 speaks for itself, and to the extent the allegations in Paragraph 157 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 157.

---

[43] Alexander Hecht, Article, *Legal and Ethical Aspects of Sports-Related Concussions: The Merril Hoge Story*, 12 SETON HALL J. SPORTS & ENT. L. 17, 23 (2002).

158.    Both analogies emphasize the severity of the impact on the brain.  As Dr. Bennet Omalu, co-founder of the Brain Injury Research Institute at West Virginia University notes, "there is no such thing as a mild concussion." [44]

**ANSWER:**

The material referenced in Footnote 44 and Paragraph 158 speaks for itself, and to the

extent the allegations in Paragraph 158 vary therewith, the NCAA denies those allegations.  The

NCAA denies any and all remaining allegations in Paragraph 158.

### 2.    Signs and symptoms of concussions.

159.    The general public, including student-athletes, may not recognize the signs of a concussion.  And because of that, student-athletes may put themselves at risk for another injury.  For example, players may return to a game before they should, thinking nothing is wrong.  That is a problem because if a player's brain has not healed properly from a concussion and the player then receives another brain injury (even if it is with less force), it can be serious.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 159 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 159.

160.    Repeated injury to the brain can lead to swelling, and sometimes people develop long-term disabilities, or even die, as a result of serious head injuries.  It is therefore very important to recognize and understand the signals of a concussion.

**ANSWER:**

The NCAA admits that in certain instances and depending upon a number of individual

factors that vary, repeated injury to the brain can lead to swelling or other long-term issues.  The

NCAA denies any and all remaining allegations in Paragraph 160.

---

[44]    Associated Press, *Expert: Bench Youths After Concussions*, ESPN (Feb. 1, 2010, 9:29 PM), http://sports.espn.go.com/ncf/news/story? id=4877480.  Dr. Benet Omalu, a major neuropathologist, who is researching athletes and chronic traumatic encephalopathy (CTE) has testified before the House Judiciary Committee in hearings on head injuries in sports.  *Id.*

161.    Although a concussion is commonly perceived as causing loss of consciousness (passing out), a person can have a concussion and never lose consciousness.

**ANSWER:**

The NCAA admits that each person's concussion is different and that a person can sustain a concussion without losing consciousness.  Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 161.

162.    As college coaches, trainers, and the NCAA know or should know, symptoms of a concussion may include:

"seeing stars" and feeling dazed, dizzy, or lightheaded;

memory loss, such as trouble remembering things that happened right before and after the injury;

nausea or vomiting;

headaches;

blurred vision and sensitivity to light;

slurred speech or saying things that don't make sense;

difficulty concentrating, thinking, or making decisions;

difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

feeling anxious or irritable for no apparent reason; or

feeling overly tired.

**ANSWER:**

The NCAA admits that Paragraph 162 lists some symptoms that may be associated with concussions.  The NCAA affirmatively states that each concussion is different, and the symptoms associated with a concussion as well as causes and contributing factors may vary from individual to individual.  Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 162.

### 3.    *Second-Impact Syndrome.*

163.    When athletes who have sustained a concussion return to competition too soon, they risk the occurrence of Second-Impact Syndrome ("SIS"), a condition that can be instantly

fatal.[45] SIS occurs when an athlete sustains a second blow to the head before the symptoms from the first concussion have subsided, or before the brain has fully recovered. The second injury may occur within minutes, days, or even weeks after the first, and still have a devastating effect.

**ANSWER:**

The material referenced in Footnote 45 and Paragraph 163 speaks for itself, and to the

extent that the allegations in Paragraph 163 vary therewith, the NCAA denies those allegations.

The NCAA denies any remaining allegations in Paragraph 163.

164.    Even a relatively light hit, if sustained during this vulnerable post-concussion period, may spark the onset of SIS. The second impact causes rapid swelling of the brain, resulting in cerebral edema. When the brain swells, the pressure inside the skull increases, preventing blood flow to the brain and decreasing the brain's essential oxygen levels.[46]

**ANSWER:**

The material referenced in Footnote 46 and Paragraph 164 speaks for itself, and to the

extent that the allegations in Paragraph 164 vary therewith, the NCAA denies those allegations.

The NCAA denies any and all remaining allegations in Paragraph 164.

### 4.    What doctors do.

165.    If a doctor suspects that someone may have a concussion, he or she will ask about the head injury – such as how it happened and when – and the symptoms. The doctor may ask what seem like silly questions – things like "Who are you?" or "Where are you?" or "What day is it?" and "Who is the president?" Doctors ask these questions to check the person's level of consciousness and memory and concentration abilities.

---

[45]    *See AAN Statement*, *supra* n.15, at 581 (recognizing cumulative damage of multiple concussions); *Handbook*, *supra* ¶ 37, at 53 ("There are potentially serious complications of multiple or severe concussions, including second impact syndrome, postconcussive syndrome, or post-traumatic encephalopathy"); *see also* Sean Gregory, *Study: Kids Competing Too Soon After Concussions*, TIME (Jan. 21, 2009), http://www.time.com/time/magazine/article/0.9171.1873131,00.html (reporting on concussion study by the Center for Injury Research and Policy at Nationwide Children's Hospital that found half of concussed student-players returned too soon to play).
[46]    *See Brain and Nervous System Health Center: Brain Swelling,* WebMD, http://www.webmd.comlbrainlbrain-swelling-brain-edema-intracranial-pressure?print=true (last updated Mar. 2, 2010) (describing brain swelling).

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 165 and, on that basis, denies them and demands strict proof thereof. The NCAA affirmatively states that each concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 165.

166. The doctor will perform a thorough examination of the nervous system, including testing balance, coordination of movement, and reflexes. The doctor may ask the patient to do some activity such as running in place for a few minutes to see how well the brain functions after a physical workout.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 166 and, on that basis, denies them and demands strict proof thereof. The NCAA affirmatively states that each concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 166.

167. Sometimes a doctor may order a CT scan (a special brain X-ray) or an MRI (a special non-X-ray brain image) to rule out bleeding or other serious injury involving the brain.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 167 and, on that basis, denies them and demands strict proof thereof. The NCAA affirmatively states that each concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 167.

168. If the concussion is not serious enough to require hospitalization, the doctor will give instructions on what to do at home, like having someone wake the person up at least once during the night. If a person with a concussion cannot be easily awakened, becomes increasingly

confused, or has other symptoms such as vomiting, it may mean there is a more severe problem that requires contacting the doctor again.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 168 and, on that basis, denies them and demands strict proof thereof. The NCAA affirmatively states that each concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 168.

169.   The doctor will probably recommend that someone with a concussion take acetaminophen or other aspirin-free medications for headaches. The person also will have to take things easy at school or work.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 169 and, on that basis, denies them and demands strict proof thereof. The NCAA affirmatively states that each concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 169.

**5.     After a concussion.**

170.   After a concussion, the brain needs time to heal until all symptoms of a concussion have cleared up before returning to normal activities. The amount of time someone needs to recover depends on how long the symptoms last. Healthy teens can usually resume their normal activities within a few weeks, but each situation is different. A doctor should monitor the athlete closely to make sure it is appropriate to return to the game.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 170 and, on that basis, denies them and demands strict proof thereof. The NCAA affirmatively states that each concussion is

different and that appropriate treatment varies from individual to individual. The NCAA denies

any and all remaining allegations in Paragraph 170.

171.    Someone who has had a concussion and has not recovered within a few months is said to have post-concussion syndrome. The person may have the same problems described earlier – such as poor memory, headaches, dizziness, and irritability – but these will last for longer periods of time and may even be permanent.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 171 and, on that basis, denies them and

demands strict proof thereof. The NCAA affirmatively states that each concussion is different

and that the duration and severity of concussion symptoms vary from individual to individual.

The NCAA denies any and all remaining allegations in Paragraph 171.

172.    If someone has continuing problems after a concussion, the doctor may refer him or her to a rehabilitation specialist for additional help.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 172 and, on that basis, denies them and

demands strict proof thereof. The NCAA affirmatively states that each concussion is different

and that appropriate treatment varies from individual to individual. The NCAA denies any and

all remaining allegations in Paragraph 172.

**C.    Long-Term Effects**

173.    Concussions are often defined as "a head injury with a temporary loss of brain function," but recent studies and testimonies show that the loss of brain function is far from temporary. Although the precise long-term effects of concussions are unknown, research has revealed a significant correlation between generally decreased cognitive function and participation in contact sports. This revelation has led to a proactive response from many current and former athletes who believe in the profound significance of what the studies have revealed, because they have experienced it themselves: "repeated concussions can, some twenty years after the fact, have devastating consequences if left unrecognized and untreated."

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the remaining allegations contained in Paragraph 173 and, on that basis, denies them

and demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 173.

174. The two major contemporary studies of the long-term effects of concussions have been conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies have revealed the "devastating consequences" of repeated concussions, including an increased risk of depression, dementia, and suicide. Further, the studies have demonstrated the physiological effect of multiple hits on the brain, manifested by red flecks of protein deposits on the brain called chronic traumatic encephalopathy ("CTE"). Generally, these proteins appear when the brain is hit, and disappear as healthy brain cells devour them, leading to recovery. Yet, when the brain suffers too many blows, the brain cells cannot keep up with the protein and eventually give up and die, leaving just the red flecks associated with CTE.

**ANSWER:**

The material referenced in Paragraph 174 speaks for itself, and to the extent that the

allegations in Paragraph 174 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 174.

175. Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Waters and Nash killed themselves; Webster, homeless and cognitively impaired, died of heart failure; Strzelcyyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed "the telltale red flecks of abnormal protein" characteristic of CTE. Dr. McKee, of the Boston University Center has examined the brains of 16 former athletes, and found CTE in all of them. Their research demonstrates how devastating multiple concussions are to the brain and to human function, and reiterates the need for concussion awareness, management, and prevention.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 175 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 175.

**D.      Studies Ignored by the NCAA**

176.    For decades, the NCAA has been aware that multiple blows to the head can lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

**ANSWER:**

The NCAA denies the allegations in Paragraph 176.

177.    In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] … if they ke[pt] at the game long enough" (the "Martland study"). The article was published in the *Journal of the American Medical Association*. The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

**ANSWER:**

The material referenced in Paragraph 177 speaks for itself, and to the extent that the

allegations in Paragraph 177 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 177.

178.    In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

**ANSWER:**

The material referenced in Paragraph 178 speaks for itself, and to the extent that the

allegations in Paragraph 178 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 178.

179.    In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic

encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 179 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 179.

180. The recommendations were codified as rules of the New York State Athletic Commission.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 180 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 180.

181. In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

**ANSWER:**

The material referenced in Paragraph 181 speaks for itself, and to the extent that the allegations in Paragraph 181 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 181.

182. That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.*, recommending that players cease to play football after receiving their third concussion).

**ANSWER:**

The material referenced in Paragraph 182 speaks for itself, and to the extent that the allegations in Paragraph 182 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 182.

183.    In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 183 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 183.

184.    A 1963 study by Drs. Mawdsley & Ferguson published in Lancet found that some boxers sustain chronic neurological damage as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.

**ANSWER:**

The material referenced in Paragraph 184 speaks for itself, and to the extent that the allegations in Paragraph 184 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 184.

185.    A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

**ANSWER:**

The material referenced in Paragraph 185 speaks for itself, and to the extent that the allegations in Paragraph 185 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 185.

186.    In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading

medical expert in the treatment of head injuries, recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

**ANSWER**:

The material referenced in Paragraph 186 speaks for itself, and to the extent that the

allegations in Paragraph 186 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 186.

187.    In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing. This study outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

**ANSWER**:

The material referenced in Paragraph 187 speaks for itself, and to the extent that the

allegations in Paragraph 187 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 187.

188.    A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion. The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

**ANSWER**:

The material referenced in Paragraph 188 speaks for itself, and to the extent that the

allegations in Paragraph 188 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 188.

189.    In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram. By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 189 and, on that basis, denies them and

demands strict proof thereof. The NCAA denies any and all remaining allegations in

Paragraph 189.

190. In 1973, a potentially fatal condition known as "Second Impact Syndrome" – in which re-injury to the already concussed brain triggers swelling that the skull cannot accommodate – was identified. It did not receive this name until 1984. Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least 40 football players.

**ANSWER:**

The NCAA admits that some publications have described a condition called Second

Impact Syndrome. The NCAA is without knowledge or information sufficient to form a belief as

to the truth or falsity of the remaining allegations contained in Paragraph 190 and, on that basis,

denies them and demands strict proof thereof. Except as expressly admitted the NCAA denies

any and all remaining allegations in Paragraph 190.

191. Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

immediate retrograde memory issues occur following concussions;

mild head injury requires recovery time without risk of subjection to further injury;

head trauma is linked to dementia;

a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

**ANSWER:**

The material referenced in Paragraph 191 speaks for itself, and to the extent that the allegations in Paragraph 191 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 191.

192.    In 1997, the *NHL* instituted a concussion policy that included baseline testing.

**ANSWER:**

The material referenced in Paragraph 192 speaks for itself, and to the extent that the allegations in Paragraph 192 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 192.

193.    In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.

**ANSWER:**

The material referenced in Paragraph 193 speaks for itself, and to the extent that the allegations in Paragraph 193 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 193.

194.    In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second,

particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

**ANSWER:**

The material referenced in Paragraph 194 speaks for itself, and to the extent that the

allegations in Paragraph 194 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 194.

195. The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

**ANSWER:**

The material referenced in Paragraph 195 speaks for itself, and to the extent that the

allegations in Paragraph 195 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 195.

196. In 1986, Dr. Robert Cantu of the American College of Sports Medicine published *Concussion Grading Guidelines*, which he later updated in 2001.

**ANSWER:**

The material referenced in Paragraph 196 speaks for itself, and to the extent that the

allegations in Paragraph 196 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 196.

197. By 1991, three distinct medical professionals/entities – Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society – developed return-to-play criteria for football players suspected of having sustained head injuries.

**ANSWER:**

Any policies developed by Dr. Cantu speak for themselves. Likewise, any policies

developed by the Colorado Medical Society speak for themselves. The NCAA is without

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 197 and, on that basis, denies them and demands strict proof thereof.

198.    On May 15, 2000, a third-party organization called "SoccerDocs" wrote in to the US Consumer Product Safety Commission highlighting serious concerns: "1. There is a high risk of sustaining a concussion in soccer.  2. Amateur soccer players generally perform significantly more poorly on cognitive tests than control groups.  3. Additional studies must be undertaken in key areas with a focus on children.  4. ***Most importantly, preventative action can be taken now including:  (a) recommending that parents consider protective headgear for their children now that a range of products are on the market; (b) Consideration of other measures such as stricter return to play guidelines; improvements in proper technique among players; and proper enforcement of rules limiting dangerous play.***"[47]  The letter also highlights statistics demonstrating the high risk of sustaining a concussion in soccer and that "there is no doubt we need to gather additional data to complete the picture…For example, we do not know what levels of impact typically cause concussions…There is also a lack of knowledge about the symptoms which can be detected to identify concussion."[48]

**ANSWER:**

The material referenced in Footnotes 47 and 48 and Paragraph 198 speaks for itself, and

to the extent that the allegations in Paragraph 198 vary therewith, the NCAA denies those

allegations.  The NCAA denies any and all remaining allegations in Paragraph 198.

199.    A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

**ANSWER:**

The material referenced in Paragraph 199 speaks for itself, and to the extent that the

allegations in Paragraph 199 vary therewith, the NCAA denies those allegations.  The NCAA

denies any and all remaining allegations in Paragraph 199.

200.    In November 2001, the first international symposium on concussion in sport was held in Vienna.[49]  The goal was for a group of experts to provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries.[50]  The consensus

---

[47]    NCAA00002631-NCAA00002642.

[48]    NCAA00002632.

[49]    NCAA00007999-8012.

[50]    *Id.*

statement recommended return to play guidelines and that when a player shows ANY symptoms or signs of a concussion: "(1) the player should not be allowed to return to play in the current game or practice; (2) the player should not be left alone; and regular monitoring for deterioration is essential; (3) the player should be medically evaluated after the injury; (4) return to play must follow a medically supervised stepwise process."[51]

**ANSWER:**

The material referenced in Footnotes 49 through 51 and Paragraph 200 speaks for itself, and to the extent that the allegations in Paragraph 200 vary therewith, the NCAA denies those allegations. The NCAA admits that an international symposium on concussion in sport was held in Vienna in November of 2001. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 200.

201.    The statement also recommended a return to play stepwise process as follows: "(1) no activity, complete rest. Once asymptomatic, proceed to level (2); (2) light aerobic exercise such as walking or stationary cycling; (3) sport specific training – for example, skating in hockey, running in soccer; (4) non contact training drills; (5) full contact after medical clearance; (6) game play."[52] The statement also recommends education of athletes is "a mainstay of progress in this field."[53]

**ANSWER:**

The material referenced in Footnotes 52 and 53 and Paragraph 201 speaks for itself, and to the extent that the allegations in Paragraph 201 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 201.

202.    The NCAA did not act on these recommendations.

**ANSWER:**

The NCAA denies the allegations in Paragraph 202.

203.    Dr. Brian Halpern, the "Past President of the American Medical Society for Sports Medicine" wrote a letter to the NCAA announcing a shocking trend in field hockey -- that

---

[51]    *Id.* at 8001.

[52]    *Id.* at 8002.

[53]    *Id.*

neck and head injury and concussion percentages in field hockey games rank above 35%.[54] In the letter, Dr. Halpern officially requests that the NCAA look further into prevention of injuries above the neck in field hockey.[55]   In particular, the letter states that "This is an extremely high percentage of injuries that are potentially disabling and possibly life threatening at times … I'm surprised at the high percentage of injuries occurring in practices and games in field hockey gathered from your data of 2000-2002.[56]  The most interesting aspect of this letter is that it cites the NCAA's own ISS data.  Therefore, it is evident that others in the medical community had viewed the high concussion injury rates in college sports and were expressing their concern. Despite these concerns, the NCAA did not take any action.

**ANSWER:**

The material referenced in Footnotes 54 through 56 and Paragraph 203 speaks for itself, and to the extent that the allegations in Paragraph 203 vary therewith, the NCAA denies those allegations.  The NCAA expressly denies that it has failed to take appropriate action in response to student-athlete injury trends.  The NCAA denies any and all remaining allegations in Paragraph 203.

204.  160.   Research studies were published in November, 2003 that were a collaboration of many top neurologists and experts in the field.  They were research studies specific to NCAA athletics.[57]  In sum, the "Acute Effects and Recovery Time" study was conducted because of the "lack of empirical data on recovery time following sport-related concussion" which "hampers clinical decision making about return to play after injury."[58]  The study concluded, and the NCAA was clearly on notice of, the fact that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after concussion … [f]urther research is required to determine factors that predict variability in recovery time after concussion."[59]   The context of the "Cumulative Effects" study was that "approximately 300,000 sport-related concussions occur annually in the United States, and the likelihood of serious sequelae may increase with repeated head injury."[60]  The study concluded that "players with a history of previous concussions are more likely to have future concussive injuries than those with no history; 1 in 15 players with a concussion may have additional concussions in the same playing season; and previous concussions may be associated

---

[54]    NCAA00002758.

[55]    *Id.*

[56]    *Id.*

[57]    NCAA00007837-7844; NCAA00007909-7915.

[58]    *Id.* at 7837.

[59]    *Id.*

[60]    *Id.* at 7909.

with slower recovery of neurological function."[61]  Despite this knowledge, the NCAA did not implement a concussion-management plan policy until 2010.

**ANSWER:**

The material referenced in Footnotes 57 through 61 and Paragraph 204 speaks for itself, and to the extent that the allegations in Paragraph 204 vary therewith, the NCAA denies those allegations.  The NCAA expressly denies that it has failed to take appropriate action in response to student-athlete injury trends.  The NCAA denies any and all remaining allegations in Paragraph 204.

205.    In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

**ANSWER:**

The material referenced in Paragraph 205 speaks for itself, and to the extent that the allegations in Paragraph 205 vary therewith, the NCAA denies those allegations.  Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 205.

206.    The NCAA released its injury surveillance data for the 2005-2006 football season and it showed high rates of concussions and head injuries.[62]  Specifically, head injuries accounted for 11% of practice and 5% of game injuries.[63]  "Concussions ranked third highest in both practice and competition."[64]  In addition, "a team averaging 60 game participants could expect one concussion every five games.  Seven percent of all practice and game injuries involved concussions."[65]

---

[61]  *Id*.

[62]  NCAA00002934-NCAA00002961.

[63]  *Id*. at NCAA00002937.

[64]  *Id*. at NCAA00002938.

[65]  *Id*. at NCAA00002937.

**ANSWER:**

The material referenced in Footnotes 62 through 65 and Paragraph 206 speaks for itself, and to the extent that the allegations in Paragraph 206 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 206.

207.    The men's ice hockey injury surveillance data for 2005-2006 had similarly high rates of concussions and head injuries. NCAA00002962-NCAA00002980. Specifically, for practices in 2004-2005, concussions constituted 12% of all injuries and 7% of all injuries in 2005-2006. *Id.* at NCAA0002980. In addition, for games in 2004-2005, concussions constituted 16% of all injuries and 12% of all injuries in 2005-2006. *Id.* Another figure in the NCAA release shows that head injuries accounted for 14% of all injuries in 2005-2006 and 17% of all injuries in 2004-2005. *Id.* at NCAAA2977. And, head injuries constituted 16% of all injuries in practices for the years 2004-2005 and 2005-2006. *Id.* at NCAA0002976.

**ANSWER:**

The material referenced in Paragraph 207 speaks for itself, and to the extent that the allegations in Paragraph 207 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 207.

208.    Finally, the 2005-2006 Injury Surveillance System report for men's soccer showed that concussions accounted for 6% of all competition injuries. NCAA00003000-NCAA00003019. Head injuries accounted for 11% and 12% of all injuries in 2005-2006 and 2004-2005 respectively. *Id.* at NCAA00003017.

**ANSWER:**

The material referenced in Paragraph 208 speaks for itself, and to the extent that the allegations in Paragraph 208 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 208.

209.    The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

**ANSWER:**

The material referenced in Paragraph 209 speaks for itself, and to the extent that the allegations in Paragraph 209 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 209.

210.     A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

**ANSWER:**

The material referenced in Paragraph 210 speaks for itself, and to the extent that the allegations in Paragraph 210 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 210.

211.     Since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA. Further, based on studies that the NCAA *itself* paid for (as explained in detail below), the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.

**ANSWER:**

The referenced studies speak for themselves, and to the extent the allegations in Paragraph 211 vary therewith, the NCAA denies those allegations. The NCAA denies any remaining allegations in Paragraph 211.

212.     Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease. Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 212.

213.    As early as in 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that there were enduring effects in youth who have experienced a history of two or more concussions.[66]  These include decreased overall neuropsychological functioning, as well as decreased mental speed.

**ANSWER:**

The material referenced in Footnote 66 and Paragraph 213 speaks for itself, and to the

extent that the allegations in Paragraph 213 vary therewith, the NCAA denies those allegations.

The NCAA denies any and all remaining allegations in Paragraph 213.

214.    In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal.[67]  The study concluded that ***athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities***.

**ANSWER:**

The material referenced in Footnote 67 and Paragraph 214 speaks for itself, and to the

extent that the allegations in Paragraph 214 vary therewith, the NCAA denies those allegations.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 214.

215.    Despite this knowledge, the NCAA continues to allow student-athletes to return to play the very next calendar day after sustaining a concussion.  In practice, this means that a student-athlete can be back on the field less than 24 hours after sustaining a serious brain injury – thereby placing the student-athlete in serious medical jeopardy.

---

[66]    Moser, *et al.*, Archives of Clinical Neuropsychology, 17 (2002) 91-100.

[67]    McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.

**ANSWER:**

The NCAA's Concussion Management Plan ("CMP") speaks for itself, and to the extent the allegations in Paragraph 215 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 215.

216. In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the effects of multiple concussions sustained by a single athlete were examined.[68] The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions. The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

**ANSWER:**

The material referenced in Footnote 68 and Paragraph 216 speaks for itself, and to the extent that the allegations in Paragraph 216 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 216.

217. The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student-athletes should rest before returning to play. Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing football.

**ANSWER:**

The material referenced in Paragraph 217 speaks for itself, and to the extent that the allegations in Paragraph 217 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 217.

218. But there is more. In 2005 UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment

---

[68] Guskiewicz, *et al.*, *Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

("MCI") and early-onset Alzheimer's disease.[69] In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early on-set Alzheimer's disease. The NCAA did not even acknowledge the study, let alone act on it or even alert its student-athletes of these known risks.

**ANSWER:**

  The material referenced in Footnote 69 and Paragraph 218 speaks for itself, and to the extent that the allegations in Paragraph 218 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 218.

