**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**LEAD CLASS COUNSEL'S MEMORANDUM REGARDING
PLAINTIFF NICHOLS' RENEWED MOTION TO APPOINT JAY EDELSON AS
<u>LEAD COUNSEL OF THE PERSONAL INJURY CLASS</u>**

010270-12  757726 V1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....................................................................................................1

II. ARGUMENT........................................................................................................3

    A. Rule 23 Provides the Protections for Class Members to Participate in the Settlement Approval Process ............................................................3

    B. The Appointment of Edelson as Lead Counsel on Behalf of Individuals with Personal Injury Claims is Unnecessary ...........................................5

        1. Edelson does not address – and does not satisfy – the factors to demonstrate that additional class counsel is necessary..............................5

        2. Contrary to Edelson's unsupported arguments, there is no putative "personal injury class" to represent. .............................................6

        3. The complicated mass tort context Edelson envisions does not exist here. ...............................................................9

        4. Co-Lead Counsel have not "repudiated" class members' right to obtain personal injury damages. ............................................11

    C. Edelson Does Not Satisfy the FED. R. CIV. P. 23(g) Factors ................................13

III. CONCLUSION....................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armstrong v. Board of Sch. Dirs.*,
  616 F.2d 305 (7th Cir. 1980), *overruled on other grounds by*
  *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)..................................................................3, 4

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp. 2d 935 (N.D. Ill. 2011) .................................................................................4

*Beaulieu v. EQ Indus. Servs., Inc.*,
  2009 WL 2208131 (E.D.N.C. July 22, 2009) ..........................................................12

*Benedict v. Altria Group, Inc.*,
  241 F.R.D. 668 (D. Kan. 2007).........................................................................12

*Bentley v. Honeywell Int'l, Inc.*,
  223 F.R.D. 471 (S.D. Ohio 2004) ................................................................12

*Carrier v. Am. Bankers Life Assurance Co. of Fla.*,
  2006 U.S. Dist. LEXIS 76346 (D.N.H. Oct. 19, 2006) ........................................5, 6

*Cima v. WellPoint Health Networks, Inc.*,
  250 F.R.D. 374 (S.D. Ill. 2008) .......................................................................2

*Clark v. Experian Information Solutions, Inc.*,
  2002 WL 2005709 (D.S.C. June 26, 2002)..........................................................12

*Crowder v. Lash*,
  687 F.2d 996 (7th Cir. 1982) ...........................................................................12

*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir. 1996)...........................................................................8, 11

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995).................................................................................4

*Jenkins v. Missouri*,
  78 F.3d 1270 (8th Cir. 1996) ..............................................................................3

*Leib v. Rex Energy Operating Corp.*,
  2008 WL 5377792 (S.D. Ill. Dec. 19, 2008)..........................................................12

010270-12  757726 V1

*In re M.L. Stern Overtime Litig.*,
   2009 U.S. Dist. LEXIS 31650 (S.D. Cal. Apr. 13, 2009) ........................................................3

*In re Mexico Money Transfer Litig.*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................................4

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ...........................................................................................4

*Szabo v. Bridgeport Machs., Inc.*,
   249 F.3d 672 (7th Cir. 2001) ..............................................................................................3

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004)..........................................................................................14

*In re Zyprexa Prods. Liab. Litig.*,
   433 F. Supp. 2d 268 (E.D.N.Y. 2006) .................................................................................10

## Other Authorities

7B WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 1802.3 (3d ed. 2014) .....................................5

FED. R. CIV. P. 23(g)(1)(A) ..................................................................................................13

FED. R. CIV. P. 23(g)(3) .........................................................................................................5

FED. R. CIV. P. 23, 1966 Advisory Committee Notes...................................................................9

MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.11 (2004) ......................................................5

010270-12  757726 V1

Lead Counsel[1] respectfully responds to Plaintiff Nichols' ("Nichols") Renewed Motion to Appoint Jay Edelson ("Edelson") as Lead Counsel of the Personal Injury Class.

## I.       INTRODUCTION

Edelson's repeated, and failed, attempts to obtain a leadership position in this case are best equated to a general who has never fought a battle attempting to lead injured soldiers into a war. Other than one asymptomatic soldier (Nichols),[2] the injured army (real plaintiffs with injuries caused by concussions or the accumulation of subconcussive hits) has chosen to go to battle without him and without the need for a personal injury class.[3] Despite having an asymptomatic client and having *never* fought a battle on behalf of a student-athlete client with concussion-related personal injury claims on an individual *or* class basis, Edelson again requests a leadership position.

