IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE:  NATIONAL COLLEGIATE          )  Docket No. 13 C 9116
ATHLETIC ASSOCIATION                 )
STUDENT-ATHLETE CONCUSSION           )  Chicago, Illinois
INJURY LITIGATION.                   )  December 19, 2014
                                     )  10:00 o'clock a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN Z. LEE

APPEARANCES:

For the Plaintiffs:        HAGENS BERMAN SOBOL SHAPIRO
                           BY:  MR. STEVE W. BERMAN
                                MS. ELIZABETH A. FEGAN
                           1918 8th Avenue, Suite 3300
                           Seattle, Washington 98101

                           SIPRUT PC
                           BY:  MR. JOSEH J. SIPRUT
                           17 North State Street, Suite 1600
                           Chicago, Illinois 60602

                           ZIMMERMAN REED
                           BY:  MR. CHARLES S. ZIMMERMAN
                                (appearing telephonically)
                           1100 IDS Center
                           80 South 8th Street
                           Minneapolis, Minnesota 55402

                           HAUSFIELD LLP
                           BY:  MS. MINDY B. PAVA
                                (appearing telephonically)
                           1700 K Street NW, Suite 650
                           Washington, DC 20006

                           DUGAN LAW FIRM
                           BY:  MR. DAVID B. FRANCO
                                (appearing telephonically)
                           One Canal Place
                           365 Canal Street, Suite 1000
                           New Orleans, Louisiana 70130

```
1    APPEARANCES (continued)

2    For the Plaintiffs:       THE LANIER LAW FIRM
                               BY:  MR. RYAN D. ELLIS
3                                   (appearing telephonically)
                               6810 FM 1960 West
4                              Houston, Texas 77069

5                              ZELLE HOFMANN VOELBEL & MASON
                               BY:  MR. SHAWN D. STUCKEY
6                                   (appearing telephonically)
                               500 Washington Avenue, Suite 400
7                              Minneapolis, Minnesota 55415

8                              COATS ROSE YALE RYMAN & LEE
                               BY:  MR. DWIGHT E. JEFFERSON
9                                   (appearing telephonically)
                               Nine Greenway Plaza, Suite 1100
10                             Houston, Texas 77046

11   For Plaintiff Nichols     EDELSON PC
     and Proposed Personal     BY:  MR. ARI JONATHAN SCHARG
12   Injury Class:             350 North LaSalle Street, Suite 1300
                               Chicago, Illinois 60654
13
     For Defendant NCAA:       LATHAM & WATKINS
14                             BY:   MR. MARK STEVEN MESTER
                                     MS. JOHANNA MARGARET SPELLMAN
15                             330 North Wabash Avenue, Suite 2800
                               Chicago, Illinois 60611
16

17

18

19

20
                         Mary M. Hacker, CSR, FCRR
21                         Official Court Reporter
                         United States District Court
22               219 South Dearborn Street, Suite 1212
                         Chicago, Illinois  60604
23                     Telephone:  (312) 435-5564

24

25
```

```
 1              (Proceedings had in open court:)
 2              THE CLERK:   13 C 9116, NCAA Student-Athlete
 3    Concussion Injury Litigation.
 4              MR. BERMAN:  Good morning, your Honor.  Steve
 5    Berman on behalf of the plaintiffs.
 6              MR. SIPRUT:  Good morning, your Honor.  Joseph
 7    Siprut on behalf of the plaintiffs.
 8              MR. SCHARG:  Ari Scharg on behalf of Mr. Nichols.
 9              MR. MESTER:  Good morning, your Honor.  Mark Mester
10    and Johanna Spellman on behalf of the NCAA.
11              THE COURT:  Who do we have on the phone?
12              MR. ZIMMERMAN (via telephone):  Good morning, your
13    Honor.  Charles Zimmerman on behalf of the plaintiffs, by
14    telephone.
15              MR. JEFFERSON (via telephone):  Judge, Dwight
16    Jefferson on behalf of plaintiff Whittier, by phone.
17              MR. FRANCO (via telephone):  Good morning, your
18    Honor.  David Franco on behalf of the plaintiffs, by phone.
19              THE COURT:  Anyone else on the phone?
20              MR. ELLIS (via telephone):  Ryan Ellis for the
21    plaintiffs, by phone.
22              MS. PAVA (via telephone):  Mindy Pava on behalf of
23    the plaintiffs, by phone.
24              MR. STUCKY (via telephone):  Sean Stucky on behalf
25    of the plaintiffs, by phone.
```

1    THE COURT:  Do we have everyone who is on the phone

2  now?

