UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION STUDENT – ATHLETE
CONCUSSION INJURY LITIGATION, ET AL

*Plaintiffs,*

V.

Case No.: 1:13-cv-09116
Honorable John Z. Lee

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

*Defendant.*

**PLAINTIFF JULIUS WHITTIER'S MEMORANDUM
IN SUPPORT OF PLAINTIFF NICHOL'S RENEWED MOTION
TO APPOINT JAY EDELSON AS LEAD CLASS COUNSEL
FOR THE PERSONAL INJURY CLASS**

This is Plaintiff Julius Whittier's Memorandum in Support of Plaintiff Nichol's Renewed Motion to Appoint Jay Edelson as Lead Class Counsel for the Personal Injury Class, and in support thereof, would show the Court as follows:

The standards by which the Court is to be guided in the appointment of interim class counsel is found in Rule 23(g)(2), whereby the Court may appoint an applicant seeking appointment as class counsel only if the applicant is adequate under Rule 23(g)(1) and (4). Rule 23(g)(1)(a) identifies the factors that must be considered by the Court in appointing class counsel:

(i) The work counsel has done in identifying or investigating potential claims in the action;
(ii) Counsel's experience in handling class actions, other complex litigation and the types of claims asserted in the action;
(iii) Counsel's knowledge of the applicable law; and
(iv) Resources that counsel will commit in representing the class.

1

Rule 23(g)(1) also has sections (b), (c), (d), and (e) which are factors the Court may consider in making a determination of appointment of class counsel, including 23(g)(1)(b), which states, "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Rule 23(g)(4) states the duty of class counsel, including interim class counsel, "<u>class counsel must fairly and adequately represent the interest of the class.</u>"[1]

### EDELSON'S QUALIFICATIONS FOR APPOINTMENT

Edelson set forth in his Motion for Appointment as Lead Class Counsel for the Personal Injury Class, his extensive experience in class action and mass tort litigation, including personal injury, involving thousands of Plaintiffs. Moreover, in *Donaldson*, the Court cited the Manual of Complex Litigation (4th), §21.11 (2004) where it states, "in cases of overlapping, duplicative, or competing suits in which a number of lawyers may compete for class appointment, designation of interim counsel can clarify responsibility for protecting the interests of the class during pre-certification activities, including "negotiating settlement." *Id* at 2. The Court is entitled to consider all relevant sections under Rule 23(g)(3), which may be applicable to Edelson's Motion for Appointment as Lead Class Counsel.

### PLAINTIFFS' EXPERTS IDENTIFY PERSONAL INJURY CLAIMS AS THE CORE OF THEIR ANALYSIS

Current interim co-class counsel's attempt to diminish the prevalence of personal injury claims in the class based upon the number of claims filed, is in direct contradiction of the findings of their own experts. Review of the findings

---

[1] Rule 23(g)(1)(a), (2), (3), (4) Federal Rules of Civil Procedure.

4845-3942-5314.v1

contained in the Expert Report of Bruce Deal, identifies post-concussion syndrome (PCS), and most notably, chronic traumatic encephalopathy (CTE) as a "longer-term outcome of repetitive head trauma.[2] The Deal Report found that symptoms of CTE present later in life, usually beginning 8-10 years after experiencing repetitive mild traumatic brain injury. With advancing disease, more sever neurological changes develop. In late stages CTE may be clinically mistaken for Alzheimer's disease unlike the behavior symptoms which typically appear in roughly the age span 35-45, these dementia-like symptoms typically appear at age 50-60.[3] The Deal Report presented estimates of the size of the class population, the size of the disease population, and its corresponding estimates of the proportions of the population likely to present with CTE.

The Deal Report found that the rates of concussion varied significantly across sporting activities. The number of concussions among football players is significantly higher than in other contact sports, because of the proclivity for concussions in football and the large number of participants.[4] The Deal Report found that football had a reported concussion rate roughly twice the rate observed in other contact sports, and many times higher than that in non-contact sports.[5]

### CLASS COUNSEL MISCONSTRUED FINDINGS OF ITS EXPERTS

Notwithstanding the findings of its experts, the current interim co-class counsel agreed to a settlement that was skewed towards 3,502,138 class members

---

[2] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 4.
[3] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 5.
[4] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at ps. 6-7.
[5] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 11.

