# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL No. 2492 |
| | Master Docket No. 13-cv-09116 |
| | Judge John Z. Lee |
| | Magistrate Judge Geraldine Soat Brown |
| ADRIAN ARRINGTON, DEREK OWENS, ANGELICA PALACIOS, KYLE SOLOMON, SHELBY WILLIAMS, BRICE SHEEDER, SHAVAUGHNE DESECKI, SPENCER TRAUTMANN, RYAN PARKS, URSULA KUNHARDT, JESSICA MILLER, RACHEL HARADA, ADAM WALKER, ANNA BARTZ, NATALIE HARADA, DACHE WILLIAMS and PETER DYKSTRA, individually and on behalf of all others similarly situated, | Case No. 11-cv-06356 |
| | **JURY DEMAND** |
| Plaintiffs, | |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT

## [REDACTED VERSION]

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   PROCEDURAL HISTORY ................................................................................. 2

III.  BACKGROUND FACTS .................................................................................... 4

    A.    The Proposed Class Representatives Unanimously Support the
        Settlement ................................................................................................... 4

        1.    Ms. Rachel Harada is a senior and member of an NCAA
               women's soccer team. ...................................................................... 5

        2.    Mr. Adam Walker is a former NCAA men's golfer. ................................. 6

        3.    Ms. Anna Bartz is a former NCAA's women's track and field
               participant. .................................................................................... 7

        4.    Ms. Natalie Harada is a sophomore and a member of a NCAA
               women's soccer team. ...................................................................... 9

        5.    Ms. DaChe Williams is a current student-athlete and member
               of a NCAA women's basketball team. .................................................. 11

        6.    Mr. Peter Dykstra is a former NCAA men's track and field
               participant. .................................................................................... 13

    B.    The Proposed Class Representatives Had a Meaningful Opportunity to
        Review and Discuss the Settlement with Judge Andersen ................................. 14

    C.    The Proposed Class Representatives Adequately Represent the
        Continuum of Concussion Incidences ................................................................ 16

    D.    The Information Produced in Discovery Confirms that the Class
        Representatives Cover the Appropriate Sports .................................................... 18

IV.   ARGUMENT ...................................................................................................... 23

    A.    The Proposed Class Representatives Adequately Represent the
        Settlement Class .......................................................................................... 23

    B.    The Proposed Class Representatives Claims Are Typical of the
        Settlement Class .......................................................................................... 24

C.    The Addition of the Proposed Class Representatives May Be Necessary to Protect Settlement Class Members ................................................. 26

D.    NCAA Athletes Who Play or Played Women's Soccer, Women's Basketball, Golf, and Track & Field May Otherwise Suffer Prejudice if the Court Deems the Current Plaintiffs Inadequate to Represent Them *and* Denies the Addition of the Proposed Class Representatives as Plaintiffs ............................................................................................................. 27

V.    CONCLUSION ............................................................................................................. 28

010270-12 768695 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)............................................................................................23

*Anderson v. Cornejo*,
    199 F.R.D. 228 (N.D. Ill. 2000)........................................................................23

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) .............................................................................24

*Brider v. Nationwide CR Inc.*,
    1999 U.S. Dist. LEXIS 2681 (N.D. Ill. Mar. 5, 1999)......................................26

*In re Discovery Zone Secs. Litig.*,
    181 F.R.D. 582 (N.D. Ill. 1998).........................................................................27

*Espenscheid v. DirectSat USA, LLC*,
    688 F.3d 872 (7th Cir. 2012) .............................................................................23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).................................................................................23

*Foster v. Gueory*,
    655 F.2d 1319 (D.C. Cir. 1981) .........................................................................26

*Gates v. Rohm & Haas Co.*,
    248 F.R.D. 434 (E.D. Pa. 2008).........................................................................25

*In re Gen. Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*,
    2000 WL 45534 (N.D. Ill. Mar. 13, 2000).........................................................24

*Gooch v. Life Investors Ins. Co. of Am.*,
    672 F.3d 402 (6th Cir. 2012) .............................................................................23

*Hill v. Western Elec. Co.*,
    672 F.2d 381 (4th Cir. 1982) .............................................................................26

*Jordan v. Commonwealth Fin. Sys., Inc.*,
    237 F.R.D. 132 (E.D. Pa. 2006).........................................................................24

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) .............................................................................25

010270-12  768695 V1

*Kohen v. Pacific Inv. Mgmt. Co. LLC & PIMCO Funds*,
    571 F.3d 672 (7th Cir. 2009) ...................................................24

*Marshall v. H&R Block Tax Servs.*,
    270 F.R.D. 400 (S.D. Ill. 2010) ...............................................25

*Nelson v. IPALCO Enters.*,
    2003 U.S. Dist. LEXIS 26392 (S.D. Ind. Sept. 30, 2003) .......................26

*Searcy v. eFunds Corp.*,
    2010 U.S. Dist. LEXIS 73881 (N.D. Ill. July 22, 2010)..........................26

*South v. Rowe*,
    759 F.2d 610 (7th Cir. 1985) .................................................26

*Srail v. Village of Lisle*,
    249 F.R.D. 544 (N.D. Ill. 2008)..............................................23

*Stallworth v. Monsanto Co.*,
    558 F.2d 257 (5th Cir. 1977) .................................................26

*United States v. Union Elec. Co.*,
    64 F.3d 1152 (8th Cir. 1995) .................................................27

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ............................................23, 24

## OTHER AUTHORITIES

6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 18:14 (4th
    ed. 2002) ...................................................................23

Plaintiffs Adrian Arrington, Derek Owens, Kyle Solomon, Angela Palacios, Abram Robert Wolf, Sean Sweeney, Jim O'Conner, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John DuRocher, Sharron Washington, Shelby Williams, Brice Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, and Jessica Miller (collectively, the "Settlement Class Representatives"), on behalf of themselves and as representatives of the Settlement Class, seek leave to amend the Third Amended Complaint for the purpose of adding class representatives Rachel Harada, Adam Walker, Anna Bartz, Natalie Harada, DaChe Williams, and Peter Dykstra (collectively, the "Proposed Class Representatives") and state as follows:

## I.  INTRODUCTION

The Proposed Class Representatives are current and former NCAA student-athletes who play or played both contact and non-contact sports.[1] The Proposed Class Representatives have reviewed, understand, and support the Amended Settlement Agreement ("Settlement") from the perspective of current or former NCAA student-athlete who played golf, soccer, track and field, and basketball.[2] The unanimous support of the Settlement demonstrates that there is no conflict between Settlement Class members who participated in Contact Sports and those who participated in non-contact sports. Rather, the Settlement Class shares a single goal regardless of sport – to obtain access to the Medical Monitoring Program in the Settlement and to obtain necessary changes to the NCAA's concussion-management and return-to-play guidelines to further protect student-athletes in the future.

