# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT
## MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND
## <u>CERTIFICATION OF SETTLEMENT CLASS</u>


### [REDACTED VERSION]

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     DESCRIPTION OF THE AMENDED SETTLEMENT TERMS.......................................3

    A.      The Proposed Settlement Class and Expanded Settlement Class
         Representatives ........................................................................................3

    B.      The Amended Settlement Benefits ...........................................................6

         1.      The Sufficiency of the Medical Monitoring Fund. .......................6

         2.      The Medical Monitoring Program. ............................................7

         3.      Appointment of the Medical Science Committee.......................9

         4.      NCAA changes to concussion-management and return-to-play
             policies. .................................................................................9

    C.      Release and Waiver................................................................................10

    D.      Attorneys' Fees and Costs, and Plaintiff Service Awards .....................11

    E.      Class Notice ..........................................................................................12

III.    THE AMENDED SETTLEMENT MEETS THE CRITERIA NECESSARY
       FOR PRELIMINARY APPROVAL AND FOR THIS  COURT TO
       CERTIFY THE SETTLEMENT CLASS .........................................................13

    A.      The Rule 23(a) Requirements are Satisfied ...........................................13

         1.      Rule 23(a)(1):  Joining all members of the Class is
             impracticable..........................................................................14

         2.      Rule 23(a)(2):  There are questions of law or fact common to
             the Class. ...............................................................................14

         3.      Rule 23(a)(3):  Plaintiffs' claims are typical of those of the
             proposed Class. ......................................................................14

         4.      Rule 23(a)(4): Plaintiffs and Class Counsel will fairly and
             adequately protect the interests of the proposed Class. ............15

    B.      The Settlement Class Satisfies Rule 23(b)(2) with the Protections
         Afforded by Rule 23(d)(1)....................................................................17

C.      Alternatively, the Settlement Class Satisfies Rule 23(b)(3) ..................................20

      1.      Common questions of fact predominate. ....................................................21

      2.      A class action is superior to other methods of adjudication. .....................22

D.      Preliminary Approval of the Settlement Should Be Granted................................22

      1.      Weighing the strength of Plaintiffs' case compared to the terms of the proposed settlement supports preliminary approval........................24

      2.      The risk, expense, complexity, and likely duration of further litigation weigh in favor of preliminary approval......................................27

      3.      Evaluating opposition to the settlement is premature. ...............................28

      4.      The terms of the proposed Settlement were only reached following discovery by attorneys familiar with the legal and factual issues of the case. .........................................................................28

IV.      THE COURT SHOULD ORDER NOTICE TO THE SETTLEMENT CLASS AND SCHEDULE A FAIRNESS HEARING.....................................................29

      A.      The Court Should Approve the Contents of the Notice to be Provided to the Class....................................................................................................29

      B.      The Court Should Approve the Method of Notice Distribution ...........................30

      C.      The Court Should Set Settlement Deadlines.........................................................30

V.      CONCLUSION.............................................................................................................31

010270-12  769267 V2

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Air Lines Stewards & Stewardesses Ass'n v. American Airlines, Inc.*,
   455 F.2d 101 (7th Cir. 1972) ................................................29

*Allison v. Citgo Petroleum Corp.*,
   151 F.3d 402 (5th Cir. 1998) ...............................................19

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997).............................................15, 16, 22

*Armstrong v. Board of Sch. Dirs.*,
   616 F.2d 305 (7th Cir. 1980), *overruled on other grounds by Felzen v.*
   *Andreas*, 134 F.3d 873 (7th Cir. 1998) ...........................23, 24

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010)........................................16, 17, 24

*Boring v. Medusa Portland Cement Co.*,
   63 F.R.D. 78 (M.D. Pa. 1974)..........................................26

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013), *cert. denied*, __, U.S. __, 134 S. Ct. 1277 (2014)..................22

*Caronia v. Philip Morris USA, Inc.*,
   5 N.E.3d 11 (N.Y. App. Ct. 2013) ....................................25

*Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*,
   296 F.3d 624 (7th Cir. 2002) .............................................16

*Durrett v. Housing Auth. of Providence*,
   896 F.2d 600 (1st Cir. 1990)..............................................29

*EEOC v. Hiram Walker & Sons, Inc.*,
   768 F.2d 884 (7th Cir. 1985) ............................................24

*Fresco v. Automotive Directions, Inc.*,
   2009 WL 9054828 (S.D. Fla. Jan. 20, 2009) ......................20

*Gabriel v. Standard Fruit & S.S. Co.*,
   448 F.2d 724 (5th Cir. 1971) ............................................27

*Gates v. Rohm & Haas Co.*,
   248 F.R.D. 434 (E.D. Pa. 2008)........................................14, 15, 18

- iii -

*In re General Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*,
    2000 WL 45534 (N.D. Ill. Mar. 13, 2000)...............................................................16

*Hawaii-Pacific Venture Capital Corp. v. Rothbard*,
    564 F.2d 1343 (9th Cir. 1977)...............................................................27

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
    204 F.R.D. 330 (N.D. Ohio 2001).............................................................26

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996).............................................................22, 23

*Jamie S. v. Milwaukee Pub. Schs.*,
    668 F.3d 481 (7th Cir. 2012).............................................................14, 19

*Jenkins v. Missouri*,
    78 F.3d 1270 (8th Cir. 1996)...............................................................27

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011).............................................................17, 18

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998)...............................................................15

*Lemon v. International Union of Operating Eng'rs, Local No. 139*,
    216 F.3d 577 (7th Cir. 2000).............................................................17, 18

*Marshall v. H&R Block Tax Servs.*,
    270 F.R.D. 400 (S.D. Ill. 2010)...............................................................15

*Martin v. Kalvar Corp.*,
    411 F.2d 552 (5th Cir. 1969)...............................................................27

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012)...............................................................21

*In re Mex. Money Transfer Litig.*,
    267 F.3d 743 (7th Cir. 2001)...............................................................22

*In re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847 (9th Cir. 1982)...............................................................26

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).............................................................15, 26

*Payton v. Abbott Labs.*,
    100 F.R.D. 336 (D. Mass. 1983).............................................................26

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)......................................29

*Reynolds v. Benefit Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ...............................................................................................23

*In the Matter of Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ...............................................................................................26

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011)...........................................................................................22, 25

*Sutton v. Bernard*,
   2002 WL 1794048 (N.D. Ill. Aug. 5, 2002) .......................................................................24

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ...............................................................................................23

*In re Trans Union Corp. Privacy Litig.*,
   741 F.3d 811 (7th Cir. 2014) .........................................................................................19, 20

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
   309 F.3d 978 (7th Cir. 2002) ...............................................................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
   ___ U.S. ___, 131 S. Ct. 2541 (2011)..................................................................................14

*Williams v. Burlington N., Inc.*,
   832 F.2d 100 (7th Cir. 1987) .........................................................................................19, 20

*Yandle v. PPG Indus., Inc.*,
   65 F.R.D. 566 (E.D. Tex. 1974)...........................................................................................26

*Yslava v. Hughes Aircraft Co.*,
   845 F. Supp. 705 (D. Ariz. 1993) ........................................................................................14

## OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION § 22.74 (4th ed. 2004) ........................................................19

MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004) ......................................................29

Plaintiffs Adrian Arrington, Derek Owens, Kyle Solomon, Angela Palacios, Abram Robert Wolf, Sean Sweeney, Jim O'Conner, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John DuRocher, Sharron Washington, Shelby Williams, Brice Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, and Jessica Miller (collectively, the "Class Representatives"), on behalf of themselves and as representatives of the Settlement Class, through Class Counsel[1] respectfully submit this Memorandum in Support of Joint Motion for Preliminary Approval of Amended Class Action Settlement and Certification of Settlement Class (the "Motion").[2]

