**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492 <br><br> Master Docket No. 13-cv-09116 <br><br> Judge John Z. Lee <br><br> Magistrate Judge Geraldine Soat Brown |

**REPORT OF THE GARRETSON RESOLUTION GROUP REGARDING
ADMINISTRATION OF THE PROPOSED MEDICAL MONITORING
<u>PROGRAM UNDER THE AMENDED SETTLEMENT AGREEMENT</u>**

## TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................................1

    A.   Overview of the Report ...........................................................................1

    B.   About the Garretson Resolution Group......................................................2

II.  DUTIES OF THE PROGRAM ADMINISTRATOR .......................................4

    A.   Specific Requirements .............................................................................4

        1.   Payment of Expenses & Distribution of Settlement Proceeds...................4

            a.   Establishing a Medical Monitoring Fund .......................................4

            b.   Financial Controls ......................................................................5

        2.   Administration of Screening Questionnaires ................................................5

            a.   Questionnaire design ...................................................................5

            b.   Online Application......................................................................6

            c.   Paper Questionnaires...................................................................6

            d.   Additional Telephonic Screening ..................................................7

            e.   Procedures Related to the Number of Questionnaires Submitted ...7

        3.   Appointment Scheduling ...............................................................8

        4.   Reimbursement of Travel Expenses...................................................8

        5.   Medical Evaluation Processing ........................................................9

            a.   Invoicing...................................................................................9

            b.   Collection, Analysis, and Submission of Data ...............................9

        6.   Reporting and Recordkeeping..........................................................10

            a.   Provide Yearly Reporting.............................................................10

            b.   Keep Records and Maintain Confidentiality ..............................10

    B.   Additional Duties ....................................................................................10

|     |     | 1.  | Class Member Service Center, Class Member Registration, and Program Web Site | 11 |
|-----|-----|-----|------|----|
|     |     | 2.  | Opt-Out Processing | 11 |
|     |     | 3.  | Medicare Secondary Payer Act Compliance | 12 |
|     |     | 4.  | Fraud Prevention | 12 |
| III. |     |     | PROGRAM LOCATIONS | 13 |
|     | A.  |     | Program Location Selection | 13 |
|     | B.  |     | Provider Credentialing | 16 |
| IV. |     |     | ESTIMATED ADMINSTRATIVE COSTS | 17 |
|     | A.  |     | Foundational Costs | 17 |
|     | B.  |     | Program Fixed Costs | 18 |
|     | C.  |     | Variable Costs | 18 |
|     | D.  |     | Total | 18 |

EXHIBIT A: PROPOSED PROGRAM LOCATIONS ...........................................................20

EXHIBIT B: DISTANCE TO PROPOSED PROGRAM LOCATIONS ...................................21

## I.     INTRODUCTION

### A.     Overview of the Report

1.     The purpose of this report ("Report") is to outline the role that the
Garretson Resolution Group ("GRG") has been asked to and can perform in initiating and
administering the Medical Monitoring Program described in the Amended Class Action
Settlement Agreement and Release (the "Settlement Agreement").[1]

2.     Section VI of the Settlement Agreement calls for the appointment of a
Program Administrator "selected by the Parties and their counsel," subject to the
approval of the Court. Since the fall of 2014, the Lead Class Counsel, Special Class
Counsel for Medical Monitoring Relief, the NCAA's Counsel, and the Medical Science
Committee have conferred with GRG over the course of several meetings and discussions
on the specific requirements and tasks to be undertaken by the Program Administrator
and the estimated administrative costs of the Medical Monitoring Program.

3.     This Report summarizes GRG's assessment of those requirements and
tasks, particularly in light of certain concerns raised by the Court in its December 17,
2014, Memorandum Opinion and Order denying the October 21, 2014, motion for
preliminary approval of the Settlement. In addition, this Report provides an estimate of
the administrative costs of the Medical Monitoring Program.

---

[1]     Capitalized terms used without definition in this Report have the meanings ascribed them in
the Settlement Agreement.

**B.      About the Garretson Resolution Group**

4.      GRG provides services to parties settling major litigation, focusing in particular on resolution of complex problems requiring specialized knowledge, capabilities, and processes. Founded in 1998, GRG is now staffed by more than 400 professionals, including attorneys, operations managers, IT professionals, claims auditors, nurse reviewers, system developers, claims/class member service representatives, billing and coding experts, and data analysts.

