## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL No. 2492<br><br>Master Docket No. 1:13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

## DECLARATION OF ALAN VASQUEZ
## REGARDING DISSEMINATION OF NOTICE TO CLASS MEMBERS

I, Alan Vasquez, hereby declare and state as follows:

## I.    INTRODUCTION

1.    I am the Director of the Larkspur Design Group ("LDG"), which is located at 3301 Kerner Blvd., San Rafael, California. LDG was retained to design and administer the Notice Program in this matter. I have personal knowledge of the matters set forth in this declaration and, if called as a witness, can and will testify competently thereto.

2.    LDG is Gilardi & Co. LLC's ("Gilardi") in-house advertising agency specializing in notice plan design and implementation. Gilardi was established in 1984 and is one of the largest full-service class action notice and claims administrators in the United States. In this matter, Gilardi will provide notice administration services, including the printing and mailing services outlined in the notice program, and LDG will handle the implementation of the notice program's publication efforts.

3.    LDG has specialized in designing, developing, and implementing legal notification plans for more than 25 years. As such, LDG is familiar with, and guided by, constitutional due process provisions, rules of states and local jurisdictions, and the relevant case law relating to legal notification. Media plans designed and implemented by LDG include publication in both domestic and international newspapers and magazines, internet-based banners, search engine advertising, case specific websites, and notice by wire service, radio, television, point-of-purchase displays, outreach,

and direct mail.  In my role as the Director of LDG, I oversee all of LDG's activities as they relate to these notice services.

4.      I have been involved in the development and implementation of media plans for class action notification for more than ten years. Prior to my engagement with Gilardi, I spent five years with another nationally recognized claims administrator serving in a similar capacity. I have also spoken as faculty on CLE panels related to trends in class action notice.

5.      I have provided expert testimony regarding our firm's quantitative and qualitative evaluation of judicially approved notice plans in numerous cases. I have testified in person and was acknowledged as an expert in *Larson v. Sprint Nextel Corporation*, No. 07-cv-5325 (D. N.J.). Media campaigns for which I have been directly responsible include but are not limited to *Pappas v. Naked Juice*, No LA CV 11-08276-JAK (C.D. Cal.), *Mattel, Inc., Toy Lead Paint Products Liability Litigation*, No. 07-ML-01897 (S.D. Cal.), *Pecover et al. v. Electronic Arts Inc.*, No. 08-cv-02820 (N.D. Cal.), *New Motor Vehicles Canadian Export Antitrust Litigation*, No. MDL 03-1532 (D. Me.), and *SRAM Antitrust Litigation*, No. 07-MD-01819 (N.D. Cal). A more comprehensive list of notable matters for which I have been personally responsible for the notice planning and implementation services is attached as Exhibit 1.

6.      This declaration is based upon my personal knowledge, information provided by counsel, and my independent research regarding the litigation and the defined class, including information obtained by LDG's staff and reliable industry sources.  I have personal knowledge of the matters set forth in this declaration and, if called as a witness, can and will testify competently thereto.

## II.      CASE BACKGROUND

7.      LDG is informed the proposed Settlement Class is defined as follows:

> All current or former student-athletes who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date.

Excluded from the Settlement Class are the NCAA and the NCAA's officers and directors;

Class Counsel; and the judges who have presided over this Litigation.  Individuals who

otherwise meet the criteria of the class definition do not need to have been diagnosed with a concussion to be a member of the Settlement Class.

8. On information provided by the Parties, LDG understands the class size is estimated to be approximately 4.2 million individuals.[1] LDG has been informed that the NCAA will work with its member institutions to obtain all reasonably available names and addresses of both current and former student athletes and believes the list could include millions of records. Direct, mailed notice will be provided to all members of the Settlement Class for whom the Parties are able to obtain a name and last-known address from NCAA member institutions or other sources.

9. The nature of the proposed settlement calls for a tailored approach to providing supplemental indirect notice to the Settlement Class. A description of some of the factors involved are as follows:

a. **Long class period**. The class definition includes anyone who formerly played or currently plays an NCAA-sanctioned sport at the collegiate level. The NCAA was established more than one hundred years ago; thus, the age range for potential class members is broad and must be taken into consideration.

b. **Long Medical Monitoring Period**. LDG understands that the Medical Monitoring Period is a 50 year period, with the potential for additional notice to Class Members.

c. **Wide range of sports involved**. While contact sports may be most often thought of when concussions come to mind, there are many sports where participants are at risk for concussion. Many people who play sports at the college level are fans of sports in general, but the individuals who play sports other than football, basketball and

---

[1] The Parties had previously estimated the class size to be 4.1 million individuals. LDG has been informed that this estimate has been updated to include student-athletes participating in NCAA-sanctioned sports during the 2014-15 season. LDG has, thus, revised its reach and cost calculations to incorporate the updated class size of approximately 4.2 million individuals, and these revised calculations are set forth in this declaration and the exhibits hereto.

baseball may principally follow different sports, requiring a different approach for providing notice.

      d.    **Extensive news coverage of concussions**. Concussions have received extensive coverage both generally and in sports news. News stories have covered the issue from many angles, including changes to equipment, changes to protocol for treatment, and changes to the rules of different sports in an effort to reduce the number of concussions. In order to capitalize on such news coverage, the Notice program must ensure that news outlets reporting on the issue are aware of this particular case and encourage these outlets to pass the website URL on to their audiences.

    10.   Indeed, the wide coverage of concussions in the media creates both an opportunity and a challenge for the notice campaign in this matter. The opportunity presented is the potential for a great deal of news coverage (a form of earned media) prior to and upon preliminary approval of the settlement. The accompanying challenge is the need to clearly distinguish the case from other concussion coverage and direct appropriate traffic to the case website. In order to leverage earned media and take advantage of the unique aspects of the case, LDG suggests an approach that involves multiple phases of notice, depending on the availability of class member contact information for direct notice and the amount of earned media generated at the onset of the Notice campaign.

    11.   LDG understands the notice period will be approximately 6 months and recommends a phased approach: providing direct notice and spending a portion of the notice budget on indirect notice at the onset of the Notice period and then monitoring both the paid and earned media over a 120 day period to evaluate the campaign's effectiveness before determining whether to spend the balance of the total notice plan budget. Articles published on major news outlets that contain a link to the case website will be evaluated to determine whether impressions generated could be used in place of paid advertising impressions. After assessing the amount of direct notice, website traffic, major news outlet coverage and publication efforts, LDG will work with the Parties to determine whether to spend the balance of the budget. At the conclusion of the program, statistics generated

will be evaluated against other notice program statistics for similar cases that received court approval.

## III.   NOTICE DOCUMENTS

12.   LDG has reviewed the Notice to ensure compliance with the following guidelines outlined on the Federal Judicial Center's Class Action Notice website:[2]

     a.     The nature of the action

     b.     The definition of the Settlement Class

     c.     The class claims, issues, and defenses

     d.     The method by which one may exclude oneself

     e.     The timing and manner for requesting exclusion

     f.     The timing and manner for objection

     g.     The binding effect of the class judgment on the class members

     h.     The manner by which to contact class counsel

     i.     The manner by which to obtain copies of relevant documents

13.   Attached as Exhibits 2 and 3 to this Declaration are the draft Long Form Notice and the Summary Notice.  These notices effectively communicate information about the Settlement.

## IV.   NOTICE PLAN

### A.   Overview

14.   The objective of the proposed notice plan is to provide the best notice practicable, consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure, to reach a large percentage of the class while meeting or exceeding the requirements of due process and all applicable state laws and court rules.

15.   The proposed approach to notice is built on two principles:  (1) providing direct notice, and leveraging earned media (where quantifiable) and targeted internet advertising; and (2)

---

[2]    http://www.fjc.gov/public/home.nsf/pages/376

measuring the effectiveness of the initial campaign to determine the appropriate level of publication notice for the notice period.

16. Precise tactics and publication budget will be determined by the amount of direct notice provided, which in turn is directly related to the amount of reliable contact information available for class members.

17. The proposed plan, when implemented to its fullest degree, is designed to reach at least 80% of the Settlement Class. As mentioned in Paragraph 11, LDG recommends a phased approach: In the first phase, LDG will implement the initial campaign of direct notice, print publication, and targeted internet advertising. Analysis of the first phase will direct the volume of internet advertising in the second. In the likely case that the first campaign phase results exceed projections, there is the opportunity to scale the budget accordingly for the second phase and make the campaign more cost-effective for the class and Fund.

18. LDG believes an incremental approach is appropriate for this matter for the following reasons:

    a. **Better targeting**. In the initial phase of the program, LDG will be able to evaluate audience feedback (information) using server log data for the case website, information from our online vendor partners, and data that may be obtained from third party websites that have carried a news story related to the matter. This evaluation allows LDG to focus advertising where it will be most successful, minimizing budget waste.

    b. **Cost effective**. By structuring the program in two phases and utilizing online media vehicles, costs can be managed more efficiently by displacing paid media with earned media that has been statistically evaluated to be a valid replacement for the paid media impressions. Since Notice costs come out of the fund, which is to last 50 years, it is critical to manage the funds available for notice efficiently. LDG understands

the Court may also order additional direct notice in the future; judicious spending of the initial Notice budget will facilitate these efforts.[3]

      c.    **Credibility**.  Articles and stories about the settlement that include the case website boost the credibility of the case website.  Individuals who see these stories often either search other resources to determine validity or go directly to the case website.

19.    Although each case is unique, the methods and tools used in developing the Notice Plan described below for this Settlement have been employed in many other court-approved notice plans. To effectively reach Class Members LDG has chosen efficient media vehicles that will ensure comprehensive reach and therefore ensure a large percentage of Class members receive legal notice of their due process rights in the settlement.  Specifically, the Notice Plan relies on the following elements:

      a.    Direct Notice;

      b.    Print Publication in *USA Today*, *Sports Illustrated*, and *ESPN the Magazine*;

      c.    Case-Dedicated Settlement Website;

      d.    Internet Publication, including Sponsored Search advertising on the Google and Yahoo!/Bing networks, text link and banners on the Google Display Network, targeted banner advertising on the Xaxis and Steel Media networks, and banner advertising through Xaxis on Facebook;

      e.    Press Release; and

      f.    Other Earned Media

---

[3]    LDG understands that the Settlement Agreement provides for a Reminder Notice to be disseminated to Settlement Class Members ten (10) years from the Settlement's Effective Date, the costs of which will be deducted from the Fund.  The form and manner of the Reminder Notice, however, will depend on then-available technology.  As a result, the costs of the Reminder Notice are unknown and are not included in the calculations set forth in this declaration and the exhibits hereto.

B.    **Direct Notice**

20.    Based on information from counsel, Gilardi understands that there are as many as 4.2 million current and former NCAA athletes who may be class members.  We are also informed that approximately 2.9 million records including full or partial address data for these student-athletes may be provided.

21.    Gilardi understands that request letters and subpoenas (as necessary) will be sent to all NCAA member institutions requesting contact information (i.e., names, United States Postal Service ("USPS") address data and email addresses) for all current and former students who participated in an NCAA-sanctioned sport.  The notice period is designed to include time for the service of letters and/or subpoenas for class member contact information.

22.    The letters and/or subpoenas described above will direct member institutions to a dedicated website, to be developed and maintained by Gilardi, where member institutions can securely upload the requested student-athlete data.  An optional template will be provided.  The website will accept datasets conformed to the template as well as data that may not conform to the requested specifications.

23.    Data received in the template provided will be aggregated into one file.  Non-conformed data will be aggregated into a separate file for Gilardi's data specialists to evaluate and normalize.[4]  Once the non-conforming data has been normalized and combined into one table with consistent fields, Gilardi will combine the data with other data that was provided in the correct format.

24.    After these data normalization steps are complete, Gilardi will submit the entire dataset for a National Change of Address ("NCOA") update.  The NCOA system provides updated addresses for individuals who have filed a change-of-address with the USPS in the past four years.  Running the NCOA update also ensures that addresses are in the USPS-standard format for

---

[4]    Database normalization is the process of organizing the attributes and tables of data provided to minimize data redundancy.

obtaining the best possible postage rate.  It is anticipated that the NCOA-updated database will be used for the initial class mailing.

25.    Gilardi has been directed to disseminate notice to <u>both</u> addresses if potential class members have both an associated email address and USPS address.  In addition to processing records for a USPS mailing, Gilardi will also aggregate any email addresses in the data provided and create an email table for sending direct notice via email.  As part of developing this table, the email addresses from the provided data will be assessed by a third party vendor to determine deliverability and ensure accuracy.

26.    In Gilardi's experience with mass email dissemination, approximately 10% to 20% of the emails bounce back undelivered.[5]  Considering the potential variation in age of any email data to be provided, Gilardi estimates conservatively that 30% of the emails in the broadcast will bounce back.

27.    In Gilardi's experience, USPS-returned undeliverable mail ("RUM") rates generally fall between 10% and 20% of the volume of mailed pieces.  Considering the potential age of the data for direct mail, conservatively, Gilardi estimates that approximately 30% of the USPS-mailed pieces will be returned as undeliverable.

28.    For any mailed notices that are returned undeliverable by USPS, Gilardi will perform supplemental address searches through Accurint, a service of LexisNexis. Accurint uses information from public records to locate and return updated address information.[6]  Results from these searches will be used to update the mailing database.  Notices will be re-mailed to any updated addresses found.  Of the individuals whose initial USPS notice is returned undeliverable, based on Gilardi's experience, we assume Accurint searches will yield last-known addresses for approximately 50% of records.

---

[5]    Once an email broadcast is deployed, the email system will make up to three attempts to deliver the message to each email address. Emails are considered "bounce backs" if they are not deemed delivered by the system.

[6]    For more detail, please see Exhibit 4.

29.    Applying the percentage assumptions for returned mail and address searches to a presumed USPS mailing to 2.9 million class members, Gilardi estimates that direct notice will be sent to a last-known address for between 59% and 62% of the proposed settlement class.[7]

30.    At counsel's instruction, Gilardi will send direct notice via email to any email addresses contained in the provided data in addition to the USPS mailing. Currently we do not have an estimate of how many email addresses are contained in the data.

31.    The case website, discussed in further detail below, will include a form for individuals who wish to stay apprised of the settlement to submit their information. Any records obtained through the website will be used to continue building on a contact database for use in any subsequent mailings.

**C.    Publication Notice**

**1.    Phase One**

32.    **Print Publication**. LDG utilized Simmons National Consumer Survey Data (the "Simmons data")[8] to evaluate the most effective national magazines to reach the class members. *ESPN the Magazine* and *Sports Illustrated* were chosen because they were the highest ranked magazines with substantial circulation dedicated to sports. *USA Today* was included because it is a national newspaper with a readership that includes non-sports fans as well as many individuals who

---

[7]    This estimate is slightly lower than that set forth in my February 23, 2015 declaration filed with the Court. That declaration estimated that "direct notice will be sent to a last-known address for between 60% and 63% of the proposed settlement class." *See* Feb. 23, 2015 Decl. of A. Vasquez Regarding Direct Notice (Dkt. #142), ¶12. That estimate, however, accounted for the fact that "consideration [was] being given to obtaining Social Security Account Numbers" from NCAA member institutions to facilitate direct notice. *See id.* ¶5. LDG has been informed that the Parties no longer plan to seek such Social Security Account Numbers ("SSANs") from member institutions. The lack of SSANs will slightly reduce the total number of last-known addresses LDG is able to generate for class members through the Accurint address search service. *See id.* ¶11. As set forth above, LDG has considered this factor in formulating its revised estimate that direct notice will now be sent to a last-known address for between 59% and 62% of the proposed settlement class and in formulating the indirect notice program set forth herein.

