**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | ) ) ) ) ) ) ) ) ) | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Document Relates to All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

**JOINT SUPPLEMENTAL SUBMISSION REGARDING NOTICE**

Plaintiffs Adrian Arrington, et al. ("Plaintiffs") and the National Collegiate Athletic Association ("NCAA," and together with Plaintiffs, the "Parties") jointly make this supplemental submission regarding the Notice Plan, as amended:[1]

## I.     INTRODUCTION

On February 23, 2015, the Parties filed a Joint Submission Regarding the Feasibility and Cost of Direct Notice (Dkt. #142). In that filing, the Parties advised the Court that in-house and outside counsel for the NCAA had contacted nine NCAA member institutions in an effort to determine the scope, nature and extent of records maintained by those institutions regarding the names and last-known addresses of individuals who participated in NCAA-sanctioned sports while enrolled at each institution. See Spellman Decl., Ex. A hereto, at ¶¶ 2-5. The nine institutions included schools in each of the three divisions, and counsel for the NCAA made an effort to ensure that the institutions were otherwise broadly representative vis-a-vis other metrics

---

[1]     Capitalized terms in this submission have the meaning ascribed to them in the Amended Class Action Settlement Agreement And Release, which itself is Exhibit 1 to the joint motion for preliminary approval of class settlement and certification of settlement class. See Am. Settlement Agt. (Dkt. #154-1).

(e.g., private versus public, geographic location, respective size of the athletic department, etc.).
See id. at ¶ 4.

Since the February 23, 2015 submission, counsel for the NCAA have consulted with an
additional three member institutions.  In total, counsel for the NCAA have now consulted with
12 member institutions.  The interviews and other communications with those 12 member
institutions reveal that again as would be expected, the contact information maintained varies by
institution and in several different respects.  See Spellman Decl., Ex. A hereto, at ¶¶ 5-6.  As
indicated in the February 23, 2015 submission, some institutions maintain dedicated lists of
student-athletes by sport or otherwise, while other institutions maintain rosters of various sports
that can then be matched up against broader lists of current and former students.  See id. at ¶ 6.
In many instances, these lists are maintained by the institutions themselves, whereas in other
instances, the best, most complete and up-to-date lists are maintained by separate alumni
organizations, which themselves are typically separate, tax-exempt entities.  See id. at ¶ 7.

The information provided to the NCAA confirms that direct notice will in fact be feasible
for a substantial majority of the members of the Settlement Class, and the information obtained
by the NCAA and its counsel since the filing of the February 23, 2015 submission only further
confirms that to be the case.  See Spellman Decl., Ex. A hereto, at ¶ 9.  Moreover, the Amended
Notice Plan supplements direct notice with well-accepted methods of indirect notice, providing
for robust notice that we believe fully satisfies the requirement of Fed. R. Civ. P. 23(c)(2)(B) that
class members receive "the best notice that is practicable under the circumstances, including
individual notice to all members who can be identified through reasonable effort."

## A. Direct Notice Should Be Feasible For Fifty-Nine Percent Or More Of The Settlement Class

Based upon the information obtained from the member institutions contacted by the NCAA and its counsel and after review and analysis of that information by the proposed Notice Administrator, it should be feasible to send direct, mailed notice to fifty-nine percent (59%) to sixty-two percent (62%) of the Settlement Class. See Spellman Decl., Ex. A hereto, at ¶ 13; see also Vasquez Decl. (Dkt. #162) at ¶ 29.

In light of the concerns raised in the Court's December 17, 2014 Memorandum Opinion and Order, the Parties have amended the Notice Plan in order to better clarify the role of direct notice and the fact that direct, mailed notice will be provided to all members of the Settlement Class for whom the Parties are able to obtain a name and last-known address from NCAA member institutions or other sources. See Spellman Decl., Ex. A hereto, at ¶ 10; see also Vasquez Decl. (Dkt. #162) at ¶¶ 8, 20-31. Under the Amended Notice Plan, the proposed Notice Administrator will use the National Change of Address update ("NCOA") to obtain last-known addresses for all Settlement Class Members for whom the Parties have been able to obtain an address from an NCAA member institution or otherwise. See Vasquez Decl. (Dkt. #162) at ¶ 24. In addition, the proposed Notice Administrator will utilize the NCOA and other available sources of information in order to obtain current addresses (as is practicable) for all members of the Settlement Class identified by member institutions. See id. at ¶¶ 24-28. Direct notice will then be sent to all such persons. See id. at ¶¶ 8, 20-31.

As previously indicated, a number of member institutions raised the Family Educational Rights and Privacy Act ("FERPA") and expressed the view that the issuance of subpoenas would be necessary in order to comply with the dictates of FERPA before the names and last-known

addresses of student-athletes could be released to the Parties or their counsel.[2]  See Feb. 23, 2015

Submission (Dkt. #142) at 7-8.  Similar concerns were raised by member institutions contacted

since the filing of the February 23, 2015 Submission.  See Spellman Decl., Ex. A hereto, at ¶ 8.

