# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | MDL No. 2492 <br><br> Master Docket No. 1:13-cv-09116 <br><br> This Document Relates To: <br> All Cases <br><br> Judge John Z. Lee <br><br> Magistrate Judge Geraldine Soat Brown |

### DECLARATION OF JOHANNA SPELLMAN

I, Johanna Spellman, declare as follows:

1. I am an attorney with Latham & Watkins LLP, counsel of record for the National Collegiate Athletic Association ("NCAA"). On July 30, 2014, I was appointed by the Court as Liaison Counsel for the NCAA. I make this declaration based upon my personal knowledge, and I am competent to testify as to its contents.

2. On December 17, 2014, this Court issued its Memorandum Opinion and Order, directing the Parties to select nine (9) NCAA member institutions (i.e., three (3) from each division) and request that those institutions provide the address and contact information they maintain for members of the proposed Settlement Class, as that term is defined in the Amended Settlement Agreement. See Dec. 17, 2014 Mem. Op. and Order (Dkt. #115) at 15.

3. After the issuance of the Court's December 17, 2014 Memorandum Opinion and Order and following the December 19, 2014 hearing, counsel for the NCAA began contacting NCAA member institutions to discuss their respective institutions' ability to provide name and contact information for student-athletes. Specifically, the NCAA's counsel asked member institutions to describe the scope, nature and extent of records maintained by those institutions

regarding the names and last-known addresses of individuals who have participated in NCAA-sanctioned sports while enrolled at each institution.

4.     An effort was made to ensure not only that member institutions from each NCAA division were contacted, but that the member institutions were otherwise broadly representative (e.g., private versus public, geographic location, respective size of the athletic department, etc.).

5.     On February 23, 2015, I filed a declaration describing the efforts that had been made to date. See Spellman Decl. (Dkt. #142-2). Since that filing, in-house counsel for the NCAA and I have continued to reach out to member institutions. In total, in-house counsel for the NCAA or I have conferred with twelve (12) NCAA member institutions (six (6) in Division I, three (3) in Division II and three (3) in Division III).[1]

6.     From these discussions, we learned that there is variety among the NCAA member institutions in terms of how their student-athlete contact information is maintained. Some member institutions maintain that information in a way that identifies student-athletes. Others maintain alumni contact information that does not distinguish between athletes and non-athletes. Some institutions also maintain rosters of various sports that can then be matched up against broader lists of current and former students. Some institutions were able to confirm that for each name identified, the data they maintain includes at least one point of contact (e.g., an email, phone number or mailing address) that is current.[2]

---

[1]     I have personally conferred with seven (7) member institutions and have conferred with in-house counsel for the NCAA regarding their communications with the other member institutions.

[2]     In my February 23, 2015 Declaration, I noted that many institutions maintain the Social Security Account Numbers ("SSANs") of their students and student-athletes and suggested that information could be useful in obtaining current addresses of members of the Settlement Class whose last-known addresses could not be used to determine current addresses through other means. See Spellman Decl. (Dkt. #142-2) at ¶ 7. I also noted that member institutions raised privacy and security concerns regarding providing SSANs. See id. at ¶ 9. Through subsequent

(continued...)

7. Several institutions that were contacted explained that the institution's athletic department maintains separate contact data for current and former student-athletes. Others stated that outside, Section 501(c)(3) tax-exempt organizations (e.g., alumni associations and development groups) maintain the most comprehensive sets of student-athlete contact information available.[3]

8. During the discussions with various member institutions, the issues of privacy and compliance with applicable state and federal law were repeatedly raised. As a general matter, the institutions that were contacted expressed the view that their respective institutions and/or the alumni associations and development groups that maintain contact information would require a subpoena before providing that information in order to ensure compliance with, inter alia, the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.

9. On balance, the institutions contacted estimated that they and their affiliated organizations maintain contact data identifying student-athletes going back approximately twenty-five (25) to thirty (30) years, although some institutions indicated that their data is less circumscribed than that. Based upon the information obtained from the institutions contacted, however, we believe it would be reasonable to assume that on average, member institutions will in most instances have names and last-known addresses for student-athletes who participated in NCAA-sanctioned sports over the course of the last twenty-five (25) to thirty (30) years.

---

(...continued)
discussions, the Parties have determined to not seek SSANs due to the privacy and security concerns raised by many member institutions.

[3] In my February 23, 2015 Declaration, I noted that I had asked the proposed Notice Administrator, Gilardi & Co. LLC ("Gilardi"), to consider how databases and publicly-available information could be used to obtain rosters from which student-athletes could be identified. See Spellman Decl. (Dkt. #142-2) at ¶ 15. After subsequent discussions with Gilardi, the Parties concluded that the potential yield from such resources would likely be very low and would not justify the considerable anticipated expense associated with such manual searches.

10. The Amended Notice Plan makes clear that direct, mailed notice will be provided to <u>all</u> members of the Settlement Class for whom the Parties are able to obtain a name and last-known address from NCAA member institutions or other sources. <u>See</u> Vasquez Decl. (Dkt. #162) at ¶¶ 8, 20-31. The Parties have further specified in the Amended Notice Plan the need for the issuance of subpoenas and propose appropriate allowances in terms of timing and relevant deadlines. <u>See</u> <u>id.</u> at ¶¶ 21, 48.

11. For purposes of analyzing the cost and feasibility of direct notice, based on the information we learned from the member institutions that were contacted, we have assumed that NCAA member institutions would be able to provide contact information for current student-athletes and for former student-athletes who played up to thirty (30) years ago. This would mean that approximately 2.9 million direct, mailed notices would be sent to members of the Settlement Class, based upon calculations performed for the NCAA by The Claro Group, the economic consultants retained by the NCAA.

12. The Parties have asked Gilardi to include in the Amended Notice Plan the estimated cost of providing direct notice to these 2.9 million class members and to estimate the percentage of the Settlement Class to whom it is feasible to send direct, mailed notice. The Parties have also asked Gilardi to consider the fact that some of the contact information may not be current and to consider the costs of running contact information against the United States Postal Service change of address database, otherwise known as NCOA. The Parties have asked Gilardi to make reasonable estimates of the percentage of mail that will be returned as undeliverable, based on Gilardi's experience administering notice programs for nationwide class action settlements. The Parties have also asked Gilardi to make reasonable estimates as to how

4

successful they will be at using public records databases to find contact information for class members whose initial direct notice is returned as undeliverable.

13. Gilardi estimates that assuming names and last-known addresses are available for 2.9 million Settlement Class Members and accounting for a certain percentage of mail being returned undeliverable, direct notice will be sent to between fifty-nine percent (59%) and sixty-two percent (62%) of the Settlement Class. See Vasquez Decl. (Dkt. #162) at ¶ 29. Gilardi further estimates the cost of direct notice to be between $1,137,140 and $1,168,490. See id. at ¶ 53. This range is based upon the actual cost of mailing as well as all related costs. See id. at ¶ 53, Ex. 6.

14. The Amended Notice Plan is designed to reach at least eighty percent (80%) of the Settlement Class. See Vasquez Decl. (Dkt. #162) at ¶¶ 64-65, Ex. 5. To attain that reach, several forms of indirect notice will also be used. See id. at ¶¶ 32-52.

15. Gilardi estimates the combined costs of direct notice and of the supplemental, indirect notice efforts required to reach eighty percent (80%) of the Settlement Class to be between $1,465,636 and $1,489,927. See Vasquez Decl. (Dkt. #162) at ¶ 57.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

EXECUTED on this 15th day of April, 2015, at Chicago, Illinois.

_____
Johanna M. Spellman
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Liaison Counsel for Defendant NCAA