**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL No. 2492 |
| | Master Docket No. 13-cv-09116 |
| | Judge John Z. Lee |
| | Magistrate Judge Geraldine Soat Brown |
| ADRIAN ARRINGTON, DEREK OWENS, ANGELICA PALACIOS, KYLE SOLOMON, SHELBY WILLIAMS, BRICE SHEEDER, SHAVAUGHNE DESECKI, SPENCER TRAUTMANN, RYAN PARKS, URSULA KUNHARDT, JESSICA MILLER, RACHEL HARADA, ADAM WALKER, ANNA BARTZ, NATALIE HARADA, DACHE WILLIAMS and PETER DYKSTRA, individually and on behalf of all others similarly situated, | Case No. 11-cv-06356 |
| | **JURY DEMAND** |
| Plaintiffs, | |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | |

**FOURTH AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ........................................................................1

II.    JURISDICTION AND VENUE ................................................................7

III.   PARTIES .....................................................................................................7

     A.      Plaintiff Arrington...........................................................................7

     B.      Plaintiff Owens ............................................................................10

     C.      Plaintiff Palacios .........................................................................15

     D.     Plaintiff Solomon ........................................................................17

     E.      Plaintiff Williams.........................................................................20

     F.      Plaintiff Sheeder..........................................................................20

     G.     Plaintiff Desecki..........................................................................21

     H.     Plaintiff Trautmann......................................................................22

     I.      Plaintiff Parks..............................................................................23

     J.      Plaintiff Kunhardt ........................................................................24

     K.     Plaintiff Miller .............................................................................25

     L.      Plaintiff R. Harada .......................................................................26

     M.     Plaintiff Walker............................................................................26

     N.     Plaintiff Bartz...............................................................................27

     O.     Plaintiff N. Harada.......................................................................28

     P.      Plaintiff D. Williams....................................................................28

     Q.     Plaintiff Dykstra...........................................................................29

     R.      Defendant .....................................................................................30

     S.      Reported Concussion Injuries of Other Student-Athletes.....................31

           1.      Preston Plevretes.............................................................31

2.      James Hilaire......................................................................................32

3.      Catherine Varner................................................................................34

4.      Additional examples of improper steps to make players safe
        regarding concussions in eleven NCAA sports and statistics
        evidencing a class-wide problem. ...................................................36

IV.     FACTUAL BACKGROUND ........................................................................38

    A.      The NCAA Had a Duty to Protect and Safeguard Student-Athletes ....................38

        1.      The NCAA Constitution declares that the NCAA will control
                intercollegiate sports to protect the physical and educational
                well-being of student-athletes. ...................................................39

        2.      The NCAA has publicly acknowledged its duty to protect the
                health and safety of student-athletes. ........................................40

        3.      The NCAA promulgates annual guidelines for the protection
                of student-athletes' health and well-being. ...............................42

    B.      A Primer on Concussions...........................................................................42

        1.      Concussions and what they cause. ..........................................42

        2.      Signs and symptoms of concussions.......................................46

        3.      *Second-Impact Syndrome.* .........................................................47

        4.      What doctors do. ......................................................................47

        5.      After a concussion....................................................................48

    C.      Long-Term Effects......................................................................................49

    D.      Studies Ignored by the NCAA .................................................................50

    E.      The NCAA's Inadequate Rules and Policies Regarding How the
            Games are Played......................................................................................62

    F.      The NCAA's Inadequate Concussion Treatment and Return to Play
            Rules .........................................................................................................64

        1.      From 1994-2002, the NCAA refused to endorse any return-
                to-play criteria. ........................................................................64

        2.      The NCAA fails to adopt the guidelines promulgated by the
                2001 Vienna Conference...........................................................64

3.  The NCAA fails to adopt the guidelines promulgated by the 2004 Prague Conference. ...........................................................................68

4.  The NCAA fails to adopt the guidelines promulgated by the 2008 Zurich Conference. .........................................................................69

5.  Too little, too late, the NCAA finally requires schools to have a concussion plan. ....................................................................................71

G.  The NCAA's Attempt to Shift the Economic Burden of its Negligence to the Class...........................................................................76

H.  Discovery of the Cause of Action, the NCAA's Fraudulent Concealment and Plaintiffs' Vulnerability ............................................77

V.  CLASS ACTION ALLEGATIONS ..............................................................79

VI.  CLAIMS ALLEGED ....................................................................................82

COUNT I  BREACH OF EXPRESS CONTRACT (On Behalf of the Class) ..............................82

COUNT II  BREACH OF IMPLIED CONTRACT (On Behalf of the Class)............................86

COUNT III  BREACH OF EXPRESS CONTRACT (On Behalf of the Class as Third-Party Beneficiaries) ................................................................88

COUNT IV  FRAUDULENT CONCEALMENT (On Behalf of the Class)................................92

COUNT V  NEGLIGENCE (On Behalf of the Class) ..................................................93

COUNT VI  MEDICAL MONITORING (On Behalf of the Class) ...........................................96

COUNT VII  NEGLIGENCE (On Behalf of Arrington, Owens, Solomon and Palacios).................................................................................101

JURY DEMAND ...................................................................................................103

REQUEST FOR RELIEF ......................................................................................103

010270-11  768283 V1

Plaintiffs Adrian Arrington ("Arrington"), Derek Owens ("Owens"), Angelica Palacios ("Palacios"), Kyle Solomon ("Solomon"), Shelby Williams ("Williams"), Brice Sheeder ("Sheeder"), Shavaughne Desecki ("Desecki"), Spencer Trautmann ("Trautmann"), Ryan Parks ("Parks"), Ursula Kunhardt ("Kunhardt"), Jessica Miller ("Miller"), Rachel Harada ("R. Harada"), Adam Walker ("Walker"), Anna Bartz ("Bartz"), Natalie Harada ("N. Harada"), DaChe Williams ("D. Williams"), and Peter Dykstra ("Dykstra") (collectively, the "Plaintiffs")[1] bring this class action complaint against Defendant National Collegiate Athletic Association ("NCAA"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I. NATURE OF THE ACTION

1. President Obama January 2013:

> I'm a big football fan, but I have to tell you if I had a son, I'd have to think long and hard before I let him play football. And I think that those of us who love the sport are going to have to wrestle with the fact that it will probably change gradually to try to reduce some of the violence. In some cases, that may make it a little bit less exciting, but it will be a whole lot better for the players, and those of us who are fans maybe won't have to examine our consciences quite as much.

> I tend to be more worried about college players than NFL players in the sense that the NFL players have a union, they're grown men, they can make some of these decisions on their own, and most of them are well-compensated for the violence they do to their bodies. You read some of these stories about college players who undergo some of these same problems with concussions and so forth and then have nothing to fall back on. That's something that I'd like to see the NCAA think about.

---

[1] Plaintiffs reserve the right to add or propose additional class representatives.

2.      The NCAA controls and regulates every aspect of the game of football and other

college sports including rules regarding player safety and health.  The NCAA has used this

authority to compel all players and participants to follow the policies, rules, and regulations the

NCAA has enacted and imposed.  As the governing body of college athletics, the NCAA has

held itself out as the guardian and authority on the issue of player safety and has unilaterally

shouldered for itself a common law duty to provide players with rules, information, and best

practices that protect them as much as possible from short-term and long-term health risks.

3.      The NCAA was founded "to protect young people from the dangerous and

exploitive athletics practices of the time."[2]  According to the NCAA, "[t]he rugged nature of

early-day football, typified by mass formations and gang tackling, resulted in numerous injuries

and deaths," prompting President Theodore Roosevelt to convene two White House conferences

with college athletics leaders to encourage safety reforms.  As a result of several subsequent

meetings of colleges and universities to initiate changes in football playing rules to protect the

safety of student-athletes, 62 higher-education institutions became charter members of the

original NCAA, then called the Intercollegiate Athletic Association of the United States

(IAAUS).[3]

4.      The NCAA's founding purpose to protect student-athletes has been repeated

often, and as far back as 1909 at the annual convention of member institutions.  There,

Chancellor James Roscoe Day of Syracuse University stated:

> The lives of the students must not be sacrificed to a sport.  Athletic
> sports must be selected with strict regard to the safety of those
> practicing them.  It must be remembered that the sport is not the

---

[2] http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/history (last updated
Aug. 13, 2012).  The Intercollegiate Athletic Association of the United States changed its name
to the National Collegiate Athletic Association in 1910.  *Id.*

[3] *Id.*

> end.  It is incidental to another end far more important.  We lose
> sight of both the purpose and the proportion when we sacrifice the
> student to the sport.[4]

5.    The NCAA's role as the guardian of player health and safety has continued

throughout the last century, and continues up through the present day.  The NCAA has exercised

that role through its unilateral decisions to issue rules to regulate the way in which games are

played, to make a profit, and to address issues of player safety.  During these decades, the NCAA

voluntarily provided teams and players with information and extensive regulations that directly

affected the short and long-term health of NCAA players, including the Plaintiffs.

6.    Over the years the NCAA has assumed a duty to make sure that athletic programs

are conducted in a manner "designed to protect and enhance the physical and educational well-

being of the student athlete."  The NCAA's website provides that "its core mission is to provide

student athletes with a competitive environment that is safe" and that the NCAA itself takes

"protective steps" with respect to student-athletes' health and safety."

7.    Despite the NCAA's assumption of this responsibility, the NCAA was negligent

and failed to carry out this duty in that it failed to implement regulations that would properly

protect student-athletes from the risks associated with concussions and/or manage those risks to

properly respond to the medically proven fact that repetitive concussions would lead to neuro-

cognitive injuries in many players, including the Plaintiffs.

8.    The NCAA was aware that the number of concussions was increasing and

occurring over a broad range of sports.  Its five year estimates of the number of concussions in

NCAA sports:  (1) 16,000 for football; (2) 5,751 for women's soccer; (3) 3,374 for men's soccer;

---

[4] James Roscoe Day, Chancellor, Syracuse University, The Function of College Athletics, *in*
PROCEEDINGS OF THE FOURTH ANNUAL CONVENTION OF THE INTERCOLLEGIATE ATHLETIC
ASSOCIATION OF THE UNITED STATES (Dec. 28, 1909), 34-43, at 38, *available at*
http://google.com/books?id=dh0LAAAAIAAJ.

and (4) 1,209 for women's volleyball.[5]  Although public attention focused on concussions in football, large numbers of female athletes in particular were being concussed in sports such as soccer, basketball, lacrosse, and volleyball.  Further, the NCAA suppressed and kept secret from student-athletes, information about the extent of concussion injuries in NCAA sports and their long-term consequences.

9.      The NCAA was aware of the health risks associated with repetitive blows producing sub-concussive and concussive results and the fact that some members of the NCAA athlete population were at significant risk of developing brain damage and cognitive decline as a result.  Despite its knowledge and controlling role in governing player conduct on and off the field, the NCAA turned a blind eye to the risk and failed to timely and adequately impose safety regulations governing this health and safety problem.

10.      While the NCAA has assumed voluntarily its role as the unilateral guardian of player safety, college athletes and their families, including the Plaintiffs, have looked to the NCAA for guidance on player-safety issues.  Student-athletes are 18 when they begin their athletic careers and are not on equal footing with the NCAA when it comes to understanding the importance of brain injury prevention and treatment.

11.      In its supervisory role, as well as in its position as arbiter of all aspects of college athletics, the NCAA has, since its inception, unilaterally and voluntarily chosen how to spend its funds to investigate and regulate many different circumstances affecting player health and safety, including, but not limited to, requiring players to wear certain equipment, designating some player gear as illegal, deciding what helmet brands should be recognized as the official equipment of the NCAA.

_____

[5] NCAA10091830.

12.     As early as the 1980s the NCAA was aware of publications in the medical-science community establishing that concussive and sub-concussive injuries to athletes and the general population were a significant risk factor for short-term and long-term neuro-cognitive health complications, both as single incidents and particularly as repetitive impacts.  By the year 2004 the NCAA was aware of over 20 scientific studies documenting the relationship between concussions and brain injury.  These studies recommended prevention and treatment regimens the NCAA ignored.

13.     The NCAA has failed to meet its contractual and legal responsibility to safeguard student-athletes, despite being aware that its members have a "legal obligation to use reasonable care to protect athletes from foreseeable harm in any formal school sponsored activity."[6]  The NCAA has engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by its student-athletes, all the while profiting immensely from those same student-athletes.

14.     Specifically, the NCAA has failed to timely address and/or correct the coaching of tackling, checking or playing methodologies that cause head injuries; the NCAA has failed to timely educate coaches, trainers, and student-athletes as to the symptoms indicating possible concussions; the NCAA has failed to timely implement system-wide "return to play" guidelines for student-athletes who have sustained concussions; the NCAA has failed to implement system-wide guidelines for the screening and detection of head injuries; the NCAA has failed to implement legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play; and the NCAA has failed to implement a financial support system for student-athletes who, after sustaining concussions, are left unable to

---

[6] NCAA10023685.

either – play their sport or even lead a normal life and who have continuing medical costs arising from participation in NCAA athletics.

15.     On average, the NCAA makes over $750 million in revenue each year and recently signed multi-billion-dollar television contracts for football games.  Unlike professional sports organizations, however, the NCAA does not use revenues to pay its athletes, nor does the money go towards pension or medical benefits for post-collegiate athletes.  Unlike professional athletes, student-athletes have no collective bargaining power to negotiate for such benefits.  The NCAA gives no medical or financial support to collegiate student-athletes who sustained concussions while playing an NCAA sport and who are then left to cope with the necessary costs and care resulting from their injuries.  The NCAA, however, retains the economic benefits resulting from the student-athletes' labors.

16.     The NCAA's conduct is particularly egregious in light of the fact that its policies and procedures – or lack thereof – leave student-athletes like Plaintiffs and members of the Class inadequately protected from sustaining, monitoring, and recovering from brain injuries at a particularly early and vulnerable point in their lives.  Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, collegiate players typically range in age from 18-23 and are just beginning their adult lives.  For such NCAA student-athletes, including Plaintiffs and the putative Class, these injuries can or may in the future have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, to depression, and early-onset dementia.

17.     The NCAA was in a superior position to know of student-athletes' concussion-injury rates and the long-term medical consequences.  The NCAA and its members breached its

duty to provide a "safe environment" and by failing to provide long-term and/or complete

medical coverage for student-athletes who suffered concussion(s) while playing NCAA sports.

18.     Accordingly, this nation-wide class action seeks injunctive relief, and equitable

relief in the form of medical monitoring for the purpose of diagnosis of long-term injury and

disease resulting from concussions, as a result of the NCAA's carelessness, negligence, and

concealment of information.

## II.     JURISDICTION AND VENUE

19.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  In the

aggregate, Plaintiffs' claims and the claims of the other members of the Class exceed $5,000,000

exclusive of interest and costs, and there are numerous Class members who are citizens of states

other than the NCAA's states of citizenship.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) and

1391(c) as:  the NCAA is deemed to reside in this judicial district because it is subject to

personal jurisdiction here; and a substantial part of the events and/or omissions giving rise to the

claims emanated from activities within this jurisdiction and the Defendant conducts substantial

business in this jurisdiction.

## III.     PARTIES

**A.     Plaintiff Arrington**

21.     Adrian Arrington is a natural person and a citizen of the State of Illinois.

Arrington is 25 years old.  Arrington currently attends Eastern Illinois University ("EIU"), an

NCAA member school, where he formerly competed on the EIU football team.

22.     Before attending EIU, Arrington was named All-State for the Illinois Football

Coaches Association Class 6A; he received a special All-State mention by the *Chicago Tribune*

and *Champaign News-Gazette*; he was a three-time Illinois 6A State runner-up; he was named

the WJBC Player of the Year; he was Big 12 Conference Defensive MVP and team MVP; and he competed in the summer Shrine All-Star game.

23.     Arrington continued to shine as a member of the EIU football team.  From 2006-2009, he was a Strong Safety and was the captain of the EIU football team during the 2009 season.  In 2007, he earned a starting position and led the team with 48 solo tackles.  Arrington finished his career with an impressive 154 total tackles.

24.     During his time on the team, however, Arrington suffered numerous and repeated concussions during football games.  In each instance after he sustained his first three concussions, the EIU team doctor told Arrington he could return to play the very next day.

25.     After his third concussion, Arrington started experiencing memory loss unrelated to a specific traumatic event.  Around the same time, Arrington also began experiencing seizures.  Only after these symptoms started to manifest did EIU finally send Arrington to a neurologist for testing.

26.     At no time was Arrington coached on how to make safer tackles.  In fact, at all times the message from EIU was to "play hard and play fast" without regard to safety, and that those who did not play in that manner would be summarily cut.  Arrington was also never given literature or lectures about concussion or other head-injury prevention.

27.     Arrington sustained two more concussions before finally leaving the football team to focus on matriculating from EIU.  That has proved difficult, however, as Arrington had to drop out of a number of his classes due to the memory loss, depression and the almost-daily migraines he continues to experience as a result of his head injuries.

28.     Recently, as a result of his symptoms, Arrington's doctors suggested he receive an MRI.  The MRI showed that he has scarring on the frontal lobe of his brain.

