<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   IN RE:  NATIONAL COLLEGIATE      )  Docket No. 13 C 9116
     ATHLETIC ASSOCIATION STUDENT-    )  April 17, 2015
 4   ATHLETE CONCUSSION INJURY        )  Chicago, Illinois
     LITIGATION,                      )
 5                                    )  10:00 o'clock p.m.

 6            TRANSCRIPT OF PROCEEDINGS - STATUS, MOTION
                 BEFORE THE HONORABLE JOHN Z. LEE
 7

     APPEARANCES:
 8

     ALSO PRESENT:              HONORABLE GERALDINE SOAT BROWN
 9

     For the Arrington Plaintiffs: HAGENS BERMAN SOBOL SHAPIRO, by
10                                  MS. ELIZABETH A. FEGAN
                                    MR. THOMAS E. AHLERING
11                                  1144 West Lake Street
                                    Suite 400
12                                  Oak Park, Illinois 60301

13                                  HAGENS BERMAN SOBOL SHAPIRO, by
                                    MR. STEVE W. BERMAN
14                                  1918 8th Avenue
                                    Suite 3300
15                                  Seattle, Washington 98101

16                                  SIPRUT PC, by
                                    MR. MICHAEL SILVERMAN
17                                  MR. RICHARD L. MILLER II
                                    17 North State Street
18                                  Suite 1600
                                    Chicago, Illinois 60602
19
                                    COATS ROSE YALE RYMAN & LEE, by
20                                  MR. DWIGHT E. JEFFERSON
                                    Nine Greenway Plaza
21                                  Suite 1100
                                    Houston, Texas 77046
22

23                    ALEXANDRA ROTH, CSR, RPR
                        Official Court Reporter
24                     219 South Dearborn Street
                            Room 1224
25                     Chicago, Illinois 60604
                          (312) 408-5038
</pre>

```
 1   APPEARANCES:   (Continued)

 2   For Personal Injury Class:    EDELSON PC, by
                                   MR. JAY EDELSON
 3                                 350 North LaSalle Street
                                   Suite 1300
 4                                 Chicago, Illinois 60654

 5   For Defendant NCAA:           LATHAM & WATKINS, by
                                   MR. MARK STEVEN MESTER
 6                                 MS. JOHANNA MARGARET SPELLMAN
                                   233 South Wacker Drive
 7                                 Suite 5800
                                   Chicago, Illinois 60606
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings had in open court:)

2              THE CLERK:  13 C 9116, NCAA Student Athlete Concussion

3    Injury Litigation, for status and motion hearing.

4              MR. BERMAN:  Good morning, your Honor.  Steve Berman,

5    Beth Fegan and Thomas Ahlering on behalf of the class.

6              MR. MESTER:  Good morning, your Honor.  Mark Mester

7    and Johanna Spellman for the NCAA.

8              MR. SILVERMAN:  Good morning, your Honor.  Michael

9    Silverman with my colleague Rich Miller on behalf of Siprut PC

10   and the settlement class.

11             MR. JEFFERSON:  Judge, Dwight Jefferson on behalf of

12   plaintiff.

13             MR. EDELSON:  Good morning, your Honor.  Jay Edelson,

14   proposed lead for the personal injury class.

15             THE COURT:  Good morning, everyone.

16         We are here for a status.  There are a number of

17   motions that were filed and noticed for today for presentation.

18   Let's deal with a couple of them first off before we proceed to

19   the motion for preliminary approval of the revised settlement.

20         So first of all, the plaintiffs have filed a motion

21   for leave to file plaintiffs' fourth amended complaint to add

22   additional class representatives.  Is that correct, Mr. Berman?

23             MR. BERMAN:  That's correct, your Honor.  Six

24   representatives.

25             THE COURT:  Is there any objection to the motion?

1      MR. MESTER:  No objection, your Honor.

2      THE COURT:  Very well.  So the plaintiffs' motion for

3  leave to file fourth amended complaint is granted.

