# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Documents Relates To:**<br>**All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

**NICHOLS' RESPONSE TO PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

**Respectfully submitted by**:

Jay Edelson
Rafey S. Balabanian
Ari J. Scharg
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Robert A. Clifford
Shannon M. McNulty
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602

Brian W. Coffman
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614

Richard R. Gordon
GORDON LAW OFFICES, Ltd.
211 West Wacker Drive, Suite
Chicago, Illinois 60606

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115

John J. Driscoll
THE DRISCOLL FIRM, P.C.
211 N. Broadway
St. Louis, Missouri 63102

Jeffrey L. Raizner
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006

# TABLE OF CONTENTS

I.      **INTRODUCTION** ................................................................................................1

II.     **ARGUMENT**.........................................................................................................4

    A.    **Rather Than Represent the Entire Class, the Settlement Leverages Conflicts of Interest—By Trading Some Class Members' Claims for the Benefit of Others** .......................................................................................5

        1.    **Judge Brody's Rule 23(a)(4) adequacy analysis illustrates the un-reconciled conflicts of interest central to the undifferentiated NCAA class** ...........................................................................7

        2.    **Judge Brody's Rule 23(b)(3) predominance analysis illustrates the viability of the NCAA class members' personal injury class claims—fatally undercutting Class Counsel's justification for abandoning them to obtain medical monitoring relief** ................................................10

        3.    **Judge Brody's Rule 23(b)(3) superiority analysis shows that class treatment of concussion-related injuries is preferred** ...........................13

    B.    **Nearly 9 Out of 10 Class Members Receive Absolutely No Benefit From the Settlement at All But Are Forced To Forfeit Valuable Rights** .................15

        1.    **In exchange for giving up their ability to sue on a class basis, former NCAA athletes with present personal injury claims get nothing** ....................................................................................15

        2.    **The medical monitoring benefits only provide about $40 to an estimated 0.11% of the class—assuming anyone makes the considerable effort to try and claim them**..............................................16

        3.    **The Settlement's "injunctive relief" does nothing—and even if it did have value, it only benefits 11% of the Class**....................................19

        4.    **The Settlement's proposed *cy pres* distributions don't benefit the Class—but will utilize the vast majority of the Fund** ...........................20

    C.    **Class Counsel's Proposed Class Notice Is Deficient and Withholds Critical Information from Putative Class Members**........................................................22

    D.    **Additional Provisions of the Settlement Demonstrate That the Deal is Unfair, Unreasonable, and Inadequate, and Cannot be Approved**.................24

        1.    **The Settlement is marred by other conflicts of interest** .......................24

i

**2.**     **The Settlement prematurely terminates the tolling of claims**..............**26**

**III.**     **CONCLUSION** ............................................................................................................**27**

**TABLE OF AUTHORITIES**

**UNITED STATES SUPREME COURT CASES**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................... *passim*

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ............................................27

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) ...........................................................27

*General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982).........................................24

*Marek v. Lane*, 134 S. Ct. 8 (2013)...........................................................................................22

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996) .............................................24

*Ortiz v. Fibreboard,* 527 U.S. 815 (1999) ...................................................................................8

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) .............................................................10

**UNITED STATES CIRCUIT COURT OF APPEALS CASES**

*Adams Public School Dist. v. Asbestos Corp., Ltd.*, 7 F.3d 717 (8th Cir. 1993) ..........................27

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ................................................12

*Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877 (7th Cir. 2000)....................................15

*Edwards v. Boeing Vertol Co.*, 717 F.2d 761 (3d Cir. 1983).........................................................27

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)........................................................4, 22, 23

*Georgine v. Amchem Prods., Inc.* 83 F.3d 610 (3d Cir. 1996) ......................................................8

*Grispino v. New England Mut. Life Ins. Co.*, 358 F.3d 16 (1st Cir. 2004) ...................................27

*In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*,
    369 F.3d 293 (3d Cir. 2004)..............................................................................................12

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009).............................................11

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)..........................................................................................7, 11

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)...............................................................................................7

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)............................8

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009)................................25

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) ......................................20

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012) ..................................................................................12

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) ..................................12

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ..................25

*Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781 (7th Cir. 2004)..............................4, 8

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014)............................................20, 21

*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584 (7th Cir.1993)................8

*Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002)....................................8

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981) ................................................................20

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990)....... 22

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ....................................25

*Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011) ......................15

**UNITED STATES DISTRICT COURT CASES**

*Brewton v. City of Harvey*, 285 F. Supp. 2d 1121 (N.D. Ill. 2003) ..............................27

*Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397 (W.D.N.Y. 2013) ................15

*Gomez v. PNC Bank, Nat'l Ass'n*,
    No. 12 C 1274, 2014 WL 3640798 (N.D. Ill. July 24, 2014) ...........................25

*In re Diet Drugs*, No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)..................12

*In re Nat. Football League Players' Concussion Injury Litig.*,
    No. 2:12-MD-02323-AB, 2015 WL 1822254 (E.D. Pa. Apr. 22, 2015) .................. *passim*

*In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) ..........12

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553 (W.D. Wash. 2004).......12

*In re Serzone Prods. Liab. Litig.,* 231 F.R.D. 221 (S.D.W.Va. 2005)...........................................12

*In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418 (N.D. Cal. 2009).............................17

*O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266 (E.D. Pa. 2003)......................................17

*Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013)....................................5, 15

**STATUTES**

Fed R. Civ. P. 23 ............................................................................................................... *passim*

IL. R. S. CT. RPC. Rule 1.8.........................................................................................................4

WA. R. RPC. 1.8.........................................................................................................................24

**OTHER AUTHORITIES**

Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 VAND. L. REV. 995 (2005)....................................................................25

Nancy Morawetz, *Underinclusive Class Actions*, 71 N.Y.U. L. Rev. 402 (1996) .......................23

Newberg on Class Actions § 3:58 (5th ed.) ................................................................................7

## I.     INTRODUCTION

This is Class Counsel's second attempt to settle this case on a class basis. The first time around, Anthony Nichols—who seeks to appoint Jay Edelson of Edelson PC as lead class counsel of the putative class's personal injury claims against the NCAA—objected and pointed out a number of fundamental flaws with Class Counsel's initial effort. The Court, in turn, accepted many of Nichols' objections (in addition to identifying its own concerns) and sent Class Counsel and the NCAA back to the drawing board.

Now Class Counsel say they've addressed the Court's concerns and seek approval of a second class settlement (Dkt. 156-1, the "Settlement"). True to form, Class Counsel's new Settlement has slightly better window dressing, but still exhibits the same (if not worse) flaws as the first one:

- The Settlement was negotiated by (i) a team of plaintiffs' attorneys that have now fully and completely abandoned the class personal injury claims, having dropped such claims from the pleadings entirely, and (ii) a defendant that is highly incentivized to secure a release against these un-asserted claims;

- In exchange for this massive release of liability, and as a result of having attorneys that just don't care about the Class's claims, the Settlement provides the vast majority of the Class with—quite literally—nothing;

- Further exacerbating matters, the statute of limitation issue still hasn't been fixed. Of course, the *reason* it hasn't been addressed is all part of the plan: have the statute of limitations run well before Class members are tested and figure out whether they have a personal injury claim in the first place. Under this framework, the NCAA avoids virtually *all* liability for Class members' injuries.

