**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Documents Relates To:**<br>**All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

**NICHOLS' FIRST OBJECTIONS TO PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

**Respectfully submitted by**:

Jay Edelson
Rafey S. Balabanian
Ari J. Scharg
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Robert A. Clifford
Shannon M. McNulty
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602

Brian W. Coffman
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614

Richard R. Gordon
GORDON LAW OFFICES, Ltd.
211 West Wacker Drive, Suite
Chicago, Illinois 60606

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115

John J. Driscoll
THE DRISCOLL FIRM, P.C.
211 N. Broadway
St. Louis, Missouri 63102

Jeffrey L. Raizner
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

II.    ARGUMENT..........................................................................................................2

    A.    The Settlement Is Beset by Conflicts of Interests ........................................2

        1.    In violation of Rule 23(a)(4), Class Counsel negotiated a settlement on behalf of an undifferentiated class of current and former athletes, without ensuring that *all* class members were adequately represented .....................2

        2.    The Settlement creates additional conflicts by requiring that all class members prospectively release the individuals implementing and running the Medical Monitoring Program ...................................................6

        3.    The Settlement creates conflicts between those class members with valid medical monitoring claims, and those without ...............................7

    B.    Nearly 9 Out of 10 Class Members Receive Absolutely No Benefits from the Settlement, But Are Forced to Forfeit Valuable Rights ...............................8

        1.    In exchange for giving up their ability to sue on a class basis, former NCAA athletes with present personal injury claims get nothing ................8

        2.    The medical monitoring benefits only provide about $40 to an estimated 0.11% of the class—assuming anyone makes the considerable effort to try and claim them ......................................................................9

        3.    By only asking the NCAA to do what it's already doing, the Settlement's "injunctive relief" provides no value to NCAA athletes.............................11

        4.    The Settlement's proposed *cy pres* distributions don't benefit the Class— but will utilize the vast majority of the Fund.................................11

    C.    The Settlement Prematurely Terminates the Tolling of Claims.............................13

    D.    Class Counsel's Proposed Class Notice is Deficient and Withholds Critical Information from Putative Class Members .................................................14

III.    CONCLUSION .......................................................................................................15

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................ 2, 3, 4

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ................................................14

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) ............................................................14

*Marek v. Lane*, 134 S. Ct. 8 (2013) .............................................................................................13

*Ortiz v. Fibreboard,* 527 U.S. 815 (1999)........................................................................................4

## UNITED STATES CIRCUIT COURT OF APPEALS CASES

*Adams Public School Dist. v. Asbestos Corp., Ltd.*, 7 F.3d 717 (8th Cir. 1993)..............................14

*Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877 (7th Cir. 2000)...........................................8

*Edwards v. Boeing Vertol Co.*, 717 F.2d 761 (3d Cir. 1983)........................................................14

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014).............................................................. 2, 15

*Georgine v. Amchem Prods., Inc.* 83 F.3d 610 (3d Cir. 1996) ..........................................................4

*Grispino v. New England Mut. Life Ins. Co.*, 358 F.3d 16 (1st Cir. 2004)......................................14

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*,
      55 F.3d 768 (3d Cir. 1995)..................................................................................................3

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)................................................4

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009).......................................................7

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) .........................................................12

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012)......................................7

*Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781 (7th Cir. 2004) ..........................................................4

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014)....................................................................12

*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584 (7th Cir.1993)....................................4

*Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002)........................................................4

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981)......................................................................12

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ..........13

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ...........................................7

*Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011).............................8

## UNITED STATES DISTRICT COURT CASES

*Brewton v. City of Harvey*, 285 F. Supp. 2d 1121 (N.D. Ill. 2003) ....................................14

*Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397 (W.D.N.Y. 2013)......................8

*Gomez v. PNC Bank, Nat'l Ass'n*, No. 12 C 1274, 2014 WL 3640798 (N.D. Ill. July 24, 2014) ......7

*In re Nat. Football League Players' Concussion Injury Litig.*,
    No. 2:12-MD-02323-AB, 2015 WL 1822254 (E.D. Pa. Apr. 22, 2015) ..................... 3, 4, 5

*In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418 (N.D. Cal. 2009) ..................9

*O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266 (E.D. Pa. 2003) ...........................9

*Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013)...............................8

## STATUTES

Fed R. Civ. P. 23 ..................................................................................................*passim*

