**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**PLAINTIFFS' RESPONSE TO NICHOLS' FIRST OBJECTIONS
TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT ......................................................................................................................2

    A.      There Is No Conflict of Interest Among Class Members or Class Counsel ............2

          1.      Nichols fundamentally misapplies *Amchem*. ...............................................2

          2.      The intra-class conflicts among personal injury claims identified in the *NFL* decision are not present here. ...................................6

          3.      The pursuit of medical monitoring and injunctive relief does not render Class Counsel or the Class Representatives inadequate. ....................................................................................................8

          4.      Release of Class Counsel from future liability relating to the MMP should be deleted. ........................................................................9

    B.      Every Class Member is Entitled to Participate in the MMP and Thus Receives a Benefit................................................................................................9

    C.      The Research Fund Benefits Class Members and is Appropriate Because a Direct Distribution is Not Feasible and Would Not Provide Meaningful Relief ............................................................................................11

    D.      The Notice is Sufficient Because it Provides a Truthful Basis for Deciding Whether to Opt Out ..............................................................................12

III. CONCLUSION.................................................................................................................14

010270-12  785871 V1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Lines Stewards & Stewardesses Ass'n v. American Airlines, Inc.*,
  455 F.2d 101 (7th Cir. 1972) ...................................................................................13

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 101 (7th Cir. 1972) ............................................................................ *passim*

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010)...............................................................................4

*Beaulieu v. EQ Indus. Servs., Inc.*,
  2009 WL 2208131 (E.D.N.C. July 22, 2009) ..........................................................9

*Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*,
  296 F.3d 624 (7th Cir. 2002) ...................................................................................4

*Cima v. WellPoint Health Networks, Inc.*,
  250 F.R.D. 374 (S.D. Ill. 2008) ...............................................................................5

*Clark v. Experian Info. Solutions, Inc.*,
  2002 WL 2005709 (D.S.C. June 26, 2002).............................................................8, 9

*DeBoer v. Mellon Mortgage Co.*,
  64 F.3d 1171 (8th Cir. 1995), *cert. denied*, 517 U.S. 1156 (1996)...........................4

*Eubank v. Pella Corp.*,
  753 F.3d 718 (7th Cir. 2014) ...................................................................................13

*Gates v. Rohm & Haas Co.*,
  248 F.R.D. 434 (E.D. Pa. 2008)...............................................................................7

*In re General Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*,
  2000 WL 45534 (N.D. Ill. Mar. 13, 2000)..............................................................4

*Hughes v. Kore of Ind. Enter., Inc.*,
  731 F.3d 672 (7th Cir. 2013) ...................................................................................11

*Ingram v. Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001)..............................................................................7

*In re Lupron Mktg. & Sales Practices Litig.*,
  677 F.3d 21 (1st Cir. 2012)......................................................................................12

010270-12 785871 V1

*In re MetLife Demutualization Litig.*,
    689 F. Supp. 2d 297 (E.D.N.Y. 2010) ....................................................................12

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) ...........................14

*In re NFL Players' Concussion Litig.*,
    2015 WL 1822254 (E.D. Pa. Apr. 22, 2015) ...........................................5, 7, 8, 10

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).................................................................................................2

*In re Pet Food Prods. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2010)....................................................................................7

*Petrovic v. AMOCO Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ...................................................................3, 4, 6, 7

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    588 F.3d 24 (1st Cir. 2009).....................................................................................12

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).......................13

*Szabo v. Bridgeport Machs., Inc.*,
    249 F.3d 672 (7th Cir. 2001) ..................................................................................5

### Other Authorities

MANUAL FOR COMPLEX LITIGATION § 30.212 (3d ed. 1995) .......................................................13

*Newberg on Class Actions* § 12:32 (5th ed. 2013).........................................................................10

*Newberg on Class Actions* § 13:13 (5th ed. 2013).........................................................................1

