# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | MDL No. 2492<br><br>Master Docket No. 1:13-cv-09116<br><br>This Document Relates To:<br>All Cases<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

## RESPONSE OF THE NCAA TO NICHOLS' MAY 27, 2015 SUBMISSION

Date: June 22, 2015

Mark S. Mester
 mark.mester@lw.com
Johanna M. Spellman
 johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 3

    A. The Proposed Settlement Class Is Not Overbroad ............................................... 4

        1. Numerous Courts Have Certified For Settlement Nationwide Medical Monitoring Classes In Spite Of Differences In State Law ............ 4

        2. The Authorities Relied Upon By Nichols Are Inapposite .......................... 5

    B. The Continuing Reliance Of Nichols And His Counsel On The NFL Settlement Is Misplaced ....................................................................................... 6

    C. The Screening Questionnaire Benefits All Class Members .................................. 7

        1. Providing A Reliable Screening Mechanism For Concussion-Related Impairments Is A Benefit To All Members Of The Settlement Class ......................................................................................... 8

        2. There Are Good Reasons For All Portions Of The Screening Questionnaire ............................................................................................. 9

    D. Nichols And His Counsel Grossly Underestimate The Value Of The Medical Monitoring ............................................................................................. 10

    E. Nichols Could Not Adequately Represent A Bodily Injury Class ...................... 11

    F. The Settlement Provides Meaningful Injunctive Relief ...................................... 12

    G. The Settlement Properly Tolls Class Member Claims Through Final Approval ............................................................................................................. 13

III. CONCLUSION ............................................................................................................. 15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Amchem Products, Inc. v. Windsor,
 521 U.S. 591 (1997) ............................................................................................... 5, 6

American Pipe and Construction Co. v. Utah,
 414 U.S. 538 (1974) .................................................................................................. 14

Brewton v. City of Harvey,
 285 F.Supp.2d 1121 (N.D. Ill. 2003) ....................................................................... 14

Butler v. American Cable & Telephone, LLC,
 2011 U.S. Dist. LEXIS 115506 (N.D. Ill. 2011) ....................................................... 4

Crown, Cork & Seal Company, Inc. v. Parker,
 462 U.S. 345 (1983) .................................................................................................. 14

Davis v. J.P. Morgan Chase & Co.,
 775 F.Supp.2d 601 (W.D.N.Y. 2011) ........................................................................ 4

In re AT&T Mobility Wireless Data Sales Litigation,
 270 F.R.D. 330 (N.D. Ill. 2010) ................................................................................. 3

In re Diet Drugs Products Liability Litigation,
 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000) ........................................................ 4

In re Inter-Op Hip Prosthesis Liability Litigation,
 204 F.R.D. 359 (N.D. Ohio 2001) ............................................................................. 4

In re Lupron® Marketing and Sales Practices Litigation,
 228 F.R.D. 75 (D. Mass. 2005) ................................................................................. 4

In re Mexico Money Transfer Litigation,
 164 F.Supp.2d 1002 (N.D. Ill. 2000) ........................................................................ 3

In re Mexico Money Transfer Litigation,
 267 F.3d 743 (7th Cir. 2001) .................................................................................... 4

In re National Football League Players' Concussion Injury Litigation,
 2015 U.S. Dist. LEXIS 52565 (E.D. Pa. 2015) ..................................................... 6, 7

June v. Union Carbide Corporation,
 577 F.3d 1234 (10th Cir. 2009) ............................................................................... 12

Case: 1:13-cv-09116 Document #: 191 Filed: 06/22/15 Page 4 of 20 PageID #:4677

                            **Pages(s)**

Lewis v. City of Chicago, Illinois,
 702 F.3d 958 (7th Cir. 2012) ........................................................................................ 14

Potter v. Firestone Tire and Rubber Company,
 863 P.2d 795 (Cal. 1993) ............................................................................................. 12

Randall v. Rolls-Royce Corporation,
 637 F.3d 818 (7th Cir. 2011) ........................................................................................ 12

Robinson v. Sheriff of Cook County,
 167 F.3d 1155 (7th Cir. 1999) ...................................................................................... 12

Sawyer v. Atlas Heating and Sheet Metal Works, Inc.,
 642 F.3d 560 (7th Cir. 2011) ........................................................................................ 14

Sullivan v. DB Investments, Inc.,
 667 F.3d 273 (3d Cir. 2011) ..................................................................................... 5, 15

Williams v. Manchester,
 888 N.E.2d 1 (Ill. 2008) ............................................................................................... 12

Wong v. Accretive Health, Inc.,
 773 F.3d 859 (7th Cir. 2014) ..................................................................................... 3, 4

### OTHER AUTHORITIES

Raizner Slania LLP, NCAA Head Injury Concussion Litigation,
 http://www.raiznerlaw.com/ncaa-class-action-lawsuit-concussions/
 (last visited June 22, 2015) ............................................................................................ 8

