**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| | **MDL No. 2492** |
| | |
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | **Master Docket No. 1:13-cv-09116** |
| | **This Documents Relates To:** <br> **All Cases** |
| | **Judge John Z. Lee** |
| | **Magistrate Judge Geraldine Soat Brown** |

## NICHOLS' SECOND OBJECTIONS TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

### Respectfully submitted by:

Jay Edelson
Rafey S. Balabanian
Ari J. Scharg
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

| | | |
|---|---|---|
| Brian W. Coffman | Richard R. Gordon | Steven K. Mamat |
| COFFMAN LAW OFFICES | GORDON LAW OFFICES, Ltd. | STEVEN MAMAT, PLLC |
| 2615 North Sheffield Avenue | 211 West Wacker Drive, Suite | 302 S. Main St., Suite 202 |
| Chicago, Illinois 60614 | Chicago, Illinois 60606 | Royal Oak, Michigan 48067 |
| | | |
| Jeffrey L. Raizner | Samuel M. Lasser | John J. Driscoll |
| RAIZNER SLANIA LLP | LAW OFFICE OF SAMUEL LASSER | THE DRISCOLL FIRM, P.C. |
| 2402 Dunlavy Street | 1934 Divisadero St. | 211 N. Broadway |
| Houston, Texas 77006 | San Francisco, California 94115 | St. Louis, Missouri 63102 |

## TABLE OF CONTENTS

I.      **INTRODUCTION**................................................................................................1

II.    **FACTUAL BACKGROUND**.............................................................................3

      A.    **As the Central Governing Body for Collegiate Sports At All Member Institutions, the NCAA Controls, Regulates, and Provides Institutional Guidance for Every Aspect of College Sports**...................................................3

      B.    **The NCAA Has Assumed a Duty to Protect and Safeguard Student-Athletes**........................................................................................4

      C.    **The NCAA Has Long-Recognized That Concussion Management Is a Core Part of Its Duty to Protect Student-Athletes**......................................6

      D.    **An International Consensus Reached in 2002 Firmly Established the Standard of Care for Concussion Management**................................................7

      E.    **Since At Least 2002, the NCAA's Concussion Policies Have Not Met the Accepted Standard of Care**................................................................10

      F.    **The NCAA's Failure to Meet the Standard of Care Damaged the Personal Injury Class Members.**..........................................................13

III.    **ARGUMENT**.....................................................................................................14

      A.    **The NFL Order Demonstrates That a Rule 23(b)(3) Class of Current and Former NCAA Athletes with Present Concussion-Related Injuries Is Certifiable.**...........................................................................14

          1.    *The PI Class satisfies Rule 23(a)'s four requirements.*.............................15

               a.    Numerosity.......................................................................15

               b.    Commonality....................................................................16

               c.    Typicality........................................................................18

               d.    Adequacy of Representation.........................................18

          2.    *The PI Class satisfies Rule 23(b)(3)'s predominance and superiority requirements.*.........................................................................20

               a.    Judge Brody's analysis shows that common issues would predominate PI class members' personal injury claims.................20

i

b. Judge Brody's order supports that, here, class-wide adjudication of personal injury claims is superior to individual litigation ........................................................................................25

c. Any manageability concerns relating to the class-wide treatment of personal injury claims are addressable .....................26

**B.** **A "Core Issues" Class Is Certifiable Under Rule 23(c)(4)** .............................30

1. *The Core Issues Class satisfies Rule 23(a)'s four requirements* ..............31

2. *The Core Issues Class satisfies Rule 23(b)(3)'s predominance and superiority requirements, while avoiding manageability concerns.* ..........33

**IV.** **CONCLUSION** ........................................................................................35

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Amchem Products v. Windsor,*
    521 U.S. 591 (1997) ................................................................................. *passim*

*Wal-Mart Stores Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ....................................................................................16

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ..........................................................................18

*Bieneman v. City of Chicago,*
    864 F.2d 463 (7th Cir. 1988) ..........................................................................19

*Bouaphakeo v. Tyson Foods, Inc.,*
    765 F.3d 791 (8th Cir. 2014), .........................................................................28

*Butler v. Sears, Roebuck & Co.,*
    727 F.3d 796, 801 (7th Cir. 2013) ..............................................20, 23, 24, 27

*Carnegie v. Household Int'l, Inc.,*
    376 F.3d 656 (7th Cir. 2004) .......................................... 20, 26, 27, 31

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) ............................................................................31

*De La Fuente v. Stokely-Van Camp, Inc.,*
    713 F.2d 225 (7th Cir. 1983) ....................................................................18, 32

*Espenscheid v. DirectSat USA, LLC,*
    705 F.3d 770 (7th Cir. 2013) ..........................................................................15

*Hilao v. Estate of Marcos,*
    103 F.3d 767 (9th Cir. 1996) .....................................................................28, 29

*In re IKO Roofing Shingle Products Liab. Litig.,*
    757 F.3d 599 (7th Cir. 2014) .....................................................23, 24, 27

*In re Sch. Asbestos Litig.,*
    789 F.2d 996 (3d. Cir. 1986) ..........................................................................22

*Kartman v. State Farm Mut. Auto Ins. Co.*,
    634 F.3d 883 (7th Cir.2011) ...................................................................................27

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ...........................................................................18, 32

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012) ...........................................................................30, 34

*Mejdrech v. Met-Coil Sys. Corp.*,
    319 F.3d 910 (7th Cir. 2003) ...................................................................................27

*Messner v. Northshore University Health System*,
    669 F. 3d 802 (7th Cir. 2012) ...................................................................................20

*Mirfasihi v. Fleet Mortgage Corp.*,
    356 F.3d 781 (7th Cir. 2004) ...................................................................................19

*Mullen v. Treasure Chest Casino, LLC*,
    186 F.3d 620 (5th Cir. 1999) ...................................................................................29

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ...................................................................................20

*Pella Corp. v. Saltzman*,
    606 F.3d 391 (7th Cir. 2010) ...........................................................................24, 27

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ...........................................................................25, 26

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ...................................................................................20

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ...................................................................................19

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ...................................................................................17

**UNITED STATES DISTRICT COURT CASES:**

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014) ...................................................................................27

*Bowers v. NCAA,*
    974 F. Supp. 459 (D.N.J. 1997) ...................................................................................3

*Buford v. H & R Block, Inc.,*
    168 F.R.D. 340 (S.D. Ga. 1996) .................................................................................27

*Dunn v. City of Chicago,*
    231 F.R.D. 367 (N.D. Ill. 2005).............................................................................17, 18

*In re Estate of Marcos Human Rights Litigation* ("*Hilao*"),
    910 F. Supp. 1460, 1464 (D. Haw. 1995) .............................................................28, 29

*Hudson v. City of Chicago,*
    242 F.R.D. 496 (N.D. Ill. 2007).......................................................................17, 18, 32

*In re Motor Vehicle Air Pollution Control Equip.,*
    52 F.R.D. 398 (C.D. Cal. 1970) .................................................................................27

*In re Nation Football League Players' Concussion Injury Litigation* ("*In re NFL*"),
    No. 2:12-MD-02323-AB, 2015 WL 1822254 (E.D. Pa. Apr. 22, 2015) .................. *passim*

*Jacks v. DirectSat USA, LLC,*
    No. 10-CV-1707, 2015 WL 1087897, (N.D. Ill. Mar. 10, 2015)................................31, 34

*Schmidt v. Smith & Wollensky,* LLC
    268 F.R.D. 323 (N.D. Ill. 2010)...........................................................................16, 32

*Turner v. Murphy Oil USA, Inc.*,
    234 F.R.D. 597 (E.D. La. 2006)..................................................................................29

**FEDERAL RULES:**

Fed. R. Civ. P. 23 ....................................................................................................*passim*

**OTHER AUTHORITIES:**

FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION (Fourth) (2004).................29, 30

James Wm. Moore, *Moore's Federal Practice* (3d ed. 2014) ......................................31

William B. Rubenstein et al., *Newberg on Class Actions* (4th ed. 2002) .......................31

William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2011)...........................19, 28

Charles Alan Wright et al., *Federal Practice & Procedure* (3d ed. 2005)....................31

## I.      INTRODUCTION

On May 27, 2015, Anthony Nichols filed the first of his two memorandums objecting to

Interim Class Counsel's most recent motion for preliminary approval of a proposed "Medical

Monitoring Settlement." (Dkt. 183.) That memorandum addressed the Settlement's many

shortcomings *other than* its requirement that class members waive viable concussion-related

class claims.

*This* brief, in turn, addresses the Court's request that Nichols submit a memorandum

concerning whether "a personal injury class can be certified in this action[.]"[1] (*See* Dkt. 182.)

Here, Nichols submits that the following class is certifiable—either as a Personal Injury Class

("PI Class") under Rule 23(b)(3) or, in the alternative, as a "Core Issues Class" under Rule

23(c)(4)[2] with respect to key issues central to every class member's claim:

>      All current and former NCAA athletes who (i) suffered a documented concussion
>      in or after 2002 while participating in a NCAA athletic event, and (ii) thereafter
>      received a documented diagnosis of one or more concussion-related injuries,
>      including PCS, CTE, Alzheimer's disease, ALS, or Parkinson's disease.[3]

As discussed below, the certifiability of the PI Class is demonstrated by both the

extensive record in this case and Judge Brody's recent certification order and analysis in *In re*

*Nation Football League Players' Concussion Injury Litigation* ("*In re NFL*"), No. 2:12-MD-

02323-AB, 2015 WL 1822254 (E.D. Pa. Apr. 22, 2015). In *In re NFL*, Judge Brody certified,

---

[1] It is Nichols' understanding that the Court indicated it would not approve a class settlement where the NCAA member institutions receive a class-wide release under the current structure. Thus, this brief does not address the viability of Rule 23(b)(3) classes against those institutions, but Nichols expressly reserves all rights with respect to such issues.

