# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| ADRIAN ARRINGTON, DEREK OWENS, ANGELICA PALACIOS, and KYLE SOLOMON, individually and on behalf of all others similarly situated, | Case No. 11-cv-06356 |
|  | Judge John Z. Lee |
| Plaintiffs, | Magistrate Judge Brown |
| v. | **JURY DEMAND** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, |  |
| Defendant. |  |

**PROFFER OF COMMON FACTS IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

[REDACTED VERSION]

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................1

II.    FACTS COMMON TO THE CLASS .............................................................1

     A.     The NCAA Has Assumed a Duty to Protect and Safeguard Student-Athletes........1

         1.     The NCAA's founding purpose: "to protect young people from the dangerous and exploitive athletics practices of the time."...........................1

         2.     The NCAA Constitution and other pronouncements evidence a duty to protect and safeguard student-athletes. ........................................................3

         3.     The NCAA annual guidelines for the protection of student-athletes' health and well-being evidence a duty to protect and safeguard student-athletes. ...................................................................................................7

     B.     The NCAA's Knowledge of the Dangers of Concussions to Student-Athletes Dates Back to at Least 1933........................................................................8

         1.     Since at least 1933, the NCAA has known of the serious nature of concussions and the need for return-to-play guidelines............................8

         2.     Since at least 1937, the NCAA has studied the significant numbers of concussions suffered by student-athletes but ignored its duty to protect them...................................................................................................9

         3.     The NCAA commissions two studies on the acute and cumulative effects of concussions, then ignores those studies. ...................................12

         4.     The NCAA also knew about the prevalence of concussion injuries among its student-athletes by conducting multi-year, sport-wide analyses of concussions. ...........................................................................16

         5.     Third parties regularly contacted the NCAA requesting more protection for students...............................................................................20

     C.     The Consensus Reached in the Scientific and Medical Communities Regarding Concussion Management and Return to Play – and the NCAA's Decisions Not to Follow at Each Critical Time Period..........................................24

         1.     1994-1997: The NCAA's first non-mandatory concussion-management guideline....................................................................................24

         2.     1997-2002: The NCAA backtracks and removes any return-to-play criteria. ...................................................................................................25

         3.     2002-2007: International consensus on concussion management and return to play is reached – but the NCAA fails to adopt the consensus.....27

4.      2009-10:  The NCAA Health and Safety Group fights to implement mandatory rules that meet the standard of care – but the NCAA rejects the consensus standard. ................................................................32

5.      The NCAA finally requires schools to implement concussion-management plans for the 2010-11 school year – but did not confirm whether schools followed the mandate. ..........................59

D.      The NCAA Knew That Schools Were Not Following the Standard of Care – But Chose Not to Enforce It...............................................................61

E.      Educating Student-Athletes, Parents and Coaches on Recognizing a Concussion and the Consequences of Returning to Play While Symptomatic Is a Critical Component of the Standard of Care and Yet Virtually Non-Existent at the NCAA ...................................................................65

F.      The NCAA does not Provide Support for Students That Have Suffered Concussions ..............................................................................................69

1.      The NCAA does not provide academic accommodations for students with concussions. ........................................................................69

2.      The NCAA does not provide the means to pay ongoing medical bills related to concussions. .............................................................70

3.      The NCAA does not protect student-athletes' scholarships when concussions prevent them from continuing to play. ....................71

G.      Plaintiffs' Experiences Are Typical of those of the Class ....................72

1.      Adrian Arrington....................................................................72

2.      Derek Owens..........................................................................74

3.      Angelica Palacios....................................................................75

4.      Kyle Solomon. ........................................................................77

# I.  INTRODUCTION

Plaintiffs submit this Proffer of Facts as common material facts that would be proven at trial for the claims of the Negligence/Medical Monitoring Class and the Core-Issues Class and their sub-classes.  Each Plaintiff and Class Member will present these facts at trial.

# II.  FACTS COMMON TO THE CLASS

## A.  The NCAA Has Assumed a Duty to Protect and Safeguard Student-Athletes

### 1.  The NCAA's founding purpose:  "to protect young people from the dangerous and exploitive athletics practices of the time."

1.      The NCAA was founded "to protect young people from the dangerous and exploitive athletics practices of the time."[1]  According to the NCAA, "[t]he rugged nature of early-day football, typified by mass formations and gang tackling, resulted in numerous injuries and deaths," prompting President Theodore Roosevelt to convene two White House conferences with college leaders to encourage safety reforms.[2]  As a result, colleges and universities initiated changes in football playing rules to protect the safety of student-athletes, and sixty-two higher-education institutions became charter members of the original NCAA, then called the Intercollegiate Athletic Association of the United States ("IAAUS").[3]

2.      At the 1909 annual convention of member institutions, Syracuse University Chancellor James Roscoe Day trumpeted the need to protect student-athletes:

> The lives of the students must not be sacrificed to a sport.  Athletic sports must be selected with strict regard to the safety of those practicing them.  It must be remembered that the sport is not the end.  It is

---

[1] Ex. 5 (History, NCAA, http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/history (last updated Aug. 13, 2012)).  The Intercollegiate Athletic Association of the United States changed its name to the National Collegiate Athletic Association in 1910.  *Id*.  All exhibits referenced herein are attached to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification.

[2] *Id*.

[3] *Id*.

incidental to another end far more important.  We lose sight of both the
purpose and the proportion when we sacrifice the student to the sport.[4]

3.      Since that time, the NCAA has repeatedly confirmed its duty to ensure that

athletic programs are "conducted in a manner designed to protect and enhance the physical and

educational well-being of student athletes."[5]  The NCAA's website provides that its "core

mission is to provide student-athletes with a competitive environment that is safe" and that the

NCAA itself takes "proactive steps to student-athletes' health and safety."[6]

4.      Throughout the Class Period, the NCAA reaffirmed its duty to protect student-

athletes  For example, on April 7, 2008, the NCAA's Director of Health and Safety, David

Klossner, stated that "[i]nstitutions have a legal obligation to use reasonable care to protect

student-athletes from foreseeable harm in any formal school-sponsored activity, in-season or out-

of-season."[7]

5.      In an October 27, 2009 letter to Congress, NCAA Interim President James Isch

described the duty of the NCAA to student-athletes.[8]  Isch stated that "[a]mong the core purposes

of the Association is a commitment to govern athletics competitions in a manner designed to

protect the health and safety of all student-athletes."[9]  He assured Congress that:  "[a]s data and

---

[4] Ex. 20 (James Roscoe Day, Chancellor, Syracuse University, *The Function of College Athletics*, *in* PROCEEDINGS OF THE FOURTH ANNUAL CONVENTION OF THE INTERCOLLEGIATE ATHLETIC ASSOCIATION OF THE UNITED STATES (Dec. 28, 1909), 34, at 38, *available at* http://books.google.com/books (last accessed July 10, 2013).

[5] Ex. 10 (NCAA Const. art. 2, § 2.2).

[6] Ex. 4 (*Health and Safety Overview*, NCAA.org, http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/ (last accessed July 10, 2013)).

[7] Ex. 91 (NCAA10023685-86, at NCAA10023685).

[8] Ex. 78 (NCAA00014890-94).

[9] *Id.* at NCAA00014890.

science dictate, the NCAA will continue to make the necessary additions to its health and safety measures that will provide a safe environment for all competing student-athletes."[10]

6.      On January 4, 2010, the NCAA's Health and Safety Director testified during the House Judiciary Committee's hearings on Legal Issues Relating to Football Head Injuries, and admitted that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."[11]

7.      Yet despite these founding purposes and assurances, the NCAA actually leaves the responsibility "to protect the health of, and provide a safe environment for," the student-athletes with its member institutions.[12]  The NCAA also left individual schools with the sole "responsibility to educate their student athletes," given the NCAA's view that, "[a]t the end of the day, they make the decisions of what happens with their student athletes and how they educate them on various topics related to their student athlete health."[13]

**2.      The NCAA Constitution and other pronouncements evidence a duty to protect and safeguard student-athletes.**

8.      College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which comprise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

---

[10] *Id*.

[11] Ex. 21 (Legal Issues Relating to Football Head Injuries (Part I & II):  Hearings Before the Committee on the Judiciary House of Representatives, 111th Congress (First and Second Sessions, Oct. 28, 2009, and Jan. 4, 2010) (testimony of David Klossner, Director, Health and Safety, NCAA), at 288, *available at* http://judiciary.house.gov/hearings/printers/111th/111-82_53092.pdf (last accessed July 16, 2013)).

[12] Ex. 78, at NCAA00014893.

[13] Ex. 21, at 366.

9.      The NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for member schools.  The NCAA promulgates sport-specific standards through its Playing-Rules Committees, which write the rules for fifteen of the twenty-three men's and women's sports that it regulates.[14]  The playing-rules committees are comprised primarily of coaches, who act as consultants to the Association in the event that any "major changes" to the rules are considered.  However, the primary responsibility for developing and interpreting the rules falls to the secretary-rules editor.

10.      The NCAA also publishes a Sports Medicine Handbook (the "Handbook"), which includes policies and guidelines for the treatment and prevention of injury, as well as return-to-play instruction.  The Handbook is also produced annually and sent directly to head athletic trainers.  It is not sent directly to the entire athletic trainer staff or to student-athletes, but it is made available online.[15]

11.      The NCAA Constitution clearly defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes.  Among those purposes:  "(a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes[; and] (b) to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association…."[16]  One of the NCAA Constitution's "Fundamental Policies" is the

---

[14] *See* Ex. 6 (NCAA, *Playing Rules Overview*, http://web.archive.org/web/20120705172330/https://www.ncaa.org/wps/ wcm/connect/public/test/issues/playing+rules+overview (last visited June 11, 2013) (defining "playing rules" as "[r]ules that govern competition between institutions in NCAA-sponsored sports")).

[15] Ex. 63 (NCAA00007590).

[16] Ex. 10, at NCAA Const. art.1, § 1.2(a), (b).

- 4 -

requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation."[17]

12.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides in pertinent part:

> **2.2   The Principle of Student-Athlete Well-Being**
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. *(Revised: 11/21/05.)*
>
> \* \* \*
>
> **2.2.3  Health and Safety**.  It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. *(Adopted:  1/10/95.)*

13.     The NCAA Constitution also mandates that "each member institution … establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience."[18]

14.     To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations…."[19]

15.     Other NCAA pronouncements have consistently recognized the duty to provide student-athletes a safe environment.  For example, the NCAA's website states:  "Part of the NCAA's core mission is to provide student-athletes with a competitive environment that is safe and ensures fair play.  While each school is responsible for the welfare of its student-athletes, the NCAA provides leadership by establishing safety guidelines, playing rules, equipment standards,

---

[17] Ex. 10, at NCAA Const. art. 1, § 1.3.2.

[18] Ex. 10, at NCAA Const. art. 2, § 2.2.1 *(Adopted:  1/10/95)*.

[19] Ex. 10, at NCAA Const. art. 2, § 2.8.2.

drug testing procedures and research into the cause of injuries to assist decision making. By taking proactive steps to student-athletes' health and safety, we can help them enjoy a vibrant and fulfilling career."[20]

16.     The NCAA maintains The Committee on Safeguards and Medical Aspects of Sports, which is publicly touted by the NCAA as "serv[ing] to provide expertise and leadership to the NCAA in order to provide a healthy and safe environment for student-athletes through research, education, collaboration and policy development."[21]

17.     The NCAA website promised its athletes a safe environment as recently as August 27, 2012:

> The NCAA takes appropriate steps to modify safety guidelines, playing rules and standards to minimize those risks and provide student athletes with the best opportunity to enjoy a healthy career. The injury surveillance program collects, analyzes, interprets and disseminates data on injuries in each sport, providing a wealth of information through which we can provide athletes with a safe competitive environment.[22]

18.     One of the NCAA's "core concepts and priorities" was to use its knowledge to promote health and safety:

> The NCAA has been conducting injury surveillance for more than 20 years. Over time, the underlying principle of the program has remained unchanged – to promote and support student-athlete health and safety.[23]

19.     The NCAA explains on its website how it promises to use the injury surveillance data it collects to increase safety:

> How does [the injury surveillance data] help prevent sports injuries?

---

[20] Ex. 4.

[21] Ex. 8 (Sports Injuries, http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/(last updated Aug. 27, 2012)).

[22] Id.

[23] Ex. 121 (NCAA10107716-19, at NCAA10107716).

Once we know how they occur we can take the necessary steps to reduce
student-athletes' exposure to situations that cause injuries. For instance,
we can make adjustments to rules – such as eliminating tackling
techniques in football or high-sticking in ice hockey – to reduce
situations that expose student-athletes to high risks of injury. Or we can
adjust equipment requirements and standards to increase safety.[24]

20.     For these reasons, the NCAA's Interim President, James Isch, stated that one of

"the core purposes of the Association is a commitment to govern athletic competitions in a

manner designed to protect the health and safety of all student-athletes."[25] Further, NCAA's

Director of Health and Safety testified that "student-athletes rightfully assume that those who

sponsor intercollegiate athletics have taken reasonable precautions to minimize risks of injury

from athletics participation."[26] Similarly, the NCAA's Vice President of Championships and

Alliances testified that: "… the NCAA, we – the NCAA as an organization has a responsibility

for all – the welfare of student-athletes."[27]

**3.      The NCAA annual guidelines for the protection of student-athletes' health
and well-being evidence a duty to protect and safeguard student-athletes.**

21.     The Committee on Safeguards and Medical Aspects of Sports annually publishes

the NCAA Sports Medicine Handbook (the "Handbook") "to formulate guidelines for sports

medicine care and protection of student-athletes' health and safety" and "to assist member

---

[24] *See* Ex. 7 (Frequently Asked Questions (expanding "How does it help prevent sports injuries" in "Frequently Asked Questions"),
http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/ (last accessed June 11, 2013)).

[25] Ex. 78, at NCAA00014890.

[26] Ex. 21, at 288.

[27] Ex. 28 (Poppe Tr. at 145:16-18). *See also id.* at 146:19-24 ("I think all who are involved in college athletics have that responsibility [to protect the health of student-athletes] is all I'm saying. Myself as a representative of the championships group or anyone who works in college athletics, that's one of our overall responsibilities."); 165:22-24 ("I think we need mandates in place just to make sure we're protecting the student-athletes.").

schools in developing a safe intercollegiate athletic program[.]"[28]  The Committee on Safeguards

and Medical Aspects of Sports recognizes that the Handbook "may constitute some evidence of

the legal standard of care."[29]  The Handbook expressly recognizes that "student-athletes

***rightfully assume*** that those who sponsor intercollegiate athletics have taken reasonable

precautions to minimize the risks of injury from athletics participation."[30]

22.    In discussing the "Shared Responsibility for Intercollegiate Sports Safety," the

NCAA states that:

> In an effort to do so [i.e., take reasonable precautions to minimize the
> risks of injury from athletics participation], the NCAA collects injury
> data in intercollegiate sports.  When appropriate, the NCAA Committee
> on Competitive Safeguards and Medical Aspects of Sports makes
> recommendations to modify safety guidelines, equipment standards, or a
> sport's rules of play.[31]

23.    Thus, the NCAA has described, time and again, its responsibility for the health

and well-being of student-athletes.

**B.    The NCAA's Knowledge of the Dangers of Concussions to Student-Athletes Dates
Back to at Least 1933**

**1.    Since at least 1933, the NCAA has known of the serious nature of concussions
and the need for return-to-play guidelines.**

24.    The 1933 National Collegiate Athletic Association Medical Handbook for

Schools and Colleges discussed the prevention and care of athletic injuries and contained

recommendations for medical examination as well as diagnosis and treatment for concussions.[32]

25.    Discussing "'[c]oncussion of the brain' and 'fracture of the skull,'" the NCAA

noted that "[t]he seriousness of these injuries is often overlooked," and recognized that "[w]hen

---

[28] Ex. 80 (NCAA00016592).

[29] *Id.*

[30] *Id.* at NCAA00016594 (emphasis added).

