UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**PLAINTIFFS' RESPONSE TO NICHOLS' SECOND OBJECTIONS TO
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

[REDACTED VERSION, PUBLICLY FILED]

## TABLE OF CONTENTS

                                                                      **Page**

I. INTRODUCTION ....................................................................................................... 1

II. ARGUMENT ............................................................................................................... 2

    A. Nichols Has Not and Cannot Demonstrate That Common Questions of Fact Predominate Under Rule 23(b)(3) for The Elements of Causation and Damages In A Negligence Claim. ............................ 2

        1. Some student-athletes received a form of concussion-related education and some did not............................................................. 3

        2. Some student-athletes received baseline testing and some did not; of those that received baseline testing, sometimes the baseline testing was used post-concussion and sometimes it was not. .................................................................................. 4

        3. Some student-athletes were put through a form of a stepwise return-to-play protocol and some were not. ................................ 5

        4. Some student-athletes were seen by medical personnel with expertise in concussion diagnosis, treatment and management after a concussion and some were not. ................................. 7

        5. Just as Nichols admits that each student-athlete's injury will differ, the damages incurred by each Plaintiff differs. ....................... 9

            a. The vast range of potential damages based on individualized facts is demonstrated in other cases. ....................... 9

            b. The fact that damages for a brain injury are not "one size fits all" is also reflected in the facts of this case. .................. 11

    B. There Is No Conflict of Interest Among Class Members or Class Counsel ........................................................................................................ 13

III. CONCLUSION .......................................................................................................... 13

## I. INTRODUCTION

To assess whether the release of the Rule 23 procedural mechanism to pursue personal injury claims on a class-wide basis is a release of a substantive claim valued in the billions of dollars right as Nichols contends, this Court requested that Nichols' counsel file a brief demonstrating that a personal injury class could be certified under Rule 23(b)(3) *based on the facts*. However, Nichols has wholly failed to do anything more than copy the work Class Counsel submitted with Plaintiffs' Motion For Class Certification in *Arrington.*

Lead Class Counsel have always been quite clear that a Rule 23(b)(3) class for personal injury could not be certified because, while duty and breach may be provable class-wide, causation and damages cannot be proven on a class-wide basis. Apparently recognizing that Class Counsel is correct, Nichols now argues for the same Core Issues Class (*i.e.* excluding the questions of causation and damages) briefed by Class Counsel in *Arrington.* Speculating that a Core Issues Class would be certified, Nichols would apparently throw out the extensive medical monitoring relief for four million Class Members and changes to NCAA practices that will benefit all current student-athletes under the Settlement in exchange for a trial on just 50% of the negligence equation that has the potential to benefit less than a thousand people.

***Nichols' position squarely answers the question posed by this Court in the negative: A Rule 23(b)(3) class for personal injury cannot be certified because common questions of fact (on causation and damages) predominate. And Nichols' position is a wholesale retreat from the main thrust of his objection, namely that the Settlement was squandering a class action worth billions.[1]***

---

[1] Nichols' First Objections To Plaintiffs' Motion For Preliminary Approval Of Class Settlement (Dkt. # 183), at 2. Nichols' basis for the billion-dollar estimate was a purported out-of-context quote from Mr. Siprut, which is not supported by the record. However, as reflected below, the record does reflect substantial settlements and verdicts for individual personal injury claims involving concussions, supporting the view that such claimants would be and are motivated to pursue those claims individually.

Plaintiffs[2] submit this response separate from the NCAA to demonstrate that common issues of fact predominate with respect to student-athletes' personal injury claims, using the facts of the *Arrington* plaintiffs in the record as examples. As reflected below, other than facts concerning the NCAA's duty and breach as set forth in the *Arrington* Fact Proffer, the facts concerning the *Arrington* Plaintiffs differ with respect to causation and damages in nearly every respect.

Because Nichols has failed to demonstrate that a class-wide personal injury class could be certified under Rule 23(b)(3) based on the facts of this case, Plaintiffs request that this Court overrule the objections and grant their Motion For Preliminary Approval.

## II.    ARGUMENT

### A.    Nichols Has Not and Cannot Demonstrate That Common Questions of Fact Predominate Under Rule 23(b)(3) for The Elements of Causation and Damages In A Negligence Claim.

