# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | ) ) ) ) ) ) ) ) ) | MDL No. 2492<br><br>Master Docket No. 1:13-cv-09116<br><br>This Document Relates to All Cases<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

## RESPONSE OF THE NCAA TO
## NICHOLS' JULY 15, 2015 SUBMISSION

[REDACTED VERSION, PUBLICLY FILED]

September 14, 2015

Mark S. Mester
  mark.mester@lw.com
Johanna M. Spellman
  johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

J. Christian Word
  christian.word@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................3

    A.    The NCAA ..................................................................................3

    B.    Health And Safety .......................................................................4

    C.    The NCAA Has Taken Numerous Steps To Reduce Concussion Risks ................4

        1.    Rule Changes ...................................................................4

        2.    Research ..........................................................................5

        3.    Education ........................................................................5

        4.    Concussion Management Plan Legislation ................................7

    D.    The NCAA's Actions Have Been Fully Consistent With Consensus Standards Where And When Such Consensus Actually Existed............................7

ARGUMENT ...........................................................................................................8

    I.    THE NEW CLASS DEFINITION NOW BEING PROPOSED BY NICHOLS AND HIS COUNSEL IS FATALLY FLAWED ..................................9

        A.    Nichols' Newly-Proposed Class Is Indefinite And Not Ascertainable..............................................................................9

        B.    Nichols' Newly-Proposed Class Definition Would Create Serious Issues With Respect To Notice ..................................................11

        C.    Nichols' Newly-Proposed Class Represents Only A Small Fraction Of The Settlement Class Itself ..................................................13

        D.    Nichols Is Not A Member Of The Class He Is Now Proposing ................15

    II.    APPROVAL OF THE NFL SETTLEMENT PROVIDES LITTLE OR NO GUIDANCE IN TERMS OF THE VIABILITY IN THIS CASE OF A CONTESTED PERSONAL INJURY CLASS................................16

        A.    Judge Brody Did Not Consider Manageability In Granting Final Approval Of The NFL Settlement ............................................16

        B.    The Individual Cases Already Pending Against The NCAA Make Clear How Severe The Manageability Problems Would Be Here............17

**Page**

    C.    Even If Manageability Had Been Considered By Judge Brody, Class Treatment Of Personal Injury Claims Against The NCAA Would Be Far More Problematic Than For The Claims That Were Made Against The NFL ..................................................................20

III.    NICHOLS AND HIS COUNSEL ESSENTIALLY IGNORE THE TYPICALITY REQUIREMENT ..........................................................21

IV.    PREDOMINANCE WOULD PLAINLY BE LACKING....................................23

V.    NICHOLS AND HIS COUNSEL GIVE SHORT SHRIFT TO THE ISSUE OF SUPERIORITY ..............................................................................25

VI.    NO MEMBER OF THE SETTLEMENT CLASS WITH COMPENSABLE PERSONAL INJURIES WILL BE PREJUDICED ..............27

VII.    THE CONTINUING EFFORTS OF NICHOLS AND HIS COUNSEL TO ELEVATE CLASS TREATMENT TO THE LEVEL OF A SUBSTANTIVE RIGHT SHOULD LIKEWISE FAIL ...........................28

VIII.    NICHOLS' "CORE-ISSUES" CLASS COULD NOT PROPERLY BE CERTIFIED EITHER.........................................................................29

    A.    Nichols' Proposed Core-Issues Class Could Not Satisfy The Requirements Of Rule 23(c)(4) ...................................................29

    B.    Individual Issues Would Predominate ........................................30

    C.    Variations In State Law Would Undermine Predominance And Create Serious Manageability Issues .........................................31

    D.    An Issues Class Is Not A Superior Means Of Resolving Nichols' "Core Issues" ............................................................................32

    E.    Impaneling Two Or More Juries To Address The Same Issues Would Also Violate The Seventh Amendment .........................................34

    F.    This Is Not The Type Of Case Where A Core-Issues Class Would Be Appropriate ............................................................................34

CONCLUSION..........................................................................................35

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Abuan v. General Electric Co.,
   3 F.3d 329 (9th Cir. 1993) ........................................................... 27

Allen v. Dover Co-Recreational Softball League,
   807 A.2d 1274 (N.H. 2002) ......................................................... 31

Amchem Products, Inc. v. Windsor,
   521 U.S. 591 (1997) ............................................. 15, 16, 17, 18, 20, 24, 26

American Express Co. v. Italian Colors Restaurant,
   133 S. Ct. 2304 (2013) ............................................................... 28

Baker v. Home Depot USA, Inc.,
   2013 WL 271666 (N.D. Ill. 2013) ................................................. 22

Barnes v. American Tobacco Company,
   161 F.3d 127 (3d Cir. 1998) ..................................................... 20, 24

Bell v. PNC Bank, National Association,
   2015 WL 5093052 (7th Cir. 2015) ................................................. 15

Boundas v. Abercrombie & Fitch Stores, Inc.,
   280 F.R.D. 408 (N.D. Ill. 2012) .................................................. 10

Burns v. First American Bank,
   2006 U.S. Dist. LEXIS 92159 (N.D. Ill. 2006) ................................. 16

Butler v. Sears, Roebuck and Co.,
   727 F.3d 796 (7th Cir. 2013) ................................................. 19, 34, 35

Carnegie v. Household International, Inc.,
   376 F.3d 656 (7th Cir. 2004) ................................................... 17, 35

Carrera v. Bayer Corporation,
   727 F.3d 300 (3d Cir. 2013) ....................................................... 13

Castano v. American Tobacco Company,
   84 F.3d 734 (5th Cir. 1996) ................................................ 20, 26, 29, 30

Chicago Teachers Union v. Board of Education of the City of Chicago,
   301 F.R.D. 300 (N.D. Ill. 2014) .................................................. 32

Cima v. WellPoint Health Networks, Inc.,
   250 F.R.D. 374 (S.D. Ill. 2008) ................................................ 12, 13

iii

**Page(s)**

Cimino v. Raymark Industries, Inc.,
151 F.3d 297 (5th Cir. 1998) ........................................................ 25

Comcast Corporation v. Behrend,
133 S.Ct. 1426 (2013) .................................................................. 14

Craig v. Amateur Softball Association of America,
951 A.2d 372 (Pa. Super. Ct. 2008) ............................................. 31

Daniels v. Amerco,
1983 WL 1794 (W.D.N.Y. 1983) .................................................. 19

Dhamer v. Bristol-Myers Squibb Company,
183 F.R.D. 520 (N.D. Ill. 1998) ................................................... 33

Emig v. American Tobacco Company,
184 F.R.D. 379 (D. Kan. 1998) .................................................... 30

Espenscheid v. DirectSat USA, LLC,
705 F.3d 770 (7th Cir. 2013) ........................................................ 24

Feder v. Electronic Data Systems Corporation,
248 Fed. Appx. 579 (5th Cir. 2007) ............................................. 16

Fisher v. Bristol-Myers Squibb Company,
181 F.R.D. 365 (N.D. Ill. 1998) ................................................... 24

Fujiwara v. Sushi Yasuda Ltd.,
58 F. Supp. 3d 424 (S.D.N.Y. 2014) ............................................ 21

Gauvin v. Clark,
537 N.E.2d 94 (Mass. 1989) ........................................................ 31

Georgine v. Amchem Products, Inc.,
83 F.3d 610 (3d Cir. 1996), aff'd, 521 U.S. 591(1997) ............... 32

Gleason v. Board of Education of the City of Chicago,
792 F.2d 76 (7th Cir. 1986) .......................................................... 18

Henke v. Arco Midcon, L.L.C.,
2014 WL 982777 (E.D. Mo. 2014) .............................................. 30

Hiller v. Harsh,
426 N.E.2d 960 (Ill. App. Ct. 1981) ....................................... 22, 23

Hughes v. Kore of Indiana Enterprise, Inc.,
731 F.3d 672 (7th Cir. 2013) ........................................................ 12

In re Allstate Insurance Company,
400 F.3d 505 (7th Cir. 2005) ................................................. 34, 35

**Page(s)**

In re Bridgestone / Firestone, Inc.,
  288 F.3d 1012 (7th Cir. 2002) ................................................................. 20

In re General Motors Corporation Dex-Cool Products Liability Litigation,
  241 F.R.D. 305 (S.D. Ill. 2007) ............................................................... 30

In re IKO Roofing Shingle Products Liability Litigation,
  757 F.3d 599 (7th Cir. 2013) ................................................................. 19

In re Jackson National Life Insurance Company
  Premium Litigation, 183 F.R.D. 217 (W.D. Mich. 1998) ........................ 30

In re Nassau County Strip Search Cases,
  461 F.3d 219 (2d Cir. 2006) ................................................................. 30

In re National Football League Players' Concussion Injury Litigation,
  307 F.R.D. 351 (E.D. Pa. 2015) ............................................... 17, 20, 21, 25

In re Paxil Litigation,
  212 F.R.D. 539 (N.D. Cal. 2003) ........................................................... 30

In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869,
  725 F.3d 244 (D.C. Cir. 2013) ............................................................... 28

In re Rhone-Poulenc Rorer Incorporated,
  51 F.3d 1293 (7th Cir. 1995) ........................ 2, 17, 18, 19, 20, 23, 25, 26, 30, 31, 32, 33, 34, 35

In re Sears, Roebuck and Co. Tools Marketing and Sales Practices Litigation,
  2009 WL 3460218 (N.D. Ill. 2009) ........................................................ 14

In re Tetracycline Cases,
  107 F.R.D. 719 (W.D. Mo. 1985) .......................................................... 33

In re Trans Union Corp. Privacy Litigation,
  741 F.3d 811 (7th Cir. 2014) ........................................................... 28, 29

In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and
  Products Liability Litigation, 275 F.R.D. 270 (S.D. Ill. 2011) ................ 17

Jacks v. DirectSat USA, LLC,
  2015 WL 1087897 (N.D. Ill. 2015) .................................................. 30, 35

Johnson v. Bond,
  94 F.R.D. 125 (N.D. Ill. 1982) .............................................................. 22

Karas v. Strevell,
  884 N.E.2d 122 (Ill. 2008) .................................................................... 31

Kern v. Siemens Corporation,
  393 F.3d 120 (2d Cir. 2004) ................................................................. 11

**Page(s)**

McCullough v. IPFW University,
  2013 U.S. Dist. LEXIS 20224 (N.D. Ind. 2013) ...................................................... 18

McLaughlin v. American Tobacco Company,
  522 F.3d 215 (2d Cir. 2008) ........................................................................................ 33

McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
  672 F.3d 482 (7th Cir. 2012) ................................................................................. 34, 35

Miller v. Janssen Pharmaceutica Products,
  2007 WL 1295824 (S.D. Ill. 2007)................................................................... 18, 19, 26

Mullins v. Direct Digital, LLC,
  2015 WL 4546159 (7th Cir. 2015) ................................................... 10, 11, 12, 29

Murray v. GMAC Mortgage Corporation,
  434 F.3d 948 (7th Cir. 2006) ....................................................................................... 26

Murray v. GMAC Mortgage Corporation,
  532 F. Supp. 2d 938 (N.D. Ill. 2007), aff'd, 274 Fed. Appx. 489 (7th Cir. 2008) ................... 12

Newton v. Southern Wood Piedmont Company,
  163 F.R.D. 625 (N.D. Ga. 1995) ................................................................................. 13

Ortiz v. Fibreboard Corporation,
  527 U.S. 815 (1999) ..................................................................................................... 28

Oshana v. Coca-Cola Company,
  472 F.3d 506 (7th Cir. 2006) ....................................................................................... 10

Pella Corporation v. Saltzman,
  606 F.3d 391 (7th Cir. 2010) ....................................................................................... 19

Puffer v. Allstate Insurance Company,
  255 F.R.D. 450 (N.D. Ill. 2009) .................................................................. 25, 30, 33, 34

Rink v. Cheminova, Inc.,
  203 F.R.D. 648 (M.D. Fla. 2001) ................................................................................. 30

Robinson v. Texas Automobile Dealers Association,
  387 F.3d 416 (5th Cir. 2004) ....................................................................................... 18

