**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: NATIONAL COLLEGIATE** | ) | |
| **ATHLETIC ASSOCIATION** | ) | **MDL No. 2492** |
| **STUDENT-ATHLETE CONCUSSION** | ) | |
| **INJURY LITIGATION** | ) | **Master Docket No. 13 C 9116** |
| | ) | |
| | ) | **Judge John Z. Lee** |
| | ) | |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **This Document Relates to All Cases** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs in this multi-district litigation are current and former collegiate athletes, who have sued the National Collegiate Athletic Association ("NCAA") on a class-wide basis, asserting various contractual and common law claims arising from the manner in which the NCAA has handled student-athlete concussions and concussion-related risks over the years. After extensive discovery, the parties in the first-filed case, *Arrington v. NCAA*, No. 1:11-cv-06356 (N.D. Ill. 2011), commenced settlement negotiations with the assistance of two prominent retired federal judges. At around this time, a number of similar actions were filed on behalf of NCAA student-athletes nationwide, and those actions were consolidated by the Judicial Panel of Multidistrict Litigation before this Court.[1]

---

[1]     Those actions are: (i) *Walker, et al. v. NCAA*, No. 1:13-cv-00293 (E.D. Tenn., filed Sept. 3, 2013); (ii) *Durocher, et al. v. NCAA*, No. 1:13-cv-01570 (S.D. Ind., filed Oct. 1, 2013); (iii) *Doughty v. NCAA*, No. 3:13-cv-02894 (D.S.C., filed Oct. 22, 2013); (iv) *Caldwell, et al. v. NCAA*, No. 1:13-cv-03820 (N.D. Ga., filed Oct. 18, 2013); (v) *Powell, et al. v. NCAA*, No. 4:13-cv-01106 (W.D. Mo., filed Nov. 11, 2013); (vi) *Morgan, et al. v. NCAA*, No. 0:13-cv-03174 (D. Minn., filed Nov. 19, 2013); (vii) *Walton, et al. v. NCAA*, No. 2:13-cv-02904 (W.D. Tenn., filed Nov. 20, 2013); (viii) *Washington, et al. v. NCAA*, No. 4:13-cv-02434 (E.D. Mo., filed Dec. 3, 2013); (ix) *Hudson v. NCAA*, No. 5:13-cv-00398 (N.D. Fla., filed Dec. 3, 2013); (x) *Nichols v. NCAA*, No. 1:14-cv-00962 (N.D. Ill., filed Feb. 11, 2014); (xi) *Wolf v. NCAA*, No. 1:14-cv-01268 (N.D. Ill., filed Feb. 10, 2014); (xii) *Jackson v. NCAA*, No. 1:14-cv-02103

After extensive, arms-length negotiations, the parties arrived at a settlement, and a number of the Plaintiffs (the "Settling Plaintiffs") submitted the settlement agreement to the Court for approval under Fed. R. Civ. P. 23(e). However, Anthony Nichols, the named Plaintiff in *Nichols v. NCAA*, 1:14-cv-00962 (N.D. Ill. 2014), opposed the settlement on various grounds.

On December 17, 2014, the Court declined to approve the settlement agreement, raising a number of significant concerns. *See* Mem. Op. & Order, Dec. 17, 2014, ECF No. 115.[2] Since that time, the Settling Plaintiffs and the NCAA have gone back to the drawing board to negotiate an amended settlement agreement in an effort to address these concerns. As part of this process, the Settling Plaintiffs also expanded the group of class representatives to include individuals who played non-contact sports at NCAA-affiliated schools. They did so in order to obtain the participation of non-contact sports athletes in the settlement process. After additional negotiations, the Settling Plaintiffs and the NCAA agreed on an amended settlement agreement, and the Settling Plaintiffs filed a Fourth Amended Class Action Complaint and a motion for preliminary approval of the amended class settlement agreement. *See* Joint Mot. Prelim. Approval Class Settlement, ECF No. 154 ("Mot. Prelim. Approval"); 4th Am. Compl., ECF No. 171.

As before, not all of the Plaintiffs are happy with the amended settlement. The Court again has permitted Nichols, whom the Court has appointed Interim Lead Objector, to file objections to the amended settlement. The Court also allowed Adrian Arrington, the former lead plaintiff in the *Arrington* case, to submit his objections as well.

---

(E.D.N.Y., filed Apr. 2, 2014); and (xiii) *Whittier v. NCAA*, No. No. 1:14-cv-0978 (W.D. Tex., filed Oct. 27, 2014) (collectively "Related Actions").

[2]     Unless otherwise noted, "ECF No. __" refers to documents filed in the multi-district ligation, Case No. 1:13-cv-09116.

Nichols directs his principal objection to the provision in the amended settlement agreement whereby the Settling Plaintiffs agree to release their right to pursue their personal injury claims on a class-wide basis. According to Nichols, these procedural rights are extremely valuable, and the benefits conferred upon the class members by the settlement pale in comparison. In order to evaluate this contention, the Court ordered the parties to submit supplemental briefs using the extensive factual record that had already been developed in the *Arrington* case.

After considering the voluminous materials submitted by the parties, the Court now preliminarily certifies the settlement class under Fed. R. Civ. P. 23(b)(2); orders the Settling Plaintiffs and the NCAA to provide notice to the settlement class, as well as an opportunity for individual class members to opt out of the class settlement; and finds that the amended settlement is within the range of possible approval. This approval, however, is subject to a number of modifications.

The first of these modifications limits the scope of the settlement class's release of class-wide personal injury claims to those instances where the plaintiffs or claimants seek a nationwide class or where the proposed class consists of student-athletes from more than one NCAA-affiliated school. The Court also has proposed a number of modifications to the notice program and the way in which certain settlement funds are to be utilized. To the extent that the Settling Plaintiffs and the NCAA are agreeable to these modifications or are otherwise able to address the Court's concerns, preliminary approval of the amended class settlement is granted.

## **The Proposed Settlement**

The procedural history of this multi-district litigation, the terms of the prior settlement agreement, and the prior concerns of the Court are detailed in the order issued on December 17, 2014, and the Court assumes familiarity with it.

After another round of negotiations, the Settling Plaintiffs and the NCAA have agreed to the terms of an Amended Class Settlement Agreement and Release (the "Amended Settlement Agreement"). Mot. Prelim. Approval, Ex. 1 ("Am SA"). A brief summary of its terms is provided below.

First, the proposed Settlement Class is defined as:

> All Persons who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date.

Am. SA ¶ III(A). The Settlement Class Representatives are:

| Representative | Sport | Institution | Participation Dates |
|---|---|---|---|
| Derek Owens | Football | University of Central Arkansas | 2008–11 |
| Angelica Palacios | Soccer | Ouachita Baptist University | 2010–11 |
| Kyle Solomon | Hockey | University of Maine | 2008–10 |
| Abram Robert Wolf | Football | Simpson College | 2012–present |
| Sean Sweeney | Wrestling | Buena Vista College | 1991–93 |
| Jim O'Connor | Football | Drake University | 1971–74 |
| Dan Ahern | Football | North Carolina State University | 1972–76 |
| Paul Morgan | Football | Vanderbilt University | 1994–97 |
| Jeffery Caldwell | Football | Georgia Tech University | 1995–98 |
| John DuRocher | Football | University of Oregon; University of Washington | 2003–06 |
| Sharon Washington | Football | University of Missouri | 1987–91 |
| Shelby Williams | Golf | Northwest Missouri State University | 2015 |
| Brice Sheeder | Track | Simpson College | 2015 |
| Shavaughne Desecki | Softball | DePaul University | 2003 |
| Spencer Trautmann | Baseball | Western Oregon University | 2015 |

| Ryan Parks | Baseball | University of Illinois | 2002 |
| Ursula Kunhardt | Volleyball | Montana State University | 2011–12 |
| Jessica Miller | Volleyball | Seattle-Pacific University | 2015 |
| Anna Bartz | Track and Field | University of Wisconsin | 2007 |
| Peter Dykstra | Track & Field | University of Wisconsin | 2006 |
| DaChe Williams | Basketball | Northeastern University | 2015 |
| Rachel Harada | Soccer | Rockhurst University | 2015 |
| Natalie Harada | Soccer | Maryville University | 2015 |
| Adam Walker | Golf | Simpson College | 2009–10[3] |

As alleged in the complaint, each of the Settlement Class Representatives has played an NCAA sport during a time when the NCAA's concussion-management and return-to-play guidelines failed to meet the best practice consensus standards, and each is at risk for developing future symptoms related to concussions and/or the accumulation of subconcussive hits. 4th Am. Compl. ¶¶ 29, 46, 60, 67, 76, 83, 91, 99, 106, 114, 118, 122, 126, 132, 138, 146, 151.

As part of the settlement, the NCAA has agreed to the following terms. The NCAA and its insurers will pay $70 million to create a Medical Monitoring Fund (the "Fund"). Am. SA ¶ IV(A)(1)(a).[4] The Fund will be used to pay the expenses associated with the Medical Monitoring Program, including: Screening Questionnaires; Medical Evaluations; Notice and Administrative Costs; Medical Science Committee Costs; approved Attorneys' Fees and Costs; and Class Representatives' Service Awards. Am. SA ¶ IV(A)(1)(b).

The Medical Monitoring Program (the "Program") will last for a period of fifty years. Am. SA ¶ II(U). If the funding for the Medical Monitoring Program is depleted before the fifty-year period ends, the Settlement Class Members may pursue individual *or* class claims seeking

---

[3]     Although Arrington, who played football at Eastern Illinois University from 2006 to 2009, also served as a Class Representative, he now objects to the proposed amended settlement for the reasons that will be discussed below.

[4]     Capitalized terms, to the extent they appear in this order, are as defined in the Amended Settlement Agreement.

medical monitoring, and the statute of limitations will be tolled during the fifty-year period. Am. SA ¶ IV(A)(5). In addition, as part of the settlement, the NCAA also will provide $5 million in additional funds for concussion-related research over the course of the first ten years of the Medical Monitoring Period. Am. SA ¶ X(A).

The Program itself contemplates two different assessment phases: screening and evaluation. In the screening phase, Class Members may seek an analysis of their symptoms by completing a Screening Questionnaire, in hard copy form or online, once every five years until age fifty and then not more than once every two years after the age of fifty. Their scores on the Screening Questionnaire will determine whether they qualify for a Medical Evaluation.

The standard for determining whether a Class Member qualifies for a Medical Evaluation will be set by the Medical Science Committee (the "Committee"), which will consist of four medical experts, who have expertise in the diagnosis, care, and management of sports-related concussions and mid- to late-life neurodegenerative disease. These medical experts will be appointed jointly by the parties, and the Committee will be chaired by Special Master and retired United States District Judge Wayne R. Anderson. Am. SA ¶ V(A)(1). At the Court's request, a copy of the questionnaire and the parameters that will drive the Committee's review has been provided in the settlement materials.

Once the Committee reviews a Class Member's responses to the Screening Questionnaire, the Class Member will be notified whether he or she qualifies for a Medical Evaluation and instructed on where and how to obtain one. Medical Evaluations will be performed at thirty-three program locations nationwide. The Program Administrator will assist Class Members, who qualify for Medical Evaluations, find the most convenient location.

