UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF SECOND AMENDED CLASS SETTLEMENT AND <u>CERTIFICATION OF SETTLEMENT CLASS AND SETTLEMENT SUBCLASSES</u>**

010270-12 872305 V1

## TABLE OF CONTENTS

**<u>Page</u>**

I. INTRODUCTION ...........................................................................................................1

II. DESCRIPTION OF CHANGED TERMS IN THE AMENDED SETTLEMENT.............2

    A. Creation of subclasses........................................................................................2

    B. Changes to extent of notice................................................................................3

    C. Deletion of provisions allowing subrogation or reimbursement of program costs ......................................................................................................3

    D. Payment of class members' costs ......................................................................4

    E. Provisions relating to the end of medical monitoring period.................................4

    F. Changes relating to NCAA's contribution of $5 million.........................................5

    G. Changes relating to publicity campaign..................................................................6

    H. Providing for Court to request reports ......................................................................6

    I. Exclusion of Class Counsel from waiver of future claims ......................................7

III. RELEASE AND WAIVER ..............................................................................................7

IV. THE COURT SHOULD SET SETTLEMENT DEADLINES.........................................13

V. CONCLUSION................................................................................................................13

010270-12 872305 V1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ..................................................................................................11

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ...........................................................................................10, 11

*Culver v. City of Milwaukee*,
    277 F.3d 908 (7th Cir. 2002) ..................................................................................................12

*Herman v. Southeastern Conference, et al*,
    Case No. 2:16-at-00572 (E.D. Cal.)........................................................................................12

*In re Oil Spill by Oil Rig Deepwater Horizon*,
    295 F.R.D. 112 (E.D. La. 2013)..............................................................................................10

*Retired Chicago Police Ass'n v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ......................................................................................................12

*In re Rhone-Poulenc Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ....................................................................................................9

*Smith v. Family Video Movie Club, Inc.*,
    2013 U.S. Dist. LEXIS 54512 (N.D. Ill. Apr. 15, 2013) ........................................................12

*Swan v. Bd. of Educ. of Chicago*,
    2013 U.S. Dist. LEXIS 112867 (N.D. Ill. Aug. 9, 2013)..................................................10, 11

*Tamas v. Family Video Movie Club, Inc.*,
    2013 U.S. Dist. LEXIS 114130 (N.D. Ill. Aug. 13, 2015).......................................................11

I.     INTRODUCTION

Plaintiffs Derek Owens, Kyle Solomon, Angela Palacios, Abram Robert Wolf, Sean Sweeney, Jim O'Conner, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John DuRocher, Sharron Washington, Shelby Williams, Brice Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, and Jessica Miller, on behalf of themselves and as representatives of the Settlement Class, through Class Counsel[1] respectfully submit this memorandum in support of the joint motion for preliminary approval of the Second Amended Class Settlement ("Second Amended Settlement") and certification of the Settlement Class and Settlement Subclasses.[2]

In this memorandum, Plaintiffs focus solely on those issues left outstanding by this Court's Memorandum Opinion and Order ("Order"), dated January 26, 2016 (Dkt. No. 246). With one exception, the Parties have satisfied each directive in the Order. The sole exception relates to the scope of the Settlement Class's release of class-wide personal injury claims. In the Order, this Court stated that it could not "conclude from the present record that a very narrowly defined, single-school personal injury class could never be certified against the NCAA." Order at 29. As explained in Section III, below, the Second Amended Settlement releases all class-wide personal injury claims except for classwide-claims "pursued on behalf of a class of persons who allege personal injuries or bodily injuries resulting from their participation in a single NCAA-sanctioned sport at a single-NCAA member school, and relating to concussions or

---

[1] Capitalized terms have the same meaning as defined in the Second Amended Class Action Settlement Agreement and Release ("Second Amended Settlement" or "Sec. Am. SA"), attached as Exhibit 1 to the Motion and a red-lined version is attached as Exhibit 2. "Class Counsel" means Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC as Lead Class Counsel ("Lead Counsel"), Richard Lewis of Hausfeld LLP as Special Class Counsel for Medical Monitoring Relief ("Special Class Counsel"), and Charles Zimmerman of Zimmerman Reed, James Dugan of the Dugan Law Firm, and Mark Zamora of The Orlando Law Firm as the Executive Committee. Sec. Am. SA, ¶ II(E).

