**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Document Relates to All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

**MEMORANDUM OF THE NCAA IN FURTHER SUPPORT OF
THE JOINT MOTION FOR PRELIMINARY APPROVAL OF SECOND
AMENDED CLASS SETTLEMENT AND CERTIFICATION OF
<u>SETTLEMENT CLASS AND SETTLEMENT SUBCLASSES</u>**

May 20, 2016

Mark S. Mester
  mark.mester@lw.com
Johanna M. Spellman
  johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

J. Christian Word
  christian.word@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................1

II.  FACTUAL BACKGROUND ....................................................................3

     A.   The NCAA.......................................................................................3

          1.   Committee On Competitive Safeguards And The Medical Aspects Of Sports ("CSMAS") ..............................................4

          2.   Play Rules Oversight Panel ("PROP") ...................................5

          3.   Individual Sport Committees ..................................................5

          4.   NCAA Concussion Guidance And Concussion Management Plan Legislation..............................................7

     B.   Role Of Coaching And Sports Medicine Personnel .................8

     C.   Different Individuals Serve As Coaches And Trainers For <u>Each</u> Different Sport At <u>Each</u> Member Institution ......................10

     D.   The Vast Majority Of Student-Athletes Who Sustain A Concussion Recover Fully Within A Short Period Of Time....................12

III. ARGUMENT ............................................................................................16

     A.   A Single-School / Multi-Sport Bodily Injury Class Could Not Satisfy The Predominance Requirement..............................17

     B.   A Putative Single-School / Multi-Sport Bodily Injury Class Of Student-Athletes From A Single NCAA Member School Could Not Satisfy Numerosity ..............................................22

     C.   The Creation Of Subclasses Would Not Solve The Numerosity Problem And Would Only Add To The Manageability Problems ....................26

IV.  CONCLUSION .........................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Amchem Prods., Inc. v. Windsor,
   521 U.S. 591 (1997)........................................................................17

Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee,
   616 F.2d 305 (7th Cir. 1980)........................................................2

Blaz v. Galen Hosp. Ill., Inc.,
   168 F.R.D. 621 (N.D. Ill. 1996) ...................................................21

Block v. First Blood Assocs.,
   125 F.R.D. 39 (S.D.N.Y. 1989)...................................................24

Boykin v. Georgia-Pacific Corp.,
   706 F.2d 1384 (5th Cir. 1983).....................................................24

CL-Alexanders Laing & Cruickshank v. Goldfeld,
   127 F.R.D. 454 (S.D.N.Y. 1989).................................................24

Clay v. Am. Tobacco Co.,
   188 F.R.D. 483 (S.D. Ill. 1999) ..................................................18

Commonwealth of P. R. v. M/V Emily S.,
   158 F.R.D. 9 (D.P.R. 1994)........................................................21

Danis v. USN Commc'ns, Inc.,
   189 F.R.D. 391 (N.D. Ill. 1999) ......................................23, 24, 27

Gen. Tel. Co. of the Nw. v. EEOC,
   446 U.S. 318 (1980)...........................................................22, 23

Guillory v. Am. Tobacco Co.,
   2001 WL 290603 (N.D. Ill. 2001) ......................................17, 22

Humphrey v. Int'l Paper,
   2003 WL 22111093 (N.D. Ill. 2003) ..........................................24

Ikonen v. Hartz Mountain Corp.,
   122 F.R.D. 258 (S.D. Cal. 1988) ...............................................23

In re AT&T Mobility Wireless Data Serv. Litig.,
   270 F.R.D. 330 (N.D. Ill. 2010) ..................................................2

In re Fosamax Prods. Liab. Litig.,
   248 F.R.D. 389 (S.D.N.Y. 2008).................................................17

ii

**Page(s)**

Insolia v. Philip Morris, Inc.,
 186 F.R.D. 535 (W.D. Wis. 1998) ........................................................................ 18, 26

Johnson v. Meriter Health Servs. Emp. Ret. Plan,
 702 F.3d 364 (7th Cir. 2012) .................................................................................... 26

Kaufman v. Am. Express Travel Related Serv. Co., Inc.,
 264 F.R.D. 438 (N.D. Ill. 2009) ................................................................................. 2

Lyne v. Arthur Andersen & Co.,
 1991 WL 247576 (N.D. Ill. 1991) ............................................................................. 24

Mays v. Tenn. Valley Auth.,
 274 F.R.D. 614 (E.D. Tenn. 2011) ............................................................................ 24

Miller v. Motorola, Inc.,
 76 F.R.D. 516 (N.D. Ill. 1977) .................................................................................. 24

Mulvania v. Sheriff of Rock Island Cty.,
 2012 WL 3486133 (C.D. Ill. 2012) ..................................................................... 23, 25

Peoples v. Sebring Capital Corp.,
 2002 WL 406979 (N.D. Ill. 2002) ...................................................................... 23, 27

Pruitt v. City of Chi.,
 472 F.3d 925 (7th Cir. 2006) .................................................................................... 23

Retired Chi. Police Ass'n v. City of Chi.,
 7 F.3d 584 (7th Cir. 1993) .................................................................................. 18, 26

Rivera v. Grossinger Autoplex, Inc.,
 2000 WL 1280904 (N.D. Ill. 2000) .......................................................................... 22

Rodriguez v. Vill. of Montgomery,
 2009 WL 310893 (N.D. Ill. 2009) ....................................................................... 24, 25

Sanft v. Winnebago Indus., Inc.,
 214 F.R.D. 514 (N.D. Iowa 2003) ............................................................................. 24

Shields v. Local 705, Int'l Bhd. of Teamsters,
 1996 WL 616548 (N.D. Ill. 1996) ............................................................................. 26

Smith v. Nike Retail Servs., Inc.,
 234 F.R.D. 648 (N.D. Ill. 2006) ............................................................................... 23

State Sec. Ins. Co. v. Frank B. Hall & Co., Inc.,
 95 F.R.D. 496 (N.D. Ill. 1982) ................................................................................. 23

**Page(s)**

## OTHER AUTHORITIES

Alexander Persoskie, et al., Association of Cancer Worry and Perceived Risk
  with Doctor Avoidance:  An Analysis of Information Avoidance in a Nationally
  Representative U.S. Sample, 37 J. BEHAVIORAL MED. 977 (2014)...........................................16

Alzheimer's Ass'n, 2015 Alzheimer's Disease Facts and Figures,
  11 ALZHEIMER'S & DEMENTIA 332 (2015) .............................................................................14

Bart Swinnen & Wim Robberecht, The Phenotypic Variability of Amyotrophic
  Lateral Sclerosis, 10 NATURE REV. NEUROLOGY 661 (2014) ...................................................14

Jennifer M. Taber, et al., Why Do People Avoid Medical Care? A Qualitative
  Study Using National Data, 30 J. GEN. INTERNAL MED. 290 (2014).........................................16

Jorge R. Barrio, et al., In Vivo Characterization of Chronic Traumatic
  Encephalopathy Using [F-18] FDDNP PET Brain Imaging,
  112 Proceedings of the National Academy of Sciences E2039 (2015) ...................................15

Joseph C. Maroon, et al., Chronic Traumatic Encephalopathy in Contact Sports:
  A Systematic Review of All Reported Pathological Cases, 10 PLOS ONE 1 (2015) ...............15

Michael McCrea, et al., Acute Effects and Recovery Time Following
  Concussion in Collegiate Football Players: The NCAA Concussion Study,
  290 J. AM. MED. ASS'N 2556 (2003) .....................................................................................13

Michael McCrea, et al., An Integrated Review of Recovery After Mild
  Traumatic Brain Injury (MTBI): Implications for Clinical Management,
  23 THE CLINICAL NEUROPSYCHOLOGIST 1368 (2009) .............................................................13

Michael McCrea, et al., Incidence, Clinical Course, and Predictors of Prolonged
  Recovery Time Following Sport-Related Concussion in High School and
  College Athletes, 19 J. INT'L NEUROPSYCHOLOGY SOC'Y 22 (2013) .......................................13

Michael McCrea, et al., Standard Regression-Based Methods for Measuring Recovery
  After Sport-Related Concussion, 11 J. INT'L NEUROPSYCHOLOGICAL SOC'Y 58 (2005)...........13

Paul McCrory, et al., What Is the Evidence for Chronic Concussion-Related
  Changes in Retired Athletes:  Behavioural, Pathological and Clinical Outcomes?,
  47 BRITISH. J. SPORTS MED. 327 (2013) .................................................................................14

Stephen L. Ristevedt & Kathryn M. Trinkaus, Psychological Factors Related to Delay in
  Consultation for Cancer Symptoms, 14 PSYCHOONCOLOGY 339 (2005).................................16

Tamara Pringsheim, et al., The Prevalence of Parkinson's Disease:  A Systematic
  Review and Meta-Analysis, 29 MOVEMENT DISORDERS 1583 (2014) .....................................14

Teri R. Thomsen & Robert L. Rodnitzky, Juvenile Parkinsonism:  Epidemiology,
  Diagnosis and Treatment, 24 CNS DRUGS 467 (2010)...........................................................14

**Page(s)**

Viji D. Kannan & Peter J. Veazie, <u>Predictors of Avoiding Medical Care
and Reasons for Avoidance Behavior</u>, 52 MED. CARE 336 (2014) .........................................16

**RULES**

Fed. R. Civ. P. 23 .......................................................................................................................2, 16

Defendant National Collegiate Athletic Association ("NCAA") respectfully submits the following Memorandum in Support of the Joint Motion for Preliminary Approval of Second Amended Class Settlement and Certification of Settlement Class and Settlement Subclasses, which motion is being filed with the Court on May 20, 2016.[1]

## I.     INTRODUCTION

In its January 26, 2016 Memorandum Opinion and Order, the Court determined that the Amended Settlement Agreement filed by the Parties on April 14, 2015 was within the range of possible approval and that it would approve the proposed settlement, subject to several proposed modifications.  See Mem. Op. and Order (Dkt. #246) at 53.  Those modifications included limiting the scope of the class waiver for bodily injury claims "to those instances where the plaintiffs or claimants seek a nationwide class or where the proposed class is comprised of student-athletes from more than one NCAA-affiliated school."  Id. at 45.  Conversely, the Court concluded that based upon the limited record before it at the time, single-school / single-sport and single-school / multi-sport classes could conceivably be feasible, though the Court acknowledged a number of issues that those classes could face as well.  See id.

