**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | ) ) ) ) ) ) ) ) ) ) | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Document Relates to All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

**EXHIBITS TO MEMORANDUM OF THE NCAA IN FURTHER SUPPORT OF THE
JOINT MOTION FOR PRELIMINARY APPROVAL OF SECOND AMENDED CLASS
SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS AND
<u>SETTLEMENT SUBCLASSES</u>**


A.  Declaration of Johanna Spellman

B.  Expert Report of Ross Mishkin of The Claro Group, LLC

C.  Declaration of Dr. Julian E. Bailes

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | ) ) ) ) ) ) ) ) ) | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Document Relates to All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

## DECLARATION OF JOHANNA SPELLMAN

I, Johanna Spellman, declare as follows:

1.          I am an attorney with Latham & Watkins LLP, counsel of record for the National Collegiate Athletic Association ("NCAA").  On July 30, 2014, I was appointed by the Court as Liaison Counsel for the NCAA.  I make this declaration based upon my personal knowledge, and I am competent to testify as to its contents.

## EXHIBITS

1.          Exhibit 1 attached hereto is a true and correct copy of certain excerpts from the NCAA Constitution excerpted from the 2015-16 NCAA Division I Manual.

2.          Exhibit 2 attached hereto is a true and correct copy of the Minutes of the NCAA Sports Science Safety Subcommittee of the Committee on Competitive Safeguards and Medical Aspects of Sports on February 5-6, 1996, produced as NCAA00001690 in Arrington.

3.          Exhibit 3 attached hereto is a true and correct copy of the Minutes of the NCAA Sports Science Safety Subcommittee of the Committee on Competitive Safeguards and Medical Aspects of Sports on January 26-27, 1998, produced as NCAA00014396 in Arrington.

4.      Exhibit 4 attached hereto is a true and correct copy of the Minutes of the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports on June 10-12, 2007, produced as NCAA10117813 in <u>Arrington</u>.

5.      Exhibit 5 attached hereto is a true and correct copy of the Minutes of the NCAA Playing Rules Oversight Panel on April 14, 2010, produced as NCAA00009785 in <u>Arrington</u>.

6.      Exhibit 6 attached hereto is a true and correct copy of the NCAA Football Rules Committee -- Historical Review of Rules Intended to Prevent/Reduce Head Injury, produced as NCAA10145748 in <u>Arrington</u>.

7.      Exhibit 7 attached hereto is a true and correct copy of an excerpt from the Agenda -- NCAA Playing Rules Oversight Panel (February 21, 2013), produced as NCAA10153603 in <u>Arrington</u>.

8.      Exhibit 8 attached hereto is a true and correct copy of Greg Johnson, <u>Panel Approves Rule Adjustments:  Changes Set in Swimming and Diving, Softball, Track, Wrestling</u>, NCAA (July 19, 2011).

9.      Exhibit 9 attached hereto is a true and correct copy of Greg Johnson, <u>Basketball Rules Committees Address Court Surface Issues</u>, NCAA (May 14, 2012), *http://www.ncaa.org/ about/resources/media-center/news/basketball-rules-committees-address-court-surface-issues* (last visited May 13, 2016).

10.      Exhibit 10 attached hereto is a true and correct copy of an excerpt from Football Rules and Interpretations, produced as NCAA10039554 in <u>Arrington</u>.

11.      Exhibit 11 attached hereto is a true and correct copy of an excerpt from the Soccer 2010 and 2011 Rules and Interpretations, produced as NCAA00010402 in <u>Arrington</u>.

12.　　Exhibit 12 attached hereto is a true and correct copy of an excerpt from the Water Polo 2010-12 Rules and Interpretations, produced as NCAA00011093 in <u>Arrington</u>.

13.　　Exhibit 13 attached hereto is a true and correct copy of an excerpt from the Lacrosse 2005 Men's Rules, produced as NCAA10044528 in <u>Arrington</u>.

14.　　Exhibit 14 attached hereto is a true and correct copy of an excerpt from the Ice Hockey 2004 Rules and Interpretations, produced as NCAA10150339 in <u>Arrington</u>.

15.　　Exhibit 15 attached hereto is a true and correct copy of an excerpt from the 2006 Education Services Review: Health and Safety Response, produced as NCAA10148981 in <u>Arrington</u>.

16.　　Exhibit 16 attached hereto is a true and correct copy of an excerpt from the 2011-2012 NCAA Sports Medicine Handbook, produced as NCAA00017591 in <u>Arrington</u>.

17.　　Exhibit 17 attached hereto is a true and correct copy of an NCAA News Archive article entitled "NCAA changes to minimize risk of injury" dated December 10, 2009, produced as NCAA00007876 in <u>Arrington</u>.

18.　　Exhibit 18 attached hereto is a true and correct copy of a flyer entitled "Protect Your Head and Neck," NCAA 2008 Rule Changes, produced as NCAA00007933 in <u>Arrington</u>.

19.　　Exhibit 19 attached hereto is a true and correct copy of an excerpt from the 2011 and 2012 NCAA Football Rules and Interpretations, produced as NCAA10013391 in <u>Arrington</u>.

20.　　Exhibit 20 attached hereto is a true and correct copy of an excerpt from the April 16, 2013 deposition of Plaintiff Kyle Solomon.

21.　　Exhibit 21 attached hereto is a true and correct copy of an excerpt from the 2011 and 2012 NCAA Football Points of Emphasis, produced as NCAA00009075 in <u>Arrington</u>.

22.     Exhibit 22 attached hereto is a true and correct copy of an excerpt from the NCAA Lacrosse 2009 Rules and Interpretations, produced as NCAA10070084 in Arrington.

23.     Exhibit 23 attached hereto is a true and correct copy of an excerpt from the 2011 and 2012 NCAA Baseball Rules, produced as NCAA10045052 in Arrington.

24.     Exhibit 24 attached hereto is a true and correct copy of Plaintiffs' Response In Opposition to "Frostburg Defendants" Motion to Dismiss (Dkt. #46), Sheely v. NCAA et al., Case No. 380569-V (Circuit Court for Montgomery County, Maryland).

25.     Exhibit 25 attached hereto is a true and correct copy of the Complaint (Dkt. #1) filed in the matter of Schmitz v. NCAA, et al., Case No. CV 14 834486 (Court of Common Pleas, Cuyahoga County, Ohio).

26.     Exhibit 26 attached hereto is a true and correct copy of the Complaint (Dkt. #1) filed in the matter of Bradley v. NCAA, et al., Case No. 14-0006580 (Superior Court for the District of Columbia).

27.     Exhibit 27 attached hereto is a true and correct copy of the Complaint (Dkt. #1) filed in the matter of Walen v. Portland State University, et al., Case No. 14CV12218 (Circuit Court of the State of Oregon, County of Multnomah).

28.     Exhibit 28 attached hereto is a true and correct copy of the Complaint (Dkt. #1) filed in the matter of Zegel v. NCAA, et al., Case No. 2015-5804 (Court of Common Pleas of Westmoreland County, Pennsylvania).

29.     Exhibit 29 attached hereto is a true and correct copy of Exhibit No. 5 to the April 23, 2013 deposition of Plaintiff Derek Owens entitled "University of Central Arkansas Concussion Protocol and Management Plan," produced as OWENS_UCA200000038 in Arrington.

30. Exhibit 30 attached hereto is a true and correct copy of certain excerpts from the April 9, 2013 deposition of Plaintiff Angela Palacios.

31. Exhibit 31 attached hereto is a true and correct copy of the Third Amended Complaint (Dkt. #226) filed in the matter of <u>Sheely v. NCAA, et al.</u>, Case No. 380569-V (Circuit Court for Montgomery County, Maryland).

32. Exhibit 32 attached hereto is a true and correct copy of the Complaint (Dkt. #1) filed in the matter of <u>Whalley v. Stetson University, et al.</u>, Case No. 2015-11600 CIDL (Circuit Court of the Seventh Judicial Circuit, Volusia County, Florida).

33. Exhibit 33 attached hereto is a true and correct copy of an excerpt from the NCAA Softball 2012 and 2013 Rules and Interpretations, produced as NCAA00010613 in <u>Arrington</u>.

34. Exhibit 34 is a true and correct copy of the Minutes of the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports on June 8-11, 2006, produced as NCAA10138894 in <u>Arrington</u>.

35. Exhibit 35 attached hereto is a true and correct copy of a Memorandum from Debra Runkle (Chair of the Committee on Competitive Safeguards and Medical Aspects of Sports) to Head Football Coaches regarding "[u]se of the helmet as a weapon & targeting of defenseless players" dated October 7, 2008, produced as NCAA00015869-70 in <u>Arrington</u>.

36. Exhibit 36 attached hereto is a true and correct copy of certain excerpts from the March 14, 2013 deposition of Adrian Arrington.

37. Exhibit 37 attached hereto is a true and correct copy of an excerpt from the April 23, 2013 deposition of Derek Owens.

38.    Exhibit 38 attached hereto is a true and correct copy of the Complaint (Dkt. #1)

filed in the matter of Calderone v. Molloy College, et al., Case No. 14-706987 (Supreme Court

of the State of New York, County of Queens).

I declare under penalty of perjury under the laws of the state of Illinois that the foregoing

is true and correct.

EXECUTED on this 20th day of May, 2016, at Chicago, Illinois.

Johanna M. Spellman
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile: (312) 993-9767

Liaison Counsel for Defendant
National Collegiate Athletic Association

# EXHIBIT 1

Case: 1:13-cv-09116 Document #: 268-1 Filed: 05/20/16 Page 10 of 195 PageID #:7259



# 2015-16 NCAA®
# DIVISION I **MANUAL**

EFFECTIVE
AUGUST 1, 2015



THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
P.O. Box 6222
Indianapolis, Indiana 46206-6222
317/917-6222
ncaa.org
July 2015
[ISSN 1093-3174]

**Text Prepared By:** NCAA Academic and Membership Affairs Staff.

**Production By:** NCAA Membership Affairs Staff.

*This publication incorporates final legislative actions taken through April 30, 2015. Legislation adopted after August 1, 2014, interpretations incorporated by the Legislative Review/Interpretations Committee, modifications of wording and editorial revisions are set off by a gray background and also include an adoption or revision date. Readers seeking the legislative history of a given provision (earlier dates of adoption or revision) should consult the appropriate paragraphs in the 1988-89 NCAA Manual or the NCAA academic and membership affairs staff.*

NCAA, NCAA logo and National Collegiate Athletic Association are registered marks of the Association, and use in any manner is prohibited unless prior approval is obtained from the Association.

©2015 by the National Collegiate Athletic Association

CONSTITUTION, ARTICLE 2

# Principles for Conduct of Intercollegiate Athletics

## 2.01 General Principle. [*]

Legislation enacted by the Association governing the conduct of intercollegiate athletics shall be designed to advance one or more basic principles, including the following, to which the members are committed. In some instances, a delicate balance of these principles is necessary to help achieve the objectives of the Association.

## 2.1 The Principle of Institutional Control and Responsibility. [*]

**2.1.1 Responsibility for Control. [*]**  It is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association. The institution's president or chancellor is responsible for the administration of all aspects of the athletics program, including approval of the budget and audit of all expenditures. *(Revised: 3/8/06)*

**2.1.2 Scope of Responsibility. [*]**  The institution's responsibility for the conduct of its intercollegiate athletics program includes responsibility for the actions of its staff members and for the actions of any other individual or organization engaged in activities promoting the athletics interests of the institution.

## 2.2 The Principle of Student-Athlete Well-Being. [*]

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. *(Revised: 11/21/05)*

**2.2.1 Overall Educational Experience. [*]**  It is the responsibility of each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience. *(Adopted: 1/10/95)*

**2.2.2 Cultural Diversity and Gender Equity. [*]**  It is the responsibility of each member institution to establish and maintain an environment that values cultural diversity and gender equity among its student-athletes and intercollegiate athletics department staff. *(Adopted: 1/10/95)*

**2.2.3 Health and Safety. [*]**  It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. *(Adopted: 1/10/95)*

**2.2.4 Student-Athlete/Coach Relationship. [*]**  It is the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach. *(Adopted: 1/10/95)*

**2.2.5 Fairness, Openness and Honesty. [*]**  It is the responsibility of each member institution to ensure that coaches and administrators exhibit fairness, openness and honesty in their relationships with student-athletes. *(Adopted: 1/10/95)*

**2.2.6 Student-Athlete Involvement. [*]**  It is the responsibility of each member institution to involve student-athletes in matters that affect their lives. *(Adopted: 1/10/95)*

## 2.3 The Principle of Gender Equity. [*]

**2.3.1 Compliance With Federal and State Legislation. [*]**  It is the responsibility of each member institution to comply with federal and state laws regarding gender equity. *(Adopted: 1/11/94)*

**2.3.2 NCAA Legislation. [*]**  The Association should not adopt legislation that would prevent member institutions from complying with applicable gender-equity laws, and should adopt legislation to enhance member institutions' compliance with applicable gender-equity laws. *(Adopted: 1/11/94)*

**2.3.3 Gender Bias. [*]**  The activities of the Association should be conducted in a manner free of gender bias. *(Adopted: 1/11/94)*

## 2.4 The Principle of Sportsmanship and Ethical Conduct. [*]

For intercollegiate athletics to promote the character development of participants, to enhance the integrity of higher education and to promote civility in society, student-athletes, coaches, and all others associated with these athletics programs and events should adhere to such fundamental values as respect, fairness, civility, honesty and responsibility. These values should be manifest not only in athletics participation, but also in the broad spectrum of activities affecting the athletics program. It is the responsibility of each institution to: *(Adopted: 1/9/96)*

**2**

**PRINCIPLES**

**4.01.2.3 Championships. [\*]** Members are guaranteed access to national championships. *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.3.1 Championships Access. [◆]** Members are guaranteed access to national championships (including the play-in structure in certain championships, sizes of championship fields and the number and ratio of automatic qualifying conferences) at least at the level provided as of August 1, 2014. *(Adopted: 1/9/96 effective 8/1/97, Revised: 12/15/06, 1/18/15)*

**4.01.2.3.2 Championships—Sports Other Than Football. [◆]** With the exception of football, not more than one national championship shall be conducted in each men's and women's sport. *(Adopted: 1/14/97 effective 8/1/97)*

**4.01.2.4 Membership Services. [\*]** Members are guaranteed services provided through the Association's national office at least at the level provided as of January 9, 1996 (e.g., membership services, statistics, research). *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.5 Special Programs. [\*]** Members are guaranteed the continuation of Association programs operating at the time of the adoption of this legislation (e.g., the catastrophic-injury insurance program, the drug-testing program, the Division I institutional performance program). In addition, members are guaranteed the continuation of Association programs that were considered by the NCAA Council or Presidents Commission by the spring of 1995 and began operating after the adoption of this legislation. *(Adopted: 1/9/96 effective 8/1/97, Revised: 1/19/13)*

## 4.02 Definitions and Applications.

**4.02.1 Association. [\*]** The "Association," as used in this Manual, refers to the National Collegiate Athletic Association, a diverse, voluntary, unincorporated Association of four-year colleges and universities, conferences, affiliated associations and other educational institutions. *(Adopted: 1/9/96 effective 8/1/97)*

**4.02.2 Faculty Athletics Representative.** A faculty athletics representative is a member of an institution's faculty or administrative staff who is designated by the institution's president or chancellor or other appropriate entity to represent the institution and its faculty in the institution's relationships with the NCAA and its conference(s), if any (see also Constitution 6.1.3). *(Revised: 3/8/06)*

**4.02.3 "On the Staff."** "On the staff," as it applies to individuals from member institutions or conferences who are eligible to serve on committees or as officers or representatives of the Association, is defined as those individuals who receive a regular salary from a member institution or organization for the performance of a regular staff function representing at least 50 percent of the normal workload for a staff member at that institution or conference. In addition, a conference office staff member must be employed at one of the multisport conferences set forth in Constitution 4. An individual on sabbatical or other temporary leave for a period not exceeding 12 consecutive months may be considered to be "on the staff" of an institution or organization. An individual on terminal leave or on leave in excess of 12 consecutive months shall not be considered to be "on the staff." *(Revised: 10/31/02 effective 8/1/03)*

**4.02.4 Senior Woman Administrator.**

**4.02.4.1 Institutional Senior Woman Administrator. [#]** An institutional senior woman administrator is the highest-ranking female involved in the management of an institution's intercollegiate athletics program. An institution with a female director of athletics may designate a different female involved with the management of the member's program as a fifth representative to the NCAA governance structure. *(Adopted: 11/1/01 effective 8/1/02, Revised: 10/27/05)*

**4.02.4.2 Conference Senior Woman Administrator.** A conference senior woman administrator is the highest-ranking female involved with the conduct and policy processes of a member conference's office. A conference with a female commissioner may designate a different female involved with the management of the conference as a representative to the NCAA governance structure. *(Adopted: 11/1/01 effective 8/1/02, Revised: 10/27/05)*

**4.02.5 Gender and Diversity Requirements.** The Board of Directors membership shall include at least one person who is an ethnic minority and at least one person of each gender, and a single member shall not be considered to meet both minimums. The combined membership of the Council, Committee on Academics and other Division I governance entities (other than sport committees) shall include representatives who comprise at least 20 percent of persons who are ethnic minorities and at least 35 percent of persons of each gender. *(Adopted: 11/1/07 effective 8/1/08, Revised: 8/7/14)*

**4.02.6 Selection/Term of Office of Board of Directors and Council.**

**4.02.6.1 Selection.** Members of the Board of Directors shall be selected by the constituencies that they represent. Each membership unit (e.g., conference) that is authorized to select or nominate individuals must have a plan to assure diversity among these individuals. Members of the Council shall be selected by the Board of Directors or a committee designated by the Board of Directors. *(Adopted: 11/1/07 effective 8/1/08, Revised: 8/7/14)*

CONSTITUTION, ARTICLE 6

# Institutional Control

## 6.01 General Principle.

**6.01.1 Institutional Control.** The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself and by the conference(s), if any, of which it is a member. Administrative control or faculty control, or a combination of the two, shall constitute institutional control.

## 6.1 Institutional Governance.

**6.1.1 President or Chancellor.** A member institution's president or chancellor has ultimate responsibility and final authority for the conduct of the intercollegiate athletics program and the actions of any board in control of that program. The term "president or chancellor" refers to the individual with primary executive authority for an institution and does not include an individual who has executive responsibility over a system of institutions. *(Revised: 3/8/06, 5/22/13)*

**6.1.2 Athletics Board.** A board in control of athletics or an athletics advisory board, which has responsibility for advising or establishing athletics policies and making policy decisions, is not required. However, if such a board exists, it must conform to the following provisions.

    **6.1.2.1 Composition.** Administration and/or faculty staff members shall constitute at least a majority of the board in control of athletics or an athletics advisory board, irrespective of the president or chancellor's responsibility and authority or whether the athletics department is financed in whole or in part by student fees. If the board has a parliamentary requirement necessitating more than a simple majority in order to transact some or all of its business, then the administrative and faculty members shall be of sufficient number to constitute at least that majority. *(Revised: 3/8/06)*

        **6.1.2.1.1 Administrator Defined.** An administrator (for purposes of this legislation) is an individual employed by the institution as a full-time administrative staff member who holds an academic appointment, is directly responsible to the institution's president or chancellor or serves as a chief administrative official (e.g., admissions director, finance officer, department head, or athletics department head). Other nonacademic staff members and individuals who are members of an institution's board of trustees or similar governing body would not be considered to be administrators for purposes of this regulation. *(Revised: 3/8/06)*

        **6.1.2.1.2 Board Subcommittee.** If a board subcommittee is appointed, it is not necessary for the subcommittee to have majority control by administration and/or faculty members (see Constitution 6.1.2.1), provided all actions of the subcommittee are approved by the entire board before becoming effective. However, if the subcommittee's actions are effective permanently or become effective immediately and remain in effect until reviewed by the entire board at a later date, the subcommittee's membership must satisfy the majority-control requirement.

        **6.1.2.1.3 Attendance.** A parliamentary majority of administrators and faculty members of a board in control of athletics is not required to be present at any single meeting in order to conduct business.

    **6.1.2.2 Chair or Voting Delegate.** Only an administrator or faculty member (as opposed to a student, alumnus or governing board member) may serve as chair of a member institution's board in control of intercollegiate athletics or represent the board as the institution's voting delegate at Conventions. Institutional representatives in these positions have responsibility for advising or establishing athletics policies and making policy decisions that require administrative and/or faculty control.

**6.1.3 Faculty Athletics Representative.** A member institution shall designate an individual to serve as faculty athletics representative. An individual so designated after January 12, 1989, shall be a member of the institution's faculty or an administrator who holds faculty rank and shall not hold an administrative or coaching position in the athletics department. Duties of the faculty athletics representative shall be determined by the member institution. *(Adopted: 1/11/89)*

**6.1.4 Student-Athlete Advisory Committee.** Each institution shall establish a student-athlete advisory committee for its student-athletes. The composition and duties of the committee shall be determined by the institution. *(Adopted: 1/10/95 effective 8/1/95)*

## 6.2 Budgetary Control.

**6.2.1 Normal Budgeting Procedures.** The institution's annual budget for its intercollegiate athletics programs shall be controlled by the institution and subject to its normal budgeting procedures.

**6.2.2 President or Chancellor Approval.** The institution's president or chancellor or an institutional administrator designated by the president or chancellor from outside the athletics department shall approve the annual budget in the event that the institution's normal budgeting procedures do not require such action. *(Revised: 3/8/06)*

**6**

**INSTITUTIONAL CONTROL**

BYLAW, ARTICLE 21

# Committees

## 21.02  Definitions and Applications.

**21.02.1  Association-Wide Committees. [*]**  Association-wide committees deal with issues that affect all members of the Association and perform duties necessary to the on-going operation of the Association. Association-wide committees are comprised of members from each of the Association's divisions. *(Adopted: 1/14/97 effective 8/1/97)*

**21.02.2  Common Committees. [*]**  Common committees deal with issues that apply to more than one division of the Association. Common committees perform duties necessary to the on-going operation of the applicable divisions and are comprised of members from the applicable divisions. *(Adopted: 1/14/97 effective 8/1/97)*

**21.02.3  Federated Committees. [*]**  Federated committees deal with issues that apply to a specific membership division. Federated committees perform duties necessary to the on-going operation of that division and are comprised only of members from that division. *(Adopted: 1/14/97 effective 8/1/97)*

**21.02.4  Districts. [#]**  For purposes of committee composition, the geographical districts are as follows: *(Adopted: 10/30/03)*

(a)  District 1—Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont;

(b)  District 2—Delaware, New Jersey, New York, Pennsylvania, Puerto Rico, West Virginia;

(c)  District 3—Alabama, District of Columbia, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia;

(d)  District 4—Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin;

(e)  District 5—Iowa, Kansas, Missouri, Nebraska, North Dakota, Oklahoma, South Dakota;

(f)  District 6—Arkansas, New Mexico, Texas;

(g)  District 7—Arizona, Colorado, Idaho, Montana, Utah, Wyoming; and

(h)  District 8—Alaska, California, Hawaii, Nevada, Oregon, Washington.

**21.02.5  Conflict of Interest.**  A committee member shall not participate in the committee's discussion or vote on any action that might bring direct or indirect financial benefit to the member of any organization in which the member is financially interested (other than the member's institution or the conference of which it is a member). A violation of this rule by a member of a committee shall not invalidate the action taken by the committee if, following disclosure of the conflict of interest, the committee authorizes, ratifies or approves the action by a vote sufficient for the purpose, without counting the vote of the committee member with the conflict of interest, and the Council approves such action. All committee members shall agree to this policy prior to committee service and shall abide by the policy at all times. The current conflict of interest policy is located on the NCAA website (NCAA.org) or may be obtained from the NCAA national office. *(Adopted: 1/13/09, Revised: 8/7/14)*

## 21.1  Playing Rules Oversight Panel. [#]

**21.1.1  Composition. [#]**  The panel shall consist of 12 members, including six members from Division I and three representatives each from Divisions II and III. A single conference may not have more than one representative on the panel. *(Adopted: 4/28/05)*

**21.1.2  Method of Selection. [#]**  Three of the six Division I representatives shall be appointed by the Division I Council and one of those three must have experience working with playing rules. The remaining three shall be appointed by the Division I Collegiate Commissioners Association (CCA). Two of those three shall have experience working with playing rules. One of the three Divisions II and III representatives shall be appointed by the divisions' Championships Committees (these appointees must be current members of the divisions' Championships Committees). The remaining two representatives in Divisions II and III will be appointed at large and one of the two per each division shall have experience working with playing rules. *(Adopted: 4/28/05, Revised: 11/1/07 effective 8/1/08, 8/7/14)*

**21.1.2.1  Definition of "Working with Playing Rules." [#]**  The following experience will be considered to be the equivalent of "working with playing rules": officiating experience, previous service on a rules committee, previous service on a committee with responsibility for playing rules administration or coaching. *(Adopted: 4/28/05)*

**21.1.3  Term of Office. [#]**  At-large and Division I members of the panel will serve four-year terms. Championships Committee appointments will serve for the duration of their committee term. *(Adopted: 4/28/05, Revised: 11/1/07 effective 8/1/07, 8/7/14)*

**21**

**COMMITTEES**

# EXHIBIT 2

APPENDIX B

MINUTES OF THE

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

SPORTS SCIENCES SAFETY SUBCOMMITTEE OF THE COMMITTEE ON COMPETITIVE

SAFEGUARDS AND MEDICAL ASPECTS OF SPORTS

Ritz-Carlton, Kansas City, Missouri                    February 5-6, 1996

Those is attendance were:

Elizabeth A. Arendt, M.D., University of Minnesota, Twin Cities
Donald Bunce, M.D., Stanford University
Bernard F. DePalma, Cornell University
Susan S. True, National Federation of State High School Associations
Christine L. Wells, Arizona State University
Sue Williams, University of California, Davis, chair
Randall W. Dick, NCAA

[Note: These minutes reflect only committee actions (formal votes or
"sense of meeting") in accordance with the established policy governing
minutes of all NCAA entities.]

<u>Monday, February 5</u>

The meeting was called to order at 9 a.m. by the chair, Ms. Williams.
Dennis Wilson, committee chair, and Kevin White were also in attendance.

1. <u>Previous Minutes</u>.

   The minutes of the June 21-22, 1995, meeting were approved as
   submitted.

2. <u>External Sports-Science Research</u>.  The subcommittee addressed
   issues related to external sports-sciences research for both the
   current and 1996-97 fiscal years.

   a.  <u>Current year</u>.  The subcommittee discussed options for applica-
       tion of the $30,000 in sports-sciences external-research funds
       available for fiscal years 1995-96.

       In priority order, it was recommended that money be allocated
       to (1) retain an independent researcher to assist in the devel-
       opment of recommendations related to equity in medical care,(2)
       fund a one-day-roundtable meeting to establish a unified di-
       rection on identifying causative factors for gender differences
       in anterior cruciate ligament injury rates (Drs. Arendt and
       Bunce coordinating), (3) develop a drug-use survey that would
       be conducted with assistance of the faculty athletics

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA Sports Sciences Safety
 Subcommittee Minutes
February 5-6, 1996
Page No. 2 -- Minute No. 2-a

representatives and, (4) assist the baseball and softball rules
committee with studies that evaluate the issue of increasingly
"livelier" bats and their effect on injury.

b.    1996-97.   The subcommittee requested that $70,000 be allocated
      to sports-sciences research from the 1996-97 Research Committee
      budget.   The topics to be considered for funding include:

      (1)  ACL research.   Pending  the outcome of the above meeting,
           funds will be directed as appropriate.

      (2)  Overuse injury tool.   Establish a focus group and identify
           consultants to develop a survey tool compatible with the
           existing NCAA Injury Surveillance System (ISS) to identify
           and track overuse injuries in all sports.   Drs. Arendt and
           Bunce,  Mr.  DePalma,  Dr.  Bryan  Smith  (new  member  in
           September 1996) and Ms. Williams will coordinate this
           effort.

      (3)  Bat characteristics and reaction time in baseball and
           softball.   If funds are not available from the 1995-96
           budget,  it  is  anticipated  that  the  need  will  still  be
           there in 1996-97.

      In addition, it was recommended that future calls for research
      proposals be publicized in The NCAA News as soon as possible
      even though funding may be pending.   It was agreed that
      increasing the time between proposal announcement and return
      deadline would allow researchers more time to prepare a quality
      proposal.

c.    Final reports.   The subcommittee accepted three final reports
      of NCAA-funded research: Dietary Practices and Weight Loss
      Techniques of College Athletes, Psychosocial Antecedents of
      Injury and Academic Performance for Female Collegiate Athletes,
      and Lifestyles and Health Risks of Collegiate Athletes.   It was
      recommended that the "lifestyle article," in particular, be
      featured in The NCAA News or Sports Sciences Education
      Newsletter to justify further the need for programs such as
      CHAMPS/Life Skills.

3.  Long-Range Planning.   The subcommittee reviewed the long-range
    plan.   It was recommended that future committee and staff outreach
    activities  be  specifically  recognized  in  the  full-committee
    minutes.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                     NCAA00001691

NCAA Sports Sciences Safety
    Subcommittee Minutes
February 5-6, 1996
Page No. 3 -- Minute No. 4

---

4. <u>NCAA/ACSM Current Comments Project</u>. The subcommittee reviewed and approved drafts of three NCAA guidelines which were proposed to be adopted by the American College of Sports Medicine (ACSM) as Current Comments. Staff was requested to inform ACSM that the reference on the three publications should read: "Written by the NCAA, and reviewed and modified by the ACSM."

[Mr. White and Mr. Wilson left the meeting at 11:45 a.m.]

5. <u>Sports Medicine Handbook</u>. The subcommittee reviewed several issues related to the handbook.

    a. <u>Distribution</u>. The following were recommended for distribution of the 1996-97 handbook:

        (1) A handbook should be sent to individual school Student Athletic-Advisory Committees (SAAC) and a second handbook to athletic trainers, in addition to the previous practice of one each to the athletics director, senior woman administrator and student health services.

        (2) An in-house inventory of additional handbook orders should be created for direction in future distribution adjustments.

        (3) A memorandum, written by the national SAAC, should accompany the individual SAAC handbook with suggestions on how the guidelines should be used to empower these groups.

        (4) The cover memorandum for all groups should encourage the review of the handbook with the head athletic trainer at each institution.

    b. <u>New guidelines</u>. The subcommittee considered additions and new guidelines to the handbook.

        (1) It was recommended that staff contact ACSM and gauge interest on joint development of a Current Comment on surface-related injuries.

        (2) The subcommittee considered including information on tuberculosis screening in physical exams in Guideline No. 1B, Medical Evaluations, Immunizations and Records. It was recommended that Dr. Gikas investigate the topic and update the group at the June meeting.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA Sports Sciences Safety
  Subcommittee Minutes
February 5-6, 1996
Page No. 4 -- Minute No. 6

6. <u>NCAA Injury Surveillance System (ISS)</u>. The subcommittee reviewed
   reports of the 1995-96 ISS data for fall sports. No significant
   new trends were noted. Staff was requested to evaluate injuries in
   the second half of practice and games and report findings at the
   June 1996 meeting. In addition, staff was requested to follow up
   the committee memorandum to NCAA Men's and Women's Soccer Rules
   Committee regarding the medical authority of the official.
   Finally, it was noted that the ISS reconfiguration project was
   underway with expectations for pilot work this fall.

7. <u>Nutrition and Eating Disorders</u>. The subcommittee reviewed and en-
   dorsed the National Eating Disorders Screening Program and noted
   the NCAA's contribution to this effort. It was recommended that
   future educational efforts in this area should continue to address
   disordered eating as well as to emphasize how to eat well.
   Committee Working Group No. 3, the CHAMPS/Life Skills Program and
   the ACSM strategic-health initiative for women in sport were
   identified as avenues to continue this educational effort.

[The meeting recessed at 5:10 p.m.]

<u>Tuesday, February 6</u>

The meeting was called to order at 8:30 a.m. by the chair, Ms. Williams.
Dennis Wilson, committee chair, Kevin White, and Cal Bowers, a member of
the NCAA Student-Athlete Advisory Committee, were also in attendance.

8. <u>Concussions in Football</u>. The subcommittee discussed the continued
   medical and media concern about concussions in the sport of foot-
   ball. This concern was verified by ISS data. It was noted that
   the football helmet was not designed to prevent this type of
   injury. A survey regarding mouthpiece use was reviewed and it was
   noted that almost 40 percent of Division I football officials did
   not believe the current mouthpiece rule was appropriate, although a
   high percentage of coaches and student-athletes supported the rule.
   The subcommittee recommended that this issue be discussed at the
   NCAA Football Rules Committee meeting and emphasized that mandatory
   mouthguard use by all players could help reduce concussions in the
   sport.

9. <u>Injuries in Spring Football</u>. The subcommittee continues to be
   concerned about the significantly high injury rate in spring
   football practice relative to fall-football practice. Discussions
   with the American Football Coaches Association (AFCA) and the
   College Football Association (CFA) were reviewed, and it was noted

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA Sports Sciences Safety
    Subcommittee Minutes
February 5-6, 1996
Page No. 5 -- Minute No. 9
_____

that no formal interaction had occurred between the committee and
these groups since August 1995.  In addition, the subcommittee
discussed other groups that could influence any action on this
issue.  Finally, updated ISS data were discussed that indicated
that teams with initial spring practices designated as noncontact
had overall injury rates significantly lower than teams that had
initial contact practices.

The following action items were recommended:

a.   Continue efforts to seek input from the AFCA and CFA.

b.   Target NCAA conference commissioners and presidents for
     educational efforts on this issue.

c.   Propose first two days of spring practice be noncontact with no
     formal padding except a football helmet and reduce the number
     of contact days to seven or eight.

d.   Obtain Student-Athlete Advisory Committee support of recommen-
     dation c above.

e.   Better differentiate between contact and noncontact days, per-
     haps by basing the practice designation on activity (blocking,
     tackling) rather than on equipment worn (full pads versus
     almost full pads).

f.   Produce an article for the American Orthopedic Society for
     Sports Medicine (AOSSM) and AFCA newsletters regarding the com-
     mittee's position on this issue (staff, Dr. Bunce and Mr.
     Wilson).

10.  Weight Loss and Skin Infections in Wrestling.  The subcommittee
     reviewed recent joint competitive safeguards-wrestling committee
     actions regarding acute weight loss at NCAA wrestling championships
     and also discussed the bigger picture of weight loss in the sport.
     It was recommended that:

     a.   Selected committee members meet with the wrestling rules com-
          mittee during its meeting in Kansas City April 8-12. (Note:
          Subsequent to the meeting, it was decided that Mr. Wilson, Ms.
          Williams, and Dr. Bryan Smith would represent the committee.)

     b.   The ACSM position stand should be the basis for the committee's
          positions on the timing and purpose of weigh-ins and weight-
          class changes prior to post-season tournaments.  The specific
          positions are outlined in the subcommittee minutes from the
          June 1995 meeting.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA00001694

NCAA Sports Sciences Safety
  Subcommittee Minutes
February 5-6, 1996
Page No. 6 -- Minute No. 10-C

_____

    c.  A user-friendly graph of temperature humidity index be incorpo-
rated into the NCAA Sports Medicine Handbook guideline on heat
stress and into the wrestling rules book.  Mr. DePalma and Ms.
Wells agreed to work on this issue.

The subcommittee acknowledged a request from the wrestling
rules committee requesting specific information on skin infec-
tions, which was handled by Dr. McGrew before the meeting.