  219. Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which found that recurrent concussions were linked to a heightened risk of depression in former football players.[70] The results of that study showed that former football players who sustained three or more concussions were three times more likely to be diagnosed with depression. Those with two or more concussions were one and one-half times more likely to be diagnosed with depression.

**ANSWER:**

  The material referenced in Footnote 70 and Paragraph 219 speaks for itself, and to the extent that the allegations in Paragraph 219 vary therewith, the NCAA denies those allegations. The NCAA denies that it ignored any studies regarding concussions. The NCAA denies any and all remaining allegations in Paragraph 219.

  220. Further, it is well known that student-athletes in the NCAA are at risk for concussion. In 2010, a study from the University of North Carolina reported that men's hockey players suffered 1.47 concussions per 1,000 player hours. Women's college hockey was worse, with 2.72 concussions occurring for every 1,000 hours.[71]

---

[69] Guskiewicz, *et al.*, *Association between recurrent concussions and late-life cognitive impairment in retired professional football players*, NEUROSURGERY, Vol. 50, October 2005, at 719.

[70] *Guskiewicz, et al.*, *Recurrent concussions and risk of depression in retired professional football players,* MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

[71] http://www.hockeyprimetime.com/news/futures-watch/ncaa-hockeys-growing-headache.

**ANSWER:**

The material referenced in Footnote 71 and Paragraph 220 speaks for itself, and to the

extent that the allegations in Paragraph 220 vary therewith, the NCAA denies those allegations.

The NCAA denies any and all remaining allegations in Paragraph 220.

221.     At a 2010 Mayo Clinic conference on concussions, researchers discussed that concussions comprised about 25 percent of the injuries in women's ice hockey, the highest cause of injury in the sport.  In men's ice hockey concussions account for 9 percent of the injuries (No. 2 in the sport), and in football they account for 7 percent (No. 3 in the sport).[72]

**ANSWER:**

The material referenced in Footnote 72 and Paragraph 221 speaks for itself, and to the

extent that the allegations in Paragraph 221 vary therewith, the NCAA denies those allegations.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 221.

222.     The NCAA also knows, but has ignored, that concussions are not limited to helmeted sports.  A study conducted by McGill University in Montreal found that 60 percent of college soccer players reported symptoms of a concussion at least once during the season.  The study also revealed that concussion rates in soccer players were comparable to those in football.  According to this study, athletes who suffered a concussion were four to six times more likely to suffer a second concussion.[73]/[74]

**ANSWER:**

The material referenced in Footnotes 73 and 74 and Paragraph 222 speaks for itself, and

to the extent that the allegations in Paragraph 222 vary therewith, the NCAA denies those

allegations.  The NCAA denies that it ignored any studies regarding concussions.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 222.

---

[72]     http://slapshot.blogs.nytimes.com/2010/10/19/at-the-mayo-clinic-womens-hockey-a-most-dangerous-game/.

[73]     http://www.aans.org/Patient%20Information/Conditions%20and%20Treatments/Sports-Related%20Head%20Injury.aspx.

[74]     http://aans.org/en/Patient%20Information/Conditions%20and%20Treatments/ Concussion.aspx.

223.     Consistent with the pattern described herein, the NCAA chose to ignore the fact that the mental health of student-athletes was at risk, implementing no policy or educational stance that would properly protect and/or inform the football players at risk.

**ANSWER:**

The NCAA denies the allegations in Paragraph 223.

**E.     The NCAA's Inadequate Rules and Policies Regarding How the Games are Played**

224.     In the early 1970s, rule-makers in the NCAA recognized that the use of the helmeted head as an offensive weapon was dangerous and was increasing the rate of concussions.

**ANSWER:**

The NCAA admits that in the 1970s, the committee that promulgates rules governing

football recognized that the use of the helmeted head as a weapon was potentially dangerous.

The NCAA is without knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in Paragraph 224 regarding the causes of changes to the alleged rate of

concussions and, on that basis, denies them and demands strict proof thereof.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 224.

225.     In 1976, the NCAA passed a rule prohibiting initial contact of the head in blocking and tackling in football.

**ANSWER:**

The NCAA admits the allegations in Paragraph 225.

226.     Even after the football regulations of the 1970s were passed, however, football student-athletes continued to be coached and trained to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. While these techniques were *publicly* condemned by the NCAA, on a private level they were not meaningfully condemned by the NCAA.  To date, the harshest penalty imposed on football coaches whose players were found to use the helmeted head to tackle was a letter of reprimand.

**ANSWER:**

The NCAA admits that it discourages the use of the helmeted head to block, tackle, butt,

spear, ram and/or injure opposing players.  The NCAA is without knowledge or information

sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 226 regarding

the substance of the coaching and training provided to each individual student-athlete at each

member institution and by others and, on that basis, denies them and demands strict proof

thereof.  Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 226.

227.     At the individual level, the penalties for student-athletes who make dangerous helmet-based tackles include being either ejected or suspended from play.  But at the *team* level, teams are assessed only a 15-yard penalty for dangerous tackling.  What is more, the stated rationale behind these penalties has consistently been to protect *the player being tackled* without regard for the player *using* the helmet to make the tackle – as he was coached to do.

**ANSWER**:

The rules and policies of the NCAA speak for themselves, and to the extent that the

allegations in Paragraph 227 vary therewith, the NCAA denies those allegations.  The NCAA

denies any remaining allegations in Paragraph 227.

228.     Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student-athletes.

**ANSWER**:

The NCAA denies the allegations in Paragraph 228.

229.     Similarly, in hockey, inadequate guidance existed on hitting with the head in the NCAA.  Finally, in 2010, the NCAA installed new rules in the hockey off-season to address the growing problem of concussions and head and neck injuries.  As of the 2010-11 season, all hits to the head are supposed to be penalized by a five-minute major and the referee's option of a game misconduct or disqualification.  A disqualification carries with it an automatic one-game suspension.

**ANSWER**:

The NCAA incorporates its answer to Paragraph 227 as and for its answer to

Paragraph 229.

230.    However, rules are only as effective as their enforcement.  And, even today, the NCAA continues to turn a blind eye to the type of game play that causes concussions.

**ANSWER:**

The NCAA admits that enforcement of rules is an important factor in their effectiveness.

Except as expressly admitted, the NCAA denies the allegations in Paragraph 230.

**F.    The NCAA's Inadequate Concussion Treatment and Return to Play Rules**

**1.    From 1994-2002, the NCAA refused to endorse any return-to-play criteria.**

231.    Guideline 2o, "Concussions and Second Impact Syndrome," first appeared in the 1994-1995 NCAA Sports Medicine Handbook and largely remained the same through 2002. Rather than providing protection for student-athletes or a treatment protocol for member institutions, Guideline 2o largely left treatment to the individual team's discretion.

**ANSWER:**

The material referenced in Paragraph 231 speaks for itself, and to the extent that the

allegations in Paragraph 231 vary therewith, the NCAA denies those allegations.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 231.

232.    For example, while the 1998-99 version of Guideline 2o reported that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," the NCAA stated that it "does not endorse any specific concussion grading scale or return-to-play criteria."  The NCAA left the discretion on return to play to the individual school.

**ANSWER:**

The material referenced in Paragraph 232 speaks for itself, and to the extent that the

allegations in Paragraph 232 vary therewith, the NCAA denies those allegations.  The NCAA

affirmatively states that under the NCAA Constitution, each member institution is responsible

for protecting the health of its student-athletes.  Except as expressly admitted, the NCAA denies

any and all remaining allegations in Paragraph 232.

233.    Moreover, the NCAA did not enforce Guideline 2o's statement that:  "A student-athlete rendered unconscious for any period of time should not be permitted to return to the

practice or game in which the head injury occurred.  In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."  Thus, Guideline 2o acted as a liability cover for the NCAA without any NCAA enforcement activity to actually protect student-athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 233.

## 2. The NCAA fails to adopt the guidelines promulgated by the 2001 Vienna Conference.

234.    In November 2001, the first International Symposium on Concussion in Sport was held in Vienna, Austria ("Vienna Conference").  The aim of the Vienna Conference was to provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, football (soccer), and other sports.  Experts were invited "to address specific issues of epidemiology, basic and clinical science, grading systems, cognitive assessment, new research methods, protective equipment, management, prevention, and long-term outcome, and to discuss a unitary model for understanding concussive injury."

**ANSWER:**

The material referenced in Paragraph 234 speaks for itself, and to the extent that the

allegations in Paragraph 234 vary therewith, the NCAA denies those allegations.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 234.

235.    The result of the Vienna Conference was the publication of an international consensus statement that was "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions" ("Vienna Protocol").  The Vienna Protocol was intended to "be widely applicable to sport related concussion" and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of injured athletes, whether at the recreational, elite, or professional level."[75]/[76]  The Vienna Protocol includes direction with respect to each of the following areas in diagnosing and treating concussions:  Clinical history; Evaluation; Neuropsychological testing; Imaging procedures; Research methods; Management and rehabilitation; Prevention; Education; Future directions; and Medicolegal considerations.[77]

---

[75]    "Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med 2002;36:6-7 doi:10.1136/bjsm.36.1.6, available at http://bjsm.bmj.com/content/36/1/6.full.

[76]    The NCAA possessed a copy of the Vienna Protocol. NCAA00007999-8012.

[77]    *Id.*

**ANSWER**:

The material referenced in Footnotes 75 through 77 and Paragraph 235 speaks for itself, and to the extent that the allegations in Paragraph 235 vary therewith, the NCAA denies those allegations.  Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 235.

236.    In fact, the Vienna Protocol recommended specific internationally-accepted return to play guidelines, stating:

When a player shows ANY symptoms or signs of a concussion:

(1)    The player should not be allowed to return to play in the current game or practice.

(2)    The player should not be left alone; and regular monitoring for deterioration is essential.

(3)    The player should be medically evaluated after the injury.

(4)    Return to play must follow a medically supervised stepwise process.

A player should never return to play while symptomatic.  "When in doubt, sit them out!"[78]

**ANSWER**:

The material referenced in Footnote 78 and Paragraph 236 speaks for itself, and to the extent that the allegations in Paragraph 236 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 236.

237.    The Vienna Protocol also recommended an internationally-accepted return to play stepwise process as follows:

Return to play after a concussion follows a stepwise process:

---

[78]    Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med2002;36:6-7 doi:10.1136/bjsm.36.1.6, available at http://bjsm.bmj.com/content/36/1/6.full.  *See also* NCAA 00007999, at 8001.

(1)     No activity, complete rest. Once asymptomatic, proceed to level (2).

(2)     Light aerobic exercise such as walking or stationary cycling.

(3)     Sport specific training – for example, skating in hockey, running in soccer.

(4)     Non-contact training drills.

(5)     Full contact training after medical clearance.

(6)     Game play.

With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level.  If any symptoms occur after concussion, the patient should drop back to the previous asymptomatic level and try to progress again after 24 hours.[79]

**ANSWER:**

The material referenced in Footnote 79 and Paragraph 237 speaks for itself, and to the extent that the allegations in Paragraph 237 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 237.

238.    Despite the internationally-accepted consensus guidelines set forth in the Vienna Protocol, the NCAA did not revise the substance of Guideline 2o in the 2002-03 NCAA Sports Medicine Handbook, nor in the 2003-04 Sports Medicine Handbook.  In fact, in both identical versions, the NCAA continued to state that there was a "current lack of consensus among the medical community on management of concussions [and thus] the NCAA does not endorse any specific concussion grading scale or return-to-play criteria."[80]  The NCAA's position was directly contrary to the consensus set forth in the Vienna Protocol.

**ANSWER:**

The material referenced in Paragraph 238 speaks for itself, and to the extent that the allegations in Paragraph 238 vary therewith, the NCAA denies those allegations.  The NCAA further expressly denies that it has ever taken a position contrary to any scientific consensus with

---

[79]     *Id.*

[80]     *See*, *e.g.*, NCAA000017196.

respect to concussion.  Except as expressly admitted, the NCAA denies any and all remaining

allegations in Paragraph 238.