Edelson's renewed motion appears to be an attempt to derail or participate in Lead Counsel's work with the NCAA on the Settlement, which if approved will bring needed changes

---

[1] Lead Counsel means Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC. *See* Case Management Order No. 3 (July 30, 2014) (Dkt. No. 76).

[2] The "coalition of attorneys" cited in support of Edelson's appointment – consisting of 11 attorneys in 8 different law firms – represent Edelson's sole asymptomatic client. Again Edelson's "collation" is another overblown claim.

[3] As of February 5, 2015, outside of this MDL, the following individual concussion-related personal injury lawsuits are pending nationwide against the NCAA: *Sheely v. NCAA*, Case No. 380569V (Montgomery Cnty., MD); *Wells v. NCAA*, Case No. 02-cv-2013-902657.00 (Mobile Cnty., AL); *Anderson v. NCAA*, Case No. 631093 (East Baton Rouge, LA); *Flasher v. NCAA*, Case No. CACE14009698 (Broward Cnty., FL); *Cunningham v. NCAA*, Case No. 3:14-cv-02256 (N.D. Tex.); *Onyshko v. NCAA*, Case No. C-63-CV-201403620 (Wash. Cnty., PA); *Bradley v. NCAA*, Case No. 2014 CA 004932 B (D.C. Sup. Ct.); *Walen v. NCAA, et al.*, No. 14-cv-12218 (Multnomah Cnty., Or.); *Schmitz v. NCAA*, CV 14 834486 (Cuyahoga Cty., Oh.). Also, counsel for one plaintiff has actually filed three identically-captioned actions in two different jurisdictions: *Calderone v. NCAA, et al.*, 14-706941 (N.Y. Sup. Ct. – Queens Cnty.); *Calderone v. NCAA, et al.*, 14-706987 (N.Y. Sup. Ct. – Queens Cnty.); and *Calderon v. NCAA, et al.*, No. 140903509 (Philadelphia Cnty., PA). The NCAA has only been served with one of these complaints. Finally, Plaintiffs Arrington, Owens, Solomon and Palacios have individual personal injury claims pending before this Court.

010270-12  757726 V1

to protect student athletes and detect concussion injury in former athletes.[4] Edelson's objections

to the Settlement, however, are best addressed through the procedural mechanisms set forth under

FED. R. CIV. P. 23. It is premature and unnecessary to appoint lead counsel for "class personal

injury" claims where the majority of personal injury claimants are proceeding individually

without Edelson's leadership, and the record now before the Court suggests that the class Edelson

seeks to represent does not exist. The only science before the Court, from Dr. Cantu, Dr. Stern,

and the academic literature, establishes that most concussions resolve; those that don't or those

that result in late-life symptoms result in Post-Concussion Syndrome ("PCS") or Chronic

Traumatic Encephalopathy ("CTE"). Both are serious conditions.[5] Lawyers can and do take on

cases for clients with such conditions on an individual basis. Thus, there is no evidence in the

record (and Edelson has provided no evidence) that the class he seeks to lead, those with small

cases, exists.

Therefore, the primary basis for Edelson's renewed motion – that additional lead counsel

is needed to "pick up the personal injury claims torch"[6] – has no basis in fact. Lacking any

factual basis for his proposed class, it is not surprising that virtually all of the current personal

injury plaintiffs have chosen to pursue their claims independently.[7] Moreover, "[a] difference of

---

[4] Edelson's assistance is not needed in this (or any) regard. For years, Co-Lead Counsel and the NCAA have worked with the top experts in the field to develop changes to protect student athletes and detect concussion injury in former athletes. Since the Court's denial of preliminary approval, Co-Lead Counsel and the NCAA have again met with Judge Andersen and the Medical Science Committee to refine the settlement terms to address the Court's specific concerns. On the other hand, Edelson has yet to provide any scientific or evidentiary support for his attacks on the Settlement or in support of his claim that there is a class that needs his leadership, and does not have any experience in concussion or medical monitoring issues which would provide any additional value to these discussions. *See supra*, n.45.

[5] *See* Expert Report of Robert C. Cantu in Support of Preliminary Approval of Settlement (Dkt. No. 69) ("Cantu Report"), ¶¶ 37-45; *see* Affidavit of Robert A. Stern, Ph.D. (Dkt. No. 6-3, 4-7).

[6] Plaintiff Nichols' Renewed Motion to Appoint Jay Edelson as Lead Counsel of the Personal Injury Class (Dkt. No. 128), p. 1.

[7] *See, e.g.*, *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 384 (S.D. Ill. 2008) ("Correspondingly, in a case involving, as here, substantial individual claims worth tens of thousands of

- 2 -

opinion concerning litigation strategy or individual aspects of a remedy does not overcome the

presumption of adequate representation."[8] Accordingly, Edelson's motion should be denied.