3         (No response.)

4    THE COURT:  All right.  Very good.  Good morning,

5  everyone.

6         We are here, first of all, on the settlement class

7  representatives' motion to add non-contact sports plaintiffs

8  and class representatives.  That is their renewed motion.

9         I have reviewed the motion.  Is there anyone here

10  who objects to the motion?

11    MR. SCHARG:  Well, your Honor, I think it's

12  probably moot at this point given that the approval was

13  denied.  I think the proper way to add additional class

14  representatives is through an amendment to the complaint.

15    THE COURT:  Well, let me ask you:  Is there -- let

16  me ask everyone this:  Is there an objection to the

17  plaintiffs amending their complaint, to the extent that they

18  need to, to add the non-contact sports plaintiffs and class

19  representatives?

20    MR. MESTER:  No, your Honor.

21    MR. JEFFERSON:  Judge, this is Dwight Jefferson on

22  behalf of plaintiff Mildred Whittier.  (Inaudible)

23    THE COURT:  I'm sorry, can you speak up and put

24  your mouth closer to the mike, please?

25    MR. JEFFERSON:  Yes, Judge.  Can you hear me better

1    now?

2               THE COURT:  That is better.  Go ahead and slow

3    down.

4               MR. JEFFERSON:  All right, Judge.  Yes, Dwight

5    Jefferson here.

6               I would object to the plaintiffs' motion adding

7    class members for non-contact sports because I believe that

8    from the standpoint of the proposed settlement, as it stands

9    now, inclusions of non-contact sports, plaintiffs would have

10   the -- have the effect of diluting the -- diluting any

11   compensation or recovery for those members of the class

12   involving contact sports which, in fact, represent the

13   overwhelming majority of any group of plaintiffs as well as

14   the primary basis for the litigation itself.

15              THE COURT:  Right.

16              Now, Mr. Jefferson, that's basically -- to put it

17   another way, you're just objecting to the terms of the

18   previously proposed settlement to the extent that non-contact

19   sports participants or former participants are entitled to

20   seek any recovery under that settlement.  Is that correct?

21              MR. JEFFERSON:  Yes, your Honor.

22              THE COURT:  So it's not a -- so in some respects

23   it's not a specific objection to these particular potential

24   class representatives; it's really an overall objection to

25   the previously proposed class settlement and the structure of

1  that settlement?

2          MR. JEFFERSON:  Judge, or to the extent that these

3  particular representative class plaintiffs, to the extent

4  that they would be entitled to participation and/or any

5  recovery that would come out of this litigation.  So that

6  would just be only the direct objection to these particular

7  individuals who have been put forward.

8          THE COURT:  I understand.

9          Anyone else?

10         MR. SCHARG:  I would have said that we have no

11  objection to the extent that they have standing to be added

12  to the case.

13         THE COURT:  And, Mr. Berman, that raises an

14  interesting point, which is, do the current allegations in

15  the second amended complaint -- would it -- were the

16  allegations broad enough to encompass the claims that would

17  be asserted by the prospective new class members?

18         MR. BERMAN:  I believe so, your Honor.  But I can

19  check on that, just to double-check, belt and suspenders.

20         THE COURT:  I believe so, too, because I believe,

21  as I recall, the operative complaint -- the allegations

22  address -- it's not specific to particular sports; it

23  addresses athletes and NCAA sanctioned sports, NCAA

24  affiliated members, institutions, generally speaking?