4845-3942-5314.v1

with significantly lower reported rates of concussions than towards the 717,028 football class members for whom the plaintiffs experts concluded the reported rate of concussions were "roughly twice to many times" greater. Moreover, the Deal Report stated that the Plaintiffs' expert committee, who compiled the analysis for the Deal Report, estimated that the <u>risk of CTE-like symptoms among former NCAA football players to be three times as high as they are in the general population; which the committee regarded as conservative</u>.[6] One of the more startling of the Report's findings is that the available data suggests that the vast majority of those presenting initially with mood-behavioral symptoms will present later with cognitive symptoms at the rate of 90%.[7] For these reasons, the Plaintiffs' expert committee treated the rate of specific cognitive impairment as a proxy for rates of CTE. The committee then focused its attention on CTE symptoms, including cognitive symptoms, which resemble dementia on the population with comparable symptoms between ages 35-65. Applying this age range (35-65), <u>the Plaintiff expert committee "took the risks for former football players to be 300% of the resulting age specific population base line rate of relevant cognitive impairment, and 150% the rate of non-football contact sports players</u>.[8] The committee concluded that they regarded these rates as "conservative."

The Report included figures which show the resulting model population of student athletes eventually developing CTE; combining the base line population estimates and the relative risk factors for football and other contact sports. The

---

[6] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 12.
[7] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 12.
[8] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 13.

committee estimates between <u>50 and 300</u> cases of CTE per academic year.[9] For the current interim co-class counsel to imply in its Memorandum in Opposition to Plaintiff Whittier's withdrawn Rule 23 Motion, that the number of claims for personal injury in a potential class action consists of only eleven claims is incomprehensible. The findings of the Deal Report regarding the number of estimated CTE cases per academic year, combined with the waiver of class rights to personal injury claims in the proposed class settlement, contradicts the current co-class counsel's assertions that the interests of the putative class is adequately protected by current interim co-class counsel.

## CURRENT CLASS COUNSEL ABANDONED PERSONAL INJURY CLASS CLAIMS

Regarding Respondent's assertion that co-lead counsel adequately represents the putative class, including members with personal injury claims, Plaintiff Whittier need only refer the Court to the findings of the Deal Report referenced above. Respondent misconstrues the basis of the adequacy of representation to refer to normal discovery in the case applicable to all class members, rather, the criticism regarding the adequacy of representation relates to the structure of the settlement proposed by current interim co-class counsel and its adequacy in addressing the "between 50 and 300" cases of CTE the Plaintiffs' expert committee estimates will occur per academic year over the term of the settlement referenced in the Deal Report. The proposition that this number of cases occurring annually must be litigated on an individual basis or as a mass tort borders on the absurd.

---

[9] Expert Report of Bruce Deal p. 14, Figure 5. Population of student athletes with CTE by academic start year.

**EVIDENCE OF INADEQUACY OF REPRESENTATION**

As this Court pointed out at the preliminary approval hearing, one of the significant inadequacies of the proposed class settlement relates to the provision in the settlement that allows for any funds not consumed by testing or administration to revert back to the Defendants. Again, the Plaintiffs' expert's analysis by Mr. Deal and his committee shows the inadequacy of representation of personal injury claims by interim co-class counsel. Notably, the Deal Report's analysis of the proposed settlements participation rate, referred to as "take rates" in the report. The Deal Report states, "[i]n class action, the participation rate or "take rate" is the percentage of those eligible who will complete the process and access the provided relief." The first finding of the Deal Report in this regard is that all of the putative class of an estimated 4,219,166 never suffered a concussion, and therefore, <u>the committee modeled its "take rate", believe it or not, on "those who actually have PCS or CTE", personal injury claims</u>.[10] The Deal Report next resolved that "take rates" were informed by professional judgment and historical rates of uptake of past class settlements, where available to the committee.[11] Because the committee could only find two past class settlements that considered medical monitoring, the committee also considered consumer class settlements. The results of the committee's findings were proof of why there were only two settlements involving medical monitoring programs for it to consider.

---

[10] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 14.
[11] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 14.