---

[1] "Contact Sports" is defined in the Amended Settlement Agreement to include football, lacrosse, wrestling, ice hockey, field hockey, soccer, and basketball, whether a men's or women's team. Amended Settlement Agreement, ¶ II(G) (Dkt. No. 92).

[2] *See* Declaration of Judge Wayne R. Andersen (ret.) ("Andersen Decl."), Ex. B. "Ex." Refers to Exhibits to the Motion For Leave to File Fourth Amended Complaint.

Therefore, the request should be granted for three reasons: (1) the Proposed Class Representatives are typical, and they will fairly and adequately protect the Settlement Class, including current and former student-athletes who played non-contact sports; (2) according to the Court's prior ruling the rights of and benefits for Settlement Class Members would otherwise at risk; and (3) as a result of the Court's prior ruling, the denial of the right to add the Proposed Class Representatives would prejudice Settlement Class Members. Accordingly, the motion should be granted.

## II.    PROCEDURAL HISTORY

On July 29, 2014, the Settlement Class Representatives filed their Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class ("Motion for Preliminary Approval") seeking preliminary approval of the Settlement Agreement on behalf of a Settlement Class defined as: "All persons who played an NCAA-sanctioned sport at an NCAA member institution at any time through the date of Preliminary Approval."[3] On October 10, 2014, Plaintiffs filed their Amended Motion ("Amended Motion") for Preliminary Approval of Amended Class Settlement and Certification of Settlement Class seeking approval of the Amended Settlement Agreement ("Amended Settlement Agreement").[4]

During the October 23, 2014 hearing on the Motion for Preliminary Approval of the Amended Settlement Agreement, the Court inquired: "[C]an the current class representatives adequately represent the interests of those who played non-contact sports when it comes to the terms that are set forth in this settlement?"[5] In an attempt to address the Court's "concern that the

---

[3] *See* Motion for Preliminary Approval (Dkt. No. 64) at 1.

[4] *See* Amended Motion for Preliminary Approval (Dkt. No. 91).

[5] *See* Transcript of Proceedings – Motion Before the Honorable John Z. Lee, Oct. 23, 2014, at 9.

interests of people who play non-contact sports be formally represented in this case,"[6] the Settlement Class Representatives filed their Motion to Add Non-Contact Sports Plaintiffs and Class Representatives ("Motion to Add Non-Contact Sports Plaintiffs") requesting to add two current participants in non-contact NCAA sports as Class Representatives.[7]

During the November 18, 2014 hearing on the Motion to Add Non-Contact Sports Plaintiffs, the Court requested Plaintiffs: (1) to obtain "the thoughts of various class representatives along the spectrum of both sports and time period to some extent, and whether or not they would approve of the overall settlement …";[8] (2) "to make sure that whoever the additional class members are, that they have a meaningful opportunity to sit down with Judge Andersen and the parties and ask whatever questions they have";[9] (3) "to the extent there is a continuum [of concussions among non-contact sports] … to make sure that whoever the additional class representatives are adequately represent that continuum";[10] and (4) to have the expert "team take another look at their work to make sure that they have the most relevant data to adequately calculate participation rate."[11]

Settlement Class Representatives took these additional steps as documented in their Renewed Motion to Add Non-Contact Sports Plaintiffs and Class Representatives.[12] However,

---

[6] *Id.* at 13.

[7] *See* Settlement Class Representatives' Motion to Add Non-Contact Sports Plaintiffs and Class Representatives (Dkt. No. 96).

[8] *See* Transcript of Proceedings – Motion Before the Honorable John Z. Lee, Nov. 18, 2014, at 10-11.

[9] *Id.* at 13.

[10] *Id.* at 8.

[11] *Id.* at 11.

[12] *See* Settlement Class Representatives' Renewed Motion to Add Non-Contact Sports Plaintiffs and Class Representatives (Dkt. No. 105).

on December 17, 2014, the Court issued an order denying the Motion for Preliminary Approval. In its Order denying Plaintiffs' Motion for Preliminary Approval, the Court stated:[13]

> [T]he risks of suffering a concussion while playing NCAA-sanctioned sports are scattered along a continuum with football on the highest end and sports such as riflery on the lower end. The class representatives as a group must adequately represent this continuum as a whole so that the various interests along the continuum can be voiced as part of the settlement process.

The Court stated: "[a]dditional representation is necessary for those putative class members who formerly played both non-Contact Sports, as well as Contact Sports other than football. Only in this way will the class representative adequately represent the interests of the entire putative settlement class, rather than only parts of it."[14]

On December 19, 2014, the Court denied the Settlement Class Representatives' Renewed Motion to Add Non-Contact Sports Plaintiffs and Class Representatives as moot.[15] However, the Court granted an oral motion to amend the Second Amended Complaint in the *Arrington* action to join as named plaintiffs the individuals who were the subject of the renewed motion.[16] Accordingly, on January 7, 2015, Plaintiffs' filed their Third Amended Complaint adding the individuals.[17]

### III.     BACKGROUND FACTS

#### A.     The Proposed Class Representatives Unanimously Support the Settlement

Each Proposed Class Representative reviewed the Amended Settlement Agreement on behalf of current and former NCAA student-athletes to determine if the Settlement is fair, adequate, and reasonable as it applies to student-athletes and consulted with Judge Andersen

---

[13] Memorandum Opinion and Order (Dkt. No. 115) at 12.

[14] *Id.* at 12-13.

[15] Order (Dkt. No. 116).