## I.      INTRODUCTION

Each of the issues raised by the Court in its Memorandum Opinion and Order dated December 17, 2014 ("Order") has been addressed by the Parties in the presentation of this Amended Class Action Settlement Agreement and Release ("Amended Settlement"), including:

- A review of and support for the Amended Settlement by current and former student-athletes in both Contact Sports, including football, soccer, hockey, wrestling, and non-Contact Sports, including golf, track and field, cross country, softball, baseball, and volleyball;[3]

- An updated report from Plaintiffs' expert Bruce Deal, who calculated the anticipated participation rate in the Medical Monitoring Program based on the reported concussion data for both Contact and non-Contact Sports, as well as took into account updated cost analyses when analyzing the sufficiency of the Fund;[4]

---

[1] Capitalized terms have the same meaning as defined in the Amended Class Action Settlement Agreement and Release ("Am. SA"), attached as Exhibit 1 to the Motion for Preliminary Approval. "Class Counsel" means Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC as Lead Class Counsel ("Lead Counsel"), Richard Lewis of Hausfeld LLP as Special Class Counsel for Medical Monitoring Relief ("Special Class Counsel"), and Charles Zimmerman of Zimmerman Reed, James Dugan of the Dugan Law Firm, and Mark Zamora of The Orlando Law Firm as the Executive Committee. Am. SA, ¶ II(E).

[2] Plaintiffs incorporate the procedural and factual background of the litigation and settlement negotiations set forth in the Memorandum In Support of Motion For Preliminary Approval dated July 29, 2014 (Dkt. No. 65), as if fully set forth herein.

[3] *See* Order at 11-12. *See also* Section II.A, *infra.*

[4] *See* Order at 11-12. *See also* Expert Report of Bruce Deal ("Deal Report").

- A Notice Plan for providing direct notice to the Settlement Class Members for which contact information is available, as well as publication notice;[5]

- A requirement that, within six (6) months after the NCAA adopts legislation to implement the concussion-management and return-to-play guidelines, each NCAA member institution must certify in writing that it has adopted the requirements; any NCAA member institution that fails to submit written certification will not be considered a Released Person under the Settlement.[6]

- A Report from the Medical Science Committee, setting out the Screening Questionnaire, the cut scores to qualify for Medical Evaluations, a three-phased approach for analyzing the cut scores during the course of the Program, and the scope of the Medical Evaluations;[7]

- A specific procedure for Settlement Class Members to seek more than two Medical Evaluations, and a specific timeframe within which the Medical Science Committee must respond;[8]

- A report from the Garretson Resolution Group, the proposed Program Administrator, regarding the identification of the proposed thirty-three Program Locations, as well as additional information regarding the administration of the Program;[9]

- A provision that, at the discretion of the Medical Science Committee, any remainder of the original $70 million at the expiration of the 50-year Medical Monitoring Period, together with any accrued interest, shall be either used to extend the Program or donated to an institution(s) selected by the Medical Science Committee to be used for concussion-related research or treatment;[10]

---

[5] *See* Order at 13-15. *See also* Section II.E, *infra*; Declaration of Alan Vasquez (Vasquez Decl.").

[6] *See* Order at 15-16. *See also* Am. SA, IX.C, D.

[7] *See* Order at 16-17. *See also* Section II.B.2, *infra*; Expert Report of Medical Science Committee ("MSC Report").

[8] *See* Order at 17-18. *See also* Am. SA, IV.B.4.h.

[9] *See* Order at 18-19. *See also* Section II.B.2, *infra*; Report of Garretson Resolution Group ("Garretson Report"); Am. SA, IV.B.5.a ("If a Qualifying Class Member lives more than one hundred (100) miles from the nearest Program Location, the Qualifying Class Member may: (i) receive reimbursement from the Medical Monitoring Fund for the cost of driving to the nearest Program Location based on the then-prevailing rate for mileage reimbursement…; or (ii) obtain a Medical Evaluation from the provider of his or her choice and be reimbursed from the Medical Monitoring Fund for the lesser of (1) the average cost of a Medical Evaluation within the Medical Monitoring Program… or (2) the Qualifying Class Member's actual out-of-pocket costs for the Medical Evaluation….").

[10] *See* Order at 19. *See also* Am. SA, IV.A.4.

- A provision that permits Settlement Class Members to pursue class or individual medical monitoring claims in the event that the Fund is depleted before the end of the Medical Monitoring Period;[11]

- A recognition that this Court has the discretion to award fees to an attorney hired by a Settlement Class Member;[12] and

- The option for the Court to appoint a Special Master to oversee the implementation of the Settlement Agreement.[13]

Accordingly, for the reasons more fully described below, as well as the reasons set forth in Plaintiffs' original Motion For Preliminary Approval, Plaintiffs respectfully request that the Court grant preliminary approval of the Amended Settlement and direct that Notice be provided to the Settlement Class.

## II.    DESCRIPTION OF THE AMENDED SETTLEMENT TERMS

Below is a summary of the benefits and releases provided in the Amended Settlement with an emphasis on the changed terms.

## A.    The Proposed Settlement Class and Expanded Settlement Class Representatives

The proposed Settlement Class is defined as:

> All persons who played an NCAA-sanctioned sport at an NCAA member institution through the date of preliminary approval.[14]

The proposed Settlement Class Representatives have expanded significantly from the original *Arrington* plaintiffs, and include current and former student-athletes who play or played both Contact Sports and non-Contact Sports.  The Proposed Class Representatives have reviewed, understand, and enthusiastically support the Amended Agreement from the perspective

---

[11] *See* Order at 20. *See also* Am. SA, IV.A.5.

[12] *See* Order at 20-21. *See also* Am. SA, XII.C.1.q.

[13] *See* Order at 21. *See also* Am. SA, IV.A.3, VIII.

[14] Am. SA, ¶ II(D).

of current or former NCAA student-athletes who played Contact Sports, including football, soccer, hockey, basketball, and wrestling, and non-Contact Sports, including golf, cross country, track and field, volleyball, softball, and baseball.[15]

This Court previously inquired as to whether the Proposed Class Representatives represent the range of sports on the continuum of reported concussion rates at NCAA schools. Plaintiffs believe that the continuum is now amply represented. For example, an article published in 2007 summarized injury and exposure data for 16 NCAA sports from 1988 to 2004, including concussions:[16]

Table 2. Frequency, Distribution, and Rates of Select Injuries (Ankle Ligament Sprains, Anterior Cruciate Ligament Injuries, and Concussions) for Games and Practices Combined for 15 Sports, 1988–1989 to 2003–2004

| Injuries | Frequency | Percentage of All Injuries | Injury Rate per 1000 Athlete-Exposures | 95% Confidence Interval |
|---|---|---|---|---|
| **Concussions** | | | | |
| Men's baseball | 210 | 2.5 | 0.07 | 0.06, 0.08 |
| Men's basketball | 387 | 3.2 | 0.16 | 0.14, 0.17 |
| Women's basketball | 475 | 4.7 | 0.22 | 0.20, 0.24 |
| Women's field hockey | 129 | 3.9 | 0.18 | 0.15, 0.21 |
| Men's football | 4404 | 6.0 | 0.37 | 0.36, 0.38 |
| Women's gymnastics | 64 | 2.3 | 0.16 | 0.12, 0.20 |
| Men's ice hockey | 527 | 7.9 | 0.41 | 0.37, 0.44 |
| Women's ice hockey* | 79 | 18.3 | 0.91 | 0.71, 1.11 |
| Men's lacrosse | 271 | 5.6 | 0.26 | 0.23, 0.29 |
| Women's lacrosse | 213 | 6.3 | 0.25 | 0.22, 0.28 |
| Men's soccer | 500 | 3.9 | 0.28 | 0.25, 0.30 |
| Women's soccer | 593 | 5.3 | 0.41 | 0.38, 0.44 |
| Women's softball | 228 | 4.3 | 0.14 | 0.12, 0.16 |
| Women's volleyball | 141 | 2.0 | 0.09 | 0.07, 0.10 |
| Men's wrestling | 317 | 3.3 | 0.25 | 0.22, 0.27 |
| Men's spring football | 612 | 5.6 | 0.54 | 0.50, 0.58 |
| Total concussions | 9150 | 5.0 | 0.28 | 0.27, 0.28 |

*Data collection for women's ice hockey began in 2000–2001.