5.      GRG's work in nationally notable matters at the request of courts and/or settling parties includes:

- Deepwater Horizon Medical Benefits Settlement. For the medical benefits settlement arising from the Deepwater Horizon oil spill, GRG serves as the program administrator, including process development, class member intake, correspondence, claims processing, medical record validation, fund administration, and fraud detection. The settlement includes the Periodic Medical Consultation Program, a 21-year medical monitoring program for which GRG established a national network of healthcare providers.

- World Trade Center Disaster Site Litigation. As the Allocation Neutral for the World Trade Center Captive Settlement, GRG reviewed claims and disbursed $712.5 million to more than 10,000 first responders who had alleged injuries from the rescue and clean-up operations at the World Trade Center. The program was administered through a web-based portal and claims management system,

allowing GRG to resolve all claims within eight months of our appointment by the Court.

- National Football League Concussion Litigation. Upon joint recommendation of Co-lead Class Counsel and Counsel for the NFL, the United States District Court for the Eastern District of Pennsylvania has preliminarily appointed GRG to serve as the Baseline Assessment Program Administrator and the Lien Resolution Administrator of the NFL Concussion Settlement. Upon final approval of the settlement, GRG will establish a national network of medical service providers to perform baseline assessments and follow-up care of the neurocognitive functioning of retired NFL players, as well as resolve healthcare liens asserted against class member awards.

- GM Ignition Compensation Claims Resolution Facility. GRG serves as the lien resolution administrator and, in consultation with the Facility Administrator, designed an unprecedented healthcare lien resolution program to support the Facility's goals of prompt, equitable compensation without sacrificing cost effectiveness and procedural and regulatory compliance.

6.     Accordingly, GRG has an established record designing and administering programs that are similar to the Medical Monitoring Program and is prepared to serve as the Program Administrator upon the request of the Parties and approval of the Court.

## II.     DUTIES OF THE PROGRAM ADMINISTRATOR

### A.     Specific Requirements

7.     Subject to Court approval and operating under the supervision and jurisdiction of the Special Master, Sections IV and VI of the Agreement enumerate specific duties for the Program Administrator. These specific requirements and GRG's proposed approach to executing them are described below.

### 1.     Payment of Expenses & Distribution of Settlement Proceeds

8.     Section VI.A.1 of the Settlement Agreement charges the Program Administrator with "[r]eceiving, processing, and paying expenses as provided in this Agreement and any applicable orders of the Court." In this situation, expenses will include the costs associated with the medical evaluations, travel expenses, attorney fees and expenses, the Medical Science Committee's expenses, GRG's expenses (subject to approval by the Parties and/or the Special Master), notice and second notice costs, any service awards to the named class members, and any other expenses ordered by the Court. After receiving appropriate documentation of any allowable expense, along with the requisite approvals outlined in the Settlement Agreement, GRG will pay the expenses according to the procedures ordered by the Court, including payments to Program Locations as authorized under Section VI.A.6 of the Settlement Agreement.

### a.     Establishing a Medical Monitoring Fund

9.     In accordance with Section IV.A.1.c of the Settlement Agreement, within ten days after the Preliminary Approval Date, GRG will establish a Medical Monitoring

Fund in an interest-bearing account in a bank selected by Settlement Class Counsel (the "Settlement Account") and agreed to by the NCAA.

### b. Financial Controls

10.     The Settlement Account will be managed using best practices, including segregation of duties, established fraud measures (e.g., positive pay), and a dedicated settlement fund administration team with more than 15 years of experience managing assets under fiduciary rules and controls.

### 2. Administration of Screening Questionnaires

11.     Section VI.A.2 of the Settlement Agreement charges the Program Administrator with "[i]mplementing and overseeing administration of the Screening Questionnaires designed and approved by the Medical Science Committee…." These questionnaires, which are described in Section IV.B.4 of the Settlement Agreement, are required to assess, "self-reported symptoms and cognitive, behavioral, and motor problems that may be associated with persistent post-concussion syndrome and/or mid- to late-life onset problems, such as Chronic Traumatic Encephalopathy ("CTE") and related disorders."