[8]    Simmons Winter 2014 12-Month National Consumer Survey.

---

buy it solely for national sports content that they cannot get in their local papers. *Sports Illustrated* and *USA Today* will run in the first phase of the Notice program, while *ESPN the Magazine* will run in the second phase of the notice program. According to the Simmons data, these three publications will reach 17.8% of US Adults who have attended college and have interest in college sports. The 17.8% reach was calculated using the Simmons One-View Reach & Frequency planning tool which uses survey based data to calculate unduplicated reach across multiple print publications. Because it is based on survey data, Simmons' Reach & Frequency planning tool can filter for those surveyed who may read one publication, but not another. As a result, the tool provides an unduplicated reach for the print publications selected for this notice program.

33. **Settlement Website**. LDG and Gilardi will establish a case-dedicated settlement website, which will be a source of reliable and accurate information for the class members, the media, and the general public. In addition to being a primary source of information about the case, the case website will also serve as an important means of measuring audience engagement with the campaign. Both the direct notice and paid media will direct individuals to the case website.

34. Once preliminary approval is granted, the full settlement website will go live at the selected URL. Analytics installed on the website and the data gathered will be a key basis for our assessment of the notice plan's performance and allow for optimization of the efforts during the campaign. Analytics can provide total visits, unique visits, time spent on website, time spent on specific pages, which ads are directing the most traffic and which URLs are generating high traffic. Analytics is further discussed in the Earned Media section, below.

35. **Internet Publication**. LDG firmly believes that the best notice practicable should include a substantial online campaign.

36. LDG will implement a comprehensive Internet notice campaign that will offer many advantages to the Class, including flexibility to adjust message during the campaign, tracking capabilities that allow optimization of the plan during the campaign, and cost efficiency due to the ability to shut down the efforts if the Parties' goals are met early in the notice period. If the

campaign is not generating the anticipated reach, as well, there is the ability to scale up the campaign.

37.     Specifically, to ensure an effective online campaign, LDG will utilize:

  i.  Sponsored Links (search) advertising on the Google and Yahoo!/Bing networks

  ii.  Text link and banner advertising through Google Display Network

  iii.  Targeted banner advertising through the Xaxis and Steel Media networks

  iv.  Banner advertising through Xaxis on Facebook

38.     Current and former athletes tend to be sports fans in general, and there are many platforms for them to share information about the case.  LDG believes a great deal of conversation will take place on social media which will further enhance reach of the notice program.  Our team will monitor websites with discussions about the topic and direct online advertising accordingly.

39.     For the online display banner portion of the plan, LDG will work with vendors who will employ various targeting tactics including behavioral targeting, keyword based targeting, and interest targeting through the Facebook exchange.  Behavioral targeting uses technologies and techniques aimed at increasing the effectiveness of advertising by using user behavior information. When a consumer visits a website, the site can collect data on the pages they view, the amount of time they view each page, the links they click on, the searches they make and the things that they interact with.  This information is used to create a "profile" that links to the user's web browser. As a result, our vendors can use this data to create defined audience segments based upon users that have similar profiles.  In this case, that profile would be individuals who are likely to have played college sports during the class period.  Keyword Targeting scans the text of a website for keywords and returns advertisements to the webpage based on those keywords.  For example, if the user is viewing a website pertaining to sports and that website uses contextual advertising, the user may see advertisements for sports-related companies, such as memorabilia dealers, ticket sellers or in this case legal notice for a sports related class action.

40.     Because former college athletes tend to stay interested in sports and health throughout their lives, the targeting employed for this plan is inclusive of the class member definition.  That is, by targeting based on sports and collegiate interest, we are likely targeting a group that is inclusive of the class members.  To ensure a number of unique impressions equal or greater than the estimated class size are served, LDG will use frequency capping by IP address.  In addition, to ensure maximum visibility of the ads and the greatest opportunity to be exposed, LDG will endeavor to place all ads within a viewable page on the websites where they are published.  In other words, we will attempt to ensure users do not have to scroll down a page to view the banner ad.

41.     **Press release**.  LDG will release a party-neutral Press Release about the settlement through PR Newswire that is pre-approved by the Parties.  A press release is still one of the most cost effective ways to supplement notice efforts and provide an opportunity for media outlets to pick up the story and post it both to print publications as well as websites.  PR Newswire is one of largest wire release distributors with the ability to reach more than 200,000 media points and 10,000 Websites.  The reporting options for PR Newswire offer substantial data, including where the release appeared, online links to it, how many people read it, where they are located, and how your coverage ranks against others.  LDG will review the reports, determine sites that have picked up the release, and visit those sites to evaluate the content and whether it can be helpful for optimizing the performance of the campaign.

42.     LDG assumes a press release will be issued shortly after preliminary approval with two additional releases to follow within the Notice Period.  Once live, each press release is available to media outlets for up to 30 days.

43.     **Earned Media.**  As mentioned in the plan overview, earned media will be evaluated by analyzing traffic volume to various news stories and to the settlement website, as well as referrals to the case website. The case website, which will include analytics code to track this activity, will be

launched in advance of the campaign. We will also employ our server log query software, which may provide more accurate statistical information about who is visiting the website.[9]

44. Websites with page content directing high volumes of traffic will be contacted for statistical information if we have a partnership or if possible, we will utilize third party traffic analysis tools to evaluate whether the page's share of the total site traffic can be used to replace paid advertising impressions. After evaluation of the site's number of daily unique visitors, LDG will estimate the share of page views for the content where our link is located and estimate the number of impressions generated to those likely to be class members.

45. LDG will also perform general searching online for sites that include content related to the settlement in addition to having a link to our site.

46. To determine if earned media impressions should be considered valid in reaching the target audience, LDG's team will evaluate the site content and demographics of its users.

47. Gilardi and LDG will work with the Parties to set specific goals for the determination of whether additional budget is needed or whether we can pause the paid advertising so that it could be utilized at a time when the concussion issue is less prominent in the news cycle.

a.    Assessment of Phase One Campaign

48. As mentioned in Paragraph 11, 120 days after the start of the Notice program or at an interval to be approved by the Court, LDG will collect all data available related to the matter and measure the impact of direct notice, paid advertising, and earned media. Paid media will be evaluated based on statistics collected through our vendor partners, Google analytics, and the website server logs. The way in which LDG measures the impact of any earned media is described in Paragraph 50 below. A decision regarding implementation of the Notice efforts outlined in Phase

---

[9]    A server log is a log file (or several files) that automatically maintain a history of page requests for the server where the website is being hosted. A statistical analysis of the server log may be used to examine traffic patterns by time of day, day of week, referrer, or user agent. Efficient website administration, adequate hosting resources and the fine tuning of sales efforts can be aided by analysis of the web server logs.

Two of the plan will be made, in consultation with the Parties, based on the following measurable performance indicators:

49.  Website interaction

    i.       Overall traffic to the website

    ii.      Unique visitors

    iii.    Number of impressions served to unique IP addresses

    iv.    Number of referring URLs

    v.       Traffic related to major news stories

    vi.    Number of media outlets who pick up the press release

    vii.   Volume of social media engagements or mentions

    viii.  Bonus data:  number of visitors who sign up to learn more

50.  Sites with stories related to the NCAA case will be contacted directly or analyzed through online traffic estimation sites to determine daily unique visitors and potentially, the article page's share of the overall traffic to the site.  From that analysis, an estimation of the number of impressions will generated.

    **2.**    <u>Publication Notice:  Phase Two</u>

51.  The results of Phase One will direct the volume of publication notice in the second phase of the campaign.  LDG has outlined levels of effort to be applied depending on the volume of direct contact information obtained and the evaluation of the results of Phase One.  The following chart provides the cost detail for each media vehicle along with the estimated reach calculation for each scenario.  The chart can also be found attached as Exhibit 5.

| Direct Notice | Notice Phases and Outside Budget | | Reach Analysis - Class Size: 4,200,000 | | | |
|---|---|---|---|---|---|---|
| **85%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Direct Notice | $ 1,643,427 | Direct | 1 | 85.0% | 0.150 |
| | USPS to approx. 4.2 million | | Print | 1 | 9.1% | 0.909 |
| | Print Publication | $ 81,298 | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | *Sports Illustrated* | | Online Display Banners | 1 | 25.0% | 0.750 |
| | *USA Today* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 29,412 | 0.15 x 0.909 x 0.995 x 0.75 = | 0.101751 | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | 1 - 0.102 = | 0.898249 | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | **REACH:** | **89.8%** | | |
| | **TOTAL COST:** | $ 1,769,137 | | | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | 89.8% | | | | |
| **62%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Direct Notice | $ 1,168,490 | Direct | 1 | 62.0% | 0.380 |
| | Email to 1.45 million, USPS to 2.9 million | | Print | 1 | 17.8% | 0.822 |
| | Print Publication | $ 81,298 | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | *Sports Illustrated* | | Online Banners | 1 | 47.0% | 0.530 |
| | *USA Today* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 94,624 | 0.38 x 0.822 x 0.995 x 0.53 = | 0.164723 | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | 1 - 0.165 = | 0.835277 | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 1,359,412 | **REACH:** | **83.5%** | | |
| | **PHASE II** | | | | | |
| | Print Publication | $ 51,692 | | | | |
| | *ESPN the Magazine* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 63,823 | | | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | | | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 130,515 | | | | |
| | **TOTAL COST:** | $ 1,489,927 | | | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | 83.5% | | | | |
| **59%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Direct Notice | $ 1,137,140 | Direct | 1 | 59.0% | 0.410 |
| | USPS to approx. 2.9 million | | Print | 1 | 17.8% | 0.822 |
| | Print Publication | $ 81,298 | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | *Sports Illustrated* | | Online Banners | 1 | 50.0% | 0.500 |
| | *USA Today* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 94,624 | 0.41 x 0.822 x 0.995 x 0.5 = | 0.167667 | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | 1 - 0.168 = | 0.832333 | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 1,328,062 | **REACH:** | **83.2%** | | |
| | **PHASE II** | | | | | |
| | Print Publication | $ 51,692 | | | | |
| | *ESPN the Magazine* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 70,882 | | | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | | | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 137,574 | | | | |
| | **TOTAL COST:** | $ 1,465,636 | | | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | 83.2% | | | | |
| **0%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Print Publication | $ 81,298 | Direct | 1 | 0.0% | 1.000 |
| | *Sports Illustrated* | | Print | 1 | 17.8% | 0.822 |
| | *USA Today* | | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | Press Release | $ 2,500 | Online Banners | 1 | 75.5% | 0.245 |
| | Display Banners | $ 153,447 | | | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | | | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | 1 x 0.822 x 0.995 x 0.2451 = | 0.200465 | | |
| | | $ 249,745 | 1 - 0.200 = | 0.799535 | | |
| | **PHASE II** | | **REACH:** | **80.0%** | | |
| | Print Publication | $ 51,692 | | | | |
| | *ESPN the Magazine* | | | | | |
| | Press Release | $ 2,500 | * Banner reach is based on serving a minimum of 90 million impressions, frequency capped to ensure a minimum of 4.2 million unique IP addresses are reached that fit within the class definition. Assuming 25% of the users reached online also see the notice in other mediums, the estimated reach of the online banners is 75% of the class. | | | |
| | Display Banners | $ 291,471 | | | | |
| | Outreach (aka Social Media Monitoring) | $ 7,500 | | | | |
| | Google Display Network | $ 10,000 | | | | |
| | Facebook | $ 15,000 | | | | |
| | | $ 378,163 | | | | |
| | **TOTAL COST:** | $ 627,908 | | | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | 80.0% | | | | |

52.   By examining the amount of traffic from unique users and the number of signups for more information, and then relating those statistics against similarly situated cases which received court approval, a decision will be made whether to implement the vehicles for Phase Two outlined in the chart attached as Exhibit 5.

## V. COST

### A.  Estimated Cost of Direct Notice

53.   Exhibit 6 contains three estimates outlining the cost of a direct mail program in the following scenarios:

- <u>Scenario 1</u> assumes that direct notice will be sent via USPS mail to 2.9 million members of the settlement class.  It assumes that no email addresses will be available.  The estimated cost of direct notice under Scenario 1 is $ 1,137,140.

- <u>Scenario 2</u> assumes that in addition to USPS data, email addresses will be available for half (50%) of the 2.9 million individuals in the data.  It assumes direct USPS notice to 2.9 million class members and email notice to 1.45 million. The estimated cost of direct notice under Scenario 2 is $1,168,490.

54.   Counsel has asked Gilardi to provide a cost estimate to mail notice via USPS to the entire class, assuming mailing information for 4.2 million presumed class members.  <u>Scenario 3</u> estimates the cost of direct USPS notice to 4.2 million to be $1,643,427.

### D.   Estimated Cost of Supplemental (Indirect) Notice

55.   The amount of supplemental notice required varies based on the level of anticipated direct notice.  The supplemental notice budget for the scenarios outlined above is provided on each respective estimate in Exhibit 6, and is further detailed in Exhibit 5.

56.   As set forth above, under Scenario 3, direct notice would be sent to each member of the class.  This would yield an estimate reach of approximately 85% at a cost of $1,643,427.  The amount of supplemental notice required would consist of an insertion in both *Sports Illustrated* and *USA Today* and a small budget for online advertising, and would cost approximately $125,710.  The

estimated total cost of notice in Scenario 3—the most expensive of the notice scenarios—is $1,769,137.

57.    Although we will make a concerted effort, as described in Section B, to obtain current addresses for as many class members as possible, we believe it is unlikely we will be able to send direct notice to 100% of the class as contemplated under Scenario 3.  Assuming Scenario 3 does not apply, based on our estimates, the total cost of the proposed Notice Plan as amended will be between approximately $1,465,636 and $1,489,927.    These estimated numbers include all expenses associated with direct notice as well as the expenses associated with the supplemental indirect notice program called for by the Notice Plan.

58.    To present the court with a thorough analysis of the range of possible costs and notice scenarios, we have also estimated the cost of providing notice if no direct notice were provided. This is for illustrative purposes only as we fully expect to provide robust direct notice.  If only indirect notice were provided, we estimate that providing notice would cost $627,908.

## V.    REACH

59.    Reach is defined as an individual's opportunity to be exposed to a given advertising message during a specific period of time.  LDG will utilize Random Media Combination Theory ("RCT") to determine the reach of the Notice campaign.  Random probability has been found to be an adequate statistical assessment tool for the purpose of calculating reach across multiple mediums. With Random Media Combination Theory, the combined reach of one media schedule and another media schedule (for example direct mail and online or print publication) is calculated on the probability that neither reached the target.  For example, if one media vehicle in a schedule has 30% reach of the target, then that vehicle has a .30 probability of reaching the target and .70 probability of not reaching the target. If the other media vehicle in the schedule has 60% reach, then that vehicle has a .60 probability of reaching the target and .40 probability of not reaching the target. To calculate the combined reach, multiply the probability that they do not reach the audience, .70 x .40 which

results in .28. Subtract .28 from 1 to get the approximate reach of the two combined mediums at 72% (1 - .28 = .72).