The Parties have, in turn, specified in the Amended Notice Plan the possible need for the

issuance of subpoenas and have proposed a plan that provides sufficient time for issuance of

subpoenas.  See id. at ¶ 10; see also Vasquez Decl. (Dkt. #162) at ¶¶ 21, 48.

Based on the information obtained by the NCAA from member institutions, the Parties

estimate that direct notice will cost between $1,137,140 and $1,168,490.  See Spellman Decl.,

Ex. A hereto, at ¶ 13; see also Vasquez Decl. (Dkt. #162) at ¶ 53.  This range is based upon the

actual cost of mailing as well as all other related costs.  See Spellman Decl., Ex. A hereto, at

¶ 13; see also Vasquez Decl. (Dkt. #162) at ¶ 53, Ex. 6.

## B.    Supplemental Indirect Notice

In addition to direct notice, several forms of indirect notice will also be utilized in order

to ensure the broadest possible reach.[3]  See Spellman Decl., Ex. A hereto, at ¶ 14; see also

Vasquez Decl. (Dkt. #162) at ¶¶ 32-52.  The indirect notice efforts will include:

---

[2]     Under FERPA, educational institutions generally must receive written permission from
either an eligible student or that student's parent in order to release information from the
student's education record.  See 20 U.S.C. § 1232g(b).  FERPA and its related regulations make
clear, however, that such information may otherwise be disclosed pursuant to a lawfully-issued
subpoena, and to the extent that similar statutes or regulations exist in certain states, those state
laws would be subject to the Supremacy Clause.  See 20 U.S.C. § 1232g(b)(2)(B); 34 C.F.R.
§ 99.31(a)(9)(ii); U.S. Const. art. VI.

[3]     Such forms of indirect notice are acceptable supplements to individual, direct notice
efforts.  See Manual for Complex Litigation (Fourth) § 21.311 (2004) ("Posting notices on
dedicated Internet sites, likely to be visited by class members and linked to more detailed
certification information, is a useful supplement to individual notice, might be provided at
relatively low cost, and will become increasingly useful as the percentage of the population that
regularly relies on the Internet for information increases. . . .  Publication in magazines,

(continued...)

1.  Print publication in national publications, namely <u>ESPN The Magazine</u>, <u>Sports Illustrated</u> and <u>USA Today</u>;

2.  Establishment of a case-dedicated settlement website;

3.  Implementation of a substantial online advertising campaign;

4.  Wide dissemination of a press release; and

5.  Evaluation of earned media.[4]

As set forth in the February 23, 2015 submission, numerous courts have held that such forms of indirect notice can meaningfully augment and strengthen a given notice program.  <u>See</u> Feb. 23, 2015 Submission (Dkt. #142) at 12-13 (collecting cases).  The planned supplemental notice efforts, when combined with direct notice, would bring the total cost of implementation of the Amended Notice Plan to between approximately $1,465,636 and $1,489,927.  <u>See</u> Spellman Decl., Ex. A hereto, at ¶ 15; <u>see also</u> Vasquez Decl. (Dkt. #162) at ¶ 57.  That amount, however, still represents less than 2.2 percent (2.2%) of the Medical Monitoring Fund and falls well within the reported range of notice programs for comparable settlements.[5]

---

(...continued)
newspapers, or trade journals may be necessary if individual class members are not identifiable after reasonable effort or as a supplement to other notice efforts.").

[4]     As more fully described in the September 5, 2014 declaration of Alan Vasquez, "earned media" is unpaid publicity such as news coverage.  <u>See</u> Vasquez Decl. (Dkt. #84-1) at ¶¶ 9, 10, 15, 34-38; <u>see also</u> Motion for Approval of Notice Plan (Dkt. #84) at 2-4, 7-8.

[5]     <u>See</u>, <u>e.g.</u>, <u>In re Capital One Tel. Consumer Prot. Act Litig.</u>, 2015 U.S. Dist. LEXIS 17120, at *12 (N.D. Ill. 2015) (granting final approval of settlement and deducting "notice and administration costs" of $5,093,000, including direct notice pass-through expenses of approximately $3.7 million, from "settlement fund of $75,455,099"); <u>In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.</u>, 733 F. Supp. 2d 997, 1004 (E.D. Wis. 2010) (granting final approval of settlement and deducting over $7,000,000 for notice from common fund of $65,000,000); <u>Ko v. Natura Pet Prods.</u>, 2012 U.S. Dist. LEXIS 128615, at *13-14 (N.D. Cal. 2012) (granting final approval of settlement and deducting $400,000 for "costs for notice and claims administration" from common fund of $2,150,000); <u>see also</u> <u>Larson v. AT&T Mobility LLC</u>, 687 F.3d 109, 116 n.9 (3d Cir. 2012) (noting that the district court rejected the objection that "class notice was deficient because the costs of notice and administrative expenses were to be paid from the Common Fund").