29.     Specifically, with respect to Arrington, *inter alia*, the NCAA failed to implement system-wide "return-to-play" guidelines for student-athletes who have sustained concussions. As a result, Arrington was returned to play football while still recovering from prior concussion injuries.  The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff, and athletes about the symptoms and dangers of concussions.  Moreover, the NCAA failed to implement system-wide guidelines for screening and detecting head injuries that would have detected the numerous concussions Arrington received and prevented him from playing until he had fully recovered.  The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Arrington, who have sustained multiple concussions in the course of play.

30.     The NCAA did not require its members to properly educate its student-athletes as to the true symptoms of when a concussion can occur.  Without such knowledge, requiring student-athletes to report symptoms is meaningless.

31.     Further, the NCAA has utterly failed Arrington because he has had to take time off from school due to his injuries.  Neither the NCAA nor EIU have provided Arrington with any support system; in fact, neither the NCAA nor EIU have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

32.     Finally, Arrington has incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the post-concussion syndrome with which he has been diagnosed.

**B.       Plaintiff Owens**

33.       Derek K. Owens is a natural person and a citizen of the State of Arkansas.  Owens is 22 years old.  Owens was a student at the University of Central Arkansas ("UCA"), was on an academic scholarship and was a member of the football team.

34.       Before attending UCA in the fall of 2008, Owens played football at Russellville High School in Russellville, Arkansas.  He was the only person to attend that school who lettered in three varsity sports in three consecutive years.  He was the first chair in trumpet in the school band for three years.  He scored a 32 on his ACT.  And he was a star football player.  As a wide receiver, he was named the Top Offensive Player in the State of Arkansas, he was chosen to play at his position in the state All-Star Game, and he was named one of the top Scholar-Athletes in the State.

35.       UCA recruited Owens, and offered Owens the choice between an academic scholarship or a football scholarship.  He chose the academic scholarship.  But he could not wait to play football for UCA.

36.       In the summer of 2008, UCA offered incoming freshman football players the chance to attend "voluntary practices" with certain other members of the team, but without coaches, to get acquainted with the school.  No baseline concussion assessment was conducted for Owens.  Prior to the "voluntary practice," Owens did not receive any information from or on behalf of the NCAA on how to recognize or report head injuries.  Owens did not receive any information from or on behalf of the NCAA concerning proper tackling and blocking techniques that could avoid head injuries.  Owens attended and excelled as a receiver.  During one practice without pads or helmets, however, Owens was hit in the head from behind.  No one from the team provided him any treatment.  After practice, Owens called his parents, telling them he was dizzy, he was having difficulty seeing, and he did not think he could drive.  He stayed that

- 10 -

evening locally with his cousin because he could not drive and went home the next day. He did

not return to the summer practices. No one at UCA followed up with him. No one at UCA

provided concussion education prior to his attendance at this practice.

37.     Owens returned to school for the fall semester and the fall football season. Before

the start of the season Owens did not receive any training on how to recognize a potential

concussion, nor the steps to take to report any potential symptoms that may signify a concussion

has occurred. Owens believed that a concussion only occurred if he "blacked out" or was

"knocked out." Again, no baseline assessment was performed. During a practice in the second

week of the season, however, Owens was hit by a linebacker and was knocked unconscious. No

one from UCA called Owens' family. In fact, the UCA trainers returned Owens to his dorm

room, told his roommates that Owens had a "severe concussion," and asked his roommates to

wake him up every couple of hours to make sure he was okay. The UCA staff did not administer

any of the widely recommended concussion tests. His mother learned what had happened after

receiving several strange texts from her son, which prompted her to call his cell phone to see if

he was okay. One of Owens' roommates answered his cell phone and said that Owens was

unable to talk as a result of the concussion. Owens' mother called the UCA trainers and stated

that this was Owens' second concussion of the season. UCA red-shirted Derek for the 2007-

2008 Season; he sat out for three to four weeks until the team doctor cleared him to return to the

practice team.

38.     During his time as a player, the NCAA did not pass regulations requiring its

members to educate student-athletes on what symptoms may be signs of a concussion. Owens

suffered numerous and repeated concussions while playing football at UCA. Some of those he

did not recognize as concussions, as he did not "black out" or was not "knocked out" but instead

would get headaches, hear ringing in his ears, feel pressure in his head, feel as if his head was

swollen, or would vomit.

39.     In the fall of 2010, Owens was playing in a game against University of Tulsa as

the punt returner and was hit just as he caught the ball.  Owens' mother saw that he hit his head.

The Tulsa player even bragged about how hard he hit Owens to the newspaper *The Tulsa World*.

*The Tulsa World* wrote after the game:

> TU deep snapper Bo Abbott said racing down to drill Central
> Arkansas punt returner Derek Owens last Saturday night was the
> highlight of his career.  "The only problem was, his helmet didn't
> fly off," Abbott said with a chuckle.

Mike Brown, "TU notebook:  Headhunter," THE TULSA WORLD (Oklahoma) (September 30,

2010).  The Tulsa player had not been properly coached on helmet to helmet contact.  No one

from the team checked on Owens when he returned to the sidelines.  It was obvious, however,

from watching the play that Owens had a possible head injury.  No one at UCA graded his

concussion; utilized standard concussion tests or monitored Owens in any meaningful fashion.

40.     By the fall of 2010, Owens had been and was experiencing memory loss,

headaches, an inability to concentrate or focus, anxiety, and depression.  He complained that he

was not feeling well and was having trouble sleeping.  He would study for tests, but if he went to

sleep he would forget what he had studied, so he started making himself stay up all night out of

fear of failing.  His grades plummeted even though academics had been his priority.  As a result,

he lost his regular academic scholarship.  Thus, for the fall semester 2010, Owens obtained a

school loan and a partial state lottery scholarship to make up for the lost academic scholarship.

41.     During the spring semester 2011, Owens was paying for school through a small

football scholarship, the state lottery scholarship and his school loan.  But Owens' grade in one

of his core science classes was a low C/high D.  Owens therefore either had to drop the class and

lose his state lottery scholarship (because he would not meet the minimum hours required to maintain it), or take the grade. He dropped the class and sacrificed his lottery scholarship in an attempt to keep his grade-point average up.

42.     In May 2011, Owens asked to go to his family doctor because he feared he had ADHD. After hearing Owens' story, however, Owens' doctor diagnosed the problems as being related to his concussions. This was the first time he learned that the symptoms he had been experiencing and the steady decline in his academics were directly related to the multiple concussions he had suffered. At no time did the NCAA require UCA to provide Owens with adequate information about (a) how to tackle and block so as to avoid as much as possible a head injury, (b) the symptoms of a head injury, and (c) the possible long-term consequences of concussions. The NCAA did not conduct baseline testing prior to his participation in NCAA sports.

43.     Owens attempted to take classes during the first period of the summer of 2011 but was forced to drop out of school and football as a result of his symptoms. Owens told his mother: "I feel like a 22 year old with Alzheimer's." Owens lost his lottery scholarship because he did not maintain the required hours.

44.     When Owens informed his coach that he could not play due to medical issues, the coach inquired "so what's your plan?," informing Owens that as soon as he walked out the door all of the benefits Owens had from football would cease. At no time did his coach offer to take responsibility for the consequences of Owens' injury. Owens felt like he had been "kicked to the gutter." Subsequently, after Owens' mother went directly to the Athletic Director to fight for Owens' right to retain his athletic scholarship because Owens was injured while playing football,

UCA agreed Owens would maintain his athletic scholarship (approximately $2,000) since he had to quit as a result of his medical condition.

45.     Since then, Owens has seen both a neurologist as well as a specialist in football-related concussions, has been diagnosed with post-concussion syndrome, and was told the front part of his brain had been injured.  The symptoms of post-concussion syndrome, each of which Owens has suffered, include migraine headaches, dizziness, fatigue, irritability, anxiety, insomnia, loss of concentration and memory, and noise and light sensitivity.

46.     Specifically, with respect to Owens, *inter alia*, the NCAA failed to implement system-wide "return-to-play" guidelines for student-athletes who have sustained concussions.  As a result, Owens was returned to play football while still recovering from prior concussion injuries, even despite his mother's intervention.  The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff, and athletes about the symptoms and long-term consequences of concussions if not properly treated, as well as the proper treatment protocol for head injuries.  Moreover, the NCAA failed to implement system-wide guidelines for screening and detecting head injuries that would have detected the numerous concussions Owens received and thus prevented him from playing until he had fully recovered.  The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Owens, who have sustained multiple concussions in the course of play.

47.     Owens did not learn that concussions could occur without a "blackout" or "knockout experience" until he saw his doctor.  The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur without a "blackout" or "knockout."  Without such knowledge, requiring athletes to report symptoms is meaningless.

48.     Further, the NCAA has utterly failed Owens since he has had to take time off from school due to his injuries.  Neither the NCAA nor UCA have provided Owens with any support system; in fact, neither the NCAA nor UCA have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

49.     Finally, Owens has incurred out-of-pocket costs as a result of the loss of his academic scholarship, and has incurred and continues to incur out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which Owens has been diagnosed.

**C.     Plaintiff Palacios**

50.     Plaintiff Angelica Palacios is a natural person and a citizen of the State of Texas. Palacios is 19 years old.  Palacios currently attends Ouachita Baptist University ("OBU"), an NCAA member school located in Arkadelphia, Arkansas, where she formerly competed on the OBU women's soccer team.

51.     Before attending OBU, Palacios sustained two concussions playing soccer in high school.  Her parents alerted the school about Palacios' concussions and provided protective head gear for her to wear while playing on OBU women's soccer team.

52.     Prior to starting her career, the NCAA did not provide Palacios with concussion education or conduct baseline testing.

53.     As a freshman at OBU, Palacios started in 14 of 18 games and played in 17 games overall.  Palacios is listed among the 2010 team leaders in points, assists, shots on goal, and game winning goals.

54.     At a team practice held on September 13, 2011 – just before OBU's fourth game of the season – Palacios' face collided with another team member's head during a practice drill.

Immediately after the incident, the athletic trainer asked Palacios if she was dizzy, nauseated, or had a headache.  Palacios answered yes to all three.

55.     Despite her responses and despite Palacios' eye swelling shut almost instantly, no further concussion-related tests were administered on the day of her injuries and she was not sent to the emergency room.  Instead, the team trainer directed Palacios to go to her dorm room to rest, never once checking in on her or arranging for Palacios to have any type of monitoring.

56.     The following day, Palacios was given an online test to determine whether she had any lingering neurological deficiencies.  Based on that test, Palacios did not participate in practices until September 17th.  That morning, after consistently suffering from headaches every day since her injury, Palacios vomited.  When she arrived at practice she alerted her coach that she was still not feeling well.

57.     Without any clearance from the training staff and despite Palacios' lingering side effects, the coach made her participate in running drills.  After being ordered to run, Palacios asked a trainer for help.  The trainer simply said:  "you don't want to make the coach mad."

58.     Palacios was finally excused from practice after her mother contacted the coach.  After that call, Palacios' coach told her that she was allowed to sit out – and should expect to sit out for a long time, insinuating that Palacios would no longer be allowed to play.

59.     Realizing that OBU was ignoring her medical needs, Palacios sought medical attention at a hospital emergency room.  There, the doctor found that Palacios had diminished sensation on her left side, that her memory was sluggish, and that she had sustained a serious concussion.  The ER doctor told Palacios that she should not participate in any activities for two more weeks.

60.     Specifically, with respect to Palacios, *inter alia*, the NCAA failed to implement system-wide "return-to-play" guidelines for student-athletes who have sustained concussions. As a result, Palacios was returned to play soccer while still recovering from prior concussion injuries.  The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff, and athletes regarding the symptoms and dangers of concussions.  Moreover, the NCAA failed to implement system-wide guidelines for screening and detecting head injuries that would have prevented Palacios from playing until she had fully recovered.  The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Palacios, who have sustained multiple concussions in the course of play.

61.     The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur.  Without such knowledge, requiring athletes to report symptoms is meaningless.

62.     Finally, Palacios has incurred out-of-pocket costs directly related to the concussion with which she has been diagnosed.

**D.     Plaintiff Solomon**

63.     Kyle Solomon is a student at the University of Maine and formerly was a member of the university's hockey team.  Before attending Maine in the fall of 2008, he shined as a prep high school hockey player.  At age 17, he led the Cedar Rapids RoughRiders team to a United States Hockey League national championship, and subsequently played for the Boston Junior Bruins in the Eastern Junior Hockey League.  As a result, he received numerous offers to play collegiate hockey.

64.     Prior to starting at Maine in the fall of 2008, he disclosed that he had sustained three previous concussions during his time in prep hockey.  While he was given a baseline test upon starting at Maine, neither the coaching or training staff ever addressed or discussed

- 17 -

concussions or concussion symptoms with him. He also did not receive any information from or on behalf of the NCAA on how to recognize or report head injuries.

65.     In October 2009, while playing for Maine, Solomon suffered a concussion in a nationally-televised game on ESPN against Boston College. Midway through the second period, Solomon was blindsided by an opposing player and hit his head above the right ear on the ledge of the boards. Solomon completely blacked out on the ice. When he awoke, he was seeing "stars" and experienced double vision for approximately 10 minutes. The trainer examined Solomon in the locker room by asking him to follow a flashlight and his finger. Solomon was not officially diagnosed with a concussion by the trainer nor did the trainer administer a baseline test.

66.     While the trainer told Solomon that his eyes were dilated, Solomon was given seven stiches and returned to the game during the third period despite exhibiting concussive symptoms. After the game, Solomon was told to "go back to his dorm room and rest," despite the fact that he lived alone and no one was present to monitor his condition. Solomon was symptomatic for approximately one week, experiencing headaches and sensitivity to light.

67.     In March 2009, Solomon sustained another concussion at Maine as a result of an elbow to the head during a practice. When he tried to get up after the hit, his legs collapsed and he experienced dizziness, sleepiness and felt "foggy." These symptoms lasted for several few days and he was diagnosed with a Grade 2 concussion. The team cleared him to return to practice within a week of the hit.

68.     In a January 2010 game against Merrimack, as a sophomore, Solomon received another concussion. He received an elbow to his face mask, which jammed his face mask against his throat, rupturing one of his vocal cords. He was told he had also received a "slight"

concussion. He was taken by ambulance from the game to the hospital, and was out for approximately two weeks.

69. Just two months later, in a March 2010 practice, Solomon was elbowed softly in the side of the head by a teammate. As a result, he was diagnosed with a Grade 3 concussion. Yet, two weeks after the injury, Maine cleared him to return to the ice despite the fact that Solomon felt something was wrong with him. He felt like a different person. He noticed a change in his personality, felt depressed, and was disconnected from reality.

70. Solomon subsequently visited Dr. Robert Cantu, a neurologist, who concluded that Solomon's brain had sustained severe trauma and who diagnosed Solomon with post-concussion syndrome. Dr. Cantu advised Solomon of the risks of continuing to play hockey and advised that another concussion could kill him. Solomon made the decision at that time to retire from hockey fearing that further concussions could be fatal.

71. Yet, at the same time of Dr. Cantu's diagnosis of post-concussion syndrome and recommendation that Solomon retire from hockey, the Maine trainers cleared Solomon to play. The Maine coaches thus actively tried to get Solomon back on the ice, even assuring him that he could wear a "no-contact" red jersey during practices. Solomon nonetheless retired.

72. Solomon has continued his studies at Maine in an attempt to obtain a degree but the effects of the concussions have been debilitating. He has had to drop classes and cannot read or study for long stretches of time. In addition, Solomon suffers from migraine headaches that last as long as 72 hours, vomiting, intense seizures that trigger unconsciousness and an inability to breathe, depression, irritability, anxiety, insomnia, loss of concentration and memory, noise and light sensitivity, and an inability to cope with anxiety or stress. Solomon continues to incur

out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which he was diagnosed.

**E.     Plaintiff Williams**

73.     Shelby Williams is a current student-athlete at Northwest Missouri State University in Maryville, Missouri. She is a sophomore and a member of the women's golf team.

74.     Williams believes that the concussion issues are very important to NCAA student-athletes. Many NCAA student-athletes are impacted on a daily basis by concussion-management practices. While non-contact sport athletes may not be affected on a daily basis, concussions can and do still occur.

75.     Williams believes that all current or former student-athletes should have access to a medical monitoring program – regardless of the sport they played – and that non-contact sports athletes should receive medical monitoring.

76.     Like other current student-athletes, Plaintiff Williams has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for future injury.

**F.     Plaintiff Sheeder**

77.     Brice Sheeder is a current student-athlete at Simpson College in Indianola, Iowa, where he is a junior and member of the men's track and field and cross country teams.

78.     Sheeder believes that concussion issues are very important to student-athletes regardless of sport.

79.     Sheeder has roommates that have received concussions and were returned to play on the same day and he has never received any baseline testing.

80.     Sheeder believes that all student-athletes should have access to a medical monitoring program, receive baseline testing before each season, and be protected by a prohibition against same-day return-to-play guidelines.

81.     Sheeder also believes that the NCAA should provide training to teachers regarding the need for academic accommodations to protect all student-athletes and provide adequate time for recovery from head injuries without being penalized.

82.     At many non-contact sporting events attended by Sheeder, athletic trainers – who are often just college students – are the only medical personnel present.