4      The other motion to address before we proceed is

5  plaintiffs' motion for leave to file documents under seal.

6  That is, motion for leave to file certain documents that were

7  attached to Mr. Berman's affidavit, as well as leave to redact

8  certain portions of the memorandum in support of the settlement

9  agreement.

10      Is there an objection to that motion?

11      MR. MESTER:  No objection, your Honor.

12      THE COURT:  All right.  Very well.  So plaintiffs'

13  motion for leave to file documents under seal is also granted.

14      MR. JEFFERSON:  Yes, can I ask this question on that?

15  Being under seal, will we have an opportunity at any point to

16  be able to review those documents?

17      THE COURT:  You may.

18      All right.  Let's then turn to plaintiffs' motion in

19  support or for preliminary approval of class settlement and

20  certification of settlement class.  I will note that there has

21  been a lot of materials that have been submitted to the Court

22  over the course of the last couple of days.  And I have

23  reviewed the memorandum in support as well as the settlement

24  agreement.  I am still going through the supporting

25  declarations, including the declarations of Mr. Deal, as well

1   as Mr. Mishkin.

2         MR. MESTER:  Yes, your Honor.

3         THE COURT:  Mr. Mishkin, who has been offered in

4   support of the financial adequacy of the $70 million for the

5   proposed medical monitoring class.  I thought I would -- since

6   it's noticed for presentation today, Mr. Berman, I thought I'd

7   give you an opportunity to go ahead and highlight some of the

8   revisions that were made to the agreement and provide any other

9   arguments that you would like today.  Also hear from the NCAA.

10        And, Mr. Edelson, to the extent that you have any

11   comments, I know that your prior comments are probably equally

12   applicable to the settlement that's revised because the release

13   claims haven't changed.  But I will give you an opportunity to

14   be heard today as well.

15        Mr. Berman?

16        MR. BERMAN:  Yes.  First of all, your Honor, I

17   appreciate that we gave you this material.  I apologize that it

18   came so close to the 17th.  We tried to get it to you much

19   earlier.  But with the schedules of the four doctors and

20   special master, it was difficult to get everyone together in

21   the same room.  So I apologize for that.  And I expect that you

22   may have further questions of us down the road.  But let me

23   highlight what we did do.

24        As you can see from the volume, and volume of course

25   doesn't speak to quality, we put a lot of work into this.  And

1   we went back, and we looked at your December 18 order and your

2   comments.  And we tried to address with a yes every single

3   comment and request that you made.  I think we did.  So I'll

4   just walk through them.

5          Your first concern -- and I'm not sure these are in

6   order of your concerns, but this is the order which I will

7   address them in.

8          One of your concerns was that we didn't have enough

9   representation across the class members.  And so we have -- now

10  have eight current class members, 17 former class members.  We

11  have 11 non-contact class members, and we have 14 contact class

12  members.  And so we didn't get every single sport covered, but

13  we did I think get enough sports to have typicality.

14         And these class representatives did more than most.

15  They had an extensive telephone interview with Judge Andersen.

16  Judge Andersen talked to them, the risk and benefits of the

17  settlement.  And each one has individually commented why they

18  think the settlement is in the best interest of the class based

19  on their experience as an NCAA athlete.  And I think if you get

20  a chance to read those, you will find them to be important.

21         The second thing we did was, we updated the Deal

22  report to deal with what is the effect of the participation

23  rate if you add non-contact sports.  And he's dealt with that.

24  And the key note there is the finding that he made based on his

25  review of the medical literature in consultation with Dr. Cantu

1    that there is not a significant increase in CTE in non-contact

2    sports.  So we don't expect increased cost in that regard.

3            I also --

4            THE COURT:  Mr. Deal, he also took into consideration

5    the questionnaire and scoring parameters that were proposed by

6    the medical or the proposed medical committee, is that correct?