To justify all of this, Class Counsel don't mince words: they say that the benefits they *have* obtained for the medical monitoring members and the current NCAA athletes that stand to benefit from "enhanced" concussion protocols—i.e., the part of the case that they do care about—is so good, they're worth trading away the rights of the people they care less about.

1

Putting aside the dangerousness of this approach—and the fact that it violates Rule 23 and Supreme Court precedent—it's not even true. The relief that the Settlement purports to offer to a fraction of the Class isn't even real relief:

- First, the injunctive relief does *nothing*—rather, it only codifies what the NCAA has already been doing for years. And offering the status quo as a benefit actually hurts the Class, inasmuch as it suggests that nothing more needs to be done (even though many NCAA member institutions are already doing much more than the bare minimum that the Settlement would require).

- Second, by their own experts' admission, Class Counsel have designed the Settlement's medical monitoring program to *discourage* members of the Class from seeking help. And for those that do choose to fill out the lengthy and highly personal questionnaire—the majority of which isn't even used to determine who gets tested—only a handful of Class members actually get to "make a claim on the Fund" and save around $40 on a co-pay, after traveling as much as hundreds of miles.

- Third, while the parties have taken a big step in making the $70 million settlement fund non-reversionary, it's *still* structured such that the vast majority of the money will almost certainly go to NCAA's own member institutions in 50 years to purportedly fund more concussion research—which cannot possibly benefit the members of the class given that (i) most of the class will be deceased and (ii) there's no reason to believe that such research will even be relevant or necessary at that point.

Of course, very little of this is disclosed to the class. Instead, the proposed Notice materials hide critically important parts of the Settlement. For example:

- In contravention of *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), the Notice does *not* disclose the significant conflicts of interests that permeate the entire settlement (i.e., wherein *no* class representative and *no* attorney has advocated for those class members that have personal injury claims that must be litigated on a class basis—or else not at all). Likewise, the Notice doesn't even suggest that the Settlement has already been objected to on this same basis or that the Court has expressed concerns over such conflicts.

- The Notice says outright that the NCAA is changing its concussion practices and policies for current NCAA athletes—when, in reality, the Settlement only requires the NCAA to keep doing what its already been doing for some time.

2

Although the instant settlement isn't vastly different from the one presented nine months ago, the ground under this lawsuit has shifted dramatically. Over the last 18 months, Class Counsel and the NCAA have traded largely theoretical arguments with Nichols about the propriety of the Settlement. Nichols—along with his attorneys and the many groups of current and former NCAA athletes expressing his same concerns—has said that if you dig into the case law, here, personal injury claims related to concussions *can* be certified and prosecuted on a class basis. And without class treatment, Nichols has stressed that billions of dollars of claims will go uncompensated because no one will sue the NCAA individually. Nichols has also emphasized that attorneys and class representatives who aren't pressing—and, in fact, have expressly stated they have no interest in pressing—class personal injury claims cannot possibly negotiate a global deal by *leveraging* serious conflicts of interests amongst class members to secure relief unrelated to the released claims. Class Counsel have responded by disagreeing with Nichols' take on the law.

On April 22, 2015, Judge Anita Brody granted motions for class certification and final approval of the NFL concussion settlement—and, through her 132-page order (the "NFL Order"), eliminated any need for more theoretical debates. The NFL Order addressed *all* of the issues Class Counsel and Nichols have disputed and concluded, without any equivocation, that (i) a single, undifferentiated class comprised of individuals with disparate claims—i.e., persons with present injuries and persons without—*cannot* be certified without adequately representing the claims of the *entire* class; (ii) class personal injury claims related to concussions *can* meet Rule 23(b)(3)'s predominance test and be certified; and (iii) individuals far prefer class treatment to individual lawsuits—even in the NFL context, where damages are much greater.

Here, because of the competing—but unaddressed—interests internal to this proposed

3

class (where only a portion of the class is being represented) and the proposed Settlement (where there is no real injunctive relief and only 0.11% of the Class—4,735 out of 4.2 million individuals—will benefit from the Settlement Fund by receiving medial screening tests), the pending motion for preliminary approval must be rejected. Additionally, the Court should (i) appoint Nichols' counsel to represent those members of the proposed Class with personal injury claims, (ii) vacate its prior order appointing Class Counsel as lead of the "Medical Monitoring Plaintiffs" given their track record, and (iii) appoint a new set of attorneys to represent those class members—ones who are willing to negotiate, or achieve through litigation, real results for the proposed class members.

## II.    ARGUMENT

"[B]ecause class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements. . . ." *Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (quoting *Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781, 785 (7th Cir. 2004)). Just as important, Rule 23 "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Applied here, approval must be denied. Class Counsel admit outright that this Settlement turns on the "strategic decision" to trade some class members' claims (i.e., those with present injuries and, potentially, "billions and billions of dollars" in damages, as calculated by Class Counsel[1]) "in return for" some relief provided to others (i.e., those class members who lack present injuries but want some form of medical monitoring, or those who are current NCAA

---

[1] Jon Solomon, CBS Sports *NCAA reaches concussion settlement for $70 million in testing*, available at http://www.cbssports.com/collegefootball/writer/jon-solomon/24641342/ncaa-reaches-concussion-settlement-for-70-million-in-testing (last accessed May 8, 2015).

athletes and may benefit from concussion protocols).[2] And even if the Court were willing to look past Class Counsel's opportunistic treatment of this serious conflict of interest, under the relief that *is* provided as a result of this trade, the vast majority of the Class still gets absolutely nothing, while the NCAA achieves "global peace" and Class Counsel nets a fortune.

A. **Rather Than Represent the Entire Class, the Settlement Leverages Conflicts of Interest—By Trading Some Class Members' Claims for the Benefit of Others.**

Previously, Nichols identified the conflict of interest central (and, in Nichols' view, fatal) to Class Counsel's proposed settlement, wherein "Class Members [were asked to] sacrifice their ability to bring or participate in any class action even amorphously related to concussions" in exchange for nothing. (Dkt. 83 at 8-9.) In the motion now before the Court, Class Counsel aren't coy about this tradeoff; instead, they embrace it:

> [A]fter weighing the benefits that could be provided under the Medical Monitoring Settlement against the unlikely certification of a personal injury class, Lead Plaintiffs made the strategic decision to support a $70 million Medical Monitoring Program with meaningful changes to the NCAA's return to play practices in return for waiving a virtually non-existent right to class personal injury claims.

(Pls. Br. at 27.) This "strategy" is further reflected in the recently amended complaints, wherein Class Counsel drop the class's personal injury claims and focus exclusively on seeking medical monitoring relief. (*See*, Dkt. 119 ¶¶ 288, 293, 300, 313, request for relief; Dkt. 171 ¶¶ 321, 326, 333, 346, request for relief.)