IL. R. S. CT. RPC. Rule 1.8 ...................................................................................6

WA. R. RPC. 1.8 ...................................................................................................6

## OTHER AUTHORITIES

Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 Vand. L. Rev. 995 (2005)....................................................................7

Nancy Morawetz, *Underinclusive Class Actions*, 71 N.Y.U. L. Rev. 402 (1996)............15

Newberg on Class Actions § 3:58 (5th ed.) ....................................................................3

## I.    INTRODUCTION

On May 8, 2015, Anthony Nichols filed his objections to Class Counsel's and Lead Plaintiffs' most recent motion for preliminary approval of a proposed "Medical Monitoring Settlement." (Dkt. 178-1.) Following that submission—and after meeting with Nichols, Class Counsel, and the NCAA for an in-chambers conference—the Court directed Nichols to re-submit his objections in two parts: first, by discussing his objections *apart from* the argument that a personal injury class is certifiable and, second, by "address[ing] his argument that a personal injury class can be certified in this action under Rule 23(b)(3)." (Dkt. 182.) Per the Court's instruction, this first submission addresses several of Nichols' objections *other than* those relating to the viability of concussion-related class claims[1]—including that:

- The Settlement violates Rule 23(a)(4) by leveraging—rather than accounting for— divergent interests amongst class members;

- In violation of Illinois (among other states') law, class members must prospectively release future claims relating to the Medical Monitoring program;

- According to Class Counsel's expert, the $70 million Fund will only benefit 0.11% of the class (but still requires all class members to release the NCAA);

- By design, the claims process discourages class members from submitting claims;

- The injunctive relief is illusory, requiring the NCAA to do nothing;

- The *cy pres* remedies take money that should (and could) be going to the class and, instead, divert it to research programs unlikely to benefit anyone;

- By prematurely cutting short the tolling of concussion-related claims, the NCAA further (and improperly) insulates itself against future claims; and

- The class notice withholds critical information and, in so doing, deprives class members from making an informed choice about whether to participate.

---

[1] It is Nichols' understanding that the Court indicated it would not approve a class settlement where the NCAA member institutions receive a class-wide release under the current structure. Thus, while this brief doesn't address that issue, Nichols expressly reserves all rights with respect to it.

## II.    ARGUMENT

Because class actions are "rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements. . . ." *Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014). Further, Rule 23 "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Applied here, approval must be denied. Class Counsel admit that this Settlement turns on the "strategic decision" to trade some class members' claims (e.g., those with present injuries and "billions and billions of dollars" in damages, as calculated by Class Counsel[2]) "in return for" some relief provided to others (i.e., those who might benefit from medical monitoring or concussion protocols.) Further, even if the Court were willing to look past this serious conflict of interest, under the relief that *is* provided, the vast majority of the class still gets nothing. And the Settlement has other shortcomings—including, among others, an agreement to cut short the tolling of class members' personal injury claims and deficient class notice.

The proposed Settlement falls outside the range of possible approval and must be rejected.

### A.    The Settlement Is Beset by Conflicts of Interests.

#### 1.    In violation of Rule 23(a)(4), Class Counsel negotiated a settlement on behalf of an undifferentiated class of current and former athletes, without ensuring that *all* class members were adequately represented.

To start, the Medical Monitoring Settlement fails Rule 23(a)(4)'s adequacy inquiry because it does not account for or even address the divergent interests amongst individual class members. This conflict of interest has been central to Nichols' objections to Class Counsel's previous

---

[2] Jon Solomon, CBS Sports *NCAA reaches concussion settlement for $70 million in testing*, available at http://www.cbssports.com/collegefootball/writer/jon-solomon/24641342/ncaa-reaches-concussion-settlement-for-70-million-in-testing (last accessed May 27, 2015).

attempts to settle this case, (*see* Dkt. 83 at 8-9), and is even more apparent in the most recent

motion for preliminary approval, where Class Counsel explain that:

> [A]fter weighing the benefits that could be provided under the Medical Monitoring
> Settlement against the unlikely certification of a personal injury class, Lead
> Plaintiffs made the strategic decision to support a $70 million Medical Monitoring
> Program with meaningful changes to the NCAA's return to play practices in return
> for waiving a virtually non-existent right to class personal injury claims.

(Pls. Br. at 27.) This "strategy" is reflected in the recently amended complaints, where Class

Counsel drop the class's personal injury claims and focus on seeking medical monitoring relief.