010270-12  785871 V1

## I.    INTRODUCTION

Nichols' so-called "First Objections" represent Nichols' *second* opposition to the proposed Settlement.[1]  Despite the second chance, Nichols' arguments have no basis in fact and are unsupported by medical or scientific experts.[2]  Nichols primarily argues that (i) the Settlement contains conflicts of interest and (ii) the vast majority of the Class "gets nothing."[3] Nichols remains wrong on both accounts. First, all Class Members are entitled to participate in the Medical Monitoring Program ("MMP") and the Settlement does not differentiate amongst Class Members. Therefore, no conflict exists. Second, Nichols' claim that hardly anyone will benefit from the MMP has no basis in fact. 100% of the Settlement Class can complete the Screening Questionnaire up to five times over the 50-year Medical Monitoring Period, as symptoms may not arise until mid- to late-life. Moreover, those whose symptoms demonstrate a need for a Medical Evaluation will be seen by a specialist trained to administer important medical tests outside the ordinary work performed by general practitioners.

Unlike Nichols, Plaintiffs provide support from four of the top medical experts on concussion in sports opining that the MMP is appropriate and will provide the sophisticated

---

[1] *See* Nichols' Response to Plaintiffs' Motion for Preliminary Approval of Class Settlement (Dkt. No. 83).

[2] This brief addresses certain issues raised in Nichols' First Objections to Plaintiffs' Motion for Preliminary Approval of Class Settlement (Dkt. No. 183). The NCAA will be filing a separate brief addressing the following arguments made by Nichols: (1) the class is overbroad because it includes those with valid medical monitoring claims as well as those who may not have such claims (or whose states do not recognize such claims); (2) the claims process improperly discourages claims; (3) the prospective injunctive relief is illusory; and (4) Class Member claims are improperly tolled between Final Approval and the Effective Date. For the sake of efficiency and to reduce duplication, Plaintiffs join in the NCAA's brief on those issues.

Plaintiffs also incorporate all arguments made in Plaintiffs' Memorandum in Support of Joint Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class, including Plaintiffs' satisfaction of the five factors confirming that the Settlement is within the range of possible approval. *See* Dkt. No. 156, § III.D.

[3] Nichols made identical arguments in his first objection. *See* Nichols' Response to Plaintiffs' Motion for Preliminary Approval of Class Settlement (Dkt. No. 83), §§ II.A., II.C.1.

- 1 -

analysis and diagnosis for assessment of post-concussion syndrome or early-onset neurological

diseases caused by head trauma, such as Chronic Traumatic Encephalopathy. Moreover, two

former federal judges oversaw the mediation process and have attested that all negotiations were

zealous and at arms-length. Accordingly, as further reflected below, preliminary approval should

be granted.

## II.     ARGUMENT

### A.     There Is No Conflict of Interest Among Class Members or Class Counsel

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect

the interests of the class."[4] This requirement is "concerned with the 'competency and conflicts of

class counsel.'"[5] As confirmed below, no conflicts exist.

#### 1.     Nichols fundamentally misapplies *Amchem*.

Nichols declares that the Settlement fails the adequacy inquiry because it does not

address what he perceives to be divergent interests among Class Members.  Nichols is wrong.

Because the MMP is equally accessible to all Class Members, and because benefits under the

Settlement are equally available to all Class Members, there is no conflict.

In *Amchem Prods., Inc. v. Windsor*, the Supreme Court considered a global common fund

settlement providing monetary relief for class members with diverse medical conditions.[6] On

appeal, the Court found that the class members' interests were not aligned because the class

consisted of both class members who were currently injured (whose main goal was "generous

---

[4] Fed. R. Civ. P. 23(a)(4).

[5] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 n.31 (1999) (quoting *Amchem Prods.*, 521 U.S. at 626 n.20, 117 S. Ct. at 2251).

[6] 521 U.S. 591, 626 (1997).

010270-12 785871 V1

immediate payments") and exposure-only plaintiffs (who mainly sought an "ample, inflation-protected fund for the future").[7]

First, the Court noted that while all class members were "'united in seeking the maximum possible recovery for their asbestos-related claims…the settlement does more than simply provide a general recovery fund, rather, it makes important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others.'"[8] Here, however, the Settlement does not provide a common fund for injury claims nor attempt to allocate the common fund among the Class Members based on their injuries. Rather, the Settlement provides the same medical monitoring benefits to all current and former NCAA student-athletes, regardless of age and sport and regardless of whether they are symptomatic now or will be in 40 years.[9] By providing all Class Members access to the Screening Questionnaire and, if they qualify, to the Medical Evaluations, Plaintiffs have achieved the right for *all* Class Members to receive specialized and expensive evaluations to determine whether their symptoms or conditions are related to concussions or the accumulation of subconcussive hits.