The Driscoll Firm, P.C., NCAA Concussions,
 http://www.ispot.tv/ad/7TRq/the-driscoll-firm-ncaa-concussions
 (last visited June 22, 2015) ............................................................................................ 9

William B. Rubenstein, Newberg on Class Actions § 13:13 (5th ed.) ........................................ 3

Defendant National Collegiate Athletic Association ("NCAA") respectfully submits the following response to the May 27, 2015 submission of Plaintiff Anthony Nichols ("Nichols"):[1]

## I. INTRODUCTION[2]

Tacitly acknowledging the enormous manageability problems that would be posed by trying to actually litigate these cases on a class basis, Nichols and his counsel point in their May 27, 2015 submission to alleged conflicts between members of the Settlement Class, suggesting the purported need for numerous subclasses and separate class counsel for various types of claims. Nichols and his counsel make these claims in a quixotic effort to derail settlement and put this proceeding back into active litigation, even though the arguments they make would strongly suggest that manageability problems alone would preclude class treatment and leave Nichols and the Settlement Class in a much worse position with no settlement to be had. Apart from what the issues raised by Nichols and his counsel would portend for the certification of any class on a contested basis, however, the allegations made by Nichols in his May 27, 2015 submission are otherwise largely illusory and seem designed to distract from two fundamental facts: (1) Nichols and his counsel are simply unable to demonstrate that the Amended Settlement Agreement does not meet the standard for preliminary approval; and (2) Nichols and his counsel are scarcely in a position to complain of conflicts of interest.

As addressed in detail below, the Amended Settlement Agreement readily meets the governing standard for preliminary approval, and little or nothing in Nichols' May 27, 2015 submission would suggest otherwise. Indeed, the bulk of the arguments being made by Nichols

---

[1] On June 10, 2015, Class Counsel submitted a separate response to the submission made by Nichols and his counsel on May 27, 2015. The NCAA, however, does not wish to unnecessarily burden the Court with unduly duplicative responses. Accordingly, we address below the issues raised by Nichols and his counsel that were allocated to the NCAA. See Pls.' Corrected Response to Nichols' First Objections (Dkt. #187) at 1 n.3.

[2] Capitalized terms have the meaning ascribed to them in the Amended Settlement Agreement, which itself is Exhibit 1 to the joint motion for preliminary approval filed with the Court on April 14, 2015. See Am. Settlement Agt. (Dkt. #154-1) (hereinafter cited as the "ASA").

are properly considered in the context of final approval, and the continuing efforts of Nichols and his counsel to conflate the separate and distinct standards for preliminary and final approval of a class settlement in order to avoid providing notice to the Settlement Class seem misguided at best.  On the issue now before the Court, however, namely preliminary approval, the operative standard is clear, and Nichols and his counsel offer no reason why notice should not be provided to the Settlement Class, let alone why the Court should not have the benefit of hearing from more members of the Settlement Class other than the same one or two over and over again.

Moreover, the broader implications of the arguments made by Nichols and his counsel should not be obscured by the stridency of their arguments.  While quick to question the adequacy of Class Counsel, Nichols and his counsel are nevertheless asking the Court to scuttle the Settlement <u>before</u> members of the Settlement Class as a whole have been provided notice and an opportunity to comment on it themselves.  Nichols and his counsel are pursuing this course in the hope they may be able to pursue a classwide bodily injury claim that Class Counsel determined was not viable after <u>extensive</u> discovery on the underlying claims.

The likelihood of certification of a bodily injury claim under Fed. R. Civ. P. 23(b)(3) is, of course, the subject of separate briefing currently underway.  For present purposes, however, it is important to note that Nichols himself is by no means representative of members of the Settlement Class who might actually have a viable bodily injury claim.  Quite to the contrary, Nichols is by his own admission at worst asymptomatic, and under most governing law, he would have no viable claim for bodily injury unless and until symptoms actually arise.  No doubt Nichols and his counsel hope that they could leverage a classwide bodily injury claim into some recovery for Nichols in spite of the infirmities in his individual claim, but that would obviously be a misuse of the class device and is plainly not a reason to eliminate any possibility of settlement by foregoing an existing agreement that would benefit the <u>entire</u> Settlement Class.

## II.     ARGUMENT

As noted, the standard for preliminary approval is well-established in this district and circuit, and it is largely ignored by Nichols and his counsel:

> District court review of a class action settlement proposal is a two-step process. The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is within the range of possible approval. This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. If the district court finds a settlement proposal within the range of possible approval, it then proceeds to the second step in the review process, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard.

In re AT&T Mobility, 270 F.R.D. 330, 346 (N.D. Ill. 2010).[3] It is equally well-established that "the standard that governs the preliminary approval inquiry is less demanding than the standard that applies at the final approval phase." Newberg on Class Actions § 13:13 (5th ed.).