[2] While the Court only specifically requested briefing on the certifiability of a Rule 23(b)(3) personal injury class, here, the Core Issues Class must be addressed as well, given that it too is *specifically* waived by the proposed settlement and is, as explained below—and as previously stressed by Interim Class Counsel—vital to any class member's ability to recover via an individual personal injury claim.

[3] The requirement of documentation would, here, both ensure the class is fully ascertainable and preserve the ability of other current and former athletes (e.g., those that suffered a head injury without an official "concussion" diagnosis, or those that suffered an undocumented head injury) to pursue individual litigation. And, of course, the definition is flexible and could be adjusted to rely more on the NCAA's records, a narrower subset of required "documentation," etc.

under Rule 23(b)(3), the concussion-related personal injury claims of a subclass of former NFL players—claims that are, in all material respects, indistinguishable from those asserted here by class members like Adrian Arrington.

Next, and at least between Nichols and Interim Class Counsel, no one seems to dispute that a Core Issues Class is certifiable. Likewise, no one disputes that certifying a Core Issues Class would provide value for any class member deciding to individually litigate his or her personal injury claim against the NCAA. Indeed, as Interim Class Counsel previously explained:

> Class Members, in individual litigation unaided by Rule 23(c)(4), *would be at substantial disadvantage* trying to prosecute separate and enormously expensive actions against the well-resourced NCAA.

(Arrington Dkt. 175 at 35 (emphasis added).) Despite this warning, however, Interim Class Counsel now seem to believe that individual personal injury litigation *without* the aid of Rule 23(c)(4) is the answer to the conflicts issues raised by Nichols—a position that benefits "the well-resourced" NCAA, but harms the individual personal injury claims of settlement class members.

Either way, the point is that Rule 23 can indisputably and materially help class members' personal injury claims. Thus, waiving *all* rights to pursue class relief indisputably hurts the class, benefits the NCAA, and would—by Interim Class Counsel's own analysis—put those with individual personal injury claims at a "substantial disadvantage."[4] There is no possible way this deal can pass the fairness test. It must be rejected.

---

[4] This is, of course, the rather obvious point that Interim Class Counsel and the NCAA continue to ignore and the source for the conflict of interest internal to the proposed Medical Monitoring Settlement. (*See* Interim Class Counsel Response, Dkt. 184 at 6-8 (trying to distinguish *In re NFL* because the Medical Monitoring Settlement provides the same relief to all (i.e., medical monitoring), but ignoring that, *inter alia*, (i) that relief does not benefit presently-injured class members; (ii) the class waiver disproportionately harms class members with personal injury claims and (iii) such individuals had no independent representation during settlement negotiations, even though their claims were "strategically" traded away for unrelated medical monitoring relief)); (NCAA Response, Dkt. 191 at 6-7 (trying to

## I.    FACTUAL BACKGROUND[5]

### A.    As the Central Governing Body for Collegiate Sports At All Member Institutions, the NCAA Controls, Regulates, and Provides Institutional Guidance for Every Aspect of College Sports.

The NCAA is the "governing body for collegiate athletics."[6] In that capacity, the NCAA implements—and regulates its member institutions with—rules governing athletic events, including rules affecting player safety, player conduct, amateurism, recruiting, eligibility, and scholarships. These rules are promulgated through the NCAA's Constitution, Bylaws, and other legislative policies, which are contained within the annually updated and published NCAA Manual. *See Bowers v. NCAA*, 974 F. Supp. 459, 461 (D.N.J. 1997). The NCAA Constitution defines the NCAA's purpose and fundamental policies, lets the NCAA "uphold the principal of institutional control of, and responsibility for, all intercollegiate sports," (Proffer of Facts ¶ 11), and requires that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." (Report of Dr. Robert C. Cantu ("Cantu Rpt.") at 23).[7] The NCAA's Sports and Playing Rules Committees (the "Playing Rules Committees"), in turn, develop sports-specific standards for practice and playing time and contest rules. (Proffer of Facts ¶ 9.)

Apart from its role as a rule maker and enforcer, the NCAA also provides leadership for member institutions via research, education, collaboration, policy development, and best

---

distinguish *In re NFL* for the same reasons, but failing to discuss—at all—the Settlement's sweeping class waiver, its disproportionate impact on class members with personal injury claims, or its massive benefit to the NCAA).) (*See* also Nichols' First Objection, Dkt. 183 at § II.A.1.)

[5] For the Court's convenience, this section primarily cites paragraphs from the "Proffer of Facts" previously submitted by Interim Class Counsel in connection with their motion for class certification in the *Arrington* matter. A copy of the Proffer of Facts, filed at *Arrington* Dkt. 176, is attached hereto as Exhibit A. The actual discovery documents referenced by the Proffer of Facts have been filed with the Court in the *Arrington* matter at Dkts. 178-179.

[6] *Investing where it matters,* NCAA.com, http://www.ncaa.org/about/resources/media-center/investing-where-it-matters (last visited July 14, 2015).

[7] A copy of the Dr. Cantu's Report, which was filed in support of Interim Class Counsel's motion for class certification in the *Arrington* matter, is attached hereto as Exhibit B.

practices guidelines that help ensure the safety and wellness of each student-athlete. (*See* Proffer of Facts ¶ 15.)[8] For example, the NCAA annually publishes and delivers to head athletic trainers its *Sports Medicine Handbook* (the "Handbook"), which includes research into the cause of injuries and guidelines for injury diagnosis, treatment, and prevention. (*Id.* ¶ 21.) The Handbook is maintained by the Sports Sciences Safety Subcommittee, a subcommittee of the NCAA's Committee on Competitive Safeguards and Medical Aspects of Sports (the "CSMAS"), which is charged with providing guidance to student-athletes and athletic trainer staff at member institutions so as to "assist [them] . . . in developing a safe intercollegiate program." (*Id.*) Likewise, and as part of the NCAA's "Shared Responsibility for Intercollegiate Sports Safety," (*id.* ¶ 22), the CSMAS operates the NCAA's Injury Surveillance System, which monitors injury trends and makes recommendations to the Playing Rules Committees, in order to reduce situations that expose student-athletes to high risks of injury by modifying safety guidelines, equipment standards, or a sport's rules of play. (*Id.* ¶ 19.)

### B. The NCAA Has Assumed a Duty to Protect and Safeguard Student-Athletes.

The NCAA was founded on the principle of protecting player safety and, throughout its history, has continuously developed and leveraged its institutional capacity to safeguard student-athletes. (*Id.* ¶¶ 1-3.) Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes." (*Id.* ¶ 12.) To help member institutions meet this goal, the Constitution promises that "[t]he Association shall assist the institution . . . to achieve full compliance with all

---

[8] *See also supra* note 6 ("While NCAA rules are proposed and approved by NCAA member schools, those same campuses often turn to the NCAA to help interpret and enforce the rules fairly across the Association. To assist with this work, the NCAA dedicates significant resources to the governance process, including committees and the NCAA convention, in addition to training for campuses and national office support.").

rules and regulations," (*id.* ¶ 14), which includes "the responsibility . . . to protect the health of, and provide a safe environment for, each of its participating student-athletes," (*id.* ¶ 12).

Today, the NCAA recognizes that part of its core mission is "to provide student-athletes with a competitive environment that is safe and ensures fair play." (*Id.* ¶ 15.) To this end, its website explains that the "NCAA provides leadership [to aid member institutions] by establishing safety guidelines, playing rules, equipment standards, drug testing procedures and research into the cause of injuries to assist decision making." (*Id.*) Further embracing its duty to provide student-athletes with a safe environment, the NCAA promises student-athletes that it "takes appropriate steps to modify safety guidelines, playing rules and standards to minimize those risks and provide student athletes with the best opportunity to enjoy a healthy career." (*Id.* ¶ 17.) It also explains that its Injury Surveillance System lets the NCAA collect "a wealth of information through which [it] can provide athletes with a safe competitive environment." (*Id.*)

In recognizing the perspective of—and the NCAA's relationship to—student-athletes, the Handbook has recognized that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation." (*Id.* ¶ 20.)[9] Further, the NCAA has continuously acknowledged its unique institutional role in ensuring player safety, including by recognizing that neither schools nor the athletic conferences do anything more than what the NCAA itself requires in terms of protecting student-athletes. (*Id.* ¶ 140.)

---

[9] Other examples abound. The Handbook's statement was, for example, echoed by the NCAA's Interim President when discussing the Association's "core purposes." (*Id.* ¶ 20.) Further, the NCAA's Vice President of Championships and Alliances testified that: "… the NCAA, we – the NCAA as an organization has a responsibility for all – the welfare of student-athletes." (*Id.* ¶ 20.) Likewise, the CSMAS has acknowledged that the NCAA Handbook "may constitute some evidence of the legal standard of care." (*Id.* ¶ 21.)