[31] *Id.*

[32] Ex. 134 (UNCCH 2228-31).

one realizes that 'concussion of the brain' should be defined as 'bruising of brain tissues' often accompanied with actual bleeding into the tissues, one may realize that the condition should not be regarded lightly."[33]  The NCAA offered information regarding the signs and symptoms of concussion, as well as methods to be used on the sidelines for diagnosing concussion, which included objective tests testing for dizziness and loss of balance.[34]  In a table, the NCAA provided seven rudimentary steps for "IMMEDIATE TREATMENT" of concussions:[35]

| TABLE—(Continued) | | | |
|---|---|---|---|
| TYPE OF INJURY | IMMEDIATE TREATMENT | CONVALESCENT TREATMENT | EXPECTED PERIOD OF CONVALESCENCE |
| Concussion | 1. Responsibility is medical<br>2. Rest in recumbency<br>3. Chaperone constantly<br>4. Sudden change in pulse rate and blood pressure require expert attention<br>5. If headache persists over 1 hour examine eye grounds and give an ounce of Epsom salt by mouth<br>6. If headache or dizziness persist over 2 hours the individual is better off in the hospital<br>7. X-ray of skull in every case of prolonged headache or dizziness | Infirmary or hospital treatment until symptom free 48 hours | If symptoms of headache, dizziness, blurred vision, vomiting continue over 48 hours, individual should not be permitted to compete for 21 days or longer, if at all<br>There is definitely a condition described as "punch drunk" and often recurrent concussion cases in football and boxing demonstrate this<br>Any individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport |

**2.      Since at least 1937, the NCAA has studied the significant numbers of concussions suffered by student-athletes but ignored its duty to protect them.**

26.      The December 29, 1937 Proceedings of the Seventeenth Annual Meeting of American Football Coaches Association states that "[d]uring the past seven years the practice

---

[33] *Id.* at UNCCH 2229.

[34] *Id.*

[35] *Id.* at UNCCH 2231.

has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true…. Sports demanding personal contact should be eliminated after an individual has suffered one concussion."[36]

27.    Yet, fifty years later in 1994, Randall Dick, the NCAA Assistant Director of Sports Sciences, admitted that the NCAA was still not paying enough attention to concussions. In an article entitled "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Surveillance System," Dick documented the high incidence of concussions in sports and noted that "head and neck injuries are not unique to football" and that "[l]ess attention however, has been devoted to monitoring the prevalence of less severe head and neck injuries, such as concussions, in a variety of sports."[37]

28.    By 1994, the NCAA admitted that it was acutely aware of the significant numbers of head injuries being suffered by its student-athletes. In an article titled "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System" and published with the American Society for Testing And Materials, Randall Dick brought to light hard numbers of the concussion epidemic within the NCAA. Using data collected by the NCAA from its Injury Surveillance System,[38] Dick reported that "[c]oncussions accounted for at least

---

[36] Ex. 19 (Floyd R. Eastwood, Purdue University, *Seventh Annual Report on Football Injuries and Fatalities: High School and College*, *in* PROCEEDINGS OF THE SEVENTEENTH ANNUAL MEETING OF THE AMERICAN FOOTBALL COACHES ASSOCIATION (Dec. 29, 1937), at 25 (on file with the American Football Coaches Association)).

[37] Ex. 33 (NCAA00001729-37, at NCAA00001731).

[38] In the article, Dick writes that "[t]he ISS was developed in 1982 to provide current and reliable data on injury trends in intercollegiate athletics. Injury data are collected annually from a representative sample of NCAA member institutions in sixteen sports, and the resulting data summaries are reviewed by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports. The committee's goal continues to be to reduce injury rates through suggested changes in rules, protective equipment or coaching techniques based on data provided by the ISS." *Id.* at NCAA00001732.

60% of head injuries in each of the sports monitored."[39]  His summary also showed a dire need

for education and rule changes:[40]

> Concussion make up the majority of head injuries in the twelve sports examined.  With the recent focus on multiple impact syndrome, an evaluation of concussions may be a first step in the prevention of severe injuries (7).  Without protective headgear, the rate of concussions in sports requiring this equipment would be even higher.
>
> Mouth guards have also been shown to be an effective means of prevention of concussions in sport (9).  Currently mouth guards are required in the sports of NCAA ice hockey, football, men's lacrosse, women's lacrosse and field hockey.  Mouth guards are also worn by many men's and women's soccer and basketball players, although they are not currently mandatory equipment in these sports.
>
> In summary, non-catastrophic head injuries have been shown to account for three to five percent of the injuries in twelve intercollegiate sports while neck injuries were much less frequent.  Concussions made up the bulk of the reported head injuries.  Medical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced. The rules against butting, ramming and spearing are for the protection of both the player initiating the blow as well as the receiver of the blow.  A player who does not comply with these rules in any sport is a candidate for a serious head or neck injury.

29.     Despite clear notice of the problem, the NCAA responded weakly.  With no

attention paid to rule changes or education, the NCAA included the first concussion guidelines in

its Handbook.[41]  But the guidelines were non-binding on member institutions.[42] And the NCAA

did not change any game-playing rules or pass legislation, nor did it take steps to educate

coaches, student-athletes or parents about the problem of concussions.

30.     The NCAA even deferred coaching education. On July 13, 1995, G. Dennis

Wilson, Chair of the NCAA Committee on Competitive Safeguards and Medical Aspects of

Sports wrote a memorandum to the NCAA President's Commission Committee on

Sportsmanship and Ethical Conduct in Intercollegiate Athletics.  In it, he stated that "the

committee … discussed the possibility of future ***optional*** certification levels for coaching

---

[39] *Id.* at NCAA00001734.

[40] *Id.* at NCAA00001736.

[41] *See* Ex. 122 (NCAA10139563-638, at NCAA10139602-05).

[42] *See supra* at n.105.

010270-11  596435 V3

competency in health and safety issues" but that it was "a long-range plan that may not be aggressively pursued at this time...."[43]

31.     The NCAA Sports Sciences Safety Subcommittee of the Committee on Competitive Safeguards and Medical Aspects of Sports met on February 5-6, 1996 in Kansas City, Missouri[44] and acknowledged the increase in concussions in football and ice hockey.[45]  The minutes reflect that "[t]he subcommittee discussed the continued medical and media concern about concussions in the sport of football.  This concern was verified by [NCAA's] ISS data.  It was noted that the football helmet was not designed to prevent this type of injury."[46]  The minutes also reported that "ISS data indicated a rise in concussions" in ice hockey.[47]

**3.      The NCAA commissions two studies on the acute and cumulative effects of concussions, then ignores those studies.**

32.     On February 3, 1997, the Committee on Safeguards and Medical Aspects of Sports, Sports Sciences Safety Subcommittee began discussing "█████████████████ ████████████████████████████" as a potential 1997-98 research project, but only after prioritizing studies regarding creatine and smokeless tobacco.[48]  The decision to actually provide funding would not take place for another year, even though the minutes noted the need to prevent head trauma:[49]

---

[43] Ex. 35 (NCAA00001808-11, at NCAA00001810) (emphasis added).

[44] *See* Ex. 32 (NCAA00001690-96).

[45] *Id.* at NCAA00001693, NCAA00001695.

[46] *Id.* at NCAA00001693.

[47] *Id*. at NCAA00001695.

[48] *See* Ex. 203 (NCAA00014372-78, at NCAA00014372-73) (stating that "the concussion issue would be addressed" only "[i]f funds allow[ed]").

[49] Ex. 73 (NCAA00014396-401, at NCAA00014397).

(3) $50,000 for concussion research. Drs. Griffin and Smith recent-
ly attended a head trauma meeting with representatives from na-
tional medical organizations. Issues ranging from classification
of head trauma to return to play were discussed. It was agreed
that much more research in this area was necessary. The NCAA
has a guideline in the Sports Medicine Handbook regarding con-
cussions, and several sports rules committees (football, ice
hockey, women's lacrosse, men's and women's soccer) have a par-
ticular interest in preventing head trauma. The research find-
ings in this area would address a concern for much of the Asso-
ciation. Drs. Griffin, Green and Smith agreed to research the
most effective application of these funds, including the possi-
ble combination of NCAA monies with matching funds from other
organizations. This group's recommendations will be considered
at the June meeting.

Thereafter on June 26, 1998, the Subcommittee determined that the NCAA would



"[50]

33.     On or about October 29, 1998, the NCAA solicited research proposals on

"**Return to Play Criteria Following Concussion Using Objective Measurements and**

**Techniques.**"[51]  After receiving responses, on or about January 7, 1999, Dick collected the

proposals and forwarded them to the Sport Science Safety Subcommittee for review and

approval.[52]  On January 17, 1999, the Subcommittee approved          for funding to Drs. Kevin

Guskiewicz and Michael McCrea for their study titled "A Prospective Study on Injury

Assessment, Return to Play and Outcome Following Concussion in Athletes."[53]  The Committee

on Safeguards and Medical Aspects of Sports reported that "[t]his effort is in response to the

---

[50] Ex. 200 (NCAA00002079-86, at NCAA00002081).

[51] Ex. 36 (NCAA00002087-94, at NCAA00002088) (emphasis in original).

[52] Ex. 38 (NCAA00002135).

[53] Ex. 205 (NCAA10117832-41, at NCAA10117833).

medical community's need to develop standardized return to play criteria and its concern about increasing concussion rates in many NCAA sports, including football and ice hockey."[54]

34.      This NCAA-funded research was published in the *Journal of the American Medical Association* as two studies on November 19, 2003.  First, Guskiewicz and McCrea published the NCAA "Acute Effects" Study titled "Acute Effects and Recovery Time Following Concussion in Collegiate Football Players."  This study was conducted because of the "[l]ack of empirical data on recovery time following sport-related concussion," which "hampers clinical decision making about return to play after injury."[55]

35.      Among other findings, the Acute Effects study concluded, and the NCAA was clearly on notice of, the fact "that a [c]ollegiate football players may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after concussion" and that "[f]urther research [wa]s required to determine factors that predict variability in recover time after concussion."[56]

36.      The study explained that cognitive deficits took up to seven days to resolve, as "athletes required a full 7 days for postconcussive symptoms to completely return to baseline and control levels."[57]  Given such findings, the authors suggested a pattern of premature return to play at NCAA member institutions, stating:

> We previously found that the largest percentage of collegiate football players were withheld from competition for an average of less than 5 days after concussion.  The disparity between our data on average recovery time and concurrent reports on time withheld from play after concussion raises concerns based on the common assumption that resuming competition before reaching full recovery may increase the

---

[54] Ex. 83 (NCAA10010876-79, at NCAA10010876).

[55] Ex. 64 (NCAA00007837-44, at NCAA00007837).

[56] *Id.*

[57] *Id.* at NCAA00007841, NCAA00007842.

risks of recurrent injury, cumulative impairment, or even catastrophic outcome.[58]

37.     Guskiewicz and McCrea also published a "Cumulative Effects" study titled "Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players." The Cumulative Effects study related to the finding that "[a]pproximately 300,000 sport-related concussions occur annually in the United States, and the likelihood of serious sequelae may increase with repeated head injury."[59]

38.     The Cumulative Effects study concluded that "players with a history of previous concussions are more likely to have future concussive injuries than those with no history; 1 in 15 players with a concussion may have additional concussions in the same playing season; and previous concussions may be associated with slower recovery of neurological function."[60]  And, echoing the Acute Effects study, Guskiewicz and McCrea reiterated the need for time to allow student-athletes' brains to recover following their injury:  "Within a given season, there may be a 7- to 10-day window of increased susceptibility for recurrent concussive injury," but recognized the need for a larger study.[61]

39.     Other than issuing press releases, the NCAA appears to have ignored the studies despite being well aware of their findings.  In 2003, the NCAA's Director of Health and Safety, David Klossner, made substantial revisions to an article discussing and describing the results of the Cumulative Effects study.[62]  Klossner confirmed the NCAA's knowledge of the study by adding more language highlighting the NCAA's specific involvement in the study, clarified that

---

[58] *Id.* at NCAA0007843 (internal citation omitted).

[59] Ex. 66 (NCAA00007909-15, at NCAA00007909).

[60] *Id.*

[61] *Id.* at NCAA00007914.

[62] *See* Ex. 118 (NCAA10104397-98); Ex. 119 (NCAA10104399-400); Ex. 120 (NCAA10104401-02).

the study came from NCAA student-athlete data (and changed language from "college football players" to "NCAA student-athletes"), added in a statistic regarding concussion incidence rate that was not in the original draft (showing familiarity with the details of the study), and made the section regarding likelihood of repeat concussions read more clearly.[63]  Yet, the NCAA made no changes to the NCAA Sports Medicine Handbooks to reflect the research results; indeed, the Handbooks did not even mention the studies.  And the NCAA made no attempt to warn any student-athlete, let alone student-athletes with a history of concussion, regarding the acute or cumulative effects of concussions.

4.      **The NCAA also knew about the prevalence of concussion injuries among its student-athletes by conducting multi-year, sport-wide analyses of concussions.**

40.     Using injury surveillance data from member schools, the NCAA tracked the incidences of concussions at member institutions.  Concern was evident as early as Fall 2004,[64] when the Injury Surveillance System documented a game concussion rate in football of 3.96, which is very high one concussion per every four games for a team of 60 participants.[65]  In women's soccer, 14% of all reported game injuries were concussions.  For men's soccer, concussions accounted for 6.3% of game injuries and, for field hockey, 7% of all game injuries.[66]

---

[63] *Id.*

[64] Ex. 44 (NCAA00003042-44).  The NCAA admits that the data underestimates the number of concussions, because "[a]thletes may not report their symptoms for fear of losing playing time."  Ex. 67 (NCAA00007931-32). *See also* Ex. 65 (NCAA00007854) (according to the NCAA, "there is reason to believe" the concussion data in the injury surveillance program "is understated since student-athletes may not necessarily report injuries for fear of losing playing time.").

[65] Ex. 44, at NCAA00003043.

[66] *Id.* at NCAA00003043, NCAA00003044.

41.     A press release summarized the Injury Surveillance System results for Winter 2004 sports.[67]  Of particular note:  22% of all injuries in women's ice hockey were concussions, and 18% of all injuries in men's hockey were concussions.[68]

42.     The NCAA released its injury surveillance data for the 2005-2006 football season, and it continued to show high rates of concussions and head injuries.[69]  Specifically, head injuries accounted for 11% of practice and 5% of game injuries.[70]  "Concussions ranked third highest in both practice and competition."[71]  In addition, "a team averaging 60 game participants could expect one concussion every five games.  Seven percent of all practice and game injuries involved concussions."[72]

43.     The men's ice hockey injury surveillance data for 2005-2006 had similarly high rates of concussions and head injuries.[73]  Specifically, concussions constituted 12% of all injuries and 7% of all injuries in 2005-2006.[74]  In addition, for games in 2004-2005, concussions constituted 16% of all injuries and 12% of all injuries in 2005-2006.[75]  Another figure in the NCAA release shows that head injuries accounted for 14% of all injuries in 2005-2006 and 17% of all injuries in 2004-2005.[76]  And, head injuries constituted 16% of all injuries in practices for the years 2004-2005 and 2005-2006.[77]

---

[67] Ex. 45 (NCAA00003045-47).

[68] *Id.*

[69] Ex. 41 (NCAA00002934-61).

[70] *Id.* at NCAA00002937.

[71] *Id.* at NCAA00002938.

[72] *Id.* at NCAA00002937.

[73] Ex. 42 (NCAA00002962-80).

[74] *Id.* at NCAA0002980.

[75] *Id.*

[76] *Id.* at NCAA0002977.

[77] *Id.* at NCAA0002976.

44. The 2005-2006 Injury Surveillance System report for men's soccer showed that concussions accounted for 6% of all competition injuries.[78] Head injuries accounted for 11% and 12% of all injuries in 2005-2006 and 2004-2005 respectively.[79]

45. In 2007, the NCAA amplified its knowledge regarding the commonality of concussions among its student-athletes through a series of articles co-authored by the NCAA's Randy Dick and published in the *Journal of Athletic Training*. Dick reviewed the NCAA's injury surveillance data from 1988-1989 to 2003-2004 across men's and women's sports in order to identify potential areas for injury prevention initiatives and made numerous observations regarding the commonality of concussion across NCAA sports, including the following:

   a. Men's Basketball: concussions were the fourth most common game and eighth most common practice injury;[80]

   b. Women's Field Hockey: concussions were the third most common game injury and ninth most common practice injury, stating "[c]oncussion and head laceration injuries increased over this same time, and the risk of sustaining a concussion in a game was 6 times higher than the risk of sustaining one in practice;[81]

   c. Men's Football, concussions were the third most common game injury, fourth most common fall and spring practice injury, and eighth most common practice injury;[82]

   d. Women's Gymnastics (identifying concussion as the sixth most common game and eighth most common practice injury);[83]

   e. Men's Ice Hockey (identifying concussion as the second most common game and fourth most common practice injury, adding "[c]oncussions and facial injuries remain a significant concern in ice hockey");[84]

[78] Ex. 43 (NCAA00003000-19 at NCAA00003003).

[79] *Id.* at NCAA00003017.

[80] Ex. 46 (NCAA00003351-59, at NCAA00003356).

[81] Ex. 47 (NCAA00003370-80, at NCAA00003371, NCAA00003374).

[82] Ex. 48 (NCAA00003381-94, at NCAA00003386).

[83] Ex. 49 (NCAA00003395-402, at NCAA0003399).