The facts that could be presented at trial by the *Arrington* Plaintiffs relative to their individual experiences differ.[3] By way of example only, Plaintiffs set forth below a summary of some of the categories of facts that differ by Plaintiff, which may affect both proof of causation for purposes of personal injury as well as the damages to which each Plaintiff is entitled.[4]

---

[2] This brief is filed by Plaintiffs Derek Owens, Kyle Solomon, Angelica Palacios, Abram Robert Wolf, Sean Sweeney, Jim O'Conner, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John DuRocher, Sharron Washington, Shelby Williams, Brice Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, and Jessica Miller, on behalf of themselves and as representatives of the Settlement Class.

[3] Attached as Exhibit A is an Exemplar Proffer of Facts Concerning the *Arrington* Plaintiffs' Individual Experiences ("Ex. Proffer") based on the evidence in the record. Plaintiffs reserve the right to update, revise, or amend these facts to conform to the evidence prior to any trial on their individual claims.

[4] Because these facts are relevant to both causation and damages, Nichols' suggestion that the Court could bifurcate liability and damages is not supported by the facts nor law. In fact, negligence cases in which courts have properly bifurcated liability and damages claims are in the single-event type disasters, such as airplane crashes or plant explosions – where everyone suffered the same fate from a single occurrence (although their damages may differ). *See e.g., Aretz v. United States,* 604 F.2d 417 (5th Cir. 1979) (affirming trial court's finding, after a trial on liability in 25 consolidated cases, that the government's misclassification of certain illuminants was a contributing proximate cause to a plant explosion); *Martin v. Bell Helicopter Co.*, 85 F.R.D. 654, 659 (D. Colo. 1980) (bifurcating liability and damages phases in a multi-party case arising out of an Army model helicopter crash resulting in five deaths and five survivors with various injuries).

### 1. Some student-athletes received a form of concussion-related education and some did not.

The Consensus Best Practices provide: "Athletes and their healthcare providers must be taught how to detect concussion, its clinical features, assessment techniques, and principles of safe return to play."[5] Nichols contends that one of the common questions which "will drive each PI Class member's claim" includes whether the NCAA breached its duty of care by "[f]ailing to mandate and/or require that member institutions provide student-athletes with catastrophic injury risk education."[6] However, the evidence that each putative class member would submit on whether they received catastrophic injury education – or the substance of any education they did receive – differs.

For example, neither the University of Maine ("Maine") nor Eastern Illinois University ("EIU") provided any catastrophic injury education to Kyle Solomon ("Solomon") or Adrian Arrington ("Arrington"), respectively, during their time as NCAA student-athletes in hockey and football.[7]

On the other hand, while Ouachita Baptist University ("OBU") did not provide any concussion-related education to Angelica Palacios ("Palacios") prior to her freshman soccer season, OBU did require Palacios to sign OBU's "Concussion and Reporting of Injuries" form prior to her sophomore year.[8]

Similarly, Derek Owens did not receive formal catastrophic injury education prior to his freshman football season but was required to sign a statement which contained the following language: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[5] Report of Robert C. Cantu, M.A., M.D., F.A.C.S., F.A.C.S.M., (*Arrington* Dkt. #180) ("Cantu Report"), ¶ 189.

[6] 2nd Obj., at 17.

[7] Ex. Proffer, ¶¶ 69, 89, 91, 93.

[8] Ex. Proffer, ¶ 41.

Subsequently, for the first time prior to his junior year, Owens apparently received the NCAA's one-page fact sheet called "Concussion: A Fact Sheet for Student-Athletes."[10]

Accordingly, for purposes of causation, individual questions of fact predominate concerning whether Plaintiffs received catastrophic injury education and the substance thereof.

> 2. **Some student-athletes received baseline testing and some did not; of those that received baseline testing, sometimes the baseline testing was used post-concussion and sometimes it was not.**

Baseline testing permits a physician to compare an athlete's post-injury performance to the athlete's own pre-injury baseline to determine the severity of the concussion as well as the status of recovery.[11] Nichols contends that one of the common questions which "will drive each PI Class member's claim" includes whether the NCAA breached its duty of care by "[f]ailing to mandate and/or require that member institutions implement appropriate baseline concussion testing."[12] However, the evidence that each putative class member would submit on baseline testing differs.