Saltzman v. Pella Corporation,
  257 F.R.D. 471 (N.D. Ill. 2009) .................................................................................. 20

Sandoval v. City of Chicago,
  2007 WL 3087136 (N.D. Ill. 2007)............................................................................. 27

Schwarz v. National Van Lines, Inc.,
  375 F. Supp. 2d 690 (N.D. Ill. 2005)........................................................................... 32

**Page(s)**

Spano v. Boeing Company,
633 F.3d 574 (7th Cir. 2011) ........................................................................ 22

Sterling v. Velsicol Chemical Corporation,
855 F.2d 1188 (6th Cir. 1988) ...................................................................... 27

Sylvester v. Wintrust Financial Corporation,
2013 U.S. Dist. LEXIS 140381 (N.D. Ill. 2013) ...................................... 29

Szabo v. Bridgeport Machines, Inc.,
249 F.3d 672 (7th Cir. 2001) ........................................................................ 26

Taylor v. CSX Transportation, Inc.,
264 F.R.D. 281 (N.D. Ohio 2007) .............................................................. 30

Thorogood v. Sears, Roebuck and Co.,
547 F.3d 742 (7th Cir. 2008) ........................................................................ 28

Ticknor v. Rouses Enterprises, L.L.C.,
592 Fed. Appx. 276 (5th Cir. 2014) ............................................................ 21

Vertin v. Mau,
8 N.E.3d 658 (Ill. App. Ct. 2014) .............................................................. 23

Walewski v. Zenimax Media, Inc.,
502 Fed. Appx. 857 (11th Cir. 2012) .......................................................... 14

Wal-Mart Stores, Inc. v. Dukes,
131 S.Ct. 2541 (2011) ............................................................................ 14, 25

Zinser v. Accufix Research Institute, Inc.,
253 F.3d 1180 (9th Cir. 2001) ...................................................................... 24

## OTHER AUTHORITIES

Health Insurance Portability and Accountability Act,
PL 104–191, Aug. 21, 1996, 110 Stat 1936 ............................................... 11

## RULES

Fed. R. Civ. P. 23 ................................................................................................ 29

Defendant National Collegiate Athletic Association ("NCAA") respectfully submits the following response to the July 15, 2015 submission of Plaintiff Anthony Nichols ("Nichols"):[1]

## <u>INTRODUCTION</u>

Nichols and his counsel have <u>repeatedly</u> berated Class Counsel for ultimately deciding to not pursue class certification of the personal injury claims of the Settlement Class. When faced with the need to demonstrate that those personal injury claims are actually appropriate for class treatment, however, Nichols and his counsel attempted what amounts to little more than a bait and switch.

In his July 15, 2015 submission, Nichols does not even attempt to suggest that the personal injury claims of the Settlement Class as a whole could be certified under Rule 23(b)(3), which we understood was the issue to be addressed in his submission. Instead, Nichols and his counsel now propose a far narrower personal injury class that most likely totals less than 1,000 individuals, representing only a very small fraction of the Settlement Class itself. Nichols and his counsel propose this new class in spite of the fact that the proposed classes in <u>each</u> of the twelve class cases consolidated before this Court by the Multidistrict Panel are far broader and in spite of the fact that the proposed class in Nichols' own Complaint is also much broader.

The efforts of Nichols and his counsel to sidestep the problems already recognized by Class Counsel <u>vis-à-vis</u> the classwide pursuit of personal injury claims should be rejected for a number of reasons. Among other things, Nichols' newly-proposed class definition is fundamentally flawed and would create serious ascertainability issues, and Nichols himself would <u>not</u> be a member of his newly-proposed class, raising obvious questions regarding standing and adequacy, not to mention the real motivations of Nichols and his counsel. Nichols' pared-down class, however, would still pose insuperable typicality, predominance and

---

[1] Capitalized terms have the meaning ascribed to them in the Amended Settlement Agreement, which is Exhibit 1 to the joint motion for preliminary approval filed with the Court on April 14, 2015. <u>See</u> Am. Settlement Agt. (Dkt. #154-1) (hereinafter cited as the "ASA").

manageability problems, and the pursuit of these types of personal injury claims on a classwide basis in no sense satisfies the superiority requirement of Fed. R. Civ. P. 23, as the Seventh Circuit first recognized in In re Rhone-Poulenc, 51 F.3d 1293 (7th Cir. 1995). Indeed, the notion that individual personal injury claims for hundreds of thousands or millions of dollars cannot feasibly be pursued on a non-class basis simply does not square with reality. Just as in Rhone-Poulenc, the types of personal injury claims arising from the long-term effects of concussions that are currently being pursued and would be pursued against the NCAA and others are perfectly suited for individual litigation and simply not appropriate for class treatment.

The class now being proposed by Nichols and his counsel also creates other adequacy issues and concerns. At base, Nichols and his counsel are asking the Court to scuttle the Settlement Agreement (which will establish a $70 million common fund and provide the opportunity for screening and medical monitoring for upwards of four million current and former student-athletes, along with significant injunctive relief and a dedicated research fund) so that Nichols and his counsel can gamble that they might somehow be able to pursue personal injury claims on a class basis on behalf of 1,000 or so individuals. Nichols and his counsel make this request even though there is no plausible reason why anyone with a viable personal injury claim could not and should not pursue that claim on an individual basis. For the reasons addressed below, however, Nichols' objections should be overruled, and the amended motion for preliminary approval should be granted so that notice of the Settlement Agreement can be provided to members of the Settlement Class, at which point the Court will inevitably have a much better sense of whether the objections of Nichols and his counsel are idiosyncratic (as they would now appear to be) or whether the Settlement Class is prepared to forego relief for four million individuals so that fewer than 1,000 individuals can try to pursue on a class basis personal injury claims they could and should otherwise pursue on their own.

2

## FACTUAL BACKGROUND

The factual background for this memorandum is set forth below.  See disc. infra at 3-8.[2]

### A.    The NCAA

The NCAA is an unincorporated association of more than 1,200 colleges, universities, conferences, affiliated associations and other institutions.  See NCAA Const., Ex. 1, at § 4.02.1.[3] The authority of the NCAA national office over member institutions, however, is limited, and the NCAA cannot unilaterally impose mandatory legislation on member institutions.  See id. at §§ 2.1, 3.2.1.  To the contrary, the NCAA's governance structure consists of committees composed of representatives from member institutions, and all policies and legislation governing the conduct of intercollegiate athletics must be adopted and ratified by the membership at large at the NCAA's annual convention or through the divisional governance structure outlined in the NCAA's Constitution.  See NCAA Const., Ex. 1, at § 5.01.1; id. at § 4.01.1 (divisional structure); see also, e.g., id. at §§ 5.01.1, 5.02, 5.1.4.1.

The resources of NCAA member institutions vary dramatically across its three divisions and within the divisions themselves.  See, e.g., Poppe Dep., Ex. 2, at 160:5-10.  As a result, NCAA committees include representatives from institutions of disparate financial means, and NCAA policies reflect the fact that the respective resources of member institutions materially impact and influence the feasibility of association-wide rules and legislation.  See id.

---

[2]    The factual background presented in Nichols' submission is apparently based almost entirely on the discovery record previously amassed by Class Counsel in Arrington and on the materials filed with the class motion in Arrington.  See Nichols Mem. (Dkt. #201) at 3 n.5.  Along with that motion, a Proffer of Facts was submitted, to which Nichols and his counsel now liberally cite.  See Proffer of Facts (Arrington Dkt. #176); see also Nichols Mem. at 3-7, 10, 13.  The NCAA, of course, did not provide a written response to the Proffer of Facts at the time it was filed due to the commencement of the mediation efforts that ultimately led to the Settlement Agreement.  See Minute Entry (Arrington Dkt. #186).  The NCAA is nevertheless prepared to address any allegation contained in the Proffer should the Court wish us to do so.  See disc. infra at 3-8.

[3]    Publicly-available documents and documents from the Arrington discovery record cited herein are attached as exhibits to the Declaration of Johanna Spellman, Exhibit A hereto.

## B.     Health And Safety

Each member institution is <u>directly</u> responsible for conducting its athletic programs "in a manner designed to protect and enhance the physical and educational well-being of student-athletes."  NCAA Const., Ex. 1, at § 2.2.  Although NCAA committees provide guidance on issues relating to health and safety, ultimately "[i]t is the responsibility of <u>each</u> member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes."[4]  <u>Id.</u> at § 2.2.3.  Indeed, this principle is enshrined in the NCAA Constitution, which makes clear "[t]he control and responsibility for the conduct of intercollegiate athletics <u>shall</u> <u>be</u> <u>exercised</u> <u>by</u> <u>the</u> <u>institution</u> <u>itself</u> and by the conference(s), if any, of which it is a member."  <u>Id.</u> at § 6.01.1.

### C.     The NCAA Has Taken Numerous Steps To Reduce Concussion Risks

For decades, the NCAA, through its various committees, has provided assistance to member institutions on head injuries and concussions.  <u>See</u> NCAA00007876, Ex. 3.  It has acted by promulgating playing rules, funding research on concussions, undertaking educational efforts and publishing guidance on student-athlete health and safety.  <u>See</u> disc. <u>infra</u> at 4-8.

### 1.     Rule Changes

The playing rules committees of the NCAA have implemented rule changes in various sports in order to reduce the risk of head injury, including the following:

- In 1970, the Football Rules Committee banned "spearing," defined as "the deliberate and malicious use of the head and helmet in an attempt to punish a runner after his momentum has stopped." <u>See</u> NCAA10145748, Ex. 4.

- In 1976, that same committee enacted a rule eliminating the head as a primary initial contact area for blocking and tackling.  <u>See</u> NCAA00007876, Ex. 3.

- In 1995, the Ice Hockey Rules Committee enacted a rule change to reduce hitting from behind and contact with the head.  <u>Id.</u>

- In 2005, the Football Rules Committee revised the football spearing rule to impose a penalty for striking another player with a helmet, regardless of intent, making it easier for officials to enforce the rule.  <u>Id.</u>

---

[4]   Unless stated otherwise, all emphasis is supplied and all internal citations, quotations and footnotes are omitted from any quoted material.

- In 2007, the Football Rules were amended to add a point of emphasis "to encourage officials to penalize head-down contact and leading with the crown of the helmet when tackling." <u>See</u> NCAA00006208, Ex. 5.
- In 2008, the Football Rules were again amended to prohibit the initiation of contact above the shoulders and the targeting of a defenseless opponent above the shoulders. <u>See</u> NCAA00006331, Ex. 6, at 35, 91.[5]

## 2. Research

The NCAA has also funded decades of concussion research, including the following:

- Since 1965, the NCAA has funded the Annual Survey of Football Injury Research and the Annual Survey of Catastrophic Football Injuries by Drs. Robert Cantu and Frederick Mueller. <u>See</u> NCAA00014899, Ex. 7.
- The NCAA has maintained an injury surveillance program since 1983, collecting injury data from athletic trainers and analyzing the data to understand injury trends. <u>See</u> NCAA00007876, Ex. 3, at 77.
- In 1999, the NCAA funded a study on injury assessment, return-to-play and effects of concussions on collegiate football players. The results of that research were published in The Journal of the American Medical Association in 2003. <u>See</u> Exs. 8-9.
- The NCAA recently awarded a $399,999 grant to study possible long-term effects of concussions. <u>See</u> Ex. 10 .

## 3. Education

The NCAA has engaged in educational efforts as well, collaborating with physicians on research publications based on NCAA injury surveillance data. <u>See generally</u> Exs. 8-9. It publishes articles in the NCAA News that inform members of developments in concussion research. <u>See</u>, <u>e.g.</u>, NCAA10149421, Ex. 11; NCAA00007874, Ex. 12; NCAA00003115, Ex. 13. The Football Rules Committee likewise annually produces an educational video for referees that provides examples of fouls related to spearing, head-to-head contact and other conduct that can lead to concussions. <u>See</u>, <u>e.g.</u>, Klossner Dep. (Apr. 16, 2013), Ex. 14, at 207:11-15.