Class Members may qualify for up to two Medical Evaluations during the Medical Monitoring Period and may seek a third by submitting an appropriate request to the Committee. The Medical Evaluations will be submitted to a physician, who will provide a diagnosis as well as the results of the testing to the Class Member or his or her personal physician, at the option of the Class Member, within sixty days of the Medical Evaluation.[5]

The Committee will determine the scope of the Medical Evaluations, which will be designed to assess symptoms related to persistent post-concussion syndrome, as well as cognitive, mood, behavioral, and motor problems associated with mid- to late-life onset diseases, such as Chronic Traumatic Encephalopathy ("CTE") and other disorders. The Committee also will review annually, and amend as needed, the Questionnaire and the scope of the Evaluations to reflect the then-current standard of care; oversee the performance of the Program Locations; provide an annual written report regarding their responsibilities and performance to the Court; and recommend how research funds should be expended. The Committee will be compensated at a reasonable hourly rate from the Fund by the Program Administrator.

In addition to the Medical Monitoring Program, the NCAA has agreed to continue implementing changes to its concussion-management and return-to-play policies to be consistent with consensus best practices. Cantu Report ¶¶ 47–48, ECF No. 69. First, the NCAA has instituted a policy requiring all student-athletes to undergo pre-season baseline testing for each sport they play prior to the first practice or competition. Am. SA ¶ IX(A)(1). Second, the NCAA has revised its return-to-play guidelines to provide that an NCAA student-athlete who has

---

[5]    Under the amended agreement, if a class member lives more than one hundred miles from the nearest Program Location, he or she has two options. The class member may request to receive a mileage reimbursement for travel to the Program Location, or the class member may have a Medical Evaluation performed by a local physician if the Program Administrator and Special Master approve and retain that local physician as a Medical Evaluation service provider and find that travel for the class member to the Program Location is unduly burdensome. Am. SA ¶ IV(B)(5)(a).

been "diagnosed with a concussion will be prohibited from returning to play or participation in any practice or game on the same [d]ay on which he or she sustained such concussion" and "must be cleared by a physician before being permitted to return to play in practice or competition." Am. SA ¶¶ IX(A)(2)–(3). Third, medical personnel, who are trained in the diagnosis, treatment, and management of concussions, are required to be present at all games of Contact Sports—defined as football, lacrosse, wrestling, ice hockey, field hockey, soccer, and basketball—and are required to be available during all Contact Sports practices for Division I, II, and III schools. Am. SA ¶¶ IX(A)(4)–(5). Fourth, the NCAA is instituting a uniform process for schools to report diagnosed concussions and their resolution, and for concerned persons to report potential problems directly to the NCAA. Am. SA ¶¶ IX(E)–(F). Fifth, NCAA-affiliated schools are required to provide approved concussion education and training to student-athletes, coaches, and athletic trainers prior to the start of each athletic season. Am. SA ¶ IX(H). Sixth, the NCAA is providing education for faculty with respect to accommodations for students suffering from concussions. Am. SA ¶ IX(G).

As consideration for the Settlement Terms outlined above, the Settlement Class Members agree to release any and all claims for "damages for medical monitoring, or other legal or equitable relief for medical monitoring, related to concussions or sub-concussive hits or contact . . . arising from or relating to concussions or sub-concussive hits or contact sustained during participation in NCAA-sanctioned sports as an NCAA student-athlete." Am. SA ¶ II(NN), XV(A)(7). Furthermore, the Settlement Class Members agree to release any and all claims "brought or pursued on a class-wide basis and relating to concussions or sub-concussive hits or contact." Am. SA ¶ II(NN). However, they will retain the right to bring "individual personal or

bodily injury claims" and "class claims that do not relate in any way to medical monitoring or medical treatment of concussions or sub-concussive hits or contact." Am. SA ¶ II(NN).

These releases would inure to the benefit of "the NCAA, its member institutions (past and present), its current and former officers, directors, employees, insurers, attorneys and agents." Am. SA ¶ II(OO). Additionally, the NCAA has agreed to toll the statute of limitations for all personal injury claims from September 12, 2011, the date the *Arrington* action was filed, through the date of the Court's final approval of the settlement. Am. SA ¶ XXI(S).

The Settling Plaintiffs and the NCAA state that the issue of attorneys' fees was deferred until after an agreement on all other material terms had been reached during the mediation process. Since that time, the parties have arrived at an agreement as to the attorneys' fees and costs incurred by Lead Counsel. Specifically, the NCAA has agreed that it will not oppose a request for an award of attorneys' fees up to $15 million and out-of-pocket expenses up to $750,000. Am. SA ¶ XVII(B). Any application for attorneys' fees and costs must be approved by the Court.

Because Class Counsel will have a continuing obligation to implement the terms of the settlement throughout the Medical Monitoring Period, the NCAA also has agreed not to object to applications from Lead Counsel and one member of the Plaintiffs' counsel Executive Committee for additional attorneys' fees, at a rate not to exceed $400 per hour, to a maximum of $500,000 for work performed after the first year from the Effective Date of Settlement. Am. SA ¶ XVII(C). These requests also would be subject to court approval.

The Settling Plaintiffs also intend to apply to the Court for reasonable service awards for the Class Representatives in this matter, which will be paid from the Fund. The NCAA agrees not to object to Service Awards in the amount of $5,000 for the Class Representatives deposed in

the *Arrington* matter (namely, Adrian Arrington, Derek Owens, Angelica Palacios, and Kyle Solomon), and $2,500 for each Settlement Class Representative who has not been deposed. Am. SA ¶ XVII(A).

Finally, the Amended Settlement Agreement provides that, if the Settlement Class is certified, the Court will appoint a Notice Administrator. Am SA ¶ XII(C)(1). The Notice Administrator will provide notice to the class and inform class members of the ability to opt out of the settlement. Am SA ¶ XII(A)–(C).

## Legal Standard

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). When parties seek preliminary approval of a class action settlement agreement and certification of a settlement class, the district court must undertake two essential inquiries.

First, "the court must conduct an independent class certification analysis." *Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C2026, 2011 WL 3290302, at *3 (N.D. Ill. July 26, 2011). "This analysis 'demand[s] undiluted, even heightened, attention' when applied to classes for which certification is sought for settlement purposes only." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *see also Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002). This need for heightened attention is necessary because, when parties jointly seek approval of a class action settlement, the adversarial relationship between the plaintiffs and defendant may fall away, and potential conflicts of interest between class counsel and the class members may arise. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). To this end, the Seventh Circuit has gone so far as to describe "the district judge

as a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (quotation omitted).[6]

Second, the district court must determine whether the proposed settlement is "within the range of possible approval." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). The purpose of this inquiry "is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Id.* At this initial stage, the court is not "resolving the merits of the controversy or making a precise determination of the parties' respective legal rights." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). This is why some courts at this stage perform a summary version of the exhaustive final fairness inquiry. *See Am. Int'l*, 2011 WL 3290302, at *6 (listing cases).

In assessing a settlement's fairness, "relevant factors include: (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014). "The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 n.44 (7th Cir. 1979).

If the district court finds that the certification of the settlement class is appropriate and the proposed settlement is within the range of possible approval, the court will then order the plaintiffs to provide notice of the settlement to the class "in a reasonable manner" so that the

---

[6]     In those instances where a class has yet to be certified, the court also has the discretion at the preliminary approval stage to certify the class on a conditional basis for purposes of providing notice to putative class members. *See Manual for Complex Litigation (Fourth)* § 21.632 (2004).

class members can raise any objections to the settlement. Fed. R. Civ. P. 23(e)(1). Once the class is provided with notice of the settlement and an opportunity to object, the court conducts a final approval hearing to determine whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). If the district court is satisfied that the settlement meets these criteria, it will grant final approval of the settlement, which binds the defendant and all class members to the terms of the settlement.

It is worth noting that, at the preliminary approval stage, the extent of the district court's inquiry into the appropriateness of class certification and the reasonableness of the settlement terms depends, as it must, on the circumstances of the individual case. Where the size of the class is small, the cost of notice minimal, and the issues discrete, the court may be able to determine that class certification is proper and the settlement is "within the range of possible approval" with minimal fuss. But in a case such as this, where the putative class members range in the millions, the parties have completed extensive discovery, substantive objections are raised at the preliminary stage, and the costs and efforts to provide notice are substantial, it may be advisable for the court to engage in a more piercing and thorough analysis of the issues in the first instance, rather than waiting until the final approval hearing, in order promote the "just, speedy, and inexpensive" resolution of the case. Fed. R. Civ. P. 1.

<u>Analysis</u>

Although Nichols and Arrington object to a number of the substantive terms of the Amended Settlement Agreement, their primary argument is that the settlement impermissibly requires the putative class members to waive their ability to pursue personal injury claims on a class-wide basis under Fed. R. Civ. P. 23(b)(3) and 23(c)(4). According to Nichols, based upon the factual record, the personal injury claims brought by putative class members can (and should)

be certified under Rule 23(b)(3) or 23(c)(4), and this in turn demonstrates that the Settling Plaintiffs and Lead Counsel have not adequately represented the interests of the class and renders the proposed settlement fundamentally unfair.

In response, the Settling Plaintiffs and the NCAA contend that the personal injury claims raise a host of individual issues and, therefore, are not amenable to class-wide treatment under Rule 23(b)(3) or 23(c)(4). Because this dispute is central to the viability of the proposed settlement and impacts the appropriateness of class certification under Rule 23(b)(2) as will be explained, the Court will address it first, before turning to the remaining objections raised by Nichols and Arrington.

## I. Strength of Class Claims for Damages Against the NCAA and Whether Certification Under Rule 23(b)(3) or Rule 23(c)(4) Is Likely

Before proceeding, it is important to define the precise nature of the current inquiry. The Court is not deciding whether certification of a class under Rule 23(b)(3) and 23(c)(4) is proper for the purposes of litigation as a formal matter; no such motion has been filed with the Court. Rather, the Court is evaluating the strength of these procedural claims—that is, whether the personal injury claims of the proposed class against the NCAA are capable of being certified under Rule 23(b)(3) and 23(c)(4)—so that the value of those claims can be "balanced against the extent of settlement offer." *Wong*, 773 F.3d at 863.[7]

---

[7]  The parties do not challenge the application of Seventh Circuit law to this proceeding; however, because this is a multi-district action, there is a threshold question as to whether the Court should apply the law of this circuit or that of the transferor circuits to this question. Although the Seventh Circuit has not addressed this issue directly, it has addressed a similar issue in the context of cases transferred under 28 U.S.C. § 1404(a). There, the Seventh Circuit has stated that "the transferee court is usually 'free to decide [federal issues] in the manner it views as correct without deferring to the interpretation of the transferor circuit.'" *McMasters v. United States*, 260 F.3d 814, 819 (7th Cir. 2001) (quoting *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1174 (D.C. Cir. 1987 (Ginsburg, J.))). This is because "the general rule is that '[a] single federal law implies a national interpretation . . . [T]he norm is that each court of appeals considers the question independently and reaches its own decision, without regard to the geographic location of the events giving rise to the litigation.'" *Id.* (quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1126–27 (7th Cir. 1993)). Because the application of Rule 23 is a question of

To aid the Court in this determination, it appointed Nichols' counsel to present the arguments in support of class certification on behalf of those putative class members who may wish to pursue certification of their personal injury claims under Rule 23(b)(3) and 23(c)(4). Because this has been Nichols' position from the outset, this appointment has ensured that the Court would have the benefit of the adversarial process in evaluating this issue. Furthermore, Nichols' counsel was provided with access to the extensive discovery in the *Arrington* case, which was performed before any settlement had been reached between Lead Counsel and the NCAA.[8]

Having reviewed all of the materials submitted by the Settling Plaintiffs, the NCAA, Nichols, and Arrington, and based on the factual record before it, the Court finds that the likelihood that Plaintiffs would be able to obtain certification of their personal injury claims against the NCAA in this action pursuant to Rule 23(b)(3) and 23(c)(4) based upon the alleged claims of negligence and fraudulent concealment is minimal, at best. Accordingly, the Court finds that the ability of putative class members to assert these procedural claims in future proceedings provides them with minimal value.