[2] Plaintiffs incorporate the background of litigation and settlement negotiations set forth in previous memoranda in support of motions for settlement approval. *See* Dkt. Nos. 65 and 156.

sub-concussive hits or contact."[3] Therefore, the release preserves single-sport, single-school class-wide personal injury claims. The scope of the proposed release satisfies this Court's statement in the Order that "[p]erhaps there is a putative personal injury class that a potential plaintiff could allege—limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied—that might be appropriate for certification under Rule 23(b)(3)."[4]

Accordingly, for the reasons more fully described below, as well as the reasons set forth in Plaintiffs' previous memoranda in support of motions for preliminary approval, Plaintiffs respectfully request that the Court grant preliminary approval of the Second Amended Settlement and direct that Notice be provided to the Settlement Class.[5]

## II. DESCRIPTION OF CHANGED TERMS IN THE AMENDED SETTLEMENT

In this section, Plaintiffs describe changes in the Second Amended Settlement that fully implement this Court's directives in the Order.

### A. Creation of subclasses

This Court ruled that "it is appropriate to divide the proposed class into two separate sub-classes—one consisting of student athletes who played Contact sports and the other consisting of student athletes who played Non-Contact sports."[6] As a result, the Second Amended Settlement creates two settlement subclasses.[7] The Settlement Class is defined as "[a]ll Persons

---

[3] Sec. Am. SA, ¶ II(RR).

[4] Order at 29.

[5] The lead objector, Jay Edelson of Edelson PC, does not object to the Second Amended Settlement.

[6] Order at 16.

[7] The Subclass Members get identical relief under the Second Amended Settlement, except that medical personnel must be present at all games and available at all practices for Contact Sports only. Sec. Am. SA, ¶ IX(4) ("NCAA member institutions shall ensure that medical personnel with training in the diagnosis, treatment and management of concussion are present at all

who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date."[8] The Contact Sport Settlement Subclass is defined as "[a]ll Persons who played an NCAA-sanctioned Contact Sport at an NCAA member institution on or prior to the Preliminary Approval Date."[9] The Non-Contact Sport Settlement Subclass is defined as "[a]ll Persons who played an NCAA-sanctioned non-Contact Sport at an NCAA member institution on or prior to the Preliminary Approval Date."[10]

### B. Changes to extent of notice

This Court directed the Parties "to provide notice to the settlement class via the internet and social media using the NCAA's website, as well as the NCAA's Facebook pages and Twitter accounts."[11] So Paragraph XI(A)(2) of the Second Amended Settlement states, "Notice will be provided in the manner described in the Notice Plan and prescribed by the Court, including, but not limited to, through the use of the NCAA's website, Facebook pages, and Twitter accounts."

### C. Deletion of provisions allowing subrogation or reimbursement of program costs

This Court directed the Parties to omit two provisions from paragraph IV(B)(5)(g) of the amended settlement agreement;[12] those provisions allowed "the Medical Monitoring Program Administrator to seek subrogation or reimbursement of the program costs from a class member's

---

Contact Sports games for Divisions I, II and III."); ¶ IX(5) ("NCAA member institutions shall ensure that medical personnel with training in the diagnosis, treatment and management of concussion are available at all Contact Sports practices for Divisions I, II and III.").

[8] Sec. Am. SA, ¶ III(A).

[9] *Id.* The proposed Class Representatives for the Contact Sport Settlement Subclass are Derek Owens, Angelica Palacios, Kyle Solomon, Rachel Harada, Natalie Harada, and Dache Williams. *Id.*, ¶ II(G).

[10] *Id.*, ¶ III(A). The proposed Class Representatives for the Non-Contact Sport Settlement Subclass are Shelby Williams, Brice Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, Jessica Miller, Adam Walke, Anna Bartz, and Peter Dykstra. *Id.*, ¶ II(H).

[11] Order at 41.

[12] Order at 48.

private insurance carrier."[13]  Those two provisions are omitted from paragraph IV(B)(5)(g) of the Second Amended Settlement Agreement, which states, "Neither the Program Administrator nor the Program Locations shall pursue subrogation or reimbursement from the Qualifying Class Member or his or her private health insurance, Medicare, Medicaid, or any other payor or administrator.  In no event shall a Qualifying Class Member be responsible for making a claim on his or her insurance policy to receive or qualify for the benefits of the Settlement."