Since January, the Parties and their counsel have expended a good deal of time and effort addressing the issues raised by the Court and have agreed to the changes set forth in the Court's January 26, 2016 Memorandum Opinion and Order, with one proposed modification.  On April 29, 2016, the Parties and counsel for Lead Objector Anthony Nichols ("Nichols") participated in mediation before the Hon. Wayne R. Andersen (Ret.).  Through mediation, the Parties and

---

[1]     Capitalized terms have the meaning ascribed to them in the Second Amended Settlement Agreement, which is Exhibit 1 to the joint motion for preliminary approval filed with the Court on May 20, 2016.  See Second Am. Settlement Agt. (Dkt. #266-1).  The NCAA understands that Class Counsel are submitting a separate memorandum in support of the joint motion for preliminary approval.  See Pl.'s Mem. in Supp. of Joint Mot. (Dkt. #267).  This memorandum addresses the proposed modifications to the class waiver and, in particular, the feasibility of single-school / multi-sport classes.  See disc. infra at 17-27.

counsel for Nichols agreed to modify the Settlement's release of bodily injury class claims so that personal injury or bodily injury claims may be pursued on behalf of a class of persons who played a single NCAA-sanctioned sport at a single NCAA member school.  See Second Am. Settlement Agt. (Dkt. #266-1) at ¶ II(RR).[2]  Settlement Class Members would, in turn, release the right to bring single-school / multi-sport bodily injury claims on a class basis.  See id.

As set forth below, the Second Amended Settlement Agreement, with its modified class waiver, is well within the range of possible approval, such that it is appropriate to provide notice of the proposed settlement to class members so that they can have an opportunity to react to the settlement terms.  See, e.g., In re AT&T Mobility Wireless Data Serv. Litig., 270 F.R.D. 330, 346 (N.D. Ill. 2010) (citing, inter alia, Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee, 616 F.2d 305, 314 (7th Cir. 1980)); Kaufman v. Am. Express Travel Related Serv. Co., Inc., 264 F.R.D. 438, 447 (N.D. Ill. 2009) (same).  A multi-sport bodily injury class action brought on behalf of student-athletes from a single NCAA member school could not be properly certified for the reasons discussed below, and thus, the procedural right to bring single-school / multi-sport bodily injury class claims is of minimal (if any) value.

More specifically, a single-school / multi-sport bodily injury class would be too broad to be certified and could not satisfy the predominance requirement of Fed. R. Civ. P. 23.  See Fed. R. Civ. P. 23(b)(3).  Moreover, even at the NCAA member institutions with the largest numbers

---

[2]     Throughout this case, the NCAA has contested the viability of bodily injury class claims.  See, e.g., NCAA Mem. (Dkt. #222) at 17-26.  Consistent with that position, the NCAA believes that single-school / single-sport bodily injury claims could not properly be certified for class treatment.  It was agreed during the aforementioned mediation, however, that the NCAA would not address in this submission the certifiability of such claims.  The NCAA nevertheless reserves the right to argue in future submissions that single-school / single-sport bodily injury claims are not appropriate for class treatment, including, but not limited to, in response to any objections to the Second Amended Settlement Agreement, in briefing any appeal related to the Second Amended Settlement Agreement and/or in any single-school / single-sport bodily injury class cases that may be filed.

of student-athletes, a proposed class of student-athletes who (1) suffered a documented concussion in or after 2002 while participating in an NCAA athletic event and (2) thereafter received a documented diagnosis of a concussion-related injury would simply fail to meet the numerosity requirement of Fed. R. Civ. P. 23(a)(1). See Nichols' Mem. (Dkt. #201) at 1 (defining proposed bodily injury class).[3] Accordingly, the NCAA has joined the joint motion for preliminary approval and respectfully requests that the Court grant preliminary approval of the Second Amended Settlement Agreement. See disc. infra at 27.

## II. FACTUAL BACKGROUND

The factual background for this submission is set forth below.[4] See disc. infra at 3-16.

### A. The NCAA

The NCAA is an unincorporated association of more than 1,200 colleges, universities, conferences, affiliated associations and other institutions. See NCAA Const., Ex. 1, § 4.02.1. Of its members, approximately 1,100 are colleges and universities.[5] The NCAA's governance structure consists of numerous committees composed of representatives from member institutions. See NCAA Mem. (Dkt. #222) at 3. For decades, the NCAA, through its various committees, has published guidance on the evaluation of concussions and has taken numerous steps intended to reduce the risk of concussion and head injury for participants in college sports. See disc. infra at 7-8.

---

[3]    The foregoing definition of a proposed class is derived (as noted) from the submission Nichols and his counsel made to the Court on July 15, 2015. See Nichols' Mem. (Dkt. #201) at 1 (defining proposed bodily injury class). But see NCAA Mem. (Dkt. #222) at 1-2.

[4]    The NCAA otherwise incorporates by reference the factual background set forth in its September 14, 2015 Response to Nichols' July 15, 2015 submission. See NCAA Mem. (Dkt. #222) at 3-7.

[5]    See NCAA, About the NCAA, www.ncaa.org/about (last visited May 13, 2016).

### 1. Committee On Competitive Safeguards And The Medical Aspects Of Sports ("CSMAS")[6]

CSMAS and its Sports Science and Safety Subcommittee sponsor research on health and safety issues, promote education to enhance student-athlete health and safety and monitor injury trends.[7] Because each sport presents its own unique health and safety risks, however, CSMAS and the Sports Science and Safety Subcommittee largely address health and safety issues on a sport-by-sport basis. See, e.g., Ex. 2, NCAA00001690 at 1690-91 (recommending that money be allocated for study of "the issue of increasingly 'livelier' bats and their effect on injury" in baseball and softball); id. at 1694-95 (addressing issues of acute weight loss and skin infections in wrestling); Ex. 3, NCAA00014396 at 4399-400 (addressing injury prevention methods for athletes who play ice hockey, softball, and field hockey respectively).

Over the years, CSMAS and the Sports Science and Safety Subcommittee have addressed the potential risks of head injuries and concussions, and as with other health and safety issues, they largely have done so on a sport-by-sport basis. See, e.g., Ex. 4, NCAA10117813 at 7818 (noting CSMAS supported development of concussion safety DVD "focused on educating student-athletes and coaches in the sport of football"); Ex. 2, NCAA00001690 at 1695 (discussing rules modifications allowing "for optional use of 'soft' head protection in" women's lacrosse and field hockey); Ex. 3, NCAA00014396 at 4399 (discussing concussion prevention points of emphasis to be addressed in upcoming meeting with ice hockey coaches); id. at 4400 (considering rule to mandate that softball catchers wear helmets).

---

[6] CSMAS consists of 22 members and must include, among others, athletic directors, physicians, student-athletes and medical experts. See NCAA, Committee on Competitive Safeguards and Medical Aspects of Sports, www.ncaa.org/governance/committees/committee-competitive-safeguards-and-medical-aspects-sports (last visited May 13, 2016).

[7] See NCAA, Committee on Competitive Safeguards and Medical Aspects of Sports, supra note 6.

## 2. Play Rules Oversight Panel ("PROP")

PROP is another NCAA committee that provides guidance to member institutions on health and safety issues. See NCAA Const., Ex. 1, § 21.1.1. Its duties include overseeing the NCAA committees for individual sports, monitoring playing rules maintained outside the NCAA and reviewing playing rules changes. See id. § 21.1.4-5. At times, PROP considers rules that bear on student-athlete health and safety. See, e.g., Ex. 5, NCAA00009785 at 9786 (approving football rule change making illegal use of wedge formation on kicking plays); see also Ex. 6, NCAA10145748 at 5749 (noting blocking schemes with more than two players shoulder-to-shoulder on kick plays are illegal). When it does, however, it does so on a sport-by-sport basis, further reflecting the heterogenity of the various sports as well as the rules that govern them. See, e.g., Ex. 7, NCAA10153603 at 3606 ("The Panel reviewed . . . the long term vision for reviewing proper equipment and new technology relating to a three-quarter shield" in men's ice hockey.).[8]

## 3. Individual Sport Committees

In addition to CSMAS and PROP, each NCAA sport has its own committee.[9] The individual sport committees address issues that bear on student-athlete safety. For example, sport committees consider whether changes regarding equipment required for a particular sport may reduce the risk of certain injuries posed by participation in that sport.[10] They also consider

---

[8]  See also, e.g., Ex. 8, Greg Johnson, Panel Approves Rule Adjustments: Changes Set in Swimming and Diving, Softball, Track, Wrestling, NCAA (July 19, 2011) (highlighting PROP's approval of changes to the "carding structure" in women's lacrosse to "encourage safer play" and to ensure compliant helmets are worn in pole vaulting).