11.  <u>Concussions in Ice Hockey</u>.  The subcommittee reviewed studies that
evaluated full face protection for both NCAA and comparable
Canadian league ice hockey teams.  It was noted that both studies
concluded that mandatory full face protection was appropriate for
the sport and that these conclusions were consistent with those of
the committee.  ISS data indicated a rise in concussions in the
sport.  The subcommittee recommended that concerns regarding
compliance of mouthguard and other rules that may prevent head
injury should be emphasized to the NCAA Ice Hockey Rules Committee.
It was noted also that liability concerns associated with non-
compliance of safety rules be emphasized in this and all sports.

12.  <u>Head Protection in Women's Lacrosse and Field Hockey</u>.  The subcom-
mittee reviewed recent joint competitive safeguards-field hockey
and competitive safeguards-women's lacrosse committee actions re-
sulting in rules modification to allow for optional use of "soft"
head protection in the two sports.  The subcommittee praised all
involved in reaching this solution.

13.  <u>Bats and Reaction Time in Baseball and Softball</u>.  The subcommittee
reviewed with interest the concerns of the baseball and softball
rules committee regarding injuries due to impact with a batted
ball.  It was noted that bats in both sports were becoming "live-
lier," and research needed to be developed to create a limit.
Identification of a minimal-reaction time to a batted ball was pro-
posed.  The subcommittee was receptive to this as an area of need
and recommended awaiting a direct request for involvement, while
tentatively earmarking some research funds for this project.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA00001695

NCAA Sports Sciences Safety
    Subcommittee Minutes
February 5-6, 1996
Page No. 7 -- Minute No. 14

14. <u>Medical Staffing at NCAA Championships</u>.  It was noted that some
    NCAA championships have medical staffing requirements that are ex-
    cessive, relative to recommendations in the NCAA Sports Medicine
    Handbook.  Staff was directed to discuss this issue with the NCAA
    championships staff.

15. <u>Adjournment</u>.  The meeting was adjourned at noon.

                        #  #  #  #  #

The National Collegiate Athletic Association
March 29, 1996                    RWD:jd

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    NCAA00001696

# EXHIBIT 3



Appendix B

MINUTES OF THE

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

SPORTS SCIENCES SAFETY SUBCOMMITTEE OF THE COMMITTEE ON COMPETITIVE

SAFEGUARDS AND MEDICAL ASPECTS OF SPORTS

Santa Barbara Inn, Santa Barbara, California                January 26-27, 1998

Those is attendance were:

Priscilla M. Clarkson, University of Massachusetts, Amherst
Bernard F. DePalma, Cornell University, chair
Letha Y. Griffin, M.D., Georgia State University
Joy L. Reighn, Rowan University
Brian J. Sharkey, University of Montana
Bryan W. Smith, M.D., University of North Carolina, Chapel Hill
Susan S. True, National Federation of State High School Associations
Randall W. Dick, NCAA

[Note:  These minutes reflect only committee actions (formal votes or "sense
of meeting") in accordance with the established policy governing minutes of
all NCAA entities.]


                        Monday, January 26

The meeting was called to order at 9:15 a.m. by the chair, Mr. DePalma.  All
members present as noted except Ms. True.  Mr. Arnet, full committee chair,
was also present.


   1.  Previous Minutes.

       It was VOTED

       "That the minutes from the subcommittee's June 25-26, 1997, meeting be
       approved as distributed."

   2.  Mission Statement.  The subcommittee reviewed the committee mission
       statement and recommended that references to "standards" be changed to
       "guidelines."


[Note:  Mr. Arnet left the meeting at 9:30 a.m.]


   3.  External Research Issues.

       a.  Creatine Research Proposals.  The committee reviewed eleven proposals
           on the subject of physiological effects (other than performance en-
           hancement) of creatine supplementation in collegiate athletes as a
           part of the 1997-98 sports science research project.  It recommended
           three for funding:

           (1)  Effect of Creatine Supplementation on Body Composition and Risk
                of Injury in Male and Female Collegiate Athletes, $20,000, Dr.
                Mindy Millard-Stafford, Georgia Institute of Technology.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA00014396

NCAA Sports Sciences Safety
  Subcommittee Minutes
January 26-27, 1998
Page No. 2 -- Minute No. 3-a-(2)

_____

    (2) Physiological Responses to Exercise in the Heat after Loading with Creatine Monohydrate, $20,000, Dr. William J. Kraemer, Pennsylvania State University.

    (3) The Effects of Creatine Supplementation on Total Body Fluids and Muscle Cramping during Exercise, $12,000, Dr. Jeffrey A. Potteiger, the University of Kansas.

The subcommittee also recommended that the informed consent reflect that the long-term effects of creatine use is unknown and that proper hydration during the experiment will be maintained.

b.   <u>Anterior Cruciate Ligament (ACL) Study</u>.  The subcommittee reviewed the current work being conducted by Dr. Elizabeth Arendt regarding ACL injuries.

c.   <u>Proposed Topics for 1998-99 Health and Safety Research</u>.  The committee recommended that the 1998-99 NCAA budget for health and safety outside research be expanded from its current $70,000 to $100,000. The requested funds would be utilized as follows:

    (1) $10,000 for catastrophic injury research (Dr. Fred Mueller). This has been an annual funded project for several years and has been a valuable resource, most recently concerning the fatalities in the sport of wrestling.

    (2) $20,000 for anterior cruciate ligament (ACL) injury research (including an analysis of videotaped injuries). The subcommittee anticipates that one more year of funding is necessary to complete this project. A bidding process for the prospective work and video review was recommended.

    (3) $50,000 for concussion research. Drs. Griffin and Smith recently attended a head trauma meeting with representatives from national medical organizations. Issues ranging from classification of head trauma to return to play were discussed. It was agreed that much more research in this area was necessary. The NCAA has a guideline in the Sports Medicine Handbook regarding concussions, and several sports rules committees (football, ice hockey, women's lacrosse, men's and women's soccer) have a particular interest in preventing head trauma. The research findings in this area would address a concern for much of the Association. Drs. Griffin, Green and Smith agreed to research the most effective application of these funds, including the possible combination of NCAA monies with matching funds from other organizations. This group's recommendations will be considered at the June meeting.

    (4) $20,000 for wrestling/weight loss with specific application to be determined after USA Wrestling consensus statement and the April NCAA Wrestling Committee and competitive safeguards joint meeting.

[Note: Mr. Arnet joined the meeting at 10:30 a.m.]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA Sports Sciences Safety
  Subcommittee Minutes
January 26-27, 1998
Page No. 3 -- Minute No. 4

_____

4. <u>Inter-association task force to develop uniform guidelines for helmet /facemask removal</u>. The subcommittee considered a request to participate in a task force meeting to develop uniform guidelines for helmet removal. It was noted that such guidelines exist in the NCAA Sports Medicine Handbook and that they had previously been reviewed and endorsed by the National Athletic Trainers' Association (NATA) and a national Emergency Medical Technician (EMT) group. Mr. DePalma agreed to raise these issues with the NATA to clarify the need for the meeting. If such a meeting appeared justified, Dr. Griffin agreed to attend on behalf of the committee. The subcommittee noted that such guidelines should address helmet removal in all sports, not just football.

5. <u>NCAA Sports Medicine Handbook.</u> The subcommittee reviewed and endorsed the 1997-98 handbook. No new guidelines were recommended for the next edition. The subcommittee also considered a system of updating existing guidelines. It was recommended that at the annual winter meeting any guideline that had not received a revision in the previous five years be assigned to a committee member for review.

The following guidelines were assigned for review prior to the June meeting: 1-C (Dr. Green), 2-C (Drs. Clarkson and Sharkey), 2-D (Dr. Sharkey), 2-E (Drs. Clarkson and Sharkey), 2-F (Drs. Clarkson and Griffin), 2-G (Dr. Clarkson), 2-I (Dr. Green), 2-K (Dr. Griffin), 2-L (Dr. Griffin), 3-C (Dr. Smith), 4-C (Ms. True) and 4-E (Dr. Smith). It was suggested that a discussion of rhabdomyolysis be incorporated into guideline Nos. 2-C and 3-C revisions. Review should include both revised content and updated references, if appropriate. Revised drafts should be forwarded to staff by May 20 for inclusion in the June agenda.

It also was noted that guideline No. 1-B would have to be modified in the next edition to reflect the modified American Heart Association stand on cardiovascular screening. Finally, it was recommended that the emergency care coverage for all practices and games issue noted in Guideline No. 1-A be considered at the June meeting for possible legislation.

[Mr. Uryasz joined the meeting at 2:05 p.m.]

6. <u>NCAA Injury Surveillance System</u>.

   a. <u>Data evaluation</u>. Mr. Dick briefly reviewed data from the fall 1997 ISS. Due to computer modifications, final reports were not available for formal committee review. The subcommittee also considered assignments for future ISS data review: Football - Dr. Smith, Women's Volleyball - Mr. DePalma, Men's and Women's Soccer - Dr. Sharkey, Field Hockey - Ms. Reighn, Men's Basketball - Dr. Griffin, Women's Basketball - Ms. Reighn, Men's and Women's Gymnastics - Dr. Clarkson, Ice Hockey, Dr. Smith, Wrestling - Mr. DePalma, Spring Football - Dr. Smith, Baseball and Softball - Dr. Griffin, Men's and Women's Lacrosse - Mr. Dick.

   b. <u>ISS system upgrade</u>. The subcommittee discussed the current system limitations due to computer changes. While it appeared that the final report issue may be resolved in the next few months, staff reported little progress on the project devoted to integration of ISS

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA Sports Sciences Safety
 Subcommittee Minutes
January 26-27, 1998
Page No. 4 -- Minute No. 6-b

forms into independent vendor injury-tracking software. It was rec-
ommended that the development of an internal NCAA injury software
package be pursued. Staff was directed to begin initial discussion
with national office information services staff on the feasibility
and cost of this project. It was noted that the American Football
Coaches Association (AFCA) had expressed some interest in development
of such a system for football and that this interest should be pur-
sued at an appropriate time.

c.  ISS scientific support. The subcommittee discussed the upcoming NCAA
Research Committee review of the ISS and also recommended possible
future consultation with a biostatistician or epidemiologist. The
American College of Sports Medicine (ACSM) and the Centers for Dis-
ease Control and Prevention (CDC) were suggested as possible re-
sources for such assistance. Staff was directed to contact these
groups about this issue.

d.  AFCA Surveillance Project. The subcommittee reviewed the AFCA desire
to expand injury surveillance for spring and fall football. It was
noted that the NCAA had been involved in past discussions on this is-
sue. It was recommended that staff and appropriate subcommittee mem-
bers keep communication open with this group and continue to provide
updates on ISS issues.

[Note: Mr. Arnet and Ms. Reighn left the meeting at 3:30 p.m.]

7.  Sports Injury Issues.

a.  Educational Piece for Spring Football. The subcommittee reviewed and
endorsed committee and AFCA efforts to develop an educational piece
for spring football.

b.  Pitcher/Ball Impact in Baseball. The subcommittee reviewed and en-
dorsed the NCAA Baseball Rules Committee request for monitoring all
incidences of Division I pitchers being hit with a batted ball.

Tuesday, January 27

The meeting was called to order at 9:20 a.m. by the chair, Mr. DePalma. All
members were present. Mr. Arnet and Dr. Green, also were present.

7.  Sports Injury Issues (cont.).

c.  Concussions. The subcommittee discussed content for the upcoming
meeting with ice hockey coaches. The following points were recom-
mended for emphasis: eye injuries, face mask's role in other inju-
ries, catastrophic injury data, helmet's role in concussions preven-
tion, mouthguard's role in concussion prevention and variables to be
measured to determine aggressive play.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA00014399

NCAA Sports Sciences Safety
  Subcommittee Minutes
January 26-27, 1998
Page No. 5 -- Minute No. 7-c

_____

      The subcommittee revisited the issue of concussion research, current sport specific issues and the best way to apply research funds. Drs. Griffin, Green and Smith re-emphasized a commitment to determine the best way to apply funds for maximum Association benefit.

[Note: Dr. Green left the meeting at 9:45 a.m.]

    d.  <u>Helmets for Softball Catchers</u>.  The subcommittee reviewed correspondence with the NCAA Softball Rules Committee regarding mandatory helmets for catchers.  While noting that the head injury rate for catchers was low, there was agreement that the potential for injury existed, especially from contact with a bat.  In addition, the subcommittee noted that such equipment was mandatory in high school; therefore, collegiate softball catchers had been exposed to helmets.  Given the above rationale, the subcommittee requested input from the softball committee prior to June as to why such helmets should not be required.

[Note: Ms. Patricia Thomas joined the meeting at 10 a.m.]

    e.  <u>Field Hockey Issues</u>.  The subcommittee reviewed correspondence from concerned parents about the lack of head protection in field hockey. Ms. Thomas also discussed concerns raised by representatives at her institution.  The subcommittee reviewed past discussions, noting the game-injury rate in the sport was relatively low, but when injuries did occur, about 15 percent were to the head or face.  Primary concern was voiced about the potential injury to the eyes, nose and mouth from high sticks, harder shots and elevated balls that appear to be more prevalent in today's game. Other concerns involved a lack of developed eye protection from manufacturers and inconsistent officiating, which had been suggested by the field hockey committee as the appropriate way to control these types of injuries.  Staff was directed to forward these concerns to the field hockey committee for a response.  The subcommittee also recommended developing a head injury questionnaire that could be applied to all schools sponsoring field hockey (and women's lacrosse) in an attempt to monitor all facial injuries in these activities.

[Note: Ms. Thomas left the meeting at 10:25 a.m.]

    f.  <u>Cheerleading</u>.  The subcommittee reviewed correspondence regarding cheerleading injuries.  It expressed concern regarding safety in this activity but noted that this issue has sparked little action within the NCAA structure.

8.  <u>Nutrition and Eating Disorders</u>.  The subcommittee reviewed and endorsed the Association's participation in the 1998 National Eating Disorder Screening Program.  It also reviewed and supported two new posters regarding eating disorders that will be distributed to the membership in mid-February.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER      NCAA00014400

NCAA Sports Sciences Safety
  Subcommittee Minutes
January 26-27, 1998
Page No. 6 -- Minute No. 9

9. <u>Wrestling</u>.   The subcommittee reviewed a request by the NCAA Wrestling
Committee to eliminate the two-hour weigh-in at 1998 NCAA Wrestling Cham-
pionships due to logistical problems and to require weigh-ins each day of
the championships.   After much discussion, the subcommittee recommended
not to endorse either request.   The subcommittee believed that both re-
quests were inconsistent with the original rule modification implemented
January 13, 1998, and not in the best interest of student-athlete safety.

10. <u>Adjournment</u>.   The meeting was adjourned at 11:30 a.m.

# # # # #

The National Collegiate Athletic Association
March 20, 1998                    RWD:hmm

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA00014401

# EXHIBIT 4

MINUTES OF THE

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

COMMITTEE ON COMPETITIVE SAFEGUARDS AND MEDICAL ASPECTS OF SPORTS

Conrad Hotel                                                    June 10-12, 2007
Indianapolis, Indiana


Participants:

Ken Akizuki, University of San Francisco
Janet Kay Bailey, Glenville State College
Bob Colgate, National Federation of State High School Associations
Ron Courson, University of Georgia
Daniel Dickson, California State University, Chico
Eric Hamilton, The College of New Jersey
Kimberly Harmon, University of Washington
Jerry Koloskie, University of Nevada, Las Vegas, chair
Scott Lynch, Penn State University
Colleen McCullough, Chapman University
Jennifer Palancia Shipp, University of North Carolina, Greensboro
Marc Paul, University of Nevada, Reno
Daniel Pepicelli, St. John Fisher College
Tracy Ray, Samford University
Yvette Rooks, University of Maryland, College Park
Debra Runkle, University of Dubuque
Gary Skrinar, Boston University
Charlie Wilson, Olivet College
Robyn Bailey, NCAA
David Klossner, NCAA
Mary Wilfert, NCAA

Committee members, Megan McGrane, University of Pittsburgh and Larry Holstad, Winona
State University were not able to attend.

Guests, Frank Uryasz and Andrea Wickerham, The National Center for Drug Free Sport;  Julian
Bailes, West Virginia University; Denise DeHass; NCAA research consultant; Scott Bearby,
Elsa Cole, Jay Jones, Michael Mangarelli, Karen Morrison, Stephanie Quigg, and Juanita Sheely,
NCAA; were in attendance for portions of the meeting. Jim Thornton, Clarion University of
Pennsylvania participated via teleconference for portions of the meeting.

[NOTE:  These minutes contain only actions taken (formal votes or stated "sense of the
meeting") in accordance with NCAA policy regarding minutes of all Association entities.  All

NCAA Committee on Competitive Safeguards
  and Medical Aspects of Sports
June 10-12, 2007
Page No. 2
_____

votes were unanimous voice votes unless otherwise indicated. While certain items on the committee's agenda were acted on at various times throughout the meeting all final actions within a given topic are combined in these minutes for convenience of reference.]

<u>Sunday June 10</u>

The meeting was called to order at 4:00 p.m. by the chair, Mr. Koloskie. All members were present as noted above.

1. <u>Opening Remarks</u>. Mr. Koloskie welcomed the returning committee members, new committee members, and guests. Mr. Koloskie thanked Megan McGrane, Kim Harmon, Jennifer Palancia-Shipp, Gary Skrinar, Matthew McDougall, and Colleen McCullough for their committee work.

2. <u>Approval of Previous Minutes</u>. The committee approved meeting minutes from the December 2006 meeting and March 26, 2007 teleconference meetings."

3. <u>NCAA Governance Actions and Issues</u>. The committee reviewed relevant actions from the NCAA Executive Committee, the NCAA Division I Championships/Competition Cabinet, and the NCAA Divisions II and III Management Councils.

- The committee reaffirmed its position that all coaches (including strength and conditioning staff) be certified in first aid and cardiopulmonary resuscitation (CPR). The committee also supported the concept of a common provision across divisions since the committee noted that there is a lack of evidence that would require variance between divisions. In an effort to assist the governance process and engage membership feedback, the committee did not elect an effective date so that it could collect further data on the current practice of the certification of coaches on member campuses. The committee conducted a survey examining emergency care policies on campuses in 1998. At that time, most sports required less than 50 percent of personnel to be CPR certified and even less required first aid certification. The committee also will examine membership support for the inclusion of first aid certification or whether CPR certification is most paramount for rendering first response emergency care on our campuses. The committee will also address issues of liability, volunteer coaches, time frames for certification and cost. The committee noted that this training certification is intended to provide initial care until more skilled responders arrive as a supplement to an emergency situation and is not intended to replace

NCAA Committee on Competitive Safeguards
 and Medical Aspects of Sports
June 10-12, 2007
Page No. 3
_____

appropriate medical care and coverage.  Over 80 percent of student-athlete sudden deaths occur during practices and conditioning sessions.  Sixty percent of those sudden deaths are attributed to heart conditions.  Rapid response and immediate care is paramount in these situations.  The requirement of an emergency action plan and mandatory cardiopulmonary resuscitation certification of coaches for every practice, conditioning session, and event is the key preliminary step toward activating medical care response for student-athletes.  The committee emphasized that even with other skilled personnel available (ATC, MD), emergency situations require multiple rescuers and the CPR trained coach may be able to assist the other rescuers.  The growth of practice opportunities that include year-round exposures and extensive out-of-season sessions has greatly increased the risk that coaches will be the first to respond to a collapsed student-athlete.

4.  NCAA Student-Athlete Advisory Committee (SAAC) Report.

   - Division II.  Daniel Dickson updated the committee on Division II initiatives including their efforts to develop a model campus and conference Student-Athlete Advisory Committee (SAAC) best practices DVD, the student-athlete interests in discussing individual skill instruction proposals, and that they will be meeting again in July.

6.  Outreach.  The committee received the following information from its affiliated-outreach groups:  information about the Female Athletic Triad Coalition co-sponsored by the American College of Sports Medicine (ACSM); that the 2007 edition of the American College Health Association health assessment tool, the NCHA, includes the demographic "athletes", which will be helpful in comparing general student-athlete health against that of the broader student body; information about multiple education initiative from the National Athletic Trainers' Association (NATA) including their publication of a consensus statement on sudden cardiac arrest and emergency care, the Appropriate Medical Coverage for Intercollegiate Athletics (AMCIA) tool will be developed into a user-friendly website, continued support in the study of exertion heat illness, posting of Methicillin Resistant Staphylococcus Aureus (MRSA) survey results through a collaborative Center for Disease Control (CDC) best practices document printed in the NATA News, continued efforts to collaborate with the National Football League (NFL) on the medical document information for prospective draft players, and continuation of the spearing in football safety education initiative.  The American Medical Society for Sports medicine (AMSSM) expressed their gratitude for the continued support of sponsoring cases and presentations on collegiate health

NCAA Committee on Competitive Safeguards
  and Medical Aspects of Sports
June 10-12, 2007
Page No. 4

_____

and safety. Their cases and presentation on the college population has expanded since the implementation of the grant opportunity. The committee received a report from the National Federation of High School's (NFHS) Sports Medicine Committee.

7. <u>Supplements</u>.  The committee recommended forming a subgroup to review its position on dietary supplementation, the role of supplements in today's athletic culture, the evolution of energy drinks, and the use of whole food as they relate to NCAA Bylaw 16.5.2.g which permits institutions to provide supplements as an extra benefit for providing calorie replacement and hydration.  The committee will evaluate current peer-reviewed research, current industry practices and expert opinion.

8. <u>Testosterone and Human Growth Hormone</u>.  The committee discussed the need for stringent criteria and review for any requests by student-athletes to use either of these banned substances, noting that student-athletes may not practice or compete until use is reviewed and approved, with no timeline set to submit documentation.

9. <u>Medical Examinations</u>. The committee recommends that the NCAA Division II Management Council issue an official interpretation that specifies that a medical examination administered by a licensed physician within six months prior to a prospective student-athlete's participation in practice, competition or out-of-season conditioning activities during his or her senior year, that is accepted by the prospective student-athlete's high school for his or her participation in athletics during that senior year, may be used to satisfy the provision set forth in Bylaw 13.11.2.1-(c) for tryouts conducted by a Division II institution. The committee noted that many institutions have inquired whether a medical examination that is accepted by the prospective student-athlete's high school for use during his or her senior year may be used to satisfy the provision set forth in Bylaw 13.11.2.1-(c). The committee confirmed that such medical examinations are sufficient and are acceptable and conforms to the intent of the original legislation.

10. <u>Drug Education and Drug Testing Subcommittee Report</u>.

   a. Banned Drug list.  The class of anti-estrogens have been added to the list of banned drug classes, effective August 1.  The class of diuretics will be renamed "diuretics and other urine manipulators", and finasteride and probenecid will be added to the list of examples. Marijuana will continue to be tested as positive at 15 nanograms/ml, to be revisited following the outcome of the street-drug testing recommendation.  Medical marijuana use will be reviewed on appeal on a case-by-case basis.

NCAA Committee on Competitive Safeguards
  and Medical Aspects of Sports
June 10-12, 2007
Page No. 5
_____

b.  Drug Testing Protocol.  Exit tests will be viewed as a second positive test if the student-athlete tests positive for a different substance or for non-declining values of the same substance for which he or she originally tested positive.  Drug testing crews are not mandated to wear gloves within the "universal protection" guidelines, and use is left to the individual preference of the crew.  Staff will discuss with championship staff a recommendation to include "appropriate drug-testing facilities" as a requirement for consideration when institution's bid to host championship events.  The drug-testing site coordinator manual will identify that separate facilities for opposing teams should be secured as part of the facilities plan.

c.  Appeals and Medical Exceptions.  Anti-estrogen use will not require pre-approval, but rather be addressed in a medical exception review post positive drug test, so as not to interrupt treatment.

d.  DIII Championship drug testing forms will be reviewed for clarity and consistency to reflect the intent of the committee that any eligible student-athlete that is present and listed on the official "championship roster" is subject to drug testing at that championship.

e.  Summer drug testing will include DII football this year.  In addition, for those student-athletes not within the locality of the campus, notification will be made by Drug Free Sport rather than the institutional site coordinator in order to better coordinate timing between notification and testing.

f.  The committee will visit the World Anti-Doping Agency (WADA) accredited lab in Salt Lake City in December, and further consider sending NCAA samples to that lab following the visit.

g.  The committee will consider testing at the National Invitation Tournament (NIT) following review of a proposed testing budget and discussions with national office staff and relevant committees.

h.  The NCAA Drug Education and Testing survey, administered on campus every two years, will be administered this fall in electronic form for the first time, as the research staff noted no specific concerns in decreased response rate for this method of administration.

i.  The committee will review the Substance Use Survey and discuss possible revision at the December meeting, as this survey will be administered to student-athletes in the fall of 2008, and revisions will need to be completed in the spring 2008.

NCAA Committee on Competitive Safeguards
and Medical Aspects of Sports
June 10-12, 2007
Page No. 6
_____

j. The committee recommended that the Resource Exchange Center (REC) continue to be broadly marketed to the membership, including sending a direct link to the REC in a mass email, to include a "downloadable" version of an abbreviated list of banned drugs, similar to the wallet card. The committee agreed that the REC should add an FAQ posting on its web resource regarding caffeine.

k. The committee recommended an increase in the APPLE Conference budget in order to accommodate a third conference for member institutions. The outside review of Education Services programs noted that the APPLE Conference model was an effective use of Association funding, and that opportunities should be increased to address the unmet demand by the membership.

l. The committee recommended enhanced spit tobacco education efforts targeted to coaches and umpires, through collaborations with sports committees, coaches association and officials associations.

11. Sport-Specific Issues.

a. Baseball. The committee raised concerns because of recent witnessed direct head hits of pitchers. It was noted that the NCAA Baseball Research Panel is in the process of field testing the ball exit speed of bats and a second lab to test metal bats will be utilized. The committee will consult with the Baseball Research Panel and suggest that a member of CSMAS be involved in panel discussions to improve communication and the deliver of injury data.

b. Field Hockey. The NCAA Field Hockey committee recommended permitting field players to use protective eyewear or head covering throughout a match at any time. The CSMAS committee recommended conducting a survey of teams at the conclusion of the season to examine the extent to which student-athletes wore protective eyewear.

c. Football.

(1) The committee continues to follow the findings of NFL players with reported concussions and links to long-term mental deficits. The committee supported developing a multi-organizational educational project to develop a concussion safety DVD that will be focused on educating student-athletes and coaches in the sport of football. This concept follows a similar educational campaign on prevention spearing in football in recent years.

(2) Football helmet warning label and National Operating Committee on Standards for Athletic Equipment (NOCSAE) seal. It was brought to the committee's attention that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10117818

NCAA Committee on Competitive Safeguards
  and Medical Aspects of Sports
June 10-12, 2007
Page No. 7
_____

some member institutions are covering over (i.e., painting) over the label. The committee noted that the warning label language is often communicated to student-athletes verbally and in writing at the beginning of the season. The committee supported collaboratively sending a letter that would outline athletics equipment staff should not paint over the NOCSAE label or the warning label on football helmet or any other equipment that have labels for safety purposes.

d. Wrestling. The committee received a report from the NCAA Wrestling Rules committee liaison, Jim Thornton.

(1) The committee supported the recommendation to conduct medical skin checks each day of all competitions. The committee recommended that certified athletic trainers ensure their team physician is available for in-person consultations. The committee recommends that medical staffs monitor the weigh-ins and skin check areas consistent with the medical checks at the national tournament.

(2) The committee also supported the recommendation to reduce the time for anti-fungal treatment of tinea infections (ringworm) pending review of current research on the topical antifungal creams.

(3) The committee applauded the Wrestling Rules Committee training video efforts to better educate coaches and certified athletic trainers on the weight management system and skin infection prevention.

e. Championship Host Medical Evaluations. In an attempt to provide logistical information to future NCAA championship sites on the access to medical care and supplies, the committee reviewed pilot surveys and made the following recommendations: (1) medical staff from the host site should send out their medical coverage model, available equipment and supplies, and contact information that will be available on-site to all traveling teams prior to their arriving (i.e., general medical access and supplies, EMS, physician coverage, main hospital, imaging availability, 24-hour pharmacy access); (2) a brief sports medicine session should be held during the coaches meeting at which time the medical director should be introduced, the emergency plan discussed, and the phone numbers of host medical staff and local medical facilities should be provided.

f. Research Grants. The committee reviewed the Sports Science Research Grant program and recent submitted proposals.

12. Health and Safety Issues and Updates.

NCAA Committee on Competitive Safeguards
  and Medical Aspects of Sports
June 10-12, 2007
Page No. 8
_____

a.  Hazing. The committee received an update on the NCAA's involvement in hazing
    education, through the National Hazing Prevention Week Resource kit, the National
    Hazing Study from the University of Maine, and the Coaches and Captains Handbook,
    under development. It was noted that the NCAA will host a National Hazing Summit on
    January 10, as a pre-conference to the 2008 NCAA Convention in Nashville.

b.  Sickle cell trait.   The NATA hosted a summit on "Sickle Cell Trait and the Athlete"
    where the NCAA was a participant.   The committee did not endorse the consensus
    statement since it does not regulate the practice of medicine. The committee supports the
    current policy that promotes institutional autonomy when deciding the medical care and
    clearance of its student-athletes. Consensus statements published by medical
    organizations such as the NATA add to the collective knowledge base which NCAA
    members draw upon to make informed decisions on their campus.   The committee
    supported the statements educational emphasis to educate about the role of sickle cell
    trait.

c.  The committee received an update report of the Division III drug use deterrence project,
    which will be implemented on 100 campuses beginning August 2007 and extending
    through May 2009.

d.  Injury Surveillance System (ISS).   The committee emphasized the impact of the ISS
    crosses all sports and divisions providing committees invaluable data for decision making
    on policy and legislative initiatives.   The committee reviewed summary reports of
    individual sports.   The committee recommends staff examine incentive options for data
    input possibly from the Sports Science Safety research grant funds, external vendors,
    insurance carriers and NCAA affiliates.   The committee noted today's athletics culture
    and financial limitations are placing hardships on sports medicine staffs which are
    impacting their ability to voluntarily participate in the ISS data collection process.   The
    committee also noted that the inclusion of external vendor products with an upload
    process to the ISS database would greatly increase the amount of information.
    Mandating the ISS program to be used across the association was not supported by the
    committee at this time.

e.  Sports Medicine Handbook.  The committee approved the following edits to the 2007-08
    Sports Medicine Handbook: revision of the pregnant student-athlete guideline, edits to the
    lightning safety guideline, the addition of sports rules chart within the mouth guard
    guideline, updated to the Legislation Appendix and the Injury Surveillance Appendix.
    The committee identified future revisions need to focus on the menstrual-cycle
    dysfunction and skin infection guidelines to better reflect the current literature.

NCAA Committee on Competitive Safeguards
and Medical Aspects of Sports
June 10-12, 2007
Page No. 9
_____

f.  Basic accident insurance program update. Juanita Sheely provided an update on the new NCAA Basic Accident insurance program. This program helps institutions meet the insurance needs of the student-athlete below the catastrophic insurance deductible of $75,000 per injury. Mutual of Omaha is the provider of the program. Currently eight institutions participated in the pilot program last year. The target for 2007-08 will be 100 institutions however the program is open enrollment. Interest is evenly split across the divisions. Institutions do have the flexibility to add or delete options within their policy.

g.  The committee recommended developing additional education materials to clarify the role of sports psychologist on campuses focusing on qualifications, expectations, and membership services interpretation regarding countable coaches.

h.  The committee received a presentation on the NCAA medical hardship wavier process by Michael Mangarelli from membership services. The committee recommended that this information be readily accessible for consistent application across institutions and conferences. They supported the development of a webcast on the topic.

i.  The committee supported adding a web page to the Health and Safety Website that would list external links to national databases for the recording of injury and illnesses in collegiate student-athlete population (i.e., sudden death, ICD, AED, catastrophic injury, NCAA ISS).

j.  The committee discussed issues related to medical care provided to student-athletes and how compensation is handled at the membership level. Additional information will be prepared for further discussion at the December committee meeting.

k.  The committee received data regarding student-athlete nutrition behaviors and discussions within Division I pertaining to the practice of providing per diem. The committee received a notice regarding the new certification of "sports dietitian", encouraging inclusion on the sports medicine team.

l.  The committee received the final draft of the NCAA Mental Health Handbook, and were advised of the scheduled publication and dissemination plan to the membership this summer.

13. Future Meetings.  The committee approved the following dates and sites for its upcoming meetings:

a.  December 13 – 16, 2007 in Salt Lake City, Utah.

b.  May 31 – June 2, 2008 in Indianapolis, Indiana.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10117821

NCAA Committee on Competitive Safeguards
   and Medical Aspects of Sports
June 10-12, 2007
Page No. 10
_____

14. <u>Adjournment</u>.  The meeting was adjourned at 11:30 a.m.

# # # # # #

The National Collegiate Athletic Association
July 24, 2007                MEW/DK:rhb

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                NCAA10117822

# EXHIBIT 5

MINUTES OF THE

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

PLAYING RULES OVERSIGHT PANEL


Teleconference                                                    April 14, 2010
                                                              Noon Eastern time


Participants:

Tom Byrnes, Capital Athletic Conference
Jim Fallis, Northern Arizona University
Ted Gumbart, Atlantic Sun Conference
John Iamarino, Southern Conference
Greg McVey, Quincy University
Alan Patterson, Conference Carolinas
Larry Scott, Pacific-10 Conference
Jeff Stapleton, Monmouth University
Don Tencher, Rhode Island College, chair
Ira Zeff, Nebraska Wesleyan University
Ty Halpin, NCAA
Rachel Seewald, NCAA
Teresa Smith, NCAA


Jim Fiore, Stony Brook University, and Janet Montgomery, University of West Alabama, were
unable to participate on the call.


[Note: These minutes contain only actions taken (formal votes or stated "sense of the meeting")
in accordance with NCAA policy regarding minutes of all Association entities. While certain
items on the Panel's agenda were acted on at various times throughout the meeting, all final
actions within the given topic are combined in these minutes for convenience of reference.]


1.   Welcome.  Chair Don Tencher brought the call to order at 12:02 p.m. and welcomed the
     Panel members, thanking them for their time.


2.   Approval of Minutes.  Minutes from the January 13 annual meeting and the February 23
     conference call were approved as submitted.


3.   Soccer Proposals.  Alan Patterson reviewed the soccer proposals, noting the standardization
     of field size required no financial implication for existing fields, as the new standards apply

NCAA Playing Rules Oversight Panel
  Teleconference Minutes
April 14, 2010
Page No. { PAGE }
_____

only to installation of new fields. The Panel approved the proposal package, requesting that the Soccer Rules Committee provide further clarification to the changes associated with scorekeeper's responsibilities, including electronic scoring.

4. <u>Football Report</u>. Ty Halpin and Larry Scott presented the football report, noting that the committee proposed a rules change in the off-year of the printing cycle. The committee proposed making the formation of a wedge blocking scheme (more than two players shoulder to shoulder) on kicking plays. After the National Football League used this rule in the 2009 season, data collected indicated a significant decrease in injuries during kickoffs. The rules committee, therefore, proposed the rule to be implemented immediately due to the significant safety impact it could have on the game. The Panel approved this rules change effective with the 2010 season and accepted the committee's report, including several changes to be effective with the 2011 season.