239.    In the 2004-05 NCAA Sports Medicine Handbook, the NCAA replaced Guideline 2o with Guideline 2i, entitled "Concussion or Mild Traumatic Brain Injury (mTBI) in the Athlete."[81]  While Guideline 2i continued to recommend that students not be allowed to return to play while symptomatic, the NCAA nonetheless approved of absolute discretion being left to the team and student-athlete on when a student should be allowed to return to play.[82]  Guideline 2i, in both the 2004-05 and 2005-06 Handbooks, stated in pertinent part:

> The duration of time that an athlete should be kept out of physical activity is unclear, and in most instances, individualized return to play decisions should be made.  These decisions will often depend on the clinical symptoms, as well as previous history of concussion, and severity of previous concussions.  Additional factors include the sport, position, age, support system for the athlete, and the overall "readiness" of the athlete to return to sport.[83]

**ANSWER:**

The material referenced in Footnotes 81 through 83 and Paragraph 239 speaks for itself,

and to the extent that the allegations in Paragraph 239 vary therewith, the NCAA denies those

allegations.  Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 239.

240.    The NCAA's position was, once again, contrary to the Vienna Protocol.  In fact, the NCAA outright dismissed the Vienna Protocol in Guideline 2i, instead advocating for individual school decisions stating:  "More recent grading systems have been published which attempt to take into account the expanding research in the field of mTBI in athletes.  Though it is useful to become familiar with these guidelines, it is important to remember that many of these injuries are best treated in an individual fashion (Cantu '01, Vienna Conference, NATA '04)."

---

[81]    NCAA00007098, at 7144-49.

[82]    *Id*. at NCAA00007146-47.

[83]    *Id*. at NCAA00007147.

**ANSWER:**

The material referenced in Paragraph 240 speaks for itself, and to the extent that the allegations in Paragraph 240 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 240.

>   3.   **The NCAA fails to adopt the guidelines promulgated by the 2004 Prague Conference.**

241.   The 2nd International Symposium on Concussion in Sport was held in Prague, Czech Republic in November 2004 ("Prague Conference"), resulting in a revision and update of the Vienna Protocol ("Prague Protocol").[84] While the return to play guidelines were largely unchanged, the Prague Conference distinguished between simple concussions and complex concussions.[85] The Prague Protocol defined simple concussions generally as those that "resolve without complication over 7-10 days," and complex concussions as those "where athletes suffer persistent symptoms (including persistent symptom recurrence with exertion), specific sequelae (such as concussive convulsions), prolonged loss of consciousness (more than one minute), or prolonged cognitive impairment after the injury."[86]

**ANSWER:**

The material referenced in Footnotes 84 through 86 and Paragraph 241 speaks for itself, and to the extent that the allegations in Paragraph 241 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 241.

242.   The Prague Protocol stated that this latter group with complex concussions:

[M]ay also include athletes who suffer multiple concussions over time or where repeated concussions occur with progressively less

impact force. In this group, there may be additional management considerations beyond simple return to play advice. Formal neuropsychological testing and other

---

[84]   Summary and agreement statement of the 2nd International Conference on Concussion in Sport, Prague 2004, Br J Sports Med2005; 39:196-204 doi:10.1136/bjsm.2005.018614 (Feb. 2005).

[85]   "Historically, concussions have been classified with a number of different grading systems. In the Vienna Statement, this approach was abandoned. One of the key developments by the Prague Group is the understanding that concussion may be categorised for management purposes as either simple or complex." *Id.*

[86]   *Id.*

investigations should be considered in complex concussions. It is envisaged that such athletes would be managed in a multidisciplinary manner by doctors with specific expertise in the management of concussive injury such as a sport medicine doctor with experience in concussion, sports neurologist, or neurosurgeon.

**ANSWER**:

The material referenced in Paragraph 242 speaks for itself, and to the extent that the allegations in Paragraph 242 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 242.

243.    Thus, building on the return to play guidelines in the Vienna Protocol, the Prague Protocol adopted the same stepwise process, but added the admonition that: "In cases of complex concussion, the rehabilitation will be more prolonged, and return to play advice will be more circumspect. It is envisaged that complex cases should be managed by doctors with a specific expertise in the management of such injuries."

**ANSWER:**

The material referenced in Paragraph 243 speaks for itself, and to the extent that the allegations in Paragraph 243 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 243.

244.    Despite the publication of the Prague Protocol in February 2005, the NCAA did not update its Guideline 2i in the 2006-07 Handbook – but repeated Guideline 2i from the prior years. The NCAA thus did not adopt the internationally-accepted guidelines set forth first in 2002 in the Vienna Protocol that were now reaffirmed in the 2005 Prague Protocol. Moreover, the NCAA failed to mandate that student-athletes with concussions be managed by doctors with a specific expertise in the management of such injuries, instead leaving all care to a school's "medical staff."

**ANSWER:**

The material referenced in Paragraph 244 speaks for itself, and to the extent that the allegations in Paragraph 244 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 244.

4.     **The NCAA fails to adopt the guidelines promulgated by the 2008 Zurich Conference.**

245.     The 3rd International Symposium on Concussion in Sport was held in Zurich, Switzerland, in November 2008 ("Zurich Conference"), resulting in an update of the Vienna Protocol and Prague Protocol ("Zurich Protocol").[87]

**ANSWER**:

The material referenced in Footnote 87 and Paragraph 245 speaks for itself, and to the

extent that the allegations in Paragraph 245 vary therewith, the NCAA denies those allegations.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 245.

246.     Once again, the Zurich Protocol reaffirmed the need for a graduated stepwise return to play process after a concussion, with a 24-hour wait period between each step.  The Zurich Protocol stated:

Return to play protocol following a concussion follows a stepwise process as outlined in Table 1.

**Table 1**
Graduated return to play protocol

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 1. No activity | Complete physical and cognitive rest | Recovery |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum predicted heart rate | Increase heart rate |
| | No resistance training | |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |
| 4. Non-contact training drills | Progression to more complex training drills, eg passing drills in football and ice hockey | Exercise, coordination, and cognitive load |
| | May start progressive resistance training) | |
| 5. Full contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. Generally each step should take 24

[87]     Consensus Statement on Concussion in Sport:  the 3d International Conference on Concussion in Sport held in Zurich, November 2008, http://bjsm.bmj.com/content/43/Suppl_1/i76.full.pdf+html.

hours so that an athlete would take approximately one week to proceed through the full rehabilitation protocol once they are asymptomatic at rest and with provocative exercise. If any post-concussion symptoms occur while in the stepwise programme, the patient should drop back to the previous asymptomatic level and try to progress again after a further 24-hour period of rest has passed.[88]

**ANSWER:**

The material referenced in Footnote 88 and Paragraph 246 speaks for itself, and to the

extent that the allegations in Paragraph 246 vary therewith, the NCAA denies those allegations.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 246.

247.    The Zurich Protocol also reinforced that sport governing bodies, like the NCAA, may need to change their rules and/or enforce the rules in order to protect the well-being of athletes who suffer or show signs of concussions, stating:

Consideration of rule changes to reduce the head injury incidence or severity may be appropriate where a clear-cut mechanism is implicated in a particular sport. An example of this is in football (soccer) where research studies demonstrated that upper limb to head contact in heading contests accounted for approximately 50% of concussions. As noted earlier, rule changes may also be needed in some sports to allow an effective off-field medical assessment to occur without compromising the athlete's welfare, affecting the flow of the game or unduly penalising the player's team. It is important to note that rule enforcement may be a critical aspect of modifying injury risk in these settings; referees play an important role in this regard.[89]

**ANSWER:**

The material referenced in Footnote 89 and Paragraph 247 speaks for itself, and to the

extent that the allegations in Paragraph 247 vary therewith, the NCAA denies those allegations.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 247.

248.    Despite the publication of the Zurich Protocol in early 2009, the NCAA did not update its Guideline 2i in the 2009-10 Handbook – but repeated Guideline 2i from the prior

---

[88]    *Id.*

[89]    *Id.*

years. The NCAA thus did not adopt the internationally-accepted guidelines set forth first in 2002 in the Vienna Protocol, as reaffirmed and explained in the 2005 Prague Protocol and the 2009 Zurich Protocol. In fact, the NCAA did not even discuss in its Guidelines the Prague or Zurich Protocols, but continued to repeat its dismissal of the Vienna Protocol: "More recent grading systems have been published which attempt to take into account the expanding research in the field of mTBI in athletes. Though it is useful to become familiar with these guidelines, it is important to remember that many of these injuries are best treated in an individual fashion (Cantu '01, Vienna Conference, NATA '04)."

**ANSWER:**

The material referenced in Paragraph 248 speaks for itself, and to the extent that the

allegations in Paragraph 248 vary therewith, the NCAA denies those allegations. Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 248.

> **5.      Too little, too late, the NCAA finally requires schools to have a concussion plan.**

249.      As previously discussed, the NCAA Sports Medicine Handbook notes that "student-athletes rightfully assume that those who sponsor intercollegiate athletes have taken reasonable precaution to minimize the risks of injury from athletics." This assumption is bolstered by the NCAA's requirement of medical examination prior to participation and the requirement that each student-athlete should be covered by medical insurance.

**ANSWER:**

The material referenced in Paragraph 249 speaks for itself, and to the extent that the

allegations in Paragraph 249 vary therewith, the NCAA denies those allegations. Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 249.

250.      The *Handbook*'s section on concussions cites to 17 references, dating back to 1991, all documenting the dangers of concussions and the need to carefully assess and treat student-athletes:

> 1.      Cantu RC:  Concussion severity should not be determined until all postconcussion symptoms have abated.  Lancet 3:437-8, 2004.

> 2.      Cantu RC:  Recurrent athletic head injury: risks and when to retire.  Clin Sports Med. 22:593-603, 2003.

> 3.      Cantu RC:  Post traumatic (retrograde/anterograde)) amnesia: pathophysiology and implications in grading and safe return to play. Journal of Athletic Training, 36(3): 244-8, 2001.

4.      Centers for Disease Control and Prevention. Sports-related recurrent brain injuries: United States. MMWR Morb Mortal Wkly Rep 1997; 46:224-227.

5.      Collie A, Darby D, Maruff P: Computerized cognitive assessment of athletes with sports related head injury. Br. J Sports Med 35(5):297-302, 2001.

6.      Collins MW, Iverson GL, Lovell MR, McKeag DB, Norwig J, Maroon J: On-field predictors of neuropsychological and symptom deficit following sports- related concussion. Clin J Sport Med 2003; 13:222-229.

7.      Collins MTV, Grindel SH, Lovell MR et al: Relationship Between Concussion and Neuropsychological Performance in College Football Players. JAMA 282:964-970, 1999.

8.      Guskiewicz KM. Bruce SL, Cantu R, Ferrara MS, Kelly JP, McCrea M, Putukian M, McLeod-Valovich TC; National Athletic Trainers' Association Position Statement: Management of Sport-related Concussion: Journal of Athletic Training, 39(3): 280-297, 2004.

9.      Guskiewicz KM: Postural stability assessment following concussion: One piece of the puzzle. Clin J Sport Med 2001; 11:182-189.

10.     Hovda DA, Lee SM, Smith ML et al: The Neurochemical and metabolic cascade following brain injury: Moving from animal models to man. J Neurotrauma 12(5):143-146, 1995.

11.     Johnston K, Aubry M, Cantu R et al: Summary and Agreement Statement of the First International Conference on Concussion in Sport, Vienna 2001, Phys & Sportsmed 30(2):57-63, 2002.

12.     Lovell MR, Iverson GL, Collins MW et al: Does loss of consciousness predict neuropsychological decrements after concussion? Clin J Sport Med 9: 193-198, 1999.

13.     Makdissi M, Collie A. Maruff et al: Computerized cognitive assessment of concussed Australian Rules, footballers. Br J Sports Med 35(5):354-360, 2001.

14.     McCrea M.: Standardized mental status assessment of sports concussion. Clin J Sport med 11(3):176-181, 2001.

15.     McCrea A Hammeke T, Olsen G, Leo, Guskiewicz K: Unreported concussion in high school football players. Clin J Sport Med;14:13-17, 2004.

16.    McCrory P, Meeuwisse W, Johnston K, Dvorak J, Aubry M, Molloy M, Cantu R. Consensus Statement on Concussion in Sport: the 3rd International Conference on Concussion in Sport:  Zurich, Switzerland, 2008. Br J Sports Med;43: i76-i84, 2009.

17.    Torg, JS:  Athletic Injuries to the Head, Neck, and Face.  St. Louis, Mosby-Year Book, 1991.

**ANSWER:**

The material referenced in Paragraph 250 speaks for itself, and to the extent that the

allegations in Paragraph 250 vary therewith, the NCAA denies those allegations.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 250.