## II.     ARGUMENT

**A.     Rule 23 Provides the Protections for Class Members to Participate in the Settlement Approval Process**

Edelson's criticisms of Lead Counsel are rooted in what he perceives as purported

inadequacies in the proposed Settlement. Edelson's objections to the Settlement, however, do not

justify appointment of additional class counsel at this late stage, after Lead Counsel have

performed the substantial work of bringing, prosecuting, and negotiating settlement of this case.

Indeed, the Federal Rules of Civil Procedure provide a process through which Edelson, his

clients and all members of the Settlement Class can raise whatever objections they may have to

the settlement and have those objections thoroughly reviewed by the Court.

In its December 17, 2014 Order denying the motion for preliminary approval, the Court

identified particular issues in the proposed settlement that it wishes the parties to address. The

parties are, in turn, working to address those issues, and Lead Counsel anticipate filing a revised

settlement agreement and accompanying motion for preliminary approval before the April 17

status hearing. At that point, the Court will consider whether the proposed settlement is "within

the range of possible approval" such that it is appropriate "to notify the class members of the

proposed settlement and to proceed with a fairness hearing."[9]

---

dollars or more, class members obviously have an important interest in bringing individual actions."); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 678 (7th Cir. 2001) (holding that "it is unnecessary to certify a nationwide class. Each [class member] has a substantial claim, of the sort that could be, and often is, pursued independently.").

[8] *Jenkins v. Missouri*, 78 F.3d 1270, 1275 (8th Cir. 1996).

[9] *See Armstrong v. Board of Sch. Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *In re M.L. Stern Overtime Litig.*, 2009 U.S. Dist. LEXIS 31650, at *9-10 (S.D. Cal. Apr. 13, 2009) ("preliminary approval is appropriate so long as the proposed settlement falls within the range of possible judicial approval") (internal quotation marks

- 3 -

If the Court grants preliminary approval of the settlement, notice will be provided to members of the putative settlement class, and those individuals, including the individuals Edelson purports to represent, will have ample opportunity to review the proposed settlement and opt-out or object as they see fit.[10] The quantity of opt-outs and objections, as well as the nature of any such objections, however, will likely play a role in the Court's decision whether to grant final approval of the settlement.[11] The briefing of the final approval motion will provide all interested parties with a full and fair opportunity to address any such objections.[12] In short, Rule 23 sets forth a process to allow those who object to a proposed settlement to raise their objections and have those objections fully considered.[13] There is no legitimate reason why Edelson should not follow Rule 23 to address what are, at base, objections to the Settlement rather than otherwise delaying, interrupting or interfering with the approval process itself.

---

omitted); *In re Prudential Sec. Inc. Ltd. P'ships Litig*., 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (at preliminary approval, court considers whether the settlement is "possibly fair, reasonable and adequate").

[10] *See Armstrong*, 616 F.2d at 313 ("To safeguard the rights of class members and allow consideration of the broader implications of a class action settlement, Rule 23(e) of the Federal Rules of Civil Procedure requires that notice of a proposed settlement be sent to all class members …."); *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d 1002, 1032-33 (N.D. Ill. 2000) ("The purpose of class notice is … to advise [class members] of the terms of the agreement which has been reached and provide those who disapprove of those terms an opportunity to object or to opt out.").

[11] *See, e.g.*, *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig*., 789 F. Supp. 2d 935, 964 (N.D. Ill. 2011) ("The Seventh Circuit has instructed district courts to evaluate the amount of opposition to a settlement among affected parties in deciding whether to approve a class-action settlement."); *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d at 1021 (fact that more than "99.9% of class members have neither opted out nor filed objections … is strong circumstantial evidence in favor of the settlements."); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 812 (3d Cir. 1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors.").

[12] *See Armstrong*, 616 F.2d at 313; *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d at 1032.

[13] *See Armstrong*, 616 F.2d at 314.

- 4 -

**B.     The Appointment of Edelson as Lead Counsel on Behalf of Individuals with Personal Injury Claims is Unnecessary**

**1.     Edelson does not address – and does not satisfy – the factors to demonstrate that additional class counsel is necessary.**

As in his previous attempt to be appointed lead counsel, Edelson has not demonstrated that his appointment is necessary.[14] Rule 23(g)(3) is a permissive rule stating that a "court **may** designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."[15] The purpose of an interim lead counsel appointment is to clarify the responsibilities of various attorneys during *precertification* activities, "such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement."[16] Lead Counsel has already undertaken these activities. Lead Counsel conducted full merits discovery as to the NCAA's negligence and filed a Motion for Class Certification seeking a 50-state Core Issues Class and 18-state Medical Monitoring Class.