25         MR. BERMAN:  That's correct.

1          THE COURT:  Okay.  So given the fact that I have

2   denied without prejudice the motion for preliminary approval

3   that was pending, Mr. Berman, what do you believe is the most

4   procedurally efficient way to get these prospective class

5   representatives into the case?

6          MR. BERMAN:  By granting the motion.  I don't think

7   it's necessary to amend the complaint.  We could do that,

8   just so the record is perfectly clear, if you have any

9   concerns.  Obviously it's not hard to do.  We could have done

10  it earlier.  If counsel had asked us to do that, we would

11  have.

12         But I think you should grant the motion because we

13  want these new class representatives to be involved in the

14  further negotiations that we're going to have.

15         THE COURT:  Right.

16         And so adding them as -- formally as class

17  representatives or representatives in whatever particular

18  transferred case it is, would be really more -- and perhaps

19  necessary but more of a pleading technicality?

20         MR. BERMAN:  Correct.

21         MR. JEFFERSON:  Judge, this is Jefferson.  If I may

22  respond to that just briefly?

23         THE COURT:  You may.

24         MR. JEFFERSON:  Judge, I think you raise a very

25  good question because -- I mean, my understanding, quite

1    frankly, is that the memorandum opinion of two days ago

2    really mooted the motion that is before the Court now.  And

3    from the standpoint of any new class plaintiffs coming in and

4    being made part of the case, procedurally that's something

5    that really probably should have to be done, since the motion

6    -- since the motion was denied without prejudice, in the form

7    of an amended complaint and having to come before the Court

8    with a motion to amend the class petition in order to -- in

9    order to add these people.

10            Thank you.

11            THE COURT:  Mr. Berman, if they're added as named

12   plaintiffs in the case, to what particular suit would they be

13   added?

14            MR. BERMAN:  To the Arrington case.

15            THE COURT:  Okay.  So given the fact that -- to

16   address Mr. Jefferson's technical, although be it, I guess,

17   logically correct argument, that the motion for preliminary

18   approval of the settlement has been denied, Mr. Berman, are

19   you then, on behalf of the Arrington class, formally moving

20   to add the class representatives that are set forth in this

21   motion, with regard to non-contact sports, as plaintiffs in

22   the Arrington case?

23            MR. BERMAN:  I guess we will do that, your Honor.

24            THE COURT:  All right.

25            So given the fact that Mr. Berman is seeking leave

1    of this Court to amend the Arrington complaint to include

2    these individuals, now is there any objection to that motion

3    that was before the Court?

4              Mr. Jefferson?

5         (No response.)

6              THE COURT:  Okay.  Hearing none --

7              MR. SCHARG:  Yes, I think we would have one.

8              I mean, to be added to the complaint, they've got

9    to be able to show that they've suffered some sort of injury.

10   To be a class representative you have to have suffered some

11   form of injury.  It's a requirement.  And these particular

12   individuals are -- by the declarations themselves, have

13   stated they have not suffered any sort of injury.  So I'm not

14   sure how they could be added to the complaint to lead some

15   sort of injury class.

16             THE COURT:  Well, I'm not quite sure that's right

17   because it really depends on the claim they're seeking,

18   right?

19             And if what they're seeking is medical monitoring,

20   then at least from my understanding of the case law -- and

21   albeit it's at this point an imperfect understanding -- is

22   that basically being subjected to increased risks as a result

23   of negligent action is sufficient to state a claim, at least

24   among most of the states where medical monitoring is

25   recognized as a claim.

1    So it seems to me that even though they may not

2    have -- they may not themselves have realized they suffered a

3    concussion, that the very fact that they have been exposed to

4    that increased risk and perhaps been exposed to, say, some

5    concussive hits or what have you, in a number of states,

6    including, say, Pennsylvania, it would be sufficient for them

7    to state a cause of action for medical monitoring.

8    So I understand your point, that some of these

9    class members did not suffer any concussions; some of them

10   did.  But I don't think that legally, at least at this

11   preliminary stage where they're seeking to amend the

12   complaint, that that's really going to carry the day at this

13   point.