4845-3942-5314.v1

## THE EVIDENCE BEGS FOR ADDITIONAL CLASS COUNSEL

The two medical monitoring settlements considered by the committee had "take rates" of less than 3% for a class of 12,657 eligible claimants, and of that 3%, only 2% actually attended the first monitoring examination.[12] The second medical monitoring program considered by the committee was found to be "an instructive analog" because of the time period of the monitoring program and because it was the "largest medical monitoring program arising from class action litigation over environmental exposure."[13] The "take rate" for that monitoring program, the (FMMP) was "roughly 25%." However, the committee concluded that because of "important dis-analogous" between the two monitoring programs (the NCAA Fund and the FMMP), <u>the committee concluded that it was confident the "take rate" for the NCAA monitoring program would be a "significantly lower 'take rate' among potential fund (NCAA) claimants</u>."

The committee's findings regarding consumer settlements were even worse. The materials reviewed by the committee on consumer settlements showed that they were "seldom more than 2-3% and can be much less than 1%." To emphasis the enormity of this finding as it relates to medical monitoring, the committee found that, "antidotally, this is even true of settlements offering significant monetary benefits in the hundreds or even thousands of dollars per member."

Other committee findings in the Deal Report highlight the gross inadequacy of the settlement negotiated by the interim co-class counsel for the personal injury

---

[12] *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468 (5th Cir. 2011).
[13] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 15.

7

class, <u>including the finding that the average utility to the members of the test will be considerably lower than the cash costs of the test</u>.[14] The Report also identified factors related to the effort required to claim benefits as those identified by the Court at the preliminary approval hearing such as extensive travel to access benefits, the complexity of the screening questionnaire, and the geographical magnitude of other proposed NCAA medical monitoring programs. However, the most damning finding of the Deal Report as to the adequacy of the proposed medical monitoring settlement and its "take rate" was the following:

> "Taken by itself, the effort required to claim the medical monitoring benefit under the NCAA settlement is moderately high. In these situations, participation will be concentrated among those class members who are experiencing active symptoms which are interfering with their functional lives and for which they have not received treatment [personal injury claims] this high level of effort suggests a relatively low take rate compared with the historical examples the committee reviewed."

### THE COURT HAS DISCRETION TO APPOINT EDELSON UNDER RULE 23

The Deal Report's findings on "take rates" when combined with the provisions of the proposed class settlement that provides for a reversion of the unapplied settlement funds back to the NCAA makes the rejected proposed settlement, except for those who will actually receive monetary compensation, for all intents and purposes illusory. A better and more adequate settlement can be structured with the funds proposed in the rejected settlement, but to do so the settlement must recognize and incorporate the findings of the Deal Report which

---

[14] Expert Report of Bruce Deal regarding the medical monitoring fund of July 28, 2014 at p. 16.

4845-3942-5314.v1

identifies the personal injury claims as the basis for supporting any settlement in this case, including medical monitoring.

The Court has taken the first step in addressing the inadequacies of the proposed settlement. Plaintiff Whittier's counsel has experience with the asbestos settlement trust, as a former counsel for an asbestos Defendant, and as an arbitrator and mediator with the American Arbitration Association. Plaintiff Whittier's counsel believes asbestos trusts can provide a structural model for negotiating a settlement of the NCAA concussion litigation that can meet the Court's approval.

## CONCLUSION

Rule 23(g)(3) is a permissive Rule stating that, "a Court may designate interim counsel to act on behalf of a putative class before determining whether to certify a class action." The advisory committee's notes to Rule 23 suggest that the Court has the discretion to appoint interim counsel when the Court determines that it is necessary to protect the interests of the class. Thus, the factors identified in Rule 23(g)(1)(a) have been met by Edelson and counsel should be considered by the Court for appointment as additional interim class counsel for the personal injury class.

WHEREFORE, Plaintiff Julius Whittier, requests that the Court grant Plaintiff Nichol's Renewed Motion to Appoint Jay Edelson as Lead Class Counsel for the Personal Injury Class and for any and all other relief, both in law and in equity to which he shows himself justly entitled.

Date: March 31, 2015.

Respectfully submitted,

By: */s/ Dwight E. Jefferson*
_____
Dwight E. Jefferson
State Bar No. 10605600
djefferson@coatsrose.com

**ATTORNEY FOR CLASS-PLAINTIFF MILDRED WHITTIER, A/N/F, JULIUS WHITTIER**

OF COUNSEL:

COATS ROSE YALE RYMAN & LEE
9 Greenway Plaza, Suite 1100
Houston, Texas 77046-0307
Telephone: (713) 651-0111
Facsimile: (713) 651-0220

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record on this 31st day of March, 2015.

By: */s/ Dwight E. Jefferson*
_____

4845-3942-5314.v1