[16] *Id.*

[17] *See* Third Amended Complaint (*Arrington* Dkt. No. 217).

- 4 -

prior to doing so.[18] Unanimously the Proposed Class Representatives approve of the Settlement and believe that the Settlement should apply to all sports. The Proposed Class Representatives believe that the Settlement is important because it provides both medical monitoring to all current and former student-athletes and significant changes to the NCAA's concussion management and return-to-play rules.

### 1. Ms. Rachel Harada is a senior and member of an NCAA women's soccer team.

Ms. R. Harada is a current student-athlete at Rockhurst University in Kansas City, Missouri. She is a senior and a member of the women's soccer team.[19]

Ms. R. Harada believes that the Settlement is a major step in the right direction to address concussions in NCAA sports. Concussions are unfortunately common in soccer and can result from contact with other players, the ground, and heading the ball.[20]

Ms. R. Harada believes that it is important that student-athletes, coaches, and trainers receive concussion management education. It is important that student-athletes, coaches, and trainers be able to recognize a concussion and when a student-athlete should be removed from play to avoid further injury.[21] Ms. R. Harada further explains that it is important that doctors be present at each game and practice for contact sports to ensure that student-athletes do not attempt to continue to play while experiencing symptoms.[22] In addition, the requirement that all schools conduct mandatory baseline testing is very important. While having trainers and doctors present

---

[18] *See* Declaration of Rachel Harada ("R. Harada Decl.), ¶ 2, Ex. D; Declaration of Adam Walker ("Walker Decl."), ¶ 2, Ex. E; Declaration of Anna Bartz ("Bartz Decl."), ¶ 2 Ex. F; Declaration of Natalie Harada ("N. Harada Decl."), ¶ 2, Ex. G; Declaration of DaChe Williams ("Williams Decl."), ¶ 2, Ex. H; Declaration of Peter Dykstra, ¶ 2, Ex. I ("Dykstra Decl.").

[19] R. Harada Decl., Ex. D, ¶ 1.

[20] *Id.*, ¶ 3.

[21] *Id.*, ¶ 4.

[22] *Id.*, ¶ 5.

at games and practices is extremely helpful, baseline testing provides an objective measurement to determine when it is appropriate for a student-athlete to return to play.[23] Ms. R. Harada further explains that, for those student-athletes who suffer effects from concussions, she believes that all current or former student-athletes should have access to the Medical Monitoring Program – regardless of the sport they played.[24]

Ms. R. Harada also supports the Settlement because she has friends who have suffered concussions, including a former teammate forced to retire from soccer due to cumulative concussions. She wants to be a class representative to ensure that student-athletes obtain the benefits provided under the Settlement.[25]

### 2. Mr. Adam Walker is a former NCAA men's golfer.

Mr. Walker is a former student-athlete and played golf from 2009-2010 at Simpson College in Indianola, Iowa.[26]

Mr. Walker believes that the most important aspect of the Settlement is that it requires all schools to follow the same standards. Concussion management should not vary based on what school you go to or what sport you play. Mr. Walker further believes that the Settlement will require that all schools implement the same concussion management rules which will ensure that *all* NCAA student-athletes receive the protection they deserve. The Settlement also provides a mechanism by which the NCAA and the Court can implement and enforce proper concussion management rules.[27]

---

[23] *Id.*, ¶ 6.

[24] *Id.*, ¶ 7.

[25] *Id.*, ¶ 8.

[26] *See* Walker Decl., Ex. E, ¶¶ 1-2.

[27] *Id.*, ¶ 3.

- 6 -

Overall, Mr. Walker believes that the Settlement provides the proactive approach necessary to protect student-athletes by mandating baseline testing and requiring proper concussion education for student-athletes, coaches, and trainers.[28]

Mr. Walker acknowledges that the Settlement provides for trained personnel to be present at contact sports events but not at non-contact sports events and does not believe that this difference means that the Settlement is unfair to non-contact sports athletes. Concussions happen much less frequently in sports like golf. However, if concussions do happen in non-contact sports, Mr. Walker believes it is important that a student-athlete will have to obtain medical clearance before returning to play and not return to play on the same day of the injury.[29]

Mr. Walker thinks that all current and former student-athletes should have access to the Medical Monitoring Program and wants to be a part of the case to ensure that student-athletes who play non-contact sports obtain the benefits of this Settlement.[30]

### 3. Ms. Anna Bartz is a former NCAA's women's track and field participant.

Ms. Bartz is a former student-athlete and graduated from the University of Wisconsin in Madison, Wisconsin in 2007. Ms. Bartz participated in the heptathlon for the track and field team.[31]

Ms. Bartz sustained a concussion during her track and field career. While lifting weights during practice, Ms. Bartz fell backwards and hit her head on the ground. Her school did not conduct baseline testing and therefore there was no way to objectively determine how severe the concussion was. Although she was withheld from participating in practice for approximately a

---

[28] *Id.*, ¶ 4.

[29] *Id.*, ¶ 5.

[30] *Id.*, ¶¶ 6-7.

[31] Bartz Decl., Ex. F, ¶ 1.

week, she still felt sick after the injury. To Ms. Bartz's knowledge, there were no rules regarding return to play following a concussion during the time she participated in track and field. In addition, student-athletes, particularly those who participated in non-contact sports with a lower incidence of concussion, did not receive any concussion education from the school or the NCAA.[32]

Therefore, Ms. Bartz thinks it is important that all current and former student-athletes have access to the Medical Monitoring Program. Ms. Bartz thinks that there are former student-athletes struggling with the effects of concussions who may not be able to link these symptoms to their injuries. Former student-athletes should be able to access the Medical Monitoring Program to determine if their symptoms are concussion related.[33]

Ms. Bartz believes that one of the most attractive aspects of the Medical Monitoring Program is the number of testing locations across the country which will be accessible to current and former student-athletes regardless of geographic location. She also believes that another important benefit of the Settlement is that it requires that all student-athletes be baseline tested; in the event they are injured, the baseline test will help determine when it is safe to return to play. Following her injury, there was no testing which could have provided an objective measure to indicate when it was safe to return.[34]

Based on Ms. Bartz's personal experience, track and field includes events with concussion risks such as the shot-put, high jump, and pole-vaulting. Therefore, it is important to

---

[32] *Id.*, ¶ 3.