Similarly, an NCAA internal report dated April 25, 2011, reflects similar documented rates of concussions in Contact Sports and non-Contact Sports competitions:[17]

---

[15] *See* Declaration of Judge Wayne R. Andersen (ret.) ("Andersen Decl.").

[16] *See* Exhibit 3 attached to the Declaration of Steve W. Berman In Support of Plaintiffs' Unopposed Motion for Leave to File Fourth Amended Complaint ("Berman Decl.") (NCAA00003483-91, at 3488).

[17] ████████████████████████████████████████████████

010270-12 769267 V2



Based on internal NCAA reports, Plaintiffs have ensured that the majority of both the Contact Sports and non-Contact Sports that reflect concussion rates are represented. Plaintiffs have also ensured that current and former players of sports with concussion incidences near zero (such as golf and track and field) had the opportunity to review and opine on the Settlement. Accordingly, the Proposed Class Representatives are typical and adequate in satisfaction of Rules 23(a)(3) and (4), representing the "continuum" of concussion rates across all NCAA sports. Moreover, each of the Proposed Class Representatives supports the Amended Settlement, and shares a common desire to obtain access to the Medical Monitoring Program and necessary changes to the NCAA's concussion-management and return-to-play guidelines to protect student-athletes in the future.

See Berman Decl., Ex. 5 (NCAA00013786-98, at NCAA00013786-87).

**B.     The Amended Settlement Benefits**

In consideration for the Settlement Class's release of claims against the NCAA for medical monitoring arising from participation in NCAA-sanctioned sports, the NCAA has agreed to provide the following Settlement benefits:

**1.     The Sufficiency of the Medical Monitoring Fund.**

Unchanged from the original Settlement, the NCAA and its insurers have agreed to pay $70 million to create the Medical Monitoring Fund, which will be used to pay the costs of the Medical Monitoring Program, Notice and Administrative Costs, Attorneys' Fees and Costs, and the Class Representatives' Service Awards.[18]  The NCAA has also agreed to separately dedicate $5 million to concussion-related research.

Based on updated cost projections from the Medical Science Committee and proposed Program Administrator, the Analysis Group has re-analyzed the adequacy of the Medical Monitoring Fund and concluded that the Medical Monitoring Fund is adequate for the purposes for which it was formed.[19]  Its opinion is based on modeling an appropriately conservative range of values for the main drivers of Fund economics:  incidence and prevalence of the conditions that testing aims to detect; anticipated participation rates for those who have the conditions (including for Contact and non-Contact Sports); the number of tests each tested individual receives; and the cost of each test.[20]

To address the Court's concerns regarding class members' rights if the Fund is unexpectedly depleted before the expiration of the fifty (50) year Medical Monitoring Period,

---

[18] Am. SA, ¶ IV(A)(1)(b).

[19] *See* Deal Report.

[20] *Id*. at 2-3.

Settlement Class Members may now pursue individual *or class* claims for medical monitoring.[21/22]

## 2. The Medical Monitoring Program.

The Medical Monitoring Program is designed to screen those members of the Settlement Class who choose to participate in the Program at any time during the 50-year Medical Monitoring Period.[23] The Medical Monitoring Program consists of two phases: the first phase is designed to assess self-reported symptoms and cognitive, mood, behavioral, and motor problems that may be associated with persistent post-concussion syndrome and/or mid-to late-life onset problems, such as Chronic Traumatic Encephalopathy ("CTE") and related disorders; and the second phase provides in-person Medical Evaluations for those who are eligible as a result of the self-reported responses.[24]

This Court asked for additional detail from the Medical Science Committee concerning the scope of the Program. The Medical Science Committee has submitted a detailed report regarding the substance and scoring of the Screening Questionnaire,[25] which will determine

---

[21] Am. SA, IV.A.5. The statute of limitations for medical monitoring will be tolled during the Medical Monitoring Period. Am. SA, ¶ IV(A)(5).

[22] In addition, if it appears that the Fund is going to be depleted before the expiration of the Medical Monitoring Period, Class Counsel may serve written notice on the NCAA requiring that the NCAA meet and confer within thirty (30) days regarding additional funding of the Medical Monitoring Fund. In such event, the NCAA and/or its insurers may elect to deposit or cause to be deposited additional funds into the Settlement Account for the Medical Monitoring Fund but are not required to do so. Am. SA, ¶ IV(A)(7). If they choose not to deposit additional funds, Notice will be provided to the Class that the statute of limitations will begin to run on tolled claims. Am. SA, ¶ IV(A)(8).

[23] Am. SA, ¶ IV(B)(3).

[24] Am. SA, ¶ IV(B)(4).

[25] Class Members may complete the Screening Questionnaire not more than once every five (5) years until the age of fifty (50) and then not more than once every two (2) years after the age of fifty (50) until the end of the fifty (50) year Medical Monitoring Period. A Class Member may complete no more than five (5) Screening Questionnaires during the Medical Monitoring Period. After a Class Member has submitted three (3) Screening Questionnaires without qualifying for an examination, any further Screening Questionnaires completed by that Class

whether Settlement Class Members qualify for a Medical Evaluation.[26]  According to the Committee, completed Screening Questionnaires will be scored electronically, based on existing published normative data using standardized scores (*e.g.*, T-Scores or cut scores) or published "impairment" levels.[27]  A Class Member who meets the criteria (*i.e.*, scores above the cut score) on any one or more of the five standardized symptom scales and does not score above the cut score on the symptom validity measure will screen in for a Medical Evaluation,[28] except for persons who only meet the criteria for behavioral or mood disorders.[29]  Persons in the latter group will be screened by a Behavioral Health Specialist and referred to their local mental health provider.[30]

Medical Evaluations will take place at Program Locations, of which there will be at least thirty-three (33) nationwide.[31]  The initial Program Locations were identified by Garretson, in consultation with the MSC, to address both population centers as well as locations that will best support enrollment of quality providers (both neurologists and neuropsychologists) with the requisite education, skill, and experience to perform Medical Evaluations properly.[32]

---

Member will be sent to the Medical Science Committee for review and decision as to the appropriateness of further Medical Evaluation. Am. SA, ¶ IV(B)(4)(g).

[26] MSC Report, ¶¶ 8-12.

[27] MSC Report, ¶ 8.

[28] Class Members may qualify for at least two Medical Evaluations during the Medical Monitoring Period. Am. SA, ¶ IV(B)(4)(h).

[29] MSC Report, ¶¶ 8, 12.

[30] MSC Report, ¶ 12.

[31] Am. SA, ¶ IV(B)(5)(a). *See* Garretson Report, at 13.

[32] Garretson Report at ¶ 31. If a qualifying Class Member lives more than 100 miles from the nearest location, the qualifying Class Member may seek either reimbursement from the Medical Monitoring Fund for the cost of driving to the nearest Program Location or obtain a Medical Evaluation from a local healthcare provider and request reimbursement from the Medical Monitoring Fund for the lesser of the average cost of a Medical Evaluation provided in the Program or the Qualifying Member's actual out-of-pocket costs. Am. SA, ¶ IV(B)(5)(a).