### a. Questionnaire design

12.     As noted in Section IV.B.4.b of the Settlement Agreement, the Medical Science Committee has submitted its proposed initial Screening Questionnaire as part of its Expert Report. This report includes the proposed algorithms and predetermined cut scores for qualifying for a Medical Evaluation. Per Section IV.B.4.d of the Settlement Agreement, all Screening Questionnaires will be scored electronically using the pre-

determined cut scores, although Class Members will have the option to complete the Screening Questionnaire online or using a paper copy, as required by Section IV.B.4.a of the Settlement Agreement. GRG will notify Class Members eligible for a Medical Evaluation within 30 days of receiving the Screening Questionnaire, as required by Section IV.B.4.i of the Settlement Agreement, and will provide instructions and/or assistance on how to schedule a Medical Evaluation.

### b.     Online Application

13.     GRG will establish a Class Member web portal that will enable Class Members to submit a Screening Questionnaire online. This portal will verify the identity of the Class Member before administering the Screening Questionnaire as designed by the Medical Science Committee. As envisioned by Medical Science Committee, the online Screening Questionnaire will record an extensive medical history and will incorporate five standardized Psychological/Cognitive Functioning scales, along with an instrument used to detect symptom validity.

### c.     Paper Questionnaires

14.     For Class Members without online access, or who prefer to complete a hard copy, GRG will mail the Class Member a paper version of the Screening Questionnaire, including instructions, and prepaid return envelope. Upon receipt of the form, GRG will enter the Class Member's data and the questionnaire will be scored using the same automated process as applies to Class Members who choose to complete the Screening Questionnaire online.

### d. Additional Telephonic Screening

15. As part of the Medical Science Committee's Expert Report accompanying the Motion for Preliminary Approval, the Medical Science Committee has recommended in Section II.B.12 of the Expert Report that Class Members scoring as "impaired" in the behavior measures but not on the cognitive measures be further screened via telephone by a Behavioral Health Specialist or be referred to a mental health specialist outside the Medical Monitoring Program. Using credentialing criteria that will be established by the Medical Science Committee, GRG will retain the Behavioral Health Specialists performing the telephone screenings and will supervise their performance of the telephone screenings in accordance with the instructions provided by the Medical Science Committee.

### e. Procedures Related to the Number of Questionnaires Submitted

16. GRG will implement controls to ensure that Class Members are permitted to complete no more than their allowed number of Screening Questionnaires without seeking approval from the Medical Science Committee, as required by Section IV.B.4.g of the Settlement Agreement. Such controls will be built into the online Screening Questionnaire adjudication system itself, including algorithms that allow the Class Member to access the Screening Questionnaire only if age and frequency requirements outlined in Section IV.B.4.g of the Settlement Agreement are satisfied.

17. If the Class Member meets the frequency requirement but has already submitted three or more Screening Questionnaires without qualifying for a Medical Evaluation, the system will allow the Class Member to proceed but will inform the Class

7

Member before and after completing the Screening Questionnaire that the Screening Questionnaire will be submitted to the Medical Science Committee, which will determine within 60 days whether the Class Member is entitled to a Medical Evaluation, as required by Section IV.B.4.g of the Settlement Agreement.

### 3. Appointment Scheduling

18.    Qualifying Class Members will be able to contact GRG Class Member Services or log in to GRG's secure web portal to request a Medical Evaluation. The Class Member Services team will manage all aspects of scheduling in order to coordinate and track activity, make follow-up contacts as needed, ensure that results of the Medical Evaluations and medical records are secured in a timely fashion, and track benefit usage. Before the appointment, GRG will send the Class Member a reminder letter, directions to the Program Location, and instructions on what to bring to the Medical Evaluation.

### 4. Reimbursement of Travel Expenses

19.    Section IV.B.5.a of the Settlement Agreement allows Class Members residing more than 100 miles from the nearest Program Location to request reimbursement for travel expenses. GRG's appointment scheduling system automatically calculates the driving distance from the Class Member's residence to the nearest Program Location and will prompt the Class Member Services representative to inform the Class Member of his or her eligibility for travel expense reimbursement. Once GRG confirms attendance at the Medical Evaluation, our system will automatically calculate the expense reimbursement owed to the Class Member and will generate a check to be mailed to the

Class Member, along with a cover letter explaining how the reimbursement amount was calculated.

### 5.    Medical Evaluation Processing

#### a.    Invoicing

20.    Network providers can submit invoices electronically (via Electronic Data Interchange) or on paper. GRG Provider Services processes invoices using licensed, industry-standard claims software that ensures claims are paid only to authorized providers for covered services delivered to eligible class members at an approved Medical Evaluation. We will pay approved invoices within 45 days of receipt of invoice and other required Program documentation, either electronically via automated clearing house (ACH) or manually by paper check (depending on the preference of the provider). We will simultaneously issue an Explanation of Payment to the provider to explain reimbursement decisions. In the event of a dispute, a provider will be able to contact GRG via the Provider web portal or by calling a Provider Services representative.