60.     RCT is based on the premise that when the probability of two unrelated phenomena occurring is known, then the probability of both occurring is calculated by the product of the two probabilities.  The combined reach of one media schedule and another media schedule is calculated based on the probability that neither reached the target.  Reach is determined by subtracting the calculated probability from 1.

61.     In a multimedia application, Phenomenon A may be an individual's chance of seeing an advertisement in the newspaper (30%, or 0.30), and Phenomenon B may be that individual's chance of hearing an advertisement for the same product on the radio (60%, or 0.60). The probabilities of the newspaper and radio advertisement not reaching their target would be 0.70 and 0.40, respectively. Applying RCT, the probability of this individual neither seeing the newspaper ad nor hearing the radio ad would be the product of the probability that neither channel reached the individual, or 0.28.  The calculated reach, or probability that the individual had the opportunity to view the newspaper ad or hear the radio ad, would be 1-0.28 or 0.72 (72%).

62.     The reach for the direct notice component of the Notice Plan was calculated based on the volume of records to be mailed, while factoring in a conservative estimate for returned mail and re-mails through address searches.  As referenced in Paragraph 32, the reach for the print publication portion of the plan was calculated using the Simmons OneView Reach & Frequency planning tool, which uses survey-based data provided by the Simmons National Consumer Surveys.  These surveys are mailed to more than 30,000 people nationwide and provide statistics about the media preferences for audiences defined by the user.  In this case, the defined target used was adults in the United States who attended college and have an interest in college sports.

63.     Reach for the online component of the media plan was calculated based on the number of unique impressions served to the target individuals at a frequency likely to generate traffic to the website.  For example, if 59% of the class receives direct notice, approximately 41%, or 1.72 million class members, will not receive direct notice.  Many online marketing experts and studies estimate

that it takes a frequency of exposure of 5 to 10 times per unique IP address in order to maximize the chances someone will click on the display ad and be directed to the case website. If 41% of the class does not receive direct notice, LDG and Gilardi will serve impressions to an audience inclusive of likely class members in excess of 5 to 10 times the volume who do not receive direct notice (approximately 17.2 million unique IP address impressions).

64.    After the number of direct mail records is determined and reach for the direct notice is calculated, LDG and Gilardi will determine the number of impressions needed in order to ensure that a minimum of 80% of the class is reached with a minimum frequency of 5 times. Lastly, to maximize visibility of the online advertising, LDG will secure viewable impressions with our ad partners. This will ensure that when our ads appear on websites that they are immediately viewable without having to scroll down the page to have an opportunity to click and be directed to the website.

65.    LDG has applied the reach calculation methodology referenced in Paragraphs 59-64 to the three direct notice scenarios described in Paragraph 53-54 to calculate the estimated reach. Exhibit 5 to this declaration outlines, for each of the three direct notice scenarios, the indirect media necessary to reach 80% or more of the class, the associated cost, and the methodology used to calculate the reach, assuming full implementation of both notice phases. For the components of the plan that cannot be calculated at this time, LDG used a very conservative estimate of .5%. This .5% represents the potential Reach for the press release and Google search advertising.

66.    While reach and frequency measurements across direct mail and paid media campaigns are important considerations in evaluating notice plan adequacy, LDG believes assessment of the notice program should not be limited to these efforts. Indeed, the industry definition of "reach" is the opportunity to be exposed to an advertising message in a given period of time. Given the length of the claims period in this matter, LDG believes the plan should also leverage earned media; in particular, the current trends in sports media and the level of coverage the topic of concussions is receiving every day.

67. To this end, LDG proposed a phased, or incremental, notice program. Disseminating the notice incrementally will provide time to measure earned media and determine which media vehicles are performing best at directing traffic to the settlement website. This in turn will save expense on the initial notice efforts to preserve the Fund for subsequent notice efforts and settlement administration.

## VI.     CONCLUSION

68. It is LDG's opinion that the notice plan set forth herein more than comports with the requirements of due process and of Fed. R. Civ. P. 23. The notice plan provides for a robust direct notice program, supplemented as necessary by an array of effective and well-recognized indirect notice methods. The chart attached in Exhibit 5 illustrates how the provision of indirect notice will be adjusted depending on the amount of direct notice available. While the measurement for audience duplication[10] is not certain, the reach of the print publication combined with the online media alone is expected to reach well in excess of 4.2 million unique individuals who are likely to fit within the profile of someone likely to have played college sports.

69. Many courts have held that notice plans estimated to reach a minimum of 70% of the settlement class are adequate and sufficient and thus comply with Fed. R. Civ. P. 23. When implemented, the Notice Plan will exceed this standard of reach using reach calculation methodology consistent with other national class action notice programs. LDG believes that the plan results in a campaign that will reach large percentage of the class members and comport in all respects with Fed. R. Civ. P. 23.

---

[10]     The number of class members who may have the opportunity to view the notice in print and also see the notice in other media.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of April 2015, at San Rafael, California.

Alan Vasquez

# EXHIBIT – 1



**EXHIBIT - 1**

**Notice Plans Designed and Implemented by Alan Vasquez**

**Automotive**

Automobile Antitrust Cases I and II , No. JCCP 4298 and 4303 (San Francisco Sup. Ct., CA)

New Motor Vehicles Canadian Export Antitrust Litigation , No. MDL 03-1532 (Dist. Court of Maine) & New Motor Vehicles Canadian Export

Antitrust Litigation, No. 2:03-MD-1532-DBH (Dist. Court of Maine)

**Entertainment**

Herbert et al. v. Endemol USA, Inc. et al. , Case No. 2:07-cv-03537-JHN-VBKx (C.D. Cal.)

Couch v. Telescope Inc., et al, Case No. 2:07-cv-03916-JHN-VBKx (C.D. Cal.)

McDonald v. RealNetworks, Inc. , No. 816666 (Orange County Sup. Ct., CA)

Pecover et al. v. Electronic Arts Inc. , No. 08-cv-02820 CW (N.D. Cal.)

**Environment**

Koepf et al. v. Hanjin Shipping, Co. et al., No. CGC-07-469379 (San Francisco County Sup. Ct., CA)

Loretz et al. v. Regal Stone Limited et al., No. 07-5800-SC (N.D. Cal.)

Tarantino et al. v. Regal Stone et al., No. CGC-07-469379 (San Francisco County Sup. Ct., CA)

**Government**

McKesson Governmental Entities Average Wholesale Price Litigation, No. 1:08-cv-10843-PBS (D. Mass.)

**Technology**

SRAM Antitrust Litigation, No. 4:07-MD-01819-CW (N.D. Cal)

**Telecommunications**

White v. Cellco Partnership , No. RG04-137699 (Alameda County Sup. Ct., CA)

In re Universal Service Fund Telephone Billing Practices Litig., MDL No. 1468 (D. Kan.)

**Consumer Products**

Natalie Pappas v. Naked Juice Co. of Glendora, Inc. Case No. LA CV 11-08276-JAK (C.D. Cal)

Barbara Marciano v. Schell & Kampeter, Inc. et al No. 12-cv-02708-SJF-AKT (E.D. NY)

Mattel, Inc., Toy Lead Paint Products Liability Litigation, No. 2:07-ML-01897-DSF-AJW (S.D. Cal.)

Gallucci v. Boiron, Inc. et al., No. 11-cv-2039-JAH (NLSx)

Nigh v. Humphreys Pharmacal, Incorporated et al., Case No. 3:12-cv-02714-MMA-DHB

In re: Bayer Corp. Combination Aspirin Products Marketing and Sales Practices Litigation, No. 09-MD-2023

In Re: Aurora Dairy Corp. Organic Milk Marketing and Sales Practices Litigation, Civil Litigation No. 4:08-md-01907-ERW

Eliason v. Gentek Building Products, Inc., and Associated Materials, Inc. , No. 1:10-cv-02093 (N.D. Ohio)

Hart v. Louisiana-Pacific Corporation , No. 2:08-cv-00047 (E.D.N.C.)

**Debt Collection Practices**

Adams, et al., v. AllianceOne Receivables Management, Inc. (Case No. 08-CV-0248)

Pepper v. Midland Credit Management, Inc. and Encore Capital Group, Inc., No. 37-2011-00088752 (San Diego Sup. Ct. Ca)

# EXHIBIT – 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | ) ) ) ) ) ) ) ) ) ) ) | **MDL No. 2492**<br><br>**Case No. 1:13-cv-09116**<br><br>**This Document Relates To:**<br>**All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

## NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

**If you played a National Collegiate Athletic Association ("NCAA")-sanctioned sport at an NCAA member school, you may be entitled to free medical screening and may receive free medical testing, known as "medical monitoring," up to two times over the next 50 years.**

**In addition, the NCAA and its schools have committed to follow certain concussion management and return-to-play guidelines.**

*The United States District Court for the Northern District of Illinois authorized this Notice. This is not a solicitation from a lawyer.*

On _____, 2015, the Court issued an Order preliminarily approving a Settlement that provides benefits for all persons who played a sport for an NCAA-sanctioned team.[1]  The Settlement establishes a Medical Monitoring Program and Fund that provides eligible members of the Settlement Class with medical monitoring to screen, assess and diagnose effects from concussions or the cumulative effects of subconcussive hits.  You may be entitled to receive the medical screening even **if you were not diagnosed with a concussion**.

The Settlement also requires the NCAA and its member institutions to implement concussion management and return-to-play guidelines, having trained medical personnel in attendance or available for contact sport play, and step-wise return to play guidelines for injured athletes and further requires the NCAA to contribute or cause to be contributed $5,000,000 to research the prevention, treatment, and/or effects of concussions.

If this Settlement receives final approval from the Court, all Settlement Class Members will have the opportunity to participate in, object to, or exclude themselves from the Settlement. All Settlement Class Members who decide to participate in the Settlement or who do nothing

---

[1] Definitions for capitalized terms in this Notice can be found in the Amended Settlement Agreement available at www.XXXXXX.com.  To the extent any statement in this notice conflicts with the terms of the Amended Settlement Agreement, the terms of the Amended Settlement Agreement control.

will release the NCAA for all medical monitoring claims. All Settlement Class Members who decide to participate in the Settlement or who do nothing will preserve and have the right to bring any personal injury claims on an individual, non-class basis.

The Court still has to decide whether to grant final approval of the Settlement. The Medical Monitoring Program will only be provided if the Court finally approves the Settlement and any appeals are resolved.

Your legal rights are affected whether or not you act. These rights and options, **and the deadlines to exercise them**, are explained in this Class Notice. Please read it carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS MEDICAL MONITORING SETTLEMENT | |
|---|---|
| **PROVIDE YOUR CONTACT INFORMATION TO THE PROGRAM ADMINISTRATOR TO RECEIVE INFORMATION REGARDING THE FREE MEDICAL MONITORING PROGRAM** | If you think you might want to participate in the Medical Monitoring Program, you should send the Program Administrator your contact information to be sure you receive further notice. If you do not do so, however, you will still have the right to participate later. The commencement of the Medical Monitoring Period will be announced on the Settlement Website and inquiries regarding the Medical Monitoring Program can be directed to the Program Administrator at XXX-XXX-XXXX. |
| **COMMENT ON THE PROPOSED SETTLEMENT** | Write to the Court about why you do, or do not, like the Settlement. Your comments or objections must be in writing and postmarked no later than XXXXX, 2015. |
| **ATTEND THE FAIRNESS HEARING** | Ask to speak in Court about the fairness of the Settlement. You may not speak unless have asked to do so in writing before XXXXX, 2015. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT CLASS** | If you are a member of the Settlement Class but do not want to be bound by the proposed settlement, you must exclude yourself ("opt-out") from the Settlement Class. If you exclude yourself, you will get no benefits. To ask to be excluded, you mail a written request stating that you want to be excluded. (*See* Paragraph 24 of this Notice for further information about your right to exclude yourself from the Settlement Class.) |
| **DO NOTHING** | Participation in the Medical Monitoring Program is completely voluntary. Final approval by the Court of the Settlement simply means that those eligible Settlement Class Members who wish to participate will have the opportunity to do so. If you do nothing now, you will have the right to participate in the Medical Monitoring Program in the future. |

**Questions? Call the Program Administrator at [1-800-__-____]**

| BASIC INFORMATION |
|---|

**1.     What is this Notice and why should I read it?**

This Notice is to inform you of the settlement of a class action lawsuit titled *In re National Collegiate Athletic Association Student-Athlete Concussion Litigation*, Case No. 1:13-cv-09116, brought on behalf of current and former NCAA student-athletes and pending before Judge John Z. Lee of the United States District Court for the Northern District of Illinois.  You need not live in Illinois to get a benefit under the Settlement.  The Court has granted preliminary approval of the Settlement and has set a final hearing to take place on _____ at _____ in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois to determine if the Settlement is fair, reasonable and adequate, and to consider the request by Class Counsel for Attorneys' Fees and Expenses and Service Awards for the Class Representatives.  This Notice describes the Settlement.

Your rights and options – and the deadlines to exercise them – are explained in this Notice.  This Notice and the Amended Settlement Agreement in its entirety are posted on the Settlement Website, www.XXXX.com, and are also available from the Program Administrator. Other documents available on the Settlement Website include the complaints filed in the Litigation and the papers that are or will be filed with the Court requesting preliminary and final approval of the Settlement described in this Notice.  If you are a Settlement Class Member, your legal rights are affected regardless of whether you act.

**2.     What is the Litigation about?**

Former student-athletes who played football and soccer at NCAA member schools filed class action lawsuits on behalf of themselves and current and former student-athletes against the NCAA.  They claimed that the NCAA was negligent and had breached its duty to protect all current and former student-athletes by failing to adopt appropriate rules regarding concussions and/or manage the risks from concussions.  The named plaintiffs sought medical monitoring for all current and former student-athletes, as well as changes to the NCAA's return-to-play guidelines for student-athletes who had suffered concussions or concussion symptoms.

The NCAA denied and continues to deny all allegations of liability and wrongdoing. Nonetheless, the Parties to the Litigation have reached a preliminary Settlement.

The Settlement has already been preliminarily approved by the Court.  Because the settlement of a class action determines the rights of all members of the proposed class, the Court must give final approval to the Settlement before the Settlement can take effect.

The Court has conditionally certified the Settlement Class for settlement purposes only, so that members of the Settlement Class can be given this notice and the opportunity to exclude themselves from the Settlement Class, voice their support or opposition to final approval of the Settlement, and explain how those who do not exclude themselves from the Settlement Class may obtain the relief offered by the Settlement.  If the Settlement is not granted final approval by the Court or the Parties terminate it, the Settlement will be void and the Litigation will continue as if there had been no Settlement and no certification of the Settlement Class.

**3.     Does this Notice pertain to me? What if I was never diagnosed with a concussion?**

This Notice pertains to you if you are or were an NCAA student athlete:

**Questions?  Call the Program Administrator at [1-800-__-____]**

- You are a member of the Settlement Class if you played an NCAA-sanctioned sport at an NCAA school at any time prior to [insert date of preliminary approval].

- You do **not** need to have been diagnosed with a concussion to be a member of the Medical Monitoring Class.

If you have any questions about whether you are a member of the Medical Monitoring Class, please contact the Program Administrator at XXXX@XXXX.com or XXX-XXX-XXXX.

**4.     What is a class action?**

In a class action, one or more people called "Class Representatives" sue on behalf of a group of people with similar claims.  All of these people together are called the "Class" or "Settlement Class Members."  When a class action is settled, one court resolves the issues for all Settlement Class Members, except for those who exclude themselves from the settlement. Excluding yourself means that you will not receive any benefits from the Settlement.  The process for excluding yourself is described in Paragraph 24 of this Notice.