### C. The Amended Notice Plan Provides The Best Notice Practicable Under The Circumstances

The Amended Notice Plan further comports with Fed. R. Civ. P. 23(c)(2)(B)'s requirement that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); see also, e.g., Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc., 271 F.R.D. 139, 144 (N.D. Ill. 2010).

First, the Parties are committed to providing individual direct notice to all class members "whose identity can be ascertained with reasonable effort." See, e.g., Larson v. AT&T Mobility LLC, 687 F.3d 109, 126 (3d Cir. 2012) (quoting Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 (3d Cir. 1973)); see also Spellman Decl., Ex. A hereto, at ¶ 10; Vasquez Decl. (Dkt. #162) at ¶¶ 8, 20-31. As set forth more fully in the February 23, 2015 submission, numerous courts have held that due process does not require that every member of a settlement class be sent individual direct notice, recognizing that such direct notice would be infeasible for most large classes. See Feb. 23, 2015 Submission (Dkt. #142) at 9-11 (collecting cases). Nonetheless, as set forth above and in the Amended Notice Plan, the Parties estimate being able to obtain names and addresses for almost seventy percent (70%) of the Settlement Class --approximately 2.9 million Settlement Class members -- and, working with the proposed Notice Administrator, estimate that individual direct notice will be sent to approximately fifty-nine percent (59%) to sixty-two percent (62%) of the Settlement Class. See Spellman Decl., Ex. A hereto, at ¶ 13; see also Vasquez Decl. (Dkt. #162) at ¶¶ 8, 20-31.

Second, when combined with the supplemental indirect notice efforts, the estimated overall "reach" of the notice under the Amended Notice Plan will be at least eighty percent (80%). See Spellman Decl., Ex. A hereto, at ¶ 14; see also Vasquez Decl. (Dkt. #162) at ¶ 64

(proposed Notice Administrator will calculate reach of direct notice and will determine additional, indirect notice efforts required to ensure that notice reaches 80% of Settlement Class); id. at Ex. 5.  This figure, however, substantially exceeds the minimum requirements established by the relevant requirements and authorities.  See, e.g., Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010) ("The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class.  It is reasonable to reach between 70-95%.  A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%."); see also, e.g., In re Heartland Payment Sys., 851 F. Supp. 2d 1040, 1061 (S.D. Tex. 2012) (holding that "[t]he notice that has been given clearly complies with Rule 23(e)(1)'s reasonableness requirement" where "the court ordered the 'Summary Notice' form to reach a minimum of 80 percent of the proposed class"); In re M3 Power Razor Sys. Mktg. & Sales Practices Litig., 270 F.R.D. 45, 55 (D. Mass. 2010) (preliminarily approving settlement that "provides for notice with 80 percent reach to inform consumers of their rights as class members").

Dated:  April 15, 2015     Respectfully submitted,

/s/ Mark S. Mester       /s/ Steve W. Berman
Lead Counsel for Defendant     Co-Lead Counsel for Plaintiffs
National Collegiate Athletic Association

Mark S. Mester        Steve W. Berman
 mark.mester@lw.com      steve@hbsslaw.com
Johanna M. Spellman      HAGENS BERMAN SOBOL SHAPIRO LLP
 johanna.spellman@lw.com    1918 Eighth Avenue, Suite 3300
LATHAM & WATKINS LLP    Seattle, Washington 98101
330 North Wabash Avenue, Suite 2800  Telephone:  (206) 623-7292
Chicago, Illinois 60611      Facsimile:  (206) 623-0594
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

J. Christian Word
  christian.word@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

Joseph J. Siprut
  jsiprut@siprut.com
SIPRUT PC
122 South Michigan Avenue, Suite 1850
Chicago, Illinois  60603
Telephone:  (312) 588-1440
Facsimile:  (312) 878-1342

## **CERTIFICATE OF SERVICE**

I, Mark S. Mester, certify that on April 15, 2015, a true and correct copy of the foregoing

Joint Supplemental Submission Regarding Notice was filed through the ECF system and served

upon the following parties by prepaid first class mail.

Timothy J. McIlwain
TIMOTHY J. MCILWAIN
ATTORNEY AT LAW, LLC
89 River Street #1538
Hoboken, New Jersey 07030
Telephone:  (877) 375-9599
Facsimile:  (609) 450-7017

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Edgar D. Gankendorff
PROVOSTY & GANKENDORFF, L.L.C.
650 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone:  (504) 410-2795
Facsimile:  (504) 410-2796

/s/ Mark S. Mester
Mark S. Mester
  mark.mester@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767