83.     Like other current student-athletes, Plaintiff Sheeder has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore he is at risk for future injury.

## G.     Plaintiff Desecki

84.     Shavaughne Desecki is a former student-athlete, who graduated from DePaul University in Chicago, Illinois in 2003.

85.     Desecki played softball at DePaul and is currently a volunteer assistant softball coach at Concordia University in River Forest, Illinois.

86.     Desecki believes that the NCAA and its member institutions should be responsible to provide medical monitoring to athletes who think that they may be suffering from concussion symptoms and that the monitoring should extend to all sports.

87.     During the time she played softball at DePaul, Desecki witnessed others sustain concussions as a result of accidents during the course of play on the softball field.

88.     Desecki never received baseline testing and, to her knowledge, there were no concussion management rules in place despite the fact that concussions did occur.

89.     It is important to Desecki that she be eligible to obtain medical monitoring if symptoms of concussion-related injuries arise in the future.

90.     As a current volunteer assistant NCAA softball coach, it is important to Desecki that coaches, athletic trainers, and student-athletes receive mandatory concussion education prior to the start of the season.  Because coaches are with the student-athletes most often, it is important that they be able to recognize symptoms of concussions, refer the student-athlete to medical personnel after a head injury, and require the student-athletes to be cleared by a physician before returning to play.

91.     Like other former student-athletes, Plaintiff Desecki played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**H.      Plaintiff Trautmann**

92.     Spencer Trautmann is a current student-athlete at Western Oregon University.  He is a senior and a pitcher for the baseball team.

93.     Trautmann believes that the all student-athletes should be eligible for medical monitoring regardless of sport.

94.     Trautmann believes that a medical monitoring program would benefit athletes who are either currently struggling with concussion symptoms or may in the future.

95.     Trautmann has witnessed other players suffer head injuries as a result of accidents or being hit in the head by a ball.  The injuries he has witnessed on the baseball diamond are serious because of the pure force behind the hit of a baseball – especially since the NCAA allows the use of metal bats.

96.     Trautmann believes that all student-athletes should be baseline tested.

97.     It is important to Trautmann that, if a concussion occurs at a non-contact sports event, that a student-athlete obtain medical clearance prior to returning to play regardless of sport.

98.     Due to the rarity of concussions in baseball, Trautmann realizes that it may not be practical for a physician to be present at every game. However, if a concussion does occur, it is important to him that the student-athlete must see and be cleared by a physician before returning to play. In addition, it is important to him that all student-athletes, coaches, and athletic trainers receive concussion education before each season.

99.     Like other current student-athletes, Plaintiff Trautmann has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore he is at risk for future injury.

**I.      Plaintiff Parks**

100.     Ryan Parks is a former student-athlete, who graduated from the University of Illinois in Champaign, Illinois in 2002. He was a pitcher for the baseball team.

101.     During Parks' baseball career, his school did not conduct baseline testing. However, concussions did occur in baseball; he witnessed other players (including fellow pitchers) sustain injuries as a result of being hit in the head by a ball.

102.     To his knowledge, there were no rules regarding return to play following a concussion during the time he played.

103.     Parks thinks it is important that all current and former student-athletes have access to medical monitoring. He also thinks it is important that all student-athletes be baseline tested.

104.     Parks believes that it is important that coaches and athletic trainers are properly trained in concussion management and recognition and return-to-play guidelines are necessary to protect baseball players going forward.

105.    Parks believes that medical monitoring should extend to former athletes and significant changes should be made going forward to protect current players.

106.    Like other former student-athletes, Plaintiff Parks played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore he is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**J.    Plaintiff Kunhardt**

107.    Ursula Kunhardt is a former student-athlete who played volleyball at Montana State University in Bozeman, Montana from 2011 to 2012.  She played outside hitter for the volleyball team until suffering a concussion in practice which forced her to quit the team.

108.    During her career, Kunhardt hit her head on the floor during a drill in practice and sustained a concussion.  Despite remaining symptomatic, she was rushed back to play by the training staff even though she did not feel ready to return to play.  Kunhardt was not subject to medical screening and did not see a physician until she requested a neuropsychological evaluation well after the injury occurred.

109.    For her own safety, she decided to quit the team rather than participate in the same drills that caused her concussion.

110.    Kunhardt's performance in certain classes also suffered as a result of the concussion.

111.    Kunhardt believes that all former student-athletes should have access to medical monitoring – regardless of the sport they played.

112.    Kunhardt understands that it is not practical for medical personnel to be present at all non-contact sports games.  However, it is important to her that, if a concussion occurs at a non-contact sports event, that a student-athlete obtain medical clearance prior to returning to

- 24 -

play.  It is also important to her that student-athletes, coaches, and athletic trainers receive concussion education before each season, decreasing the likelihood that injured athletes are returned to play too soon.

113.    Kunhardt believes that all concussed student-athletes, regardless of sport, obtain medical clearance prior to returning to play.  She is convinced her symptoms could have been alleviated if she had promptly been evaluated by a physician and withheld from play until she fully recovered.  Kunhardt also believes that the NCAA should provide education for faculty regarding academic accommodations for student-athletes suffering from concussions is also very important.  Following her injury, it was extremely difficult to focus and study which caused her to struggle with classes and school work.

114.    Like other former student-athletes, Plaintiff Kunhardt played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**K.    Plaintiff Miller**

115.    Jessica Miller is a current student-athlete at Seattle Pacific University.  She is a senior and a member of the women's volleyball team.

116.    Miller believes that all schools should have the same return-to-play standards, and implement baseline testing.

117.    During her career, Miller suffered a concussion while playing volleyball and also witnessed a teammate suffer a concussion as a result of being hit in the head with a ball. Therefore she thinks that all current or former student-athletes should have access to medical monitoring.

118.    Like other current student-athletes, Plaintiff Miller has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**L.    Plaintiff R. Harada**

119.    Rachel Harada is a current student-athlete at Rockhurst University.  She is a senior and a member of the women's soccer team.

120.    R. Harada believes that all student-athletes, coaches, and trainers should receive mandatory concussion education.  She also believes that doctors should be present at each contact sport game and practice and all schools should implement baseline testing.

121.    R. Harada may have sustained a concussion that went undetected and has also witnessed teammates sustain concussions.  Therefore she thinks that all current and former student-athletes should have access to medical monitoring.

122.    Like other current student-athletes, Plaintiff R. Harada has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**M.    Plaintiff Walker**

123.    Plaintiff Walker is a former student-athlete and played golf at Simpson College from 2009-2010.

124.    Walker believes that all schools should live up to the same concussion standards and concussion management should not vary based on what school you go to or what sport you play.  Walker also believes that every school should implement baseline testing and require proper concussion education for student-athletes, coaches, and trainers.

125.     Although concussions are rare in golf, he thinks that all current and former student-athletes should have access to medical monitoring.

126.     Like other former student-athletes, Plaintiff Walker has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**N.     Plaintiff Bartz**

127.     Plaintiff Bartz is a former student-athlete and graduated from the University of Wisconsin in 2007.  She participated in the heptathlon for the track and field team.

128.     During her career, Bartz sustained a concussion while lifting weights during practice and hitting her head on the ground.

129.     To her knowledge, her school did not conduct baseline testing and there were no rules regarding return to play.  The NCAA and her school also did not provide her with any form of concussion education.

130.     Bartz believes that all current and former student-athletes should have access to medical monitoring.  Bartz also believes that all schools should implement baseline testing and return to play guidelines.

131.     Track and field includes events with concussion risks and therefore, it is important that student-athletes receive mandatory concussion education and coaches and athletic trainers are properly trained in concussion management and recognition.

132.     Like other former student-athletes, Plaintiff Bartz has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**O.     Plaintiff N. Harada**

133.    Plaintiff N. Harada is a current student-athlete at Maryville University.  She is a sophomore and a member of the women's soccer team.

134.    N. Harada believes that all schools should have the same return-to-play standards, implement baseline testing, and have doctors present at each contact sporting event.

135.    N. Harada has seen teammates sustain concussions and has a former teammate who was forced to retire due to accumulative concussions.

136.    N. Harada believes that concussions occurring in soccer may be just as serious as those occurring in other sports.  In soccer, concussions may occur not only as a result of "body to body" contact but also "ball to body" contact such as heading.

137.    N. Harada believes that all current and former student-athletes should have access medical monitoring – regardless of the sport they play.

138.    Like other current student-athletes, Plaintiff N. Harada has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**P.     Plaintiff D. Williams**

139.    Plaintiff D. Williams is a current student-athlete and a sophomore member of the women's basketball team at Northeastern University.

140.    During her career, she has sustained two concussions and can attest from personal experience that concussions are extremely serious – regardless of sport played.

141.    During her freshman year, she was elbowed in the head by a teammate in practice and was knocked unconscious.  She sustained a second concussion during a game later in the

season.  As a result of these concussions, she did not play during her sophomore season and has been told by doctors that one more concussion could end her career.

142.    Despite her disappointment with being unable to play, D. Williams understand that her health takes precedence over basketball.

143.    D. Williams believes that all schools should handle concussions in the same manner and implement universal concussion management procedures.

144.    She believes that all current and former student-athletes should have access to medical monitoring – regardless of the sport they play.

145.    In addition, from her personal experience, it is also extremely important that all student-athletes, regardless of sport, obtain medical clearance prior to returning to play.

146.    Like other current student-athletes, Plaintiff D. Williams has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

**Q.    Plaintiff Dykstra**

147.    Plaintiff Dysktra is a former student-athlete and graduated from the University of Wisconsin where he participated in the decathlon for the track and field team.

148.    Dykstra had teammates who sustained concussions and saw first-hand that concussions are serious injuries.  Track and field consists of dangerous events such as high jump and pole-vaulting.

149.    Dykstra believes that all current and former student-athletes should have access to medical monitoring – regardless of the sport they play.  When a student-athlete graduates, they often no longer have access to the university medical and training staffs.

150.     Dykstra also believes that all student-athletes should be baseline tested.  During his career, there was no testing which could have provided an objective measure to indicate when it was safe to return.  He also believes that student-athletes should receive mandatory concussion education and coaches and athletic trainers are properly trained in concussion management and recognition.

151.     Like other former student-athletes, Plaintiff Dykstra has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines did not meet the consensus standards, and therefore she is at risk for developing future symptoms related to concussions or the accumulation of subconcussive hits.

152.     In sum, while playing NCAA sports, the NCAA did not encourage Plaintiffs or other student-athletes to report or complain about their physical well-being, did not thoroughly educate or warn Plaintiffs or other student-athletes of the long-term effects of concussions, and did not thoroughly educate Plaintiffs, or other student-athletes about head-injury prevention. Moreover, the NCAA did not provide baseline testing before each season to identify and manage a concussion once it occurred and failed to conduct any follow up with players forced to stop playing as a result of concussions.  As a result, Plaintiffs and the members of the Class have or may have suffered physical injury, including post-concussion syndrome or Chronic Traumatic Encepholopathy, symptoms of which may not manifest until the future.

**R.     Defendant**

153.     Defendant National Collegiate Athletic Association is an unincorporated association that acts as the governing body of college sports.  Its principal office is located in Indianapolis, Indiana.  According to its website, the NCAA oversees 88 championships in 23 sports.  There are more than 400,000 student-athletes competing in three divisions at over 1,000

colleges and universities within the NCAA.  Through various licensing programs, the NCAA

takes in, on average, over $750 million in revenues each year.

**S.      Reported Concussion Injuries of Other Student-Athletes**

154.    The Plaintiffs are just examples of thousands of athletes that suffer concussions

and are returned to play symptomatic or are returned to play before they have fully recovered

from their concussion.  Some additional examples follow, and their stories are typical of the

NCAA's concussion problem and:

> (a)      the NCAA's failure to conduct baseline testing prior to a student-athlete's
>
> participation;
>
> (b)      the NCAA's failure to educate athletic departments and trainers;
>
> (c)      the NCAA's failure to educate athletes;
>
> (d)      the NCAA's failure to warn of long-term risks;
>
> (e)      the NCAA's failure to guarantee a safe playing environment;
>
> (f)      the NCAA's failure to have proper return-to-play guidelines;
>
> (g)      the NCAA's failure to provide adequate post-concussion care; and
>
> (h)      the NCAA's failure to provide adequate insurance coverage.

**1.      Preston Plevretes**

155.    In 2005, Preston Plevretes was a 19-year-old sophomore starting linebacker at

Division I La Salle University in Philadelphia, Pennsylvania.[7]  In October 2005, Plevretes

sustained a concussion during a football practice.  Subsequently, he reported to the coaching staff

---

[7] Andrew B. Carrabis, *Head Hunters:  The Rise of Neurological Concussions in American Football and Its Legal Implications*, J. SPORTS & ENTM'T LAW (2011) 2:371-386, 381-383, *available at* harvardjsel.com/wp-content/uploads/2011/06/Carrabis.pdf.  *See also The NCAA Takes Stronger Action* in *Concussion in Athletes:  Where We Are and What to Do Now?*, Jackson Lewis (Jan. 2010), *available at* http://www.jacksonlewis.com/resources.php?NewsID=3869.

that he had been having headaches since the practice.  Plevretes went to the Student Health

Center at La Salle after the game and was examined by a nurse who explained that he had, in

fact, sustained a Grade 1 concussion.  Plevretes was cleared to play on October 16, 2005.

156.    On November 5, 2005, Plevretes suffered a second helmet-to-helmet collision at a

game at Duquesne University.  During a play, Plevretes was momentarily knocked unconscious.

After regaining consciousness, Plevretes collapsed and then lapsed into a coma due to swelling

of the brain.  Upon arrival at the hospital, Plevretes's brain was so swollen that part of his skull

had to be removed.  Plevretes now needs constant treatment and has difficulty walking and

speaking.

157.    On November 2, 2006, Plevretes filed a personal injury lawsuit against La Salle,

Duquesne, and their respective physicians, athletic trainers, and football staff and players

"alleging that the severity of [Preston's] injury was caused, or at least aggravated, by an earlier

concussion he suffered during a prior game [rendering Preston] more vulnerable to the second,

catastrophic blow."[8]  Dr. Robert Cantu served as Plevretes's medical expert and testified that

Plevretes's erratic on-field behavior, combined with the excessive bleeding, point to second-

impact syndrome:  "'[h]e enters the game symptomatic (for concussion).  That sets him up for

another injury causing this malignant brain swelling,' he [Cantu] said."[9]  The case ultimately

settled for $7.5 million.

**2.    James Hilaire**

158.    James Hilaire is a resident of the state of Connecticut and was formerly a student

at the University of New Haven ("UNH") where he was a member of the soccer team.

---

[8] *Id*. at n.1.

[9] *Id*. at n.2.

159.     Before attending UNH in the fall of 2006, Hilaire played high school soccer at Stamford High School in Connecticut where he shined as a goalie for his high school team. Following high school and obtaining his associates degree at a local community college, Hilaire was recruited to play as a goalie for the University of New Haven Men's soccer team on a partial athletic scholarship.

160.     On October 26, 2006, Hilaire sustained his first concussion during a conference final game for UNH.  While attempting to make a save, he dove for a ball in the manner that he had been trained.  During this save attempt, he was kneed in the head by an opposing player and was knocked unconscious.  Upon regaining consciousness, Hilaire was asked a series of questions such as "Where are you?" and "What day is it?" by the trainer.  Despite the fact that he had been knocked unconscious, Hilaire was allowed to continue participating in the game and played the remainder of the game in its entirety.  Following this concussion, Hilaire did not receive any other tests or assessments nor any follow-up treatment despite the fact that Hilaire experienced painful headaches during the remainder of the game as well as following the game.

161.     During a September 24, 2008 game, an opposing player's knee hit Hilaire in the face causing him to bounce along the turf, breaking Hilaire's jaw and knocking him unconscious. This injury put Hilaire in a life-threatening coma for eight days during which doctors struggled to save his life and even told his coaches that he "might not make it."  Hilaire spent the remainder of the school year in treatment and rehabilitation.  Shortly after the 2008 injury however, UNH revoked Hilaire's athletic scholarship and, as a result, the remainder of his tuition was subsidized by student loans.

010270-11  768283 V1

162.     Hilaire is still recovering from this injury today.  He has limited movement of his right hand and still experiences numbness on the right side of his body.  Hilaire is responsible for the cost of his ongoing treatment related to the injury and continues to incur out-of-pocket costs.

163.     Despite his injuries, Hilaire returned to UNH and obtained a degree in criminal justice and graduated with a 3.4 overall grade point average.  The injuries he suffered while playing soccer at UNH made it extremely difficult to concentrate and hard to focus and therefore, Hilaire consistently had to ask for extra and special help in his studies.  He could not read or study for long stretches of time.