7            MR. BERMAN:  He did.  But I -- I regretfully say, I

8    found this morning in my final, final preparation, he made an

9    error.  And we will try to get a revised report.  He did not

10   take into account the notice cost.  It somehow dropped out of

11   the draft.  I apologize.  We will get that to you.  So maybe

12   you hold off reading that until we get that hopefully Monday.

13           You commented about the notice plan.  We have been

14   working with the NCAA.  We believe we're going to be able to

15   obtain within six months 2.9 million addresses of the

16   4.4 million potential class members.  That's a fairly high

17   number for a direct mail campaign.

18           Now, of course, we recognize that there is going to be

19   some bad addresses.  And Mr. Vasquez has given you some

20   information about the percentages of bad addresses that we see.

21   So we think that we're going to be able to mail to at least

22   half the class.  And we're going to wait for a period to see

23   what the returns are on the addresses.  And then we'll ramp our

24   publication, internet and media notice up higher if we have a

25   lower return, until we -- until we reach the frequency and

1    reach the -- what we think is required by the case law.

2            The next point was, you addressed the concerns what

3    happens if one of these schools doesn't participate in the

4    concussion management protocols.  Now every school must certify

5    in writing within six months that they will do so.  And if they

6    don't do so, they will not be released.

7            We've also added a little twist to that that we

8    thought about.  And that is, if a class member is an athlete at

9    one of the schools that decides not to participate and is not

10   released, that class member now can opt out again.  They can

11   get back on the website at the appropriate time, see that the

12   school did not participate, and they will be allowed to opt

13   out.  So we think that's a good benefit to the class.

14           The medical science committee report.  We met with

15   Judge Andersen.  We've had numerous phone calls.  There was a

16   vigorous exchange of scientific information.  In fact, I was

17   commenting to Mr. Mester this morning that it was amazing how,

18   much like lawyers they can be in a room not getting along.

19           But they eventually reached a consensus.  And I think

20   one interesting point that you might want to look at when you

21   are reading the materials is what I call the look-back

22   provision.  So they've established cut scores based on general

23   information that's out in the public.  And we're going to

24   recommend those cut scores be used for the first year.

25           Then after the first year is done, they're going to

1    take a look at actual data that we're getting from the student

2    athletes, and they are going to redo the cut scores.  And they

3    are going to keep doing that.  And then they're going to go

4    back.  And anyone who is disqualified in the first year, we're

5    going to rerun to see if they qualify under the new cut scores

6    and let them know that they now qualify.

7               THE COURT:  So that would be if, for example, for

8    whatever reason the original evaluation thresholds were too

9    stringent based upon the statistical analysis, you can look at

10   that and say, well, perhaps we're not catching everyone that we

11   need to catch.  So we're going to try to broaden the criteria a

12   little bit.

13              MR. BERMAN:  Exactly, exactly.

14              You also directed us to deal with what happens if a

15   settlement class member requests more than two medical

16   evaluations.  That will now -- that request will be bumped up

17   to the special master.  Special master will contact the class

18   member and will then contacted the medical science committee to

19   see what needs to be done.  So it will be done on an

20   individual-by-individual basis.

21              You asked that we address program location.  And so we

22   are now establishing or recommending to the Court 33 program

23   locations.  And the way we came up with the 33 is that -- that

24   means that 50 percent of the population would live within 50

25   miles of a treatment center, and 70 percent would live within a

1    hundred miles.  And after that, the Garretson did some economic

2    analysis and said, it's a law of diminishing returns to spend

3    money to -- to get more centers.

4         The $7 million he directed -- well, you told us that

5    you would not approve the settlement if the money reverted back

6    to the NCAA.  The settlement provides that it will either be

7    used to extend the program, or it will be donated to an

8    institution selected by the medical science committee.  So the

9    money will not revert back.