---

[2] While Nichols focuses here on the Settlement's release of class injury claims, it also bars other certifiable classes. For example, the Settlement releases Rule 23(c)(4) issues-only classes, (Settlement § II.NN), despite the fact that Class Counsel's Motion for Class Certification had sought to certify one. (*Arrington* Dkt. 175.) Likewise, as the release extends to any class action in any way "related to" concussions, (Settlement § II.NN), the Settlement threatens to waive countless other causes that future plaintiffs might advance. *See, Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 187 (D.D.C. 2013) ("Hypothesizing about every possible set of potential class members and engaging in the complex analysis of class certification, all without the aid of adversarial briefing, is not an appropriate task for the Court.")

As noted above, the propriety of Class Counsel's tradeoff "strategy" has driven the debate before this Court.[3] And while neither Class Counsel nor Nichols could previously point to a tiebreaker (assuming, *arguendo*, there ever was a tie to break), that changed with Judge Brody's Order granting class certification and final approval to the settlement reached in *In re Nat. Football League Players' Concussion Injury Litig.*, No. 2:12-MD-02323-AB, 2015 WL 1822254 (E.D. Pa. Apr. 22, 2015.)

Here, Judge Brody's Order resolves three critical points of contention between Nichols and Class Counsel. First, the NFL Order illustrates that Class Counsel's attempt to certify and settle the claims of an undifferentiated class (i.e., persons with and without present concussion-related injuries) without any procedural safeguards betrays a serious and unaddressed conflict of interest, and thus violates both *Amchem* and Rule 23. Second, the NFL Order shows that Class Counsel's main justification for trading away class personal injury claims—i.e., their contention that such claims cannot be certified—is flatly incorrect. Third, the NFL Order—and Judge Brody's evaluation of the 300 individual claims filed on behalf of 5,000 retired NFL players—disproves Class Counsel's speculative theory that class members would prefer individual litigation of personal injury claims over class treatment.

In total, the NFL Order demonstrates the enormous conflicts of interest permeating Class Counsel's proposed Settlement and shows why it—and the proposed Settlement Class tied to it—falls far outside the range of possible approval.

---

[3] While this brief challenges the proposed Class settlement, Nichols has additionally questioned whether Class Counsel can even fairly represent the entire proposed Class (i.e., as opposed to their preferred "Medical Monitoring Plaintiffs") given their recent wholesale abandonment of the Class's personal injury claims in the Third and Fourth Amended Complaints. (*See* Dkt. 128 at 4-5.)

1.      **Judge Brody's Rule 23(a)(4) adequacy analysis illustrates the un-reconciled conflicts of interest central to the undifferentiated NCAA class.**

Both the NFL and NCAA classes face the same internal tension. Each sets out a class of athletes that includes (i) individuals who are presently suffering form concussion-related injuries and (ii) individuals who are not. Under *Amchem*, Judge Brody observed that "an undifferentiated class containing those with present injuries and those who have not yet manifested injury  is beset by a conflict of interest." *In re NFL*, 2015 WL 1822254, at *18 (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 313 (3d Cir. 1998)). But while NFL Class Counsel relied upon several "structural protections" to address and avoid this internal conflict, NCAA Class Counsel made the "strategic decision" to trade one group's claims (i.e., those presently suffering from injuries) "in return for" benefits for the other (i.e., those without any present injuries). That Class Counsel decided to capitalize on —rather than account for and protect against—the manifest conflict of interest amongst proposed class members shows why, here, the proposed class cannot be certified and the proposed Settlement must be rejected.

The adequacy inquiry under Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *In re NFL*, 2015 WL 1822254, *17 (quoting *Amchem*, 521 U.S. at 625). The rationale underlying this rule is plain:

> A fundamental conflict exists where . . . by maximizing their own interests, the putative representatives would necessarily undercut the interests of another portion of the class . . . Benefits awarded to some class members, but not others, without adequate justification may indicate that other class members were inadequately represented.

*Id.* (quoting Newberg on Class Actions § 3:58 (5th ed.); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 797 (3d Cir. 1995)) (internal citations omitted). Such "fundamental conflicts" are not insurmountable; rather, "[s]tructural protections in the class

definition and settlement, such as separate subclasses or uncapped funds" can resolve them. *Id.*

(quoting *Georgine v. Amchem Prods., Inc.* 83 F.3d 610, 631 (3d Cir. 1996); *Accord Reynolds v.*

*Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) ("Conflicts of interest can create serious

problems for class action settlements . . . and require the creation of separately represented

subclasses." (citing *Amchem,* 521 U.S. 591, 626–27; *Retired Chicago Police Ass'n v. City of*

*Chicago,* 7 F.3d 584, 598 (7th Cir.1993))).

    In the context of the *In re NFL* case and settlement, Judge Brody explained that NFL

Class Counsel "recognized" and accounted for this inherent conflict with procedural safeguards.

First, NFL Class Counsel "subdivided the Class into two Subclasses: Retired Players who [had]

already received a Qualifying Diagnosis [i.e., who have present personal injury claims] . . . and

Retired Players who [had] not." *In re NFL*, 2015 WL 1822254, *17 (citing *Ortiz v. Fibreboard,*

527 U.S. 815, 856 (1999) (holding that "a class including holders of present and future claims . .

. *requires* division into homogenous subclasses")) (emphasis added). Next, NFL Class Counsel

made sure that "[e]ach Subclass [had] its own independent counsel [and class representative]."

*Id.* (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 (3d Cir. 2004) (holding that

"any potential for conflicts of interest . . . that may have arisen prior to and during the settlement

negotiations were adequately [addressed] by the presence of separate counsel")); *see also*

*Mirfasihi*, 356 F.3d at 785 (Discussing class settlement's "questionable feature[] . . . that the

class that was denied relief did not have separate counsel from the counsel for the favored

class."). Under this structure, Judge Brody explained that:

> Each Subclass Representative's interests reflect the interests of the Subclass as a
> whole. As with all other Retired Players who already have a Qualifying
> Diagnosis, [subclass representative] Kevin Turner is interested in immediately
> obtaining the greatest possible compensation for his injuries and symptoms.
> [Subclass representative] Shawn Wooden, like all other Retired Players without a
> Qualifying Diagnosis, is interested in monitoring his symptoms, guaranteeing that

generous compensation will be available far into the future, and ensuring an agreement that keeps pace with scientific advances. Because Wooden does not know which, if any, condition he will develop, he has an interest in ensuring that the Settlement compensates as many conditions as possible.

*In re NFL*, 2015 WL 1822254, at *18. Finally, NFL Class Counsel negotiated class-wide relief that benefited *all* class members' interests—including *both*:

    (i)    Payments compensating those members who had been diagnosed with any of six "Qualifying Diagnoses" associated with concussive or sub-concussive events, *id.* at *6-8; and

    (ii)    Medical monitoring to all retired players who played at least half a season in the NFL, as well as supplemental benefits (e.g., counseling and prescription drug benefits) to former players who "are impaired but have not deteriorated to the point of receiving a Qualifying Diagnosis," *id.* at *6.