(*See* Dkt. 171 ¶¶ 321, 326, 333, 346, Request for Relief.) Thus, and even though they *acknowledge*

that members' of their proposed Settlement Class have divergent interests, Class Counsel

nonetheless negotiated and "achieved a global compromise with no structural assurance of fair and

adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627.

The adequacy inquiry under Rule 23(a)(4) "serves to uncover conflicts of interest between

named parties and the class they seek to represent." *In re NFL*, 2015 WL 1822254, *17 (E.D. Pa.

Apr. 22, 2015) (quoting *Amchem*, 521 U.S. at 625). The rationale underlying this rule is plain:

> A fundamental conflict exists where . . . by maximizing their own interests, the
> putative representatives would necessarily undercut the interests of another portion
> of the class . . . Benefits awarded to some class members, but not others, without
> adequate justification may indicate that other class members were inadequately
> represented.

*Id.* (quoting Newberg on Class Actions § 3:58 (5th ed.); *In re Gen. Motors Corp. Pick-Up Truck*

*Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 797 (3d Cir. 1995)) (internal citations omitted). Such

"fundamental conflicts" are not insurmountable; rather, "[s]tructural protections in the class

definition and settlement, such as separate subclasses or uncapped fund[s]" can resolve them. *In re*

*NFL*, 2015 WL 1822254, *17 (citing *Georgine v. Amchem Prods., Inc.* 83 F.3d 610, 631 (3d Cir.

1996); *accord Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) ("Conflicts of

interest can create serious problems for class action settlements . . . and require the creation of separately represented subclasses." (citing *Amchem,* 521 U.S. 591, 626–27; *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 598 (7th Cir.1993))).

In this regard, the structure of the recently approved NFL settlement demonstrates how the conflicts inherent to the NCAA Settlement Class *could have been* (but were not) accounted for. In both this and the *In re NFL* matter, the proposed classes faced identical conflicts given that each set out an undifferentiated class that includes (i) persons who are presently suffering form concussion-related injuries or have other concussion-related claims, and (ii) those who are/do not. While Judge Brody observed that under *Amchem*, "an undifferentiated class containing those with present injuries and those who have not yet manifested injury is beset by a conflict of interest," *In re NFL*, 2015 WL 1822254, at *18, she explained that NFL Class Counsel "recognized" and accounted for this conflict with procedural safeguards.

First, NFL Class Counsel "subdivided the Class into two Subclasses: Retired Players who [had] already received a Qualifying Diagnosis [i.e., who have present personal injury claims] . . . and Retired Players who [had] not." *In re NFL*, 2015 WL 1822254, *17 (citing *Ortiz v. Fibreboard*, 527 U.S. 815, 856 (1999) (holding that "a class including holders of present and future claims . . . requires division into homogenous subclasses")). Next, NFL Class Counsel ensured "[e]ach Subclass [had] its own independent counsel [and class representative]." *Id.* (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 (3d Cir. 2004) (holding that "any potential for conflicts of interest . . . that may have arisen prior to and during the settlement negotiations were adequately [addressed] by the presence of separate counsel")); *see also Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (discussing class settlement's "questionable feature[] . . . that the class that was denied relief did not have separate counsel from the counsel for the favored class.").

Under this structure, Judge Brody explained that:

> Each Subclass Representative's interests reflect the interests of the Subclass as a whole. As with all other Retired Players who already have a Qualifying Diagnosis, [subclass representative] Kevin Turner is interested in immediately obtaining the greatest possible compensation for his injuries and symptoms. [Subclass representative] Shawn Wooden, like all other Retired Players without a Qualifying Diagnosis, is interested in monitoring his symptoms, guaranteeing that generous compensation will be available far into the future, and ensuring an agreement that keeps pace with scientific advances.

*In re NFL*, 2015 WL 1822254, at *18.

As a result of these structural protections and independent representation, NFL Class Counsel negotiated class-wide relief that benefited *all* (instead of some) class members' interests—including *both*: (i) payments compensating those members who had been diagnosed with any of six "Qualifying Diagnoses" associated with concussions, and (ii) medical monitoring to all retired players who played at least half a season in the NFL, as well as supplemental benefits (e.g., counseling and prescription drug benefits). *Id.* at *6-8. Indeed, with respect to this relief, Mediator Judge Layne Phillips—who oversaw the negotiations between NFL Class Counsel and the NFL parties—commented that "[NFL Class Counsel] . . . fought hard for the greatest possible benefits for *all* of the players." *Id.* at *19 (emphasis in original).