Second, the Court was concerned in *Amchem* that plaintiffs' counsel represented "thousands of plaintiffs with then-pending…related claims" while also endeavoring in settlement negotiations "to represent the interests of the anticipated future claimants, although those lawyers then had no attorney-client relationship with such claimants."[10] Here however, Class Counsel

---

[7] *Id.*

[8] *Id.* at 610 (quoting 83 F.3d at 630) (emphasis in original).

[9] *See* Amended Settlement Agreement ("Am.SA") (Dkt. No. 92), § II.D.

[10] *Amchem*, 521 U.S. at 601; *see also Petrovic v. AMOCO Oil Co.*, 200 F.3d 1140, 1144, 1147 (8th Cir. 1999) (rejecting objectors' argument that the district court's failure to divide the certified class into subclasses deprived them of adequate representation, noting that the 33 class representatives included owners of property in a variety of locations, including all three "compensation zones" in the settlement).

- 3 -

represents both current and former student-athletes, some with manifested symptoms and some without.[11] Unlike in *Amchem*, Class Counsel have not negotiated on behalf of anticipated future personal injury plaintiffs. Thus, Plaintiffs' interests are entirely consistent with those of the other Class Members because they – like the other Class Members – seek access to diagnostic relief – today and if needed in the future as new or additional symptoms arise.[12/13] Judge Andersen affirms that "the Proposed Class Representatives unanimously concluded that it was not only fair but important for all student-athletes, regardless of which sport they participate in, to have access to the Medical Monitoring Program in the Settlement."[14]

Third, the Settlement protects the right of Class Members to pursue individual personal injury claims – *which is entirely consistent with Amchem*.[15] Here, Class Members with personal injury claims will control their own litigation destinies rather than be subjected to an allocation

---

[11] *See, e.g.*, Expert Report of Robert C. Cantu, *Arrington v. NCAA*, ¶¶ 237, 270, 302 (*Arrington* Dkt. No. 69).

[12] *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 343-44 (N.D. Ill. 2010) (citing *Amchem Prods.*, 521 U.S. at 615); *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) (noting that the class representatives fairly and adequately represented the class where there was no indication that their interests were antagonistic to the remainder of the class or that the claims were not vigorously pursued), *cert. denied*, 517 U.S. 1156 (1996); *Petrovic*, 200 F.3d at 1148 ("The interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'") (internal citation omitted); *In re General Elec. Capital Corp. Bankr. Debtor Reaffirmation Agreements Litig.*, 2000 WL 45534, at *7 (N.D. Ill. Mar. 13, 2000) ("[T]he named plaintiffs suffered the exact same injury and advanced the exact same interest as the Stastny Plaintiffs … The Stastny Plaintiffs' interests were no doubt properly represented in this Settlement Agreement. Unlike in *Amchem*, their interests and injuries are perfectly aligned with those of the name plaintiffs.").

[13] The Settlement does not release individual personal injury claims, obviating any conflict. *See* Am. SA, § II.NN. Plaintiffs also request that the Court expressly state that the Settlement only encompasses claims for medical monitoring and excludes all other individual damage claims, which are expressly reserved for subsequent individual litigation. *See Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 629 (7th Cir. 2002) (ruling that "under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action").

[14] *See* Declaration of Judge Wayne R. Andersen (ret.) ("Andersen Decl."), ¶ 21 (Dkt. No. 158).

[15] *See, e.g.*, Am.SA, § II.NN. (excluding claims for personal injury and bodily injury from the definition of "Released Claims").