Through preliminary approval, a court allows notice to be provided to the class, and the reaction of class members through objections and opt-outs then plays an important role in the final approval process. See, e.g., Wong v. Accretive Health, 773 F.3d 859, 863 (7th Cir. 2014) (noting "the amount of opposition to the settlement" and "the reaction of members of the class to the settlement" as factors in final approval). Indeed, the reaction of the class to a proposed settlement often plays a critical role in the approval process, and there is no valid reason to allow Nichols and his counsel to speculate as to what that reaction might be (as they are otherwise wont to do), especially given the conflicting interests of Nichols and his counsel relative to the rest of the Settlement Class. See, e.g., In re Mexico Money, 164 F.Supp.2d 1002, 1020-21 (N.D. Ill. 2000) (considering number and nature of objections and opt-outs when evaluating fairness of proposed class settlement); see also disc infra at 11-12 (addressing conflicts issue). The Amended Settlement Agreement clearly falls well "within the range of possible approval," and

---

[3]   Unless stated otherwise, all emphasis is supplied and all internal citations, quotations and footnotes are omitted from any quoted material.

3

Nichols' purported concerns are best addressed at a fairness hearing, once the Settlement Class as a whole has had an opportunity to fully evaluate the Amended Settlement Agreement and react to it. See Butler v. Am. Cable, 2011 U.S. Dist. LEXIS 115506, *28-30 (N.D. Ill. 2011); Wong, 773 F.3d at 863.

### A. The Proposed Settlement Class Is Not Overbroad

Relying on the settlement in the NFL concussion litigation, Nichols asserts that the scope of the Settlement Class purportedly creates conflicts between class members. See Nichols Obj. (Dkt. #183) at 2-7. Among other things, Nichols suggests that a conflict exists between members of the Settlement Class depending upon whether or not they come from states that recognize medical monitoring. See id. at 6-7. This claim, however, ignores precedents and confuses the nature of this Settlement with the NFL settlement. See disc. infra at 6-7.

#### 1. Numerous Courts Have Certified For Settlement Nationwide Medical Monitoring Classes In Spite Of Differences In State Law

The claims of Nichols notwithstanding, federal courts around the country routinely certify for settlement nationwide classes in which the principal relief is medical monitoring, in spite of the differences in state law to which Nichols and his counsel allude. See, e.g., In re Diet Drugs, 2000 U.S. Dist. LEXIS 12275, *207 (E.D. Pa. 2000) (approving nationwide medical monitoring settlement); In re Inter-Op Hip Prosthesis, 204 F.R.D. 359, 388 (N.D. Ohio 2001) (same). Furthermore, the Seventh Circuit and other courts have held that in the settlement context, variations in state law do not raise the kinds of manageability concerns that can preclude certification of a contested class. See, e.g., In re Mexico Money, 267 F.3d 743, 746-47 (7th Cir. 2001) (state law variations are less important in the settlement context where "no one need draw fine lines among state-law theories of relief"); Davis v. J.P. Morgan, 775 F.Supp.2d 601, 609 (W.D.N.Y. 2011) ("[S]tate-law distinctions impact trial manageability, which is principally with respect to litigation at trial."); In re Lupron, 228 F.R.D. 75, 92 (D. Mass. 2005) (same).

4

## 2. The Authorities Relied Upon By Nichols Are Inapposite

Nichols nonetheless relies on a Third Circuit dissent and a ten-year-old law review article in suggesting that the fact some states do not recognize medical monitoring as a cause of action somehow creates irreconcilable conflicts. See Nichols Obj. at 7. In Sullivan v. DB Invs., 667 F.3d 273 (3d Cir. 2011), however, an en banc panel of the Third Circuit rejected the very argument Nichols tries to advance, holding that variations in state law did not preclude certification of a settlement class and noting it could "find no persuasive authority for deeming the certification of a class for settlement purposes improper based on differences in state law." Id. at 304. Recognizing that variations in state law might mean some settlement class members could not state a valid claim, the Third Circuit nonetheless rejected the notion that a district court must "undertak[e] the scrupulous review of state laws" in the settlement context. Id. at 308-09. To the contrary, such an inquiry into the merits would exceed the requirements of Fed. R. Civ. P. 23 and would "effectively rule out the ability of a defendant to achieve 'global peace' by obtaining releases from all those who might wish to assert claims, meritorious or not." Id. at 310. As such, the variations in state law on which Nichols relies simply do not preclude certification of the Settlement Class. See, e.g., id. at 304 ("[W]hile we are cognizant of our responsibility to protect absentees by blocking unwarranted or overbroad class definitions, state law variations are largely irrelevant to certification of a settlement class.").[4]

---

[4] The further suggestion by Nichols that the Settlement Class is conflicted because not every member may have had a concussion while participating in interscholastic sports is doubly ironic. See Nichols Obj. at 7. First, every member of the Settlement Class is entitled to complete a Screening Questionnaire, and for individuals who are unsure of whether they may have experienced a concussion or whether their participation in interscholastic sports may warrant medical monitoring, the availability of the Screening Questionnaire would be a valuable benefit, providing an economical and efficient means of achieving peace of mind. See disc. infra at 7-9. Second, the presence of uninjured class members would be especially problematic for the bodily injury class that Mr. Nichols is otherwise advocating. See, e.g., Amchem v. Windsor, 521 U.S. 591, 626 (1997) ("Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.").