**C.**    **The NCAA Has Long-Recognized That Concussion Management Is a Core Part of Its Duty to Protect Student-Athletes.**

Consistent with its assumed duty, the NCAA has long-recognized that concussion prevention and management falls within its founding purpose. Throughout the 1990's—and in direct response to concussion data collected from its Injury Surveillance System, which showed an unusually high, and growing, concussion rate among student athletes—the NCAA evinced concern about the prevalence and seriousness of concussion injuries and, in turn, commissioned several studies on the acute and cumulative effects of concussions. (*See* Proffer of Facts ¶¶ 27-33.) And while the NCAA did not promulgate any rules about concussion management during this period, its Sports Medicine Handbooks did adopt a guideline (entitled "Concussion and Second-Impact Syndrome") from 1994-1997, which included recommendations for return to play guidelines, a concussion grading scale, and a sideline evaluation tool. (*Id.* ¶ 55-56.) After 1997, however, the NCAA backed away from these suggested guidelines—citing a "lack of consensus among the medical community on the management of concussions"—and instead generally recommended what member institutions "should" do in response to concussions, while failing to offer schools any real structure, requirements, or concussion policy enforcement. (*Id.* ¶¶ 57-59.)

Even while refusing to implement concussion rules, the NCAA continued to recognize the seriousness of—and its role with respect to—the concussion issue. For instance, in 2010, the estimated 29,225 concussions that had been documented in NCAA sports from 2004-09 prompted the NCAA's Director of Health and Safety to admit that concussions were "a concern across all sports." (*Id.* ¶ 46.) Concussions were also an on-going focus for the CSMAS, which regularly expressed concern over the high incidence of concussions documented by the Injury Surveillance System, the importance of referring affected student-athletes to appropriate medical

6

care, (*see, e.g., id.* ¶¶ 40-46),[10] and the fact that "many coaches outside football [were] still in the dark on [the] topic [of concussions]," (*id.* ¶ 157).

Of course, other parties recognized that NCAA oversight of concussion management and education is necessary to protect student-athletes from suffering concussions in the first place and, once a concussion was suffered, ensuring their proper "return to play." The record reflects that since 1996, scores of parents, medical providers, and medical sports associations have all asked the NCAA to take steps to ensure that student-athletes receive better protection against head injuries. (*See, e.g., id.* ¶ 48 (detailing correspondence sent from representatives of the American Academy of Neurology, Brain Injury Association, and American Association of Neurological Surgeons to the Executive Director of the NCAA on the issue of head injuries and the risks created by NCAA policies).) These concerns include requests that the NCAA adopt sports-specific rules prohibiting dangerous playing techniques, (*id.* ¶ 53), along with rules regulating return to play decisions, (*id.* ¶ 54). In response to this demand and other concerns (specifically including the recognized demand from the NCAA's own constituency), the NCAA's Senior Vice President for Championships explained in 2010 that the NCAA had formed a Concussion Working Group because "[t]here was continued agreement that the membership was looking to National [NCAA] Office for guidance on the [concussion] issue." (*Id.* ¶ 99.)

### D. An International Consensus Reached in 2002 Firmly Established the Standard of Care For Concussion Management.

Various experts agree that "[a]s of 2002, consensus had been reached in the medical and scientific community for the cornerstones of the management and treatment of concussions." (*See, e.g.,* Cantu Report ¶ 98.) This was primarily marked through (i) a series of consensus

---

[10] In addition, the NCAA has acknowledged that the data it has accumulated significantly underestimates the incidence of concussions across specific sports because "student-athletes may not necessarily report injuries for fear of losing playing time." (*Id.* ¶ 40 (also discussing sport-specific concussion rates).)

statements from the International Symposium on Concussion in Sport, the first of which was published in 2002 through the document "Summary and Agreement Statement of the First International Conference on Concussion and Sport, Vienna 2001,"[11] (the "Vienna Protocol") and (ii) a position statement published by the National Athletic Trainers Association (the "NATA Statement," and, with the Vienna Protocol, the "Consensus Standard"). (*See* Cantu Rpt. ¶¶ 21-22; Report of Dr. Micky Collins ("Collins Rpt.") at 8-10.)[12] The Consensus Standard set out "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions," was intended to "be widely applicable to sport related concussion," and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of injured athletes, whether at the recreational, elite, or professional level." (Cantu Rpt. ¶ 100.) Among other guidelines, the Consensus Standard included the following:

- **Specific return to play guidelines**, including that a player should never be allowed to return to play the same day;

- **A graduated return to play process**, wherein (i) an athlete must be asymptomatic and have normal neurological and cognitive evaluations before the start of the rehabilitation program; (ii) the athlete undergoes a stepwise process, which includes gradual increases in exercise, with pauses or backtracks when concussive symptoms reoccur; and (iii) ensuring that each step in the process take a minimum of one day, or more if required, (a chart demonstrating the most recently-published graduated return to play process is shown below in Figure 1);

- **Sideline evaluation** including neurological assessment and mental status testing, a process that would ideally use a standardized scale of post-concussion symptoms for comparison purposes and standardized acute injury testing;

- **Baseline, pre-injury testing**, which would maximize the clinical utility of later sideline evaluation or other neuropsychological assessment; and

- **Concussion education** of athletes, colleagues, and those working with athletes.

---

[11] The Vienna Protocol was updated as the expert group who originally compiled and recommended the Vienna Protocol (the "Concussion in Sport Group") met subsequently in Prague (2004), Zurich (2008) and Zurich (2012); updated protocols were published following each meeting.

[12] A copy of Dr. Collin's report, which was submitted as his "Professional Opinion on the Case of Preston Plevretes," [2:07-cv-05186-MAM], is attached hereto as Exhibit C.

(Cantu Rpt. ¶¶ 101-106, 108-110; *see also id.* ¶¶ 119-155.)

| Table 1 | Graduated return to play protocol | |
|---|---|---|
| **Rehabilitation stage** | **Functional exercise at each stage of rehabilitation** | **Objective of each stage** |
| 1. No activity | Symptom limited physical and cognitive rest | Recovery |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum permitted heart rate No resistance training | Increase HR |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |
| 4. Non-contact training drills | Progression to more complex training drills, eg, passing drills in football and ice hockey May start progressive resistance training | Exercise, coordination and cognitive load |
| 5. Full-contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

**Figure 1**[13]

Over the past several years, experts have cited to the Consensus Standard as having "memorialized the standards of care for [both] the physician/healthcare professional and the certified athletic trainer" and, of course, institutional actors like the NCAA. (*See*, *e.g.*, Collins Rpt. at 8-10; Cantu Rpt. ¶ 98.) For example, Michael Collins, an Assistant Professor in the Department of Orthopaedic Surgery and Neurological Surgery at the University of Pittsburgh Medical Center, and an expert retained by former football player, Preston Plevertes, explained:

> [S]cientific consensus has been achieved in understanding cornerstones of care and management of [the concussion] injury . . . Both Vienna and the NATA Position Statement were written secondary to the vast accumulation of published research and evolving understanding of sports-related concussion that occurred between 1999 and the early 2000s. Both of these documents . . . outlined very specific recommendations pertaining to appropriate symptom assessment, role of exertion in recovery from injury, appropriate sideline assessment of injury, the importance of post injury neuropsychological testing prior to return to play following cerebral concussion, the importance of a protocol-driven management approach, the need for a multidisciplinary approach to safe management of injury, and the critical aspect of education surrounding this injury. The Vienna and NATA Position Statement set forth . . . the uniformly accepted standard of care in

---

[13] A complete copy of the "Consensus statement on concussion in sport: the 4th International Conference on Concussion in Sport held in Zurich, November 2012" is attached hereto as Exhibit D. The chart shown in Figure 1 appears on page 4 of the statement.

9

the proper assessment and management of cerebral concussion for all physician, sub-specialty, and allied health professionals, including athletic trainers.

. . .

The lack of institutional involvement in assuring appropriate care for . . . student athletes and also not having any written protocols for appropriate management of injury is a reckless and gross deviation from the standard of care.

(Collins Rpt. at 8-10, 25-26.)

By the time the Plevretes lawsuit settled in 2009, the National Football League had adopted stricter—and more in line with the Consensus Standard—return to play guidelines (including the implementation of playing rules wherein a "player cannot return to a practice or game if he shows any of the symptoms of a concussion, not just a loss of consciousness"), (Proffer of Facts ¶ 75 at n. 151), as had the National Federation of State High School Associations (which required officials to remove athletes from play if they exhibited concussion symptoms), (*Id.* ¶ 75 at n. 152.) Only the NCAA—as described below—did not require its member institutions to do *anything* in response to student-athlete concussions.

### E. Since At Least 2002, the NCAA's Concussion Policies Have Not Met the Accepted Standard of Care.

Despite wide recognition that the Consensus Standard "set forth . . . the uniformly accepted standard of care in the proper assessment and management of cerebral concussion," (Collins Rpt. at 8-10; Proffer of Facts ¶ 103 (NCAA's Director of Health and Safety recognizing that the Vienna Protocol reflected "the most recent consensus document on the topic of [concussion] prevention, identification, care, and return to play[.]")), the NCAA consistently failed to adopt rules to ensure that member schools followed the Consensus Standard. In this regard, Dr. Cantu's report provides a detailed comparison between the Consensus Standard and

the NCAA's concussion management policies set forth in the NCAA's Handbooks prior to

2010,[14] the latter of which failed to:

- Adopt the 24 hour stepwise return to play guidelines;
- Acknowledge that a day is needed between return to play steps and that typically a week of asymptomatic time is needed to resolve symptoms relating to a concussion prior to return to play;
- Acknowledge that if any symptoms occur after concussion, the patient should drop back to the previous asymptomatic level and try to progress again after 24 hours;
- State the complete importance of neuropsychological ("NP") and baseline testing;
- Recommend or mandate baseline testing especially for high risk sports;
- Note that, in the absence of NP testing and formal balance assessment, a more conservative return to play approach may be appropriate;
- Note that neuropsychologists are in the best position to interpret NP tests and where neuropsychologists are not available, other medical professionals may perform or interpret NP screening tests;
- Recommend, mandate or implement a standardized sideline concussion evaluation process;
- Recommend, mandate or implement the usage of a standardized sideline concussion assessment tool (e.g., SCAT2);
- Acknowledge that the appearance of symptoms might be delayed several hours following a concussive episode;
- Take into account the education of athletes and others regarding concussion;
- Acknowledge that rule changes may be necessary;

---

[14] In 2010, the NCAA passed legislation requiring that member institutions have a basic concussion management plan in place for all sports and, through the Handbook, recommended "Best Practices for a Concussion Management Plan." The concussion management plan regulation requires that member intuitions have:

    (1) An annual process that ensures student-athletes are educated about the signs and symptoms of concussion;

    (2) A process that ensures a student-athlete who exhibits signs, symptoms or behaviors consistent with a concussion shall be removed from athletics activities and evaluated by a medical staff member with experience in the evaluation and management of concussion;

    (3) A policy that precludes a student-athlete diagnosed with a concussion from returning to athletic activity for at least the remainder of that calendar day; and

    (4) A policy that requires medical clearance for a student-athlete diagnosed with a concussion to return to athletics activity as determined by a physician or the physician's designee.