[84] Ex. 50 (NCAA00003403-11, at NCAA00003407, NCAA00003410).

010270-11 596435 V3

f. Women's Ice Hockey (identifying concussion as the *most* common game and practice injury, adding "[c]oncussions were the most common injury sustained in practices as well as in games. The upward trend in the rate of game concussions in women's ice hockey is of great concern," that "[t]he relatively high rate of concussions in games and the high number of player-contact injuries relative to other mechanisms raise the question regarding the effectiveness of the current rules against body checking," and that "[i]t is also possible that inconsistent enforcement of the rules resulted in this higher incidence of concussions");[85]

g. Men's Lacrosse (identifying concussion as the third most common game and fifth most common practice injury);[86]

h. Women's Lacrosse (identifying concussion as the third most common game and sixth most common practice injury);[87]

i. Men's Soccer (identifying concussion as the fifth most common game and eleventh most common practice injury, noting that "concussions continue to be a prominent concern in soccer" and that "[o]ur preventive efforts should spotlight the nature of the contact leading to concussions and lower extremity injury, as well as the rules in place to limit the frequency and severity of these injuries");[88]

j. Women's Soccer (identifying concussion as the third most common game and seventh most common practice injury, adding that "[t]hese results are not surprising and underscore the need for prevention of lower extremity injuries and concussions" and also that "concussions continue to be a concern during games");[89]

k. Women's Softball (identifying concussion as the third most common game and ninth most common practice injury);[90]

l. Women's Volleyball (identifying concussion as the fifth most common game and fourteenth most common practice injury);[91] and

m. Men's Wrestling (identifying concussion as the fourth most common game and sixth most common practice injury).[92]

---

[85] Ex. 51 (NCAA00003412-18, at NCAA00003416, NCAA00003417).

[86] Ex. 52 (NCAA00003419-26, at NCAA00003423).

[87] Ex. 53 (NCAA00003427-35, at NCAA00003431).

[88] Ex. 54 (NCAA00003436-44, at NCAA00003440, NCAA00003441, NCAA00003443).

[89] Ex. 55 (NCAA00003445-53, at NCAA00003449, NCAA00003451, NCAA00003452).

[90] Ex. 56 (NCAA00003454-63, at NCAA00003458).

[91] Ex. 57 (NCAA00003464-72, at NCAA00003468).

[92] Ex. 58 (NCAA00003473-81, at NCAA00003477).

- 19 -

46.     The data from the Injury Surveillance System reflected an estimated 29,225 total concussions in NCAA Sports from 2004-2009.  In addition, the statistics show that approximately 16,277 of these occurred in football, which is more than all other Fall sports combined.[93]  The NCAA's Director of Health and Safety noted in 2010, "[t]oo many people think concussion is just a football injury, but from the NCAA's perspective, it's a condition that is a concern across all the sports."[94]

### 5.     Third parties regularly contacted the NCAA requesting more protection for students.

47.     The studies of the effects of concussions and the data reflecting the estimated number of concussions in NCAA sports did not constitute the only information the NCAA had on these issues.  Concerned parents, medical providers and medical and sport associations contacted the NCAA asking the NCAA to take steps to protect student-athletes from concussions and returning to play after a concussion.

48.     For example, on August 27, 1996, Dr. Kenneth Viste, Jr., President of the American Academy of Neurology, Dr. George Zitany, President and CEO of the Brain Injury Association, and Dr. Jay Charles Rich, President, American Association of Neurological Surgeons, wrote a letter to Cedric Dempsey, the Executive Director of the NCAA articulating many of the concerns that still exist surrounding the issue of head injuries in athletics and putting the NCAA on notice regarding the NCAA's deficiencies.[95]  Because of the pressure to win, the letter warned, "coaches, owners, fans, and family expect and sometimes demand that an injured player 'tough it out' and play through the pain…."[96]  The letter also states that concussions were

---

[93] Ex. 70 (NCAA00007964-66, at NCAA00007964).

[94] Ex. 74 (NCAA00014606-09).

[95] Ex. 34 (NCAA00001760-61).

[96] *Id.* at NCAA00001760.

"being overlooked as one of the most serious health problems facing amateur and professional athletes" and that "expressions like 'getting dinged' and 'having your bell rung' downplay the severity of concussions."[97]  It also emphasizes that an athlete who suffers such an injury should not merely be told to "shake it off" but that close monitoring is required of such an athlete.  The letter recognized that part of the problem is that coaches and trainers are not equipped to properly handle a player who suffers a concussion and have not been trained to identify symptoms and do not know how long a player with a concussion should be kept out of a game.  The increasing incidence of concussions in sports demanded that action be taken, and the authors enclosed a draft of the American Academy of Neurology's "Practice Parameter on the Management of Concussion in Sports," as well as draft "palm cards" for coaches and trainers.

49.     On January 6, 1998, Dr. Jeffrey Barth of the University of Virginia Health System wrote to Randall Dick, suggesting that "in order to make recommendations for institutions instituting standard practices, it would be prudent to gain an accurate understanding of current practices."[98]  Dr. Barth suggested a survey be completed by the senior athletic trainer at approximately 1,000 NCAA schools, which would identify whether standardized measures of assessing concussion are currently in use and what individual has final authority to determine return to play in addition to a more in depth survey of current return-to-play practices at approximately 200 schools.

50.     On May 15, 2000, a third-party organization called "SoccerDocs" wrote to the US Consumer Product Safety Commission (and the NCAA possessed a copy), highlighting serious concerns:

1.     There is a high risk of sustaining a concussion in soccer.

---

[97] *Id.*

[98] Ex. 37 (NCAA00002095-98, at NCAA00002095).

2.      Amateur soccer players generally perform significantly more poorly on cognitive tests than control groups.

3.      Additional studies must be undertaken in key areas with a focus on children.

4.      ***Most importantly, preventative action can be taken now including:***

     a)      ***recommending that parents consider protective headgear for their children now that a range of products are on the market.***

     b)      ***Consideration of other measures such as stricter return- to-play guidelines; improvements in proper technique among players; and proper enforcement of rules limiting dangerous play***.[99]

The letter also highlights statistics demonstrating the high risk of sustaining a concussion in soccer and that "[t]here is no doubt we need to gather additional data to complete the picture. For example, we do not know what levels of impact typically cause concussions. There is also a lack of knowledge about the symptoms which can be detected to identify concussion."[100]

51.      On November 12, 2002, Dr. Brian Halpern, the Past President of the American Medical Society for Sports Medicine wrote a letter to the NCAA announcing a "shocking" trend in field hockey, explaining that neck and head injury and concussion percentages in field hockey games rank above 35% based on the NCAA's data.[101] Dr. Halpern officially requests that the NCAA look further into prevention of these injuries, noting that "[t]his is an extremely high percentage of injuries that are potentially permanently disabling and possibly life threatening at times…I am surprised at the high percentage of injuries occurring in practices and games in field hockey gathered from your data of 2000-2002."[102]

---

[99] Ex. 39 (NCAA00002629-42, at NCAA00002632) (emphasis in original).

[100] *Id.*

[101] Ex. 40 (NCAA00002757-67, at NCAA00002758).

[102] *Id.*

010270-11 596435 V3

52.



103

.”104

05

53.     On April 6, 2008, Dr. Frederick Mueller sent David Klossner the "Catastrophic Head Injuries in High School and College Football Players (1977-2008)" and noted that "[n]umbers are going up" and that "[a]lmost all are NCAA players."[106]  The study found that "[t]hese numbers are not acceptable and an all-out effort must be made to reduce them."[107]  The study recommended that the football rules prohibiting spearing (helmet-to-helmet contact) should be enforced and that the head should not be used as a weapon and states that "[i]f more of these penalties are called there is no doubt that both players and coaches will get the message and discontinue this type of play."[108]  The study reiterated that a student-athlete should not return

---

[103] Ex. 202 (NCAA00012206-08).

[104] *Id*. at NCAA00012207.

[105] *Id*.

[106] Ex. 59 (NCAA00003842-73, at NCAA00003843).

[107] *Id*.

[108] *Id*. at NCAA00003852.

to play if they show signs of head trauma and that "[d]uring the 2008 football season there was the possibility of eight second impact syndrome injuries."[109]

54.    On October 16, 2009, Tayna Miller, Associate Athletic Trainer at Elizabethtown College, sent an email to the NCAA, requesting clarification as to what direction return-to-play decisions were heading.[110]  She expressed concern about return-to-play decisions being made by the on-field official in soccer and that "at almost every game that I've attended this year" she noticed issues.  Moreover, she noted that an athlete was returned to play despite concussion symptoms that kept her out for two weeks that were ignored by the on-field official during the game.[111]

## C.    The Consensus Reached in the Scientific and Medical Communities Regarding Concussion Management and Return to Play – and the NCAA's Decisions Not to Follow at Each Critical Time Period

### 1.    1994-1997:  The NCAA's first non-mandatory concussion-management guideline.[112]

55.    From 1994-97, the NCAA Sports Medicine Handbooks contained Guideline 2o, entitled "Concussion and Second-Impact Syndrome," which included return-to-play guidelines, a concussion grading scale, and a sideline evaluation tool adopted from the Colorado Medical

---

[109] *Id.*

[110] Ex. 60 (NCAA00003907-08, at NCAA00003908).

[111] *Id.*

[112] The NCAA promulgates three types of rules or policies relevant here.  First, the NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for member schools.  Next, the NCAA promulgates sport-specific standards through its Playing Rules Committees, which write the rules for fifteen of the twenty-three men's and women's sports that it regulates.  Finally the NCAA annually publishes a Sports Medicine Handbooks ("Handbooks") and sends it to the Head Athletic Trainer at each school.  The NCAA does not require that its member schools follow the guidelines in the Handbooks.  Rather, the NCAA states:  "These recommendations are not intended to establish a legal standard of care that must be strictly adhered to by member institutions.  In other words, these guidelines are not mandates that an institution is required to follow to avoid legal liability or disciplinary sanctions by the NCAA."  *See*, *e.g.*, Ex. 9 (2012-13 NCAA Sports Medicine Handbook, at 2).

Society Guidelines for Management of Concussion in Sports.[113]  Guideline 2o acknowledged

that "some of the mild concussions, the so-called 'bell rung' or 'ding,' with no loss of

consciousness or posttraumatic amnesia may go unrecognized by the coaches, athletics trainers,

fellow players or team physicians."[114]

> 56.    Guideline 2o explained that it implemented
>
>> basic guidelines for the management of concussion in sports.  These
>> guidelines … have reasonable application to clearance guidelines in the
>> preparticipation evaluation.  Although these guidelines may assist in
>> clinical decision-making, they are not absolute and should not be
>> substituted for the clinical judgment of the examining physician.  If there
>> are any questions as to the severity of past head trauma, or if the trauma
>> required intracranial surgery, clearance should be deferred until further
>> records are obtained and/or neurosurgical evaluation is performed.  No
>> athlete should be allowed to return to contact sports on the same day that
>> a grade-three concussion was received.[115]

**2.    1997-2002:  The NCAA backtracks and removes any return-to-play criteria.**

> 57.    The NCAA abandoned the Colorado Medical Society Guidelines in its 1997-98

Handbook and refused to endorse any guidelines, citing a **"lack of consensus among the**

**medical community on management of concussions…."**[116/117]  Guideline 2o was revised to

delete the concussion grading scale, return-to-play guidelines, and sideline evaluations tables

included in previous versions.  In their place, it stated:[118]

> **A student-athlete rendered unconscious for any period of time**
> **should not be permitted to return to the practice or game in which**

---

[113] *See*, *e.g.*, Ex. 122; Ex. 123 (NCAA10139678-81); Ex. 124 (NCAA10139758-61).

[114] *See*, *e.g.*, Ex. 122, at NCAA10139602.

[115] *Id*.

[116] *See*, *e.g.*, Ex. 125 (NCAA10140116-19).

[117] As demonstrated below, the NCAA continued, and continues to this day, to repeat this reason as justification for its failure to adopt specific and mandated return-to-play guidelines despite the fact that "consensus" was indeed reached by the International Conferences on Concussion in Sport which took place in 2001, 2004 and 2008.

[118] Ex. 125, at NCAA10140116-117 (emphasis in original; citations omitted).

the head injury occurred.  In addition, no student-athlete should be allowed to return to athletics activity while symptomatic.  Prolonged unconsciousness and neurologic abnormalities suggesting intracranial pathology may require urgent neurosurgical consultation or transfer to a trauma center.  If there are any questions as to the severity of past head trauma, or if the trauma required intracranial surgery, clearance of the student-athlete should be deferred until further records are obtained or neurosurgical evaluation is performed.

**Several grading scales have been proposed to characterize the degrees, potential severity and return-to-play criteria of concussion. Unfortunately, these categorizations vary and are not universally accepted.  Based on the current lack of consensus among the medical community on management of concussions, the NCAA does not endorse any specific concussion grading scale or return-to-play criteria. Although the grading scales and return-to-play criteria currently in the literature may assist in the clinical decision-making for the student-athlete who has suffered a concussion, these grading scales and return-to-play criteria should not be substituted for the clinical judgment of the examining physician.**

58.     With respect to "multiple concussions," Guideline 2o stated:[119]

The athlete who suffers one concussion may be at greater risk for another.  Evidence of cognitive impairment and neuroanatomical damage has been reported in some individuals.  The number and degree of concussions necessary for permanent impairment is unknown.  Return-to-play decisions should be made on an individual basis after the student-athlete has full recovery of neuronal function and can be informed of the potential risks for subsequent concussion and possible complications.  As with all concussions, careful review of the mechanism of injury and appropriate changes in the environment that can be made to reduce the likelihood of subsequent concussion should be undertaken.

*** 

The attending medical staff should not allow a player to resume participation in physical activity while the injured student-athlete is recovering from his/her post-concussive symptoms.

59.     The NCAA placed a greater emphasis on the necessity of concussion education during this time period and stated in the Handbooks that "[a]ll individuals involved in sports, including coaches, athletic trainers, team physicians, student-athletes and parents should be

_____

[119] *Id.* at NCAA10140117, NCAA10140118.

educated in the symptoms of concussion and the need for medical attention in the event of such an injury."[120]

### 3. 2002-2007: International consensus on concussion management and return to play is reached – but the NCAA fails to adopt the consensus.

60. As reflected in the Report of Dr. Cantu, the November 2001 International Symposium on Concussion in Sport held in Vienna, Austria ("Vienna Conference") resulted in the early 2002 publication of a consensus statement that was "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions" ("Vienna Protocol").[121] The Vienna Protocol was intended to "be widely applicable to sport related concussion" and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of injured athletes, whether at the recreational, elite, or professional level."[122] While the Vienna Protocol acknowledged that individual decisions on return to play would be made, the Vienna Protocol was clear that "agreement exists about the principal messages conveyed by this document…."[123] The Vienna Protocol recommended the consensus view of specific return-to-play guidelines, baseline testing, neuropsychological testing, sideline testing, and concussion education.[124]

---

[120] *Id.*

[121] Ex. 16 (M. Aubry, *et al.*, Summary and Agreement Statement of the First International Conference on Concussion in Sport, Vienna 2001, Brit. J. Sports Med 6, at 6 (2002)).

[122] *Id.*

[123] *Id.* at 9.

[124] *See* Cantu Report, § VIII.B.1.

61.     Reaffirming the consensus in the Vienna Protocol, in 2004, the National Athletic Trainers Association ("NATA") published an extensive position statement regarding management of concussion.[125]

62.     Despite the Vienna Protocol and NATA Position Statement, which reflected the consensus best practice, the NCAA did not revise the substance of Guideline 2o from 2002-2004.[126]

63.     An example of how this consensus was relied upon by experts but not adopted by the NCAA nor used by NCAA member institutions is reflected in the case of Preston Plevretes. In 2005, Plevretes was a 19-year-old sophomore starting linebacker at Division I La Salle University.[127/128]

64.     On October 4, 2005, Plevretes was "



"[129]

[130]

---

[125] Ex. 18 (Kevin M. Guskiewicz, *et al.*, National Athletic Trainers' Association Position Statement: Management of Sport-Related Concussion, 39 J. Athletic Training, 280 (2004)). *See also* Cantu Report, § VII.B.2.

[126] Ex. 62 (NCAA00006946-48); Ex. 81 (NCAA00017195-97).

[127] Ex. 14 (*La Salle Settles Injured Player's Lawsuit*, Associated Press (updated Nov. 30, 2009), *available at* http://sports.espn.go.com/ncf/news/story?id=4700355 (last accessed June 10, 2013)).

[128] Ex. 15 (*Preston Plevretes: Link Between Football Concussions and Brain Damage All Too Clear in Former Player*, The Huffington Post (Mar. 18, 2010), http://www.huffingtonpost.com/2009/12/29/preston-plevretes-footbal_n_406474.html (last accessed July 10, 2013)).