For example, while Arrington could demonstrate at trial that he was not given baseline testing at EIU prior to any season,[13] the evidence at a trial for Owens' personal injury claim would show that UCA started doing baseline testing for the first time his junior year (although did not do baseline testing prior to his freshman or sophomore seasons).[14]

On the other hand, Palacios and Solomon both received baseline testing prior to their freshman seasons at OBU and Maine.[15]

---

[9] Ex. Proffer, ¶ 2.

[10] Ex. Proffer, ¶ 19.

[11] Cantu Report, ¶ 61.

[12] 2nd Obj., at 17.

[13] Ex. Proffer, ¶ 89.

[14] Ex. Proffer, ¶¶ 4, 18.

[15] Ex. Proffer, ¶¶ 44, 69.

Thus, for Owens, Palacios, and Solomon, the next question is whether they were re-administered the baseline tests post-concussion to assess their injuries and recoveries. Owens did not receive baseline testing following concussions he received in a June 2008 practice game, a September 2008 practice, or a September 2010 game.[16]

While Solomon did not receive baseline testing following concussions he received during November 2008 and February 2010 games, Solomon did receive baseline testing after a concussion during a March 2010 practice.[17] Solomon's scores reflected gross impairment, which should have resulted (but did not) in a referral to a physician skilled in the diagnosis, management and treatment of concussions.[18]

On the other hand, Palacios did receive baseline testing the day after she received a concussion in September 2011, which reflected the severity of her concussion and should have resulted (but did not) in her referral to a physician skilled in the diagnosis, management and treatment of concussions.[19]

Accordingly, for purposes of causation, individual questions of fact predominate concerning whether Plaintiffs received baseline testing pre- and post-injury, and how that testing (or the lack thereof) may have affected their injury outcomes.

### 3. Some student-athletes were put through a form of a stepwise return-to-play protocol and some were not.

The Consensus Best Practices provide that "a structured and supervised concussion rehabilitation protocol is conducive to optimal injury recovery and safe and successful return to play."[20] A stepwise return to play protocol requires that the player (i) be asymptomatic before

---

[16] Ex. Proffer, ¶¶ 5, 6-8, 20, 21.

[17] Ex. Proffer, ¶¶ 70, 75, 76.

[18] Ex. Proffer, ¶¶ 77-79.

[19] Ex. Proffer, ¶¶ 49.

[20] Cantu Report, ¶ 102.

undergoing the protocol, (ii) undergo gradual incremental increases in exercise with 24 hours between each step, and (iii) pause or backtrack with any symptom reoccurrence.[21]

Nichols contends that one of the common questions which "will drive each PI Class member's claim" includes whether the NCAA breached its duty of care by "[f]ailing to mandate and/or require that member institutions mandate a stepwise return to play protocol."[22] However, the evidence that each putative class member would submit on whether they had to undergo a stepwise return to play protocol (and whether it met the consensus best practices) differs.

For example, Arrington did not return to play after a concussion until he reported he was asymptomatic in April 2007,[23] but did not otherwise undergo a stepwise increase in exertion. In another example, Arrington was kept out of play for one week following an October 2007 concussion but again did not undergo a documented stepwise return to play.[24]

After a September 2008 concussion, UCA did require Owens to undergo a limited (but deficient) stepwise protocol.[25]

After a September 2011 concussion, Palacios was told by athletic trainers not to practice if she did not feel ok. Despite the fact that Palacios was experiencing headaches, chills and vomiting, her coach told her not to listen to the trainers and to return to practice.[26]

Solomon was returned directly to play after losing consciousness in a November 2008 game, and was also returned to play several times after subsequent concussions while still symptomatic.[27]

---

[21] Cantu Report, ¶ 102.

[22] 2nd Obj., at 17.

[23] Ex. Proffer, ¶ 90.

[24] Ex. Proffer, ¶ 92.

[25] Ex. Proffer, ¶¶ 10-13.

[26] Ex. Proffer, ¶ 53.

[27] Ex. Proffer, ¶¶ 70, 72, 80.

Accordingly, for purposes of causation, individual questions of fact predominate concerning the existence or implementation of stepwise return to play protocols and the potential resulting effects on Plaintiffs' injuries.