The NCAA, however, has <u>never</u> purported to dictate how medical care is delivered to student-athletes nor could it permissibly do so. <u>See id.</u> at 18:5-10, 167:2-7. Those medical

---

[5]    The NCAA continues to make changes to protect student-athletes. For example, the Football Rules Committee moved the kickoff line in 2012 to limit the running start of the kicking team. <u>See</u> Ex. 15. Also in 2012, the Football Rules Committee passed a rule providing for removal from the game of any player who loses his helmet. <u>See id.</u> Moreover, starting with the 2013 football season, NCAA rules now provide that targeting and hitting defenseless players above the shoulder results in a 15-yard penalty <u>and</u> ejection. <u>See</u> Ex. 16.

decisions are, of course, best left to medical professionals at member institutions and to the personal physicians of student-athletes.  See, e.g., Guskiewicz Dep., Ex. 17, at 95:13-20.

In order to assist member institutions in providing appropriate care to student-athletes, the NCAA commissioned a Medical Handbook beginning in 1933.  See NCAA10140157, Ex. 18.  That original handbook provided "suggestions and recommendations" and was designed to be a convenient "ready reference" for doctors, coaches and trainers.  See id.  It noted that concussions "should not be regarded lightly" and set forth recommendations for the examination of a player with a suspected head injury.[6]  See id. at 59.  As medical evidence regarding the causes and effects of concussions has evolved, however, the NCAA has responded with appropriate guidance to its member institutions, including:

- In 1994, CSMAS added a section to the Handbook on concussions, which provided member institutions with guidance on diagnosing and treating concussions as well as return-to-play criteria.  See NCAA10139563, Ex. 19, at 602-05.

- In 1997 -- four years before the Vienna conference on concussions that resulted in the "Vienna Protocol" -- CSMAS revised the concussion guidelines in the Handbook to provide that "a student-athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred.  In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."  NCAA10140071, Ex. 20, at 116 (emphasis in original).

- In 2004, the concussion guidelines in the Handbook were again amended to (i) emphasize that athletes should not return-to-play when any symptoms persist, (ii) note that recent publications endorsed neurocognitive testing and (iii) state that athletes with confusion and amnesia should not be allowed to return-to-play on the same day.  See NCAA00017243, Ex. 21, at 89-90.

- In 2009, the Handbook was updated to reference the CDC: Heads Up Concussion Tool Kit and Video.  See NCAA0007461, Ex. 22, at 513-16.

---

[6]   Today, CSMAS publishes the NCAA Sports Medicine Handbook, which is distributed to trainers annually and available online to athletes and others.  See Klossner Dep. (Nov. 8, 2012), Ex. 23, at 88:21-89:9.  The Handbook is a convenient resource containing "guidelines . . . not accessible in another easily obtainable source."  2013-14 Handbook, Ex. 24, at 2.  The Handbook, however, does not dictate how medical conditions or injuries must be diagnosed or treated.  Instead, it is intended "[t]o provide guidance" to help member institutions meet their responsibility to guard the health and safety of their student-athletes.  See id.

### 4. Concussion Management Plan Legislation

In 2010, the NCAA's Executive Committee announced a proposed policy with respect to concussion management.  See NCAA00007832, Ex. 25.  The policy required member institutions in all three divisions to have a concussion management plan, mandating that student-athletes who exhibit symptoms associated with a concussion be removed from competition or practice and evaluated by a healthcare provider with experience in evaluating concussions.  See id.  As specified in the policy, student-athletes diagnosed with a concussion should not return-to-play the same day or before they are cleared by a team physician or his or her designee.  See id. The Executive Committee further recommended that each division consider the policy for legislation.  See Klossner Dep. (Apr. 16, 2013), Ex. 14, at 184:24-25.  Later in 2010, the legislative bodies for each division enacted legislation requiring member institutions to have a concussion management plan.  See, e.g., NCAA00007903, Ex. 26.[7]

### D. The NCAA's Actions Have Been Fully Consistent With Consensus Standards Where And When Such Consensus Actually Existed

Nichols' assertions notwithstanding, there was no "consensus" for concussion management in 2002 or in the years immediately following.  See, e.g., 2006 Team Physician Consensus Stmt., Ex. 27, at 397 ("[S]ignificant controversy exists for a same-day RTP decision and no conclusive evidence-based data are available.").  For example, the 2001 Vienna Protocol did not represent a one-size-fits-all template for the diagnosis and treatment of concussions.  See Bailes Decl., Ex. B, at ¶ 15. Instead, the authors themselves "acknowledge[d] that the science of concussion is at the early stages and therefore management and return to play decisions remain

---

[7]   The NCAA Constitution was, in turn, amended to require that all member institutions have a concussion management plan that includes:  (i) education of student-athletes about concussions; (ii) a process to ensure that athletes who exhibit signs of concussions are removed from play and evaluated by a medical staff member; (iii) a policy precluding athletes diagnosed with concussions from returning to play the same day; and (iv) a policy requiring medical clearance for concussed athletes to return-to-play.  See NCAA Const., Ex. 1, at § 3.2.4.17.

largely in the realm of clinical judgment on an individual basis."[8]  Vienna Conf., Ex. 28, at 9.  Dr.

Cantu likewise stated the 2004 Prague protocol "represents a work in progress, and, as with all

other recommendations or proposals, it must be updated as" the science evolves.  See Ex. 29 at 4.

Nonetheless, the NCAA's guidelines throughout the period were fully consistent with the

recommendations in the so-called "consensus" documents on which Nichols purports to rely.

See Bailes Decl., Ex. B, at ¶ 31.  For example, when one compares the 2001 Vienna Protocol to

the contemporaneous NCAA Handbook, it becomes clear that both documents:

- Cautioned against relying on previously promulgated grading scales and return-to-play guidelines.  See Vienna Conf., Ex. 28, at 7; NCAA00006798, Ex. 30, at 850-52.
- Emphasized the individual nature of return-to-play determinations.  See Vienna Conf., Ex. 28, at 7; NCAA00006798, Ex. 30, at 850-52.
- Stated that an athlete should never return-to-play while symptomatic.  See Vienna Conf., Ex. 28, at 8; NCAA00006798, Ex. 30, at 850; see also NCAA10140071, Ex. 20, at 116 (recommending this practice four years earlier).

As the understanding of concussions developed, however, the NCAA continued to update its

guidance.  Compare, e.g., 2004 Prague Stmt., Ex. 31, at 202 (recommending stepwise return-to-

play), with NCAA00007098, Ex. 32, at 147 (same).  And while the science surrounding

concussion management has certainly evolved over time, the NCAA has remained fully engaged,

providing timely guidance to its membership, and the membership has adopted appropriate rules,

policies and guidelines.  See Bailes Decl., Ex. B, at ¶¶ 24-31.

## ARGUMENT

For the reasons addressed below, the pursuit of personal injury claims on a classwide

basis would not be appropriate in this context.  See disc. infra at 9-29.  This would be equally

true whether class certification were sought under Rule 23(b)(3) or for an "issues-only" class

under Rule 23(c)(4).  See disc. infra at 29-35.

---

[8]   Nichols also tries to rely on the 2004 position statement of the National Athletic Trainers' Association.  See Nichols Mem. at 8.  That document, however, allowed for same-day return-to-play in cases where an athlete's symptoms resolved quickly.  See Bailes Decl., Ex. B, at ¶ 17.

## I. THE NEW CLASS DEFINITION NOW BEING PROPOSED BY NICHOLS AND HIS COUNSEL IS FATALLY FLAWED

In contrast to the broader class definitions in Arrington as well as his own pleading, Nichols is now proposing a much narrower class, all in a fairly obvious effort to sidestep some of the issues that Class Counsel already recognized would preclude class treatment of the personal injury claims of the Settlement Class as a whole. See Nichols Mem. at 22-24. Nichols' new class definition, however, is itself fatally flawed and would create more problems than it solved.

In his July 15, 2015 submission, Nichols proposes a class consisting of persons who (1) had a "documented concussion in or after 2002 while participating in a NCAA athletic event" and (2) who "thereafter received a documented diagnosis" of one or more concussion-related injuries. See Nichols Mem. at 1. Nichols does not explain precisely what a "documented concussion" or "documented diagnosis" would be for purposes of implementing the proposed class definition, but the discovery record in Arrington makes it crystal clear that neither is a proper criteria for defining and delimiting an ascertainable class. See disc. infra at 10-11. Moreover, Nichols and his counsel give no indication of how they would propose to address any personal injury claims of members of the Settlement Class who did not have both a "documented concussion" and a "documented diagnosis," which in some sense begs the core of the question now before the Court as it undertakes its fairness analysis. See Minute Entry (Dkt. #182).

### A. Nichols' Newly-Proposed Class Is Indefinite And Not Ascertainable

In order for a class to be ascertainable, its definition must be "precise, objective, and presently ascertainable."[9] See, e.g., Boundas v. Abercrombie, 280 F.R.D. 408, 417 (N.D. Ill.

---

[9] The Seventh Circuit's recent decision in Mullins does not materially alter applicable law on ascertainability. See Mullins v. Direct Digital, 2015 WL 4546159, at *16 (7th Cir. 2015). In Mullins, the Seventh Circuit departed from the Third Circuit's approach on ascertainability, suggesting that ascertainability is simply part of the required manageability analysis for a Rule 23(b)(3) class and that the administrative burden of identifying class members (if possible) should be considered relative to the other alternatives to class treatment, consistent with the required analysis for superiority. See id.; see also Mem. Op. and Order (Dkt. #115) at 13-15 (addressing ascertainability). In so doing, however, the Seventh Circuit emphasized that the class device remains best suited to "low-value claims," where only a "lunatic or a fanatic" would litigate the claim on an individual basis and noted that ascertainability (and notice) concerns are far less acute for claims of lesser value like the ones in Mullins. See Mullins, 2015 WL 4546159, at *7, 10.

2012); Mullins, 2015 WL 4546159, at *16 ("If the proposed class presents unusually difficult manageability problems, district courts have discretion to press the plaintiff for details about the plaintiff's plan to identify class members. A plaintiff's failure to address the district court's concerns adequately may well cause the plaintiff to flunk the superiority requirement of Rule 23(b)(3)."). In this instance, however, Nichols' newly-proposed class would not meet the foregoing standard for at least two reasons. See disc. infra at 10-11.

First, there is no database or other source from which a list of "documented concussions" could be derived. See Mishkin Decl., Ex. C, at ¶¶ 5-8. While the NCAA maintains a database of concussions reported to it by member institutions (i.e., the "Injury Surveillance System"), that database does not contain the names of the student-athletes who reportedly sustained concussions while participating in NCAA-sanctioned sports but, instead, simply includes other relevant, non-identifying information (e.g., sport, type of injury, etc.).[10] See id. at ¶ 5. The Injury Surveillance System, however, plainly could not serve as the repository of names of persons with "documented concussions," since no names are contained in the database itself and no other viable source is available.[11] See id.

---

[10] Shortly after receiving Nichols' July 15, 2015 submission, we raised with Nichols' counsel the Injury Surveillance System and asked them to confirm whether they intended to rely on that database as the source for "documented concussions." See July 31, 2015 Corresp. fr. M. Mester to A. Scharg, Ex. 33. They initially equivocated but eventually indicated that they were not intending to rely upon the Injury Surveillance System. See Spellman Decl., Ex. A, at ¶¶ 13-19. Mr. Edelson was steadfast, however, in refusing to advise the NCAA of what source (if any) he actually did intend to rely upon, in spite of repeated requests, and to date, he has given no indication of any alternative source. See id. at ¶¶ 14-23. Mr. Edelson was nevertheless provided with the document productions of the parties in Arrington and written discovery responses as well as documents produced by third parties in Arrington (i.e., almost 200,000 pages of documents as well as the Injury Surveillance System database itself), and there is nothing in that record which would facilitate the creation of a comprehensive list of persons with a "documented concussion," let alone a list of persons with a "documented diagnosis." See id. at ¶¶ 3, 24; Mishkin Decl. Ex. C, at ¶¶ 5-8. Moreover, as the proponents of class certification, Nichols and his counsel would bear the burden of affirmatively demonstrating ascertainability, a burden they plainly cannot discharge. See, e.g., Oshana v. Coca-Cola, 472 F.3d 506, 513 (7th Cir. 2006).