## A.    Rule 23(a) Prerequisites

Our analysis begins with the personal injury classes proposed in the *Nichols* and *Arrington* actions. Nichols' complaint seeks Rule 23(b)(3) certification of "[a]ll current and former NCAA student-athletes who sustained a concussion(s) or suffered concussion-like symptoms while playing an NCAA-regulated sport and who incurred medical expenses as a

---

federal law intended to have nationwide application, the Court will apply Seventh Circuit law in its analysis.

[8]    After providing Nichols' counsel an opportunity to review the *Arrington* discovery, the Court also asked counsel whether he believed any additional discovery into class certification issues would be necessary; counsel responded that the *Arrington* discovery was sufficient for his arguments.

result."  Compl. ¶ 41, Nichols v. NCAA, No. 1:14-cv-00962, ECF No. 1.  This is similar to the Rule 23(b)(3) class proposed in Arrington's third amended complaint of "[a]ll persons who are playing or have played an NCAA-sanctioned sport at an NCAA member institution."  3d Am. Compl. ¶ 271, Arrington v. NCAA, No. 13 C 9116, ECF No. 119.[9]

To be certified under Rule 23(b)(3) or 23(c)(4), a proposed personal injury damages class first must meet each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation.  The parties do not contest the first three requirements.

First, numerosity is satisfied because the proposed class is estimated to consist of approximately 4.4 million members, whose joinder would be impracticable.

Second, there is at least one common question of fact underlying each of Plaintiffs' claims.  For example, common questions include whether the NCAA had held itself out as the guardian of the health and safety of collegiate athletes at NCAA-affiliated schools, and whether

---

[9]  Plaintiffs in *Wolf* also seek Rule 23(b)(3) certification of "[a]ll current and former NCAA student-athletes who played an NCAA sport," Compl. ¶ 164, Wolf v. NCAA, No. 1:14-cv-1268, ECF No. 1 , while the *Durocher* Plaintiffs seek certification of as "[a]ll former NCAA football players, and spouses of players, who sustained a concussion(s) or suffered concussion-like symptoms while playing football in a NCAA football game, and who have developed or will develop mental or physical problems as a result of the concussion(s) suffered and have incurred or will incur medical expenses from such injuries," Am. Compl. ¶ 128, Durocher v. NCAA, No. 1:14-cv-00035, ECF No. 9.  Plaintiffs in the remaining Related Actions only seek a medical monitoring class under Rule 23(b)(2) comprised of "[a]ll former NCAA football players residing in the United States, who did not go on to play professional football in the National Football League."  Compl. ¶ 10, Walker v. NCAA, No. 1:13-cv-09117, ECF No. 4; Compl. ¶ 10, Hudson v. NCAA, No. 1:14-cv-00194, ECF No. 1; Am. Compl. ¶ 66, Caldwell v. NCAA, No. 1:14-cv-00195, ECF No. 3; Am. Compl. ¶ 66, Morgan v. NCAA, No.1:14-cv-00196, ECF No. 3; Compl. ¶ 9, Washington v. NCAA, No. 1:14-cv-00197, ECF No. 1; Compl. ¶ 10, Doughty v. NCAA, No. 1:14-cv-00199, ECF No. 1; Compl. ¶ 9, Walton v. NCAA, No. 1:14-cv-00200, ECF No. 1  Nichols, in his objections to the amended settlement, proposes a personal injury damages class of "[a]ll current and former NCAA athletes who (i) suffered a documented concussion in or after 2002 while participating in a NCAA athletic event, and (ii) thereafter received a documented diagnosis of one or more concussion-related injuries, including PCS, CTE, Alzheimer's disease, ALS, or Parkinson's disease."  Nichols' 2d Objs. at 1, ECF No. 201.  The differences in the class definitions are discussed below to the extent they are material to the Court's decision.

the NCAA's concussion protocols (to the extent they were in place) satisfied generally accepted standards of care.

As for the third element, typicality, the proposed class consists of student athletes who played Contact and Non-Contact sports. Because the proposed settlement mandates different requirements for Contact and Non-Contacts sports, the Court believes that it is appropriate to divide the proposed class into two separate sub-classes—one consisting of student athletes who played Contact sports and the other consisting of student athletes who played Non-Contact sports. *See In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1129 n.38 (7th Cir. 1979) (the district court has a "broad range of discretion in determining whether to create subclasses pursuant to Fed. R. Civ. P. 23(c)(4)(B)"). That said, class representatives have been offered for both categories, and they all have participated in the settlement process and approved of the settlement's terms. As such, there is no dispute that they are typical of the category of athletes they represent.

Nichols and Arrington do contest the fourth element of Rule 23(a), adequacy of representation. First, Nichols and Arrington contend that there is a conflict of interest between class members who have not yet been diagnosed with a neurodegenerative condition and those who have. *See Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 331 (1980) ("[T]he adequate-representation requirement is typically construed to foreclose the class action where there is a conflict of interest between the named plaintiff and the members of the putative class."). According to this argument, those class members who already have been diagnosed with a concussion-related condition receive no benefit from the settlement's Medical Monitoring Program, and the only class members who stand to benefit are those who are currently asymptomatic. Plaintiffs and the NCAA counter that the Medical Monitoring Program benefits

16

every class member, regardless of whether he or she has already been diagnosed with a head injury.

It is undisputed that there are multiple neurodegenerative conditions associated with concussions and subconcussive hits, including Post-Concussion Syndrome ("PCS") and Chronic Traumatic Encephalopathy ("CTE"), often clinically mistaken for Alzheimer's disease or frontotemporal dementia. Corrected Deal Report ¶¶ 21–27, 36–53, ECF No. 170. Each of these conditions involves a progressive decline that may occur over years or even decades. *See id.* ¶¶ 20, 22. Furthermore, a class member who already has been diagnosed with one type of neurodegenerative condition may experience further decline or even develop a different neurodegenerative condition in later years. Cantu Report ¶¶ 39–40. Moreover, the Medical Monitoring Program is required to incorporate the then-governing standard of care over the course of the fifty-year Medical Monitoring Period, and it is reasonable to believe that the program will utilize ever-improving methods for detecting neurodegenerative diseases made possible by advancements in scientific research and technology. Thus, even class members with already diagnosed conditions will likely benefit from the Medical Monitoring Program by enabling them to determine whether their condition is progressively declining and/or whether they are experiencing symptoms related to a different, yet-undiagnosed condition.

Additionally, Nichols argues that there is a conflict of interest between those class members who reside in states that recognize medical monitoring claims and those in states that do not. Specifically, Nichols contends, but provides no authority for the proposition, that those class members in medical monitoring states could sue for relief above and beyond out-of-pocket expenses for medical monitoring. The Court has taken upon itself to peruse the law in various states that allow such claims and has found that, contrary to Nichols' position, recovery in those

states appears to be limited to medical monitoring expenses. *See, e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 850 (3rd Cir. 1990) (Pennsylvania law); *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984) (D.C. law); *Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109, 1118 (N.D. Ill. 1998) (Illinois law); *Patton v. Gen. Signal Corp.*, 984 F. Supp. 666, 673–74 (W.D.N.Y. 1997) (New York law); *Day v. NLO*, 851 F. Supp. 869, 879–80 (S.D. Ohio 1994) (Ohio law); *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1476–77 (D. Colo. 1991) (Colorado law); *see also Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 429–30 (W. Va. 1999) (West Virginia law); *Petito v. A.H. Robins Co.*, 750 So. 2d 103, 105 (Fla. Dist. Ct. App. 1999) (Florida law). These are precisely the type of expenses that the Medical Monitoring Program is designed to cover. Accordingly, the Court rejects Nichol's argument that a conflict of interest exists between those class members that reside in states that recognize medical monitoring claims and those that do not. *See* Am. SA ¶¶ IV(A)(1)–(2), IV(B).[10]

For his part, Arrington argues that, as an individual who has been diagnosed with life-changing injuries, his interests are not being adequately represented because the Settlement Agreement prevents him from pursuing compensatory relief. This is incorrect. The Amended Settlement Agreement expressly preserves individual personal injury claims for compensatory relief. *See* Am. SA ¶ II(NN). Indeed, nothing in the Settlement Agreement prohibits Arrington, or any other class member, from suing the NCAA or NCAA-affiliated institutions on an individual basis for damages stemming from his or her personal injuries, including medical bills.

---

[10]     Nichols also argues that a conflict of interest exists between those class members in states that prohibit the waiver of future malpractice claims and those class members in states that lack such a prohibition. *See* Am. SA ¶ XXI(F). To address this concern, Class Counsel has agreed to revise this provision.

18

What is more, the Amended Settlement Agreement defines the term "Medical Monitoring" as "the Screening Questionnaire and Medical Evaluations, described in Sections IV(B)(4)–(5), to assess, detect and/or diagnose any conditions, symptoms, or injuries from concussions or the accumulation of subconcussive hits. Medical Monitoring does not mean rendering medical care." Am. SA ¶ II(S). Thus, to the extent that the Settlement Agreement requires class members to release claims seeking the costs of medical monitoring or other legal or equitable relief related to medical monitoring, the release does not preclude class members from seeking recovery of medical care already incurred, as Arrington fears.

Arrington also contends that he, and other injured athletes like him, are prejudiced by the settlement agreement because it tolls the statute of limitations only up to the date that the Court rules on the motion for final approval of the settlement, rather than the Effective Date of the settlement, which may occur months later. *See* Am. SA ¶ XXI(S). But the tolling provision in the Amended Settlement Agreement provides the same protections offered by federal and Illinois law. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *Sawyer v. Atlas Heating & Sheet Metal Works, Inc*., 642 F.3d 560, 563 (7th Cir. 2011); *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 645 (Ill. 1977). Arrington may prefer a longer tolling period, but this preference in and of itself is not sufficient to create a conflict of interest between himself and the Settling Plaintiffs.

Finally, the objectors argue that the right to file personal injury lawsuits on a class-wide basis under Rule 23(b)(3) or 23(c)(4) has tremendous value to the class and that the Settling Plaintiffs' agreement to waive this right in exchange for minimal value (at least in the objectors' eyes) demonstrates the inadequacy of the representation provided by the Lead Counsel. This

argument, of course, assumes that the procedural claims are certifiable under Rule 23(b)(3) and 23(c)(4).

### B. Certification of the Putative Class Under Rule 23(b)(3)

Certification of a class under Rule 23(b)(3) is proper when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and [when] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods.*, 521 U.S. at 623–24.[11]

Predominance is not satisfied where liability determinations are individual and fact-intensive. *See Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 891 (7th Cir. 2011). Predominance also fails where "affirmative defenses will require a person-by-person evaluation of conduct to determine whether [a defense] precludes individual recovery." *Clark v. Experian Info., Inc.*, 233 F.R.D. 508, 512 (N.D. Ill. 2005), *aff'd*, *Clark v. Experian Info. Solutions*, 256 F. App'x 818 (7th Cir. 2007). Nichols and Arrington lean heavily on Judge Anita Brody's certification of a Rule 23(b)(3) settlement class in *In re National Football League Players' Concussion Injury Litigation* (the "NFL Litigation"), 307 F.R.D. 351, 370–82 (E.D. Pa. 2015). In that multi-district litigation, a class of retired professional football players sued the NFL for negligence and fraudulent concealment, seeking declaratory relief, medical monitoring, and damages. *Id.* at 362. The class members alleged that the NFL had breached its duty to protect

---

[11] Although the requirement of manageability is not required for a settlement class, *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial.") (citations omitted), here the Court is evaluating whether the claims can be certified for the purposes of litigation, not settlement.

players from short-term and long-term health risks associated with concussive and sub-concussive head injuries and fraudulently concealed those risks. *Id.* at 361–62.