D.  **Payment of class members' costs**

This Court ruled that paragraph VI(A)(4) of the Parties' settlement agreement "should simply provide that the Program Administrator will pay the medical institution or physician for performing the Medical Evaluation pursuant to the negotiated contract."[14]  Paragraph VI(A)(4) of the Second Amended Settlement now states that upon receiving proof of the Medical Evaluation, the Program Administrator is charged with the task of "paying fees owed pursuant to the contract negotiated with the local medical institution or provider…."

E.  **Provisions relating to the end of medical monitoring period**

As to paragraph IV(A)(4) of the settlement agreement, this Court directed that "one year prior to the expiration of the program, the Medical Science Committee should inform the Court whether sufficient funds remain to extend the Medical Monitoring Period for a period greater than six months; if such funds exist, the period should be so extended.  If there are insufficient funds to extend the Medical Monitoring Period for six months, then the Medical Science Committee may elect to donate the remaining funds to an institution used for concussion-related research or treatment, subject to approval by the Court at that time."[15]

---

[13] Order at 47.

[14] Order at 50.

[15] Order at 51.

Paragraph IV(A)(4) of the Second Amended Settlement makes those changes:

> The Program Administrator, after consulting with the Medical Science Committee, shall report to the Court on the state of the Medical Monitoring Fund one year prior to the expiration of the Medical Monitoring Period. If the Medical Monitoring Fund contains funds sufficient to extend to the Medical Monitoring Program six months or more beyond the expiration of the Medical Monitoring Period, the Medical Monitoring Period shall be so extended. If the Medical Monitoring Fund does not contain funds sufficient to extend the Medical Monitoring Period beyond six months, except as otherwise provided in Section IV(A)(7), at the discretion of the Medical Science Committee and subject to Court approval, any monies remaining in the Medical Monitoring Fund at the expiration of the fifty (50) year Medical Monitoring Period, together with any accrued interest (if any), shall be donated to an institution or institutions selected by the Medical Science Committee and approved by the Court to be used for concussion-related research or treatment.

### F. Changes relating to NCAA's contribution of $5 million

This Court ruled that "NCAA's $5 million contribution to concussion research must constitute *additional* funding for research that otherwise would not have occurred absent this settlement. And the following provision in the Amended Settlement Agreement should be deleted: 'For purposes of this provision, research undertaken by NCAA member institutions with respect to the prevention, treatment and/or effects of concussions will be credited (as appropriate) toward the foregoing monetary requirement.' *See* Am. SA ¶ X(A)."[16]

To effectuate those changes, Paragraph X(A) of the Second Amended Settlement states, "The NCAA will contribute five million U.S. dollars ($5,000,000.00), over a period not to exceed ten (10) years, to research the prevention, treatment, and/or effects of concussions. These funds are in addition to any funds the NCAA has already spent on concussion research as of the

---

[16] Order at 51-52.

- 5 -

Effective Date and must be used to fund research that would not have occurred absent this Settlement Agreement."

### G.  Changes relating to publicity campaign

With respect to the publicity campaign, this Court ruled that "additional publicity campaigns via relevant print publications, internet publications, and social media on the ten-year, twenty-year, thirty-year, and forty-year anniversaries of the commencement of the Medical Monitoring Program will be necessary to ensure that class members remain aware of the availability of the program."[17]  Accordingly, paragraph XI(A)(3) of the Second Amended Settlement states, "Unless they have excluded themselves from the Settlement, Settlement Class Members will receive a Reminder Notice regarding the Medical Monitoring Program ten (10) years after the Effective Date.  The manner of notice will depend upon then available technology and other factors such as the accuracy of mailed notice.  Publicity campaigns publicizing the Settlement will be performed each of the following intervals: ten (10) years, twenty (20) years, thirty (30) years, and forty (40) years after the Effective Date."[18]

### H.  Providing for Court to request reports

This Court ruled that the settlement "should provide that the Court can request a report from the Medical Science Committee, the Program Administrator, the Notice Administrator, and/or the Special Master regarding the status of the Medical Monitoring Program at any time

---

[17] Order at 52.  In a footnote to that statement, this Court inquired whether the settlement website will remain online for the duration of the monitoring period.  Order at 52 n.34.  Class Counsel confirm that it *will* remain online.

[18] In addition, paragraph II(UU) of the Second Amended Settlement defines "Reminder Notice" as "the Notice to Settlement Class Members in the manner and form approved by the Court to be sent ten (10) years, twenty (20) years, thirty (30) years, and forty (40) years after the Effective Date and at such other dates and times as required by the Court."

during the monitoring period."[19] Paragraph XXI(L) of the Second Amended Settlement provides for such a request: "The Court may request and require a report from the Medical Science Committee, the Program Administrator, the Notice Administrator, and/or the Special Master regarding the status of the Medical Monitoring Program at any during the Medical Monitoring Period."