[9]  See, e.g., NCAA, NCAA Sports & Playing Rules Committee Rosters, http://www.ncaa.org/ governance/committees/ncaa-sports-playing-rules-committee-rosters (last visited May 13, 2016) (listing Committees and Rules Committees for each sport).

[10]  See, e.g., Ex. 8, Johnson, Panel Approves Rule Adjustments, supra note 8 (noting that PROP approved a rule change recommended by the Men's and Women's Track and Field Committee to ensure

(continued...)

whether changes to rules may reduce the risk of injury.[11]  As one might expect, however, the

playing rules adopted by each committee reflect the <u>different</u> types of risks inherent in <u>different</u>

sports.[12]

      Over the past several decades, various sport committees of the NCAA have considered

the particular risks of head injury and concussion in their particular sports and have implemented

rule changes designed to reduce the risk of head injury in those sports.  Such changes include the

following:

- In 1970, the Football Rules Committee banned "spearing," defined as "the deliberate and malicious use of the head and helmet in an attempt to punish a runner after his momentum has stopped."  <u>See</u> Ex. 6, NCAA10145748.

---

(…continued)
that any helmet worn is "specifically designed for pole vault competition and manufactured to comply with American Society for Testing and Materials standards").

[11]  <u>See</u>, <u>e.g.</u>, Ex. 8, Greg Johnson, <u>Basketball Rules Committees Address Court Surface Issues</u>, NCAA (May 14, 2012), http://www.ncaa.org/about/resources/media-center/news/basketball-rules-committees-address-court-surface-issues (last visited May 13, 2016) ("[T]he Men's and Women's Basketball Rules Committees are recommending a rules change that requires the court to be 'of a consistent surface' so student-athlete safety is not compromised."); Ex. 9, Johnson, <u>Panel Approves Rule Adjustments</u>, <u>supra</u> note 8 (PROP approving "significant changes to the carding structure for players and coaches in women's lacrosse" because the "NCAA Women's Lacrosse Rules Committee believes this will encourage safer play").

[12]  <u>See</u>, <u>e.g.</u>, Ex. 10, NCAA10039554 at 9593 (listing football rules changes throughout the years and stating that "coaches are reminded to instruct their players not to initiate contact with any part of their helmets, including the face mask.  In addition, players should be encouraged not to intentionally strike opponents in the head"); Ex. 11, NCAA00010402 at 479 (defining prohibited dangerous play in soccer to include "lowering the head to a position level with or below the waist in an effort to head the ball in the presence of an oncoming player"); Ex. 12, NCAA00011093 at 1190 (noting one of most serious fouls in water polo occurs when player throws elbow or head back into an opposing player); Ex. 13, NCAA10044528 at 4584, 4586-87 (lacrosse rules prohibiting body checking from the rear at or below the waist, body checking above the neck and recklessly swinging a crosse at an opponent); Ex. 14, NCAA10150339 at 413-14 (ice hockey playing rules forbidding slashing, swinging, or stabbing the stick at opponents); <u>see also</u> Ex. 15, NCAA10148981 at 8993-94 (listing recent sports rules modifications to minimize the risk of injury in baseball, ice hockey, women's lacrosse, wrestling, and football); Ex. 16, NCAA00017591 at 7681-86 (2011-12 Sports Medicine Handbook Guideline 3a:  Protective Equipment, identifying different mandatory protective equipment for different sports).

- In 1976, that same committee enacted a rule "eliminat[ing] the head and face as a primary and initial contact area for blocking and tackling." See Ex. 17, NCAA00007876.

- In 1995, the Ice Hockey Rules Committee enacted a rule change to reduce hitting from behind and contact with the head. Id.

- In 2005, the Football Rules Committee revised the football spearing rule to impose a penalty for striking another player with a helmet (regardless of intent) making it easier for officials to enforce the rule. See Ex. 5, NCAA10145748 at 5749.

- For the 2007-2008 season, the Football Rules Committee added a point of emphasis highlighting that helmet-to-helmet contact is never legal, nor is any other blow directed toward an opponent's head. See Ex. 18, NCAA00007933.

### 4. NCAA Concussion Guidance And Concussion Management Plan Legislation

In addition to sport-specific measures, the NCAA has provided guidance to member institutions on concussion management. As set forth in the NCAA's September 14, 2015 Submission, CSMAS publishes a Sports Medicine Handbook, which includes concussion guidelines. See NCAA Mem. (Dkt. #222) at 6 n.6. As medical evidence regarding the causes and effects of concussions evolved, however, the NCAA amended the concussion guidelines in the Sports Medicine Handbook in 1994, 1997, 2004 and 2009. See id. at 6.

In 2010, the legislative bodies for each NCAA division also enacted legislation requiring member institutions to have a concussion management plan, mandating that student-athletes who exhibit symptoms associated with a concussion be removed from competition or practice and be evaluated by a healthcare provider with experience in evaluating concussions. See NCAA Mem. (Dkt. #222) at 7. As specified in the policy, student-athletes diagnosed with a concussion should not return to play the same day or before they are cleared by a team physician or his or her designee. See id. Primary responsibility, however, for implementation of the required concussion management plans and the overall health and safety of student-athletes remains as

always with the NCAA's member institutions and with the specific coaches, trainers and physicians employed by and affiliated with those individual institutions.  See disc. infra at 8-12.

### B.    Role Of Coaching And Sports Medicine Personnel

The NCAA Constitution is clear that each member institution is directly responsible for conducting its athletic programs "in a manner designed to protect and enhance the physical and educational well-being of student-athletes."  See NCAA Const., Ex. 1, § 2.2.  Although NCAA committees provide guidance on issues relating to health and safety, ultimately "[i]t is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes."  Id. § 2.2.3.  "The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself and by the conference(s), if any, of which it is a member."  Id. § 6.01.1.

The role of individual coaches and medical personnel in carrying out this responsibility is both critical and central.  See, e.g., Ex. 19, NCAA10013391 at 3400 (2011-12 NCAA Football Rules stating "[c]oaches and medical personnel should exercise caution in the treatment of a student-athlete who exhibits signs of a concussion"); Ex. 3, NCAA00014396 at 4399 (discussing action items for meeting with ice hockey coaches and noting that points for emphasis included eye injuries, face masks' role in injuries, helmets' and mouthguards' roles in concussion prevention, and "variables to be measured to determine aggressive play"); Solomon Dep., Ex. 20, at 82:2-83:10 (Plaintiff Solomon testifying that team doctor attended home games and athletic trainer attended practices and travelled with the team).

For <u>each</u> sport at <u>each</u> member institution, the coach and his or her coaching staff are responsible for ensuring compliance with NCAA rules and guidelines.[13]  Moreover, the coach and his or her coaching staff at each member institution set the tone for how issues concerning student-athlete safety and health will be addressed.[14]  Coaches determine what drills are run in practices, instruct players in contact sports how to engage in contact with opposing players, direct players on how aggressively to play, decide who will play in games and in what position and, due to their frequent interactions with their players, are in the best position to hear complaints from players who believe they have suffered injury.  <u>See</u>, <u>e.g.</u>, Fourth Am. Compl. (Dkt. #171) ¶ 26 (alleging that football coaches at Eastern Illinois University instructed players to "'play hard and play fast' without regard to safety, and that those who did not play in that

---

[13]    <u>See</u>, <u>e.g.</u>, Ex. 21, NCAA00009075 (2011-12 NCAA Football Points of Emphasis "emphasiz[ing] that coaches and officials must be diligent to insure that players understand and abide by these rules"); Ex. 22, NCAA10070084 at 92 (2009 NCAA Women's Lacrosse Rules Book, Points of Emphasis requesting that "players, officials and coaches concentrate" on "dangerous checks and slashing" and "strict enforcement of the rules that prohibit" stick-to-body or body-to-stick contact); Ex. 23, NCAA10045052 at 5059 (2011-12 NCAA Baseball Rules Book, Points of Emphasis "direct[ing] coaches and umpires to adhere to these rules without exception").