5. <u>Field Hockey Modifications</u>. Mr. Halpin reported that a secretary-rules editor was selected to manage the collegiate modifications to the international rules for umpires and the membership. This addition received full support from all three championship committees and was in lieu of forming a separate rules committee for the sport. The Panel also approved a short list of modifications.

6. <u>Committee Zones</u>. Mr. Halpin explained the Collaboration Zones are a new online system being used by all NCAA committees. This structure will allow easy, secure access to material and provides a convenient place for committee discussion. All future PROP materials and agendas will be housed on the collaboration zone and will eliminate the need for e-mailing large documents.

7. <u>Other Business</u>. Mr. Tencher applauded the Panel for their actions taken in January regarding concussions. Based on information and feedback, he is certain the Panel took the correct steps.

The call was adjourned at 12:57.

# # # # #

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA Playing Rules Oversight Panel
  Teleconference Minutes
April 14, 2010
Page No. { PAGE }
_____


The National Collegiate Athletic Association
April 14, 2010                    TS:nkb

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                              NCAA00009787

# EXHIBIT 6

**NCAA Football Rules Committee**

**Historical review of rules intended to prevent/reduce head injury**

1906 – As the culmination of six meetings called by President Teddy Roosevelt to address the number of catastrophic injuries in college football, a joint committee approves nearly 30 changes to the playing rules, with most intended to remove brutality and to change the character of the game in a positive way.

1916 – First NCAA Football Rules Code developed and published.

1939 – All players required to wear helmets.

1962 – Recommended that properly fitted mouth protectors be worn.

1964 – No player may deliberately and maliciously use his helmet or head to butt or ram an opponent.

1970 – Spearing is defined as "the deliberate and malicious use of the head and helmet in an attempt to punish a runner after his momentum has stopped."

1973 – All players required to wear mouth protectors.

1973 – All players must have a helmet "with a secured chin strap."

1975 – Recommended that helmets meet NOCSAE test standards, and announced that it would be required starting with the 1978 season.

1976 – All players must have a helmet with a four-point chin strap fastened to participate in play.

1976 – Spearing redefined as "the deliberate use of the helmet in an attempt to punish the opponent."

NCAA10145748

1979 – Striking a runner with the crown or top of the helmet added as a foul.

1994 – Fighting defined and penalties established.

1996 – If the ball carrier's helmet comes off, the play is blown dead immediately. Also, the snapper is protected and may not be contacted for one second after snapping the ball.

2002 – Wording added to define a "defenseless player" and a point of officiating emphasis added to protect these players.

2006 – Eye shields must be completely clear to allow for quick medical diagnoses of student-athletes.

2005 – Modified rules regarding spearing and head-down contact, removing any reference to "intent." A significant educational focus is placed on the prevention of head and neck injuries with the membership and encourages appropriate groups (e.g., American Football Coaches Association) to teach proper tackling techniques.

2008 – The NCAA makes the horse-collar tackle illegal, revamps illegal contact of an opponent and simplifies the chop-block rule. More emphasis is placed on eliminating hits on defenseless players and blows to the head. No player is permitted to initiate contact and target an opponent with the crown of his helmet, and no player is permitted to initiate contact and target a defenseless opponent above the shoulders.

2009 – It becomes mandatory for the conference to review any flagrant personal fouls for targeting defenseless players or using the crown of the helmet. *(Note: Following the rules change in 2009 requiring conferences to further examine these fouls after games, 73 plays were reviewed, resulting in four suspensions from games. In addition, some conferences sent letters of reprimand to coaches and student-athletes following post-game reviews.)*

2010 – Strengthened existing rules regarding targeting and initiating contact and mandated that any injured player be removed from play and cleared by medical personnel before returning to play. Limited blocking schemes on kick plays to no more than two players shoulder to shoulder.

NCAA10145749

2011-Made the three-man wedge illegal on kickoffs. Also made it illegal for a player to go out of bounds to block an opponent.

2012 – Moved the kickoff location to the 35-yard line from the 30-yard line to encourage more touchbacks and limited kicking team players to be no more than five yards behind the kickoff line. Moved the touchback spot on free kicks to the 25-yard line to further encourage touchbacks. Also protected the receiving team during onside kick plays to allow for a reasonable opportunity to catch the ball. Further clarified and limited blocking below the waist.

Also in 2012, the committee approved a proposal to treat the helmet becoming dislodged (except if by a facemask or foul by the opponent) to be treated like an injury. The player that loses his helmet must be removed from play for at least one play to have the helmet checked and refitted by the team's equipment staff. By rule, a player that loses his helmet must not continue to participate and that player may not be contacted by the opposition.

Another safety rule was put in place to reduce potentially dangerous actions by the team receiving a punt. Shield block formations in use by kicking teams have created efforts to block the punt by jumping over the blockers, causing some receiving team players to land on their head/neck if contacted in the air. This action is now illegal and the receiving team is not allowed to leap over a blocker.

*Note: Research for portions of this report comes from former NCAA Secretary-Rules Editor David Nelson's book, The Anatomy of a Game, published in 1994.*

Compiled October 18, 2011 *(Updated April 11, 2012)*

NCAA10145750

# EXHIBIT 7

A G E N D A

National Collegiate Athletic Association

Playing Rules Oversight Panel

Teleconference                                      February 21, 2013
Call-in number: 866/590-5055                          11 a.m. Eastern
Access code: 2438588#

1.   Welcome. (Ted Gumbart)

2.   Approval of January 16, 2013, annual meeting report. [Supplement No. 1]

3.   Track and field proposal. [Supplement Nos. 2a and 2b] (Erin Lind and Rachel Seewald)

4.   Soccer report. [Supplement No. 3] (Doug Blais and Teresa Smith)

5.   Water polo report. [Supplement No. 4] (Tom Byrnes and Ashlee Ferguson)

6.   Women's volleyball report. [Supplement No. 5] (Derita Ratcliffe and Seewald)

7.   Review of communication to Playing Rules Committees. [Supplement No. 6] (Gumbart)

8.   Softball secretary-rules editor terms. (Gumbart)

9.   Other business.

10.  Adjournment.

NCAA10153603

# REPORT OF THE
# NCAA PLAYING RULES OVERSIGHT PANEL
# JANUARY 16, 2013, MEETING

## *ACTION ITEMS.*

- **None.**

## *INFORMATIONAL ITEMS.*

1. **Welcome and Opening Remarks.**  The Panel was welcomed to the meeting and all members introduced themselves and stated their background in playing rules and officiating.  Gratitude was expressed to NCAA staff for their work throughout the year.

2. **Approval of September 21, 2012, Teleconference Report and October 4–10, 2012, Electronic Communication Report.**  The reports from the September 21, 2012 teleconference and October 4–10, 2012, electronic communication were approved as written.

3. **Review of the NCAA Playing Rules Oversight Panel Policies and Procedures Manual.**  The Panel reviewed the Policies and Procedures Manual, and discussed its role and duties.

4. **Review of Significant, Historical PROP Actions.**  Significant actions taken by the Panel from 2003 to 2012 were reviewed and discussed.

5. **Report on the 2012 PROP Directive to NCAA Playing Rules Committees and the Request for Information.**  The Panel reviewed the information compiled from the rules committees and agreed the areas below should be priorities to be monitored in the future.  Staff was encouraged to share the compiled information with each rules committee to find common ground where possible.  In addition, it was suggested that the compiled information be distributed to conference offices and posted on the playing rules website.

    a. **Appeals, Protests and Forfeits.**  The Panel suggested that each sport should have rules stating the game officials' authority and jurisdiction.  The Panel also requested that the playing rules staff communicate internally with championship administrators regarding how contests with non-traditional conclusions (appeals, forfeits, no contests) are dealt with in the selection process.  The Panel further recommended continued discussion and communication with NCAA conference offices to continue to refine and standardize procedures where possible.

    b. **Game Environment and Sportsmanship.**  It was noted that the rules across sports penalizing unsporting behavior are inconsistent due to cultural differences

Report of the NCAA Playing Rules Oversight Panel
Page No. 2

_____

within each sport.  The Panel acknowledged that there has been an increased emphasis on sportsmanship over the past several years and that the NCAA "RESPECT" campaign and other sportsmanship initiatives are making a difference in the membership.

    **c.**    **Technology Impact.**  Technology continues to be a growing part of competition, from communication devices to performance monitors.  The Panel suggested that the fan experience should be included in future technology discussions if rules committees consider making alterations.

    **d.**    **By Sport Addendums.**  The Panel reviewed additional information that was provided for each sport in the areas of appeals/protests/forfeits, sportsmanship and technology.

    **e.**    **Statistics Policies and Guidelines.**  Some inconsistencies exist between NCAA championship policies and playing rules.  To assist conferences, the Panel suggested that all of these policies be posted in one place on the NCAA website.  Also, it was suggested that the statistics policies be reviewed at rules committee meetings with the goal of ensuring consistency.

**6.**    **National Collegiate Men's Volleyball Rule Modifications.**  The National Collegiate Men's Volleyball modifications were approved as written.  Key items included not allowing the libero to serve, limiting the number of substitutions to six per set, amending the centerline rule to reflect the modification made in men's Division III competition and permitting players to pursue the ball beyond the court as long as the play does not extend into the bleachers.

**7.**    **Review of Current Issues.**

    **a.**    **Equipment and Manufacturer Issues.**  NCAA staff discussed several areas where new equipment and uniform designs create challenges for the playing rules committees and secretary-rules editors.  The Panel continues to support the rules committee's efforts in this area with a focus on proper game administration and safety of the student-athletes.

    **b.**    **NCAA Central Hubs/ArbiterSports.**  The Panel reviewed a report of activity on the NCAA Central Hubs and the focus on national education and officiating training.  Across the board, membership and activity are growing with these sites and additional tools are being developed.

    **c.**    **Soccer Cards Update.**  NCAA staff shared the yellow and red card penalties reported through the NCAA statistics process, noting the numbers are not unreason-

Report of the NCAA Playing Rules Oversight Panel
Page No. 3

_____

able based on the number of players and number of games. Development of a central repository on the ArbiterSports Soccer Central Hub is underway whereby conferences will be given access to red card reports filed by referees. In addition, a Fair Play Rating System, which is calculated using a team's number of fouls, and yellow and red cards, was mentioned as a potential tool to rank teams' sporting conduct.

d. **Pole Vault Box Collar Update.** The NCAA Men's and Women's Track and Field Rules Committee approved a rules change during its January teleconference that would require a pole vault box collar that meets the most current ASTM Specification Standard to be in place by December 1, 2013. The rules proposal was distributed to the NCAA membership for comment and will be reviewed by PROP during its February teleconference.

e. **Men's Ice Hockey Visor Update.** The Panel reviewed a letter sent to the men's ice hockey membership detailing the long-term vision for reviewing proper equipment and new technology relating to a three-quarter shield in the sport. Further data will be collected throughout this season and a proposal may be considered at the playing rules committee's summer meeting.

f. **Update on New Rules Committees.** The Panel was reminded of the three new rules committees that were established in August 2012: Men's and Women's Swimming and Diving, Men's and Women's Track and Field/Cross Country and Wrestling.

g. **Process and Status for Replacement of Secretary-Rules Editors.** NCAA staff reviewed the status of and process for the secretary-rules editor replacements. PROP has oversight and approval authority of this process. The Panel was comfortable with the procedure in place and noted that finding qualified candidates is sometimes a challenge.

8. **Committee Reports.**

a. **Update on the Direction of the NCAA Committee on Sportsmanship and Ethical Conduct.** NCAA staff provided an update on the NCAA Committee on Sportsmanship and Ethical Conduct, which included the Violence Prevention Think Tank in Washington, D.C. on October 4. This meeting was attended by guest experts in the areas of research, education, advocacy, private and government specialists and athletics administrators who discussed interpersonal violence, activation on campus and the role of the NCAA. In addition, staff reported that the "RESPECT" campaign is considering the development of a fan-generated YouTube contest.

NCAA10153606

Report of the NCAA Playing Rules Oversight Panel
Page No. 4

———————

b.  **Update on the Playing Rules Portion of the December 2012 Report of the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports.** At its December meeting, the Committee on Competitive Safeguards and Medical Aspects of Sports (CSMAS) discussed several playing rules items, which included pole vault safety, basketball headgear, field hockey eyewear and ice hockey face-protection. The CSMAS report will be available to the membership in late January.

9.  **New Business and Open Forum.** The Panel requested that a letter be distributed to all rules committee chairs and secretary-rules editors thanking them for the response to the 2011-12 directive and outlining any remaining issues and concerns. NCAA staff will draft a letter and circulate it to the Panel for review.

10. **Planning for 2013.** Sport liaison assignments and the teleconference schedule for 2013 were discussed and approved. The next in-person meeting will be at the 2014 NCAA Convention in San Diego, California.

11. **Election of Chair.** Ted Gumbart, Commissioner of the Atlantic Sun Conference, will serve as chair through September 1, 2013. Nominations for the 2013-14 chair can be submitted to Ty Halpin (thalpin@ncaa.org) and Rachel Seewald (rseewald@ncaa.org).

*Committee Chair:* *Ted Gumbart, Atlantic Sun Conference*
*Staff Liaisons:* *Ty Halpin, Championships and Alliances*
*Rachel Seewald, Championships and Alliances*
*Teresa Smith, Championships and Alliances*
*Ashlee Ferguson, Championships and Alliances*
*Brad Woodward, Championships and Alliances*

| January 16, 2013, Meeting | |
|---|---|
| Attendees | Absentees |
| Shelley Appelbaum, Michigan State University | Larry Scott, Pacific-12 Conference |
| Kristy Bayer, Arkansas Tech University | |
| Doug Blais, Southern New Hampshire University | |
| Mary Bradbury, Eastern College Athletic Conference | |
| Thomas Byrnes, Capital Athletic Conference Inc. | |
| Ted Gumbart, Atlantic Sun Conference | |
| Sue E. Lauder, Fitchburg State University | |
| Erin Lind, Northern Sun Intercollegiate Conference | |
| Noreen Morris, Northeast Conference | |

NCAA10153607

Report of the NCAA Playing Rules Oversight Panel
Page No. 5

_____

| Derita Ratcliffe, University of Alabama, Birmingham | |
|---|---|
| Jon Steinbrecher, Mid-American Conference | |
| Other Attendees:<br><br>Scott Bearby, NCAA; Ashlee Ferguson, NCAA; Ty Halpin, NCAA; Greg Johnson, NCAA; Rachel Seewald, NCAA; Teresa Smith, NCAA; Brad Woodward, NCAA | |

NCAA10153608

# EXHIBIT 8



LEARN MORE
NISSAN    PROUD SUPPORTER OF COLLEGE ATHLETICS
Advertisement



**Sports   Schools   Championships   Video   Tickets   Shop**                    SIGN IN TO SAVE **Favorites**

# Panel approves rule adjustments
## Changes set in swimming and diving, softball, track, wrestling

**Greg Johnson, NCAA.com**
Last Updated - Jul 19, 2011 19:51 EDT
Contact | Archive | RSS

It's gone. Undo
What was wrong with this ad?
○ Irrelevant
○ Inappropriate
○ Repetitive

The NCAA Playing Rules Oversight Panel, which met via conference call last Wednesday, approved rules proposals in swimming and diving, including a "no-recall false start" proposal that goes into effect for the 2011-12 season.

| HOW WE GOT HERE |
| --- |
| • Softball committee pitches changes |
| • Swimming committee proposes changes |

The panel also approved proposals in softball, track and wrestling.

The no-recall false start rule means that unless a false start is blatant, the race would be allowed to continue and the student-athlete committing the false start would be disqualified after the event is finished. The false start must still have dual confirmation from the starter and the referee.

This rule is already in effect for international, national and high school swimming events. Previously, NCAA swimmers had to return to the starting blocks when false starts occurred.

PROP also approved a recommendation from the Men's and Women's Swimming and Diving Committee that any swimmer found wearing an illegal swimsuit will be disqualified from that event. The disqualified swimmer will be allowed to compete in another event in a dual meet or on another day in a multiple-day meet, so long as he or she wears a swimsuit that complies with NCAA regulations.

In 2009, the committee placed restrictions on high-tech swimsuits for collegiate competition. Suits cannot extend past the knee; men's suits must stop at the waist, and women's at the shoulder. Materials must be completely permeable to air and water and be no more than 0.8 millimeters thick.

The panel approved two other swimming and diving rules changes for next season:
• A track-style starting block with wedges is allowed for collegiate competition. These starting blocks, which will not be required but will be allowed, began appearing about two years ago. Research shows that there is no significant advantage to using this style of starting block.
• Swimmers may wear tape during competition if the referee determines it does not give the participant a competitive advantage. Before the start of the competition, the referee must receive a letter from a certified athletic trainer or doctor stating that the tape is being worn for a documented medical purpose. (The concern previously had been that some tapes with elasticity were being worn to gain an advantage.)

**Softball**
The Playing Rules Oversight Panel approved rules changes for 2012 in softball that include a "delayed dead ball" in cases when a runner leaves a base before the ball leaves the pitcher's hand.

Umpires will still signal that the runner left the base early but the play will continue. The defense will then be allowed to choose the result of the play, or it could opt to have the runner called out and a no pitch where the count would return to what it was on the hitter before the pitch was thrown.

For example, if the hitter lined into a double play, the defense could choose to take the two outs. Previously if a runner left a base early, the play was considered immediately dead and the pitch didn't count.

The panel also approved a rule that coaches will be required to provide to the umpires before the game a printed copy of the current NCAA Approved Softball Bat List with all of their team's bat models to be used in the game highlighted and the number of bats of each model indicated. The list will be used to conduct the umpires' pregame bat inspection.

Google
Advertisement

## NCAA News

NCAA   2016 Spring Championships Selections
MGLF   Benard wins DII individual title | Leaders
WTEN   Stanford upsets Florida
SOFT   Missouri shuts out BYU
SOFT   Nebraska downs Louisville in final inning
WGLF   Rollins separates itself from pack | Leaders
MGLF   Soliders honored at Championships
SOFT   Southern Arkansas beats West Texas A&M

More News »

By using this site, you agree to NCAA's **Terms of Service** and **Privacy Policy**    X

The Softball Rules Committee agreed earlier to predetermined dates for bat manufacturers to make any changes to their bats as listed on the NCAA Approved Softball Bat list. Dates for the 2012 season are Jan. 15, March 15, April 15 and June 15.

Other rules changes that go into effect for the 2012 season in softball are:
• A batter hit by a pitch that is completely inside of the batter's box will not be required to attempt to get out of the way of the pitch in order to be awarded first base.
• Brick, wood and cement backstops and home-run fences are required to be padded by the 2016 season.
• Host teams must provide 12 softballs, two of which need to be brand new, before a game begins.

**Women's Lacrosse**
The panel approved significant changes to the carding structure for players and coaches in women's lacrosse.

When a player receives a yellow card, her short-handed team is required to play one person down on the offensive and defensive ends of the field below the 30-yard restraining line. In other words, four players must remain above the restraining line in the defensive zone.

The NCAA Women's Lacrosse Rules Committee believes this will encourage safer play.

Additionally, all yellow cards are two-minute releasable penalties. For example, if a player on Team A receives a card and Team B scores before the two minutes are served, the player on Team A will be allowed to return to the field after the goal.

If a team has multiple players serving yellow cards, only one player will be released after a goal.

Previously, players with yellow cards were required to serve a non-releasable three minutes.

Players issued yellow cards must serve their penalties behind the substitution box, which is located five yards on both sides of midfield near the scorer's table. Any player who returns to the game before her penalty is up will have to start serving another two-minute releasable penalty.

Any yellow card issued to the bench will be given to the head coach instead of the individual who may have been called for the infraction. Any time a head coach receives a yellow card, that team must have a player serve a two-minute releasable penalty.

**Track and Field**
The Playing Rules Oversight Panel also approved a rules change in pole vault that requires schools to ensure that if a helmet is worn (helmets are permissive equipment), it must be specifically designed for pole vault competition and manufactured to comply with American Society for Testing and Materials standards.

However, the panel referred back to the Men's and Women's Track and Field Committee two recommendations the committee had made regarding pole vault. One would require schools to place suitable padding around the base of the pole vault standards and reasonably cover any hard or unyielding surface around the perimeter of the landing pad. The other would allow schools to place suitable padding around the vaulting box and extend into the box as long as it does not affect the bend of the pole.

The Playing Rules Oversight Panel, though, wants the committee to clarify where the pads should be placed.





**Featured Sections**
March Madness
Bracket Challenge Game
Schools
NCAA Sports App
Video
Brackets
Rankings
Newsletters

**Experience It Live**
Championship Tickets
NCAA Ticket Exchange
The NCAA Experience
NCAA Vault
NCAA Travel
DI Men's Basketball Tickets
March Madness Schedule

**NCAA Championships**
Championship Central
Championship Store
2016 Men's Final Four
2016 Women's Final Four
2016 Frozen Four
2016 Men's CWS
2016 Men's College World Series

**About the NCAA**
NCAA.org
Hall of Champions
Eligibility Center
Corporate Champions & Partners
Broadcast Media and Services
Elite 90

By using this site, you agree to NCAA.com's **Terms of Service** and **Privacy Policy**      X

Feedback  |  Terms of Service  |  Closed Captioning  |  AdChoices  |  Privacy Policy  |  RSS

© 2016 NCAA | Turner Sports Interactive, Inc.
NCAA.com is a part of Bleacher Report - Turner Sports Network, part of the Turner Sports and Entertainment Network.

Back to Top

By using this site, you agree to NCAA.com's **Terms of Service** and **Privacy Policy**    X

# EXHIBIT 9

Case: 1:13-cv-09116 Document #: 268-1 Filed: 05/20/16 Page 62 of 195 PageID #:7311

- [Home](#)
- [About](#)
- [Resources](#)
- [Media Center](#)
- [News](#)

# Basketball rules committees address court surface issues

May 14, 2012 12:00am

By Greg Johnson

Citing temporary decals and logos that may cause players to slip, the Men's and Women's Basketball Rules Committees are recommending a rules change that requires the court be "of a consistent surface" so student-athlete safety is not compromised.

The committees believe most surfaces already are in compliance, but no rule exists requiring a consistent surface. In some cases, temporary decals can create a difference on the floor that may cause players to lose their footing.

All rules proposal must be approved by the Playing Rules Oversight Panel, which is scheduled to meet via conference call June 12.

While this is a non-rules change year, committee members believe this change should be effective for the 2012-13 season for student-athlete safety purposes. The committees have asked NCAA staff to work with appropriate facility managers and court manufacturers to provide resources and best practices to the membership.

Members of both committees, which conducted their annual meeting May 6-8 in Indianapolis, agreed that "the playing court must be completely finished in a manner that is consistent throughout."

This rules change does not restrict the use of decals, but it does make clear that those marks must be similar to the rest of the court. This includes the three-foot sideline and restricted area behind the baseline.

The host game management will be responsible for ensuring the court is of a consistent finish, including any logos or decals that are legally allowed on the floor.

Members of the National Association of Basketball Coaches were briefed on the rules proposal last week and were supportive of making sure the playing surface was a safe environment.

Rules committee members cited times they've seen players slip on areas not consistent with the rest of the court. They are suggesting that any additional logos or decals have the same kind of traction as the rest of the floor.

"The safety of our student-athletes has to come before anything else," said John Dunne, the chair of the men's basketball rules committee and coach at St. Peter's. "We're seeing players slip on the non-consistent parts of the floor too many times."

Case: 1:13-cv-09116 Document #: 268-1 Filed: 05/20/16 Page 63 of 195 PageID #:7312

Dunne said the committees have talked about this change in the past.

"Sometimes it takes a high-profile event to make a rules change," Dunne added. "But we don't want to sit back and wait for injuries to happen and then pass the rule."

**Sportsmanship**

Both committees also recommended more stringent adherence to officiating guidelines regarding bench decorum by coaches and bench personnel next season.

Committee members believe the following behaviors hurt the image of the game and should result in a technical foul against the coach or other bench personnel:

- Comments directed at or referring to any game official that question the integrity of an official (repeated references to the number of fouls called against each team; suggesting an official is cheating" a team, etc.).
- Profane, vulgar, threatening, or derogatory remarks or personal comments relating to race, ethnicity, religion, gender or sexual orientation directed at or referring to any game official or opposing player/bench personnel.
- Prolonged, negative responses to a call/no-call that are disrespectful or unprofessional and include waving or thrashing the arms in disgust, dramatizing contact by re-enacting the play, or running or jumping "in disbelief" over a call/non-call.
- A negative response to a call/no-call that includes approaching/charging an official in a hostile, aggressive or otherwise threatening manner; emphatically removing one's coat in response to a call/no-call; or throwing equipment or clothing on to the floor.
- Continual criticism during a game regarding the same incident after being warned by an official.

Committee members understand that there will be spontaneous reactions to calls, but they don't want coaches to cross the line with officials.

"Emotion is a big part of the game, and you don't want to take it out of the game," Dunne said. "But you can still be emotional without displaying unsportsmanlike behavior."

The Men's College Basketball Officiating, LLC Board of Managers assisted and supported the development of more specific guidelines in this initiative. The MCBO, composed of NCAA conference commissioners, was developed to encourage consistent officiating nationally.

**Monitor reviews**

Both committees talked broadly about the use of video replay monitors during the game.

The women's committee split into working groups and discussed areas to monitor, such as which calls fall under correctable errors and technical fouls. Thatled to a discussion about whether monitor reviews hurt the flow of the women's game.

"We want to give our officials a tool to get the plays right," said Leslie Claybrook, women's basketball rules committee chair and assistant commissioner for championships at the Southeastern Conference. "But we don't want unnecessary stoppages of play. We want officials to use the monitor when something egregious has occurred or has a significant impact in the game."

Key in the discussion is whether the last few minutes of a contest merit different treatment.

"We are asking ourselves questions like, are we considering the last minute of a game to be more important than the previous 39 minutes?" Claybrook said. "The bottom line is the technology is here to stay, and it's not going anywhere."

The men's committee discussed the last minute of the game as a potential area to expand the use of the monitor to get calls right. With the expanded acceptance of technology, the committee will continue to review the appropriate use.

The women's committee also decided not to tinker with the rule that allows teams to have electronic devices such as tablets and laptops on the bench. These are allowable in the women's game for keeping statistics, but they cannot be used to transmit information. The men's committee discussed this and will continue to prohibit these devices on the bench, regardless of purpose.

**Men's Officiating Guidance**

The men's committee reviewed blocking and charging plays and the impact of the three-foot restricted area arc. The committee believes that in some cases the call is not being made correctly, sometimes giving the defense an advantage.

To help address this, the committee approved guidelines to help better administer these rules:

- Before the offensive player (with the ball) becomes airborne, the defender must have two feet on the floor, be facing the opponent and be stationary to draw a charge. Otherwise it should be a blocking foul.
- Secondary defenders (help defenders) moving forward or to the side are also in violation, and these should be blocking fouls.
- Contact that is "through the chest" is not de facto proof of a charge. The rule in its entirety must be considered before determining a foul.
- In some cases, it appears that a defender is being rewarded solely for being outside the arc, without considering the other aspects of the rules.

The committee plans a more thorough review of several other areas during the next year and will continue to develop better guidance for officials as needed.

**Women's chair**

Eastern Illinois Athletics Director Barbara Burke was nominated to be the next chair of the Women's Basketball Rules Committee.

If the Playing Rules Oversight Panel approves, she will replace Claybrook, who is rotating off the committee.

- News
- Men's Basketball
- Women's Basketball

  - Privacy/Legal Statement
  - Terms of Use

Case: 1:13-cv-09116 Document #: 268-1 Filed: 05/20/16 Page 65 of 195 PageID #:7314

- [Contact Us](#)
- [NCAA Employment](#)
- [FAQs](#)

# EXHIBIT 10

# **Football Rules and Interpretations**

**{ HYPERLINK \l "Rules_by_Year" }**

**{ HYPERLINK \l "Rule_Change_by_Subject" }**

**{ HYPERLINK \l "Emphasis_by_Year" }**

**{ HYPERLINK \l "Emphasis_by_Subject" }**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    NCAA10039554

{ HYPERLINK \l "coverpage" }

{ HYPERLINK \l "sixty_nine" } { HYPERLINK \l "eighteen_seventies" } { HYPERLINK \l "eighteen_eighties" } { HYPERLINK \l "eighteen_nineties" } { HYPERLINK \l "nineteen_hundreds" } { HYPERLINK \l "tens" } { HYPERLINK \l "twenties" } { HYPERLINK \l "thirties" } { HYPERLINK \l "forties" } { HYPERLINK \l "fifties" } { HYPERLINK \l "sixties" } { HYPERLINK \l "seventies" } { HYPERLINK \l "eighties" } { HYPERLINK \l "nineties" } { HYPERLINK \l "two_thousand" }

**1869-70**
- Round, rubber Association ball.
- 120 yards by 75 yards; uprights 24 feet apart.
- All goals count 1 each.
- Each team consisted of 25 players.

*{ HYPERLINK \l "Rules_by_Year" }*

**1871-72**
- 166 2/3 yards by 100 yards.

*{ HYPERLINK \l "Rules_by_Year" }*

**1872-73**
- 133 1/3 yards by 831/3 yards.

*{ HYPERLINK \l "Rules_by_Year" }*

**1873-74**
- Uprights 25 feet apart.
- Each team consisted of 20 players.

*{ HYPERLINK \l "Rules_by_Year" }*

**1875-76**
- Egg-shaped, leather-covered Rugby ball.

*{ HYPERLINK \l "Rules_by_Year" }*

**1876-77**
- 110 yards by 531/3 yards. Uprights 181/2 feet apart; crossbar 10 feet high.
- Each team consisted of 15 players.
- Fifteen players to a team and few if any substitutions.
- Holding and carrying the ball permitted.

*{ HYPERLINK \l "Rules_by_Year" }*

**1880-81**
- Each team consisted of 11 players.
- Eleven players on a side and a scrimmage line established.

*{ HYPERLINK \l "Rules_by_Year" }*

**1882-83**
- Field marked with transverse lines every five yards. This distance to be gained in three downs to retain possession.
- Touchdown 2 points; field goal 5 points; extra points 4 points
- Replacements for disqualified or injured players.
- Downs and yards to gain enter the rules.

*{ HYPERLINK \l "Rules_by_Year" }*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**1883-84**
- Safety 1, touchdown 4, goal after TD 4, goal from field 5.
- Touchdown 4 points; field goal 5 points; extra points 4 points
- Scoring system established.

*{ HYPERLINK \l "Rules_by_Year" }*


**1884-85**
- Safety 2, touchdown 4, goal from field 5.

*{ HYPERLINK \l "Rules_by_Year" }*

**1894-95**
- No one wearing projecting nails or iron plates on his shoes, or any metal substance upon his person, is allowed to play. No greasy or sticky substance shall be used on the person of players.

*{ HYPERLINK \l "Rules_by_Year" }*

**1895-96**
- Only one man in motion forward before the snap. No more than three players behind the line. One player permitted in motion toward own goal line.

*{ HYPERLINK \l "Rules_by_Year" }*

**1896-97**
- Prolate spheroid, without specific measurements.

*{ HYPERLINK \l "Rules_by_Year" }*

**1897-98**
- Touchdown 4, field goal 5, touchdown failing goal 5, safety 2.
- Substitutions may enter the game any time at discretion of captains

*{ HYPERLINK \l "Rules_by_Year" }*

**1898-99**
- Touchdown 5 points; field goal 5 points; extra points 1 point

*{ HYPERLINK \l "Rules_by_Year" }*

**1902-03**
- Teams change goals after every try at goal following a touchdown, after every goal from the field and also at the beginning of the half.

*{ HYPERLINK \l "Rules_by_Year" }*

**1903-04**
- If head protectors are worn, there can be no sole leather or other hard or unyielding substances in their construction. Leather cleats on shoes allowed.

*{ HYPERLINK \l "Rules_by_Year" }*

**1904-05**
- Goal from field 4.
- Touchdown 5 points; field goal 4 points; extra points 1 point

*{ HYPERLINK \l "Rules_by_Year" }*

**1906-07**
- One forward pass legalized behind the line if made five yards right or left of center. Ball went to opponents if it failed to touch a player of either side before touching the ground. Either team could recover a pass touched by an opponent. One pass each scrimmage down.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Forward passes permitted. Ten yards for first down.

*{ HYPERLINK \l "Rules_by_Year" }*

**1908-09**
- First documented jersey numbers used by Washington & Jefferson.

*{ HYPERLINK \l "Rules_by_Year" }*

**1909-10**
- Goal from field 3.
- Touchdown 5 points; field goal 3 points; extra points 1 point

*{ HYPERLINK \l "Rules_by_Year" }*

**1910-11**
- Seven players required on line.
- Pass interference does not apply 20 yards beyond the line of scrimmage. Passer must be five yards behind the line of scrimmage. One forward pass permitted during each down.

*{ HYPERLINK \l "Rules_by_Year" }*

**1911-12**
- Illegal to conceal ball beneath a player's clothing.

*{ HYPERLINK \l "Rules_by_Year" }*

**1912-13**
- 28-281/2 inches around ends, 221/2-23 inches around middle, weight 14-15 ounces.
- Field 120 yards by 531/3 yards, including two 10-yard end zones.
- Touchdown 4.
- Touchdown 6 points; field goal 3 points; extra points 1 point

*{ HYPERLINK \l "Rules_by_Year" }*

**1914-15**
- Roughing the passer added.

*{ HYPERLINK \l "Rules_by_Year" }*

**1915-16**
- Numbers added to jerseys.

*{ HYPERLINK \l "Rules_by_Year" }*

**1920-21**
- Clipping defined.

*{ HYPERLINK \l "Rules_by_Year" }*

**1921-22**
- Ball put in play at 30-yard line after a safety, 20-yard line after a touchback.

*{ HYPERLINK \l "Rules_by_Year" }*

**1922-23**
- Try-for-point by scrimmage play from 5-yard line.
- Players withdrawn during the first half may be returned during the second half. A player withdrawn in the second half may not return.
- Try-for-point introduced. Ball brought out five yards from goal line for scrimmage, allowing try for extra point by place kick, drop kick, run or forward pass.

*{ HYPERLINK \l "Rules_by_Year" }*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10039557

**1923-24**
- Handing the ball forward is an illegal forward pass and receivers going out of bounds and returning prohibited.

*{ HYPERLINK \l "Rules_by_Year" }*

**1924-25**
- Try-for-point by scrimmage play from 3-yard line.

*{ HYPERLINK \l "Rules_by_Year" }*

**1925-26**
- Kickoff returned to 40-yard line. Clipping made a violation, with penalty of 25 yards.

*{ HYPERLINK \l "Rules_by_Year" }*

**1927-28**
- Goal posts moved back 10 yards, to end line.
- Goal posts placed on end lines.
- Rubber cleats allowed, but under no conditions are cleats to be dangerously sharp.
- One-second pause imposed on shift. Thirty seconds allowed for putting ball in play. Huddle limited to 15 seconds. To encourage use of lateral pass, missed backward pass other than from center declared dead ball when it hits the ground and cannot be recovered by opponents.

*{ HYPERLINK \l "Rules_by_Year" }*

**1929-30**
- 28-281/2 inches around ends, 22-221/2 inches around middle, weight 14-15 ounces.
- Try-for-point by scrimmage play from 2-yard line.
- All fumbles ruled dead at point of recovery.

*{ HYPERLINK \l "Rules_by_Year" }*

**1930-31**
- No player shall wear equipment that endangers players. The committee forbids the use of head protectors or jerseys that are so similar in color to the ball that they give the wearer an unfair and unsportsmanlike advantage over the opponent.
- Stripes may be used to break up the solid colors.