251.    Despite this extensive knowledge of the danger of concussion, it was not until April 2010 that the NCAA passed legislation requiring its member schools to have a Concussion Management Plan ("CMP") in place for all sports.  The NCAA did so in reaction to the NFL's concussion policy, as well as the significant liability incurred as a result of the lawsuit brought by Preston Plevretes.  The fact that the NCAA waited until nearly nine years after the first international consensus statement on concussions (and still did not meet the consensus standards) is no surprise.  Historically, the NCAA has regulated on the basis of public perception,[90] and courts have largely left the NCAA alone because of the Association's unique position of authority in intercollegiate athletics, and its worthy goal of preserving amateurism.[91]

---

[90]    *See*, *e.g.*, *Cureton v. NCAA*, 198 F.3d 107, 110 (3d Cir. 1999) (implementing notorious student-athlete academic standards, including minimum GPA, number of core courses, and SAT score, for student-athlete eligibility "in response to the public's perception" that it was  needed); *see also* NCAA History, *supra* n.156 (creating NCAA to quell public's concerns over violence in intercollegiate athletics).

[91]   In doing so, the NCAA has become almost "an extra-judicial entity, a society unto itself, answerable to no one …."  Mitchell Nathanson, The Sovereign Nation of Baseball:  Why Federal Law Does Not Apply to "America's Game" and How It Got That Way, 16 Vill. Sports & Ent.  L.J. 49, 52-3 (2009) (referring to MLB, which has been given "wide latitude" by federal courts and describing MLB as largely "free to govern itself pursuant to its own definition of what is in the best interests of baseball"). Similarly, federal courts been deferential to NCAA rules because of the Association's unique position of authority in intercollegiate athletics, and its worthy goal of preserving amateurism:

The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports.  There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds

richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act.

*NCAA v. Bd. of Regents*, 468 U.S. 85, 120 (1984).

**ANSWER:**

The material referenced in Footnotes 90 and 91 and Paragraph 251 speaks for itself, and

to the extent that the allegations in Paragraph 251 vary therewith, the NCAA denies those

allegations.  Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 251.

252.    However, rather than creating a system-wide policy that focused on the best
interest of the student-athletes, the NCAA's so-called "plan" for concussion management  relies
on member schools to self-police their return-to-play policies.  Further, the NCAA's plan put the
onus of concussion management on the student-athletes by requiring that they "sign a statement
in which they accept the responsibility for reporting their injuries and illnesses to the institutional
medical staff, including signs and symptoms of concussions."[92]  Specifically, the NCAA added
the following text-box to Guideline 2i in the 2010-11 Sports Medicine Handbook:

> **The NCAA Executive Committee adopted
> (April 2010) the following policy for
> institutions in all three divisions.**
>
> "Institutions shall have a concussion management plan on file such
> that a student-athlete who exhibits signs, symptoms or behaviors con-
> sistent with a concussion shall be removed from practice or competi-
> tion and evaluated by an athletics healthcare provider with experience
> in the evaluation and management of concussions. Student-athletes
> diagnosed with a concussion shall not return to activity for the
> remainder of that day. Medical clearance shall be determined by the
> team physician or his or her designee according to the concussion
> management plan.
>
> "In addition, student-athletes must sign a statement in which they ac-
> cept the responsibility for reporting their injuries and illnesses to the
> institutional medical staff, including signs and symptoms of concus-
> sions. During the review and signing process, student-athletes should
> be presented with educational material on concussions."

**ANSWER:**

The material referenced in Footnote 92 and Paragraph 252 speaks for itself, and to the

extent that the allegations in Paragraph 252 vary therewith, the NCAA denies those allegations.

---

[92]    NCAA Rule 3.2.4.17 (*available at* http://www.ncaapublications.com/productdownloads/D112.pdf).

Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph

252.

253.     Boiled down to its essence, the plan rejects any measure of responsibility for the NCAA, its member schools, and the coaching staff of individual teams; and instead, puts the burden squarely on the shoulders of student-athletes – *the same student-athletes who have just sustained fresh head trauma* – to seek out medical attention, or decide whether to seek it in the first place.  Second, the NCAA Plan assumes that NCAA conferences and member institutions understand concussion research, and will supplement and enforce the Plan.  However, since the Plan's inception, few member institutions have accepted the NCAA's invitation to do so.

**ANSWER:**

The NCAA denies the allegations in Paragraph 253.

254.     Unlike the comprehensive NFL plan, which provided for specific baseline testing and mandated objective evaluations for athletes, the NCAA plan is skeletal.  Rather than directing member institutions to comply with particular procedures, the NCAA plan places the onus of developing the particular means of prevention and management upon NCAA member institutions, almost none of which have stepped forward with a comprehensive, compliant plan.  Moreover, the NCAA plan burdens member institutions with the nearly impossible task of identifying when an athlete might have suffered a concussion, and should therefore be removed from play.  And, the NCAA plan does not outline any specific stepwise return to play protocol, even though an international consensus had first been reached at the Vienna Conference in 2001 and reaffirmed at the Prague and Zurich Conferences.

**ANSWER:**

The material referenced in Paragraph 254 speaks for itself, and to the extent that the

allegations in Paragraph 254 vary therewith, the NCAA denies those allegations.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 254.

**G.     The NCAA's Attempt to Shift the Economic Burden of its Negligence to the Class**

255.     The NCAA requires that every member institution certify that each student-athlete is covered by the student-athlete's or parents' personal insurance coverage or through a basic accident medical policy carried by the institution (or through an institution's formal self-insurance plan).

**ANSWER**:

The NCAA admits that it requires that its member institutions certify that student-athletes

are covered by insurance in an amount equal to or greater than the deductible amount of the

NCAA's Catastrophic Injury Insurance Program.  Except as expressly admitted, the NCAA

denies any and all remaining allegations in Paragraph 255.

256.    For any medical care required by a student-athlete that has suffered a concussion
or is displaying concussion symptoms, outside of the immediate treatment (if any) provided by
the institution's sports medical staff, the NCAA requires that the costs be paid by the student-
athlete's or parents' personal insurance or through the institution's plan.

**ANSWER**:

The NCAA affirmatively states that it maintains a Catastrophic Injury Insurance program

and that that program does not exclude student-athletes who have suffered a concussion or

concussion-like symptoms but are otherwise eligible for the NCAA's Catastrophic Injury

coverage.  Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 256.

257.    While the NCAA maintains the NCAA Catastrophic Injury Insurance Program,
the current $90,000 deductible must first be borne by the student-athlete's or parents' personal
insurance or through the institution's plan.  Moreover, on information and belief and based on
the evidence to date, the NCAA Catastrophic Injury Insurance Program has not covered the long-
term debilitating effects resulting from repetitive head impacts in intercollegiate sports as
described herein.  In fact, the NCAA defines "true catastrophic injuries" that would be covered
under the NCAA Catastrophic Injury Insurance Program as "relatively rare."[93]

**ANSWER**:

The NCAA admits that it maintains a Catastrophic Injury Insurance Program with a

$90,000 deductible, but that deductible is $75,000 for students attending institutions that

participate in the NCAA Group Basic Accident Medical Program.  The material referenced in

---

[93]    http://www.ncaa.org/wps/wcm/connect/public/NCAA/NCAA+Insurance+Programs/
Student+Athlete+Insurance+Programs/Student+Athlete+Insurance+Programs+Homepage.

Footnote 93 and Paragraph 257 speaks for itself, and to the extent that the allegations in

Paragraph 257 vary therewith, the NCAA denies those allegations.  Except as expressly

admitted, the NCAA denies any and all remaining allegations in Paragraph 257.

258.    Many injured student-athletes leave the sport burdened by medical bills as there is
no uniform NCAA policy requiring that adequate insurance coverage be provided by the school:

> "I thought I would be covered," said Erin Knauer, a *Colgate University* student
> who piled up $80,000 in medical bills after injuring her back and legs in training
> for the crew team.  Insurance has covered less than a third of the cost because of
> the way her condition was diagnosed.  "You never think you're going to rack up
> that much of a bill."

**<u>ANSWER</u>:**

The NCAA affirmatively states that it requires that its member institutions certify that

student athletes are covered by insurance in an amount equal to or greater than the deductible

amount of the NCAA's Catastrophic Injury Insurance Program. The NCAA is without

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations contained in Paragraph 258 and, on that basis, denies them and demands strict proof

thereof.

259.    Other athletes discover their financial problems long after their bodies have
healed.  An Ohio University football player, temporarily paralyzed during a workout, learned
that he still owed $1,800 in unpaid medical bills when he went to buy a car six years after his
injury.

**<u>ANSWER</u>:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 259 and, on that basis, denies them and

demands strict proof thereof.

260.    Many students, whether athletes or not, have medical insurance through their
parents.  But these plans often exclude varsity sports injuries, limit out-of-state treatment or do
not cover much of the bill.  Some colleges buy secondary policies to fill the gaps, although even
these plans have holes.  And only players hurt badly enough to require extensive care can turn to

the NCAA for coverage. Its catastrophic insurance carries a $75,000 deductible, which will increase to $90,000 next year.

**ANSWER:**

The NCAA admits that it maintains a Catastrophic Injury Insurance Program with a $90,000 deductible, but that deductible is $75,000 for students attending institutions that participate in the NCAA Group Basic Accident Medical Program. The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 260 and, on that basis, denies them and demands strict proof thereof.

261. The absence of mandated coverage for athletes has prompted calls for change. "That's part of the cost of having an athletic program," said David Dranove, a professor of health industry management at *Northwestern University's* Kellogg School of Management. "It makes no more sense to tell the athletes, 'You go buy your own *health insurance*,' than it does to say, 'You go buy your own plane tickets and uniform.'"[94]

**ANSWER:**

The material referenced in Footnote 94 and Paragraph 261 speaks for itself, and to the extent that the allegations in Paragraph 261 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 261.

**H.    Discovery of the Cause of Action, the NCAA's Fraudulent Concealment and Plaintiffs' Vulnerability**

262. When student-athletes sign their athletic participation packet the NCAA does not explain the short- or long-term dangers of concussions or the potential post-college medical expenses students may incur as a result of concussion-related injuries. The NCAA does not share with the student-athlete the injury surveillance data it has collected or the number of concussions in the athletes' sport.

---

[94]    http://www.nytimes.com/2009/07/16/sports/16athletes.html?pagewanted=all&_r=0.

**ANSWER**:

The NCAA is without information sufficient to form a belief as to the truth or falsity of

the allegations in Paragraph 262 regarding information provided by individual member

institutions to their student-athletes and, on that basis, denies those allegations and demands

strict proof thereof. Except as expressly admitted the NCAA denies any and all allegations in

Paragraph 262.

263.    Prior to passage of the NCAA CMP on August 13, 2010, Plaintiffs and the Class
were unaware that the conduct of the NCAA with respect to precaution, detection and treatment
of concussions may have caused them to be at an increased risk for developing chronic brain
injury symptoms, including, but not limited to, dementia and/or Alzheimer's disease.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 263 regarding the purported knowledge of

Plaintiffs and/or members of the proposed class and, on that basis, denies them and demands

strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 263.

264.    Until at least April, 2010, Plaintiffs and the Class did not have a reasonable basis
to know or believe that the aforementioned harm was caused by the concealment, neglect and/or
misconduct of the NCAA.

**ANSWER**:

The allegations in Paragraph 264 state legal conclusions to which no response is required,

but to the extent a response is required, the NCAA denies those allegations. The NCAA denies it

caused any harm to Plaintiffs and/or the Class. The NCAA denies any and all remaining

allegations in Paragraph 264.

265.    Leading up to August 13, 2010, and over the past four decades, the NCAA has
actively concealed any correlation between on-field concussions, its return-to-play policies and
the chronic mental illnesses and maladies suffered by former student-athletes, including the
Plaintiffs and the Class. Indeed, in 1996, a subcommittee of the NCAA observed an increase in

concussions and noted that the "football helmet was not designed to protect this type of injury."[95]
The NCAA did not warn student football or hockey players that their helmets did not protect
against concussions and that the NCAA was seeing an increase in concussions. This is despite
the fact an athlete would naturally think of his or her helmet as protective. But the NCAA knew
of no "sports helmets … set to prevent concussions."[96]

**ANSWER:**

      The material referenced in Footnotes 95 and 96 and Paragraph 265 speaks for itself, and

to the extent that the allegations in Paragraph 265 vary therewith, the NCAA denies those

allegations. The NCAA denies that it has concealed any information regarding concussions.

Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph

265.

      266.    The discovery of the NCAA's wrongdoing was also delayed due to the players'
unequal bargaining power. Unlike the NFL there is no players union to study and advocate
concerning players' health.

**ANSWER:**

      The NCAA admits that to its knowledge, student-athletes are not unionized. Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 266.