The only remaining work to be done on behalf of those with personal injury claims requires *individualized* inquiries – which does not require Edelson's oversight. The majority of personal injury plaintiffs have utilized the *Arrington* work product regarding the NCAA's duty and breach of that duty.[17] The remaining issues of causation and damages are individual.

---

[14] Edelson, of course, bears the burden of demonstrating that the appointment of interim class counsel is necessary. *See Carrier v. Am. Bankers Life Assurance Co. of Fla.*, 2006 U.S. Dist. LEXIS 76346, at *3 (D.N.H. Oct. 19, 2006) (finding plaintiffs failed to "provide[] any concrete examples of circumstances … under which … interim counsel would be advantageous for the putative class").

[15] FED. R. CIV. P. 23(g)(3) (emphasis added).

[16] MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.11 (2004). *See also* 7B WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 1802.3 (3d ed. 2014) (citing Committee Note to the 2003 amendments to Rule 23) ("[Rule 23(g)] recognizes the fact that there is a need for an attorney to take some actions in preparation for the class-certification decision, including possibly discovery and even settlement negotiations. Although in many instances these may appropriately be handled by the attorney who originally filed the suit, in some cases 'there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate.'").

[17] For example, in *Sheely v. NCAA*, pending in Montgomery County (Md.) Circuit Court on behalf of the family of a Frostburg State University football player who died in 2011 after suffering a head injury

- 5 -

Edelson has not "provided any concrete examples of circumstances in this case under which" additional class counsel "would be advantageous for the putative class."[18] Edelson has not identified any motions, discovery, or class communications for which his assistance is needed, nor does he have the support of most lawyers litigating personal injury lawsuits. Edelson's appointment is unnecessary, because his coalition represents one asymptomatic client.

### 2.     Contrary to Edelson's unsupported arguments, there is no putative "personal injury class" to represent.

First, Edelson's arguments are based on the false premise that a massive personal injury class of more than four million persons can be certified. We understand the Court will not decide his class motion now; for context however, it is worth noting that courts have almost uniformly rejected motions to certify personal injury classes as inconsistent with Rule 23.[19]

Second, and perhaps most importantly, the Court need not reach the issue of whether such a class can be certified, because there are no facts in the record to suggest that the class Edelson seeks to lead exists. The medical and scientific record establishes that student athletes who have concussions that do not resolve suffer from either Post-Concussion Syndrome or Chronic Traumatic Encephalopathy, which can cause early-onset dementia and disabling

---

during practice, the plaintiff independently conducted discovery and retained Dr. Cantu based, in part, on his work in *Arrington*. The plaintiffs in *Sheely* have also relied in part on the *Arrington* Plaintiffs' Proffer of Facts. *See, e.g.*, THE WASHINGTON TIMES (Aug. 22, 2013), available at http://www.washingtontimes.com/news/2013/aug/22/death-frostburg-state-player-derek-sheely-due-egre/?page=all (last accessed February 3, 2015) ("Several emails unearthed in that [*Arrington*] case, however, are cited in the laundry list of allegations against the NCAA in the *Sheely* lawsuit.").

[18] *See Carrier v. Am. Bankers Life Assurance Co. of Fla.*, 2006 U.S. Dist. LEXIS 76346, at *3.

[19] *See* Appendix A, Table of Authorities Denying Class Certification of a Personal Injury Class.

- 6 -

symptoms.[20] As Dr. Cantu opines, while most concussions resolve spontaneously, PCS and CTE are not minor injuries.[21]

Thus, Settlement Class Members with meritorious personal injury claims *have chosen* to pursue those claims on an individual basis because they have significant value. The unrefuted evidence demonstrates that: (1) meritorious individual personal injury claims are worth an average of $1,374,907.41 according to evidence in the NFL MDL; and (2) there are just 21 concussion-related personal injury claims currently pending against the NCAA.

In the NFL MDL, the plaintiffs allege significant personal injuries, are represented by respected lawyers, and agreed to a Monetary Award Grid for settling the individual claims:[22]

| MONETARY AWARD GRID (BY AGE AT TIME OF QUALIFYING DIAGNOSIS) | | | | | |
|---|---|---|---|---|---|
| Age Group | ALS | Death w/CTE | Parkinson's | Alzheimer's | Level 2 | Level 1.5 |
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45-49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50-54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55-59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60-64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65-69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70-74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75-79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

The above Monetary Award levels are the average base Monetary Awards for each of the Qualifying Diagnoses for particular age groups, except for the "Under 45" and "80+" rows, which list the maximum and minimum base Monetary Awards, respectively, for those age groups. A Settlement Class Member's actual base Monetary Award for ages 45-79 may be higher or lower than the average base Monetary Award listed for the Retired NFL Football Player's age group, depending on the Retired NFL Football Player's actual age at the time of Qualifying Diagnosis.