14   Furthermore, frankly, I'm not really sure whether

15   the other plaintiffs in the other transferred cases really

16   have standing to object, frankly, to any sort of amendment.

17   And given the fact that this motion is coming in

18   the Arrington case and defendant has no objection, and also,

19   I don't see any prejudice in adding them to this case now,

20   and to the extent that defendant eventually needs some

21   additional discovery, you know, we can talk about it then.

22   But, Mr. Mester, I take it, again, that defendant

23   is on record not objecting to Mr. Berman's motion to amend

24   the complaint in the Arrington case, is that correct?

25   MR. MESTER:  That's correct, your Honor.

11

1          THE COURT:  All right.  Very well.

2          In light of that, Mr. Berman's motion to add the

3    non-contact sports plaintiffs as class representatives and

4    plaintiffs in the Arrington case is granted.

5          Mr. Berman, how much time do you need to get that

6    on file?  I don't think it's anything particularly pressing.

7          MR. BERMAN:  Let me just see what Ms. Fegan is

8    doing over the holidays.  One second.

9        (Brief pause.)

10         MR. BERMAN:  How about the end of next week, your

11   Honor?

12       (Brief pause.)

13         MR. BERMAN:  The 30th?  Does that work for your

14   Honor?

15         THE COURT:  Okay, tell you what.  As I said, I

16   don't really see any particularly pressing need to make that

17   amendment.  So the -- and I know the parties have a lot of

18   other things they need to deal with in light of my order.  So

19   I'm going to order that the Arrington plaintiffs file their

20   amended complaint no later than January 7th.

21         MR. BERMAN:  Thank you very much.

22         THE COURT:  Okay.  Any answer or responsive

23   pleading should be filed by January 28th.

24         MR. MESTER:  Thank you, your Honor.

25         THE COURT:  All right.

1       Having dealt with that, I wanted to talk to the
2   parties and get their thoughts on the issues that were raised
3   in the order of a couple of days ago.  I know that it hasn't
4   been a whole lot of time for you to digest it, but I wanted
5   to get a sense of where we were.  And I have some particular
6   questions in mind, so let me start with that.

7       First of all, as noted, I am directing the NCAA to
8   contact a number of schools to obtain the information --
9   contact information for putative class members to assess the
10  plausibility and costs and efforts associated with direct
11  notice.  I ask that that be done within 60 days of the
12  issuance of the order.

13      Mr. Mester, is that enough time for you to do that?
14      MR. MESTER:  Unfortunately, your Honor, I was out
15  of town when your order was issued.  I have not had a chance
16  to speak directly with the NCAA, and in light of the
17  intervening holiday I, frankly, am a little concerned.

18      But I can't tell you today that it's not feasible,
19  and I can tell you that we've already started to put the
20  process in place, in the works.  So we're going to do our
21  very best to meet that deadline.  And I'm hopeful that we
22  can, but if we can't, we'll certainly be back and let your
23  Honor know.

24      THE COURT:  Okay.  I understand because of the
25  calendar that -- and various school vacations and whatnot,

1  that it may be difficult this time of year to get that

2  process started.

3          Let me say this:  I will keep the deadline in

4  place.  But, Mr. Mester, in the event that you need

5  additional time, I would like you to let the Court know that

6  as soon as possible.

7          MR. MESTER:  Yes, your Honor.

8          THE COURT:  Okay.  And I will be amenable to

9  providing some reasonable time beyond that, if necessary,

10  because I think this is a key issue.

11          With regard to -- let me just go through my list

12  and then I'll open it up for any comments or questions.

13          With regard to the adequacy of representation, as I

14  noted in my order, I do think that we need a cross-section

15  along that continuum, both for contact and non-contact

16  sports.

17          Having looked at all the named plaintiffs in the

18  various cases --

19          MR. BERMAN:  I have a chart that shows the

20  continuum, if that helps you at all.