[33] *Id.*, ¶ 4.

[34] *Id.*, ¶¶ 5-6.

Ms. Bartz that student-athletes receive mandatory concussion education and coaches and athletic trainers are properly trained in concussion management and recognition.[35]

Ms. Bartz understands that the Settlement provides for trained personnel to be present at contact sports events but not at non-contact sports events. However, she understands the expense that would come with requiring the medical personnel be present at every single NCAA sporting event.[36]

Overall, Ms. Bartz thinks that the Settlement is important because it both provides medical monitoring to former athletes who have sustained concussions and also makes significant changes going forward to protect current student-athletes. Therefore, Ms. Bartz supports the Settlement on behalf of a former player in a "non-contact" sport, and is willing to participate as a class representative.[37]

### 4. Ms. Natalie Harada is a sophomore and a member of a NCAA women's soccer team.

Ms. N. Harada is a current student-athlete at Maryville University in St. Louis, Missouri. She is a sophomore and a member of the women's soccer team.[38]

Ms. N. Harada believes that the most important aspect of the Settlement is that it requires all schools to live up to the same standards. Concussions should be diagnosed and treated the same across the board – regardless of what school you go to or sport you play. Requiring all schools to be on the same page and to implement the same concussion management policies and rules is important.[39]

---

[35] *Id.*, ¶ 7.

[36] *Id.*, ¶ 8.

[37] *Id.*, ¶ 9.

[38] N. Harada Decl., Ex. G, ¶ 1.

[39] *Id.*, ¶ 4.

While Ms. N. Harada has never sustained a diagnosed concussion, she has seen teammates sustain concussions. In Ms. N. Harada's opinion, concussions occurring in soccer may be just as serious as those sustained in football. Concussions may occur in soccer not only as a result of "body to body" contact but also "ball to body" contact such as heading.[40]

Therefore, Ms. N. Harada thinks that all current and former student-athletes should have access to the Medical Monitoring Program. By monitoring and testing current and former student-athletes, the risk of the student-athletes suffering long-term injuries will be greatly reduced.[41]

It is also important to N. Harada that if she sustains a concussion, the Settlement requires that medical personnel be present and also that she must obtain medical clearance prior to returning to play.[42] In addition, it is important to Ms. N. Harada that student-athletes, coaches, and trainers receive concussion education. Therefore, everyone involved will understand the importance of promptly attending to concussions, removing student-athletes from practices and games, and prohibiting student-athletes from returning to play too soon.[43]

Overall, Ms. N. Harada believes the Settlement is an important step in the right direction. Due to the prevalent concern regarding concussions, the Settlement is necessary to protect student-athletes and also give student-athletes a way to obtain medical screening if they have been injured. She think that all schools should require these changes regardless of sport and

---

[40] *Id.*, ¶ 5.

[41] *Id.*, ¶ 6.

[42] *Id.*, ¶ 7.

[43] *Id.*, ¶ 9.

- 10 -

wants to be involved as a class representative to ensure that the changes in the Settlement are implemented.[44]

### 5. Ms. DaChe Williams is a current student-athlete and member of a NCAA women's basketball team.

Ms. DaChe Williams is a current student-athlete and a member of the women's basketball team at Northeastern University in Boston, Massachusetts. Ms. Williams plays guard for the basketball team and has suffered two concussions while at Northeastern.[45]

Ms. Williams can attest from personal experience that concussions are extremely serious. Concussions can and do occur in sports other than football and are common in basketball. When concussions occur, they can be devastating and have a profound effect on a student-athlete's health regardless of the sport they play. Therefore, Ms. Williams believes that the Settlement should cover players in all sports.[46]

During her freshman year, Ms. Williams was elbowed in the head by a teammate in practice and was knocked unconscious. She was treated by the training staff at Northeastern and was not allowed to return to play until her symptoms resolved. However, she sustained a second concussion during a game later in the season and was diagnosed with a concussion by the training staff and doctors who subsequently prohibited her from returning to play. As a result of these two concussions, Ms. Williams did not play during her sophomore season and has been told by doctors that one more concussion could end her career. [47]

---

[44] *Id.*, ¶ 9.
[45] D. Williams Decl., Ex. H, ¶ 1.
[46] *Id.*, ¶ 3.
[47] *Id.*, ¶ 4.

Despite her disappointment with being unable to play, Ms. Williams understands that her health takes precedence over basketball, and her academic career is just as important – if not more important – than her basketball career.[48]

Ms. Williams is grateful for the Settlement because it will require that all schools handle concussions in the proper manner and implement universal concussion management procedures. Accordingly, Ms. Williams believes that all current and former student-athletes should have access to the Medical Monitoring Program – regardless of the sport they played. The ability to obtain access to the diagnostic program provided under the Settlement is a valuable benefit for both current and former student-athletes.[49]

As Ms. Williams can attest to from personal experience, it is especially important for medical personnel to be present at all contact sports games. In addition, Ms. Williams also believes that it is extremely important that the Settlement requires that all student-athletes, regardless of sport, obtain medical clearance prior to returning to play.[50]

Finally, Ms. Williams believes that the requirement that the NCAA provide education for faculty regarding academic accommodations for student-athletes suffering from concussions is also very important. Following her injuries, it was extremely difficult to focus and study which caused her to struggle with classes and school work.[51]

Based on her personal experiences, Ms. Williams wants to be a class representative to ensure that all student-athletes regardless of sport receive proper concussion management. She thinks that the Settlement will ensure that student-athletes are handled with the proper

---

[48] *Id.*, ¶ 5.

[49] *Id.*, ¶¶ 6-7.

[50] *Id.*, ¶¶ 8-9.

[51] *Id.*, ¶ 10.