The Medical Science Committee has also provided details concerning the scope of the Medical Evaluations, which will include the following types of testing:  (i) a neurological examination; (ii) a neuropsychological examination; (iii) mood, behavioral, and movement evaluation; and (iv) ancillary testing necessary to complete the evaluation of the Class Member as determined by the neurologist.[33]

### 3.    Appointment of the Medical Science Committee.

By agreement, the Parties request that this Court appoint a Medical Science Committee,[34] comprised of four (4) medical experts with expertise in diagnosis, care, and management of concussions in sport and mid- to late-life neurodegenerative disease.[35]  The Parties request that the Court appoint the following experts to the initial Medical Science Committee:  (i) Dr. Brian Hainline; (ii) Dr. Robert Cantu; (iii) Dr. Ruben Echemendia; and (iv) Dr. Robert Stern.[36]  The Parties request that the Court appoint the Hon. Wayne R. Andersen (Ret.) as Chair of the Medical Science Committee for an initial term of five (5) years.[37]

### 4.    NCAA changes to concussion-management and return-to-play policies.

Under the Settlement, the NCAA will implement the following policies:

---

[33] MSC Report, ¶¶ 21-26.

[34] The Medical Science Committee will have responsibility to ensure the Screening Questionnaire and Medical Evaluations meet the then-current standard of care and fit the purposes of the Medical Monitoring Program. The MSC will also ensure the Program Locations are properly providing Medical Evaluations. Am. SA, ¶ V(C)(6).

[35] Am. SA, ¶ V(A)(1).

[36] Dr. Hainline and Dr. Cantu will be appointed for an initial five (5) year term with the potential to be reappointed by the Parties for a second five (5) year term. Dr. Echemendia and Dr. Stern will be appointed for an initial three (3) year term with the potential to be reappointed by the Parties for a second, five (5) year term. All subsequent appointments for all members will be for five (5) year terms. Am. SA, ¶ V(A)(2).

[37] Am. SA, ¶ V(A)(3).

- ***Baseline testing***: "Every student-athlete will undergo pre-season baseline testing, for each sport in which they participate, prior to participating in practice or competition."[38]

- ***No same day return to play***: "Students with a diagnosed concussion will be prohibited from returning to play or participation in any practice or game on that same day and must be cleared by a physician before being permitted to return to play in practice or competition."[39]

- ***Medical personnel for Contact Sports***: all schools will be required to have medical personnel with training in the diagnosis, treatment, and management of concussion present at games and available during practices.[40]

- ***Concussion tracking***: the NCAA will put a reporting process in place for schools to report diagnosed concussions and their resolution, as well as a reporting mechanism from concerned persons to the NCAA.[41]

- ***Concussion education***: the NCAA will require that its schools provide NCAA-approved concussion education and training to student-athletes, coaches and athletic trainers before each season.[42]

- ***Academic accommodation***: the NCAA will provide member institutions with educational materials for faculty regarding academic accommodations for students with concussions.[43]

## C.    Release and Waiver

Other than with respect to tolling, the release and waiver has not changed from the

original Settlement. Plaintiffs and the Settlement Class have agreed to release (i) any and all

claims seeking damages or other legal or equitable relief for medical monitoring related to

concussions or subconcussive hits sustained during participation in collegiate sports as an NCAA

student-athlete; and (ii) any and all claims seeking relief for personal injury on a class-wide basis

related to concussions or subconcussive hits sustained during participation in collegiate sports as

---

[38] Am. SA, ¶ IX.A.1.

[39] Am. SA, ¶ IX.A.2, 3.

[40] Am. SA, ¶ IX.A.4, 5.

[41] Am. SA, ¶ IX.E.

[42] Am. SA, ¶ IX.G.

[43] Am. SA, ¶ IX.G.

an NCAA student-athlete. Plaintiffs are not releasing, and have expressly reserved, individual

personal injury claims, as well as any other claims unrelated to medical monitoring relief for

concussions or subconcussive hits.[44] Further, the NCAA has agreed that the statute of limitations

will be tolled upon final approval for all personal injury claims from September 12, 2011 (the

date that *Arrington* was filed) through the date of final approval.[45]

## D.     Attorneys' Fees and Costs, and Plaintiff Service Awards

The NCAA has agreed not to oppose an application for the award of Attorneys' Fees and

Expenses not to exceed a total of fifteen million U.S. dollars ($15,000,000.00) in attorneys' fees

and up to $750,000 in out-of-pocket expenses.[46]

The Parties have also amended the Settlement to reflect that this Court has the discretion

to award fees to an attorney hired by a Settlement Class Member.[47]

Plaintiffs will apply to the Court for reasonable Service Awards for the time and service

spent by the Class Representatives in this matter to be paid from the Medical Monitoring Fund,

including $5,000 for each Class Representative deposed in *Arrington* and $2,500 for each

Settlement Class Representative who was not deposed.[48]

---

[44] Am. SA, ¶ II.NN.

[45] Am. SA, ¶ XI.S.

[46] Am. SA, ¶ XVII.B. Class Counsel will have a continuing obligation to implement the terms of the Settlement throughout the Medical Monitoring Period. Thus, the NCAA has also agreed not to object to applications from Lead Counsel and one (1) member of the Executive Committee for additional attorneys' fees, at a rate not to exceed $400 per hour from the Fund for work performed after the first year from the Effective Date, and up to $500,000. The Chair of the Medical Science Committee shall approve any such fee requests in the first two (2) years. Am. SA, ¶ XVII.C.

[47] Am. SA, ¶ XVII.C.3.

[48] Am. SA, ¶ XVII(A).

E.      **Class Notice**

The proposed notice plan is designed to reach at least 80% of the Settlement Class. As described in the Declaration of Alan Vasquez, the Notice Plan includes: (a) direct notice; (b) print publication in *USA Today*, *Sports Illustrated*, and *ESPN the Magazine*; (c) case-dedicated settlement website; (d) internet publication, including sponsored search advertising on the Google and Yahoo!/Bing networks, text link and banners on the Google Display Network, targeted banner advertising on the Xaxis and Steel Media networks, and banner advertising through Xaxis on Facebook; (e) press release; and (f) other earned media.[49]

For purposes of providing direct notice, the parties will send letters and subpoenas (as necessary) to all NCAA member institutions to obtain contact information (*i.e.*, names, United States Postal Service ("USPS") address data and email addresses) for all current and former students who participated in an NCAA-sanctioned sport. The notice period is designed to include time for the service of letters and/or subpoenas for class member contact information.  The NCAA has represented that it believes approximately 2.9 million records, including full or partial address data for these student-athletes, may be provided. Notice will be sent to both email addresses and USPS addresses provided. Gilardi estimates that direct notice will be sent to a last-known address for between 59% and 62% of the proposed Settlement Class.[50]

Mr. Vasquez explains that Simmons National Consumer Survey Data (the "Simmons data")[51] was used to evaluate the most effective national magazines to reach the class members.

---

[49] Vasquez Decl., ¶ 19.

[50] Vasquez Decl., ¶¶ 20, 29.

[51] Simmons Winter 2014 12-Month National Consumer Survey.

The print publications chosen, including *Sports Illustrated, ESPN the Magazine,* and *USA Today*, will reach 17.8% of U.S. Adults who have attended college and have interest in college sports.[52]

One hundred and twenty (120) days after the start of the Notice program or at an interval to be approved by the Court, impact of direct notice, paid advertising, and earned media will be measured. Based on the results of the analysis, additional notice may be added to ensure an 80% reach.[53]

### III. THE AMENDED SETTLEMENT MEETS THE CRITERIA NECESSARY FOR PRELIMINARY APPROVAL AND FOR THIS COURT TO CERTIFY THE SETTLEMENT CLASS

This Court has previously inquired whether the Settlement Class is more properly certified under Rule 23(b)(2) (with the protections afforded by Rule 23(d)(1)) or Rule 23(b)(3). While Plaintiffs addressed these rules previously in separate briefs, Plaintiffs have restated their collective positions below, demonstrating that the Settlement Class satisfies Rule 23(a), as well as both Rules 23(b)(2) and (b)(3), although it need only satisfy one.