#### b.    Collection, Analysis, and Submission of Data

21.    As outlined in Section IV.B.5.d of the Settlement Agreement, and subject to the written consent of the Qualifying Class Member, GRG will collect designated information about the results of the Medical Evaluations from the evaluating health care professionals. While maintaining the confidentiality of individual results, GRG will aggregate the data for the Medical Science Committee's use in assessing and adjusting the algorithm used in the Screening Questionnaire. As required by the Medical Science

Committee, GRG can also perform analytics for the Medical Science Committee's use in this process.

### 6.    Reporting and Recordkeeping

####    a.    Provide Yearly Reporting

22.    As required by Section VI.B of the Settlement Agreement, GRG will report the following information by December 1 of each year: (i) the total number of Screening Questionnaires that have been submitted; (ii) the total number of Qualifying Class Members; (iii) the total number of Medical Evaluations at each Program Location; (iv) the total costs paid from the Medical Monitoring Fund to date, and (v) such other information as is requested by the Court or the Special Master.

####    b.    Keep Records and Maintain Confidentiality

23.    As required by Section VI.D of the Settlement Agreement, GRG will maintain all records relating to payment of claims or expenses from the Medical Monitoring Fund for a period of five years from the end of the Medical Monitoring Period. We will also maintain the confidentiality of all personal health information found in any records we maintain in accordance with the HIPAA Protective Order to be entered in the MDL Action.

### B.    Additional Duties

24.    In addition to the specific duties described above, in light of (i) other provisions of the Settlement Agreement, (ii) GRG's experience administering programs similar to the Medical Monitoring Program, (iii) consultation with the Lead Class Counsel, Special Class Counsel for Medical Monitoring Relief and the NCAA's Counsel,

and (iv) specific concerns raised by the Court, there are additional requirements and tasks that will be necessary for the successful initiation and administration of the Medical Monitoring Program. Those tasks are described below.

**1.  Class Member Service Center, Class Member Registration, and Program Web Site**

25.     Following preliminary approval of the Settlement, GRG will activate a Class Member Services Call Center with trained representatives to answer questions about the Settlement and to gather basic contact information from individuals who assert that they are Class Members and that they desire to participate in the Settlement. In addition, GRG will initiate work simultaneously on launching the systems necessary to administer the Medical Monitoring Program, including the Class Member web portal. During the Notice period, GRG will work with the Notice Administrator to effect handoff and integration of the Settlement Website onto GRG's platform, including the consolidation of any data the Notice Administrator has collected during the Notice period.

**2.  Opt-Out Processing**

26.     GRG will work in tandem with the Notice Administrator to process and tabulate opt-out requests in accordance with the requirements of the Settlement Agreement, including establishing a post office box to receive requests for exclusion, furnishing Settlement Class Counsel with copies of written requests for exclusion, and providing the Opt-Out List to Settlement Class Counsel, the NCAA's Counsel and the Court in a timely manner.

### 3. Medicare Secondary Payer Act Compliance

27.     GRG will work with Program Locations to ensure that they have controls in place to prevent their invoicing of any third-party payer for services covered by the Settlement. We will also work with the Centers for Medicare and Medicaid Services ("CMS") to obtain a determination of "no interest" from Medicare, indicating that CMS believes GRG's program controls are sufficient to prevent Medicare from being billed for services covered by the Settlement.

### 4. Fraud Prevention

28.     The procedures GRG uses to detect and prevent fraudulent claims and abuses fall into three categories or "channels"—namely, random audit, data analysis, and tips. Each channel consists of three stages—identification, processing, and reporting. GRG has developed these procedures from its experience in claims processing across a variety of settlement programs. The objective in any particular program is to tailor the procedures to fully satisfy the requirements of a settlement while placing the minimum possible burden on the Class Member.

29.     Our provider qualifications and invoice review procedures for medical monitoring programs consist of audit and data analysis. We validate all aspects of the program and billing, including confirming appointments; ensuring follow up with Class Members; credentialing providers; auditing provider's billing records; validating out of pocket expense claims; and ensuring claims are processed according to the settlement agreement.