**5.     Why is there a settlement?**

Although the Court has not yet resolved the merits of the lawsuit, or determined whether the Class Representatives' or the NCAA's contentions are true, the Parties have agreed to settle the Litigation.  The NCAA denies all allegations of wrongdoing and liability and believes that its conduct was lawful.  The NCAA, however, is settling to avoid the substantial cost, inconvenience and disruption of litigation.  The Class Representatives and their attorneys believe that the Settlement is in the best interests of the Settlement Class because it provides an appropriate remedy for Settlement Class Members now, while avoiding the substantial risk, expense and delay of pursuing the case through trial and any appeals.

| BACKGROUND ON CONCUSSIONS AND SUBCONCUSSIVE HITS |
|---|

**6.     What is a concussion?**

Concussion or mild traumatic brain injury (mTBI) has been defined as "a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces." Although concussions most commonly occur after a direct blow to the head, they can occur after a blow elsewhere in the body that transmits forces to the head. Sometimes, athletes refer to hits that result in concussions as getting "dinged" or having their "bell rung."

According to the experts retained by Class Counsel and the Class Representatives, when a concussion occurs, there is a traumatically induced alteration of brain function that may include a rapid onset of cognitive impairment (e.g., impairment to the mental processes of perception, learning, memory, judgment, and reasoning).  Most times, the short-term effects of the concussion spontaneously resolve.

Other concussion symptoms include: amnesia, confusion, nausea, loss of consciousness, balance problems or dizziness, double or fuzzy vision, sensitivity to light or noise, headache, feeling sluggish, foggy or groggy, feeling unusually irritable, concentration or memory problems, or slowed reaction time.

**Questions?  Call the Program Administrator at [1-800-__-____]**

You may have suffered a concussion if you experienced any of these symptoms while playing an NCAA sport, even if you were not formally diagnosed with a concussion. You do **not** need to have lost consciousness to have suffered a concussion.

**7.      What is a subconcussive hit?**

Subconcussive hits, or impacts, do not produce any clinical concussion symptoms, but may adversely affect brain function in the same way symptomatic concussions do.  Some published data reflecting high school and college football players who did not exhibit clinical signs of concussion and did not report symptoms of concussion but nonetheless had physiological and structural changes to the brain suggest the possibility that subconcussive hits can lead to changes in the brain that are similar to those observed in concussed players.

**8.      Do concussions only occur in football?**

Many people associate concussion with football.  However, concussions can occur in any sport, including most often in a range of contact sports, including but not limited to men's and women's soccer, ice hockey, basketball, field hockey, lacrosse and wrestling.

**9.      What is post-concussion syndrome?**

Although the symptoms of most concussions go away after a relatively short period of time, especially if the individual receives adequate rest (both physical and cognitive), some concussions in some people result in symptoms that may last for months or even longer.  This long-term persistence of concussion symptoms is referred to as Post-Concussion Syndrome or PCS.  PCS symptoms can include headaches, fatigue, memory problems, feeling in a fog, depression, impulsivity, and other physical, cognitive, mood, and behavioral problems.  There may be treatments that can alleviate some or all of these symptoms and in almost all cases they resolve eventually.

**10.     What is Chronic Traumatic Encephalopathy (CTE)?**

Repetitive impacts to the head from participation in sports can lead to a later-life, progressive neurodegenerative disease called Chronic Traumatic Encephalopathy (CTE), which may manifest in cognitive, mood, behavioral, and motor disorders.  The Parties in this Litigation and their experts disagree regarding the nature, extent and causes of CTE. The Class Representatives and their experts, however, believe that concussive and sub-concussive hits play a significant role in most if not all cases of CTE.  In light of a limited understanding of CTE, CTE is thought to be a unique disease, similar to Alzheimer's disease, which has been referred to as "punch drunk" or dementia pugilistica when it is seen in boxers.  It appears that the process may begin earlier in life and, once enough brain tissue is affected by the disease, symptoms become apparent.  It is thought that in some cases there may be a delay of years or even decades between the end of the repetitive head impacts (i.e., the end of playing the contact sport) and the beginning of the symptoms.

CTE can present with recent memory loss and other cognitive impairments similar to those experienced by people with Alzheimer's disease.  People with CTE can also have changes in behavior (e.g., impulsivity, rage, aggression, having a short fuse) and mood (e.g., depression, hopelessness, feeling suicidal). Less commonly there can be movement disorders such as parkinsonism (e.g., tremor, difficulty walking or speaking, stiffness).  Some people with CTE may first have behavior or mood problems.  Others may first have cognitive difficulties, with the changes in mood and behavior later.  In some people, the symptoms of the disease progress to

**Questions?  Call the Program Administrator at [1-800-__-____]**

the point where there is difficulty in daily functioning, requiring assistance or being unable to live alone.  In these cases, CTE may be clinically mistaken for Alzheimer's disease or dementia. In other cases, CTE may be mistakenly diagnosed as Amyotrophic Lateral Sclerosis (ALS) or "Lou Gehrig's Disease."

**11.     What symptoms may signal that I should participate in the Medical Monitoring Program?**

Any current athlete should speak to their team physician, private physician, and/or athletic trainer immediately if they experience any of the following symptoms after receiving a blow to head (or the body that may have jolted the head suddenly). If you continue to experience any of the following symptoms, you may also decide to complete a Screening Questionnaire to determine whether you qualify for a Medical Evaluation in the Medical Monitoring Program.

These symptoms include but may not be limited to: balance issues, confusion, difficulty concentrating, difficulty remembering, dizziness, don't feel right, drowsiness/fatigue/low energy, feeling in a fog, feeling more emotional, feeling slowed down, headache/head pressure, irritability, loss of  consciousness, nausea/vomiting, neck pain, nervous/anxious, numbness/tingling, ringing in the ears, sadness, sensitivity to light, sensitivity to noise, sleeping less than usual, sleeping more than usual, trouble falling asleep, visual problems/blurred vision. These symptoms may not occur immediately following the trauma, but may begin to be noticeable the following day or two.  If you are a current student-athlete, the decision regarding when you may return to play will be determined by the team physician and medical team.  It is important to remember that the symptoms listed above could also be due to causes other than concussion.  It is important to inform your medical staff if the symptoms exist and they can help determine whether or not they may be related to concussion.

A former athlete should speak to their personal physician or other appropriate health care provider if they experience a new onset of any of the following symptoms: poor memory for recent events; difficulty learning new information; problems with organization, planning, judgment, or multi-tasking; difficulties with speech, gait, or strength; language or spatial difficulties; problems with attention, concentration, or orientation; mood changes, including depression, hopelessness, or thoughts of suicide; or changes in behavior, including having a "short fuse," irritability, rage, aggression, or problems with impulse control.

If you have any of these symptoms, you may also decide to complete an online or paper-and-pencil Screening Questionnaire to determine whether you qualify for an in-person Medical Evaluation as part of the Medical Monitoring Program.

| THE MEDICAL MONITORING PROGRAM |
|---|

**12.     What Is The Medical Monitoring Program?**

The Medical Monitoring Program will screen Settlement Class Members and provide Qualifying Class Members with a Medical Evaluation designed to assess symptoms related to persistent post-concussion syndrome, as well as cognitive, mood, behavioral, and motor problems that may be associated with mid- to late-life onset diseases resulting from concussions and/or subconcussive hits, such as Chronic Traumatic Encephalopathy and related disorders. The Medical Monitoring Program will last 50 years from the Settlement's Effective Date.

**Questions?  Call the Program Administrator at [1-800-__-____]**

Settlement Class Members who wish to participate in the Medical Monitoring Program must complete a Screening Questionnaire prepared by a Court-appointed Medical Science Committee to determine whether they qualify for an in-person Medical Evaluation.

Settlement Class Members may complete a Screening Questionnaire online or download a Screening Questionnaire by going to www.XXXXX.com and following the instructions provided on the website. Settlement Class Members can also obtain a Settlement Questionnaire by writing to the Program Administrator at _____.

A Settlement Class Member may complete a Screening Questionnaire not more than once every five (5) years until the age of 50 and then not more than once every two (2) years after the age of 50, unless otherwise permitted on a case-by-case basis by the Medical Science Committee.

If you are a member of the Settlement Class and the Settlement becomes Final, you should complete a Screening Questionnaire if you wish to qualify for a Medical Evaluation or are concerned that you may be at risk for long-term effects from any concussions or the accumulation of subconcussive hits you experienced while playing in NCAA-sanctioned sports at member institutions.

The Program Administrator will notify Settlement Class Members whether they qualify for a Medical Evaluation based on the responses to the Screening Questionnaire, and explain how to arrange for a Medical Evaluation if they qualify. Eligibility for a Medical Evaluation will be determined through a scoring algorithm and "cut scores" established by the Medical Science Committee. More information regarding the scoring of Screening Questionnaires is available in the Medical Science Committee's Report posted on the Settlement Website.

A Settlement Class Member may qualify for up to two (2) Medical Evaluations during the Medical Monitoring Period, and a third Medical Evaluation may be permitted on a case-by-case basis by the Medical Science Committee. The Medical Evaluations will be administered at numerous regional locations across the United States. If you qualify for a Medical Evaluation but live more than one hundred (100) miles from the nearest location, you have the option to be reimbursed based on the then-prevailing rate for reimbursement of mileage to travel to a designated regional institution or the average cost of the examination in the Medical Monitoring Program if done locally.

The NCAA and its insurers will pay $70 million into the Medical Monitoring Fund to pay the costs of the Medical Monitoring Program, as well other costs including payments to the Medical Science Committee, Notice costs, administrative costs, Attorneys' Fees and Expenses, and Class Representative Service Awards.

**13.    What are the responsibilities of the Medical Science Committee?**

The Parties have agreed to create a Medical Science Committee to determine the scope of the Medical Evaluations provided under the Medical Monitoring Program. The Medical Science Committee has also created the Screening Questionnaire and Screening Criteria used to determine if a Settlement Class Member qualifies for a Medical Evaluation. The Medical Science Committee's initial recommendations regarding the scope of Medical Evaluations, the Screening Questionnaire, and Screening Criteria are contained within the Expert Report of the Medical Science Committee, Exhibit __ to the Renewed Motion for Preliminary Approval, and is available on the Settlement Website. The Medical Science Committee is composed of four (4)

**Questions?  Call the Program Administrator at [1-800-__-____]**

medical experts with expertise in the diagnosis, care and management of concussions in sport and mid- to late-life neurodegenerative disease, and a neutral Chair of the Medical Science Committee. The current members of the Medical Science Committee are Dr. Brian Hainline, Dr. Robert Cantu, Dr. Ruben Echemendia and Dr. Robert Stern, as well as the Honorable Wayne R. Andersen (Ret.) as Chair.

**14.    What is the scope of the Medical Evaluation if I qualify after completing the Screening Questionnaire?**

The scope of the Medical Evaluation for Qualifying Class Members will be determined by the Medical Science Committee. The Medical Science Committee's initial recommendations are contained within the Report of the Medical Science Committee, Exhibit __ to the Renewed Motion for Preliminary Approval, and are available on the Settlement Website. The Medical Science Committee will update the scope of the Medical Evaluations annually to ensure that the examinations meet the current standard of care for assessment of and diagnoses related to persistent post-concusssion syndrome, Chronic Traumatic Encephalopathy and related disorders. The results of the Medical Evaluation will be evaluated by a physician skilled in the diagnosis, treatment and management of concussions, persistent post-concussion syndrome, and mid- to late- life cognitive, mood, behavior, or motor disorders associated with concussive and subconcussive head impacts. The physician will send the results and/or diagnosis to the Qualifying Class Member or the Qualifying Class Member's physician at the direction of the Qualifying Class Member.

**The results of the Medical Evaluations will not be shared with the NCAA or anyone else without your express, written consent.**

**15.    When will the Medical Monitoring Program begin?**

Settlement Class Members may complete Screening Questionnaires after the Settlement is approved by the Court and after the time for any appeals has expired or any appeals have been dismissed. Medical Evaluations may take place at any time during the Medical Monitoring Period after Settlement Class Members have been notified that they qualify.

**16.    If I qualify, do I need to pay for a Medical Evaluation?**

Settlement Class Members who qualify for the Medical Evaluation will not have to pay out-of-pocket for any of the costs of a Medical Evaluation. The Program Administrator may seek subrogation or reimbursement from your health insurance for the Medical Evaluation, as long as it does not prejudice your ability to qualify for at least one more wellness examination under your health insurance plan in the two (2) year period following your Medical Evaluation. In no event, however, will you be responsible for making a claim on your insurance policy to receive or qualify for the benefits of the Settlement, nor will you be responsible for any co-pays or deductibles associated with any Medical Evaluation received pursuant to the Settlement.

**Questions?  Call the Program Administrator at [1-800-__-____]**

8

# EXHIBIT – 3

**LEGAL NOTICE**

*In re National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*,
Case No. 1:13-cv-09116 (United States District Court for the Northern District of Illinois)

**NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION AND
FAIRNESS HEARING FOR MEDICAL MONITORING AND RELEASE OF CLAIMS**

**If You Are a Current or Former Student-Athlete Who Played An
NCAA-Sanctioned Sport at an NCAA School At Any Time Through _____, 2015,**

**Your Rights May Be Affected by a Class Action Lawsuit**

A Settlement, subject to court approval, has been reached in a class action lawsuit called *In re National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*, Case No. 1:13-cv-09116 (N.D. Ill.). It is pending in the United States District Court for the Northern District of Illinois.

**WHAT IS THE LAWSUIT ABOUT?**

The lawsuit claims that the NCAA was negligent and breached its duty to protect all current and former student-athletes by failing to adopt appropriate rules regarding concussions. The lawsuit seeks medical monitoring relief to diagnose possible long-term effects of concussions or the accumulation of sub-concussive hits for all current and former student-athletes. The lawsuit also seeks changes to the NCAA's concussion management and return-to-play guidelines.

The NCAA denies these allegations and denies it did anything wrong. If the Court does not approve the Settlement, the NCAA will argue, among other things, that the case should not be a class action. The Court has not decided whether or not Defendant did anything wrong.

**WHO IS INCLUDED?**

You are a Class Member and included in the Settlement if you played an NCAA-sanctioned sport at an NCAA school at any time up to _____, 2015.

**WHAT DOES THE SETTLEMENT PROVIDE?**

The NCAA has agreed to a Medical Monitoring Fund of $70,000,000, which, after deducting administrative costs, and attorneys' fees and expenses, will fund the screening of Class Members as well as medical evaluations for those Class Members who qualify as a result of the screening during the 50-year Medical Monitoring Program. The medical evaluations will be designed to assess symptoms related to persistent post-concussion syndrome, as well as cognitive, mood, behavioral, and motor problems that may be associated with mid- to late-life onset diseases that may be linked to concussions and/or subconcussive hits, such as Chronic Traumatic Encephalopathy and related disorders. In addition, the NCAA has committed $5,000,000 to fund research regarding the prevention, diagnosis, care, and management of concussions and mid- to late-life neurodegenerative disease. The NCAA has also agreed to change its policies and procedures for concussion management and return to play. You can download the Amended Settlement Agreement from www._____.com or call the toll-free number listed below and request one.