### 3.     Catherine Varner

164.     In the spring of 2010, Catherine Varner, a lacrosse midfielder, suffered a stick check to the head.[10]  After the hit, she rose to her feet slowly, stunned and visibly shaking.[11] Varner was a student-athlete at Agnes Scott College,[12] a NCAA Division-III institution.  Checks to the head are illegal in NCAA women's lacrosse, but because this hit was not especially egregious, Varner simply took possession of the ball and play resumed.[13]  She finished the rest of

---

[10] Catherine Varner, *Letting Go of Lacrosse:  Catherine Varner's Story*, THE CONCUSSION BLOG (May 3, 2011), http://theconcussionblog.com/2011/05/03/letting-go-of-lacrosse-catherine-varners-story/ (recounting details of the game in which the student-athlete suffered the concussion).  Unlike in men's lacrosse, women's lacrosse players wear goggles, which protect against eye injury, but they do not wear helmets.  *See About the Sport*, USLACROSSE.ORG, http://www.uslacrosse.org/UtilityNav/AboutTheSport/SportsScienceandSafety/Approved EyewearList.aspx (last updated June 29, 2011).

[11] *See* Varner, *supra* n.10 (characterizing player's recollection of post-hit impressions).

[12] Agnes Scott College is a Division-III NCAA member institution.  *See* AGNES SCOTT ATHLETICS, http://www.agnesscott.edu/athletics (last visited June 16, 2012).

[13] *See* Varner, *supra* n.10 (explaining how the head check appeared to be a "normal" foul, requiring only that the offending player be removed from the field).

the first half, and played the entire second half, though she continued to experience nausea and sensitivity to light.[14]

165.    The lacrosse player had suffered a Grade 2 concussion, which is characterized by transient confusion and mental-status abnormalities that last for more than 15 seconds.[15] Varner's coach was concerned, but, like many student-athletes, Varner brushed herself off and readied herself to return to the game, dazed, with slower processing speed and susceptibility to additional head trauma.[16] Following the game, Varner continued to experience nausea and moodiness.[17] The next day, she went to her school's Health Center and described her symptoms. She complained of a splitting headache, nausea, and tremors, but no one considered the possibility that she had a concussion.[18] Varner even played in the last game of the season the following day, though she had no recollection of playing after the fact.[19]

166.    In the weeks following the hit, Varner struggled to complete her remaining coursework for the semester.[20] She experienced difficulty in retaining information, focusing,

---

[14] See Varner, supra n.10 (describing player's symptoms).

[15] See AM. ACAD. OF NEUROLOGY QUALITY STANDARD SUBCOMM., Practice Parameter: The Management of Concussion in Sports (Summary Statement), 48 NEUROLOGY 581, 582 (1997), available at http://www.neurology.org/content/48/3/581.full.html (last updated Sept. 16, 2011) (describing Grade 2 concussion) (hereinafter AAN Statement).

[16] See Varner, supra n.10 (recalling player's criticism of herself for shaking, brushing off coach's concerns:  "I just wanted to be left alone and to be able to block out what I was feeling so that we could finish the game and go home.").

[17] See id. (reciting player's strange behaviors, such as crying to her mother, snapping at her teammates and trainers).

[18] See id. (noting Health Center's suggestion that player might have been experiencing an allergic reaction to medication).

[19] Id.

[20] See id. (describing how papers took "much longer than usual" and "all had a slightly incoherent element").

reasoning, following directions, balancing, exercising, and recognizing her surroundings.[21]  In

the months that followed, as her symptoms worsened, she spent her time searching for ways to

relax and lift her mood, and let her body heal.[22]  Finally, three months after her symptoms

started, Varner's mother suggested that she might have suffered a concussion from the hit.[23]

Varner saw a concussion specialist and took an ImPACT test, which confirmed and officially

diagnosed the concussion.[24]

### 4.  Additional examples of improper steps to make players safe regarding concussions in eleven NCAA sports and statistics evidencing a class-wide problem.

167.  Examples of the concussion problem in the NCAA student-athlete body continued

throughout 2012.  According to a report by the National College Players Association ("NCPA"),

the 2012 season was "studded with examples of questionable treatment of players with potential

head injuries, stating:

> Two weeks ago, Florida State quarterback E.J. Manuel
> needed to be helped off the field after taking a vicious hit to the
> head against Florida.  Manuel returned to the game after an
> abbreviated medical examination, and FSU coach Jimbo Fisher
> later claimed farcically that Manuel had suffered an abdominal
> injury.  In a game against Utah earlier this year, USC wide receiver
> Robert Woods stumbled and fell while trying to run to the sidelines
> after taking a helmet-to-helmet hit.  Woods missed just one play.
> In another Pac-12 game, Arizona quarterback Matt Scott puked on
> the field after getting hit in the head, leading ESPN announcers
> Matt Millen and Joe Tessitore to plead on the air for him to be
> taken out.  But Scott stayed in, getting pulled only after that series
> was complete.  In the Wildcats' next game, Scott suffered another

---

[21] *See id.* (indicating student-athlete's difficulty expressing herself coherently in papers, following sequences of driving directions, and exiting a three-story parking garage).

[22] *See id.* (listing Varner's attempts to improve her "foul mood").

[23] *Id.*

[24] *See id.* (relaying doctor's diagnosis and prediction that Varner should feel better "sometime after three to six months" with rest).

concussion. After taking a week off, the quarterback returned to action and was shown barfing on the sidelines against Utah.[25]

168. The examples provided above do not scratch the surface of the problem, but are merely illustrative. In fact, the NCAA reports:

- Data from the NCAA Injury Surveillance System (ISS) for the period 1994-96 estimated that more than 1,500 concussions occur annually in college football. Nine of every 10 head injuries in the sport are reported as concussions.

- "In the years 2000 to 2002, the rate of concussion during games per 1,000 athlete exposures for football was 3.1, for men's ice hockey 2.4, for men's wrestling 1.6, for men's lacrosse, 1.4, for women's ice hockey 2.4, for women's soccer 2.1, for men's soccer 1.7, for field hockey 0.8, for women's lacrosse 0.8, for women's basketball 0.7, and for men's basketball 0.5, accounting for between 6.4 and 18.3 percent of the injuries for these sports as reported by the NCAA Injury Surveillance System (ISS)."[26]

- "In the years 2004 to 2009, the rate of concussion during games per 1,000 athlete exposures for football was 3.1, for men's lacrosse 2.6, for men's ice hockey 2.4, for women's ice hockey 2.2, for women's soccer 2.2, for wrestling 1.4, for men's soccer 1.4, for women's lacrosse 1.2, for field hockey 1.2, for women's basketball 1.2, and for men's basketball 0.6, accounting for between 4 and 16.2 percent of the injuries for these sports as reported by the NCAA Injury Surveillance Program by the Datalys Center."[27]

- "Our data reports record concussion injury rates in football since 1986."[28]

169. Thus, the NCAA has express knowledge that the examples provided above are just a miniscule portion of the number of student-athletes that have suffered concussions while playing intercollegiate sports.

---

[25] http://www.ncpanow.org/news_articles?id=0048.

[26] 2007-08 Handbook, at NCAA00012928.

[27] 2010-11 Handbook, at 52.

[28] Email from David Klossner (NCAA) dated June 19, 2007, NCAA10022589.

## IV.     FACTUAL BACKGROUND

### A.     The NCAA Had a Duty to Protect and Safeguard Student-Athletes

170.     College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which comprise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

171.     The NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for member schools.[29]  The NCAA promulgates sport-specific standards through its Playing-Rules Committees, which write the rules for 15 of the 23 men's and women's sports that it regulates.[30] The playing-rules committees are comprised primarily of coaches, who act as consultants to the Association in the event that any "major changes" to the rules are considered.  However, the primary responsibility for developing and interpreting the rules falls to the secretary-rules editor.

172.     The NCAA also publishes a Sports Medicine Handbook (the "*Handbook*"), which includes policies and guidelines for the treatment and prevention of injury, as well as return-to-play instruction.  The *Handbook* is also produced annually and sent directly to head athletic trainers, as well as various individuals at NCAA member institutions.  It is not sent directly to the entire athletic trainer staff or to student-athletes, but it is made available online to athletics

---

[29] *See Bowers v. NCAA*, 974 F. Supp. 459, 461 (D.N.J. 1997) (explaining NCAA Governing legislation).

[30] *See* NCAA, *Playing Rules*, http://www.ncaa.org/wps/wcm/connect/public/Test/lssues/ Issues+Landing+Page (last visited June 17, 2012) (defining "playing rules" as "regulations governing recruiting, eligibility, financial aid, amateurism, and other such categories").

directors, senior administrators, faculty athletics representatives, other athletic trainers, student-athlete advisory committees at each member institution, and conference commissioners.[31]

**1.    The NCAA Constitution declares that the NCAA will control intercollegiate sports to protect the physical and educational well-being of student-athletes.**

173.    The NCAA Constitution clearly defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes.  The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes….;
>
> (b) to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;….

NCAA Const., Art.1, § 1.2(a),(b).  The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation."[32]

174.    Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides in pertinent part:

> **2.2    THE PRINCIPLE OF STUDENT-ATHLETE WELL-BEING**
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes.  *(Revised: 11/21/05.)*

*        *        *

---

[31] *Id.*

[32] NCAA Const., Art. 1, § 1.3.2.

**2.2.3 Health and Safety**.  It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes.  *(Adopted:  1/10/95.)*

175.    In fact, the NCAA Constitution mandates that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience."  NCAA Const., Art. 2, § 2.2.1 *(Adopted:  1/10/95)*.

176.    To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations…."[33]

**2.      The NCAA has publicly acknowledged its duty to protect the health and safety of student-athletes.**

177.    The NCAA has consistently recognized its duty to provide a safe environment for student-athletes.  For example, the NCAA's website states:  "Part of the NCAA's core mission is to provide student-athletes with a competitive environment that is safe and ensures fair play. While each school is responsible for the welfare of its student-athletes, the NCAA provides leadership by establishing safety guidelines, playing rules, equipment standards, drug testing procedures and research into the cause of injuries to assist decision making.  By taking proactive steps to student-athletes' health and safety, we can help them enjoy a vibrant and fulfilling career."[34]

178.    Thus, the NCAA maintains The Committee on Safeguards and Medical Aspects of Sports, which is publicly touted by the NCAA as "serv[ing] to provide expertise and

---

[33] NCAA Const., Art. 2, § 2.8.2.

[34] http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/index.html (last visited Jan. 31, 2013).

leadership to the NCAA in order to provide a healthy and safe environment for student-athletes through research, education, collaboration and policy development."[35]

179.    The NCAA promises its athletes a safe environment as recently as August 27, 2012, where its website states:

> The NCAA takes appropriate steps to modify safety guidelines, playing rules and standards to minimize those risks and provide student athletes with the best opportunity to enjoy a healthy career. The injury surveillance program collects, analyzes, interprets and disseminates data on injuries in each sport, providing a wealth of information through which we can provide athletes with a safe competitive environment.

180.    One of the NCAA's "core concepts and priorities" was to use its knowledge to promote health and safety:

> The NCAA has been conducting injury surveillance for more than 20 years. Over time, the underlying principle of the program has remained unchanged – to promote and support student athlete health and safety.[36]

181.    In fact, the NCAA explains on its website how it promises to use the injury surveillance data it collects:

> How does [the injury surveillance data] help prevent sports injuries?
>
> Once we know how they occur we can take the necessary steps to reduce student-athletes' exposure to situations that cause injuries. For instance, we can make adjustments to rules – such as eliminating tackling techniques in football or high-sticking in ice hockey – to reduce situations that expose student-athletes to high risks of injury. Or we can adjust equipment requirements and standards to increase safety.[37]

---

[35] http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/.

[36] NCAA10107716.

[37] http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/.

**3.      The NCAA promulgates annual guidelines for the protection of student-athletes' health and well-being.**

182.      On an annual basis, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports publishes ("Medical Committee") the NCAA Sports Medicine Handbook ("Handbook") "to formulate guidelines for sports medicine care and protection of student-athletes' health and safety" and "to assist member schools in developing a safe intercollegiate athletic program"[38]  The Medical Committee recognizes that the Handbook "may constitute some evidence of the legal standard of care."  The Handbook expressly recognizes that "student-athletes *rightfully assume* that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."[39]

183.      In discussing the "Shared Responsibility for Intercollegiate Sports Safety," the NCAA states that:

> In an effort to do so [i.e. take reasonable precautions to minimize the risks of injury from athletics participation], the NCAA collects injury data in intercollegiate sports.  When appropriate, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports makes recommendations to modify safety guidelines, equipment standards, or a sport's rules of play.[40]

184.      Thus, the NCAA has described, time and again, its responsibility for the health and well-being of student-athletes.

**B.      A Primer on Concussions**

**1.      Concussions and what they cause.**

185.      The brain is made of soft tissue and is cushioned by spinal fluid.  It is encased in the hard, protective skull.  When a person gets a head injury, the brain can slosh around inside

---

[38] The 2010-11 NCAA Sports Medicine Handbook, at 2.

[39] *Handbook*, at 4 (emphasis added).

[40] *Handbook*, at 4.

the skull and even bang against it. This can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves. When this happens, a person can get a concussion – a temporary loss of normal brain function.

186. Concussions and other brain injuries are fairly common. One of the most common reasons people get concussions is through a sports injury. High-contact sports such as football, boxing, soccer, and hockey pose a higher risk of head injury, even with the use of protective headgear:



**School of hard knocks**

A concussion occurs when a violent blow to the head causes the brain to slam against the skull beyond the ability of the cerebrospinal fluid to cushion the impact. Between 1996 and 2001, NFL teams reported nearly 900 concussions.

**1** When a football player takes a hit to the head, speeds range from 17 to 25 miles per hour with a force averaging 98 times the force of gravity.

**2** The shock wave passes through the brain and bounces back off the skull. The concussion usually occurs at the opposite side from the point of impact.

**3** The impact can cause bruising of the brain, tearing of blood vessels and nerve damage.

A study commissioned by the NFL revealed most hits occurred from a blow to the side of the head, often on the lower half of the face.

Skull
Cerebro-spinal fluid
Brain
Blood vessel

**Symptoms**

**Immediate**
Confusion
Amnesia
Loss of consciousness
Ringing in the ears
Nausea and vomiting
Convulsions

**Delayed**
Irritability
Headaches
Depression
Sleep disorders
Poor concentration
Trouble with memory

**Cumulative effects**
Studies show that prior concussions may lower the threshold for subsequent concussion injury and increase severity of symptoms.

Sources: MayoClinic.com, Biokinetics, Washington Post, Science Daily, kidshealth.org, Kaiser Permanente

Andrew Lucas, Jeff Goertzen | The Denver Post

- 43 -

187.     Men are more likely to get concussions than women.  However, in certain sports, like soccer, girls have a higher potential for concussion.  Below is a depiction of how a concussion occurs in athletics:



188.     The Brain Injury Association of America and the Centers for Disease Control and Prevention estimate that up to 3.8 million sports- and recreation-related concussions occur in the United States each year.  That makes concussions the most common type of brain injury.[41]  The reason for the frequency is due to the brain's somewhat precarious placement within the skull. Surrounded by fluid, it is normally suspended within the skull's bony structure.  In everyday activity, this fluid is sufficient to protect the brain from crashing against the skull, but there is a low threshold of impact necessary to cause damage, and athletes, in particular, frequently induce

---

[41] Interview:  Concussions, An Overlooked Epidemic, Interview by Diane Rehm with Dr. Gerard Gioia, Children's National Medical Center, in Washington, DC (Sept. 12, 2011), transcript *available at* http://thedianerehrnshow.orglshows/2011-09-12/concussions-overlooked-epidemic/transcript.

this threshold.[42]  For example, when an athlete sustains a sudden blow to the head, or if the head

whips around too quickly, the brain is jolted within the surrounding fluid, and knocked against

the inside of the skull.

189.    Some experts have described the impact of a concussion with more vivid

analogies.  Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research

Program, compared the impacts sustained in a routine college football practice to crashing a car:

"If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your

seat belt, the force of your head hitting the windshield would be around 100 gs:  in effect, the

player [who sustained two hits above 80-gs,] had two car accidents that morning."

190.    The Institute for Preventative Sports Medicine likens the effect to mashing up

Jell-O:

> Put a piece of saran wrap over a bowl of jello [*sic*] …. That jello
> [*sic*] is your brain.  Now shake the bowl pretty vigorously.  You
> see the bits of jello [*sic*] stuck to the sides of the bowl and the
> saran wrap?  That's the bruising that occurs, the tearing of the
> nerve tissue.  That's how folks get injured.[43]

191.    Both analogies emphasize the severity of the impact on the brain.  As Dr. Bennet

Omalu, co-founder of the Brain Injury Research Institute at West Virginia University notes,

"there is no such thing as a mild concussion."[44]

---

[42] *See id.* (describing how the brain is "floating around in fluid and it's not anchored" in the skull).

[43] Alexander Hecht, Article, *Legal and Ethical Aspects of Sports-Related Concussions:  The Merril Hoge Story*, 12 SETON HALL J. SPORTS & ENT. L. 17, 23 (2002).

[44] Associated Press, *Expert: Bench Youths After Concussions*, ESPN (Feb. 1, 2010, 9:29 PM), http://sports.espn.go.com/ncf/news/story?  id=4877480.  Dr. Benet Omalu, a major neuropathologist, who is researching athletes and chronic traumatic encephalopathy (CTE) has testified before the House Judiciary Committee in hearings on head injuries in sports.  *Id.*

**2.      Signs and symptoms of concussions.**

192.    The general public, including student-athletes, may not recognize the signs of a concussion.  And because of that, student-athletes may put themselves at risk for another injury.  For example, players may return to a game before they should, thinking nothing is wrong.  That is a problem because if a player's brain has not healed properly from a concussion and the player then receives another brain injury (even if it is with less force), it can be serious.