10        You expressed concern about the motion that if there

11   was not enough money, that the original settlement provided

12   that you could not bring a class action.  Now you can bring a

13   class action.  And I think to me, my colleagues may disagree,

14   but that's probably the most -- one of the most important

15   changes because it means that if the settlement is inadequate,

16   we can start over again.

17        And it's something that I want and could not get,

18   because I had a case like this.  It was involving Louisiana

19   Pacific Siding.  Thousands of homeowners' siding fails.  The

20   defendant wanted the same provision, and I wanted to be able to

21   start over if the money ran out.  The judge struck it, just

22   like you did and the money ran out, and we got a lot more

23   money.

24        So I think this is a very important change, and it

25   reduces the pressure on Mr. Deal's analysis.

1    THE COURT:  It provides a safety valve, right?

2    MR. BERMAN:  It's a safety valve.

3    THE COURT:  I recognize that Mr. Deal and Mr. Mishkin

4  are very qualified in looking at damages and damages forecasts.

5  But 50 years is a long time.  And to the extent that there are

6  contingencies that none of us can anticipate, that in the event

7  that the funds that are allocated for the medical monitoring

8  run out for whatever reason, then at least at a minimum, the

9  class can then restart the lawsuit to try to obtain relief.

10    MR. BERMAN:  Yes.  And I think it's even -- if I just

11  add one little tag line on that.  It's even more important

12  because as -- as vigorous as the medical science committee has

13  been, and as vigorous as Mr. Deal has been, the area of CTE is

14  still an unknown area in which science is evolving.  And this

15  way if things are much worse than anyone anticipated, we can

16  start over again.

17    THE COURT:  All right.  I also hope that that

18  provision provides some additional incentive for the parties,

19  in the event the funds do run out, to get back together and

20  decide whether or not additional funds should be invested in

21  the program to keep it going for the 50-year period.

22    MR. BERMAN:  Exactly.  I mean, we'll have the benefit

23  of everything we've learned both from our statistics, our

24  analysis.  And -- and I think the parties will be well educated

25  to do something that provides the right remedy in the future.

1          The last two points, you wanted the settlement to make

2     sure that you had discretion to award attorneys' fees to any

3     attorney.  It now provides for that.  And you wanted the option

4     for the Court to appoint a special master.  And we are

5     suggesting that Judge Andersen be the special master, and he is

6     willing to serve in that capacity.  And he has been working

7     diligently with us throughout this process.

8          And so when I sum up the settlement, your Honor, you

9     have now 25 class members that are vigorously in support of the

10    settlement and have taken the time to work with Judge Andersen.

11    You have two federal Judges who have served as settlement

12    participants or mediators.  They support the settlement.  I'm

13    not suggesting that, you know, your judgment is not the

14    ultimate judgment.

15          You have four distinguished medical doctors.  These

16    are the best in the field.  They are the premier people who

17    have been analyzing these issues, all of whom support the

18    medical science protocol and the importance of doing this.

19          And facing us is one class member, who's atypical.

20    He's not been injured by a concussion.  He has been offered

21    five or six months of time to present an expert that says

22    settlement is not good and fair.  He hasn't done so.

23          So we think at this stage, we're at the preliminary

24    approval stage, that we've done everything that could and

25    should be done to have the settlement receive preliminary

1    approval.

2            THE COURT:  Mr. Berman, let me ask you a little bit

3    about the examination location centers.

4            MR. BERMAN:  Yes.

5            THE COURT:  As I said, I am still in the process of

6    diving into all of the supporting documents.  But with regard

7    to the Garretson declaration as to the location of these

8    centers, I understand that if a proposed class member lives

9    outside the hundred-mile radius of a center, that he can seek

10   reimbursement.  I also noted, based upon the medical committee

11   declaration, that they anticipate that a typical evaluation

12   will take about five to eight hours, right?