With respect to this relief, Mediator Judge Layne Phillips—who oversaw the negotiations between NFL Class Counsel and the NFL parties—commented that "[NFL Class Counsel] . . . fought hard for the greatest possible benefits for *all* of the players" and "demanded that a range of injuries consistent with those alleged in the Complaints be considered eligible for a monetary award." *Id.* at *19 (emphasis in original).

Here, NCAA Class Counsel's game plan couldn't be more different. Rather than taking *any* steps to ensure that those class members with present injuries are adequately represented (e.g., by creating subclasses, assigning independent subclass counsel and/or class representatives to represent presently injured class members, or by negotiating *any* relief for members with present injuries in exchange for a broad release), Class Counsel and the Lead Plaintiffs made the "strategic decision" to leverage injured class members' claims "in return for" those that may potentially benefit from medical monitoring or injunctive relief. (Pls. Br. at 27.) And they don't even pretend that this decision was made for the benefit of the proposed Class as a whole; rather, Class Counsel have made clear that they are focused *solely* on obtaining medical monitoring

and/or injunctive benefits for, presumably, those members of the proposed Class that could conceivably benefit from such relief. (*See*, *e.g.*, Dkt. 49 at 1; *supra*, n.1.)

With Judge Brody's Order as a guide, it's clear that Class Counsel's and Lead Plaintiffs' "strategy"—both (i) in the trading of some claims "in return for" others without any correlating benefit and (ii) the decision to keep this massive settlement Class undifferentiated, despite the disparate interests between class members—destroys their ability to adequately represent the NCAA Class. And as described in the two sections that follow, Class Counsel's explanation for the trade (i.e., that a personal injury class cannot be certified and individual litigation is preferred to class treatment) was expressly addressed—and rejected—by Judge Brody as well.

**2.    Judge Brody's Rule 23(b)(3) predominance analysis illustrates the viability of the NCAA class members' personal injury class claims— fatally undercutting Class Counsel's justification for abandoning them to obtain medical monitoring relief.**

Next, both the NFL and NCAA classes face identical challenges with respect to certification of personal injury class claims under Rule 23(b)(3)—i.e., showing that common issues predominate given that athletes were (or will be) "injured 'in unique and disparate ways.'" *In re NFL*, 2015 WL 1822254, at *12 (referencing objections to the NFL Settlement, based on *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011)). But while NFL Class Counsel sought certification of a personal injury class and negotiated an uncapped billion dollar compensation scheme for (current and future) injured class members, NCAA Class Counsel decided not to try and, instead, assert that any "contention that a personal injury class could be certified here is unsupportable." (Pls. Br. at 26.) On that basis, Class Counsel maintain that any "conflict between Plaintiffs and Class Members that wish to pursue individual claims for bodily injury [is obviated because the Settlement does not release individual personal injury claims.]" (*Id.* at 16.) In this

regard, Judge Brody's commonality and predominance analysis[4] confirms that a personal injury class *is* certifiable under the facts of this case, and, far from "obviating" any conflict of interest, the waiver of class injury claims gives up the "billions and billions of dollars" in liability previously recognized by Class Counsel.

Addressing Rule 23(b)(3)'s predominance inquiry, and focusing again on *Amchem*, Judge Brody considered "whether [the proposed NFL] classes [were] sufficiently cohesive to warrant adjudication by representation . . . [so as] to determine whether the proposed class[es] 'would achieve economies of time, effort, and expense.'" *In re NFL*, 2015 WL 1822254, at *21 (quoting *Amchem*, 521 U.S. at 615, 623). In finding that common issues would "advance the litigation [such] that they may fairly be said to predominate," *id.* at *22, Judge Brody made the following findings:

(i)     That "factual questions regarding the NFL Parties' knowledge and conduct [would predominate because, for example,] Class Members' negligence claims depend[ed] on establishing that the NFL Parties knew of the dangers of concussive hits, yet failed to modify the rules of NFL Football to mitigate them, or even to warn Retired Players that they were risking serious cognitive injury by continuing to play." *Id.*

(ii)    That "the NFL Parties' alleged conduct injured Class Members in the same way [because] Retired Players all returned to play prematurely after head injuries and continued to experience concussive and sub-concussive hits." *Id.*

(iii)   That the "[p]redominance [of common issues] exists even though [concussive and sub-concussive] hits resulted in different symptoms with different damages [because] [t]he calculation of damages on an individual basis does not prevent certification."[5] *Id.*

---

[4] While NFL Class Counsel did not seek adversarial certification, Judge Brody recognized that "[c]lass certification 'demand[s] undiluted, even heightened, attention in the settlement context.'" *In re NFL*, 2015 WL 1822254, at *11 (quoting *Amchem,* 521 U.S. at 620).

[5]     Judge Brody further recognized that a class could be certified as to liability, even if separate proceedings were required to answer "individualized issues such as damages or reliance [because] such individual questions do not ordinarily preclude the use of the class action device." *Id.* (quoting *GM Trucks*, 55 F.3d at 817); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269

(iv) That "the NFL Parties' alleged conduct raises common and dispositive scientific questions [because] [e]ach Class Member would have to confront the same causation issues in proving that repeated concussive blows give rise to long-term neurological damage." *Id.*

Further, Judge Brody expressly rejected the objectors' argument that—like Class Counsel asserts here—"courts simply do not permit the certification of personal-injury classes." *Id.* at *23. To the contrary, Judge Brody observed that even *Amchem* stated that it did not categorically foreclose "mass tort cases from class certification," *id.* (quoting *Amchem* 521 U.S. at 625), before citing to several examples of certified personal injury classes, both within and without the Third Circuit:

> [*In re Diet Drugs*, No. 1203,] 2000 WL 1222042, at *68 (E.D. Pa. Aug. 28, 2000) (certifying personal injury settlement class for individuals who received harmful drug prescriptions); *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.,* 369 F.3d 293, 317 (3d Cir. 2004) (describing settlement as a "landmark effort to reconcile the rights of millions of individual plaintiffs with the efficiencies and fairness of a class-based settlement"); [*In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 161 (E.D. La. 2013)] (certifying a Rule 23(b)(3) settlement class for personal injuries resulting from oil spill); *In re Serzone Prods. Liab. Litig.,* 231 F.R.D. 221, 223 (S.D.W.Va. 2005) (certifying a Rule 23(b)(3) settlement class of "users and purchasers" of pharmaceutical products alleging a "range of physical and economic injuries"); [*In re Phenylpropanolamine (PPA) Products Liab. Litig.,* 227 F.R.D. 553, 555-56 (W.D. Wash. 2004)] (certifying a Rule 23(b)(3) class and approving settlement of claims alleging "increased risk of hemorrhagic stroke" and "a variety of injuries" caused by defective products).

*Id.* at *23.

Here, and given the substantive overlap between the core allegations of this case and those addressed in the NFL Order, Judge Brody's findings would support certification of a Rule

---

(3d Cir. 2009). Nichols previously made this and other points with respect to the potential certification of "issues classes," just like Class counsel previously sought to certify in the *Arrington* mattter. (Dkt. 83 at 13 (citing *Arrington* Dkt. 175 30-35, *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012), cert. denied, 133 S. Ct. 338 (2012); Fed R. Civ. P. 23(c)(4).)