Here, in contrast, NCAA Class Counsel proceeded with one massive and undifferentiated class. Thus, rather than taking *any* steps to ensure that class members with present injuries were adequately represented (e.g., by creating subclasses, assigning independent subclass counsel or representatives, or by negotiating *any* relief for members with present injuries in exchange for a broad release), they made the "strategic decision" to leverage injured class members' claims "in return for" those that may benefit from medical monitoring or injunctive relief. (Pls. Br. at 27.)

With Judge Brody's Order as a guide, it's clear that Class Counsel's and Lead Plaintiffs' "strategy"—both (i) in the trading of some claims "in return for" others without any correlating

benefit and (ii) in the decision to keep the Settlement Class undifferentiated, despite conflicting interests between class members—destroys their ability to adequately represent the class.[3]

### 2. The Settlement creates additional conflicts by requiring that all class members prospectively release the individuals implementing and running the Medical Monitoring Program.

Next, the Settlement requires that everyone release all of the lawyers and program administrators from future liability related to the Medical Monitoring Program—essentially allowing these individuals to get paid for years and years without fear of being sued and, thus, without having to do work of any real quality.[4] Requiring class members to prospectively waive claims that have not yet manifested is improper, unethical, and a clear source of conflict. Both Washington and Illinois, for example, have adopted versions of Model Rule of Professional Conduct 1.8(h)(1), which bars lawyers from entering into an agreement to limit prospective malpractice claims unless the client is independently represented.[5] Class Counsel's and Plaintiffs' insistence on the inclusion of provisions such as these—which benefit only them and hurt the class—begs the question of what the class traded away in exchange.

### 3. The Settlement creates conflicts between those class members with valid medical monitoring claims and those without.

---

[3] Class Counsel claim that because "the Settlement does not release individual personal injury claims [or other individual claims 'related to' concussions'], . . . any conflict between Plaintiffs and Class Members that wish to pursue individual claims for bodily injury [is obviated]." (Pls. Br. at 16.) This position doesn't address—at all—the fact that concussion-related *class* lawsuits are both viable and valuable, but are waived by the proposed Medical Monitoring Settlement in exchange for nothing. Such issues will be addressed more thoroughly in Nichols' forthcoming supplemental memorandum.

[4] Indeed, located apart from the definition of "Released Claims," tucked away on page 62 (of 66) of the Settlement, under the heading "Miscellaneous Provisions," it states "No Person shall have any claim against the Class Representatives, Settlement Class Counsel, the NCAA, the NCAA's counsel, Program Administrator, Notice Administrator, or the Released Persons or their agents based on administration of the Settlement. . . ." (Settlement § XXI.F.)

[5] *See* WA. R. RPC. 1.8(h)(1) (a lawyer shall not "make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement"); IL. R. S. CT. RPC. Rule 1.8 (a lawyer shall not "make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement").

Finally, conflicts arise due to the overbreadth of the Class Definition. The Seventh Circuit has admonished that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) (same); *Gomez v. PNC Bank, Nat'l Ass'n*, No. 12 C 1274, 2014 WL 3640798, at *11 (N.D. Ill. July 24, 2014) ("a class is overbroad if it necessarily includes many members who cannot satisfy the elements of the legal claim.").

The issue with this Settlement is that Class Counsel treated all medical monitoring plaintiffs the same, regardless of whether they reside in a state that *even allows* such claims. Thus, Class Counsel's approach waters down the good claims with the bad. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 353 n.22 (3d Cir. 2011) (Jordan, J. dissenting) ("The problem is that some class members who deserve nothing are included in the settlement and hence are diluting the recovery of those who are entitled to make claims."); Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 VAND. L. REV. 995, 1088 n.201 (2005) (noting that, with overbroad classes, class members with strong claims effectively subsidize those with weak claims). As such, had Plaintiffs focused on those with viable medical monitoring claims, perhaps in addition to the $40 co-pay they could have secured additional benefits as well. *See infra*, § II.B.4.

In sum, the proposed Settlement is rife with conflicts of interests, *none* of which were accounted for by Class Counsel. Unless and until such conflicts are addressed—primarily by requiring that *all* class members receive independent representation throughout any settlement negotiation processes—Class Counsel cannot settle this lawsuit on the terms before the Court.