010270-12 785871 V1

of benefits from a limited common fund. This is important where "[e]ach plaintiff [in an action involving claims for personal injury and death] has a significant interest in individually controlling the prosecution of [his case]; each 'has a substantial stake in making individual decisions on whether and when to settle.'"[16] Because virtually all of the current personal injury plaintiffs are independently pursing their claims,[17] the Settlement ensures that individuals who wish to bring such claims can do so while still having access to state of the art medical monitoring.

Fourth, Plaintiffs understand the terms of the Settlement and their fiduciary responsibilities as representatives of the Settlement Class. This point differentiates this case from *Amchem*, where the Court found "no assurance here – either in the terms of the settlement or in the structure of the negotiations – that the named plaintiffs operated under a proper understanding of their representational responsibilities."[18] Here, Plaintiffs understand the applicability of the injunctive relief, the scope of the benefits provided for in the Settlement, as well as the Release (including the waiver to proceed on a class-wide basis with regard to personal injuries).[19] *All* Plaintiffs have reviewed, understand, and support the Settlement from the perspective of current or former NCAA student-athletes who played Contact Sports and non-

---

[16] *Amchem*, 521 U.S. at 616 (quoting 83 F.3d at 633). *See also Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 384 (S.D. Ill. 2008) ("Correspondingly, in a case involving, as here, substantial individual claims worth tens of thousands of dollars or more, class members obviously have an important interest in bringing individual actions."); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 678 (7th Cir. 2001) (holding that "it is unnecessary to certify a nationwide class. Each [class member] has a substantial claim, of the sort that could be, and often is, pursued independently.").

[17] There are currently 21 personal injury claims pending against the NCAA – only 11 of which are included in this MDL. Only Nichols and Whittier are seeking to proceed as a class. *Arrington* (4), *Doughty* (1), *Durocher* (3), *Hudson* (1), *Nichols* (1), *Whittier* (1). These numbers present a significantly different landscape than the claims asserted against the NFL for example. As reflected in Judge Brody's order granting final approval, about 5,000 players filed over 300 substantially similar lawsuits against the NFL. *In re NFL Players' Concussion Litig.*, 2015 WL 1822254, at *1 (E.D. Pa. Apr. 22, 2015).

[18] *Amchem*, 521 U.S. at 627.

[19] Andersen Decl., ¶¶ 19-20.

010270-12 785871 V1

Contact Sports.[20] And following individual interviews, Judge Andersen concluded each Plaintiff

clearly "understands the role of a class representative and expressed their desire to participate as

a class representative."[21]

Fifth, using knowledge gained from years of litigation, Class Counsel negotiated the

Settlement with a clear view of the case's strengths and weaknesses based on a robust factual

record. This stands in stark contrast to the settlement in *Amchem* where "[t]he class action…was

not intended to be litigated. Rather, within the space of a single day, January 15, 1993, the

settling parties…presented to the District Court a complaint, an answer, a proposed settlement

agreement, and a joint motion for conditional class certification."[22] Indeed, this matter has been

intensely litigated for nearly five years, with the Class Members benefiting from full merits

discovery, opinions from the country's top concussion and economic experts, and a Settlement

guided by esteemed mediators over multiple sessions. Given these extensive efforts, there can be

no doubt that the Settlement incorporated all interests and with a clear view of the strengths and

weaknesses of the claims.

> **2.      The intra-class conflicts among personal injury claims identified in the *NFL* decision are not present here.**

In his opposition to the Settlement, Nichols relies heavily on Judge Brody's discussion of

conflicts with the NFL class. Her analysis is inapposite here, however, where all Class Members

benefit equally from the MMP. First, Judge Brody's final approval order analyzes structural

---

[20] Andersen Decl., ¶¶ 19-22.

[21] Andersen Decl., ¶ 22.