## B.   The Continuing Reliance Of Nichols And His Counsel On The NFL Settlement Is Misplaced

Throughout their May 27, 2015 submission, Nichols and his counsel repeatedly rely upon the approval by Judge Anita B. Brody of the settlement in the NFL concussion litigation.  See Nichols Obj. at 3-5, 10.  In particular, Nichols cites Judge Brody's opinion in arguing here for subclasses and separate counsel for each.  See id. at 4-5.  What Nichols ignores, however, is that the scope of relief in this Settlement was tailored to avoid conflicts of interest, whereas the relief provided in the NFL settlement and the decisions that had to be undertaken as to "who got what" made conflicts of interest inevitable and perhaps ultimately irreconcilable, Judge Brody's opinion notwithstanding.  Compare ASA at §§ II(D), IV (benefits of Settlement provided to all members of Settlement Class), with In re NFL, 2015 U.S. Dist. LEXIS 52565, *28-34 (E.D. Pa. 2015) (granting final approval of a settlement that provides monetary compensation pursuant to a pre-determined formula).  But see, e.g., Amchem, 521 U.S. at 627 ("[T]he terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability[.]").  As such, the procedural safeguards that had to be adopted in the NFL settlement to address the many conflicts of interest created by the broad scope of that settlement are scarcely a template for this Settlement.[5]

The Amended Settlement Agreement does not place any limits whatsoever on the ability of class members to pursue bodily injury claims nor does it place dollar value caps on what any class member could recover on any such claim.[6]  See ASA at § II(NN) (excluding bodily injury

---

[5]   There are, of course, many other distinguishing features between this Settlement and the NFL settlement and even more distinguishing features between that litigation and this Litigation.  Compare, e.g., In re NFL, 2015 U.S. Dist. LEXIS 52565, *99 ("The claims of over 20,000 [former football players] are at issue."), with Deal Rpt. (Dkt. #170) at ¶ 28 ("[T]he class population comprises 4.4 million . . . student-athletes in all NCAA-sanctioned sports.").  Most critically, Judge Brody did not have to consider the manageability of the settlement class in the NFL litigation, whereas manageability would be a significant impediment to certification of the bodily injury claims being proposed by Nichols and his counsel, as their May 27, 2015 submission makes clear.  See Nichols Obj. at 3-7.

[6]   In contrast, the NFL settlement imposes a broad release, barring the pursuit of any claims for bodily injury, and the NFL settlement likewise places monetary caps on what any class member

(continued...)

6

claims from scope of Release). Instead, all members of the Settlement Class are treated the same, and the scope of the Release is comparatively narrow, addressing only medical monitoring, which is, of course, the very thing provided by the Settlement to all members. See id.; see also id. at §§ IV, IX, X (detailing relief provided to entire Settlement Class). Accordingly, the Amended Settlement Agreement does not differentiate between members of the Settlement Class or provide greater benefits to some and not others, and thus, the procedural mechanisms required in the NFL settlement to address the differential benefits available to class members are not necessary here. See, e.g., id. But see In re NFL, 2015 U.S. Dist. LEXIS 52565, *61-63 (explaining divergent interests that necessitated procedural protections).

### C. The Screening Questionnaire Benefits All Class Members

Nichols further claims that the Screening Questionnaire is somehow designed to discourage class members from seeking a medical evaluation. See Nichols Obj. at 9-10. This claim, however, is bereft of any credible support and otherwise counterfactual on its face. See disc. infra at 7-9. The Medical Science Committee ("MSC") designed the Screening Questionnaire over the course of four months and through extensive efforts of the members of the MSC itself. See MSC Rpt. (Dkt. #159) at § 3. The members of the MSC are, in turn, among the nation's leading experts in neurology and neuropsychology. See MSC Bios, Ex. A hereto. All told, members of the MSC have a collective 134 years of relevant experience, are nationally-recognized experts in the field and have published hundreds of articles on head trauma. See id. Accordingly, the assertion by Nichols that the members of the MSC, who have devoted their professional careers to the diagnosis and treatment of head trauma, are incapable of constructing

---

(...continued)
can receive for any form of bodily injury, through a complex and controversial framework that provides little monetary relief for some conditions and more for others, with yet other factors reducing available compensation (e.g., age, unrelated traumatic brain injury, stroke, length of NFL career, etc.). See In re NFL, 2015 U.S. Dist. LEXIS 52565, *149-76. It is notable, however, that the NFL settlement provides no monetary compensation whatsoever for asymptomatic persons like Mr. Nichols. See id. at *26-39.