(*See Concussion guidelines*, NCAA.com, http://www.ncaa.org/health-and-safety/concussion-guidelines (last accessed July 14, 2015).) Despite this, the NCAA does not audit any member institution's plan, nor does it require schools to adopt the recommended best practices. (Cantu Rpt. ¶ 158.) Further, and as previously noted by Nichols, these requirements (together with the NCAA's currently recommended "Guidelines" for member institutions' concussion management plans) effectively overlap with the Medical Monitoring Settlement's proposed "injunctive relief," through which—if approved—the NCAA must only make *recommendations* about member instructions' concussion management plans.

11

- Acknowledge the importance of rule enforcement;
- Acknowledge risk compensation in athletes;
- Acknowledge that protective equipment does not prevent concussion.

(Cantu Rpt. ¶ 164.)[15] Dr. Cantu further opined that even with the 2010 legislation in place, the

NCAA's concussion management practices still do not meet the standard of care because the

Consensus Standard "should [be] mandated by the NCAA." (*Id.* ¶ 173.)

In summing up his expert opinion, Dr. Cantu opined that the NCAA—and, by virtue of

its inaction, its member institutions—"violated the consensus best practices with respect to the

education about, prevention of, and management of concussions in student-athletes . . . in one or

more of the following ways:

1. Until 2010, the NCAA failed to maintain or require, and the schools thus failed to maintain, a written protocol on concussion management against consensus best practices…[;]

2. The NCAA failed to provide student-athletes with catastrophic injury risk education…[;]

3. The NCAA failed to implement appropriate baseline concussion testing…[;]

4. The NCAA failed to require a stepwise return to play protocol…[;]

5. The NCAA failed to require that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management… [and;]

6. The NCAA failed to require adequate documentation of concussion incidents."

(Cantu Rpt. ¶¶ 206 – 217.) (*See also id.* at ¶ 159

("[T]he NCAA's failure to mandate a Concussion Management Plan for all institutions, in accordance with the consensus best practices, demonstrated inadequate and substandard conduct in the management of student athletes' concussions. The NCAA did not exercise, nor require its member institutions to exercise, the ordinary and reasonable care that would be expected in the care of student-athletes that suffer concussions, given the undertakings the NCAA made regarding the safety of student athletes.").)

---

[15] Dr. Cantu's report addresses each of these points in great detail. (*See* Cantu Rpt. ¶¶ 163-198.)

Further, the record establishes—again and again—that the NCAA's refusal to regulate its member institutions' compliance with the recognized standard of care was driven by one key concern: money. For example, while several NCAA officials recognized that the NCAA's concussion policy (i.e., that "no rule [was] needed") was contrary to the Consensus Standard and thus, unnecessarily dangerous to the health of student-athletes, (Proffer of Facts ¶¶ 76-79; *see also id.* ¶¶ 81-84), the NCAA refused to implement return to play rules across all sports, fearing that any such rule would increase the risk of liability for the NCAA and its members in the event that officials were put in charge of "return to play" decisions, (*id.* ¶ 80; *see also* ¶ 94). Other examples abound, wherein key NCAA leaders and committee/group members repeatedly stressed that rather than promulgating *rules* (which would require action on the part of member institutions with regard to implementing them, as well as the NCAA with regard to enforcing them), the NCAA should clarify that any concussion guidelines were "educational and not direct[ed] to officials as a requirement." (*Id.* ¶¶ 94-96.)

## F. The NCAA's Failure to Meet the Standard of Care Damaged the Personal Injury Class Members.

There is agreement within the scientific community that concussions—as well as subsequent concussive or sub-concussive (even minor) impacts that occur to the head before an initial concussion has been properly managed—can cause long-term health consequences including post-concussion syndrome ("PCS") and chronic neurocognitive impairment ("CNI"), chronic traumatic encephalopathy ("CTE"), amyotrophic lateral sclerosis ("ALS"), Parkinsonism, Alzheimer's disease, and dementia. (*See, e.g.*, Cantu Rpt. ¶¶ 46-60 (discussing "the second-impact syndrome" and studies suggesting that "concussions or a combination of concussions and sub-concussive head impacts" may lead to conditions such as CTE and mild cognitive impairment); Dkt. 170 (Expert Report of Bruce Deal ("Deal Rpt.")) ¶¶ 20-24

(identifying PCS and CTE as two disease states of interest among "the potential long-term health consequences of traumatic brain injury")).[16]

Consistent with these findings, Dr. Cantu—in evaluating documentation associated with the student-athletes in *Arrington* (Adrian Arrington, Derek Owens, Angelica Palacios and Kyle Solomon)—concluded that, the NCAA's and each respective member institution's failure to mandate and follow the Consensus Standard caused each athlete's injury, resulting in both concussions and PCS. (Cantu Rpt. ¶¶ 218-303.)

## II.  ARGUMENT

### A.  The NFL Order Demonstrates that a Rule 23(b)(3) Class of Current and Former NCAA Athletes with Present Concussion-Related Injuries Is Certifiable.

Judge Brody's order granting class certification to a personal injury subclass in *In re NFL* demonstrates that, here, a Rule 23(b)(3) class of current and former NCAA athletes with concussion-related personal injury claims is certifiable. That opinion is apposite to the certification of a PI Class here, even though Judge Brody analyzed proposed settlement classes because, as Judge Brody observed, the Supreme Court has stressed that "[c]lass certification 'demand[s] undiluted, even heightened, attention in the settlement context.'" *In re NFL*, 2015 WL 1822254, at *11 (quoting *Amchem Products v. Windsor,* 521 U.S. 591, 620 (1997)). As such, here, Interim Class Counsel's "strategic decision" of asking settlement class members to completely give up *any* realistic ability to pursue the "billions and billions of dollars" in personal

---

[16] Several experts in the *In re NFL* litigation offered consistent understandings of the scientific association between repeated traumatic brain injury and certain specific diseases/syndromes, in addition to various uncategorized neurocognitive impairments. (*See, e.g., In re NFL* Dkt. 6423, 17 (Declaration of Kenneth C. Fisher, M.D.) ¶¶ 6-7, 9) (discussing the increased risk of ALS, Parkinsonism, Alzheimer's disease, and dementia, and well as various levels of neurocognitive impairments), *In re NFL* Dkt. 6423, 18 (Declaration of Christopher C. Giza, M.D., ¶¶13, 20-21) (discussing the causal relationship between chronic neurocognitive impairment and exposure to professional sports and the association between traumatic brain injury of varying severities and ALS, Parkinsonism, Alzheimer's disease, and dementia)).

injury damages[17] demonstrates that the Medical Monitoring Settlement improperly leverages some class members' claims "in return for" others—a textbook conflict of interest.[18]

The current record supports certification. First, even Interim Class Counsel has agreed that, here, a PI Class would meet the requirements of Rule 23(a). Second, given the tight fit between the facts of the concussion-related personal injury claims here and those at issue in *In re NFL*, Judge Brody's analysis shows that a PI Class could satisfy Rule 23(b)(3)'s predominance and superiority requirements. Third, any concerns about the manageability of a Rule 23(b)(3) PI Class—which were less of an issue for the *In re NFL* settlement class—can be addressed through any number of "imaginative solutions."

      1.    *The PI Class satisfies Rule 23(a)'s four requirements.*

To begin—and just as Interim Class Counsel affirmed when moving for certification in the *Arrington* matter, (*Arrington* Dkt. 175 at 32-33), and Judge Brody found with respect to the personal injury subclass in *In re NFL*, 2015 W, 2015 WL 1822254, at *11-12—a PI Class would readily satisfy the four requirements of Rule 23(a).

      a.    Numerosity.

To start, Rule 23(a)'s numerosity requirement is easily satisfied. Here, Mr. Deal has estimated that, based predominately on NCAA records, an estimated 6,767 concussions occur among NCAA student-athletes annually. (Deal Rpt. at 11.) Of these, Mr. Deal explained that

---

[17] Jon Solomon, *NCAA reaches concussion settlement for $70 million in testing*, CBSSports.com, http://www.cbssports.com/collegefootball/writer/jon-solomon/24641342/ncaareaches-concussion-settlement-for-70-million-in-testing (last accessed May 8, 2015) (quoting Joseph Siprut).