[129] Ex. 206 (NCAAPLS000557-68, at NCAAPLS000561-62).

[130] *Id.* at NCAAPLS000562.

65.     Plevretes sustained a cerebral concussion on October 4, 2005, and suffered

 "███████████████████████████████████████

████" [131]

66.     On November 2, 2006, Preston filed a personal injury lawsuit[132] against La Salle,

Duquesne, and their respective physicians, athletic trainers, and football staff and players

"alleg[ing] that the severity of [Preston's] injury was caused, or at least aggravated, by an earlier

concussion he suffered during a prior game …" rendering Preston more vulnerable to the second,

catastrophic blow.[133]

67.     Multiple experts testified regarding the standard of care for managing concussions

at the time and defendants' failure to follow the standard of care.

68.     Plevretes' experts included Michael W. Collins, Ph.D., an Assistant Professor in

the Department of Orthopaedic Surgery and Neurological Surgery at the University of Pittsburgh

Medical Center ("UPMC") and the Assistant Director of the UPMC Sports Medicine Concussion

Program, the largest clinical and research-based concussion program in the United States.[134] As

to the standard of care, he opined:[135]

> In short, scientific consensus has been achieved in understanding
> cornerstones of care and management of this injury.
>
> *          *          *
>
> Both Vienna and the NATA Position Statement were written secondary
> to the vast accumulation of published research and evolving

---

[131] *Id.* at NCAAPLS000563.

[132] Ex. 13 (Complaint, *Plevretes v. La Salle Univ.*, Civil No. 071004973 (Ct. Com. Pl. Pa.)
(Nov. 2, 2007)).

[133] Ex. 139 (Memorandum & Order, *Plevretes v. La Salle Univ.*, Civil No. 07-5186 (E.D. Pa.
Dec. 19, 2007) at 1 (citing complaint at ¶¶ 37, 83), *available at*
http://www.paed.uscourts.gov/documents/opinions/07D1500P.pdf (last accessed July 16, 2013).

[134] Ex. 131 (NCAAPLS000582-607, at NCAAPLS000582).

[135] *Id.* at NCAAPLS000589-91.

understanding of sports-related concussion that occurred between 1999 and the early 2000s. Both of these documents…outlined very specific recommendations pertaining to appropriate symptom assessment, role of exertion in recovery from injury, appropriate sideline assessment of injury, the importance of post injury neuropsychological testing prior to return to play following cerebral concussion, the importance of a protocol-driven management approach, the need for a multidisciplinary approach to safe management of injury, and the critical aspect of education surrounding this injury. The Vienna and NATA Position Statement set forth, at the time of Preston Plevretes' October 4, 2005 concussion, the uniformly accepted standard of care in the proper assessment and management of cerebral concussion for all physician, sub-specialty, and allied health professionals, including athletic trainers.

69.     Dr. Collins opined that defendants failed to follow the standard of care, finding that: (1) the school's treating practitioners "had scant, if any, understanding of the voluminous amounts of research and consensus agreement that had occurred in the field and how this information should have been applied to the appropriate management of Preston's initial injury;"[136] (2) the school did not have a "written protocol for management and care of the concussed athletes," as required by Vienna and NATA;[137] (3) the school did not refer Plevretes to a physician or specialist, as required by Vienna and NATA;[138] (4) the school did not conduct any formal baseline and/or post-injury neurocognitive testing, as required by Vienna and NATA;[139] and (5) Plevretes' treatment was reckless.[140] Dr. Collins also opined:

> The lack of institutional involvement in assuring appropriate care for their student athletes and also not having any written protocols for appropriate management of injury is a reckless and gross deviation from the standard of care. As such, the lack of institutional support was also responsible for Preston's mismanagement and catastrophic outcome.[141]

---

[136] *Id.* at NCAAPLS000594.

[137] *Id.* at NCAAPLS000599.

[138] *Id.* at NCAAPLS000599-600.

[139] *Id.* at NCAAPLS000601-03.

[140] *Id.* at NCAAPLS000603-05.

[141] *Id.* at NCAAPLS000606.

010270-11  596435 V3

70.     Plevretes' experts also included Scott L. Bruce, MS, ATC, a certified athletic trainer and Lecturer and Approved Clinical Instructor in the Graduate Athletic Training Program at the University of Tennessee at Chattanooga.[142]  He opined that, at the time of Plevretes' injury, "the protocols in both the Vienna statement and the NATA Position Statement were accepted as the standard of care in the proper assessment and management of cerebral concussion for both physicians and certified athletic trainers."[143]

71.     Bruce's opinions mirrored Dr. Collin's findings on how the defendants failed to follow the standard of care.  Further, Bruce opined that the school failed "to ensure proper medical coverage was available and provided to ensure quality healthcare for not only Preston, but for all of their athletes."[144]  He further found that the school failed "to educate team members, including Preston Plevretes, on the signs and symptoms of concussion and the risks of catastrophic injury associated with playing while symptomatic."[145/146]

72.     Despite the fact that "[t]he Vienna and NATA Position Statement set forth…the uniformly accepted standard of care in the proper assessment and management of cerebral concussion,"[147] the NCAA's guidelines in the Handbooks did not follow them (and thus member schools like Plevretes' school did not either).

---

[142] Ex. 132 (NCAAPLS000608-622, at NCAAPLS000608-09).

[143] *Id.* at NCAAPLS000610.

[144] *Id.* at NCAAPLS000611.

[145] *Id.*

[146] In November 2009, La Salle agreed to settle the lawsuit for $7.5 million "to provide care" for Plevretes.  *See* Ex. 14.

[147] Ex. 131, at NCAAPLS000591.  The 2nd International Conference on Concussion in Sport was held in Prague in November 2004 which resulted in a revision and update of the Vienna Protocol.  Ex. 17 (P. McCrory, *et al.*, *Summary and Agreement Statement of the 2nd International Conference in Concussion in Sport, Prague 2004*, 39 BRIT. J. SPORTS MED 196 (2005) (the "Prague Protocol"), *available at* http://bjsm.bmj.com/content/39/4/196.full.pdf (last accessed July 16, 2013).  The Prague Protocol reaffirmed the standard of care for return-to-play guidelines from the Vienna Protocol.  The Prague Protocol also reaffirmed the necessity of

73.     In the 2004-05 NCAA Sports Medicine Handbook, the NCAA replaced Guideline 2o with Guideline 2i, entitled "Concussion or Mild Traumatic Brain Injury (mTBI) in the Athlete."  This Guideline 2i was not significantly revised again until the 2010-2011 edition, despite multiple intervening reaffirmations of the consensus best practices.[148]

### 4.     2009-10:  The NCAA Health and Safety Group fights to implement mandatory rules that meet the standard of care – but the NCAA rejects the consensus standard.

74.     In April 2009, the NCAA's Health and Safety group reviewed all of the sport-specific playing rules promulgated by the NCAA.  The group documented that, of 16 sports, only wrestling made indirect reference to a concussion by referring to a player knocked unconscious.[149]

75.     In November 2009, the Plevretes' lawsuit settled for $7.5 million.[150]  And, by this time, the NFL had adopted stricter return-to-play guidelines,[151] and the National Federation of

baseline testing for comparison purposes, and specifically recommended both a baseline cognitive assessment as well as baseline neuropsychological screening particularly for "organized high risk sports."  *Id.* at 198.  The Prague Protocol stated that neuropsychological testing is "one of the cornerstones of concussion evaluation in complex concussion."  *Id.* at 201.  The Prague Protocol also emphasized the importance of concussion education and consideration of rule changes and increased rule enforcement.  In addition, the Prague Protocol stated that "[t]here is no clinical evidence that currently available protective equipment will prevent concussion."  *Id.* at 202.

[148] *See* Cantu Report, § IX.B.1.

[149] Ex. 82 (NCAA00019595-602, at NCAA00019595).

[150] *See* Ex. 14.

[151] *See*, *e.g.*, Ex. 1 (ESPN, *Concussions in Sports* (updated Jan. 10, 2013 11:32 AM) ("In August 2009, NFL executives and lawmakers joined at the House Judiciary Committee to discuss the effects of head injuries in the sport, at which they were roundly criticized for not taking more action against concussions.  A new, stricter set of guidelines followed that year, which said that a player cannot return to a practice or game if he shows any of the symptoms of a concussion, not just a loss of consciousness.  A player also now must be analyzed by an independent neurologist as well as his team physician after a concussion"), *available at* http://espn.go.com/nfl/topics/_/page/concussions (last accessed June 15, 2013)); Ex. 12 (Press Release, NFL Adopts Stricter Statement on Return-To-Play Following Concussions (Dec. 2, 2009) ("The [NFL's] stricter 2009 statement on return-to-play was developed by the NFL's medical committee on concussions in conjunction with team doctors, outside medical experts,

State High School Associations[152] required officials to remove athletes from playing if they exhibited symptoms of concussions.

76.     On December 7, 2009, the NCAA Managing Director of Government Relations and the NCAA's Director of Health and Safety acknowledged the backlash against the NCAA for not having concussion-management rules in place:

> The landscape has clearly changed around us, at the professional and high school levels, so the focus will remain on us as long as we do not have a rule that keeps a player out (at least same day) after a hit to the head.
>
> It probably is not inconsistent to both have a base line rule regarding return to play and still keep most of the decisions at the local institution level.[153]

77.     In response, Klossner asked: "And if not, what is the fall out. I am not sure I have a grasp of not having a rule versus recommendations that favor institutional control."[154]  Burch replied:

---

and the NFL Players Association in order to provide more specificity in making return-to-play decisions.  The new guidance supplements the 2007 statement on return-to-play that encouraged team physicians and athletic trainers to continue to take a conservative approach to treating concussions and established that a player should not return to the same game after a concussion if the team medical staff determined that he had lost consciousness"), *available at* http://www.nflevolution.com/wordpress/wp-content/uploads/2012/08/nfl_adopts_stricter_statement_on_return-to-play_following_concussions-508.pdf (last accessed July 10, 2013)).

    [152] Ex. 138 (Press Release, *National Federation of State High School Associations' "Concussion in Sports" Course* (Aug. 26, 2010), *available at* http://www.nfhs.org/content.aspx?id=4187 (last accessed July 16, 2013).

    [153] Ex. 113 (NCAA10075934-36, at NCAA10075935).

    [154] *Id*.

010270-11  596435 V3

```
From: Frank, Abe
Sent: Monday, December 07, 2009 12:26 PM
To: Klossner, David; Burch, Edgar
Subject: RE: Researchers say NCAA needs head-injury rules


I assume we will continue to get negative press and likely continued
Congressional scrutiny in the short run.    I do not expect the issue
to go away soon as some baseline requirement, as other medical experts have suggested in the
NFL and other medical experts in some states for high schools,  in this important area for
the health and safety of our student-athletes is likely seen as a reasonable act to deter
long term injury by many in the public.


Certainly, I defer to you and our experts to continue to do what is in the best interests of
the student-athletes.  If it is decided that the our current policies with no rule needed are
the best way to protect our student-athletes, I suggest that we need some very well worded
and clear talking points so that we can try to educate others why our view is best for our
student-athletes and why the positions taken by the medical community that the NFL has used
would not provide better protection for our student-athletes or be appropriate for college
sports.


Thanks.
```

Thus, the NCAA recognized that its guidelines were not up to par, and certainly behind those

recommended by the NFL's medical experts and youth sport medical experts.

        78.      On December 13-15, 2009, Committee on Safeguards and Medical Aspects of

Sports held its biannual meeting, at which it:

> [D]etermined that a common playing rule is necessary to provide an
> emphasis on the significant of head injuries, their prevalence, and the
> importance to refer for appropriate medical care.
>
>       *        *        *
>
> The committee recommends that the NCAA Playing Rules Oversight
> Panel (PROP) consider a common sport playing rule for concussion in
> all NCAA sports for which the NCAA writes rules as well as adopt a
> modification to playing rules not governed by the NCAA.
>
>       *        *        *
>
> Specifically, the committee recommends the adoption of a rule that
> states:
>
> a.  'An athlete who exhibits signs, symptoms, or behaviors consistent
> with a concussion (such as unconsciousness, amnesia, headache,
> dizziness, confusion, or balance problems), either at rest of exertion,
> shall be immediately removed from practice or competition and shall not
> return to play until cleared by a physician or her/his designee.'

010270-11  596435 V3

      b. 'Athletes who are rendered unconscious or have amnesia or persistent confusion shall not be permitted to continue for the remainder of the day. These athletes shall not return to any participation until cleared by a physician.'[155]

79.     The Committee also recommended sport-specific playing rules for soccer (to permit a substitution for the concussed player) and wrestling (to amend the prior rule permitted a wrestler knocked unconscious to return to the match if cleared by a physician).[156]

80.     After the meeting on December 15, 2009, Klossner relayed the recommendation to Ty Halpin, the NCAA Associate Director of Playing Rules Administration. Halpin then circulated the recommendations to the NCAA Playing Rules Association and commented that "the rules could be problematic; certainly some liability issues with somehow having game officials be responsible for returning to game action."[157]

81.     E-mails among members of the Committee on Safeguards and Medical Aspects of Sports members noted complaints from athletic trainers to the proposed rule. In response, committee member and head athletic trainer at Princeton, Charles Thompson, commented:

      Why are they complaining? If they are not already using these guidelines, we are in trouble. If they are allowing athletes back in the game after losing consciousness, still suffering from amnesia, etc., we have a bigger problem than we thought.[158]

Thompson also noted his further concern regarding the NCAA's approach:

      I am still concerned that there are physicians out there that will be making these decisions that do not really understand concussions. I also think that until referees start making the calls on a consistent basis, this problem will continue no matter what other steps are taken.[159]

---

[155] Ex. 61 (NCAA00004054-62, at NCAA00004056-57).

[156] *Id.* at NCAA00004057.

[157] Ex. 108 (NCAA10065087-89, at NCAA10065087).

[158] Ex. 84 (NCAA10011982-84).

[159] Ex. 100 (NCAA10043936-37, at NCAA10043936).

82.     Similarly, Committee member and the University of Georgia assistant football athletic trainer responded:[160]

> My thought on this is that is unfortunate that a playing rule would have to be created to legislate a standard of care that is already in our NATA position statement, but we all know that there are times where athletes are returned to games with concussions. I personally have seen an athlete knocked unconscious and return in the same quarter in recent years.

83.     Subsequently, the Committee on Safeguards and Medical Aspects of Sports submitted a formal report to the Playing Rules Oversight Panel ("PROP"), for PROP's January 13, 2010 meeting, requesting that PROP **"[a]dopt a common sport playing rule for concussion injury."**[161]  Alarming statistics were submitted in support of the request:[162]

---

[160] Ex. 84, at NCAA10011982.

[161] Ex. 141 (NCAA00011563-67, at NCAA00011563) (emphasis in original).

[162] *Id.* at NCAA00011564.

010270-11  596435 V3

The NCAA Injury Surveillance data collected from 2004/05 to 2008/09 notes the following summary points and as presented by the Datalys Center.

- During this period, concussion was the 2nd most frequent injury in fall Football. It was the 4th most frequent injury in Men's Soccer, the 2nd most frequent injury in Women's Soccer, the 4th most frequent injury in Field Hockey, and the 4th most frequent injury in Women's Volleyball.
- Across these 5 Fall sports, concussion accounts 7.2% of competition injuries and 4.9% of practice injuries.
- On average per year, there were 2,830 competition concussions and 2,629 practice concussions across these 5 fall sports. The average annual total (competition and practice) over the 5 sports was 5,459 concussions.
- It was estimated that 27,296 concussions occurred in these 5 sports over the 5 year period with over 16,000 occurring in football. This is due in large part to the simple fact that football has a large squad size compared to other sports. It is also a popular sport (595 schools sponsored football in 2008/09). The point of emphasis in the proposed rule language pertaining to practice comes from the fact that 58% of football concussions occurred in practice.
- For every 1,000 student-athletes stepping on the field of play, football's average rate of concussion was 2.7; men's soccer was 1.1; women's soccer was 2.1.
- Concussions during games accounted for approximately 10 percent of women's soccer injuries, 8 percent of field hockey injuries, 6 percent of football injuries, 6 percent of men's soccer injuries and 4 percent of women's volleyball injuries.
- Concussions in football most frequently arose from player contact in blocking and tackling.
- Nearly one-third of concussions in men's and women's soccer games were due to direct player contact while heading the ball.
- In Field Hockey "Contact with apparatus" (mostly stick and ball) accounted for over half of competition injuries.