> **4. Some student-athletes were seen by medical personnel with expertise in concussion diagnosis, treatment and management after a concussion and some were not.**

Leaving discretion of return to play for a student-athlete that has suffered a concussion or displayed concussion symptoms to an individual member institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management is against Consensus Best Practices.[28] Nichols contends that one of the common questions which "will drive each PI Class member's claim" includes whether the NCAA breached its duty of care by "[f]ailing to mandate and/or require that member institutions mandate that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment and management."[29] However, the evidence that each putative class member would submit on whether they were seen by medical personnel with specific expertise in concussion diagnosis, treatment and management differs.

For example, after his April 2007 concussion, Arrington was seen by an athletic trainer who merely requested that Arrington report any symptoms. Over the course of a week, Arrington was only asked if he was symptomatic. The trainer did not test Arrington in accordance with the Consensus Best Practices on concussion management, nor did he refer Arrington to a physician.[30] Then, after a November 2008 concussion, Arrington was experiencing amnesia, memory loss, spells of confusion, and seizures. Despite being seen by

---

[28] Cantu Report, ¶ 182.

[29] 2nd Obj., at 17.

[30] Ex. Proffer, ¶ 90.

several doctors and athletic trainers over the next six months, all of them permitted Arrington to continue to play until June 2009.[31]

When Owens suffered a concussion during a pre-season practice game in 2008, there were no UCA athletic trainers or physicians present – much less medical personnel with concussion expertise.[32] Later, after losing consciousness and receiving a second collegiate concussion, Owens was only seen by an athletic trainer who failed to follow proper concussion management protocols.[33] And, following his third collegiate concussion in a game, Owens was not seen or checked on by any medical personnel. And, when he complained of concussion symptoms on the way home from the game to assistant athletic trainers, they gave him Tylenol or ibuprofen, which is contraindicated when a concussion occurs.[34]

Palacios was seen by athletic trainers after she sustained a concussion, but the trainers' direction that she should refrain from returning to play while symptomatic was overruled by her coach.[35]

Finally, Maine's team physician passed away Solomon's sophomore year, and he was not replaced.[36] While the physician had examined Solomon after Solomon was knocked out during a game his freshman year, the physician allowed him to return to play in that same game contrary to the standard of care.[37]

Accordingly, for purposes of causation, individual questions of fact predominate concerning whether Plaintiffs were seen by medical personnel or medical personnel with specific expertise in concussion diagnosis, treatment and management and whether Consensus Best Practices were followed.

---

[31] Ex. Proffer, ¶¶ 94-102.

[32] Ex. Proffer, ¶¶ 5.

[33] Ex. Proffer, ¶¶ 6-8.

[34] Ex. Proffer, ¶¶ 20, 21.

[35] Ex. Proffer, ¶ 53.

[36] Ex. Proffer, ¶ 73.

[37] Ex. Proffer, ¶ 70.

### 5. Just as Nichols admits that each student-athlete's injury will differ, the damages incurred by each Plaintiff differs.

Nichols admits that each student-athlete's "actual injury is unique…."[38] However, Nichols completely ignores the fact that, because the injuries will differ, the damages will differ.

In fact, in addition to compensatory damages that can be calculated, e.g. medical bills, Plaintiffs are entitled to seek non-economic damages. Non-economic damages – or quality of life damages - are intended to compensate an injured party or its estate for injuries and losses that are hard to quantify, such as pain and suffering, disability, physical and emotional distress and disfigurement and loss of a normal life.[39] Each of these categories is highly individualized.

#### a. The vast range of potential damages based on individualized facts is demonstrated in other cases.

Individualized facts – including but not limited to diagnosis, disability, disfigurement, medical expenses, lost wages, future earnings, future medical care, pain and suffering, grief, sorrow and mental suffering, and loss of quality of life – drive the question of damages.

How these individual fact questions affect damages is demonstrated in the personal injury case of 19-year-old Preston Plevretes, a linebacker at Division I La Salle University in 2005.[40] After being head butted during a practice and receiving subsequent hits during a game, Plevretes complained to the school's trainer and student health center that he was having headaches, but continued to play while symptomatic. Then, during a game: "he was blocked, lost consciousness, regained consciousness, attempted to stand up, and then lapsed into a coma." As a result of playing while suffering from a concussion, Plevretes suffered "Second Impact Syndrome." On November 2, 2006, Plevretes filed an individual personal injury lawsuit against La Salle.[41]

---

[38] 2nd Obj., at 13, 23 (admitting "…it is unavoidable that each PI Class member's actual injury is unique…").