[11] The various source materials used by member institutions in providing data for the Injury Surveillance System would likewise not be a feasible source for defining Nichols' proposed class. See disc. supra at 10 & n.10. All of that information is, of course, in the possession, custody and control of the NCAA's more than 1,200 member institutions, much of it would no longer exist since Nichols' newly-proposed class dates back to 2002 and most documentation possessed by member institutions of events occurring a decade or so ago is apt to have been discarded through the

(continued...)

Second, even if a list of persons with a "documented concussion" could be compiled (which it cannot), there is plainly no way of knowing which persons on that list have had a "documented diagnosis." See Bailes Decl., Ex. B, at ¶¶ 33-34. To the contrary, diagnoses are obviously provided by healthcare practitioners on an individualized and confidential basis to patients who elect to seek medical care. See id. at ¶ 33. Not only is there no list or compilation of the names of persons with a "documented diagnosis," but state and federal privacy laws would strictly prohibit the creation of such a list. See, e.g., Health Ins. Portability and Acct. Act, 110 Stat. 1936, et seq. Moreover, making a confidential diagnosis a criteria for class membership could easily create the potential for an opt-in class, the very thing the 1966 amendments to Rule 23 were designed to eliminate. See Kern v. Siemens, 393 F.3d 120, 124 (2d Cir. 2004) ("Not only is an 'opt in' provision not required, but substantial legal authority supports the view that by adding the 'opt out' requirement to Rule 23 in the 1966 amendments, Congress prohibited 'opt in' provisions by implication.").

## B.  Nichols' Newly-Proposed Class Definition Would Create Serious Issues With Respect To Notice

As the Seventh Circuit recognized in Mullins, the importance of direct notice to class members increases as the value of individual claims increases. See Mullins, 2015 WL 4546159, at *10. In a typical consumer class action such as Butler, Pella or Carnegie, where the value of any one person's claim is only $50 or $100 or $1,000 and the stakes are sufficiently low that no class member would ever pursue his or her claim on an individual basis, actual notice is less important, because the right to opt out is less consequential. See, e.g., Hughes v. Kore, 731 F.3d

---

(...continued)

application of the routine document retention policies at those institutions. See Mishkin Decl., Ex. C, at ¶¶ 6-7. Furthermore, a class definition that would require subpoenas to be issued to over 1,200 different institutions for otherwise disparate documents and data that in the aggregate likely no longer exists is scarcely the basis for an ascertainable class or a recipe for manageability in keeping with the holding in Mullins. See, e.g., Mullins, 2015 WL 4546159, at *16. Last but not least, some concussions experienced while participating in interscholastic sports are not reported to the NCAA, and others that are reported as concussions are not actually concussions. See Mishkin Decl., Ex. C, at ¶ 7. As such, the Injury Surveillance System would not be a good source for a class list even if it contained names, which it does not. See id. at ¶¶ 5-6.

672, 677 (7th Cir. 2013) ("[T]here is no indication that any member of the class in this case has a damages claim large enough to induce him to opt out and bring an individual suit for damages.").

In <u>Mullins</u>, the Seventh Circuit was less concerned with the feasibility of notice, because the claims were "low-value" claims involving false statements about a dietary supplement and the class device was the only way consumers would possibly get relief. See <u>Mullins</u>, 2015 WL 4546159, at *10. But where the claims at issue are more substantial and involve personal injury claims for hundreds of thousands of dollars or more (as reflected in the individual cases the NCAA is litigating), then the need for robust notice and an ample opportunity to opt out is far more acute. <u>See</u>, <u>e.g.</u>, <u>Cima v. WellPoint</u>, 250 F.R.D. 374, 380-81 (S.D. Ill. 2008); <u>see</u> <u>also</u> Ex. D (individual cases pending against the NCAA). And where individual claims are substantial, the consequences of not opting out are far greater, and the need for actual notice is also much greater. <u>See</u> <u>Cima</u>, 250 F.R.D. at 381 ("[A] class seeking substantial monetary remedies will more likely consist of members with divergent interests, requiring class members to be afforded an opportunity to protect those interests through the devices of notice and opt-out.").

If Nichols' newly-proposed class were ever certified, however, the task of creating a class list and providing notice would be enormously complex, if it could be done at all. <u>See</u> disc. <u>supra</u> at 9-11. There is no readily available list of persons with "documented concussions," and there is obviously no list anywhere of all persons with a "documented diagnosis." <u>See</u> disc. <u>supra</u> at 9-11. Accordingly, there would be no feasible means of providing actual notice to all members of Nichols' newly-proposed class, and this alone would be reason enough to deny any request for class certification. <u>See</u>, <u>e.g.</u>, <u>Murray v. GMAC</u>, 532 F. Supp. 2d 938, 945-46 (N.D. Ill. 2007), <u>aff'd</u>, 274 Fed. Appx. 489 (7th Cir. 2008) (decertifying class based on the parties' inability to identify class members and provide effective notice). Otherwise, class members would be bound by determinations made in a proceeding for which they received no notice and

for which they had no meaningful opportunity to opt out, with the viability of high-value

individual claims hanging precariously in the balance.  See, e.g., Cima, 250 F.R.D. at 380-81.[12]

### C. Nichols' Newly-Proposed Class Represents Only A Small Fraction Of The Settlement Class Itself

Tellingly, Nichols makes no effort to estimate the size of his newly-proposed class,

which itself indicates a lack of ascertainability.  See Nichols Mem. at passim; see also, e.g.,

Carrera v. Bayer, 727 F.3d 300, 304 n.1, 308 (3d Cir. 2013) (vacating class certification where

plaintiff failed to propose feasible method for determining class members).  Based upon the

information relied upon in Nichols' July 15, 2015 submission, however, it is clear Nichols' new

class would be exceedingly small and bear no resemblance to any of the proposed classes in any

of the underlying complaints in the twelve class actions consolidated before this Court for

pretrial proceedings by the Multidistrict Panel.[13]  See Ex. E (class definitions in each of the class

actions currently before this Court).  This enormous discrepancy between the proposed classes in

the underlying complaints and Nichols' newly-proposed class obviously speaks volumes about

the ability of Nichols and his counsel to actually address the question posed by the Court (i.e.,

the viability of a Rule 23(b)(3) class for the personal injury claims of the Settlement Class), but it

---

[12]  Nichols' class definition would create other problems, most of which are ignored in Nichols' submission.  For example, Nichols proposes that only persons with a "documented diagnosis" of "one or more concussion-related injuries" would be members of his class.  See Nichols Mem. at 1. What happens, however, if a person receives conflicting diagnoses from two or more physicians, and one diagnosis is that there is no concussion-related injury?  Likewise, what if a person receives a concussion-related injury but that diagnosis is wrong or is later altered or revised or if the source of the concussion-related injury is some activity other than participation in an NCAA-sanctioned sport? Is that person in Nichols' proposed class or out?  And what if a person is diagnosed, for instance, with Alzheimer's, which affects over five million Americans, but there is no indication that concussions had anything to do with the Alzheimer's?  It is for these and other reasons that class definitions are properly based on objective facts and not subjective things like diagnoses, opinions or the presence of one or another medical condition.  See, e.g., Newton v. S. Wood Piedmont, 163 F.R.D. 625, 632 (N.D. Ga. 1995) (holding that class definition "calls for a medical diagnosis" and as a result "[t]he type of questions which must be answered in order to determine the members of such a class are of a highly individualized nature").

[13]  The definition of the proposed class in Nichols' current pleading is as follows:

> All current and former NCAA student-athletes who sustained a concussion(s) or suffered concussion-like symptoms while playing an NCAA-regulated sport and who incurred medical expenses as a result.

Compl. (Dkt. #1), Nichols v. NCAA, Case No. 1:14-cv-00962 (N.D. Ill.) ("Nichols Compl.").

also highlights just how far afield Nichols and his counsel have come from their earlier proclamations. See Minute Entry (Dkt. #182); see also, e.g., Nichols' Mot. to Appoint (Dkt. #50) at 3 (suggesting without more that the personal injury claims of the Settlement Class as a whole were fully amenable to class treatment).[14]

In his July 15, 2015 submission, Nichols suggests that 6,767 concussions occur annually among NCAA student-athletes, and he cites the Deal Report for the proposition that approximately one percent of concussed individuals are expected to develop post-concussion syndrome ("PCS").[15] See Nichols Mem. at 15-16. Using Nichols' proposed class period, this would mean his proposed class would number approximately 880 individuals, a far cry from the Settlement Class, which includes more than 4.2 million persons, and the number 880, of course, is before opt outs (likely many) and it also assumes that the parties and the Court can somehow divine everyone who has received a "documented diagnosis" (which is plainly not the case), such that every person who has received a specified diagnosis would be placed on the class list for purposes of notice, opting out and ultimately preclusion.[16] See Mishkin Rpt. (Dkt. #168-1) at 4;

---

[14] If Nichols and his counsel actually believe that far fewer than one percent of the Settlement Class have a viable personal injury claim (and they are no doubt correct), then their pursuit of class treatment of such claims from the Settlement Class as a whole is a bit like looking for needles in haystacks. See Nichols Mem. at 15-16. The class device, however, is generally ill-suited to finding needles in haystacks, as numerous courts have recognized. See Walewski v. Zenimax, 502 Fed. Appx. 857, 861 (11th Cir. 2012) (affirming denial of class certification where proposed class included overbroad definition requiring extensive fact-finding to cull appropriate class members from millions of potential class members); In re Sears Tools, 2009 WL 3460218, at *5 (N.D. Ill. 2009) (denying certification where class definition was overbroad). Instead, class treatment is most appropriate where class members have suffered a common injury and where damages are similar. See, e.g., Wal-Mart v. Dukes, 131 S.Ct. 2541, 2551 (2011) ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[.]'"); Comcast v. Behrend, 133 S.Ct. 1426, 1433 (2013) ("Questions of individual damage calculations will inevitably overwhelm questions common to the class.").

[15] Stated otherwise, the vast majority of concussions self-resolve in "several days" and result in no long-term effects. See Cantu Rpt. (Arrington Dkt. #180) at ¶ 120. In his newly-proposed class, however, Nichols does not appear to be focusing on persons without long-term consequences, though Nichols himself apparently has no long-term effects. See Nichols Compl. at ¶ 40.

[16] To be sure, PCS is but one of five concussion-related injuries included in Nichols' new class definition, but virtually all persons diagnosed with CTE, Alzheimer's, ALS or Parkinson's would also be diagnosed with PCS, making it the most inclusive by far of the diagnoses referenced by Nichols in his class definition. See Nichols Mem. at 1; Bailes Decl., Ex. B, at ¶ 41.

see also Bailes Decl., Ex. B, at ¶¶ 33-34.  The reality, however, is there would be no way to compile a list of all persons with a "documented concussion" who also have a "documented diagnosis," and it is inevitable the number of persons with a "documented diagnosis" who could be identified is a fraction of the total universe of such persons.  See Bailes Decl., Ex. B, at ¶¶ 32-33.  Thus, Nichols and his counsel may try to claim that the total number of persons with a "documented concussion" and a "documented diagnosis" is more than 1,000, but it is virtually certain that the number of such persons who could actually be identified and included in Nichols' new class is lower and likely much lower.  See id.

### D.   Nichols Is Not A Member Of The Class He Is Now Proposing

Even more ironically, Nichols would not be a member of the class he is now proposing.  See Nichols Mem. at 1.  Nichols played football at San Diego State University from 1989 to 1992, whereas the cutoff date for his new class is 2002.  See id.; Nichols Compl. at ¶ 3.  Moreover, based on the allegations in Nichols' Complaint, he does not have a "documented diagnosis" of PCS or any other condition enumerated in his submission but, instead, only has "brain calcifications" which "may have been caused by the brain trauma he sustained during his time playing football."  See Nichols Compl. at ¶ 38; see also NCAA Response (Dkt. #191) at 11 (noting brain calcifications may or may not lead to compensable injuries).  Lastly, by now taking the position that no consensus was reached on concussion management until 2002, Nichols' counsel have paradoxically made it more difficult for Nichols himself to pursue a claim against the NCAA, since Nichols was a student-athlete before the date on which his counsel now claim a consensus was reached, all of which raises other adequacy issues.  See, e.g., Bell v. PNC, 2015 WL 5093052, at *9 (7th Cir. 2015).