In granting certification, Judge Brody found that the NFL's alleged conduct injured the class members in the same, unvarying way: each class member "returned to play prematurely after head injuries and continued to experience concussive and sub-concussive hits." *Id.* at 380. In addition, Judge Brody held that the NFL's alleged conduct raised "common and dispositive scientific questions" and that each class member "would have to confront the same causation issues in proving that repeated concussive blows give rise to long-term neurological damage." *Id.* Accordingly, Judge Brody concluded that "[r]esolution of these issues would so advance the litigation that they may fairly be said to predominate because the same set of core operative facts and theory of proximate cause apply to each member of the class." *Id.* at 381 (citations omitted).

There are stark contrasts, however, between the NFL Litigation and this case. That case involves approximately 20,000 former NFL football players. *Id.* at 371. This case involves an estimated 4.4 million athletes in forty-three different men's and women's sports. *See* Am. SA ¶ III(A); Corrected Deal Report ¶ 28; NCAA Resp. Nichols' July 15, 2015 Submission at 20, ECF No. 222 ("NCAA Resp. Nichols' 2d Obs."). The NFL Litigation involves roughly thirty-two NFL teams directly governed by the NFL's concussion policies. *In re NFL,* at 362. This case involves over a thousand NCAA member institutions, ranging from Division I schools to Division III schools, each of which has the option to adopt or reject the NCAA's concussion policies as well as the option to create its own concussion policies on a school-by-school, team-by-team, or coach-by-coach basis. *See* Poppe Dep. at 160, Spellman Decl. ¶ 24, Ex. 2, NCAA Resp. Nichols' 2d Objs., Ex. A. (stating NCAA guidelines account for the wide diversity of schools and comparing Ohio State University to Oberlin College); Klossner Dep. at 167,

Spellman Decl. ¶ 40, Ex. 14, NCAA Resp. Nichols' 2d Objs., Ex. A ("[I]t is the responsibility of both the national office and the membership for policies to protect student-athlete health and well-being, but the local medical care rests with the individual institution."); 4th Am. Compl. ¶ 174 (citing NCAA Const. art. 2.2.3 ("It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes.")). .

The examples provided by the Settling Plaintiffs starkly demonstrate how concussion education, evaluation, and treatment varied widely from one NCAA-affiliated school to another. Some schools warned student-athletes about the risks of head injuries, while others did not. For example, the University of Central Arkansas informed Derek Owens about the potential risks of head injuries from playing football and required him to sign a document acknowledging the warning. *See* Exemplar Proffer ¶ 2, Pls.' Resp. Nichols' 2d Objs., Ex. A, ECF No. 218. Dkt. 219-1 ¶ 2. In contrast, Angelica Palacios, who played soccer for Ouachita Baptist University, and Kyle Solomon, who played hockey for University of Maine, were never warned about the long-term consequences of brain injuries from concussions suffered while playing their sport. *Id.* ¶¶ 42, 69.

Some schools administered baseline testing for concussions, while others did not. *Id.* ¶¶ 19, 44, 49, 69, 89.[12] For example, Ouachita Baptist University required Palacios to undergo baseline testing prior to playing. *Id.* ¶ 44. At the University of Maine, Solomon underwent baseline testing during the course of his freshman hockey season, but not at the beginning. *Id.* ¶ 69. University of Central Arkansas did not provide Owens with any baseline testing before his freshman or sophomore football seasons, but did so prior to his junior year season. *Id.* ¶¶ 4, 19.

---

[12]    Baseline testing assesses an athlete's overall cognitive abilities, and the baseline score is used as a comparator when tracking the deterioration and recovery of the athlete's cognitive processes following a concussion. Cantu Report ¶¶ 47–48.

And Adrian Arrington played football for four years at Eastern Illinois University and never received any baseline testing. *Id.* ¶¶ 89, 91, 93.

The evaluation and treatment that student-athletes received after a concussion event also varied from school to school and sometimes even within the same school. At Eastern Illinois University, Owens told his coach he felt dizzy after being hit from behind by another player at a summer football practice, but no trainer or physician was available at school that day, and he went home without an evaluation. *Id.* ¶ 5. Three months later, when Owens was knocked unconscious at football practice, a student athletic trainer was present. The trainer immediately diagnosed Owens with a concussion, sent him home, and provided a list of instructions for him and his roommates to follow. *Id.* ¶ 7. At the University of Maine, after Solomon was knocked unconscious during the second period of a hockey game, the hockey team's trainer and doctor examined him in the locker room. *Id.* ¶ 70. But, once the team doctor passed away, the University of Maine did not have a physician to evaluate hockey players for the 2009-10 season. *Id.* ¶ 73. At Ouachita Baptist University, when Palacios was "headed" in the eye by another soccer player during practice, a trainer provided ice for her eye, but she was not evaluated for a concussion. *Id.* ¶ 47.

Each school also had different rules as to when an athlete could return to play after suffering a concussion. When Owens tried to return to football practice three days after a concussion, the athletic trainer did not permit Owens to participate because Owens said he felt "cloudy." *Id.* ¶ 10. Solomon was cleared to play two weeks after suffering a concussion, even though he was still vomiting. *Id.* ¶ 80.

Because all of Plaintiffs' claims arise out of their experiences while in college, the nature and extent of the concussion protocols employed at individual schools play a critical role in the

23

adjudication of Plaintiffs' claims against the NCAA.  For example, even assuming, for the sake of argument, that the NCAA had a legally cognizable obligation to safeguard the health of student-athletes at NCAA-affiliated schools and failed to take any action to alleviate the risks of head trauma (despite knowing it should do so), a student who attended a school with its own satisfactory concussion management plan may not have a claim against the NCAA or would have to prove that he or she was injured despite the school's efforts due to the NCAA's inaction. Or, assume that the NCAA adopted some safeguards, but a particular school ignored them.  Or, assume that the NCAA adopted concussion safeguards that passed muster, but a particular school refused to adopt them, or adopted some of them.  Or, assume that the NCAA adopted satisfactory standards, the school adopted them, but the coaching staff or medical staff at the school did not follow them.  Or, assume that the NCAA did not adopt any standards, and the school likewise had no standards, but the coaching staff in a particular sport decided to implement concussion standards during the tenure of a particular head coach or athletic director.   And, this is all assuming that the NCAA had a duty to learn what each school was doing for each sport during the relevant time period.  Consider too that each sport at each school had different coaches during different periods of time, who may or may not have instituted their own concussion management protocols, and that the pre-college, college, and post-college concussion history of the individual class members may differ[13] and one begins to appreciate the myriad individual issues of causation and injury that would overshadow any common ones.

Due to the unique circumstances of this case involving different schools, different sports, different coaches, and different concussion management practices, this Court cannot conclude, as Judge Brody did in *The NFL Litigation*, that the NCAA's alleged conduct injured the class

---

[13]     For example, prior to participating in collegiate sports, Owens and Arrington had sustained one concussion, Palacios had sustained two concussions, and Solomon had sustained three concussions.  *Id.* ¶¶ 1, 38-40, 85.

members in the same, unvarying way. Rather, the facts produced in discovery present a multitude of potential permutations regarding whether the NCAA breached a duty to protect its athletes and caused any particular plaintiff injury. And the need to make individual, fact-intensive determinations as to liability with respect to each class member eclipses any common issues as to whether the NCAA had a duty to protect players from concussion-related risks, breached that duty, and fraudulently concealed those risks. Such individual issues also preclude a finding that class treatment would be the superior method of adjudicating such claims as compared to individual actions.

In addition, because the putative class members reside in all fifty states, any effort to certify a personal injury class under Rule 23(b)(3) would confront other serious hurdles. *In re Bridgestone/Firestone, Inc. Tires Prods. Liability Litig.*, 288 F.3d 1012 (7th Cir. 2002), illustrates one such hurdle. There, the district court granted nationwide certification under Rule 23(b)(3) to certain classes consisting of buyers and lessees of SUVs with tires known to have had an abnormally high failure rate. The plaintiffs sued the tire manufacturer for unjust enrichment, breach of various warranties, and violations of consumer protection statutes. *In re Bridgestone/Firestone Inc. Tires Prods. Liability Litig.*, 205 F.R.D. 503, 520–30 (S.D. Ind. 2001). The Seventh Circuit reversed, holding, in part, that a nationwide class would not be manageable as required by Rule 23(b)(3), because under Indiana's choice-of-law rule, the claims of each class member would be governed by the laws of that person's place of residence. *Bridgestone/Firestone*, 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.").

Because *Nichols* and *Arrington* were filed in Illinois, the Court must apply Illinois choice-of-law rules. *See In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp.2d 827, 852–53 (N.D.

Ill. 2010) ("When cases are based on diversity of citizenship, the transferee court [in an MDL proceeding] must apply the state laws that the transferor forums would have, according to that forums' choice-of-law rules.") (citing *In re Air Crash Disaster Near Chi., Ill., on May 25*, 1979, 644 F.2d 594, 610 (7th Cir. 1981)). "[U]nder Illinois conflicts principles the law of the place of injury presumptively governs in a tort suit." *Speakers of Sport, Inc. v. Proserv, Inc.*, 178 F.3d 862, 864 (7th Cir. 1999). Because the student-athletes allegedly were injured at their schools (or at another NCAA school if they were at an "away" game or meet), the Court would have to consider the law of virtually every state and territory in order to evaluate Plaintiffs' claims in these actions. *See* NCAA Member Schools, http://www.ncaa.com/schools/ (last visited Jan. 14, 2016).[14]

This is significant because, as the NCAA correctly notes, the law governing Plaintiffs' fraud and negligence claims, as well as the affirmative defenses of comparative negligence and assumption of risk, may vary materially by state, implicating the concerns raised in *Bridgestone*. *See* Sample Pattern Jury Instructions at 1–7, NCAA Resp. Nichols' 2d Objs., Ex. I. Accordingly, the Court concludes that it would be extremely difficult, if not impossible, for Plaintiffs to satisfy Rule 23(b)(3)'s requirements of superiority and predominance for their personal injury claims. *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995) (denying certification as to negligence claim); *In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310, 336 n.24 (S.D. Fla. 2013) (denying certification as to fraudulent concealment claim); *In re Ford Motor Co. Ignition*

---

[14]     Indiana, where the *Durocher* case was filed, follows a similar rule. *See Bridgestone/Firestone*, 288 F.3d at 1016 (noting that Indiana is a *lex loci delicti* state). So too do a number of the other states where the Related Actions were filed. *See Kennedy v. Dixon*, 439 S.W.2d 173, 184–85 (Mo. 1969) (discussing law in Missouri, where *Washington* and *Powell* cases were filed); *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992) (discussing law in Tennessee, where *Walker* case was filed); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984) (discussing law in Texas, where *Whittier* case was filed); *State Farm Mut. Auto. Ins. Co. v. Olsen*, 406 So.2d 1109, 1110–11 (Fla. 1981) (discussing law in Florida, where *Hudson* case was filed).