I.  **Exclusion of Class Counsel from waiver of future claims**

This Court stated, "Nichols also argues that a conflict of interest exists between those class members in states that prohibit the waiver of future malpractice claims and those class members in states that lack such a prohibition. *See* Am. SA ¶ XXI(F). To address this concern, Class Counsel has agreed to revise this provision." Paragraph XXI(F) of the Second Amended Settlement addresses that concern by excluding Class Counsel from the waiver of future claims: "No Person shall have any claim against the Class Representatives. Further, no person shall have any claim against the NCAA, the NCAA's Counsel, the Program Administrator, the Notice Administrator, the Special Master, the Medical Science Committee or the Released Persons or their agents based on administration of the Settlement substantially in accordance with the terms of the Agreement or any order of the Court or any appellate court."

III.  **RELEASE AND WAIVER**

By preserving potential single-school, single-sport class claims, the Second Amended Settlement comports with this Court's analysis of class claims in the Order. Specifically, the Settlement Class releases "any and all claims, actions, causes of action, rights, demands, suits, debts, liens, contracts, agreements, offsets or liabilities brought or pursued on a class-wide basis (other than claims pursued on behalf of a class of persons who allege personal injuries or bodily injuries resulting from their participation in a single NCAA-sanctioned sport at a single-NCAA

---

[19] Order at 52 (footnote omitted).

member school, and relating to concussions or sub-concussive hits or contact)…."[20] As shown below, any broader class could not obtain class certification.

In the Order, this Court explained that "a putative class consisting of student-athletes from more than one NCAA-affiliated school is unlikely to satisfy the requirements of Rule 23(b)(3)."[21] But this Court also ruled that it could not "conclude from the present record that a very narrowly defined, single-school personal injury class could never be certified against the NCAA."[22] As this Court explained, a single-sport, single-school class might be certified:

> Perhaps there is a putative personal injury class that a potential plaintiff could allege--limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied--that might be appropriate for certification under Rule 23(b)(3).[23]

This Court also stated that "the scope of the release of class-wide personal injury claims must be limited to those instances where the plaintiffs or claimants seek a nationwide class or where the proposed class is comprised of student-athletes from more than one NCAA-affiliated school."[24]

Plaintiffs respectfully submit that the proposed release of class-wide claims properly preserves only single-school, single-sport classes, i.e., classes "limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied…."[25] A class action for multiple sports at a single school could not satisfy Rule 23 requirements, because proof of liability on a class-wide

---

[20] Sec. Am. SA, ¶ II(RR) (emphasis added). The scope of the release of class-wide claims is reflected in several other provisions of the Second Amended Settlement. *Id*., ¶¶ XII(C)(1)(l); XV(A)(7); XV(A)(12).

[21] Order at 28.

[22] *Id*. at 29.

[23] *Id*. at 29.

[24] Order at 45 (footnote omitted).

[25] Order at 29.

basis would depend on extensive proof unique to each sport, so that a plaintiff who played one sport could not adequately represent the personal-injury interests of athletes who played other sports, even at the same school. In particular, liability for personal injury on a class-wide basis would depend on the actions of at least five actors: (1) the NCAA; (2) the school; (3) the coaches for each sport; (4) the medical personnel for each sport; and (5) the trainers for each sport. The last three categories differ for each sport.

Proof of liability, therefore, depends on a careful examination of practices *for each sport*. As this Court explained, the need to examine the actions of each sport's coaching staff makes certification of a multi-sport class problematic:

> [A]ssume that the NCAA adopted satisfactory standards, the school adopted them, but the coaching staff or medical staff at the school did not follow them. Or, assume that the NCAA did not adopt any standards, and the school likewise had no standards, but the coaching staff in a particular sport decided to implement concussion standards during the tenure of a particular head coach or athletic director…. Consider too that each sport at each school had different coaches during different periods of time, who may or may not have instituted their own concussion management protocols, and that the pre-college, college, and post-college concussion history of the individual class members may differ and one begins to appreciate the myriad individual issues of causation and injury that would overshadow any common ones.[26]

Those considerations would preclude certification of a multi-sport class, even at a single school. Courts usually deny motions for class certification in personal injury cases, for a variety of reasons.[27] And courts that have certified classes for personal-injury claims have done so only for liability to the entire class, leaving causation or damages or both for individualized consider-

---

[26] Order at 24 (footnote omitted).