[14]    <u>See</u>, <u>e.g.</u>, Ex. 19, NCAA10013391 at 401 (2011-12 NCAA Football Rules, stating that "[t]he rules committee reminds head coaches of their responsibility for the behavior of their players before and after, as well as during, the game"); <u>id.</u> at 402 (setting forth "Coaching Ethics" that bar coaching of "intentional roughing," and including on list of unethical practices "[u]sing the football helmet as a weapon"); Fourth Am. Compl. (Dkt. #171) ¶ 57 (alleging that trainer encouraged soccer player to participate in practice despite concussion symptoms because player should not "make the coach mad").  The pleadings in the individual bodily injury actions that have been filed against the NCAA further illustrate the central role allegations regarding a particular coach's attitude towards player health and safety will play in adjudicating <u>any</u> bodily injury claims.  <u>See</u>, <u>e.g.</u>, Ex. 24, Pl.'s Opp. to "Frostburg Defendants" Mot. to Dismiss (Dkt. #46) at 9-10, <u>Sheely v. NCAA</u>, No. 380569-V (Cir. Ct., Montgomery Cty., Md.) (alleging that head football coach wrote, developed and implemented team policies that "made clear that injured players, like Derek Sheely, should play through the pain, rather than report possibly life-threatening injuries to coaches and medical staff"); Ex. 25, Compl. (Dkt. #1) ¶ 60, <u>Schmitz v. NCAA</u>, No. CV 14 834486 (Ohio Ct. Com. Pl.) ("If a player failed to continue to participate or otherwise failed to abide by the coaches' instructions, the player risked his place on the Notre Dame football team, his scholarship, and his contractual rights to attend classes at Notre Dame."); Ex. 26, Compl. (Dkt. #1) ¶ 89, <u>Bradley v. NCAA</u>, No. 14-0006580 (Super. Ct., D.C.) (alleging that head field hockey coach "establish[ed] a 'win at all costs' environment at AU").

manner would be summarily cut"); id. ¶¶ 56-57 (alleging that the Ouachita Baptist University women's soccer coach "made [Palacios] participate in running drills" after Palacios alerted the coach that she continued to suffer from concussion symptoms).[15]

### C. Different Individuals Serve As Coaches And Trainers For Each Different Sport At Each Member Institution

With very limited exceptions, different athletic teams have different coaches at all NCAA member institutions. See Mishkin Rpt., Ex. B, at 5. Currently, more than 80% of coaches coach only one sport. See id. Fewer than 20% of coaches coach more than one non-contact sport, and approximately one-half of individuals who coach two sports coach combinations of track and field and cross-country programs, across men's and women's programs. See id. Less than 1% of coaches coach one contact sport and one or more non-contact sports. See id.[16] Less than .5% of coaches coach two contact sports, and none coach more than two contact sports. See id.

---

[15]    See also, e.g., Ex. 24, Pl.'s Opp. to "Frostburg Defendants" Mot. to Dismiss (Dkt. #46) at 9-10, Sheely v. NCAA, No. 380569-V (Cir. Ct., Montgomery Cty., Md.) ("With regard to Coach Rogish, in particular, his conduct on the practice field will be considered in light of his role as the head coach in charge of his assistant coaches, which likely includes, but [is] not limited to, the implementation and approval of all drills and techniques his assistant coaches teach."); Ex. 25, Compl. (Dkt. #1) ¶ 58, Schmitz v. NCAA, No. CV 14 834486 (Ohio Ct. Com. Pl.) ("[T]he Notre Dame coaching staff accepted, praised, and rewarded tackling and blocking techniques that involved the use of the helmeted head against opposing players and teammates."); Ex. 27, Compl. (Dkt. #1) ¶ 105, Walen v. Portland State Univ., No. 14CV12218 (Cir. Ct. Or.) (alleging that plaintiff's "concussion prompted the athletic coaches to essentially assume a surrogate-parent relationship"); Ex. 28, Compl. (Dkt. #1) ¶ 10, Zegel v. NCAA, No. 2015-5804 (Pa. Ct. Com. Pl.) (alleging Dartmouth's football coaches instructed players to "participate in helmet-to-helmet contact during Oklahoma drills" and directed players "return to play and practice" even "[a]fter exhibiting symptoms of concussions in practices or games").

[16]    All of the individuals who coach two contact sports coach some combination of field hockey, lacrosse and soccer. See Mishkin Rpt., Ex. B, at 5. Only one individual coaches football and a second sport, and that second sport is men's golf (a non-contact sport). See id.

Member institutions also typically employ athletic trainers who are often dedicated to a single sport or several sports, and many member institutions employ team physicians.[17] These individuals, however, each play a key role in the treatment of concussions. See, e.g., Ex. 29, OWENS_UCA200000038 (University of Central Arkansas concussion management policy providing that "[t]he UCA Team Physician will have full discretion on disqualifying a student-athlete for the season or career."); Solomon Dep., Ex. 20, at 83:11-85:21 (Plaintiff Solomon testifying that he hit his head and lost consciousness during a college hockey game, was treated by his team trainer and returned to play in the same game); Palacios Dep., Ex. 30, at 13:5-14:21 (Plaintiff Palacios testifying that a student trainer told her she could resume running at soccer practice four days after sustaining a concussion); Ex. 16, NCAA00017591 at 7593 (2011-12 Sports Medicine Handbook stating that "[t]hese general guidelines are not intended to supersede

---

[17]    See, e.g., Athletic Training – Important Information for Student Athletes, BOWDOIN COLLEGE, http://athletics.bowdoin.edu/information/at/index (last visited May 15, 2016) (specifying sports for which individual athletic trainers provide coverage); Sports Medicine Staff, NW. UNIV. ATHLETICS, http://www.nusports.com/sports/2015/3/18/GEN_20140101108.aspx (last visited May 15, 2016) (same); Sports Medicine Staff, UNIV. OF TX. ATHLETICS, http://www.texassports.com/sports/2015/9/1/GEN_0901151930.aspx?id=648 (last visited May 15, 2016) (same); Wake Forest Sports Medicine, WAKE FOREST UNIV. ATHLETICS, http://www.wakeforestsports.com/sportsmedicine/staff.html (last visited May 15, 2016) (same); Sports Medicine, UNIV. OF TENN. ATHLETICS, http://www.utsports.com/inside-ut/sports-medicine.html (last visited May 15, 2016) (same); Athletic Training Staff, UNIV. OF S. CAL. ATHLETICS, http://www.usctrojans.com/ot/usc-ath-medicine-staff.html (last visited May 15, 2016) (same); Staff Athletic Trainers, FLA. STATE UNIV. SPORTS MED., https://fsusportsmedicine.com/staff-athletic-trainers/ (last visited May 15, 2016) (same); Sports Medicine Staff, UNIV. OF NOTRE DAME, http://performance.nd.edu/sports-medicine/staff/ (last visited May 15, 2016) (same); Athletic Training, STANFORD UNIV. SPORTS MED., http://www.stanfordsportsmedicine.com/athletic-training/ (last visited May 15, 2016) (specifying sports for which individual athletic trainers provide coverage and identifying multiple team physicians); Sports Medicine Staff, GEORGETOWN UNIV. ATHLETICS, http://www.guhoyas.com/ot/sportsmed-staff.html (last visited May 15, 2016) (same); Sports Medicine Staff Directory, UNIV. OF GA. ATHLETICS, http://www.georgiadogs.com/genrel/071210aad.html (last visited May 15, 2016) (same); GT Athletics Sports Medicine Staff, GA. INST. OF TECH. ATHLETICS, http://www.ramblinwreck.com/sportsmedicine/staff.html (last visited May 15, 2016) (identifying both athletic trainers and team physicians dedicated to specific sports); Sports Medicine, UNIV. OF N.C. ATHLETICS, http://www.goheels.com/ViewArticle.dbml?SPID=108097&DB_OEM_ID=3350&ATCLID=205496399 (last visited May 15, 2016) (listing team physicians dedicated to specific sports); Sports Medicine Team Physicians, MICH. STATE UNIV. ATHLETIC TRAINING, http://athletictraining.msu.edu/people/physicians.html (last visited May 15, 2016) (same).

the exercise of medical judgment in specific situations by a member institution's sports medicine staff"). Indeed, the allegations in the individual bodily injury cases pending against the NCAA demonstrate that questions regarding the conduct of team physicians and team trainers would be important to resolving almost all individual bodily injury claims.[18]

### D. The Vast Majority Of Student-Athletes Who Sustain A Concussion Recover Fully Within A Short Period Of Time

Even in contact sports, many participants in NCAA-sanctioned sports do not experience a concussion during their college careers. See Mishkin Rpt., Ex. B, at 4. In fact, the vast majority of NCAA student-athletes never experience a concussion. See id. Concussion rates vary, however, by sport. Men's wrestling has the highest rate, with an average of 7.38 concussions per 100 participants per season. See id. Football, the largest sport by count, has a lower concussion rate of 3.62%. See id. Concussion rates for other contact sports range between 1.69% and 6.71%. See id. Non-contact sports have concussion rates between 0% and 2.88%. See id.