*{ HYPERLINK \l "Rules_by_Year" }*

**1932-33**
- Most far-reaching changes in nearly a quarter of a century set up safeguards against hazards of game. (1) Ball declared dead when any portion of player in possession, except his hands or feet, touches ground. (2) Use of flying block and flying tackle barred under penalty of five yards. (3) Players on defense forbidden to strike opponents on head, neck or face. (4) Hard and dangerous equipment must be covered with padding.

*{ HYPERLINK \l "Rules_by_Year" }*

**1933-34**
- Head protectors or helmets recommended to be worn by all players.

*{ HYPERLINK \l "Rules_by_Year" }*

**1934-35**
- 28-281/2 inches around ends, 211/4-211/2 inches around middle, weight 14-15 ounces.
- Three changes encourage use of pass. (1) First forward pass in series of downs can be incomplete in the end zone without loss of ball except on fourth down. (2) Circumference of ball reduced,

NCAA10039558

making it easier to throw. (3) Five-yard penalty for more than one incomplete pass in same series of downs eliminated.
*{ HYPERLINK \l "Rules_by_Year" }*

**1937-38**
- All players must wear minimum 6-inch Arabic numerals on the front and minimum 8-inch Arabic numerals on the back of jerseys.

*{ HYPERLINK \l "Rules_by_Year" }*

**1939-40**
- All players must wear helmets.

*{ HYPERLINK \l "Rules_by_Year" }*

**1941-42**
- For night games, a white ball or other colored ball with two black stripes around the ball may be used at the discretion of the referee.
- A player may substitute any time but may not be withdrawn or the outgoing player returned to the game until one play had intervened. Platoon football made possible.
- Fourth-down forward pass incomplete in end zone no longer a touchback. Ball goes to opponentat spot where put in play.
- Legal to hand ball forward behind the neutral zone.

*{ HYPERLINK \l "Rules_by_Year" }*

**1945-46**
- Forward pass may be thrown from anywhere behind the line, encouraging use of modern T formation.

*{ HYPERLINK \l "Rules_by_Year" }*

**1946-47**
- All players must wear minimum 8-inch Arabic numerals on front (changed from 6 inches) and minimum 10-inch Arabic numerals on back of jerseys (changed from 8 inches), of a single color which must be in sharp contrast with the color of the jerseys.

*{ HYPERLINK \l "Rules_by_Year" }*

**1947-48**
- All players urged to be numbered in a uniform manner. Ends to wear numbers in the 80s; tackles, 70s; guards, 60s; centers, 50s; and backs, 10-49.

*{ HYPERLINK \l "Rules_by_Year" }*

**1948-49**
- One-inch kicking tees permitted.
- Unlimited substitution on change of team possession.

*{ HYPERLINK \l "Rules_by_Year" }*

**1949-50**
- Intentional grounding of a pass shall result in a loss of down and a five-yard penalty from the spot of the foul.
- Blockers are required to keep hands against their chest.

*{ HYPERLINK \l "Rules_by_Year" }*

**1951-52**

NCAA10039559

- Any circular or ring cleat prohibited unless it has rounded edges and a wall at least 3/16-inch thick. Face masks added to helmet. Must be made of non-breakable, molded plastic with rounded edges.
- Fair catch restored.

*{ HYPERLINK \l "Rules_by_Year" }*

**1952-53**
- Ball may be inclined no more than 45 degrees by snapper.
- Penalty for striking with forearm, elbow or locked hands, or for flagrantly rough play or unsportsmanlike conduct, changed from 15 yards to mandatory suspension.

*{ HYPERLINK \l "Rules_by_Year" }*

**1953-54**
- Two-platoon abolished and players allowed to enter the game only once in each quarter.

*{ HYPERLINK \l "Rules_by_Year" }*

**1954-55**
- Changes each year toward more liberalized substitution rule and platoon football.

*{ HYPERLINK \l "Rules_by_Year" }*

**1956-57**
- Rubber-covered ball permitted.

*{ HYPERLINK \l "Rules_by_Year" }*

**1957-58**
- Team area at 35-yard lines.
- Penalty for grabbing face mask.

*{ HYPERLINK \l "Rules_by_Year" }*

**1958-59**
- One-point & two-point conversion (from 3-yard line). One-point safety added.
- Touchdown 6 points; field goal 3 points; extra points 1 point/kick, 2 points/run or pass.

*{ HYPERLINK \l "Rules_by_Year" }*

**1959-60**
- Uprights widened to 23 feet, 4 inches apart.
- Distance penalties limited to one-half distance to offending team's goal line.

*{ HYPERLINK \l "Rules_by_Year" }*

**1962-63**
- All players are recommended to wear properly fitted mouth protectors.

*{ HYPERLINK \l "Rules_by_Year" }*

**1965-66**
- Two-inch kicking tees permitted.
- Platoon football returns. Unlimited substitutions between periods, after a score or try

*{ HYPERLINK \l "Rules_by_Year" }*

**1966-67**
- Pylons placed in corners of end zone and at goal lines mandatory in 1974.
- Mandatory numbering of five players on the line 50-79.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10039560

- Players prohibited from wearing equipment with electronic, mechanical or other signal devices for the purpose of communicating with any source.
- Compulsory numbering system makes only players numbered other than 50-79 eligible forward pass receivers.

*{ HYPERLINK \l "Rules_by_Year" }*

**1967-68**
- Coaching from sideline permitted.

*{ HYPERLINK \l "Rules_by_Year" }*

**1968-69**
- Metal face masks having surfaces with material as resilient as rubber are allowed.

*{ HYPERLINK \l "Rules_by_Year" }*

**1970-71**
- All players numbered 1-99.
- Shoe cleats more than one-half inch in length (changed from three-quarters inch) prohibited.
- Eleven-game schedule permitted.

*{ HYPERLINK \l "Rules_by_Year" }*

**1971-72**
- Crack-back block (blocking below waist) illegal.

*{ HYPERLINK \l "Rules_by_Year" }*

**1972-73**
- All players must wear mouth protectors, beginning with 1973 season.
- Freshman eligibility restored.

*{ HYPERLINK \l "Rules_by_Year" }*

**1973-74**
- Teams are allowed to use ball of their choice while in possession.
- All players shall wear head protectors with a secured chin strap.

*{ HYPERLINK \l "Rules_by_Year" }*

**1974-75**
- Ball must go between the uprights for a successful field goal, over the uprights previously scored.
- All players shall wear shoulder pads.
- Substitutes must be in for one play and replaced players out for one play.

*{ HYPERLINK \l "Rules_by_Year" }*

**1976-77**
- All players shall wear hip pads and thigh guards.
- Forfeit score changed from 1-0 to score at time of forfeit if the offended team is ahead at time of forfeit.
- Offensive blocking changed to provide half extension of arms to assist pass blocking.

*{ HYPERLINK \l "Rules_by_Year" }*

**1977-78**
- Clock started on snap after a penalty.

*{ HYPERLINK \l "Rules_by_Year" }*

**1978-79**
- Ball may not be altered, and new or nearly new balls added.

NCAA10039561

- Unsuccessful field goal returned to the previous spot.

*{ HYPERLINK \l "Rules_by_Year" }*

**1979-80**
- Beginning in 1981, one team shall wear white jerseys.

*{ HYPERLINK \l "Rules_by_Year" }*

**1980-81**
- Retreat blocking added with full arm extension to assist pass blocking, and illegal use of hands reduced to five yards.

*{ HYPERLINK \l "Rules_by_Year" }*

**1982-83**
- 107/8 to 117/16 inches long, 20 3/4 to 211/4 inches around middle, and 27 3/4 to 281/2 inches long-axis circumference.
- Tearaway jersey eliminated by charging a timeout.
- Pass interference only on a catchable forward pass. Forward pass intentionally grounded to conserve time permitted.

*{ HYPERLINK \l "Rules_by_Year" }*

**1983-84**
- Mandatory white jersey for visiting teams.
- First down added to roughing the passer.
- Offensive encroachment changed...no offensive player permitted in or beyond the neutral zone after snapper touches ball.

*{ HYPERLINK \l "Rules_by_Year" }*

**1984-85**
- Try may be eliminated at end of game if both captains agree.
- Defensive pass interference penalty changed from spot of foul to 15 yards from previous spot.

*{ HYPERLINK \l "Rules_by_Year" }*

**1985-86**
- Retreat block deleted and open hands and extended arms permitted anywhere on the field.
- One or both feet on ground required for blocking below waist foul.

*{ HYPERLINK \l "Rules_by_Year" }*

**1986-87**
- Therapeutic or preventive knee braces must be worn under the pants.
- Kickoff from the 35-yard line.

*{ HYPERLINK \l "Rules_by_Year" }*

**1988-89**
- Extra points 2 points/defense.  Note: Safety worth 1 point from 1882-1883, 2 points in all seasons since 1884.
- Defensive team is allowed to score two points on return of blocked extra-point kick attempt or interception of extra-point pass attempt.

*{ HYPERLINK \l "Rules_by_Year" }*

**1989-90**
- Kicking tees eliminated for field goals and extra point attempts.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*{ HYPERLINK \l "Rules_by_Year" }*

**1990-91**
- Pass thrown immediately to the ground to conserve time legal.
- Defense allowed to advance fumbles that occur beyond the neutral zone.

*{ HYPERLINK \l "Rules_by_Year" }*

**1991-92**
- Uprights moved back to 18 feet, 6 inches apart.
- Rib and back pad covering mandatory.
- Width between goal-post uprights reduced from 23 feet, 4 inches to 18 feet, 6 inches. Kickoffs out of bounds allow receiving team to elect to take ball 30 yards beyond yard line where kickoff occurred. Holding behind the neutral zone penalized 10 yards from the spot of the foul.

*{ HYPERLINK \l "Rules_by_Year" }*

**1992-93**
- Defense is allowed to advance fumbles regardless of where they occur. Changes ruling of 1990 fumble advancement.

*{ HYPERLINK \l "Rules_by_Year" }*

**1993-94**
- Rubber or composition ball ruled illegal
- Hash marks moved six feet, eight inches closer to center of field to 60 feet from each sideline (40 feet apart)
- Players who are bleeding or whose uniforms are saturated with blood must come out of the game until their return has been approved by medical personnel.
- Guard-around or "fumblerooski" play ruled illegal.

*{ HYPERLINK \l "Rules_by_Year" }*

**1994-95**
- Players involved in a fight after half time disqualified for first half of next game; substitutes and coaches who participate in a fight in their team area or leave the team area to join a fight disqualified for entire next game; squad members and coaches involved in a fight during half time disqualified for first half of next game.
- Standards established to limit glove stickiness. Jerseys that extend below the top of the pants must be tucked into the pants.
- Ball must be catchable for offensive player to be charged with pass interference.

*{ HYPERLINK \l "Rules_by_Year" }*

**1995-96**
- Try at end of game mandatory unless team behind in score leaves field.
- Home team may wear white jerseys if both teams agree before the season.
- Defense penalized five yards for entering neutral zone before snap and causing offensive player to react immediately. Players prohibited from removing helmets on the field. Players disqualified after second unsportsmanlike-conduct foul in one game. Fight suspensions allowed to carry over to next season.

*{ HYPERLINK \l "Rules_by_Year" }*

**1996-97**
- Cleats limited to one-half inch in length (see 1970). Violators disqualified for remainder of game and entire next game. Rule a dead ball when a ball carrier's helmet comes completely off, with the ball belonging to runner's team at that spot. Jerseys must extend to top of pants and must be tucked in if longer.

NCAA10039563

- Principle of "reasonable opportunity to catch the pass" applied to intentional grounding situations.
- NCAA tiebreaker system to be used in all games tied after four periods.

*{ HYPERLINK \l "Rules_by_Year" }*

**1997-98**
- Require all players on the same team to wear white or team-colored socks of the same design and length. Leg coverings, such as tights, if worn, must be in team colors and of a uniform design for all players on the same team.
- In overtime tiebreaker system, require a team that scores a touchdown to attempt a two-point conversion in the third overtime period. Approved a rule requiring a game to be declared a tie if it is in overtime but cannot be finished due to weather, darkness or other conditions. Chop block redefined to be penalized if "obviously delayed" and added restrictions to the "crack-back" block to make it illegal up to five yards beyond line of scrimmage regardless of position of the ball.
- Officials prompted to enforce mouthpiece rule, charging a timeout to offending team if clock is stopped and player does not have mouthpiece in place. To prevent opponents from leveling punt returners with unnecessarily vicious hits, the penalty was increased from five to 15 yards.

*{ HYPERLINK \l "Rules_by_Year" }*

**1998-99**
- All eye shields, if worn, must be clear (transparent) and made from molded and rigid material. NCAA member institutions can, in the case of a death or catastrophic injury or illness, memorialize a player or person with a patch or decal not greater than 1 1/2 inches in diameter that displays the number, name or initials of the individual on the uniform or helmet.
- A backward pass can be recovered and advanced by the defense.
- For the first time in history, a backward pass can be recovered and advanced by the defense. It is now consistent with the application of the rules similar to how the defense is allowed to advance a fumble.

*{ HYPERLINK \l "Rules_by_Year" }*

**1999-00**
- Visible bandanas are ruled an illegal uniform attachment. Eye shields that are not clear are permitted, only with proper documentation from the player's institution and approval from a medical doctor designated by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports.
- Intentional grounding of a pass shall result in a loss of down at the spot of the foul.
- Holding behind the neutral zone will be penalized 10 yards from the previous line of scrimmage. Dead-ball fouls by both teams which are part of continuing action or of a retaliatory nature and reported at the same time will be canceled and the penalties disregarded. However, any disqualified player must leave the game. Teams may not break the huddle with 12 or more players.

*{ HYPERLINK \l "Rules_by_Year" }*

**2000-01**
- A maximum of two defensive players are allowed to wear 4-inch by 12-inch white towels without markings attached to the front belt.
- Offensive teams, while in the process of substitution or simulated substitution, are prohibited from rushing quickly to the line of scrimmage and snapping the ball with the obvious attempt to create a defensive disadvantage.
- Allowing a passer, who is five yards or more toward the sideline from the original position of the ball at the snap, to throw the ball so that it lands beyond the neutral zone to avoid loss of yardage without penalty

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- An illegal block shall now include any high-low, low-high or low-low combination block by any two offensive players beyond the neutral zone regardless of simultaneous contact by both. Also, blocking below the waist by offensive players ("crack-back block") now includes not only wide receivers or players in motion but any player in motion in any direction at the snap and the area is expanded to included the neutral zone and 10 yards beyond.
- Prohibiting a defensive player(s) aligned in a stationary position within one yard of the line of scrimmage from making quick or abrupt actions that are not part of normal player movement in an obvious attempt to cause an offensive player(s) to foul.

*{ HYPERLINK \l "Rules_by_Year" }*

**2001-02**
- A charged team timeout can be 30 seconds in duration if so desired by the team calling the timeout.
- Most penalties for offensive-team fouls that occur behind the neutral zone will be enforced from the previous spot.

*{ HYPERLINK \l "Rules_by_Year" }*

**2002-03**
- The penalty for interference with the opportunity to catch a kick, when no contact is involved, increased from five to 10 yards.
- Yardage enforcement of flagrant personal fouls during possession by the defensive team may carry from one extra period to the next.

*{ HYPERLINK \l "Rules_by_Year" }*

**2003-04**
- The game clock on all kickoffs will start when the ball is legally touched in the field of play.
- The two-yard restricted area around a player positioned to catch a free or scrimmage kick is deleted.
- Offensive linemen at the snap positioned more than seven yards in any direction from the middle lineman of the offensive formation are prohibited from blocking below the waist toward the original position of the ball in or behind the neutral zone and within 10 yards beyond the neutral zone. Backs at the snap positioned outside the normal tackle position in either direction toward a sideline, or in motion at the snap, are prohibited from blocking below the waist toward the original position of the ball in or behind the neutral zone and within 10 yards beyond the neutral zone.

*{ HYPERLINK \l "Rules_by_Year" }*

**2004-05**
- A glove cannot include any additional material that connects any of the fingers and/or thumb.
- On scrimmage plays, one white towel without markings may be worn by one interior offensive lineman, one offensive backfield player and a maximum of two defensive players. The towels of the offensive backfield and defensive players must be 4-inches by 12-inches and must be worn on the front or side belt. There are no restrictions on the size or location of the towel worn by the offensive lineman. On free kicks, one white towel without markings may be worn by a maximum of two Team A and two Team B players. The towels worn on free kicks must be 4-inches by 12-inches and must be worn on the front or side belt.
- The defensive team will be given the opportunity to complete its substitutions when offensive teams, while in the process of substitution or simulated substitution, rush quickly to the line of scrimmage with the obvious attempt to create a defensive disadvantage.
- A defensive player who is blocked into the passer is exempt from being penalized for roughing the passer.
- A camera, with no audio component, may be attached to cables that hang over the team area.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- The head coach may now request a charged team timeout when timeouts are not exhausted, and when the ball is dead.
- No defensive player who runs forward and leaps in an obvious attempt to block a field goal or try may land on an opponent.
- The referee, if he is equipped with a microphone, will announce the number of the player committing the foul.
- The receiving team has the option of assessing the penalty for encroachment by the kicking team during a free kick from either the previous spot or from the end of the receiving team's run.

*{ HYPERLINK \l "Rules_by_Year" }*

**2005-06**
- Expanded experimental use of in-game video officiating review to all member conferences and institutions for the 2005 season. The same parameters approved for 2004 for the Big Ten Conference will be used. The video replay will not be allowed in postseason bowl games or in NCAA championships.
- Blocking from behind near the line of scrimmage was limited to contact above the knee.
- Another safety concern – helmet-to-helmet contact and spearing -- was addressed by taking a player's intention out of the equation to assist officials in the proper enforcement of the rule governing that type of contact.
- The committee also defined regulation of unsportsmanlike conduct and celebration penalties to assist officials, players and coaches in understanding what type of action warrants a penalty. That means the committee does believe that spontaneous celebrations that are not prolonged or intended to bring attention to the individual should be allowed on a limited basis.
- A defined list of unacceptable behaviors was included in the 2005 rules book.

*{ HYPERLINK \l "Rules_by_Year" }*

**2006-07**
- The length of the kicking tee was shortened to one inch. Also, the use of eye shields that are not clear during games was eliminated.
- After allowing instant replay to review a game official's call on the field for two seasons on an experimental basis, the committee approved one procedure for all institutions and conferences that choose to use it. The procedure calls for the replay official in the press box to review all plays on the field and stop the game.
- The committee also decided to allow each team one challenge during the course of a game, as long as the challenging team has a timeout. The head coach may request a review by signaling for a timeout. If the challenge overturns the call on the field, the challenging team is not charged a timeout. If the call is not overturned, the team is charged a timeout. If a team does not have any timeouts remaining, it is not allowed to request a review.
- In hopes of shortening the length of games, halftime is recommended to be 20 minutes in duration, but competing institutions are now permitted to shorten or lengthen halftime by mutual consent.
- Other changes include starting the game clock on kickoffs when the kicker's foot touches the ball, rather than when the returning team touches the ball, and starting the game clock when the ball is ready for play after a change of possession.
- The enforcement of all procedural fouls committed by the kicking team that occur before a scrimmage kick (except field goals) was changed. Now, the receiving team will have the option of accepting the penalty after the return or forcing the kicking team to kick again five yards from the original line of scrimmage.

*{ HYPERLINK \l "Rules_by_Year" }*

**2007-08**
- The coin toss ends when captains return to the nine-yard marks
- After television timeouts, the ready-for-play interval is 15 seconds

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- After an inadvertent whistle game time is restored
- The clock starts when a free kick is legally touched
- When Team B is awarded a first down, the clock starts on the snap
- The free kicking team's restraining line is the 30-yard line
- The referee declares the ball ready for play when the umpire hands the ball to the kicker
- Free kick out of bounds: Five-yard penalty previous spot or Team B's ball 35 yards from Team A's restraining line
- Penalty enforcement on kick is the previous or succeeding spot
- Defensive players restricted on kicks
- Egregious fouls added to reviewable replays

*{ HYPERLINK  \l "Rules_by_Year" }*

**2008-09**
- Referee microphone mandatory in 2010
- Recording opponent's signals prohibited
- 40/25-second play clock system instituted
- Chop block redefined
- 15-second play clock eliminated
- Clock adjustment on inadvertent whistle
- Game clock starts when ball is ready for play after ball carrier goes out of bounds
- Kickoff out of bounds: option to snap at 40-yard line
- Horse-collar tackle prohibited
- Five-yard facemask foul eliminated
- Helmet contact/targeting an opponent rule redefined
- Sideline warning changed to sideline interference foul
- Field goals included in reviewable scoring plays
- If runner ruled down, immediate fumble recovery is reviewable
- If runner ruled out of bounds, immediate score is reviewable
- Replay official may correct egregious errors
- Successful coach's challenge extended to maximum of two per game

*{ HYPERLINK  \l "Rules_by_Year" }*


**{ HYPERLINK  \l "coverpage" }**


A **{ HYPERLINK  \l "B" }** C **{ HYPERLINK  \l "D" }** **{ HYPERLINK  \l "E" }** **{ HYPERLINK  \l "F" }** **{ HYPERLINK  \l "G" }** H I J **{ HYPERLINK  \l "K" }** L **{ HYPERLINK  \l "M" }** N **{ HYPERLINK  \l "O" }** **{ HYPERLINK  \l "P" }** Q **{ HYPERLINK  \l "R" }** **{ HYPERLINK  \l "S" }** **{ HYPERLINK  \l "T" }** U V W X Y Z


**The Ball**
**1869- 70** Round, rubber Association ball.
**1875-76** Egg-shaped, leather-covered Rugby ball
**1896-97** Prolate spheroid, without specific measurements.
**1912-13** 28-281/2 inches around ends, 221/2-23 inches around middle, weight 14-15 ounces.
**1929-30** 28-281/2 inches around ends, 22-221/2 inches around middle, weight 14-15 ounces.
**1934-35** 28-281/2 inches around ends, 211/4-211/2 inches around middle, weight 14-15 ounces.
**1941-42** For night games, a white ball or other colored ball with two black stripes around the ball may be used at the discretion of the referee.
**1952-53** Ball may be inclined no more than 45 degrees by snapper.
**1956-57** Rubber-covered ball permitted.
**1973-74** Teams allowed to use ball of their choice while in possession.
**1978-79** Ball may not be altered, and new or nearly new balls added.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

comments that the substitution of skilled offensive players is timed so closely to the snap that the defense has little or no chance to place personnel in proper positions.

Therefore, rules for 2000 prohibit "late substitution(s) and snapping the ball with an obvious attempt to create a defensive disadvantage." This restriction does not allude to "hurry-up" offense near the end of a half, where the purpose is to start as many plays as possible in minimal-time situations.

- **ILLEGAL BLOCKS** – Rules restricting blocking below the waist have developed over many years to prevent devastating knee and ankle injuries. The theory is that a player who does not see the impending contact is much more susceptible to injury than one who is aware of the opponent and therefore can attempt to ward him off.

  As a consequence, blocking below the waist is restricted on all kicks, change of possession plays, chop blocks, clipping, eligible receivers, and players positioned to receive backward passes behind the neutral zone. New rules have been enacted to eliminate combination blocks beyond the neutral zone and crack back blocks below the waist behind, in, and up to 10 yards beyond the neutral zone.

  When teaching blocking techniques, coaches are encouraged to instruct players to initially contact opponents at the waist or above, rather than below the waist, whenever possible.

- **RESPECT FOR OPPONENTS** – Football is a rugged contact sport rewarding a level of aggressiveness unseen in any other sport. However, a lack of respect for teammates, opponents and spectators is beyond the realm of aggressive behavior.

  Individuals must realize that for every outstanding play they make, their 10 teammates aided in their success. Baiting or insulting an opponent exceeds the limits of good taste.

  Delayed, excessive or prolonged acts by which a player attempts to focus attention upon himself belittle the efforts of teammates. Team celebration is important to the treat tradition of American football, but choreographed displays are not spontaneous and will be penalized.

{ HYPERLINK \l "Emphasis_by_Year" }

**2001-02**

- **SPORTSMANSHIP AND PENALTY ENFORCEMENT OF UNSPORTSMANLIKE ACTS–** For over 50 years after the introduction of the Football Code, the only rule pertaining to unsportsmanlike conduct was directed at penalizing "abusive or insulting language to opponents or officials." This statement was replaced nearly 10 years ago by "obscene or vulgar language or gestures, or acts that provoke ill will or are demeaning to opponents or game officials."

  As the trend toward individuals drawing attention to themselves, rather than celebrating with teammates, grew in the late 1960s, a rule was added requiring a player in possession of the ball to return it to an official immediately after a score.

  It has been with great reluctance that subsequent rules committees have had to add specific violations and severe penalties to these rules, but it has been the result of changing attitudes of players and their negative actions on the field. The rules committee remains steadfast to its goal of preserving the integrity of one of our nation's marvelous traditions and greatest team games.

  Consequently, the sportsmanship rules will be efficiently and accurately enforced in 2001 by game officials with strong support from coaches, athletics administrators and conference supervisors of officials. This will enable all parties involved – from the student-athletes themselves to the spectators who simply enjoy the game and the collegiate atmosphere – to have an even more rewarding football experience.

- **SAFETY AND STUDENT-ATHLETE WELFARE** – The NCAA Football Rules Committee understands that contact and aggressiveness are two integral components of the game of football. However, it is strongly opposed to talking and blocking techniques that are potentially dangerous for both the tackler/blocker and his opponent.

  Coaches are reminded to instruct their players not to initiate contact with any part of their helmets, including the face mask. In addition, players should be encouraged not to intentionally strike opponents in the head.

 NCAA10039593

These actions should be viewed not only as enhancing players' safety, but also as showing a proper level of respect for opponents and the game itself Combined with the emphasis stated before, the committee has intended to illustrate the importance of fair play and sportsmanship.

*{ HYPERLINK \l "Emphasis_by_Year" }*

**2002-03**

- **PROTECTION OF DEFENSELESS PLAYERS –** Football players are well-conditioned, skilled athletes involved in aggressive, contested competition. Players also have responsibilities to their teams and their opponents to play within the rules.

    Due to the combative nature of the game, players usually are alert and aware of legal contacts by opponents. Therefore, injuries are minimized.

    However, certain aspects of play require a higher level of concentration. The resulting vulnerability places players involved in these aspects in an unprotected (defenseless) status.

    The following are situations in which defenseless players are susceptible to serious injury:
    - The quarterback moving down the line of scrimmage who has handed or pitched the ball to a teammate, and then makes no attempt to participate further in the play;
    - The kicker who is in the act of kicking the ball, or who has not had a reasonable length of time to regain his balance following the kick;
    - The passer who is in the act of throwing the ball, or who has not had a reasonable length of time to participate in the play again after releasing the ball;
    - The pass receiver who whose concentration is on the ball;
    - The pass receiver who has clearly relaxed when the pass is no longer catchable;
    - The kicker receiver whose attention is on the downward flight of the ball;
    - The kick receiver who has just touched the ball; and
    - The player who has relaxed once the ball has become dead.

    These players are protected by rules that have been in place for many years. It is of the utmost importance that participants, coaches and game officials carefully and diligently observe safety rules.

    Intentional helmet-to-helmet contact is never legal, nor is any other blow directed toward an opponent's head. Flagrant offenders shall be disqualified.

- **SPORTSMANSHIP AND PENALTY ENFORCEMENT OF UNSPORTSMANLIKE ACTS–** For over 50 years after the introduction of the Football Code, the only rule pertaining to unsportsmanlike conduct was directed at penalizing "abusive or insulting language to opponents or officials." This statement was replaced nearly 10 years ago by "obscene or vulgar language or gestures, or acts that provoke ill will or are demeaning to opponents or game officials."

    As the trend toward individuals drawing attention to themselves, rather than celebrating with teammates, grew in the late 1960s, a rule was added requiring a player in possession of the ball to return it to an official immediately after a score.

    It has been with great reluctance that subsequent rules committees have had to add specific violations and severe penalties to these rules, but it has been the result of changing attitudes of players and their negative actions on the field. The rules committee remains steadfast to its goal of preserving the integrity of one of our nation's marvelous traditions and greatest team games.

*{ HYPERLINK \l "Emphasis_by_Year" }*

**2003-04**

- **SIDELINE CONTROL** — NCAA member institutions and conferences are strongly encouraged to develop plans to enforce the rules regarding the team area and coaching box (Rule 1-2-4-a, back of the limit lines between the 25-yard lines), and the space between the limit lines (Rules 1-2-3-a and b, 12 feet outside the sidelines and the end line) and the sidelines. These plans should focus on keeping these field-level positions clear of persons who have no game responsibilities.

    Each team is limited to 60 persons in its team area, not including squad members in full uniform, who shall be wearing a "team" credential. These persons should only be those who are directly involved in the game.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 11



NCAA00010402

**A.R. 12.6.5.b.** The goalkeeper throws the ball at an opponent. **RULING:** Caution or eject the goalkeeper and award a direct kick at the point where the ball struck the player (if the player is outside the penalty area) or penalty kick (if the player is within the penalty area).

**PENALTY—Direct free kick.**

12.6.6 *Kicking Ball Held by Goalkeeper.* A player shall be penalized for kicking or attempting to kick the ball when it is in possession of the goalkeeper.

**PENALTY—Indirect free kick.**

**A.R.12.6.6.** A player raises his or her foot as the goalkeeper kicks the ball from his or her hands. **RULING:** Indirect free kick.

## 12.7 Obstruction

Obstruction is the deliberate act of impeding or attempting to impede an opponent from access to a ball that is not within playing distance of either player.

**PENALTY—Indirect free kick to the opposing team from point of infraction.**

**A.R. 12.7.a.** May a player stand in front of the goalkeeper during a corner kick without trying to play the ball but merely trying to stop the goalkeeper from playing it? **RULING:** No. Indirect free kick from the point of infraction.

**A.R. 12.7.b.** May an opposing player ever take a position in front of a goalkeeper who is in possession of the ball? **RULING:** No.

**PENALTY—Caution the player and restart play with an indirect free kick from the point of infraction.**

## 12.8 Dangerous Play

Dangerous play is any action likely to cause injury to oneself or an opponent. Some examples of dangerous play are: raising the foot to the level that may endanger an opponent; lowering the head to a position level with or below the waist in an effort to head the ball in the presence of an oncoming player, which is likely to cause injury to the player heading the ball in such a manner; and a player other than the goalkeeper covering the ball while sitting, kneeling or lying on the ground.

**PENALTY—Indirect free kick from point of infraction.**

NCAA00010479

**A.R. 12.8.** Is the scissor kick permitted? **RULING:** Yes, if the act does not endanger an opponent.

## 12.9 Goalkeeper Privileges

Within his or her penalty area, the goalkeeper has certain privileges not given to any other player. These privileges include:

12.9.1 *Handling.* The goalkeeper may catch, carry, strike or propel the ball with the hands or arms; and

12.9.2 *Possession.*

    12.9.2.1 The act of distributing the ball after control (for example, dropping the ball for the kick, parrying, throwing, etc.);

    12.9.2.2 Tossing the ball into the air and re-catching it as long as the ball is released into play within six seconds; or

    12.9.2.3 Pinning the ball to the ground.

## 12.10 Goalkeeper Violations

12.10.1 *Six-second limit.* An indirect free kick shall be awarded from the point of infraction if the goalkeeper fails to put the ball back into play once the individual takes control of the ball with the hands within six seconds.

    **A.R. 12.10.1.** A goalkeeper appears to sustain an injury making a save while maintaining possession of the ball, during which time the six-second limitation elapses. **RULING:** If the goalkeeper is able to continue, play shall restart with an indirect free kick for his or her team.

12.10.2 *Repossession.* After releasing the ball from possession, the goalkeeper may touch or receive the ball with his or her hands only under the following conditions:

    12.10.2.1 The ball has been touched by a member of the opposing team, whether inside or outside the penalty area; or

    12.10.2.2 The ball has been touched by a member of his or her own team, providing that player is outside the penalty area and the ball has not been deliberately kicked or thrown to the goalkeeper. Further, throwing the ball into the air and allowing it to hit the ground is considered releasing the ball, and the goalkeeper may not retake possession unless the ball is touched or played by an opponent.

NCAA00010480

# EXHIBIT 12



NCAA00011093



Fig. 19

## Misconduct

SECTION 10. To be guilty of misconduct, including the use of obscene, abusive, threatening language or gestures, persistent foul play, or overaggressive fouls, or to refuse obedience to or show disrespect for a referee or official. Persistent foul play refers to play that is unacceptable within the spirit of the rules and that is likely to bring the game into disrepute. Persistent foul play is entirely different from and unrelated to "persisting in an ordinary foul." Overaggressive fouls are hard fouls unacceptable within the spirit of the rules, including deliberate elbowing to the head, face or neck or head-butting an opponent. Taunting, baiting or ridiculing an opponent are additional examples of misconduct.

The offending player shall be excluded from the remainder of the game, with substitution after the earliest occurrence referred to in Rule 21-3. A referee shall have the power to order any player from the water for misconduct and to issue a red card should a player refuse to leave the water when so ordered. The referee has the power to abandon the game if a player continues to refuse to leave the water when so ordered.

If a player of either team commits a foul of misconduct during play, the player is excluded for the remainder of the game, the ball awarded to the offended team and play restarted with a substitute in the reentry area for 20 seconds or the earliest occurrence of one of the events referred to in Rule 21-3.

> Interpretation: The term "during play" refers to the time between the calling of a foul and the taking of the free throw, goal throw, corner throw, penalty throw or neutral throw and to the time after the ball is put into play. It incorporates what was formerly called "dead time" before the ball was put into play, and "live time" after the ball was put into play.

NCAA00011190

# EXHIBIT 13



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10044528

# RULE 5

# Personal and Expulsion Fouls

## Personal Fouls

**Description**

SECTION 1. Personal fouls are those of a serious nature: illegal body checking, slashing, cross-checking, tripping, unnecessary roughness, unsportsmanlike conduct and the use of an illegal crosse.

**Penalty**

SECTION 2. The penalty for a personal foul shall be suspension from the game of the offending player for one to three minutes, depending on the official's judgment of the severity and perceived intent of the personal foul. The ball shall be given to the team fouled.

**Cross Check**

SECTION 3. A player may not check his opponent with his crosse in a cross-check position—that is, check him with that part of the handle of his crosse that is between his hands, either by thrusting it away from his body or by holding it extended from his body.

**Illegal Body Check**

SECTION 4. Illegal body checking includes the following actions:

a. The body checking of an opponent who is not in possession of the ball or within 5 yards of a loose ball.

b. The body checking of an opponent from the rear or at or below the waist.

c. The body checking of an opponent by a player, in which contact is made above the shoulders of the opponent. To be legal, such a body check must be below the neck; and both hands of the player applying the body check must remain in contact with his crosse.

*Note: If a player who is about to be body checked turns his back, ducks or jumps in such a manner as to make what started to be a legal check appear illegal, no foul is*

57

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10044584

*committed by the player applying the body check. The initial contact, not any secondary contact, shall determine whether a body check is legal. No official should make the call "from the rear" or "below the waist," unless he sees the initial contact.*

d.  The body checking of an opponent who has any part of his body other than his feet on the ground.

e.  The blocking of an opponent with the head or initiating contact with the head, known as "spearing."

f.  A minimum of a one-minute non-releasable penalty shall be assessed for spearing. A three-minute non-releasable penalty shall be assessed if the spearing was violent.