      267.    Even today, by failing to implement appropriate policies to prevent, manage,
mitigate and remedy head injuries and concussions sustained by its student-athletes, the NCAA
continues to ignore and actively conceal the repeated warnings and patterns of injury of which
the NCAA has actual knowledge.

**ANSWER:**

      The NCAA denies the allegations in Paragraph 267.

      268.    Although the debilitating effects of concussions and other head injuries have
already manifested for many former student-athletes, there are many others who have sustained
such injuries as a direct result of the NCAA's failures and inactivity described above, but whose
symptoms have only partially manifested or not yet manifested at all.

---

[95]    NCAA00001690-96.

[96]    NCAA10025084.

**ANSWER:**

The NCAA denies the allegations in Paragraph 268.

269.    The NCAA has failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This has increased the risk of injury that will materialize in the future.

**ANSWER:**

The NCAA denies the allegations in Paragraph 269.

270.    As a result, Plaintiffs and the Class require medical monitoring to detect the manifestation of post-injury symptoms.

**ANSWER:**

The NCAA denies the allegations in Paragraph 270 and specifically denies that Plaintiffs

and the Class are entitled to any relief whatsoever, included but not limited to medical

monitoring.

**V.      CLASS ACTION ALLEGATIONS**

271.    Plaintiffs bring Counts I-VI, as set forth below, individually and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

All persons who are playing or have played an NCAA-sanctioned sport at an NCAA member institution.

(The "Class").

Excluded from the Class are all the following persons:  (i) the NCAA and the NCAA's officers and directors; (ii) Class counsel; (iii) the judges who have presided over this litigation; (iv) Mildred Whittier; and (v) Anthony Nichols.

**ANSWER:**

The NCAA admits that Plaintiffs purport to bring their claims on behalf of themselves

and the proposed class identified in Paragraph 271.  Except as expressly admitted, the NCAA

denies any and all remaining allegations in Paragraph 271.

272.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**ANSWER:**

The NCAA denies the allegations in Paragraph 272.

273.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Class are so numerous that individual joinder of all members of the Class is impracticable.  On information and belief, there are thousands of student-athletes who have been damaged by the NCAA's wrongful conduct as alleged herein.  The precise number of members of the Class and their addresses is presently unknown to Plaintiffs.  In the period 2004-2009 the NCAA estimated 29,225 concussions in nine sports.[97]  Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**ANSWER:**

The material referenced in Footnote 97 and Paragraph 273 speaks for itself, and to the extent that the allegations in Paragraph 273 vary therewith, the NCAA denies those allegations. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 273.

274.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Class, including, without limitation:

a.      whether the NCAA engaged in the conduct as alleged herein; and

b.      whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

**ANSWER:**

The NCAA denies the allegations in Paragraph 274.

275.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all members of the Class are at risk for short- and long-term injuries resulting from concussions and the accumulation of subconcussive hits as a result of the uniform misconduct described above.

---

[97]    NCAA10091830.

**ANSWER:**

    The NCAA denies the allegations in Paragraph 275.

    276.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**
Plaintiffs are adequate representatives of the Class because their interests do not conflict with the
interests of the members of the Class they seek to represent; they have retained counsel
competent and experienced in complex commercial and class action litigation; and Plaintiffs
intend to prosecute this action vigorously.  The interests of the Class will be fairly and
adequately protected by Plaintiffs and their counsel.

**ANSWER:**

    The NCAA denies the allegations in Paragraph 276.

    277.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
The NCAA has acted or refused to act on grounds generally applicable to Plaintiffs and the
members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as
described below.

**ANSWER**:

    The NCAA denies the allegations in Paragraph 277, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the Third

Amended Class Action Complaint.

    278.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action.
The costs of current or future testing for diagnostic purposes are relatively small compared to the
burden and expense that would be required to individually litigate Class Members' individual
claims against the NCAA, so it would be impracticable for members of the Class to individually
seek medical monitoring or injunctive relief for the NCAA's wrongful conduct.  Even if
members of the Class could afford individual litigation, the court system could not.
Individualized litigation for medical monitoring and injunctive relief creates a potential for
inconsistent or contradictory judgments, and increases the delay and expense to all parties and
the court system.  By contrast, the class action device presents far fewer management difficulties,
and provides the benefits of single adjudication, economy of scale, and comprehensive
supervision by a single court.

**ANSWER:**

    The NCAA denies the allegations in Paragraph 278.

# VI.    CLAIMS ALLEGED

## COUNT I
## BREACH OF EXPRESS CONTRACT
### (On Behalf of the Class)

279.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.

280.    Plaintiffs and the NCAA were parties to a contract.  Each student-athlete, prior to participation as an NCAA athlete, must complete a form where they affirm that they have read the NCAA regulations and the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively "Manual"), that they understand all of the respective NCAA Division Bylaws, and that they will abide by them.

**ANSWER:**

The allegations in Paragraph 280 state a legal conclusion to which no response is

required, but to the extent a response is required, the NCAA denies those allegations.  The

NCAA denies that Plaintiffs and the NCAA were parties to a contract.  The NCAA denies any

and all remaining allegations in Paragraph 280.

281.    In the Manual, the NCAA promises to perform the following services, *inter alia*, for the student-athletes' benefit:

(a)    "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," NCAA Const., Art.1, § 1.2(a);

(b)    "to uphold the principal [sic] of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

(c)    to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, NCAA Const., Art. 1, § 1.3.2;

(d)    to conduct intercollegiate athletics "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," NCAA Const., Art. 2, § 2.2;

(e)     to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3;

(f)     to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2;

(g)     to "assist the institution in its efforts to achieve full compliance with all rules and regulations …," NCAA Const., Art. 2, § 2.8.2.

**ANSWER:**

The material referenced in Paragraph 281 speaks for itself, and to the extent that the allegations in Paragraph 281 vary therewith, the NCAA denies those allegations. The remaining allegations in Paragraph 281 state legal conclusions to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 281.

282.    For consideration in return for the NCAA's promises, each student-athlete agrees to abide by the Manual and any other NCAA rules, participates in an NCAA sport which provides a benefit to the NCAA and its member institutions, and agrees to waive certain rights including the right to profit from participation.

**ANSWER:**

The allegations in Paragraph 282 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA denies it made any promises, or that there was any consideration therefor. The NCAA denies any and all remaining allegations in Paragraph 282.

283.    The NCAA acknowledges that "student-athletes *rightfully assume* that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."[98]

---

[98]    *Handbook*, at 4 (emphasis added).

**ANSWER:**

The material referenced in Footnote 98 and Paragraph 283 speaks for itself, and to the

extent that the allegations in Paragraph 283 vary therewith, the NCAA denies those allegations.

The NCAA denies any and all remaining allegations in Paragraph 283.

284.    The Manual thus constitutes a contract between the NCAA, its member

institutions and the student-athletes.

**ANSWER:**

The allegations in Paragraph 284 state a legal conclusion to which no response is

required, but to the extent a response is required, the NCAA denies those allegations.  The

NCAA denies any and all remaining allegations in Paragraph 284.

285.    The student-athletes have fulfilled their obligations under the contract by

providing their services.

**ANSWER:**

The allegations in Paragraph 285 state a legal conclusion to which no response is

required, but to the extent a response is required, the NCAA denies those allegations.  The

NCAA denies any and all remaining allegations in Paragraph 285.

286.    The NCAA, and its member institutions, have breached their contractual

commitment to provide a safe environment by:

   a.    failing to educate players concerning symptoms that may indicate a
         concussion has occurred;

   b.    failing to warn of the risk of unreasonable harm resulting from
         concussions;

   c.    failing to disclose the special risks of long-term complications from
         concussions and return to play;

   d.    failing to disclose the role of repeated concussions in causing chronic life-
         long cognitive decline;

   e.    failing to promulgate rules and regulations to adequately address the
         dangers of repeated concussions and a return-to-play policy to minimize
         long-term chronic cognitive problems;

    f.      concealing pertinent facts;

    g.      failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions including limits on contact practices; and

    h.      failing to provide long-term insurance coverage for concussion-related injuries.

**<u>ANSWER</u>:**

The allegations in Paragraph 286 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 286.

287. The NCAA, and its member institutions, have breached their contractual commitment to student-athletes to provide a safe environment in one or more of the following ways:

    (a)    by failing "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," in breach of NCAA Const., Art.1, § 1.2(a), including, but not limited to, by:

        (i)    failing to implement or require the implementation of concussion-management practices that met consensus best practices;

        (ii)    failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student athlete who was concussed or displayed concussion symptoms to be asymptomatic;

        (iii)    failing to require, prior to 2010, that student athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

        (iv)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

        (v)    leaving discretion of return to play for a student- athlete that had suffered a concussion or displayed concussion symptoms to an individual member's institution's [sic] "medical staff" without regard to

whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)     failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)     failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

(viii)    failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

(b)     by failing "to uphold the principal [sic] of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," in breach of NCAA Const., Art.1, § 1.2(b);

(c)     by failing to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, in breach of NCAA Const., Art. 1, § 1.3.2;

(d)     by failing to conduct intercollegiate athletics  "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," in breach of NCAA Const., Art. 2, § 2.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 287(a)(i)-(viii);

(e)     by failing to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student- athletes," in breach of NCAA Const., Art. 2, § 2.2.3;

(f)     by failing to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," in breach of NCAA Const., Art. 2, § 2.2; and

(g)     by failing to "assist the institution in its efforts to achieve full compliance with all rules and regulations …," in breach of NCAA Const., Art. 2, § 2.8.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 287(a)(i)-(viii).

**ANSWER:**

The allegations in Paragraph 287 state legal conclusions to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 287.

288.    As a result of the foregoing, Plaintiffs and the Class have been injured, and are entitled to injunctive relief as well as equitable relief in the form of medical monitoring.

**ANSWER:**

The NCAA denies the allegations in Paragraph 288, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Third Amended Class Action Complaint.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf Of The Class)**

289.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth therein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth fully herein.

290.    To the extent an express contract does not exist, the facts and circumstances set forth above establish an implied contract wherein student-athletes, in return for participation, agreed to be bound by NCAA rules and expected the NCAA to provide appropriate rules and regulations so as to protect their health and safety to the extent possible.

**ANSWER:**

The allegations in Paragraph 290 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 290.

291.    The NCAA acknowledges that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."[99]

**<u>ANSWER</u>:**

The material referenced in Footnote 99 and Paragraph 291 speaks for itself, and to the

extent that the allegations in Paragraph 291 vary therewith, the NCAA denies those allegations.

292.    The NCAA, and its member institutions, have breached their contractual commitment to provide a safe environment by:

(i)    failing to implement or require the implementation of a [sic] concussion-management practices that met consensus best practices;

(ii)    failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)    leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's [sic] "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)    failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

---

[99]    Handbook, at 4 (emphasis added).

(viii)    failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

**ANSWER:**

The allegations in Paragraph 292 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations.  The NCAA denies any and all remaining allegations in Paragraph 292.

293.    As a result of the foregoing, Plaintiffs and the Class have been injured and are entitled to injunctive relief as well as equitable relief in the form of medical monitoring.

**ANSWER:**

The NCAA denies the allegations in Paragraph 293, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Third Amended Class Action Complaint.

## COUNT III
## BREACH OF EXPRESS CONTRACT
### (On Behalf Of The Class As Third-Party Beneficiaries)

294.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth fully herein.

295.    To the extent the Court finds no contract exists, either express or implied, between the student-athlete and the NCAA, then the NCAA and its member institutions were parties to a contract.  As an express condition of their membership in the NCAA, each institution must agree to abide by the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively "Manual").  The Manual thus constitutes a contract between the NCAA and its member institutions.

**ANSWER:**

The allegations in Paragraph 295 state a legal conclusion to which no response is

required, but to the extent a response is required, the NCAA denies those allegations. The

NCAA denies any and all remaining allegations in Paragraph 295.

296. Plaintiffs and members of the Class are third-party beneficiaries of the contract between the NCAA and its members because the parties to the contract intended to benefit student-athletes and indeed the contract expressly provides for benefits to flow to the student-athlete as part of the "Fundamental Policy of the NCAA":

1.2 PURPOSES [*]

The purposes of this Association are:

(a) To initiate, stimulate and improve intercollegiate athletics programs for student-athletes and to promote and develop educational leadership, physical fitness, athletics excellence and athletics participation as a recreational pursuit;

1.3 FUNDAMENTAL POLICY [*]

1.3.1 Basic Purpose. [*] The competitive athletics programs of member institutions are designed to be a vital part of the educational system. A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

**ANSWER:**

The allegations in Paragraph 296 state a legal conclusion to which no response is required,

but to the extent a response is required, the NCAA denies those allegations. The NCAA denies

any and all remaining allegations in Paragraph 296.