---

[20] *See* Cantu Report, ¶¶ 19-20.

[21] Cantu Report, ¶ 38 (describing PCS as a "very serious concussion" and that "not every case recovers"); ¶¶ 39-45 (documenting symptoms of CTE including "irritability, impulsivity, aggression, depression, short term memory loss, heightened suicidality," "cognitive impairments similar to those experienced by people with Alzheimer's disease," and significant neurological changes).

[22] Ex. B-3 to the Class Action Settlement Agreement as of June 25, 2014, in the *NFL MDL*, *available at* https://www.nflconcussionsettlement.com/CourtDocs.aspx (last accessed Aug. 27, 2014).

This grid underscores the fact that individual concussion cases are: (1) valuable; (2) will be litigated; and (3) are not the $8,000 to $20,000-type of cases no one will litigate.[23] Thus, there is no evidence to suggest that plaintiffs need the class vehicle to vindicate injury claims. Despite Lead Counsel's challenge of Edelson for his lack of medical or scientific support in support of his claim that we left "billions on the table" for the class,[24] Edelson has repeatedly failed to offer any evidence that the injury class exists; he cannot now do so on reply.

The ten plaintiffs who have sued the NCAA for personal injury outside of the MDL "have a substantial stake in making individual decisions on whether and when to settle."[25] This Court should not preclude, or interfere with, the existing injury litigation by appointing Edelson.[26]

---

[23] *See* Nichol's Response to Plaintiffs' Motion for Preliminary Approval of Class Settlement (Dkt. No. 83) at 16 (arguing that individual claims "are too small to allow vindication."). The value of individual concussion cases is also supported by jury verdicts in the Chicago-area, nationwide verdicts and settlements on behalf of middle school or high school football players that suffered brain injuries, and NFL players outside the current MDL. *See, e.g.*, Settlement Class Representatives' Reply in Support of Plaintiffs' Motion for Preliminary Approval of Settlement (Response to the Nichols' Opposition), Ex. 3. (Dkt. No. 88-3) (Cook County Jury Verdict Reporter reports showing that, for concussion-related cases, settlements and verdicts for non-sport concussion-related injuries range from $30,245-$790,860); Bermes, Whitney, "Judge enforces settlement in Three Forks School District brain injury lawsuit," BOZEMAN DAILY CHRONICLE (July 10, 2014) (high school football player settled individual action against school district for $300,000 after the player suffered a second, same-day concussion in football practice and was knocked unconscious); Draper, Heather, "Frank Azar wins lawsuit against helmet maker Riddell," DENVER BUS. JOURNAL (April 14, 2013) ($11.5 million verdict in favor of high school football player that suffered a head injury and was paralyzed on one side); "Cash Awards In Death Suits Are Often Lower," HERALD NEWS (Passaic Cnty., NJ, Sept. 29, 2012) (the family of a 17-year-old football player who died as a result of Second Impact Syndrome settled with the school district for $125,000 plus an undisclosed sum with the helmet manufacturer); Clarridge, Christine, "Tahoma schools settle football-injury claim for $14.6 million," THE DAILY NEWS (Longview, Washington) (Sept. 18, 2009) ($14.6 million settlement for middle school football player who suffered a concussion in a game, was twice returned to play and, after the game was over, collapsed); *See, e.g.*, A.P., "Former Bears players wins lawsuit against former team doctor" (July 22, 2000) ($1.55 million jury verdict for former Bears fullback who contended he was cleared to play by the team doctor too soon after suffering a concussion, forcing his retirement from the NFL in October 1994).

[24] *See, e.g.*, Settlement Class Representatives' Reply in Support of Plaintiffs' Motion for Preliminary Approval of Settlement (Response to the Nichols' Opposition) (Dkt. No. 88) at 10.

[25] *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996) (a class action was not a superior means for resolving personal injury claims against manufacturers of asbestos-containing products where "the amounts at stake for individuals" were not "so small that separate suits would be impracticable").

- 8 -

Further, unlike Lead Counsel and others who are representing injury plaintiffs, Edelson's

client does not allege that he has PCS or CTE, but instead that *he is currently asymptomatic*:[27]

> The neurologist explained that Nichols' brain calcifications *may have been* caused by the brain trauma he sustained during his playing time in football, and informed him that he needed to be alert to any signs of headaches or pressure, as those could indicate that the calcifications had turned into tumors.