21          THE COURT:  No.  I have a chart, too.  Thanks.

22          MR. BERMAN:  Okay.

23          THE COURT:  Although, understandably, it's -- most

24  of the people are football players -- and it seems like we

25  have a good cross section of current as well as former

1    football players, or both players that have been very

2    recently football players.  We have a smattering of class

3    representatives in the other sports.  But I want the parties

4    to consider perhaps -- explore the possibility of adding a

5    couple more class representatives of contact sports to deal

6    with both the timing issue and also the different sports

7    issue.  Okay?

8              MR. BERMAN:  Can I inquire, your Honor?

9              And so on the contact sports, we have football,

10   soccer, volleyball, wrestling.  Is there a particular sport

11   or a particular time that you think we're lacking?

12             THE COURT:  Sure.  Like so, for example, for

13   wrestling, you don't have any current wrestlers, right?

14   They're all -- they're both former wrestlers.

15             So again, if you think of the class as a matrix,

16   like you have contact and non-contact sports and then you

17   have former and current players.  And as I said in the order,

18   I don't need every single dot along that matrix represented,

19   but I would like the class representatives as a whole to

20   represent the continuum as a whole.

21             MR. BERMAN:  Okay.  We'll get to work.  Thank you,

22   your Honor.

23             MR. JEFFERSON:  Judge?

24             THE COURT:  Yes?

25             MR. JEFFERSON:  This is Jefferson again.

1          THE COURT:  Yes.

2          MR. JEFFERSON:  Judge, and then also, too -- I mean

3   -- I mean, I'm thinking from the standpoint of the current

4   class representatives, there's no one represented in the

5   class that Mr. Whittier represents, which are former players

6   who, in fact, have been diagnosed with traumatic head injury

7   related conditions.

8          And so I would submit to the Court that along that

9   continuum, that he really represents a class that should be

10  represented within the structure of the case.

11         THE COURT:  I thought Mr. Arrington would satisfy

12  -- would fall within that particular category.

13         MR. BERMAN:  Yes.

14         THE COURT:  That is, a former football player that

15  has been diagnosed with an illness related to prior

16  concussions that he's currently receiving treatment for.

17         MR. BERMAN:  Both Mr. Owens and Mr. Arrington

18  satisfy that.

19         THE COURT:  Okay.

20         MR. JEFFERSON:  And so they are -- they are named

21  class plaintiffs now, Judge?

22         THE COURT:  That's correct.

23         MR. JEFFERSON:  And so -- and so within the

24  settlement that was proposed, then they would not have been

25  -- they would not have been included at all?

1           THE COURT:  No.  They would have been included in

2    the settlement.

3           MR. BERMAN:  That's correct.  Just --

4           MR. JEFFERSON:  Well, if they have already been

5    diagnosed, medical monitoring does not do anything to them.

6           THE COURT:  Again, Mr. Jefferson, we're -- you know

7    --

8           MR. JEFFERSON:  I understand, your Honor.

9           THE COURT:  I --

10          MR. JEFFERSON:  I understand, Judge.

11          THE COURT:  Right.  I mean, I'm just trying to

12   address kind of some of the concerns that I raised.

13          I understand that, as I noted in the order, there

14   are particular class members, like Mr. Nichols and other

15   people, that may have issues with the settlement that was

16   previously proposed.  We don't know what the settlement is

17   going to look like when it's proposed again, if it's going to

18   be proposed again.

19          And so, Mr. Jefferson, at that time I will address

20   whatever objections you have, okay?

21          MR. JEFFERSON:  Yes, Judge.

22          And then the only reason that I did raise that,

23   just to be quite honest with you, was under the hopes that if

24   the case moves forward and there's additional mediation or

25   something like that with regard to finalizing the settlement,

1   that I have an opportunity to participate in that process.

2   THE COURT:  Well, Mr. Jefferson, what I would

3   suggest, if you wish to do so, you may file a motion in that

4   regard.  Okay?

5   MR. JEFFERSON:  A motion requesting -- just so that

6   I'm clear, Judge --

7   THE COURT:  Well, the reason, Mr. Jefferson, is

8   that you are a -- I believe the case that -- in which you're

9   counsel is a case that -- a related case that was added to

10  the MDL.  By that time I had already appointed lead counsel

11  to represent the MDL class, or the MDL plaintiffs.