- 12 -

concussion management procedures and also will provide medical screening for athletes who are struggling because of concussion symptoms.[52]

### 6. Mr. Peter Dykstra is a former NCAA men's track and field participant.

Mr. Dykstra is a former student-athlete and graduated from the University of Wisconsin in Madison, Wisconsin in 2008. Mr. Dykstra participated in the decathlon for the track and field team.[53]

Mr. Dykstra never sustained a concussion during his track and field career but had teammates who did sustain concussions. Concussions are serious injuries and are not just limited to contact sports. For example, track and field consists of dangerous events such as high jump and pole-vaulting.[54]

Mr. Dykstra believes that many former-student athletes may suffer from symptoms relating to concussions regardless of the sport they played. Therefore, he thinks it is important that all current and former student-athletes have access to the Medical Monitoring Program. According to Mr. Dykstra, the establishment of the Medical Monitoring Program is a valuable and proactive measure which will benefit many current and former student-athletes who may not be able to link these symptoms to their injuries.[55]

Mr. Dykstra believes that when a student-athletes graduates, they often no longer have access to the university medical and training staffs. Therefore, having convenient Medical Monitoring Program locations nearby is a great benefit. He also believes that another important benefit of the Settlement is that it requires that all student-athletes be baseline tested; in the event

---

[52] *Id.*, ¶ 11.
[53] Dykstra Decl., Ex. I, ¶ 1.
[54] *Id.*, ¶ 3.
[55] *Id.*, ¶ 4.

- 13 -

they are injured, the baseline test will help determine when it is safe to return to play. During Mr. Dykstra's career, there was no testing which could have provided an objective measure to indicate when it was safe to return. Mr. Dykstra also believes that it is important that student-athletes receive mandatory concussion education and coaches and athletic trainers are properly trained in concussion management and recognition.[56]

Mr. Dykstra understands that the Settlement provides for trained personnel to be present at contact sports events but not at non-contact sports events. However, he also understands the great expense that would come with requiring the medical personnel be present at every single NCAA sporting event.[57]

Overall, Mr. Dykstra supports the Settlement, understands his role as a class representative, and wants to participate in the case to ensure that current and former student-athletes obtain the significant benefits of the Settlement.[58]

**B.      The Proposed Class Representatives Had a Meaningful Opportunity to Review and Discuss the Settlement with Judge Andersen**

At the request of the Court, Judge Andersen conducted interviews of the Proposed Class Representatives.[59] The interviews were detailed, at arm's length, and in good faith.[60] During each individual phone call, Judge Andersen explored whether the proposed Class Representative had reviewed and understood the Settlement, and each Proposed Class Representative was given the opportunity to ask, and did ask, questions about the Settlement.[61] In addition, Judge Andersen explored whether they understood the scope (and limitations) of the benefits provided for in the

---

[56] *Id.*, ¶¶ 5-7.

[57] *Id.*, ¶ 8.

[58] *Id.*, ¶ 9.

[59] Andersen Decl., Ex. B, ¶ 17.

[60] *Id.* ¶ 18.

[61] *Id.*, ¶ 19.

- 14 -

Settlement, as well as the Release (including the waiver to proceed on a class-wide basis with regard to personal injuries).[62] During the discussions, Judge Andersen solicited their opinion of the Release (including the waiver to proceed on a class-wide basis with regard to personal injuries) and the prospective injunctive relief.[63] *This level of interaction between the mediator and the class representatives is almost unprecedented in the experience of Class Counsel.*

Based on Judge Andersen's discussions with the Proposed Class Representatives, he opined the Proposed Class Representatives have reviewed, understand, and support the proposed Settlement, including the limitations and releases contained in the Settlement.[64] Judge Andersen also concluded that the Proposed Class Representatives unanimously and enthusiastically supported the Settlement. Each of the Proposed Class Representatives believes that the Settlement will provide extraordinary benefits to thousands of current and former NCAA athletes that would not otherwise exist in the absence of the Settlement.[65]

The Proposed Class Representatives unanimously concluded that it was not only fair but important for all student-athletes, regardless of which sport they participate in, or when they participated, to have access to the Medical Monitoring Program in the Settlement.[66]

In sum, the Proposed Class Representatives fully support the Settlement and the important benefits provided by the Settlement that would not exist in the absence of this

---

[62] *Id.*, ¶¶ 19-20.

[63] *Id.*, ¶ 20.

[64] *Id.*, ¶¶ 21-22.

[65] *Id.*, ¶ 22.

[66] *Id.*, ¶ 21.

litigation.[67] Moreover, each of the Proposed Class Representatives understands the role of a class representative and expressed their desire to participate as a class representative.[68]

### C. The Proposed Class Representatives Adequately Represent the Continuum of Concussion Incidences

As detailed in the chart below, the current Settlement Class Representatives consist of NCAA student-athletes who play or played various contact or non-contact sports.

The addition of these new proposed Plaintiffs amends the coverage chart so that the sports and time periods covered by the class representatives are:

| CLASS REP | SPORTS | SCHOOL | DIVISION | TIME PERIOD |
|---|---|---|---|---|
| Spencer Trautmann | Baseball | Western Oregon | Division II | Current |
| Ryan Parks | Baseball | University of Illinois | Division I | Former |
| Dache Williams | Baseball | Northeastern | Division I | Current |
| Abram Wolf | Football | Simpson | Division III | Current |
| Derek Owens | Football | Central Arkansas | Division I | Former |
| Adrian Arrington | Football | Eastern Illinois University | Division I | Former |
| Johnny DuRocher | Football | Oregon | Division I | Former |
| Jerry Caldwell | Football | Georgia Tech | Division I | Former |
| Paul Morgan | Football | Vanderbilt | Division I | Former |
| Sharron Washington | Football | University of Missouri | Division I | Former |
| Dan Ahern | Football | North Carolina State | Division I | Former |
| Jim O'Conner | Football | Drake | Division I | Former |
| Shelby Williams | Golf | Northwest Missouri | Division II | Current |

---

[67] *Id.*, ¶ 21.