### A. The Rule 23(a) Requirements are Satisfied

The proposed Class and Class Representatives satisfy all of Rule 23(a)'s requirements: (i) the size of the proposed Class makes joinder impracticable; (ii) the proposed Class's members share common questions of law and fact; (iii) Plaintiffs' requests for medical monitoring relief and changes to the NCAA's concussion-management policies are typical of the relief needed by the proposed Class; and (iv) Plaintiffs and their counsel will vigorously protect the proposed Class's interests.

---

[52] Vasquez Decl., ¶ 32.
[53] Vasquez Decl., ¶¶ 48, 64.

1.    **Rule 23(a)(1):  Joining all members of the Class is impracticable.**

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable."[54] As reflected in the Deal Report, the Settlement Class is comprised of several million living persons.[55] Accordingly, joinder is impracticable.

2.    **Rule 23(a)(2):  There are questions of law or fact common to the Class.**

Rule 23(a)(2) requires that there be questions of law *or* fact common to the class. This requires that class members' claims "must depend upon a common contention,"[56] "of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[57] Here, the fundamental issues of the NCAA's duty to protect student-athletes' safety, health and welfare, and its alleged breach of that duty is common to all Settlement Class Members.[58] These are the same questions – duty and breach – that form the core common issues in many medical monitoring settlements nationwide.[59] Accordingly, Rule 23(a)(2) is satisfied.

3.    **Rule 23(a)(3):  Plaintiffs' claims are typical of those of the proposed Class.**

Rule 23(a)(3) requires that the "claims … of the representative parties [be] typical of the claims … of the class."  A "plaintiff's claim is typical if it arises from the same event or practice

---

[54] FED. R. CIV. P. 23(a)(1).

[55] Deal Report at 6.

[56] *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011).

[57] *Id.  See also Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (citing *Wal-Mart*, 131 S. Ct. at 2556) (while a "superficial" common question is not enough, "[e]ven a single [common] question" can suffice for commonality) (alteration in original).

[58] *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 440 (E.D. Pa. 2008) ("Here, the fundamental factual issue of exposure to the alleged pollutants is common to all class members in the Medical Monitoring Settlement Class, as are the legal issues of duty and breach."); *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993) ("The core issues of liability and exposure [in the medical monitoring claim before the court] are common to all class members. Commonality among the members exists notwithstanding certain factual variations.").

[59] *Id.*

or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."[60]  This requirement ensures that the class representative's interests align with those of the class as a whole.[61]

Plaintiffs satisfy this requirement. They played NCAA-sanctioned sports at NCAA schools. Their requests for medical monitoring do not differ by sport, age, symptoms, or injury.[62] All of the Settlement Class Members will have access to the same type of testing as the Plaintiffs, and their claims arise from the same conduct of the NCAA that caused the need for medical monitoring and for changes to the NCAA's concussion-management guidelines. Therefore, Plaintiffs are typical.

### 4. Rule 23(a)(4): Plaintiffs and Class Counsel will fairly and adequately protect the interests of the proposed Class.

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." The adequacy-of-representation requirement is "concerned with the 'competency and conflicts of class counsel.'"[63]

Plaintiffs have satisfied the adequacy-of-representation requirement. First, Plaintiffs have claims for medical monitoring and equitable relief that are typical of those brought by other Class Members,[64] and their interests appear to be entirely consistent with those of the other Class

---

[60] *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

[61] *E.g.*, *Marshall v. H&R Block Tax Servs.*, 270 F.R.D. 400, 405 (S.D. Ill. 2010).

[62] *Gates v. Rohm & Haas Co.*, 248 F.R.D. at 441 (finding medical monitoring class representatives typical where they "do not allege that they were singled out; instead, they allege that they suffered harm as a result of the same conduct that allegedly injured the absentee class members").

[63] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 n.31 (1999) (quoting *Amchem Prods.*, 521 U.S. at 626 n.20, 117 S. Ct. at 2251).

[64] The *Amchem* Court explained that Rule 23(a)(4)'s adequacy-of-representation requirement "tends to merge" with Rule 23(a)'s commonality and typicality criteria, which "serve as guideposts for determining whether … maintenance of a class action is economical and whether the named

Members because they – like the other Class Members – seek relief from the NCAA's breach of its duties to protect their health, safety and welfare.[65] Moreover, Plaintiffs and absent Class Members seek the same goal arising out of the same factual allegations: the establishment of a medical monitoring program to identify whether and the extent to which they suffer from post-concussion syndrome, mid- to late-life neuropsychological disease, or any other form of post-concussion injury from their participation in NCAA sports, as well as changes to the NCAA's deficient concussion-management and return-to-play guidelines.[66]

Furthermore, the Settlement does not release individual personal injury claims, which obviates any conflict between Plaintiffs and Class Members that wish to pursue individual claims for bodily injury.[67] Plaintiffs also request that the Court, in its Final Approval Order, expressly state that the Settlement only encompasses claims for medical monitoring and excludes all other individual damage claims, which are expressly reversed for subsequent individual litigation.[68]

Second, Lead Counsel have invested substantial time and resources in this case by investigating the underlying facts, conducting full merits discovery, researching the applicable law, working with experts, filing their Motion for Class Certification, and negotiating a detailed

---

plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *General Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

[65] *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 343-44 (N.D. Ill. 2010) (citing *Amchem Prods.*, 521 U.S. at 615).

[66] *See, e.g.*, *In re General Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*, 2000 WL 45534, at *7 (N.D. Ill. Mar. 13, 2000) ("[T]he named plaintiffs suffered the exact same injury and advanced the exact same interest as the Stastny Plaintiffs … The Stastny Plaintiffs' interests were no doubt properly represented in this Settlement Agreement. Unlike in *Amchem*, their interests and injuries are perfectly aligned with those of the name plaintiffs.").

[67] Am. SA, ¶ II.NN.

[68] *Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 629 (7th Cir. 2002) (ruling that "under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action").

settlement.[69] Lead Counsel has substantial experience pursuing national class-action cases, including medical monitoring, and does not have interests that conflict with those of the Class.[70] Accordingly, Rule 23(a)(4) is satisfied.

**B.      The Settlement Class Satisfies Rule 23(b)(2) with the Protections Afforded by Rule 23(d)(1)**

The Settlement Class also satisfies Rule 23(b)(2), which provides for class treatment where defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[71] Rule 23(b)(2) requires plaintiffs to (i) allege grounds for liability generally applicable to the class and (ii) seek relief that is predominantly injunctive or declaratory, as opposed to monetary.[72]

Here, Plaintiffs' claims for medical monitoring relief and changes to the way the NCAA handles concussion management are based on NCAA conduct that is "generally applicable to the class." The NCAA breached its duty to protect the safety, health and welfare of its student-athletes. Plaintiffs allege that the NCAA owed a uniform duty to every Class Member to promulgate and enforce concussion-management best practices, which the NCAA failed to do putting Class Members at risk for short and long-term effects from concussions and the accumulation of subconcussive hits.

---

[69] *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 343-44 (citing *Rand*, 926 F.2d at 598-99).

[70] *See id.* at 343-44 (citing *Amchem Prods.*, 521 U.S. at 615).

[71] FED. R. CIV. P. 23(b)(2); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

[72] *See, e.g.*, *Lemon v. International Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000).

The second (b)(2) requirement is based on the notion that class cohesiveness breaks down when the class seeks to recover damages from individual injuries.[73] The predominantly "injunctive or declaratory" requirement hence protects the legitimate interests of potential class members who might wish to pursue their monetary claims individually.[74] This concern is absent here because the Settlement Agreement is for relief in the form of a Court-ordered Medial Monitoring Program and equitable relief in the form of changes to the NCAA's concussion management directives.