### III.   PROGRAM LOCATIONS

The Settlement Agreement requires that a certain number of Program Locations be established for the Medical Evaluations. Initially the parties intended that this number would be at least ten, but after discussions with counsel and in response to the Court's concerns outlined in its December 17, 2014 Order, the Settlement Agreement now requires at least 33 Program Locations. Specifically, Section II.LL of the Settlement Agreement defines Program Locations as "the regional institutions, of which there will be at least thirty-three (33), where Medical Evaluations will be conducted for Qualifying Class Members."

In its December 17, 2014, Order, the Court noted that "[t]he placement of these Program Locations will directly impact participation rates from the Settlement Class," and it asked to review the Medical Science Committee's "decision-making process and the parameters they used when selecting locations," particularly the 200-mile radius and the duration of a typical Medical Evaluation. GRG met with the parties and the Medical Sciences Committee to address the Court's concerns, and GRG has recommended the following to the Parties and MSC.

### A.   Program Location Selection

30.     After consultation with the Parties and the Medical Science Committee, GRG believes that the optimal size of the Program Location network is 33 metropolitan areas. In coming to this conclusion, three primary factors were considered:

1.   Maximizing the percentage of class members within a "same-day" travel radius of Program Locations;

2. Preservation of Settlement funds where the establishment of a Program Location might result in greater expense than alternative means to minimize travel burden; and

3. Ability to comply with the standard of care and credentialing criteria established by the Medical Science Committee.

31.    First, assuming geographic distribution of Class Members roughly approximates the U.S. population, a 33-city network will place Program Locations within 50 miles of approximately 50% of the Class and within 100 miles of 70% of the Class. Further analysis indicates that expansion beyond the 33-city network quickly falls prey to the law of diminishing returns, both in terms of Class Member coverage and in the likelihood of medical providers with extensive experience in the diagnosis of PCS and CTE. After discussion with the GRG, the Medical Science Committee concluded that a network rooted in 33 of the largest metropolitan areas will best support enrollment of quality neurologists and neuropsychologists with the requisite education, skill, and experience to perform Medical Evaluations properly.

32.    The Medical Science Committee advised GRG that a typical Medical Evaluation will last from five to nine hours and can be performed in a single day or over the course of two days. Given that, and considering the level of experience and expertise that the Medical Science Committee expects from the providers at the Program Locations, GRG believes that the majority of the Class Members will be within a day of a well-placed Program Location. For those Class Members who are not, an increase in

14

expense reimbursements allocated for travel costs will adequately compensate those Class Members who need to travel more, while at the same time preserving the integrity of the Medical Monitoring Program network.

33.    That said, adding a Program Location is ultimately more cost-efficient than paying travel expenses, so long as the Program Location serves multiple Class Members. Put another way, it is less costly to bring Program Locations to groups of Class Members than to bring groups of Class Members to Program Locations. As we learn more about the Class population from the effectiveness of the direct notice program and actual experiences in the Medical Monitoring Program, GRG will be able to adjust the network of Program Locations in a way that best addresses the concerns articulated by the Court in the December 17, 2014 Order. Meanwhile, we estimate that travel expense reimbursement providing for mileage at IRS rates plus meals and lodging for one night for the Class Member and a travel companion would range from $300-$400 per Medical Evaluation for those traveling between 100 and 250 miles. The small number of Class Members outside a 250-mile radius (which represents a drive of about four hours on the highway) could be considered on a case-by-case basis to assure that the expense reimbursement policy provides an adequate benefit if a multi-day trip or (domestic) air travel is the only practical alternative.

34.    Exhibit A includes the list of proposed metropolitan areas provided by GRG to the Medical Science Committee, which both agreed met the goals of the Program in these initial stages. Exhibit B shows the updated coverage analysis of the 33 cities within radiuses of 50, 100, and 200 miles.

B.       **Provider Credentialing**

35.       Based on GRG's experience enrolling providers into program networks, potential credentialing criteria to be definitively developed in consultation with the Medical Science Committee would include:

- education, training, licensing, experience, and credentialing;

- general commercial liability and professional malpractice insurance coverage of at least $1,000,000 per occurrence/$2,000,000 aggregate;

- ability to provide the specified Medical Evaluations under the Medical Monitoring Program;

- ability to provide required Medical Evaluations in a timely manner, which includes adequate capacity to see the required number of Class Members in a reasonable time period;

- ability and willingness to fulfill all Medical Monitoring Program administrative requirements, including timely reporting of the results of Medical Evaluations, subject to the Qualifying Class Member's written consent;

- provider locations; and

- rate structure and payment terms.