**WHO REPRESENTS YOU?**

The Court appointed the law firms Hagens Berman Sobol Shapiro LLP and Siprut PC to represent you. You do not have to pay these attorneys or anyone else to participate. They will ask the Court for attorneys' fees and costs, which would be paid from the Medical Monitoring Fund. You may hire your own lawyer to appear in Court for you; if you do, you have to pay that lawyer.

**WHAT ARE YOUR OPTIONS?**

- **Do Nothing and Remain in the Settlement**. If you do nothing, you are considered a participant in the Settlement. You will be bound by all Court orders. If the Settlement is approved, certain potential legal claims you may have against the NCAA will be resolved and forever released. Also, if the Settlement is approved, you will have the opportunity to complete a screening questionnaire to determine whether you qualify for up to two medical evaluations during the 50-year medical monitoring period.

- **Opt Out ("Exclude Yourself") from the Settlement.** You must submit a written request to Opt Out of the Class and the Settlement to the Notice Administrator. The complete, signed Opt-Out request must be mailed to the Notice Administrator **postmarked no later than _____, 2015. However,** if you are a current NCAA student-athlete on or after twelve (12) months after the Effective Date and your school fails to put in place a concussion management plan within six months of legislation by the NCAA requiring adoption of such a plan, you will have a second opportunity to opt-out so long as you do so within 18 months of the Effective Date with a mailed request **postmarked no later than _____, 2016.** Please see www._____.com for more information.

- **Object or Comment on the Settlement.** Written objections must be filed and served **no later than _____, 2015.** You give up your right to sue and are bound by Court orders even if your objection is rejected. If you file an objection, you may appear at the Fairness Hearing to explain your objection, but you are not required to attend.

The Court will determine whether to approve the Settlement and attorneys' fees and expenses at a Fairness Hearing to be held on _____, 2015, at __ a.m., at the Everett M. Dirksen United States Courthouse for the United States District Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois. You may attend this hearing if you wish, but you do not have to attend in order to participate in the proposed Settlement.

**HOW CAN I GET MORE INFORMATION?**
**If you have questions or want to complete a Screening Questionnaire:**
*Visit*: **www._____.com;** *Call*: 1-8XX-XXX-XXXX; *Write*: In re: National Collegiate
Athletic Association Student-Athlete Concussion Injury Litigation, c/o [NOTICE ADMINISTRATOR]

# EXHIBIT – 4

LexisNexis®

*Risk Solutions Data Dictionary*

# LexisNexis®
# Risk Solutions
# Data Dictionary

**Version 2.43**
**January 15, 2013**



*Risk Solutions Data Dictionary*
*Table of Contents*

# Table of Contents

**CONSUMER** .................................................................................................................**3**
    **Overview** ....................................................................................................................3
    **Consumer Database** .................................................................................................3
    **Field Elements** ........................................................................................................3

**CONSUMER** .................................................................................................................**4**
    **Relatives and Associates** .........................................................................................4
    **Other Consumer Data** ............................................................................................4

**PHONE & EMAIL DATA** ............................................................................................**5**
    **Overview** ....................................................................................................................5
    **Coverage Summary** .................................................................................................5

**ASSET DATA** ...............................................................................................................**6**
    **Overview** ....................................................................................................................6
    **Coverage Summary** .................................................................................................6

**REAL PROPERTY DATA** ...........................................................................................**7**
    **Overview** ....................................................................................................................7
    **Coverage Summary** .................................................................................................7

**LICENSING INFORMATION** ....................................................................................**8**
    **Overview** ....................................................................................................................8
    **Coverage Summary** .................................................................................................8

**BUSINESS & EMPLOYMENT DATA** ........................................................................**9**
    **Overview** ....................................................................................................................9
    **Coverage Summary** .................................................................................................9

**BUSINESS & EMPLOYMENT DATA** ......................................................................**10**
    **Coverage Summary – continued –** .......................................................................10

**LEGAL INFORMATION** ...........................................................................................**11**
    **Overview** ..................................................................................................................11
    **Coverage Summary** ...............................................................................................11

**DEROGATORY INFORMATION** .............................................................................**12**
    **Overview** ..................................................................................................................12
    **Coverage Summary** ...............................................................................................12



# CONSUMER

## Overview

LexisNexis Risk & Information Analytics Group's consumer databases include personal information on subjects such as dates of birth, addresses, Social Security numbers, etc. Sources include a variety of public record databases, numerous phone data sources, and credit header data. While other services rely more heavily upon credit header searching, LexisNexis' Risk Solutions technology incorporates a wider variety of sources to provide the most current and comprehensive database.

LexisNexis' Link ID employs algorithms that provide a single, consolidated view of each of the unique identities contained within disparate repositories of person-centric information.

## Consumer Database

The LexisNexis primary consumer database is updated monthly utilizing all available consumer information received, including credit bureau data, driver's license information, resident services file information, phone numbers, and current and historical addresses spanning 33 years. The 15.3 billion consumer records contained in this consumer database are used to create unique identifiers. The non-SSN-dependent unique identifier forms the basis of the LexisNexis search technology.

## Field Elements

- Dates of Birth – Over 7.8 billion records contain date of birth information from a variety of different consumer sources. Examples of the types of sources that may contain dates of birth are credit headers, utilities, driver's licenses, voter registrations, professional licenses, marketing files, and non-credit-header consumer files.
- Addresses – Our database contains approximately 8.2 billion unique name/address combinations that map to over 683 million unique identities. The unique identities are further enhanced to remove any that are known to belong to deceased individuals, are inactive or appear to be duplicates; referred to as current active list. The current active list contact contains over 267 million identities. If an address has a potential risk, we will display a yellow flag below the address with one or more of the following risk indicators:

| Hunting, Trapping, And Game Services | Residential Mobile Home Site Operator | Credit Reporting Services | General Medical And Surgical Hospitals | Libraries |
|---|---|---|---|---|
| Newspaper Facility | Hotels And Motels | Direct Mail Advertising Services | Psychiatric Hospitals | Individual And Family Social Services |
| US Postal Service | Rooming And Boarding Houses | Photocopying And Duplicating Services | Home Health Care Services | Residential Care Facility |
| Water Transportation Of Freight, Not Elsewhere Classified | Sporting And Recreational Camps | Skilled Nursing Care Facilities | Elementary And Secondary Schools | Correctional Institution |
| Packing & Crating Facility | RV Parks And Campsites | Intermediate Care Facilities | Colleges & Universities | National Security |
| Telegraph And Other Message Communications | Tax Return Preparation Services | Nursing And Personal Care Facilities | Junior Colleges And Technical Institutes | |

- SSN's – 10.1 billion consumer records containing Social Security numbers and 4.2 million containing individual taxpayer identification numbers (ITIN's) are available. We provide verification of an SSN against the SSN Death Master and an SSN issued-date file.
- AKA's – The database also contains access to alternate identity information, such as alternative name spellings, all names using an SSN, and all SSN's that may be associated with an individual.
- Address History – Dates are provided on the record, when possible, to identify the first and last time that an individual was associated with a particular address.



# CONSUMER

## Relatives and Associates

Our Relatives and Associates file consists of approximately 2.6 billion records, which represent potential relatives and associates. These associations are made using complex algorithms based on relationships established by utilizing available field information within various types of source data. "First-degree relative" includes mother, father, sister, brother, husband, wife, and child over the age of 18. "Associate" means a person that has lived with a subject in two or more places but does not share the same last name.

## Other Consumer Data

- The Resident Services File (phone, internet, satellite, cable, electric, gas, water, fuel, etc.) is also available. This information may be useful in indicating a new move for an individual.
- Several aggregated consumer demographic files are available. Consumer Universe contains demographic and lifestyle information for 131.3 million consumers. The Tracker database provides field elements such as name, address, phone, SSN, and partial date of birth. The Total Source database contains consumer and household data that has been enhanced with a wide variety of demographic, lifestyle, and geo-demographic attributes. Data for up to five individuals is available per household. This file is restricted to marketing use only.
- The High School Student and Young Adult file, comprised of high school students and young adults (ages 20 to 36 years old), includes name, full address, phone number, age, class year, gender, date of birth, school type, and school name. View Coverage
- The U.S. Military Locator is a historical file that contains information for U.S. military personnel in the Air Force, Army, Coast Guard, Marine Corps, and Navy. The file may contain name, military address (when available), branch of service, pay grade code, gender, rank, primary Military Occupational Specialty (MOS) code, active service date, date assigned to current duty station, estimated date of separation, and date separated.
- The Alaska Permanent Fund file provides name and address information for residents of Alaska who received the permanent fund dividend from 1982 to 2004.
- Death records sourced from the Social Security Administration (SSA) for 50 states plus DC include approximately 110 million individuals since 1911 for whom the SSA paid benefits. Additional individual state death repositories are available, which contain additional field elements such as cause, condition, location, and time of death. State death coverage additional updating and historical information. View Coverage
- The SSN Issue file provides the date range during which a particular SSN was issued and the state or locality of issuance. Coverage for this file starts in 1936 to present and updates monthly.



# PHONE & EMAIL DATA

## Overview

LexisNexis phone data consists of the most current telephone subscriber information and historical data on individuals and businesses. Subscriber information on landlines, cell phones, unlisted numbers, and unpublished numbers is included.

## Coverage Summary

- The national Electronic Directory Assistance (EDA) file consists of 102.3 million total records and 79.6 million unique phones: 66.6 million are residential, 12.4 million are business, and approximately 571,392 are combined-use business and residential numbers. In addition, the EDA database consists of approximately 948.5 million historical telephone records. The EDA database updates daily for listing changes, new connections, and new disconnections.
- The Phones Plus file delivers access to approximately 421.8 million phone numbers not currently found in EDA. This database contains 249.3 million unique phone numbers, which have met the threshold of using a scoring algorithm for validity. Of the phone numbers included, 84% are likely cell phones. The Phones Plus file is updated weekly.
- Other sources of phone data include a national White Pages database of 109 million records and 13.9 million Yellow Pages records. In addition, the Canadian Phone file provides access to 342 million records from all Canadian Provinces & territories, of which there are over 2.3 million unique Canadian Business Phone Numbers and 15.3 million unique Residential Phone Numbers.
- In addition, several other files are available which provide phone number metadata. These include the TDS file, which maps area codes and dedicated exchanges to phone types (land, cell, etc.); the TPM file, which utilizes latitude and longitude coordinates to determine where an exchange may be located; and a file that provides lists of ported phones.
- The email address file allows users to see possible email addresses for their subjects. The file includes name, email address and postal address. Our database provides access to over 1.6 billion records, with 473 million unique email addresses. In addition, approximately 80% of the email addresses are tied to a unique identity. Coverage for this file is national and updates monthly.

# ASSET DATA

## Overview

LexisNexis provides access to various sources of assets, including over 3 billion motor vehicle registration records, approximately 717 million vehicle title records, and 62 million watercraft registration records. Nationwide aircraft registrations are also available.

## Coverage Summary

- The Motor Vehicle Registration file contains information on individuals or corporations who have registered or titled motor vehicles with a state motor vehicle registration agency. Information includes license/tag plate numbers.   View Coverage
- The Watercraft Registration file contains information for individual states plus nationwide USCG registrations.   View Coverage
- The Federal Aviation Administration (FAA) file includes national plane registration coverage.  The coverage range for this file is January 14, 1977 and ranges to present. The Federal Aviation Administration file is updated monthly.   View Coverage
- In addition, Vehicle Identification Numbers (VINs) are available to provide enhanced information for motor vehicles, including make, model, color, safety features, etc.

 LexisNexis®

*RISK SOLUTIONS Data Dictionary*
*Real Property Data*

# REAL PROPERTY DATA

## Overview

Our personal property data coverage includes almost 95% of the United States population base and represents approximately 3.4 billion records. LexisNexis's real property data is a combination of information from the real estate fabrication industry's two largest and most respected fabricators, and is unrivaled in both depth of historical coverage and current updating coverage.

These real property records include data originating from tax assessors and property recorders' offices. LexisNexis is the only major commercial provider of real property data that maintains archived tax assessor records, and in most cases a 5-year archive is available. Also included are mortgage and deed records containing county courthouse real estate records for selected states. The mortgage materials include both purchase-money and non-purchase-money loans. The term "mortgage" includes both mortgages and deeds of trust. Data for these files comes primarily from the records of recorders' offices and market sources.

## Coverage Summary

- The Property Assessment file can include multiple owner names, multiple seller names, property address, owner address, value of property, land value, parcel number, year of sale, prior sales date, homestead exemption, and additional property characteristics. The Property Deed/Mortgage file can include multiple buyer names, multiple seller names, borrower information, loan type, interest rate, and interest rate type. Property deed images are also available for select counties and states. View Coverage

- The Foreclosures file includes information on legal proceedings initiated by a creditor to repossess the real property collateral for a mortgage loan. View Coverage



# LICENSING INFORMATION

## Overview

LexisNexis provides access to a variety of license and permit information. The license and permit data includes over 94 million Hunting and Fishing license records, 3 million Concealed Weapons Permit records, 7.9 million Pilot records, and 122.7 million Professional License records.

## Coverage Summary

- The DEA Controlled Substances file contains individuals registered under the Controlled Substances Act (CSA). Coverage for this file is national and updates monthly.  View Coverage
- The Federal Firearms and Explosive License file contains the names of licensees who are registered with the Federal Bureau of Alcohol, Tobacco, and Firearms. Coverage for this file is national and updates monthly.
- Several files providing information on physicians and other healthcare providers, including sanction (disciplinary action) information, are also available.
- Federal Communications Commission (FCC) Licenses Including Wireless, Radio, and Television Licenses. Coverage for this file is national, begins November 15, 1987, ranges to present, and updates quarterly.
- The Driver's Licenses file provides access to driver's licenses for various states.  View Coverage
- The Voter Registrations file covers various states.  View Coverage
- The Professional License file contains coverage for various states. There are a variety of current and historical license types available.
- The Concealed Weapons Permits file covers various states and includes current and historical coverage.  View Coverage
- The Hunting/Fishing License file covers various states and includes current and historical coverage. View Coverage
- Marriage and divorce records come from various state and county offices.  View Coverage



# BUSINESS & EMPLOYMENT DATA

## Overview

LexisNexis collects business data on millions of companies, both international and domestic. The LexisNexis database contains approximately 1.2 billion business records and approximately 2.1 billion business contact records, which represent 374 million unique businesses and 1.2 billion unique contacts. LexisNexis employs algorithms to calculate a business identifier, which provides a single consolidated view of each of the unique business identities contained within disparate repositories of business-centered information.

This data includes 11.7 million Federal Employer Identification Numbers (FEINs). Approximately 19% of unique businesses have an assigned SIC code. LexisNexis business information is drawn from such sources as Dun & Bradstreet (D&B), state incorporation filings, UCC filings, business registrations, and other aggregated sources.

In addition, proprietary linking technology is utilized to compile the People at Work file, which contains over 2.1 billion records and links 324 million unique individuals to businesses. Available information includes business addresses, phone numbers, and possible dates of employment.