193.    Repeated injury to the brain can lead to swelling, and sometimes people develop long-term disabilities, or even die, as a result of serious head injuries.  It is therefore very important to recognize and understand the signals of a concussion.

194.    Although a concussion is commonly perceived as causing loss of consciousness (passing out), a person can have a concussion and never lose consciousness.

195.    As college coaches, trainers, and the NCAA know or should know, symptoms of a concussion may include:

> "seeing stars" and feeling dazed, dizzy, or lightheaded;
>
> memory loss, such as trouble remembering things that happened right before and after the injury;
>
> nausea or vomiting;
>
> headaches;
>
> blurred vision and sensitivity to light;
>
> slurred speech or saying things that don't make sense;
>
> difficulty concentrating, thinking, or making decisions;
>
> difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);
>
> feeling anxious or irritable for no apparent reason; or
>
> feeling overly tired.

### 3. *Second-Impact Syndrome.*

196.    When athletes who have sustained a concussion return to competition too soon, they risk the occurrence of Second-Impact Syndrome ("SIS"), a condition that can be instantly fatal.[45]  SIS occurs when an athlete sustains a second blow to the head before the symptoms from the first concussion have subsided, or before the brain has fully recovered.  The second injury may occur within minutes, days, or even weeks after the first, and still have a devastating effect.

197.    Even a relatively light hit, if sustained during this vulnerable post-concussion period, may spark the onset of SIS.  The second impact causes rapid swelling of the brain, resulting in cerebral edema.  When the brain swells, the pressure inside the skull increases, preventing blood flow to the brain and decreasing the brain's essential oxygen levels.[46]

### 4. What doctors do.

198.    If a doctor suspects that someone may have a concussion, he or she will ask about the head injury – such as how it happened and when – and the symptoms.  The doctor may ask what seem like silly questions – things like "Who are you?" or "Where are you?" or "What day is it?" and "Who is the president?"  Doctors ask these questions to check the person's level of consciousness and memory and concentration abilities.

---

[45] *See AAN Statement*, *supra* n.15, at 581 (recognizing cumulative damage of multiple concussions); *Handbook*, *supra* ¶ 37, at 53 ("There are potentially serious complications of multiple or severe concussions, including second impact syndrome, postconcussive syndrome, or post-traumatic encephalopathy"); *see also* Sean Gregory, *Study: Kids Competing Too Soon After Concussions*, TIME (Jan. 21, 2009), http://www.time.com/time/magazine/article/0.9171.1873131,00.html (reporting on concussion study by the Center for Injury Research and Policy at Nationwide Children's Hospital that found half of concussed student-players returned too soon to play).

[46] *See Brain and Nervous System Health Center:  Brain Swelling,* WebMD, http://www.webmd.comlbrainlbrain-swelling-brain-edema-intracranial-pressure?print=true (last updated Mar. 2, 2010) (describing brain swelling).

199.    The doctor will perform a thorough examination of the nervous system, including testing balance, coordination of movement, and reflexes.  The doctor may ask the patient to do some activity such as running in place for a few minutes to see how well the brain functions after a physical workout.

200.    Sometimes a doctor may order a CT scan (a special brain X-ray) or an MRI (a special non-X-ray brain image) to rule out bleeding or other serious injury involving the brain.

201.    If the concussion is not serious enough to require hospitalization, the doctor will give instructions on what to do at home, like having someone wake the person up at least once during the night.  If a person with a concussion cannot be easily awakened, becomes increasingly confused, or has other symptoms such as vomiting, it may mean there is a more severe problem that requires contacting the doctor again.

202.    The doctor will probably recommend that someone with a concussion take acetaminophen or other aspirin-free medications for headaches.  The person also will have to take things easy at school or work.

**5.      After a concussion.**

203.    After a concussion, the brain needs time to heal until all symptoms of a concussion have cleared up before returning to normal activities.  The amount of time someone needs to recover depends on how long the symptoms last.  Healthy teens can usually resume their normal activities within a few weeks, but each situation is different.  A doctor should monitor the athlete closely to make sure it is appropriate to return to the game.

204.    Someone who has had a concussion and has not recovered within a few months is said to have post-concussion syndrome.  The person may have the same problems described earlier – such as poor memory, headaches, dizziness, and irritability – but these will last for longer periods of time and may even be permanent.

205.    If someone has continuing problems after a concussion, the doctor may refer him or her to a rehabilitation specialist for additional help.

## C.    Long-Term Effects

206.    Concussions are often defined as "a head injury with a temporary loss of brain function," but recent studies and testimonies show that the loss of brain function is far from temporary.  Although the precise long-term effects of concussions are unknown, research has revealed a significant correlation between generally decreased cognitive function and participation in contact sports.  This revelation has led to a proactive response from many current and former athletes who believe in the profound significance of what the studies have revealed, because they have experienced it themselves:  "repeated concussions can, some twenty years after the fact, have devastating consequences if left unrecognized and untreated."

207.    The two major contemporary studies of the long-term effects of concussions have been conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute.  These studies have revealed the "devastating consequences" of repeated concussions, including an increased risk of depression, dementia, and suicide.  Further, the studies have demonstrated the physiological effect of multiple hits on the brain, manifested by red flecks of protein deposits on the brain called chronic traumatic encephalopathy ("CTE").  Generally, these proteins appear when the brain is hit, and disappear as healthy brain cells devour them, leading to recovery.  Yet, when the brain suffers too many blows, the brain cells cannot keep up with the protein and eventually give up and die, leaving just the red flecks associated with CTE.

208.    Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players:  Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash.  Waters and Nash killed themselves; Webster, homeless

and cognitively impaired, died of heart failure; Strzelcyyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed "the telltale red flecks of abnormal protein" characteristic of CTE. Dr. McKee, of the Boston University Center has examined the brains of 16 former athletes, and found CTE in all of them. Their research demonstrates how devastating multiple concussions are to the brain and to human function, and reiterates the need for concussion awareness, management, and prevention.

D.     **Studies Ignored by the NCAA**

209.    For decades, the NCAA has been aware that multiple blows to the head can lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

210.    In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] … if they ke[pt] at the game long enough" (the "Martland study"). The article was published in the *Journal of the American Medical Association*. The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

211.    In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

212.    In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed

to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

213.    The recommendations were codified as rules of the New York State Athletic Commission.

214.    In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

215.    That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.*, recommending that players cease to play football after receiving their third concussion).

216.    In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

217.    A 1963 study by Drs. Mawdsley & Ferguson published in Lancet found that some boxers sustain chronic neurological damage as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.

218.    A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

219.    In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended that any concussive event with

transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

220.    In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing.  This study outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

221.    A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion.  The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

222.    In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram.  By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

223.    In 1973, a potentially fatal condition known as "Second Impact Syndrome" – in which re-injury to the already concussed brain triggers swelling that the skull cannot accommodate – was identified.  It did not receive this name until 1984.  Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least 40 football players.

224.    Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple

- 52 -

concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

> encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

> acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

> with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

> immediate retrograde memory issues occur following concussions;

> mild head injury requires recovery time without risk of subjection to further injury;

> head trauma is linked to dementia;

> a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

> minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

225.    In 1997, the NHL instituted a concussion policy that included baseline testing.

226.    In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.

227.    In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered

pathological short-term and long-term damage. With respect to concussions, the same studies

showed that a person who sustained one concussion was more likely to sustain a second,

particularly if that person was not properly treated and removed from activity so that the

concussion symptoms were allowed to resolve.

228. The same studies showed that two or more concussions close in time could have

serious short-term and long-term consequences in both football players and other victims of

brain trauma.

229. In 1986, Dr. Robert Cantu of the American College of Sports Medicine published

*Concussion Grading Guidelines*, which he later updated in 2001.

230. By 1991, three distinct medical professionals/entities – Dr. Robert Cantu of the

American College of Sports Medicine, the American Academy of Neurology, and the Colorado

Medical Society – developed return-to-play criteria for football players suspected of having

sustained head injuries.

231. On May 15, 2000, a third-party organization called "SoccerDocs" wrote in to the

US Consumer Product Safety Commission highlighting serious concerns: "1. There is a high

risk of sustaining a concussion in soccer. 2. Amateur soccer players generally perform

significantly more poorly on cognitive tests than control groups. 3. Additional studies must be

undertaken in key areas with a focus on children. 4. ***Most importantly, preventative action can

be taken now including: (a) recommending that parents consider protective headgear for their

children now that a range of products are on the market; (b) Consideration of other measures

such as stricter return to play guidelines; improvements in proper technique among players;

and proper enforcement of rules limiting dangerous play.***"[47] The letter also highlights statistics

---

[47] NCAA00002631-NCAA00002642.

010270-11 768283 V1

demonstrating the high risk of sustaining a concussion in soccer and that "there is no doubt we need to gather additional data to complete the picture…For example, we do not know what levels of impact typically cause concussions…There is also a lack of knowledge about the symptoms which can be detected to identify concussion."[48]

232.    A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

233.    In November 2001, the first international symposium on concussion in sport was held in Vienna.[49]  The goal was for a group of experts to provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries.[50]  The consensus statement recommended return-to-play guidelines and that when a player shows any symptoms or signs of a concussion:  "(1) the player should not be allowed to return to play in the current game or practice; (2) the player should not be left alone; and regular monitoring for deterioration is essential; (3) the player should be medically evaluated after the injury; (4) return to play must follow a medically supervised stepwise process."[51]

234.    The statement also recommended a return to play stepwise process as follows: "(1) no activity, complete rest.  Once asymptomatic, proceed to level (2); (2) light aerobic

_____

[48] NCAA00002632.

[49] NCAA00007999-8012.

[50] *Id.*

[51] *Id.* at 8001.

exercise such as walking or stationary cycling; (3) sport specific training – for example, skating in hockey, running in soccer; (4) non contract training drills; (5) full contact after medical clearance; (6) game play." [52]  The statement also recommends education of athletes is "a mainstay of progress in this field."[53]

235.     The NCAA did not act on these recommendations.

236.     Dr. Brian Halpern, the "Past President of the American Medical Society for Sports Medicine" wrote a letter to the NCAA announcing a shocking trend in field hockey – that neck and head injury and concussion percentages in field hockey games rank above 35%.[54]  In the letter, Dr. Halpern officially requests that the NCAA look further into prevention of injuries above the neck in field hockey.[55]  In particular, the letter states that "[t]his is an extremely high percentage of injuries that are potentially disabling and possibly life threatening at times … I'm surprised at the high percentage of injuries occurring in practices and games in field hockey gathered from your data of 2000-2002.[56]  The most interesting aspect of this letter is that it cites the NCAA's own ISS data.  Therefore, it is evident that others in the medical community had viewed the high concussion injury rates in college sports and were expressing their concern.  Despite these concerns, the NCAA did not take any action.

237.     Research studies were published in November, 2003 that were a collaboration of many top neurologists and experts in the field.  They were research studies specific to NCAA

---

[52] *Id*. at 8002.

[53] *Id.*

[54] NCAA00002758.

[55] *Id.*

[56] *Id.*

athletics.[57]  In sum, the "Acute Effects and Recovery Time" study was conducted because of the "lack of empirical data on recovery time following sport-related concussion" which "hampers clinical decision making about return to play after injury."[58]  The study concluded, and the NCAA was clearly on notice of, the fact that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after concussion … [f]urther research is required to determine factors that predict variability in recover time after concussion."[59]  The context of the "Cumulative Effects" study was that "approximately 300,000 sport-related concussions occur annually in the United States, and the likelihood of serious sequelae may increase with repeated head injury."[60]  The study concluded that "players with a history of previous concussions are more likely to have future concussive injuries than those with no history; 1 in 15 players with a concussion may have additional concussions in the same playing season; and previous concussions may be associated with slower recovery of neurological function."[61]  Despite this knowledge, the NCAA did not implement a concussion-management plan policy until 2010.

238.    In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

---

[57] NCAA00007837-7844; NCAA00007909-7915.

[58] *Id*. at 7837.

[59] *Id*.

[60] *Id*. at 7909.

[61] *Id*.

239.    The NCAA released its injury surveillance data for the 2005-2006 football season

and it showed high rates of concussions and head injuries.[62]  Specifically, head injuries

accounted for 11% of practice and 5% of game injuries.[63]  "Concussions ranked third highest in

both practice and competition."[64]  In addition, "a team averaging 60 game participants could

expect one concussion every five games.  Seven percent of all practice and game injuries

involved concussions."[65]

240.    The men's ice hockey injury surveillance data for 2005-2006 had similarly high

rates of concussions and head injuries.  NCAA00002962-NCAA00002980.  Specifically, for

practices in 2004-2005, concussions constituted 12% of all injuries and 7% of all injuries in

2005-2006.  *Id*. at NCAA0002980.  In addition, for games in 2004-2005, concussions constituted

16% of all injuries and 12% of all injuries in 2005-2006.  *Id*.  Another figure in the NCAA

release shows that head injuries accounted for 14% of all injuries in 2005-2006 and 17% of all

injuries in 2004-2005.  *Id*. at NCAAA2977.  And, head injuries constituted 16% of all injuries in

practices for the years 2004-2005 and 2005-2006.  *Id*. at NCAA0002976.

241.    Finally, the 2005-2006 Injury Surveillance System report for men's soccer

showed that concussions accounted for 6% of all competition injuries.  NCAA00003000-

NCAA00003019.  Head injuries accounted for 11% and 12% of all injuries in 2005-2006 and

2004-2005 respectively.  *Id*. at NCAA00003017.

242.    The University of North Carolina's Center for the Study of Retired Athletes

published survey-based papers in 2005 through 2007 that found a strong correlation between

---

[62] NCAA00002934-NCAA00002961.

[63] *Id*. at NCAA00002937.

[64] *Id*. at NCAA00002938.

[65] *Id*. at NCAA00002937.

depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

243.    A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

244.    Since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.  Further, based on studies that the NCAA *itself* paid for (as explained in detail below), the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.

245.    Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease. Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

246.    As early as in 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that there were enduring effects in youth who have experienced a history of two or more concussions.[66]  These include decreased overall neuropsychological functioning, as well as decreased mental speed.

---

[66] Moser, *et al*., Archives of Clinical Neuropsychology, 17 (2002) 91-100.

247.    In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal.[67]  The study concluded that ***athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities***.

248.    Despite this knowledge, the NCAA continues to allow student-athletes to return to play the very next calendar day after sustaining a concussion.  In practice, this means that a student-athlete can be back on the field less than 24 hours after sustaining a serious brain injury – thereby placing the student-athlete in serious medical jeopardy.

249.    In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the effects of multiple concussions sustained by a single athlete were examined.[68]  The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions.  The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

250.    The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student-athletes should rest before returning to play.  Despite this knowledge, the NCAA has failed to implement any guidelines or rules

---

[67] McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.

[68] Guskiewicz, *et al.*, *Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing football.

251.    But there is more.  In 2005 UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment ("MCI") and early-onset Alzheimer's disease.[69]  In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early on-set Alzheimer's disease.  The NCAA did not even acknowledge the study, let alone act on it or even alert its student-athletes of these known risks.

252.    Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which found that recurrent concussions were linked to a heightened risk of depression in former football players.[70]  The results of that study showed that former football players who sustained three or more concussions were three times more likely to be diagnosed with depression.  Those with two or more concussions were one and one-half times more likely to be diagnosed with depression.

253.    Further, it is well known that student-athletes in the NCAA are at risk for concussion.  In 2010, a study from the University of North Carolina reported that men's hockey players suffered 1.47 concussions per 1,000 player hours.  Women's college hockey was worse, with 2.72 concussions occurring for every 1,000 hours.[71]

---

[69] Guskiewicz, *et al*., *Association between recurrent concussions and late-life cognitive impairment in retired professional football players*, NEUROSURGERY, Vol. 50, October 2005, at 719.

[70] *Guskiewicz, et al., Recurrent concussions and risk of depression in retired professional football players,* MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

[71] http://www.hockeyprimetime.com/news/futures-watch/ncaa-hockeys-growing-headache.

254.     At a 2010 Mayo Clinic conference on concussions, researchers discussed that concussions comprised about 25 percent of the injuries in women's ice hockey, the highest cause of injury in the sport.  In men's ice hockey concussions account for 9 percent of the injuries (No. 2 in the sport), and in football they account for 7 percent (No. 3 in the sport).[72]

255.     The NCAA also knows, but has ignored, that concussions are not limited to helmeted sports.  A study conducted by McGill University in Montreal found that 60 percent of college soccer players reported symptoms of a concussion at least once during the season.  The study also revealed that concussion rates in soccer players were comparable to those in football. According to this study, athletes who suffered a concussion were four to six times more likely to suffer a second concussion.[73]/[74]

256.     Consistent with the pattern described herein, the NCAA chose to ignore the fact that the mental health of student-athletes was at risk, implementing no policy or educational stance that would properly protect and/or inform the football players at risk.

**E.      The NCAA's Inadequate Rules and Policies Regarding How the Games are Played**

257.     In the early 1970s, rule-makers in the NCAA recognized that the use of the helmeted head as an offensive weapon was dangerous and was increasing the rate of concussions.