13           And so I think in the Garretson declaration there was

14   some mention of the fact that in addition perhaps to the

15   mileage reimbursement, there might be also a reimbursement for

16   a reasonable overnight stay for the particular class member and

17   an additional person.  I didn't see that particularly in the

18   settlement agreement, but I'm assuming that that would be part

19   of the reimbursement.  So it would be allowable, is that

20   correct?

21           MR. BERMAN:  Absolutely.  It's at paragraph 33 of the

22   Garretson report.  He details the amount that you would be able

23   to get for an overnight stay.  It's at the IRS rate plus meals

24   and lodging.

25           THE COURT:  Right.  And I just note that because in

1    the settlement agreement it just says miles.

2              MR. BERMAN:  Okay.

3              THE COURT:  But I think we all are on the same page as

4    to what will be reimbursable or not.

5              Let me hear from the NCAA to the extent that you want

6    to say anything.

7              MR. MESTER:  Thank you, your Honor.

8              I don't have a lot to add.  Mr. Berman was very

9    thorough.  As he says, though, our focus was to try to address

10   each of the issues you raised in your December 17 memorandum

11   opinion order.  And we worked very hard at that.  Believe me,

12   we did.  His list was, I believe, comprehensive and accurate.

13             So I don't have anything to add other than answer any

14   questions you may have.

15             THE COURT:  Very well.  Is there anyone else that

16   wishes to speak at this point in time?  Mr. Edelson?

17             MR. EDELSON:  Thank you, your Honor.

18             Like you we only got the -- the voluminous documents

19   couple days ago.  So we have not fully reviewed everything.

20   I've got some initial thoughts.  But we would request the

21   ability to file a brief so that we can be both precise and have

22   it for the record and for your Honor.

23             Couple things I'd like to mention.  First and the most

24   looming issue is the conflicts issue.  We filed a motion

25   explaining that.  At this point they can't even pretend that

1   they are representing the plaintiffs' personal injury class.

2   Mr. Berman was very candid, both in discussions with me and in

3   -- in his brief, where he said that he made a conscious

4   decision to trade the class claims in order to get the medical

5   monitoring deal through.

6          The class claims for personal injury, those class

7   members get no benefit from the medical monitoring claims.

8   They get no benefit from the injunctive relief.  So he's taking

9   people that shouldn't be part of his class, and he's saying,

10  because I don't believe in your claims -- although even that he

11  slipped back.  Before it was, there is no way.  You can't ever

12  certify these.  Now he's saying, it's hard to certify, which we

13  agree with.  It's hard but it's not impossible.

14         And he's saying, those people, they are going to lose

15  rights because I care more about my people.

16         THE COURT:  And, Mr. Edelson, with regard to

17  certification, you mean, certification under 23(b)(3)?

18         MR. EDELSON:  It wouldn't matter what it's under.  If

19  there is (b)(3) release, correct.  He seems to be suggesting

20  that he can do a (b)(2) certification with the (b)(3) release,

21  which I -- I'm not smart enough to understand that.

22         THE COURT:  But, I mean, I just want to understand

23  your position.  Your position is that the personal injury

24  claims can be certified under 23(b)(3).

25         MR. EDELSON:  Oh, I'm sorry.  Yes, they can, which is

1  what -- and they tried -- tried a version of that initially

2  when they tried to get a core -- core issues class, which was

3  along those same lines.

4          THE COURT:  I'm not sure whether that's exactly along

5  the same lines.  But I understand your gist.

6          MR. EDELSON:  Okay.  The second thing is, the Pella

7  the recent Seventh Circuit decision which talks about what

8  happens when -- when a good-faith objector has raised issues of

9  conflicts.  In that case, the District Court disagreed and

10 said, I don't see conflicts there.

11         The Seventh Circuit said, there are two problems.

12 One, there were conflicts.  And it ended up ending with the

13 removal of class counsel.  But the Seventh Circuit said

14 something else, which was, you've got to put in the notice that

15 there is this conflict.

16         They don't do that.  They don't say, there is an

17 objector who has an argument that might be relevant to you.