23(b)(3) personal injury class. Here, and just as in the NFL case, Plaintiffs' entire case flows

from the NCAA's alleged failure to protect its athletes:

(i)     "[T]he NCAA assumed a duty to make sure that athletic programs are
        conducted in a manner designed to protect and enhance the physical and
        educational well-being of the student athlete";

(ii)    "[T]he NCAA was negligent and failed to carry out this duty in that it
        failed to implement regulations that would properly protect student-
        athletes from the risks associated with concussions and/or manage those
        risks to properly respond to the medically proven fact that repetitive
        concussions would lead to neurocognitive injuries in many player"; and

(iii)   "Despite its knowledge and controlling role in governing player conduct
        on and off the field, the NCAA turned a blind eye to the risk and failed to
        timely and adequately impose safety regulations governing this health and
        safety problem."

(*See* Fourth Am. Compl. at ¶¶ 6, 7, 9.) *See In re NFL*, 2015 WL 1822254, at *2 (noting that the

plaintiffs claimed "'the NFL held itself out as the guardian and authority on the issue of player

safety,' yet failed to properly investigate, warn of, and revise league rules to minimize the risk of

concussive and sub-concussive hits in NFL Football games."). And given these matching

allegations, *each* of the predominating questions identified by Judge Brody applies with equal

force here. Accordingly, Class Counsel's view that certification of a personal injury class here is

"unsupportable" or "illusory"—their main excuse for bargaining away supposedly worthless

class claims in exchange for medical monitoring relief—is without merit.

### 3.    Judge Brody's Rule 23(b)(3) superiority analysis shows that class treatment of concussion-related injuries is preferred.

Finally, and particularly given that 300 individual claims (filed on behalf of 5,000 former

NFL players) had been consolidated in her Court, Judge Brody was uniquely situated to analyze

whether class treatment of the NFL plaintiffs' personal injury claim met Rule 23(b)(3)'s

superiority requirement. Here, NCAA Class Counsel have pointed to these 5,000 claimants in

support of their view that individual concussion cases are "valuable" and "will be litigated." (Dkt. 85-1 at 18 (citing to Ex. B-3 to the Class Action Settlement Agreement as of June 25, 2014 in the *NFL MDL*).)

Judge Brody found differently. In analyzing the "desirability . . . of concentrating the litigation of the claims in the particular forum, and class members' interests in individually controlling the prosecution or defense of separate actions," *In re NFL*, 2015 WL 1822254, at \*24 (quoting Fed. Rule Civ. Pro 23(b)(3))(internal quotations omitted), Judge Brody concluded that class treatment of personal injury claims was preferred because even though 5,000 individuals— *25%* of the 20,000 person NFL class—had brought individual lawsuits, "only *one percent* of the Class [opted out and] elected to pursue separate litigation." *Id.* (emphasis added). In addition, Judge Brody cited other advantages that come with class treatment of similar claims, including the "decades of litigation at significant expense" associated with individual lawsuits; the uncertainty of compensation for any given case; and the fact that many Retired Players that were presently injured "with progressive neurodegenerative conditions would continue to suffer while awaiting relief." *Id.*

Stated plainly, Judge Brody concluded that even in the context of retired NFL players— where compensatory injuries for professional (and highly paid) athletes far exceeds those suffered by the typical amateur NCAA athlete—the class treatment of personal injury claims is preferable. Thus, here, the alternative to a class action therefore isn't a groundswell of individual claims—it's essentially no claims, which is the entire point of the class waiver. As such, by handing over a total release of all class claims, Class Counsel allow the NCAA to extinguish billions in class damages claims and other aggregate claims, absolving the NCAA from billions in liability for individual claims that won't be brought absent a class proceeding.

14

Here, the NFL Order not only demonstrates the dangers of trying to settle the claims of an undifferentiated class beset by internal conflicts, but also that a personal injury class is both certifiable and preferred. Judge Brody's analysis more than shows why this Settlement isn't anywhere near the range of possible approval.

### B. Nearly 9 Out of 10 Class Members Receive Absolutely No Benefit From The Settlement at All But Are Forced To Forfeit Valuable Rights.

#### 1. In exchange for giving up their ability to sue on a class basis, former NCAA athletes with present personal injury claims get nothing.

This Settlement offers nothing—zero—to former NCAA athletes with present injuries, including diagnoses of PCS and CTE, or other concussion-related conditions. For these class members, Class Counsel asks them to accept a class action waiver "in return for" medical monitoring and injunctive benefits that are of no use to them—a major red flag in this Circuit. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) ("[W]hen a settlement confers no benefit on a subset of the class, the district court should take special care to determine that the relevant claims actually have no settlement value."). This circumstance is the very reason why the Seventh Circuit has held that class action waivers should not simply be thrown into a settlement, *especially* where putative class members might obtain damages through "the benefits of aggregation in a class"—as Judge Brody's Order *confirmed* is feasible here. *See Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) (finding that such waivers "cut [class members] off at the knees."); *see also Richardson*, 991 F. Supp. 2d at 199 (preservation of individual damages claims meaningless where "most . . . plaintiffs would have no realistic day in court if a class action were not available."); *Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013) (Rejecting class waiver because "absent class members . . . no money whatsoever [and limited injunctive relief] . . . [i]n return for this ethereal

benefit, the absent Settlement Class Members are required to release Northstar and its affiliates from, *inter alia,* 'all *class* claims for damages or injunctive relief'").

> ### 2. The medical monitoring benefits only provide about $40 to an estimated 0.11% of the class—assuming anyone makes the considerable effort to try and claim them.

Next, while Class Counsel clearly think the $70 million medical monitoring Fund is the star of this Settlement, everyone—including Class Counsel's own expert—agrees that, relative to the 4.2 million class members, that Fund will hardly benefit anyone in the class.

*First,* Class Counsel's expert, Bruce Deal, estimates that 4,735 medical evaluations will be provided over the entire 50-year Monitoring Period. (Dkt. 170 at Table 6.) Even assuming that each evaluated athlete receives only a single examination, this means only 0.11% of the Class will potentially benefit.[6] (*Id.* ¶ 61.)

*Second*, Deal's report further explains that because most Class Members are insured, the real value of the medical monitoring program to those who receive tests is merely the value of a co-pay reimbursement.[7] At an average co-pay cost of $40,[8] the tests will therefore confer only

---

[6] In addition to saying Nichols is just "play[ing] games with numbers," Class Counsel have suggested that *100%* of the class benefits from the medical monitoring portion of the Settlement because *all* class members can fill out questionnaires. (*See* Dkt. 85-1 at 9.) But as Class Counsel's own expert unequivocally states, the *only* "potential benefit from making a claim on the Fund is access to the diagnostic medical testing at no out of pocket cost." (Dkt. 170 ¶ 61.) Filling out a Questionnaire, in contrast, is the *means* to, potentially, obtain this benefit—just as filling out a simple "postcard questionnaire or answer a brief online survey" is the *means* to receive a payment in a consumer class action. (*Id.* ¶ 68.) Only a masochist would relish, and claim as a "benefit," the process of filling out a massive medical questionnaire.