**B.      Nearly 9 Out of 10 Class Members Receive Absolutely No Benefits from the Settlement, But Are Forced to Forfeit Valuable Rights.**

1. **In exchange for giving up their ability to sue on a class basis, former NCAA athletes with present personal injury claims get nothing.**

This Settlement offers nothing to former NCAA athletes with present injuries, including diagnoses of PCS and CTE, or other concussion-related conditions.[6] For these class members, Class Counsel asks them to accept a class action waiver "in return for" medical monitoring and injunctive benefits that are of no use to them—a major red flag in this Circuit. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) ("[W]hen a settlement confers no benefit on a subset of the class, the district court should take special care to determine that the relevant claims actually have no settlement value."). This circumstance is why the Seventh Circuit has held that class action waivers should not simply be thrown into a settlement, *especially* where class members might obtain damages through "the benefits of aggregation in a class." *See Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) (finding that such waivers "cut [class members] off at the knees."); *see also Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 199 (D.D.C. 2013) (preservation of individual damages claims meaningless where "most . . . plaintiffs would have no realistic day in court if a class action were not available."); *Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013) (rejecting class waiver because "absent class members . . . receive no money whatsoever [and limited injunctive relief] . . . [i]n return for this ethereal benefit, the absent Settlement Class Members are required to release Northstar and its affiliates from, *inter alia,* 'all *class* claims for damages or injunctive relief'").

2. **The medical monitoring benefits only provide about $40 to an estimated 0.11% of the class—assuming anyone makes the considerable effort to try and claim them.**

Next, everyone—including Class Counsel's own expert—agrees that, relative to the 4.2

---

[6] In fact, the Settlement doesn't provide anything to class members with *any* concussion-related claims that might be asserted on a class basis—but still asks everyone to accept a sweeping waiver.

million class members, the $70 million Medical Monitoring Fund will hardly benefit anyone.

*First,* Class Counsel's expert, Bruce Deal, estimates that 4,735 medical evaluations will be provided over the entire 50-year Monitoring Period. (Dkt. 170 at Table 6.) Assuming that each evaluated athlete receives one examination, this means only 0.11% will benefit.[7] (*Id.* ¶ 61.)

*Second*, Deal's report further explains that because most Class Members are insured, the real value of the medical monitoring program to those who receive tests is the value of a co-pay reimbursement. (*See* Dkt. 170 ¶ 62.) At an average co-pay cost of $40,[8] the tests will confer only **$189,400** in value to the Class. Further, Class Counsel's focus on the point-of-transaction cost of the test is irrelevant: the inquiry should focus on the value delivered to the class, not the *retail cost* of certain tests. *See In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009) ("the standard is not how much money a company spends on purported benefits, but the value of those benefits to the class."); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 304 (E.D. Pa. 2003) (finding that the value of a settlement fund should be based on the benefit to the class and not the cost to the defendant). Indeed, that is especially the case here, given that the Program Administrator may seek subrogation/reimbursement from class members' own private health insurers to cover the costs of any provided medical tests. (Settlement § IV.B.5.g.)

*Third*, aspects of the medical monitoring relief are designed to *discourage* class members from even trying to get a $40 co-pay benefit. In particular, Deal explained that "the effort required to fill out the Questionnaire will itself serve as a deterrent[.]" (Dkt. 170 ¶ 76.) That's almost certainly because a significant portion of the Questionnaire **won't even be used to determine who**

---

[7] Class Counsel have suggested that *100%* of the class benefits from the medical monitoring portion of the Settlement because *all* class members can fill out questionnaires. (*See* Dkt. 85-1 at 9.) But as Class Counsel's own expert unequivocally states, the *only* "potential benefit from making a claim on the Fund is access to the diagnostic medical testing at no out of pocket cost." (Dkt. 170 ¶ 61.) The act of filling out a claim form (the *means* to potentially benefit from the Fund) hardly counts as a "benefit."

[8] *See* http://www.debt.org/medical/doctor-visit-costs/ (last visited May 27, 2015) (co-pays run $30 - $50.)

**gets tested**—including its entire History section,[9] which spans 15 condensed pages of the Proposed

Medical Section Committee's report and asks individuals incredibly detailed and personal

questions. (Dkt. 159 at 7-22.)[10]

And even if a class member actually fills out a form and qualifies for a test, he or she must

still decide whether it's worth "up to a day or two of time and travel" (i.e., in addition to the other

costs of travel—gas, wear-and-tear, taxi/bus/train fares, missed workdays, etc.—that must be

shouldered) to save a $40 co-pay,[11] or whether it's easier just to go to their own doctor, given that

the tests "may well be similar or identical to tests their commercial or government insurance would

cover, even without the Fund's existence." (Dkt. 170 ¶¶ 62, 65.)