[22] *Amchem*, 521 U.S. at 601-02; *see also Petrovic*, 200 F.3d at 1144, 1145-46 (rejecting objectors' argument that the district court failed to divide the certified class into subclasses and distinguishing the settlement from *Amchem* because the case was not settled "before formally initiating litigation, and then presented the district court with the complaint, proposed class, and proposed settlement" rather, "the parties engaged in more than three years of extensive discovery and preparation for trial, and the class was certified…before the parties reached the settlement.").

protections implemented to avoid a conflict of interest *among personal injury claims*. For example, the court explained:

> Each Subclass Representative's interests reflect the interests of the Subclass as a whole. As with all other Retired Players who already have a Qualifying Diagnosis, Kevin Turner is interested in immediately obtaining the greatest possible compensation for his injuries and symptoms. Shawn Wooden, like all other Retired Players without a Qualifying Diagnosis, is interested in monitoring his symptoms, guaranteeing that generous compensation will be available far into the future, and ensuring an agreement that keeps pace with scientific advances. Because Wooden does not know which, if any, condition he will develop, he has an interest in ensuring that the Settlement compensates as many conditions as possible.[23]

Here, there is no need to create subclasses or each with its own separate counsel because the Settlement treats all Class Members exactly the same, and the Settlement is not attempting to distinguish between various types of personal injury claims, let alone what the compensation should be for each such type of claim.[24] In this Settlement, all Qualifying Class Members will receive the same benefits from the Settlement.[25] Thus, the procedural protections needed to avoid conflicts of interest in the personal injury context in *In re NFL* are inapplicable here.

---

[23] *In re NFL Players' Concussion Litig.*, 2015 WL 1822254, at *18, 36 (E.D. Pa. Apr. 22, 2015).

[24] *See, e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 344, 349 (3d Cir. 2010) (rejecting objectors' argument that subclasses were necessary for class members with purchase claims and injury claims because "[a]ll of the claims covered by the settlement are claims for economic damages…"; "[I]t is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest."); *see also Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 692 n.8 (N.D. Ga. 2001) (finding adequate representation and no need for subclasses for current and former employees because "[t]hey are eligible to participate on equal footing in the settlement"); *Petrovic*, 200 F.3d at 1146 (rejecting objectors' argument that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement as "untenable" because "almost every settlement will involve different awards for various class members.").

[25] *See, e.g.*, *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 441 (E.D. Pa. 2008) (finding medical monitoring class representatives typical where they "do not allege that they were singled out; instead, they allege that they suffered harm as a result of the same conduct that allegedly injured the absentee class members"); *Ingram v. Coca-Cola Co.*, 200 F.R.D. at 692 n.8 (finding adequate representation and no need for subclasses for current and former employees because "[t]hey are eligible to participate on equal footing in the settlement").

While Nichols suggests that a conflict necessarily exists if some class members are symptomatic and others are not, Judge Brody expressly rejected that view. She explained that "adequacy of representation of a class is not compromised simply because there may be differences in the condition or treatment of different class members."[26]

Further, Nichols' position that Class Members who have been diagnosed with present injuries do not benefit from the MMP demonstrates his fundamental misunderstanding of the potential for various concussion related symptoms to change or manifest over time.[27] For example, Derek Owens, who is currently symptomatic and has been diagnosed with Post-Concussion Syndrome still desires access to the MMP (and considers such access a benefit), because he remains at risk of developing CTE and related disorders later in life.

### 3. The pursuit of medical monitoring and injunctive relief does not render Class Counsel or the Class Representatives inadequate.

Next, Class Counsel's pursuit of injunctive relief and medical monitoring does not render them or the class representatives inadequate. For example, in *Clark v. Experian Information Solutions, Inc.*, the court held that the plaintiffs provided adequate representation, even though a number of alternative causes of action that could have brought were not included in the complaint, because "Plaintiffs have demonstrated that only a very small number of 'alternative claims' have been filed."[28] The court found it dispositive that "over the past three years, twenty-two lawsuits out of a potential class of 40,000 to 100,000 members have been filed against

---

[26] *In re NFL Players' Concussion Litig.*, 2015 WL 1822254, at *20.

[27] Nichols' current position contravenes his complaint, in which he requested medical monitoring, and asserted that "concussive trauma…also cause latent injuries that can develop over time and manifest later in life…and include…varying levels of neuro-cognitive disability and decline, mood and personality changes, and development of encephalopathy." *See* Nichols Complaint, ¶ 95.

[28] *Clark v. Experian Info. Solutions, Inc.*, 2002 WL 2005709, at *3 (D.S.C. June 26, 2002).