7

an appropriate questionnaire that will allow for the determination of whether members of the Settlement Class should have further diagnosis and treatment is threadbare, but the further suggestion that they designed the Screening Questionnaire to deter claims borders on the offensive.[7] The Screening Questionnaire was designed by noted experts to assist (not hinder) members of the Settlement Class, and it represents an efficient and effective mechanism for members of the Settlement Class to determine whether they would benefit from further diagnosis and treatment. See MSC Rpt. at ¶¶ 14-20; Andersen Decl. (Dkt. #158) at ¶¶ 7, 15-16.

### 1. Providing A Reliable Screening Mechanism For Concussion-Related Impairments Is A Benefit To <u>All</u> Members Of The Settlement Class

Although Nichols portrays the Screening Questionnaire as an impediment to obtaining a benefit under the Settlement, the Screening Questionnaire is actually a benefit in and of itself. See ASA at § IV.B.4.g. Any Class Member who believes that he or she may be suffering from the effects of a sports-related head trauma can complete the Screening Questionnaire and obtain insight into their current cognitive functionality. See id. at § IV(B)(4). Indeed, "[a] substantial and mature body of literature from the clinical and research setting" supports the use of questionnaires to identify "clinically significant symptomology." See MSC Rpt. at ¶¶ 16-17.

Nichols, of course, fails to provide <u>any</u> expert opinion to the contrary, but there is no legitimate dispute that the publicity surrounding this and other concussion litigation has created uncertainty and anxiety regarding the risk of concussion among persons participating in many different sports.[8] The Screening Questionnaire, however, was designed by leading experts as an

---

[7] Notably, Nichols and his counsel are quick to cast aspersions on the efforts of the MSC, but they offer <u>nothing</u> in the way of actual expert opinion with regard to the Screening Questionnaire or other matters, apparently hoping to substitute rhetoric for well-founded medical opinion and demonstrated expertise. See Nichols Obj. at 10 n.10 (attacking the MSC's work product). But see id. at passim (advancing no alternative expert opinion).

[8] A quick search on Google reveals many ads by lawyers trolling for prospective clients with concussion-related claims, with the websites of these lawyers containing considerable amounts of misinformation. See, e.g., Raizner Slania LLP, NCAA Head Injury Concussion Litigation, http://www.raiznerlaw.com/ncaa-class-action-lawsuit-concussions/ (last visited June 22, 2015) (inaccurately claiming that "[h]aving 'your bell rung' . . . too often results in permanent

(continued...)

economical and effective means of allowing members of the Settlement Class to learn whether they in fact are at greater risk of neurologic disease, such that they should receive further evaluation.[9] See MSC Rpt. at ¶¶ 3-21, 26.

### 2. There Are Good Reasons For All Portions Of The Screening Questionnaire

Nichols further objects to the "History" section of the Screening Questionnaire, asserting that -- in his lay opinion -- requiring individuals to complete this section "doesn't make any sense at all." Nichols Obj. at 10 n.9. Including these background questions, however, is consistent with the standard of care and serves two important functions. First, as explained in the MSC's April 14, 2015 report, the information provided "will be important in determining risk factors for later life clinical symptoms and will be made available to clinicians conducting the in-person Medical Evaluation if the Class Member receives one." See MSC Rpt. at ¶ 5. Second, including these questions in the Screening Questionnaire will make the Medical Evaluations more efficient. See id. at ¶ 25 ("[T]he results from the questionnaire-based screening will be provided electronically to the clinician to be incorporated into the examination[.]").[10]

---

(...continued)
consequences" and, generally, that the NCAA "remains silent on the issue of player safety"). Late-night television does likewise. See, e.g., The Driscoll Firm, P.C., NCAA Concussions, http://www.ispot.tv/ad/7TRq/the-driscoll-firm-ncaa-concussions (last visited June 22, 2015).

[9] Nichols selectively quotes from the report of Bruce Deal that "the effort required to fill out the Questionnaire will itself serve as a deterrent[.]" Deal Rpt. at ¶ 76. Nichols omits, however, the remainder of that sentence, in which Mr. Deal makes clear the Screening Questionnaire will deter "people who are not sufficiently motivated - which will largely correlate with being diseased and having a history of symptoms since college athletic participation." Id. That is, the Screening Questionnaire will ensure that Class Members who need medical monitoring receive it, while preserving the Fund for those who actually need medical monitoring. See id. at ¶ 77 ("The aim of the Screening Questionnaire is to limit tests to appropriate subjects, while minimizing the number of appropriate subjects who are ruled ineligible for a test.").