[18] Besides, all parties have now agreed that—in accordance with Judge Brody's *In re NFL* opinion—a Rule 23(b)(3) *settlement* class could be certified here. (Dkt. 156 (Pls. Memo. ISO Mot. for Prel. Appr.) at 20-22.) That alone demonstrates that the waived class claims have clear value for the class. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) (observing that bifurcating class liability versus individual damages phases "would not eliminate variance in damages across class members, but once liability is established damages claims can usually be settled with the aid of a special master, and trials thus avoided[.]") (citing collected cases).

15

around 1% of concussed individuals are expected develop "persistent PCS"—*one* of the long-term disease states associated with concussions.[19] (*Id.* at 6.) Accordingly, and given that the PI Class covers a 13-year period, the class is sufficiently numerous. *See Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) ("While there is no threshold or magic number at which joinder is impracticable, a class of more than 40 members is generally believed to be sufficiently numerous…Courts rely on 'common sense' to determine whether an estimate of class is reasonable [for the purposes of Rule 23(a)(1).]") (internal citations omitted).

b. <u>Commonality.</u>

Next, each PI Class member's claim for damages stems from the same common issues of law and fact, easily satisfying Rule 23(a)'s requirement of commonality. A common question is one "that is capable of class-wide resolution, which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "Even a single [common] question" will satisfy commonality. *Id.* at 2556 (internal citations omitted).

Here, because each PI Class member's primary claim[20] for damages sounds in negligence and thus stems from (i) his or her relationship with the NCAA (which is common among the Class) and (ii) the NCAA's knowledge, practices, and policies surrounding concussions (which are also common),[21] the issues of duty and breach present classic common questions. *See Hudson*

---

[19] Thus, as more diseases are considered (such as CTE and others), the expected class size will continue to grow. (*See, e.g.*, Deal Rpt. at 7 (noting that individuals with CTE are not a subset of the PCS population).)

[20] As Nichols previously noted, other potential viable, non-personal injury "concussion related" Rule 23(b)(3) claims would be waived by the proposed Settlement. (*See* Dkt. 83 at 15-16.) Unfortunately, because Interim Class Counsel did not take discovery on these matters—but, instead, moved forward with a sweeping release— evaluating their viability as potential Rule 23(b)(3) class actions at this juncture is impossible. Nichols reserves all rights with respect to these issues.

[21] While this brief focuses on the common issues for PI Class members' negligence claims, similar issues would present almost identical common questions for PI Class members' fraudulent concealment claims, which would turn on nearly identical questions regarding the NCAA's conduct. *See Wigod v. Wells Fargo*

16

*v. City of Chicago*, 242 F.R.D. 496, 501 (N.D. Ill. 2007) ("Claims arising out of Defendants'

standardized conduct towards members of the proposed class present a classic case for treatment

as a class action."). As such, several common questions will drive each PI Class member's claim,

including the following:

1. Whether the NCAA owed him/her a duty of care;

2. Whether (and as explained by the expert reports of Dr. Cantu, Dr. Collins, and others) all or part of the Consensus Standard set forth that standard of care; and

3. Whether the NCAA breached that standard of care—specifically by:

   - Until 2010, failing to maintain or require that member institutions maintain a written protocol on concussion management;

   - After 2010, failing to require that member institutions maintain a written protocol on concussion management that meets the Consensus Standard;

   - Failing to provide and/or require that member institutions provide student-athletes with catastrophic injury risk education;

   - Failing to implement and/or require that member institutions implement appropriate baseline concussion testing;

   - Failing to mandate and/or require that member institutions mandate a stepwise return to play protocol;

   - Failing to mandate and/or require that member institutions mandate that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management; and

   - Failing to mandate and/or require that member institutions mandate adequate documentation of concussion incidents.

(*See supra* § II.E.) Thus, because PI Class Members' claims would necessarily "challenge[] [the

NCAA's] system-wide practice[s] or polic[ies] that affect[] all of the putative class members" in

the exact same way, commonality is satisfied, *Dunn v. City of Chicago*, 231 F.R.D. 367, 373

(N.D. Ill. 2005) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)).

---

*Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012).

c.    Typicality.

As for Rule 23(a)'s typicality requirement, given the issues common to every PI Class member's personal injury claim, finding a representative (such as Arrington) with a "typical" claim will be no challenge at all. *See Hudson*, 242 F.R.D. at 501 (quoting *Dunn*, 231 F.R.D. at 372) ("A proposed class that meets the commonality standard will generally meet the typicality requirement"). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

Here, Rule 23(a)'s typicality requirement would be easily met. Arrington, for example, is (i) a former NCAA college athlete, (ii) that suffered multiple, documented concussions during play, (iii) during the relevant time period, and (iv) received a documented diagnosis of one or more concussion-related injuries, (v) that were, according to Dr. Cantu, caused by the NCAA's failure to follow the Consensus Standard. Because the proof for Arrington's injury is the same as each and every other putative PI Class member, his claims are typical of the PI Class.

d.    Adequacy of Representation.

Finally, identifying adequate class representatives *and* adequate Interim Class Counsel would not only satisfy Rule 23(a)(4), but is critical to avoiding the presently unaddressed conflicts of interest presented by the Medical Monitoring Settlement.[22] Rule 23(a)'s adequacy inquiry "uncover[s] conflicts of interest between named parties and the class they seek to represent." *In re NFL*, 2015 WL 1822254, *17 (quoting *Amchem*, 521 U.S. at 625). The rationale underlying this rule is plain:

---

[22] (*See* Dkt. 183 at 2-6 (§ II.A.1 "In violation of Rule 23(a)(4), Interim Class Counsel negotiated a settlement on behalf of an undifferentiated class of current and former athletes, without ensuring that *all* class members were adequately represented").)

> A fundamental conflict exists where . . . by maximizing their own interests, the putative representatives would necessarily undercut the interests of another portion of the class" . . . Benefits awarded to some class members, but not others, without adequate justification may indicate that other class members were inadequately represented.

*Id.* (quoting William B. Rubenstein, *Newberg on Class Actions* § 3:58 (5th ed. 2011) (citations omitted)*; see also Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) ((discussing *Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988) ("This circuit is not alone in interpreting Rule 23(a)(4) to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members.")).

Here, in having a PI Class member (such as Arrington) represent and advocate for class members with similar interests (the proposed PI Class, all of whom have an interest in receiving compensation for their concussion-related injuries caused by the NCAA's conduct), the conflicts inherent to the proposed settlement class *could have been* rectified. Thus, and just as Judge Brody found with respect to the *In re NFL* settlement class, assigning *both* an appropriate class representative *and* independent counsel to represent the interests of the proposed PI Class would provide the procedural safeguards necessary to avoid the conflicts of interest warned of in *Amchem. See In re NFL*, 2015 WL 1822254, at *17; *see also Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781, 785 (7th Cir. 2004) (discussing class settlement's "questionable feature[] . . . that the class that was denied relief did not have separate counsel from the counsel for the favored class."). With such safeguards in place, representation of a broader medical monitoring class and the proposed PI Class could—*together*—satisfy Rule 23(a)'s adequacy requirement.

2. *The PI Class could also satisfy Rule 23(b)(3)'s requirements.*

Next, and as previewed above, the *In re NFL* Rule 23(b)(3) analysis demonstrates that a PI Class is certifiable. Specifically, Judge Brody's opinion shows that, under the facts of this case—which are materially identical to those at issue in *In re NFL*—the elements of predominance and superiority are met. And while aspects of class adjudication would admittedly present manageability challenges, those can be overcome by taking seriously (rather than ignoring) the Seventh Circuit's instruction that district courts and Interim Class Counsel must exhaustively explore and "devise imaginative solutions," to overcome such challenges. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)

a. <u>Judge Brody's analysis shows that common issues would predominate PI Class members' personal injury claims.</u>

Rule 23(b)(3) certification requires that "[common] questions of law or fact . . . predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), and tests whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 622 (citation omitted). There is no mathematical or mechanical test for evaluating predominance, *see Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("[P]redominance is [not] determined simply by counting noses"); rather, the predominance test looks at the issues to be resolved qualitatively, *see Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014); *see also Messner v. Northshore University Health System*, 669 F. 3d 802, 814 (7th Cir. 2012). As such, the predominance inquiry looks to whether there are *enough* common questions such that class action treatment would be more efficient than individual trials. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy.").

20

These principles drove Judge Brody's predominance analysis in *In re NFL*, where she considered whether class treatment of the subclass's negligence and fraud claims "would achieve economies of time, effort, and expense" contemplated by Rule 23(b)(3), even while recognizing that individual issues existed in the case.[23] *In re NFL*, 2015 WL 1822254, at *12 (recognizing that "no two Retired Players' concussion history or symptoms are identical"), *21 (quoting *Amchem*, 521 U.S. at 623). Three key holdings drove Judge Brody's analysis:

(i) **Duty/Breach:** First, with respect to class members' negligence claims, Judge Brody held that "factual questions regarding the NFL Parties' knowledge and conduct [are central to the subclass members' negligence claims.] Class Members' negligence claims depend on establishing that the NFL Parties knew of the dangers of concussive hits, yet failed to modify the rules of NFL Football to mitigate them, or even to warn Retired Players that they were risking serious cognitive injury by continuing to play."[24] *Id*. at *22.

(ii) **Common injuries:** Second, that "the NFL Parties' alleged conduct injured Class Members in the same way [because] Retired Players all returned to play prematurely after head injuries and continued to experience concussive and sub-concussive hits . . . even though these hits resulted in different symptoms with different damages." *Id*.