84.    Prior to the meeting, the then-NCAA Managing Director for Baseball and Football, Dennie Poppe, asked Klossner whether the rule would require football officials to determine whether a student-athlete should be withheld from play.[163]  Klossner confirmed that an official would remove a student-athlete from competition if the student-athlete "exhibits signs, symptoms or behaviors consistent with a concussion."  He explained that "[t]he proposed concussion rule is similar to the playing rules for all sports pertaining to exposure to blood and charges the sports official to remove a student-athlete if they see a noticeable sign of a possible head injury."[164]  Poppe responded:  "there might be a problem."  He noted that there was a belief

---

[163] Ex. 99 (NCAA10042565-66, at NCAA10042565).

[164] *Id.* at NCAA10042566.

that "there is a difference for an official to determine if there is a blood issue and whether or not a s/a has concussion symptoms."[165]

85.     At the January 13, 2013, Playing Rules Oversight Panel meeting, before turning to concussions, the chair of the committee reviewed the role of the panel, including (1) "to support the rules committees' work," and (2) to review rules with "three specific areas of responsibility in mind":  "student-athlete safety; financial impact; and impact on the integrity or image of the game."[166]  The chair also stated:  "Another focal point for the Panel is to be a sounding board for key issues, such as the upcoming concussion discussion."[167]

86.     When it came time for discussion of the Committee on Safeguards and Medical Aspects of Sports' recommendations for a common sport playing rule for concussions, the Playing Rules Oversight Panel decided "it is not a playing rules issue" and rejected the recommendations.[168]  The Playing Rules Oversight Panel did agree, however, to ask each sport-specific rules committee to review their playing rules with respect to "stoppage of play for an injury" and "safety issues, particularly those directed at head protection."[169]

87.     Klossner left the January 13th Playing Rules Oversight Panel meeting stunned. The next morning he wrote an email to Halpin, stating:[170]

---

[165] *Id.*

[166] Ex. 114 (NCAA10080215-21, at NCAA10080216).

[167] *Id.*

[168] *Id.* at NCAA10080218.

[169] *Id.*

[170] Ex. 89 (NCAA10016226-29, at NCAA10016226).

```
From: Klossner, David
To: Halpin, Ty
Sent: Thu Jan 14 09:32:36 2010
Subject: concussion follow-up


Ty,


I am in the office all day today and then traveling to US Lacrosse tomorrow.  I would like to
chat at some point prior to Tuesday to understand better what the true issues were yesterday
and what needs to be better communicated going forward to the individual playing rules
committees.  We have spend hundreds of hours on the this topic and there seemed to be very
little respect to that fact or the work of the Association thus far.  I think it would be
useful to anyone that you feel needs to better understand the situation to review the
articles written on the topic within the last 60 days and read our congressional testimony.
I felt like that even though there were a great number of administrators in the room no one
really had a handle on what has been communicated by the office or the media over the last
few months?


Many of the questions asked were not on point and of random situations, all of which were
considered in the rule development.  For example, here is a direct quote from the most recent
expert consensus on the topic and one that the CDC even uses. Even though expressed many
times there was no acknowledgement as with many of the answers.  I am at a loss.


·       "A player with diagnosed concussion should not be allowed to
return to play on the day of injury. Occasionally, in adult athletes, there may be return to
play on the same day as the injury."

NCAA Congressional Testimony attached.
```

88.     Klossner also included links in the email to 28 media reports from the last 60 days

reporting on, *inter alia*:  football brain injuries, the NFL's more advanced steps in managing

concussions, long-term concussion effects, stories regarding the recent mistreatment of a

concussed football player by an NCAA coach, and critiques of the NCAA's handling of

concussions.[171]

89.     Halpin responded, stating:  "This isn't about whether or not we agree with the

proposal – it really is a great one and right on for football, for example.  But putting it in each

book as a hard/fast rule is problematic and has a much harder impact on all divisions."[172]

---

[171] *Id.* at NCAA10016227-28.

[172] *Id.* at NCAA10016226.

90.     As a result of the Playing Rules Oversight Panel's rejection, Klossner reported to his Health and Safety group:  "What an uphill task we have now."[173]

91.     On January 22, 2010, the Playing Rules Oversight Panel chair sent a memo to the Members of the NCAA Rules Committees, explaining that the Committee on Safeguards and Medical Aspects of Sports had recently submitted "a set of proposals designed to minimize the risk of concussions in sports for the Association and to assist those involved with removal and return to play of student-athletes with a concussion."[174]  He did not include the Committee on Safeguards and Medical Aspects of Sports proposed common playing rule.  Rather he requested the committees to review their playing rules with respect to injuries generally – and not concussions specifically – in five areas.  The only mention of concussions was in a request to the rules committees to provide educational materials on concussions in the next annual publications.[175]  He then stated:

> It should be noted that this action should not be perceived by rules
> committees as an indictment of current rules or procedures.  PROP
> believes each rules committee holds student-athlete safety in the highest
> regard and expects that to continue.[176]

92.     Thus, even though the Committee on Safeguards and Medical Aspects of Sports – the committee tasked with protecting the health and safety of the student-athletes – did in fact believe that the current rules and procedures were plainly insufficient, the Playing Rules Oversight Panel stood as an obstacle to change.

93.     Indeed, it was clear that Ty Halpin, the Director of the Playing Rules Administration, did not care for Klossner or his concussion-related efforts.  In banter with a

---

[173] Ex. 85 (NCAA10014738-39, at NCAA10014738).

[174] Ex. 141 (NCAA00011563-67, at NCAA00011566).

[175] *Id.* at NCAA00011567.

[176] *Id.*

colleague, Halpin mentioned he was working with Klossner but that he was not going to let Klossner make rules changes.  He stated:[177]

```
----- Original Message -----
From: Halpin, Ty
To: Bracken, Nicole M.
Sent: Thu Jan 28 21:09:47 2010
Subject: RE: Help w/basketball

Dave is hot/heavy on the concussion stuff. He's been trying to force our rules committees to
put in rules that are not good -- I think I've finally convinced him to calm down.
```

94.     Because the Playing Rules Oversight Panel did state that it would consider including the common sport playing rule as a recommended practice in the appendices to the rule books, on January 29, 2010, Klossner sent Halpin and Poppe drafts of a fact sheet for coaches on concussions as well as "a shorter version for playing rules appendix."[178]  The Playing Rules Administrative group discussed Klossner's watered-down proposal, and commented that they were really concerned with keeping it out of any rule book for fear of liability – as opposed to being concerned about student welfare:[179]

---

[177] Ex. 95 (NCAA10029172-75, at NCAA10029172).

[178] Ex. 115 (NCAA10083762-63, at NCAA1008376262).

[179] *Id.*

| From: | Seewald, Rachel |
| --- | --- |
| Sent: | Friday, January 29, 2010 8:32 AM |
| To: | Halpin, Ty; Smith, Teresa |
| Cc: | Cessna, Sharon |
| Subject: | RE: coaches education for rules book and fact sheet |

I'm concerned about this paragraph:

An athlete who exhibits signs, symptoms, or behaviors consistent with a concussion, either at rest or exertion, should be immediately removed from practice or competition and should not return to play until cleared by an appropriate health care professional. Sports have injury time outs and player substitutions so that student-athletes can get checked out and the team can perform at its best.

I thought we were trying to avoid this language in the rules books??
Won't someone (i.e. officials) be liable even if this language just appears in the Appendix?

95.     Halpin responded: "I think the use of 'should' versus 'shall' is important here, but I also had the same thought. I'd like to be sure that we're clear that this is educational and not directed to officials as a requirement."[180]

96.     And while she ultimately recommends that the information be included "[s]ince CSMAS has made it available," Teresa Smith, the Assistant Director of Playing Rules Administration, muses whether inclusion puts both officials and the NCAA at risk, stating:

> Are the refs more at risk if we don't provide the educational piece on concussions or if we do provide it?
>
> And, what about the NCAA? Would we be protecting/helping the organization by not providing the information?[181]

She never asks whether it is best for the student-athlete to include the concussion materials in the rule books.

---

[180] Ex. 102 (NCAA10054651-53, at NCAA10054652).

[181] *Id.* at NCAA10054651.

97.     Thus, it was clear the Playing Rules Administration and the Playing Rules Oversight Panel were more concerned with liability for the NCAA and its own members than the safety and welfare of the student-athletes.

98.     As 2010 progressed and the NCAA's government relations group tracked congressional and state action on concussion laws, the Managing Director of Government Relations, Abe Frank, told Klossner that he expected pressure from the government to support a federal bill on concussions.[182]  He inquired whether "the recommendations for youth sports would go beyond what is required at the college level?"  Klossner responded:  "***Well since we don't currently require anything all steps are higher than ours.***"[183]

99.     As the NCAA then scrambled to come up with an actual concussion policy, the NCAA formed a Concussion Working Group.  Joni Comstock, the NCAA's Senior Vice President for Championships and head of the Concussion Working Group, explained that the Concussion Working Group was formed because "[t]here was continued agreement that the membership was looking to National Office for guidance on the [concussion] issue."[184]

100.     Apparently in preparation for a meeting with the Concussion Working Group, on or about February 12, 2010, Klossner prepared a document titled "Developing a concussion specific protocol" to help "[d]etermine if a mandate should be suggested that would require each member institution to have a plan for prevention and care of concussion injuries."[185]  Klossner noted that education of the coaches on concussion should be mandatory.[186]  Moreover, Klossner highlighted concerns that reflected a degradation of access to health care for student-athletes and

---

[182] Ex. 92 (NCAA10025935-39, at NCAA10025935).

[183] *Id.* (emphasis added).

[184] Ex. 29 (Comstock Tr. at 32:9-23).

[185] Ex. 129 (NCAA10140274).

[186] *Id.*

a need for education.  But instead of educating them, he proposed to punt on the issue by

sponsoring research and funding a public relations campaign:[187]

There is (1) a growing concern about the increased out of season exposures of student-athletes (summer, non-traditional seasons) to the risks of injuries; (2) a sense of decline in the access and availability of medical care and coverage (see SAAC request attached and articles attached), (3) less athletic trainers are traveling with teams for competitions (soccer rules committee concern), and (4) a sense that we put coaches in positions to return s-a's to play with injury. This one is not as easily resolved given the diversity of our membership.

    a. **Sponsor a research** study to look at medical care access and on-field care.
    b. **Fund a PR campaign** the shows how our student-athletes receive some of the best medical care in  America, particularly related to Division I FBS schools and conferences.

101.    In another document from that same day titled "Outline current facts," Klossner

outlined the NCAA's knowledge of the concussion problem:[188]

**Outline current facts** and data that would be considered relevant medical research to apply to the current discussion.

- Concussion incidence increasing
    - 7% per year
        - ATC's, MD's better at detecting injuries
        - Athletes stronger, bigger, hit harder, more aggressive play?
        - Athletes more likely to report injuries given recent media attention
- Helmeted sports have similar injury rates to non-helmeted sports
- 6-10 days average for resolving symptoms
- NCAA student-athletes 3x likely of a second concussion if returned within 10 days of first
- Helmets are not designed to prevent concussion in any sport
- Women appear to have increased incidence vs men in sports w/ same rules (b-ball, soccer)
    - ? reporting bias
    - Differences in head size, neck strength
    - Hormonal influence
- Injuries likely under-reported; athletes minimize injury, don't want to be held out, think sx are "part of the game", don't realize symptoms are consistent with concussive injury

102.    Critically, Klossner also recognized the commonality of the concussion injury and

the effect of the NCAA's policy of failing to educate student-athletes, athletic trainers and team

physicians:[189]

---

[187] *Id.*

[188] Ex. 130 (NCAA10140278).

> **NCAA Issues:**
>
> - College age athlete difficult to manage; many freshman closer to adolescent than adult.
> - College age athletes often minimize symptoms and/or under-report their injuries; they often feel immortal, and may not understand the consequences of playing with injury.
> - Economics seem to be playing a role in care and coverage
> - Variety of member institutions with very different resources available to them; may not have access to ATC staff, team physicians, additional testing tools (neuropsych)
> - Despite the significance and commonality of this injury, a significant number of athletic trainers and team physicians are not up to date when it comes to concussion

103.    Klossner also recognized that the Zurich Protocol reflected the consensus standard of care:[190]

> Care and Return-to-Play. The science of concussion is evolving and therefore management and return to play decisions remain in the realm of clinical judgment on an individualized basis. The Sports Medicine handbook guideline provides an overview of the topic and reference from which institutions can refer for more detailed guidelines. The most recent consensus document on the topic of prevention, identification, care and return to play are the Zurich Consensus statement.

104.    Shortly thereafter, on February 24, 2010, the NCAA Concussion Working Group held a meeting for approximately one hour at the NCAA's national headquarters. In minutes prepared by Joni Comstock, the NCAA's Senior Vice President of Championships, the NCAA Concussion Working Group discussed the policies of other organizations and "the overall status of medical opinion and data related to concussion cases."[191] In addition, "[t]here was continued agreement that the membership was looking to the national office for guidance on the issue," with "a discussion related to policy versus legislation and the course to implement policy or propose legislation on the topic."[192] The group reached agreement on a number of issues.

---

[189] Id.

[190] Ex. 116 (NCAA10089308).

[191] Ex. 93 (NCAA10028800-02, at NCAA10028800).

[192] Id.

105.    First, the group determined to "[r]einforce the current Playing Rules Oversight Panel policy as an interim first step."[193]

106.    Second, they decided to hold a summit "to develop a definitive concussion related policy and outline a plan for broad review with possible proposed legislation related to appropriate health care coverage reform."[194]

107.    Finally, they considered adopting "a concussion policy and a package of legislative changes put forth for membership consideration after the summit."[195]  However, student-athlete education already disappeared from the NCAA's agenda.[196]

108.    After the meeting, Klossner began reaching out to concussion experts, such as neuropsychologists and athletic trainers.  On February 12, 2010, Klossner inquired of one clinical neuropsychologist/sports psychologist:  "If you could write a collegiate baseline testing and return-to-play program, what would that look like and what would the cost be per athlete (both initial and follow-up)."[197]

109.    Klossner prepared concussion education materials (*see* Section 2.C.4, *infra*) and sought expert input.  During that process, he noted that the NCAA was still struggling with implementing a policy that prohibited student-athletes from returning to play on the same day they suffered a concussion – even though that was the standard of care.  Klossner stated:[198]

---

[193] *Id.*

[194] *Id.*

[195] *Id.* at NCAA10028801.

[196] *See generally* Ex. 93.

[197] Ex. 111 (NCAA10069971-74, at NCAA10069972).

[198] Ex. 94 (NCAA10029036-38, at NCAA10029036).

> Return same day issues seems to be our biggest barrier.  I have yet to find legitimate data to show same day return to play is a good thing and most of the recent studies and positions/expert commentaries suggest resting is better.  The fact that state laws, federal legislation, the NFHS and NFL have all come out and said not return sets a pretty clear standard of care that carries over to our age population.

Thus, he admitted that the NCAA's failure to prohibit same day return to play for a concussed student-athlete was negligent.

110.    The Concussion Working Group reconvened on February 24, 2010, and discussed "the current National Football League policy and anticipated action; the National Federation of State High School Association concussion rule announced on February 24, 2010; and the overall status of medical opinion and data related to concussion cases."[199]  The participants also noted deference provided by member schools to the NCAA:[200]

> 2.    <u>National Office</u>.  There was continued agreement that the membership was looking to the national office for guidance on the issue.  There was a discussion related to policy versus legislation and the course to implement policy or propose legislation on the topic.

111.    At this meeting, the Concussion Working Group agreed to implement three steps:[201]

> a.    Next steps agreed on:
>
> > (1)    Reinforce the current Playing Rules Oversight Panel policy as an interim first step.
> >
> > (2)    Identify participants for a summit of membership and medical experts to develop a definitive concussion related policy and outline a plan for a broad review with possible proposed legislation related to appropriate health care coverage reform.  This is tentatively scheduled for April 12, 2010.

---

[199] Ex. 93, at NCAA10028800.

[200] *Id.*

[201] *Id.* at NCAA10028800-01.

> (3) The final step considered would be the adoption of a concussion policy and a package of legislative changes put forth for membership consideration after the summit.

112.    Pursuant to the Concussion Working Group's plan, the Committee on Safeguards and Medical Aspects of Sports convened a Concussion in Sports Collegiate Medical Summit ("Concussion Summit") on April 9, 2010.[202]  In preparing for the meeting, Klossner put together a group of materials for the participants to read in advance, including a reading list, a concepts document, and a concussion-management plan document.[203]  In the concepts document, Klossner discussed the purpose of the Concussion Summit, the goals, an overview of actions taken by the NCAA and other organizations, and potential strategies.

113.    In the concepts document, Klossner identified the goals of the Summit:[204]

> **Goals:**
>
> - Promote a consistent approach for the development of a concussion management plan.
> - Reduce and eliminate premature return to play or practice relative to concussion.
> - Ensure student-athletes have access to appropriate healthcare coverage for injury assessment and return-to-play.