[39] http://definitions.uslegal.com/n/non-economic-damages/ (last accessed September 3, 2015).

[40] *See* Plaintiffs' Proffer of Facts In Support of Class Certification (*Arrington* Dkt. No. 176) ("Arrington Proffer"), ¶¶ 63-73.

[41] *Plevretes v. La Salle Univ.*, Civil No. 071004973 (Ct. Com. Pl. Pa.) (Nov. 2, 2007).

Multiple world-renowned experts testified on Plevretes' behalf.[42] In late 2009, La Salle agreed to settle the lawsuit for $7.5 million "to provide care" for Plevretes.

In another example, a former Bears fullback, Meril Hoge, received a $1.55 million jury verdict against the team doctor for failing to warn him about the severity of his concussions, which forced him to retire at age 29.[43] While the Bears player had sued the doctor for $2.2 million (his estimated potential earnings had he remained in the NFL) plus unspecified pain and suffering, the jury awarded $1.45 million for two years of a three-year contract for which he was not paid and $100,000 for pain and suffering.[44]

Public news reports reflecting nationwide verdicts and settlements on behalf of middle school or high school football players that suffered brain injuries show that verdicts or settlements could range from $125,000 to more than $14 million.[45] The Jury Verdict Reporter for the Chicago area reflects settlements and verdicts for non-sport concussion-related injuries ranging from $30,245-$790,860.[46] Accordingly, the wide range of damages for concussion-related injuries reflects the highly individualized inquiry a jury will undertake based on the plaintiff's facts, as well as the motivations that an individual plaintiff will have to pursue his or her own claims.

---

[42] Arrington Proffer, ¶ 67.

[43] *See, e.g.*, A.P., "Hoge Wins Lawsuit Against Doctor" (July 22, 2000), available at http://articles.chicagotribune.com/2000-07-22/sports/0007220191_1_hoge-concussions-brain-damage (last accessed September 1, 2015).

[44] *Id.*

[45] *See, e.g.*, Bermes, Whitney, "Judge enforces settlement in Three Forks School District brain injury lawsuit," BOZEMAN DAILY CHRONICLE (July 10, 2014) (high school football player settled individual action against school district for **$300,000**, after the player suffered a second, same-day concussion in football practice and was knocked unconscious); Draper, Heather, "Frank Azar wins lawsuit against helmet maker Riddell," DENVER BUS. JOURNAL (April 14, 2013) (**$11.5 million** verdict in favor of high school football player that suffered a head injury and was paralyzed on one side); "Cash Awards In Death Suits Are Often Lower," HERALD NEWS (Passaic Cnty., NJ, Sept. 29, 2012) (the family of a 17-year-old football player who died as a result of Second Impact Syndrome settled with the school district for **$125,000** plus an undisclosed sum with the helmet manufacturer); Clarridge, Christine, "Tahoma schools settle football-injury claim for $14.6 million," THE DAILY NEWS (Longview, Washington) (Sept. 18, 2009) (**$14.6 million** settlement for middle school football player who suffered a concussion in a game, was twice returned to play and, after the game was over, collapsed).

[46] *See generally* combined Exhibit B, attached (Cook County Jury Verdict Reporter reports showing that, for concussion-related cases, settlements and verdicts for non-sport concussion-related injuries range from $30,245-$790,860).

### b. The fact that damages for a brain injury are not "one size fits all" is also reflected in the facts of this case.

While each of the original *Arrington* Plaintiffs is or was seeking compensatory and punitive damages from the NCAA for their individual personal injury claims, the amounts differ by Plaintiff. Nonetheless, each of them will be seeking at least six-figure recoveries for, *inter alia,* past and future medical expenses, educational expenses, pain and suffering, emotional distress, loss of earnings capacity, and reduced life expectancy.