The fact Nichols would not be a member of the proposed class on which his objections are based nevertheless raises many issues.  See Amchem v. Windsor, 521 U.S. 591, 625-26 (1997).  First, it is far from clear that Nichols has standing to make the objections he is making, because a class representative must be a member of the class he seeks to represent.  See, e.g.,

Burns v. First Am., 2006 U.S. Dist. LEXIS 92159, at *9-10 (N.D. Ill. 2006).  Second, if Nichols would not be a member of his proposed class, then he obviously would not be an adequate representative of that class either.  See Amchem, 521 U.S. at 625-26.  Third, if Nichols is not a member of his newly-proposed class, then it is fair to ask what standing or basis his lawyers have to be making the arguments and objections they have been making on his behalf for some time.  See, e.g., Feder v. Elec. Data, 248 Fed. Appx. 579, 580-81 (5th Cir. 2007) (applying standing requirements to objectors); Burns, 2006 U.S. Dist. LEXIS 92159, at *10 ("[P]rerequisite that a class representative fall within the class definition is akin to a standing requirement.").

## II.    APPROVAL OF THE NFL SETTLEMENT PROVIDES LITTLE OR NO GUIDANCE IN TERMS OF THE VIABILITY IN THIS CASE OF A CONTESTED PERSONAL INJURY CLASS

As reflected in his July 15, 2015 submission, Nichols largely bases his argument for a personal injury class in this litigation on the recent approval by Judge Anita B. Brody of a proposed settlement in the concussion litigation involving the National Football League ("NFL").  See Nichols Mem. at 14-15, 20-26.  Indeed, Nichols cites to Judge Brody's opinion no less than twenty times in his July 15, 2015 submission, and he otherwise relies extensively on Judge Brody's findings and analysis.  Id. at 14-26.  The decision of Judge Brody in approving a settlement in the NFL litigation, however, says little about the viability of actually adjudicating personal injury claims on a contested class basis in this litigation, and the differences between the NFL litigation and this litigation could not be more pronounced.  See NCAA Response (Dkt. #191) at 6; NCAA Fed. R. Civ. P. 23(b) Submission (Dkt. #81) at 4 (collecting cases).

### A.   Judge Brody Did Not Consider Manageability In Granting Final Approval Of The NFL Settlement

Because she was addressing Fed. R. Civ. P. 23 in the context of a settlement class, Judge Brody did not (by her own admission) have occasion to consider whether it actually would be manageable to adjudicate the claims of that class on a contested basis through all necessary

pretrial discovery, let alone trial itself.[17]  See In re NFL, 307 F.R.D. 351, 370-71 (E.D. Pa. 2015).

If this Court were to accept the invitation of Nichols and his counsel, however, it and the other

eleven transferor courts from which the other class actions were transferred by the Multidistrict

Panel obviously would not have that luxury.  See disc. infra at 17-21.

### B.   The Individual Cases Already Pending Against The NCAA Make Clear How Severe The Manageability Problems Would Be Here

In this instance, neither the parties nor the Court need speculate on how challenging the

manageability problems would be if personal injury claims for the long-term effects of

concussions were to be pursued on a class basis.  See disc. infra at 17-20.  Indeed, the Court need

only look to the nine individual cases now pending against the NCAA for confirmation that those

types of claims could not be feasibly brought or tried on a class basis.  See, e.g., Ex. D .

First, many additional parties would need to be joined in order for a full adjudication of

liability vis-à-vis each person in Nichols' newly-proposed class.  See, e.g., NCAA Answer (Dkt.

#177) at Aff. Def. 22 (affirmative defense addressing failure to join necessary parties).  In the

individual cases now pending against the NCAA, a variety of other defendants have been joined,

including the college or university attended by the student-athlete who filed suit as well as

coaches, trainers, physicians and others.  See Ex. D .  Indeed, there are up to ten defendants in

each of the individual cases pending against the NCAA.  See id.  As such, the specter of having

to join as many as nine additional parties for each of the 1,000 or so members of Nichols'

proposed class would itself seriously undermine manageability and make the pursuit of these

---

[17]   Under the Supreme Court's decision in Amchem, manageability is the one requirement of Rule 23 that does not need to be addressed in the context of certifying a class for settlement, precisely because the settlement means that the class claim will not have to be litigated or tried.  See Amchem, 521 U.S. at 620; see also, e.g., Carnegie v. Household Int'l, 376 F.3d 656, 660 (7th Cir. 2004).  For a contested class like Nichols' with claims that would have to be tried, however, manageability is often the primary stumbling block to class certification, and this is all the more true where the underlying claims are individual personal injury claims brought on behalf of roughly 1,000 individuals.  See, e.g., Rhone-Poulenc, 51 F.3d at 1296-1300; In re Yasmin, 275 F.R.D. 270, 275-79 (S.D. Ill. 2011).

types of claims on a class basis simply infeasible.[18]  See, e.g., Robinson v. Tex. Auto. Dealers, 387 F.3d 416, 426 (5th Cir. 2004) (noting significant manageability concerns with "several hundred defendants").

Second, roughly thirty-five percent of the member institutions that would be necessary and indispensable parties for adjudication of individual personal injury claims would not be subject to this Court's jurisdiction.  See, e.g., Gleason v. Bd. of Educ., 792 F.2d 76, 79 (7th Cir. 1986) ("The eleventh amendment prohibits federal courts from entertaining suits by private parties against States and their agencies.").  Those institutions are arms of their respective states, and they enjoy Eleventh Amendment immunity, meaning they are not amenable to suit in federal court.  See, e.g., McCullough v. IPFW, 2013 U.S. Dist. LEXIS 20224, at *6 (N.D. Ind. 2013) ("Purdue is an arm of the state entitled to Eleventh Amendment immunity[.]").

Third, the amount of discovery and pretrial activity necessary to adjudicate the individual claims of each member of Nichols' new class would be enormous and anything but manageable.  See, e.g., Miller v. Janssen Pharma., 2007 WL 1295824, at *7 (S.D. Ill. 2007) (noting the "[e]xtensive discovery" necessary rendered the class "unmanageable").  For example, in the nine individual cases now pending against the NCAA, an average of 6.56 depositions have been taken or are planned in each case, and an average of 60.33 interrogatories and 105.33 document requests have been served.  See Ex. D .  Giving effect, however, to the estimated size of Nichols'

---

[18]  The class device, of course, cannot permissibly alter or abridge the rights of the parties.  See, e.g., Amchem, 521 U.S. at 613.  In the context of pursuing personal injury claims in this case, however, that would necessarily entail a separate mini-trial for every member of the class, and it would make the trial of the proposed class claims wholly unmanageable by any standard, even for a pared-down class of 1,000 individuals, as Nichols is now proposing.  Assuming an average trial length for each individual claim of five days, 5,000 total trial days would have to be devoted to full adjudication of the classwide personal injury claim, and in keeping with the Seventh Circuit's ruling in Rhone-Poulenc, the same jury would likely have to hear the entire case, especially since the liability issues (e.g., duty, breach, causation, comparative fault, etc.) are closely intertwined with the damages issues, just as in Rhone-Poulenc.  See Rhone-Poulenc, 51 F.3d at 1303.  Even if the issue of damages, however, could be tried before separate juries, that would still require the impaneling of 1,000 juries, and if each damages trial lasted three days (almost certainly a conservative estimate), that would still amount to 3,000 days of trial time on damages alone.  By way of comparison, there were 920 trial days last year in this entire district and 1,702 trial days in all district courts in this circuit.  See Ex. 34.

newly-proposed class (see disc. supra at 15), that would mean the Court would be required to oversee an enormously expansive discovery process, consisting of over 6,000 depositions, 60,000 interrogatories and 100,000 document requests. See Ex. D . And even if those estimates were halved to give effect to the "efficiencies" claimed by Nichols, the sheer volume of discovery necessary for the adjudication of the personal injury claims of 1,000 individuals would place an undue burden on any court or courts if litigated on a class basis. See, e.g., Miller, 2007 WL 1295824, at *7; Daniels v. Amerco, 1983 WL 1794, at *8 (W.D.N.Y. 1983) ("The problems that would be entailed in managing discovery into the reasons behind each and every one of the 153 terminations could make the proceedings interminable, if not wholly unmanageable.").

Fourth, trying the individual personal injury claims of 1,000 persons would itself place an enormous burden on the finder of fact as well as on this Court or any other court. See disc. supra at supra at 18 n.18. As noted, roughly 5,000 days would have to be devoted to the trial of the individual claims, using a conservative estimate of five days per claim, and the burden would, of course, be even greater if the same jury would have to hear all claims, as is likely the case.[19] See Rhone-Poulenc, 51 F.3d at 1303. Moreover, the need to apply the varying negligence and other laws of the fifty states and the District of Columbia would only serve to further complicate the management of the class claim, even putting aside the high potential for jury confusion, given

---

[19] The passing suggestion by Nichols of bifurcation as a way to address "manageability challenges" would raise the same issues in this context that Rule 23(c)(4) raises vis-à-vis the Seventh Amendment and the concerns raised in Rhone-Poulenc. See Nichols Mem. at 27. Bifurcation as between liability and damages can help address manageability concerns in a more typical consumer class action where the issue of liability is separate from the question of damages (e.g., in a case involving a single defect in a single product), as the Seventh Circuit has noted. See, e.g., In re IKO, 757 F.3d 599, 603 (7th Cir. 2013); Pella v. Saltzman, 606 F.3d 391, 394-96 (7th Cir. 2010). In this case, however, liability and damages are closely intertwined due to questions of proximate causation and contributory negligence, meaning the jury that decides liability should also decide damages, lest one jury be reexamining issues decided by an another. See Rhone-Poulenc, 51 F.3d at 1303. Moreover, the manageability of assessing damages on an individualized basis for mold in a washing machine that costs $600 or water resistance in organic shingles that typically cost less than $2,000 is a very different proposition from the prospect of assessing damages for 1,000 individuals for the long-term effects of concussions such as Parkinson's or Alzheimer's. See, e.g., In re IKO, 757 F.3d at 603; Butler v. Sears, 727 F.3d 796, 799-800 (7th Cir. 2013).

the multiplicity of differing instructions.  See, e.g., id. at 1300-01; In re Bridgestone, 288 F.3d

1012, 1017-20 (7th Cir. 2002); Castano v. Am. Tobacco, 84 F.3d 734, 740-44 (5th Cir. 1996).

### C. Even If Manageability Had Been Considered By Judge Brody, Class Treatment Of Personal Injury Claims Against The NCAA Would Be Far More Problematic Than For The Claims That Were Made Against The NFL

As noted (see disc. supra at 16-17), Judge Brody did not have occasion to evaluate the

manageability of pursuing the claims against the NFL on a class basis.  See Amchem, 521 U.S.

at 620.  If Judge Brody had considered manageability, however, it would have been clear that

adjudication on a class basis of personal injury claims against the NFL would have been highly

problematic, and it would be all the more so against the NCAA.[20]  See disc. infra at 20-21; see

also disc. supra at 17-20.

First, there are fundamental differences in the composition of the NFL class versus the

class now proposed by Nichols.  Compare In re NFL, 307 F.R.D. at 365 (all retired NFL

players), with Nichols Mem. at 1.  Every member of the NFL settlement class played exactly the

same sport, whereas Nichols' new class would encompass all 20 NCAA men's sports and all 23

women's sports, the only criteria for class membership being participation in any NCAA sport

and a "documented concussion" and "documented diagnosis."  See Nichols Mem. at 1.

Second, the playing conditions experienced by members of the NFL class are far more

uniform than what would be at issue here.  See Mot. to Dismiss, In re NFL (Dkt. #3590-1) at 7-8.

There are 32 NFL teams, and by and large, the playing conditions of all NFL players are similar.