*Switch Prods. Liability Litig.*, No. 1112, 2001 WL 1869820, at *3 (D.N.J. Feb. 8, 2001) (denying certification due to different standards of comparative and contributory negligence).[15]

Furthermore, a Rule 23(b)(3) class of personal injury claimants would confront other manageability problems. For example, because of the indispensable role that the colleges played in this dispute, the NCAA would likely request (and the Court would likely grant) the joinder of the approximately six hundred and fifty non-governmental colleges and universities, as well as the conferences to which they belong, as necessary parties.[16] *See* NCAA Resp. Nichols' 2d Objs. at 17 (listing non-NCAA defendants in individual concussion lawsuits filed by student-athletes). The NCAA likely also would file third-party complaints against other potentially liable parties, including various equipment manufacturers and the trainers and physicians that treated some of the class members. *See* Issues and Defenses Likely To Arise in Individual Cases at 3, NCAA Exs. Resp. Nichols' 2d Objs., Ex. F (noting potentially liable third parties). As a result, thousands of additional parties would arrive at this Court's doorstep. Even when discounting for economies of scale, the sheer magnitude of discovery necessary to ascertain the efforts made (or not made) by these parties to warn of, prevent, evaluate, or treat concussions

---

[15]     In contrast, variations in state laws are not obstacles to certification in the settlement context. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . ."); *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) ("Given the settlement, no one need draw fine lines among state-law theories of relief."); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp.2d 935, 974 (N.D. Ill. 2011) (differences in state law do not defeat predominance for the purposes of certifying a settlement class); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298–99 (3d Cir. 2011) (certifying a settlement class despite the fact that variances in state law would likely have defeated predominance if the class was being certified for trial); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) (noting that difference between evaluating a class for settlement versus litigation is "key" and "variations [in state laws] are irrelevant to certification of a settlement class").

[16]     Yet another complicating factor is that approximately thirty-five percent of the member institutions are state schools that are entitled to Eleventh Amendment immunity, and those institutions would not be amenable to suit in federal court. *Gleason v. Bd. of Educ.*, 792 F.2d 76, 79 (7th Cir. 1986); NCAA Resp. Nichols' 2d Objs. at 18.

and concussion-related risks and symptoms would be unmanageable. And, no matter how imaginative an approach Nichols would have the Court take (and it is telling that Nichols does not detail any particular solutions himself), trying a nationwide class action seeking damages for personal injuries against the NCAA would require a multitude of mini-trials to adjudicate even basic liability issues, such as breach of duty and causation.[17]

For all of these reasons, the Court finds it highly unlikely that Plaintiffs would be able to certify a nationwide personal injury class under Rule 23(b)(3) and concludes that this procedural right has little, if any, value.[18] As such, Nichols and Arrington have not established that the Settlement Plaintiff's waiver of the right to pursue a class action for personal injury claims against the NCAA, in and of itself, demonstrates that Lead Counsel's representation of the putative class is inadequate.

That said, this determination has significant limitations. First, the factual record presented by the parties is sufficient for the Court to conclude that certification under Rule 23(b)(3) of Plaintiffs' personal injury class—as they are defined in the various Related Actions, as well as in Nichols' objections—is highly unlikely against the NCAA. For the reasons stated above, based upon this record, the Court also can confidently conclude that a putative class consisting of student-athletes from more than one NCAA-affiliated school is unlikely to satisfy the requirements of Rule 23(b)(3). The factual record before the Court, however, does not provide sufficient facts from which the Court can conclude that a class that is much more narrowly defined in terms of size, type of sport, and/or time period could never be certified

---

[17]     The more limited class definition proposed by Nichols in his objections suffers from these same deficiencies.

[18]     For many of the same reasons, the Settling Plaintiffs' request in their motion for preliminary approval to certify the settlement class under Rule 23(b)(3) is denied.

against a particular school. Nor can the Court conclude from the present record that a very narrowly defined, single-school personal injury class could never be certified against the NCAA.

This is not to say that such efforts to certify personal injury claims against even individual schools and the NCAA would not face significant, perhaps insurmountable, hurdles. The examples discussed above aptly illustrate some of the potential difficulties. But the individual schools are not parties to this action, and the *Arrington* discovery did not address the particular concussion-related practices and policies at each and every NCAA-affiliated school. Perhaps there is a putative personal injury class that a potential plaintiff could allege—limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied—that might be appropriate for certification under Rule 23(b)(3). But the Court simply is unable to evaluate the strength (or value) of such a procedural claim on the limited record before it.[19]

### C. Certification Under Rule 23(c)(4)

Nichols also argues that a nationwide personal injury class could be certified under Rule 23(c)(4). That rule provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Under *In re Rhone–Poulenc Rorer Inc.*, 51 F.3d at 1297–1304, however, certification of a nationwide personal injury damages class under Rule 23(c)(4) would likely be untenable.

In that case, the plaintiffs consisted of a class of hemophiliacs who allegedly contracted the HIV-virus through blood transfusions. Plaintiffs sued the manufacturers of the blood solids used in the transfusions, claiming that the manufacturers acted negligently by failing to ensure that the blood solids were free of the HIV-virus and to implement effective donor screening.

---

[19]     This limitation impacts the reasonableness of the release contained in the Amended Settlement Agreement as will be discussed below. *See infra* at 44–45.

*Rhone-Poulenc*, 51 F.3d at 1297–98. When the plaintiffs sought class certification, the district court found that the class did not satisfy Rule 23(b)(3), but certified it under Rule 23(c)(4), explaining that "he did not envisage the entry of a final judgment but rather the rendition by a jury of a special verdict that would answer a number of questions bearing, perhaps decisively, on whether the defendants are negligent under either of the theories sketched above." *Id.* at 1297.

While it lauded the district court's "commendable desire to experiment with an innovative procedure for streamlining the adjudication of this 'mass tort,'" the Seventh Circuit reversed, stating that "we believe that [the] plan so far exceeds the permissible bounds of discretion in the management of federal litigation as to compel us to intervene and order decertification." *Id.* The Seventh Circuit first reasoned that the risk for defendants in certifying a Rule 23(c)(4) class was simply too high given the number of hemophiliacs nationwide and the fact that defendants would have "to stake their companies on the outcome of a single jury trial." *Id.* at 1299. In addition, the court explained that certifying a nationwide issues class violated the *Erie* doctrine, because thousands of class members and the four defendants would have their rights determined "under a law that is merely an amalgam, an averaging, of the nonidentical negligence laws of 51 jurisdictions." *Id.* at 1300 (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78–80 (1938)).

Lastly, the court found it inappropriate to certify a class under Rule 23(c)(4) where the plan was to obtain a special verdict as to a defendant's duty and breach in federal court, only to litigate causation and damages in different courts scattered throughout the country at a later date. *Id*. at 1303. The court explained that certifying the duty and breach issues for class treatment violated the "right to have juriable issues determined by the first jury impaneled to hear them . . . and not reexamined by another finder of fact." *Id.* Because issues related to causation and

damages overlapped with issues relating to duty and breach, the court concluded that any subsequent jury would inevitably be required to reexamine any special verdict obtained in the district court. *Id.*

The concerns expressed by Judge Posner in the *Rhone-Poulenc* case are equally applicable here. Nichols identifies three "core issues" upon which he argues Rule 23(c)(4) certification can be based: whether the NCAA owed class members a duty of care; the nature of that duty; and whether the NCAA breached that duty. This argument is unpersuasive.

First, like the defendants in *Rhone–Poulenc*, the NCAA would be forced to risk facing tremendous liability in a single proceeding "when it is entirely feasible to allow a final, authoritative determination of [its] liability . . . from a decentralized process of multiple trials, involving different juries, and different standards of liability in different jurisdictions" and, with the participation of individual schools as likely co-defendants, that can provide additional particularized facts. *Id.* at 1299. Furthermore, like *Rhone-Poulenc*, this is not a situation where "individual suits are infeasible because the claim of each class member is tiny relative to the expense of litigation." *Id.* In fact, numerous personal injury suits already have been filed by individual student-athletes, some seeking more than a million dollars in damages. *See* Pls.' Resp. Nichols' 1st Objs. at 5, n.18, ECF No. 187 (noting that there are currently twenty-one individual personal injury claims pending against the NCAA); Discovery Status in Individual NCAA Concussion-Related Cases at 1–3, NCAA Resp. Nichols' 2d Objs., Ex. D (listing the status of several individual lawsuits).

Additionally, Nichols' "core issues" class would include class members in all fifty states, and certification would require the Court to evaluate Nichols' "core issues" under "a kind of

Esperanto" multi-state standard in contravention of *Erie*. *Rhone-Poulenc*, 51 F.3d at 1300.[20]

Again, such an exercise seems unnecessary and imprudent when injured student-athletes can

seek damages in their respective forum based upon the particular forum's substantive law. *See*

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012)

("The kicker is whether the accuracy of the resolution would be unlikely to be enhanced by

repeated proceedings.") (internal quotations omitted).

Lastly, limiting certification, as Nichols suggests, to the issues of duty and breach would

violate the Seventh Amendment, which guarantees the putative class members and the NCAA

the "right to have juriable issues determined by the first jury impaneled to hearing them . . . and

not reexamined by another finder of fact." *Rhone-Poulenc*, 51 F.3d at 1303.

Undeterred, Nichols argues that, because he is only seeking Rule 23(c)(4) certification as

to the issues of duty and breach and not liability *per se*, he has properly "carved at the joint."

Nichols' Combined Reply at 29. Such a narrow approach may be permissible in some

circumstances, but the crucial role that the individual schools play in this case not only makes it

untenable, but impractical. For example, assume, again for the sake of argument, that the NCAA

had a duty to safeguard student-athletes from concussions risks, but did not impose requirements

on a particular school because it knew (or was told) that the school had its own concussion

management protocols that met the prevailing standard of care. This is hypothetical, of course,

but not implausible, and under this scenario the first empaneled jury would not be in a position to

adjudicate the issues surrounding NCAA's breach without also evaluating the actions of the

---

[20]     Nichols contends in a footnote that "any concerns surrounding state level variance in duty of care
and foreseeability can be addressed, as needed, by the use of subclasses at trial." Nichols' Combined
Reply at 23 n.23, ECF No. 233. But Nichols does not specify what those subclasses might be or how they
would be delineated. And creating fifty subclasses would effectively nullify whatever efficiencies would
be gained by certification.

particular school and its interaction with the NCAA—the same issues that a subsequent jury would have to consider when deciding issues of causation and comparative negligence.[21]

For all of these reasons, the Court concludes that Nichols' "core issues" class likely would not satisfy the requirements of Rule 23(c)(4) and has little, if any, value to the putative class members. Having determined, then, that Plaintiffs' personal injury damages class and "core issues" class likely would not satisfy Rule 23(b)(3) and Rule 23(c)(4), the Court now turns to the Settling Plaintiffs' request to certify the proposed settlement class under Rule 23(b)(2) and the reasonableness of the Amended Settlement Agreement.

## II. The Proposed Settlement Class Satisfies Rule 23(b)(2)

The Settling Plaintiffs, along with the NCAA, move to certify the settlement class under Rule 23(b)(2) with notice to the class and the ability of class members to opt out of the class as provided under Rule 23(c)(2)(B). Under Rule 23(b)(2), a court may certify a class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Colloquially, 23(b)(2) is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 441 (7th Cir. 2015).