[27] *See In re Rhone-Poulenc Rorer Inc*., 51 F.3d 1293 (7th Cir. 1995) (reversing certification of multi-state liability class, where standards of proof of liability varied state by state). *See also* Table of Authorities Denying Certification of a Personal Injury Class, Appendix A.

- 9 -

ation.[28] So in those cases, the class representative's proof of liability necessarily proves liability to *all* class members, leaving only individual issues of causation and damages.[29]

In contrast, proof of liability for personal injuries suffered by athletes in one sport at a single school would *not* establish liability for such injuries suffered by athletes in other sports at that school. For example, a class representative who plays football would seek to establish liability for personal injuries on behalf of a class of football players by focusing not only on the actions of the NCAA and the school but also on the football coaches, trainers, and medical personnel. The conduct of coaches, medical personnel, and trainers in other sports would be irrelevant to the football players' claims for personal injuries. Thus, proving liability for the football players would not establish liability towards athletes in other sports for personal injuries.

As a result, a multi-sport class could not be certified, because the personal-injury claim of an athlete in one sport would not be typical of such claims by athletes in other sports. In an analogous case, *Swan v. Bd. of Educ. of Chicago*, 2013 U.S. Dist. LEXIS 112867 (N.D. Ill. Aug. 9, 2013), the plaintiffs asked this Court to delay the closure of three schools their children attended but also the closure of 46 other schools. But this Court ruled that "Plaintiffs have failed to satisfy the commonality, typicality, and adequacy of representation requirements of Rule 23(a)." *Id*. at *4. In particular, this Court explained that to "satisfy Rule 23(a)(3) typicality, 'there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group.'" *Id*. at *41 (citation omitted). This Court then explained that the plaintiffs failed to satisfy typicality:

---

[28] *See, e.g.*, *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 135 (E.D. La. 2013) (certifying class for personal injuries, because "BP's liability for the spill will thus drive the resolution of each Class Member's case," with damages to be determined individually).

[29] *See also Butler v. Sears, Roebuck & Co*., 727 F.3d 796, 801 (7th Cir. 2013) ("There is a single, central, common issue of liability: whether the Sears washing machine was defective.").

- 10 -

> Plaintiffs fail to satisfy the typicality and adequacy elements for a number of reasons. First, although the proposed class includes "the parents and all minor children with IEPs in the over 50 designated receiving or welcoming schools," none of the named Plaintiffs have children who attend the receiving schools. What is more, Plaintiffs have offered no evidence that the claims of students in receiving schools are typical of those in the closing schools or that their interests are sufficiently aligned so that they would be adequately represented by Plaintiffs.

*Id*. at *41-42. Similarly, an athlete from one sport could not establish that the claims relating to that sport are sufficiently aligned with the interests of athletes in other sports, given the different evidence that would potentially establish liability for each sport.

And common questions would not predominate for a multi-sport class. As the Seventh Circuit has explained, "[t]o determine whether common questions predominate . . . the court must look only so far as to determine whether . . . common evidence could suffice to make out a prima facie case for the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). But here, the evidence of the steps undertaken for the various sports is not common. Proof of actions by the NCAA and the school would not make out a prima facie case for participants in any sport, because the actions of each sport's coaches, medical personnel, and trainers are unique to that sport. So key questions of liability (not just causation of damages) are not common for participants in different sports, precluding certification of a multi-sport class. As the Seventh Circuit has ruled, "*[i]f the issues of liability are genuinely common issues*, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler*, 727 F.3d at 801 (emphasis added).[30]

---

[30] *See also Tamas v. Family Video Movie Club, Inc*., 2013 U.S. Dist. LEXIS 114130, at *28 (N.D. Ill. Aug. 13, 2015) (denying class certification, because "even if [plaintiff] can show that the majority of the tasks that *she* performed were non-managerial in nature, her experience may vastly differ from that of a salaried SM or MIT at another store in Illinois") (footnote omitted);

- 11 -

Finally, subclasses cannot be used to allow an athlete from one sport to represent the interests of athletes from different sports. In the Seventh Circuit, subclasses must meet all the class action requirements, and each subclass must be represented by a member of that subclass. *See Culver v. City of Milwaukee*, 277 F.3d 908, 912 (7th Cir. 2002) ("Culver might … be an adequate representative of the subclass to which he belongs, and the lawyer for the class might be able to interest a member of the other subclass in becoming the representative of that subclass."); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993) ("Subclasses must satisfy the class action requirements before they may be certified.").