---

[18] See, e.g., Ex. 26, Compl. (Dkt. #1) ¶¶ 84-86, Bradley v. NCAA, No. 14-0006580 (Super. Ct., D.C.) (alleging that the team physician for field hockey was "responsible for the safety of the student-athletes at AU participating on the field hockey team"); Ex. 31, Third Am. Compl. (Dkt. #226) ¶ 57, Sheely v. NCAA, No. 380569-V (Montgomery Cty. Cir. Ct., Md.) (alleging that "Defendant Sweitzer was the [football] team's primary athletic trainer and was responsible for overseeing the care provided to Derek"); Ex. 27, Compl. (Dkt. #1) ¶ 10, Walen v. Portland State Univ., No. 14CV12218 (Cir. Ct. Or.) (naming head athletic trainer for Portland State University football team as defendant); Ex. 32, Compl. (Dkt. #2) ¶ 36, Whalley v. Stetson Univ., No. 2015-11600 CIDL (Cir. Ct. Fla.) (alleging that "coaches and trainers, knew the Plaintiff sustained a head injury in which she suffered symptoms . . . and cleared the Plaintiff to continue playing"); Ex. 28, Compl. (Dkt. #1) ¶ 10, Zegel v. NCAA, No. 2015-5804 (Pa. Ct. Com. Pl.) (alleging that "on multiple occasions, after hits to the head, Mr. Risha exhibited symptoms of concussions . . . [that] were or should have been noticed by Dartmouth's football coaching and training staff").

Those student-athletes who do sustain concussions may experience symptoms such as headaches, blurred vision, dizziness and concentration or memory problems. See Bailes Decl., Ex. C, ¶ 9.[19] With rest, however, almost all concussion symptoms self-resolve in seven days. See id.[20] More specifically, research suggests that approximately 90% of concussions resolve within one week of injury. See id.[21] For those athletes who do experience lingering symptoms, sometimes referred to as post-concussion syndrome ("PCS"), the majority of those cases resolve spontaneously or with standard medical therapy and rest, and only a small fraction continue to experience symptoms months after injury. See id.[22] Thus, the vast majority of student-athletes who sustain concussions have no likelihood of sustaining long-term effects from concussion. See id.[23]

---

[19]    See also, e.g., Michael McCrea, et al., An Integrated Review of Recovery After Mild Traumatic Brain Injury (MTBI): Implications for Clinical Management, 23 THE CLINICAL NEUROPSYCHOLOGIST 1368, 1370 (2009).

[20]    See also, e.g., Michael McCrea, et al., Standard Regression-Based Methods for Measuring Recovery After Sport-Related Concussion, 11 J. INT'L NEUROPSYCHOLOGICAL SOC'Y 58, 65 (2005) ("Less than 5% of injured athletes reported higher-than-base rate postconcussive symptoms by day 7 postinjury . . . ."); Michael McCrea, et al., Acute Effects and Recovery Time Following Concussion in Collegiate Football Players: The NCAA Concussion Study, 290 J. AM. MED. ASS'N 2556, 2561 (2003) ("[A]pproximately 10% of players in this study required more than a week for symptoms to fully resolve.").

[21]    See also, e.g., Michael McCrea, et al., Incidence, Clinical Course, and Predictors of Prolonged Recovery Time Following Sport-Related Concussion in High School and College Athletes, 19 J. INT'L NEUROPSYCHOLOGY SOC'Y 22, 30 (2013) ("In our study sample, 10% of injured athletes exhibited postconcussive symptoms that persisted beyond the typical seven day window of recovery commonly reported in group studies."); McCrea, Acute Effects, supra note 20, at 2561.

[22]    See also, e.g., McCrea, Incidence, Clinical Course, and Predictors, supra note 21, at 30 ("Nearly a quarter of those athletes who failed to meet the criteria of recovery within 1 week (2.3% of the total injured sample) continued to report elevated symptoms 6 to 12 weeks post-injury."); id. (noting "there were no statistically significant deficits that persisted on objective neuropsychological or postural stability testing, suggesting that functional impairment 2-3 months following concussion is likely minimal" and "no evidence of residual impairments on performance based measures of cognitive functioning and balance 45-90 days after concussion").

[23]    See also, id.

Although in recent years some have posited the existence of possible links between concussions and long-term medical conditions such as chronic neurocognitive impairment, amyotrophic lateral sclerosis ("ALS"), Parkinsonism, Alzheimer's disease, dementia and chronic traumatic encephalopathy ("CTE"), there is continued debate within the scientific community concerning the role of concussions and subsequent concussive or sub-concussive impacts and the risks of neurodegeneration. See Bailes Decl., Ex. C, at ¶ 10. The requisite exposure, genetic predisposition, prevalence, incidence and natural history are not yet completely understood medically or epidemiologically. See id.[24] The incidence, prevalence, risk and mechanisms by which such conditions occur are not fully understood, however, and remain the source of considerable debate. See id.[25] Further, these conditions are largely diseases of the elderly and would be extremely rare in any single-school bodily injury class composed of student-athletes who played an NCAA-sanctioned sport in or after 2002, the earliest year in which it has been

---

[24]    See also, e.g., Paul McCrory, et al., What Is the Evidence for Chronic Concussion-Related Changes in Retired Athletes: Behavioural, Pathological and Clinical Outcomes?, 47 BRITISH. J. SPORTS MED. 327, at p.4 (2013) ("At present, the interpretation of causation in the modern CTE case studies should proceed cautiously. The causal assumptions require further prospective or longitudinal studies on the topic.").

[25]    The most significant cause of chronic neurocognitive impairment is dementia, which has several different types, including Alzheimer's disease, vascular dementia, diabetes dementia and Pick's disease. See Bailes Decl., Ex. C, ¶ 10. Dementia, however, can have many causes, including genetics, stroke and diabetes, and the cause of many types of dementia is unknown. See id. The causes of ALS are also unknown, but certain gene variations appear to increase the risk of ALS. See id.; see also, e.g., Bart Swinnen & Wim Robberecht, The Phenotypic Variability of Amyotrophic Lateral Sclerosis, 10 NATURE REV. NEUROLOGY 661, 662-63 (2014). Likewise, the causes of Parkinsonism are unknown, but some researchers believe it results from genetic mutations or interactions between genetic and environmental factors. See Bailes Decl., Ex. C, ¶ 10; see also, e.g., Tamara Pringsheim, et al., The Prevalence of Parkinson's Disease: A Systematic Review and Meta-Analysis, 29 MOVEMENT DISORDERS 1583, 1583 (2014); Teri R. Thomsen & Robert L. Rodnitzky, Juvenile Parkinsonism: Epidemiology, Diagnosis and Treatment, 24 CNS DRUGS 467, 469-72 (2010). As with dementia, ALS and Parkinson's, the causes of Alzheimer's disease are unknown. See Bailes Decl., Ex. C, ¶ 10. It is believed that Alzheimer's develops as a result of multiple factors rather than a single cause. See id.; see also, e.g., Alzheimer's Ass'n, 2015 Alzheimer's Disease Facts and Figures, 11 ALZHEIMER'S & DEMENTIA 332, 336 (2015). Risk factors include: genetic mutations; age; moderate traumatic brain injury (defined as loss of consciousness or amnesia that lasts more than 30 minutes); cardiovascular disease risk factors such as smoking, obesity and diabetes; level of education; and level of social and cognitive engagement. See Bailes Decl., Ex. C, ¶ 10.

alleged that a concussion management "consensus" emerged, as student-athletes who graduated from college in 2002 and were in their early twenties at the time of graduation would be in their mid-to-late thirties today.  See id.; Nichols Mem. (Dkt. #201) at 7-10.[26]

Although CTE has been observed in the brains of 42 individuals who played for the National Football League, CTE has only been diagnosed in nine people who played football in college but did not go on to play after college.  See Bailes Decl., Ex. C, at ¶ 11.[27]  Those individuals were diagnosed pathologically.  While research is ongoing to identify CTE in living individuals, currently a definitive diagnosis is only made by autopsy.  See id.[28]

In short, an extremely small percentage of student-athletes who sustain concussions would possibly go on to suffer prolonged and intractable PCS or could be theoretically predisposed to develop chronic neurocognitive impairment, ALS, Parkinsonism, Alzheimer's disease, dementia or CTE.  See Bailes Decl., Ex. C, at ¶¶ 9-11.  Moreover, out of that very small percentage, by no means would every individual have a "documented diagnosis," as it is well established that a significant proportion of the U.S. population avoids seeking medical care, even

---

[26]    As set forth in the NCAA's September 14, 2015 submission, the NCAA maintains that there was no "consensus" for concussion management in 2002 or in the years immediately following.  See NCAA Mem. (Dkt. #222) at 7-8.  That date is nevertheless being used for this analysis simply to demonstrate why a single-school / multi-sport class would not be feasible, even if the claims of Nichols and his counsel were to be fully credited regarding the date on which a consensus emerged.  See disc. infra at 22-26.

[27]    See Joseph C. Maroon, et al., Chronic Traumatic Encephalopathy in Contact Sports: A Systematic Review of All Reported Pathological Cases, 10 PLoS ONE, at pp. 1, 4 (2015).