## Illegal Crosse

**SECTION 5.** A player may not use a crosse that does not conform to required specifications. Use of an illegal crosse carries a one- or three-minute non-releasable penalty. A crosse found illegal due to a deep pocket will carry a one-minute non-releasable penalty. A player using a crosse found illegal because it was altered to gain an advantage will receive a three-minute non-releasable penalty, and the illegal crosse will remain in the table area for the remainder of the game. Every crosse on a team is subject to inspection, and the crosse need not have been in the game to be inspected. (See 4-29.)

**A.R. 1.** Officials should make themselves available before the game to clarify questionable construction of any crosse. A crosse found to be illegal may not be used in the game unless the necessary adjustments are made to make the crosse legal.

**A.R. 2.** During game, an official inspects a player's equipment and finds that his crosse is of illegal length (i.e., it measures less than 40 inches; greater than 42 inches but less than 52 inches; or greater than 72 inches). **RULING:** Crosse removed from game. A three-minute non-releasable penalty must be served.

**A.R. 3.** During game, an official inspects the equipment of a player and he finds the head of the player's crosse is less than 6½ inches (inside measurement) and the pocket is deeper than that allowed by rule. **RULING:** Crosse out of the game. Three-minute non-releasable penalty must be served.

**A.R. 4.** During game, an official inspects the equipment of a player and finds that the longitudinal weaving of the crosse is not firmly attached to bottom edge of the throat-stop construction. **RULING:** One-minute non-releasable penalty must be served. Crosse, if adjusted, may be returned to the game.

**A.R. 5.** During game, an official asks a player for his crosse so the official can inspect it. Before the player hands the crosse to the official, he adjusts the strings or jams his crosse into the ground and the crosse is found to be illegal. **RULING:** A one-minute non-releasable penalty for pulling on the strings or jamming the head of the crosse into the ground shall be charged. An additional one-minute non-releasable penalty shall be charged if the pocket is found to be illegal. An additional three-minute non-releasable penalty shall be charged if the crosse is found to be altered. The official shall continue

RULE 5-5/PERSONAL AND EXPULSION FOULS                                    59

with the stick check after calling the penalty for adjusting the strings or jamming the crosse.

**A.R. 6.** A1 scores. Before the next whistle, it is discovered that A1 was playing with an illegal crosse. **RULING:** Goal does not count. A1 serves a one- or three-minute non-releasable penalty.

**A.R. 7.** Player scores goal by kicking ball into goal. Before the next whistle, the opposing head coach requests an equipment inspection on the player that scored. **RULING:** If the crosse is found to be illegal, the goal shall not count. The player shall serve a one- or three-minute non-releasable penalty.

**A.R. 8.** A1 scores. Before next whistle, Team B head coach requests an equipment inspection on A2, the player who fed A1 for the score. **RULING:** Even if the crosse is found to be illegal, the goal counts. A2 serves a one- or three-minute non-releasable penalty.

## Use of Illegal Equipment

SECTION 6. A player may not use equipment that does not conform to specifications. The fingers and palms may not be cut out of the gloves, nor may the gloves or shoulder pads be altered in a way that compromises their protective features. Use of illegal equipment other than an illegal crosse is a non-releasable foul. (See 5-5, for illegal crosse.)

**A.R. 9.** Before a game, officials should make themselves available to clarify any questions concerning the legality of any equipment. Once the game begins, it is the officials' responsibility to enforce this rule—coaches may not request to have their team's gloves inspected, and officials shall not warn players.

**A.R. 10.** Team A, which already has called for an unsuccessful equipment check, calls for another equipment check. Equipment is found to be legal. Team A has used all timeouts. What is the penalty? **RULING:** Technical foul on Team A.

**A.R. 11.** B1 is not wearing shoulder pads or arm pads. **RULING:** One-minute non-releasable personal foul.

**A.R. 12.** A1 scores a goal. Before the faceoff, it is noticed that A1 is not wearing a piece of required equipment (e.g., shoulder pads, arm pads). **RULING:** Goal counts. A1 is assessed a one-minute non-releasable personal foul."

## Slashing

SECTION 7. Slashing includes the following actions:

a. Swinging a crosse at an opponent's crosse or body with deliberate viciousness or reckless abandon, regardless of whether the opponent's crosse or body is struck.

b. Striking an opponent in an attempt to dislodge the ball from his crosse, unless the player in possession, in an attempt to protect his crosse, uses some part of his body other than his head or neck to ward off the thrust of the defensive player's crosse and, as a result, the defensive player's crosse strikes some part of the attacking player's body other than his head or neck.

c.  Striking an opponent in any part of the face, on the neck, in the chest, on
    the back, on the shoulders, in the groin or on the head with the crosse
    (including its butt end), except when done by a player in the act of pass-
    ing, shooting or attempting to scoop the ball.

*Note 1: In all situations except when a player's gloved hand on his own crosse is
in contact with a line marking, that hand shall be considered part of his crosse.*

*Note 2: For the purpose of paragraph c of this rule, mere contact is not a "strike."
To be a "strike," the contact must be a definite blow and not merely a brush.*

**A.R. 12.** A1, in the act of shooting or passing, strikes B1 on the head because of his legit-
imate follow-through motion. Has A1 committed a foul for striking an opponent on the
head? **RULING:** No.

**A.R. 13.** B1, while playing A1, makes contact on A1's head with his crosse. Has a foul
been committed? **RULING:** Contact in and of itself does not constitute a foul. The con-
tact must be a definite blow or strike. Otherwise, it is considered a brush.

**A.R. 14.** Can a defensive player, who does not have *reasonable access* to an opponent's
crosse and makes no apparent attempt to dislodge the ball or prevent a feeder's pass,
choose to strike repeatedly the lower gloved hand on the crosse with undue force to
inflict physical damage or "beat the hand to death"? **RULING:** No—slashing, personal
foul.

**A.R. 15.** The one-hand wraparound check with the crosse is legal. The check must be
crosse-on-crosse, and no holding may be done with the free hand.

**A.R. 16.** A1, advancing toward B1, holds his crosse back with one hand and protects his
crosse with the other arm. B1 then swings his crosse and strikes A1's protecting arm.
**RULING:** Personal foul—slashing against B1.

**A.R. 17.** A3 has beaten defender B2, who swings crosse in a check and strikes A3 on the
shoulder or across the back in an attempt to get A3's crosse. **RULING:** Slashing. This is
an illegal back check.

## Tripping
SECTION 8. A player may not trip an opponent with any part of his body
or crosse.

Tripping is obstructing an opponent at or below the waist with the
crosse, hands, arms, feet or legs—by any positive primary action if the
obstructing player is on his feet or by any positive secondary action if the
obstructing player is not on his feet. When a player legally checks the
crosse of an opponent and the result is to cause the opponent to trip over
his own crosse, no foul is committed. Similarly, if an opponent falls over a
player's crosse when that player is attempting to scoop a loose ball, no foul
has been committed.

**A.R. 18.** A1, while dodging B1, falls over B1's stationary leg. Is this tripping? **RULING:**
No.

# EXHIBIT 14

# Ice Hockey

## 2004
### Rules and Interpretations

**NCAA**

NCAA10150339

# 2004 NCAA MEN'S AND WOMEN'S ICE HOCKEY RULES AND INTERPRETATIONS

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**

NCAA10150340



[ISSN 0735-9195]

THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
P.O. Box 6222
Indianapolis, Indiana 46206-6222
317/917-6222
www.ncaa.org
August 2003

**Manuscript Prepared By:** Paul J. Duffy, *Secretary-Rules Editor, NCAA Men's and Women's Ice Hockey Rules Committee.*

**Editorial Assistance Provided By:** Jack Doherty, *National Ice Hockey Officials Association.*

**Edited By:** Ty Halpin, *Assistant Director of Communications.*

NCAA, NCAA logo and NATIONAL COLLEGIATE ATHLETIC ASSOCIATION are registered marks of the Association and use in any manner is prohibited unless prior approval is obtained from the Association.

COPYRIGHT, 1974, BY THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
REPRINTED: 1975, 1976, 1977, 1978, 1979, 1980, 1981, 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003
PRINTED IN THE UNITED STATES OF AMERICA

NCAA10150341

**PENALTY—Forfeit (score shall be 1-0).**

## Roughing

SECTION 45. A player shall not push or shove an opponent with unnecessary force.

**PENALTY—Minor.**

## Shooting Puck After the Whistle

SECTION 46. a. A player shall not shoot the puck away from an official after the whistle has blown.

**PENALTY — Misconduct.**

b. A player shall not shoot the puck at the goalkeeper or bench after the whistle.

**PENALTY—Minor and misconduct, game misconduct or disqualification at the discretion of the referee.**

## Slashing

SECTION 47. a. A player shall not slash an opponent with the stick. Slashing includes all cases where a slashing gesture is made regardless of whether contact occurs.

**PENALTY—Minor or major at discretion of the referee.**

b. A player shall not swing the stick at another player in the course of an altercation.

**PENALTY—Disqualification.**

## Spearing

SECTION 48. A player shall not spear an opponent. Spearing shall mean stabbing an opponent with the point of the stick blade while the stick is being carried with one or both hands. Spearing includes all cases where a spearing gesture is made regardless of whether contact occurs.

**PENALTY—Disqualification.**

## Spitting

SECTION 49. A player shall not spit on an official, player or non-playing person.

**PENALTY—Game misconduct.**

## Spraying the Goalkeeper

SECTION 50. A player shall not spray the goalkeeper.

**PENALTY—Minor or misconduct at the discretion of the referee.**

## Start of Game and Periods

SECTION 51. a. The game shall commence at the scheduled time by a face-off in the center of the rink and shall be renewed promptly at the conclusion of each intermission in the same manner.

Delay shall not be permitted by reason of any ceremony, exhibition, demonstrations or presentation unless consented to in advance by the visiting team.

The home team shall have the choice of ends at the start of the pregame warm-up (see 8-2-a).

b. The teams shall change ends at the beginning of each subsequent regular period. If, in the opinion of the official, conditions are more favorable to play at one end of the rink than at the other, the official may equalize opportunities by having teams change ends at the middle of one or all three regular and overtime periods, but not in only two regular periods. The official must rule that this change is to be made before the commencement of the game or period.

c. During the pregame warm-up (which shall not exceed 15 minutes in duration), each team must confine its activity to its own end of the rink for the duration of the warm-up (see 8-2-a).

## Taunting

SECTION 52. A player shall not taunt an official or opponent.

**PENALTY—Misconduct or game misconduct.**

## Throwing Stick

SECTION 53. a. A player, including the goalkeeper, shall not throw a stick in any zone.

**PENALTY—Minor. If thrown to prevent an obvious and imminent goal, the goal shall be awarded.**

b. A player shall not throw a stick or portion of a stick from the playing surface. It must be dropped to the ice immediately.

**PENALTY—Misconduct.**

c. When a player discards a broken stick by tossing it to the side of the ice (and not over the boards) in such a way that it shall not interfere with play or opposing players, a penalty shall not be imposed.

d. A player shall not kick or throw an opponent's stick for the purpose of keeping it away from the opponent.

**PENALTY—Minor.**

# EXHIBIT 15

# 2006 Education Services Review: Health and Safety Response

David Klossner, Associate Director • Mary Wilfert, Associate Director



NCAA10148981

## Table of Contents            Page

Overview ……………………………………………………………………… 3

Synergy and Collaboration ……………………………………………… 4

Substance Abuse Prevention ………………………………………….. 5

Response to Specific Concerns ………………………………………… 5

Review Summary ………………………………………………………… 8

Current State of Affairs ………………………………………………… 9

Future Enhancements …………………………………………………….. 10

Appendix A:  Minimizing the Risk of Injury: A review of health and safety actions ……. 12

Appendix B:  NCAA Legislation involving Health and Safety ………………………….. 17

Appendix C:  Direct Reporting vs. Direct Communications ……………………………. 23

Appendix D:  Health and Safety Program Elements ……………………………………… 27

Appendix E:  1996 Report to Heighten Awareness of Health and Safety Issues …………. 31

## Acknowledgments

The Health and Safety Staff wishes to express its appreciation for the review, comments and guidance provided by the three Presidential Task Force members, Ann Die Hasselmo, Robert Lawless, and Charlie Nelms.  The incisive questions and thoughtful consideration given to this review have contributed to an effort on our part to rethink and reassess the purpose and goals of these programs, and helped us to consider improvements that in the end will lead to healthier and safer environments for student-athletes.  In the following report, we have provided additional information that frames these programs within our mission, and responses to the reviewers' comments.  In addition, we have also provided information about the broader efforts undertaken under the umbrella of health and safety and overseen by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports, charged with providing the Association leadership on health and safety concerns of student-athletes.  Though this information was not included in the original presentation to the review committee, because the task was to identify programs with specific budget lines, this information will help to present a more complete picture of the efforts undertaken by this committee and staff to ensure a healthy and safe environment for all student-athletes.

NCAA10148982

**National Collegiate Athletic Association**

**Committee on Competitive Safeguards and
Medical Aspects of Sports**

**Minimizing the Risk of Injury: A review of recent actions**

The health and safety principle of the National Collegiate Athletic Association's (NCAA) constitution provides that it is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. Participation in intercollegiate athletics involves unavoidable exposure to an inherent risk of injury. However, student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletic participation. The Association's health and safety needs are addressed through the collaborative efforts of national office staff, governance committees, sports rules committees, sports issues committees, and external associations.

The NCAA Committee on Competitive Safeguards and Medical Aspects of Sports (CSMAS) serves an adversary role to all of the Association's constituents and continually tracks on events and issues related to the health and safety of the student-athlete. The mission of the CSMAS is to provide expertise and leadership to the Association in order to promote a healthy and safe environment for student-athletes through research, education, collaboration and policy development. The committee acts on issues through the use of NCAA Injury Surveillance System data, NCAA-sponsored sports science research, expert opinion and clinical experience. The following examples highlight significant changes that have occurred through the NCAA structure that have helped to mitigate the risk of injury in sports participation.

1.  **NCAA Sports Rules Modifications**

    **Baseball**

    1998 – Establishment of a wood-like standard for non-wood bats that protects the integrity of the game and the safety of the student-athletes.

    **Ice Hockey**

    1995 – Analysis of concussion injuries in ice hockey led to rules changes and officiating emphasis on reducing hitting from behind and contact to the head in the sport.

    **Women's Lacrosse**

    2003 – Mandated the use of appropriate eye protection in women's lacrosse to minimize the risk of catastrophic eye injury.

    **Wrestling**

NCAA10148993

1998 – Following the sudden deaths of three collegiate wrestlers, the NCAA Wrestling Rules Committee and the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports implemented a mandatory weight certification program that promotes safe weight management practices.

1998 – The NCAA requires all wrestling coaches covering practice or competition to be certified in first aid and CPR.

**Football**

1997 – Modifications of permissible equipment and contact in spring football practices to reduce injury risk were implemented.

2003 – Division I, II, and III modified permissible equipment during the pre-season period for student-athletes to minimize their risk of heat illness.

2005 - Head-Down Contact and Spearing Prevention
Due to concerns over continued head and neck injuries related to head-down contact and spearing in football, the NCAA Football Rules Committee changed the college football rules regarding spearing and head-down contact. In addition to the rule change, the NCAA focused on the education of student-athletes, coaches, officials and administrators regarding prevention of head and neck injuries.

2.    **NCAA Legislation**

A review of NCAA Legislation involving health and safety issues is summarized in Attachment B. Examples of the most recent changes include:

2003 – Division I, II, and III modified permissible equipment and multiple practice sessions by mandating an acclimatization pre-season period for student-athletes to minimize their risk of heat illness and general injuries in the sport.

2003 – Division I modified the summer workout period to help minimize the risk of heat illness and general injuries. The legislation mandated that a sports medicine staff member be present during conditioning session and supervising strength and conditioning coaches have certification in first aid and CPR.

2007 - Proposed legislation slated for an August 1, 2007 effective date:

**Student-athlete pre-participation examinations**.

Proposal. To mandate that prior to participation in any physical activity (preseason, regular season, non-traditional season) all prospects, walk-ons and student-athletes shall be required to undergo a medical examination that is administered or supervised by a physician.

NCAA10148994

Rationale.  The Committee on Competitive Safeguards and Medical Aspects of Sports believes before student-athletes accept the rigors of organized sport, their health should be evaluated by qualified medical personnel.  The intent is to ensure all participants have a medical examination upon entrance to the sport. During subsequent years, an interim history should be performed upon which a physician would determine if additional physical, cardiovascular or neurological examinations are required.

**Coach's sport safety training.**

Proposal: To mandate that all coaches conducting practice, competition, skill instruction, and strength and conditioning sessions shall be certified in first aid, cardiopulmonary resuscitation (CPR), and automated external defibrillation (AED), and have training in emergency plan activation.

Rationale.  The Committee on Competitive Safeguards and Medical Aspects of Sports has been tracking the recent legislative changes that have increased the time demands on sports medicine staff and the increased injury exposures related to dramatic increase in out-of-season skill instruction activities and summer conditioning across all sports. Athletic participation has evolved into year-round participation, with extended practice and conditioning opportunities and non-traditional competitive seasons added to the regular season.  Data indicates that the risk of sports injury increases during practices, demanding a commensurate increase in the institution's ability to provide emergency response on site of any practice, conditioning session or skill instruction.  Due to this increase in injury exposure and the trend of not hiring additional sports medicine staff on campuses, these legislative changes in sports participation opportunities have led to a greater need for on-site first responders to respond to emergency situations as an alternative to qualified sports medicine staff.


3.    **NCAA Sports Medicine Handbook**

The guidelines in the Sports medicine Handbook are developed on topics relevant to intercollegiate athletics, applicable to a large population of student-athletes, and not accessible in another easily obtainable source.  These guidelines are reviewed and updated at least every four years.  Guidelines added to the handbook since 1992 include:

1994 – Added the "*Cold Stress*" guideline to help education the membership about reducing life-threatening condition due to cold exposures in athletics.

1994 – Added the "*Concussion or Mild Traumatic Brain Injury in the Athlete*" guideline to help reduce recognition, management and return to play decision for athletes with concussion therefore helping reduce catastrophic events secondary to concussions.

1997 – Added the "*Lightning Safety*" guideline that is recognized as the gold standard for preventing lighting strike incidence in sports.

NCAA10148995

2000 – Added the "*Institutional Alcohol, Tobacco, and other Drug Education Programs*" guideline to educate the NCAA membership on the minimal criteria for conducting an adequate drug-education program to prevent drug and alcohol abuse.

2004 – Added the "*Catastrophic Incident in Athletics*" guideline to help institutions appropriately respond to a catastrophic event.

2006 – Added the "*Depression: Interventions for Intercollegiate Athletics*" guideline in an effort to address suicide in the sport population and educate the membership on the importance of its prevalence, early recognition, and appropriate referral.

2007 – Currently working with external medical organizations examining the recommendations within the guideline "The Student-athlete with Sickle Cell Trait (est. 1975)," a condition that has been linked to a very small number of sudden deaths in athletes.


4.    **Additional NCAA Health and Safety Initiatives**

1992 – 2005 – Thirteen-year analysis of non-contact anterior cruciate ligament (ACL) injuries in basketball and soccer that led to a focus on prevention efforts for female athletes, who have a higher risk than their male counterparts for these types of injuries.

2002 – Division I out-of-season workout guidelines were forwarded to the membership in an effort to curb unsafe practices.

2003 – Following the sudden death of an NCAA student-athlete participating in pole vault, the NCAA now conducts a live, web cast video addressing proper pole vault techniques, reviews the rules of the sport, and discussion injury prevention every December.  The Big Ten conference archives the video on their web site for continued access throughout the year.

2004 – Following a Cornell University's student-athlete sudden death in lacrosse, the NCAA hosted a multi-organizational summit addressing the prevalence, mechanism, and  prevention of commotio cordis in sports.  Immediate outcome was adding language to the "*Emergency Care and Coverage*" NCAA Sports Medicine Handbook guideline recommending planned access to early defibrillation as well as continued research and development of appropriate chest protectors for the sports of men's lacrosse.

2004 – Division II and Division III initiated an educational campaign designed to increase awareness of institutional responsibility for protecting the health of and providing a safe environment for all student-athletes participating in pre-season workout sessions.

2004 – Fast pitch softball field test and bat swing speed research study was conducted following concerns of significant injury to pitchers.

NCAA10148996

# EXHIBIT 16



2011-12 NCAA®

# Sports
# Medicine
# Handbook



NCAA00017591

# PREFACE

The health and safety principle of the National Collegiate Athletic Association's constitution provides that it is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. To provide guidance in accomplishing this objective and to assist member schools in developing a safe intercollegiate athletics program, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports creates a Sports Medicine Handbook. The committee has agreed to formulate guidelines for sports medicine care and protection of student-athletes' health and safety for topics relevant to intercollegiate athletics, applicable to a large population of student-athletes, and not accessible in another easily obtainable source.

This handbook consists of guidelines for each institution to consider in developing sports medicine policies appropriate for its intercollegiate athletics program. In some instances, accompanying best practices, and references to sports medicine or legal resource materials are provided for further guidance. These recommendations are not intended to establish a legal standard of care that must be strictly adhered to by member institutions. In other words, these guidelines are not mandates that an institution is required to follow to avoid legal liability or disciplinary sanctions by the NCAA. However, an institution has a legal duty to use reasonable care in conducting its intercollegiate athletics program, and guidelines may constitute some evidence of the legal standard of care.

These general guidelines are not intended to supersede the exercise of medical judgment in specific situations by a member institution's sports medicine staff. In all instances, determination of the appropriate care and treatment of student-athletes must be based on the clinical judgment of the institution's team physician or athletic health care team that is consistent with sound principles of sports medicine care. These recommendations provide guidance for an institution's athletics administrators and sports medicine staff in protecting student-athletes' health and safety, but do not establish any rigid requirements that must be followed in all cases.

This handbook is produced annually, sent to head athletic trainers, and made available online to directors of athletics, senior woman administrators, faculty athletics representatives, athletic trainers, team physicians, Life Skills coordinators, and student-athlete advisory committees at each member institution, and conference commissioners. Please view the NCAA Sports Medicine Handbook as a tool to help your institution develop its sports medicine administrative policies. Such policies should reflect a commitment to protecting your student-athletes' health and well-being as well as an awareness of the guidelines set forth in this handbook.

NCAA00017593

# NCAA® GUIDELINE 3a
# Protective Equipment

Rules governing mandatory equipment and equipment use vary by sport. Athletics personnel should be familiar with what equipment is mandatory by rule and what constitutes illegal equipment; how to wear mandatory equipment during the contest; and when to notify the coaching staff that the equipment has become illegal during competition. Athletics personnel involved in sports with established equipment standards should adhere to those standards.

The NOCSAE mark on a helmet or HECC seal on an ice hockey face mask indicates that the equipment has been tested by the manufacturer in accordance with NOCSAE or HECC test standards. By keeping a proper fit, by not modifying its design, and by reporting to the coach or equipment manager any need for its maintenance, the student-athlete also is complying with the purpose of the standard.

The following list of mandatory equipment and rules regarding protective equipment use is based on NCAA sports rules. The most updated information should be obtained from relevant NCAA rules committees.

| Sport | Mandatory Protective Equipment* | Rules Governing Special Protective Equipment |
|---|---|---|
| **1. Baseball** | 1. A double ear-flap protective helmet while batting, on deck and running bases. Helmets must carry the NOCSAE mark. 2. All catchers must have a built-in or attachable throat guard on their masks. 3. All catchers are required to wear a protective helmet when fielding their position. | None |
| **2. Basketball** | None | Elbow, hand, finger, wrist or forearm guards, casts or braces made of fiberglass, plaster, metal or any other nonpliable substance shall be prohibited. Pliable (flexible or easily bent) material covered on all exterior sides and edges with no less than 0.5-inch thickness of a slow-rebounding foam shall be used to immobilize and/or protect an injury. The prohibition of the use of hard-substance material |

NCAA00017681

| Sport | Mandatory Protective Equipment* | Rules Governing Special Protective Equipment |
|---|---|---|
| **Basketball (continued)** | | does not apply to the upper arm, shoulder, thigh or lower leg if the material is padded so as not to create a hazard for other players. Equipment that could cut or cause an injury to another player is prohibited, without respect to whether the equipment is hard. |
| | | Equipment that, in the referee's judgment, is dangerous to other players, may not be worn. |
| **3. Fencing** | **1.** Masks with meshes (space between the wires) of maximum 2.1 mm and from wires with a minimum gauge of 1 mm diameter. | |
| | **2.** Gloves, of which the gauntlet must fully cover approximately half the forearm of the competitor's sword arm. | |
| | **3.** Jacket or vest and metallic lames. | |
| | **4.** Ladies' chest protectors made of metal or some other rigid material. | |
| | **5.** Underarm protector. | |
| **4. Field Hockey** | **1.** The following equipment is permitted for use only by goal-keepers: body and wrap-around throat protectors, pads, kickers, gauntlet gloves, helmet incorporating fixed full-face protection and cover for the head, and elbow pads. | Players shall not wear anything that may be dangerous to other players. Players have the option of wearing soft headgear subject to game official approval. |
| | **2.** Mouthguards for all players including goalkeepers. | |
| | **3.** Wrap-around throat protector and helmet for player designated as a "kicking back." In the event of a defensive penalty corner, the "kicking back" must also wear a chest protector and distinguishing jersey. | |

81

NCAA00017682

| Sport | Mandatory Protective Equipment* | Rules Governing Special Protective Equipment |
|---|---|---|
| **5. Football** | **1.** Soft knee pads at least ½-inch thick that are covered by pants. It is strongly recommended that they cover the knees. No pads or protective equipment may be worn outside the pants. **2.** Face masks and helmets with a secured four- or six-point chin strap. All players shall wear helmets that carry a warning label regarding the risk of injury and a manufacturer's or reconditioner's certification indicating satisfaction of NOCSAE test standards. **3.** Shoulder pads, hip pads with tailbone protectors and thigh guards. **4.** An intra-oral mouthpiece of any readily visible color (not white or transparent) with FDA-approved base materials (FDCS) that covers all upper teeth. It is recommended that the mouthpiece be properly fitted. | Illegal equipment includes the following: **1.** Equipment worn by a player, including artificial limbs, that would endanger other players. **2.** Hard, abrasive or unyielding substances on the hand, wrist, forearm or elbow of any player, unless covered on all exterior sides and edges with closed-cell, slow-recovery foam padding no less than ½-inch thick, or an alternate material of the same minimum thickness and similar physical properties. Hard or unyielding substances are permitted, if covered, only to protect an injury. Hand and arm protectors (covered casts or splints) are permitted only to protect a fracture or dislocation. **3.** Thigh guards of any hard substances, unless all surfaces are covered with material such as closed-cell vinyl foam that is at least ¼-inch thick on the outside surface and at least ³/₈-inch thick on the inside surface and the overlaps of the edges; shin guards not covered on both sides and all edges with closed-cell, slow-recovery foam padding at least ½-inch thick, or an alternate material of the same minimum thickness having similar physical properties; and therapeutic or preventive knee braces, unless worn under the pants and entirely covered from direct external exposure. |



NCAA00017683

| Sport | Mandatory Protective Equipment* | Rules Governing Special Protective Equipment |
|---|---|---|
| **Football (continued)** | | 4. Projection of metal or other hard substance from a player's person or clothing. |
| **6. Gymnastics** | None | None |
| **7. Ice Hockey** | 1. Helmet with chin straps securely fastened. It is recommended that the helmet meet HECC standards.<br>2. An intra-oral mouthpiece that covers all the upper teeth.<br>3. Face masks that have met the standards established by the HECC-ASTM F 513-89 Eye and Face Protective Equipment for Hockey Players Standard. | 1. The use of pads or protectors made of metal or any other material likely to cause injury to a player is prohibited.<br>2. The use of any protective equipment that is not injurious to the player wearing it or other players is recommended.<br>3. Jewelry is not allowed, except for religious or medical medals, which must be taped to the body. |
| **8. Women's Lacrosse** | 1. The goalkeeper must wear a helmet with face mask, separate throat protector, a mouth piece, a chest protector.<br>2. All field players shall wear properly an intra-oral mouthpiece that covers all upper teeth.<br>3. All field players shall wear protective eyewear that meets current ASTM lacrosse standards (effective January 1, 2005). | Protective devices necessitated on genuine medical grounds must be approved by the umpires. Close-fitting gloves, nose guards, eye guards and soft headgear may be worn by all players. These devices must create no danger to other players. |
| **9. Men's Lacrosse** | 1. Protective helmet that carries the NOCSAE mark, equipped with face mask and chin pad, with a cupped four-point chin strap (high-point hookup).<br>2. Intra-oral mouthpiece that covers all the upper teeth and is yellow or any other highly visible color.<br>3. Protective gloves, shoulder pads, shoes and jerseys. Shoulder pads shall not be altered.<br>4. Throat protector and chest protector are required for the goalie. | 1. A player shall not wear any equipment that, in the opinion of the official, endangers the individual or others.<br>2. The special equipment worn by the goalkeeper shall not exceed standard equipment for a field player, plus standard goalkeeper equipment, which includes shin guards, chest protectors and throat protectors. |

93

NCAA00017684

| Sport | Mandatory Protective Equipment* | Rules Governing Special Protective Equipment |
|---|---|---|
| **10. Rifle** | Shooters and range personnel in the immediate vicinity of the range required to wear hearing protection during smallbore. Shooters urged to wear shatterproof eye protection. | None |
| **11. Soccer** | Players shall wear shin guards under the stockings in the manner intended, without exception. The shin guards shall be professionally manufactured, age and size appropriate and not altered to decrease protection. The shin guards must meet NOCSAE standards. | **1.** A player shall not wear anything that is dangerous to another player. **2.** Knee braces are permissible provided no metal is exposed. **3.** Casts are permitted if covered and not considered dangerous. **4.** A player shall not wear any jewelry of any type whatsoever. Exception: Medical alert bracelets or neck laces may be worn but must be taped to the body. |
| **12. Skiing** | Helmets manufactured for ski racing are required in all Alpine events and event training. | None |
| **13. Softball** | **1.** Catchers must wear foot-to-knee shin guards; NOCSAE-approved protective helmet with face mask and built-in or attachable throat guard; and chest protector. **2.** A NOCSAE-approved double-ear flap protective helmet must be worn by players while batting, running the bases or warming-up in the on-deck circle. | Casts, braces, splints and protheses must be well-padded to protect both the player and opponent and must be neutral in color. If worn by pitcher, cannot be distracting on nonpitching arm. If worn on pitching arm, may not cause safety risk or unfair competitive advantage. |
| **14. Swimming and Diving** | None | None |

NCAA00017685

| Sport | Mandatory Protective Equipment* | Rules Governing Special Protective Equipment |
|---|---|---|
| **15. Track and Field** | None | **1.** No taping of any part of the hand, thumb or fingers will be permitted in the discus and javelin throws, and the shot put, except to cover or protect an open wound. In the hammer throw, taping of individual fingers is permissible. Any taping must be shown to the head event judge before the event starts. **2.** In the pole vault, the use of a forearm cover to prevent injuries is permissible. |
| **16. Volleyball** | None | **1.** It is forbidden to wear any object that may cause an injury or give an artificial advantage to the player, including but not limited to headgear, jewelry and unsafe casts or braces. Religious medallions or medical identifications must be removed from chains and taped or sewn under the uniform. **2.** All jewelry must be removed. Earrings must be removed. Taping of earrings or other jewelry is not permitted. 3. Hard splints or other potentially dangerous protective devices worn on the arms or hands are prohibited, unless padded on all sides with at least ½-inch thick of slow rebounding foam. |
| **17. Water Polo** | Cap with protective ear guards. | None |
| **18. Wrestling** | Protective ear guard. | **1.** Anything that does not allow normal movement of the joints and prevents one's opponent from applying normal holds shall be barred. **2.** Any legal device that is hard and abrasive must be covered and padded. Loose pads are prohibited. It is recommended that all wrestlers wear a protective mouth guard. **3.** Jewelry is not allowed. |

95

NCAA00017686

# EXHIBIT 17



**National Collegiate Athletic Association**

## NCAA News Archive - 2009

« back to 2009 | Back to NCAA News Archive Index

**NCAA changes to minimize risk of injury**

Dec 10, 2009 9:53:53 AM

The NCAA News

The NCAA's health and safety needs are addressed through the collaborative efforts of national office staff, governance committees, sports rules committees, sports issues committees and external associations.

The NCAA Committee on Competitive Safeguards and Medical Aspects of Sports advises the Association's constituents and continually tracks on events and issues related to the health and safety of the student-athlete. The committee acts on issues through the use of NCAA injury-surveillance data, NCAA-sponsored sports-science research, expert opinion and clinical experience.

The following examples highlight significant changes that have mitigated the risk of injury in sports participation.

**NCAA sports rules modifications**

**Baseball**

1998 – The establishment of a wood-like standard for non-wood bats protects the integrity of the game and the safety of the student-athletes.

**Ice hockey**

1995 – An analysis of concussion injuries in ice hockey leads to rules changes and officiating emphasis on reducing hitting from behind and contact to the head.

**Women's lacrosse**

2003 – The use of appropriate eye protection in women's lacrosse is mandated to minimize the risk of catastrophic eye injury.

**Track and field**

2002 – The size of the pole vault landing pit is increased.

**Wrestling**

1998 – Following the sudden deaths of three collegiate wrestlers, the NCAA Wrestling Rules Committee and the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports implement a mandatory weight-certification program that promotes safe weight-management practices.

1998 – The NCAA requires all wrestling coaches covering practice or competition to be certified in first aid and cardiopulmonary resuscitation.

**Football**

1976 – Rule changes for the 1976 football season eliminate the head and face as a primary and initial contact area for blocking and tackling.

1997 – Modifications of permissible equipment and contact in spring football are implemented to reduce risk of injury.

2003 – Divisions I, II and III modify permissible equipment during the preseason period for student-athletes to minimize risk of heat illness.

2005 – The NCAA Football Rules Committee changes college football rules regarding spearing and head-down contact. In addition to the rule change, the NCAA focuses on the education of student-athletes, coaches, officials and administrators regarding prevention of head and neck injuries.

2008 – The NCAA makes the horse-collar tackle illegal, revamps illegal contact of an opponent and simplifies the chop-block rule. More emphasis is placed on eliminating hits on defenseless players and blows to the head. No player is permitted to initiate contact and target an opponent with the crown of his helmet, and no player is permitted to initiate contact and target a defenseless opponent above the shoulders.

2009 – A rule is added to allow for conference review and sanctions on fouls related to targeting/initiating contact to players.

**NCAA legislation**

*A more complete listing of NCAA legislation involving health and safety issues is summarized in Appendix A of the NCAA Sports Medicine Handbook. Examples of the most recent changes include:*

NCAA00007876

2003 –Divisions I, II, and III modify permissible equipment and multiple practice sessions by mandating an acclimatization preseason period for student-athletes to minimize their risk of heat illness and general injuries in football.

2003 – Division I modifies the summer workout period to help minimize the risk of heat illness and general injuries. The legislation mandates that a sports-medicine staff member be present during conditioning sessions and that supervising strength and conditioning coaches be certified in first aid and cardiopulmonary resuscitation.

2005 – The NCAA approves legislation that requires member institutions to certify insurance coverage for medical expenses resulting from athletically related injuries sustained while participating in defined covered events.