297. The basic principles of the NCAA also benefit the student-athlete:

2.2 THE PRINCIPLE OF STUDENT-ATHLETE WELL- BEING [*]

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well- being of student-athletes. *(Revised: 11/21/05)*

2.2.1   Overall Educational Experience.  [*]  It is the responsibility of each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience. *(Adopted:  1/10/95)*

2.2.2   Cultural Diversity and Gender Equity.  [*]  It is the responsibility of each member institution to establish and maintain an environment that values cultural diversity and gender equity among its student-athletes and intercollegiate athletics department staff.  *(Adopted:  1/10/95)*

2.2.3   Health and Safety.  [*]  It is the responsibility of each member institution to protect the health of and provide a safe environment for each of its participating student-athletes. *(Adopted:  1/10/95)*

2.2.4   Student-Athlete/Coach Relationship.  [*]  It is the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach.  *(Adopted:  1/10/95)*

2.2.5   Fairness, Openness and Honesty.  [*]  It is the responsibility of each member institution to ensure that coaches and administrators exhibit fairness, openness and honesty in their relationships with student-athletes. *(Adopted:  1/10/95)*

2.2.6   Student-Athlete Involvement. [*]  It is the responsibility of each member institution to involve student-athletes in matters that affect their lives. *(Adopted:  1/10/95)*

**ANSWER:**

The allegations in Paragraph 297 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations.  The NCAA denies any and all remaining allegations in Paragraph 297.

298.    The foregoing provisions of the contract are just a small fraction of the contractual provisions that are intended to benefit the student-athlete.  Thus the student-athletes are the intended third-party beneficiaries of the contract.

**ANSWER:**

The allegations in Paragraph 298 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations.  The NCAA denies any and all remaining allegations in Paragraph 298.

299.    The NCAA and its member institutions have breached the contract in on or more of the following ways:

(a)    by failing "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," in breach of NCAA Const., Art.1, § 1.2(a), including, but not limited to, by:

(i)    failing to implement or require the implementation of concussion-management practices that met consensus best practices;

(ii)    failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)    leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's [sic] "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)    failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

(viii)    failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

(b)    by failing "to uphold the principal [sic] of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," in breach of NCAA Const., Art.1, § 1.2(b);

(c)     by failing to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, in breach of NCAA Const., Art. 1, § 1.3.2;

(d)     by failing to conduct intercollegiate athletics  "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," in breach of NCAA Const., Art. 2, § 2.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 299(a)(i)-(viii);

(e)     by failing to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," in breach of NCAA Const., Art. 2, § 2.2.3;

(f)     by failing to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," in breach of NCAA Const., Art. 2, § 2.2; and

(g)     by failing to "assist the institution in its efforts to achieve full compliance with all rules and regulations…," in breach of NCAA Const., Art. 2, § 2.8.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 299(a)(i)-(viii).

**ANSWER:**

The allegations in Paragraph 299 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations.  The NCAA denies any and all remaining allegations in Paragraph 299.

300.     As a direct result of these breaches, Plaintiffs and members of the Class have been injured and are entitled to injunctive relief as well as equitable relief in the form of medical monitoring.

**ANSWER:**

The NCAA denies the allegations in Paragraph 300, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Third Amended Class Action Complaint.

## COUNT IV
## FRAUDULENT CONCEALMENT
### (On Behalf Of The Class)

301.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.

302.    The NCAA concealed facts and information which were material to student-athletes.  As more fully described above, since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.  Further, based on studies for which the NCAA *itself* paid, the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.  Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.

**ANSWER:**

The NCAA denies the allegations in Paragraph 302.

303.    Through concealment of material facts, the NCAA intended to induce a false belief, under circumstances creating a duty to speak.  The NCAA specifically intended to induce a false belief in its student-athletes that they should continue to play and should not be prevented from playing their respective sports even after a concussion or several concussions that should have required time to heal.

**ANSWER:**

The NCAA denies the allegations in Paragraph 303.

304.    Plaintiffs could not have discovered the truth through reasonable inspection or inquiry, or were prevented from doing so.  Plaintiffs were under the care and treatment of the NCAA and school trainers and doctors, and justifiably relied on their silence as representing that the facts did not exist.

**ANSWER:**

The NCAA denies the allegations in Paragraph 304.

305.    The concealed information was such that Plaintiffs would have acted differently if they had been aware of the material facts.  Plaintiffs would not have continued to play, or would

have taken additional time to allow their brain injuries to heal before returning to play, and/or would have obtained insurance policies that provided long-term coverage. Despite the NCAA's knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 305.

306.    As a proximate cause of the NCAA's concealment, Plaintiffs and the Class suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

**ANSWER:**

The NCAA denies the allegations in Paragraph 306.

**COUNT V**
**NEGLIGENCE**
**(On Behalf Of The Class)**

307.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.

308.    At all relevant times, the NCAA had a duty toward Plaintiffs and the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

**ANSWER:**

The allegations in Paragraph 308 state a legal conclusion to which no response is

required, but to the extent a response is required, the NCAA denies those allegations. The

NCAA denies any and all remaining allegations in Paragraph 308.

309.    The NCAA acted carelessly and negligently in its position as the regulatory body for college teams and its student-athletes, including Plaintiffs and the Class. The NCAA knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long-term.

**ANSWER:**

The NCAA denies the allegations in Paragraph 309.

310. The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs and the Class, both generally and in the following particular respects:

(i)     failing to implement or require the implementation of concussion-management practices that met consensus best practices;

(ii)     failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)     failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)     failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)     leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's [sic] "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)     failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)     failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period;

(viii)     failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms; and

(ix)     Other acts of negligence or carelessness that may materialize during the pendency of this action.

**ANSWER:**

The allegations in Paragraph 310 state a legal conclusion to which no response is required, but to the extent a response is required, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 310.

311. The Plaintiffs individually and the Class members may have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described above, including but not limited to post-concussion syndrome and Chronic Traumatic Encephalopathy, as well as such symptoms as headaches, dizziness, loss of memory, depression, anxiety, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, loss of the pleasures of life, early-onset dementia, and Parkonsonism [sic], among other things.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 311 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 311.

312. The Plaintiffs and the Class are entitled to injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding: the coaching of tackling methodologies that cause head injuries; the implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and the implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA denies the allegations in Paragraph 312, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Third Amended Class Action Complaint.

313. Moreover, Plaintiffs have no adequate remedy at law in that monetary damages cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Thus, Plaintiffs and the Class are entitled to medical monitoring. Without a Court-approved medical monitoring program as described herein in Count VI, or established by the Court, Plaintiffs and the Class members will continue to face an unreasonable risk of injury and disability.

**ANSWER:**

The NCAA denies the allegations in Paragraph 313, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the Third

Amended Class Action Complaint.

**COUNT VI**
**MEDICAL MONITORING**
**(On Behalf Of The Class)**

314.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this
Complaint as if fully set forth herein.  Plaintiffs bring this Count VI as a remedy under the law of
the State of Indiana. Alternatively, Plaintiffs bring this Count VI under the laws of the states in
which they reside and assert claims on behalf of the Class under the laws of the states in which
class members reside.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.  The NCAA admits that Plaintiffs purport to bring Count VI under the law of the

State of Indiana or, alternatively, under the laws of the states in which they reside.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 314.

315.    The Plaintiffs experienced repetitive traumatic brain impacts during their
respective NCAA careers that significantly increased their risk of developing post-concussion
syndrome, neurodegenerative disorders and diseases, including, but not limited to, CTE,
Alzheimer's disease, and other similar cognitive-impairing conditions.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 315 and, on that basis, denies them and demands strict

proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 315.

316.    Repetitive head impacts during practices and games has a microscopic and latent
effect on the brain.  Repetitive exposure to accelerations to the head causes deformation,
twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take
place, including the release of small amounts of chemicals within the brain, such as the Tau
protein.  Among other things, the gradual build-up of Tau protein – sometimes over decades –

causes CTE, which is the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 316 and, on that basis, denies them and demands strict proof thereof. The material referenced in Paragraph 316 speaks for itself, and to the extent that the allegations in Paragraph 316 vary therewith, the NCAA denies those allegations. The NCAA denies any and all remaining allegations in Paragraph 316.

317.    The game of football and other games as played in the NCAA such as soccer, lacrosse, ice hockey, wrestling, field hockey, and basketball, including both practices and game play, have exposed student-athletes to hazardous conditions and risks of harm. These repetitive head accelerations to which the Plaintiffs and the Class have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiffs' exposure to the risks of harm as described above would have been materially lower.

**ANSWER:**

The NCAA admits that playing sports such as soccer, lacrosse, ice hockey, wrestling, field hockey, and basketball presents a risk of injury. The NCAA denies any negligence, fraud or misrepresentation. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 317.

318.    Accordingly, the repetitive head impacts sustained by NCAA players in NCAA games and practices exposed NCAA players, including the Plaintiffs, to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which NCAA players have sustained repetitive head impacts exposed them to substantive hazards.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 318 and, on that basis, denies them and demands strict proof thereof. The NCAA denies any and all remaining allegations in Paragraph 318.

319.     Depending on many factors, including the amount of the exposure to repetitive head impacts and the release of Tau protein, the player/victim will develop a range of subtle to significant neuro-cognitive changes over time.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 319 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 319.

320.     The latent injuries which develop over time and manifest later in life include, but are not limited to, varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and, sometimes, fully developed encephalopathy.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 320 and, on that basis, denies them and

demands strict proof thereof.  The NCAA denies any and all remaining allegations in

Paragraph 320.

321.     The NCAA was fully aware of the danger of exposing all NCAA players to repetitive head impacts, including the repetitive sub-concussive and concussive blows that increase the risk to NCAA players of, among other latent injuries, encephalopathy.

**ANSWER:**

The NCAA denies the allegations in Paragraph 321.

322.     As noted above, by its actions and omissions and fraudulent conduct, the NCAA further breached its duty (which it had assumed long ago) of reasonable and ordinary care to the Plaintiffs by failing to provide NCAA players, including the Plaintiffs, with necessary or adequate protections in or more of the following ways:

(i)     failing to implement or require the implementation of concussion management practices that met consensus best practices;

(ii)    failing to implement or require the implementation of medically-supervised stepwise return to play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

- 128 -

(iii)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)    leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual member's institutions [sic] "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play and practice designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)    failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

(viii)    failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

The NCAA thus exposed Plaintiffs and the Class to the heightened risks of neurological damage that arise from repetitive head impacts during NCAA games and practices.

**<u>ANSWER</u>:**

The NCAA denies the allegations in Paragraph 322.

323.    As a proximate result of the NCAA's tortious conduct, the Plaintiffs and the Class have experienced an increased risk of developing post-concussion syndrome, and serious latent neurodegenerative disorders and diseases, including, but not limited to, CTE, Alzheimer's disease, and/or other and similar cognitive-impairing conditions.

**<u>ANSWER</u>:**

The allegations in Paragraph 323 state a legal conclusion to which no response is

required, but to the extent a response is required, the NCAA denies those allegations.

324.    The latent brain injuries from which Plaintiffs and the Class may suffer require specialized testing (with resultant treatment) that is not generally given to the public at large and is different from that normally recommended in the absence of exposure to this risk of harm.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 324 and, on that basis, denies them and

demands strict proof thereof.

325.    The medical monitoring regime should include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with concussion related injuries.  This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries and lack of concussion management practices in accordance with consensus best practices that Plaintiffs experienced in the NCAA.

**ANSWER:**

The NCAA denies the allegations in Paragraph 325, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the Third

Amended Class Action Complaint.

326.    The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis of head injuries and their potential link to, *inter alia*, memory loss, impulse rage, depression, early-onset dementia, CTE, Alzheimer-like syndromes, and similar cognitive-impairing conditions.

**ANSWER:**

The NCAA denies the allegations in Paragraph 326.

327.    By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long-term injuries, disease, and losses without adequate treatment will be significantly reduced.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 327 and, on that basis, denies them and

demands strict proof thereof.

328.    Plaintiffs, therefore, seek an injunction creating a Court-supervised, NCAA-funded medical monitoring program which will facilitate the diagnosis of Plaintiffs and the Class for post-concussion syndrome, and other neurodegenerative disorder or disease resulting from repetitive head impacts.  The medical monitoring should include a trust fund to pay for the medical monitoring and diagnosis of Plaintiffs and the Class as frequently and appropriately as necessary.