Accordingly, Edelson cannot adequately represent an injury damages class where his client is

asymptomatic (not typical) and whose claim is likely outside of the statute of limitations.[28]

### 3. The complicated mass tort context Edelson envisions does not exist here.

In this MDL, there are currently 80 Plaintiffs.[29] Of those Plaintiffs, *just 11 have asserted*

*individual personal injury claims against the NCAA*.[30] Thus, in this MDL alone, just 13.75% of

---

[26] Rule 23, 1966 Advisory Committee Notes ("In this connection the court should inform itself of any litigation actually pending by or against the individuals. The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action.").

[27] *Nichols* Complaint, ¶ 38 (emphasis added). *Compare with* Expert Report of Robert C. Cantu, *Arrington v. NCAA*, ¶ 237 (Arrington "continues to suffer seizures, chronic severe headaches, depression, nausea and vomiting, photophobia, confusion, short-term memory loss/cognitive impairment, insomnia, and spells of unresponsiveness. These conditions in my opinion stem from concussions."); ¶ 270 ("… Owens continues to report migraines, moodiness, anxiety, feeling "shortfused," depression, trouble concentrating and short-term memory problems."); ¶ 302 ("… Solomon continues to suffer from headaches (including migraines caused by sensitivity to light, working on a computer, or stress), short term memory loss, intense psychological distress, anxiety, seizures ….").

[28] *See* http://www.courts.ca.gov/9618.htm (The statute of limitations in California for personal injury is "[t]wo years from the injury. If the injury was not discovered right away, then it is 1 year from the date the injury was discovered.").

[29] *Arrington, et al. v. NCAA* (11); *Walker, et al. v. NCAA*, No. 1:13-cv-09117 (N.D. Ill., filed Jan. 2, 2014) (3); *Durocher, et al. v. NCAA*, No. 1:14-cv-00035 (N.D. Ill., filed Jan. 8, 2014) (3); *Doughty v. NCAA*, No. 1:14-cv-00199 (N.D. Ill., filed Jan. 13, 2014) (1); *Caldwell, et al. v. NCAA*, No. 1:14-cv-00195 (N.D. Ill., filed Jan. 14, 2014) (43); *Powell, et al. v. NCAA*, No. 1:14-cv-00198 (N.D. Ill., filed Jan. 28, 2014) (1); *Morgan, et al. v. NCAA*, No. 1:14-cv-00196 (N.D. Ill., filed Jan. 14, 2014) (3); *Walton, et al. v. NCAA*, No. 1:14-cv-00200 (N.D. Ill., filed Jan. 13, 2014) (2); *Washington, et al. v. NCAA*, No. 1:14-cv-00197 (N.D. Ill., filed Jan. 14, 2014) (2); *Hudson v. NCAA*, No. 1:14-cv-00194 (N.D. Ill., filed Jan. 14, 2014) (1); *Nichols v. NCAA*, No. 1:14-cv-00962 (N.D. Ill., filed Feb. 11, 2014) (1); *Wolf v. NCAA*, No. 1:13-cv-09116 (N.D. Ill., filed Feb. 20, 2014) (7); *Jackson v. NCAA*, No. 1:14-cv-04387 (N.D. Ill., filed April 2, 2014) (1); *Mildred Whittier v. NCAA*, No. 14-cv-00978 (W.D. Tex., filed Oct. 27, 2014) (1).

[30] *Arrington* (4), *Doughty* (1), *Durocher* (3), *Hudson* (1), *Nichols* (1), *Whittier* (1).

the Plaintiffs have pending personal injury claims. Moreover, of the 11 individuals with personal injury claims in this MDL, only two are seeking to proceed as a class.

Also, outside the MDL, there are ten pending cases brought by individual student athletes against the NCAA related to concussions.[31] None of those cases was brought by Edelson, nor have those plaintiffs sought to participate in this MDL. Thus, of the pending concussion-related personal injury claims against the NCAA nationwide, 90% prefer to go it alone.

While courts have acknowledged a large mass-tort case may be coordinated as a "quasi-class action," these cases are distinguishable. For example, in *In re Zyprexa*, the court appointed a special master to oversee the settlement claims of over 8,000 personal injury plaintiffs. Characterizing the matter as a "quasi-class action," the court explained:[32]

> The large number of plaintiffs subject to the same settlement matrix approved by the court, the utilization of special masters appointed by the court to control discovery and to assist in reaching and administering a settlement, the court's order approving and controlling a huge escrow fund, other interventions by the court in controlling discovery for all claimants, the employment of a multidistrict reference, and cooperation among many federal and state courts, reflect a degree of court control that supports the imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding issues such as settlement procedures.