12  So if you want to be included in that as well as,

13  you know, what other relief, participation you want to seek,

14  go ahead and file a motion, because I've already set forth

15  the current procedures that I want the parties to use in

16  trying to address their concern to represent their clients.

17  MR. JEFFERSON:  Yes, Judge.

18  THE COURT:  All right.

19  MR. JEFFERSON:  Thank you.

20  THE COURT:  So then the -- a couple other things.

21  First of all, with regard to the locations of the

22  program sites, Mr. Berman, where are we on that?

23  MR. BERMAN:  Well, we haven't done anything until

24  -- so now what we're going to do, in reaction to your order,

25  which we just digested, is we're going to huddle with the

1    Garretson group; that's the program administrator.  We're

2    going to have a meeting of the medical science committee to

3    address the questionnaires.  And so, we'll have more

4    information after those meetings, with your Honor's directive

5    about location, obviously, in mind.

6           THE COURT:  Okay.  And how much time do you think

7    that's going to take?  I'm just trying to get an

8    understanding of where we are in this process.

9           I know that some of these issues will take some

10   time for the parties to kind of work out, try to think about,

11   talk to one another about.  I'm just trying to get a sense of

12   how long you think that inquiry will take.

13          MR. BERMAN:  Well, I haven't consulted with

14   Mr. Mester.  But my thinking is driven by, one, I would like

15   to get the settlement going so kids get base-line tested as

16   soon as possible.

17          So assuming that the NCAA can stick to its 60-day

18   schedule on getting the returns back on mailing, I was hoping

19   we would be back in court with a proposal 30 days after that,

20   which would be March 16th.

21          THE COURT:  All right.  That's fine.

22          And then would that be the same for kind of

23   addressing, for example, the evaluation criteria --

24          MR. BERMAN:  Everything.  Complete package by

25   March 16th.  That's what I thought the goal would be.

1          THE COURT:  Okay.  That will be fine.

2          So those are the points that I wanted to raise with

3   regard to the issues that I raised in the order of a couple

4   of days ago.  Is there anything else in particular the

5   parties want to talk about?

6          MR. BERMAN:  No, your Honor.  Thank you for your

7   comments, and we take them to heart and we're going to go to

8   work.

9          THE COURT:  All right.  I did have a question about

10  the amended -- or the revised Deal report, if I could ask

11  you.

12          MR. BERMAN:  Sure.

13          THE COURT:  So I have a -- and you may be at a

14  disadvantage because you might not have it with you, but I

15  do, so --

16          MR. BERMAN:  I do.

17          THE COURT:  In my mind one of the key cornerstones

18  of the cost estimates are the underlying data provided by the

19  NCAA with regard to the reported occurrences of concussions

20  between basically I believe it's 2004 and 2012.

21          MR. MESTER:  That's correct, your Honor.

22          THE COURT:  I don't believe that -- what form is

23  that data in?  Is it in a spreadsheet?  Is it in a --

24          MR. MESTER:  It's a database, your Honor.

25          THE COURT:  Okay.

1      One of the things that I was curious about is, on

2   the one hand you have the data that Mr. Deal provided

3   regarding the increases in participation at the NCAA schools

4   in the sports, right, particularly sports of interest; and

5   then you have data regarding the reporting of concussions

6   over time.  I haven't seen that data.  Obviously I don't know

7   what the annual breakdown of those reported things are.

8      I wondered, though -- and perhaps -- and if you

9   know, you can let me know, otherwise I would be interested to

10  know -- whether the reporting of concussions over those years

11  proportionally follows the participation rate increases in

12  the sports or whether there's a spike at some point with

13  regard to the number of reported concussions based upon, for

14  example, people are just more aware of concussions.