[68] *Id.*, ¶ 22.

| CLASS REP | SPORTS | SCHOOL | DIVISION | TIME PERIOD |
|-----------|--------|--------|----------|-------------|
| Adam Walker | Golf | Simpson | Division III | Former |
| Kyle Solomon | Hockey | University of Maine | Division I | Former |
| Angelica Palacios | Soccer | Ouachita Baptist | Division II | Former |
| Natalie Harada | Soccer | Marysville | Division III | Current |
| Rachel Harada | Soccer | Rockhurst | Division II | Current |
| Shavaughne Desecki | Softball | DePaul | Division I | Former |
| Brice Sheeder | Track, Cross Country | Simpson | Division III | Current |
| Anna Bartz | Track | Wisconsin | Division I | Former |
| Peter Dykestra | Track | Wisconsin | Division I | Former |
| Jessica Miller | Volleyball | Seattle Pacific University | Division II | Current |
| Ursula Kunhardt | Volleyball | Montana State | Division I | Former |
| Sean Sweeney | Wrestling | Buena Vista | Division III | Former |

With the new representatives, the breakdown of contact and non-contact sports and former and current athletes is as follows:

| | |
|---|---|
| Current Athletes | 8 |
| Former Athletes | 17 |
| Non-Contact Athletes | 11 |
| Contact Athletes | 14 |

The Proposed Class Representatives consist of current or former NCAA student-athletes who play or played soccer, basketball, golf, and track and field. While soccer and basketball are considered Contact Sports for purposes of the Settlement, NCAA documents confirm that the other sports played by the Proposed Class Representatives (golf and track and field) have lower concussion injury rates than Contact Sports – and indeed concussion rates of almost zero. The

- 17 -

addition of current and former student-athletes who play or played soccer, basketball, golf, and track and field sufficiently satisfies the continuum of concussions across all sports.

**D.     The Information Produced in Discovery Confirms that the Class Representatives Cover the Appropriate Sports**

Review of the NCAA documents revealed that, starting in 1988, the NCAA used voluntarily reported injury data from member schools to track the incidences of concussions at member institutions. The data from the NCAA Injury Surveillance System reflected an estimated 29,225 total concussions in NCAA Sports from 2004-2009.[69] The statistics showed that approximately 16,277 of these occurred in football.[70]

While the majority of the NCAA documents and analysis focus on football and other Contact Sports, the documents also reveal that concussions can and do occur – albeit with far less frequency – in  non-contact sports. In fact, the NCAA's Director of Health and Safety noted in 2010, "[t]oo many people think concussion is just a football injury, but from the NCAA's perspective, it's a condition that is a concern across all the sports."[71]

Internal NCAA reports generally reflect the incidence of concussions in the non-contact Sports of softball, baseball, women's volleyball, and women's gymnastics. The NCAA tracks those particular non-contact sports because the data tends to reflect concussion rates above zero (but obviously below the Contact Sports' rates). Accordingly, the concussion rates for golf and track and field are likely close to zero, whereas the concussion rates for soccer and basketball are higher.

---

[69] *See* Exhibit 1 attached to the Declaration of Steve W. Berman (NCAA00007964-66, at NCAA00007964).

[70] *Id.*

[71] *See* Exhibit 2 attached to the Declaration of Steve W. Berman (NCAA00014606-09).



Mr. Dick published a similar article in 2007, which summarized injury and exposure data for 16 sports from 1988-89 through 2003-2004.[76] A table in the article summarized the "frequency, distribution, and rates" of concussions for games and practices combined for 15 sports for the years 1988-89 through 2003-2004:[77]

---

[72] *See* Exhibit 4 attached to the Declaration of Steve W. Berman (NCAA00001639-45).

[73] *Id.* at NCAA00001639.

[74] *Id.* at NCAA00001643.

[75] *Id.* at NCAA00001643.

[76] *See* Exhibit 3 attached to the Declaration of Steve W. Berman (NCAA00003483-91).

[77] *Id.* at NCAA00003488.

Table 2.  Frequency, Distribution, and Rates of Select Injuries (Ankle Ligament Sprains, Anterior Cruciate Ligament Injuries, and Concussions) for Games and Practices Combined for 15 Sports, 1988–1989 to 2003–2004

| Injuries | Frequency | Percentage of All Injuries | Injury Rate per 1000 Athlete-Exposures | 95% Confidence Interval |
|---|---|---|---|---|
| **Concussions** | | | | |
| Men's baseball | 210 | 2.5 | 0.07 | 0.06, 0.08 |
| Men's basketball | 387 | 3.2 | 0.16 | 0.14, 0.17 |
| Women's basketball | 475 | 4.7 | 0.22 | 0.20, 0.24 |
| Women's field hockey | 129 | 3.9 | 0.18 | 0.15, 0.21 |
| Men's football | 4404 | 6.0 | 0.37 | 0.36, 0.38 |
| Women's gymnastics | 64 | 2.3 | 0.16 | 0.12, 0.20 |
| Men's ice hockey | 527 | 7.9 | 0.41 | 0.37, 0.44 |
| Women's ice hockey* | 79 | 18.3 | 0.91 | 0.71, 1.11 |
| Men's lacrosse | 271 | 5.6 | 0.26 | 0.23, 0.29 |
| Women's lacrosse | 213 | 6.3 | 0.25 | 0.22, 0.28 |
| Men's soccer | 500 | 3.9 | 0.28 | 0.25, 0.30 |
| Women's soccer | 593 | 5.3 | 0.41 | 0.38, 0.44 |
| Women's softball | 228 | 4.3 | 0.14 | 0.12, 0.16 |
| Women's volleyball | 141 | 2.0 | 0.09 | 0.07, 0.10 |
| Men's wrestling | 317 | 3.3 | 0.25 | 0.22, 0.27 |
| Men's spring football | 612 | 5.6 | 0.54 | 0.50, 0.58 |
| Total concussions | 9150 | 5.0 | 0.28 | 0.27, 0.28 |

*Data collection for women's ice hockey began in 2000–2001.

As demonstrated in this chart, concussions occur in all sports but are more prevalent in

Contact Sports. 

*See* Exhibit 5 attached to the Declaration of Steve W. Berman (NCAA00013786-98, at NCAA00013786-87).



In another example, also dated April 25, 2011, the NCAA similarly summarizes the national annual estimate of concussions in practice and competition by sport:[79]

---

[79] *See* Exhibit 5 attached to the Declaration of Steve W. Berman (NCAA00013786-98, at NCAA00013788).