Thus, courts generally find that settlement classes providing medical monitoring and equitable relief are appropriate for certification under Rule 23(b)(2). As one court approving a medical monitoring settlement and certifying a Rule 23(b)(2) settlement class explained:

> Because the class members exclusively seek some form of medical monitoring, they have nothing to gain from monetary relief beyond funding for the costs of any such monitoring. The value of any "medical monitoring" is the medical screening itself, not any monetary sum.[75]

There can also be no doubt that the Medical Monitoring Program sought here is relief appropriate for Rule 23(b)(2) certification. The Seventh Circuit has specifically held that relief in which a court establishes a medical-monitoring program managed by court-appointed trustees – which is precisely the relief reflected in the Settlement Agreement – is properly "characterized as injunctive even if the defendants are required to pay for the program."[76] The Settlement Agreement provides final relief to the entire Class and does not "require[] thousands of

---

[73] *Id.*

[74] *Id.* (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)).

[75] *Gates v. Rohm & Haas Co.*, 248 F.R.D. at 442.

[76] *Kartman*, 634 F.3d at 894 n.9.

individual determinations of class membership, liability, and appropriate remedies."[77] Rather, the

relief is purely for injunctive, non-monetary medical monitoring relief which expressly reserves

the right of Class Members to pursue any and all claims other than medical monitoring and

accordingly should be certified under Rule 23(b)(2),[78] with Notice to the Class and the right for

Settlement Class Members to exclude themselves pursuant to Rule 23(d)(1).

The Seventh Circuit has held that this option, sometimes referred to as hybrid

certification, provides "safeguards … [which are] the functional equivalent of those offered by

Rule 23(b)(3)."[79] The purpose of these safeguards, such as notice and the right to object or opt-

out, is to ensure "adequate protection from any potentially antagonistic interest between class

members."[80]

While actions for class-wide injunctive relief "are intended for (b)(2) certification

precisely because they involve uniform group remedies,"[81] Plaintiffs recognized that Settlement

Class Members should have the notice of and the opportunity to object to the Settlement,

including to the waiver of the class action mechanism for negligence claims.[82]

---

[77] *Cf.*, *Jamie S.*, 668 F.3d at 499.

[78] MANUAL FOR COMPLEX LITIGATION § 22.74, at 427 (4th ed. 2004) (footnote omitted) (advising that "Rule 23(b)(2) generally applies" to a mass tort class for medical monitoring "when the relief sought is a court-supervised program for periodic medical examination and research to detect diseases attributable to the product in question.") ("MANUAL").

[79] *Williams v. Burlington N., Inc*., 832 F.2d 100, 103-04 (7th Cir. 1987) (finding that the district court did not abuse its discretion in certifying a class for purposes of a settlement, which provided both monetary and equitable relief in an employment discrimination case, under Rule 23(b)(2), where the class members were provided notice and an opportunity to object to the settlement), *cited with approval in Lemon*, 216 F.3d at 582.

[80] *Williams*, 832 F.2d at 104.

[81] *Allison v. Citgo Petroleum Corp*., 151 F.3d 402, 414 (5th Cir. 1998), *reasoning adopted in Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999).

[82] The Seventh Circuit has previously considered a settlement of a class action which barred future class actions, and found it important that the "settlement in this case did not foreclose outside lawyers from asserting and settling thousands of modest follow-on claims." *In re Trans Union Corp. Privacy Litig*., 741 F.3d 811, 813 n.1 (7th Cir. 2014). In *In re Trans Union Corp.*

- 19 -

Thus, Plaintiffs seek an order, pursuant to this Court's powers under Rule 23(d) "to protect class members and fairly conduct the action," to provide notice to the Class and the right to exclude themselves. By requesting a Rule 23(d) order, Plaintiffs seek to provide Settlement Class Members the "safeguards … [which are] the functional equivalent of those offered by Rule 23(b)(3)."[83]

## C. Alternatively, the Settlement Class Satisfies Rule 23(b)(3)

Alternatively, the Settlement Class also satisfies the requirements of Rule 23(b)(3), making certification appropriate. Rule 23(b)(3) instructs that a class should be certified if Rule 23(a) is satisfied,[84] "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior" to other methods of adjudication.[85]

---

*Privacy Litig.*, plaintiffs brought a class action for violations of the Fair Credit Reporting Act and the parties "agreed to an unusual feature that preserved class members' substantive claims even after settlement." Instead of releasing all claims against defendant, class members who did not request cash set aside for the settlement ($75 million) gave up only their ability to sue as part of a future class action. In exchange for the class members' agreement not to proceed further on a class basis, defendant offered online credit monitoring to all class members. The district court certified the settlement class under Rule 23(b)(1) and approved the settlement agreement as fair, adequate, and reasonable. *Id.* at 813. *See also Fresco v. Automotive Directions, Inc.*, 2009 WL 9054828, at *6, 20 (S.D. Fla. Jan. 20, 2009) (certifying a settlement class pursuant to Rule 23(b)(2), where the settlement waived the ability to "use the class action procedural device in any future lawsuit," noting that the court was "not aware of any binding authority holding that parties may not waive such rights in a settlement agreement").

[83] *Williams v. Burlington N., Inc.*, 832 F.2d at 103-04 (finding that the district court did not abuse its discretion in certifying a class for purposes of a settlement, which provided both monetary and equitable relief in an employment discrimination case, under Rule 23(b)(2), where the class members were provided notice and an opportunity to object to the settlement), *cited with approval in Lemon*, 216 F.3d at 582.

[84] Plaintiffs incorporate their analysis of Rule 23(a) from their Memorandum In Support of Motion For Preliminary Approval as if fully set forth herein.

[85] *See* FED. R. CIV. P. 23(b)(3).

### 1. Common questions of fact predominate.

Rule 23(b)(3)'s predominance requirement is satisfied when "common questions represent a significant aspect of [a] case and … can be resolved for all members of [a] class in a single adjudication."[86] Analysis of predominance under Rule 23(b)(3) "begins, of course, with the elements of the underlying cause of action."[87] The focus of a claim seeking medical monitoring and injunctive relief is on the conduct of the NCAA, rather than the conduct of individual Class Members. The NCAA had a duty to protect the health and welfare of its student-athletes, breached that duty, and put student-athletes at risk for short- and long-term brain injuries caused by concussions and the accumulation of subconcussive hits. The facts underlying these contentions are common to the Class.

As reflected in the *Arrington* Motion For Class Certification and accompanying Fact Proffer and Expert Report, Plaintiffs demonstrated that they intended to prove at trial, on a class-wide basis and using documents and testimony from the NCAA, that:

- the NCAA owed a duty to safeguard student-athletes during their participation in NCAA-sanctioned sports activities;

- this duty required the NCAA to promulgate and enforce best-practices concussion-management standards; and

- the NCAA failed to promulgate or enforce consensus best-practices concussion-management standards.

All of these core issues, and the underlying proof, are common for all Class Members. Resolution of these core issues will be the same for each Class Member who faced heightened risk of post-concussion syndrome and other disorders related to Chronic Traumatic

---

[86] *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (quoting WRIGHT & MILLER, *supra*, § 1778).

[87] *Id.* (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, __ U.S. __, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011)).

Encephalopathy as a result of the NCAA's failure to promulgate and enforce appropriate best-practices concussion-management standards. These are exactly the type of issues that are "central to the validity of each one of the claims in a class action," and since they "can be resolved in one stroke, can justify class treatment" under Rule 23(b)(3).[88/89]

### 2. A class action is superior to other methods of adjudication.

Rule 23(b)(3) also requires a showing that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Addressing these core issues now by implementing a Medical Monitoring Program and changing the way the NCAA handles concussion management is far superior to individualized lawsuits. Class certification for purposes of Settlement will assure that all Class Members have access to the same diagnostic opportunities overseen by this Court and that current athletes are protected by the same programmatic changes, rather than having these issues be re-litigated in countless courts around the country. Accordingly, this Court could certify the Settlement Class under Rule 23(b)(3).