36.       In addition to requiring prospective Program Locations to submit documentation of their qualifications for participation, GRG will perform thorough background checks that include licensing, state or federal disciplinary actions, criminal records, malpractice litigation, and other civil actions (such as bankruptcy and liens).

GRG will also ask prospective providers to document all work performed as an expert witness or consultant as part of any sport-related brain injury litigation.

Acting as the Medical Science Committee's designee and pursuant to Section IV.B.1 of the Settlement Agreement, GRG will issue a RFP to medical institutions or providers in at least 33 regionally geographic locations. Based on the institution or medical provider's qualification to participate in the Medical Monitoring Program (including completion of the background check process described above), GRG will populate the details of a Provider Agreement and forward it to the prospective Program Location for review and negotiation. Upon the successful conclusion of the enrollment process, GRG will gain final approval by the Medical Science Committee and the Parties and will then execute the Provider Agreement with the Program Location.

## IV.     ESTIMATED ADMINSTRATIVE COSTS

37.     As described below, GRG's estimate of the costs to initiate and administer the Medical Monitoring Program fall into three basic categories: (i) foundational costs, (ii) ongoing fixed costs, and (iii) variable costs driven by the level of participation of Class Members in the Medical Monitoring Program such as work to schedule and process appointments for Medical Evaluations.

### A.     Foundational Costs

38.     The primary drivers of estimated foundational costs are (i) overall program planning and initiation, (ii) establishing and enrolling the Program Location network, and (iii) IT system customization and development, including development of the online Screening Questionnaire.

**B.    Program Fixed Costs**

39.    The primary drivers on ongoing fixed costs are (i) maintenance of active providers at Program Locations due to ordinary course contract renewal and attrition, and (ii) IT systems maintenance.

**C.    Variable Costs**

40.    The primary variable costs of the Medical Monitoring Program—the ultimate amount of which will be driven by the participation of Class Members—are (i) Class Member services (i.e. call center communication and correspondence) related to registration and opt-outs, (ii) the screening process, and (iii) scheduling and processing Medical Evaluations.

**D.    Total**

41.    In total, GRG estimates the costs to initiate and administer the Medical Monitoring Program will be $8,029,459. All of GRG's costs estimates include a 3.5% annual increase beginning in the second year of the program, and are presented on an unadjusted basis (i.e., no discount rate has been applied to costs estimates for activity in future years). It should be noted that GRG cost estimates do not include the actual costs of Medical Evaluations, travel reimbursements to qualifying Class Members, or Medical Science Committee fees.

Dated: April 14, 2015

THE GARRETSON RESOLUTION GROUP

By: _____
Matthew L. Garretson
Chief Executive Officer

6281 Tri-Ridge Blvd.
Suite 300
Cincinnati, OH 45140
(513) 794-0400

19

**EXHIBIT A: PROPOSED PROGRAM LOCATIONS**

| Population Rank | Proposed Network Metro Areas | | Population Rank | Proposed Network Metro Areas | |
|---|---|---|---|---|---|
| 1 | New York | NY | 21 | Denver | CO |
| 2 | Los Angeles | CA | 22 | Pittsburgh | PA |
| 3 | Chicago | IL | 23 | Charlotte | NC |
| 4 | Dallas | TX | 24 | Portland | OR |
| 5 | Houston | TX | 25 | San Antonio | TX |
| 6 | Philadelphia | PA | 28 | Cincinnati | OH |
| 7 | Washington | DC | 29 | Cleveland | OH |
| 8 | Miami | FL | 30 | Kansas City | MO |
| 9 | Atlanta | GA | 31 | Las Vegas | NV |
| 10 | Boston | MA | 36 | Nashville | TN |
| 11 | San Francisco | CA | 37 | Virginia Beach | VA |
| 12 | Phoenix | AZ | 41 | Memphis | TN |
| 14 | Detroit | MI | 42 | Oklahoma City | OK |
| 15 | Seattle | WA | 45 | New Orleans | LA |
| 16 | Minneapolis | MN | 48 | Salt Lake City | UT |
| 18 | Tampa | FL | 54 | Honolulu | HI |
| 19 | St. Louis | MO | | | |

**EXHIBIT B: DISTANCE TO PROPOSED PROGRAM LOCATIONS**



## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on April 14, 2015 a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: */s/ Steve W. Berman*