## Coverage Summary

- Our Corporation Filings database contains various types of business filings, including incorporations, limited liability companies, and limited partnerships. Information may include company name, registered agent, corporate officers, and filing dates. LexisNexis has rolled up the corporation filings to the Charter Number, allowing you to pull just one Corporation Report for all of the filings on that Charter Number. We have also added the name type to the search results, which will reveal if the business name is the legal name or trade name. <u>View Coverage</u>
- Our national Uniform Commercial Code (UCC) file contains approximately 140 million UCC lien filings containing the financing statement information filed with the Secretary of State. LexisNexis allows users to search by original filing number or FEIN and to narrow results by using the filing date range or filing jurisdiction. <u>View Coverage</u>
- The search results and report may include the following fields:
  - Filing Jurisdiction
  - Filing Status
  - Original Filing Number
  - SSN/FEIN for Debtor, Creditor, Secured, and Assignee
  - Filing Pages
  - Document Amount
  - Collateral Quantity
- The Internet Domains file includes historical Internet registration information. Coverage for this file is national and is non-updating.
- The FEIN file contains Federal Employer Identification Numbers assigned by the Internal Revenue Service to business entities expected to file federal tax returns. The file includes the business name, address, and information source. Coverage for this file is national, begins January 1, 1994 to present, and updates quarterly. <u>View Coverage</u>



# BUSINESS & EMPLOYMENT DATA

## Coverage Summary – continued –

- Our Dun & Bradstreet[®] file contains address, DUNS number, annual sales, officers and directors, SIC code, etc. Coverage for this file is national from October 20, 1980 to present. The Dun & Bradstreet file is a monthly update.

- The U.S. Securities and Exchange Commission (SEC) requires a public company in the United States to file financial statements regularly for public availability. Investors and financial professionals rely on these filings for information about companies that they are evaluating for investment purposes. Filing types include registration statement, statement of changes in ownership, prospectus information, information on proposed sale of securities, registration of securities of foreign private issuers, annual report, etc. This file also includes over 1.68 million insider-trading filings back to 1980. Coverage for this file is national and updates monthly.

- Business credit reports are now available and provide valuable information regarding how a company is performing financially and how that company compares against other businesses in the same industry. Business credit reports can help companies complete their business due diligence quickly and easily. Coverage for this file is national from September 5, 2005 to present, and updates weekly.

- Our IRS files contain Annual Return/Report of Employee Benefit Plans as well as IRS reported non-profit charitable organizations.

- Many additional sources of business filings are collected both direct and from aggregators. These include business registrations, fictitious business filings, gaming licenses, liquor licenses, lottery agents, sweepstakes licenses, sales tax registrations, and FCC licenses. *Coverage available upon request.*

- Several other national business and employment files are available from aggregators, including a U.S. Business and Executive file and a National People at Work file.



*RISK SOLUTIONS Data Dictionary*
*Legal Information*

# LEGAL INFORMATION

## Overview

LexisNexis collects a variety of legal information, including bankruptcies, liens, and judgment data. This information updates frequently—guaranteeing that investigators have the most complete and up-to-date view of a search subject.

## Coverage Summary

- Our Bankruptcy file includes personal and business bankruptcy filings dating back to 1990. Bankruptcy filings can include chapter filed, disposition, attorney information, trustee information, asset availability, creditors' meeting date and location, and more.  View Coverage
- The Judgments and Liens file may include debtor's address, filing type, filing date, filing location, and more.  View Coverage
- The Civil Court file contains state and county level coverage.  View Coverage
- The Official Records file contains several different types of documents. In the State of Florida, official records are those instruments required or authorized for recording in one general series called "Official Records" at the county level. Document types you might find in an official records search may include, but are not limited to, the following (View Coverage):
    - Affidavit, agreement, assignment, bond, certificate, certified copy of court judgment, declaration of condominium, court paper, death certificate, deed, easement, financing statement, judgment, lien, lis pendens, marriage record, military discharge, modification, mortgage, notice, order, partial release, plat-related filing, power of attorney, probate document, release, restriction, satisfaction, termination, and transfer.
- The Florida Traffic Accidents file updates annually and contains reports for the State of Florida. Coverage for this file begins January 1, 1986 to present and updates annually.  View Coverage

 LexisNexis®

*RISK SOLUTIONS Data Dictionary*
*Derogatory Information*

# DEROGATORY INFORMATION

## Overview

LexisNexis provides a robust collection of derogatory information, including statewide criminal courts, Departments of Corrections, county arrest records, county criminal court records, and Sex Offender Registries (SOR). We provide access to approximately 302 million criminal records: 1.5 million sexual offenders, 42 million Department of Corrections records, 242 million criminal court records, and 17 million arrest records.

## Coverage Summary

- Depending on the state, the Department of Corrections information will include historical and current data on statewide felony and misdemeanor convictions, statewide current inmates, institution rosters, and photos where available. Updating criminal court filings are available. County arrest log records are available at the state and county level. View Coverage
- Sex Offender Registry coverage is available. View Coverage
- The Watch List file provides access to 24 sources, including 31 thousand Office of Foreign Asset Control records, UN Named Terrorists, and a variety of other agency lists. In addition, the World Check file is available for batch processing. This file is updated daily. View Coverage

**LEXIS RISK SOLUTIONS ONLINE DATA DESCRIPTIONS**

| Search Name | Data Returned | Update Frequency | File Description |
|---|---|---|---|
| LexisNexis Identity Trace | Names, Address, SSN, DOB, employment information, inquiries and fraud/risk information | Daily | An FCRA regulated service provided by LexisNexis which allows gateway access connection to non-trade information in a consumer's credit report for the purposes of determining the High Risk Fraud Alerts associated with the input or on-file SSN and Address as well as input Phone Number. |
| Find a Person | Name and name variations, current and former addresses, telephone numbers, SSN, DOB | EDA Phone File - Daily<br>Other Data -Update schedules vary | A database combined from over 1500 sources containing nationwide person locator information for approximately 400 million unique individuals based in the US and territories. Sources include all three national credit reporting companies, current and historic address files, phone publishers, the Electronic Directory Assistance database, Social Security death records from the Social Security Administration, numerous public record sources and data collected by marketing, registrations and warranty card aggregators. |
| SSA Verify | SSA - 89 | N/A | A link which is used to generate form SSA- 89 which is filed to enable verification of Social Security information on individuals directly from the Social Security Administration. |
| IRS Verify | IRS Form 4506 - T | N/A | A link which enables authoritative due diligence of income and financial information on individuals and businesses. Used to generate IRS Form 4506 - T which is used to order Forms 1040 or 1041, Form 941, 1065 or 1120 and Forms W-2, 1099, 1098 and 5498 directly from the source. |
| InstantID® Consumer Verification | CVI, NAP, NAS | N/A | InstantID is an identity verification and validation service designed to provide positive verification and validation of consumer identity information (first and last name, social security number, date of birth, home address and home phone number). InstantID summarizes the results of identity verification into an easy to use identity confidence score called the Consumer Verification Index (CVI). It is a score matrixed from both name/address/phone indices (NAP) and name/address/ssn indices (NAS). |
| InstantID® Consumer Verification with Red Flags & FraudPoint® Score | CVI, NAP, NAS, Fraud Score, Report which highlights High Risk Factors | N/A | Same as above with an additional score called FraudPoint. FraudPoint® provides a score that helps identify characteristics indicative of fraud and material misrepresentation that are not obvious in the verification and validation process. And provides an easy to understand numeric score and reason codes to pinpoint high-risk applicants. The scoring model predicts true-name and synthetic name fraud, legitimate customers who may be more likely to commit fraud, and first-pay defaults.<br>The LexisNexis® Red Flags Rule Report identifies suspicious personal identifying information and displays warning codes when red flags risk factors are present. Red flag alerts warn users of suspicious activity with warning conditions or red flag alerts, clearly associated with red flags guidelines. Users will be alerted to suspicious personal information such as false or disconnected telephone numbers, miskeyed or mismatched social security numbers, invalid zip codes and more. |
| InstantID® Q&A | Out of Wallet Questions | NA | An Identity authentication product which generatesa series of knowledge based authentication questions and tracks and records results. The configuration as to question types, numbers, correct answers required and time to answer is extremely flexible. |
| LexisNexis® Identity Report | see description | | LexisNexis® Identity Report provides deep identity intelligence, risks associated with personally identifiable information and additional details on associated data and subjects linked to the primary identity. This information helps identify characteristics indicative of fraud and material misrepresentation that are not obvious in the verification and validation process. It provides easy to understand risk indicators to pinpoint possible high-risk applicants. |
| People at Work | Name, place of employment, employment information, telephone numbers, SSN, possible dates of employment | Monthly | A database which links over 160 million individuals to businesses utilizing multiple redundant business public record databases and publicly available data. |
| Phone Lookup | Name, address, telephone number | Daily | A database which contains the nationwide Electronic Directory Assistance data. |
| Phones Plus | Name, address, telephone number, carrier | Monthly | The Phones Plus application provides access to over 200,000,000 phone numbers not typically published, including cell phone and unlisted numbers. |
| LexisNexis Phone Finder | Name, Address, Best Phone, Other Phones, Phone Detail | Real Time | A data search option which combines the data in Find a Person, Phones Plus and gateways to three additional databases real time to present the best phone data available for an individual or address and the detail about the time that phone has been associated with that person and address, other numbers which relate to that person or address and details related to the type and issuer of the phone. |
| Bankruptcies | Petitioner(s), SSN/FEIN data, jurisdiction, case number, chapter, filing date, filing status, trustee, attorney | Daily | A file of personal and business bankruptcy filings from 50 states, District of Columbia, Guam and Puerto Rico. All US Bankruptcy District Courts are contained in this file as well as all Chapters. Date coverage may vary depending on the District Court but most coverage begins with 1991 filings. |
| Driver Licenses | Name, Address, license issue and expiration date, license type, DOB, height, weight, hair color, eye color | | Contains Driver's License information for all registered drivers from the following states: |
| | | | 26 states available: |
| | | Monthly | 13 updating states: CT, FL, LA, ME, MI, MN, NE, NV*, OH, TN, TX, WI, WY |
| | | | 13 states historical - CO, DE, ID, IL, KY, MD, MA, MO, MS, NH, ND, SC, WV |
| Drug Enforcement Administration Registrants | Name, Address, SSN, Business Type, License Number, License Date | Monthly | The DEA Registrants file contains records from 50 states plus DC. Everyone that has a license to distribute controlled substances with the Drug Enforcement Agency under the Controlled Substances Act under their individual name. |
| Federal Fiearms and Explosives Licenses | License Name, Trade Name, SSN, Address, Telephone Number, License Number, License Type, Expiration Date, County, IRS Region | Monthly | The Federal Explosives and Firearms licenses registered with the Federal Bureau of Alcohol, Tobacco and Firearms coverage includes 50 states plus DC. |
| Email Address/Social Network Report | Name, Address, SSN, E-Mail address | Daily | The Email Address search can be used to find an email address for an individual or to reverse search to find the individual that belongs to the email address. The LexisNexis® Social Network Report helps identify e-mail addresses associated with more than 35 social networking sites, returning new insight and perspective on individuals. |
| Real Property | Owner(s)' Name(s), property and tax mailing addresses, parcel number, property use, property characteristics, valuation information, sales information | Varies by jurisdiction | A national file contain tax assessor, deed transfer and mortgage information. For coverage, see attached. |
| Motor Vehicle Registrations | Owner name and address, registrant name and address, lien holder information, title date, plate number, VIN, make model, year and color of automobile, | | Contains information on individuals, corporations, or other organizations who have registered or titled motor vehicles with any of the following states: |
| | | Bi-monthly | 29 state plus D.C. available: |
| | | | 24 states current + D.C. - AK CO FL ID IL KY LA ME MA MI MN MS MO MT NE NV NM NY OH TN TX UT WI WY |
| | | | 5 states historical - AL CT DE MD SC |
| Boat Registrations | Owner's name and mailing address, Registration number, date, and county, Title number, Decal number, Hull identification number, Vessel make, model, year, and length, Vessel propulsion and fuel type, Vessel use information | Bi-monthly | Contains information from 34 states on individuals, corporations, or other organizations who have registered or titled boats with any of the following states: AK, AL, AZ, AR, CO, CT, FL, GA, IA, IL, KS, KY, ME, MD, MA, MI, MN, MO, MS, MT, NC, ND, NE, NV, NY, OH, SC, TN, TX, UT, VA, WV, WI, WY |
| Aircraft Registrations | Owner's name on the current registration, Mailing address, Registration information, Aircraft and engine information | Monthly | Contains United States Aircraft registrations from the Federal Aviation Administration for the entire United States. |
| FAA PilotsLicenses | Name, address,status, medical classification, class, certification date and expitation date. | Annually | National |

| | | | |
|---|---|---|---|
| Professional Licenses | Names, Address, License Type, License State, License Number, Status, Issue and Renewal Dates | Varies by state | National. License Types vary by state. |
| Concealed Weapons Permits | Names, Address, License Type, License State, License Number, Status, Issue and Renewal Dates | Varies by state | Arkansas, Florida, Indiana, Louisiana, Maine, North Dakota, Tennessee and Virginia |
| Hunting/Fishing Licenses | Names, Address, License Type, License State, License Number, Status, Issue and Renewal Dates | Varies by state | ALABAMA (Historical), ALASKA, ARKANSAS, CONNECTICUT, FLORIDA, GEORGIA, ILLINOIS, MASSACHUSETTS, MINNESOTA (Historical), MISSISSIPPI, MISSOURI, MONTANA, NEVADA, NEW JERSEY (Historical), NORTH CAROLINA (Historical), NORTH DAKOTA, OHIO, OREGON, UTAH, VIRGINIA, WISCONSIN |
| E-mail Search/Social Networking Report | Name, Address, E-mail Address/Business and Social Networking sites linked to the relevant e-mail . | Daily | The Email Address Search can be used to find an email address for an individual or to reverse search to find the individual that belongs to the email address. The LexisNexis® Social Network Report targets access to more than 35 social networking sites, returning new insight and perspective on individuals in minutes.<br><br>Clients supply the subject's email address or LexisNexis® generates the email address after the user conducts an email address search.  The Social Network Report provides the end user with a list of all matching social network public-facing pages (URLs) for the search subject in cases where a match to the sites' registered email address is found. |
| Foreclosures | Mortgagor, Buyer, Property Address, Tax Mailing Address, Parcel Number, Brief Legal Description, Recording Date | Varies by State | A national file containing completed foreclosure matters. |
| Judgments and Tax Liens | Debtor name and address, creditor name, case or lien number, filing and/or release dates, liability amount | Weekly | A nationwide file containing judgments taken in the courts of general jurisdiction in most every county in the US, plus any judgment certified or abstracted at the county clerk's office and state and federal tax liens from every state. |
| Federal Civil & Criminal Docket Summaries | Party names, jurisdictional information, case number, filing/offense dates, case type, case status or disposition | Daily | Federal Criminal and Civil filings for 49 states (no filings for Alaska) the District of Columbia and Puerto Rico. |
| State Civil & Criminal Filings | Party names, jurisdictional information, case number, filing/offense dates, case type | Varies by state - most monthly | The Civil and Criminal file is a group file of civil filings from 20 states plus DC and criminal filings from 11 states. |
| Criminal Records | Party names, jurisdictional information, case number, filing/offense dates, case type, case status or disposition | Varies by state - most monthly | The Criminal file is a collection of criminal history information, including statewide criminal court, department of corrections, county arrest records, traffic violations and  county criminal court records.<br><br>**Arrest Logs** - County Arrest Records are available for select counties.<br><br>Updating coverage is available for  AL, AZ, AR, CA, CO, FL, GA, ID, IL, LA, MI, MO, MT, NC, NM, OK, OR, TN, TX, WA, and WV.<br><br>**Department of Correction** - Depending on the state, information will include historical and current data on statewide felony and misdemeanor convictions, statewide current inmates, and institution rosters.<br><br>Coverage includes 45 states including DC.  Updating states include: AL, AZ, AR, CO, CT, FL, GA, ID, IL, IN, KS, LA (Parole Board information only), MD, MI, MN, MS, MO, MT, NE, NH, NM, NJ, NY, NC, NV, OH, OK, OR, RI, SC, & TN.<br><br>Historical includes:  DC, GA, IA, KY, LA, ME, PA, TX, UT, VA, WA, WI & WV.<br><br>**Criminal Court Filings** - Includes statewide coverage for 22 states.<br><br>Updating states include - CT, HI, IA, MD, NC, NJ, OK, PA, TN, UT, WA & WI.<br><br>Historical states include:  AK, AR, AZ, FL, GA, MN, MS, OR, RI & VA.<br><br>Select additional county coverage is provided for updating - AZ, CA, CO, FL, GA, IL, LA, MI, MS, NM, OH, OK, SC, TN, TX. |
| OFAC and other watch lists | Name, Sanctioning Body, DOB, address, designation | As updated by Office of Foreign Asset Control | The file contains the following interdiction lists:<br><br>• Australian Reserve Bank Businesses<br>• Australian Reserve Bank Individuals<br>• Bank of England Sanctions<br>• Commodity Futures Trading Commission List of Regulatory and Self-Regulatory Authorities<br>• Defense Trade Controls (DTC) Debarred Parties<br>• FBI Fugitives 10 Most Wanted, Most Wanted Terrorists and Monthly Most Wanted<br>• Financial Crimes Enforcement Network Special Alert List<br>• Foreign Agent Registrations<br>• International Police Most Wanted<br>• Office of Foreign Assets Control<br>• OFAC - Enhanced Sanctioned Countries<br>• Office of Controller of Currency of Unauthorized Banks<br>• OSFI - Canada<br>• Palestinian Legislative Council<br>• Politically Exposed Persons<br>• State Department Terrorist Exclusions<br>• Terrorists Inside of European Union<br>• Terrorists Outside of European Union<br>• United Nations Named Terrorists<br>• US Bureau of Industry and Security - Unverified Entity List<br>• US Bureau of Industry and Security - Denied Entity List<br>• US Bureau of Industry and Security - Denied Person List<br>• World Bank Ineligible Firms<br><br>Explanation of OFAC:<br><br>The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions against targeted foreign countries, terrorism sponsoring organizations and international narcotics traffickers based on U.S. foreign policy and national security goals. OFAC acts under Presidential wartime and national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze foreign assets under U.S. jurisdiction.  Many of the sanctions are based on United Nations and other international mandates, are multilateral in scope, and involve close cooperation with allied governments. |