258.     In 1976, the NCAA passed a rule prohibiting initial contact of the head in blocking and tackling in football.

---

[72] http://slapshot.blogs.nytimes.com/2010/10/19/at-the-mayo-clinic-womens-hockey-a-most-dangerous-game/.

[73] http://www.aans.org/Patient%20Information/Conditions%20and%20Treatments/Sports-Related%20Head%20Injury.aspx.

[74] http://aans.org/en/Patient%20Information/Conditions%20and%20Treatments/Concussion.aspx.

259.    Even after the football regulations of the 1970s were passed, however, football student-athletes continued to be coached and trained to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. While these techniques were *publicly* condemned by the NCAA, on a private level they were not meaningfully condemned by the NCAA.  To date, the harshest penalty imposed on football coaches whose players were found to use the helmeted head to tackle was a letter of reprimand.

260.    At the individual level, the penalties for student-athletes who make dangerous helmet-based tackles include being either ejected or suspended from play.  But at the *team* level, teams are assessed only a 15-yard penalty for dangerous tackling.  What is more, the stated rationale behind these penalties has consistently been to protect *the player being tackled* without regard for the player *using* the helmet to make the tackle – as he was coached to do.

261.    Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student-athletes.

262.    Similarly, in hockey, inadequate guidance existed on hitting with the head in the NCAA.  Finally, in 2010, the NCAA installed new rules in the hockey off-season to address the growing problem of concussions and head and neck injuries.  As of the 2010-11 season, all hits to the head are supposed to be penalized by a five-minute major and the referee's option of a game misconduct or disqualification.  A disqualification carries with it an automatic one-game suspension.

010270-11  768283 V1

263.    However, rules are only as effective as their enforcement.  And, even today, the NCAA continues to turn a blind eye to the type of game play that causes concussions.

**F.    The NCAA's Inadequate Concussion Treatment and Return to Play Rules**

**1.    From 1994-2002, the NCAA refused to endorse any return-to-play criteria.**

264.    Guideline 2o, "Concussions and Second Impact Syndrome," first appeared in the 1994-1995 NCAA Sports Medicine Handbook and largely remained the same through 2002. Rather than providing protection for student-athletes or a treatment protocol for member institutions, Guideline 2o largely left treatment to the individual team's discretion.

265.    For example, while the 1998-99 version of Guideline 2o reported that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," the NCAA stated that it "does not endorse any specific concussion grading scale or return-to-play criteria."  The NCAA left the discretion on return to play to the individual school.

266.    Moreover, the NCAA did not enforce Guideline 2o's statement that:  "A student-athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred.  In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."  Thus, Guideline 2o acted as a liability cover for the NCAA without any NCAA enforcement activity to actually protect student-athletes.

**2.    The NCAA fails to adopt the guidelines promulgated by the 2001 Vienna Conference.**

267.    In November 2001, the first International Symposium on Concussion in Sport was held in Vienna, Austria ("Vienna Conference").  The aim of the Vienna Conference was to

- 64 -

provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, football (soccer), and other sports. Experts were invited "to address specific issues of epidemiology, basic and clinical science, grading systems, cognitive assessment, new research methods, protective equipment, management, prevention, and long-term outcome, and to discuss a unitary model for understanding concussive injury."

268.     The result of the Vienna Conference was the publication of an international consensus statement that was "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions" ("Vienna Protocol"). The Vienna Protocol was intended to "be widely applicable to sport related concussion" and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of injured athletes, whether at the recreational, elite, or professional level."[75]/[76] The Vienna Protocol includes direction with respect to each of the following areas in diagnosing and treating concussions: Clinical history; Evaluation; Neuropsychological testing; Imaging procedures; Research methods; Management and rehabilitation; Prevention; Education; Future directions; and Medicolegal considerations.[77]

269.     In fact, the Vienna Protocol recommended specific internationally-accepted return to play guidelines, stating:

> When a player shows ANY symptoms or signs of a concussion:
>
> (1) The player should not be allowed to return to play in the current game or practice.

---

[75] "Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med2002; 36:6-7 doi:10.1136/bjsm.36.1.6, *available at* http://bjsm.bmj.com/content/36/1/6.full.

[76] The NCAA possessed a copy of the Vienna Protocol. NCAA00007999-8012.

[77] *Id.*

(2) The player should not be left alone; and regular monitoring for deterioration is essential.

(3) The player should be medically evaluated after the injury.

(4) Return to play must follow a medically supervised stepwise process.

A player should never return to play while symptomatic. "When in doubt, sit them out!"[78]

270.    The Vienna Protocol also recommended an internationally-accepted return to play stepwise process as follows:

Return to play after a concussion follows a stepwise process:

(1) No activity, complete rest. Once asymptomatic, proceed to level (2).

(2) Light aerobic exercise such as walking or stationary cycling.

(3) Sport specific training – for example, skating in hockey, running in soccer.

(4) Non-contact training drills.

(5) Full contact training after medical clearance.

(6) Game play.

With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. If any symptoms occur after concussion, the patient should drop back to the previous asymptomatic level and try to progress again after 24 hours.[79]

271.    Despite the internationally-accepted consensus guidelines set forth in the Vienna Protocol, the NCAA did not revise the substance of Guideline 2o in the 2002-03 NCAA Sports Medicine Handbook, nor in the 2003-04 Sports Medicine Handbook. In fact, in both identical

---

[78] Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med2002;36:6-7 doi:10.1136/bjsm.36.1.6, *available at* http://bjsm.bmj.com/content/36/1/6.full. *See also* NCAA00007999, at 8001.

[79] *Id.*

versions, the NCAA continued to state that there was a "current lack of consensus among the medical community on management of concussions [and thus] the NCAA does not endorse any specific concussion grading scale or return-to-play criteria."[80] The NCAA's position was directly contrary to the consensus set forth in the Vienna Protocol.

272.    In the 2004-05 NCAA Sports Medicine Handbook, the NCAA replaced Guideline 2o with Guideline 2i, entitled "Concussion or Mild Traumatic Brain Injury (mTBI) in the Athlete."[81] While Guideline 2i continued to recommend that students not be allowed to return to play while symptomatic, the NCAA nonetheless approved of absolute discretion being left to the team and student-athlete on when a student should be allowed to return to play.[82] Guideline 2i, in both the 2004-05 and 2005-06 Handbooks, stated in pertinent part:

> The duration of time that an athlete should be kept out of physical activity is unclear, and in most instances, individualized return to play decisions should be made. These decisions will often depend on the clinical symptoms, as well as previous history of concussion, and severity of previous concussions. Additional factors include the sport, position, age, support system for the athlete, and the overall "readiness" of the athlete to return to sport.[83]

273.    The NCAA's position was, once again, contrary to the Vienna Protocol. In fact, the NCAA outright dismissed the Vienna Protocol in Guideline 2i, instead advocating for individual school decisions stating: "More recent grading systems have been published which attempt to take into account the expanding research in the field of mTBI in athletes. Though it is useful to become familiar with these guidelines, it is important to remember that many of these injuries are best treated in an individual fashion (Cantu '01, Vienna Conference, NATA '04)."

---

[80] *See*, *e.g.*, NCAA000017196.

[81] NCAA00007098, at 7144-49.

[82] *Id*. at NCAA00007146-47.

[83] *Id*. at NCAA00007147.

### 3. The NCAA fails to adopt the guidelines promulgated by the 2004 Prague Conference.

274. The 2nd International Symposium on Concussion in Sport was held in Prague, Czech Republic in November 2004 ("Prague Conference"), resulting in a revision and update of the Vienna Protocol ("Prague Protocol").[84] While the return to play guidelines were largely unchanged, the Prague Conference distinguished between simple concussions and complex concussions.[85] The Prague Protocol defined simple concussions generally as those that "resolve without complication over 7-10 days," and complex concussions as those "where athletes suffer persistent symptoms (including persistent symptom recurrence with exertion), specific sequelae (such as concussive convulsions), prolonged loss of consciousness (more than one minute), or prolonged cognitive impairment after the injury."[86]

275. The Prague Protocol stated that this latter group with complex concussions:

> [M]ay also include athletes who suffer multiple concussions over time or where repeated concussions occur with progressively less impact force. In this group, there may be additional management considerations beyond simple return to play advice. Formal neuropsychological testing and other investigations should be considered in complex concussions. It is envisaged that such athletes would be managed in a multidisciplinary manner by doctors with specific expertise in the management of concussive injury such as a sport medicine doctor with experience in concussion, sports neurologist, or neurosurgeon.

276. Thus, building on the return-to-play guidelines in the Vienna Protocol, the Prague Protocol adopted the same stepwise process, but added the admonition that: "In cases of

---

[84] Summary and agreement statement of the 2nd International Conference on Concussion in Sport, Prague 2004, Br J Sports Med2005; 39:196-204 doi:10.1136/bjsm.2005.018614 (Feb. 2005).

[85] "Historically, concussions have been classified with a number of different grading systems. In the Vienna Statement, this approach was abandoned. One of the key developments by the Prague Group is the understanding that concussion may be categorised for management purposes as either simple or complex." *Id.*

[86] *Id.*

complex concussion, the rehabilitation will be more prolonged, and return to play advice will be more circumspect. It is envisaged that complex cases should be managed by doctors with a specific expertise in the management of such injuries."

277.     Despite the publication of the Prague Protocol in February 2005, the NCAA did not update its Guideline 2i in the 2006-07 Handbook – but repeated Guideline 2i from the prior years. The NCAA thus did not adopt the internationally-accepted guidelines set forth first in 2002 in the Vienna Protocol that were now reaffirmed in the 2005 Prague Protocol. Moreover, the NCAA failed to mandate that student-athletes with concussions be managed by doctors with a specific expertise in the management of such injuries, instead leaving all care to a school's "medical staff."

> **4.     The NCAA fails to adopt the guidelines promulgated by the 2008 Zurich Conference.**

278.     The 3rd International Symposium on Concussion in Sport was held in Zurich, Switzerland, in November 2008 ("Zurich Conference"), resulting in an update of the Vienna Protocol and Prague Protocol ("Zurich Protocol").[87]

279.     Once again, the Zurich Protocol reaffirmed the need for a graduated stepwise return to play process after a concussion, with a 24-hour wait period between each step. The Zurich Protocol stated:

> Return to play protocol following a concussion follows a stepwise process as outlined in Table 1.

---

[87] Consensus Statement on Concussion in Sport:  the 3d International Conference on Concussion in Sport held in Zurich, November 2008, http://bjsm.bmj.com/content/43/Suppl_1/i76.full.pdf+html.

**Table 1**
Graduated return to play protocol

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 1. No activity | Complete physical and cognitive rest | Recovery |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum predicted heart rate<br><br>No resistance training | Increase heart rate |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |
| 4. Non-contact training drills | Progression to more complex training drills, eg passing drills in football and ice hockey<br><br>May start progressive resistance training) | Exercise, coordination, and cognitive load |
| 5. Full contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

> With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. Generally each step should take 24 hours so that an athlete would take approximately one week to proceed through the full rehabilitation protocol once they are asymptomatic at rest and with provocative exercise. If any post-concussion symptoms occur while in the stepwise programme, the patient should drop back to the previous asymptomatic level and try to progress again after a further 24-hour period of rest has passed.[88]

280.     The Zurich Protocol also reinforced that sport governing bodies, like the NCAA, may need to change their rules and/or enforce the rules in order to protect the well-being of athletes who suffer or show signs of concussions, stating:

> Consideration of rule changes to reduce the head injury incidence or severity may be appropriate where a clear-cut mechanism is implicated in a particular sport. An example of this is in football (soccer) where research studies demonstrated that upper limb to head contact in heading contests accounted for approximately 50% of concussions. As noted earlier, rule changes may also be needed in some sports to allow an effective off-field medical assessment to occur without compromising the athlete's welfare, affecting the flow of the game or unduly penalising the player's team. It is important to note that rule enforcement may be a critical aspect of

---

[88] *Id.*

modifying injury risk in these settings; referees play an important role in this regard.[89]

281.    Despite the publication of the Zurich Protocol in early 2009, the NCAA did not update its Guideline 2i in the 2009-10 Handbook, but repeated Guideline 2i from the prior years. The NCAA thus did not adopt the internationally-accepted guidelines set forth first in 2002 in the Vienna Protocol, as reaffirmed and explained in the 2005 Prague Protocol and the 2009 Zurich Protocol.  In fact, the NCAA did not even discuss in its Guidelines the Prague or Zurich Protocols, but continued to repeat its dismissal of the Vienna Protocol:  "More recent grading systems have been published which attempt to take into account the expanding research in the field of mTBI in athletes.  Though it is useful to become familiar with these guidelines, it is important to remember that many of these injuries are best treated in an individual fashion (Cantu '01, Vienna Conference, NATA '04)."

**5.      Too little, too late, the NCAA finally requires schools to have a concussion plan.**

282.    As previously discussed, the NCAA Sports Medicine Handbook notes that "student-athletes rightfully assume that those who sponsor intercollegiate athletes have taken reasonable precaution to minimize the risks of injury from athletics."  This assumption is bolstered by the NCAA's requirement of medical examination prior to participation and the requirement that each student-athlete should be covered by medical insurance.

283.    The *Handbook*'s section on concussions cites to 17 references, dating back to 1991, all documenting the dangers of concussions and the need to carefully assess and treat student-athletes:

---

[89] *Id.*

1.    Cantu RC:  Concussion severity should not be determined until all postconcussion symptoms have abated.  Lancet 3:437-8, 2004.

2.    Cantu RC:  Recurrent athletic head injury: risks and when to retire.  Clin Sports Med. 22:593-603, 2003.

3.    Cantu RC:  Post traumatic (retrograde/anterograde) amnesia:  pathophysiology and implications in grading and safe return to play.  Journal of Athletic Training, 36(3): 244-8, 2001.

4.    Centers for Disease Control and Prevention. Sports-related recurrent brain injuries:  United States. MMWR Morb Mortal Wkly Rep 1997; 46:224-227.

5.    Collie A, Darby D, Maruff P:  Computerized cognitive assessment of athletes with sports related head injury.  Br. J Sports Med 35(5):297-302, 2001.

6.    Collins MW, Iverson GL, Lovell MR, McKeag DB, Norwig J, Maroon J:  On-field predictors of neuropsychological and symptom deficit following sports-related concussion.  Clin J Sport Med 2003; 13:222-229.

7.    Collins MTV, Grindel SH, Lovell MR et al:  Relationship Between Concussion and Neuropsychological Performance in College Football Players.  JAMA 282:964-970, 1999.

8.    Guskiewicz KM. Bruce SL, Cantu R, Ferrara MS, Kelly JP, McCrea M, Putukian M, McLeod-Valovich TC; National Athletic Trainers' Association Position Statement: Management of Sport-related Concussion:  Journal of Athletic Training, 39(3):280-297, 2004.

9.    Guskiewicz KM:  Postural stability assessment following concussion:  One piece of the puzzle.  Clin J Sport Med 2001; 11:182-189.

10.   Hovda DA, Lee SM, Smith ML et al:  The Neurochemical and metabolic cascade following brain injury:  Moving from animal models to man.  J Neurotrauma 12(5):143-146, 1995.

11.   Johnston K, Aubry M, Cantu R et al:  Summary and Agreement Statement of the First International Conference on Concussion in Sport, Vienna 2001, Phys & Sportsmed 30(2):57-63, 2002.

12. Lovell MR, Iverson GL, Collins MW et al: Does loss of consciousness predict neuropsychological decrements after concussion? Clin J Sport Med 9:193-198, 1999.

13. Makdissi M, Collie A. Maruff et al: Computerized cognitive assessment of concussed Australian Rules, footballers. Br J Sports Med 35(5):354-360, 2001.

14. McCrea M: Standardized mental status assessment of sports concussion. Clin J Sport med 11(3):176-181, 2001.

15. McCrea A Hammeke T, Olsen G, Leo, Guskiewicz K: Unreported concussion in high school football players. Clin J Sport Med;14:13-17, 2004.

16. McCrory P, Meeuwisse W, Johnston K, Dvorak J, Aubry M, Molloy M, Cantu R. Consensus Statement on Concussion in Sport: the 3rd International Conference on Concussion in Sport: Zurich, Switzerland, 2008. Br J Sports Med;43:i76-i84, 2009.