18 They don't even in their notice say, you're going to be

19 releasing class claims.  It's incredible.  So someone who's

20 actually evaluating the notice will have no idea about all this

21 fight going on and what they're giving up.  That's another big

22 issue.

23         Another issue is -- and I only make a few of these.

24 I'm not going to keep you here very long.

25         Another issue is, they still don't get it right when

1    it comes to tolling the personal injury claims.  This is maybe

2    the fourth iteration.  First it was through the filing of

3    preliminary approval.  Then it was at preliminary approval.

4    Now it's at final approval.

5         The tolling for personal injury claims has to be the

6    effective date.  If it is the date of final approval, that does

7    nothing for the class because after this -- if the Court does

8    accept this settlement, there will be an appeal.  Two years

9    later there will be a decision.  During those two years

10   everybody's personal injury claims will be extinguished, which

11   means the class will have to make a distinction:  Do we hold

12   out that there may be a much better avenue through a class

13   action?  Or do we bring our individual personal injuries right

14   now?  It's untenable, which is why nobody does it like this.

15        The -- we also -- we also take issue with -- with

16   something which I have to give them the most credit for.  And

17   it's unfortunate they did it wrong, which was they took your

18   Honor's idea and they said, let's make this a non-reversionary

19   fund.  And that -- that is the game-changer here.  That changes

20   from a settlement where only a few million dollars is going to

21   be paid out to 70 million.

22        The problem is that they did it wrong.  What the

23   Seventh Circuit has said is, you got to look at who's getting

24   the money.  And the class ought to be getting the money.

25        The way they do it, at the end of 70 years, you've got

1    these -- these -- it won't be these doctors anymore.  It will

2    be some other doctors who will get in the room and decide, does

3    it go to continuing on the program, or does it go to research

4    or to academic institutions, which I'm sure of they'll all be

5    affiliated with.

6         It's hard to imagine they're not going to end up

7    giving it to research for concussions.  If they did, of course,

8    that offers no benefit at all to the -- to the class, even to

9    their class.  Their class members don't need to have 70

10   million -- $40 million going to research concussions in 50

11   years.  And it doesn't help them.  There'll be a lot of

12   research done before that.  And in 50 years the game's really

13   changed a lot.

14        There are ways that you can take the $70 million and

15   make sure that -- that even for their medical monitoring part,

16   where the people are actually getting more benefits through

17   medical monitoring.

18        The last thing that I'll say is -- is, they claim

19   that -- they said this from the beginning, and -- and it's

20   almost getting tiring correcting them.  But they keep

21   pretending that this is -- this is me, this is just me making

22   this objection.  There is just one person.  It's not true.  We

23   have hundreds of -- of clients to stand behind us.

24        And the National College Players Association with

25   17,000 members came out publicly in support of our position.

1    So the idea that -- that their crew represents some objective

2    criteria just isn't true.  Everybody in their crew is getting

3    paid, everybody, all the doctors, the special master.  And

4    Judge Andersen is my favorite guy in the world.  So I am -- in

5    no sense am I claiming that he is in a conflict at all.

6           All of those guys were supporting the first version of

7    the settlement, which was held not to be adequate.  So this

8    idea that they got some ground-swell support I think is just

9    backwards.

10          Last thing I'll say, they -- they didn't mention this

11   to the Court, but they do something unusual in the settlement.

12   We weren't able to find any -- anyone actually daring to do

13   this.

14          In their quest to try to make sure that nobody can

15   file an objection, they excluded two class members from -- from

16   their class:  My client and his client.  And the only goal

17   there is similar when they -- when they -- when they said that

18   objectors shouldn't get paid, which they later claim was a

19   mistake.

20          Their only goal is to -- is to hope that -- that the

21   Court doesn't get full information, and that good-faith

22   objections don't get hurt.  And the Seventh Circuit has made it

23   clear that that is incredibly improper.