[7] Dkt. 170 ¶ 62 ("Furthermore, even for symptomatic class members, these tests may well be similar or identical to tests their commercial or government insurance would cover, even without the Fund's existence. For those members, the utility of receiving the testing via the Fund is limited to the out-of pocket cost they would incur under their insurance coverage.") Hence, where insurance would cover the cost of the test, the test's value is limited to the Class Member's insurance co-pays.

[8] *See* http://www.debt.org/medical/doctor-visit-costs/ (last visited May 8, 2015) (co-pays typically run $30 - $50.)

**$189,400** in value to the Class. Class Counsel's focus on the point-of-transaction cost of the test is not only deceptive, but also irrelevant: the inquiry should focus on the value delivered to the class, not the *retail cost* of certain tests. *See In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009) ("the standard is not how much money a company spends on purported benefits, but the value of those benefits to the class."); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 304 (E.D. Pa. 2003) (The value of a settlement fund should be based on the benefit to the class and not the cost to the defendant).

*Third*, aspects of the medical monitoring relief are designed to *discourage* class members from even trying to get their $40 co-pay benefit. In particular, Class Counsel's expert has explained that "the effort required to fill out the Questionnaire will itself serve as a deterrent[.]" (Dkt. 170 ¶ 76.) That's almost certainly because a significant portion of the Questionnaire **won't even be used to determine who gets tested**—including its entire History section, [9] which spans 15 condensed pages of the Proposed Medical Section Committee's report and asks individuals incredibly detailed and personal questions, including:

- Extensive personal and medical histories, including about—among many other subjects—the respondent's current and past usage of alcohol and recreational drugs;

- Questions about respondents' "Neurological/Psychological/Psychaiatric" history; and

- Concussion history questions, which ask respondents to—for *every* diagnosed and undiagnosed concussion, even those that happened years and years ago—

---

[9] The Medical Science Committee notes that while the History section is not used to determine who gets an exam, it can later "be made available to clinicians conducting the in-person Medical Evaluation if the Class Member receives one." (Dkt. 159 ¶ 5.) The fact that *everyone*—not just those receiving exams—must fill it out doesn't make any sense at all, until one considers (i) the aforementioned "deterrent" factor and (ii) the fact that, under the terms of the Settlement, the NCAA can potentially use the information provided in the History section to later defend against individual lawsuits (e.g., by leveraging, perhaps, a given claimant's admission that he was intoxicated when he received a given concussion).

17

provide many specific details that no one is likely to recall.

(Dkt. 159 at 7-22.)[10]

And even if a class member actually fills out a form and qualifies for a test, he or she must still decide whether it's worth "up to a day or two of time and travel to attend[] a test at an [unnamed] approved institution" (i.e., in addition to the other costs of travel—gas, wear-and-tear, taxi/bus/train fares, missed workdays, etc.—that almost all class members must shoulder) in order to save a $40 co-pay, or whether it's easier just to go to their own doctor (with whom, presumably, they have an established history and relationship), given that the tests "may well be similar or identical to tests their commercial or government insurance would cover, even without the Fund's existence." (Dkt. 170 ¶¶ 62, 65.) Here, it's telling that Class Counsel voiced strong concerns about almost identical requirements in the NFL Settlement. *See* URL http://www.hbsslaw.com/cases-and-investigations/cases/NFLSettlement-details-long (last visited May 8, 2014.) ("We are very concerned that the settlement has requirements that many former players are going to need to travel to totally undefined locations for medical testing…We are further concerned that it appears that the former players will be responsible for all expenses to get to/from the testing.")

Unsurprisingly, the Deal Report concedes that the relatively low value of the medical monitoring program, combined with the "high level of effort [required to claim the medical monitoring benefit under the NCAA settlement]," means that relatively few Class Members will actually make a claim for medical monitoring. (Dkt. 170 ¶ 69.)

---

[10] Plaintiffs' experts seem to suggest there's empirical research supporting the design/use of both the proposed (i) Questionnaire and (ii) Screening Algorithm to determine which claimants get tested. Neither claim would survive a Daubert analysis.

### 3. The Settlement's "injunctive relief" does nothing—and even if it did have value, it only benefits 11% of the Class.

Apart from the presently injured former NCAA athletes (who get nothing) and the 0.11% of the Class that might receive a free medical exam and save a $40 co-pay, the rest of the Class Members who purportedly get a benefit under the Settlement are the approximately 460,000 current NCAA student-athletes.[11] But even this relief is thin—if not non-existent. In fact, the Settlement actually "provides" current athletes with nothing because the NCAA has *already promulgated* the very same return-to-play guidelines that this Settlement purports to secure. As NCAA attorney Mester made clear —in response to Class Counsel's suggestion that the proposed injunctive relief would represent "a *change* in the return-to-play practices in all NCAA institutions"—"in terms of the return-to-play guidelines, that would really be a reaffirmation of guidelines that were put into place a couple of years ago . . . I just want to make clear, those are guidelines that have been in place a couple years." *See* April 14, 2014 Hearing Trans. 9:7-11, 13:1-7 (Dkt. No 39.) Indeed, the NCAA's website confirms that the NCAA has already implemented return to play guidelines, an academic accommodations policy, and a concussion education policy.[12] The NCAA even claims such policies were put in place *not* as a result of this litigation.[13] What's more, this practice—codifying the status quo—may ultimately *harm* current and former athletes, given that many NCAA member institutions have taken steps to advance their concussion protocols *beyond* what the Settlement requires.[14]

---

[11] *See* Student-Athletes, http://www.ncaa.org/student-athletes (last accessed May 8, 2015).

[12] *See* "Concussion Guidelines," http://www.ncaa.org/health-and-safety/concussion-guidelines (last accessed May 8, 2015).

[13] *See* "New guidelines aim to improve student-athlete safety," http://www.ncaa.org/about/resources/media-center/news/new-guidelines-aim-improve-student-athlete-safety (last accessed May 8, 2015).

[14] For example, under the Notre Dame Concussion Management Plan, any athlete that suffers a concussion (or displays "signs, symptoms, or behaviors that a Notre Dame athletics staff member

**4.    The Settlement's proposed *cy pres* distributions don't benefit the Class—but will utilize the vast majority of the Fund.**

Last, the Settlement calls for two forms of *cy pres* remedies (or "fluid recoveries"): (i) a $5 million research fund, and (ii) the spending of whatever money is left in the Settlement fund after 50 years (estimated by Class Counsel's expert to exceed $50 million). These provisions are improper for at least two reasons.

First, a *cy pres* recovery is only appropriate "where the individuals injured are not likely to come forward and prove their claims or cannot be given notice of the case." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) (quoting *Simer v. Rios*, 661 F.2d 655, 675 (7th Cir. 1981)); *see also Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014) ("A *cy pres* award is supposed to be limited to money that can't feasibly be awarded to the intended beneficiaries, here consisting of the class members."). "[W]hen the injured parties can be identified, [there is no reason] to deny them even a small recovery in favor of disbursement through some other means." *Mace*, 109 F.3d at 345. Here, there's no reason to divert money to research—at all—when the funds could go to class members by, for example, offsetting the cost of further medical treatment, testing for a wider spectrum of disorders, offering tests to more class members, or providing travel compensation to all (rather than some) persons who qualify for medical exams. A thoughtfully constructed settlement—especially one with such a small fund, relative to the 4.2 million-member class—wouldn't have any money going to *cy pres*.