Unsurprisingly, the Deal Report concedes that the relatively low value of the medical

monitoring program, combined with the "high level of effort [required to claim the medical

monitoring benefit under the NCAA settlement]," means that relatively few Class Members will

actually make a claim for medical monitoring. (Dkt. 170 ¶ 69.)

> **3.      By only asking the NCAA to do what it's already doing, the
> Settlement's "injunctive relief" provides no value to NCAA athletes.**

Apart from the presently injured former NCAA athletes (who get nothing) and the 0.11%

of the class that may receive a medical exam, the rest of the class members who purportedly

---

[9] The Medical Science Committee notes that while the History section is not used to determine who gets an exam, it can later "be made available to clinicians conducting the in-person Medical Evaluation if the Class Member receives one." (Dkt. 159 ¶ 5.) The fact that *everyone*—not just those receiving exams— must fill it out doesn't make any sense at all, until one considers (i) the aforementioned "deterrent" factor and (ii) the fact that, under the terms of the Settlement, the NCAA can potentially use the information provided in the History section to later defend against individual lawsuits.

[10] Plaintiffs' experts seem to suggest there's empirical research supporting the design/use of both the proposed (i) Questionnaire and (ii) Screening Algorithm to determine which claimants get tested. Neither claim would survive a Daubert analysis.

[11] Class Counsel voiced strong concerns about *almost identical requirements* in the NFL Settlement. *See* http://www.hbsslaw.com/cases-and-investigations/cases/NFLSettlement-details-long (last visited May 27, 2014.) ("We are very concerned that the settlement has requirements that many former players are going to need to travel to totally undefined locations for medical testing…We are further concerned that it appears that the former players will be responsible for all expenses to get to/from the testing.")

benefit under the Settlement are the 460,000 current NCAA student-athletes.[12] But the Settlement actually "provides" current athletes with nothing because the NCAA has *already promulgated* the same guidelines the Settlement purports to secure. As NCAA attorney Mester made clear—in response to Class Counsel's suggestion that the injunctive relief would be "a *change* in the return-to-play practices in all NCAA institutions"—"the return-to-play guidelines . . . would really be a reaffirmation of guidelines that were put into place [by the NCAA] a couple of years ago." *See* April 14, 2014 Hearing Trans. 9:7-11, 13:1-7 (Dkt. No 39). Indeed, the NCAA's website confirms that it has already implemented return-to-play guidelines, an academic accommodations policy, and a concussion education policy; and even claims such policies were put in place *not* as a result of this litigation.[13] What's more, this practice—codifying the status quo—may *harm* athletes, given that many NCAA member institutions have advanced their concussion protocols *beyond* what the Settlement requires.[14]

### 4. The Settlement's proposed *cy pres* distributions don't benefit the Class—but will utilize the vast majority of the Fund.

Next, the Settlement calls for two forms of *cy pres* remedies (or "fluid recoveries"): (i) a $5 million research fund, and (ii) the spending of whatever money is left in the Settlement fund after 50 years. These provisions are improper for at least two reasons.

First, a *cy pres* recovery is only appropriate "where the individuals injured are not likely to come forward and prove their claims or cannot be given notice of the case." *Mace v. Van Ru Credit*

---

[12] *See* Student-Athletes, http://www.ncaa.org/student-athletes (last accessed May 27, 2015).

[13] *See* "Concussion Guidelines," http://www.ncaa.org/health-and-safety/concussion-guidelines; "New guidelines aim to improve student-athlete safety," http://www.ncaa.org/about/resources/media-center/news/new-guidelines-aim-improve-student-athlete-safety (last accessed May 27, 2015).

[14] For example, under the Notre Dame Concussion Management Plan, any athlete that suffers a concussion, must first receive clearance from a physician that he or she can be *evaluated* for return to play, and then move through a detailed six-stage, multi-day rehabilitation. *See* http://performance.nd.edu/assets/136349/concussionmgmtplan_appendix_final_2014.pdf (last accessed May 27, 2015).

*Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) (quoting *Simer v. Rios*, 661 F.2d 655, 675 (7th Cir. 1981)); *see also Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014) ("A *cy pres* award is supposed to be limited to money that can't feasibly be awarded to the intended beneficiaries, here consisting of the class members."). "[W]hen the injured parties can be identified, [there is no reason] to deny them even a small recovery in favor of disbursement through some other means." *Mace*, 109 F.3d at 345. Here, there's no reason to divert money to research—at all—when the funds could go to class members by, for example, offsetting the cost of further medical treatment, testing for a wider spectrum of disorders, offering tests to more class members, or providing travel compensation to all (rather than some) persons who qualify for medical exams. A thoughtfully constructed settlement wouldn't have any money going to *cy pres*.

Second, even if a *cy pres* recovery were appropriate, the Settlement's proposals still won't benefit class members. To start, no class members will actually benefit from the $5 million research fund because "research undertaken by NCAA member institutions with respect to . . . concussions will be credited (as appropriate) toward [that] monetary requirement." (Settlement § X.A.) Given that NCAA schools are already spending millions annually on concussion research,[15] and that these and other monies can be credited against the $5 million, no value is added in this regard. Next, while the monies remaining in the Fund no longer revert to the NCAA, *none* of the leftover amounts are likely to benefit class members.[16] Instead, in 50 years, the Medical Science Committee decides whether "to extend the Medical Monitoring Program or donate[] [the remaining money] to an institution or institutions selected by the [Committee] to be used for

---

[15] *See*, *e.g.*, http://www.uofmhealth.org/medical-services/brain-neurological-conditions/concussion. (describing the University of Michigan's NeroSport Program) (last accessed May 27, 2015).

[16] Deal estimates that, under any projection, the Fund will still be available in year 50 and, under all but one estimate, more than *$50* million will remain at that time. (Dkt. 170 Table 9, ¶ 89.) And even these projections are conservative, given that *none* of Deal's projections account for the fact that the Fund will receive substantial "inflows from subrogation . . . thus reducing the net cost to the Fund." (*Id.* ¶ 16.)

concussion-related research or treatment." (Settlement 20.) Neither option makes sense, given that (i) the majority of the class will be deceased by that point and (ii) there's no way to know whether more concussion research will be relevant to anyone in 50 years, much less benefit the class. The Seventh Circuit has been sharply critical of *cy pres* distributions like these. *See*, *e.g.*, *Pearson*, 772 F.3d at 784 (rejecting settlement in part because "[t]he $1.13 million *cy pres* award to the orthopedic foundation did not benefit the class, except insofar as armed with this additional money the foundation may contribute to the discovery of new treatments for joint problems—a hopelessly speculative proposition."); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990) (rejecting *cy pres* proposal because "there is no reasonable certainty that any member will be benefited."). And even the Supreme Court recently weighed in on *cy pres*, sending a very clear signal that district courts should scrutinize proposed *cy pres* awards. *See Marek v. Lane*, 134 S. Ct. 8, 9 (2013).

As such, the vast majority of the Class won't benefit from the Settlement—at all.

## C.  The Settlement Prematurely Terminates the Tolling of Claims.

Next, the Settlement improperly cuts short the tolling of all claims asserted in *Arrington*, including personal injury claims. (Settlement § XX.S.) Now, under the Settlement, tolling ceases for all claims upon Final Approval, and, on the Effective Date, tolling will resume *only* with respect to the medical monitoring claims.[17] (Settlement §§ IV.A.5, XX.S.) This leaves open the likelihood that claims will become stale in the time after Settlement is finally approved but before the Effective Date and long before tests have been completed and evaluated—a period that could

---

[17] To further ensure Settlement class members can *never* bring class personal injury claims, the Settlement contains a provision stating that "[i]f the Medical Monitoring Fund is depleted before the expiration of the fifty (50) year Medical Monitoring Period, Settlement Class Members may pursue claims seeking medical monitoring, *including both individual and class claims*." (Settlement at 20.) There is, of course, no companion provision for class personal injury claims, which are forever released upon the Effective Date.

last months or longer. Thus, by the time class members find out they have suffered injury—e.g., presumably by (i) filling out a lengthy Questionnaire (perhaps multiple times, before qualifying for testing), (ii) qualifying for a medical examination, and (iii) receiving a positive diagnosis—their claims will be gone.