- 8 -

Defendants."[29] This logic applies equally here. Among the millions of Class Members, there are only 21 *total* personal injury claims against the NCAA nationwide – and are being willingly pursued independently. Thus, no conflict of interest exists.

### 4. Release of Class Counsel from future liability relating to the MMP should be deleted.

Class Counsel agrees that they should be deleted from Section XXI.F. The Parties had amended the previous Settlement accordingly and will do so again here.

### B. Every Class Member is Entitled to Participate in the MMP and Thus Receives a Benefit

Contrary to Nichols' claim that only 0.11% of the Class Members will benefit,[30] *100% of Class Members* are entitled to participate in the written screening designed to assess issues "that may be associated with persistent post-concussion syndrome and/or mid- to late-life onset problems, such as Chronic Traumatic Encephalopathy ("CTE") and related disorders."[31] No Class Member – regardless of age, gender, sport, or eligibility status – is precluded from completing the Screening Questionnaire up to five times over 50 years.[32]

The ability to complete the Screening Questionnaire several times is an important benefit as Class Members will receive valuable medical insight into their current cognitive functionality and the ability to track their current health with those symptoms that may develop later. This is also a benefit to Class Members who are currently symptomatic but whose condition may change over time. This in turn may trigger a future desire (and right) to participate in the Program. For example, a Class Member who is asymptomatic today may later develop, *e.g.*, early-onset

---

[29] *Id*. *See also Beaulieu v. EQ Indus. Servs., Inc.*, 2009 WL 2208131, at \*18 (E.D.N.C. July 22, 2009) (rejecting that a conflict existed because of an express exclusion of claims for personal injury in the complaint, because "few, if any, class members are likely to have or file personal injury claims").

[30] Nichols Opp. at 9.

[31] Am.SA, § IV.B.4.

[32] *Id*. at § IV.B.4.g.

010270-12 785871 V1

dementia or other CTE-related disorders, and may again complete the Screening Questionnaire.

At that time, a Medical Evaluation would likely be deemed necessary "to assess, detect and/or

diagnose any conditions, symptoms, or injuries from concussions or the accumulation of

subconcussive hits."[33]

Recognizing the value of such testing, Judge Brody in *In re NFL* approved similar testing

finding the testing would be "effective at identifying impairment," adding:

> [T]hese tests provide Retired Players with a comprehensive
> baseline assessment of their cognitive capabilities and their
> neuropsychological state. Numerous empirical studies show that
> these tests are effective at identifying impairment, especially in
> persons who have sustained brain injury. It would be very difficult
> for any significant neurological abnormalities to escape an
> examination of this breadth.[34]

Thus Nichols' declaration that the Program is practically worthless is baseless.[35]/[36]

Accordingly, Nichols' desire to ascribe zero benefit to the MMP in an effort to scuttle the

Settlement should be rejected. Further, Nichols' claim – unsupported by expert and scientific

support – that no Class Members will receive a benefit is directly contradicted by the members of

the Medical Science Committee who support the Settlement.[37] For example, Dr. Cantu opines:

"that the proposed Medical Monitoring Program provides an appropriate diagnostic remedy for

current or former NCAA student-athletes at risk for PCS or mid- to late-life onset problems

---

[33] Am.SA, § II.S.

[34] *In re NFL*, 2015 WL 1822254, at *58 (internal citations omitted).

[35] Nichols Opp. at 9. *See also* Deal Report, at 38, 29. Nichols' argument that the economic value of the medical testing should be reduced by subrogation and calculated solely on the basis of co-pays should be rejected. Government health insurance plans (*i.e.*, Medicare) make clear that they are the secondary payer, not the primary payer (which would be the Settlement). Private health insurance plans also have coordination of benefits provisions, which may not allow for subrogation. For these reasons, the Deal Report did not consider subrogation in evaluating medical costs.

[36] Nichols' assertion that medical monitoring is worthless is directly controverted by his complaint requesting medical monitoring. *See* Nichols Complaint, Count VII.