[10] In its December 17, 2014 Memorandum Opinion and Order, the Court expressed concern regarding the length of the Medical Evaluations. See Dec. 17, 2014 Mem. Op. and Order (Dkt. #115) at 18-19. Collecting background information in the Screening Questionnaire, however, and providing it to the clinician conducting the in-person Medical Evaluation will obviously help shorten the length of these evaluations. See MSC Rpt. at ¶ 25.

### D. Nichols And His Counsel Grossly Underestimate The Value Of The Medical Monitoring

Nichols also criticizes the Medical Evaluation, because a Qualifying Class Member purportedly may be able to obtain the same tests from his or her "own doctor" at the supposed cost of a $40 co-pay. See Nichols Obj. at 10. As with Nichols' other claims, however, this one is long on speculation and short on substance. See disc. infra at 10-11. First, there is no assurance that the health insurance of a member of the Settlement Class would cover the detailed neurological examination, neuropsychological examination and mood and behavioral evaluations that will be part of each Medical Evaluation. See MSC Rpt. at ¶¶ 21-26. Second, the personal physician of a member clearly may not have the expertise required to administer these examinations. In selecting the initial 33 Program Locations, the MSC and the Garretson Group identified geographic areas that will "best support enrollment of quality providers (both neurologists and neuropsychologists) with the requisite education, skill, and experience to perform Medical Evaluations properly." Mem. in Supp. of Mot. for Prelim. Approval. (Dkt. #156) at 8. Under the Amended Settlement Agreement, the MSC will issue a request for proposals to institutions and providers after preliminary approval, requesting bids to provide Medical Evaluations. See ASA at § IV(B)(1)(a). The MSC will then evaluate the bids received and select providers that have the demonstrated ability to comply with the standard of care and the MSC's credentialing criteria. See id. at § IV(B)(1)(b); Garretson Rpt. (Dkt. #161) at ¶ 30. Moreover, the MSC will prepare a written protocol for how Medical Evaluations are to be conducted, drawing on the considerable expertise of the members of the MSC and ensuring uniformity in all Medical Evaluations to be provided. See MSC Rpt. at ¶¶ 21-26.

In short, Qualifying Class Members will receive free examinations performed pursuant to established protocols designed by some of the foremost experts in the field of sports-related head trauma and administered by physicians with relevant credentials and experience. To suggest as Nichols does, however, that the monitoring and evaluations contemplated by the Amended

Settlement Agreement could be easily replicated by any personal physician of any member of the Settlement Class simply ignores reality. The Medical Evaluations provide a real benefit to the members of the Settlement Class, and that benefit is not readily obtainable (if at all) outside the context of this Settlement.[11] See MSC Rpt. at passim; Andersen Decl. at ¶¶ 7, 15-16.

### E. Nichols Could Not Adequately Represent A Bodily Injury Class

Although Nichols devotes much of his submission to the adequacy of Plaintiffs and Class Counsel, there are real questions as to whether Nichols himself could adequately represent the bodily injury class with which he otherwise seems so preoccupied. See Nichols Obj. at 1. Nichols has not alleged any impairment or disease associated with concussions that occurred as an NCAA athlete but, instead, claims only to have "brain calcifications" which "may have been caused by the brain trauma he sustained during his time playing football" and as a result of which places him at "an increased risk of developing latent brain injuries or future neurodegenerative disorders." See Compl., Nichols v. NCAA, No. 1:14-cv-00962 (N.D. Ill.) (Dkt. #1) at ¶¶ 34-40. Calcifications, however, are commonly seen in the human brain and, depending on location, size and other characteristics, may be normal findings. See Ex. B hereto at 427. They can be associated with age, infections, vascular disease, tumors, metabolic disorders or other conditions but are not themselves physical injury; at most, they are only potential precursors of actual symptoms that may or may not develop in the future. See id. at 427-49.

Without present physical injury, Nichols would be unable to state a claim for bodily injury under the law of most states. See, e.g., Williams v. Manchester, 888 N.E.2d 1, 13 (Ill.

---

[11] Nichols asserts that "neither [the Screening Questionnaire nor the Screening Algorithm] would survive a Daubert analysis." See Nichols Obj. at 10 n.10. He cites no authority, however, for the notion that the Court must perform a Daubert analysis as part of the settlement approval process. Nevertheless, should the Court wish to hear from the MSC regarding the medical bases supporting the Screening Questionnaire and Medical Evaluation, the Parties can certainly make members of the MSC available, and if Nichols and his counsel have any medical experts to support what would otherwise seem to be nothing more than rank speculation on their part, they can, of course, present those opinions and that testing as well.