(iii) **Causation:** Third, and in terms of each subclass member's burden to prove causation, that "the NFL Parties' alleged conduct raises common and dispositive scientific questions [because] [e]ach Class Member would have to confront the same causation issues in proving that repeated concussive blows give rise to long-term neurological damage." *Id.*

As such, and "because the 'same set of core operative facts and theory of proximate cause apply to each member of the class,'" Judge Brody concluded that these core issues would "advance the

---

[23] Judge Brody expressly rejected the objectors' argument that—just as Interim Class Counsel asserts here—"courts simply do not permit the certification of personal-injury classes." *In re NFL*, 2015 WL 1822254, at *23. To the contrary, Judge Brody observed that even *Amchem* stated that it did not categorically foreclose "mass tort cases from class certification," *id.* (quoting *Amchem* 521 U.S. at 625), before citing to several examples of certified personal injury classes, both within and without the Third Circuit.

[24] Judge Brody also found that "Class Members' fraud claims suggest a similarly far-reaching scheme, alleging that the NFL Parties . . . obfuscated the link between football play and head trauma." *Id*. at *22.

litigation [such] that they may fairly be said to predominate." *Id.* (quoting *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d. Cir. 1986)).

Each of the above holdings maps directly onto the PI Class Members' claim for damages and—just as Judge Brody held with respect to the *In re NFL* personal injury subclass—demonstrates that analogous common questions will predominate. First, with respect to the NCAA's duty and breach, the core of every PI Class Member's negligence claim will turn on establishing (i) that the NCAA owed him or her a duty of care relating to concussion prevention, education, and management, *see supra* §§ II.B., II.C. (describing the NCAA's assumed and affirmative duty to protect student-athletes), (ii) the specific duty owed, *see supra* § II.D. (describing the Consensus Standard), and (iii) the NCAA's breach of that duty, *see supra* § II.E. (describing the NCAA's failure to require member institutions to comply with the Consensus Standard). *See In re NFL*, 2015 WL 1822254, at *2 (finding that common questions predominate plaintiffs' negligence claims where plaintiffs allege that "'the NFL held itself out as the guardian and authority on the issue of player safety,' yet failed to properly investigate, warn of, and revise league rules to minimize the risk of concussive and sub-concussive hits in NFL Football games."). Further, by limiting the class to those that played during the time period *after* an international consensus was reached on concussion management (2002), the proposed PI Class avoids potentially unique defenses on the core issues of the NCAA's duty and breach,[25] further ensuring that common issues predominate.

Second, with respect to each PI Class member's injury, because each was equally exposed to and affected by the NCAA's failure to implement sufficient concussion management

---

[25] For example, no member of the PI Class would face the NCAA's defense that he or she was injured before a clear standard of care arose. Likewise, to the extent the Court believes that the NCAA has a unique defense against those PI Class members that were injured *after* the NCAA promulgated *some* rules that arguably required member institutions to comply with aspects of the Consensus Standard (i.e., in 2010), predominance could be preserved by utilizing subclasses.

rules, such conduct injured each PI Class member "in the same way . . . even though [each individual's experience would have] resulted in different symptoms with different damages." *In re NFL*, 2015 WL 1822254, at *22. Thus, and just as Dr. Cantu explained with respect to the injuries of Arrington, Owens, Palacios, and Solomon, while each individual exhibited different concussion symptoms and now suffers different long-term effects, each individual's injury was nevertheless caused by the fact that "[t]he NCAA [and one of its member institutions][26] did not follow the consensus best practices for concussion treatment in [each individual's] treatment." (Cantu Rpt. ¶¶ 239, 271, 303.) The same analysis would hold for *any* member of the PI Class, *all of whom* were equally subject to and affected by the NCAA's failure to abide by its duty of care. *See In re NFL*, 2015 WL 1822254, at *22 ("[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct . . . . A common scheme generates predominant legal and factual questions.") (citations omitted).

Third, and just as in *In re NFL*, while it is unavoidable that each PI Class member's actual injury is unique, *see id.* at *12 (acknowledging that "no two Retired Players' concussion history or symptoms are identical"), each member will nevertheless face identical questions of causation. Namely, here—and just as Judge Brody held when certifying the *In re NFL* personal injury subclass—every Class member's claim "raises common and dispositive scientific questions [because] *[e]ach* . . . would have to confront the *same* causation issues in proving that repeated concussive blows give rise to long-term neurological damage." *Id.* at *22 (emphasis added). The Seventh Circuit, in particular, has dealt with this issue by suggesting that district

---

[26] The fact that each PI Class member's individual school would have contributed to his or her injury (i.e., by virtue of being the "hands-on" caretaker) is of no moment, given the NCAA's duty of regulating its member institutions to come within the Consensus Standard and the fact that the NCAA long-understood that member institutions would not act, unless made to do so. *See supra* § II.B. The same would be true, of course, for each former NFL player's team—a fact that did not prevent certification in *In re NFL*.

23

courts can first "confin[e] any class certification as to questions of liability," and then utilize class member-specific hearings to determine the actual damages sustained by each class member. *In re IKO Roofing Shingle Products Liab. Litig.*,[27] 757 F.3d 599, 603 (7th Cir. 2014) (citing *Butler*, 727 F.3d at 798);[28] *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("Proximate cause [in this case] ... is necessarily an individual issue…[but] the need for individual proof alone does not necessarily preclude class certification."); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("It is routine in class actions to have a final phase in which individualized proof must be submitted."). In other words—and precisely as Judge Brody recognized when finding that issues of causation would still predominate the *In re NFL* litigation—common questions of causation still predominate the PI Class members' claims even though individual issues of proximate cause may exist.

Ultimately, because the core of each PI Class member's concussion-related personal injury claim stems from the NCAA's uniform conduct, common questions can be fairly said to predominate each Class Members' claim. *See In re NFL*, 2015 WL 1822254, at *23-24.

---

[27] The district court in *In re IKO* expressed analogous concerns regarding the issues of individual/ proximate causation. In that case, the plaintiff class sought to recover damages relating to allegedly faulty shingles, and the district court held that potential issues of proximate causation precluded class certification. *In re IKO*, 757 F.3d at 599-602 (noting that, *inter alia*, "IKO's tiles are exposed to the elements, where they may fail no matter how well constructed"). In reversing and addressing recent Supreme Court precedent, the Seventh Circuit instructed the lower court to consider whether a "buyer-specific remedial approach [where class certification was confined] to questions of liability, as in *Pella I* and *Butler*…[was appropriate, given that, in the context of the case] [i]t's not hard to frame liability issues suited to class-wide resolution." *Id.* at 603.

[28] In *Butler*, the Seventh Circuit noted that because the case-dispositive question presented by every class member's claim (i.e., whether the washing machines at issue were defective) was common to the entire class, "[a] class action [was] the efficient procedure. . . ." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013). The Court then noted that because individual class member claims were certain to vary, "[a] determination of liability could be followed by individual hearings to determine the damages sustained by each class member." *Id.*

b. <u>Judge Brody's order supports that, here, class-wide adjudication of personal injury claims is superior to individual litigation.</u>

Next, and particularly given that 300 individual claims (filed on behalf of 5,000 former NFL players) had been consolidated in her court, Judge Brody was uniquely situated to analyze whether class treatment of the sort of personal injury claims asserted here and in *In re NFL* met Rule 23(b)(3)'s requirement that "a class action is superior to the available methods for the fair and efficient adjudication of the controversy." NCAA Interim Class Counsel have pointed to these 5,000 claimants in support of their view that individual concussion cases are "valuable" and "will be litigated." (Dkt. 85-1 at 18 (citing to Ex. B-3 of the Class Action Settlement Agreement as of June 25, 2014 in the *NFL MDL*).)

Judge Brody took a different view. In analyzing the "desirability . . . of concentrating the litigation of the claims in the particular forum, and class members' interests in individually controlling the prosecution or defense of separate actions," *In re NFL*, 2015 WL 1822254, at *24 (internal quotations omitted), Judge Brody concluded that class treatment of personal injury claims was preferred because even though 5,000 individuals—*25%* of the 20,000 person NFL class—had brought individual lawsuits, "only *one percent* of the Class [opted out and] elected to pursue separate litigation." *Id.* (emphasis added). In addition, Judge Brody cited other advantages that come with class treatment of similar claims, including the "decades of litigation at significant expense" associated with individual lawsuits and the fact that many Retired Players that were presently injured "with progressive neurodegenerative conditions would continue to suffer while awaiting relief." *Id.*

This approach comports with the Seventh Circuit's observations that where "resolution of the merits may require costly . . . evidence and expert testimony . . . the class action device [may be] superior, because no rational individual plaintiff would be willing to [individually] bear the

costs of [the] lawsuit." *Suchanek*, 764 F.3d at 760. One need only look at the massive discovery burden shouldered by the plaintiffs to date—particularly in the *Arrington* matter—to realize that these concerns apply with full force here. (*See Arrington* Dkt. 175 at 35 ("Class Members, in individual litigation unaided by [Rule 23], would be at substantial disadvantage trying to prosecute separate and enormously expensive actions against the well-resourced NCAA.").)

Stated plainly, Judge Brody concluded that even in the context of retired NFL players—where compensatory injuries for professional (and highly paid) athletes far exceeds those suffered by the typical amateur NCAA athlete (regulated by the NCAA's rules regarding amateurism)—the class treatment of personal injury claims is preferable and superior to individual litigation. Thus, here, the alternative to a class action is not a groundswell of individual claims; it is essentially no claims, which—especially from the NCAA's perspective—is the entire purpose (and strategy) behind the class waiver. (*See id*.)

c. <u>Any manageability concerns relating to the class-wide treatment of personal injury claims are addressable.</u>

As Nichols' previously flagged, there are many "solutions available—sampling, phased litigation, bell-weather trials and other potential trial plans—[that] could be devised to ensure predominance of common issues in a manageable setting." (Dkt. 83 at 14.) And here, such solutions can address the fact that, as in *In re NFL*, while each PI Class member's claim turns on the same "theory of proximate cause," the "question of specific causation would remain." *In re NFL*, 2015 WL 1822254, at *22, *31.