114.    Klossner noted that the NCAA and its member institutions were facing the following issues:

- Many college-aged student-athletes are closer to adolescent than adult.

- Most NCAA schools do not have the resources or expertise to meet the requirements as set for "elite" athlete return-to-play.

- College age athletes often minimize symptoms and/or under-report their injuries and may not understand the consequences of playing with a concussion.

---

[202] Ex. 69 (NCAA00007962-63).

[203] Ex. 104 (NCAA10056395); Ex. 105 (NCAA10056396-99); Ex. 106 (NCAA10056400-12); Ex. 107 (NCAA10056413-37).

[204] Ex. 105, at NCAA10056396.

- Despite the significance and commonality of this injury, a significant number of athletic trainers and team physicians are not up to date when it comes to concussion.[205]

115.    He further admitted that medical care for students is impacted by the "win at all costs" attitude of coaches.  He explained:

> Ethical and medical decision making have become intertwined in the coaching realm and are played out in the media as the increasing coaching contract dollars and win at all costs for the coach and athletic department impact medical staff reporting lines and decision making for student-athlete care.[206]

Klossner requested that the Concussion Summit participants consider actions that:

> [C]ould result in a safer athletics environment for the welfare of student-athletes by establishing a standard duty of care for NCAA sports that will ensure appropriate access to healthcare services for injuries and illnesses incidental to a student-athlete's participation in intercollegiate athletics.[207]

116.    He further provided them with a draft "Concussion Management Plan for the Collegiate Student-Athlete," which incorporated mandatory baseline testing; computerized neuropsychological testing and the use of a neuropsychologist in baseline testing for student-athletes with a complicated history (such as multiple concussions); and return-to-play guidelines that prohibited same day return to play and included a medically-supervised stepwise process for return to play.[208]

117.    As some summit participants started commenting on Klossner's suggestions, including whether smaller schools had the resources for neuropsychological testing, Klossner responded:[209]

---

[205] *Id.* at NCAA10056396-97.

[206] *Id.* at NCAA10056397.

[207] *Id.*

[208] Ex. 106, at NCAA10056400-01.

[209] Ex. 142 (NCAA10045422-24, at NCAA10045422).

- 49 -

| From: | Klossner, David |
|---|---|
| Sent: | Thursday, April 01, 2010 9:40 PM |
| To: | 'jkutcher@med.umich.edu'; 'rechemendia@comcast.net'; 'gus@email.unc.edu'; 'jbailes@hsc.wvu.edu'; 'putukian@princeton.edu' |
| Cc: | 'drrunkle@dbq.edu' |
| Subject: | Re: Concussion Meeting Materials |

Thanks for the quick responses.  I know this might be hard to believe but I've been tasked to try to get the best recommended plan irrelevant of resources.  I think for too long we have been giving up this for that in medical care and this is not the time. So I will throw it out there that what you believe to be true and needed it should be recommended.  All of the shalls will be should's.

118.     The Concussion Summit was held on April 9, 2010. At the Summit, the NCAA made a full presentation to spark discussion.  First, it opened the presentation with a discussion of estimated concussion rates at NCAA schools:[210]



| | | | | | |
|---|---|---|---|---|---|
| | | Concussions in NCAA from 2004-2009 | | | |
| | % of Injuries Competition | Median Days Out | Injury Frequency Rank | 12 most common injury Rank | National 5-yr Estimate (concussion) | Comments |
| Football | 6.6 | 6 | 4 | 2 | 16,277 | more concussions than all other fall sports combined |
| W. Soccer | 10.7 | 6 | 2 | 2 | 5,751 | Mech. simliar to M. Soccer |
| M. Soccer | 6.2 | 6 | 4 | 4 | 3,374 | nealy 1/3 due to direct player contact while heading ball |
| W. Volleyball | 3.9 | 6 | 7 | 4 | 1209 | |
| W. Basketball | 6.8 | 5 | 4 | 2 | 827 | |
| W. Field Hockey | 8.7 | 4 | 7 | 4 | 685 | |
| M. Basketball | 4.3 | 4 | 6 | 2 | 664 | |
| Wrestling | 4.5 | 8 | 5 | 4 | 256 | |
| W. Ice Hockey | 12.6 | 6 | 4 | 1 | 154 | |
| W. Gymnastics | 2.3 | 9 | 11 | 4 | 28 | |

Sport 5-yr Concussion
Estimate    29,225
Per year     2,923

NCAA.org/health-safety

[210] Ex. 109 (NCAA10068879-922, at NCAA10068883).

119.    During the discussion on this topic, participants "note[d] high rates in women's sports behind football as the highest" and asked "[c]an we look at this on a year-to-year basis – eg women's basketball?"[211]

120.    The NCAA also presented the preliminary results of a survey tracking how concussions were managed at member schools.  The NCAA sent a survey to the Head Athletics Trainers at all schools and received 512 responses (48%).[212]  The NCAA presented the following results, which led to a discussion among the participants:

- **Result Presented:** 66% of the schools performed some form of baseline testing for some sports.[213]

- **Result Presented:** For the 172 schools that did not require a baseline concussion assessment on their student-athletes, they responded that the following factors contributed to their decision: cost (70%), inconvenience (20%), too time consuming (48%), lack of qualified clinicians to administer (34%), not enough evidence showing utility of test (21%), as well as  "a lack of support from coaches/administrators[.]"[214]

- **Result Presented:** Less than 50% of all schools confirmed that "a physician is _required_ to see all student-athletes with a concussion."[215]

- **Result Presented:** "Overall, 39% of respondents indicated their institution does not have an established return to play guidelines."[216] **Related Discussion:** The Summit participants discussed that even for those schools that have return to play guidelines, "[m]any are following old guidelines."[217]  They also discussed that the NCAA "[n]eed[s] **mandates in place for minimum protocol**, to avoid litigation, even if it doesn't pick up what's going on with the kid or impact the kids medical outcome. And following a strict protocol may

---

[211] Ex. 117 (NCAA10101404-09, at NCAA10101404).

[212] Ex. 109, at NCAA10068892.

[213] _Id._ at NCAA10068898.

[214] _Id._ at NCAA10068900.

[215] _Id._ at NCAA10068904 (emphasis in original).

[216] _Id._ at NCAA10068907 (emphasis in original).

[217] Ex. 117, at NCAA10101406.

raise some more questions (open up doors) that lead to something that would identify concussion."[218] Also, the "**First mandate – a written protocol in place that everyone understands.**"[219]

- **Result Presented:** "[N]early one-half also responded that they will allow a student-athlete to return-to-play in the <u>same game after a concussion diagnosis.</u>"[220] The NCAA presented the following chart reflecting these findings:



# Return-to-Play (cont.)

- In spite of the majority of institutions indicating they have a required waiting period prior to returning to play, nearly one-half also responded that they will allow a student-athlete to return-to-play in the <u>same game after a concussion diagnosis</u>. There were no significant divisional differences.

| | |
|---|---|
| Depends on the sport | 6% |
| Anytime when symptoms are less severe | 1% |
| Anytime as long as all symptoms have resided | 7% |
| After 15 minutes and all symptoms have resided | 33% |
| Never same game | 19% |
| Never same day | 34% |

- The majority of respondents indicated they believe medical staff (ATCs and team physicians) have positional authority for withholding student-athletes from return-to-play without negative impact in <u>all cases</u> (91%). Another 7% believed they have this authority in <u>some cases</u>, while just 1% believe they <u>never</u> have this authority without fear of negative impact.

- **Related Discussion:** "**No rtp that day. If you don't have comprehensive neuropsyche testing, out for 7 days.**" (emphasis in original).[221] "When you have evaluated that player has a concussion, player should not be back in that game."[ 222] "**At Practice, if concussion enters your mind, there should be no tolerance for rtp.**"[223]

- **Result Presented:** With respect to a physician-directed concussion management plan, 26% of the schools did not have one and 50% had

---

218 *Id.* (emphasis in original).

219 *Id.* at NCAA10101407 (emphasis in original).

220 Ex. 109, at NCAA10068909 (emphasis in original).

221 Ex. 117, at NCAA10101407.

222 *Id.*

223 *Id.* (emphasis in original).

one but did not require that it be presented annually to the medical staff and coaches.[224]

- **Result Presented:** "With the exception of ATCs [athletic trainers], the majority of institutions reported not having required education in the past two years on concussion management for others in the athletics department."[225]

- **Result Presented:** Just 13% of all student-athletes and 17% of student-athletes in high risk sports had "been required to receive [concussion management] education in the past two years." [226]
  **Related Discussion:** Yet Summit participants discussed that "We are responsible for educating them, and the s-a is responsible for reporting."[227]

- **Result Presented:** Just 24% of all coaches and 17% of coaches in high risk sports had "been required to receive [concussion management] education in the past two years."[228]

- **Result Presented:** Just 15% of campus health care nurses had "been required to receive [concussion management] education in the past two years."[229]

121.    The NCAA identified the following challenges at the Summit for which it sought

solutions:[230]

---

[224] Ex. 109, at NCAA10068910.

[225] *Id.* at NCAA10068911.

[226] *Id.*

[227] Ex. 117, at NCAA10101406.

[228] Ex. 109, at NCAA10068911.

[229] *Id.*

[230] *Id.* at NCAA10068917.



122.     Klossner identified that the solutions to these problems could take the form of
Playing Rules, Legislation, Best Practices and/or Education.[231]  The Summit participants then
discussed a variety of best practices for a concussion-management plan.[232]

123.     An April 12, 2010 draft entitled "Policy and Best Practice Outcomes from the
Concussion in Sports Collegiate Medical Summit"[233] ("Summit Outcomes") noted that
"establishing a set of best practices can help provide consistency and encourage collegiate
healthcare professionals to follow a medical model that has physician oversight and direction."[234]
The Summit Outcomes state that "[t]he cornerstone of proper concussion management is rest
until all symptoms resolve and then a return to within normal limits of baseline assessment, and a

---

[231] *Id.* at NCAA10068918.

[232] Ex. 117, at NCAA10101409.

[233] Ex. 76 (NCAA00014749-57).

[234] *Id.* at NCAA00014749.

010270-11  596435 V3

stepwise program of exertion before return to sport."[235]  Notwithstanding, the NCAA continued

to only recommend, and not mandate, baseline testing.

124.    The Summit Outcomes also provide that "[i]nstitutions should ensure healthcare

professionals attain continuing education on concussion evaluation and management annually.

Structured and documented education of student-athletes and coaches is also recommended to

improve the success of a consistent concussion management program."[236]

125.    For example, the Summit Outcomes provided an education "Core Principle" with

four "action" principles:

> Action 1.1: Consider the development of materials to educate student-athletes about concussions, its signs and symptoms, their risks and importance for prompt reporting.
>
> Action 1.2: Consider the development of a "concussion management" continuing education program for medical professionals to gain experience and seek certification of completion in knowledge attainment about prevention, diagnosis, management and return-to-play.
>
> Action 1.3: Consider the development of a concussion awareness education program for coaches to gain certification….
>
> Action 1.4: Consider ongoing evaluation to ensure progress and modify actions as indicated.[237]

126.    Yet, the NCAA did not mandate a continuing education program or any

certification process for medical professionals.  The NCAA did not develop or mandate a

certification program for coaches.  Further, the NCAA did not and does not conduct "ongoing

evaluation to ensure progress" at any individual school.

127.    On April 16, 2010, the NCAA internally circulated draft concussion

recommendations from the Committee on Safeguards and Medical Aspects of Sports to the

---

[235] *Id.*

[236] *Id.*

[237] *Id.* at NCAA00014750.

NCAA Executive Committee.[238]  The draft recommends that the NCAA:  (1) consider legislation to "require each institution to have…a '[c]oncussion [m]anagement [p]lan"; (2) "[d]isseminate best practices to member institutions…in the[] development of a concussion management plan"; (3) "**[c]onsider adding language to the NCAA Student-Athlete Statement in which student-athletes accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussion.  During the review and signing process student-athletes shall be presented with educational material on concussion.**"[239]

128.    The Committee on Safeguards and Medical Aspects of Sports also recommended an "all-sport educational video on concussions be developed targeting both student-athletes and coaches and used annually by institutions during formal education sessions."[240]  The committee also recommended a webinar before the start of fall sports for athletics healthcare providers.[241]

129.    On April 21, 2010, Klossner advised the media relations group that the Committee on Safeguards and Medical Aspects of Sports planned to ask the NCAA Executive Committee "to consider requiring institutions to have a written concussion management plan on file by the start of the 2010-11 sports seasons."[242]  He advised that the NCAA will suggest that institutions "follow the guiding principles outlined in the 2008 consensus document on concussion management from an international meeting of experts in Zurich."[243]  Klossner noted

---

[238] Ex. 71 (NCAA00007980-82).

[239] *Id.* at NCAA00007980 (emphasis added).

[240] *Id.*

[241] *Id.*

[242] Ex. 98 (NCAA10041322-25, at NCAA10041322).

[243] *Id.*

010270-11  596435 V3

that the Zurich Protocol "concluded that athletes diagnosed with a concussion should not return for the remainder of the day…."[244]

130.    On April 29, 2010, the NCAA Executive Committee[245] adopted a Concussion-Management Policy.[246]  The Concussion-Management Policy required member schools to have a Concussion-Management Plan ("CMP") in place for all sports, and provided:[247]



The NCAA Executive Committee adopted (April 2010) the following policy for institutions in all three divisions.

"Institutions shall have a concussion management plan on file such that a student-athlete who exhibits signs, symptoms or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions. Student-athletes diagnosed with a concussion shall not return to activity for the remainder of that day. Medical clearance shall be determined by the team physician or his or her designee according to the concussion management plan.

"In addition, student-athletes must sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions. During the review and signing process, student-athletes should be presented with educational material on concussions."

---

[244] *Id.*

[245] Ex. 3 ("The Executive Committee acts on behalf of the entire Association and implements policies to resolve core issues, pursuant to its authority under the NCAA constitution and Bylaw 4.1.2(e)."  NCAA, *NCAA Authority to Act* (last updated July 23, 2012), http://www.ncaa.com/news/football/article/2012-07-23/ncaa-authority-act (last accessed June 13, 2013)).

[246] Ex. 11 (Gary Brown, *Executive Committee OKs Concussion Management Policy*, THE NCAA NEWS (Apr. 29, 2010), *available at*  http://web.archive.org/web/20101205112254/ http://www.ncaa.com/wps/portal/ ncaahome?WCM_GLOBAL_CONTEXT=/ncaa/NCAA/NCAA+News/NCAA+News+Online/20 10/Association- wide/Executive+Committee+OKs+concussion+management+policy_04_29_10_ncaanews (last accessed June 13, 2013)).

[247] Ex. 80, at NCAA00016644.

131.    On April 30, 2010, the chair of the Committee on Safeguards and Medical Aspects of Sports sent a memo to all NCAA Head Athletic Trainers.  She advised them that the Executive Committee had adopted the Concussion Management Policy.[248]  She also advised them of the "Recommended Best Practices for a Concussion Management Plan for all NCAA Institutions."[249]

132.    On May 26, 2010, the Concussion Working Group met again[250] to review the NCAA's next planned steps, which included:[251]

| | |
|---|---|
| a. | Policy was adopted by the Executive Committee on April 27, 2010. |
| b. | Legislation will be drafted for action by each division. |
| c. | This legislation will be considered by each division in the July 2010 cycle. |
| d. | Enforcement:  Requirement for a concussion management plan and for medical clearance per the policy adopted by the Executive Committee will be required as an obligation of membership. |
| e. | Best practices distributed to the member institutions will include a recommendation that institutions will require that student-athletes sign a statement of responsibility for reporting their injuries and illnesses to institutional medical staff.  In addition, student-athletes should be presented with educational material on concussions. |
| f. | There will be a report to the Executive Committee regarding this work at the August 2010 meeting. |

133.    When the Concussion Working Group gathered next on July 12, 2010, many of these issues still remained as action items.[252]  Moreover, discussing draft legislation, the group noted that it would "propose [the] concussion management plan and student-athlete statement of responsibility as a condition and obligation of NCAA membership."[253]

---

[248] Ex. 126 (NCAA10140211-12).

[249] *Id.* at NCAA10140211.

[250] Ex. 128 (NCAA10140273).

[251] *Id.*

[252] Ex. 127 (NCAA10140272).

[253] *Id.*

5.    **The NCAA finally requires schools to implement concussion-management plans for the 2010-11 school year – but did not confirm whether schools followed the mandate.**

134.    Ultimately, for the 2010-11 school year, the NCAA published the following

statement in Guideline 2i in the 2010-11 Handbook:[254]

> **The NCAA Executive Committee adopted (April 2010) the following policy for institutions in all three divisions.**
>
> "Institutions shall have a concussion management plan on file such that a student-athlete who exhibits signs, symptoms or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions. Student-athletes diagnosed with a concussion shall not return to activity for the remainder of that day. Medical clearance shall be determined by the team physician or his or her designee according to the concussion management plan.
>
> "In addition, student-athletes must sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions. During the review and signing process, student-athletes should be presented with educational material on concussions."