*For Plaintiff Owens*, as of April 29, 2013, Owens had incurred medical expenses and costs of at least $7,212.89 for treatment related to his concussions and post-concussion syndrome. Since that time, his medical expenses have risen exponentially due to brain surgery, the necessity of which he contends was a result of his concussion history.[47]

As of April 29, 2013, Owens also had incurred at least $5,540.25 in tuition, room and housing costs as a result of his scholarships being revoked upon being required to retire from football due to his concussions and post-concussive syndrome. Owens has incurred additional costs to complete his undergraduate education, much of which could have been avoided had his symptoms not prevented him from finishing classes on a four-year plan.[48]

*For Plaintiff Palacios*, as of April 29, 2013, Palacios had incurred medical expenses and costs of at least $4,549.00 for treatment related to her concussions and post-concussion syndrome. Palacios also had incurred at least $23,684.83 in tuition, room and housing costs as a result of her scholarships being revoked upon being required to require from soccer due to her concussions.[49]

*For Plaintiff Solomon,* as of April 29, 2013, Solomon had incurred medical expenses and costs of at least $7,212.89 for treatment related to his concussions and post-concussion syndrome. Solomon also had incurred at least $3,000 in tuition, room and housing costs as a

---

[47] Ex. Proffer, ¶ 34.

[48] Ex. Proffer, ¶ 37.

[49] Ex. Proffer, ¶ 59.

result of his scholarships being revoked upon being required to retire from hockey due to his concussions and post-concussive syndrome.[50]

For purposes of trial on the plaintiffs' individual claims, and without waiving the right to provide additional experts pursuant to Fed. R. Civ. P. 26(a)(2), Owens, Solomon and Palacios anticipate expert testimony in one or more of the following areas in support of their individual requests for compensatory and punitive damages:

1. An economist to testify regarding (i) vocational economics or the Plaintiff's loss of earning capacity, reduced earnings, and/or reduced work life arising out of his/her concussions and/or post-concussion syndrome; (ii) the future costs of his/her medical care; and/or the (iii) future costs of undergraduate education.

2. A life coach or rehabilitation specialist to testify regarding a life care plan for the individual Plaintiff given any need for ongoing medical and rehabilitative care, and the projected costs of such a plan.

3. An actuary or other expert to testify regarding the Plaintiff's reduced life expectancy and mortality rates for traumatic brain injuries.

4. One or more medical experts to testify regarding the Plaintiff's future medical care.

5. One or more experts to testify regarding the Plaintiff's emotional distress at being abandoned by the NCAA, member institution, coach and team (after they failed to protect him/her in accordance with the standard of care) upon being advised of the need to refrain from playing contact sports as a result of the concussions.

In sum, these exemplars of evidence related to causation and damages differ even among the *Arrington* Plaintiffs. The evidence also demonstrates that each of the claimants is motivated to pursue their individual personal injury claims – after the class medical monitoring claims are resolved. On the factual record before the Court, individual questions of fact predominate for

---

[50] Ex. Proffer, ¶¶ 82, 84.

- 12 -

010270.12 805149 V1

personal injury claims, such that a Rule 23(b)(3) class for personal injury claimants could not be certified.

**B.     There Is No Conflict of Interest Among Class Members or Class Counsel**

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class."[51] Nichols does not even attempt to demonstrate that he, Arrington or the Lead Objectors' counsel satisfies Rule 23(a)(4).[52] Instead, Nichols again focuses on the Proposed Settlement and Class Counsel. Accordingly, Plaintiffs incorporate Section A of Plaintiffs' [Corrected] Response To Nichols' First Objections To Plaintiffs' Motion For Preliminary Approval (Dkt. #187) as if fully set forth herein.

### III.     CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court grant their Motion For Preliminary Approval.

---

[51] Fed. R. Civ. P. 23(a)(4).

[52] Contrary to Nichols' position that Arrington may be an adequate class representative for a putative PI Class, this Court has heard first hand that Arrington's current position is motivated by his individual interests in claims he may have against EIU.

- 13 -

Date: September 14, 2015                    Respectfully submitted,

By: */s/ Steve W. Berman*_____
    Steve W. Berman

*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
Daniel J. Kurowski
*dank@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*

HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
708.628.4949
Fax: 708.628.4950


*/s/ Joseph J. Siprut*_____

Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*

SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342


*Co-Lead and Settlement Class Counsel*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on September 14, 2015, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: */s/ Steve W. Berman*