See id.  Moreover, the terms and conditions of employment in the NFL are governed by a

---

[20]  It also goes without saying that it is by no means certain Judge Brody's decision on final approval
will survive on appeal.  See Civil Case Docketed, In re NFL, No. 15-2206 (3d Cir. May 15, 2015).
To date, over 95 objectors have appealed that decision, and on its face, Judge Brody's decision
appears to be in considerable tension with the decisions of both the Third Circuit and the Supreme
Court in Amchem.  See Amchem, 521 U.S. at 623-25; see also Barnes v. Am. Tobacco, 161 F.3d 127
(3d Cir. 1998).  Nichols and his counsel, however, want to bet on the fact that Judge Brody's
decision is not reversed on appeal and are apparently willing to wager the interests of the four million
members of the Settlement Class, the vast majority of whom have no personal injury claim and never
will, which obviously creates serious adequacy issues.  See, e.g., Saltzman v. Pella, 257 F.R.D. 471,
480 (N.D. Ill. 2009) (class representative must have interests that are not "antagonistic" to the class).

comprehensive collective bargaining agreement that "address[es] in detail issues relating to assessment, diagnosis, and treatment of player injuries." See id. In contrast, however, NCAA student-athletes participate in 43 different sports at 1,299 different institutions in three different divisions and under conditions that dramatically vary. See Poppe Dep., Ex. 2, at 160:5-10.

Third, Judge Brody also had before her "over 300 lawsuits representing the claims of about 5,000 Retired Players," and the manageability analysis Judge Brody would have had to undertake would have obviously been impacted by the pendency of those individual suits and by the separate manageability problems those individual suits and claims posed, just as the superiority analysis she did undertake obviously was.[21] See In re NFL, 307 F.R.D. at 382. Conversely, no individual suits are pending before this Court, and only nine individual suits have been filed against the NCAA since Arrington was filed in 2011.[22] See Ex. D .

## III.  NICHOLS AND HIS COUNSEL ESSENTIALLY IGNORE THE TYPICALITY REQUIREMENT

Devoting a mere fourteen lines of a thirty-five page memorandum to typicality, Nichols and his counsel breezily conclude that locating a plaintiff with a "typical" personal injury claim

---

[21] In contrast, the Settlement Class here is over 200 times larger than the NFL settlement class, and yet the NCAA has only been named in nine individual suits, a far cry from the more than 300 individual suits and 5,000 individual claims against the NFL and an obvious reflection of fundamental differences between the circumstances surrounding this litigation and the NFL litigation. See In re NFL, 307 F.R.D. at 371 (class of over 20,000 retired players); Mishkin Rpt. (Dkt. #168-1) at 4 (estimating Settlement Class to be over 4.2 million). There is no question, however, that any manageability and superiority analysis is quantitatively different for a proposed class of four million where only nine class members have filed individual suits versus a proposed class of 20,000 where over 5,000 class members are pursuing individual claims in 300 separate actions. See In re NFL, 307 F.R.D. at 361; see also Ticknor v. Rouses Enters., 592 Fed. Appx. 276, 278-79 (5th Cir. 2014) (proposed class that did not yield superiority benefits should proceed through individual actions).

[22] Nichols cites the low opt-out rate in the NFL litigation as evidence of superiority. See Nichols Mem. at 25. Ironically, Nichols is the one preventing the Court from having the information regarding opt-outs that Judge Brody relied upon in her opinion. See In re NFL, 307 F.R.D. at 388 ("[A]n opt-out and objection rate of approximately 1% each reflects positively on the Settlement[.]"). If preliminary approval were granted and notice were provided to the Settlement Class, however, we believe it likely that the opt-out rate in this matter would be even lower, further confirming the fairness, reasonableness and adequacy of the proposed Settlement. See, e.g., Fujiwara v. Sushi Yasuda, 58 F. Supp. 3d 424, 432-33 (S.D.N.Y. 2014) ("The fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair, reasonable, and adequate.").

"will be no challenge at all."  <u>See</u> Nichols Mem. at 18.  Applicable law, however, would suggest

otherwise, as would the fact Nichols himself is <u>not</u> a member of the class he and his counsel are

now proposing.  <u>See</u> disc. <u>supra</u> at 15-16.  Under well-established law in the Seventh Circuit,

typicality is lacking if there would be unique defenses to the individual claims of a representative

plaintiff or to the claims of absent class members.  <u>See</u>, <u>e.g.</u>, <u>Spano v. Boeing</u>, 633 F.3d 574, 586

(7th Cir. 2011).  But in this litigation, the NCAA's defenses to the personal injury claims of

Nichols and class members are many and varied, as the discovery and pleadings in <u>Arrington</u>

make very clear.  <u>See</u>, <u>e.g.</u>, NCAA Answer (Dkt. #177) at Aff. Defs.

Indeed, the number and variety of defenses to any particular personal injury claim of any

class member would be considerable, and these variations would defeat typicality by raising a

host of individual issues that would need to be resolved for <u>each</u> class member.  <u>See</u>, <u>e.g.</u>, <u>Baker</u>

<u>v. Home Depot</u>, 2013 WL 271666, at *5 (N.D. Ill. 2013) (typicality not established due to

individual defenses); <u>Johnson v. Bond</u>, 94 F.R.D. 125, 131 (N.D. Ill. 1982) (same).  In the case

of Mr. Arrington's individual claim, for example, the NCAA and all other necessary and

indispensable parties for that claim would have a strong contributory negligence defense,

REDACTED - CONFIDENTIAL

.  <u>See</u> ARRINGTON-BREMER0000041,

Ex. 35; Arrington Dep., Ex. 36, at 95:17-96:9; <u>see also</u>, <u>e.g.</u>, <u>Hiller v. Harsh</u>, 426 N.E.2d 960,

963 (Ill. App. Ct. 1981) (addressing elements of contributory negligence under Illinois law).  No

one, in turn, can credibly suggest that the NCAA or any other defendant should bear legal

responsibility for injuries caused by a class member or an unnamed party, yet it would obviously

be necessary, in the context of addressing the issues of proximate causation and contributory

negligence, for any finder of fact to consider and determine how injuries Mr. Arrington caused

himself impacted the concussion-related injuries for which he is otherwise now seeking

compensation.[23]  See, e.g., Vertin v. Mau, 8 N.E.3d 658, 661 (Ill. App. Ct. 2014) ("Proximate cause is an essential element of a negligence claim."); Hiller, 426 N.E.2d at 963 ("What constitutes contributory negligence cannot be defined in exact terms, and each case must be determined on its own facts and circumstances.").  It would likewise be necessary for any finder of fact to make similar determinations for each member of Nichols' proposed class.  See Owens Dep., Ex. 37, at 36:8-11 (testifying with regard to the one, and possibly two, concussions Mr. Owens received before becoming an NCAA student-athlete); see also id. at 25:18-23, 42:11-47:5, 50:20-51:15 (addressing potential claims against coaches, helmet and mouthguard manufacturers and state high school sports association).[24]

## IV.    PREDOMINANCE WOULD PLAINLY BE LACKING

As the Supreme Court noted in Amchem, the predominance requirement is "far more demanding" than the commonality requirement, and while the predominance requirement is "readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws," mass tort cases are "ordinarily not appropriate for class treatment," given the presence of "significant questions, not only of damages but of liability and defenses of liability, . . . affecting

---

[23]  Issues of proximate cause and contributory or comparative negligence such as those implicated by Mr. Arrington's individual claim were prominent in the Seventh Circuit's decision in Rhone-Poulenc and its focus on having successive juries considering the same issues:

> [A] second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the Wadleigh case, such issues as comparative negligence -- did any class members knowingly continue to use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation.  Both issues overlap the issue of the defendants' negligence. . . .  A second or subsequent jury might find that the defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus.  How the resulting inconsistency between juries could be prevented escapes us.

Rhone-Poulenc, 51 F.3d at 1303.  Proximate cause and contributory or comparative negligence are rarely (if ever) an issue in a typical product defect class action (e.g., Pella or Butler), but they clearly would be issues in the adjudication of the individual personal injury claims of every member of Nichols' proposed class, whether the class claim was tried under Rule 23(b)(3) or Rule 23(c)(4).  Id.

[24]  A representative list of the types of issues and defenses that would need to be addressed for each class member is attached as Exhibit F.  See Ex. F.  This list is based on the discovery record in Arrington, which at the time included four Named Plaintiffs.  See id..  There is no reason to believe, however, that the hundreds of other members of Nichols' newly-proposed class would not present similar issues and implicate other defenses.  See, e.g., Rhone-Poulenc, 51 F.3d at 1303.

the individuals in different ways." See Amchem, 521 U.S. at 624-25. The Supreme Court further noted in Amchem that "caution" is required "when individual stakes are high and disparities among class members great."[25] See id. at 625. Contrary to stray assertions by Nichols, however, decisions rendered after Amchem have not taken a different approach.[26] See, e.g., Nichols Mem. at 29. It is still the case that class treatment of personal injury claims based on claims of negligence is routinely rejected for all the reasons noted by the Supreme Court in Amchem, the Seventh Circuit in Rhone-Poulenc and a host of other decisions in this circuit and elsewhere. See, e.g., Zinser v. Accufix, 253 F.3d 1180 (9th Cir. 2001); Barnes, 161 F.3d at 127; Fisher v. Bristol-Myers, 181 F.R.D. 365 (N.D. Ill. 1998).

In his July 15, 2015 submission, Nichols acknowledges "manageability challenges" but suggests "predominance could be preserved" and manageability somehow achieved if the Court were to utilize unspecified "subclasses" and employ "imaginative solutions" such as "sampling, phased-litigation, bell-weather trials and other potential trial plans." See Nichols Mem. at 20, 22 n.25, 26. Nichols, however, provides no more detail than that and nothing even remotely resembling a coherent trial plan. See id. at passim. But see, e.g., Zinser, 253 F.3d at 1189 (requiring detailed trial plan) (cited favorably in Espenscheid v. DirectSat, 705 F.3d 770, 775 (7th Cir. 2013)). And as numerous decisions in this circuit make clear, the types of approaches suggested by Nichols would create serious Seventh Amendment issues and are not appropriate for the sorts of personal injury claims that would be at issue in this litigation, in substantial part because of the presence of issues of contributory negligence and proximate causation and the fact

---

[25] Nichols and his counsel do not address at all the issue of disparities between class members. See Nichols Mem. at passim. The problem, however, is fairly obvious. Even if Mr. Edelson's claim could be credited that some persons who claim long-term effects from concussions such as Alzheimer's, Parkinson's and ALS are only seeking "five-figure" awards, surely no one could credibly suggest that all members of Nichols' newly-proposed class would be willing to limit their damages claim to five figures. See July 29, 2014 Hr'g Tr. (Dkt. #82) at 37. Indeed, the nine individual cases now pending against the NCAA make very clear that is not the case, with four of the persons who have filed suit seeking more than $1 million in damages each. See Ex. D.

[26] The decisions cited by Nichols for the proposition that class personal injury claims are routinely certified are themselves readily distinguishable, as addressed in Exhibit G. See Ex. G.

there would be such significant variations in the damages any participating class member would be entitled to (if any). See Rhone-Poulenc, 51 F.3d at 1299 (multiple juries examining comparative negligence and proximate causation would violate the Seventh Amendment); Puffer v. Allstate, 255 F.R.D. 450, 472-73 (N.D. Ill. 2009) (plaintiff's trial plan raised Seventh Amendment concerns); Cimino v. Raymark, 151 F.3d 297, 320 (5th Cir. 1998) (extrapolating damages violates the Seventh Amendment). Indeed, Nichols' heavy reliance on Hilao and the use of "inferential statistics" to "overcome" the acknowledged predominance and manageability problems otherwise caused by the issue of proximate causation ignores the fact that the Supreme Court conclusively rejected "Trial By Formula" over a decade after the Ninth Circuit's decision in Hilao. See Dukes, 131 S.Ct. at 2561 ("The Court of Appeals believed that it was possible to replace such proceedings with Trial by Formula. A sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a master."). But see Nichols Mem. at 28-29.

## V. NICHOLS AND HIS COUNSEL GIVE SHORT SHRIFT TO THE ISSUE OF SUPERIORITY

Relying almost entirely on Judge Brody's ruling in In re NFL, Nichols and his counsel blithely claim that "the class treatment of personal injury claims is preferable and superior to individual litigation." See Nichols Mem. at 26. The superiority requirement, however, is not so easily satisfied, and the unique circumstances facing Judge Brody would hardly be a template for a proper superiority analysis in this litigation. See disc. supra at 21.