---

[21]    The Seventh Circuit cases upon which Nichols relies are distinguishable. At issue in *McReynolds*, 672 F.3d 482, was the existence of a corporate-wide policy permitting brokers to form their own teams and prescribing criteria for account distributions that resulted in disparate impact to minority brokers and its legality, leaving only fact-of-injury and amount of damages for subsequent adjudication. The class members in *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003), were all from the same state and proceeding under the same federal and state laws. In *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010), the district court certified a class under Rule 23(b)(3), not Rule 23(c)(4). *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), involved straightforward claims that defendant's washing machines were defectively designed and did not necessitate a fact-intensive inquiry into the involvement of other intermediary parties. The Fifth Circuit case *Mullen v. Treasure Chest Casino*, 186 F.3d 620 (5th Cir. 1999), also is distinguishable because the claims only involved federal law with no individual choice-of-law issues.

Plaintiffs allege that the NCAA had a duty to protect the health and safety of student-athletes that played NCAA-sanctioned sports and knew the health risks associated with concussive and subconcussive injuries. Despite this, according to Plaintiffs, the NCAA failed to promulgate and implement the rules and regulations necessary to safeguard student-athletes from sustaining such injuries and to diagnose them properly. 4th Am. Compl. ¶¶ 2–5.

As remedy, Plaintiffs seek injunctive relief requiring the NCAA to adopt corrective measures, including "system-wide stepwise 'return to play' guidelines," protective treatment and eligibility requirements for injured student-athletes, and management and oversight by appropriate medical personnel. *Id.*, Request for Relief ¶ C. Plaintiffs also request "the establishment of a medical monitoring program that enables each class member to monitor whether he or she has any long-term effects or neurodegenerative conditions related to concussions or subconcussive hits." *Id.*, Request for Relief ¶ D.

Here, the NCAA is alleged to have failed to act on grounds that apply generally to the class. Furthermore, Plaintiffs seek injunctive relief that would apply to the class as a whole, and the Medical Monitoring Program created by the settlement benefits the entire class. As such, if this were the extent of the settlement, the inquiry would end here, and the Court would readily find that the proposed settlement class meets the requirements of Rule 23(b)(2). But the proposed settlement goes further.

Although the Settling Plaintiffs seek certification under Rule 23(b)(2), the Amended Settlement Agreement also releases the right of class members to pursue their personal injury claims on a class-wide basis (presumably under Rule 23(b)(3), Rule 23(c)(4), or a similar state procedural rule). The question is whether such a release would preclude certification under Rule 23(b)(2). Put another way, can a settlement class that is certified under Rule 23(b)(2) release its

rights to seek certification of their individual damages claims under Rule 23(b)(3)?[22]  Given the particular circumstances of this case, the ability of the class members to seek substantial damages on an individual basis, and the additional protections provided by the issuance of class notice and the ability of class members to opt-out of the settlement, the Court concludes that it can.

The Supreme Court discussed the boundaries separating Rule 23(b)(2) classes and Rule 23(b)(3) classes most recently in *Wal-Mart Stores, Inc., v. Dukes*: "Our opinion in *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994) *(per curiam)* expressed serious doubt about whether claims for monetary relief may be certified under that provision. We now hold that they may not, at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief."  131 S. Ct. 2541, 2557 (2011).  And, whatever this Court's views may be as to the fairness and reasonableness of the proposed settlement agreement, the Court must adhere mindfully to Rule 23's procedural requirements.  *See Amchem*, 521 U.S. at 622.

The appropriateness of certifying a class under Rule 23(b)(2) where the class also has asserted claims for individual damages has received various treatment by the Seventh Circuit over the years.  For example, in *Jefferson v. Ingersoll International, Inc.*, 195 F.3d 894 (7th Cir. 1999), the court reversed the district court's certification of a Title VII class action under Rule 23(b)(2), because the class also was seeking substantial damages.  "If Rule 23(b)(2) ever may be used when the plaintiff class demands compensatory or punitive damages, that step would be

---

[22]        Remember that, although the Fourth Amended Complaint filed in the *Arrington* case as part of the settlement process does not include a class claim for personal injury damages, two of the Related Actions do.  *See* Compl. ¶ 57, Nichols v. NCAA, No. 1:14-cv-00962, ECF No. 1; Compl. ¶¶ 1, 115, Whittier v. NCAA, No. 1:14-cv-09322, ECF No. 1. And the proposed settlement class, if approved, clearly would encompass the Plaintiffs in those actions.

permissible only when monetary relief is incidental to the equitable remedy—so tangential . . . that the due process clause does not require notice." *Id.* at 898.

The following year, in *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877 (7th Cir. 2000), the Seventh Circuit again reversed a Rule 23(b)(2) certification in a case involving damages claims. There, the district court approved under Rule 23(b)(2) a class-wide settlement of claims brought under the Fair Debt Collection Practices Act ("FDCPA"). *Id.* at 880–81. The settlement prohibited defendant from continuing the challenged activity, awarded damages to the named plaintiff and fees to his attorneys, and required the class members to waive their right to pursue damages on a class-wide basis. *Id.* at 880. In reversing, the Seventh Circuit was troubled that the class members, other than named plaintiff, received nothing in exchange for their class-wide rights to pursue their damages claims. *Id.*[23] This was problematic because, not only did the class members receive nothing in return, but "class members ordinarily are entitled to personal notice and an opportunity to opt out of representative actions for money damages." *Id.* at 881. The court also held that, because the FDCPA only allowed damages for private plaintiffs, the settlement could not proceed under Rule 23(b)(1) or (2), neither of which permits class members to opt out. *Id.* at 882.

That same year, the Seventh Circuit also visited the issue in *Lemon v. International Unions of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577 (7th Cir. 2000). There, the district court, without the benefit of *Jefferson*, also certified a Title VII class under Rule 23(b)(2), even though the class was seeking damages along with injunctive relief. The Seventh Circuit again reversed, but offered three different options for the district court to consider. First,

---

[23]     The court had no choice but to arrive as this conclusion because the record was insufficient to evaluate the merits of the plaintiffs' claims. *See id.* at 880 ("Whether it caused them injury depends on the merits, a subject on which we express no view. Perhaps *Crawford* settled for a pittance because plaintiffs' claim is weak . . . .").

the district court could certify the class under Rule 23(b)(3). *Id.* at 581. Second, the district court could certify a Rule 23(b)(2) class for the equitable claims and Rule 23(b)(3) for the damages claims, thus "avoid[ing] the due process problems of certifying the entire case under Rule 23(b)(2) by introducing the Rule 23(b)(3) protections of personal notice and opportunity to opt out for the damages claims." *Id.* at 582. "The third option discussed in *Jefferson* is that the district court might certify the class under Rule 23(b)(2) for both monetary and equitable remedies but exercise its plenary authority under Rules 23(d)(2) and 23(d)(5) to provide all class members with personal notice and opportunity to opt out, as though the class was certified under Rule 23(b)(3)." *Id.* at 582.

The Seventh Circuit recently has endorsed the viability of the third option, even after the Supreme Court's decision in *Wal-Mart*. In *Johnson v. Meriter Health Services Employee Retirement Plan*, 702 F.3d 364 (7th Cir. 2012), the district court certified a class under Rule 23(b)(2) seeking injunctive relief and damages under ERISA. "The class consist[ed] of more than 4000 participants in the [defendant] pension plan who allegedly were not credited with all the benefits to which the plan entitled them." *Id.* at 365. The Seventh Circuit affirmed, but because it was concerned that individual hearings may be required to determine the merits of each class member's individual damages claim, presented two permissible alternatives: "either the class members should be notified of the class action and allowed to opt out (and notice and opt out, we just said, are permitted in a (b)(2) class action even though not required), or the class should be bifurcated, . . . which is to say divided into a trial on liability followed by a trial on damages if liability is found." *Id.* at 371. The court continued that, "if the issues underlying the declaratory and damages claims overlapped," "the preferable alternative might be to stick with

the (b)(2) certification but to require that the class members receive notice and have an opportunity to opt out of the class." *Id.*

Here, the Settling Plaintiffs seek certification of their medical monitoring claims under Rule 23(b)(2) and also request that the Court exercise its discretion under Rule 23(d) to provide notice to the class and provide class members with an opportunity to opt out. The Court concludes that proceeding along these lines is consistent with the Seventh Circuit precedent discussed above. First, notice and the opportunity to opt out will safeguard the due process rights of the class members with respect to their personal injury claims.[24] Furthermore, the settlement agreement does not entirely foreclose those claims, but expressly preserves the right of class members to pursue their damages claims against the schools and the NCAA on an individual basis, as many already have done. By permitting class members to litigate their individual damages claims in future proceedings and providing notice and the ability of class members to opt out of the settlement, this case is distinguishable from *Crawford* and does not raise the necessity of individual determinations underlying the Supreme Court's concerns in *Wal-Mart*.[25]

It should also be noted that the law encourages the settlement of class actions. *See Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77-C-39, 1984 WL 21981, at *1 (N.D. Ill. Sept. 14, 1984) (citing *Dawson v. Pastick*, 600 F.2d 70, 75 (7th Cir. 1979)). And an individual's procedural right to pursue a claim under Rule 23 can be contractually waived. *See Am. Express*

---

[24]   That the scope of the Rule 23(b)(2) class in this case is identical to the scope of the putative Rule 23(b)(3) personal injury class ensures that reasonable notice will be provided to all putative class members whose Rule 23(b)(3) rights might be affected by the settlement.

[25]   Furthermore, given the significant nature of the individual personal injury claims, there is little danger that the class members' waiver of this procedural right "could extinguish their substantive rights as a practical matter." *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 814 n.1 (7th Cir. 2014).

*Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (rejecting the proposition "that federal law secures a nonwaivable opportunity to vindicate federal policies by satisfying the procedural strictures of Rule 23") (citation and emphasis omitted). Thus, it would be strange to require the Settling Plaintiffs to obtain certification under Rule 23(b)(3) before it can waive that right in exchange for other benefits when negotiating a settlement, particularly where the record demonstrates that the likelihood of succeeding on such a motion is extremely low and class members are provided notice and the ability to opt out.[26]

There is precedent in the Seventh Circuit for this approach. In *Williams v. Burlington Northern, Inc.*, 832 F.2d 100, 101 (7th Cir. 1987), the district court granted certification of a Title VII class under Rule 23(b)(2) *and* required notice and the ability of class members to opt out. The Seventh Circuit affirmed, noting that "the safeguards employed by the district court were the functional equivalent of those offered by Rule 23(b)(3)." *Id.* at 103. "From a practical standpoint, the opportunities to object in this case were tantamount to the protections envision by Fed. R. Civ. P. 23(c)(2). The district court employed measures that provided adequate protection from any potential antagonistic interest between class members." *Id.* at 104.

The Seventh Circuit also has affirmed this approach post-*Wal-Mart*. *See In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811 (7th Cir. 2014). There, the district court certified a settlement class under Rule 23(b)(1)(A) in a case alleging violations of the Fair Credit Reporting Act. *Id.* at 814; Order Granting Prelim. Approval, In re Trans Union Corp. Privacy Litig., 1:00-cv-04729 (N.D. Ill. 2008), ECF No. 468. Under the settlement, the class received free credit

---

[26]     Alternatively, a district court could require the a settling class plaintiff to formally file a Rule 23(b)(3) certification motion and rule on it prior to approving a settlement. But this would likely discourage the parties from pursuing settlement early on in the case when both sides are at risk of losing such a motion. For example, a class plaintiff may secretly believe that such a motion would be a weak one and would prefer to waive that right in exchange for what he or she considers a more valuable benefit. Likewise, a defendant also may believe that the motion would have a low chance of success, but would prefer to offer other consideration and not take the risk of certification.

monitoring and the option of a small cash amount or additional services. *In re Trans Union Corp.*, 741 F.3d at 814. In exchange, the recipients waived their right to proceed on a class-wide basis, but retained their individual claims, which could be paid from a fund established by the defendant. *Id.* As here, the settlement required that the class members be provided notice and the opportunity to object. Although the propriety of certification under Rule 23(b)(1)(A) was not contested directly on appeal, the Seventh Circuit did not find the district court's approach particularly troublesome and affirmed.