Therefore, it is proper for the Second Amended Settlement to preclude any Class Member who does not opt out from filing a personal-injury class action on behalf of persons who played different sports, even at the same school as the plaintiff.[31]

---

*Smith v. Family Video Movie Club, Inc.*, 2013 U.S. Dist. LEXIS 54512, at *35 (N.D. Ill. Apr. 15, 2013) ("the location and manager-dependent nature of the remainder of Plaintiffs' claims destroys Rule 23(b)(3) predominance" so that the plaintiffs could not show that "common issues *predominate* the individualized inquiries that would be necessary" as to liability)

[31] On May 17, 2016, Edelson PC and other law firms filed six personal-injury class actions for football players who allegedly suffered concussions and related injuries over a period of several decades. Those class actions would be permissible under the release provisions of the Second Amended Settlement, but they present a multitude of problems for class certification that would be compounded many times over if an individual athlete were allowed to seek class certification for athletes in multiple sports, even at a single school. The plaintiffs in those cases contend that each and every football player who played at a school for decades suffered concussion-related damages. For example, in *Herman v. Southeastern Conference, et al*, Case No. 2:16-at-00572 (E.D. Cal.), the plaintiff sued on behalf of a class defined as "[a]ll individuals who participated in University of Georgia's varsity football program between 1952 and 2010." Complaint, ¶ 85. The complaint alleges that the class of former players "now suffer from neurological and cognitive damage, including symptoms of traumatic encephalopathy." *Id*., ¶ 8. That case (and the five other putative class actions, which make similar claims for different schools) presents daunting obstacles to class certification, given the decades-long scope of the class and the fact that the named plaintiff only played for a few years at most during the class period, such as: (1) when did the duty of care arise for each defendant; (2) what duty of care was owed throughout the class period; (3) what actions were taken by each defendant during that time period; (4) what actions were taken by the multitude of different coaches, medical personnel, and trainers over the decades; and (5) how the plaintiff can prove that each and every football player for decades suffered concussion-related injuries. Given those insurmountable problems for class actions limited to a single sport, the Second Amended Settlement properly releases all class actions for multiple sports, even at a single school.

- 12 -

## IV. THE COURT SHOULD SET SETTLEMENT DEADLINES

In connection with preliminary approval of the Second Amended Settlement, the Parties recommend that the Court schedule the following dates:

| Date | Event |
| --- | --- |
| Within 5 Days of Preliminary Approval | Settlement website established and basic Settlement documents posted. |
| Within 15 Days of Preliminary Approval | Letter sent to NCAA member institutions requesting Settlement Class Member contact information, Publication Notice published, call center established, notice via social media begins, XXX-day Claim Period begins. |
| Within 180 days of Preliminary Approval | Due date for Plaintiffs' Class Counsel's papers in support of final approval of the Settlement, including a declaration of proof of mailing and publishing notice, and papers in support of the request for an award of attorneys' fees and expenses. |
| Within 208 Days of Preliminary Approval | Due date for postmark or delivery of requests for exclusion. Due date for delivery and filing of objections and intents to appear at the Fairness Hearing. |
| Within 229 Days of Preliminary Approval | Due date to file reply papers, if any, in support of final approval of the Settlement and request for an award of attorneys' fees and expenses. |
| Within seven days before the Fairness Hearing | Due date for filing of declarations of Class Action Settlement Administrator and Settlement Notice Administrator. |
| On or after 229 days after Preliminary Approval | Fairness Hearing. |

## V. CONCLUSION

Plaintiffs respectfully request that the Motion be granted and the Court enter an order: (i) conditionally certifying the Settlement Class, the Contact Sport Settlement Subclass, and the Non-Contact Sport Settlement Subclass; (ii) granting Preliminary Approval of the Second

- 13 -

Amended Settlement; (iii) establishing the deadlines reflected above; and (iv) setting a date and time for a Fairness Hearing; and (v) directing that Notice be provided to the Class.

Date: May 20, 2016                    Respectfully submitted,

By: */s/ Steve W. Berman*
    Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
Thomas E. Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

*Lead and Settlement Class Counsel*

- 15 -

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on May 20, 2016, a true and correct copy of the foregoing document was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

By: /s/ Steve W. Berman
Steve W. Berman