[28]    See, e.g., Jorge R. Barrio, et al., In Vivo Characterization of Chronic Traumatic Encephalopathy Using [F-18]FDDNP PET Brain Imaging, 112 Proceedings of the National Academy of Sciences E2039, E2039 (2015) ("As with most neurodegenerative diseases, clinical diagnosis remains elusive due to the lack of specificity of CTE clinical symptomatology criteria, and histopathological examination of brain at autopsy is the most definitive diagnostic modality.").

when they acknowledge that doing so may be necessary.  See id. at ¶ 12.[29]  This is true even for

"individuals with major health problems or who are experiencing symptoms."  See id.[30]

## III.   ARGUMENT

Any analysis of whether the NCAA breached an alleged duty to student-athletes would

require examining the NCAA's acts and/or alleged omissions with respect to participants in

particular sports, as well as the conduct of specific coaches, athletic trainers and team physicians

for each sport at each member school.  See disc. supra at 8-15.  As a result, a multi-sport bodily

injury class composed of student-athletes from a single NCAA member institution could not

satisfy predominance.  See disc. infra at 17-22; see also Fed. R. Civ. P. 23(b)(3).  In addition, to

obtain class certification, plaintiffs seeking to pursue bodily injury claims on behalf of student-

athletes across multiple sports at a single NCAA member school would have to show that their

proposed class "is so numerous that joinder of all members is impracticable[.]"  Fed. R. Civ. P.

23(a)(1); see also disc. infra at 23-24.  A bodily injury class consisting of student-athletes from a

single NCAA member school, however, would fail this test as well.  See disc. infra at 26-27.

---

[29]    See, e.g., Jennifer M. Taber, et al., Why Do People Avoid Medical Care?  A Qualitative Study Using
National Data, 30 J. GEN. INTERNAL MED. 290, 290 (2014) ("[N]early one-third of respondents in a
recent national United States (U.S.) survey reported avoiding the doctor."); Alexander Persoskie, et al.,
Association of Cancer Worry and Perceived Risk with Doctor Avoidance: An Analysis of Information
Avoidance in a Nationally Representative U.S. Sample, 37 J. BEHAVIORAL MED. 977, 981 (2014)
(finding that 40.4% of respondents under age 50 reported avoiding their doctor even when they
suspected they should); Viji D. Kannan & Peter J. Veazie, Predictors of Avoiding Medical Care and
Reasons for Avoidance Behavior, 52 MED. CARE 336, 336 (2014) (noting "proportion of Americans
forgoing or delaying needed medical care rose considerably from 2003 (14%) to 2007 (20%)"); id. at 344
(finding that although "[m]oney and time are the primary policy targets of delay related to access to
care" -- e.g., the Patient Protection and Affordable Care Act -- "the most frequent responses for not
seeking care were cognitive reasons").

[30]    See, e.g., Taber, supra note 29, at 290; Stephen L. Ristevedt & Kathryn M. Trinkaus, Psychological
Factors Related to Delay in Consultation for Cancer Symptoms, 14 PSYCHONCOLOGY 339, 346 (2005)
(in study of patients diagnosed with rectal tumors, 17.5% wait one year or more after symptom onset
before seeking medical consultation, and some individuals waited up to five years).

## A. A Single-School / Multi-Sport Bodily Injury Class Could Not Satisfy The Predominance Requirement

A bodily injury class consisting of student-athletes who played multiple sports at a single member school would be too broad, as the Court posited in its January 26, 2016 Order. See Mem. Op. and Order (Dkt. #246) at 29 (finding it likely that a bodily injury class would have to be "limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied" to have any chance of being certified). Determining whether the NCAA breached its alleged duty to student-athletes at a particular school would require examination of myriad facts specific to each individual sport. See, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997) ("Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard."). Among other things, one would need to assess what the NCAA knew or should have known regarding the risks of concussion for the particular sport in question. See, e.g., Guillory v. Am. Tobacco Co., 2001 WL 290603, at *6 (N.D. Ill. 2001) ("[P]laintiffs assert that evidence will demonstrate that . . . the defendants knew or should have known that nicotine was addictive."); In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 399 (S.D.N.Y. 2008) ("Proof of negligence will require an assessment of the reasonableness of Merck's actions or omissions in light of what it knew or should have known about the risk of [a certain medical condition] at the particular time that each class member used Fosamax.").

A court would also need to evaluate the actions the NCAA took or allegedly failed to take in response to the concussion risk posed by each particular sport. See, e.g., Amchem, 521 U.S. at 623 (noting that the predominance "inquiry trains on the legal or factual questions that qualify

17

each class member's case as genuine controversy"). For example, the NCAA's decision to require softball catchers to wear helmets arguably has bearing on its conduct vis-à-vis concussion risks to softball players, but it has no relevance whatsoever to whether or not the NCAA breached an alleged duty owed to football players or participants in any other sport. See Ex. 33, NCAA00010613 at 658 (2012-13 Softball Rule 3.8.2, "[t]he catcher is required to wear a protective helmet while receiving pitches in a game"). Likewise, the NCAA's decision to add a point of emphasis to football rules highlighting that helmet-to-helmet contact is never legal is arguably relevant to whether or not the NCAA breached an alleged duty owed to football players, but it has no relevance to its conduct vis-à-vis softball players or participants in other sports. See Ex. 18, NCAA00007933 (poster aimed at student-athletes explaining football rule prohibiting striking an opponent with a helmet). See also Retired Chi. Police Ass'n v. City of Chi., 7 F.3d 584, 597 (7th Cir. 1993) (affirming denial of class certification "[b]ecause the RCPA does not include individuals from all of the fund groups and there is no indication that each of these groups was treated identically by the City or by its respective fund"); Clay v. Am. Tobacco Co., 188 F.R.D. 483, 492 (S.D. Ill. 1999) ("[A]ll members of the proposed class were not subjected to the same advertising and that advertising did not have a similar effect on all members."); Insolia v. Philip Morris, Inc., 186 F.R.D. 535, 545 (W.D. Wis. 1998) ("[A]ll members of the proposed class were not subject to the same allegedly unlawful statements and these statements did not affect class members equally.").

As set forth above, the NCAA acts through its various committees, and when NCAA committees have considered issues related to the risk of head injury and concussion, they have largely done so in the context of particular sports. See, e.g., Ex. 34, NCAA10138894 at 8900 (considering whether scientific evidence supported use of headgear to reduce incidence of

18

concussions in soccer); Ex. 35, NCAA00015869 (encouraging member institutions to show football players and coaches a video on spearing in football and to place posters regarding the same "in visible areas of the football facility"); Ex. 2, NCAA00001690 at 1693-95 (making different recommendations for reducing head injuries in football, ice hockey, women's lacrosse and women's field hockey); see also disc. supra at 4-7.

Although some claimants may argue that the NCAA breached its duty to student-athletes in all sports by failing to implement mandatory, uniform concussion management practices applicable to all sports, the record shows that the NCAA took numerous sport-specific actions to protect student-athletes from risk of head injury and concussions over the years. See disc. supra at 4-7. In defending against bodily injury claims, the NCAA would thus present evidence of those actions to establish that far from breaching any alleged duty, the NCAA carefully considered concussion risks to participants in particular sports and took appropriate steps and provided appropriate guidance to reduce those risks, with close consideration of the particular risks posed by different sports. See, e.g., Ex. 2, NCAA00001690 at 1693 (1996 Sports Sciences Safety Subcommittee of CSMAS discussing concussions and considering if mandatory mouthguard use in football could help reduce concussions in the sport).

In addition and as the record in Arrington further demonstrates, the conduct of coaches, athletic trainers and team doctors would be central to adjudicating each individual's bodily injury claim. See, e.g., Fourth Am. Compl. (Dkt. #171) ¶ 26 (alleging that football coaches failed to coach Plaintiff Arrington on how to make safer tackles and instead conveyed the message to "'play fast and hard' without regard to safety"); id. ¶ 24 (alleging that after Plaintiff Arrington sustained concussions during college football games, the "team doctor told Arrington he could return to play the very next day"). Plaintiff Palacios testified that her coach ordered her to run at

soccer practice while she was still experiencing concussion symptoms, in violation of her

school's return-to-play policy. See Palacios Dep., Ex. 30, at 71:1-11, 73:12-20, 139:2-140:14.

Plaintiff Arrington likewise testified that his coach failed to take seriously a hard hit he sustained

during a football game and allowed him to stay in the game. See Arrington Dep., Ex. 36, at

45:14-47:13. Plaintiff Owens testified that his football coach told him he should attend

voluntary summer practices before his freshman year. See Owens Dep., Ex. 37, at 62:22-63:16.

Owens further alleges that he suffered a concussion at one such practice. See id. at 21:15-18.

No coaches, trainers or physician were present, however, and Owens was not evaluated for a

concussion. See id. at 63:17-19, 300:18-25. Plaintiff Solomon testified that when he told a

trainer about his concussion symptoms after a hockey game, the trainer told him to go home and

rest and did not advise him to see a doctor. See Solomon Dep., Ex. 20, at 87:21-89:7.

Indeed, out of the 13 individual bodily injury actions that have been filed against the

NCAA, four name the plaintiff's head coach, assistant coach, athletic trainer and/or team

physician as defendants.[31] In addition, four cases involve allegations that the plaintiff's head

coach, assistant coach and/or athletic trainer knew or should have known that the plaintiff may

have sustained a concussion.[32]

---

[31]    See Ex. 26, Compl. (Dkt. #1), Bradley v. NCAA, No. 14-0006580 (D.C. Super. Ct.) (naming the
team physician for field hockey as a defendant); Ex. 38, Compl. (Dkt. #1), Calderone v. Molloy Coll.,
No. 14-706987 (N.Y. Sup. Ct.) (naming head men's soccer coach as defendant); Ex. 31, Third Am.
Compl. (Dkt. #226), Sheely v. NCAA, No. 380569-V (Md. Cir. Ct.) (naming head football coach,
assistant football coach and primary football team trainer as defendants); Ex. 27, Compl. (Dkt. #1), Walen
v. Portland State Univ., No. 14CV12218 (Cir. Ct. Or.) (naming head football coach and head athletic
trainer as defendants).