2007 - NCAA Divisions I, II and III approve legislation that mandates medical examinations for all student-athletes. Before participation in any practice, competition or out-of-season conditioning activities, student-athletes who are beginning their initial season of eligibility are required to undergo a medical examination or evaluation administered or supervised by a physician.

2009 – Division III approves sport-safety training legislation that requires each head coach to maintain current certification in first aid, cardiopulmonary resuscitation and automatic external defibrillator use.


**NCAA Sports Medicine Handbook**

*The guidelines in the Sports Medicine Handbook are developed on topics relevant to intercollegiate athletics, applicable to a large population of student-athletes and not accessible in another easily obtainable source. The guidelines are reviewed or updated at least every four years. Guidelines added to the handbook since 1994:*

1994 – The "Cold Stress" guideline is added to educate the membership about reducing life-threatening condition due to cold exposures in athletics.

1994 – The "Concussion or Mild Traumatic Brain Injury in the Athlete" guideline is added to help reduce recognition-management and return-to-play decisions for student-athletes with concussions, therefore helping reduce catastrophic events secondary to concussions.

1997 – The "Lightning Safety" guideline is added and is recognized as the premium standard for preventing lightning-strike incidence in sports.

2000 – The "Institutional Alcohol, Tobacco and Other Drug-Education Programs" guideline is added to educate the NCAA membership on the minimal criteria for conducting an adequate drug-education program to prevent drug and alcohol abuse.

2004 – The "Catastrophic Incident in Athletics" guideline is added to help institutions appropriately respond to a catastrophic medical event.

2006 – The "Depression: Interventions for Intercollegiate Athletics" guideline is added to address suicide in the sport population and to educate the membership on its prevalence and the importance of early recognition and appropriate referral.


**Additional NCAA health and safety initiatives**

1983 – The NCAA starts a sports-injury surveillance program to collect accurate and reliable data on injury incidence in NCAA championships sports and to analyze, interpret and disseminate those data to assist evidence-based decision-making. The goal continues to be reducing injury rates through suggested changes in rules, protective equipment or coaching techniques based on the data.

1986 – The NCAA begins conducting drug testing for NCAA-banned substances at Divisions I, I , and III championships. All student-athletes participating in NCAA championships are subject to drug testing.

1990 – NCAA Divisions I and II start year-round drug testing. Any Division I or II student-athlete may be tested for training drugs such as anabolic steroids.

1992-2005 – A 12-year analysis of non-contact anterior cruciate ligament injuries in basketball and soccer leads to a focus on prevention efforts for female athletes, who have a higher risk than males for such injuries.

2002 – Division I out-of-season workout guidelines are forwarded to the membership in an effort to curb unsafe practices.

2004 – After the death of a Cornell University student-athlete in lacrosse, the NCAA hosts a multi-organizational summit addressing the prevalence, mechanism and prevention of commotio cordis in sports. Language is added immediately to the "Emergency Care and Coverage" guideline in the NCAA Sports Medicine Handbook that recommends planned access to early defibrillation as well as continued research and development of appropriate chest protectors for the sports of men's lacrosse

2004 – Divisions II and III initiate an educational campaign to increase awareness of institutional responsibility for protecting the health of and providing a safe environment for all student-athletes participating in preseason workouts

2006 – The NCAA teams with the American Council on Education and United Educators to publish "Safety in Student Transportation," a 60+-page resource guide that colleges and universities can use to minimize the risk involved with transporting students.

2006 – The NCAA partners with Varsity Brands, the parent company of the largest national cheer organizations, to undertake an important cheerleading risk-management initiative to enhance safety for college cheerleaders. As a first step, the NCAA's Catastrophic Injury Insurance Program includes a new requirement that cheerleading activities must be supervised by a safety-certified coach or advisor to be considered a covered event.

2009 – The NCAA recommends its member institutions test student-athletes to confirm their sickle-cell trait status if that information is not already known.


© 2010 The National Collegiate Athletic Association
Terms and Conditions | Privacy Policy

NCAA00007877

# EXHIBIT 18

# PROTECT YOUR HEAD AND NECK!

## Don't punish yourself, your team, or your opponent...

Striking your opponent with your helmet can be a 15-yard penalty
and may result in serious injury to both you and your opponent!



**Targeting Defenseless Opponent**



**Helmet-to-Helmet**



**Launching**



**Offensive \***

## NCAA® 2008 Rule Changes

9-1-2-1

a) No player shall initiate contact and target an opponent with the crown of his helmet.
b) No player shall initiate contact and target a defenseless opponent
ABOVE THE SHOULDERS (i.e., whether or not with the helmet.)

*Even though rare, an offensive player can be penalized should he use his helmet to punish a player.



For more information on football rules and policies, visit NCAA.org.

NCAA00007933

# EXHIBIT 19



# RESPECT.
## It's the name of the game.

Sportsmanship is a core value of the NCAA. The NCAA Committee on Sportsmanship and Ethical Conduct has identified *respect* and *integrity* as two critical elements of sportsmanship and launched an awareness and action campaign at the NCAA Convention in January 2009.

Athletics administrators may download materials and view best practices ideas at the Web sites below:

**www.NCAA.org, then click on "Academics and Athletics," then "Sportsmanship" and www.ncaachampspromotion.com**



# 2011 AND 12 NCAA® FOOTBALL RULES AND INTERPRETATIONS

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



[ISSN 0736-5144]
THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
P.O. Box 6222
Indianapolis, Indiana 46206-6222
317/917-6222
www.ncaa.org
MAY 2011

**Manuscript Prepared By:** Rogers Redding, Secretary-Rules *Editor, NCAA Football Rules Committee.*
**Edited By:** Ty Halpin, *Associate Director for Playing Rules Administration.*

NCAA, NCAA logo and NATIONAL COLLEGIATE ATHLETIC ASSOCIATION are registered marks of the Association and use in any manner is prohibited unless prior approval is obtained from the Association.

COPYRIGHT, 1974, BY THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
REPPRINTED: 1975, 1976, 1977, 1978, 1979, 1980, 1981, 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2011
PRINTED IN THE UNITED STATES OF AMERICA

NCAA10013393

# Contents

*page*

NCAA Football Rules Committee ............................................................... FR-4
Committee Action for 2011 and 12 ............................................................. FR-6
Index to Editorial Changes ........................................................................ FR-7
Points of Emphasis .................................................................................... FR-8
Sportsmanship Statement ....................................................................... FR-11
The Football Code ..................................................................................... FR-12
Official NCAA Football Rules .................................................................. FR-15
Field Diagram Details ................................................................................ FR-16
Diagram of Field ........................................................................................ FR-17
Blocking Zone/Tackle Box Diagrams ....................................................... FR-18
    Rule 1—The Game, Field, Players and Equipment ........................... FR-19
    Rule 2—Definitions ............................................................................. FR-31
    Rule 3—Periods, Time Factors and Substitutions ............................. FR-47
    Rule 4—Ball in Play, Dead Ball, Out of Bounds .............................. FR-78
    Rule 5—Series of Downs, Line to Gain .............................................. FR-59
    Rule 6—Kicks ...................................................................................... FR-65
    Rule 7—Snapping and Passing the Ball .............................................. FR-72
    Rule 8—Scoring ................................................................................... FR-81
    Rule 9—Conduct of Players and Others Subject to Rules ................. FR-87
    Rule 10—Penalty Enforcement .......................................................... FR-100
    Rule 11—The Officials: Jurisdiction and Duties ............................... FR-104
    Rule 12—Instant Replay ..................................................................... FR-105
    Summary of Penalties .......................................................................... FR-111
Appendix A—Guidelines for Serious On-Field Injury ........................... FR-115
Appendix B—Lightning Guidelines ......................................................... FR-116
Appendix C —Concussion Guidelines ..................................................... FR-116
Appendix D—Field Diagrams ................................................................... FR-116
Appendix E—Equipment Guidelines ....................................................... FR-116
Code of Officials' Signals ......................................................................... FR-120
Official NCAA Football Rules Interpretations ......................................... FI-1
Table of Contents for Approved Rulings .................................................. FI-2
List of New Approved Rulings .................................................................. FI-3
Index to Rules ............................................................................................ IND-1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# NCAA Football Rules Committee



**Chair**
**Scot Dapp**
Division III
Moravian College
Bethlehem,
Pennsylvania 18018
*Term expires 9-1-12*



**Secretary-Rules Editor**
**Rogers Redding**
Birmingham, Alabama
35203



**Kenneth Beazer**
Division I (FCS)
Southern Utah
University
Cedar City, Utah
84720
*Term expires 9-1-14*



**Troy Calhoun**
Division I (FBS)
US Air Force Academy
Air Force Academy,
CO 80840
*Term expires 9-1-15*



**Tony Ierulli**
Division III
Maryville College
Maryville, Tennessee
37804
*Term expires 9-1-12*



**Kevin Higgins**
Division I (FCS)
The Citadel
Charleston, South
Carolina 29409
*Term expires 9-1-12*



**Will Prewitt**
Division II
Great American
Conference
Russellville,
Arkansas 72811
*Term expires 9-1-14*



**Peter Rossomando**
Division III
University of New
Haven
West Haven, CT 06516
*Term expires 9-1-15*

*\* Not eligible for re-election.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10013395

NCAA FOOTBALL RULES COMMITTEE                                    FR-5

**Tony Samuel**
Division I (FCS)
Southeast Missouri
State University
Cape Girardeau,
Missouri 63701
*Term expires
9-1-13*

**Gregory Wallace**
Division III
Grinnell College
Grinnell, Iowa 50112
*Term expires 9-1-14*

**Alfred White**
Division I (FBS)
Conference USA
Irving, Texas 75039
*Term expires 9-1-14*

\* *Not eligible for re-election.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10013396

# Major Rules Changes for 2011-12

The numbers and letters in the left column refer to rule, section and article, respectively. Changed or altered items are identified in the rules by a shaded background, unless the change results in the deletion of the entire segment containing the change.

## MAJOR RULES CHANGES

1-4-3-a ................ Visiting team may wear colored jerseys ..................... FR-31

2-3-6 ................... Blocking zone defined ............................................... FR-45

2-24-1 (deleted) .. Spearing definition eliminated .................................... FR-55

2-33 .................... Three-and-One Principle of penalty enforcement defined .................................. FR-62

2-34 .................... Tackle box defined ..................................................... FR-62

3-2-3 ................... No extension of period on loss-of-down penalty ....... FR-67

3-2-4 and 3-3-5 ... 40-second play clock for Team B injury .............. FR-68, 73

9-1-2-q .............. Chin strap included in face mask foul ...................... FR-119

9-1-4 .................. Roughing the kicker restricted to tackle box ............ FR-120

9-6 ...................... Mandatory conference review of flagrant fouls ........ FR-132

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          NCAA10013397

# Index to Editorial Changes

For 2009-10, there are a large number of editorial changes, far too many to be listed in detail. Significant organizational changes in Rules 2, 3 and 10 are intended to clarify and simplify the rules for starting and stopping the clock and for enforcing penalties. Other editorial changes are less comprehensive but are also intended to achieve clarity and simplification. Below is a list of the sections within each rule that contain editorial changes of particular note.

**EDITORIAL CHANGES**

**Rule 1**
Sections 1 and 4.

**Rule 2**
Sections 2, 3, 7, 11, 14, 18, 24, 25 and 31.

**Rule 3**
Sections 1, 2, 3 and 4.

**Rule 4**
Section 1.

**Rule 5**
Sections 1 and 2.

**Rule 6**
Sections 1, 3 and 5.

**Rule 7**
Sections 1, 2 and 3.

**Rule 8**
Sections 2 and 4.

**Rule 9**
Sections 1, 2, 3, 4 and 5.

**Rule 10**
Sections 1 and 2.

**Rule 11**

**Rule 12**
Sections 1, 2, 3 and 6.

FR-7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10013398

# Points of Emphasis

The NCAA Football Rules Committee has extraordinary pride in the Football Code, which was introduced in 1916 and has been updated several times. These guidelines form a harmony of agreement among coaches, players, game officials and administrators that places each contest in an environment of fairness and sportsmanship. It is noted that the Code emphasizes the following unethical practices: "Using the helmet as a weapon. The helmet is for protection of the player..." and "players and coaches should emphasize the elimination of targeting and initiating contact against a defenseless opponent and/or with the crown of the helmet." Every participant in the collegiate football scene shares a responsibility for ethical conduct that enhances the future of this American tradition.

**PROTECTION OF DEFENSELESS PLAYERS AND CROWN-OF-HELMET ACTION**—In 2008, the committee introduced a separate rule prohibiting initiating contact with the helmet and targeting a defenseless opponent. These actions are now in two rules: Targeting/Initiating Contact With the Crown of the Helmet (Rule 9-1-3) and Defenseless Player: Contact to Head or Neck Area (Rule 9-1-4). Use of the helmet as a weapon and intentional (targeted) contact to the head or neck area are serious safety concerns. Flagrant offenders must be disqualified from the game. The committee continues to emphasize that coaches and officials must be diligent to insure that players understand and abide by these rules.

Rule 2-27-14 defines and lists characteristics of a defenseless player.

**HELMETS**—The helmet is intended to protect the player from head injuries. It must therefore be fitted properly so that it does not come off through play. Coaches and trainers must be diligent in seeing that players wear the helmets properly, and officials must firmly enforce the rules requiring chin straps to be tightly secured. The rules committee gave serious consideration to creating a rule requiring a player whose helmet comes off during play to leave the game for one down. Although such a rule was not adopted the committee will continue to monitor this matter closely for possible future action.

**SIDELINE CONTROL**—The rules committee admonishes NCAA member institutions and conferences to enforce strictly the rules regarding the team area and coaching box (Rule 1-2-4-a, back of the limit lines between the 25-yard lines), and the space between the limit lines (Rules 1-2-3-a and b, 12 feet outside the sidelines and the end line) and the sidelines. These field-level locations must be kept clear of persons who have no game responsibilities.

The field level is not for spectators. It must be reserved for those who are performing a service associated with action on the field of play and for administration of the game. Simply put, no job means no sideline pass.

FR-8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    NCAA10013399

Each team is limited to 60 persons in its team area, not including squad members in full uniform, who shall be wearing a team credential. (Full uniform is defined as equipped in accord with NCAA rules and ready to play.) The credentials should be numbered 1 through 60. They should be reserved only for those who are directly involved in the game. No other credential should be valid for the team area.

Persons who are directly involved in the game include (Rules 1-1-6 and 1-2-4-b): coaches, team managers, medical and athletic training staff members, athletics communications staff members, and game operations staff members (e.g., chain crew, ball persons, official media liaisons, technicians responsible for coach-to-press box communications).

While the game is in progress, the area from the limit lines outward to the stadium seating, outside the team area, should be restricted to credentialed media camera operators and on-air personnel, cheer team members in uniform, and stadium security personnel in uniform. Game management personnel and stadium security personnel are responsible for enforcing these restrictions.

**SAFETY AND MEDICAL CONSIDERATIONS**—In consultation with the National Athletic Trainers' Association (NATA), the Football Rules Committee strongly encourages coaches and officials to be diligent in insuring that players wear mandatory equipment. It is especially important that equipment and pads cover body parts for which they were designed. Particular attention is drawn to wearing uniform pants that cover the knees, which are easily abraded when exposed.

Football players are especially susceptible to methicillin-resistant staphylococcus aureus (MRSA), which is resistant to commonly used antibiotics. MRSA results in lost playing time. More seriously it has caused the deaths of several football players in recent years. MRSA is typically transmitted through body-to-body contact from an infected wound or via an object (e.g., towel) that has come in contact with the infected area. It is not transmitted through the air, is not found on mud or grass, and cannot live on artificial turf.

The committee recommends observing common medical precautions to reduce the incidence of MRSA infections. Consult the NCAA Sports Medicine Handbook, which may be found at www.ncaapublications.com.

**CONCUSSIONS**—Coaches and medical personnel should exercise caution in the treatment of a student-athlete who exhibits signs of a concussion. See Appendix C for detailed information.

FR-10                                                        POINTS OF EMPHASIS

# Statement on Sportsmanship

**NCAA Football Rules Committee**

*Adopted February 2009*

- After reviewing a number of plays involving unsportsmanlike conduct, the committee is firm in its support of the unsportsmanlike conduct rules as they currently are written and officiated. Many of these fouls deal with players who inappropriately draw attention to themselves in a premeditated, excessive or prolonged manner. Players should be taught the discipline that reinforces football as a team game.

- The rules committee reminds head coaches of their responsibility for the behavior of their players before and after, as well as during, the game. Players must be cautioned against pre-game unsportsmanlike conduct on the field that can lead to confrontation between the teams. Such action can lead to penalties enforced on the opening kickoff, possibly including disqualification of players. Repeated occurrence of such unsportsmanlike behavior by a team may result in punitive action by the conference against the head coach and his institution.

- Currently the penalties for unsportsmanlike conduct fouls are administered by treating these as dead-ball fouls, even though the fouls often take place while the ball is in play. The committee is considering the possibility that if such a foul is committed while the ball is in play, the penalty would be enforced according to the rules for other live-ball fouls. This would mean, for example, that if a ball carrier about to score a touchdown taunted his opponents while still in the field of play, the score would be voided and the penalty enforced from the spot of the foul. Although the committee has not taken any action in this regard, it is a viable option for possible rules changes in the future.

# The Football Code

Football is an aggressive, rugged contact sport. Only the highest standards of sportsmanship and conduct are expected of players, coaches and others associated with the game. There is no place for unfair tactics, unsportsmanlike conduct or maneuvers deliberately designed to inflict injury.

The American Football Coaches Association (AFCA) Code of Ethics states:

a. The Football Code shall be an integral part of this code of ethics and should be carefully read and observed.

b. To gain an advantage by circumvention or disregard for the rules brands a coach or player as unfit to be associated with football.

Through the years, the rules committee has endeavored by rule and appropriate penalty to prohibit all forms of unnecessary roughness, unfair tactics and unsportsmanlike conduct. But rules alone cannot accomplish this end. Only the continued best efforts of coaches, players, officials and all friends of the game can preserve the high ethical standards that the public has a right to expect in America's foremost collegiate sport. Therefore, as a guide to players, coaches, officials and others responsible for the welfare of the game, the committee publishes the following code:

## Coaching Ethics

Deliberately teaching players to violate the rules is indefensible. The coaching of intentional holding, beating the ball, illegal shifting, feigning injury, interference, illegal forward passing or intentional roughing will break down rather than aid in the building of the character of players. Such instruction is not only unfair to one's opponent but is demoralizing to the players entrusted to a coach's care and has no place in a game that is an integral part of an educational program.

The following are unethical practices:

a. Changing numbers during the game to deceive the opponent.

b. Using the football helmet as a weapon. The helmet is for the protection of the player.

c. Using a self-propelled mechanical apparatus in the teaching of blocking and tackling.

d. Targeting and initiating contact. Players, coaches and officials should emphasize the elimination of targeting and initiating contact against a defenseless opponent and/or with the crown of the helmet.

e. Using nontherapeutic drugs in the game of football. This is not in keeping with the aims and purposes of amateur athletics and is prohibited.

f. "Beating the ball" by an unfair use of a starting signal. This is nothing less than deliberately stealing an advantage from the opponent. An honest starting signal is needed, but a signal that has for its purpose starting the team a fraction of a second before the ball is put in play, in the hope that it will not be detected by the officials, is illegal. It is the

FR-11

NCAA10013402

same as if a sprinter in a 100-meter dash had a secret arrangement with the starter to give him a tenth-of-a-second warning before firing the pistol.

g. Shifting in a way that simulates the start of a play or employing any other unfair tactic for the purpose of drawing one's opponent offside. This can be construed only as a deliberate attempt to gain an unmerited advantage.

h. Feigning an injury for any reason is unethical. An injured player must be given full protection under the rules, but feigning injury is dishonest, unsportsmanlike and contrary to the spirit of the rules. Such tactics cannot be tolerated among sportsmen of integrity.

## Talking to an Opponent

Talking to an opponent in any manner that is demeaning, vulgar, abusive or "trashy" or intended to incite a physical response or verbally put an opponent down is illegal. Coaches are urged to discuss this conduct frequently and support all officials' actions to control it.

## Talking to Officials

When an official imposes a penalty or makes a decision, he simply is doing his duty as he sees it. He is on the field to uphold the integrity of the game of football, and his decisions are final and conclusive and should be accepted by players and coaches.

The AFCA Code of Ethics states:

a. On- and off-the-record criticism of officials to players or to the public shall be considered unethical.

b. For a coach to address, or permit anyone on his bench to address, uncomplimentary remarks to any official during the progress of a game, or to indulge in conduct that might incite players or spectators against the officials, is a violation of the rules of the game and must likewise be considered conduct unworthy of a member of the coaching profession.

## Holding

Illegal use of the hand or arm is unfair play, eliminates skill and does not belong in the game. The object of the game is to advance the ball by strategy, skill and speed without illegally holding your opponent. All coaches and players should thoroughly understand the rules for proper offensive and defensive use of the hands. Holding is a frequently called penalty; it is important to emphasize the severity of the penalty.

## Sportsmanship

The football player or coach who intentionally violates a rule is guilty of unfair play and unsportsmanlike conduct; and whether or not he escapes being penalized, he brings discredit to the good name of the game, which is his duty as a player or coach to uphold.

NCAA FOOTBALL RULES COMMITTEE

FR-12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

THE FOOTBALL CODE                                FR-13

Those who find it necessary to contact the editor for interpretations of rules, play situations or for information and guidance regarding officiating, may send an e-mail to the address below. The editor will respond as time allows. Requests should be sent to:

**ROGERS REDDING**
Secretary-Rules Editor
southeastern conference
2201 richard arrington jr. blvd. north
birmingham, alabama 35203
e-mail: footballRULES@ncaa.org

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          NCAA10013404

# Part I:

# The Rules

NCAA Football Rules and Interpretations have been designated as either administrative rules or conduct rules. Typically, administrative rules are those dealing with preparation for the contest. Conduct rules are those that have to do directly with the playing of the contest. Some administrative rules (as indicated) may be altered by the mutual consent of the competing institutions. Others (as indicated) are unalterable. No conduct rule may be changed by mutual consent. All NCAA member institutions are required to conduct their intercollegiate contests according to these rules.

**In 2009-10 NCAA Football Rules and Interpretations, administrative rules that may be altered by mutual consent of the institutions include:**

| | |
|---|---|
| 1-1-4-a | 3-2-2-a |
| 1-2-7-a | 3-3-3-c and d |
| 3-2-1-b | 11-2 |

**Administrative rules that may not be altered include:**

| | |
|---|---|
| 1-1-1-a | 1-2-7-a, b, e and f |
| 1-1-2 | 1-2-8 |
| 1-1-3-a and b | 1-2-9-a and b |
| 1-1-4-b | 1-3-1 |
| 1-1-5-a-c | 1-3-1-a-k |
| 1-1-6 | 1-3-2-b, c, e and f |
| 1-1-7-a and b | 1-3-2-d Exception |
| 1-2-1 | 1-4-3-a and d |
| 1-2-1-a-d, h, k and l | 1-4-7 |
| 1-2-2 | 1-4-7-a-d |
| 1-2-3-a and b | 1-4-9-a-f |
| 1-2-4-a-f | 3-2-4-b |
| 1-2-5-a-f | 3-3-3-e |
| 1-2-6 | 11-1-1 |
| 1-2-7 | |

**Administrative rules that may be altered by game management without mutual consent include:**

| | |
|---|---|
| 1-2-1-a Exception | 1-2-7-c and d |
| 1-2-1-e-g, i and j | 1-3-2-d |
| 1-2-4-g | 3-2-4 |
| 1-2-5-c Exception | |

**All other rules are conduct rules and may not be altered.**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    NCAA10013405

# EXHIBIT 20

Page 1

1

UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION
3      Case No. 11-cv-06356
- - - - - - - - - - - - - - - - - -x
4

ADRIAN ARRINGTON, DEREK OWENS,
5      ANGELA PALACIOS, and KYLE SOLOMON,
individually and on behalf of all
6      others similarly situated,
7                        Plaintiffs,
8
               -against-
9
10     NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,
11
                       Defendant.
12
- - - - - - - - - - - - - - - - - -x
13
14                        April 16, 2013
                         9:09 a.m.
15
16
17
18            Deposition of KYLE SOLOMON,
19     taken by Defendant, pursuant to
20     Notice, held at the offices of
21     Latham & Watkins LLP, 885 Third
22     Avenue, New York, New York, before
23     Kathleen Piazza Luongo, a Notary
24     Public of the State of New York.

1    team and their knowledge of the game.

2        Q.    Did you have a team doctor

3    while you were playing at Maine?

4        A.    I did in the beginning of the

5    season or in the beginning of my career.

6        Q.    Who was that?

7        A.    John West.

8        Q.    Was he your doctor?

9        A.    He was the team doctor.

10       Q.    Did he come to your games?

11       A.    Yes.

12       Q.    Away games?

13       A.    I don't recall.

14             No, I don't think so.

15       Q.    Was he at practices?

16       A.    No.

17       Q.    Were there trainers who worked

18   with the team?

19       A.    Yes.

20       Q.    Who were they?

21       A.    Um, Paul Culina.

22       Q.    What was his job title?

23       A.    Head athletic trainer.

24       Q.    Did he have any assistants?

Page 83

```
 1      A.    Student assistants, they were
 2   varied.
 3      Q.    Who were his student
 4   assistants?
 5      A.    I don't remember their names.
 6      Q.    Did Paul Culina attend
 7   practices?
 8      A.    Yes.
 9      Q.    Did he travel with the team?
10      A.    Yes.
11      Q.    What is the first concussion or
12   head injury after you got to the
13   University of Maine?
14      A.    Um, in October of 2008.
15      Q.    What happened?
16      A.    Uh, we were playing against
17   Boston College and I chipped a puck down
18   low into the offensive zone and got
19   blindsided and the right side of my head
20   above my ear, um, hit the ledge on the
21   boards.
22      Q.    Did you fall down?
23      A.    Yes.
24      Q.    Did you lose consciousness?
```

Page 84

1      A.    I believe so.

2      Q.    What makes you think that?

3      A.    I don't remember the actual hit

4  but I remember coming to.

5      Q.    Did you come out of that game?

6      A.    Yes.

7      Q.    How did you leave the game?

8      A.    I was helped off the ice by

9  Paul Culina.

10      Q.    What happened next?

11      A.    I was given stitches in the

12  training room to the back of my head that

13  had hit the boards.

14      Q.    How were you feeling when you

15  were back in the training room?

16      A.    Woozy, I felt concussed.

17      Q.    And you had had a couple of

18  concussions before this one; right?

19      A.    Um hum, yes.

20      Q.    So did you think at the time

21  that you had a concussion?

22      A.    Yes.

23      Q.    Did you tell anyone that?

24      A.    No.

Page 85

1      Q.    Did you tell anyone you felt
2   woozy?
3      A.    No.
4      Q.    Why not?
5      A.    I wanted to play.
6      Q.    Did anyone ask you how you were
7   feeling?
8      A.    Yes.
9      Q.    Who?
10      A.    Paul Culina.
11      Q.    What did you tell him?
12      A.    I told him -- I don't recall
13   exactly what I told him, um.
14      Q.    But you didn't tell him that
15   you were feeling woozy?
16      A.    No.
17      Q.    So you stitched up the cut
18   behind your ear?
19      A.    Um hum.
20      Q.    And then what happened next?
21      A.    I went back to the game.
22            MR. KUROWSKI:  I'm sorry, what
23      was your last question?
24            MS. SPELLMAN:  What happened

```
 1      next.
 2              MR. KUROWSKI:  Sorry, the one
 3      before that.
 4              (The requested portion of the
 5      record was read.)
 6              MR. KUROWSKI:  Thank you.
 7      Q.    Did you still feel woozy when
 8  you went back into the game?
 9      A.    Yes.
10      Q.    When you had previously
11  suffered your concussion, the one we
12  talked about in the winter of 2006 --
13      A.    Um hum.
14      Q.    -- your doctor told you not to
15  start playing hockey again until your
16  symptoms went away; right?
17      A.    Yes.
18      Q.    And then this game in 2008 you
19  knew that you still had symptoms?
20      A.    Yes.
21      Q.    And that you probably had a
22  concussion?
23      A.    Yes.
24      Q.    And you went back to play
```

Page 87

1    anyway?

2        A.    Yes.

3        Q.    Did you think that was a risky

4    decision?

5             MR. KUROWSKI:  Objection.  It

6        calls for speculation.  Legal

7        conclusion.

8             MS. SPELLMAN:  You can answer.

9        A.    Yes.

10       Q.    Why did you think it was risky?

11       A.    Because I had just been hit in

12   the head really hard.

13       Q.    What did you think might

14   happen?

15            MR. KUROWSKI:  Objection.

16       Calls for speculation.

17       A.    I had no idea.

18       Q.    Did you play the full rest of

19   the game?

20       A.    Yes.

21       Q.    How did you feel after the

22   game?

23       A.    Terrible.

24       Q.    Can you be a little bit more

```
                                        Page 88
1    specific?  How did you feel?
2         A.    Still felt very woozy, um,
3    seeing stars, double vision, terrible
4    headache.
5         Q.    Did you tell anyone?
6         A.    I, yes, I told -- I told Paul
7    Culina of some of my symptoms.
8         Q.    When did you tell him?
9         A.    After the game.
10        Q.    The same night or same day?
11        A.    Yes.
12        Q.    Which symptoms did you tell him
13   about?
14        A.    I don't recall.
15        Q.    What was his reaction?
16        A.    He told me to go back to my
17   dorm room and rest.
18        Q.    Did you tell him you thought
19   you had a concussion?
20        A.    I don't recall.
21        Q.    Did he tell you that you might
22   have a concussion?
23        A.    Um, yes.
24        Q.    Did he give you any
```

Page 89

1   instructions on how to treat your

2   concussion?

3       A.    I was told to go back to my

4   dorm room and rest.

5       Q.    Did he tell you to see a

6   doctor?

7       A.    Not at that point.

8       Q.    So what did you do?

9       A.    I went back to my dorm room and

10  went to sleep.

11      Q.    Did you tell anyone else about

12  your symptoms before you went to sleep

13  that night?

14      A.    Um, my father.

15      Q.    Was he at the game?

16      A.    No.

17      Q.    How did you tell him?

18      A.    Over the phone.

19      Q.    What was his reaction?

20      A.    I don't remember.

21      Q.    Did he tell you to see a

22  doctor?

23      A.    No.

24      Q.    How did you feel the next day?

# EXHIBIT 21

# 2011 and 2012 NCAA Football
# Points of Emphasis{xe "Points of Emphasis (
# – )"}

The NCAA Football Rules Committee has extraordinary pride in the Football Code, which was introduced in 1916 and has been updated several times. These guidelines form a harmony of agreement among coaches, players, game officials and administrators that places each contest in an environment of fairness and sportsmanship. It is noted that the Code emphasizes the following unethical practices:☐"Using the helmet as a weapon. The helmet is for protection of the player..." and "players and coaches should emphasize the elimination of targeting and initiating contact against a defenseless opponent and/or with the crown of the helmet." Every participant in the collegiate football scene shares a responsibility for ethical conduct that enhances the future of this American tradition.

**PROTECTION OF DEFENSELESS PLAYERS AND CROWN-OF-HELMET ACTION—**In 2008, the committee introduced a separate rule prohibiting initiating contact with the helmet and targeting a defenseless opponent. These actions are now in two rules: Targeting/Initiating Contact With the Crown of the Helmet (Rule 9-1-3) and Defenseless Player: Contact to Head or Neck Area (Rule 9-1-4). Use of the helmet as a weapon and intentional (targeted) contact to the head or neck area are serious safety concerns. Flagrant offenders must be disqualified from the game. The committee continues to emphasize that coaches and officials must be diligent to insure that players understand and abide by these rules.

Rule 2-27-14 defines and lists characteristics of a defenseless player.

**HELMETS—**The helmet is intended to protect the player from head injuries. It must therefore be fitted properly so that it does not come off through play. Coaches and trainers must be diligent in seeing that players wear the helmets properly, and officials must firmly enforce the rules requiring chin straps to be tightly secured. The rules committee gave serious consideration to creating a rule requiring a player whose helmet comes off during play to leave the game for one down. Although such a rule was not adopted the committee will continue to monitor this matter closely for possible future action.

**SIDELINE CONTROL—**The rules committee admonishes NCAA member institutions and conferences to enforce strictly the rules regarding the team area and coaching box (Rule 1-2-4-a, back of the limit lines between the 25-yard lines), and the space between the limit lines (Rules 1-2-3-a and b, 12 feet outside the sidelines and the end line) and the sidelines. These field-level locations must be kept clear of persons who have no game responsibilities.

The field level is not for spectators. It must be reserved for those who are performing a service associated with action on the field of play and for administration of the game. Simply put, no job means no sideline pass.

Each team is limited to 60 persons in its team area, not including squad members in full uniform, who shall be wearing a team credential. (Full uniform is defined as equipped in accord with NCAA rules and ready to play.) The credentials should be numbered 1 through 60. They should be reserved only for those who are directly involved in the game. No other credential should be valid for the team area.

Persons who are directly involved in the game include (Rules 1-1-6 and 1-2-4-b): coaches, team managers, medical and athletic training staff members, athletics communications staff members, and game operations staff members (e.g., chain crew, ball persons, official media liaisons, technicians responsible for coach-to-press box communications).

The area from the limit lines outward to the stadium seating, outside the team area, should be restricted, while the game is in progress, to credentialed media camera operators and on-air personnel, cheer team members in uniform, and stadium security personnel in uniform. Game management personnel and stadium security personnel are responsible for enforcing these restrictions.

**SAFETY AND MEDICAL CONSIDERATIONS—**In consultation with the National Athletic Trainers' Association (NATA), the Football Rules Committee strongly encourages coaches and officials to be diligent in insuring that players wear mandatory equipment. It is especially important that equipment and pads cover body parts for which they were designed. Particular attention is drawn to wearing uniform pants that cover the knees, which are easily abraded when exposed.

Football players are especially susceptible to methicillin-resistant staphylococcus aureus (MRSA), which is resistant to commonly used antibiotics. MRSA results in lost playing time. More seriously it has caused the deaths of several football players in recent years. MRSA is typically transmitted through body-to-body contact from an infected wound or via an object (e.g., towel) that has come in contact with the infected area. It is not transmitted through the air, is not found on mud or grass, and cannot live on artificial turf.

The committee recommends observing common medical precautions to reduce the incidence of MRSA infections. Consult the NCAA Sports Medicine Handbook, which may be found at www.ncaapublications.com.

**CONCUSSIONS**—Coaches and medical personnel should exercise caution in the treatment of a student-athlete who exhibits signs of a concussion. See Appendix C for detailed information.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

NCAA00009076

# EXHIBIT 22



# Points of Emphasis

The "Points of Emphasis" section highlights certain areas of the game the Women's Lacrosse Rules Committee believes warrant continued attention by placing a stronger emphasis on existing rules.

This year, the committee requests that players, officials and coaches concentrate on the following areas:

## Dangerous Checks and Slashing

Dangerous checks, those that are uncontrolled, rough or reckless, are major fouls that must be called by the officials. Officials must carefully evaluate each situation, deciding if the foul warrants an immediate whistle or if a held whistle is appropriate. A card may also be given for a dangerous check.

Slashing, or the swinging of the crosse at an opponent's body or crosse with deliberate viciousness or recklessness, must not only be called but a mandatory card must be given. Whether the crosse hits the opponent's body or crosse has no bearing on the call being made and a card being given.