**ANSWER:**

The NCAA denies the allegations in Paragraph 328.

329.    Because the NCAA has failed to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered a concussion or sub-concussion to minimize the risk of long-term injury or illness, medical monitoring is the most appropriate method by which it can be determined whether a particular individual is now at risk for long-term injury or illness from a concussion or sub-concussive event.

**ANSWER:**

The NCAA denies the allegations in Paragraph 329, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the Third

Amended Class Action Complaint.

330.    Accordingly, the NCAA should be required to establish a medical monitoring program that includes, among other things:

    a.    Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes for the purposes of diagnosis, as frequently and appropriately as necessary;

    b.    Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring for the purposes of diagnosis; and

    c.    Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the student-athlete is subjected to an increased risk of harm.

**ANSWER:**

The NCAA denies the allegations in Paragraph 330, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the Third

Amended Class Action Complaint.

331.    Plaintiffs and the Medical Monitoring Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Without a Court-approved medical monitoring program as described herein, or established by the Court, Plaintiffs and the Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability and remain undiagnosed.

**ANSWER:**

The NCAA denies the allegations in Paragraph 331, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the Third

Amended Class Action Complaint.

**COUNT VII**
**NEGLIGENCE**
**(On Behalf Of Arrington, Owens, Solomon and Palacios)**

332.    Plaintiffs Arrington, Owens, Solomon and Palacios each individually and separately bring Count VII on their own behalf, and adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.  The NCAA admits that Plaintiffs Arrington, Owens, Solomon and Palacios each

individually and separately purport to bring Count VII on their own behalf.  Except as expressly

admitted, the NCAA denies any and all remaining allegations in Paragraph 332.

333.    At all relevant times, the NCAA had a duty toward Plaintiffs Arrington, Owens, Solomon and Palacios to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

**ANSWER:**

The allegations in Paragraph 333 state a legal conclusion to which no response is

required, but to the extent a response is required, the NCAA denies those allegations.  The

NCAA denies any and all remaining allegations in Paragraph 333.

334.    The NCAA acted carelessly and negligently in its position as the regulatory body for college teams and its student-athletes, including Plaintiffs Arrington, Owens, Solomon and

Palacios. The NCAA knew or should have known that its action or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long-term.

**<u>ANSWER</u>:**

The NCAA denies the allegations in Paragraph 334.

335. The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs Arrington, Owens, Solomon and Palacios, both generally and in the following particular respects:

(i)     failing to implement or require the implementation of concussion-management policies that met consensus best practices;

(ii)    failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)   failing to require that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)    failing to require that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)     leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members [sic] institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)   failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period;

(viii)  failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms; and

(ix)    Other acts of negligence or carelessness that may materialize during the pendency of this action.

**ANSWER:**

The NCAA denies the allegations in Paragraph 335.

336.    Plaintiffs Arrington, Owens, Solomon and Palacios individually have experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described above, including but not limited to post-concussion syndrome and Chronic Traumatic Encephalopathy, as well as such symptoms as headaches, dizziness, loss of memory, depression, anxiety, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, loss of the pleasures of life, early-onset dementia, and Parkonsonism [sic], among other things.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 336 and, on that basis, denies them and demands strict

proof thereof.  The NCAA denies any and all remaining allegations in Paragraph 336.

337.    As a result of the foregoing, Arrington, Owens, Solomon and Palacios have suffered damages and will in the future suffer damages caused by the negligence of the Defendant.  Accordingly, Plaintiffs Arrington, Owens, Solomon and Palacios seek individual awards of compensatory damages, punitive damages, pain and suffering, and any other relief to which they are untitled under the law.

**ANSWER:**

The NCAA denies the allegations in Paragraph 337, and expressly denies that Plaintiffs

are entitled to any relief whatsoever, including but not limited to the relief requested in the Third

Amended Class Action Complaint.

## JURY DEMAND

338.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Third Amended Class Action Complaint so triable.

**ANSWER:**

The NCAA admits that Plaintiffs purport to seek a trial by jury of all claims in the Third

Amended Class Action Complaint.  Except as expressly admitted, the NCAA denies any and all

remaining claims in Paragraph 338.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, request judgment as follows:

      A.      Certification of the proposed Class pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

      B.      Designation of Plaintiffs as representatives of the proposed Class and designation of Plaintiffs' counsel as Class counsel;

      C.      Injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding:

      1.      The coaching of tackling methodologies or other sports plays that cause head injuries;

      2.      The implementation of legislation requiring express system-wide stepwise "return to play" guidelines with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

      3.      The implementation of legislation requiring system-wide guidelines for the screening and detection of head injuries, including concussion-management practices that meet consensus best practices;

      4.      The implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play;

      5.      The implementation of legislation requiring that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management; and that they be independent from any NCAA institution.

      6.      The implementation of legislation requiring that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

      7.      The implementation and/or enforcement of game rules of play and practice designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

8.     The implementation of legislation incorporating an express concussion-management plan to which all member institutions must adhere; and

9.     The provision of appropriate medical care or coverage for costs for diagnostic care for student-athletes who suffered concussions or displayed concussion symptoms.

D.     The establishment of a medical monitoring program that includes, among other things:

1.     Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes, as frequently and appropriately as necessary to diagnose post-concussion syndrome or any long-term effects or disease from concussions;

2.     Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring necessary to diagnose post-concussion syndrome or any long-term effects or disease from concussions; and

3.     Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the player is subjected to an increased risk of harm.

E.     An award to the Plaintiffs and the Class of prejudgment interest, costs and attorneys' fees; and

F.     An award to the Plaintiffs and Class for such other and further relief as the Court deems just and proper.

Plaintiffs Arrington, Owens, Solomon and Palacios each also individually request judgment against Defendant and for an award of compensatory damages, punitive damages, pain and suffering, and any other relief to which they are entitled under the law.

**ANSWER**:

The NCAA denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Third Amended Class Action Complaint. The NCAA denies any and all remaining allegations in the Paragraph entitled "Request for Relief."

## AFFIRMATIVE DEFENSES

The NCAA's affirmative defenses to Plaintiffs' Third Amended Class Action Complaint are set forth below.  By setting forth the following allegations and defenses, however, the NCAA does not assume the burden of proof on matters and issues other than those on which the NCAA has the burden of proof as a matter of law.

### FIRST AFFIRMATIVE DEFENSE

The Third Amended Class Action Complaint fails to state any claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Third Amended Class Action Complaint are barred, in whole or in part, because Plaintiffs and/or the members of the proposed class voluntarily participated in sports at their respective colleges or universities and assumed any and all risks inherent in the sports they chose to play.

### THIRD AFFIRMATIVE DEFENSE

Upon information and belief, the claims in Plaintiffs' Third Amended Class Action Complaint are barred, in whole or in part, because Plaintiffs and/or the members of the proposed class signed forms acknowledging the risks associated with concussions.  In doing so, they expressly assumed the concussion risks associated with the sports they chose to play.

### FOURTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Third Amended Class Action Complaint are barred, in whole or in part, under the contact sports exception to the ordinary standard of care.

### FIFTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Third Amended Class Action Complaint for breach of express and implied contract are barred, in whole or in part, for lack of consideration.

## SIXTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Third Amended Class Action Complaint for fraudulent concealment is barred, in whole or in part, because Plaintiffs have failed to plead that claim with particularity as required by Federal Rule of Civil Procedure 9(b).

## SEVENTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Third Amended Class Action Complaint for fraudulent concealment is barred, in whole or in part, because Plaintiffs cannot meet their burden of showing that any acts, conduct, statements or omissions on the part of the NCAA were likely to mislead.

## EIGHTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Third Amended Class Action Complaint for fraudulent concealment is barred, in whole or in part, because the information the NCAA allegedly concealed was publicly available.

## NINTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Third Amended Class Action Complaint for fraudulent concealment is barred, in whole or in part, because Plaintiffs and/or members of the proposed class were not actually misled or deceived by and/or did not rely upon any statements or omissions on the part of the NCAA in deciding whether to participate in sports at their respective colleges or universities.

## TENTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or one or more members of the proposed class are time-barred under the applicable statutes of limitations.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs and/or persons claiming to be members of the proposed class are barred from recovery, in whole or in part, because their injuries resulted from the intervening cause of another party and/or from incidents and events occurring before Plaintiffs or members of the proposed class enrolled in college.

## TWELFTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or one or more members of the proposed class are barred, in whole or in part, to the extent that any injury sustained by Plaintiffs and/or members of the proposed class was caused by their own conduct, whether negligent or otherwise.

## THIRTEENTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Third Amended Class Action Complaint for medical monitoring is barred, in whole or in part, to the extent that applicable state law does not recognize a claim for medical monitoring.

## FOURTEENTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Third Amended Class Action Complaint for equitable relief are barred, in whole or in part, by the fact that Plaintiffs and/or the members of the proposed class have an adequate remedy at law.

## FIFTEENTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Third Amended Class Action Complaint are barred, in whole or in part, to the extent that Plaintiffs and/or members of the proposed class did not actually sustain a concussion and therefore suffered no injury.

## SIXTEENTH AFFIRMATIVE DEFENSE

If Plaintiffs and/or persons claiming to be members of the proposed class have delayed in bringing their claims, they may be barred from recovery, in whole or in part, by the doctrines of waiver or laches.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or members of the proposed class may be barred, in whole or in part, because they have made statements and/or taken actions that estop them from asserting their claims.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or members of the proposed class may be barred, in whole or in part, to the extent they have failed to mitigate damages.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs and/or members of the proposed class may be barred from recovery, in whole or in part, if in this or other tribunals they have brought actions and have received judgments or awards on some or all claims asserted herein.

## TWENTIETH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or members of the proposed class are barred by the doctrines of collateral estoppel and/or res judicata.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

If in this or other tribunals Plaintiffs and/or members of the proposed class have settled, or are in the process of settling, the same or similar claims to those alleged in the Third Amended Class Action Complaint, they may be barred from recovery, in whole or in part, by such settlements.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs and their counsel have failed to join as parties to this action all persons and entities who would be necessary parties for the adjudication of the claims of Plaintiffs and/or members of the proposed class.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

If any persons claiming to be members of the proposed class have released claims, they may be barred from recovery, in whole or in part, by such releases.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

If any persons claiming to be members of the proposed class engaged in unlawful, inequitable or improper conduct, they may be barred from recovery, in whole or in part.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' Third Amended Class Action Complaint and the causes of action alleged therein are barred to the extent that Plaintiffs lack standing.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' Third Amended Class Action Complaint and the causes of action alleged therein are barred to the extent that they violate the economic loss doctrine.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or one or more members of the proposed class are barred, in whole or in part, to the extent that Plaintiffs and/or one or more members of the proposed class did not suffer any legally cognizable injury under applicable law.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

The NCAA has insufficient knowledge or information upon which to form a belief as to whether it may have additional affirmative defenses that govern the claims asserted by Plaintiffs

and on behalf of the persons claimed to be members of the proposed class.  The NCAA,

therefore, reserves the right to raise additional defenses as appropriate.

WHEREFORE, the NCAA prays:

A.     That Plaintiffs and all members of the proposed class take nothing by reason of this suit;

B.     For attorneys' fees and costs;

C.     That the certification of all proposed classes herein be denied; and

D.     For any other and further relief as the Court deems just and proper.

Date: January 28, 2015                    Respectfully submitted,

/s/ Mark S. Mester
Lead Counsel for Defendant
National Collegiate Athletic Association

Mark S. Mester
    mark.mester@lw.com
Johanna M. Spellman
    johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 N. Wabash Ave., Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

J. Christian Word
    christian.word@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

## CERTIFICATE OF SERVICE

I, Mark S. Mester, certify that on January 28, 2015, a true and correct copy of the foregoing ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION TO PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT was filed through the ECF system and served upon the following parties by prepaid first class mail:

Timothy J. McIlwain
TIMOTHY J. MCILWAIN, ATTORNEY AT
LAW, LLC
89 River Street #1538
Hoboken, NJ 07030
Telephone:  877-375-9599
Facsimile:  609-450-7017

Edgar D. Gankendorff
PROVOSTY & GANKENDORFF, L.L.C.
650 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone:  504-410-2795
Facsimile:  504-410-2796

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:  415-956-1000
Facsimile:  415-956-1008

/s/ Mark S. Mester
Mark S. Mester
   mark.mester@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767