The complicated mass-tort context in *In re Zyprexa*, and envisioned by Edelson, simply does not exist here.[33] Further, the NCAA has chosen not to negotiate a global settlement matrix with Edelson which would apply to the mere 11 pending personal injury claims against the

---

[31] *See* n.3, *supra*.

[32] *In re Zyprexa Prods. Liab. Litig.*, 433 F. Supp. 2d 268, 271 (E.D.N.Y. 2006) (internal citations omitted).

[33] If the Judicial Panel on Multi-District Litigation determines that there are efficiencies for personal injury claims to proceed in one court, it can centralize and coordinate individual personal injury claims when the requirements of 28 U.S.C. § 1407 are met. *See* http://www.jpml.uscourts.gov/panel-info/overview-panel (last accessed February 3, 2015).

- 10 -

NCAA in the MDL.[34] These plaintiffs are already represented by counsel and, due to the amounts and individualized nature of the personal injury claims, "have a substantial stake in making individual decisions on whether and when to settle."[35]

### 4. Co-Lead Counsel have not "repudiated" class members' right to obtain personal injury damages.

Contrary to Edelson's heated rhetoric,[36] Class Counsel have not "repudiated" class members' rights to obtain personal injury damages but rather have vigorously sought to protect and advance that very right throughout the litigation.

Class Counsel have protected the right of class members to obtain personal injury damages by: (1) ensuring that the facts they discovered were made public; (2) extensively conferring with the NCAA to ensure that hot documents marked Confidential by the NCAA under the Protective Order were de-designated during discovery so that class members would have access to those documents for individual cases; (3) publicly filing Dr. Cantu's expert analysis and an extensive Proffer of Facts detailing the NCAA's negligence; (4) specifically requesting in their Motion for Class Certification for a finding from the Court that personal injury claims will not be precluded in individual and subsequent proceedings;[37] and (5) negotiating a proposed settlement which expressly preserves personal injury claims.[38]

---

[34] *Id.* (noting that the conventions required when a class is certified under Rule 23 are appropriate in "quasi-class actions" where there is a "large aggregation of claims").

[35] *Georgine v. Amchem Prods., Inc.*, 83 F.3d at 633 (a class action was not a superior means for resolving personal injury claims against manufacturers of asbestos-containing products where "the amounts at stake for individuals" were not "so small that separate suits would be impracticable").

[36] Plaintiff Nichols' *Renewed* Motion to Appoint Jay Edelson as Lead Counsel of the Personal Injury Class (Dkt. No. 128) at 1.

[37] *See* Plaintiffs' Memorandum in Support of Motion for Class Certification (*Arrington* Dkt. No. 175) at 24-27 (requesting that the Court immunize Plaintiffs and absent class members from assertions of claim preclusion for damages claims in subsequent individual litigation).

[38] *See, e.g.*, Amended Settlement Agreement, § II.NN (Dkt. No. 92) (excluding claims for personal injury and bodily injury from the definition of "Released Claims").

Edelson's claim that Lead Counsels' "abandonment of the personal injury claims exposed putative class members to statute of limitations, statute of repose, and improper claim splitting defenses" is another inflated claim that is not supported by the facts (the NCAA has agreed that the statutes of limitations are tolled through final approval), the law,[39] or the opinions of the esteemed mediators, Hon. Layn Phillips (Ret.) and Hon. Wayne Andersen (Ret.).[40]

Moreover, the fact that Lead Counsel are pursuing injunctive relief and medical monitoring does not render them or the class representatives inadequate. For example, in *Clark v. Experian Information Solutions, Inc.*, the court held that the named plaintiffs provided adequate representation, even though a number of alternative causes of action that the members of the proposed class could have brought were not included in the complaint, because "Plaintiffs have demonstrated that only a very small number of 'alternative claims' have been filed."[41] The court found it dispositive that "over the past three years, twenty-two lawsuits out of a potential class of 40,000 to 100,000 members have been filed against Defendants."[42] The logic in *Clark* and *Beaulieu* applies equally here. Among the millions of Class members, there are only 21 personal

---

[39] *See, e.g.*, *Crowder v. Lash*, 687 F.2d 996, 1009 (7th Cir. 1982) (holding that an earlier class action in which only declaratory and injunctive relief were sought does not preclude absent class members from seeking damages for the same alleged misconduct); *Leib v. Rex Energy Operating Corp.*, 2008 WL 5377792, at *9 (S.D. Ill. Dec. 19, 2008) ("The contention that *res judicata* would bar future personal injury claims is without merit. A class action judgment binds class members to the judgment in the case, but the preclusive effect of a judgment in a class action seeking only declaratory or injunctive relief does not extend to class members' individual damage claims brought in separate actions."); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 483 (S.D. Ohio 2004) (class action for injunctive relief and property damages was not *res judicata* for subsequent personal injury suits); *Benedict v. Altria Group, Inc.*, 241 F.R.D. 668, 675 (D. Kan. 2007) (holding that named plaintiff's choice to pursue claims other than personal injury claims "which would likely inject individual issues defeating class certification" did not create a conflict of interest causing class members' personal injury claims to be barred by *res judicata*).