15      And the reason I ask that is because if it is the

16  latter, then the question I have is, should the later years

17  be weighted the same as the earlier years, and should there

18  be a straight line average as -- and I don't know whether

19  that's what Mr. Deal did, but at least it seems like that's

20  what he did -- or whether there should be more weight given

21  to the latter years as being more -- as more accurately

22  reflecting what the average concussion occurrences would be

23  as opposed to the earlier years.  I don't know if there was

24  any sort of analysis done along those lines.

25      MR. BERMAN:  We did not, but we can, if the data

1    supports that.

2              MR. MESTER:  And, your Honor, I think we mentioned

3    this earlier.  And we, likewise, had a separate set of

4    experts look at this data.  We came up with different results

5    that would suggest that the fund is even a little more

6    adequate than Mr. Deal did, without disputing what he did.

7              But I'm quite confident -- I was in all of those

8    discussions.  I don't think we analyzed the data in that

9    fashion either but I think we could.

10             THE COURT:  I think some more expostulation with

11   regard to the underlying data would be helpful to me.

12             MR. BERMAN:  Okay.

13             THE COURT:  And I know that -- and typically in a

14   case that's not in a settlement context, the Court has the

15   benefit of two experts, right, who are critiquing one

16   another's reports, assumptions, data.  I don't have that at

17   the moment.  Perhaps there may come a time where a Rule 706

18   expert may be appropriate, but I don't think it's so now.

19   Frankly, I would like to try to get that information from the

20   existing experts to minimize the costs going forward, if I

21   can.

22             But one of the questions I had was exactly that.

23   Was the nature of the data, the quality of the

24   concussion-reporting data and any sort of, for lack of a

25   better word -- I don't think it's the right word -- but

1    sensitivity analysis done with regard to that data?

2          And so, for example, if you have a significant

3    spike in 2005, 2006, that corresponds with -- or later on

4    corresponds with people becoming more aware, and so,

5    therefore, reporting more as opposed -- that would give rise

6    to the concern that the earlier years were under-reported,

7    then a straight line average would not be the right figure to

8    take, right, from that data.  At least I don't think so.

9          MR. BERMAN:  Okay.

10         THE COURT:  And my guess is -- my supposition is

11   that Mr. Deal, who has a very good reputation, probably did

12   some of that analysis.  But if not, that's something that I

13   would like done and that I would like to see.

14         All right.

15         MR. BERMAN:  So perhaps what we'll do is do almost

16   like a 26 expert report when we submit it so you have a more

17   robust -- with the data and the normal stuff that we deluge

18   courts with.

19         THE COURT:  I can't believe I'm saying that, but

20   that would be nice.

21         (Laughter.)

22         THE COURT:  I would like to see that data.

23         And you can provide me with -- to the extent that

24   it's on a disk or long spreadsheets, you can provide me with

25   summaries, but I would also like the underlying data,

1    frankly, as well.  Okay?

2            The other question I had was -- I just want to make

3    sure I understand the revised Deal report correctly.

4            So on Page 7 of the supplemental Deal report that

5    was filed on December 15th, Table 4 sets forth the base-line

6    estimate and the conservative estimate.  My understanding is

7    that the conservative estimate is based upon the, quote,

8    unquote, take rate of 25 percent --

9            MR. BERMAN:  That's correct.

10           THE COURT:  -- right?  Okay.

11           So the -- comparing the two charts -- comparing

12   that chart to the original chart.  So the figures for the

13   25 percent conservative estimate, then, increased by

14   approximately --

15           MR. BERMAN:  I have a chart that does that.

16           THE COURT:  Do you?

17           MR. BERMAN:  Yes.

18           THE COURT:  Okay.  May I see it, instead of me just

19   trying to sit here -- I tried to eyeball it.

20           (Document tendered.)

21           MR. BERMAN:  So the last column is the increase in

22   each from the previous report.

23           THE COURT:  Okay.

24           So once Mr. Deal and his team consider the data

25   from the non-contact sports, based upon that and the old --

1   with regard to the base-line estimates, there was an increase

2   of about a half a million with regard to PCS testing and

3   imaging costs and about 2.6 million with regard to CTE tests

4   and imaging costs?