010270-12 768695 V1



Accordingly, for purposes of consulting with putative Class Members who played non-contact sports, Plaintiffs identified baseball, softball, and women's volleyball as having the highest concussion rates among the non-contact sports. Given that Plaintiffs already had Proposed Class Representatives that represented those sports, Plaintiffs took steps to ensure that current and former players of sports with concussion incidences near zero (such as golf and track and field) had the opportunity to review and opine on the Settlement.

Further, Plaintiffs also identified women's soccer and basketball as sports with concussion rates which should be accounted for in the Settlement. For example, the above chart estimates national estimates of average concussion as 12% and 9% in women's soccer and women's basketball, respectively.

Accordingly, the addition of the Proposed Class Representatives – in conjunction with the existing Plaintiffs – serves to further ensure that the "continuum" of concussions across all NCAA sports is adequately represented.

## IV. ARGUMENT

### A. The Proposed Class Representatives Adequately Represent the Settlement Class

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." The Supreme Court has held that to meet this requirement, "[a] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."[80] The *Amchem* Court also explained that Rule 23(a)(4)'s adequacy-of-representation requirement "tends to merge" with Rule 23(a)'s commonality and typicality criteria, "which 'serve as guideposts for determining whether … maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"[81] The class representative's interests cannot conflict with the interests of the absent class members.[82] The existence of minor conflicts, however, between plaintiffs and the class alone will not defeat a party's claim to class certification; a conflict must be fundamental to the specific issues in controversy.[83] Such a conflict exists where the class representatives' economic interests and objectives "differ significantly from the economic interests and objectives of unnamed class members," such as when other members of the class actually benefitted from the conduct

---

[80] *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quoting *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

[81] *Id.* at 626 n.20 (quoting *General Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

[82] *Id.*

[83] 6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 18:14 (4th ed. 2002); *Srail v. Village of Lisle*, 249 F.R.D. 544, 555 (N.D. Ill. 2008) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)); *Anderson v. Cornejo*, 199 F.R.D. 228, 240 (N.D. Ill. 2000). *See also Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876 (7th Cir. 2012) ("[a] settling plaintiff would be an adequate class representative if there were no significant conflict of interest"); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citing 7A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROC. § 1768, at 326 (2d ed. 1986)).

challenged by the plaintiffs.[84] No such conflict exists amongst the Proposed Class Representatives and the Settlement Class.

Here, the Proposed Class Representatives do not have interests antagonistic to or in conflict with the Settlement Class. The Proposed Class Representatives are current and former NCAA student-athletes who played soccer, basketball, golf, and track and field and seek the same goal as other Class Members arising out of the same factual allegations: the establishment of a medical monitoring program to provide diagnostic testing for post-concussion syndrome, mid- to late-life neuropsychological disease, or any other form of post-concussion injury from participation in NCAA sports, as well as changes to the NCAA's concussion-management and return-to-play guidelines.[85]

The Proposed Class Representatives' unanimous support of the Settlement is further proof that there is not a conflict between Settlement Class members who participated in Contact Sports and those who participated in non-contact sports that "is apparent, imminent, and on an issue at the very heart of the suit" sufficient to defeat the class action.[86]

## B. The Proposed Class Representatives Claims Are Typical of the Settlement Class

Rule 23(a)(3) requires that the "claims … of the representative parties [be] typical of the claims … of the class." "A 'plaintiff's claim is typical if it arises from the same event or practice

---

[84] *Valley Drug*, 350 F.3d at 1189-90.

[85] *See, e.g.*, *In re Gen. Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*, 2000 WL 45534, at *7 (N.D. Ill. Mar. 13, 2000) ("[T]he named plaintiffs suffered the exact same injury and advanced the exact same interest as the Stastny Plaintiffs.… The Stastny Plaintiffs' interests were no doubt properly represented in this Settlement Agreement. Unlike in *Amchem*, their interests and injuries are perfectly aligned with those of the named plaintiffs.").

[86] *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975). *See also Kohen v. Pacific Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 678 (7th Cir. 2009) (holding that a class action cannot be defeated based on the existence of potential and hypothetical conflicts which have not become real); *Jordan v. Commonwealth Fin. Sys., Inc.*, 237 F.R.D. 132, 139 (E.D. Pa. 2006) ("[P]ossible factual variations between plaintiff's claims and those of the classes simply do not establish an antagonism between plaintiff's objectives and the objectives of the various classes.").

- 24 -

or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'"[87] This requirement ensures that the class representative's interests align with those of the class as a whole.[88] The Proposed Class Representatives satisfy this element and are "typical" for purposes of Rule 23 because they are current and former NCAA athletes that played NCAA-sanctioned sports at NCAA schools.[89]

The existing Settlement Class Representatives are typical of the Settlement Class Members.[90] However, the Proposed Class Representatives, as participants in soccer, basketball, golf, and track and field, are submitted here to ensure that Settlement Class Members who played those sports are represented and their opinions heard. The Proposed Class Representatives, including those who played golf and track and field, also are typical of and adequately represent current and former student-athletes who participated in sports *without* documented concussion injury rates. Therefore, the Proposed Class Representatives are typical of and adequately represent the entire spectrum of Settlement Class Members who participated in either: (1) sports with concussion median concussions (*e.g.*, women's soccer and women's basketball), and (2) sports where the risk of concussion is sufficiently low that a concussion rate has not been documented by the NCAA (*e.g.*, golf and track and field).

Accordingly, Plaintiffs' motion should be granted.

---

[87] *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

[88] *E.g.*, *Marshall v. H&R Block Tax Servs.*, 270 F.R.D. 400, 405 (S.D. Ill. 2010).

[89] *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 441 (E.D. Pa. 2008) (finding medical monitoring class representatives typical where they "do not allege that they were singled out; instead, they allege that they suffered harm as a result of the same conduct that allegedly injured the absentee class members").

[90] *See*, *e.g.*, *See* Exhibit 1 attached to the Declaration of Steve W. Berman (NCAA00007964-66, at NCAA00007964) (estimating that 16,277 of 29,225 concussions from 2004-2009, approximately 55%, occurred in football).