### D. Preliminary Approval of the Settlement Should Be Granted

"Federal courts naturally favor the settlement of class action litigation."[90] However, Rule 23(e) "requires court approval of any settlement that effects the dismissal of a class action.

---

[88] *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013), *cert. denied*, __, U.S. __, 134 S. Ct. 1277 (2014) (quotations omitted).

[89] The fact that 33 states do not recognize medical monitoring as an independent cause of action or as a remedy for negligence is not fatal to the predominance inquiry. Manageability concerns regarding differences in state laws are irrelevant in the settlement context. *See, e.g.*, *Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial."). *See also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298-99 (3d Cir. 2011) (certifying a settlement class despite the fact that variances in state law would likely have defeated predominance if the class was being certified for trial); *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) ("Given the settlement, no one need draw fine lines among state-law theories of relief.").

[90] *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

Before such a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion."[91]

The Seventh Circuit has explained:

> District court review of a class action settlement proposal is a two-step process. The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval.' This hearing is not a fairness hearing; *its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. If the district court finds a settlement proposal 'within the range of possible approval,' it then proceeds to the second step in the review process*, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard.[92]

In deciding whether to preliminarily approve the Settlement, this Court must consider: (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length, and expense of continued litigation; (3) the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed.[93] Courts "'do not focus on individual components of the settlement[ ], but rather view them in their entirety in evaluating their fairness.'"[94]

When analyzing whether a proposed settlement is fair, reasonable, and adequate, courts "should refrain from resolving the merits of the controversy or making a precise determination of

---

[91] *Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (quotation omitted).

[92] *Armstrong v. Board of Sch. Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980) (internal citation and footnote omitted) (emphasis added), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

[93] *Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby*, 75 F.3d at 1199).

[94] *Isby*, 75 F.3d at 1199.

the parties' respective legal rights."[95]  Additionally, a court "must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case,"[96] keeping in mind that the presence of different or more creative alternatives does not preclude settlement approval.[97]

> **1.    Weighing the strength of Plaintiffs' case compared to the terms of the proposed settlement supports preliminary approval.**

One of the principal factors which a district court should consider in determining the reasonableness of the settlement is the strength of the plaintiff's case on the merits balanced against the settlement offer.[98] In doing so, however, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs."[99]

Here, after full merits discovery and thousands of hours of research, Plaintiffs moved for certification of liability classes comprised of an 18-state Medical Monitoring Class and a 50-State Core Issues Class. Yet, despite the fact that 33 states do not recognize medical monitoring

---

[95] *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

[96] *Armstrong*, 616 F.2d at 314-15.

[97] *See Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 987 (7th Cir. 2002).

[98] *Armstrong*, 616 F.2d at 314. *See also Synfuel Techs.*, 463 F.3d at 653 (the "most important factor relevant to the fairness of a class action settlement" is the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement") (quotations omitted); *Sutton v. Bernard*, 2002 WL 1794048, at *1 (N.D. Ill. Aug. 5, 2002) ("The primary question is whether the proposed settlement amount is reasonable, given the risk and likely return to the class of continued litigation.").

[99] *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 347 (internal quotation marks and citations omitted).

as an independent cause of action or as a remedy for negligence,[100] this Settlement provides medical monitoring to all current and former student-athletes in all 50 states.[101]

Moreover, in their Motion for Class Certification, the *Arrington* Plaintiffs sought certification of a liability Class comprised of student-athletes in Contact Sports from 2004 to the present date, based on the date international consensus on concussion-management standards was achieved.[102] However, this Settlement provides medical monitoring benefits to all current and former NCAA student-athletes, regardless of age and sport.[103]

By providing all current and former NCAA student-athletes access to the Screening Questionnaire and, if they qualify, to the Medical Evaluations, the Settlement is unprecedented. Plaintiffs have achieved the right for all Settlement Class Members to have neurological, neuropsychological, and mood and behavior evaluations to determine whether their symptoms or conditions are related to the concussions or accumulation of subconcussive hits they sustained while playing NCAA sports. And Plaintiffs have ensured that the rights of Settlement Class Members to pursue individual personal injury claims are protected, through tolling during the pendency of these proceedings.

---

[100] Since the filing of Plaintiffs' Motion for Class Certification, the New York Court of Appeals has ruled that it does not recognize medical monitoring as an independent cause of action. *Caronia v. Philip Morris USA, Inc.*, 5 N.E.3d 11 (N.Y. App. Ct. 2013). Accordingly, Plaintiffs may have to remove New York from its Motion for Class Certification for liability purposes if the MDL Action were litigated on a contested basis.

[101] *Sullivan v. DB Invs., Inc.*, 667 F.3d at 308 ("Rule 23 does not require a district court to determine whether class members individually have a colorable claim – one that 'appears to be true, valid, or right.'").

[102] The Second Amended Complaint in *Arrington* defined the class as all student-athletes without restriction on sport or time; the Related Actions included a class definition comprised of all former NCAA football players without a time restriction.

[103] Am. SA, ¶ II(D).

The Nichols Plaintiffs have previously complained that the opt-out rights provided here are a sham, because the Settlement waives class personal injury claims, but preserves individual personal injury claims. However, such an objection should be overruled.

First, the contention that a personal injury class could be certified here is unsupportable. To the extent Nichols' counsel is attempting to certify a personal injury class, the case is more akin to a mass tort claim, which is generally not suited for class treatment.[104] Most courts have denied certification in those circumstances.[105]

Thus, Lead Plaintiffs have not "abandoned" Class Members' right to obtain personal injury damages but rather have vigorously sought to protect and advance that very right by expressly seeking to ensure those individual claims are protected and not subject to claim preclusion.[106] The fact that Nichols' counsel wants to pursue an illusory class action, which is now precluded by the Settlement, does not render the Settlement unfair.[107]

---

[104] *Ortiz v. Fibreboard Corp.*, 527 U.S. at 845 (quoting FED. R. CIV. P. 23(b)(3) advisory committee notes, "a mass accident resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions not only of damages, but of liability and defenses of liability would be present, affecting the individuals in different ways").

[105] *See, e.g.*, *In the Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1304 (7th Cir. 1995) ("[m]ost federal courts … refuse to permit the use of the class-action device in mass tort cases, even asbestos cases. Those courts that have permitted it have been criticized…."); *In re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847 (9th Cir. 1982); *Payton v. Abbott Labs.*, 100 F.R.D. 336 (D. Mass. 1983); *Yandle v. PPG Indus., Inc.*, 65 F.R.D. 566 (E.D. Tex. 1974); *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 83-85 (M.D. Pa. 1974).

[106] *See* Am. SA, ¶ XIV(A)(7). *See also* Plaintiffs' Memorandum in Support of Motion for Class Certification (Dkt. No. 175), at 24-27 (requesting that the Court immunize Plaintiffs and absent class members from assertions of claim preclusion for damages claims in subsequent individual litigation).

[107] *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 357 (N.D. Ohio 2001) (finding class action settlement fair and rejecting objections where "a large number of the comments were submitted by counsel seeking to pursue their own class action cases. To the extent these comments objected to class certification, they expressed dissatisfaction with the *sub-classification* scheme, or with the *nationwide* scope of the proposed class, or with the concept of a 'settlement class,' not the idea of class treatment. Primarily, the commenters attacked the fairness of the proposed settlement agreement, tending to focus on the argument that the opt-out provisions of the agreement were a 'sham.'").

Ultimately, Lead Plaintiffs' Counsel recognized that individual causation issues were not amenable to a class action; such a recognition does not render counsel inadequate.[108/109] Rather, after weighing the benefits that could be provided under the Medical Monitoring Settlement against the unlikely certification of a personal injury class, Lead Plaintiffs made the strategic decision to support a $70 million Medical Monitoring Program with meaningful changes to the NCAA's return to play practices in return for waiving a virtually non-existent right to class personal injury claims.