| | | | |
|---|---|---|---|
| Jury Verdicts and Settlements | Parties, Attorneys, Expert Witnesses, Dates, Amount, Cause of Action Description | Varies by publication | State and Federal Jury Verdict and Expert Witness Reporters including the following: AK Jury Verdicts & Settlements, Alabama Jury Verdict Reporter, Alabama Jury Verdicts, AL Civil Trial Reporter, Arizona Litigation Reports, Arkansas Jury Verdicts and Settlements, California Jury Verdicts and Settlements: CT JAS Publication, CT Jury Verdict Review & Analysis, DC Metro Verdicts Monthly - DC, VA and MD, expert4law - The Legal Marketplace, LA County Bar Association Expert Witness Directory, Federal Jury Verdict Reporter, FL Jury Verdict Reporter, FL Jury Verdict Review & Analysis, GA Trial Reporter, Idaho Jury Verdicts & Settlements, Indiana Jury Verdict Reporter, JurisPro Expert Witness Directory, Kentucky Trial Court Review, Louisiana Jury Verdicts and Settlements, MA JAS Publication, MA Jury Verdict Review & Analysis, MD Metro Verdicts Monthly, Medical Litigation Alert, ME Jury Verdict Review & Analysis, Mississippi Jury Verdicts and Settlements, Missouri and Illinois Jury Verdicts, MI Trial Reporter, National Jury Verdict Review & Analysis, New York State Jury Verdict Review and Analysis, NH Jury Verdict Review & Analysis, NJ Jury Verdict Review & Analysis, North Texas Reports, OH Trial Reporter, Oregon Arbitration Decisions, Oregon Jury Verdicts & Settlements, PA Jury Verdict Review & Analysis, RI JAS Publication, RI Jury Verdict Review & Analysis, SEAK National Directory of Experts, SEAK National Directory of Independent Medical Examiners, Tennessee Jury Verdict Reporter, Tennessee Jury Verdicts and Settlements, Texas Trial Reports, Twin City Jury Verdicts Reporter, TX Reporter Soele's Trial Report, UT Rocky Mountain Verdicts & Settlements, VA Metro Verdicts Monthly, Verdicts, Settlements and Tactics, VT Jury Verdict Review & Analysis, Washington Arbitration Decisions, Washington Jury Verdicts & Settlements, Wisconsin Jury Verdicts and Settlements |
| Marriage/Divorce Records | Party names, marriage/divorce date and county, certificate and case numbers | Varies by state - most monthly | Marriage and Divorce Records from the following states: CO, CT, FL, GA, KY, NV, NC, TX |
| Sexual Offenders | Name, AKA(s), address, DOB | Varies by state | National |
| Voter Registrations | Name, Address, DOB, Registration Number, Precinct | Yearly | Voter registration information from the following states: AL, AK, AR, CO, CT, DE, DC, GA, IL, KS, LA, MI, MO, MT, NJ, NY, NC, NV, OH, OK, OR, PA, RI, SC, TX, UT, WA |
| Mortgage and Financial Institutions Sanctions | Name of the individual or institution, jurisdiction, agency, date, case number, action taken, incident description, status and disposition | Weekly | Formal sanctions against members of financial and health care services industries by a range of Federal and State regulatory agencies including, but not limited to: NASD, SEC, HUD, the stock exchanges and state real estate commissions. |
| Statewide Public Records Person Search | Date elements vary according to data type | See above | All public records for a given state |
| Florida Accidents | | Quarterly | Traffic Accident Reports for the State of Florida. |
| News | Source, date, headline, text of the article or story | Daily | Contains full text articles from over 19000 English language news sources and other publications. |
| Negative News | Source, date, headline, text of the article or story | Daily | Contains full text articles from over 19000 English language news sources and other publications. A negative connotation search string has been prebuilt so that most articles retrieved will reflect negative treatment of the search subject. |
| LexisNexis Corporate Affiliations | Corporate Identity: name, private, public or international status, ticker symbol and exchange, state of incorporation, address, telephone and fax number: Descriptive Data: year founded, number of employees, ownership percentage, primary business activities, SIC Code(s), product brands, and computer systems in use: Current Financials: sales, revenue, net income/earnings, net worth, general assets and liabilities, pension assets, and fiscal year-ends: Personnel: names and titles for more than 280,000 top executives, including CEO's, marketing vice presidents, financial officers, board of directors, purchasing agents and more: Outside Service Firms: such as legal firms, auditors, insurance carriers, bankers, pension managers, and transfer agents for the companies listed. | Daily | Contains profile information and corporate linkage to the eighth level for more than 182,000 public and private companies (including more than 62,000 parent companies worldwide). |
| Thomson Directories | | Monthly | |
| Mergerstat | Company Names, Addresses, Ticker Symbols, Narratives | Annually | An annual publication tracking mergers and acquisitions activity involving U.S. companies. The publication reports and analyzes publicly announced acquisitions of $1 million or more in 50 industry classifications. |
| Hoovers Company Capsules | Company Name, Address, CEO, CFO and Chief Human Resources Officer, Sales and one-year sales change, Fiscal year end, Stock Exchange and Symbol, Industry, and a brief overview of operations. | | Domestic companies usually demonstrate revenues in excess of $10 million, substantial assets/net worth, or a work force in excess of 300 persons while non-U.S. based companies usually demonstrate revenues in excess of $50 million. |
| SEC Filings | Varies by form | Daily | Required SEC filings for all publicly traded companies |
| Standard and Poor's Corporate Descriptions Plus News | Company Name, Address, Phone, Fax, Officers and Directors, Financial Statements Fiscal year end, Stock Exchange and Symbol, Industry, and a brief overview of operations. | Daily | Contains profiles and news on more than 9,300 US public companies. |
| GuideStar | Company Name, Address, Phone, Fax, Officers and Directors. | Quarterly | Provides information on nonprofit organizations such as verifying a nonprofit's registration, learning whether a contribution will be tax deductible, or finding out more about its mission, programs, and finances. |
| Find a Business | Name, Address, Phone numbers, Principals, FEIN | Daily | A database combined from over 200 sources containing nationwide business locator information for approximately 150 million unique businesses based in the US and territories. Sources include Secretary of State filings, DBA filings, phone publishers, the Electronic Directory Assistance database, numerous other public record sources and marketing, registrations and warranty card aggregators. |
| Secretary of State Filings | Business name, address, principal information, corporate or filing numbers, registered agent and address (where applicable), business started, date filed and status date, status | Varies by state - most weekly, many mothly | Secretary of State filings from all states except DE. "Doing Business As" data from all 50 states. |
| UCC Liens | Debtor name and address, creditor name and address, number, filing and/or release dates, UCC type, collateral | Weekly | Uniform Commercial Code filings from all 50 states |

| | | | |
|---|---|---|---|
| D & B Global Market Identifiers | Company name and address and telephone, principals, parent information, sales and employment statistics, charter, duns and FEIN numbers, NASIC codes and descriptions. | Quarterly | The D&B Global Market Identifier is a global offering of Dun and Bradstreet's Market Identifier WorldBase. This file includes US and non-US business records, on both public and private companies in over 220 countries. |
| D & B FEIN | Business Name and Address, Company Executives, Parent and Headquarter Information, DUNS number and SIC code. | Quarterly | A partial listing of the Federal Employer Identification Numbers (FEIN) assigned by the Federal Government to business entities expected to file federal tax returns.  Note that D&B derives this information from a number of sources, none of which are the assigning federal office, and it is not intended to be a comprehensive list of all assigned FEIN numbers. |
| D & B DUNS Minority & Women-Owned Businesses | Business Name and Address, Company Executives, Parent and Headquarter Information, DUNS number and SIC code. | Monthly | An extensive file of businesses that are 50% owned and operated by a woman and/or minority. |
| D & B Private Company Insights | Business Name and Address, Company Executives, including biographies, Parent and Headquarter Information, DUNS number, financial information, income, business ratios and open liens, judgements and lawsuits,  and SIC code. | Quarterly | Provides key company information for the top 250,000 private companies ranked by total sales in the US. |
| Experian Business Reports | Company name and address and telephone, principals, trade information, public filings | Quarterly | Experian Business Credit Report for 8 million domestic companies and 5 million business owners. |
| Smartlinx Person Report | see description | | The Person Report file contains reports for individuals. The reports are analytically generated from select public record and publicly available data, done to rigorous quality and consistency standards. |
| | | | The reports contain categories of descriptive information about that individual - including assets, addresses, associates, relatives, neighbors, lien, bankruptcy and other information. |
| | | | The reports also contain hypertext links to the original source documents used to compile the Summary Report, as well as links to associated people, businesses and locations. |
| Smartlinx Business Report | see description | | The Business Report file contains reports for businesses and other organizations. The reports are analytically generated from select public records holdings on all entities, done to rigorous quality and consistency standards. |
| | | | The reports contain categories of descriptive information about that organization - including assets, addresses, associates, lien, bankruptcy and other information. |
| | | | The reports also contain hypertext links to the original source documents used to compile the Summary Report, as well as links to associated people, businesses and locations. |
| Smartlinx Location Report | see description | | The Location Summary Report file contains reports for locations - deliverable, valid addresses recognized by the United States Postal Service. The reports are analytically generated from select public records holdings on all entities, done to rigorous quality and consistency standards. |
| | | | Location Summary Reports contain categories of descriptive information about that site - including tax assessment, deed transfer, mortgage information, addresses, associates, and other information. |
| | | | The Summary Reports contain hypertext links to the original source documents used to compile the Summary Report, as well as links to associated people, businesses and neighbors. |

# EXHIBIT – 5

**ESTIMATED REACH AND SUPPLEMENTAL NOTICE REQUIRED DEPENDENT ON AMOUNT OF DIRECT NOTICE**

| Direct Notice | Notice Phases and Outside Budget | | Reach Analysis - Class Size: 4,200,000 | | | |
|---|---|---|---|---|---|---|
| **85%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Direct Notice | $ 1,643,427 | Direct | 1 | 85.0% | 0.150 |
| | USPS to approx. 4.2 million | | Print | 1 | 9.1% | 0.909 |
| | Print Publication | $ 81,298 | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | *Sports Illustrated* | | Online Display Banners | 1 | 25.0% | 0.750 |
| | *USA Today* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 29,412 | 0.15 x 0.909 x 0.995 x 0.75 = | 0.1017512 | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | 1 - 0.102 = | 0.8982488 | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | **TOTAL COST:** | $ 1,769,137 | **REACH:** | **89.8%** | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | **89.8%** | | | | |
| **62%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Direct Notice | $ 1,168,490 | Direct | 1 | 62.0% | 0.380 |
| | Email to 1.45 million, USPS to 2.9 million | | Print | 1 | 17.8% | 0.822 |
| | Print Publication | $ 81,298 | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | *Sports Illustrated* | | Online Banners | 1 | 47.0% | 0.530 |
| | *USA Today* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 94,624 | 0.38 x 0.822 x 0.995 x 0.53 = | 0.164723 | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | 1 - 0.165 = | 0.835277 | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 1,359,412 | **REACH:** | **83.5%** | | |
| | **PHASE II** | | | | | |
| | Print Publication | $ 51,692 | | | | |
| | *ESPN the Magazine* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 63,823 | | | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | | | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 130,515 | | | | |
| | **TOTAL COST:** | $ 1,489,927 | | | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | **83.5%** | | | | |
| **59%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Direct Notice | $ 1,137,140 | Direct | 1 | 59.0% | 0.410 |
| | USPS to approx. 2.9 million | | Print | 1 | 17.8% | 0.822 |
| | Print Publication | $ 81,298 | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | *Sports Illustrated* | | Online Banners | 1 | 50.0% | 0.500 |
| | *USA Today* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 94,624 | 0.41 x 0.822 x 0.995 x 0.5 = | 0.1676675 | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | 1 - 0.168 = | 0.8323326 | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 1,328,062 | **REACH:** | **83.2%** | | |
| | **PHASE II** | | | | | |
| | Print Publication | $ 51,692 | | | | |
| | *ESPN the Magazine* | | | | | |
| | Press Release | $ 2,500 | | | | |
| | Display Banners | $ 70,882 | | | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | | | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | | | | |
| | | $ 137,574 | | | | |
| | **TOTAL COST:** | $ 1,465,636 | | | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | **83.2%** | | | | |
| **0%** | **PHASE I: 0-120 days from Preliminary Approval** | | **Random Media Combination Calculation** | | | |
| | Print Publication | $ 81,298 | Direct | 1 | 0.0% | 1.000 |
| | *Sports Illustrated* | | Print | 1 | 17.8% | 0.822 |
| | *USA Today* | | Press Release, Outreach, Google, & Facebook | 1 | 0.5% | 0.995 |
| | Press Release | $ 2,500 | Online Banners | 1 | 75.5% | 0.245 |
| | Display Banners | $ 153,447 | | | | |
| | Outreach (aka Social Media Monitoring) | $ 5,500 | | | | |
| | Google Display Network | $ 2,500 | | | | |
| | Facebook | $ 4,500 | 1 x 0.822 x 0.995 x 0.2451 = | 0.2004648 | | |
| | | $ 249,745 | 1 - 0.200 = | 0.7995352 | | |
| | **PHASE II** | | **REACH:** | **80.0%** | | |
| | Print Publication | $ 51,692 | | | | |
| | *ESPN the Magazine* | | | | | |
| | Press Release | $ 2,500 | * Banner reach is based on serving a minimum of 90 million impressions, frequency | | | |
| | Display Banners | $ 291,471 | capped to ensure a minimum of 4.2 million unique IP addresses are reached that fit | | | |
| | Outreach (aka Social Media Monitoring) | $ 7,500 | within the class definition. Assuming 25% of the users reached online also see the | | | |
| | Google Display Network | $ 10,000 | notice in other mediums, the estimated reach of the online banners is 75% of the class. | | | |
| | Facebook | $ 15,000 | | | | |
| | | $ 378,163 | | | | |
| | **TOTAL COST:** | $ 627,908 | | | | |
| | **ESTIMATED REACH WITH 5-10X FREQUENCY:** | **80.0%** | | | | |

LDG assumes there will be duplicative notice for some individuals who receive direct notice and view the notice in other media. It is LDG's opinion that the duplication will not affect the fact that the notice plan meets Due Process requirements.