17. Torg, JS: Athletic Injuries to the Head, Neck, and Face. St. Louis, Mosby-Year Book, 1991.

284. Despite this extensive knowledge of the danger of concussion, it was not until April 2010 that the NCAA passed legislation requiring its member schools to have a Concussion Management Plan ("CMP") in place for all sports. The NCAA did so in reaction to the NFL's concussion policy, as well as the significant liability incurred as a result of the lawsuit brought by Preston Plevretes. The fact that the NCAA waited until nearly nine years after the first international consensus statement on concussions (and still did not meet the consensus standards) is no surprise. Historically, the NCAA has regulated on the basis of public perception,[90] and

---

[90] *See*, *e.g.*, *Cureton v. NCAA*, 198 F.3d 107, 110 (3d Cir. 1999) (implementing notorious student-athlete academic standards, including minimum GPA, number of core courses, and SAT score, for student-athlete eligibility "in response to the public's perception" that it was needed); *see also* NCAA History, *supra* n.156 (creating NCAA to quell public's concerns over violence in intercollegiate athletics).

courts have largely left the NCAA alone because of the Association's unique position of authority in intercollegiate athletics, and its worthy goal of preserving amateurism.[91]

285.    However, rather than creating a system-wide policy that focused on the best interest of the student-athletes, the NCAA's so-called "plan" for concussion management  relies on member schools to self-police their return-to-play policies.  Further, the NCAA's plan put the onus of concussion management on the student-athletes by requiring that they "sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions."[92]  Specifically, the NCAA added the following text-box to Guideline 2i in the 2010-11 Sports Medicine Handbook:

---

[91] In doing so, the NCAA has become almost "an extra-judicial entity, a society unto itself, answerable to no one …."  Mitchell Nathanson, *The Sovereign Nation of Baseball:  Why Federal Law Does Not Apply to "America's Game" and How It Got That Way*, 16 Vill. Sports & Ent. L.J. 49, 52-3 (2009) (referring to MLB, which has been given "wide latitude" by federal courts and describing MLB as largely "free to govern itself pursuant to its own definition of what is in the best interests of baseball").  Similarly, federal courts been deferential to NCAA rules because of the Association's unique position of authority in intercollegiate athletics, and its worthy goal of preserving amateurism:

> The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports.  There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act.

*NCAA v. Bd. of Regents*, 468 U.S. 85, 120 (1984).

[92] NCAA Rule 3.2.4.17 (*available at* http://www.ncaapublications.com/productdownloads/D112.pdf).

> **The NCAA Executive Committee adopted (April 2010) the following policy for institutions in all three divisions.**
>
> "Institutions shall have a concussion management plan on file such that a student-athlete who exhibits signs, symptoms or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions. Student-athletes diagnosed with a concussion shall not return to activity for the remainder of that day. Medical clearance shall be determined by the team physician or his or her designee according to the concussion management plan.
>
> "In addition, student-athletes must sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions. During the review and signing process, student-athletes should be presented with educational material on concussions."

286.    Boiled down to its essence, the plan rejects any measure of responsibility for the NCAA, its member schools, and the coaching staff of individual teams; and instead, puts the burden squarely on the shoulders of student-athletes – *the same student-athletes who have just sustained fresh head trauma* – to seek out medical attention, or decide whether to seek it in the first place.  Second, the NCAA Plan assumes that NCAA conferences and member institutions understand concussion research, and will supplement and enforce the Plan.  However, since the Plan's inception, few member institutions have accepted the NCAA's invitation to do so.

287.    Unlike the comprehensive NFL plan, which provided for specific baseline testing and mandated objective evaluations for athletes, the NCAA plan is skeletal.  Rather than directing member institutions to comply with particular procedures, the NCAA plan places the onus of developing the particular means of prevention and management upon NCAA member institutions, almost none of which have stepped forward with a comprehensive, compliant plan.  Moreover, the NCAA plan burdens member institutions with the nearly impossible task of identifying when an athlete might have suffered a concussion, and should therefore be removed

from play. And, the NCAA plan does not outline any specific stepwise return to play protocol, even though an international consensus had first been reached at the Vienna Conference in 2001 and reaffirmed at the Prague and Zurich Conferences.

**G.     The NCAA's Attempt to Shift the Economic Burden of its Negligence to the Class**

288.     The NCAA requires that every member institution certify that each student-athlete is covered by the student-athlete's or parents' personal insurance coverage or through a basic accident medical policy carried by the institution (or through an institution's formal self-insurance plan).

289.     For any medical care required by a student-athlete that has suffered a concussion or is displaying concussion symptoms, outside of the immediate treatment (if any) provided by the institution's sports medical staff, the NCAA requires that the costs be paid by the student-athlete's or parents' personal insurance or through the institution's plan.

290.     While the NCAA maintains the NCAA Catastrophic Injury Insurance Program, the current $90,000 deductible must first be borne by the student-athlete's or parents' personal insurance or through the institution's plan. Moreover, on information and belief and based on the evidence to date, the NCAA Catastrophic Injury Insurance Program has not covered the long-term debilitating effects resulting from repetitive head impacts in intercollegiate sports as described herein. In fact, the NCAA defines "true catastrophic injuries" that would be covered under the NCAA Catastrophic Injury Insurance Program as "relatively rare."[93]

291.     Many injured student-athletes leave the sport burdened by medical bills as there is no uniform NCAA policy requiring that adequate insurance coverage be provided by the school:

---

[93] http://www.ncaa.org/wps/wcm/connect/public/NCAA/NCAA+Insurance+Programs/ Student+Athlete+Insurance+Programs/Student+Athlete+Insurance+Programs+Homepage.

> "I thought I would be covered," said Erin Knauer, a *Colgate University* student who piled up $80,000 in medical bills after injuring her back and legs in training for the crew team. Insurance has covered less than a third of the cost because of the way her condition was diagnosed. "You never think you're going to rack up that much of a bill."

292. Other athletes discover their financial problems long after their bodies have healed. An Ohio University football player, temporarily paralyzed during a workout, learned that he still owed $1,800 in unpaid medical bills when he went to buy a car six years after his injury.

293. Many students, whether athletes or not, have medical insurance through their parents. But these plans often exclude varsity sports injuries, limit out-of-state treatment or do not cover much of the bill. Some colleges buy secondary policies to fill the gaps, although even these plans have holes. And only players hurt badly enough to require extensive care can turn to the NCAA for coverage. Its catastrophic insurance carries a $75,000 deductible, which will increase to $90,000 next year.

294. The absence of mandated coverage for athletes has prompted calls for change. "That's part of the cost of having an athletic program," said David Dranove, a professor of health industry management at *Northwestern University's* Kellogg School of Management. "It makes no more sense to tell the athletes, 'You go buy your own *health insurance*,' than it does to say, 'You go buy your own plane tickets and uniform.'"[94]

## H.    Discovery of the Cause of Action, the NCAA's Fraudulent Concealment and Plaintiffs' Vulnerability

295. When student-athletes sign their athletic participation packet the NCAA does not explain the short- or long-term dangers of concussions or the potential post-college medical

---

[94] http://www.nytimes.com/2009/07/16/sports/16athletes.html?pagewanted=all&_r=0.

expenses students may incur as a result of concussion-related injuries. The NCAA does not share with the student-athlete the injury surveillance data it has collected or the number of concussions in the athletes' sport.

296. Prior to passage of the NCAA CMP on August 13, 2010, Plaintiffs and the Class were unaware that the conduct of the NCAA with respect to precaution, detection and treatment of concussions may have caused them to be at an increased risk for developing chronic brain injury symptoms, including, but not limited to, dementia and/or Alzheimer's disease.

297. Until at least April 2010, Plaintiffs and the Class did not have a reasonable basis to know or believe that the aforementioned harm was caused by the concealment, neglect and/or misconduct of the NCAA.

298. Leading up to August 13, 2010, and over the past four decades, the NCAA has actively concealed any correlation between on-field concussions, its return-to-play policies and the chronic mental illnesses and maladies suffered by former student-athletes, including the Plaintiffs and the Class. Indeed, in 1996, a subcommittee of the NCAA observed an increase in concussions and noted that the "football helmet was not designed to protect this type of injury."[95] The NCAA did not warn student football or hockey players that their helmets did not protect against concussions and that the NCAA was seeing an increase in concussions. This is despite the fact an athlete would naturally think of his or her helmet as protective. But the NCAA knew of no "sports helmets … set to prevent concussions."[96]

299. The discovery of the NCAA's wrongdoing was also delayed due to the players' unequal bargaining power. Unlike the NFL, there is no players union to study and advocate concerning players' health.

---

[95] NCAA00001690-96.

[96] NCAA10025084.

300.     Even today, by failing to implement appropriate policies to prevent, manage, mitigate and remedy head injuries and concussions sustained by its student-athletes, the NCAA continues to ignore and actively conceal the repeated warnings and patterns of injury of which the NCAA has actual knowledge.

301.     Although the debilitating effects of concussions and other head injuries have already manifested for many former student-athletes, there are many others who have sustained such injuries as a direct result of the NCAA's failures and inactivity described above, but whose symptoms have only partially manifested or not yet manifested at all.

302.     The NCAA has failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This has increased the risk of injury that will materialize in the future.

303.     As a result, Plaintiffs and the Class require medical monitoring to detect the manifestation of post-injury symptoms.

## V.     CLASS ACTION ALLEGATIONS

304.     Plaintiffs bring Counts I-VI, as set forth below, individually and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All persons who are playing or have played an NCAA-sanctioned sport at an NCAA member institution.
>
> (The "Class").

Excluded from the Class are the following persons: (i) the NCAA and the NCAA's officers and directors; (ii) Class counsel; (iii) the judges who have presided over this litigation; (iv) Mildred Whittier; and (v) Anthony Nichols.

010270-11  768283 V1

305.     Certification of Plaintiffs' claims for class-wide treatment is appropriate

because Plaintiffs can prove the elements of their claims on a class-wide basis using the same

evidence as would be used to prove those elements in individual actions alleging the same

claims.

306.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the

Class are so numerous that individual joinder of all members of the Class is impracticable.  On

information and belief, there are thousands of student-athletes who have been damaged by the

NCAA's wrongful conduct as alleged herein.  The precise number of members of the Class and

their addresses is presently unknown to Plaintiffs.  In the period 2004-2009 the NCAA

estimated 29,225 concussions in nine sports.[97]  Members of the Class may be notified of the

pendency of this action by recognized, Court-approved notice dissemination methods, which

may include U.S. mail, electronic mail, Internet postings, and/or published notice.

307.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2)**

**and 23(b)(3).**  This action involves common questions of law and fact, which predominate over

any questions affecting individual members of the Class, including, without limitation:

        a.      whether the NCAA engaged in the conduct as alleged herein; and

        b.      whether Plaintiffs and the Class are entitled to equitable relief, including,

but not limited to, medical monitoring and other injunctive relief.

308.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are

typical of the claims of the other members of the Class because, among other things, all members

of the Class are at risk for short- and long-term injuries resulting from concussions and the

accumulation of subconcussive hits as a result of the uniform misconduct described above.

---

[97] NCAA10091830.

309.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**

Plaintiffs are adequate representatives of the Class because their interests do not conflict with the

interests of the members of the Class they seek to represent; they have retained counsel

competent and experienced in complex commercial and class action litigation; and Plaintiffs

intend to prosecute this action vigorously.  The interests of the Class will be fairly and

adequately protected by Plaintiffs and their counsel.

310.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**

The NCAA has acted or refused to act on grounds generally applicable to Plaintiffs and the

members of the Class, thereby making appropriate final injunctive relief and declaratory relief,

as described below.

311.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is

superior to any other available means for the fair and efficient adjudication of this controversy,

and no unusual difficulties are likely to be encountered in the management of this class action.

The costs of current or future testing for diagnostic purposes are relatively small compared to the

burden and expense that would be required to individually litigate Class Members' individual

claims against the NCAA, so it would be impracticable for members of the Class to individually

seek medical monitoring or injunctive relief for the NCAA's wrongful conduct.  Even if

members of the Class could afford individual litigation, the court system could not.

Individualized litigation for medical monitoring and injunctive relief creates a potential for

inconsistent or contradictory judgments, and increases the delay and expense to all parties and

the court system.  By contrast, the class action device presents far fewer management difficulties,

and provides the benefits of single adjudication, economy of scale, and comprehensive

supervision by a single court.

# VI.    CLAIMS ALLEGED

## COUNT I

## BREACH OF EXPRESS CONTRACT
### (On Behalf of the Class)

312.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint.

313.    Plaintiffs and the NCAA were parties to a contract.  Each student-athlete, prior to participation as an NCAA athlete, must complete a form where they affirm that they have read the NCAA regulations and the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively "Manual"), that they understand all of the respective NCAA Division Bylaws, and that they will abide by them.

314.    In the Manual, the NCAA promises to perform the following services, *inter alia*, for the student-athletes' benefit:

    (a)    "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," NCAA Const., Art.1, § 1.2(a);

    (b)    "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

    (c)    to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, NCAA Const., Art. 1, § 1.3.2;

    (d)    to conduct intercollegiate athletics "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," NCAA Const., Art. 2, § 2.2;

    (e)    to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for,

each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3;

(f) to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2;

(g) to "assist the institution in its efforts to achieve full compliance with all rules and regulations…," NCAA Const., Art. 2, § 2.8.2.

315. For consideration in return for the NCAA's promises, each student-athlete agrees to abide by the Manual and any other NCAA rules, participates in an NCAA sport which provides a benefit to the NCAA and its member institutions, and agrees to waive certain rights, including the right to profit from participation.

316. The NCAA acknowledges that "**student-athletes *rightfully assume* that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation**."[98]

317. The Manual thus constitutes a contract between the NCAA, its member institutions and the student-athletes.

318. The student-athletes have fulfilled their obligations under the contract by providing their services.

319. The NCAA, and its member institutions, have breached their contractual commitment to provide a safe environment by:

(a) failing to educate players concerning symptoms that may indicate a concussion has occurred;

(b) failing to warn of the risk of unreasonable harm resulting from concussions;

---

[98] *Handbook*, at 4 (emphasis added).

(c)      failing to disclose the special risks of long-term complications from concussions and return to play;

(d)      failing to disclose the role of repeated concussions in causing chronic life-long cognitive decline;

(e)      failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return-to-play policy to minimize long-term chronic cognitive problems;

(f)      concealing pertinent facts;

(g)      failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions including limits on contact practices; and

(h)      failing to provide long-term insurance coverage for concussion-related injuries.

320.    The NCAA, and its member institutions, have breached their contractual commitment to student-athletes to provide a safe environment in one or more of the following ways:

(a)      by failing "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," in breach of NCAA Const., Art.1, § 1.2(a), including, but not limited to, by:

      (i)      failing to implement or require the implementation of concussion-management practices that met consensus best practices;

      (ii)     failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student athlete who was concussed or displayed concussion symptoms to be asymptomatic;

      (iii)    failing to require, prior to 2010, that student athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

- 84 -

(iv)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)    leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)    failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

(viii)    failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

(b)    by failing "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," in breach of NCAA Const., Art.1, § 1.2(b);

(c)    by failing to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, in breach of NCAA Const., Art. 1, § 1.3.2;

(d)    by failing to conduct intercollegiate athletics "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," in breach of NCAA Const., Art. 2, § 2.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 287(a)(i)-(viii);

(e)    by failing to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," in breach of NCAA Const., Art. 2, § 2.2.3;

(f)  by failing to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," in breach of NCAA Const., Art. 2, § 2.2; and

(g)  by failing to "assist the institution in its efforts to achieve full compliance with all rules and regulations…," in breach of NCAA Const., Art. 2, § 2.8.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 287(a)(i)-(viii).

321.  As a result of the foregoing, Plaintiffs and the Class have been injured, and are entitled to injunctive relief as well as equitable relief in the form of medical monitoring.

# COUNT II

## BREACH OF IMPLIED CONTRACT
### (On Behalf of the Class)

322.  Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth therein.

323.  To the extent an express contract does not exist, the facts and circumstances set forth above establish an implied contract wherein student-athletes, in return for participation, agreed to be bound by NCAA rules and expected the NCAA to provide appropriate rules and regulations so as to protect their health and safety to the extent possible.

324.  The NCAA acknowledges that "***student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation***."[99]

325.  The NCAA, and its member institutions, have breached their contractual commitment to provide a safe environment by:

---

[99] Handbook, at 4 (emphasis added).

(i)      failing to implement or require the implementation of a concussion-management practices that met consensus best practices;

(ii)     failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)     leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)   failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

(viii)  failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

326.    As a result of the foregoing, Plaintiffs and the Class have been injured and are entitled to injunctive relief as well as equitable relief in the form of medical monitoring.

## COUNT III

### BREACH OF EXPRESS CONTRACT
### (On Behalf of the Class as Third-Party Beneficiaries)

327.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth

herein.

328.     To the extent the Court finds no contract exists, either express or implied,

between the student-athlete and the NCAA, then the NCAA and its member institutions were

parties to a contract.  As an express condition of their membership in the NCAA, each institution

must agree to abide by the respective NCAA Division Manual, each of which expressly

encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws

(collectively "Manual").  The Manual thus constitutes a contract between the NCAA and its

member institutions.