24          THE COURT:  All right.  Thank you, Mr. Edelson.  How

25   much time do you need to file?  I will give you an opportunity

1    to put your objections in writing.  How much time do you need

2    to file that?

3          MR. EDELSON:  Twenty-one days, your Honor?

4          THE COURT:  That will be fine.  That's May 8.

5          Mr. Berman, I will give you an opportunity to respond

6    today to the extent you want to.  Or I will give you an

7    opportunity to file a response as well.

8          MR. EDELSON:  Thank you, your Honor.

9          THE COURT:  Thank you, Mr. Edelson.

10          MR. BERMAN:  Since it's an either or, I will file a

11    responsive a brief.

12          THE COURT:  It is an either or.  How much time do you

13    need to do that?

14          MR. BERMAN:  Fourteen days please, your Honor.

15          THE COURT:  So Mr. Edelson, on behalf of the Nichols

16    and his clients, can file an objection to the proposed class

17    settlement as revised by May 8.  Plaintiffs and/or the NCAA can

18    file any response by May 22.

19          So at this point in time, as I said, I am still

20    getting through these materials.  And I do appreciate the

21    amount of work that the parties have done to try to address the

22    concerns that I raised in my prior memorandum and order.

23          What I'd like to do at this point is, I am going to

24    continue my review of the materials.  I am going to review the

25    briefs that are submitted by Mr. Edelson as well as Mr. Berman

1    and NCAA.  And then more than likely after the briefs come in

2    on May 22, I will set another hearing date where I can discuss

3    with the parties particular questions that I may have with

4    regard to the settlement.

5           I can tell you right now that I know that among those

6    topics will be some additional questions with regard to Mr.

7    Deal's declaration as well as the declaration provided by the

8    Claro Group, Mr. Mishkin, as well as additional questions with

9    regard to the medical committee's declaration.  I am just

10   trying to understand what exactly it is they are trying to do.

11   And that's really going to be in the next couple days here my

12   focus in reviewing these materials.

13          So that we have a date in our calendar, it is my

14   practice to customarily set a status date.  So let's set a

15   status date in this case.  Let's go about 60 days out.  And so

16   let's look at, Carmen, June 26 at 10:00 a.m.?

17          MR. BERMAN:  I hate to raise my schedule is an issue.

18   My wife has a 50th birthday.  I am taking her on a surprise

19   trip on the 19th through the 29th of June.

20          HONORABLE JUDGE BROWN:  It won't be a surprise if she

21   reads this.

22          MR. BERMAN:  She does not read transcripts, I will

23   tell you that.

24          THE COURT:  How about June 11?  Does that work?

25          MR. MESTER:  That's fine, your Honor.

1          MR. BERMAN:  That is fine, your Honor.

2          THE COURT:  So let's set it for June 11.  And we will

3   set it for 2:00 p.m.  Again, based upon the briefs, I might ask

4   the parties to come in sooner than that so that you can address

5   the questions that I have.  But at this point at least we have

6   a set out there.

7          MR. BERMAN:  And if you would like Mr. Deal or any of

8   the medical science people to be present, just let us know.

9          THE COURT:  I will.  Don't worry.  I won't be shy.

10         Anything else that we need to address today?

11         MR. MESTER:  No, your Honor.

12         MR. BERMAN:  Nothing, your Honor.

13         THE COURT:  All right.  Very well.  We are adjourned.

14  Thank you.

15      (Which were all the proceedings had at the hearing of the

16        within cause on the day and date hereof.)

17                           CERTIFICATE

18         I HEREBY CERTIFY that the foregoing is a true, correct

19  and complete transcript of the proceedings had at the hearing

20  of the aforementioned cause on the day and date hereof.

21

22   /s/Alexandra Roth                        4/22/2015
     _____        _____
23   Official Court Reporter                     Date
     U.S. District Court
24   Northern District of Illinois
     Eastern Division
25