Second, even if a *cy pres* recovery were appropriate, the Settlement's proposals still

---

believes are consistent with a concussion"), must first receive clearance from a physician that he or she can be *evaluated* for return to play, and then move through a detailed six-stage, multi-day rehabilitation before returning to normal gameplay. University of Notre Dame Sports Medicine Department Intercollegiate Athletics Concussion Management Plan, http://performance.nd.edu/ assets/136349/concussionmgmtplan_appendix_final_2014.pdf (last accessed May 7, 2015).

won't benefit class members. To start, no Class members will actually benefit from the $5 million research fund, because "research undertaken by NCAA member institutions with respect to . . . concussions will be credited (as appropriate) toward [that] monetary requirement." (Settlement § X.A.) As NCAA schools are already spending millions annually on concussion related research[15] these and other monies can be credited against the $5 million, and thus, no value is added. Next, while the monies remaining in the Fund no longer revert to the NCAA, *none* of the leftover amounts are likely to benefit Class members.[16] Instead, in 50 years, the Medical Science Committee decides whether "to extend the Medical Monitoring Program or donate[] [the remaining money] to an institution or institutions selected by the [Committee] to be used for concussion-related research or treatment." (Settlement 20.) Neither option makes sense, given that (i) the majority of the class will be deceased by that point and (ii) there's no way to know whether additional concussion research will be relevant to anyone in 50 years, much less benefit the class. The Seventh Circuit has been sharply critical of proposed *cy pres* distributions like these. *See, e.g., Pearson*, 772 F.3d at 784 (rejecting settlement in part because "[t]he $1.13 million *cy pres* award to the orthopedic foundation did not benefit the class, except insofar as armed with this additional money the foundation may contribute to the discovery of new

---

[15] *See, e.g.*, http://www.uofmhealth.org/medical-services/brain-neurological-conditions/concussion (describing the University of Michigan's NeroSport Program) (last accessed May 8, 2015); see also http://www.upmc.com/services/sports-medicine/services/concussion/program/pages/default.aspx (University of Pittsburgh Medical Center) (last accessed May 8, 2015); http://www.knowconcussion.org/about-us/ (Sports Concussion Center at Idaho State University (last accessed May 8, 2015).

[16] Class Counsel's expert estimates that, under any projection, the Fund will still be available in year 50 and, under all but one estimate, more than *$50* million will remain at that time. (Dkt. 170 Table 9, ¶ 89.) And even these projections are conservative, given that *none* of Deal's projections account for the fact that the Fund will receive "inflows from subrogation . . . [in cases where] a third-party insurer would pay for all or a portion of the medical testing, thus reducing the net cost to the Fund." (*Id.* ¶ 16.) Deal estimates that subrogation rates will be as high as 70% suggesting, here, that even more money will need to be distributed at the end of the 50-year period.

treatments for joint problems—a hopelessly speculative proposition."); *see also Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990) (rejecting *cy pres* proposal because "there is no reasonable certainty that any member will be benefited."). And even the Supreme Court recently weighed in on *cy pres*, sending a very clear signal that district courts should scrutinize proposed *cy pres* awards. *See Marek v. Lane*, 134 S. Ct. 8, 9 (2013).

As such, the vast majority of the Class won't benefit from their Settlement Fund—at all.

### C. Class Counsel's Proposed Class Notice Is Deficient and Withholds Critical Information from Putative Class Members.

Next, Class Counsel's proposed notice documents are woefully deficient. While the notice could be clearer about what relief Settlement class members stand to receive (among many other details),[17] the more pressing concern is that, in stark violation of recent Seventh Circuit precedent, the class notice makes absolutely no effort to disclose:

(i)    Nichols' objections to the Settlement (neither that there *is* an objection, nor the substance of it), or

(ii)   that Class Counsel's ability to adequately represent the Class has been challenged, given Nichol's claim that they've "unequivocally abandon[ed] the class's personal injury claims and only seek[] to recover ' injunctive relief . . . [and] medical monitoring." (Dkt. 128 at 1.)

In *Pella*, the Seventh Circuit concluded that omitting the substance of similar objections from the class notice amounted to an "un-candid communication from class counsel" that was "not neutral and [would] not provide a truthful basis for [permitting potential settlement class members from] deciding whether to opt out." 753 F.3d at 728. Here, and as in *Pella*, given the serious conflicts

---

[17] For example, it's hard to tell what the medical monitoring is testing for; the notice documents say PCS, CTE, and "related conditions" are screened for, while Class Counsel's expert confirms that *only* "two disease states are of interest: [PCS and CTE]." (*Compare* Dkt. 154-3 at 8 *with* Dkt. 170 ¶ 19.) Likewise, as explained *supra*, Section II.B.3, the Notice says that the NCAA is changing its concussion practices and policies for active NCAA athletes—when all the Settlement requires is for the NCAA to codify what it's been doing for some time.

of interest internal to the Settlement and Class Counsel's opportunistic representation of the class (i.e., concerning their "strategy" of abandoning some class members' claims for the benefit of others), the proposed settlement class members are entitled to understand the issues presently before the Court and, once informed, make an educated decision about whether to stay in the class or object to the Settlement —assuming, of course, the Court even decides that notice should be disseminated.

Here, Class Counsel's deficient notice is particularly problematic because simply providing current and former college athletes the choice to opt out and, in theory, preserve their rights to bring class personal injury claims against the NCAA may not solve anything. That's because under the Settlement, class members only waive *class* personal injury claims; and even if a would-be class member chooses to opt out, that choice may have no practical effect on his or her ability to actually assert a concussion-related class action against the NCAA. Here, for example, to *actually* preserve the ability to press class personal injury claims, a sufficiently numerous number of injured individuals (e.g., those few persons presently suffering from PCS or CTE) would *all* have to opt out of the Settlement in order for *any* single individual to litigate personal injury claims on a class basis. *Cf.* Nancy Morawetz, *Underinclusive Class Actions*, 71 N.Y.U. L. Rev. 402, 420 (1996) ("Some narrow class definitions will operate to foreclose subsequent class action litigation on behalf of those excluded from a class. This is clearest where the narrow class leaves leftover groups that are not sufficient in size to meet the numerosity requirements of Rule 23."). Here, without sufficient notice and in light of the historically low number of opt outs for class settlements, *Pella Corp.*, 753 F.3d at 728, the likely end result is that *no* potential Class member will *ever* get the chance to bring a class personal injury claim.

23

**D.   Additional Provisions of the Settlement Demonstrate That the Deal is Unfair, Unreasonable, and Inadequate, and Cannot be Approved.**

The Settlement suffers from a host of additional improprieties, described below.[18]

**1.   The Settlement is marred by other conflicts of interest.**

An unfair settlement like the present one isn't altogether surprising where conflicts of interest abound. *See e.g. Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 396 n.5 (1996) (citing *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157–158, n. 13 (1982) (noting that Federal Rule of Civil Procedure 23(a)(4)'s adequate representation requirement "raises concerns about the competency of class counsel and conflicts of interest.")). The most significant conflict has been discussed thoroughly. But others abound.