Without this provision, the claims would remain tolled until final adjudication. *See Brewton v. City of Harvey*, 285 F. Supp. 2d 1121, 1126 (N.D. Ill. 2003) ("Although a class was certified and defendants successfully defeated the [class claims], the limitations periods for class members' individual claims . . . were tolled until the final adverse determination of the class claims.") This rule, an extension of the class action tolling doctrine laid down in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and then *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) has been accepted almost unanimously.[18] Yet, Class Counsel have given up the Class's rights to have their claims tolled until the Settlement is final, forcing them to file their individual cases without knowing whether the deal will be approved.

### D. Class Counsel's Proposed Class Notice is Deficient and Withholds Critical Information from Putative Class Members.

Next, Class Counsel's proposed notice documents are woefully deficient. Here, the notice not only misrepresents what relief Settlement class members stand to receive (e.g., by saying that the NCAA "agreed to change its . . . concussion management and return to play [policies]," (*see* Dkt. 154-2 at 2), when in reality *no* changes were made, (*see supra* § II.B.3)), it makes no effort to disclose: (i) Nichols' objections to the Settlement (neither that there *is* an objection, nor its substance), or (ii) that Class Counsel's ability to represent the Class has been challenged.

In *Pella*, the Seventh Circuit concluded that omitting the substance of similar objections

---

[18] *See, e.g.*, *Grispino v. New England Mut. Life Ins. Co.*, 358 F.3d 16, 20 (1st Cir. 2004); *Edwards v. Boeing Vertol Co.*, 717 F.2d 761 (3d Cir. 1983) (cert. granted, judgment vacated on other grounds, 468 U.S. 1201 (1984)); *Adams Public School Dist. v. Asbestos Corp., Ltd.*, 7 F.3d 717 (8th Cir. 1993).

from the class notice amounted to an "un-candid communication from class counsel" that was "not neutral and [would] not provide a truthful basis for [permitting potential settlement class members from] deciding whether to opt out." 753 F.3d at 728. Here, and as in *Pella*, given the serious conflicts of interest internal to the Settlement and Class Counsel's opportunistic representation of the class, class members are entitled to understand the issues before the Court and, once informed, make an educated decision about whether to participate.

Here, Class Counsel's deficient notice is problematic because simply providing current and former college athletes the choice to opt out and, in theory, preserve their rights to bring class concussion-related claims against the NCAA may not solve anything. That's because under the Settlement, class members only waive *class* personal injury claims; and even if a would-be class member chooses to opt out, that choice may have no practical effect on his or her ability to actually assert a concussion-related class action against the NCAA. Here, for example, to *actually* preserve the ability to press class claims, a sufficiently numerous group of individuals with concussion-related claims would *all* have to opt out of the Settlement in order for *any* single individual to litigate such claims on a class basis. *Cf.* Nancy Morawetz, *Underinclusive Class Actions*, 71 N.Y.U. L. Rev. 402, 420 (1996) ("Some narrow class definitions will operate to foreclose subsequent class action litigation on behalf of those excluded from a class. This is clearest where the narrow class leaves leftover groups that are not sufficient in size to meet the numerosity requirements of Rule 23."). Here, without sufficient notice, the end result is that *no one* will ever get the chance to bring a class claim concerning concussions.

### III.    CONCLUSION

For these reasons—in addition to the fact that class members must waive viable concussion-related class claims in exchange for nothing—approval must be denied.

Respectfully submitted,

**ANTHONY NICHOLS,**

By: /s/ Jay Edelson
One of his Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Robert A. Clifford
rclifford@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
Tel: 312.899.9090
Fax: 312.251.1160

Richard R. Gordon
richard.gordon@gordonlawchicago.com
GORDON LAW OFFICES, Ltd.
211 West Wacker Drive, Suite 500
Chicago, Illinois 60606
Tel: 312.332.5200
Fax: 312.236.7727

Brian W. Coffman
bcoffmanlaw@gmail.com
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614
Tel: 773.348.1295
Fax: 773.248.6013

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067
Tel: 248.548.1009
Fax: 248.548.1012

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

John J. Driscoll
THE DRISCOLL FIRM, P.C.
211 N. Broadway
St. Louis, Missouri 63102
Tel: 314.932.3232

Jeffery L. Raizner
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9077

## CERTIFICATE OF SERVICE

I, Ari J. Scharg, an attorney, hereby certify that on May 27, 2015, I served the above and foregoing ***Nichols' First Objections to Plaintiffs' Motion for Preliminary Approval of Class Settlement***, by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this the 27th day of May, 2015.


/s/ Ari J. Scharg
Ari J. Scharg