[37] *See* Report of the Proposed Medical Science Committee in Support of Motion for Preliminary Approval (Dkt. No. 159).

associated with CTE."[38] By contrast, Nichols has had over a year to provide expert or scientific

evidence in support of his contention that the MMP will not benefit Class Members. At this

stage, the weight of the evidence (all in favor of the Settlement) supports a finding that the

Settlement is within the range of possible approval.

**C.      The Research Fund Benefits Class Members and is Appropriate Because a Direct
           Distribution is Not Feasible and Would Not Provide Meaningful Relief**

Nichols challenges "two forms of *cy pres* remedies": (i) the $5 million dollar Research

Fund; and (ii) "the spending of whatever money is left in the Settlement fund after 50 years."[39]

First, Nichols incorrectly identifies the Research Fund as a *cy pres* remedy. *Cy Pres*

directs unclaimed funds to a charity that would otherwise go to members of the class as

damages.[40] However, the Research Fund is independently funded in the Settlement and is not

contingent on unused MMP funds.[41] Further, the Research Fund for "concussion-related research

or treatment"[42] provides an independent benefit.[43]

Second, Nichols' speculation that any money left over – which will either extend the

MMP or be dedicated to concussion research – will not benefit the Class does not withstand

scrutiny. The Seventh Circuit recognizes that distributions to related causes provide an indirect

---

[38] Cantu Report, ¶ 46.

[39] Nichols Opp. at 11.

[40] *See Newberg on Class Actions* § 12:32 (5th ed. 2013); *see also Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 675-76 (7th Cir. 2013) (noting that *cy pres* "awards to a charity the money that would otherwise go to the members of the class as *damages*, if distribution to the class members is infeasible"). *See also Hughes*, 731 F.3d at 676 ("In a class action the reason for a remedy modeled on cy pres is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement…").

[41] *See* Am.SA. § X. (requiring the NCAA to contribute $5 million dollars over a period not to exceed 10 years to research the prevention, treatment, and/or effects of concussions).

[42] *See* Am.SA. § IV.A.4.

[43] *See* Am.SA. § X. (requiring the NCAA to contribute $5 million dollars over a period not to exceed 10 years to research the prevention, treatment, and/or effects of concussions).

benefit for the class.[44] Contrary to Nichols' unsupported contention that concussion research will

not "be relevant to anyone in 50 years," the most recent International Consensus Statement on

Concussion in Sport acknowledges that "the science of concussion is evolving…"[45] and requires

continued research.[46] Nonetheless, the Settlement provides the alternative to extend the MMP if

appropriate.[47]

**D.      The Notice is Sufficient Because it Provides a Truthful Basis for Deciding Whether to Opt Out**

Nichols contends that *Eubank v. Pella Corp.* requires disclosure of his objection in the

Notice.[48] *Pella* is readily distinguishable as the court identified numerous significant defects in

the notice, none of which is present here. In *Pella*, the Seventh Circuit held the notice was

misleading because it failed to disclose that: (1) four original class representatives opposed the

settlement and were promptly replaced (whereas all of the Class Representatives here support the

Settlement); (2) the only original representative who had supported the Settlement was the

---

[44] *See Hughes*, 731 F.3d at 675-76 (reversing decertification and suggesting *cy pres* be utilized instead of a $3.57 per plaintiff recovery, explaining that "[s]ince distribution of damages to the class members would provide no meaningful relief, the best solution may be what is called (with some imprecision) a 'cy pres' decree. Such a decree awards to a charity the money that would otherwise go to the members of the class as damages, if distribution to the class members is infeasible.); *see also In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 38 (1st Cir. 2012) (affirming *cy pres* distribution for research addressing medical conditions treated by Lupron for the benefit of present and future patients); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 30 (1st Cir. 2009) (affirming *cy pres* award to charitable organizations funding cancer research); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 343 (E.D.N.Y. 2010) (approving *cy pres* award of $2.5 million to a health based nonprofit in lieu of a direct payment to class members where it was not economically feasible, the proof of individual claims would be burdensome, and the distribution of damages costly).