2008) ("[A]n increased risk of future harm is an element of damages that can be recovered for a present injury -- it is not the injury itself[.]"); June v. Union Carbide, 577 F.3d 1234, 1249 (10th Cir. 2009) ("DNA damage and cell death, which creates only a possibility of clinical disease, does not constitute a 'bodily injury' under the [applicable statute]."); see also Potter v. Firestone, 863 P.2d 795, 806 n.8 (Cal. 1993). While calcification might provide a basis for medical monitoring, the Settlement obviously provides that relief, and indeed, the Settlement is designed to provide persons like Nichols with a comprehensive evaluation of their current medical condition at no cost to them. See MSC Rpt. at passim; Andersen Decl. at ¶¶ 7, 15-16. Without symptoms, however, and unlikely to be able to maintain a claim for bodily injury, Nichols would scarcely be an adequate representative of a bodily injury class, only further highlighting why his claims concerning adequacy are misplaced. See, e.g., Robinson v. Sheriff of Cook Cty., 167 F.3d 1155, 1157 (7th Cir. 1999) ("[I]f when class certification is sought it is already apparent . . . that the class representative's claim is extremely weak, this is an independent reason to doubt the adequacy of his representation[.]"); Randall v. Rolls-Royce, 637 F.3d 818 (7th Cir. 2011).[12]

### F. The Settlement Provides Meaningful Injunctive Relief

In his May 27, 2015 submission, Nichols incorrectly asserts that the Amended Settlement Agreement provides Class Members with "nothing because the NCAA has already promulgated the same guidelines the Settlement purports to secure." Nichols Obj. at 11. This claim by Nichols and his counsel has been repeated time and time again, but it is no more true now than it was when first made. See disc. infra at 12-13. In fact, the Amended Settlement Agreement includes new concussion management guidelines that provide meaningful relief. See ASA at

---

[12] In contrast to Mr. Nichols, who previously played one sport (football) at one NCAA member institution and is now asymptomatic, Class Counsel represent sixteen current and former student-athletes who span a broad range of sports and who likewise span a broad range of alleged effects from participating in intercollegiate sports. See Fourth Am. Compl. (Dkt. #171) at ¶¶ 21-151. Several Plaintiffs appear to be asymptomatic, like Mr. Nichols, whereas others have alleged direct symptoms and are seeking damages for their individual bodily injury claims. See id.

§ IX. Among other things, the Amended Settlement Agreement requires all NCAA member institutions to implement baseline testing on an annual basis for all student-athletes, and it is now recognized that baseline testing is critical to concussion management.[13] See Cantu Rpt. at ¶¶ 47-50. The Amended Settlement Agreement also requires NCAA member institutions to provide increased access to medical personnel, calling for "medical personnel with training in the diagnosis, treatment and management of concussion" to be present at specified events in all divisions. See ASA at §§ IX.A.4-5.[14] As suggested by the Court, however, the Amended Settlement Agreement also now encourages compliance with the Settlement's injunctive relief provisions by limiting the scope of the Release. See id. at §§ IX.C-D. Only member institutions that certify in writing they have put in place a concussion management plan that satisfies the requirements of Amended Settlement Agreement Section IX(B) are "Released Parties."[15] See id.

### G. The Settlement Properly Tolls Class Member Claims Through Final Approval

Finally, Nichols argues that the Amended Settlement Agreement prematurely terminates the tolling of the appropriate limitations period on Class Members' claims. See Nichols Obj. at 13-14. The Amended Settlement Agreement, however, expressly provides that all claims initially asserted in Arrington (including claims that would not remain tolled but for the Settlement)

---

[13] Nor is the cost of annual baseline testing, which is not currently required, trivial. It is estimated that annual baseline testing will cost between $500,000 and $1,000,000 per year at current rates.

[14] In addition, the NCAA will create a reporting process "through which member institutions will report to the NCAA instances of diagnosed concussions in NCAA student-athletes and their resolution" and "through which third parties, such as NCAA student-athletes and/or their parents, can report concerns about concussion management issues to the NCAA." ASA at §§ IX.E-F.

[15] Oddly, Nichols argues that the injunctive relief called for by the Settlement will somehow hurt student-athletes, because "many NCAA member institutions have advanced their concussion protocols beyond what the Settlement requires." Nichols Obj. at 11. This, however, makes little sense. The Amended Settlement Agreement's return-to-play guidelines will benefit student-athletes at all NCAA member institutions. Member institutions, however, certainly remain free to implement additional practices to safeguard student-athlete health and safety, as they see fit. The injunctive relief called for by the Settlement simply builds on existing NCAA guidelines and requires implementation of existing and new guidelines at all member institutions in all three divisions, which is and will be a meaningful benefit to the Settlement Class. See ASA at § IX.