But far from barring certification outright (as Interim Class Counsel might suggest), the Seventh Circuit has explained that district courts must exhaustively explore methods to overcome manageability challenges and "devise imaginative solutions," while noting that,

> Often . . . there is a big difference from the standpoint of manageability between the liability and remedy phases of a class action. . . . Whether particular members

26

> of the class were defrauded and if so what their damages were are another matter, and it may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief.[29]

*Carnegie,* 376 F.3d at 661. And here, a "problem-solving" approach could avoid the problems *created* by the Medical Monitoring Settlement's unrestricted class waiver—i.e., that absent class treatment, class members "in individual litigation unaided by [Rule 23], would be at a *substantial disadvantage* trying to prosecute separate and enormously expensive actions against the well-resourced NCAA." (*Arrington* Dkt. 175 at 35 (emphasis added).)

Here, the Court has several options that, once implemented, could surmount the manageability challenges associated with a PI Class. (*See* Dkt. 83 at 13-14.) The Court could, for example, follow the path advocated by the Seventh Circuit in *In re IKO*, *Butler*, and *Pella* (among other cases) and bifurcate the liability and damages phases of this litigation, which would allow PI Class members to utilize the procedural benefits of Rule 23 to settle—once and for all—the NCAA's liability before proving *whether* they were damaged and the *extent* of their damages. *See supra* § II.A.2.a., at notes 25-26; *see also Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) ("If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve

---

[29] *See also Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 888 (7th Cir.2011) ("[T]he district court has substantial latitude in the management of complex class-action litigation."); *In re Motor Vehicle Air Pollution Control Equip.*, 52 F.R.D. 398, 404 (C.D. Cal. 1970) (emphasis added) ("Manageability of the classes…may certainly tax the imagination and ingenuity of the litigants, counsel and the court. But until management is recognized as *impossible or near impossible*, the Court will depend upon the ingenuity and aid of counsel to solve the complex problems this litigation may bring."); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 254 (N.D. Ill. 2014) ("In short, it would be imprudent for the Court to presume a problem before one occurs. Moreover, as plaintiffs note, district courts have considerable flexibility in fashioning solutions to manageability issues that arise in class action litigation."); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 363 (S.D. Ga. 1996), *aff'd sub nom., Jones v. H & R Block Tax Servs.*, 117 F.3d 1433 (11th Cir. 1997) ("There exists a strong presumption against denying class certification for management reasons.") (citations omitted), *cited in Carnegie*, 376 F.3d at 663.

those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.") (citing collected cases).

Or, as another option, issues of proximate causation may potentially be overcome by the use of inferential statistics, which could allow each Class member to frame his or her case under a common, manageable scheme.[30] *See, e.g.*, *In re Estate of Marcos Human Rights Litigation* ("*Hilao*"), 910 F. Supp. 1460, 1464 (D. Haw. 1995), *aff'd sub. nom., Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) (holding, over defendant's objection that all claims should be individually tried, "[t]he use of aggregate procedures, with the help of an expert in the field of inferential statistics, for the purpose of determining class compensatory damages is proper."). In *Hilao*, the district court tried class members'—victims of former President of the Philippines, Ferdinand E. Marcos' alleged human rights violations—claims in three phases: (1) liability, (2) exemplary damages, and (3) compensatory damages. *Id.* at 1462-63 (enumerating *fourteen different types* of human rights violations allegedly experienced by individual class members). During first phases, "a jury found that defendants had committed the wrongful conduct, and awarded exemplary damages to the class." *Newberg on Class Actions* § 11:21 (5th ed. 2011). Then, in the third phase:

> a jury heard the depositions of 137 out of 9,541 class members, as well as the testimony of "an expert in the field of inferential statistics and survey sampling" on the statistical validity of a formulaic extrapolation from the sample. By dividing the plaintiffs into three categories based on the injuries they received, and into further subdivisions within those categories, the jury could extrapolate damages from the sample plaintiffs to all plaintiffs. The jury thus awarded compensatory damages on the basis of this extrapolation from the 137-claimant sample.

---

[30] The propriety of using inferential statistics to prove liability and damages is presently before the Supreme Court. *See Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791 (8th Cir. 2014), *cert. granted,* No. 14-1146, 2015 WL 1278593 (U.S. June 8, 2015).

*Id.* In finding that this procedure served Rule 23's goals of efficiency and uniformity, the *Hilao* court noted that:

> [I]ndividual trials for each of the 9,541 plaintiffs would take decades. Most of that time would be wasted since the nature of the injuries would be similar, if not identical, the testimony would be largely duplicative. Utilizing the procedure employed by the Court the injuries could be accurately categorized, and the source of the injuries would be identical.

*Hilao* at 1467.[31]

Here, the point is that while a PI Class may present manageability challenges, the Seventh Circuit's push for "imaginative solutions" warrants consideration of these, or other, options. Indeed, the flexibility courts have for overcoming manageability issues is the reason why personal injury class actions are routinely certified—even post *Amchem*. *See* FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION (Fourth) § 22.72 (2004) ("*Amchem* does not categorically preclude certification of a mass tort personal injury or property damage settlement class action."); *see, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. 2006) (finding common issues predominated resulting from oil-spill following Hurricane Katrina and granting certification in light of potential for "bifurcation of the issues of liability and damages"); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-27 (5th Cir. 1999) (distinguishing *Amchem* and certifying class of casino workers who "claim injury from the same defective ventilation system over the same general period of time"). (*See also supra* note 23.) The alternative—i.e., forcing class members to re-litigate the same—or substantially the same— case, over and over again (and at a "substantial disadvantage . . . against the well-resourced

---

[31] The Court further held that use of the class action mechanism did not violate the Seventh Amendment, given that because "Rule 23 . . . does not mandate the presence of each member of the class," and thus, "by choosing a random sample of 137 claimants in an aggregate trial, neither side was deprived of even the form of their right to a jury trial." *Id.* at 1469.

NCAA," (*Arrington* Dkt. 175 at 35))—would all but guarantee that the NCAA will never be brought to task for its alleged wrong-doing.

### B. A "Core Issues" Class Is Certifiable Under Rule 23(c)(4).

In the alternative to outright certification under Rule 23(b)(3), and as Interim Class Counsel previously argued (before they agreed to waive their clients' right to pursue *any* class relief):

> class-wide resolution of . . . [certain] common liability issues under Rule 23(c)(4) on behalf of a nation-wide, 51-jurisdiction class will be the most efficient means of litigating issues "that are the same for each class member" and should not be repeatedly tried. These core issues can be most effectively and efficiently resolved in a class jury trial before this Court, with the individual issues addressed separately in other forums. This Court can efficiently resolve "in one fell swoop" the core issues presented in this case under Rule 23(c)(4).

(*Arrington* Dkt. 175 at 32 (quoting *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012).)[32] Here, the core of *every* class member's present or future claim for damages turns on the same three issues relating to the *NCAA's* conduct:

1. Whether the NCAA owed class members a duty of care,

2. The nature of the NCAA's duty, and

3. Whether the NCAA breached that duty.[33]

Accordingly, certification of the Core Issues Class would "enable [the Court] to achieve the economies of class action treatment for a portion of [this] case, [even if] the rest . . . [is] unmanageable as a class action." MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.24, at 273 (2004).

---

[32] Notably, in the context of a personal injury class action structurally similar to this one, on September 2, 2014, Mr. Berman (along with other lawyers from his firm) moved for certification of both a Rule 23(b)(2) medical monitoring class and a Rule 23(c)(4) issues class "for liability determinations." (*See Thornton v. Davita Healthcare Partners, Inc.*, Case No. 13-cv-00573, Dkt. 109).

[33] As noted, *see supra* § III.A.1.b., similar issues could support certification of core issues for fraud—and potentially other concussion-related—claims.

Use of Rule 23(c)(4) in this manner is hardly novel. To that end, Judge Gottschall recently observed that "the issue-class approach most accurately reflects the plain language of Rule 23(c)(4)," has been formally adopted by the Second, Third, and Ninth Circuits, and

> aligns with the Seventh Circuit's expressed views on Rule 23. Repeatedly the Seventh Circuit has encouraged "district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." [As such,] [i]nterpreting subprovision (c)(4) to allow certification of issue-specific classes [is] a workable solution to such problems.

*Jacks v. DirectSat USA, LLC*, No. 10-CV-1707, 2015 WL 1087897, at *5 (N.D. Ill. Mar. 10, 2015) (quoting *Carnegie,* 376 F.3d at 661 and citing collected Seventh Circuit case law).[34] As such, Rule 23(c)(4) permits the certification "as to particular issues concerning liability even if the claim as a whole does not meet the predominance requirement of Rule 23(b)(3)."[35] *Id.* at *6.

Here, because *all* class members will face the same three issues identified above, the proposed Core Issues Class readily satisfies both Rule 23(a) and 23(b)(3).

1.    *The Core Issues Class meets Rule 23(a)'s requirements.*

To start, because *every* class member's claim turns on the three core issues identified above, the Core Issues Class could readily satisfy Rule 23(a).