135.    The substance of Guideline 2i remained substantially the same as past versions,

including that it did not endorse a specific return-to-play protocol; did not acknowledge that a

day is needed between return-to-play steps; and did not acknowledge that if any symptoms occur

after concussion, the patient should drop back to the previous asymptomatic level and try to

progress again after 24 hours.  However, the NCAA added "Best Practices for a Concussion

Management Plan":[255]

---

[254] Ex. 80, at NCAA00016644.

[255] *See*, *e.g.*, *id.* at NCAA0016645.

**In Addition to the Executive Committee Policy Requirements, Additional Best Practices for a Concussion Management Plan Include, but are not Limited to:**

1. Although sports currently have rules in place, athletics staff, student-athletes and officials should continue to emphasize that purposeful or flagrant head or neck contact in any sport should not be permitted and current rules of play should be strictly enforced.

2. Institutions should have on file and annually update an emergency action plan for each athletics venue to respond to student-athlete catastrophic injuries and illnesses, including but not limited to, concussions, heat illness, spine injury, cardiac arrest, respiratory distress (e.g., asthma), and sickle cell trait collapses. All athletics healthcare providers and coaches should review and practice the plan at least annually.

3. Institutions should have on file an appropriate healthcare plan that includes equitable access to athletics healthcare providers for each NCAA sport.

4. Athletics healthcare providers should be empowered to have the unchallengeable authority to determine management and return-to-play of any ill or injured student-athlete, as the provider deems appropriate. For example, a countable coach should not serve as the primary supervisor for an athletics healthcare provider, nor should the coach have sole hiring or firing authority over a provider.

5. The concussion management plan should outline the roles of athletics healthcare staff (e.g., physician, certified athletic trainer, nurse practitioner, physician assistant, neurologist, neuropsychologist). In addition, the following components have been specifically identified for the collegiate environment:

   a. Institutions should ensure that coaches have acknowledged that they understand the concussion management plan, their role within the plan and that they received education about concussions.

   b. Athletics healthcare providers should practice within the standards as established for their professional practice (e.g., physician, certified athletic trainer, nurse practitioner, physician assistant, neurologist, neuropsychologist).

   c. Institutions should record a baseline assessment

for each student-athlete before the first practice in the sports of baseball, basketball, diving, equestrian, field hockey, football, gymnastics, ice hockey, lacrosse, pole vaulting, rugby, soccer, softball, water polo and wrestling, at a minimum. The same baseline assessment tools should be used post-injury at appropriate time intervals. The baseline assessment should consist of one or more of the following areas of assessment.

   1) At a minimum, the baseline assessment should consist of the use of a symptoms checklist and standardized cognitive and balance assessments [e.g., SAC; SCAT; SCAT II; Balance Error Scoring System (BESS)].

   2) Additionally, neuropsychological testing (e.g., computerized, standard paper and pencil) has been shown to be effective in the evaluation and management of concussions. The development and implementation of a neuropsychological testing program should be performed in consultation with a neuropsychologist who is in the best position to interpret NP tests by virtue of background and training. However, there may be situations in which neuropsychologists are not available and a physician experienced in the use and interpretation of such testing in an athletic population may perform or interpret NP screening tests.

   d. The student-athlete should receive serial monitoring for deterioration. Athletes should be provided with written instructions upon discharge, preferably with a roommate, guardian or someone who can follow the instructions.

   e. The student-athlete should be evaluated by a team physician as outlined within the concussion management plan. Once asymptomatic and post-exertion assessments are within normal baseline limits, return-to-play should follow a medically supervised stepwise process.

6. Institutions should document the incident, evaluation, continued management and clearance of the student-athlete with a concussion.

*For references, visit www.NCAA.org/health-safety.*

136.    However, Guideline 2i still did not meet the standard of care.[256]

---

[256] *See* Cantu Report, ¶ 173.

137. Moreover, the NCAA did not intend to enforce the requirement that schools implement a concussion-management plan that met the standard of care.[257] The NCAA did not review or audit to ensure Concussion-Management Plans were actually adopted, did not review the substance of any Concussion-Management Plans to determine whether they followed the consensus standards, and did not audit to determine whether the Concussion-Management Plans were enforced.[258]

**D.    The NCAA Knew That Schools Were Not Following the Standard of Care – But Chose Not to Enforce It**

138. Before the Committee on Safeguards and Medical Aspects of Sports proposed the single sport playing rule and Concussion-Management Plan legislation, its members knew that enforcement would be an issue and inquired how it was going to be enforced.[259]

139. After the Concussion-Management Legislation was passed and the Committee on Safeguards and Medical Aspects of Sports prepared the Best Practices, it held a webinar, entitled "Concussions in Collegiate Sports:  An Overview of Facts, Policy and Practice", on July 16, 2010 "open to the entire NCAA membership."[260]  During preparation for the live webinar, Klossner discussed with the webinar presenters the topics to be included, including the scope of the recommended baseline testing contained in the Sports Medicine Handbook.  During that discussion, Klossner reminded the presenters:

> [W]e should all reference 'best practice' or 'recommended' rather than mandate. These were not mandated and one point of confusion with the membership.[261]

---

[257] Ex. 27 (Nov. 8, 2012 Klossner Tr. at 117:6-118:2; 119:16-22; 131:18-24).

[258] *Id.*

[259] *See supra* at ¶ 142.

[260] Ex. 90 (NCAA10019827-31, at NCAA10019830).

[261] *Id.* at NCAA10019827.

010270-11  596435 V3

The failure of the NCAA to mandate accepted best practices for the management of concussions was a critical failure.

140.    The NCAA knew that neither schools nor conferences typically implement concussion-management requirements stronger than the minimum required by the NCAA. Indeed, at the February 2010 forum held by the House Judiciary Committee on head injuries in college and youth football, the NCAA admitted that neither schools nor conferences do anything more than what the NCAA requires to protect student-athletes.  One report explained:

> During a committee hearing on head injuries in college and youth football, Rep. Steve Cohen, D-Tenn., chided leagues such as the Southeastern Conference and Big 12 for not implementing tougher rules.
>
> He first asked Ron Courson, director of sports medicine at the University of Georgia and a member of the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports, if any conferences had tougher policies.  When he said that they did not, Cohen seemed incensed.
>
> "Don't you think that's an indictment of each of the conferences?  That they accept the minimum that the NCAA mandates?"  Cohen said.  "Shouldn't conferences and schools get together and have some stricter regulations?"
>
> The hearing is the third on head injuries in sports held by the committee; the first two focused on problems in the NFL.  Chairman John Conyers, D-Mich, said more hearings will be held throughout the country.
>
> Cohen suggested that college athletic programs seem to care only about bringing in money and winning.
>
> "It's money, money, money and health care ought to be considered," Cohen said.  "When you hear that no college conference has any standards different from the NCAA, that's minimalism.  That's doing the least we can do to get along and that's wrong.  Somebody ought to have a rule and stand up and be a leader."[262]

---

[262] Ex. 2 (*Expert: Bench Youths After Concussions*, THE ASSOCIATED PRESS (updated Feb.1, 2010), *available at* http://sports.espn.go.com/ncf/news/story?id=4877480 (last visited June 13, 2013).

The NCAA subsequently discussed this critique reactively, finding that it "may need to push up our planned meeting on what institutions are doing from a medical management perspective."[263]

141.    But it wasn't just that the NCAA rules were not followed; the NCAA also decided not to enforce the Concussion-Management Plans put in place by the schools.

142.    As the Concussion Summit participants and the Committee on Safeguards and Medical Aspects of Sports firmed up the Concussion Management Policy and best practices, participants asked:  "Has NCAA thought/planned on how they will monitor compliance and remedy violations?"[264]

143.    On October 1, 2010, Klossner reached out to the Director of Academic and Membership Affairs and then to Chris Strobel, the Director of Enforcement, and asked what the penalty would be if a school failed to follow the new Concussion-Management Legislation.[265]

144.    On October 4, 2010, the NCAA Director of Enforcement originally responded:[266]

```
David,


Isolated incidents of the concussion policy will be dealt with as secondary violations.  The
enforcement staff will treat violations as secondary unless the institution has a pattern of
not following the policy and/or blatant disregard for the policy.


Penalties will depend on the circumstances of the violation.  For example, if a coach
requires a student-athlete to compete after being informed the student-athlete has been
diagnosed with a concussion, we would require a significant penalty (e.g., that the coach be
suspended from coaching activities for one or two contests).  If the violation is that the
institution does not have a sufficient policy in place, however, then we would look for more
educational and corrective-type of actions to ensure they get a sufficient policy in place.


I hope that helps.  Let me know if you need anything else.


Strobel
```

---

[263] Ex. 96 (NCAA10032224-25, at NCAA10032224).

[264] Ex. 112 (NCAA10071591-97, at NCAA10071591).

[265] Ex. 87 (NCAA10015556-59, at NCAA10015558).

[266] *Id.* at NCAA10015557.

145.     Just two hours later, the NCAA backtracked and removed the teeth from its

enforcement.  The Director of Enforcement changed his position and said that the NCAA would

only require schools to have a concussion-management plan in place, but would not "suspend or

otherwise penalize a coach pursuant to the current legislation even if the student-athlete was

required to participate after having been diagnosed with a concussion."[267]  He explained:[268]

```
From:            Strobel, Chris
Sent:            Monday, October 04, 2010 2:23 PM
To:              Klossner, David
Cc:              Price, David; Holzman, Lynn; Zeller, Leeland
Subject:         RE: Concussion update for Dr. Emmert

David,

I have been corrected.  I apologize, but my previous e-mail to you was premature in how
enforcement would handle 3.2.4.16 issues.  Enforcement will only process violations involving
(1) an institution not having the concussion management plan in place (secondary violation),
and (2) systemic or blatant disregard for the plan that would indicate a lack of
institutional control (most likely major).

Lynn and Leeland in AMA clarified that the legislation only requires an institution to have a
concussion management plan in place that includes the elements required in the legislation.
As they have discussed in other settings, it is not a legislative requirement that the
student-athlete is precluded from returning to athletics activities, only that the
institution have a policy in place.  As a result, it would not be appropriate for enforcement
to suspend or otherwise penalize a coach pursuant to the current legislation even if the
student-athlete was required to participate after having been diagnosed with a concussion.

The legislation was specifically written to require institutions to have a plan and describe
what minimum components had to be part of the plan - not about enforcing whether or not they
were following their plan—except for those isolated circumstances of systemic or blatant
violations.

I hope that helps and I am sorry for any confusion I created.

Strobel
```

146.     Subsequently, even when the Division II Great Northwest Athletic Conference

sought to have athletic trainers report all concussions to the conference to "control/enforce the

compliance of head injuries," the NCAA responded that "responsibility for oversight of

concussion management is in the hands of the institution," and thus not the conference.[269]

---

[267] *Id.* at NCAA10015556.

[268] *Id.*

[269] Ex. 86 (NCAA10014886-87, at NCAA10014886).

147.    Moreover, the NCAA had no intention to audit schools' Concussion-Management

Plans to make sure they followed the Concussion-Management Policy or standard of care.  The

NCAA does not audit member institution concussion-management plans or whether they are

enforced.[270]

**E.    Educating Student-Athletes, Parents and Coaches on Recognizing a Concussion and
the Consequences of Returning to Play While Symptomatic Is a Critical Component
of the Standard of Care and Yet Virtually Non-Existent at the NCAA**

148.    Education of student-athletes, coaches and parents regarding concussions is a

standard and critical component of concussion management.

149.    The NCAA has known that education is a critical component for protecting

students.  The 2002 Vienna Protocol recognized that "[a]thletes and their healthcare providers

must be educated regarding the detection of concussion, its clinical features, assessment

techniques, and principles of safe return to play."[271]

150.    Yet the NCAA provided no concussion education before 2010 to student-athletes

or their parents.[272]

151.    Moreover, in 2010, the NCAA was aware of a March 2010 study entitled

"Evaluation of the Centers for Disease Control and Prevention's Concussion Initiative for High

School Coaches:  'Heads Up:  Concussion in High School Sports,'"[273] in which the authors

explored the success of the CDC's tool kit on concussions for high school coaches with respect

to their "changing knowledge, attitudes, and practices related to the prevention and management

---

[270] *See* Ex. 103 (NCAA10055897) (email authored by David Klossner admitting that the
NCAA does not, and has no plans to, audit member institution concussion-management plans).
*See also* Ex. 27 (Nov. 8, 2012 Klossner Tr. at 117:6-118:2; 119:16-22; 131:18-24).

[271] Ex. 16, at 9.

[272] Ex. 27 (Nov. 8, 2012 Klossner Tr. at 182:23-183:20).

[273] Ex. 75 (NCAA00014621-27).

of concussions."[274]  The study found that, even for experienced coaches, education was a critical

component in teaching coaches about concussions and making them take concussions more

seriously.[275]

    152.    In 2010, the NCAA admitted that concussion education is a critical component of

concussion management.  For example, Ron Courson, the Director of Sports Medicine at

University of Georgia and a member of the NCAA's Committee on Safeguards and Medical

Aspects of Sports provided testimony at a February 1, 2010, forum held by the U.S. House of

Representatives Committee on the Judiciary.  During that forum, Courson testified:

> *Concussion education and research may be our most important*
> *undertaking. We must educate not only athletes, but parents, coaches*
> *and health care professionals*.  The NATA "Head's Up" educational
> video was produced as a result of the "Spearing and Head-Down Contact
> in Football Task Force" and distributed to every college and university
> as well as every high school in the United States. The NCAA has
> additionally developed posters and a football education player safety
> Web site to help educate student-athletes, coaches and officials. Other
> educational actions include a revision of the NCAA Sports Medicine
> Handbook guideline addressing concussions and scheduling of a summit
> meeting in midyear 2010 to review NCAA policies for medical
> management of concussions and prevention strategies appropriate to the
> collegiate environment.[276]
>
> *Further educational initiatives are needed in concussion management*.

---

[274] *Id.* at NCAA00014621.

[275] *Id.* at NCAA00014626.

[276] Ex. 22 (*Ron Courson Testimony at Congressional Forum*, THE NCAA NEWS (Feb. 23, 2010) (emphasis added), *available at* http://web.archive.org/web/20101205160842/ http://www.ncaa.org/wps/portal/ncaahome? WCM_GLOBAL_CONTEXT=/ncaa/NCAA/NCAA+News/NCAA+News+Online/2010/Associa tion-wide/Ron+Courson+testimony+at+Congressional+forum_02_23_10_NCAA_News (last accessed June 13, 2012)).

153.    Likewise, in 2010, while representing to Congress that it was providing such

education,[277] the Health and Safety Group was actually providing very little.

154.    First, in 2010, the Health and Safety Group developed a one-page Concussion

Fact Sheet for student-athletes.  But, in the drafting process, the NCAA Health and Safety Group

deleted the statement that a concussion "[c]an end your season, impact your GPA, and have

long-term life consequences."[278]  The final Concussion Fact Sheet provided no warning to

students regarding immediate or the long-term consequences from concussions.[279]

155.    Ultimately, the NCAA spent just ▆▆▆▆ on concussion-education materials,[280]

providing each campus with just "two posters and two sets of fact sheets addressing concussion

awareness for student-athletes and coaches."[281]

156.    And, when a school inquired whether the NCAA was "going to sell or offer the

concussion flyers for both the student-athlete and coach…[to be used in an] enhanced concussion

education program",[282] or how a school could "go about obtaining 900 Concussion Fact Sheets

for Student-Athletes,"[283] the NCAA responded that "[w]e will not be sending out any more flyer

[sic] or printing them."[284]

---

[277] Ex. 21, at 286 (Klossner testifying that "a Concussion in Collegiate Sports Summit…will
be  held in 2010 to review NCAA policies for medical management of concussions and
prevention strategies appropriate to the collegiate environment and the NCAA membership at
large," "[t]he NCAA will produce a video by fall 2010 to further educate student athletes about
the dangers of concussions and approve awareness of the issues among coaches and game
officials," and "the [CSMAS] committee will lead a collaborative education initiative for
coaches, officials, and student athletes.").

[278] Ex. 79 (NCAA00015153-54, at NCAA00015154).

[279] Ex. 68 (NCAA00007936).

[280] Ex. 204 (NCAA00014668).

[281] Ex. 72 (NCAA00014046-47, at NCAA00014046).

[282] Ex. 88 (NCAA10015560-61, at NCAA10015560).