As noted, Judge Brody faced over 300 individual suits and the individual claims of over 5,000 members of the NFL class (roughly 25% of the entire NFL settlement class), all of which had been consolidated before Judge Brody by the Multidistrict Panel. See In re NFL, 307 F.R.D. at 361. In addressing the superiority issue, Judge Brody expressly found that the pendency of those individual cases and claims created a "unique advantage to class resolution by this Court." See id. at 382. In this case, however, no individual cases are before the Court, and only nine

individual cases have been filed against the NCAA in total, notwithstanding the fact that the Settlement Class here is far larger than the NFL settlement class. See disc. supra at 21 n.21. Thus, the superiority analysis required in this litigation would necessarily be very different from the analysis undertaken by Judge Brody. See disc. supra at 21.

More fundamentally, however, the law in this circuit is clear that class treatment is not superior for the adjudication of personal injury claims like those encompassed by Nichols' new class. See Miller, 2007 WL 1295824, at *7 n.3 (citing, inter alia, Rhone-Poulenc, 51 F.3d 1293). As Judge Posner recognized in Rhone-Poulenc, the case for use of the class device is "most compelling" where "the claim of each class member is tiny relative to the expense of litigation[,]" but that is usually not the case where personal injury claims are involved, as they were in Rhone-Poulenc. See Rhone-Poulenc, 51 F.3d at 1299. Indeed, the value of the claims at issue in Rhone-Poulenc versus the value of the claims in Butler, Pella and Carnegie is considerable and necessarily plays a key role in any proper superiority analysis. See Murray v. GMAC, 434 F.3d 948, 953 (7th Cir. 2006); Castano, 84 F.3d at 748 ("The most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit[.]"). Nor could anyone credibly suggest that personal injury claims for the long-term effects of concussions are the sort of "low value" or "negative value claims" for which the Seventh Circuit has repeatedly recognized the class device is best suited.[27] See, e.g., Szabo v. Bridgeport Machs., 249 F.3d 672, 678 (7th Cir. 2001) ("Each buyer has a substantial claim, of the sort that could be, and often is, pursued independently."); Amchem, 521 U.S. at 617.

---

[27] The amounts sought in the nine individual cases now pending against the NCAA are set forth below. See Ex. D . The average amount being sought is approximately $1.23 million, although in several instances, only the jurisdictional minimum was pled, but the actual amount to be sought will inevitably be more:

1. Bradley – $1,000,000 or more
2. Calderone – $25,000 or more
3. Cunningham – $1,000,000 or more
4. Onyshko – $50,000 or more
5. Schmitz – $25,000 or more
6. Sheely – $1,500,000 or more
7. Walen – No more than $5,000,000
8. Specific amounts were not pled in Anderson or Wells.

## VI. NO MEMBER OF THE SETTLEMENT CLASS WITH COMPENSABLE PERSONAL INJURIES WILL BE PREJUDICED

In his July 15, 2015 submission (as in prior papers), Nichols repeatedly claims that unspecified members of the Settlement Class will somehow be "prejudiced" if the proposed Settlement is approved by this Court. See Nichols Mem. at 2, 18-19, 25-26; Nichols' First Objs. (Dkt. #183) at 5-8; Nichols' Renewed Mot. to Appoint (Dkt. #128) at 4-5. Inherent in that claim, however, are certain assumptions that bear closer examination, and once those assumptions are laid bare, it is obvious the claim itself is at best without merit. See disc. infra at 27-28.

The Settlement Agreement is very clear that no member of the Settlement Class is releasing any claim for personal injury. See ASA at § II(NN) (excluding personal injury claims from scope of Release). Indeed, the only claims being released are claims for medical monitoring. See id. Any person, however, with a claim for personal injury (now or in the future) will be fully entitled to pursue that claim on an individual basis without restriction. See id.; NCAA Response (Dkt. #191) at 6-7.

As such, the claims of Nichols and his counsel of "prejudice" are very difficult to reconcile with the terms of the Settlement Agreement. See Nichols Mem. at 2, 18-19, 25-26. It may well be the case that Nichols or his counsel hope that persons with non-viable personal injury claims might be more likely to get something if their claims were combined with the viable personal injury claims of others. See, e.g., Sandoval v. City of Chi., 2007 WL 3087136, at *2-3 (N.D. Ill. 2007) (denying class certification where proposed class included those with non-viable claims). Indeed, Nichols, who apparently does not currently have a viable personal injury claim, may well harbor such hopes. See Abuan v. GE, 3 F.3d 329, 334 (9th Cir. 1993) ("increased [future] risk" claim could not survive summary judgment); Sterling v. Velsicol, 855 F.2d 1188, 1204 (6th Cir. 1988) (same). It almost goes without saying, however, that the purpose of the class device is most certainly not to facilitate recoveries for persons who do not have valid claims or to reduce the recoveries of persons with viable claims by diluting them with

the claims of persons (like Nichols) without viable claims.  See, e.g., id.; In re Rail Freight, 725

F.3d 244, 252 (D.C. Cir. 2013) ("The [class] plaintiffs must also show that they can prove,

through common evidence, that all class members were in fact injured . . .").

## VII. THE CONTINUING EFFORTS OF NICHOLS AND HIS COUNSEL TO ELEVATE CLASS TREATMENT TO THE LEVEL OF A SUBSTANTIVE RIGHT SHOULD LIKEWISE FAIL

To avoid repetitive briefing, the NCAA incorporates by reference its prior submission on

whether the right to proceed on a class basis is a substantive right and how class waivers have

been addressed by the Seventh Circuit in the context of class settlements.  See NCAA Fed. R.

Civ. P. 23(b) Submission (Dkt. #81) at 3-8.  For purposes of this submission, however, and the

Court's analysis of the value of the class waiver in the Settlement Agreement, two points bear

particular emphasis.  See disc. infra at 28-29.

First, the right to proceed on a class basis is not a substantive right, as the Supreme Court

has repeatedly recognized.  See, e.g., Ortiz v. Fibreboard, 527 U.S. 815, 845 (1999).

Accordingly, the class waiver of which Nichols is so critical should not be elevated to the status

of a substantive right in the context of the Court's upcoming fairness analysis.  But see Nichols

Mem. at 26-27; Nichols' First Objs. (Dkt. #183) at 8.  This, however, is all the more true since

the substantive claims actually at issue here are certainly substantial enough that this is not a

situation where only a "lunatic or a fanatic" would pursue such a claim if class treatment were

not available.  See, e.g., Thorogood v. Sears, 547 F.3d 742, 744 (7th Cir. 2008).

Second, the Seventh Circuit and other courts have routinely affirmed class settlements

involving class waivers, and class waivers have otherwise been recognized by the Supreme Court

and many other courts as fully enforceable.  See, e.g., In re Trans Union, 741 F.3d 811, 814 (7th

Cir. 2014); Am. Express v. Italian Colors Rest., 133 S. Ct. 2304, 2310-12 (2013); Sylvester v.

Wintrust Fin., 2013 U.S. Dist. LEXIS 140381, *22-33 (N.D. Ill. 2013).[28]  Accordingly, the

suggestion by Nichols and his counsel that there is something unprecedented about the

Settlement Agreement is unwarranted and untrue.  See, e.g., Nichols Mem. at 2.[29]

## VIII.  NICHOLS' "CORE-ISSUES" CLASS COULD NOT PROPERLY BE CERTIFIED EITHER

Almost as an afterthought, Nichols and his counsel propose a Rule 23(c)(4) class in lieu

of a personal injury class under Rule 23(b)(3), tacitly acknowledging the difficulty of obtaining

and maintaining certification under Rule 23(b)(3).  See Nichols Mem. at 30-35.  The arguments

now being advanced by Nichols for a core-issues class are lifted almost in their entirety from the

analysis undertaken by Class Counsel in their prior class motion.  See id.  The reasons, however,

why a core-issues class is not feasible under these circumstances are no different now than they

were during the earlier mediation.[30]  See, e.g., Phillips Decl. (Dkt. #67) at ¶¶ 12-13, 15.

### A.  Nichols' Proposed Core-Issues Class Could Not Satisfy The Requirements Of Rule 23(c)(4)

To be certified under Rule 23(c)(4), a core-issues class must satisfy the requirements of

Rule 23(a).  See Fed. R. Civ. P. 23(a).  It also must meet the predominance and superiority

requirements of Rule 23(b)(3).  See, e.g., Castano, 84 F.3d at 745 n.21 ("The proper

---

[28]  The Seventh Circuit approved the class settlement and class waiver in Trans Union, even though the underlying claims in that case were "modest," amounting to only $100 to $1,000 per individual, and the feasibility of pursuing those claims on an individual basis might not "make economic sense." See Trans Union, 741 F.3d at 814.

[29]  At the July 29, 2014 hearing, Nichols' counsel suggested that personal injury claims are "five figures, not . . . six figures, not seven figures. . . . $20,000, $10,000, $8,000 . . ." See July 29, 2014 Hr'g Tr. (Dkt. #82) at 37.  This "estimate," however, was otherwise unsupported and seems particularly unrealistic, given the amount actually being sought in damages in the individual cases filed against the NCAA.  See Ex. D .  It is also notable, however, that in the wake of the filing of Nichols' July 15, 2015 submission, his counsel steadfastly refused to apprise the NCAA of how much Nichols himself is seeking in individual damages, again in spite of several requests.  See Spellman Decl., Ex. A, at Exs. 33, 43.  But in any event, it is quite clear that personal injury claims for the long-term effects of concussions are not the sort of claims that could only feasibly be pursued through use of the class device, which was the issue that most concerned the Seventh Circuit in Mullins.  See Mullins, 2015 WL 4546159, at *10.

[30]  To be fair, Nichols and his counsel did not participate in that mediation.  They certainly should not assume, however, these issues were ignored by the parties and their counsel or that Class Counsel simply capitulated.  See Nichols Mem. at 2 n.4, 14-15, 18 n.22.  Nothing could be further from the truth, as the declarations submitted by both Judge Phillips and Judge Andersen make very clear.  See Phillips Decl. (Dkt. #67) at ¶ 11; Andersen Decl. (Dkt. #68) at ¶ 9.

interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").[31]  "[The] use of Rule 23(c)(4) is generally rejected," however, "where the common issues are inextricably tied to the individual issues, or where the individual issues still make the case unmanageable."  In re Paxil Litig., 212 F.R.D. 539, 543 (N.D. Cal. 2003).  Moreover, "partial certification of class issues is not appropriate where it would not offer significant efficiencies, and instead would create constitutional concerns."  Puffer, 255 F.R.D. at 472 n.18.

### B.  Individual Issues Would Predominate

The common issues proposed by Nichols address whether the NCAA owed a duty to class members and, if so, the scope of that duty and whether it was breached.  See Nichols Mem. at 30.  These issues are, of course, governed by applicable negligence laws.  See, e.g., Rhone-Poulenc, 51 F.3d at 1300-02.  As such, individual questions of fact and law would predominate in any resolution of Nichols' proposed core-issues class, because as Nichols concedes, the Court would be required to make duty and breach determinations under the varying laws of all 50 states and the District of Columbia.  See id.; Nichols Mem. at 34-35.

Although Nichols claims "differences [in applicable law] are slight and can be managed by grouping similar duty and breach jury instructions for all or some of the States," the Seventh Circuit has recognized that even seemingly minor differences in state laws can preclude certification under Rule 23(c)(4).  See, e.g., Nichols Mem. at 35; Rhone-Poulenc, 51 F.3d at

---

[31]  To be sure, there is some uncertainty over "[w]hether the court may certify a class to resolve a specific issue, when the whole cause of action does not meet all of the requirements for class certification under Rule 23."  See Jacks v. DirectSat USA, 2015 WL 1087897, at *4 (N.D. Ill. 2015).  Compare, e.g., Castano, 84 F.3d at 745, with In re Nassau Cnty., 461 F.3d 219, 226 (2d Cir. 2006).  The Seventh Circuit has not yet expressly weighed in on the split but the rationale of the Fifth Circuit in Castano is compelling.  See, e.g., Henke v. Arco, 2014 WL 982777, at *21 (E.D. Mo. 2014) (following Castano); In re GM Dex-Cool, 241 F.R.D. 305, 314-15 (S.D. Ill. 2007) (same); Taylor v. CSX, 264 F.R.D. 281, 297 (N.D. Ohio 2007) (same); Rink v. Cheminova, 203 F.R.D. 648, 651 (M.D. Fla. 2001) (same); In re Jackson Nat'l Life, 183 F.R.D. 217, 224-25 (W.D. Mich. 1998) (same).  But see, e.g., Emig v. Am. Tobacco, 184 F.R.D. 379, 394-95 (D. Kan. 1998) (rejecting Castano).