For these reasons, the Court grants the Settling Plaintiffs' request to conditionally certify the settlement class under Rule 23(b)(2).[27] The Court also requires the parties to provide class members notice of the Amended Settlement Agreement and the opportunity to opt out pursuant to Rule 23(e)(1). Furthermore, exercising its discretion under Rule 23(d), the Court finds that "reasonable notice" in this case means "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort" as provided in Rule 23(c)(2)(B) and requires that the settlement class members be afforded an opportunity to opt out of the settlement as provided in Rule 23(c)(2)(B) and 23(c)(3). This procedure will give class members the opportunity to exclude themselves from the settlement and the settlement class.

Because adequate notice to the class is essential for this settlement, the Court has scrutinized the Settling Plaintiffs' notice program and has raised a number of concerns in its prior orders and during previous hearings. In response, the Settling Plaintiffs and the NCAA

---

[27]     The Court is aware of the Seventh Circuit's admonition that "[n]ot all forms of medical monitoring are equitable in nature, and courts have warned that certification under Rule 23(b)(2) is inappropriate if the injunction is a 'disguised request for compensatory damages.'" *Kartman*, 634 F.3d at 894 n.9 (internal citations omitted). But, in this case, the Medical Monitoring Program "is designed to relieve class plaintiffs of the prospective costs associated with medical supervision" and, therefore, is amenable to certification under Rule 23(b)(2). *Id.* at 894.

have performed additional investigations into the feasibility of direct notice and have provided additional support for their assertion that the proposed notice program will provide direct notice to fifty-nine to sixty-two percent of the settlement class members. Joint Suppl. Submission Regarding Notice at 6, ECF No. 167; Spellman Decl., Apr. 15, 2015, ¶ 13, Joint Suppl. Submission Regarding Notice, Ex. A; Vasquez Decl., Apr. 14, 2015 ¶ 29, ECF No. 162. Under the current proposal, the remaining settlement class members will receive indirect notice via national print publications (such as *ESPN The Magazine*, *Sports Illustrated*, and *USA Today*), the Settlement Class website, and a widely disseminated press release. Additionally, it is anticipated that class members will learn of the settlement through news coverage of the wide-reaching settlement. Joint Suppl. Submission Regarding Notice at 4–5.

The cost of these efforts is estimated to be $1.5 million, which is less than 2.2 percent of Medical Monitoring Fund, *see* Spellman Decl., Apr. 15, 2015 ¶ 15, and an amount the Court deems reasonable. This multi-faceted notice plan is conservatively estimated to reach eighty percent of the settlement class, *see* Spellman Decl., Apr. 15, 2015 ¶ 14; Vasquez Decl., Apr. 14, 2015 ¶ 17, which is well within an acceptable range for class actions. *See* Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide at 3 (Federal Judicial Center 2010) (finding 70% to 95% to be reasonable). In an effort to reach as many class members as possible, however, the Court also directs the parties to provide notice to the settlement class via the internet and social media using the NCAA's website, as well as the NCAA's Facebook pages and Twitter accounts. The Court does not anticipate that the costs of such additional efforts would be substantial, and they would provide additional publicity of the settlement to the class.

## III. Whether the Proposed Settlement Is Within the Range of Possible Approval

Having conditionally certified the settlement class, the Court now must determine whether the proposed settlement is "within the range of possible approval." *Gautreaux*, 690 F.2d

at 621 n.3. As previously noted, the "relevant factors include: (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong*, 773 F.3d at 863.

In this case, the parties have already engaged in a lengthy mediation process and have conducted extensive discovery, including taking depositions, reviewing hundreds of thousands of documents, and consulting with leading medical experts in sports-related concussions. Litigation of this size and complexity takes many years to complete, at great expense to the class and great risk that affirmative defenses may thwart the class's legal theories. Balancing the fairness factors in a summary fashion as is appropriate on preliminary approval, the Court finds that, with the modifications required herein, the Amended Settlement Agreement is within the range of possible approval.

### A.     The Settlement's Benefits and the Release of ClassWide Claims

The balancing of the settlement offer against the strength of Plaintiffs' case demonstrates that the settlement is within the range of possible approval. The settlement offer creates and funds a $70 million dollar Medical Monitoring Program that entitles all class members to be screened for symptoms of neurodegenerative diseases multiple times during a fifty-year period. The Screening Questionnaire incorporates questions based on scientifically and clinically accepted standardized scales and measures.[28] Proposed Medical Science CommitteeReport at 23–37, ECF No. 159 ("PMSC Report").

---

[28]     This includes the Beck Depression Inventory-II, Geriatric Depression Scale, Brief Symptom Inventory, Behavior Rating Inventory for Executive Functioning, Everyday Cognition, Functional Activities, and Structured Inventory of Malingered Symptomology.

In those instances where the screening indicates that further assessment is necessary, a class member will qualify to receive up to two medical evaluations (or more with prior approval) that is fully funded by the Medical Monitoring Program. The medical evaluation would include a neurological examination, neuropsychological examination, mood and behavioral evaluation, and any necessary ancillary tests that comply with the then-current American Academy of Neurology clinical practice guidelines for the diagnosis and treatment of neurologic diseases. *Id.* at 36–38. The breadth and extent of this program provides each class member an opportunity to monitor his or her own health at various times during the Medical Monitoring Period in order to assess whether the concussive or subconcussive impacts the individual experienced as a student-athlete may have resulted in a neurologic condition.

The strength of settlement class's claims for medical monitoring depends upon a number of factors, including: whether the state, in which the class member resides, recognizes medical monitoring as an independent cause of action; whether the state recognizes medical monitoring as a form of injunctive relief; and whether the state allows medical monitoring as a form of relief in the absence of present physical injury. The laws of the various states differ with respect to these issues. *See generally* D. Scott Aberson, Note, *A Fifty-State Survey of Medical Monitoring and the Approach the Minnesota Supreme Court Should Take When Confronted with the Issue*, 32 Wm. Mitchell L. Rev. 1095, 1114 (2006). *Compare Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 440–41 (1997) (listing Arizona, California, New Jersey, and Utah cases authorizing recovery in the form of medical monitoring in the absence of physical injury), *with Ball v. Joy Techs., Inc.*, 958 F.2d 36, 39 (4th Cir. 1991) (holding that West Virginia and Virginia would not recognize a claim for medical monitoring without a present, physical injury). Additionally, in order to prevail, Plaintiffs would have to overcome numerous defenses, such as

statute of limitations and assumption of risk arguments, and likely incur hundreds of thousands, if not millions, of additional dollars in attorneys' fees and costs to pursue this litigation through trial and possible appeal. Pls.' Mem. Supp. Prelim. Approval at 27–28, ECF No. 156 (noting that Lead Counsel has expended more than 11,000 hours in attorneys' time and $500,000.00 in out-of-pocket costs through January 2014). Given that it is far from certain that every student-athlete within the settlement class could obtain relief in the form of medical monitoring even after years of litigation, the fact that the settlement provides medical monitoring for *all* class members within ninety days of the Effective Date is a significant victory for the members of the settlement class.[29]

Nichols and Arrington's primary objection is to the provision in the settlement agreement whereby the settling class members agree to release the NCAA and its affiliates from filing claims "pursued on a class-wide basis and relating to concussions or sub-concussive hits or contact" sustained during participating in collegiate sports as an NCAA student-athlete. Am. SA ¶¶ II(NN), XV(A)(7). But the Court has concluded that there is very little likelihood that a Rule 23(b)(3) or 23(c)(4) class for personal injury claims against the NCAA could be certified on a nationwide or multi-school basis. Furthermore, the settlement preserves the right of each class member to pursue his or her personal injury claims on an individual basis. Accordingly, the Court finds that the objections raised by Nichols and Arrington are not well-founded.[30]

---

[29] As a practical matter, the Effective Date is when the time to appeal expires after the Court's final order and judgment is entered, or when the appellate process has concluded.

[30] Nichols also contends that the new concussion management guidelines proposed in the Amended Settlement Agreement fail to provide any value because they merely recite guidelines already in effect. But this is not correct. In fact, the Amended Settlement Agreement requires a number of new concussion management guidelines that will benefit the settlement class, including requiring all NCAA-affiliated schools to implement annual baseline testing for all student-athletes and requiring medically trained personnel to be present at practices and/or games across all divisions. Furthermore, the Amended Settlement Agreement now encourages the schools to implement the concussion management protocols,

That said, Nichols correctly points out that the release provision in the Amended Settlement Agreement, on its face, appears to foreclose any and all class actions based on personal injury claims, regardless of the class definition, however focused or narrowly defined. As previously discussed, the Court lacks the factual record to evaluate the likelihood of class certification for a narrowly defined class action brought against a single school and the NCAA— such as a class of student-athletes who played a single sport, on the same team, during the same time, and who were subjected to the same concussion management protocols. Such a putative class still would face substantial barriers to certification for the reasons discussed above, but the record before the Court does not permit an evaluation of its merits. As a result, the Court cannot find that the release of personal injury claims on a class-wide basis is reasonable as it is currently set forth in the Amended Settlement Agreement. To the extent that the Settling Plaintiffs and the NCAA seek approval of such a provision, the scope of the release of class-wide personal injury claims must be limited to those instances where the plaintiffs or claimants seek a nationwide class or where the proposed class is comprised of student-athletes from more than one NCAA-affiliated school.[31]

### B. Other Objections Regarding Fairness of the Settlement

#### 1. The Value of the Medical Monitoring Program

Nichols argues that the parties' estimation of the value of Medical Monitoring Program is greatly exaggerated. First, he contends that the questionnaire discourages class members from

---

by requiring that the schools provide written certification of compliance in order to be included as Released Parties under the agreement.

[31] The Court will leave it to the parties whether to address the Court's concerns by revising the definition of "Released Claims" in the Amended Settlement Agreement or by modifying the exclusions to the definition of "Released Claims," which exclude "individual personal or bodily injury claims" and "class claims that do not relate in any way to medical monitoring or medical treatment or [sic] concussions or sub-concussive hits or contact." Am. SA ¶ II(NN).

participating. Having reviewed the questionnaire, the Court does not find that answering its questions will be unduly onerous or invasive. Rather, the questions about family history, educational history, medical history, sports involvement, concussion history, and current symptoms are relevant to assessing a class member's health and well-being. Furthermore, to the extent that class members are unwilling to fill out the questionnaire, there will likely be a correlation between members who are not sufficiently motivated to fill out the questionnaire and those who are asymptomatic at that point in time such that an evaluation is likely unnecessary. *See* Corrected Deal Report ¶ 76.

Second, Nichols contends that, because many class members have private health insurance, the ultimate benefit to the class member is the amount of his or her co-pay for the services provided. That argument assumes that a class member could go to a single doctor on a single visit to determine whether they have PCS or CTE. That also assumes that the Medical Monitoring Program requires class members to assert a claim of benefits against their private health insurance company to obtain the benefits of the settlement. Neither is accurate.