[32]    See Ex. 26, Compl. (Dkt. #1) ¶ 100, Bradley v. NCAA, No. 14-0006580 (D.C. Super. Ct. (alleging
that plaintiff informed both the head field hockey coach and the head trainer of the field hockey team
"about her [concussion] symptoms and discussed the matter extensively"); Ex. 25, Compl. (Dkt. #1) ¶ 62,
Schmitz v. NCAA, No. CV 14 834486 (Ohio Ct. Com. Pl.) ("At no time, however, were the symptoms
that Steve Schmitz demonstrated recognized by the Notre Dame coaching staff as an injury that should be
monitored, treated, or even acknowledged."); Ex. 32, Compl. (Dkt. #2) ¶ 36, Whalley v. NCAA,

(continued…)

Accordingly, adjudication of each individual's claims would require examination of the degree of alleged negligence between the NCAA and that plaintiff's coaches, athletic trainers and treating physicians. See, e.g., Blaz v. Galen Hosp. Ill., Inc., 168 F.R.D. 621, 625 (N.D. Ill. 1996) (denying class certification of medical malpractice and negligence claims "due to the potentially wide variations in individuals treatments, circumstances and effects"); see also Commonwealth of P. R. v. M/V Emily S., 158 F.R.D. 9, 14 (D.P.R. 1994) (typicality lacking where "any injuries would be dependent upon the numerous variables present, including such matters as personal susceptibility to harm, and degree, nature and duration of exposure. No such claim can truly be 'typical'"). Even if a member institution had a concussion policy that was intended to apply uniformly to all sports at the time of a plaintiff's alleged injury, the policy would be implemented by different coaches, trainers and physicians for each different athletic team and sport. See Mishkin Rpt., Ex. B, at 5; see also disc. supra at 8-12.

These differences, however, create myriad individualized issues, such as how a coach responded to player reports of concussion symptoms, whether a coach enforced rules regarding required equipment during practices, whether a coach encouraged players to play recklessly, whether a coach, trainer or physician followed his or her school's concussion management program and whether a trainer or physician cleared a student-athlete to return to play too soon.[33]

---

(…continued)
No. 2015-11600 CIDL (Cir. Ct. Fla.) (alleging that "coaches and trainers, knew the Plaintiff sustained a head injury in which she suffered symptoms . . . and cleared the Plaintiff to continue playing"); Ex. 28, Compl. (Dkt. #1) ¶ 10, Zegel v. NCAA, No. 2015-5804 (Pa. Ct. Com. Pl.) (alleging that "on multiple occasions, after hits to the head, Mr. Risha exhibited symptoms of concussions . . . [that] were or should have been noticed by Dartmouth's football coaching and training staff").

[33] See, e.g., Ex. 31, Third Am. Compl. (Dkt. #226) ¶¶ 43-55, Sheely v. NCAA, No. 380569-V (Cir. Ct., Montgomery Cty., Md.) (alleging defendant head and assistant football coaches directed players to engage in "out of control" and "extremely dangerous" drills); Ex. 26, Compl. (Dkt. #1) ¶¶ 88-89, Bradley v. NCAA, No. 14-0006580 (D.C. Super. Ct.) (alleging field hockey head coach and field hockey athletic trainer "failed to implement and enforce a proper concussion management plan"); id. ¶¶ 100-105 (alleging
(continued…)

The involvement of different coaches, trainers and doctors would, therefore, present "a multitude of potential permutations regarding whether the NCAA breached a duty to protect its athletes and caused any particular plaintiff injury," in which individualized issues would predominate over any purported common questions across sports. See Mem. Op. and Order (Dkt. #246) at 25; see also, e.g., Guillory, 2001 WL 290603, at *7 (class treatment inappropriate where adjudication of claims would require "individual inquiries about each class member").[34]

### B. A Putative Single-School / Multi-Sport Bodily Injury Class Of Student-Athletes From A Single NCAA Member School Could Not Satisfy Numerosity

Although courts have recognized that "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations," (Gen. Tel. Co. of the Nw. v. EEOC, 446 U.S. 318, 330 (1980)), "a small number [of class members] militates against certification" (Rivera v. Grossinger Autoplex, Inc., 2000 WL 1280904, at *3 (N.D. Ill. 2000)). In general, courts have held that a class should consist of at least 40 members

---

(…continued)

plaintiff continued to participate in field hockey games after reporting concussion symptoms to coach and athletic trainer); Ex. 25, Compl. (Dkt. #1) ¶ 57, Schmitz v. NCAA, No. CV 14 834486 (Ohio Ct. Com. Pl.) (alleging that the Notre Dame coaching staff "never at any time discouraged players from leading with their helmets when tackling and blocking"); Ex. 32, Compl. (Dkt. #2) ¶ 36, Whalley v. NCAA, No. 2015-11600 CIDL (Cir. Ct. Fla.) (alleging "coaches and trainers, knew the Plaintiff sustained a head injury . . . and cleared the Plaintiff to continue playing in all three conference games while experiencing symptoms"); Ex. 28, Compl. (Dkt. #1) ¶ 10, Zegel v. NCAA, No. 2015-5804 (Pa. Ct. Com. Pl.) (alleging football coaches instructed team "to participate in helmet-to-helmet contact during Oklahoma drills"); Ex. 27, Compl. (Dkt. #1) ¶ 3, Walen v. Portland State Univ., No. 14CV12218 (Cir. Ct. Or.) (alleging football coaching staff "blatantly failed to follow PSU's own policies and procedures regarding the identification of concussions and post-concussion management").

[34]    In the instant litigation, the NCAA has pled affirmative defenses that class members' alleged injuries resulted from the intervening conduct of third parties and that Plaintiffs failed to join necessary parties. See NCAA Answer (Dkt. #177) at Aff. Defs. 11, 22. The necessary joinder of coaches, athletic trainers and/or team physicians across multiple sports, however, would obviously create significant manageability problems. See, e.g., Mem. Op. and Order (Dkt. #246) at 27 (highlighting manageability concerns stemming from "third-party complaints against other potentially liable parties, including . . . the trainers and physicians that treated some of the class members"); see also disc. supra at 20 n.31 (listing individual cases against both NCAA and coaches, athletic trainers and/or team physicians).

in order to satisfy numerosity.  See, e.g., Peoples v. Sebring Capital Corp., 2002 WL 406979, at
*3 (N.D. Ill. 2002); see also Pruitt v. City of Chi., 472 F.3d 925, 926-27 (7th Cir. 2006)
(affirming district court ruling that "the proposed class flunked the numerosity requirement"
because "joinder of the fewer than 40 workers" in the class would be practical); Smith v. Nike
Retail Servs., Inc., 234 F.R.D. 648, 659 (N.D. Ill. 2006) ("While there is no magic number that
automatically satisfies numerosity, it is often said that 40 members are enough to make up a
class.") (citations omitted); Mulvania v. Sheriff of Rock Island Cty., 2012 WL 3486133, at *8
(C.D. Ill. 2012) (noting "the general rule that a class of 40 is sufficient to satisfy the numerosity
requirement").

Classes of 20 or fewer members are generally too small to be certified.  See Gen. Tel.,
446 U.S. at 330 ("When judged by the size of the putative class in various cases in which
certification has been denied, this minimum [of 15 people] would be too small to meet the
numerosity requirement.").  "[C]lasses of 20-40 may or may not be big enough depending on the
circumstances of each case . . . ."  Sebring Capital, 2002 WL 406979, at *3 (quoting Ikonen v.
Hartz Mountain Corp., 122 F.R.D. 258, 262 (S.D. Cal. 1988)); see also Danis v. USN
Commc'ns, Inc., 189 F.R.D. 391, 399 (N.D. Ill. 1999) ("Certification of classes containing less
than twenty-five members is generally not permitted absent special circumstances."); State Sec.
Ins. Co. v. Frank B. Hall & Co., Inc., 95 F.R.D. 496, 498-99 (N.D. Ill. 1982) (holding putative
class of between 28 and 40 members "is at best in the lower reaches of Rule 23 permissibility")
(emphasis in original); Mulvania, 2012 WL 3486133, at *8 (holding numerosity requirement not
met with "an estimated number of class members of approximately 29 individuals").

Further, courts in this circuit routinely hold that a class of fewer than 25 members fails to
satisfy numerosity.  See, e.g., Rodriguez v. Vill. of Montgomery, 2009 WL 310893, at *2 (N.D.