## Use of Cards

Umpires are encouraged to use cards more frequently to control and change player behavior. In addition to the fouls for which a mandatory card must be given, umpires are instructed to card for excessively rough, overly aggressive and dangerous play. Officials must take into account repeated fouls by the same team or player and upgrade to cards in order to alter player behavior. Additionally, if yellow cards are not having the intended effect, red cards must be used to control the game.

## Stick-to-Body/Body-to-Stick Contact

While calling these types of fouls has improved, the committee continues to place an emphasis on strict enforcement of the rules that prohibit this type of play. Players are not allowed to hit, hold, push or detain opposing players with their stick. Attack players who use their body to push or back through a defender must be called for charging.

8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          NCAA10070092

# EXHIBIT 23

# 2011 & 2012 NCAA BASEBALL RULES

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Points of Emphasis

Generally, the committee believes the rules as written are sound and directs coaches and umpires to adhere to these rules without exception.The entire baseball community (student-athletes, coaches, administrators, game managers) has a responsibility to participate in the game in a respectful manner. The following two points are items the committee believes require additional attention and consideration:

### Coach/Umpire Philosophy

The committee reviewed several proposals that dealt with communication between coaches and umpires. While this relationship has generally improved in recent seasons, the committee continues to be concerned with some negative incidents that could hurt the image of the game. The committee believes responsibility for improving this relationship lies with coaches, umpires and administrators equally.

For the sport to continue to thrive as it has, coaches and umpires need to continue to engage in healthy discussion and explanation of the rules without creating unneeded delays in the game and unsporting conduct. Extended arguments, vulgar language and disrespectful conduct by coaches or umpires must not be tolerated. Coaches are particularly reminded that the Code of Ethics includes a statement that forbids arguing judgment calls by the umpire.

The committee will continue to monitor these situations closely and will consider rules changes in the future if warranted.

### Managing At-Bats

The committee believes improvement is needed with the pace of the game, particularly the batter stepping out of the box in conflict with current rules. Umpires in some cases are diligent in adhering to these rules, which are intended to maintain a consistent pace of play and eliminate unneeded delays. Consistency in this area is needed, however, and the committee instructs umpires to strictly enforce these rules and asks coaches and student-athletes to adhere without exception.

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10045059

# EXHIBIT 24

| KRISTEN L. SHEELY, *et al.*, | * | IN THE |
| | | |
| Plaintiffs, | * | CIRCUIT COURT |
| | | |
| v. | * | FOR |
| | | |
| THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., | * | MONTGOMERY COUNTY |
| | * | |
| Defendants, | | Civil No. 380569-V |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' RESPONSE
## IN OPPOSITION TO "FROSTBURG DEFENDANTS" MOTION TO DISMISS

The Plaintiffs, by and through counsel, file this response in opposition to the Motion to Dismiss filed by Defendants Thomas Rogish, James Schumacher and Michael Sweitzer, Jr. (collectively the "Moving Defendants").

## I.    INTRODUCTION

This case is about the needless death of Derek Sheely arising from the gross and reckless conduct of the "Frostburg defendants," the NCAA and Schutt Sports.[1] Derek's tragic death has become a national story of utmost importance – many question how a public university could allow, retain and/or condone its coaches and staff to engage in such "utter incompetence, egregious misconduct, false hope and a reckless disregard" for Derek's life. (Compl. ¶ 12.) All the while, the NCAA did nothing to investigate an institution that was completely out of control. (Compl. ¶¶ 102, 202.)

---

[1]  To buttress their Motion to Transfer, Moving Defendants have at times identified themselves as the "Frostburg defendants." However, they do not all reside in Frostburg, Maryland. On November 18, 2013, the University announced that Defendant Rogish had resigned as head football coach.

After recently learning about Derek Sheely's death, Congresswoman Linda Sanchez, senior whip of the Democratic Party, issued a statement expressing her concern over the actions of the NCAA and Frostburg:

**Something is clearly wrong when a player like Mr. Sheely is allowed to return to the playing field despite suffering a head injury. It is time for the NCAA to review its concussion policy and take stronger measures to protect the safety of its students.**

She also wrote a letter[2] to NCAA President Mark Emmert demanding action and answers from the NCAA. Notably, she asked, "[h]as the NCAA penalized colleges and universities that allow student-athletes to participate in a game after being injured or being diagnosed with a concussion?" The answer, sadly, is no. (Compl. ¶ 96.)

This case is also about a death that was "swept under the rug."[3] On information and belief, Frostburg State University administrators misrepresented the facts to the Plaintiffs and possibly spoliated evidence. It was not until—nearly two years later that—a courageous teammate informed the family about the truth of the incidents surrounding Derek's death.

Left with questions unanswered, the Plaintiffs have sought justice in this court to uncover the truth. Now, the Moving Defendants seek to hide behind the limited grant of immunity – for conduct which no such immunity can plausibly exist – to further conceal the truth.

Plaintiffs' Complaint sets forth in great detail specific allegations asserted against the Moving Defendants to support each of their causes of action, the NCAA and Schutt Sports. The Complaint sets forth facts which establish the reckless, willful and grossly negligent conduct on

---

[2] http://lindasanchez.house.gov/index.php/component/content/article/46-other/834-rep-linda-sanchez-letter-to-ncaa-president-mark-emmert

[3] See, Fenno, Nathan; *Frostburg State Football player pressured back on field after blows to the head dies*. Nov. 13, 2013.

ii

the part of all of the Defendants, allegations sufficient to warrant the denial of Defendants'

Motion to Dismiss.[4]

## II. BACKGROUND

Plaintiffs adopt in their entirety the relevant factual allegations provided by Moving

Defendants in their Memorandum in Support of Motion to Dismiss Complaint (hereinafter

"Def's Motion to Dismiss").

## III. APPLICABLE STANDARD FOR A MOTION TO DISMISS

Moving Defendants move, pursuant to Rule 2-322(b)(2), to dismiss all counts asserted

against them. When considering a motion to dismiss for failure to state a claim, this Court must

assume the truth of all well-pleaded material facts and all inferences that can be drawn from

them. *Higginbotham v. Public Service Com'n of Maryland*, 171 Md.App. 254 (2006). The grant

of a motion to dismiss is proper *only* if the complaint does not disclose, on its face, a legally

sufficient cause of action." *Id.* (emphasis added). That is not the case here.

Maryland is a notice-pleading state which merely requires a plaintiff to "provide notice to

the parties as to the nature of the claim or defense." *Hoang v. Hewitt Ave. Associates, LLC*, 177

Md.App. 562, 587 (2007). Plaintiffs' Complaint goes above and beyond the requirements by

providing all Defendants with the requisite notice of the well-pleaded material facts upon which

they base their claims. *Id.*

As was made clear in *Afamefune ex rel. Afamefune v. Suburban Hosp., Inc.*, 385 Md. 677,

683, n. 4, 870 A.2d 592, 595 n. 4 (2005), "[a] motion to dismiss for failure to state a claim tests

the sufficiency of the pleadings. (citing Md. Rule 2-322(b)(2); *Converge Services Group, LLC v.*

*Curran,* 383 Md. 462, 475, 860 A.2d 871, 878-79 (2004) ("consideration of the universe of

---

[4] Plaintiffs will enter into and file a Stipulation voluntarily dismissing the wrongful death claim of Keyton, Sheely, Derek Sheely's sister.

'facts' pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any"); Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary,* 206 (3d ed.2003) ("[t]he object of the motion is to argue that as a matter of law relief cannot be granted on the facts alleged"). *See also Faya v. Almaraz,* 329 Md. 435, 443, 620 A.2d 327, 331 (1993).

Thus, in deciding such a motion, the Court must assume the truth of the pleaded facts and allegations in the complaint, as well as the inferences reasonably drawn from them. *Id.* (citing *Porterfield v. Mascari II, Inc.,* 374 Md. 402, 414, 823 A.2d 590, 597 (2003) (indicating that the court accepts all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party); *Bennett Heating & Air Conditioning, Inc.,* 342 Md. 169, 674 A.2d 534 (1996) ("the facts to be [considered are] those that are well pleaded by the plaintiffs, including those facts that may fairly be inferred from the matters expressly alleged"); *Board of Education v. Browning,* 333 Md. 281, 286, 635 A.2d 373, 376 (1994)(in evaluating a motion to dismiss the court "must accept as true all well-pleaded facts and allegations in the complaint"); *A.J.Decoster Co. v. Westinghouse Electric Corp.,* 333 Md. 245, 249, 634 A.2d 1330, 1332 (1994) ( "the truth of all well-pleaded relevant and material facts as well as all inferences that reasonably can be drawn therefrom" must be assumed)). Only when the facts and allegations, so viewed, are insufficient to establish a cause of action, is dismissal for failure to state a claim proper. *Id.* (citing *Board of Education v. Browning,* 333 Md. at 286, 635 A.2d at 376 ("[d]ismissal is only proper if the facts and allegations viewed in the light most favorable to the plaintiff fail to afford the plaintiff relief if proven."). *See also Ricketts v. Ricketts*, 393 Md. 479, 491-92, 903 A.2d 857, 864-65 (2006).

## IV.    ARGUMENT

### A.    Plaintiffs' Complaint in Counts I, II, XII, and XIII Adequately Pleads Gross Negligence Against Each Moving Defendant.

The Maryland Tort Claims Act ("MTCA") "provides statutory immunity to insulate State employees generally from tort liability if their actions are within the scope of employment and without malice or gross negligence." *Bd. of Educ. of Prince George's Cnty. v. Marks-Sloan,* 428 Md. 1, 30, 50 A.3d 1137, 1154 (2012) (internal quotations omitted). *See also* Md. Code Ann., Courts & Jud. Proc. § 5-522(b) (2013 Repl. Vol.). Thus, State employees are *not* immune from suit if their actions are deemed grossly negligent. *Id.*

While general negligence is defined as "any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm," *Barbre v. Pope*, 402 Md. 157, 187-88 (2007) (citing *Mayor & City Council of Baltimore v. Hart,* 395 Md. 394, 410, 910 A.2d 463, 472 (2006); *Holler v. Lowery,* 175 Md. 149, 157, 200 A. 353, 357 (1938), quoting Restatement (First) Torts § 282), gross negligence is "something *more* than simple negligence." *Id.* (citing *Taylor v. Harford County Dep't of Soc. Servs.,* 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004) (emphasis in original)). Gross negligence is described as

> an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Barbre v. Pope*, 402 Md. 157, 187-88 (2007), citing *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 635, 495 A.2d 838, 846 (1985); *Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12, 14 (1968).

1

Thus, to adequately state a cause of action for gross negligence, Plaintiffs need only plead facts (as opposed to mere conclusory allegations) showing that the Moving Defendants acted with a wanton and reckless disregard for the safety of others. *Khawaja v. Mayor & City Council, City of Rockville,* 89 Md. App. 314, 320 (1991). "Ordinarily, unless the facts [alleged] are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Marriott Corp. v. Chesapeake & Potomac Tel. Co. of Maryland,* 124 Md. App. 463, 478 (1998).

In this case, there is no question that the factual allegations alleged in Counts I, II, XII and XIII, as well as all inferences that reasonably can be drawn therefrom, when viewed in a light most favorable to Plaintiffs, are sufficient to establish a cause of action for gross negligence. Indeed, this case is not too dissimilar from *Koffman v. Garnett,* 265 Va. 12, 14-16, 574 S.E.2d 258, 260 (2003) (cited with approval by *Barbre v. Pope,* 402 Md. 157, 187-88 (2007)), in which the Court held that a coach's aggressively tackling a smaller, less experienced student football player to demonstrate or teach a football technique went beyond the circumstances of simply being tackled in the course of participating in organized football giving rise to a claim (about which reasonable persons could disagree) for gross negligence.

## 1. Head Coach Rogish

Moving Defendants rely upon *Kelly v. McCarrick,* 155 Md. App. 82 (2004) in asserting that Plaintiffs must allege that Mr. Rogish did something to increase the dangers inherent in the sport. (Defs' Motion to Dismiss at p. 11). At the outset, Moving Defendants are simply wrong in asserting that the "*Kelly* court held that coaches [only] 'have a duty not to increase the risk of harm beyond what is inherent in the sport.' " (See Defs' Motion to Dismiss at p. 11.) The portion of the *Kelly* decision relied upon by Moving Defendants states as follows:

2

> Some courts also have cited policy reasons for limiting coaching liability to circumstances in which a coach increases the inherent danger of a sport, so that coaches may not be held liable for failing to decrease risks inherent in the game. In California, where sports law concerning assumption of inherent risks has been developed through case law, the Supreme Court has held that "a sports instructor or coach owes a duty of due care not to increase the risk of harm inherent in learning an active sport[.]" *Kahn* [*v. East Side Union High Sch. Dist.,*] 4 Cal.Rptr.3d 103, 75 P.3d [30,] at 39 [(2003)].

*Kelly*, 155 Md. App. at 104. While the observation by the *Kelly* court of the law in California is

not without value to some, it is hardly relevant to the case *sub judice* which concerns only the

law in Maryland.

### i. Plaintiffs have Adequately Pled that Coach Rogish Breached a Duty Owed to Derek Sheely.

While Moving Defendants are plainly unaware of the duties imposed upon them by

Maryland law, the very case upon which they rely clearly describes the duties owed by coaches

to their players:

> Prevalent case law and legal commentary establish the following specific duties upon coaches: (1) *supervision*; (2) training and instruction; (3) ensuring the proper use of safe equipment; (4) *providing competent and responsible personnel*; (5) *warning of latent dangers*; (6) *providing prompt and proper medical care*; (7) *preventing injured athletes from competing*; and (8) matching athletes of similar competitive levels.

*Kelly*, 155 Md. App. at 99, fn. 9 (citing generally Anthony S. McCaskey & Kenneth W.

Biedzynski, A Guide to the Legal Liability of Coaches for a Sports Participant's Injuries, 6 Seton

Hall J. Sports L. 7, 15 (1996)) (emphases added).

As stated above, to adequately state a cause of action for gross negligence, Plaintiffs need

only plead facts showing that the Moving Defendants breached a duty owed to Derek and acted

with a wanton and reckless disregard for the safety of Derek. *Khawaja,* 89 Md. App. at 320.

Plaintiffs submit that they have.

3

Specifically, Plaintiffs allege that Mr. Rogish wrote and implemented a "Team Policy" whereby players, including Derek Sheely, were instructed, contrary to Md. Code Ann., Educ. § 7-433, eff. July 1, 2011, to play through injuries. (Compl. ¶¶ 21-24.) Moreover, Plaintiffs allege that Mr. Rogish knew of the likelihood that the Drill (referred to at Compl. ¶ 35) resulted in players taking multiple subconcussive, or concussive, blows to the head. (Compl. ¶¶ 35-38.) In fact, at least one player is known to have suffered a concussion while performing the Drill during the 2010 season and two of Derek's teammates suffered concussions during the Drill just days before Derek's fatal blow. (Compl. ¶¶ 38-39.) A reasonable inference can be drawn that Mr. Rogish, as head coach, was aware of dangers of the Drill and the concussions that resulted from the Drill.

Plaintiffs also allege that Mr. Rogish "allowed, condoned and/or demanded that the Drill continue without modification." (Compl. ¶¶ 38-39, 61.) And, in violation of NCAA Rules, Plaintiffs allege that Rogish and the other Moving Defendants failed to provide appropriate medical treatment to Derek when it became obvious that he was seriously injured. (Compl. ¶¶ 46-48, 53-57, 59.) Plaintiffs further allege that Coach Rogish as well as the other Moving Defendants knew of the danger Derek was in when he exclaimed on the date of his death that he "didn't feel right" and that he had a "headache." (Compl. ¶¶ 64-65.) Nevertheless, despite every indication that Derek had suffered a concussion, Defendant Rogish forced Derek to return to play. (Compl. ¶ 66.)

Significantly, acknowledging their keen awareness, yet reckless disregard, of the dangers imposed by the Drill and that their conduct was a gross deviation from the standard of care and unnecessarily increased the dangers inherent in the sport, immediately following Derek's fatal

4

injury, Moving Defendants armed the linebacker with a blocking shield for protection during the Drill. (Compl. ¶ 71.)

Turning back to *Kelly*, despite Moving Defendants' reliance upon it, it provides additional support to Plaintiffs. *Kelly* is an "inadequate training" case arising out of incident that occurred during a fast pitch softball game, when a player from an opposing team slid into second base, colliding with the student plaintiff, severely fracturing the student's ankle. *Id.* at 100. The undisputed evidence was that the student's *coach properly instructed* her infielders, including the plaintiff, not to place themselves in a base runner's path and, more specifically, not to place a foot on the runner's side of the base. *Id.* at 108-09. For safety reasons, the coach had trained the plaintiff to place her feet in front of, behind, or on the far side of the base. *Id.* at 109.

The only evidence offered to dispute the testimony that the plaintiff had received proper instruction and training in how to field when a runner is approaching second base was an "awkwardly worded affidavit that the Kellys filed in opposition to summary judgment." *Id.* In that affidavit, the student stated only that it "is apparent" that her coach did not train her "in the 'rules of softball'" and that she "did not know the actual rules of softball," because she "thought [she] had to keep [her] foot on the base in order to tag out a runner." *Id.* at 110. The court ruled that the plaintiff's inability to offer any evidentiary link showing that her misunderstanding of the rules was directly attributable to the defendants was fatal to her inadequate training claims. *Id.*

The Court in *Kelly* specifically held that its decision does *not* address "injuries incurred as a result of off-field conduct that is not an intrinsic part of the sport, such as, for example, injury resulting from a coach's negligence in driving players to the field." *Id.* at 100. The crux of Plaintiffs' complaint against the Moving Defendants in this case is precisely that they repeatedly

5

and negligently drove Derek to his death. Wantonly gross conduct by coaches and the staff is clearly not an intrinsic part of the sport. (Compl. ¶¶ 21-24, 38-39, 61, 66.) Thus, insofar as *Kelly* stands for the proposition that Plaintiffs must allege that Coach Rogish did something to increase the dangers inherent in the sport (which Plaintiffs contend they need not, though clearly have), it is inapplicable to the case at bar.

The *Kelly* Court also specifically excluded from its holding "flagrant infractions unrelated to the normal method of playing the game and done without any competitive purpose." *Id.* (internal quotation omitted). Since Plaintiffs complain that Derek was fatally injured during a practice drill in which he was required to stand upright and defenseless while smashed by a fullback running at full speed, (Compl. ¶ 35), *Kelly* is inapplicable. What's more, *Kelly* involved undisputed facts that the coach properly instructed the players. As made clear in Plaintiffs' Complaint, the coaches did the opposite here: Demanding that players "lead with your head" and punishing players for reporting their injuries. (Compl. ¶¶ 22-23, 41-43.)

Finally, the *Kelly* case was dismissed on a motion for summary judgment, after numerous depositions and voluminous discovery, on the grounds that there remained no material facts upon which reasonable people could differ and that as a matter of law, the plaintiff had assumed the risk that training and instruction would not prevent the mistake that resulted in her injury on the base paths. *Id.* at 115. The record in this case has yet to be developed and yet, Plaintiffs posit that reasonable people could differ as to whether Coach Rogish acted with gross negligence.

### ii.     Plaintiffs have Adequately Pled that Derek Sheely's Death was Foreseeable.

Moving Defendants also contend that Plaintiffs have failed to allege facts showing that Derek's death was foreseeable. (Defs' Motion to Dismiss at p. 12). Moving Defendants insist that

6

> [i]n order to allege that the injuries were foreseeable, the complaint would have to allege that Coach Rogish not only directed Mr. Sheely to participate in the drill, but also that he knew that merely having Mr. Sheely participate in practice drills (without any knowledge that these drills had caused concussions or any injury to Mr. Sheely or others) would lead to serious injury or death.

(Defendants' Motion to Dismiss at p. 12). Defendants are wrong.

The test of foreseeability is not whether the particular event that has occurred was to be expected, "but whether the event fell within a general field of danger which should have been anticipated." *Collins v. Li*, 176 Md. App. 502, 569 (2007) aff'd sub nom. *Pittway Corp. v. Collins*, 409 Md. 218 (2009). "Hence, foreseeability is derived from the notion that one should be held to account for probable results, which, in the contemplation of the parties, arise naturally from the acts complained of according to the usual course of things and which should have been anticipated." *Id.*

Plaintiffs allege that Coach Rogish wrote and implemented a "Team Policy" whereby players, including Derek Sheely, were instructed, contrary to Md. Code Ann., Educ. § 7-433, eff. July 1, 2011, to play through injuries. (Compl. ¶¶ 21-24.) Moreover, Plaintiffs allege that Mr. Rogish knew of the likelihood that the Drill resulted in players taking multiple subconcussive, or concussive, blows to the head. (Compl. ¶¶ 35-38.) In fact, at least one player was known to have suffered a concussion while performing the Drill during the 2010 season and two of Derek's teammates suffered concussions during the Drill just days before Derek's fatal blow. (Compl. ¶¶ 38-39.) A reasonable inference can be drawn that Mr. Rogish, as head coach, was, in fact, acutely aware of the dangers of the Drill and the probable results, which, in contemplation, arise naturally therefrom *even if* he was not aware of particular instances of concussive injuries.

Plaintiffs also allege that Mr. Rogish "allowed, condoned and/or demanded that the Drill continue without modification." (Compl. ¶¶ 38-39, 61.) And, in violation of NCAA Rules and

7

the duties imposed by Maryland law, Plaintiffs allege that Rogish and the other Moving Defendants failed to provide appropriate medical treatment to Derek when it became obvious that he was seriously injured. (Compl. ¶¶ 46-48, 53-57, 59.) Plaintiffs further allege that Coach Rogish as well as the other Moving Defendants knew of the danger Derek was in when he exclaimed on the date of his death that he "didn't feel right" and that he had a "headache." (Compl. ¶¶ 64-65.) Plaintiffs contend that Derek's injuries and ultimate death clearly fall within the general field of danger which should have been anticipated by Coach Rogish and thus, have adequately pled that Derek's death was the foreseeable result of Coach Rogish's conduct.

### iii.     Plaintiffs have Sufficiently Pled that Coach Rogish Acted with Gross Negligence.

"[S]tate personnel are not immune from suit and liability in tort when the plaintiff's complaint sufficiently alleges malice or gross negligence." *Barbre v. Pope*, 402 Md. 157, 181-82, 935 A.2d 699, 714 (2007). "Both malice and gross negligence are amorphous concepts." *Newell v. Runnels*, 407 Md. 578, 636, 967 A.2d 729, 763 (2009). Malice is "behavior characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Id.* (*citing Barbre v. Pope*, 402 Md. 157, 182, 935 A.2d 699, 714 (2007)) (internal citations omitted). Malice is often "inferred from acts and circumstantial evidence. [It is] seldom admitted and need not be proven by direct evidence." *Id.*, 407 Md. at 637, 967 A.2d at 763 (*citing Henderson v. Md. Nat'l Bank*, 278 Md. 514, 520, 366 A.2d 1, 5 (1976)) (internal citations omitted). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another ..." Id. (*citing Taylor v. Harford County Dep't Soc. Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004)) (internal citations omitted). Generally, the question of statutory immunity is a subjective one and is usually reserved for the trier of fact. *Newell v. Runnels*, 407 Md. 578, 636, 967 A.2d 729, 763

8

(2009). This is because whether one is entitled to statutory immunity requires a factual determination of their subjective intent. *Newell*, 407 Md. at 636, 967 A.2d at 763.

So, for example, making a traffic stop when an officer knows or should know that he does not have reason for the stop is gross negligence. *See Lee v. Cline*, 384 Md. 245, 270, 863 A.2d 297, 312 (2004) (a jury could infer malice from officer's prolonging of auto stop only because the plaintiff did not consent to search of car, order of a canine sniff "when there was utterly no evidence in the record justifying such a 'search' of the vehicle," and reference to plaintiff as an uncooperative suspect). Likewise, in *Newell v. Runnels*, 407 Md. 578, 967 A.2d 729 (2009), the Court of Appeals held that the trier of fact reasonably could infer that the state's attorney could be found to have acted with gross negligence for firing employees in blatant disregard of their constitutional rights to campaign against the defendant's rival in the election. *Id.* at 637-39, 967 A.2d at 764-65 (holding that "Plaintiffs articulated facts tending to show that Newell's decision to fire them was, at worst, a targeted reprisal for speaking against him or, at best, a reckless disregard for their rights to free speech.").

In this case, Plaintiffs submit that they have sufficiently pled both a clearly established duties on the part of each of the Moving Defendants as coaches and an intentional and deliberate failure to perform their duties in reckless disregard of the consequences as affecting the life of Derek Sheely. The deliberate failure to provide adequate competent and responsible personnel; to warn of latent dangers; to provide prompt and proper medical care when Derek's injury was open and obvious; to prevent Derek from training or, at a minimum, to allow Derek not to train once he was injured; and the insistence that Derek engage in exceptionally dangerous drills without any competitive purpose are all facts from which a jury could infer malice or gross negligence. With regard to Coach Rogish, in particular, his conduct on the practice field will be

9

considered in light of his role as the head coach in charge of his assistant coaches, which likely includes, but not limited to, the implementation and approval of all drills and techniques his assistant coaches teach. In addition, his conduct considered in light of his role in developing and implementing Team Policies which were, on information and belief, written by him. (Compl. ¶ 23.) Those policies made clear that injured players, like Derek Sheely, should play through the pain, rather than report possibly life-threatening injuries to coaches and medical staff. (*Id.*) As alleged, Coach Rogish and the other Moving Defendants were motivated not by the rights and safety of the players, but by their unparalleled desire to win. (Compl. ¶¶ 22-23, 111.) Such allegations are clearly sufficient to plead gross negligence.

Notably, the only case cited by Moving Defendants in which a Maryland Court held that a complaint did *not* sufficiently allege gross negligence is *Boyer v. State*, 323 Md. 558, 594 A.2d 121 (1991), in which the Court held that the plaintiffs' allegations that a law enforcement officer "drove at high speeds on a road congested with traffic in an attempt to apprehend a suspected intoxicated driver do not indicate that he acted with wanton or reckless disregard for the safety of others." *Id.* at 580. The Court reasoned that although the complaint stated that the law enforcement officer did not "immediately" activate his emergency equipment and violated police procedures, "these somewhat vague allegations do not support the conclusion that he acted with gross negligence." *Id.* Left unmentioned by the Moving Defendants is that in *Boyer*, it was the intoxicated driver who struck and killed two motorists, and not the law enforcement officer. *Id.* Moreover, unlike the specific duties owed by the Moving Defendants in this case, in Maryland, "the general duty [owed by law enforcement officers] to protect the public, without more, does not create a duty owed to a specific individual." *Jones v. State*, 425 Md. 1, 21, 38 A.3d 333, 344 (2012). Thus, the Court in *Boyer* was left having to decide whether the complaint sufficiently

10

pled *both* a specific duty to the deceased *and* a breach and found that it did not. Further still, *Boyer* was decided on a motion for summary judgment, and not a motion to dismiss. Therefore, *Boyer* is wholly inapplicable.

### 2. Assistant Coach Schumacher

Moving Defendants assert that to state a claim for gross negligence against Coach Schumacher, Plaintiffs must allege that Schumacher knew that Derek was bleeding or had suffered a concussion. (Defendants' Motion to Dismiss at p. 15). Defendants are wrong. As stated above, the test of foreseeability is not whether the particular event that has occurred was to be expected or was known, "but whether the event fell within a general field of danger which should have been anticipated." *Collins*, 176 Md. App. at 569. "Hence, foreseeability is derived from the notion that one should be held to account for probable results, which, in the contemplation of the parties, arise naturally from the acts complained of according to the usual course of things and which should have been anticipated." *Id.*

Plaintiffs allege that Coach Schumacher repeatedly instructed Derek to engage in a "ridiculously dangerous" drill widely criticized by NFL teams and known, even by Coach Schumacher, to cause concussive injury. (Compl. ¶¶ 34-39, 45, 52, 55, 62, 65.) Significantly increasing the risk of injury, Plaintiffs allege that Coach Schumacher demanded that players "lead with [their] head" and use their "hat first." (Compl. ¶ 41.) If players objected to the gratuitous and flagrant danger, Coach Schumacher would berate and curse them. (Compl. ¶¶ 41, 43, 65.) It is alleged that Derek, who himself objected to the Drill, was upbraided by Schumacher on the day of his death after he complained of a head injury. (Compl. ¶¶ 64-65.)

Defendant Schumacher owed a duty to Derek to provide proper supervision, training and instruction, to ensure the proper use of safe equipment, to provide Derek with competent and

11

responsible personnel, to warn of latent dangers known or which should have been known, to provide prompt and proper medical care, and to prevent injured athletes, including Derek, from returning to the field. *Kelly, supra,* at 99, fn. 9. That Schumacher did not allegedly know either that Derek was bleeding or that he had suffered a concussive injury or that he was not simply "bitching and moaning" or "acting like a pussy," despite Derek conveying, even in spite of rebuke and chastisement from Schumacher, that he "didn't feel right" and that he had a "headache," does not relieve Schumacher of the duties owed to Derek. Rather, it reveals the degree to which Schumacher acted with utter indifference to the rights of Derek, as if such rights did not exist.

Moving Defendants further assert that although Plaintiffs allege that Mr. Schumacher knew that Derek was suffering from a headache and did not feel well, "such symptoms are not necessarily indicative of a concussion and persons often have headaches or do not feel well for reasons that have nothing to do with physical activity or injury." (Defendants' Motion to Dismiss at p. 15). That reckless line of reasoning is precisely what caused Derek's death. Sadly, it is true that the symptoms resulting from a fatal injury are sometimes also associated with non-fatal conditions. This spurious observation by Moving Defendants, however, also serves only to highlight the recklessness with which those entrusted to provide competent and responsible personnel, to warn of latent dangers, to provide prompt and proper medical care, and to prevent injured athletes from competing *conducted themselves*. *See Kelly,* 155 Md. App. at 99, fn. 9.

Plaintiffs submit that instructing players, including Derek, that injuries are suffered only rarely on the practice field is grossly negligent. (Compl. ¶¶ 23, 134.) It is beyond grossly negligent to threaten rebuke and chastisement to those players who, themselves unqualified to distinguish between pain and injury, complain of physical distress to those charged with the duty

12

of providing prompt and proper medical care, as Derek did (Compl. ¶¶ 55, 64). It is only with a reckless disregard of the consequences as affecting the life of a player that those charged with the duty of providing prompt and proper medical care would ignore a player who, like Derek, despite rebuke and chastisement, complains of injury or pain. (Compl. ¶ 134.) Having thus utterly failed to conduct themselves as prescribed by Maryland law, it is inconceivable that those charged with the duty of providing prompt and proper medical care, as Moving Defendants were so charged, would seek to dismiss their failing to fulfill their obligation to Derek by insisting, *still*, that the pain Derek endured, which pain and discomfort they were surely aware was such that it vanquished even their rebuke and chastisement, was "not necessarily indicative of a concussion" and that "persons often have headaches or do not feel well for reasons that have nothing to do with physical activity or injury." (See Defendants' Motion to Dismiss at p. 15).

The Moving Defendants' utter indifference to the rights of Derek and others is unmistakably shown in their continued refusal to abandon the mantra, *even now*, that injuries are "rare," that "great champions" don't "bitch and moan," and that headaches and pain complained of after repeated and excessive concussive blows to the head "are not necessarily indicative of a concussion" and that "persons often have headaches or do not feel well for reasons that have nothing to do with physical activity or injury." (*Id.*) Again, that is plainly absurd and quite frankly disturbing that Moving Defendants would advance such an asinine argument.

It is clear, however, despite attempts by Moving Defendants to minimize both the duties owed to Derek and the egregiousness of their conduct, that the *facts* pled at this very early stage of litigation, as well as the inferences reasonably drawn from them, are sufficient to enable the trier of fact to determine whether Coach Schumacher's negligent conduct amounts to gross negligence.

13

### 3.    Assistant Athletic Trainer Sweitzer

Like Coach Rogish and Coach Schumacher, Assistant Athletic Trainer, Michael Sweitzer

owed Derek the following specific duties:

> (1) supervision; (2) training and instruction; (3) ensuring the proper use of safe equipment; (4) providing competent and responsible personnel; (5) *warning of latent dangers*; (6) *providing prompt and proper medical care*; (7) *preventing injured athletes from competing*; and (8) matching athletes of similar competitive levels.

*Kelly, supra*, at 99, fn. 9 (emphases added).  Defendant Sweitzer also owed to Derek the duty to

use such professional skill, prudence and diligence as exercised by other members of the athletic

training profession. (Compl. ¶¶ 143, 218.)

Defendant Sweitzer seeks to avoid the obligations imposed upon him by Maryland law

by insisting that Derek's observable injury, though it was observed in very close proximity to his

brain and though it worsened in spite of Sweitzer's meager efforts to bandage it, was minor.

(Defendants' Motion to Dismiss at p. 16.) Moving Defendant continues that Plaintiffs failed to

allege "that Mr. Sheely told Mr. Sweitzer or anyone else that the bleeding was caused by

anything, let alone a head injury." (*Id.* at p. 17.) It is absurd, of course, to suggest that a licensed

athletic trainer need be told by athletes to whom he owes a duty to provide prompt and proper

medical care that bleeding from the head was caused by *something*, and in particular, a head

injury, before it can be shown that his conduct, as alleged in this case, amounts to gross

negligence.

Indeed, Sweitzer's treatment of Derek prior to his death is consistent with Moving

Defendants' treatment of all injuries: players were expected to play through them. (Compl. ¶ 24.)

This was despite Sweitzer's keen awareness that the Drill in which Derek was made to

14

participate caused concussive injuries, (Compl. ¶¶ 38-39) and despite his additional knowledge that Derek, himself, had previously suffered a concussive injury. (*Id.* at ¶ 50.)

Thus, that Defendant Sweitzer merely bandaged Derek's profusely bleeding forehead on August 20, 2011, without also performing a concussion evaluation, is unequivocal evidence that Sweitzer, like Coaches Rogish and Schumacher, intentionally failed to perform a manifest duty in reckless disregard of the consequences as affecting the life of Derek Sheely. (Compl. ¶ 134.) That Sweitzer cleared Derek to return to the field on August 21st and 22nd, (Compl. ¶¶ 57, 63), while the observable injury on Derek's head worsened and continued to bleed (Compl. ¶¶ 51, 53-56, 62), is only further evidence that Sweitzer, charged with the duty of providing prompt and proper medical care and preventing injured athletes from returning to the field, was so utterly indifferent to the rights of Derek that he acted as if such rights did not exist. Plaintiffs have therefore sufficiently stated a cause of action for gross negligence against Defendant Sweitzer in each of Counts I, II, XII and XIII.

As stated above, the facts in this case as alleged against each of the Moving Defendants are analogous to, though far worse than, those in *Koffman v. Garnett*, 265 Va. 12, in which the Court held that a coach's aggressively tackling a student football player who was instructed not to take any action to defend himself went beyond simply being tackled in the course of participating in organized football and "could lead a reasonable person to conclude that, in this instance, [the coach's] actions were imprudent and were taken in utter disregard for the safety of the player involved," and thus, sufficiently stated a claim for gross negligence. *Id.* at 16. In this case, Plaintiffs submit that the actions of each of the Moving Defendants, as alleged in Counts I, II, XII and XIII, could lead a reasonable person to conclude that the Moving Defendants' actions

15

were imprudent and were taken in utter disregard for the safety of Derek Sheely and thus, sufficiently state a claim for gross negligence.