[40] Declaration of Hon. Layn Phillips (Ret.) (Dkt. No. 67); Declaration of Hon. Wayne Andersen (Ret.) (Dkt. No. 68).

[41] *Clark v. Experian Information Solutions, Inc.*, 2002 WL 2005709, at *3 (D.S.C. June 26, 2002).

[42] *Id. See also Beaulieu v. EQ Indus. Servs., Inc.,* 2009 WL 2208131 (E.D.N.C. July 22, 2009) (rejecting the argument that a conflict existed because of an express exclusion of claims for personal injury in the complaint, because "few, if any, class members are likely to have or file personal injury claims").

- 12 -

injury claims against the NCAA. Thus, no conflict of interest exists requiring Edelson's appointment.

### C.     Edelson Does Not Satisfy the FED. R. CIV. P. 23(g) Factors

Even assuming, *arguendo*, that additional class counsel is necessary, Edelson fails to meet the Rule 23(g)(1)(A) factors, which include: (i) the work he has done in identifying or investigating claims; (ii) his experience in handling personal injury claims; (iii) his knowledge of the applicable law; and (iv) his resources.[43]

First, Edelson has not identified any new facts or research. In fact, it has been over one year since he filed his Motion to Intervene in the *Arrington* case, and yet it is unclear what, if any, investigation he has conducted. What we do know is that he has one atypical client and that he has not proffered any expert in the field to contradict the Medical Science Committee.

Second, while Edelson has class-action experience, he does not have any experience litigating personal injury claims. In fact, Edelson does not identify a single personal injury case he has pursued on an individual basis or class-wide basis. Comparatively, this Court has recognized that the current Lead Counsel "have substantial class action experience *and in serving as Lead Counsel in other class actions of comparable scope.*"[44]

Third, Edelson has zero experience in the field of concussions or the legal issues at the heart of this case,[45] has an asymptomatic client,[46] and has never certified a personal injury

---

[43] *See* FED. R. CIV. P. 23(g)(1)(A).

[44] *See* Case Management Order No. 3 (July 30, 2014) (Dkt. No. 76) at 4 (emphasis added).

[45] Rather, Edelson's firm generally handles "a wide range of general litigation matters, from partnership fights, to litigation involving corporate takeovers, and business-to-business disputes." *See, e.g.*, About the Firm available at: http://edelson.com/insidethefirm/#page_1 (last accessed February 3, 2015).

[46] *See supra*, n.27.

- 13 -

class.[47] Further, Edelson does not have a good faith basis for his assertion that he is supported by a "coalition" of attorneys, where the self-serving coalition has a single asymptomatic client (Nichols). Rather than a coalition of lawyers doing a favor for Edelson, this Court should look to the view and actions of attorneys nationwide who are actually litigating personal injury claims against the NCAA.[48]

### III.    CONCLUSION

WHEREFORE, the Class Representatives respectfully request that the Court deny Plaintiff Nichols' Renewed Motion to Appoint Jay Edelson as Lead Counsel of the Personal Injury Class.

Date:  February 10, 2015

Respectfully submitted,

By:    /s/ Steve W. Berman
        Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

---

[47] *See In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) (finding the proposed counsel's "experience in, and knowledge of, the applicable law in this field" the "most persuasive" factor when choosing lead counsel).

[48] In fact, after news of the Settlement broke, 13 cases were filed nationwide and coordinated as part of the MDL. This Court requested that the Plaintiffs organize. After Lead Counsel brought all of the lawyers up to speed, all but Edelson (and now Whittier) agreed that the Settlement was in the best interests of the Class.

- 14 -

- 15 -

Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL  60602
312.236.0000
Fax: 312.878.1342

*Co-Lead Counsel*

010270-12  757726 V1

- 16 -

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on February 10, 2015, a true and

correct copy of the foregoing document was filed electronically via CM/ECF, which caused

notice to be sent to all counsel of record.

*/s/ Steve W. Berman*

Steve W. Berman

010270-12  757726 V1