5            MR. BERMAN:  That's correct.

6            THE COURT:  All right.  And with regard to the

7   conservative estimate, there was an increase of about

8   1.46 million in the PCS tests and about 9.45 million in the

9   CTE tests?

10           MR. BERMAN:  Correct.

11           And just to put a footnote on that 9 million, in

12  the body of the report they discuss how they don't believe

13  that non-contact people would actually develop CTE, but,

14  nonetheless, they put a factor in to be conservative.  So we

15  don't actually think that 9 million will happen.  But, you

16  know, worst case planning.

17           THE COURT:  Okay.

18           So then from this, Mr. Deal concludes that even

19  with the -- under the new estimates that considers -- or

20  takes into consideration non-contact sports, that the

21  $70 million fund would be more than sufficient to cover the

22  lifetime of the monitoring program?

23           MR. BERMAN:  That's correct.

24           THE COURT:  Okay.

25           It does, however, obviously worst case -- or if you

1    look at a 25 percent contingency, it does decrease the --

2              MR. BERMAN:  -- the surplus.

3              THE COURT:  -- the surplus.  So without possible

4    room for error --

5              MR. BERMAN:  Right.

6              THE COURT:  -- correct?

7              Do you know -- I'm sure you do or someone does.  I

8    would like to know what the basis for the calculation of the

9    surplus was in the original case.  Okay?

10             So originally there was surplus, right, between the

11   25 million -- or the 25 percent conservative estimate and the

12   70 million, or whatever is left of 70 million after taking

13   out administrative costs?

14             MR. BERMAN:  Correct.

15             THE COURT:  There was obviously some sort of

16   contemplation and reason as to why that particular surplus

17   was arrived at versus a larger surplus, resulting in an $85

18   million fund or a smaller surplus.

19             I would like to know the rationale behind that

20   surplus, because what I want to know is whether or not an

21   additional surplus needs to be built in in light of the new

22   figures.

23             MR. BERMAN:  We will do that.

24             THE COURT:  Okay.

25             MR. BERMAN:  Of course, when we come back to you,

1    the modifications you suggest bear on the surplus issue,

2    obviously.

3              THE COURT:  No, I understand.

4              MR. BERMAN:  Right.

5              THE COURT:  They're all shifting plates, right?

6    And so, there's some factors for which we just don't have

7    enough information.  So -- for direct notice, for example, we

8    don't know how much that's going to cost, right?

9              We also, frankly -- we don't really know how much

10   the notice program even as proposed is going to cost because,

11   as I recall, there wasn't an estimate done for the Phase 2 of

12   the notification plan.

13             Obviously if there's going to be increased

14   locations, that's going to affect the cost; the new

15   calculations will.  I mean, there's -- I understand that

16   there's a number of things that are at play and --

17             MR. BERMAN:  Well, what I was getting at was, if we

18   come back and there's a right to bring a medical monitoring

19   class if it's exhausted, that puts less pressure on the

20   surplus issue, in my mind, because people can start a class

21   action over if the NCAA doesn't fund.

22             THE COURT:  Right.  I understand that as well.  I'm

23   not sure whether any of us really want that particular

24   outcome.

25             MR. BERMAN:  I understand.

1    MR. MESTER:  I certainly don't, your Honor.

2    THE COURT:  But I understand as well.

3    All right.  So those are all the issues that I

4    wanted to address today.  Is there anything else?

5    MR. MESTER:  No.

6    THE COURT:  All right.  Very well.  Thank you for

7    coming in.

8    Before everyone goes, I will go ahead and set a new

9    status hearing date somewhere beyond the March date.  Thank

10   you.

11   MR. MESTER:  Thank you, your Honor.

12   THE COURT:  Okay.

13   (Which were all the proceedings heard.)

14                     CERTIFICATE

15   I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   /s/ **Mary M. Hacker**                    *December 18, 2014*

19   _____        _____

20   Mary M. Hacker                          Date
     Official Court Reporter

21

22

23

24

25