**C.    The Addition of the Proposed Class Representatives May Be Necessary to Protect Settlement Class Members**

The interests of the Settlement Class Representatives and the Proposed Class Representatives are aligned in desiring to ensure that the interests of all current and former NCAA student-athletes continue to be protected.[91] The Proposed Class Representatives are thus taking steps to ensure that all current and former NCAA student-athletes have access to the substantial benefits provided by the Settlement Agreement.

Courts in the Seventh Circuit thus permit the addition of class representatives when the court determines that the current representatives are not adequate to represent the class.[92] This is consistent with courts nationwide which follow the Supreme Court's rule that the addition of a class representative is timely at the time class certification is denied.[93]

---

[91] *South v. Rowe*, 759 F.2d 610, 612 (7th Cir. 1985) (addition of new party nearly two years after entry of consent decree and one day before its expiration was timely because the motion was filed one month after intervener discovered detriment to his interests; court found "no indication in the record" that defendant was prejudiced by the delay).

[92] *Searcy v. eFunds Corp.*, 2010 U.S. Dist. LEXIS 73881 (N.D. Ill. July 22, 2010) (granting limited discovery of new class representative added after original class representative found inadequate); *Nelson v. IPALCO Enters.*, 2003 U.S. Dist. LEXIS 26392, at *18 n.2 (S.D. Ind. Sept. 30, 2003) ("If the problem of [individual defenses] arises later in a case, it is more likely to affect the issue of adequate representation, which could be solved by merely having a new class representative step forward rather than decertifying an otherwise proper plaintiff class."); *Brider v. Nationwide CR Inc.*, 1999 U.S. Dist. LEXIS 2681 (N.D. Ill. Mar. 5, 1999) (granting leave to add a new plaintiff after class certification was denied because the original plaintiff was found to not be adequate).

[93] *See, e.g.*, *Hill v. Western Elec. Co.*, 672 F.2d 381, 386 (4th Cir. 1982) ("In a class action the critical issue with respect to timeliness is whether the proposed intervenor moved to intervene 'as soon as it became clear … that the interests of the unnamed class members would no longer be protected by the named class representatives.'") (quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1997)); *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("In the present case appellants satisfied the timeliness requirement when their motion was made little more than one month after the district court denied the original plaintiffs' motion for class certification. Until that denial, appellants might have reasonably believed they could secure relief as members of a plaintiff class."); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 265 (5th Cir. 1977) (explaining that, for a class action, "the time that the would-be intervenor first became aware of the pendency of the case is not relevant to the issue of whether his application was timely").

Accordingly, in the event that the Court believes that Settlement Class Members who played certain sports are not adequately represented by the current Settlement Class Representatives, this motion should be granted. The Proposed Class Representatives are fully informed regarding the Settlement and are willing to serve as class representatives.

### D. NCAA Athletes Who Play or Played Women's Soccer, Women's Basketball, Golf, and Track & Field May Otherwise Suffer Prejudice if the Court Deems the Current Plaintiffs Inadequate to Represent Them *and* Denies the Addition of the Proposed Class Representatives as Plaintiffs

If the Court deems the current Plaintiffs inadequate to represent NCAA athletes who play or played women's soccer, women's basketball, golf, and track and field, those Settlement Class Members will no longer be protected in this litigation based upon the Court's prior ruling.[94] Moreover, if such Settlement Class must resort to filing a separate action, the chances of obtaining a recovery comparable to that contained in the Settlement Agreement is slim.[95]

During the October 23, 2014 hearing on the Motion for Preliminary Approval, the NCAA's counsel argued that a stand-alone class consisting solely of non-contact athletes would not be successful, but that it was important to provide the Settlement's benefits to all student-athletes:

> We are also mindful, of course, that if we don't have that broad scope, that whatever we leave left, whatever we don't include within the settlement class, will inevitably be the – the basis for some claim and it likely won't be a class claim. *I don't think it will be a particularly meritorious class claim, but that doesn't mean it wouldn't be brought*. And there is no question at all, another driving force is to avoid the relatively high transaction costs of – of class claims seriatim being filed, virtually ad nauseam.

---

[94] *See United States v. Union Elec. Co.*, 64 F.3d 1152, 1159 (8th Cir. 1995) (finding that the question in determining whether to allow additional parties is focused on whether the existing parties will be prejudiced).

[95] *See In re Discovery Zone Secs. Litig.*, 181 F.R.D. 582, 597 (N.D. Ill. 1998) (finding that if forced to file its own action, the additional party would be prejudiced because of the unlikelihood of recovery).

> So that was the driving force as well. But first and foremost, we
> want to provide this medical monitoring to every student athlete
> who needs it. And the fact that there may only be three participants
> in rifling who need it doesn't mean they shouldn't get it. I think
> they should get it. But it should be provided to everybody.[96]

Accordingly, in the event that this motion is denied, the prejudice to Settlement Class Members who played the same sports as the Proposed Class Representatives is clear. If the Court denies preliminary approval of the Settlement based on adequacy, these student-athletes will have little chance of success in an independent class lawsuit and will lose the right to substantial diagnostic testing if needed and meaningful changes to the NCAA's current concussion-management practices under the Settlement.

## V.    CONCLUSION

WHEREFORE, Plaintiffs respectfully request leave to amend the complaint for the sole purpose of adding Proposed Class Representatives Rachel Harada, Adam Walker, Anna Bartz, Natalie Harada, DaChe Williams, and Peter Dykstra, and grant such other and further relief as this Court deems appropriate.

Date:  April 14, 2015                                      Respectfully submitted,


                                                   By:   _/s/ Steve W. Berman_____
                                                          Steve W. Berman
                                                   *steve@hbsslaw.com*
                                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                                   1918 Eighth Avenue, Suite 3300
                                                   Seattle, WA 98101
                                                   206.623.7292
                                                   Fax: 206.623.0594

---

[96] Oct. 23, 2014 Transcript of Proceedings at 24-25 (emphasis added).

Elizabeth A. Fegan
*beth@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL  60602
312.236.0000
Fax: 312.878.1342

*Co-Lead and Settlement Class Counsel*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on April 14, 2015, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: */s/ Steve W. Berman*