In sum, Plaintiffs could not have achieved this same victory – a comprehensive Medical Monitoring Program for all living NCAA athletes under 50 states' laws and significant changes to the NCAA's concussion-management and return-to-play guidelines – on a contested basis. Accordingly, this Court should find that the benefits of the Settlement are substantial and encompass or exceed the relief that could be obtained through a jury verdict in favor of a class on a contested basis.

### 2. The risk, expense, complexity, and likely duration of further litigation weigh in favor of preliminary approval.

This factor also weighs heavily in favor of preliminary (and, ultimately, final) approval of the Settlement. The risk, expense, complexity, and likely duration of further litigation can only be characterized as monumental.

From 2011 through January 31, 2014, Hagens Berman and Siprut PC, as Court-appointed Lead Counsel, invested more than 11,000 hours and more than $500,000 in out-of-pocket costs

---

[108] *Hawaii-Pacific Venture Capital Corp. v. Rothbard*, 564 F.2d 1343, 1346 (9th Cir. 1977); *Martin v. Kalvar Corp.*, 411 F.2d 552, 553 (5th Cir. 1969); *Gabriel v. Standard Fruit & S.S. Co.*, 448 F.2d 724, 725 (5th Cir. 1971).

[109] Notably, "[a] difference of opinion concerning litigation strategy or individual aspects of a remedy does not overcome the presumption of adequate representation." *See, e.g.*, *Jenkins v. Missouri*, 78 F.3d 1270, 1275 (8th Cir. 1996).

on a wholly contingent basis. If this matter were to revert to a contested basis, this Court has already stated that the new parties to the MDL Action – all of the Plaintiffs – would have the right to open discovery on a class-wide basis. The Plaintiffs would be required to file the Motion For Class Certification to incorporate a consensus-based approach. There is no reason to believe that this process would be any less contentious or lengthy than the tracks on which both the *Arrington* Action and the MDL Action have proceeded.

Moreover, if this matter went to verdict, a lengthy appeal period would certainly result. The litigation road has been arduous and promises to be even more difficult absent settlement. Plaintiffs' counsel have already collectively incurred and advanced more than $500,000 in out-of-pocket expenses pursuing Plaintiffs' claims. Settlement will conserve the resources of the Parties and the Court. The proposed Settlement guarantees a substantial recovery for the Class now while obviating the need for a lengthy, complex, and uncertain trial. Additionally, the Settlement expressly reserves the right of individuals to pursue personal injury damages separately of this class action while also obtaining the benefits of the Medical Monitoring Program. Accordingly, this factor favors preliminary approval of the Settlement.

### 3. Evaluating opposition to the settlement is premature.

Because Class Members have not yet received notice of the Settlement and been provided an opportunity to comment, this factor cannot yet be fully evaluated.

### 4. The terms of the proposed Settlement were only reached following discovery by attorneys familiar with the legal and factual issues of the case.

This matter has been intensely litigated for five years and this Settlement was reached only following the close of discovery. Plaintiffs conducted an extensive investigation, including full merits discovery, to uncover and allege class-wide negligence and the need for medical monitoring relief from the NCAA. As a result, on July 19, 2013, Plaintiffs filed their extensive

Motion for Class Certification accompanied by a detailed Proffer of Facts and expert report. Given the advanced stage of these proceedings, there can be no question that Lead and Class Counsel have a clear view of the strengths and weaknesses of the Class's claims.

Because Plaintiffs satisfy the requirements for demonstrating that the Settlement is fair, adequate and reasonable for purposes of preliminary approval, the Court should grant Plaintiffs' motion.

## IV.    THE COURT SHOULD ORDER NOTICE TO THE SETTLEMENT CLASS AND SCHEDULE A FAIRNESS HEARING

### A.    The Court Should Approve the Contents of the Notice to be Provided to the Class

Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement.[110] Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs." The MANUAL sets forth several elements of the "proper" content of notice.[111] The proposed Long Form Notice, attached as Exhibit 4 to the Agreement, is clear, precise, informative, and meets these standards.[112]

---

[110] *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).

[111] MANUAL, ¶ 30.212 (3d ed. 1995); *see also, e.g.*, *Air Lines Stewards & Stewardesses Ass'n v. American Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process).

[112] The Notice is also written in plain English and is easy to read and includes other information such as the case caption; a description of the Class; a description of the claims; a description of the Settlement; the names of counsel for the Class; a statement of the maximum amount of attorneys' fees that may be sought by Plaintiffs' Class Counsel; the Fairness Hearing date; a description of Class Members' opportunity to appear at the hearing; a statement of the procedures and deadlines for requesting exclusion and filing objections to the Settlement; and the manner in which to obtain further information. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998). *See also* MANUAL, § 30.212 (Rule 23(e) notice designed to be only a summary of the litigation and settlement to apprise Class members of the right and opportunity to inspect the complete settlement documents, papers and pleadings filed in the litigation).

**B.    The Court Should Approve the Method of Notice Distribution**

The proposed Notice Plan is designed to reach at least 80% of the Settlement Class. As described in the Declaration of Alan Vasquez, the Notice Plan includes: (a) direct notice, for which the NCAA believes that the parties will obtain 2.9 million email and/or USPS addresses for current and former NCAA student-athletes; (b) print publication in *USA Today*, *Sports Illustrated*, and *ESPN the Magazine*; (c) case-dedicated settlement website; (d) internet publication, including sponsored search advertising on the Google and Yahoo!/Bing networks, text link and banners on the Google Display Network, targeted banner advertising on the Xaxis and Steel Media networks, and banner advertising through Xaxis on Facebook; (e) press release; and (f) other earned media.[113]

**C.    The Court Should Set Settlement Deadlines**

In connection with preliminary approval of the Settlement, the Parties recommend that the Court schedule the following dates:

| Date | Event |
|---|---|
| Within 5 Days of Preliminary Approval | Settlement website established and basic Settlement documents posted. |
| Within 15 Days of Preliminary Approval | Letter sent to NCAA member institutions requesting Settlement Class Member contact information, Publication Notice published, call center established, notice via social media begins, XXX-day Claim Period begins. |
| Within 180 days of Preliminary Approval | Due date for Plaintiffs' Class Counsel's papers in support of final approval of the Settlement, including a declaration of proof of mailing and publishing notice, and papers in support of the request for an award of attorneys' fees and expenses. |

---

[113] Vasquez Decl., ¶ 19.

| Within 208 Days of Preliminary Approval | Due date for postmark or delivery of requests for exclusion.<br><br>Due date for delivery and filing of objections and intents to appear at the Fairness Hearing. |
|---|---|
| Within 229 Days of Preliminary Approval | Due date to file reply papers, if any, in support of final approval of the Settlement and request for an award of attorneys' fees and expenses. |
| Within seven days before the Fairness Hearing | Due date for filing of declarations of Class Action Settlement Administrator and Settlement Notice Administrator. |
| On or after 229 days after Preliminary Approval | Fairness Hearing |

## V.    CONCLUSION

For all the above-stated reasons, Plaintiffs respectfully request that the Motion be granted and the Court enter an order: (i) conditionally certifying the Settlement Class; (ii) granting Preliminary Approval of the Amended Settlement; (iii) establishing the deadlines reflected above; and (iv) directing that Notice be provided to the Class, subject to the Court's approval of a Notice Plan.

Date:  April 14, 2015

Respectfully submitted,

By:   _/s/ Steve W. Berman_
      Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594

010270-12  769267 V2

Elizabeth A. Fegan
*beth@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

*Lead and Settlement Class Counsel*

010270-12 769267 V2

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on April 14, 2015 a true and correct copy of the foregoing document was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

By:   /s/ Steve W. Berman
       Steve W. Berman