# EXHIBIT – 6

  

**NOTICE COST SUMMARY**

**Estimate Scenario #1**

    **Key Assumptions:**

        1 - Estimated class of 4.2 million individuals
        2 - Direct notice will consist of single postcard mailed to 2.9 million Class Members
        3 - Static case-dedicated website to host case documents and information

    **Total Estimated Direct and Indirect Notice Cost To Reach Minimum 80% of Class Assuming Direct Mail for 59% of Class:**

| | | |
|---|---|---:|
| Total Direct Mailing Cost: | $ | 1,137,140 |
| Total Estimated Supplemental Notice Cost: | $ | 328,496 |
| Total Estimated Direct and Supplemental Notice Cost: | **$** | **1,465,636** |

**Estimate Scenario #2**

    **Key Assumptions:**

        1 - Estimated class of 4.2 million individuals
        2 - Direct notice will consist of single postcard mailed to 2.9 million Class Members
        3 - Email blast of Notice to 1.45 million Class Members
        4 - Static case-dedicated website to host case documents and information

    **Total Estimated Direct and Indirect Notice Cost To Reach Minimum 80% of Class Assuming Direct Mail for 62% of Class:**

| | | |
|---|---|---:|
| Total Direct Mailing Cost: | $ | 1,168,490 |
| Total Estimated Supplemental Notice Cost: | $ | 321,437 |
| Total Estimated Direct and Supplemental Notice Cost: | **$** | **1,489,927** |

**Estimate Scenario #3**

    **Key Assumptions:**

        1 - Estimated class of 4.2 million individuals
        2 - Direct notice will consist of single postcard mailed to 4.2 million Class Members
        3 - Static case-dedicated website to host case documents and information

    **Total Estimated Direct and Indirect Notice Cost Assuming Direct Mail for 85% of Class:**

| | | |
|---|---|---:|
| Total Direct Mailing Cost: | $ | 1,643,427 |
| Estimated Cost Of Supplemental Notice Suggested To Reach Class Though Multiple Channels: | $ | 125,710 |
| Total Estimated Direct and Supplemental Notice Cost: | **$** | **1,769,137** |

**ESTIMATE SCENARIO #1**

April 13, 2015



**Matter:  NCAA Student Athlete Concussion Litigation  - Administration Cost Estimate**

## NOTICE ADMINISTRATION COST ESTIMATE SUMMARY

**KEY ASSUMPTIONS:**

1 - Estimated class of 4.2 million individuals
2 - Direct notice will consist of single postcard mailed to 2.9 million Class Members
3 - Static case-dedicated website to host case documents and information

**CLASS SIZE:**

| | |
|---|---|
| **Total Estimated Class Size** | **4,200,000** |
| **Class Members To Be Mailed Direct Notice via USPS** | **2,900,000** |

**SERVICES:**

**Notification Procedures**

| | | |
|---|---|---|
| Mailing Prep & Data Prep | $ | 5,295 |
| Printing/Mailing | | 796,632 |
| RUM Handling & Address Searches | | 333,713 |
| Website Development | | 1,500 |
| **Total Direct Mailing Cost:** | **$** | **1,137,140** |

**TOTAL ESTIMATED NUMBER OF CLASS MEMBERS REACHED THROUGH DIRECT MAIL:** 2,465,000

**ESTIMATED PERCENTAGE OF TOTAL CLASS MEMBERS REACHED THROUGH DIRECT NOTICE:** 59%

| | | |
|---|---|---|
| **TOTAL DIRECT MAIL COST:** | $ | 1,137,140 |
| **TOTAL ESTIMATED COST OF SUPPLEMENTAL NOTICE REQUIRED TO ENSURE 80% REACH OF CLASS MEMBERS:** | $ | 328,496 |
| **TOTAL ESTIMATED DIRECT AND SUPPLEMENTAL NOTICE COST:** | $ | 1,465,636 |

April 13, 2015



**Matter: NCAA Student Athlete Concussion Litigation - Administration Cost Estimate**
**Page 2 of 2**

## NOTIFICATION PROCEDURES

| | Unit Rate | Volume | Cost | Total |
|---|---|---|---|---|
| **Mailing Prep & Data Prep** | | | | |
| NCOA Update | | | $ 795 | |
| Data preparation | $ 90.00 | 50 hrs | 4,500 | |
| Subtotal Mailing Prep & Data Prep | | | | 5,295 |
| **Printing/Mailing** | | | | |
| Notice Packet: | | | | |
| 4.25" x 6" Single Postcard | $ 0.016 | 2,900,000 | $ 47,082 | |
| Estimated 1st Class Postage | $ 0.258 | 2,900,000 | 748,200 | |
| Print Production Staff Hours | $ 90.00 | 15 hrs | 1,350 | |
| Subtotal Notice | | | | 796,632 |
| **Returned Undeliverable Mail ("RUM") Handling & Address Searches** | | | | |
| Estimated % and Number of RUM Notice Packets | 30% | 870,000 | | |
| RUM Scanning | $ 0.04 | 870,000 | $ 34,800 | |
| Address Searches | $ 0.20 | 870,000 | 174,000 | |
| Percentage of RUM returned without SSN available for Search | 100% | 870,000 | | |
| Amount of New Addresses Found (without SSN) and Remail Cost | 50% $ 0.021 | 435,000 | 9,083 | |
| Estimated 1st Class Postage | $ 0.258 | 435,000 | 112,230 | |
| Staff Hours Performing RUM & Remail Services | $ 90.00 | 40 hrs | 3,600 | |
| Subtotal RUM Handling & Address Searches | | | | 333,713 |
| **Website Development** | | | | |
| Static case-dedicated website with case information and documents | | | $ 1,500 | 1,500 |
| **Subtotal Notification Procedures** | | | | **$ 1,137,140** |

**ESTIMATE SCENARIO #2**

April 13, 2015



Matter:  NCAA Student Athlete Concussion Litigation  - Administration Cost Estimate

## NOTICE ADMINISTRATION COST ESTIMATE SUMMARY

**KEY ASSUMPTIONS:**

1 - Estimated class of 4.2 million individuals
2 - Postcard Notice mailed to 2.9 million Class Members
3 - Email blast of Notice to 1.45 million Class Members
4 - Static case-dedicated website to host case documents and information

**CLASS SIZE:**

| | |
|---|---:|
| **Total Estimated Class Size** | 4,200,000 |
| **Class Members To Be Mailed Direct Notice via USPS/Email** | 2,900,000 |

**SERVICES:**

| Notification Procedures | | |
|---|---|---:|
| Mailing Prep & Data Prep | $ | 5,295 |
| Email Blast | | 31,350 |
| Printing/Mailing | | 796,632 |
| RUM Handling & Address Searches | | 333,713 |
| Website Development | | 1,500 |
| **Total Direct Mailing Cost:** | **$** | **1,168,490** |

| | | |
|---|---|---:|
| **TOTAL ESTIMATED NUMBER OF CLASS MEMBERS REACHED THROUGH DIRECT MAIL:** | 2,610,000 | |
| ***ESTIMATED PERCENTAGE OF TOTAL CLASS MEMBERS REACHED THROUGH DIRECT NOTICE:** | 62% | |
| **TOTAL DIRECT MAIL COST:** | $ | 1,168,490 |
| **TOTAL ESTIMATED COST OF SUPPLEMENTAL NOTICE REQUIRED TO ENSURE 80% REACH OF CLASS MEMBERS:** | $ | 321,437 |
| **TOTAL ESTIMATED DIRECT AND SUPPLEMENTAL NOTICE COST:** | $ | 1,489,927 |

*The Estimated percentage reached through direct notice assumes that 10% of those who receive email notice will receive notice through email exclusively due to their postal notice being returned as undeliverable and no re-mail address found through searches performed.*

April 13, 2015



**Matter:  NCAA Student Athlete Concussion Litigation  - Administration Cost Estimate**
**Page 2 of 2**

## NOTIFICATION PROCEDURES

| | | Unit Rate | | Volume | | Cost | | Total |
|---|---|---|---|---|---|---|---|---|
| **Mailing Prep & Data Prep** | | | | | | | | |
| NCOA Update | | | | | | $ | 795 | |
| Data preparation | | $ | 90.00 | 50 | hrs | | 4,500 | |
| Subtotal Mailing Prep & Data Prep | | | | | | | | 5,295 |
| **Email Blast** | | | | | | | | |
| Staff time prepping and verifying email address data | | $ | 90.00 | 10 | hrs | $ | 900 | |
| Mass Email Notice | | $ | 0.021 | 1,450,000 | | | 30,450 | |
| Subtotal Email Services | | | | | | | | 31,350 |
| **Printing/Mailing** | | | | | | | | |
| Total Class Members receiving postal mail Notice | | | | 2,900,000 | | | | |
| Notice Packet: | | | | | | | | |
|   4.25" x 6" Single Postcard | | $ | 0.016 | 2,900,000 | | $ | 47,082 | |
| Estimated 1st Class Postage | | $ | 0.258 | 2,900,000 | | | 748,200 | |
| Print Production Staff Hours | | $ | 90.00 | 15 | hrs | | 1,350 | |
| Subtotal Notice | | | | | | | | 796,632 |
| **Returned Undeliverable Mail ("RUM") Handling & Address Searches** | | | | | | | | |
| Estimated % and Number of RUM Notice Packets | 30% | | | 870,000 | | | | |
| RUM Scanning | | $ | 0.04 | 870,000 | | $ | 34,800 | |
| Address Searches | | $ | 0.20 | 870,000 | | | 174,000 | |
| Percentage of RUM returned without SSN available for Search | 100% | | | 870,000 | | | | |
| Amount of New Addresses Found (without SSN) and Remail Cost | 50% | $ | 0.021 | 435,000 | | | 9,083 | |
| Estimated 1st Class Postage | | $ | 0.258 | 435,000 | | | 112,230 | |
| Staff Hours Performing RUM & Remail Services | | $ | 90.00 | 40 | hrs | | 3,600 | |
| Subtotal RUM Handling & Address Searches | | | | | | | | 333,713 |
| **Website Development** | | | | | | | | |
| Static case-dedicated website with case information and documents | | | | | | $ | 1,500 | 1,500 |
| **Subtotal Notification Procedures** | | | | | | | | **$ 1,168,490** |

**ESTIMATE SCENARIO #3**

April 13, 2015



**Matter: NCAA Student Athlete Concussion Litigation - Administration Cost Estimate**

### NOTICE ADMINISTRATION COST ESTIMATE SUMMARY

**KEY ASSUMPTIONS:**

1 - Estimated class of 4.2 million individuals
2 - Direct notice will consist of single postcard mailed to 4.2 million Class Members
3 - Static case-dedicated website to host case documents and information

**CLASS SIZE:**

| | |
|---|---|
| **Total Estimated Class Size** | **4,200,000** |
| **Class Members To Be Mailed Direct Notice via USPS** | **4,200,000** |

**SERVICES:**

| Notification Procedures | | |
|---|---|---|
| Mailing Prep & Data Prep | $ | 5,295 |
| Printing/Mailing | | 1,153,138 |
| RUM Handling & Address Searches | | 483,494 |
| Website Development | | 1,500 |
| **Total Direct Mailing Cost:** | **$** | **1,643,427** |

| | |
|---|---|
| **TOTAL ESTIMATED NUMBER OF CLASS MEMBERS REACHED THROUGH DIRECT MAIL:** | **3,570,000** |
| **ESTIMATED PERCENTAGE OF TOTAL CLASS MEMBERS REACHED THROUGH DIRECT NOTICE:** | **85%** |
| **TOTAL DIRECT MAIL COST:** | **$ 1,643,427** |
| **ESTIMATED COST OF SUPPLEMENTAL NOTICE SUGGESTED TO REACH CLASS THOUGH MULTIPLE CHANNELS:** | **$ 125,710** |
| **TOTAL ESTIMATED DIRECT AND SUPPLEMENTAL NOTICE COST:** | **$ 1,769,137** |

April 13, 2015



**Matter:  NCAA Student Athlete Concussion Litigation  - Administration Cost Estimate**
**Page 2 of 2**

## NOTIFICATION PROCEDURES

| | Unit Rate | Volume | Cost | Total |
|---|---|---|---|---|
| **Mailing Prep & Data Prep** | | | | |
| NCOA Update | | | $    795 | |
| Data preparation | $    90.00 | 50  hrs | 4,500 | |
| Subtotal Mailing Prep & Data Prep | | | | 5,295 |
| **Printing/Mailing** | | | | |
| Notice Packet: | | | | |
|   4.25" x 6" Single Postcard | $    0.016 | 4,200,000 | $  68,188 | |
| Estimated 1st Class Postage | $    0.258 | 4,200,000 | 1,083,600 | |
| Print Production Staff Hours | $    90.00 | 15  hrs | 1,350 | |
| Subtotal Notice | | | | 1,153,138 |
| **Returned Undeliverable Mail ("RUM") Handling & Address Searches** | | | | |
| Estimated % and Number of RUM Notice Packets | 30% | 1,260,000 | | |
| RUM Scanning | $    0.04 | 1,260,000 | $  50,400 | |
| Address Searches | $    0.20 | 1,260,000 | 252,000 | |
| Percentage of RUM returned without SSN available for Search | 100% | 1,260,000 | | |
| Amount of New Addresses Found (without SSN) and Remail Cost | 50% | $    0.021 | 630,000 | 13,154 |
| Estimated 1st Class Postage | $    0.258 | 630,000 | 162,540 | |
| Staff Hours Performing RUM & Remail Services | $    90.00 | 60  hrs | 5,400 | |
| Subtotal RUM Handling & Address Searches | | | | 483,494 |
| **Website Development** | | | | |
| Static case-dedicated website with case information and documents | | | $  1,500 | 1,500 |
| **Subtotal Notification Procedures** | | | | **$   1,643,427** |

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned, an attorney, hereby certifies that on April 14, 2015 a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: *<u>/s/ Steve W. Berman</u>*