329.     Plaintiffs and members of the Class are third-party beneficiaries of the contract

between the NCAA and its members because the parties to the contract intended to benefit

student-athletes and indeed the contract expressly provides for benefits to flow to the student-

athlete as part of the "Fundamental Policy of the NCAA":

1.2     PURPOSES [*]

The purposes of this Association are:

(a)     To initiate, stimulate and improve intercollegiate athletics
programs for student-athletes and to promote and develop
educational leadership, physical fitness, athletics excellence and
athletics participation as a recreational pursuit;

1.3     FUNDAMENTAL POLICY [*]

1.3.1  Basic Purpose.  [*]  The competitive athletics programs of
member institutions are designed to be a vital part of the
educational system.  A basic purpose of this Association is to
maintain intercollegiate athletics as an integral part of the
educational program and the athlete as an integral part of the

student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

330.    The basic principles of the NCAA also benefit the student-athlete:

> 2.2     THE PRINCIPLE OF STUDENT-ATHLETE WELL-BEING [*]
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes.  *(Revised:  11/21/05)*
>
> 2.2.1   Overall Educational Experience.  [*]  It is the responsibility of each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.  *(Adopted:  1/10/95)*
>
> 2.2.2   Cultural Diversity and Gender Equity.  [*]  It is the responsibility of each member institution to establish and maintain an environment that values cultural diversity and gender equity among its student-athletes and intercollegiate athletics department staff.  *(Adopted:  1/10/95)*
>
> 2.2.3   Health and Safety.  [*]  It is the responsibility of each member institution to protect the health of and provide a safe environment for each of its participating student-athletes.  *(Adopted:  1/10/95)*
>
> 2.2.4   Student-Athlete/Coach Relationship.  [*]  It is the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach.  *(Adopted:  1/10/95)*
>
> 2.2.5   Fairness, Openness and Honesty.  [*]  It is the responsibility of each member institution to ensure that coaches and administrators exhibit fairness, openness and honesty in their relationships with student-athletes.  *(Adopted:  1/10/95)*
>
> 2.2.6   Student-Athlete Involvement. [*]  It is the responsibility of each member institution to involve student-athletes in matters that affect their lives.  *(Adopted:  1/10/95)*

331.    The foregoing provisions of the contract are just a small fraction of the

contractual provisions that are intended to benefit the student-athlete.  Thus the student-athletes

are the intended third-party beneficiaries of the contract.

332.     The NCAA and its member institutions have breached the contract in on or more

of the following ways:

(a)     by failing "to initiate, stimulate and improve intercollegiate
athletics programs for student athletes…," in breach of
NCAA Const., Art.1, § 1.2(a), including, but not limited to,
by:

(i)     failing to implement or require the implementation
of concussion-management practices that met
consensus best practices;

(ii)     failing to implement or require the implementation
of medically-supervised stepwise return-to-play
criteria with express time requirements for the
student athlete who was concussed or displayed
concussion symptoms to be asymptomatic;

(iii)     failing to require, prior to 2010, that student-athletes
who suffered a concussion or displayed concussion
symptoms be managed by medical personnel with
specific expertise in concussion diagnosis,
treatment, and management;

(iv)     failing to require, prior to 2010, that student-athletes
who suffered a concussion or displayed symptoms
of a concussion not be left alone and that medical
personnel with specific expertise in concussion
diagnosis, treatment, and management regularly
monitor the student-athlete for deterioration;

(v)     leaving discretion of return to play for a student-
athlete that had suffered a concussion or displayed
concussion symptoms to an individual members
institution's "medical staff" without regard to
whether the staff included physicians or personnel
with specific expertise in concussion diagnosis,
treatment, and management;

(vi)     failing to implement and/or enforce game rules of
play designed to minimize, or that would have the
effect of minimizing, head injuries or concussions;

(vii)     failing to police or require member institutions to
follow Guideline 2o or 2i, respectively, throughout
the Class Period; and

      (viii)    failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

    (b)    by failing "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," in breach of NCAA Const., Art.1, § 1.2(b);

    (c)    by failing to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, in breach of NCAA Const., Art. 1, § 1.3.2;

    (d)    by failing to conduct intercollegiate athletics "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," in breach of NCAA Const., Art. 2, § 2.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 299(a)(i)-(viii);

    (e)    by failing to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," in breach of NCAA Const., Art. 2, § 2.2.3;

    (f)    by failing to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," in breach of NCAA Const., Art. 2, § 2.2; and

    (g)    by failing to "assist the institution in its efforts to achieve full compliance with all rules and regulations…," in breach of NCAA Const., Art. 2, § 2.8.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 299(a)(i)-(viii).

333.    As a direct result of these breaches, Plaintiffs and members of the Class have been injured and are entitled to injunctive relief as well as equitable relief in the form of medical monitoring.

## COUNT IV

## FRAUDULENT CONCEALMENT
### (On Behalf of the Class)

334.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

335.    The NCAA concealed facts and information which were material to student-athletes.  As more fully described above, since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.  Further, based on studies for which the NCAA *itself* paid, the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.  Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.

336.    Through concealment of material facts, the NCAA intended to induce a false belief, under circumstances creating a duty to speak.  The NCAA specifically intended to induce a false belief in its student-athletes that they should continue to play and should not be prevented from playing their respective sports even after a concussion or several concussions that should have required time to heal.

337.    Plaintiffs could not have discovered the truth through reasonable inspection or inquiry, or were prevented from doing so.  Plaintiffs were under the care and treatment of the NCAA and school trainers and doctors, and justifiably relied on their silence as representing that the facts did not exist.

338.     The concealed information was such that Plaintiffs would have acted differently if they had been aware of the material facts.  Plaintiffs would not have continued to play, or would have taken additional time to allow their brain injuries to heal before returning to play, and/or would have obtained insurance policies that provided long-term coverage.  Despite the NCAA's knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

339.     As a proximate cause of the NCAA's concealment, Plaintiffs and the Class suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

## COUNT V

## NEGLIGENCE
### (On Behalf of the Class)

340.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

341.     At all relevant times, the NCAA had a duty toward Plaintiffs and the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

342.     The NCAA acted carelessly and negligently in its position as the regulatory body for college teams and its student-athletes, including Plaintiffs and the Class.  The NCAA knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long-term.

343.     The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs and the Class, both generally and in the following particular respects:

(i)     failing to implement or require the implementation of concussion-management practices that met consensus best practices;

(ii)     failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)     failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)     failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)     leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)     failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)     failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period;

(viii)     failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms; and

        (ix)    other acts of negligence or carelessness that may
materialize during the pendency of this action.

344.    The Plaintiffs individually and the Class members may have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described above, including but not limited to post-concussion syndrome and Chronic Traumatic Encephalopathy, as well as such symptoms as headaches, dizziness, loss of memory, depression, anxiety, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, loss of the pleasures of life, early-onset dementia, and Parkonsonism, among other things.

345.    The Plaintiffs and the Class are entitled to injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding:  the coaching of tackling methodologies that cause head injuries; the implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and the implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

346.    Moreover, Plaintiffs have no adequate remedy at law in that monetary damages cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries.  Thus, Plaintiffs and the Class are entitled to medical monitoring.  Without a Court-approved medical monitoring program as described herein in Count VI, or established by the Court, Plaintiffs and the Class members will continue to face an unreasonable risk of injury and disability.

## COUNT VI

## MEDICAL MONITORING
### (On Behalf of the Class)

347.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this

Complaint as if fully set forth herein.  Plaintiffs bring this Count VI as a remedy under the law of

the State of Indiana.  Alternatively, Plaintiffs bring this Count VI under the laws of the states in

which they reside and assert claims on behalf of the Class under the laws of the states in which

class members reside.

348.     The Plaintiffs experienced repetitive traumatic brain impacts during their

respective NCAA careers that significantly increased their risk of developing post-concussion

syndrome, neurodegenerative disorders and diseases, including, but not limited to, CTE,

Alzheimer's disease, and other similar cognitive-impairing conditions.

349.     Repetitive head impacts during practices and games has a microscopic and latent

effect on the brain.  Repetitive exposure to accelerations to the head causes deformation,

twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take

place, including the release of small amounts of chemicals within the brain, such as the Tau

protein.  Among other things, the gradual build-up of Tau protein – sometimes over decades –

causes CTE, which is the same phenomenon as boxer's encephalopathy (or "punch drunk

syndrome") studied and reported by Harrison Martland in 1928.

350.     The game of football and other games played in the NCAA such as soccer,

lacrosse, ice hockey, wrestling, field hockey, and basketball, including both practices and game

play, have exposed student-athletes to hazardous conditions and risks of harm.  These repetitive

head accelerations to which the Plaintiffs and the Class have been exposed presented risks of

latent but long-term debilitating chronic illnesses which are not presented to the normal

population.  Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiffs' exposure to the risks of harm as described above would have been materially lower.

351.    Accordingly, the repetitive head impacts sustained by NCAA players in NCAA games and practices exposed NCAA players, including the Plaintiffs, to subtle and repetitive changes within the brain on the cellular level.  For that reason, the environment within which NCAA players have sustained repetitive head impacts exposed them to substantive hazards.

352.    Depending on many factors, including the amount of the exposure to repetitive head impacts and the release of Tau protein, the player/victim will develop a range of subtle to significant neuro-cognitive changes over time.

353.    The latent injuries which develop over time and manifest later in life include, but are not limited to, varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and, sometimes, fully developed encephalopathy.

354.    The NCAA was fully aware of the danger of exposing all NCAA players to repetitive head impacts, including the repetitive sub-concussive and concussive blows that increase the risk to NCAA players of, among other latent injuries, encephalopathy.

355.    As noted above, by its actions and omissions and fraudulent conduct, the NCAA further breached its duty (which it had assumed long ago) of reasonable and ordinary care to the Plaintiffs by failing to provide NCAA players, including the Plaintiffs, with necessary or adequate protections in or more of the following ways:

      (i)      failing to implement or require the implementation of concussion management practices that met consensus best practices;

      (ii)     failing to implement or require the implementation of medically-supervised stepwise return to play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)    failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)    leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual member's institutions "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play and practice designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)    failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

(viii)    failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

The NCAA thus exposed Plaintiffs and the Class to the heightened risks of neurological damage that arise from repetitive head impacts during NCAA games and practices.

356.    As a proximate result of the NCAA's tortious conduct, the Plaintiffs and the Class have experienced an increased risk of developing post-concussion syndrome, and serious latent neurodegenerative disorders and diseases, including, but not limited to, CTE, Alzheimer's disease, and/or other and similar cognitive-impairing conditions.

357.    The latent brain injuries from which Plaintiffs and the Class may suffer require specialized testing (with resultant treatment) that is not generally given to the public at large and is different from that normally recommended in the absence of exposure to this risk of harm.

358.    The medical monitoring regime should include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with concussion related injuries.  This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries and lack of concussion management practices in accordance with consensus best practices that Plaintiffs experienced in the NCAA.

359.    The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis of head injuries and their potential link to, *inter alia*, memory loss, impulse rage, depression, early-onset dementia, CTE, Alzheimer-like syndromes, and similar cognitive-impairing conditions.

360.    By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long-term injuries, disease, and losses without adequate treatment will be significantly reduced.

361.    Plaintiffs, therefore, seek an injunction creating a Court-supervised, NCAA-funded medical monitoring program which will facilitate the diagnosis of Plaintiffs and the Class for post-concussion syndrome, and other neurodegenerative disorder or disease resulting from repetitive head impacts.  The medical monitoring should include a trust fund to pay for the medical monitoring and diagnosis of Plaintiffs and the Class as frequently and appropriately as necessary.

362.     Because the NCAA has failed to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered a concussion or sub-concussion to minimize the risk of long-term injury or illness, medical monitoring is the most appropriate method by which it can be determined whether a particular individual is now at risk for long-term injury or illness from a concussion or sub-concussive event.

363.     Accordingly, the NCAA should be required to establish a medical monitoring program that includes, among other things:

a.     Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes for the purposes of diagnosis, as frequently and appropriately as necessary;

b.     Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring for the purposes of diagnosis; and

c.     Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the student-athlete is subjected to an increased risk of harm.

364.     Plaintiffs and the Medical Monitoring Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Without a Court-approved medical monitoring program as described herein, or established by the Court, Plaintiffs and the Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability and remain undiagnosed.

## COUNT VII

## NEGLIGENCE
### (On Behalf of Arrington, Owens, Solomon and Palacios)

365.    Plaintiffs Arrington, Owens, Solomon and Palacios each individually and separately bring Count VII on their own behalf, and adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

366.    At all relevant times, the NCAA had a duty toward Plaintiffs Arrington, Owens, Solomon and Palacios to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

367.    The NCAA acted carelessly and negligently in its position as the regulatory body for college teams and its student-athletes, including Plaintiffs Arrington, Owens, Solomon and Palacios. The NCAA knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long- term.

368.    The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs Arrington, Owens, Solomon and Palacios, both generally and in the following particular respects:

> (i)      failing to implement or require the implementation of concussion-management policies that met consensus best practices;

> (ii)     failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

> (iii)    failing to require that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)     failing to require that student-athletes who suffered a
         concussion or displayed symptoms of a concussion not be
         left alone and that medical personnel with specific expertise
         in concussion diagnosis, treatment, and management
         regularly monitor the student-athlete for deterioration;

(v)      leaving discretion of return to play for a student-athlete that
         had suffered a concussion or displayed concussion
         symptoms to an individual members institution's "medical
         staff" without regard to whether the staff included
         physicians or personnel with specific expertise in
         concussion diagnosis, treatment, and management;

(vi)     failing to implement and/or enforce game rules of play
         designed to minimize, or that would have the effect of
         minimizing, head injuries or concussions;

(vii)    failing to police or require member institutions to follow
         Guideline 2o or 2i, respectively, throughout the Class
         Period;

(viii)   failing to provide appropriate medical care or coverage for
         costs for medical care for student-athletes who suffered
         concussions or displayed concussion symptoms; and

(ix)     other acts of negligence or carelessness that may
         materialize during the pendency of this action.

369.    Plaintiffs Arrington, Owens, Solomon and Palacios individually have

experienced, and they may in the future suffer, from an assortment of problems associated with

the harm and injuries described above, including but not limited to post-concussion syndrome

and Chronic Traumatic Encephalopathy, as well as such symptoms as headaches, dizziness, loss

of memory, depression, anxiety, impulsivity to anger, cognitive dysfunction, employment

impairment, limitations in physical activities, embarrassment, loss of the pleasures of life, early-

onset dementia, and Parkonsonism, among other things.

370.    As a result of the foregoing, Arrington, Owens, Solomon and Palacios have

suffered damages and will in the future suffer damages caused by the negligence of the

Defendant. Accordingly, Plaintiffs Arrington, Owens, Solomon and Palacios seek individual

awards of compensatory damages, punitive damages, pain and suffering, and any other relief to which they are entitled under the law.

## JURY DEMAND

371. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, request judgment as follows:

A. Certification of the proposed Class pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B. Designation of Plaintiffs as representatives of the proposed Class and designation of Plaintiffs' counsel as Class counsel;

C. Injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding:

1. The coaching of tackling methodologies or other sports plays that cause head injuries;

2. The implementation of legislation requiring express system-wide stepwise "return to play" guidelines with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

3. The implementation of legislation requiring system-wide guidelines for the screening and detection of head injuries, including concussion-management practices that meet consensus best practices;

4. The implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play;

5.      The implementation of legislation requiring that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management; and that they be independent from any NCAA institution;

6.      The implementation of legislation requiring that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

7.      The implementation and/or enforcement of game rules of play and practice designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

8.      The implementation of legislation incorporating an express concussion-management plan to which all member institutions must adhere; and

9.      The provision of appropriate medical care or coverage for costs for diagnostic care for student-athletes who suffered concussions or displayed concussion symptoms.

D.      The establishment of a medical monitoring program that includes, among other things:

1.      Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes, as frequently and appropriately as necessary to diagnose post-concussion syndrome or any long-term effects or disease from concussions;

2.     Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring necessary to diagnose post-concussion syndrome or any long-term effects or disease from concussions; and

3.     Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the player is subjected to an increased risk of harm.

E.     An award to the Plaintiffs and the Class of prejudgment interest, costs and attorneys' fees; and

F.     An award to the Plaintiffs and Class for such other and further relief as the Court deems just and proper.

Plaintiffs Arrington, Owens, Solomon and Palacios each also individually request judgment against Defendant and for an award of compensatory damages, punitive damages, pain and suffering, and any other relief to which they are entitled under the law.

Date:  April 14, 2015

Respectfully submitted,

ADRIAN ARRINGTON, DEREK OWENS,
ANGELICA PALACIOS, KYLE
SOLOMON, SHELBY WILLIAMS,
BRICE SHEEDER, SHAVAUGHNE
DESECKI, SPENCER TRAUTMANN,
RYAN PARKS, URSULA KUNHARDT,
JESSICA MILLER, RACHEL HARADA,
ADAM WALKER, ANNA BARTZ,
NATALIE HARADA, DACHE
WILLIAMS and PETER DYKSTRA,
individually and on behalf of all others
similarly situated


By    */s/ Steve W. Berman*
        Steve W. Berman
        *steve@hbsslaw.com*
        Robert B. Carey
        *rob@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
206.623.7292
Fax: 206.623.0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
Daniel J. Kurowski
*dank@hbsslaw.com*
Thomas Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL  60301
708.628.4949
Fax: 708.628.4950

By   */s/ Joseph J. Siprut*

Joseph J. Siprut
*jsiprut@siprut.com*
Greg M. Barbakoff
*gbarbakoff@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342

*Co-Lead Class Counsel*

- 107 -

## CERTIFICATE OF SERVICE

I, Steve W. Berman, an attorney, hereby certify that I caused a copy of the attached

**Fourth Amended Class Action Complaint** to be filed electronically with the Clerk of the Court

and served on all counsel of record in this case using the CM/ECF system on this the 20th day of

April, 2015.


_/s/ Steve W. Berman_
Steve W. Berman