First, the Settlement *amazingly* requires that everyone release all of the lawyers and program administrators from any future liability related to the Medical Monitoring Program.[19] Requiring class members to prospectively waive claims that have not yet manifested—including potential malpractice claims—is improper and unethical: both Washington State and Illinois, for example, have adopted versions of Model Rule of Professional Conduct 1.8(h)(1), barring lawyers from entering into an agreement to limit prospective malpractice claims unless the client is independently represented.[20] And the fact that Class Counsel insisted these provisions be

---

[18] The issues described herein are by no means an exhaustive list of the objectionable portions of the Settlement. Nichols expressly reserves all rights and arguments.

[19] Indeed, located apart from the definition of "Released Claims," tucked away on page 62 (of 66) of the Settlement, under the heading "Miscellaneous Provisions," it states "No Person shall have any claim against the Class Representatives, Settlement Class Counsel, the NCAA, the NCAA's counsel, Program Administrator, Notice Administrator, or the Released Persons or their agents based on administration of the Settlement. . . ." (Settlement § XXI.F.)

[20] *See* WA. R. RPC. 1.8(h)(1) (a lawyer shall not "make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement"); IL. R. S. CT. RPC. Rule 1.8 (a lawyer shall not "make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement").

included in the Settlement—which benefit them, and hurt the class—calls into question what the class traded away in exchange.

Further conflicts arise due to the over breadth of the Class Definition. The Seventh Circuit has admonished that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) (same); *Gomez v. PNC Bank, Nat'l Ass'n*, No. 12 C 1274, 2014 WL 3640798, at *11 (N.D. Ill. July 24, 2014) ("a class is overbroad if it necessarily includes many members who cannot satisfy the elements of the legal claim.").

Class Counsel further created problems by treating all medical monitoring plaintiffs the same, regardless of whether they reside in a state that *even allows* such claims. Although they have heralded this as a victory, patting themselves on the back for getting people with no claims the same relief as the real litigants, they misunderstand the point. By doing this, they necessarily water down the good claims with the bad. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 353 n.22 (3d Cir. 2011) (Jordan, J. dissenting) ("The problem is that some class members who deserve nothing are included in the settlement and hence are diluting the recovery of those who are entitled to make claims."); Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 VAND. L. REV. 995, 1088 n.201 (2005) (noting that, with overbroad classes, class members with strong claims effectively subsidize those with weak claims). Thus, if Plaintiffs had focused on only those with viable medical monitoring claims, perhaps in addition to the $40 co-pay, they could have secured additional benefits as well. *See supra*, § II.B.4.

Finally, by seeking a class action waiver while acting as one of the only attorneys to

bring individual concussion-related personal injury lawsuits on behalf of former student-athletes,

Class Counsel Berman is simply creating more individual clients for his law firm. *See* July 29,

2014 Hr'g Tr. 11:7-15 (Dkt. 82).

### 2. The Settlement prematurely terminates the tolling of claims.

Even though Class Counsel had a second chance to get it right,[21] the Settlement *still*

improperly cuts short the tolling of all claims asserted in *Arrington*, including individual personal

injury claims. (Settlement § XX.S.) Now, under the Settlement, tolling ceases for all claims upon

Final Approval, and, on the Effective Date, tolling will resume *only* with respect to the medical

monitoring claims.[22] (Settlement §§ IV.A.5, XX.S.) This leaves open the likelihood that claims

will become stale in the time after Settlement is finally approved but before the Effective Date—

a period that, depending upon objections and appeals (both of which are certain to follow), could

last months or longer. (It is perhaps not surprising that the NCAA insisted on a lengthy testing

process; by the time class members find out they have suffered injury—e.g., presumably by (i)

filling out a lengthy Questionnaire (perhaps multiple times, before qualifying for testing),[23] (ii)

qualifying for a medical examination, and (iii) receiving a positive diagnosis, their claims will be

gone.)

Without this provision, the claims would remain tolled until final adjudication. *See*

---

[21] Previously, Class Counsel and the NCAA proposed that the class personal injury claims would only continuing tolling through the date of preliminary approval. (Dkt. 64-1 § XX.S.)

[22] In another effort to ensure Settlement class members can *never* bring class personal injury claims, the Settlement contains a provision stating that "[i]f the Medical Monitoring Fund is depleted before the expiration of the fifty (50) year Medical Monitoring Period, Settlement Class Members may pursue claims seeking medical monitoring, *including both individual and class claims*." (Settlement 20.) There is, of course, no companion provision for class personal injury claims, which are forever released upon the Effective Date—even though Class Counsel secured the Medical Monitoring Fund by handing over such claims as consideration.

[23] The Settlement doesn't even make clear when Settlement class members can access and submit Questionnaires, or when the medical evaluations will begin.

*Brewton v. City of Harvey*, 285 F. Supp. 2d 1121, 1126 (N.D. Ill. 2003) ("Although a class was certified and defendants successfully defeated the [class claims], the limitations periods for class members' individual claims . . . were tolled *until the final adverse determination of the class claims*.") (emphasis added). This rule, an extension of the class action tolling doctrine laid down in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and then *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) has been accepted almost unanimously.[24] Yet, Class Counsel have given up the Class's rights to have their claims tolled until the Settlement is final, forcing them to file their individual cases—for those Class members fortunate enough to even discover they, in fact, have cases to file—without knowing whether the deal will be approved.

## III.    CONCLUSION

Once again, Class Counsel offer a settlement where the Class Members get nothing but are forced to give up everything. Approval should be denied.

Respectfully submitted,

**ANTHONY NICHOLS**

By: /s/ Jay Edelson
          One of his Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370

---

[24] *See Grispino v. New England Mut. Life Ins. Co.*, 358 F.3d 16, 20 (1st Cir. 2004); *Edwards v. Boeing Vertol Co.*, 717 F.2d 761 (3d Cir. 1983) (cert. granted, judgment vacated on other grounds, 468 U.S. 1201 (1984)); *Adams Public School Dist. v. Asbestos Corp., Ltd.*, 7 F.3d 717 (8th Cir. 1993).

Fax: 312.589.6378

Robert A. Clifford
rclifford@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
Tel: 312.899.9090
Fax: 312.251.1160

Richard R. Gordon
richard.gordon@gordonlawchicago.com
GORDON LAW OFFICES, Ltd.
211 West Wacker Drive, Suite 500
Chicago, Illinois 60606
Tel: 312.332.5200
Fax: 312.236.7727

Brian W. Coffman
bcoffmanlaw@gmail.com
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614
Tel: 773.348.1295
Fax: 773.248.6013

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067
Tel: 248.548.1009
Fax: 248.548.1012

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

John J. Driscoll
THE DRISCOLL FIRM, P.C.
211 N. Broadway
St. Louis, Missouri 63102

Tel: 314.932.3232

Jeffery L. Raizner
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9077