[45] *See* P. McCrory, *et al.*, *Consensus statement on concussion in sport: the 4th International Conference on Concussion in Sport held in Zurich, November 2012*, 47 BRIT. J. SPORTS MED. 250 (2013), *available at* http://bjsm.bmj.com/content/47/5/250.full.pdf+html ("Zurich II Protocol").

[46] Nichols' argument that because other institutions are spending money on concussion research, the Research Fund adds "no value" is also without merit. In fact, the corollary is actually true – institutions are spending money on concussion research *because* it is a worthwhile endeavor in an evolving scientific area which has and will benefit from continued research.

[47] Am.SA § IV.A.4.

[48] Nichols Opp. at 14.

- 12 -

father-in-law of the lead class counsel who was both in financial trouble and ethically challenged (whereas none of the Class Representatives here are related to Class Counsel); (3) up to half the recipients of the notice would only receive a coupon discount on a future window purchase (whereas this is not a coupon settlement); and (4) four of the original class representatives believed the notice was misleading because it implied at least a $750 or $6,000 guaranteed payment to class members (whereas the Notice here provides a clear and accurate explanation of the MMP).[49] None of the extreme facts identified in *Pella* are present here nor does *Pella* mandate that a notice identify objections. In fact, despite the fact that objections to class action settlements are common, Nichols does not provide a single example of a notice referencing an objection.

Instead, Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs." The MANUAL sets forth several elements of the "proper" content of notice.[50] The proposed Long Form Notice is clear, precise, informative, and meets these standards.[51] It also addresses Nichols' primary objection – namely, that "***unless you exclude yourself from the Settlement, you cannot file a class action lawsuit against the NCAA or its member institutions…If you do not exclude yourself…you will still have the right to file a personal injury lawsuit against the NCAA, but you will be required to do so on an individual, non-class***

---

[49] *Eubank v. Pella Corp.*, 753 F.3d 718, 728 (7th Cir. 2014).

[50] MANUAL FOR COMPLEX LITIGATION, ¶ 30.212 (3d ed. 1995); *see also*, *e.g.*, *Air Lines Stewards & Stewardesses Ass'n v. American Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process).

[51] Attached as Exhibit B to the Amended Settlement. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998). *See also* MANUAL, § 30.212 (Rule 23(e) notice designed to be only a summary of the litigation and settlement to apprise Class members of the right and opportunity to inspect the complete settlement documents, papers and pleadings filed in the litigation).

*basis*."[52] Highlighting Nichols as an objector in the Notice would not provide any additional

information that Class Members need to evaluate in deciding whether to opt out.[53] The Notice

satisfies Rule 23(e), clearly incorporating the very terms to which Nichols objects.

### III.    CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court grant their Motion For

Preliminary Approval.

Date:  June 10, 2015                                                Respectfully submitted,


                                                                   By:    */s/ Steve W. Berman*
                                                                          Steve W. Berman
                                                                   *steve@hbsslaw.com*
                                                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                                                   1918 Eighth Avenue, Suite 3300
                                                                   Seattle, WA 98101
                                                                   206.623.7292
                                                                   Fax: 206.623.0594

                                                                   Elizabeth A. Fegan
                                                                   *beth@hbsslaw.com*
                                                                   Thomas E. Ahlering
                                                                   *toma@hbsslaw.com*
                                                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                                                   455 N. Cityfront Plaza Drive, Suite 2410
                                                                   Chicago, IL 60611
                                                                   708.628.4949
                                                                   Fax: 708.628.4950

---

[52] *See* Am.SA, Ex. B, ¶ 19 (emphasis added).

[53] *See, e.g.*, *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1032-33 (N.D. Ill. 2000) ("The purpose of class notice is … to advise them of the terms of the agreement which has been reached and provide those who disapprove of those terms an opportunity to object or to opt out."), *aff'd*, 267 F.3d 743 (7th Cir. 2001).

010270-12  785871 V1

- 15 -

Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
gbarbakoff@siprut.com
Siprut PC
17 North State Street
Suite 1600
Chicago, IL  60602
312.236.0000
Fax: 312.878.1342

*Co-Lead and Settlement Class Counsel*

- 16 -

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on June 10, 2015, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: ___*/s/ Steve W. Berman*_____
Steve W. Berman