13

remain tolled until "the Court has ruled on the Motion for Final Approval filed by Class Counsel of this Settlement." See ASA at § XX.S. The Amended Settlement Agreement further provides that medical monitoring claims will remain tolled throughout the fifty-year Medical Monitoring Period. See id. at § IV.A.5. This tolling is fully consistent with Supreme Court and Seventh Circuit precedent. See, e.g., Lewis v. Chicago, 702 F.3d 958, 961 (7th Cir. 2012).

Under the doctrine first enunciated by the Supreme Court in American Pipe, a class action suspends the applicable statutes of limitation for absent members of the proposed class. See American Pipe v. Utah, 414 U.S. 538, 554 (1974). When class allegations are dismissed or withdrawn, however, or a motion for certification of those claims is denied, the tolling period under American Pipe ends, and all applicable statutes of limitations begin running again. See, e.g., Crown, Cork & Seal v. Parker, 462 U.S. 345, 354 (1983); Lewis, 702 F.3d at 961.

In this instance, the tolling for bodily injury claims ceased when Class Counsel made clear they no longer planned to pursue those claims on a class basis. See, e.g., Sawyer v. Atlas Heating, 642 F.3d 560, 563 (7th Cir. 2011) ("Tolling lasts from the day a class claim is asserted until the day the suit is conclusively not a class action -- which may be because the judge rules adversely to the plaintiff, or because the plaintiff reads the handwriting on the wall and decides not to throw good money after bad."). Nichols nevertheless cites Brewton v. Harvey, 285 F.Supp.2d 1121 (N.D. Ill. 2003), for the proposition that tolling must extend through the Effective Date, but Brewton is inapposite. That case involved a "pattern or practice" employment discrimination lawsuit. The court certified a class, and defendants then defeated the class pattern or practice claim at trial. See Brewton, 285 F.Supp.2d at 1126. The court in Brewton subsequently held that class members' claims were properly tolled after certification of a class until a "final adverse determination" of the class claims. Id.

In this case, however, a final determination will occur when the Court decides whether to grant final approval of the Settlement. See Lewis, 702 F.3d at 961. Moreover, the Settlement's

14

tolling provisions are fully consistent with Supreme Court and Seventh Circuit precedent, neither of which require tolling past the Final Approval date (or for that matter any extension of the tolling period provided by American Pipe), and the agreement of the NCAA in the Amended Settlement Agreement to extend tolling of all applicable statutes of limitation up to the date of a decision on final approval provides a valuable benefit to members of the Settlement Class who may wish to file an individual suit, since the tolling on the claims of those individuals would otherwise have ended some time ago. See Third Am. Compl. (Dkt. #119) at Req. for Relief (not seeking damages on behalf of a proposed class).[16]

### III. CONCLUSION

For the foregoing reasons, the NCAA respectfully requests that this Court grant the joint motion for preliminary approval filed on April 14, 2015 and enter all orders requested therein.

Dated: June 22, 2015

Respectfully submitted,

/s/ Mark S. Mester
Lead Counsel for Defendant
National Collegiate Athletic Association

Mark S. Mester
  mark.mester@lw.com
Johanna M. Spellman
  johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

---

[16] At a fundamental level, Nichols' claims regarding tolling are very similar to many of his other claims. He and his counsel are basically saying that the Settlement is somehow unworthy of approval because Class Counsel could have theoretically gotten even more in terms of tolling than they already did. See Nichols Obj. at 13-14. This, however, can never be the standard for the assessment of any settlement, particularly a class settlement that provides $75 million in relief and other valuable benefits. See, e.g., Sullivan, 667 F.3d at 324 ("[T]he court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution[.]").

15

## **CERTIFICATE OF SERVICE**

  I, Mark S. Mester, certify that on June 22, 2015, a true and correct copy of the foregoing Response of the NCAA to Nichols' May 27, 2015 Submission was filed through the ECF system and served upon the following parties by prepaid first class mail:

| | |
|---|---|
| Timothy J. McIlwain<br>TIMOTHY J. MCILWAIN, ATTORNEY AT LAW, LLC<br>89 River Street #1538<br>Hoboken, NJ 07030<br>Telephone:  877-375-9599<br>Facsimile:  609-450-7017 | Edgar D. Gankendorff<br>PROVOSTY & GANKENDORFF, L.L.C.<br>650 Poydras Street, Suite 2700<br>New Orleans, LA 70130<br>Telephone:  504-410-2795<br>Facsimile:  504-410-2796 |
| Elizabeth J. Cabraser<br>LIEFF CABRASER HEIMANN & BERNSTEIN<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111<br>Telephone:  415-956-1000<br>Facsimile:  415-956-1008 | |

          /s/ Mark S. Mester
          Mark S. Mester
           mark.mester@lw.com
          LATHAM & WATKINS LLP
          330 North Wabash Avenue, Suite 2800
          Chicago, Illinois 60611
          Telephone:  (312) 876-7700
          Facsimile:  (312) 993-9767