First, the Core Issues Class is sufficiently numerous. As discussed above, *see supra* § III.A.1.a., Interim Class Counsel's expert has estimated that (i) nearly 7,000 concussions occur among NCAA student-athletes annually and (ii) around 1% of concussed individuals are expected to develop "persistent PCS"—only one of the disease states associated with

---

[34] Judge Gottshall also recognized that "legal commentators agree that sub-provision (c)(4) was drafted to facilitate the certification of issue-specific classes." *See id*. (citing James Wm, Moore, 5 *Moore's Federal Practice* § 23.23 (3d ed. 2014); Charles Alan Wright et al., 7AA *Federal Practice & Procedure* § 1790 (3d ed. 2005); and William B. Rubenstein, et al., 6 *Newberg on Class Actions* § 18:7 (4th ed. 2002).
[35] In contrast to the approach of the Second, Third, and Ninth Circuits (and the approach Judge Gottschall held is consistent with Seventh Circuit precedent), the Fifth Circuit has read Rule 23(c)(4) as a mere "housekeeping rule that allows courts to sever the common issues for a class trial," rather than as a vehicle for certifying issues classes. *Id.* at *4 (quoting *Castaino v. Am. Tobacco Co.*, 84 F.3d 734, 745 n. 21 (5th Cir. 1996).

concussions. (Deal Rpt. at 6, 11.) Accordingly, and given that the PI Class covers a 13-year period, the class is sufficiently numerous. *See Schmidt*, 268 F.R.D. at 326.

Second, Rule 23(a)(2)'s commonality requirement is also met. Here, for *any* class member to prevail on the merits—whether on a claim for concussion-related personal injury damages or on a claim for medical monitoring—he or she must address and prevail on the same three issues: the NCAA's duty, the nature of that duty, and the NCAA's breach. Because these broad issues turn entirely on the *NCAA's* relationship and conduct with respect to the class (and, thus, won't vary between individual class members), they lead to a host of questions common to every class member's claim. (*See supra* § III.A.1.b.); *see also Hudson*, 242 F.R.D. at 501 ("Claims arising out of Defendants' standardized conduct towards members of the proposed class present a classic case for treatment as a class action."). Accordingly, the identified core issues satisfy Rule 23(a)(2)'s commonality requirement.

Third, Rule 23(a)(3)'s typicality requirement is satisfied. With respect to the identified core issues, *every* class member's claim necessarily "arises from the same event or practice or course of conduct that gives rise to the claims of other class members [and is] based on the same legal theory," *Keele*, 149 F.3d at 595 (7th Cir. 1998) (quoting *De La Fuente*, 713 F.2d at 232). Therefore, any given class member's claim is—by definition—typical.

Fourth, here, identifying individuals to adequately represent the interests of *all* Core Issues Class members (i.e., those with and without concussion-related personal injuries) is no obstacle to Rule 23(c)(4) certification. This litigation has already identified NCAA athletes from a variety of contact and non-contact sports; some have personal injury claims (like Arrington) and some do not (like Ryan Parks, *see* Dkt. 171 ¶¶ 100-106). Regardless of their specific claims, each has an interest in settling—once and for all—answers to the three core issues. And once

independent counsel is assigned to represent the interests of those class members with personal injury claims, any potential conflicts of interest between class members can be avoided. *See In re NFL*, 2015 WL 1822254, at *17. Accordingly, Rule 23(a)(4)'s requirement of adequate representation can be met.

2.    *The Core Issues Class satisfies Rule 23(b)(3)'s predominance and superiority requirements, while avoiding any manageability concerns.*

Next, the Core Issues Class would meet the requirements of Rule 23(b)(3), because (i) the identified core issues would predominate *every* class member's claim for damages; (ii) resolution of the core issues in a single stroke is far superior to re-litigating them—via the *same* discovery, *same* witness testimony, and *same* determinations of fact—tens, hundreds, or thousands of times over; and (iii) any manageability concerns, including those that may be associated with outright Rule 23(b)(3) certification (e.g., those relating to injured class members' burden of proving specific causation), are non-issues for a Rule 23(c)(4) class.

First, in terms of predominance, the core issues identified here—i.e., whether the NCAA owed class members a duty, the nature of that duty, and whether the NCAA breached it—are central and common to each class member's claim. *See In re NFL*. 2015 WL 1822254, at *22 ("Central to this case are factual questions regarding the NFL Parties' knowledge and conduct. Class Members' negligence claims depend on establishing that the NFL Parties knew of the dangers of concussive hits, yet failed to modify the rules of NFL Football to mitigate them, or even to warn Retired Players that they were risking serious cognitive injury by continuing to play."). (*See also supra* § III.A.2.a.) Here, because each identified issue turns entirely on the NCAA's conduct, there is no need for any individualized determinations and, thus, the proposed Core Issues Class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 622 (citation omitted). Predominance is therefore satisfied.

33

Second, and rather than deciding them again and again as class members theoretically[36] bring individual personal injury or other concussion-related claims, class adjudication of the core issues would further "the goals of efficiency and uniformity in decision-making that underlie Rule 23," *Jacks,* 2015 WL 1087897, at *5. As explained above, the evidence needed to show that the NCAA owed class members a duty, the nature of that duty, and the NCAA's breach will not vary between class members. (*See supra* § III.A.1.b.) Thus, both the court system and all litigants presently before this Court—class members and the NCAA alike—will benefit by adjudicating these issues in one forum with the benefit of a robust and developed factual record. *See McReynolds*, 672 F.3d at 491 (observing that the "practices challenged . . . present a pair of issues that can most efficiently be determined on a class-wide basis, consistent with [Rule 23(c)(4)]," because they won't need to be re-litigated even if "hundreds of separate trials may [ultimately] be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss each class member sustained[.]"). Thus, because the core issues would be adjudicated—whether in favor of the Class or the NCAA—identically for all claimants, "it makes good sense . . . to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings," *id.*

Finally, while Rule 23(b)(3) certification of the proposed PI Class members' personal injury claims has obvious challenges, *see supra*, § III.A.2.a., none present manageability obstacles under Rule 23(c)(4). In fact, the only possible hurdles to all-at-once adjudication of the core issues come from state-to-state variances in negligence standards (i.e., relating to duty and

---

[36] Realistically, if *at least* the core issues are not litigated on a class basis, the enormous expense of litigation—whereby class members would be called to engage in duplicative discovery, hire redundant experts, and prove the core issues again and again—would have a massive chilling effect on any class member's willingness or ability to bring his or her own personal injury case. Even Interim Class Counsel identified this fact as a factor cutting sharply in favor of Rule 23(c)(4) certification. (*Arrington* Dkt. 175 at 35.)

breach)—but, as Interim Class Counsel have already demonstrated, these differences are slight and can be managed by grouping similar duty and breach jury instructions for all or some of the States. (*Arrington* Dkt. 175 at 33; *see also Arrington* Dkt. 181 at 8-12 ("Trial Plan").) As such, the proposed Rule 23(c)(4) Core Issues Class is very manageable.

In summary, and as Interim Class Counsel previously explained,

> [i]t would be enormously inefficient – for both the court system and Class Members – to engage in hundreds or thousands of individual trials on the same liability issues. Following trial of the Core Issues, Class Members and the NCAA will be able to rely on the duty-and-breach findings from this Court to streamline litigation of the remaining individualized issues. Moreover, Class Members, in individual litigation unaided by Rule 23(c)(4), would be at substantial disadvantage trying to prosecute separate and enormously expensive actions against the well-resourced NCAA. A class action is the most fair and efficient means for Plaintiffs and Class Members to litigate against the NCAA.

(*Arrington* Dkt. 175 at 35.) As such, here, certification of the Core Issue Class is an opportunity for the Court to both answer the Seventh Circuit's call to devise "imaginative solutions" for Rule 23 manageability challenges and—more importantly—remedy the chilling effect of the proposed Settlement's class waiver.

## III.   CONCLUSION

Because the proposed Medical Monitoring Settlement asks Class members to waive *all* concussion-related class claims in exchange for *no* corresponding relief—and didn't even provide those Class members who would be hurt the most (Arrington and others with concussion-related personal injury claims) with any independent representation through the settlement process—it cannot possibly pass the fairness test. Even Interim Class Counsel have admitted that their own "strategic" decision will place injured Class members at a "substantial disadvantage" in individual personal injury litigations against the NCAA. As such, the Settlement does not fall anywhere near the range of possible approval and should be rejected.

Date:   July 15, 2015

Respectfully submitted,

**ANTHONY NICHOLS**

By: /s/  Ari J. Scharg
       One of his Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 N. LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Richard R. Gordon
richard.gordon@gordonlawchicago.com
GORDON LAW OFFICES, Ltd.
211 West Wacker Drive, Suite 500
Chicago, Illinois 60606
Tel: 312.332.5200
Fax: 312.236.7727

Brian W. Coffman
bcoffmanlaw@gmail.com
COFFMAN LAW OFFICES
2615 North Sheffield Avenue
Chicago, Illinois 60614
Tel: 773.348.1295
Fax: 773.248.6013

Steven K. Mamat
STEVEN MAMAT, PLLC
302 S. Main St., Suite 202
Royal Oak, Michigan 48067
Tel: 248.548.1009
Fax: 248.548.1012

Samuel M. Lasser
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero St.
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

John J. Driscoll
THE DRISCOLL FIRM, P.C.
211 N. Broadway
St. Louis, Missouri 63102
Tel: 314.932.3232

Jeffery L. Raizner
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9077

## CERTIFICATE OF SERVICE

I, Ari Scharg, an attorney, hereby certify that on July 15, 2015, I served the above and foregoing ***Nichols' Second Objections to Plaintiffs' Motion for Preliminary Approval of Class Settlement***, by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this the 15th day of July, 2015.

/s/ Ari J. Scharg