[283] Ex. 140 (NCAA10012557-58, at NCAA10012557).

[284] Ex. 88, at NCAA10015560.

157.    This was obviously not an effective educational campaign.  The Committee on Safeguards and Medical Aspects of Sports members continued to think, as of March 2010, that "[m]any coaches outside football are still in the dark on this topic" of concussions.[285]

158.    And, in April 2010, Klossner admitted that "[d]espite the significance and commonality of this injury, a significant number of athletic trainers and team physicians are not up to date when it comes to concussion.[286]  Klossner further admitted in April 2010 that: "College athletes … may not understand the consequences of playing with a concussion,"[287]  and that the NCAA has not conducted any follow-up to confirm that, in fact, schools are using the materials provided to educate coaches, trainers, students or parents.[288]

159.    Despite the lack of an appropriate educational campaign, the 2010 Concussion-Management Legislation required school Concussion-Management Plans to require student-athletes to "sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions."[289]

160.    Yet, it is universally accepted that player's cannot make that decision for themselves[290] because "a concussion may cloud [a student-athlete's] judgment on whether or not [they] are functioning normally."[291]

161.    Moreover, the NCAA was aware that there were concerns with the NCAA's requirement.  For example, the UNC Greensboro Faculty Committee on Intercollegiate Athletics

---

[285] Ex. 77 (NCAA00014766-67, at NCAA00014766).

[286] Ex. 105, at NCAA10056397.

[287] *Id.* at NCAA10056396.

[288] Ex. 27 (Nov. 8, 2012 Klossner Tr. at 176:15-23).

[289] Ex. 80, at NCAA00016644.

[290] Ex. 101 (NCAA10054370-74, at NCAA10054373) (quoting from a Mar. 9, 2001 WALL STREET JOURNAL article).

[291] *Id.* at NCAA10054372.

("FCIA") contacted the NCAA and requested that the NCAA amend its statement "that the student-athlete is responsible for reporting they have a concussion."[292]  The school's FCIA requested that the statement "be amended to say that the student-athlete is responsible for reporting symptoms and blows to the head or other impacts that might have caused a concussion. The concern from the FCIA is that the student-athlete may not be able to 'self diagnose' but would be able to report symptoms."[293]

## F.  The NCAA does not Provide Support for Students That Have Suffered Concussions

### 1.  The NCAA does not provide academic accommodations for students with concussions.

162.    While the NCAA admits that "activities that involve a lot of concentration, such as studying, working on the computer…may cause concussion symptoms (such as headache or tiredness) to reappear or get worse,"[294] the NCAA neither provides nor mandates any academic accommodations for the students.

163.    As reported in the study entitled "Evaluation of the Centers for Disease Control and Prevention's Concussion Initiative for High School Coaches: 'Heads Up: Concussion in High School Sports,'" it is well known that:

> The experience of symptoms getting worse when doing schoolwork is a known as cognitive exertional effects.  Cognitive activities – such as thinking and learning – must be carefully monitored and managed to prevent this from happening.[295]

---

[292] Ex. 110 (NCAA10069320-21, at NCAA10069320).

[293] *Id*.

[294] Ex. 68.

[295] Ex. 75, at NCAA00014626.

Thus, concussed students who return to school may need to take rest breaks, spend fewer hours at school, be given more time to take tests or complete assignments, receive help with their school work, or reduce time on the computer, reading or writing.[296]

164.     Nonetheless, in February 2011, the NCAA's Director of Health and Safety admitted:  "We still have a gap in best practices on how to address academic accommodations for student-athletes with concussions."[297]  And at his deposition, he agreed that it was still his "view that there is a gap in the handbook regarding addressing academic accommodations."[298]

**2.     The NCAA does not provide the means to pay ongoing medical bills related to concussions.**

165.     If a student-athlete needs medical attention immediately after receiving a concussion in a game or practice, the NCAA's Basic Accident Program covers the medical expenses.[299]  Catastrophic medical coverage is triggered if the deductibles hit a certain amount; however, the NCAA has not provided catastrophic medical coverage for any student-athlete that has suffered concussions alone.[300]  However, once the student-athlete is "returned to play or practice and he's medically released," then the claim is closed[301] – even if the student-athlete is still symptomatic.

166.     By way of example, despite the fact that Plaintiff Derek Owens continues to this day to receive medical treatment related to his post-concussive syndrome, the NCAA does not pay his medical expenses.

---

[296] *Id.*

[297] Ex. 97 (NCAA10034999-5005, at NCAA10034999).

[298] Ex. 26 (Apr. 16, 2013 Klossner Tr. at 217:7-10).

[299] Ex. 30 (Martin Tr. at 24:1-11).

[300] *Id.* at 32:3-8.

[301] *Id.* at 34:1-12.

167.   As another example,



302

"303

. 304

168.

305

**3.     The NCAA does not protect student-athletes' scholarships when concussions prevent them from continuing to play.**

169.   Another way that the NCAA has control over the effects of concussions relates to

NCAA rules that cause student-athletes to lose their scholarships when they leave the team.  For

---

302 Ex. 201 (NCAA00012194-204, at NCAA00012194-95).

303 *Id*. at NCAA00012197.

304 *Id*. at NCAA00012197-98.

305 *Id*. at NCAA00012199.

example, in a letter from the University of Maine, Office of Student Financial Aid, Plaintiff Kyle Solomon was informed that his "athletic scholarship is not being renewed for the 2010-2011 school year," as "[t]he Athletic Department has recommended this action as you have left the team."[306] The letter adds that "[t]his action is in accordance with the NCAA Constitution and institutional regulations that apply."[307] As reflected below, Mr. Solomon left hockey specifically because of his concussion history.

## G.    Plaintiffs' Experiences Are Typical of those of the Class

### 1.    Adrian Arrington.

170.    Plaintiff Adrian Arrington played collegiate football for Eastern Illinois University and suffered concussions while participating in the school's athletic program.[308]

171.    Mr. Arrington "worked hard in the classroom.  I get up at 5:00 in the morning to come and workout…I was voted as team captain by my teammates…I held up my end of the bargain as a teammate, as a player, in all aspects of what they wanted me to do in my scholarship – when I signed my scholarship."[309] Yet, Arrington explained the difficulties faced by student-athletes after suffering injuries:  "I've seen a lot of people at EIU not play football and they end up getting kicked off the team, treated like nobody, that end up getting their scholarship took from the coaching staff, from the athletic director and everything just because they weren't playing no more because they got injured."[310]

172.    Mr. Arrington "didn't know that I would have a seizure every day, I would have seizures so much.  I didn't know that I couldn't be alone with my kids [because of the

---

[306] Ex. 133 (SOLOMON-UMAINE0000060).

[307] *Id.*

[308] Ex. 24 (Arrington Tr. at 20:2-8).

[309] *Id.* at 116:15-22.

[310] *Id.* at 114:10-16.

seizures]…I didn't know I couldn't drive a car to take my daughter to the store and go provide for my kids…I didn't know I couldn't use that degree I went to go to school for. What was my point of going to college?"[311]

173. Mr. Arrington understands that he has brought this case as a class action and is serving as a class representative.[312] When asked why he sought to represent other student-athletes, Mr. Arrington explained: "I want them to not go through the things that I'm going through; not be able to work, to be able to provide, to struggle, all those things that I'm going through right now."[313]

174. Arrington continues to experience seizures, but testified he "never knew about seizures happening after concussions until I experienced those."[314] He added: "I didn't know that I would have a seizure every day, I would have seizures so much."[315] Initially, he explained "I didn't think there was anything serious about the situation because I didn't think – because I have never heard anything because of seizures or long term issues because of concussions or anything like that."[316]

175. Arrington also reports memory loss.[317] Arrington noted that by 2010 "I found out that I was having a memory problem. I found out that these medicines weren't working. I found out that people were killing theyself [sic] about these seizures and concussion. I found out that there's really no answers to what's going on with my head."[318]

---

[311] *Id.* at 121:3-13.

[312] *Id.* at 181:12-19.

[313] *Id.* at 181:21-182:9.

[314] *Id.* at 12:7-8.

[315] *Id.* at 121:3-4.

[316] *Id.* at 5:4-8.

[317] *Id.* at 16:19-17:8.

[318] *Id.* at 168:4-20.

176.     Arrington explained he used marijuana, as there "was just a lot of depression and just me trying to escape from a lot of stuff[,]" though he does not recall now if he took it to alleviate pain or to help him sleep.[319]

## 2.     Derek Owens.

177.     Plaintiff Derek Owens played collegiate football for University of Central Arkansas and suffered concussions while participating in the school's athletic program.[320]

178.     Mr. Owens "had no understanding or idea of possible long-term effects that resulted from a concussion."[321]  Mr. Owens also explained that "[concussion related issues] directly as well as indirectly completely changed my life."[322]

179.     Mr. Owens discussed the lack of a support system available to student-athletes when he informed the University of Central Arkansas head football coach that he was following his neurologist's advice and quitting football.[323]  As Mr. Owens stated:

> I'm not quoting, but roughly he [head coach Clint Conque] said…well, within the next few minutes when you walk out these doors for the last time, all benefits and/or privileges you've had by being a member of this team at this university won't be there anymore, so what you are going to do?
>
> I assumed that as him saying, obviously, I wouldn't have any more of my scholarship or my benefits which I had from being on the team, and I said I assumed that I will take out a loan get a job.  And then he said well, I'm glad you've got a plan.  He then proceeded to tell me that I could have my name tag, leave everything else in the locker, and he appreciated my service to the team or whatnot.[324]

---

[319] *Id.* at 155:8-23.

[320] Ex. 23 (Owens Tr. at 122:18-123:1, 21:15-25).

[321] *Id.* at 284:8-9.

[322] *Id.* at 149:7-8.

[323] *Id.* at 188:12-16.

[324] *Id.* at 188:23-189:13.

180. Mr. Owens understands that he has brought this case as a class action and is serving as a class representative.[325]

181. Owens described concussion related side effects following his collegiate concussions to include migraines, though he "had no previous history with migraines."[326]

182. Owens noted having at least one time period "in which my memory is affected."[327]

183. Owens testified regarding self-medicating with marijuana for "[h]eadaches, anxiety" issues finding "that the marijuana temporarily relieved those."[328]

184. Discussing the connection between his collegiate concussions and their impact on his grades, Owens indicated "I believe that I was suffering from symptoms long before I actually realized it and could identify them, just like my initial visit to the doctor was I thought I had ADHD. I had no understanding or idea of possible long-term effects that resulted from a concussion."[329]

### 3. Angelica Palacios.

185. Plaintiff Angelica Palacios played women's collegiate soccer for Ouichita Baptist University and suffered a concussion while participating in the school's athletic program.[330]

186. As Ms. Palacios recounted regarding her only collegiate concussion:

> I was in a drill where one player was throwing the ball in the air to four other players, and those four players had to jump and head the ball. So we were all going for it, and if you didn't jump or if you didn't go for it you had to run, so everyone was kind of being competitive. And I

---

[325] *Id.* at 120:10-14.

[326] *Id.* at 102:14-23, 181:10.

[327] *Id.* at 105:6-11.

[328] *Id.* at 183:24-184:4.

[329] *Id.* at 283:25-284:9.

[330] Ex. 25 (Palacios Tr. at 7:5-13).

> jumped and headed the ball forward, and a girl in front of me threw her head back and hit me…[o]n my eyebrow. I immediately turned and grabbed my face, my nose, and then as soon as I did that my eyebrow was swollen pretty badly.[331]

She added:

> I got injured on a Tuesday with a concussion. I couldn't see out of my left eye because it was bruised and swollen, and not even a week later he [the head soccer coach] told me – was trying to get me to go run, and I told him that I couldn't.

> He was mad and…was saying that I disrespected him and that I was basically not being a team player and told me that I can plan on sitting out for a long time. I just decided after that that I didn't want to play. [H]e thought that after four days with a concussion I could go back and play….[332]

187. When she left the team, Ms. Palacios lost her scholarship.[333] Approximately a month after deciding that she would no longer play soccer at Ouachita Baptist University, Ms. Palacios decided to transfer schools, having felt "[i]solated" by her soccer player roommates who treated her like she "did something wrong…they didn't treat me like a friend anymore."[334]

188. Ms. Palacios understands that she has brought this case as a class action and is serving as a class representative. Ms. Palacios explained that she sued the NCAA because she "believe[s] that there needs to be better regulations for concussions and what to do for athletes that get concussions, and because I don't want anyone to have to go through what I went through…[t]he physical and emotional damages that I had to experience."[335]

---

[331] *Id.* at 32:3-15.

[332] *Id.* at 8:9-18, 9:16-18. *See also id.* at 77:10-12 ("[H]e basically…put the sport above my health, and I just didn't think it was right.").

[333] *Id.* at 83:9-23.

[334] *Id.* at 86:23-87:6.

[335] *Id.* at 91:14-19.

010270-11  596435 V3

189.     Palacios suffered from regular headaches after she suffered her collegiate concussion, "[f]or a while it was pretty consistent."[336]

**4.     Kyle Solomon.**

190.     Plaintiff Kyle Solomon played men's collegiate ice hockey for the University of Maine and suffered concussions while participating in the school's athletic program.[337]

191.     Mr. Solomon decided to quit hockey "when a certain amount of time had gone by and my symptoms hadn't subsided at all."[338]  He reported suffering in 2010 from "[c]hronic migraine headaches, sensitivity to light, depression…inability to cope with anxiety and stress."[339]  Yet, Mr. Solomon continues to suffer from migraines, headaches, depression, light sensitivity, and inability to cope with anxiety and stressful situations.[340]

192.      Mr. Solomon explained that athletes were frequently cut from the team:  "I assumed that if…the coaching staff was willing to do that [cut a player] just because they were unhappy with somebody's play, then they would definitely do it to me, somebody who was always getting hurt."[341]

193.     Mr. Solomon understands that he has brought this case as a class action and is serving as a class representative.[342]  Mr. Solomon explained that he sued the NCAA because he "played under the umbrella of the NCAA," and cited the NCAA's "[f]ailure to properly train the

---

[336] *Id.* at 149:4-13.

[337] Ex. 31 (Solomon Tr. at 27:18-19, 83:11-14, 92:9-11).

[338] *Id.* at 134:8-12.

[339] *Id.* at 139:19-24.

[340] *Id.* at 143:7-145:7.

[341] *Id.* at 236:2-7.

[342] *Id.* at 124:3-9.

people that were responsible for my health and failure to…notify players of what to look out for or failure to properly inform players before it's too late."[343]

194.    As Solomon described the short-term effects of a concussion:  "I…went back to retrieve a puck in my own defensive zone and was sort of blindsided and my head hit the glass."[344] After "[he] hit [his] head on the glass," Solomon "was punchdrunk," i.e., feeling "dizzy, saying things that made no sense whatsoever, slurring my words."[345]

195.    Solomon testified having "[c]hronic migraine headaches, sensitivity to light, depression…inability to cope with anxiety and stress."[346]  Solomon said that his migraines or severe headaches would be triggered "depending on my school workload," particularly "[h]aving to look at my computer."[347]

196.    Solomon saw a neurologist in August 2012 "[b]ecause I was having seizures."[348] Solomon noted the neurologist "came to somewhat of a conclusion…that the seizures were definitely caused by the trauma that my brain has undergone and he immediately started me on an anti-seizure medication."[349]

197.    Solomon listed memory loss among the "tremendous post-concussion syndrome" symptoms he suffered.[350]  And, he "still suffer[s] from depression, inability to cope with anxiety and everyday stress."[351]

---

[343] *Id.* at 114:2-16.

[344] *Id.* at 69:20-23.

[345] *Id.* at 70:6-12.

[346] *Id.* at 139:21-24.

[347] *Id.* at 143:15-23.

[348] *Id.* at 216:12-17.

[349] *Id.* at 216:21-217:5.

[350] *Id.* at 112:9-19.

[351] *Id.* at 144:5-8.

Date:  July 19, 2013

Respectfully submitted,

ADRIAN ARRINGTON, DEREK OWENS,
ANGELICA PALACIOS, and KYLE
SOLOMON, individually and on behalf of
all others similarly situated


By: /s/ Steve W. Berman
　　　　　Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594


By: /s/ Joseph J. Siprut
Joseph J. Siprut
*jsiprut@siprut.com*
Aleksandra M. S. Vold
*avold@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL  60602
312.236.0000
Fax: 312.878.1342

Elizabeth A. Fegan
*beth@hbsslaw.com*
Daniel J. Kurowski
*dank@hbsslaw.com*
Thomas Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

*Interim Plaintiffs' Co-Lead Class Counsel*

010270-11  596435 V3

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on July 19, 2013 a true and correct copy of the foregoing document was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

By: /s/ Steve W. Berman
Steve W. Berman