1301 (certification not appropriate where issues of duty and breach "may be affected by differing state views on the role of industry practice or custom in determining the existence of negligence").[32] But see Nichols Mem. at 35. Indeed, crafting appropriate instructions for a jury impanelled to address the core issues proposed by Nichols would present the very same issues that led the Seventh Circuit to issue a writ of mandamus decertifying the class in Rhone-Poulenc. See Rhone-Poulenc, 51 F.3d at 1300 (referring with disapproval to "a kind of Esperanto instruction" that tries to merge "the negligence standards of the 50 states and the District of Columbia").

### C. Variations In State Law Would Undermine Predominance And Create Serious Manageability Issues

In this case, significant differences in state negligence law would substantially complicate the Court's analysis of whether the NCAA owed class members a legal duty. See, e.g., Rhone-Poulenc, 51 F.3d at 1300-01 (differences in negligence law preclude class certification). Notably, many states recognize an exception to the ordinary duty of care for participants in contact sports. See, e.g., Karas v. Strevell, 884 N.E.2d 122, 131 (Ill. 2008) ("[T]he contact sports exception is an objective doctrine that defines the scope of the defendant's duty."); Gauvin v. Clark, 537 N.E.2d 94, 96 (Mass. 1989). Courts in some jurisdictions have likewise recognized an exception for sports associations like the NCAA. See, e.g., Allen v. Dover, 807 A.2d 1274, 1285 (N.H. 2002) (sports association liable only if it "creat[ed] or countenance[d] risks other than the risks inherent in the sport, or . . . increas[ed] inherent risks"); Craig v. Amateur Softball Ass'n, 951 A.2d 372, 376 (Pa. Super. Ct. 2008) (dismissing case against association because the

---

[32] Notably, Rhone-Poulenc is nowhere mentioned in Nichols' July 15, 2015 submission, even though the claims in that case (i.e., personal injury claims for damages arising from infection with the AIDS virus through exposure to contaminated blood products) are obviously much more akin to the sorts of claims that would be pursued by a personal injury class here than the product liability cases primarily relied upon by Nichols (i.e., Pella (single defect in window frames leading to wood rot) and Butler (single defect in front-loading washers leading to mold)). See Nichols Mem. at passim.

risk of "being struck by an errant softball" was inherent to the sport and could not support a suit against the association). Other states have not addressed the issue. See Ex. H .

Deciding whether the NCAA owed a duty to student-athletes injured in such states and, if so, the scope of that duty would require the Court to speculate as to whether and how various courts would apply the contact sports exception. See, e.g., Schwarz v. Nat'l Van Lines, 375 F. Supp. 2d 690, 698 (N.D. Ill. 2005). Questions regarding when the NCAA "should have" implemented various standards would also require the application of varying state laws. See, e.g., Rhone-Poulenc, 51 F.3d at 1301 (noting that questions regarding when defendant "should have known" of a danger and taken steps to eliminate it "may be sensitive to the precise way in which a state formulates its standard of negligence").[33] The multitude of these issues, however, would undermine predominance and preclude Nichols from meeting applicable requirements for the proposed core-issues class. See, e.g., Georgine v. Amchem, 83 F.3d 610, 618 (3d Cir. 1996) ("Initially, each individual plaintiff's claim raises radically different factual and legal issues from those of other plaintiffs. These differences, when exponentially magnified by choice of law considerations, eclipse any common issues in this case."), aff'd, 521 U.S. 591(1997).[34]

### D. An Issues Class Is Not A Superior Means Of Resolving Nichols' "Core Issues"

Moreover, resolution of the claims Nichols seeks to pursue on a class basis would not determine the NCAA's liability for injuries alleged by any individual class member. See CTU v. Bd. of Educ., 301 F.R.D. 300, 313 (N.D. Ill. 2014) ("Here, even were the Court to have found a common issue . . . resolution of that issue is entangled with the individualized issues discussed above regarding certification of the putative class as a whole.") Rather, class members who

---

[33] A compilation of some of these differences in state law is provided in Exhibit I hereto.

[34] The many nuances in the negligence laws of the states and the District of Columbia are aptly captured in the model jury instructions used in each jurisdiction, representative examples of which are collected in Exhibit I. As the Seventh Circuit noted in Rhone-Poulenc, however, even minor differences in applicable law and instructions can and do make a big difference in the context of adjudicating negligence claims like these. See Rhone-Poulenc, 51 F.3d at 1301 ("The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch.").

sought to recover damages from the NCAA would still have to bring their own separate lawsuits, meaning that 1,000 or more jury trials would still be necessary even if Nichols prevailed on each of his proposed issues. See, e.g., McLaughlin v. Am. Tobacco, 522 F.3d 215, 234 (2d Cir. 2008) ("[I]n this case, given the number of questions that would remain for individual adjudication, issue certification would not reduce the range of issues in dispute and promote judicial economy."); In re Tetracycline Cases, 107 F.R.D. 719, 735 (W.D. Mo. 1985) (same).  Moreover, full adjudication of the NCAA's liability (if any) to any particular person would necessarily require each finder of fact to consider the comparative negligence (if any) of that claimant and all defendants for each claim, which itself would require a reexamination of the determinations first made by the jury impaneled to hear the core-issues claim.  See Rhone-Poulenc, 51 F.3d at 1303. Not only would this violate the Seventh Amendment (see disc. infra at 34), but it also would be anything but efficient.  See McLaughlin, 522 F.3d at 234.

Because Nichols' core-issues class would not substantially reduce the number or complexity of subsequent suits against the NCAA, certification would be inappropriate and contrary to the requirements of Fed. R. Civ. P. 23.  See, e.g., Puffer, 255 F.R.D. at 472 ("[A] class proceeding that would decide one issue, but would not eliminate the need for 1,700 jury trials to determine whether each putative class member suffered discrimination and, if so, their individual damages, offers little in the way of efficiency."); Dhamer v. Bristol-Myers, 183 F.R.D. 520, 533 (N.D. Ill. 1998) (noting that "[a] nationwide class is not a superior method for resolving consumer fraud claims because each prospective plaintiff is going to be involved in extensive individualized proceedings whether a consumer fraud class is certified or not").  A core-issues class would also place the resolution of Nichols' core issues in the hands of six jurors as opposed to dispersing that decision among multiple finders of fact, an approach endorsed by the Seventh Circuit in Rhone-Poulenc.  See Rhone-Poulenc, 51 F.3d at 1300.

### E.   Impaneling Two Or More Juries To Address The Same Issues Would Also Violate The Seventh Amendment

Although ignored by Nichols and his counsel, Nichols' core-issues class would also pose serious constitutional problems under governing Seventh Circuit law.  See, e.g., Rhone-Poulenc, 51 F.3d at 1303 ("The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them . . . and not reexamined by another finder of fact.").  Juries in subsequent individual cases would have to decide issues such as comparative negligence and proximate causation, both of which plainly "overlap the issue" of the NCAA's alleged negligence.  See id.  The Seventh Circuit, however, has held that it is a violation of the Seventh Amendment for one jury to reexamine the findings of another.  See id.  By ensuring that subsequent juries would have to reexamine issues such as the degree of contributory negligence between the NCAA and individual plaintiffs as well as the comparative negligence of other parties (e.g., equipment manufacturers, physicians, healthcare providers, trainers and coaches), Nichols' proposal would violate the NCAA's rights under the Seventh Amendment, and it would otherwise be inconsistent with the spirit and purpose of Fed. R. Civ. P. 23(c)(4).  See Puffer, 255 F.R.D. at 472 n.18 ("[P]artial certification of class issues [under Rule 23(c)(4)] is not appropriate where it would not offer significant efficiencies, and instead would create constitutional concerns.").

### F.   This Is Not The Type Of Case Where A Core-Issues Class Would Be Appropriate

Over the past several years, the Seventh Circuit and courts in this district have from time to time indicated that a core issue class might be appropriate in certain instances.  See, e.g., Butler, 727 F.3d at 800.  This litigation, however, is not remotely like the cases in which the Seventh Circuit or other courts have made that observation.  See id. at 797 (alleging defect causing mold against single manufacturer); McReynolds v. Merrill Lynch, 672 F.3d 482, 488, 492 (7th Cir. 2012) (raising possible certification under Rule 23(c)(4) of a single disparate impact claim under Title VII involving two discrete but related policies of one employer); In re Allstate, 400 F.3d 505, 507-08 (7th Cir. 2005) (suggesting possibility of single hearing under

34

Rule 23(c)(4) "to determine whether Allstate had a policy of forcing its employee agents to quit[]," where the calculation of damages / benefits "is mechanical"); <u>Carnegie</u>, 376 F.3d at 660-61 (noting low stakes involved [<u>i.e.</u>, $30 per class member] and fact that no claimant would pursue a claim <u>except</u> on a class basis in suggesting possible certification under Rule 23(c)(4) of single question, namely whether two defendants violated RICO); <u>see also Jacks</u>, 2015 WL 1087897, *4-8 (certifying liability issue under Rule 23(c)(4) on statutory question of whether defendant violated the Illinois Minimum Wage Law, where court concluded that the individual claims could not feasibly be pursued absent class treatment <u>and</u> liability and damages did <u>not</u> overlap in the manner proscribed by <u>Rhone-Poulenc</u>).  To the contrary, those cases in which the Seventh Circuit has suggested Rule 23(c)(4) might be appropriate typically involve some combination of a claim of a single product defect or a single statutory violation and/or damages that are subject to easy computation.  <u>See Butler</u>, 727 F.3d at 800; <u>McReynolds</u>, 672 F.3d at 488; <u>Allstate</u>, 400 F.3d at 507-08; <u>Carnegie</u>, 376 F.3d at 660-61.  In no instance, however, has the Seventh Circuit <u>ever</u> suggested the use of Rule 23(c)(4) for the adjudication of personal injury claims involving claims of negligence in which hundreds if not thousands of other parties may have played a role in the alleged negligence and any claimed injuries.  <u>See Butler</u>, 727 F.3d at 800; <u>McReynolds</u>, 672 F.3d at 488; <u>Allstate</u>, 400 F.3d at 507-08; <u>Carnegie</u>, 376 F.3d at 660-61; <u>see also Rhone-Poulenc</u>, 51 F.3d at 1300-04.

## <u>CONCLUSION</u>

WHEREFORE, the NCAA respectfully requests that the Court overrule Nichols' objections and that the pending motion for preliminary approval be granted.  The NCAA further requests any other relief the Court deems appropriate.

Dated:  September 14, 2015                     Respectfully submitted,

                                              /s/ Mark S. Mester
                                              Lead Counsel for Defendant
                                              National Collegiate Athletic Association

Mark S. Mester
  mark.mester@lw.com
Johanna M. Spellman
  johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

J. Christian Word
  christian.word@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

## <u>CERTIFICATE OF SERVICE</u>

I, Mark S. Mester, certify that on September 14, 2015, a true and correct copy of the

RESPONSE OF THE NCAA TO NICHOLS' JULY 15, 2015 SUBMISSION was filed through

the ECF system and served upon the following parties by prepaid first class mail.


Timothy J. McIlwain
McIlwain Professional Building
2020 New Road, 2nd Floor
Linwood, New Jersey 08221
Telephone:  (877) 375-9599
Facsimile:  (609) 450-7017
E-mail:  attorney@mcilwainlaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Edgar D. Gankendorff
PROVOSTY & GANKENDORFF, L.L.C.
650 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone:  (504) 410-2795
Facsimile:  (504) 410-2796

/s/ Mark S. Mester
Mark S. Mester
  mark.mester@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767