The benefit of the Medical Monitoring Program is the streamlining of a highly specialized and multi-step process necessary to obtain a medical evaluation designed to determine whether a class member is suffering from PCS or CTE. Many class members may not have any idea that they are experiencing symptoms caused by prior head injuries and, thus, may not seek an evaluation or the appropriate treatments required to ease their symptoms. Cantu Report ¶ 76. Here, medical experts with specializing expertise in the diagnosis, care, and management of concussions in sport, as well as mid- to late-life neurodegenerative diseases, have created a screening questionnaire specifically designed to determine whether a class member is experiencing neurological symptoms caused by concussions. PMSC Report at 1–6.

46

The experts also have created a standardized scoring protocol to determine whether additional evaluation is necessary in individual cases. *Id.* at 7–36. Where additional evaluation is warranted, the class member will undergo a battery of neurologic, neurophysiological, mood, and behavioral tests. *Id.* at 36. All of the information gathered from a Medical Evaluation will be collectively evaluated by a physician skilled in the diagnosis, treatment, and management of concussions, and the results will be communicated to the class member. Cantu Report ¶ 87. Armed with the results, the Settlement Class Member will then be in a position to seek treatment appropriate to the diagnosis and be knowledgeable about the effects, if any, of concussions or subconcussive hits he or she experienced while in college. *Id.* ¶ 88. Such a comprehensive assessment program has substantial value to the class.

Furthermore, a class member is not required to assert a claim of benefits to their insurance company in order to obtain a Medical Evaluation. Am. SA ¶ IV(B)(5)(g) ("[I]n no event shall a Qualifying Class Member be responsible for making a claim on his or her insurance policy to receive or qualify for the benefits of the Settlement."). A class member would only pay a co-pay or deductible if a claim of benefits were being asserted against his or her own insurance company. Because such a claim is not required, there should never be a need for a class member to pay a co-pay or deductible.

That said, to the extent that the settlement agreement allows the Medical Monitoring Program Administrator to seek subrogation or reimbursement of the program costs from a class member's private insurance carrier, the Court rejects the provision as unreasonable. *See* Am. SA ¶ IV(B)(5)(g) (providing that "the Program Administrator may pursue subrogation or reimbursement from Qualifying Class Members' private health insurance for the cost of Medical Evaluations, as long as doing so does not preclude the Qualifying Class Member from qualifying

for at least one (1) examination under his or her health insurance plan in the two (2) year period following his or her Medical Evaluation"). Not only would such a provision shift the costs of the Medical Monitoring Program to the class member and his or her insurer, but the filing of such a claim would likely impact the availability of annual and lifetime benefits to the class member under the private plan, as well as the class member's ability to obtain health insurance in the future. The Court sees no difference between, on the one hand, forcing a class member to file a claim with her private insurer (which Am. SA ¶ IV(B)(5)(g) expressly disavows) and, on the other hand, allowing the Program Administrator to assert subrogation rights against the same insurer.

Accordingly, as a condition of preliminary approval, the Court directs that the following provisions be omitted from the Settlement Agreement: (1) "Any deductible or co-pay required to be paid by a Qualifying Class Member in order to obtain reimbursement by the Program Administrator for a Medical Evaluation at a Program Location under the Medical Monitoring Program shall be paid from the Medical Monitoring Fund." Am. SA ¶ IV(B)(5)(g); and (2) "the Program Administrator may pursue subrogation or reimbursement from Qualifying Class Members' private health insurance for the cost of Medical Evaluations, as long as doing so does not preclude the Qualifying Class Member from qualifying for at least one (1) examination under his or her health insurance plan in the two (2) year period following his or her Medical Evaluation." Am. SA ¶ IV(B)(5)(g).[32]

---

[32] For the same reasons, the following sentence should be omitted from the proposed notice: "[N]or will you be responsible for any co-pays or deductibles associated with any Medical Evaluation received pursuant to the Settlement." Notice of Proposed Class Action Settlement at 8, Mot. Prelim. Approval, Ex. B.

### 2. Class Members Who Live More than 100 Miles Away

To address the Court's concerns regarding the scarcity of Program Locations, the Settling Plaintiffs and the NCAA have agreed to expand the number of Program Locations to thirty-three sites nationwide. Assuming that the geographic distribution of the class members approximates the general population, 50 percent of the class would be within fifty miles of a Program Location and 70 percent would be within one hundred miles of a Program Location. Garretson Report ¶ 31. As explained in the Garretson Report, the Medical Science Committee concluded that the costs of adding more Program Locations at the present time would far outweigh any benefits, and the Court finds this conclusion reasonable.

Those class members who live more than one hundred miles from a Program Location would have two options. The class member could travel to the nearest Program Location and obtain reimbursement of reasonable travel expenses. Am. SA ¶ IV(B)(5)(a); Am. SA ¶ VI(A)(4). Alternatively, in the event that travel to the nearest location is unduly burdensome, the class member could request that the Program Administrator qualify another medical institution or provider that is within 100 miles of the class member's residence to provide a Medical Evaluation in accordance with standards set forth in the Amended Settlement Agreement. Am. SA ¶ IV(B)(5)(a). The Program Administrator then would enter into a contact with the alternative medical institution or provider for those services. Am. SA ¶ IV(B)(5)(a).

Under the second scenario, the settlement agreement proposes to reimburse the class member "the lesser of (1) the average cost of the Medical Evaluation within the Medical Monitoring Program or (2) the Qualifying Class Member's actual out-of-pocket costs for the Medical Evaluation by the local physician." Am. SA ¶ VI(A)(4). However, given that the provider would have to enter into a contract with the Program Administrator (which presumably

would not only specify the services to be rendered, but also any fees), *see* Am. SA ¶ IV(B)(5)(a), and the class member is not required to submit a claim to her private insurer, the provision should simply provide that the Program Administrator will pay the medical institution or physician for performing the Medical Evaluation pursuant to the negotiated contract. Am. SA ¶ VI(A)(4).

### 3. Funds Remaining at the Program's Expiration

Confirming the sufficiency of the $70 million Medical Monitoring Fund, Bruce Deal, the Settling Plaintiffs' economic expert, estimates that at least $2 million will be left over at the end of the fifty-year monitoring period based on conservative assumptions. Corrected Deal Report ¶ 13 T.1. Ross Mishkin, the economic expert offered by the NCAA, performed a different analysis and agrees that the funds are sufficient for the program, estimating that approximately $34 million (albeit, in 2066 dollars) will remain in the end of fifty years. Mishkin Report, Table 10, NCAA Mem. Supp. Sufficiency of Medical Monitoring Fund, Ex. A, ECF No. 168.[33] The Amended Settlement Agreement provides that any remaining funds "shall be either used to extend the Medical Monitoring Program or donated to an institution or institutions selected by the Medical Science Committee to be used for concussion-related research or treatment." Am. SA ¶ IV(A)(4). Nichols objects to this provision, arguing that the funds remaining at the expiration of the Medical Monitoring Period should benefit the class members rather than be donated for concussion research.

Provisions in class action settlements providing *cy pres* awards can be appropriate "if distribution to the class members is infeasible." *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 675 (7th Cir. 2013); *see also Pearson*, 772 F.3d at 784 ("A *cy pres* award is supposed to be

---

[33] Of course, the modifications proposed by the Court today, if adopted by the parties, would impact these conclusions to some extent.

limited to money that can't feasibly be awarded to the intended beneficiaries . . . ."). Here, if sufficient funds remain at the end of the monitoring period to extend the Medical Monitoring Program, doing so would provide a direct benefit to class members, some of whom will only be in their late sixties or early seventies. Accordingly, the Court directs that one year prior to the expiration of the program, the Medical Science Committee should inform the Court whether sufficient funds remain to extend the Medical Monitoring Period for a period greater than six months; if such funds exist, the period should be so extended. If there are insufficient funds to extend the Medical Monitoring Period for six months, then the Medical Science Committee may elect to donate the remaining funds to an institution be used for concussion-related research or treatment, subject to approval by the Court at that time.

### 4. The $5 Million Research Fund

Nichols argues that the NCAA's obligation under the Amended Settlement Agreement to contribute $5 million to concussion research provides no value to the class members. *See* Am. SA ¶ X(A). This value is illusory, according to Nichols, because NCAA member institutions already spend, and will continue to spend, millions on concussion-related research regardless of the settlement agreement, and, under the terms of the agreement, research conducted by any NCAA member institution is credited toward the $5 million. This point is well taken.

The research funds that have been or would have been spent in the absence of this settlement cannot be counted as a benefit arising from of the settlement itself. Accordingly, NCAA's $5 million contribution to concussion research must constitute *additional* funding for research that otherwise would not have occurred absent this settlement. And the following provision in the Amended Settlement Agreement should be deleted: "For purposes of this provision, research undertaken by NCAA member institutions with respect to the prevention,

treatment and/or effects of concussions will be credited (as appropriate) toward the foregoing monetary requirement." *See* Am. SA ¶ X(A).

### 5. The Ten-Year Publicity Campaign

In assessing the cost and effectiveness of the Medical Monitoring Program, Deal assumes there will be a publicity campaign ten years into the Medical Monitoring Period reminding class members of their eligibility for the Medical Monitoring Program. *See* Corrected Deal Report ¶¶ 70–71. The Amended Settlement Agreement, however, does not require a second publicity campaign. *See generally* Am. SA ¶¶ V, VI, VII, VIII, XI(A)(4). The Court believes that additional publicity campaigns via relevant print publications, internet publications, and social media on the ten-year, twenty-year, thirty-year, and forty-year anniversaries of the commencement of the Medical Monitoring Program will be necessary to ensure that class members remain aware of the availability of the program.[34]

### 6. Duty to Report to the Court

As currently drafted, the parties are required to file with the Court the Medical Science Committee's annual report on the first day of each year during the Medical Monitoring Period. The agreement also should provide that the Court can request a report from the Medical Science Committee, the Program Administrator, the Notice Administrator, and/or the Special Master regarding the status of the Medical Monitoring Program at any time during the monitoring period.[35]

---

[34]     Furthermore, although it is not clear from the Amended Settlement Agreement, the Court assumes that the settlement website will remain online for the duration of the monitoring period. The parties should inform the Court if this understanding is incorrect.

[35]     Nichols also objects to Paragraph XXI(F) of the Amended Settlement Agreement, claiming that it requires class members to prospectively waive claims against the Class Members, their counsel, and other enumerated parties based on the administration of the Settlement. But, Nichols overstates its impact and leaves out the rest of the provision. In its entirety, the paragraph states: "No Person shall have any claim

**Conclusion**

Subject to the modifications outlined herein, the Court grants the Joint Motion for Preliminary Approval of Amended Class Settlement and Certification of Settlement Class [154]. The parties should discuss whether they are amenable to the Court's modifications and report on the status of these discussions at the next status hearing.

**SO ORDERED**                     **ENTERED    1/26/16**

_____

**John Z. Lee**
**United States District Judge**

---

against the Class Representatives, the NCAA, the NCAA's Counsel, Program Administrator, Notice Administrator, or the Released Persons or their agents based on administration of the Settlement *substantially in accordance with the terms of the Agreement or any order of the Court or any appellate court.*" Am. SA ¶ XXI(F) (emphasis added). Furthermore, as noted, Class Counsel agrees to exclude themselves from this provision. Accordingly, the Court finds this provision reasonable.