23

Ill. 2009) ("[T]here are, at most, twenty potential class members . . . and the actual number is probably less. This is insufficient to establish the requisite numerosity."); Miller v. Motorola, Inc., 76 F.R.D. 516, 518 (N.D. Ill. 1977) ("20 aggrieved persons in a class are not so numerous as to make joinder impracticable."); Humphrey v. Int'l Paper, 2003 WL 22111093, at *11 (N.D. Ill. 2003) (class of 21 does not satisfy the numerosity requirement); Lyne v. Arthur Andersen & Co., 1991 WL 247576, at *2 (N.D. Ill. 1991) (holding putative class of 18 did not meet numerosity requirement, noting that "[c]ertification of classes containing less than 25 members is generally not permitted absent special circumstances"); see also Boykin v. Georgia-Pacific Corp., 706 F.2d 1384, 1386 (5th Cir. 1983) (class of 20 would be "much too small to meet the numerosity requirement").[35]

---

[35]   Although classes of 25 or fewer members occasionally have been certified, "in almost all [such] cases, the courts cite[] special circumstances warranting certification despite the small class size." CL-Alexanders Laing & Cruickshank v. Goldfeld, 127 F.R.D. 454, 456 (S.D.N.Y. 1989); see also Rivera, 2000 WL 1280904, at *3 ("Certification of classes containing less than twenty-five members is generally not permitted absent special circumstances."); Danis, 189 F.R.D. at 399 (same); Lyne, 1991 WL 247576, at *2 (same). Those special circumstances generally fall into four categories: (1) employment discrimination suits in which employees may be reluctant to sue their employer; (2) cases seeking injunctive relief in which the relief may benefit individuals outside the class and/or future class members; (3) cases in which class members may be deterred from pursuing an action given the limited value of individual claims; and (4) cases involving wide geographical dispersion of plaintiffs. See CL-Alexanders, 127 F.R.D. at 456; see also Sanft v. Winnebago Indus., Inc., 214 F.R.D. 514, 521-26 (N.D. Iowa 2003) (determining sufficiency of numerosity requirement by considering size of the class, geographical dispersion, identification of class members, financial resources of class members, continued employment of class members, and judicial efficiency). The first three circumstances obviously do not apply here. It is conceivable that a single-school bodily injury class could include geographically dispersed plaintiffs; that factor alone, however, is insufficient to satisfy numerosity for such a small class. See, e.g., Block v. First Blood Assocs., 125 F.R.D. 39, 42 (S.D.N.Y. 1989) (holding numerosity not met for putative class of 24, noting that while "geographical dispersion of potential class members [is] a factor in determining practicality of joinder, such dispersion is not enough to meet Rule 23(a)'s requirement"); cf. Sanft, 214 F.R.D. at 522-26 (holding putative class of 51 members "fail[ed] to meet the numerosity requirement" after weighing "the totality of the circumstances" and finding that while some factors "support[ed] a finding that the numerosity requirement ha[d] been satisfied," those were outweighed by other factors); Mays v. Tenn. Valley Auth., 274 F.R.D. 614, 621 (E.D. Tenn. 2011) ("The joinder inquiry, like that required for the entire class certification inquiry, requires a fact-specific analysis that turns on the unique circumstances of each case and not on a single factor," including "the close geographical proximity of the potential claimants.").

In this instance, a single-school bodily injury class that included participants in all NCAA-sanctioned sports from 2002 to present would almost certainly be too small to certify. Indeed, less than 4% of schools would have putative classes of more than 20 members, and no school would have a putative class of more than 40 members.  See Mishkin Rpt., Ex. B, at 12; see also Rodriguez, 2009 WL 310893, at *2 (holding numerosity not met for class of, at most, 20 members); Mulvania, 2012 WL 3486133, at *8 (holding numerosity requirement not met for a class of 29 members).  The putative bodily injury class at the NCAA member institution with the largest athletic program from 2002 to present would consist of 29 members.  See Mishkin Rpt., Ex. B, at 8, 12.

Further exacerbating the numerosity issue, any proposed class would have to be limited to a "narrow time period during which substantially similar concussion-related practices and policies were consistently applied," which as the Arrington record makes clear, may be as few as one or two years.  See Mem. Op. and Order (Dkt. #246) at 29; id. at 22 (noting that Plaintiff Owens was not administered "baseline testing before his freshman or sophomore football seasons" but was given baseline testing before his junior year season); id. at 23 (noting that Plaintiff Solomon was examined by a team doctor "[b]ut, once the team doctor passed away, the University of Maine did not have a physician to evaluate hockey players for the 2009-2010 season").

In addition, adjudicating whether the NCAA breached a duty to student-athletes would require consideration of the NCAA's concussion guidelines, which have been revised several times. See NCAA Mem. (Dkt. #222) at 6. A finder of fact would have to determine whether the NCAA guidelines in place at the time of a plaintiff's alleged injuries were consistent with the standard of care at the time the injuries occurred. The analysis of claims of student-athletes who allege they were injured before the 2010 concussion management legislation took effect, however, would obviously differ from those who claim they were injured after 2010. See, e.g., Insolia, 186 F.R.D. at 544 (cautioning against class certification "particularly when the claimed injury is tied to a complex course of conduct engaged in by the defendants over a long period of time, as opposed to a single act to which all class members have been exposed equally"). Limiting the class period to 2004 to 2010, however, yields no schools with more than 20 putative class members. See Mishkin Rpt., Ex. B, at 11. Likewise, limiting the class period to 2010 to present yields no schools with more than 20 putative class members. See id.

### C. The Creation Of Subclasses Would Not Solve The Numerosity Problem And Would Only Add To The Manageability Problems

Nor would the creation of subclasses for each sport or each coach or trainer solve the numerosity problems noted above. See disc. supra at 22-25. As the Seventh Circuit has repeatedly made clear, each subclass must independently satisfy the numerosity requirement in order to satisfy Fed. R. Civ. P. 23(a)(1). See, e.g., Johnson v. Meriter Health Servs. Emp. Ret. Plan, 702 F.3d 364, 368 (7th Cir. 2012) (finding no objection to combining claims of several subclasses in a single class action "as long as . . . each subclass otherwise satisfies the requirements for certifying a class"); see also Retired Chi. Police, 7 F.3d at 599 ("Subclasses must satisfy the class action requirements before they may be certified."); Shields v. Local 705, Int'l Bhd. of Teamsters, 1996 WL 616548, at *2 (N.D. Ill. 1996) ("Each of the subclasses must

independently meet the requirements of Rule 23(a)."). And none or virtually none of any such subclasses could do so under the circumstances presented here. <u>See</u> disc. <u>supra</u> at 22-25; <u>see also</u> <u>Sebring Capital</u>, 2002 WL 406979, at *3 (numerosity generally satisfied when class includes 40 members); <u>Danis</u>, 189 F.R.D. at 399 ("Certification of classes containing less than twenty-five members is generally not permitted absent special circumstances.").

Moreover, the creation of subclasses would only add to the manageability problems noted above. <u>See</u> disc. <u>supra</u> at 22 n.34. In fact, creating subclasses would create significant manageability problems, as there could be as many as 36 subclasses for a given school. <u>See</u> Mishkin Rpt., Ex. B, at 12 (noting NCAA member institutions participate in as many as 36 different sports); <u>see also</u> Mem. Op. and Order (Dkt. #246) at 32 n.20 (observing that "creating fifty subclasses would effectively nullify whatever efficiencies would be gained by certification").

## IV.   CONCLUSION

The Court held previously that the proposed settlement "is within the range of possible approval . . . . subject to a number of modifications." Mem. Op. and Order (Dkt. #246) at 3. With one exception, the Parties have incorporated those modifications as set forth in the Court's January 26, 2016 Memorandum Opinion and Order. <u>See</u> disc. <u>supra</u> at 1-2. The sole exception is the proposed change to the scope of the release of bodily injury class claims. For the reasons set forth above, a single-school / multi-sport bodily injury class could not be certified. Thus, as was true of a nationwide bodily injury class, the procedural right to pursue single-school / multi-sport bodily injury class claims "has little, if any, value." Mem. Op. and Order (Dkt. #246) at 28. The NCAA, in turn, respectfully submits that the Second Amended Settlement Agreement is well within the range of possible approval.

WHEREFORE, the NCAA respectfully requests that the Court grant the joint motion for preliminary approval of the Second Amended Class Settlement Agreement.  The NCAA further requests any other relief the Court deems appropriate.

Dated:  May 20, 2016

Respectfully submitted,

/s/ Mark S. Mester
Lead Counsel for Defendant
National Collegiate Athletic Association

Mark S. Mester
  mark.mester@lw.com
Johanna M. Spellman
  johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

J. Christian Word
  christian.word@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

## **CERTIFICATE OF SERVICE**

I, Mark S. Mester, certify that on May 20, 2016, a true and correct copy of the

MEMORANDUM OF THE NCAA IN FURTHER SUPPORT OF THE JOINT MOTION FOR

PRELIMINARY APPROVAL OF SECOND AMENDED CLASS SETTLEMENT AND

CERTIFICATION OF SETTLEMENT CLASS AND SETTLEMENT SUBCLASSES was filed

through the ECF system and served upon the following parties by prepaid first class mail.

Timothy J. McIlwain
McIlwain Professional Building
2020 New Road, 2nd Floor
Linwood, New Jersey 08221
Telephone:  (877) 375-9599
Facsimile:  (609) 450-7017
E-mail:  attorney@mcilwainlaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Edgar D. Gankendorff
PROVOSTY & GANKENDORFF, L.L.C.
650 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone:  (504) 410-2795
Facsimile:  (504) 410-2796

/s/ Mark S. Mester
Mark S. Mester
  mark.mester@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767