Finally, Moving Defendants cannot rely upon the misrepresentations of Defendant Kranos Corporation, D/B/A Schutt Sports, to relieve themselves, at this early stage of the litigation, of the duties *owed by them* to provide Derek with proper supervision, training and instruction, to ensure his *proper use* of safe equipment, to provide Derek with competent and responsible personnel, to warn Derek of latent dangers known or which should have been known, to provide Derek with prompt and proper medical care, and to prevent injured athletes, including Derek, from returning to the field. *See Kelly, supra,* at 99, fn. 9. Nor does the wrongful conduct engaged in by Schutt Sports lessen the degree to which Moving Defendants failed in fulfilling the obligation owed by them to Derek as alleged.

## C. Plaintiffs' Complaint in Counts XI and XXII Adequately Pleads the Elements of Intentional Infliction of Emotional Distress Against Each Frostburg Defendant.

Moving Defendants assert that an intentional infliction of emotional distress ("Intentional Infliction") claim is "rarely viable." (Defendants' Motion to Dismiss at p. 19.) Although true, "rarely" do citizens act so callously and recklessly indifferent towards the life of a human as the Moving Defendants (and all Defendants) did here. But when they do, a claim for Intentional Infliction is undoubtedly viable.

To state a claim for Intentional Infliction, the plaintiff must allege the following four elements: "(1) The conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." *Harris v. Jones,* 281 Md. 560 (1977). Extreme and outrageous conduct constitutes behavior that is "so outrageous in character,

16

and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Id.*

Although Intentional Infliction is said to involve a heightened pleading standard, the allegations asserted in Plaintiffs' Complaint must still be construed in the light most favorable to the Plaintiffs. Further, while "it is for the Court to determine in the first instance whether the defendant's conduct may reasonably be regarded as extreme and outrageous[,] where reasonable men may differ, it is for the jury to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Harris* at 569 (citations omitted). Plaintiffs respectfully submit that reasonable men may differ, and thus it is for the jury to determine whether the conduct, as alleged and taken as true, has been sufficiently extreme and outrageous.

## 1. The Coaches' Conduct Was Extreme and Outrageous

As explained above, the conduct of Rogish and Schumacher was beyond reckless. (Compl. ¶¶ 205, 279). They knew that severe emotional distress was certain or substantially certain when they fostered an environment that punished players for reporting their injuries, when they continued to expose Derek to brain trauma and when they repeatedly berated him when he sought help. (Compl. ¶¶ 22 – 24, 33 - 41, 43 – 70). Their conduct, as explained above and further set forth below, was also extreme and outrageous. (Compl. ¶¶ 206, 280). In effect, Rogish and Schumacher drove Derek to his death and left him to die.

When Derek pleaded for help, Schumacher cursed at Derek and demanded that he return to play where he subsequently suffered his fatal blow. As recognized in *Harris*, "the extreme and outrageous character of the defendant's conduct may arise from his *abuse of a position*, or relation with another person, which gives him actual or apparent authority over him, or power to

17

affect his interest." *Id.* at 569 (emphasis added) (citing *Restatement (Second) of Torts* § 46 comment e (1965). Rogish and Schumacher did precisely that – they abused their position of power until it led to Derek's severe emotional distress and subsequent death. As student-athletes, Derek and his teammates acted at the behest of the coaches. If they did not perform as the coaches demanded, even if it meant risking their lives, they would be met by their fury – cursed and berated. (Compl. ¶ 41.) In abusing their position of power, Schumacher and Rogish forced Derek and his teammates to engage in a Drill that the coaches knew was "ridiculously dangerous." (Compl. ¶¶ 37 – 38, 43).

As coaches, Rogish and Schumacher were obligated to ensure that Derek's health and safety was a priority. Rogish and Schumacher turned this principle on its head and instead caused Derek and his teammates to engage in a Drill that was so outrageously dangerous—and meaningless—that a civilized society (even football-loving fans) would consider it to be intolerable. (Compl. ¶ 34 - 35). Rather than serving as coaches, Rogish and Schumacher abused their position of power and sought excitement from the gladiatorial destruction. (Compl. ¶ 33).

The conduct in *Civitella v. Pop Warner Football Team of Shelton, Inc.*, CV095010392S, 2010 WL 5188760 (Conn. Super. Ct. Dec. 1, 2010), was far less outrageous than the case at bar, yet the court determined that the plaintiff had alleged sufficient facts to state a claim for intentional infliction of emotional distress. In that case, a football coach was alleged to have "directed disparaging, degrading, and insulting comments toward the minor Plaintiff...some of which contained ethnic slurs and sexual references." *Id.* at 1. The court determined that said conduct was sufficient to satisfy the requirement that the coach's conduct was extreme and outrageous.

18

Here, coach Schumacher, after repeatedly seeing and causing Derek's forehead to ooze with blood during a three-and-a-half-day period, disregarded Derek's life and safety and yelled, "Stop your bitching and moaning and quit acting like a pussy and get back out there Sheely!" (Compl. ¶ 66). Defendant Schumacher's outrageous conduct was more than just mere words, he abused his position of power to directly cause Derek to return to the field where Schumacher and Rogish foreseeably knew or should have know that Derek's life would be in peril and that further emotional distress would result. (Compl. ¶¶ 66 – 70). All the while, Defendant Rogish – the head coach in charge of his assistant coaches – actively condoned Defendant Schumacher's "utterly intolerable" behavior, making his conduct equally intolerable. Thus, it is crystal clear that the reckless, extreme and outrageous conduct of Defendants Schumacher and Rogish was causally related to the emotional distress suffered by Derek and the Plaintiffs.

Moving Defendants contend that Plaintiffs have not alleged that Derek suffered any emotional distress as a result of the Defendants' actions. (Defs.' Motion at p. 20). Plaintiffs disagree. This is such a case where an Intentional Infliction claim, although "imposed sparingly," is "reserved for those wounds that are truly severe and incapable of healing themselves." *Caldor, Inc. v, Bowden*, 330 Md. 632, 643 (1993) (quoting *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653 (1991)). Further, as stated in *Harris*, "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Id*. at 571. What's more, Moving Defendants fail to acknowledge that Derek not only suffered severe emotional distress during the three-and-a-half-day period when Rogish and Schumacher repeatedly berated Derek and forced him to play despite obvious symptoms, but he also suffered mental anguish and conscious pain during the six days he was fighting for his life. (Compl. ¶ 70).

19

Throughout the three-and-a-half-day period, Defendants Schumacher and Rogish engaged in a systematic scheme of mental and physical abuse towards Derek and his teammates. (Compl. ¶¶ 22 – 24, 33 - 41, 43 - 70). Beginning with the policy drafted by Defendant Rogish, coupled with the utterly intolerable Drill, the persistent physical and verbal torture and subsequent deadly order to "play through" a brain injury, Defendants Rogish and Schumacher intentionally sought to mentally destruct Derek's mind so that he would perform as if he were a gladiator. (Compl. ¶¶ 22 – 24, 33 – 39, 41, 43 - 70). While they succeeded in their sadistic goals, it cost Derek his life. Reasonable men in a civilized society could see that the coaches' outrageous conduct caused Derek to suffer severe bodily injuries, including, severe pain, suffering and unbearable mental and physical anguish over the course of the three-and-a-half-day period and during the final six days of his life, in which he further suffered conscious pain. (Compl. ¶¶ 207, 281). Plaintiffs, likewise, endured and continue to suffer from this extreme emotional distress. *Id.*

## 2. Sweitzer's Conduct Was Extreme and Outrageous

Defendant Sweitzer was required to serve as the first-line of defense and as the principal protector of Derek's health and safety. Defendant Sweitzer utterly and recklessly failed in this regard. (Compl. ¶¶ 51, 53-56, 62-63). Despite multiple opportunities to perform his manifest duties, he continued to place Derek's health and safety in peril. *Id.* Just like Defendants Schumacher and Rogish, a reasonable jury could conclude that Defendant Sweitzer's conduct was "atrocious, and utterly intolerable in a civilized community." The fact that Defendant Sweitzer continuously allowed Derek to return to play despite blood oozing from his head shows only that Defendant Sweitzer acted with the intent to inflict severe emotional distress on Derek.

20

*Id.* As stated above, the Moving Defendants caused such severe and emotional distress to Derek and the Plaintiffs. (Compl. ¶¶ 207, 281).

### D. Keyton Sheely is Not a Proper Party to the Wrongful Death Action.

Plaintiffs agree that Keyton Sheely is not a proper party to this wrongful death action. Plaintiffs will submit a stipulation of dismissal, without prejudice, as to Keyton Sheely.

## V. Conclusion

Based on the foregoing, Moving Defendants' Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

Stephen J. Nolan
Stephen J. Nolan, Chartered
Courthouse Commons, Suite A-1
222 Bosley Avenue
Baltimore, Maryland 21204
(410) 821-8600

THE KLAMANN LAW FIRM, P.A.
John M. Klamann, KS # 10190
Andrew Schermerhorn MO # 62102
Paul D. Anderson, MO #65354
The Klamann Law Firm
929 Walnut Street, Suite 800
Kansas City, MO 64106
Telephone: (816) 421-2626
Facsimile: (816) 421-8686
jklamann@klamannlaw.com
panderson@klamannlaw.com

THE POPHAM LAW FIRM, P.C.
Wm. Dirk Vandever, MO #24463
712 Broadway, Suite 100
Kansas City, MO 64105
Telephone: (816) 221-2288
Facsimile: (816) 221-3999
dvandever@pophamlaw.com

HUMPHREY, FARRINGTON & McCLAIN, P.C.
Kenneth B. McClain
221 West Lexington, Suite 400
Independence, MO 64051
Telephone: (816) 836-5050
Fax: (816) 836-8966
kbm@hfmlegal.com

ATTORNEYS FOR PLAINTIFF

## REQUEST FOR HEARING

Unless this Court denies Defendant's Motion To Dismiss without a hearing, the Plaintiffs

respectfully request a hearing on their opposition.

Stephen J. Nolan

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _13th_ day of _December_ 2013, a copy of the

foregoing Plaintiffs' Response In Opposition to "Frostburg Defendants" Motion To Dismiss and

proposed Order were mailed, via first class mail to:

John J. Kuchno, Esquire
Katherine D. Bainbridge, Esquire
Bradley Neitzel, Esquire
Assistant Attorneys General.
200 St. Paul Place
Baltimore, Maryland 21202

C. Scott Toomey, Esquire
Daniel Kain, Esquire
Littleton Joyce Ughetta Park & Kelly, LLP
201 King of Prussia Road, Suite 220
Randor, Pennsylvania 19087

22

Robert D. Klein, Esquire
Michael S. Rubin, Esquire
Wharton Levin Ehrmantraut & Klein, P.A.
P.O. Box 551
Annapolis, MD 21404-0551

Sarah M. Gragert, Esquire
J. Christian Word, Esquire
Everett C. Johnson, Esquire
Sarah Greenfield, Esquire
Latham & Watkins, LLP
222 Eleventh Street, NW, Suite 10000
Washington, D.C. 20004-1304

Stephen J. Nolan

Sheely, et al. v. NCAA, et al.

Case No. 380569V
(Specially Assigned, Boynton, J)

# Appendix to Response to Motion to Dismiss

(1) *Koffman v. Garnett*

and

(2) *Civitella v. Pop Warner Football*

265 Va. 12
Supreme Court of Virginia.

Andrew W. KOFFMAN, an Infant by his Father
and Next Friend, Richard Koffman, et al.,
v.
James GARNETT.

Record No. 020439.   |   Jan. 10, 2003.

Middle school football player, who was injured when football coach thrust his arms around player's body, lifted him off his feet, and slammed him to the ground while explaining proper tackling technique, brought negligence, assault, and battery claims against coach. The Circuit Court of Botetourt County, George E. Honts, III, J., dismissed action, and player appealed. The Supreme Court, Elizabeth B. Lacy, J., held that player who alleged that he consented to physical contact with players of like age and experience, but that he did not expect or consent to his participation in aggressive contact tackling by adult football coaches stated cause of action for the tort of battery.

Reversed and remanded.

Kinser, J., concurred in part and dissented in part and filed opinion.

**Attorneys and Law Firms**

**259 *14 Patrick T. Fennell (P. Brent Brown; Carter, Brown, Osborne & Jennings, on briefs), Roanoke, for appellants.

Iris W. Redmond (Midkiff, Muncie & Ross, on brief), Richmond, for appellee.

Present: All the Justices.

**Opinion**

Opinion by Justice ELIZABETH B. LACY.

In this case we consider whether the trial court properly dismissed the plaintiffs' second amended motion for judgment for failure to state causes of action for gross negligence, assault, and battery.

Because this case was decided on demurrer, we take as true all material facts properly pleaded in the motion for judgment and all inferences properly drawn from those facts. *Burns v. Board of Suprvs.,* 218 Va. 625, 627, 238 S.E.2d 823, 824–25 (1977).

In the fall of 2000, Andrew W. Koffman, a 13–year old middle school student at a public school in Botetourt County, began participating on the school's football team. It was Andy's first season playing organized football, and he was positioned as a third-string defensive player. James Garnett was employed by the Botetourt County School Board as an assistant coach for the football team and was responsible for the supervision, training, and instruction of the team's defensive players.

The team lost its first game of the season. Garnett was upset by the defensive players' inadequate tackling in that game and became further displeased by what he perceived as inadequate tackling during the first practice following the loss.

**260 Garnett ordered Andy to hold a football and "stand upright and motionless" so that Garnett could explain the proper tackling technique to the defensive players. Then Garnett, without further warning, thrust his arms around Andy's body, lifted him "off his feet by two feet or more," and "slamm [ed]" him to the ground. Andy weighed 144 pounds, while Garnett weighed approximately 260 pounds. The force of the tackle broke the humerus bone in Andy's left arm. During prior practices, no coach had used physical force to instruct players on rules or techniques of playing football.

In his second amended motion for judgment, Andy, by his father and next friend, Richard Koffman, and Andy's parents, Richard and Rebecca Koffman, individually, (collectively "the Koffmans") alleged that Andy was injured as a result of Garnett's simple and gross negligence and intentional acts of assault and battery. Garnett filed a demurrer and plea of sovereign immunity, asserting that the *15 second amended motion for judgment did not allege sufficient facts to support a lack of consent to the tackling demonstration and, therefore, did not plead causes of action for either gross negligence, assault, or battery. The trial court dismissed the action, finding that Garnett, as a school board employee, was entitled to sovereign immunity for acts of simple negligence and that the facts alleged were insufficient to state causes of action for gross negligence, assault, or battery because the instruction and playing of football are "inherently dangerous and always potentially violent."

**Koffman v. Garnett, 265 Va. 12 (2003)**

574 S.E.2d 258

In this appeal, the Koffmans do not challenge the trial court's ruling on Garnett's plea of sovereign immunity but do assert that they pled sufficient facts in their second amended motion for judgment to sustain their claims of gross negligence, assault, and battery.

I.

**[1]** **[2]** In *Ferguson v. Ferguson,* 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971), this Court defined gross negligence as "that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of [another]. It must be such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." Whether certain actions constitute gross negligence is generally a factual matter for resolution by the jury and becomes a question of law only when reasonable people cannot differ. *Griffin v. Shively,* 227 Va. 317, 320, 315 S.E.2d 210, 212 (1984).

The disparity in size between Garnett and Andy was obvious to Garnett. Because of his authority as a coach, Garnett must have anticipated that Andy would comply with his instructions to stand in a non-defensive, upright, and motionless position. Under these circumstances, Garnett proceeded to aggressively tackle the much smaller, inexperienced student football player, by lifting him more than two feet from the ground and slamming him into the turf. According to the Koffmans' allegations, no coach had tackled any player previously so there was no reason for Andy to expect to be tackled by Garnett, nor was Andy warned of the impending tackle or of the force Garnett would use.

**[3]** As the trial court observed, receiving an injury while participating in a tackling demonstration may be part of the sport. The facts alleged in this case, however, go beyond the circumstances of simply being tackled in the course of participating in organized football. Here Garnett's knowledge of his greater size and experience, his *16 instruction implying that Andy was not to take any action to defend himself from the force of a tackle, the force he used during the tackle, and Garnett's previous practice of not personally using force to demonstrate or teach football technique could lead a reasonable person to conclude that, in this instance, Garnett's actions were imprudent and were taken in utter disregard for the safety of the player involved. Because reasonable persons

could disagree on this issue, a jury issue was presented, and the trial court erred in holding that, as a matter of law, the second amended motion for judgment was inadequate to state a claim for gross negligence.

**\*\*261 II.**

**[4]** The trial court held that the second amended motion for judgment was insufficient as a matter of law to establish causes of action for the torts of assault and battery. We begin by identifying the elements of these two independent torts. *See* Charles E. Friend, Personal Injury Law in Virginia § 6.2.1 (2d ed.1998). The tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery. Restatement (Second) of Torts § 21 (1965); Friend § 6.3.1 at 226; Fowler V. Harper, et al., The Law of Torts § 3.5 at 3:18–:19 (3d ed. Cum.Supp.2003).

**[5]** The tort of battery is an unwanted touching which is neither consented to, excused, nor justified. *See Washburn v. Klara,* 263 Va. 586, 561 S.E.2d 682 (2002); *Woodbury v. Courtney,* 239 Va. 651, 391 S.E.2d 293 (1990). Although these two torts "go together like ham and eggs," the difference between them is "that between physical contact and the mere apprehension of it. One may exist without the other." W. Page Keeton, Prosser and Keeton on Torts § 10 at 46; *see also* Friend § 6.3.

**[6]** The Koffmans' second amended motion for judgment does not include an allegation that Andy had any apprehension of an immediate battery. This allegation cannot be supplied by inference because any inference of Andy's apprehension is discredited by the affirmative allegations that Andy had no warning of an imminent forceful tackle by Garnett. The Koffmans argue that a reasonable inference of apprehension can be found "in the very short period of time that it took the coach to lift Andy into the air and throw him violently to the ground." At this point, however, the battery alleged by the Koffmans was in progress. Accordingly, we find that the *17 pleadings were insufficient as a matter of law to establish a cause of action for civil assault.

**[7]** The second amended motion for judgment is sufficient, however, to establish a cause of action for the tort of battery. The Koffmans pled that Andy consented to physical contact with players "of like age and experience" and that

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 2

**Koffman v. Garnett, 265 Va. 12 (2003)**

574 S.E.2d 258

neither Andy nor his parents expected or consented to his "participation in aggressive contact tackling by the adult coaches." Further, the Koffmans pled that, in the past, coaches had not tackled players as a method of instruction. Garnett asserts that, by consenting to play football, Andy consented to be tackled, by either other football players or by the coaches.

Whether Andy consented to be tackled by Garnett in the manner alleged was a matter of fact. Based on the allegations in the Koffmans' second amended motion for judgment, reasonable persons could disagree on whether Andy gave such consent. Thus, we find that the trial court erred in holding that the Koffmans' second amended motion for judgment was insufficient as a matter of law to establish a claim for battery.

For the above reasons, we will reverse the trial court's judgment that the Koffmans' second amended motion for judgment was insufficient as a matter of law to establish the causes of actions for gross negligence and battery and remand the case for further proceedings consistent with this opinion. [*]

*Reversed and remanded.*

Justice KINSER, concurring in part and dissenting in part.
I agree with the majority opinion except with regard to the issue of consent as it pertains to the intentional tort of battery. In my view, the second amended motion for judgment filed by the plaintiffs, Andrew W. Koffman, by his father and next friend, and Richard Koffman and Rebecca Koffman, individually, was insufficient as a matter of law to state a claim for battery. [*]

**\*\*262** Absent fraud, consent is generally a defense to an alleged battery. *See* **\*18** *Banovitch v. Commonwealth,* 196 Va. 210, 219, 83 S.E.2d 369, 375 (1954); *Perkins v. Commonwealth,* 31 Va.App. 326, 330, 523 S.E.2d 512, 513 (2000); *People ex rel. Arvada v. Nissen,* 650 P.2d 547, 551 (Colo.1982); *Bergman v. Anderson,* 226 Neb. 333, 411 N.W.2d 336, 339 (1987); *Willey v. Carpenter,* 64 Vt. 212, 23 A. 630, 631 (1892); Restatement (Second) of Torts § 13, cmt. d (1965). In the context of this case, "[t]aking part in a game manifests a willingness to submit to such bodily contacts or restrictions of liberty as are permitted by its rules or usages." Restatement (Second) of Torts § 50, cmt. b (1965), *quoted in Thompson v. McNeill,* 53 Ohio St.3d 102, 559 N.E.2d 705, 708 (1990); *see also Kabella v. Bouschelle,* 100 N.M. 461, 672 P.2d 290, 292 (1983). However, participating in a particular sport "does not manifest consent to contacts which

are prohibited by rules or usages of the game if such rules or usages are designed to protect the participants and not merely to secure the better playing of the game as a test of skill." Restatement (Second) of Torts § 50, cmt. b (1965) *quoted in Thompson,* 559 N.E.2d at 708; *see also Kabella,* 672 P.2d at 292.

The thrust of the plaintiffs' allegations is that they did not consent to "Andy's participation in aggressive contact tackling by the adult coaches" but that they consented only to Andy's engaging "in a contact sport with other children of like age and experience." They further alleged that the coaches had not previously tackled the players when instructing them about the rules and techniques of football.

It is notable, in my opinion, that the plaintiffs admitted in their pleading that Andy's coach was "responsible ... for the supervision, training and instruction of the defensive players." It cannot be disputed that one responsibility of a football coach is to minimize the possibility that players will sustain "something more than slight injury" while playing the sport. *Vendrell v. School District No. 26C, Malheur County,* 233 Or. 1, 376 P.2d 406, 413 (1962). A football coach cannot be expected "to extract from the game the body clashes that cause bruises, jolts and hard falls." *Id.* Instead, a coach should ensure that players are able to "withstand the shocks, blows and other rough treatment with which they would meet in actual play" by making certain that players are in "sound physical condition," are issued proper protective equipment, and are "taught and shown how to handle [themselves] while in play." *Id.* The instruction on how to handle themselves during a game should include demonstrations of proper tackling techniques. *Id.* By voluntarily participating in football, Andy and his parents necessarily consented to instruction by the **\*19** coach on such techniques. The alleged battery occurred during that instruction.

The plaintiffs alleged that they were not aware that Andy's coach would use physical force to instruct on the rules and techniques of football since neither he nor the other coaches had done so in the past. Surely, the plaintiffs are not claiming that the scope of their consent changed from day to day depending on the coaches' instruction methods during prior practices. Moreover, they did not allege that they were told that the coaches would not use physical demonstrations to instruct the players.

**Koffman v. Garnett, 265 Va. 12 (2003)**

574 S.E.2d 258

Additionally, the plaintiffs did not allege that the tackle itself violated any rule or usage of the sport of football. Nor did they plead that Andy could not have been tackled by a larger, physically stronger, and more experienced player either during a game or practice. Tackling and instruction on proper tackling techniques are aspects of the sport of football to which a player consents when making a decision to participate in the sport.

In sum, I conclude that the plaintiffs did not sufficiently plead a claim for battery. We must remember that acts that might give rise to a battery on a city street will not do so in the context of the sport of football. *See Thompson,* 559 N.E.2d at

707. We must also not blur the lines between gross negligence and battery because the latter is an intentional tort. I agree fully that the plaintiffs alleged sufficient facts to proceed with their claim for gross negligence.

**\*\*263** For these reasons, I respectfully concur, in part, and dissent, in part, and would affirm the judgment of the circuit court sustaining the demurrer with regard to the claim for battery.

**Parallel Citations**

574 S.E.2d 258

Footnotes

\*     Because we have concluded that a cause of action for an intentional tort was sufficiently pled, on remand, the Koffmans may pursue their claim for punitive damages.

\*     Although the circuit court sustained the demurrer with regard to the alleged battery on the basis that an intention to batter and inflict injury on Andy could not be inferred from the alleged facts, the majority does not address that holding. Since the majority discusses only the issue of consent, I confine my dissent to that question.

**End of Document**     © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Civitella v. Pop Warner Football Team of Shelton, Inc., Not Reported in A.3d (2010)

51 Conn. L. Rptr. 94

2010 WL 5188760
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Ansonia-Milford.

Pasquale CIVITELLA, PPA Joseph Civitella
v.
The POP WARNER FOOTBALL
TEAM OF SHELTON, INC.

No. CV095010392S. | Dec. 1, 2010.

**Opinion**

RADCLIFFE, J.

### FACTS

*1 The Plaintiff, Pasquale Civitella, brings this action
on behalf of his minor son, Joseph Civitella, against the
Pop Warner Football Team of Shelton, Ct, Inc., and three
individuals who are associated with the youth football
program.

During the 2009 football season, Joseph Civitella participated
in the Pop Warner "Midget" Football program, a program
which involves boys ages twelve through fourteen. The
Defendant Anthony Branca was the team's coach.

In his complaint, the Plaintiff alleges that Coach Branca
on many occasions between September 2009 and December
31, 2009, directed disparaging, degrading, and insulting
comments toward the minor Plaintiff, Joseph Civitella, some
of which contained ethnic slurs and sexual references.

Among the insults hurled at Joseph Civitella by Anthony
Branca, according to the complaint, were "Italian Bastard,"
"Prick," "Shit for Brains," "... half-sided Italian Prick"
and "other equally offensive, malicious and inappropriate
names."

The complainant alleges that the offending statements were
made "with malicious motives," and were designed to
discredit Joseph Civitella in the eyes of his teammates and
friends. He claims to have suffered emotional trauma and

distress as a result of the offensive, degrading and malicious
comments.

In addition to The Pop Warner Football Team and Anthony
Branca, the Plaintiff has named Frank Camerino, the League's
Director of Football and Edward Brighindi, the League
President, as defendants in this action.

Count one of the First Revised Complaint dated March 23,
2010, claims that Coach Branca slandered Joseph Civitella,
while Count two alleges that the coach intentionally inflicted
emotional distress upon the minor Plaintiff. Counts three
through eight claim that the Defendants, Frank Camerino,
Edward Brighindi, and the Pop Warner Football Team, are
vicariously liable, because they took no action against Coach
Branca, and made no effort to correct his abusive behavior.

All of the Defendants now move to strike the entire complaint,
claiming that the allegations in the First Revised Complaint
fail to set forth a cause of action.

### STANDARD OF REVIEW-MOTION TO STRIKE

The purpose of a motion to strike is to test the legal sufficiency
of a pleading. *Faulkner v. United Technologies,* 240 Conn.
576, 580 (1997); *Ferryman v. Groton,* 212 Conn. 138, 142
(1989); Practice book § 39. The motion assumes all well-
pleaded facts to be true, and, if the facts as deemed proven
in the complaint would support a cause of action, then the
motion to strike must be denied. *Fort Trumbull Conservancy,
LLC v. Alves,* 262 Conn. 480, 498 (2000); *Waters v. Autuori,*
236 Conn. 820, 825-29 (1996).

In ruling upon a motion to strike, a court's inquiry is limited by
the facts alleged in the complaint. *Cavallo v. Derby Savings
Bank,* 188 Conn. 281, 285-86 (1982). All facts alleged must
be construed in the manner most favorable to sustaining the
complaint. *Novametrix Medical Systems, Inc. v. BOC Group,
Inc.,* 224 Conn. 210, 215 (1992). However, although all facts
contained in a complaint are deemed proven, conclusions of
law are not admitted. *Maloney v. Conroy,* 208 Conn. 392, 394
(1988).

*2 In construing the allegations in the complaint, they
should be read broadly, rather than in a narrow or
hypertechnical manner. *Greco v. United Technologies Corp.,*
277 Conn. 337, 347 (2006).

**Civitella v. Pop Warner Football Team of Shelton, Inc., Not Reported in A.3d (2010)**

51 Conn. L. Rptr. 94

## WORDS ATTRIBUTED TO COACH ANTHONY BRANCA NOT ACTIONABLE AS SLANDER PER SE

In Counts one, three, five and seven of the First Revised Complaint, the minor Plaintiff claims that the words uttered by Coach Anthony Branca constitute slander *per se,* and that the cause of action may be maintained without the necessity of pleading and proving special damages.

Slander is actionable *per se,* if it charges incompetence or dishonesty in office, or charges a person with general incompetence in a trade, business or profession. *Moriarty v. Lippe,* 162 Conn. 371, 384 (1972); *Zeller v. Mark,* 14 Conn.App. 651, 655 (1988). Slander is also actionable *per se,* if it charges a crime of moral turpitude, or accuses a plaintiff of theft. *Porto v. Bridgeport Herald Corporation,* 136 Conn. 557, 567 (1980); *Yavis v. Sullivan,* 137 Conn. 253, 259 (1950); *Miles v. Perry,* 11 Conn.App. 584, 602 (1987).

When defamatory words are actionable *per se,* the law conclusively presumes the existence of an injury to the plaintiff's reputation. *Urban v. Harford Gas Co.,* 139 Conn. 301, 308 (1982); *Battista v. United Illuminating Co.,* 10 Conn.App. 486, 492-93 (1987). However, a different rule applies where statements involve slander *per quod.* In those instances, there must be a link between the slanderous utterances, and any special damages sustained by the plaintiff. The special damages must be of a materially, and generally a pecuniary nature. They must result from the conduct of a person other than the defamer or the defamed, and the conduct must be directly caused by the slander. *Urban v. Hartford Gas Co., supra,* at 308.

As a general rule, words which are merely gross and vulgar expressions of abuse, regardless of how rude, uncouth or vexatious they may be, are not slanderous *per se. Moriarty v. Lippe, supra,* at 385.

In this case, the minor Plaintiff was not subject to injury in a trade or business. Nor do the utterances of the coach meet any of the other criteria for slander *per se.*

Furthermore, while the complaint alleges that the statements were uttered in an attempt to degrade and discredit the minor Plaintiff in front of his teammates, it contains no reference to the conduct of any team member. The only acts pled are those of the alleged defamer, Coach Anthony Branca.

The complaint lacks allegations which are indispensable to a claim of slander *per quod.* Therefore, counts one, three, five and seven are legally insufficient, and must be stricken.

## CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS SETS FORTH A POTENTIAL CLAIM

The Plaintiff maintains that Anthony Branca uttered the offending statements, with the intention of inflicting emotional distress on Joseph Civitella. In order to prevail in a claim of intentional infliction of emotional distress, a plaintiff must show: 1) that the defendant intended to inflict emotional distress upon the plaintiff; or, that he knew or should have known that emotional distress was a likely result of his conduct, 2) that the conduct of the defendant was extreme and outrageous, 3) that the defendant's conduct was the cause of the plaintiff's distress, and 4) that the emotional distress suffered by the plaintiff was severe. *Appleton v. Board of Education,* 254 Conn. 205, 210 (2000); *Peytan v. Ellis,* 200 Conn. 243, 253 (1986); *Carnemolla v. Walsh,* 75 Conn.App. 319, 331 (2003).

\*3 Liability for intentional infliction of emotional distress must involve conduct that exceeds all bounds usually tolerated by a decent society. *Bombalicki v. Pastore,* 71 Conn.App. 835, 839-40 (2002). The question is whether the allegations in the complaint set forth behavior that a reasonable fact finder could find to be extreme and outrageous-meaning atrocious, and utterly intolerable in a civilized society. *Tracy v. New Milford Public Schools,* 101 Conn.App. 560, 569-70 (2007); *Gagnon v. Housatonic Valley Tourism District Commission,* 92 Conn.App. 835, 847 (2006). Conduct which is merely insulting, or displays bad manners or results in hurt feelings is insufficient to form the basis of an action based upon intentional infliction of emotional distress. *Appleton v. Board of Education, supra,* at 210.

Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court. *Carnemolla v. Walsh, supra,* at 331; *Bell v. Board of Education,* 55 Conn.App. 400, 410 (1999).

Construing all facts as alleged most favorably to the Plaintiff, it cannot be said as a matter of law, that the elements necessary to support a claim of intentional infliction of emotional distress have not been pled.

A situation which involves an adult coach, in a position of command and authority vis-a-vis youngsters ages twelve through fourteen, is analogous to the situation of an employer and an employee. (See *Denault v. Connecticut General Life Ins. Co.,* Superior Court, judicial district of Ansonia/Milford (1997 Conn.Super. LEXIS 1926) (Corradino, J.).)

Although generations of high school and college football players can probably recall coaches who employed insensitive, insulting and what would now be politically incorrect language in an effort to motivate and inspire players, that approach is now as obsolete as the single wing offense.

Where once coaches may have enjoyed free rein, and used that latitude to employ equal opportunity insults, in this era of political correctness, speech codes on college campuses, and heightened sensitivity, comments which would have produced a shrug of the shoulders decades ago, may now be considered "outrageous" and unacceptable, without regard to motive or intent.

In the case at bar, it must not be forgotten that the language was employed in the presence of twelve- to fourteen-year-olds, who may not be as prepared to deal with the emotional effects or such berating, as more mature high school or college athletes.

These new attitudes are by no means confined to the gridiron. Norman Lear's award-winning situation comedies *All in the Family* and *The Jeffersons* were once considered humorous and were showcased in prime time. Those same shows might today produce gasps, and cries of "outrageous" from the enforcers of political correctness, who are quick to label offensive utterances as "hate speech," and not entitled to First Amendment protection.

*\*4 At the risk of straying beyond the record, the court might observe that Coach Anthony Branca is possibly (probably?)

of Italian-American heritage. Whether his ethnicity, if established, serves to mitigate any outrage, in the way some would excuse, explain and rationalize the ubiquitous use of the 'N' word by African-Amercan rap artists, cannot be determined as a matter of law.

Nor can it be determined at this time, whether any emotional distress suffered by the minor Plaintiff was severe, or whether a desire to motivate and encourage players was the intent of Coach Branca, rather than an intent to inflict emotional distress. A motion to strike is not the appropriate vehicle for such inquiry.

Courts have been loathe to grant motions to strike, when the offending language involves ethnic slurs or stereotypes. (See *Leone v. New England Communications,* Superior Court, judicial district of New Britain (32 Conn. L. Rptr. 72, 2002 Conn.Super. LEXIS 1361), Quinn, J., and *Savage v. Andoch,* Superior Court, judicial district of New Haven (2008 Conn.Super. LEXIS 882) (Bellis, J.).

The allegations contained in Counts two, four, six and eight of the First Revised Complaint, when construed most favorably to the Plaintiffs, set forth a viable cause of action.

## CONCLUSION

The motion to strike Counts one, three, five and seven of the First Revised Complaint, is GRANTED.

The motion to strike Counts two, four, six and eight of the First Revised Complaint, is DENIED.

**Parallel Citations**

51 Conn. L. Rptr. 94

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

| | | |
|---|---|---|
| KRISTEN L. SHEELY, et al. | * | IN THE |
| Plaintiffs, | * | CIRCUIT COURT |
| v. | * | FOR |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., | * | MONTGOMERY COUNTY |
| | * | Case No. 380569-V |
| Defendants. | * | (Specially Assigned: Boynton, J.) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER

Upon consideration of Defendants Thomas Rogish, James Schumacker and Michael Sweitzer, Jr.'s Motion to Dismiss, and any response thereto, is this _____ day of _____,

201___, by the Circuit Court For Montgomery County,

ORDERED that the Defendants' Motion to Dismiss be and the same is hereby DENIED.

_____
David A. Boynton,
Judge

Copies to:

All Counsel of Record