# EXHIBIT 25

IN THE COURT OF COMMON PLEAS CUYAHOGA COUNTY, OHIO

STEVEN SCHMITZ and       :
YVETTE SCHMITZ,        :
             :
     Plaintiffs,       :    No. _____
             :
v.              :
             :
             :
NATIONAL COLLEGIATE ATHLETIC   :
ASSOCIATION, AND       :
UNIVERSITY OF NOTRE DAME,     :
             :    <u>JURY DEMAND ENDORSED HEREON</u>
     Defendants.      :
             :

## COMPLAINT

   The Plaintiffs, STEVEN AND YVETTE SCHMITZ, by and through undersigned counsel, brings this Complaint against the Defendants, the National Collegiate Athletic Association ("NCAA") and the University of Notre Dame ("Notre Dame"), and allege, upon facts and information and belief as follows.

### Introduction

   1.  This case arises from the NCAA's and Notre Dame's (collectively referred to as "Defendants") reckless disregard for the safety of amateur collegiate football players generally and specifically for the safety of Plaintiff Steve Schmitz, a former running back and receiver for the Notre Dame football team between 1974 and 1978.

   2.  Notre Dame, its football coaches, athletic directors, and trainers, and the NCAA failed to notify, educate, and protect the plaintiff Steve Schmitz (and others) regarding the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries that result every day from amateur athletic competition in the form of football at the collegiate level.

3.      The pathological and debilitating effects of mild traumatic brain injuries (referenced herein as "MTBI") caused by concussive and sub-concussive impacts have afflicted, and currently afflict, former and present collegiate football players, including the Plaintiff Steve Schmitz, who is permanently disabled and suffers substantial symptoms of neuro-cognitive injuries, including symptoms of traumatic encephalopathy.  Those injuries were caused or substantially caused by the repetitive head impacts Steve Schmitz sustained as a four year football player at Notre Dame.

4.      The published medical literature, as detailed later in this Complaint, contains studies of athletes dating back as far as 1928 and demonstrates a scientifically-observed link between repetitive blows to the head and short-term and long-term neuro-cognitive problems.

5.      The earliest studies focused on boxers, but at least by 1933 and through the 1940s, 1950s, 1960s, 1970s, and 1980s, a substantial body of medical and scientific evidence had been developed specifically relating to brain injuries in the sport of football.

6.      Moreover, many NCAA member institutions, including Defendant Notre Dame, characterize themselves as institutions of higher learning on the leading edge of developing knowledge.  Many of the NCAA's institutions offer undergraduate and graduate courses in neuro-science and operate large medical research hospitals and facilities that include departments of neurology, neurosurgery, and psychiatry.

7.      The NCAA's access to and relationship with such member institutions places it in a unique position to understand the dangers of concussions and sub-concussive impacts and to use that information for the benefit of collegiate athletes, particularly football players.

8.      Defendant Notre Dame offers courses and an undergraduate degree in neuroscience, which placed and places Notre Dame in a unique vantage point to understand the

Electronically Filed 10/20/2014 11:13 / / CV 14 834486 / Confirmation Nbr. 263029 / CLBAG

damages of concussions in college sports, particularly football, and to disseminate such information to those students most at risk for concussive and sub-concussive injuries in amateur football, particularly players on the Notre Dame football team.

9. Defendants, therefore, have been in a unique position to be cognizant of the body of scientific evidence and its compelling conclusions that college football players are at greater risk for chronic brain injury, illness, and disability both during their football careers and later in life. The Defendants also had and have the resources and power to implement measures to prevent or minimize the risk that Notre Dame football players specifically, and NCAA football players generally, will sustain debilitating long-term brain injuries.

10. Notwithstanding the body of known scientific evidence and the resources and power possessed by the Defendants, the Defendants orchestrated an approach to football practices and games that

(a) ignored the medical risks to Steve Schmitz and other Notre Dame football players;

(b) aggravated and enhanced the medical risks to Steve Schmitz and other football players;

(c) failed to educate Steve Schmitz and other Notre Dame football players of the link between MTBI in amateur football and chronic neurological damage, illnesses, and decline; and

(d) failed to implement or enforce any system that would reasonably have mitigated, prevented, or addressed MTBI suffered by Steve Schmitz.

Electronically Filed 10/20/2014 11:13 / / CV 14 834486 / Confirmation Nbr. 263029 / CLBAG

11.     As a direct result of the Defendants' tortious actions, Plaintiff Steve Schmitz suffers from, among other things, neurological and cognitive damage that have resulted in full disability at age 58.

## Parties

### A. **Plaintiffs**

12.     Plaintiff Steve Schmitz is an individual who resides in Cleveland, Ohio.

13.     Plaintiff Yvette Schmitz is married to Steve Schmitz and lives in the same home.

14.     Steve Schmitz is a graduate of Defendant Notre Dame, where he played varsity football for four seasons.

15.     Before attending Notre Dame, Steve Schmitz was a student at St. Edward High School in Lakewood, Ohio and was an outstanding football player.

16.     While Steve Schmitz was playing high school football, representatives of the Defendant Notre Dame football program, including the Head Coach, visited him in Cleveland to convince him to attend Notre Dame and play football for the program.  In the spring of 1974, during his senior year of high school, Steve Schmitz signed a "letter of intent" in Cleveland, Ohio to attend Defendant Notre Dame and play college football for Notre Dame.  In exchange, Steve Schmitz received a scholarship and the right to attend the university.

17.     The scholarship was conditioned on his participation on the Notre Dame football team, and Plaintiff Steve Schmitz would forfeit his ability to attend Notre Dame on scholarship if he left or was cut from the football team.

18.     At no time during his participation on the Notre Dame football team was Plaintiff Steve Schmitz in a position to understand or appreciate the risks of concussive and sub-concussive injuries.  At no time did Plaintiff Steve Schmitz ever have the knowledge or authority

-4-

to impose and implement for the Notre Dame football team health-related measures, treatment, and protocols to prevent, minimize, and/or treat concussive and sub-concussive injuries.

19.     Soon after Steve Schmitz graduated from college, he stopped playing football and obtained employment in various companies in the Cleveland region of Ohio. Currently, Steve Schmitz is 58 years old and is not employable. He has been diagnosed with severe memory loss, cognitive decline, Alzheimer's, traumatic encephalopathy, and dementia, all of which have been caused, aggravated, and/or magnified by the repetitive concussive blows and/or sub-concussive blows to the head he suffered while playing running back and receiver on the Notre Dame college football team.

### B. Defendants

20.     Defendant NCAA is an unincorporated association with its principal office located in Indianapolis, Indiana and with member institutions in every state. The NCAA is the governing body of collegiate athletics and oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics. More than 1,000 colleges are members of the NCAA and submit to NCAA authority on that basis, including but not limited to the Defendant Notre Dame.

21.     In 2010, the NCAA entered into an exclusive television and media rights contract with CBS and Turner Broadcasting. Over the 14-year term contract, the NCAA is to receive $10.8 billion. Similarly, in 2011, the NCAA entered into a multi-media agreement with ESPN, which is to provide for payments totaling $500,000,000 over the life of the 14-year contract.

22.     In 2012, the NCAA's total revenues exceeded $838,000,000.

23.     Defendant Notre Dame University is a private not-for-profit university located in Notre Dame, Indiana, near South Bend. Its own mission statement describes Notre Dame as a

Electronically Filed 10/20/2014 11:13 / CV 14 834486 / Confirmation Nbr. 263029 / CLBAG

"…Catholic academic community of higher learning…dedicated to the pursuit and sharing of truth for its own sake."

24.     Notre Dame is operated and controlled by a Board of Trustees, but ultimately by the Board of Fellows, a group of six Order of the Holy Cross religious members and six lay members who have final say over the operation of Notre Dame.

25.     As a member of the NCAA, and as a private institution of higher learning, Notre Dame had (and still has) co-extensive control over the implementation of NCAA rules and regulations, its own rules and regulations, and co-extensive responsibility to notify, educate, and protect the plaintiff Steve Schmitz, both before and after he played for the Notre Dame football team, regarding the debilitating short-term and long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries.

26.     On information and belief, Notre Dame generates from football alone $78 million in gross revenue and $46 million in profit every year, for which Notre Dame pays no taxes.  According to Forbes Magazine, the Notre Dame football program is currently valued at $117 million. According to Forbes, the Notre Dame football program is the second most valuable college football program in the world.  The University of Texas is first.

27.     In 2013, NBC Sports Group announced a 10-year contract extension to televise Notre Dame football games, doubling the length of its previous agreement.  NBC and Notre Dame said the extension would begin in 2016 and run through the 2025 season.  The contract is worth $15 million annually for football.

28.     The President of Notre Dame, John Jenkins, controls all intercollegiate athletics at Notre Dame, and the Athletic Director reports directly to the President.

Electronically Filed 10/20/2014 11:13 / / CV 14 834486 / Confirmation Nbr. 263029 / CLBAG

29.     On information and belief, the current Head Coach of the Notre Dame football program receives an annual salary of approximately $3,000,000, which is on information and belief is approximately six times the salary of the President (or any other academic officer) of Notre Dame.

## Jurisdiction And Venue

30.     This Court has jurisdiction pursuant to Section 2305.01 of the Ohio Revised Code.  This Court also has subject matter jurisdiction over this case, because the plaintiffs are citizens of Ohio, and the Defendant NCAA is a citizen of the State of Ohio, because it has member institutions within this state.  Moreover, Defendant Notre Dame conducted business activities with this state and county when it recruited Plaintiff Steve Schmitz to play football at Notre Dame.  On information and belief, it continues to engage in similar activity.

31.     Venue is proper in this Court pursuant to Rule 3 (B) (3) and (7) of the Ohio Rules of Civil Procedure.

## Factual Allegations Common to All Counts

32.     Combined, the Defendants generate hundreds of millions of dollars in annual profits by organizing, sponsoring, and staging amateur football games with enrolled student-athletes, almost all of whom are between 18 and 22 years of age.

33.     Medical science, including world-renowned departments of medicine in NCAA member institutions, has known for many decades that repetitive and violent jarring of the head or impact to the head can cause sub-concussive and/or concussive brain injuries with a heightened risk of long term, chronic neuro-cognitive sequelae.  Many of the member institutions of the Defendant NCAA, including the Defendant Notre Dame, offer and have offered academic and/or professional programs in neuroscience, psychology and/or psychiatry for many years.

-7-

34.     The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

35.     The Defendants have known (or should have known) for many years that sub-concussive and concussive brain injuries generally occur when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, disorientation, blurred vision, ringing in the ears, memory loss, nausea, and sometimes unconsciousness.

36.     The Defendants have known (or should have known) for many years that medical evidence has shown that symptoms of sub-concussive and/or concussive brain injuries can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

37.     The Defendant have known (or should have known) for many years that once a person suffers sub-concussive and/or concussive brain injuries, that person is up to four times more likely to sustain a second injury. Additionally, the Defendant have known (or should have known) for decades that even a single sub-concussive or concussive blow may cause brain injury, and the injured person often requires substantial time to recover.

-8-

38.     The Defendants have known (or should have known) for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on boxers and former football players, including former NCAA players, have established that both boxers and football players who sustain repetitive head impacts often suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, decline in attention and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy (or "CTE"). The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also associated with an increased risk of suicide.

39.     Published peer-reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing football, including amateur football, are linked to significant risk for permanent brain injury.

40.     Steve Schmitz was subjected to repetitive MTBI in practices and games for the profit and promotion of the Defendants, yet he was never aware of the short-term and long-term health risk associated with MTBI, was never educated by the Defendants regarding the risk, and was never furnished with appropriate health and safety protocols that would monitor, manage, and mitigate the risks associated with MTBI while he played amateur football at Notre Dame.

**The Purported Mission to Protect Student Athletes**

41.     Formerly known as the Intercollegiate Athletic Association of the United States, the NCAA was formed in 1906 purportedly to protect college students from dangerous athletic practices.

42.     At the turn of the 20th Century, an alarming rate of deaths due to head injuries were occurring in college football. President Theodore Roosevelt convened a group of Ivy League Presidents and coaches to discuss how the game could be made safer. As a result of several subsequent meetings of colleges, the Intercollegiate Athletic Association of the United States ,, formed (IAAUS). In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

43.     The NCAA's founding purpose to protect student-athletes has been repeated often, and as far back as 1909 at the annual convention of member institutions. There, Chancellor James Roscoe Day of Syracuse University stated:

> The lives of the students must not be sacrificed to a sport. Athletic sports must be selected with strict regard to the safety of those practicing them. It must be remembered that the sport is not the end. It is incidental to another end far more important. We lose sight of both the purpose and the proportion when we sacrifice the student to the sport.

44.     Thus, since its inception, Defendant NCAA has held itself out as the supervisory force over conduct at intercollegiate events and practices throughout the country and shouldered a legal duty to protect student-athletes, including Steve Schmitz.

45.     According to its website, Defendant NCAA was founded "*to protect young people from the dangerous and exploitive athletic practices of the time.*" This core purpose is emphasized on the NCAA's website:

> Part of the NCAA's core mission is to provide student-athletes with a competitive environment that is safe and ensures fair play. While each school is responsible for the welfare of its student-athletes, the NCAA provides leadership by establishing safety guidelines, playing rules, equipment standards, drug testing procedures and research into the cause of injuries to assist decision making. By taking proactive steps to student -athletes' health and safety, we can help them enjoy a vibrant and fulfilling career.

46.     The NCAA's purported commitment to safeguarding its student-athletes is expressed

-10-

throughout the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's

purpose and fundamental policies to include maintaining control over and responsibility for

intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes;
> (b) To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association; . . .

NCAA Const., Art. 1, § 1.2(a)(b).

47.     The NCAA Constitution also defines one of its "Fundamental Policies" as the

requirement that "Member institutions shall be obligated to apply and enforce this legislation,

and the enforcement procedures of the Association shall be applied to an institution when it

fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

48.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of

Student-Athlete Well-Being," and provides in pertinent part:

> **2.2. The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)
>
> 2.2.3 **Health and Safety.** It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

49.     The NCAA Constitution also mandates that "each member institution must

establish and maintain an environment in which a student-athlete's activities are conducted as an

integral part of the student-athlete's educational experience." NCAA Const., Art. 2, § 2.2.1

(Adopted: 1/10/95).

50.     To accomplish this purported purpose, Defendant NCAA promulgates and

-11-

implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. NCAA member institutions are required to abide by the NCAA rules and requirements.

51.    The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidance, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."

52.    To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that the "…Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations...."

53.    The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which student-athletes and member institutions can rely upon for guidance on player-safety issues. The NCAA has expressly and implicitly assumed a duty of care to the student-athletes its promised to protect.

54.    As a member institution, Notre Dame was charged with implementing and enforcing those guidelines in a meaningful way to protect the health and safety of Notre Dame football players, including Steve Schmitz.

55.    The NCAA, however, long ago shirked its legal duty, as did Notre Dame, which actively compelled and promoted its players to inflict head injuries on opponents and, therefore,

-12-

themselves.  For that many other reasons set forth in this Complaint, the NCAA and its member institutions, particularly Notre Dame, have lost sight of the founding principles.  Steve Schmitz's neuro-cognitive health has been sacrificed as part of the process, exclusively for the business of college football and the millions of dollars in profit the NCAA and Notre Dame reap every year from the Notre Dame football program.

### Notre Dame Football Fostered and Aggravated Head Injuries

56.     For more than 40 years, coaches around the country have known that a football player should not lead with his helmeted head.  In 1967 the American Medical Association Committee on Medical Aspects of Sports declared that coaches should not teach players to lead with their head.  By 1976, the NCAA and the National Federation of State High School Associations passed a safety rule prohibiting initial contact with the head.

57.     Despite this elementary rule, the Notre Dame coaching staff (a) did nothing to protect the neuro-cognitive health of Steve Schmitz, and (b) never at any time discouraged players from leading with their helmets when tackling and blocking.

58.     On information and belief, the Notre Dame coaching staff accepted, praised, and rewarded tackling and blocking techniques that involved the use of the helmeted head against opposing players and teammates.

59.     As a result, it was a common method during Notre Dame football games and practices for players to use their helmeted heads when tackling and blocking, to inflict on each other and opponents helmet to helmet hits of all kinds, including concussive and sub-concussive head injuries for which they were never monitored or treated.  This practice by the Notre Dame football coaches, and the Notre Dame football program aggravated the risk to Steve Schmitz and other Notre Dame football players for the following reasons:

-13-

(a) the Notre Dame players were taught and/or encouraged and/or not

discouraged to play the game by using their helmeted heads as a weapon

and/or implement that would injure opponents and themselves; and

(b) the Notre Dame football players were taught and required to continue to

play in games and practices after they had sustained concussion

symptoms, which were never recognized, addressed, or treated.

60.    If, for example, during practices or games a player on impact had their "bell

rung" and/or was temporarily unaware of his surroundings, this meant nothing to the Notre

Dame coaching staff. Players were ordered and expected to continue to participate in the

practice or game. If a player failed to continue to participate or otherwise failed to abide

by the coaches' instructions, the player risked his place on the Notre Dame football team,

his scholarship, and his contractual right to attend classes at Notre Dame.

61.    For four years, Steve Schmitz participated in full contact tackling drills,

practices, scrimmages, and games at Notre Dame. On many occasions in drills, practices,

and games, he sustained head injuries from which he experienced concussion symptoms,

including but not limited to being substantially disoriented as to time and place.

62.    At no time, however, were the symptoms that Steve Schmitz demonstrated

recognized by the Notre Dame coaching staff as an injury that should be monitored, treated,

or even acknowledged.

63.    At no time while Steve Schmitz played football at Notre Dame did a Notre

Dame football coach or trainer advise or send Steve Schmitz to see a neurologist to test for

concussion symptoms or neuro-cognitive health.

64.    At no time while Steve Schmitz played football at Notre Dame did anyone

-14-

(a) test or examine Steve Schmitz for concussion symptoms; (b) advise or educate Steve Schmitz about what a concussion is; or (c) advise or educate Steve Schmitz about what concussion symptoms are.

### The Defendants Knew or Should Have Known of the Risks to Steve Schmitz

65.     Both before and after Steve Schmitz played football at Notre Dame, the NCAA and Notre Dame knew or should have known of the mounting literature and medical advice regarding the latent effects of MTBI and the need for disclosure to Notre Dame football players, pre-season baseline neuro-psychological testing, and safe return to play guidelines.

66.     Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized the debilitating effects of concussions and other MTBI, and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

67.     In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study"). The article was published in the *Journal of the American Medical Association*. The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

68.     In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

69.     In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident

-15-

survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

70.     The recommendations were codified as rules of the New York State Athletic Commission.

71.     In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

72.     That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.,* recommending that players cease to play football permanently after receiving their third concussion.)

73.     In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

74.     A 1963 study by Drs. Mawdsley & Ferguson published in *Lancet* found that some boxers sustain chronic neurological damages as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.

75.     A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

76.    Also in 1967 the American Medical Association Committee on Medical Aspects of Sports declared that coaches should not teach players to lead with their head.

77.    In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

78.    In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing.  This study outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

79.    A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion.  The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

80.    By 1975, the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey led to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

81.    In 1973, a potentially fatal condition known as "Second Impact Syndrome"—in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate—was identified.  It did not receive this name until 1984.  Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least forty football players.

-17-

82.     By 1976, the NCAA and the National Federation of State High School
Associations passed a safety rule prohibiting initial contact with the head.  On information and
belief, neither the NCAA nor the Notre Dame football coaches and athletic department ever
implemented or enforced this rule both during or after Steve Schmitz played college football.

83.     Between 1952 and 1994, numerous additional studies were published in medical
journals including the *Journal of the American Medical Association*, *Neurology*, the *New
England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple
concussions, and/or football-related head trauma from multiple concussions.  These studies
collectively established that:

>           repetitive head trauma in contact sports, including boxing and football, has
>           potential dangerous long-term effects on brain function;
>
>           encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-
>           concussive and concussive blows to the head;
>
>           acceleration and rapid deceleration of the head that results in brief loss of
>           consciousness in primates also results in a tearing of the axons (brain
>           cells) within the brainstem;
>
>           with respect to mild head injury in athletes who play contact sports, there
>           is a relationship between neurologic pathology and length of the athlete's
>           career;
>
>           immediate retrograde memory issues occur following concussions;
>
>           mild head injury requires recovery time without risk of subjection to
>           further injury;
>
>           head trauma is linked to dementia;
>
>           a football player who suffers a concussion requires significant rest before
>           being subjected to further contact; and,
>
>           minor head trauma can lead to neuropathological and neurophysiological
>           alterations, including neuronal damage, reduced cerebral blood flow,
>           altered brainstem evoked potentials and reduced speed of information
>           processing.

-18-

84.     In the early 1980s, the Department of Neurosurgery at the University of Virginia, an NCAA member institution, published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States and received national attention.

85.     In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

86.     The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

87.     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published *Concussion Grading Guidelines*, which he later updated in 2001.

88.     By 1991, three distinct medical professionals/entities, all independent from the NCAA—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

89.     In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

-19-

90.     In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

91.     This echoed similar medical protocol established at a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

92.     The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in professional football players and the number of concussions those players had received.

93.     A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

94.     Although the Defendants knew for decades of the harmful effects of MTBI on student-athletes, they ignored these facts and failed to institute any meaningful method of warning and/or protecting the student-athletes, including the football players, most likely because the revenue from football was so great, and the business of college football so profitable.

95.     On information and belief, during every decade referenced above, the Defendants NCAA and Notre Dame (including but not limited to its football program) had access to the foregoing information.

-20-

96.     Information collected by the NCAA's own injury surveillance data confirmed that high rates of concussions and head injuries, with concussions accounting for 7% of all football practice and game injuries and between 7% and 14% of all hockey injuries in the 2005-2006 season.

97.     In 2003, two separate studies partially funded by the NCAA concluded the following: (1) that athletes required a full seven days to regain their pre-concussion abilities after sustaining a concussion; and (2) that NCAA football players with a history of concussions were at an increased risk of sustaining additional future concussions, and thus, should receive more information about this risk before deciding whether to continue playing football. One of the studies further recommended the use of standardized assessment tools to guide medical staff in evaluating and treating student athletes.

### The NCAA and Notre Dame Ignored Mounting Medical Evidence and Refused to Implement Any of the Recommended Guidelines

98.     Despite the foregoing research studies and expert recommendations, the NCAA ignored the fact that member institutions encouraged and actually required players to play in the very same game or practice in which the player sustained a concussion or a likely concussion.

99.     Despite the foregoing research studies and expert recommendations, Defendants NCAA and Notre Dame failed to implement any guidelines or rules to prevent repeated concussions and failed to educate players about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football.

-21-

100.    Despite the forgoing research, neither the NCAA nor Notre Dame recommended return to play procedures or took any action to educate student athletes subject to its rules on the risks of repeated head trauma.

101.    Despite the foregoing research studies and expert recommendations, Notre Dame conducted a football program that proactively rewarded Steve Schmitz for inflicting head injuries on himself and others and compelled him to ignore concussion symptoms and continue to play football within moments of sustaining concussion symptoms. Specifically, the Notre Dame coaches demanded that Notre Dame football players, including Steve Schmitz, sustain head injuries and inflict head injuries on other players for the purpose of advancing the Notre Dame football program by winning games, obtaining fame and favorable publicity, and gaining millions of dollars in revenue for Notre Dame.

102.    Despite the foregoing research studies and expert recommendations, neither the NCAA nor Notre Dame ever contacted Steve Schmitz after he had graduated from Notre Dame to inform him that he had been exposed to an increased risk of long-term brain damage by the concussive and sub-concussive blows sustained while playing football for Notre Dame.

103.    Later, after Steve Schmitz had left Notre Dame, neither Notre Dame nor the NCAA accepted or adopted any of the internationally accepted guidelines regarding concussion management and return to play protocols, thereby endorsing and allowing the ongoing practices of its member institutions, including Defendant Notre Dame. Rather, the NCAA rejected the international recommendations and continued to promote individualized approaches, such as the active encouragement by Notre Dame football that it student-athletes inflict head injuries on themselves and others during games and practices for the sole purpose of winning games, obtaining fame, and making money for Notre Dame.

-22-

104.     On information and belief, Notre Dame continued to conduct its football program in the exact same way from 1979 through 2010 and, like the NCAA, ignored all medical evidence that required Notre Dame to fulfill its obligation to protect the neurological health of students who participated in the football program.

105.     It was not until April 2010 that the NCAA made changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

106.     Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

107.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and that medical clearance would be determined by the team physician.

108.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

109.     The policy was too late for Steve Schmitz.

110.     Moreover, Defendant NCAA passed the responsibility for developing prevention and management procedures on to its member schools, such as the Defendant Notre Dame, and placed the burden of actively seeking medical attention on student-athletes, most of whom are

-23-

less than 22 years old and are beholden to coaches for both a place on the team roster and the right to attend the school.

### COUNT I - NEGLIGENCE
**(Plaintiff STEVE SCHMITZ Against the NCAA and NOTRE DAME)**

111.   Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 109 set forth above.

112.   From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

113.   Defendant Notre Dame also assumed similar duties to all its student athletes, including Steve Schmitz.

114.   The duties of both Defendants included an obligation to supervise, regulate, and monitor the rules of the Notre Dame football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to Notre Dame football players.

115.   Defendant NCAA had an additional duty to educate Notre Dame and Notre Dame football players on the proper ways to evaluate and treat MTBI during football games and practices, including repetitive sub-concussive and concussive injury. The NCAA's duty further included a duty to warn student athletes of the dangers of sub-concussive and concussive injuries and

-24-

of the risks associated with football before, during, and after they played college football and as additional information came to light.

116.    Both Defendants had a duty not to conceal material information from Notre Dame football players, including Steve Schmitz.

117.    The Defendants jointly breached their duties to Steve Schmitz by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of MTBI on the playing field, in locker rooms, and in the weeks and months after a Notre Dame football player sustained an MTBI, and the providing treatment for the latent effects of MTBI. This failure includes, but is not limited to:

> (a)    failing to recognize and monitor concussive and sub-concussive injury during football practices and games;
>
> (b)    failing inform the student football players of the dangers of concussive and sub-concussive injuries;
>
> (c)    failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or is suspected of sustaining such injuries;
>
> (d)    failing to implement procedures to monitor the health of student football players who have sustained (or are suspected of sustaining) concussive and/or sub-concussive injuries;
>
> (e)    failing to inform the student football players' extended families of concussive and/or sub-concussive injuries the student football players had sustained; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time Steve Schmitz graduated from Notre Dame.

118.    Both Defendants breached their duties to Steve Schmitz by fraudulently concealing and/or failing to disclose and /or failing to recognize and /or being willfully blind to: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

119.    Notre Dame, in particular, breached its duty to Steve Schmitz by actively teaching and encouraging Notre Dame football players to inflict head injuries on themselves and others as an effective way to play football.

120.    Steve Schmitz relied upon the guidance, expertise, and instruction of both Defendants regarding the serious and life-altering medical issue of concussive and sub-concussive risk in football.

121.    At all times, the Defendants had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to Steve Schmitz, the Defendants knew or should have known that Steve Schmitz would act and rely upon the guidance, expertise, and instruction of the Defendants on this crucial medical issue, while at Notre Dame and thereafter.

122.    Repetitive MTBI during college football practices and games has a pathological and latent effect on the brain. Repetitive exposure to accelerations to the head causes

-26-

deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as Tau protein, which is a signature pathology of CTE, the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

123.    Plaintiff Steve Schmitz experienced repetitive sub-concussive and concussive brain impacts during his college football career that significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

124.    The repetitive head accelerations and hits to which Steve Schmitz was exposed presented risks of latent and long-term debilitating chronic illnesses.  Absent the defendant's negligence and concealment, the risks of harm to Steve Schmitz would have been materially lower, and Steve Schmitz would not have sustained the brain damage from which he currently suffers.

125.    The repetitive head impacts and MTBI Steve Schmitz sustained while playing football at Notre Dame resulted in neuro-cognitive and neuro-behavioral changes over time in Steve Schmitz.  Now, at age 58, Steve Schmitz is permanently disabled based on the latent effects of neuro-cognitive and neuro-behavioral injuries he sustained while playing football at Notre Dame.  The latent injuries sustained by Steve Schmitz developed over time and were manifest later in life.  They include, but are not limited to, varying forms of neuro-cognitive disability, decline, personality change, forgetfulness, early onset Alzheimer's Disease, and CTE, all of which will require future medical care.

Electronically Filed 10/20/2014 11:13 / CV 14 834486 / Confirmation Nbr. 263029 / CLBAG

126. As a direct and proximate result of the NCAA's and Notre Dame's negligence, Steve Schmitz has incurred damages in the form of permanent brain damage, emotional distress, past and future medical, health care, and home care expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Steve Schmitz will likely incur future damages caused by the NCAA's and Notre Dame's negligence.

127. As a result of their misconduct, the Defendants NCAA and Notre Dame are liable to Plaintiff Steve Schmitz for the full measure of damages allowed under applicable law.

**COUNT II - FRAUDULENT CONCEALMENT**
**(Plaintiff STEVE SCHMITZ Against the NCAA and NOTRE DAME)**

128. Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 127 set forth above.

129. Between the early 1970s and the 1990s, which includes the time period within which Steve Schmitz played football at Defendant Notre Dame, the NCAA and Notre Dame knew that repetitive head impacts in football games and full-contact practices created a risk of harm to student-athletes that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches, and professional football players, many of whom were forced to retire from professional football because of head injuries.

130. The Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which Notre Dame football players are exposed.

131. Defendants NCAA and Notre Dame were willfully blind to and/or knowingly concealed from NCAA football players generally, and Notre Dame football players specifically,

-28-

the risks of MTBI in NCAA games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

132.    Given the NCAA's and Notre Dame's superior and unique vantage point, Steve Schmitz reasonably looked to the NCAA and Notre Dame for guidance on head injuries and concussions, including the later-in-life consequences of the repetitive head impacts he sustained while a football player at Notre Dame.

133.    As a direct and proximate result of the NCAA's and Notre Dame's knowing concealment and/or willful blindness, Plaintiff Steve Schmitz has suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

134.    As a result of the NCAA's and Notre Dame's misconduct, the NCAA and Notre Dame are liable to Plaintiff Steve Schmitz for the full measure of damages allowed under applicable law.

## COUNT III- BREACH OF EXPRESS CONTRACT
### (Plaintiff STEVE SCHMITZ vs. NCAA)

135.    Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 134 as set forth above.

136.    As a student-athlete at Defendant Notre Dame, an NCAA-governed institution, Plaintiff Steve Schmitz was required to enter into a contract with Defendant NCAA as a prerequisite to sports participation. The contract required Plaintiff Steve Schmitz to sign a form affirming that he has read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by NCAA Division bylaws.

-29-

137. In exchange for Steve Schmitz's agreement, the NCAA promised to perform certain services and functions, including, inter alia:

    (a) conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational well-being of student-athletes (NCAA Const., Art. 2, § 2.2);

    (b) requiring that Notre Dame protect Steve Schmitz' health and provide a safe environment for all of its participating student-athletes, including Steve Schmitz (NCAA Const., Art. 2, § 2.2.3); and

    (c) requiring that each member institution, including Notre Dame, establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience (NCAA Const., Art. 2, § 2.2).

138. By signing and agreeing to abide by NCAA regulations, and thereafter participating in NCAA sanctioned football program, Steve Schmitz fulfilled his obligations under the contract.

139. In addition, Steve Schmitz is a third party beneficiary of the contract between the NCAA and Notre Dame, and Notre Dame adopted the same duties to Steve Schmitz to which the NCAA had agreed.

140. The NCAA breached its obligations under its contract with Steve Schmitz by failing to ensure a safe environment at Notre Dame football practices and games in which Steve Schmitz participated. The NCAA further breached its obligation by concealing and/or failing to properly educate and warn Steve Schmitz about the symptoms and long-term risks of concussions and concussion-related MTBI.

Electronically Filed 10/20/2014 11:13 / / CV 14 834486 / Confirmation Nbr. 263029 / CLBAG

141.    Furthermore, the NCAA breached its contractual duty to Steve Schmitz by failing to offer mid and late life warnings and treatment to mitigate the latent brain injuries he sustained and would sustain.

142.    The NCAA's breach of its contractual obligations caused Plaintiff Steve Schmitz to suffer physical injury and damages in the form of latent brain damage, emotional distress, loss of income and employment, and past, ongoing, and future medical expenses.

143.    Plaintiff Steve Schmitz seeks actual damages for the NCAA's breach of contract, as well as interest, reasonable attorney's fees, expenses, and costs to the extent allowable.

### COUNT IV - BREACH OF IMPLIED CONTRACT
### (Plaintiff STEVE SCHMITZ vs. NCAA)

144.    Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 143 as set forth above.

145.    Under an implied contract, all student-athletes agree to be bound by NCAA rules and regulations in exchange for their participation in NCAA-controlled athletic programs.

146.    As a condition of the implied contract, the NCAA agreed to abide by the promises set forth in its own Constitution and Bylaws, as described above.

147.    Plaintiff Steve Schmitz showed his acceptance of the contract and performed under the contract by participating in NCAA-controlled athletic programs at Notre Dame in accordance with NCAA rules and regulations.

148.    Defendant NCAA breached the contract by failing to ensure that Steve Schmitz was provided with a safe environment in which to participate in Notre Dame football.

149.    Defendant NCAA further breached the contract by concealing and/or failing to properly educate and warn Steve Schmitz and other players about the symptoms and long-term risks of concussions and concussion-related MTBI.  Furthermore, the NCAA breached its duty to

-31-

Steve Schmitz by failing to offer mid and late life warnings and treatment to mitigate his injuries.

150.    Defendant's breach of the contract caused Steve Schmitz to suffer long-term physical injury and damages in the form of latent brain damage, loss of employment, loss of income, past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages.  Plaintiff Steve Schmitz will likely incur future damages caused by Defendant's breach.

151.    Plaintiff Steve Schmitz seeks damages for Defendant's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT V- BREACH OF EXPRESS CONTRACT
### (Plaintiff STEVE SCHMITZ vs. NOTRE DAME)

152.    Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 151 as set forth above.

153.    As a Cleveland, Ohio high school student recruited by Notre Dame, Plaintiff Steve Schmitz entered into a written agreement in which he committed to play football at Notre Dame, to attend Notre Dame as a student, and to comply with all codes of conduct and obligations as both a football player and student at Notre Dame.

154.    The contract required that Notre Dame fulfill its obligations to Steve Schmitz, and those obligations included that:

> (a) Notre Dame conduct the Notre Dame football program in a manner designed to protect and enhance the physical and educational well-being of Steve Schmitz and other student football players; and

> (b) require that the Notre Dame football program furnish a safe environment for Steve Schmitz and all of the program's participants.

-32-

155.    Steve Schmitz fulfilled his obligations under the contract.

156.    In addition, Steve Schmitz is a third party beneficiary of the contract between the NCAA and Notre Dame, and Notre Dame adopted the NCAA's duties to Steve Schmitz set forth above.

157.    Notre Dame breached its obligations under the contract by failing to ensure a safe environment at Notre Dame football in which Steve Schmitz participated.

158.    Notre Dame further breached its obligation by concealing and/or failing to properly educate and warn Steve Schmitz about the symptoms and long-term risks of concussions and concussion-related MTBI.

159.    Notre Dame further breached its obligation by supporting, sponsoring, and encouraging a Notre Dame football program that demanded and urged Steve Schmitz and other student football players to inflict head injuries on themselves and others in practices and games.

160.    Furthermore, Notre Dame breached its contractual duty to Steve Schmitz by failing to offer mid and late life warnings to help him become aware of and mitigate his latent brain injuries.

161.    Notre Dame's breach of its contractual obligation caused Plaintiff Steve Schmitz to suffer physical injury and damages in the form of latent brain damage, emotional distress, loss of income and employment, and past, ongoing, and future medical expenses.

162.    Steve Schmitz seeks actual damages for Notre Dame's breach of contract, as well as interest, reasonable attorney's fees, expenses, and costs to the extent allowable.

Electronically Filed 10/20/2014 11:13 / / CV 14 834486 / Confirmation Nbr. 263029 / CLBAG

## COUNT VI
## LOSS OF CONSORTIUM
### (Plaintiff YVETTE SCHMITZ Against the NCAA AND NOTRE DAME)

163.  Plaintiff Yvette Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 162 above.

164.  As a result of their misconduct, the Defendants are liable to Plaintiff Yvette Schmitz.

165.  As a direct and proximate result of the intentional misconduct, carelessness, negligence, and recklessness, Plaintiff Steve Schmitz has sustained the injuries as set forth above and will continue to incur injuries and damages as his life progresses.

166.  As a result, Plaintiff Yvette Schmitz has been damaged as follows:

    a.  She has been and will continue to be deprived of the services, society and companionship of her husband;

    b.  She has been and will continue to be required to spend money for medical care and household care for the treatment of her husband; and

    c.  She has been and will continue to be deprived of the earnings of her husband, but for the injuries he has sustained as a result of the conduct of the Defendants.

167.  As a result of Notre Dame's and the NCAA's misconduct and the injuries sustained by Plaintiff Steve Schmitz, Plaintiff Yvette Schmitz is entitled to damages, as alleged herein and allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs Steve and Yvette Schmitz pray for judgment as follows:

A.  With respect to all Counts, an award of compensatory damages against the NCAA and Notre Dame in excess of $25,000, exclusive of costs.

B.  With respect to all Counts, an award to Plaintiffs Steve and Yvette Schmitz of punitive damages;

C.  With respect to all Counts, an award to Plaintiffs Steve and Yvette Schmitz of such other and further relief as may be appropriate; and

D.  With respect to all Counts an award to Plaintiffs Steve and Yvette Schmitz of prejudgment interest, costs and attorney's fees.

## JURY DEMAND

Pursuant to Rule 38 (B) of the Ohio Rules of Civil Procedure, plaintiffs hereby demand a trial by jury in this action.

**Dated October 20, 2014**                    **Respectfully Submitted,**

                                              **BARKAN MEIZLISH HANDELMAN**
                                              **GOODIN DEROSE WENTZ, LLP**

                                              */s/ Robert E. DeRose*
                                              Robert E. DeRose (OH Bar No. 0055214)
                                              Neal J. Barkan (OH Bar No. 000020450)
                                              250 E. Broad St., 10th Floor
                                              Columbus, Ohio  43215
                                              Phone: 614-221-4221
                                              Facsimile No.: 614-744-2300
                                              Email: bderose@barkanmeizlish.com
                                                     nbarkan@barkanmeizlish.com

                                              And

                                              David D. Langfitt (Pro Hac Vice Anticipated)
                                              Melanie J. Garner (Pro Hac Vice Anticipated)
                                              **LOCKS LAW FIRM**

The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-3423
Fax: (215) 893-3444
Email: dlangfitt@lockslaw.com
        mgarner@lockslaw.com
And

Richard S. Lewis (Pro Hac Vice Anticipated)
Mindy B. Pava (Pro Hac Vice Anticipated)
**HAUSFELD LLP**
1700 K Street, N.W.
NW Suite 650
Washington, DC 20006
Ph: 202-540-7151
Fax: 202.540.7201
Email: rlewis@hausfeldllp.com
        mpava@hausfedlllp.com

**ATTORNEYS FOR PLAINTIFFS STEVEN
AND YVETTE SCHMITZ**

# EXHIBIT 26

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**

Civil Division

FILED

CIVIL ACTIONS BRANCH

OCT 1 7 2014

Superior Court
of the District of Columbia
Washington, D.C.

JENNIFER BRADLEY,
100 Lakewood Drive
Pequea, PA 17565

      Plaintiff,

Case No.

14 - 0 0 0 6 5 8 3

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, d/b/a NCAA
700 W. Washington Street
Indianapolis, Indiana 46206

Serve: Dr. Mark A. Emmert
      President
      700 W. Washington Street
      Indianapolis, Indiana 46206

~and~

THE PATRIOT LEAGUE
3773 Corporate Parkway
Suite 190
Center Valley, PA 18034

Serve: Carolyn Schlie Femovich
      Executive Director
      3773 Corporate Parkway
      Suite 190
      Center Valley, PA 18034

~and~

THE AMERICAN UNIVERSITY
4400 Massachusetts Ave., NW
Washington, DC 20016

Serve: Douglas Kudravetz
      4400 Massachusetts Ave., NW
      Washington. DC 20016

~and~



MARYLAND     SPORTS     MEDICINE
CENTER
3420 Morningwood Drive
Olney, M.D. 20832

      Serve: David L. Higgins, M.D. P.C.
            3104 Black Chestnut LN
            Chevy Chase, M.D. 20815

~and~

DAVID L. HIGGINS, M.D. P.C.
17904 Georgia Avenue
Suite 215
Olney, MD 20832

      Serve: Charlotte Higgins
            17904 Georgia Avenue
            Suite 215
            Olney, MD 20832

~and~

DAVID L. HIGGINS, M.D.
17904 Georgia Avenue
Suite 215
Olney, MD 20832

~and~

AARON WILLIAMS, D.O.
9501 Farrell Road
Fort Belvoir, VA 22060

           Defendants.

## COMPLAINT

*COMES NOW,* Plaintiff, by and through the undersigned counsel, and files this complaint,

and for this cause of action states:

## JURISDICTION

1.     Jurisdiction of this court is invoked pursuant to D.C. Code § 11-921, and by virtue

of the fact that all acts and omissions complained of occurred within the District of Columbia.

2.      Venue in this court is proper since the cause of action arose in the District of Columbia.

## PARTIES

3.      Plaintiff Jennifer Bradley is and, at all times relevant to this action, was a resident of the Commonwealth of Pennsylvania who was residing in the District of Columbia by virtue of her attendance as a student at The American University at the time of the occurrence subject to this Complaint.

4.      Defendant The National Collegiate Athletic Association d/b/a NCAA (hereinafter "NCAA") is an unincorporated association of private and public colleges and universities which governs intercollegiate athletics. Its principal place of business is located in Indianapolis, Indiana. As an unincorporated association it is a citizen of each state its member is a citizen, including the District of Columbia.

5.      Defendant The Patriot League is and, at all times relevant to this action, was a corporation incorporated in the Commonwealth of Pennsylvania and comprised of private and public colleges and universities with a principal place of business in the Commonwealth of Pennsylvania and conducting business in all jurisdictions in which its member institutions are located, including the District of Columbia.

6.      Defendant The American University (hereinafter "AU") is an educational institution and a member institution of Defendant NCAA doing business in the District of Columbia.

7.      Defendant David L. Higgins, M.D., P.C. is and, at all times relevant to this action, was a healthcare provider incorporated in the State of Maryland and conducting business in

3

Washington, D.C.

8.      Defendant Maryland Sports Medicine Center is and, at all times relevant to this action, was a healthcare provider incorporated in the State of Maryland and conducting business in Washington, D.C.

9.      Upon information and believe, Defendant Maryland Sports Medicine Center is the trade name of Defendant David L. Higgins, M.D., P.C.

10.     Defendant David L. Higgins, M.D. is and, at all times relevant to this action, was a healthcare provider licensed in the District of Columbia and, upon information and belief, was an agent, servant, and/or employee of Defendants American University, Maryland Sports Medicine Center, and David L. Higgins, M.D. P.C.

11.     Defendant Aaron Williams, D.O. is and, at all times relevant to this action, was a healthcare provider practicing in the District of Columbia.  Upon information and believe, Defendant Williams is not nor at all times relevant to this matter was a licensed healthcare provider in the District of Columbia.

12.     Upon information and belief,  Dr. Williams was a fellow hired by Defendant Higgins, Higgins, P.C. and/or Maryland Sports Medicine Center.  Upon information and belief Dr. Williams is currently a practicing physician in the Commonwealth of Virginia.

13.     Upon information and belief, at all times relevant to the incident in question, Dr. Williams was an agent, servant, and/or employee of Defendants American University, Higgins, Higgins, P.C. and Maryland Sports Medicine Center.

14.     Steven Jennings is and, at all times relevant to this action, was the head coach of the women's field hockey team at AU.  Upon information and belief, Steven Jennings resides in the District of Columbia and conducts business at The American University in the District of

4

Columbia.

15.     Sean Dash is and, at all times relevant to this action, was the head athletic trainer at the American University.  Upon information and belief, Mr. Dash resides in the District of Columbia and conducts business at The American University in the District of Columbia.

16.     Jenna Earls is and, at all times relevant to this action, was the head trainer of the women's field hockey team at AU.  Upon information and belief, Jenna Earls resides in the District of Columbia and conducts business at The American University in the District of Columbia.

## BACKGROUND

### MEDICAL RESEARCH ON CONCUSSIONS

17.     Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause Traumatic Brain Injury ("TBI") and Mild Traumatic Brain Injury ("mTBI") with a heightened risk of long term, chronic neuro-cognitive sequelae.

18.     The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines TBI as

> A blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.  Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.  Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

19.     The Centers for Disease Control ("CDC") defines concussion as "a type of traumatic brain injury, or TBI, caused by a bump, blow, or jolt to the head that can change the way your brain normally works.  Concussions can also occur from a fall or blow to the body that causes

5

the head and brain to move quickly back and forth."

20.     Medical experts define a concussion as "a complex pathophysiological process affecting the brain, induced by traumatic biomechancical forces." (Consensus Statement of Concussion in Sport: The 3rd International Conference on Concussion in Sport [Zurich 2008]).

21.     Recently, a group of concussion specialists considered all the available medical evidence on concussions and provided a more detailed definition: "Concussion is defined as a traumatically induced transient disturbance of brain function and involves a complex pathophysiological process." (American Medical Society for Sports Medicine position statement: Concussion in Sport. *Br J Sports med*. 2013; 47:15-26).

22.     The mechanism of the injury flows from external forces (such as collisions between players or with the ground) acting on the head or anywhere on the body that transfer damaging energy to the brain cells, resulting in immediate injury to those cells. This causes a breakdown of the cell structure and metabolism and also causes impeded blood flow to the brain cells. The damage results in the cells' inability to continue functioning correctly to maintain their baseline activities and/or to recover. A concussion results in symptoms and signs that negatively affect the concussed student athlete's health and well-being for a period ranging from days to several weeks. During this recovery period the brain is much more vulnerable to subsequent and permanent injury – even from lesser force.

23.     AANS has stated that "[p]eople who suffer a head injury may suffer from side effects that persist for weeks or months. This is known as postconcussive syndrome. Symptoms include memory and concentration problems, mood swings, personality changes, headache, fatigue, dizziness, insomnia and excessive drowsiness. Patients with postconcussive syndrome should avoid activities that put them at risk for a repeated concussion. Athletes should not return

6

to play while experiencing these symptoms."

24. The American Journal of Physical Medicine & Rehabilitation published a study in 2003 concluding that "[t]his large prospective cohort study indicates the risk of sustaining a cerebral concussion is nearly six times greater for individuals with a history of concussion than for individuals with no such history."

25. The Journal of the American Medical Association published a report in 2003 identified as "The NCAA Concussion Study" in which it reported in its conclusion that "a history of previous concussions may be associated with an increased risk of future concussive injuries and that these previous concussions may be associated with slower recovery of neurological function following subsequent concussions."

DEFENDANTS' SUPERIOR KNOWLEDGE OF THE AFFECTS OF CONCUSSIONS

26. Defendants knew or should have known of the medical and scientific knowledge pertaining to concussions, post concussive syndrome, and secondary concussion affects.

27. In the early 1980's, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained mTBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.

28. In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered mTBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

7

29.     The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma, including field hockey players.

30.     In 1982 the NCAA implemented an injury surveillance system.

31.     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which were later updated in 2001.

32.     In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled, "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System" published by the American Society for Testing and Materials. The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries. The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced." In spite of this admonition, the NCAA did not proceed to educate its active student-athletes on the long term risks of concussions, nor provide necessary medical monitoring.

33.     In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal. (McCrea, et al., *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, Journal of the American Medical Association, Vol. 290, No. 19, November 19, 2003, at 2561). The study concluded that athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities.

34.     In 2003, the University of North Carolina, Chapel Hill, published another study,

8

funded in part by the NCAA, examining the effects of multiple concussion sustained by a single athlete. (Guskiewicz, et al., *Cumulative Effects Associated with Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICNA MEDICAL SSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549). The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student athletes who had three previous concussions were at a three-fold greater risk of future concussions. The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

35. This study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student athletes should rest before returning to play. Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing.

36. In 2004, the NCAA injury surveillance system documented a high rate of concussions in football and other sports, including field hockey. No action was taken by the NCAA to respond to this data in terms of educating student athletes or providing needed medical monitoring.

37. In 2004, the National Athletics Trainers Association ("NATA") published concussion management guidelines repeating the need for return to play protections and symptom monitoring as earlier medical recommendations had outlined.

38. In 2005, UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment ("MCI") and

9

early onset Alzheimer's disease. (Guakiewicz, et al., *Association between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players*, NEUROSURGERY, Vol. 50, October 2005, at 719). In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early onset Alzheimer's disease. The NCAA did not even acknowledge the study, let alone act on it or even alter its student athletes of these known risks.

39.    In 2005, the 2nd International Conference on Concussion in Sport published its summary and agreement statement in which they presented a "Concussion Management" System:

When a player shows any symptoms or signs of a concussion, the following should be applied.

  (1) The player should not be allowed to return to play in the current game or practice.
  (2) The player should not be left alone, and regular monitoring for deterioration is essential over the initial few hours after injury.
  (3) The player should be medically evaluated after the injury.
  (4) Return to play must follow a medically supervised stepwise process.

A player should never return to play while symptomatic. "When in doubt, sit them out!"

40.    In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players. The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

41.    In June of 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease – Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

10

42.    In 2011, the NCAA put out and disseminated what is titled "2011-2012 NCAA Sports Medicine Handbook." (hereinafter referred to as the "Handbook").

43.    The Handbook specifically states that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

44.    The Handbook additionally states that "[t]he health and safety principle of the National Collegiate Athletic Association's constitution provides that it is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes."

45.    According to its own Handbook, "[c]oncussion or mild traumatic brain injury (mTBI) has been defined as 'a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces.' Although concussion most commonly occurs after a direct blow to the head, it can occur after a blow elsewhere that is transmitted to the head."

46.    The Handbook goes onto state that a "concussion is characterized by the rapid onset of cognitive impairment that is self limited and spontaneously resolves."

47.    The Handbook also identifies "Signs and Symptoms of mTBI" in Table 1 on page 54. The signs and symptoms include:

a. Loss of consciousness (LOC)
b. Confusion
c. Post-traumatic amnesia (PTA)
d. Retrograde amnesia (RGA)
e. Disorientation
f. Delayed verbal and motor responses
g. Inability to focus
h. Headache
i. Nausea/vomiting
j. Excessive drowsiness
k. Visual Disturbances (Photophobia, blurry Phono/photophobia vision, double vision)

11

> l.  Disequilibrium
> m. Feeling "in a fog", "zoned out"
> n.  Vacant stare
> o.  Emotional liability
> p.  Dizziness
> q.  Slurred/incoherent speech

48.     Additionally, as indicated in the Handbook, in 2010 the NCAA finally adopted a

policy for Concussion Management. Said policy dictates that an "active member institution shall

have a concussion management plan for its student-athletes."

49.     The Concussion Management Plan (hereinafter the "Plan") has four basic

requirements, essentially modeled after the 2nd International Conference on Concussion in Sport's

findings:

> a.  An educational component;
> b.  Evaluation of student-athletes who show signs, symptoms, or behaviors consistent
>     with a concussion to be removed from athletic activities and evaluated by a medical
>     staff member;
> c.  A policy preventing student-athletes diagnosed with concussions from return to
>     play the same day; and
> d.  A policy preventing student-athletes diagnosed with concussions from returning
>     until they have been medically cleared by a physician or his/her designee.

50.     However, rather than enforcing the member institutions to strictly comply with the

Plan, the Plan instead attempts to put the responsibility upon the student-athletes by requiring each

such individual to "sign a statement in which they accept the responsibility for reporting their

injuries and illnesses to the institutional medical staff, including signs and symptoms of

concussions."

51.     Such a requirement is required by any individual no matter their age or education

to be entered into – whether they are a 17 year old minor freshman eager to start their life at the

college they worked so hard to get into or a 21 year old senior who has been fortunate enough to

make it through his or her first three collegiate years without suffering a concussion under the false

12

pretenses that he or she would understand the potential risks and dangers associated with medical symptoms associated with concussions.

52.     Ironically enough, however, is the fact that the symptoms associated and recognized to be exhibited when one suffers a concussion are the exact symptoms that would preclude one from being aware or cognizant of to identify in many circumstances.

53.     Nevertheless, with knowledge of concussions being highly complex medical issues, the NCAA has attempted to shift the accountability of vigilance unto the players in many ways, including but not limited to disseminating to participating organizations flyers that state: "If you think you or your teammate has had a concussion don't hid it report it take time to recover."

54.     Such flyers specifically depict the actions of field hockey players.

55.     Despite the common public perception that concussions are only prevalent in known contact sports, the Handbook readily acknowledges that the "incidence in helmeted versus nonhelmeted sports is also similar. In the years 2004 to 2009, the rate of concussion during games per 1,000 athlete exposures for football was 3.1 … for field hockey 1.2…"

56.     There has long been clinical and neurological studies indicating that multiple head injuries or concussions can cause severe cognitive problems such as depression and early-onset dementia.

57.     There has long been published peer review studies documenting that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injuries.

58.     There can be no doubt that prior to September 23, 2011, the NCAA, as well as the Patriot League, and their participating members including American University and their agents, servants, and employees were aware of the seriousness and dangers associated with concussions

13

and post-concussive syndrome in all athletic sports, including field hockey.

### THE DUTIES ASSUMED BY DEFENDANTS

59.     The NCAA holds itself out as the supervisory force over conduct in intercollegiate events and practices throughout the United States. According to its own website, the NCAA was founded "*to protect* young people from the dangerous and exploitive athletic practices of the time."

60.     The NCAA's founding purpose to protect student-athletes has been repeated often. In1909 at the annual convention of member institutions, Chancellor James Roscoe Day of Syracuse University stated:

> The lives of the students must not be sacrificed to a sport. Athletic sports must be selected with strict regard to the safety of those practicing them. It must be remembered that the sport is not the end. It is incidental to another end far more important. We lose sight of both the purpose and the proportion when we sacrifice the student to the sport.

61.     College athletics at NCAA member institutions, such as AU, are tightly regulated by the NCAA Constitution, Operating Bylaws and Administrative Bylaws, which compromise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including but not limited to player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

62.     The NCAA also promulgates sport-specific standards through its Playing-Rules Committees.

63.     According to the NCAA Constitution,

The purposes of this Association are:

    a. To initiate, stimulate and improve intercollegiate athletics programs for student athletes …;

    b. To uphold the principal of *institutional control* of, and responsibility for, all

14

> intercollegiate sports in conformity with the constitution and bylaws of this association…

NCAA Const., Art. 1, § 1.2(a)(b).

64.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of

Student-Athlete Well-Being," and provides:

**2.2 The Principle of Student-Athlete Well-Being**
Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05)

\*\*\*

**2.2.3 Health and Safety.** It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95)

65.     The NCAA Constitution also provides that "[t]he Association shall assist the

institution in its efforts to achieve full compliance with all rules and regulations…" Thereby, the

NCAA has both promised and acknowledged that it has a duty to protect the health and safety of

student-athletes.

66.     The NCAA also maintains The Committee on Safeguards and Medical Aspects of

Sports, which is publicly recognized by the NCAA as "serv[ing] to provide expertise and

leadership to the NCAA in order to provide a healthy and safe environment for student-athletes

through research, education, collaboration and policy development."

67.     As expressed in the Handbook and on the NCAA's own website, the NCAA utilizes

injury surveillance data to examine, explore, understand, and work to prevent sports injuries.

68.     The NCAA even requires student-athletes to sign HIPAA authorizations for the

consent of their medical records, in part to presumably examine, explore, understand, and work to

prevent sports injuries. Jennifer Bradley, in fact, signed such an authorization on August 11, 2009

15

which stated,

> The information provides NCAA committees, athletics conferences and individual schools and NCAA-approved researchers with injury, relevant illness and participation information that does not identify individual student-athletes or schools. The data provide the Association and other groups with an information resource upon which to base and evaluate the effectiveness of health and safety rules and policy, and to study other sports medicine questions.

69.     Despite all of these public displays of responsibility and oversight, the NCAA has chosen to ignore the stringent oversight and protection of its student-athletes and instead focused its resources on its own economic development and public perception.

70.     In 2005 Preston Plevretes was rendered permanently disabled after he suffered a second-impact syndrome at La Salle University. Dr. Michael W. Collins, Ph.D. opined "[t]he lack of institutional involvement in assuring appropriate care of their student athletes and also not having any written protocols for appropriate management of injury is a reckless and gross deviation from the standard of care."

71.     In 2010, during the NCAA Concussion Working Group, Joni Comstock, the NCAA's Senior Vice President of Championships, recorded in the minutes that "[t]here was continued agreement that the membership was looking to the national office for guidance…"

72.     SEC Commissioner Mike Slive also confirmed the NCAA's shortcomings in stating:

> There is much work to be done, and while the Conference has a role to play, prevention and treatment of concussion injuries is a national concern that needs and deserves a coordinated national effort. For this reason, the Presidents and Chancellors will make a formal request that the NCAA take the lead in organizing and spearheading a national research effort and examining possible revisions to playing rules in football *and other sports*.

16

73.     Additionally, upon information and belief, one year prior to the incident in question pertaining to Jennifer Bradley's concussion related injuries while playing field hockey at AU, a teammate on the AU field hockey team suffered multiple concussions that required her to quit the team.

74.     In 2001, American University became a full member in the Patriot League.

75.     According to its own website, the Patriot League "was founded on the principles of admitting athletes who are academically representative of their class, [and] is in its third decade of academic and athletic achievement.  Participation in athletics at Patriot League institutions is viewed as an important component of a well-rounded education."

76.     According to the Patriot League's own Policies and Procedures, "The Patriot League promotes opportunities for students to compete in Division I intercollegiate athletics programs within a context that holds paramount the high academic standards and integrity of member institutions, and the academic and personal growth of student-athletes."

77.     The Patriot League's Policies and Procedures also mandates that, "this document addresses compliance procedures, and, as such is to be used in conjunction with the National Collegiate Athletic Association (NCAA) Manual, which states specifically the rules that govern intercollegiate athletics.  Patriot League institutions are expected to abide by all rules and procedures set forth in both the NCAA and Patriot League Manuals."  Thereby, the Patriot League has assumed the same duties and responsibilities as the NCAA has both promised and acknowledged pertaining to the protection of the health and safety of student-athletes.

78.     The Patriot League's Policies and Procedures are silent as to any Concussion Prevention/Management policies.

79.     The Patriot League's Policies and Procedures do, however, establish a "Policy

17

Committee" that "shall, on request of the Council, act on behalf of the Presidents and shall study and make recommendations on the implementation of policy. The Policy Committee shall monitor on a continuous basis the policies and programs in the League to assure that they are consistent with the spirit and intent of the League Code."

80.　　Despite having a Policy Committee, it does not appear that any Policies were ever formulated for the management of concussions/brain injuries to student-athletes. As such, in accordance with its incorporation of the NCAA's manuals, the Patriot League has adopted the Plan as set forth in 2010 by the NCAA.

81.　　Sean Dash was at all times relevant to this action the head athletic trainer at AU.

82.　　Steven Jennings was at all times relevant to this action the head field hockey coach at AU.

83.　　Jenna Earls was at all times relevant to this action the head field hockey athletic trainer at AU.

84.　　David Higgins, M.D. was at all times relevant to this action the head physician at AU.

85.　　Aaron Williams, D.O. was at all times relevant to this action the field hockey team physician at AU.

86.　　Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams were responsible for the safety of the student-athletes at AU participating on the field hockey team.

87.　　Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams either were or should have been aware of dangers associated with concussions and with continued play of concussed athletes.

88.　　Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams were

18

or should have been in charge of implementing and enforcing a concussion management plan at AU.

89.     Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams failed to implement and enforce a proper concussion management plan at AU and instead focused their efforts on establishing a "win at all costs" environment at AU.

90.     While Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams built an impressive record for AU's Field Hockey program, they did so at the expense of the health and well being of the participating student-athletes, including Jennifer Bradley.

## THE HISTORY OF JENNIFER BRADLEY

91.     In 2008, Jennifer Bradley began her collegiate life at AU on scholarship.

92.     On August 11, 2009, Jennifer was presented and executed a HIPAA authorization as identified above as well as an authorization by AU to appropriate her likeness and accomplishments to the financial benefit of AU. Said authorization authorized AU in pertinent part to:

disseminate information and images pertaining to my athletic participation & eligibility, athletic accomplishments and honors, academic accomplishments & honors, and any other pertinent student-athlete related information ...

I hereby authorize American University, its agents, and its authorized licensees to make copies of, use, sell and distribute any photographic images of me which were taken in connection with my participation in the athletics programs of, or otherwise in connection with my status as a student-athlete at, American University. I agree that all right, title and interest in and to all such photographic images and any reproductions or derivative work thereof shall be the exclusive property of American University. I further consent to the use of my name and biographical material in connection with such photographic images. I agree that American University does not owe me any compensation for the acts that I have consented to in this agreement.

19

93.     On August 10, 2010, Jennifer was required to sign a "2010-2011 Student-Athlete

Concussion Statement." Included in that document was the following language:

> To minimize the risk of injury, I agree to obey all safety rules, to report fully any
> problems related to my physical condition to appropriate University personnel
> including medical personnel and coaches, to follow prescribed conditioning
> programs and to inspect my athletic equipment daily.

94.     On August 10, 2010, Jennifer also underwent a SCAT2 baseline test, which

identified her total number of symptoms to be an 8 and her symptom severity score to be a 21.

95.     In 2011, prior to her junior year, Jennifer was required to sign a "2011-2012

Concussion Statement." The language was identical to that of the prior year Statement.

96.     On August 9, 2011, Jennifer dutifully signed yet another "Student-Athlete

Authorization/Consent for Disclosure of Protected Health Information for NCAA-Related

Research Purposes." Again, said authorization indicated that the NCAA was attaining information

for NCAA student-athletes "to evaluate the effectiveness of health and safety rules and policy, and

to study other sports medicine questions."

97.     In September of 2011 as Jennifer was beginning her junior year at AU, she was a

20 year old female Academic All-American Field Hockey player. She had a cumulative GPA of

a 3.47

98.     On or about September 23, 2011, Jennifer was hit in the head during a field hockey

game between American University and Richmond University. Jennifer later recalled the hit to be

no more extreme than other hits routinely suffered while playing field hockey.

99.     Subsequent to the game, Jennifer began to notice vision problems (seeing

movement in snapshots), concentration problems, and early fatigue while playing a game against

Boston College.

20

100.    On October 1, 2011, she informed Ms. Earls and Mr. Jennings about her symptoms

and discussed the matter extensively.

101.    On October 2, 2011, Jennifer again played in a game with symptoms persistent.

102.    On October 3, 2011, Jennifer sent an email to the training staff spelling out in detail

her symptoms in which she stated:

I think I might have been a little confusing with how I described the way I was feeling
before.  I wrote out all my symptoms for you more clearly –

- always extremely tired – even after sleeping a good amount – sometimes I feel like
  I can't keep my eyes open and I always feel like I could fall asleep.
- Cannot concentrate for any amount of time – takes me a long time to finish tasks
  or read and have to take frequent breaks.  My sense of time seems off as well
- Fast things seem like they are moving in snapshots rather than a fluid motion and
  it's hard to focus my eyes on something
- When playing, I feel dizzy and unfocused – it's hard to concentrate on tactical
  things like the press
- Feel like things are not real and easily forget things.  Also hard for me to analyze
  something.  (When I am playing I'm not really sure if what I'm doing is "good" or
  not
- When I have to interact with someone, I feel like my answers/ actions are delayed
- When walking among people I feel like I'm in a daze – like maybe I'm not actually
  there ("dream like" feeling)
- Pressure in my head – not a headache, but have a constricting feeling in my
  forehead.

I've been having these symptoms for over a week and cannot pinpoint a cause.  I tried to
sleep more, eat better and more, and to take more sugar in and none of this has improved
the situation.

103.    On October 4, 2011, Ms. Earls gave Jennifer a SCAT2 test at 10:30 AM.  Her total

number of symptoms was 17 (over double her baseline test) and her symptom severity score was

45 (over double her baseline test).

104.    On October 5, 2011, Jennifer continued to complain to her trainers of these

complaints, and she was given a second SCAT2 test at 6:00 AM.  Her total number of symptoms

was 16 (double her baseline test) and her symptom severity score was 21.  Five hours later at

11:00AM, Jennifer was given a third SCAT2 test. Her total number of symptoms was a 19 (over double her baseline test) and her symptom severity score was back to a 40 (approximately double her baseline test).

105.   On October 8, 2011, Jennifer played in a field hockey game at Holy Cross.

106.   On October 12, 2011, Jennifer continued to complain of dizziness and difficulty seeing upon onset of activity.

107.   On October 16, 2011, Jennifer sat out of her game and was told by Dr. Williams, "I don't know what's wrong with you."

108.   On October 22, 2011, Jennifer played in a game against Bucknell College.

109.   On October 23, 2011, Jennifer played in a game against Georgetown University.

110.   On October 24, 2011, Jennifer informed Ms. Earls that she "still feel kind of weird after playing this weekend."

111.   On October 30, 2011, Jennifer played in a game at Lafayette College.

112.   On November 4, 2011, Jennifer played in a game against Bucknell College for the Patriot League Semifinals.

113.   From September 23, 2011 through the November 4, 2011 Patriot League Semifinals, Jennifer participated in the vast majority of team practices and workouts without being advised to sit out while her symptoms persisted.

114.   From September 23, 2011 through the November 4, 2011, Jennifer continued to experience the same physical exertion and contact and head traumas as she had equated with the initial blow suffered during the September 23, 2011.

115.   From September 23, 2011 through the remainder of her junior year, upon information and belief, Jennifer's medical condition was discussed among Defendant AU's agents,

22

servants, and/or employees including but not limited to Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams.

116.    Over Thanksgiving Break, Jennifer was still suffering from the symptoms that she explained to her trainer and saw her primary care doctor for the same complaints.

117.    On January 9, 2012, Jennifer was referred to Puneet Singh, D.O. in Pennsylvania by her PCP. Dr. Singh stated that Jennifer presented with "chief complaint of Dizziness, Fatigue and Memory Loss."

118.    Jennifer then underwent three spinal taps that showed no leak and was diagnosed with post concussive syndrome.

119.    On March 19, 2012, Jennifer presented to MedStar National Rehabilitation with her chief complaint being of a concussion, and the records indicate that she presented "for post concussive syndrome that was diagnosed by Dr. Puneet Singh."

120.    On April 30, 2012, her diagnosis was confirmed at NRH and she was started on propranolol for preventative medication as well as Zoloft and given orders to see a neuropsychologist for testing.

121.    Jennifer also began receiving treatment at the Brain Wellness & Biofeedback Center of Washington on March 30, 2012.

122.    Eventually, Jennifer did not finish out the school year due to the injuries she had suffered.

123.    In June of 2012, Jennifer began treatment with Jon Bentz, PH.D. who diagnosed her with:

| Axis I: | Cognitive disorder NOS, post concussion syndrome |
|---|---|
| Axis II: | No diagnosis |
| Axis III: | Suspected cerebral concussion (9/25/2012)[sic 2011] |
| Axis IV: | Educational problems |

23

Axis V:    51-60 moderate symptoms.

124.    Dr. Bentz then conducted a neuropsychological evaluation. As a result of the testing, it was recommended that she not return to school at that time; and she did not.

125.    In June of 2012, Jennifer began treating with physicians at Stephen G. Diamantoni & Associates including William Vollmer, M.D. and Zachary Geidel, M.D.

126.    On August 22, 2012, Jennifer began treatment at LG Health Campus – PRC for outpatient rehabilitation services.

127.    In January of 2013, Dr. Vollmar wrote to Defendant AU's administration seeking a "retroactive medical withdrawal" from her classes in the spring semester of 2012 due to the fact that she had received failing grades because she was unable to finish the school year because of her post concussion syndrome "that has been significant."

128.    In April of 2013, Dr. Vollmar wrote a letter directly to Coach Jennings in which he stated that "she should not have to concentrate many hours on managing the team that she could be placing on rest and continuing her education…as her physician, I am saying that she cannot be the manager of the field hockey team, because I believe this will continue to risk her academic advancement."

129.    Upon information and belief, this letter was required due to the fact that Defendant AU and its administration, including Mr. Jennings, were requiring that Jennifer be the manager of the field hockey team in order to maintain her scholarship.

130.    On October 25, 2013, Jennifer was seen by Sami L. Kellah, M.D., a neurologist at the University of Pennsylvania Presbyterian Medical Center. Dr. Kellah informed Jennifer that she was still suffering from post concussion syndrome and has residual post concussion deficits and depression.

24

131. In 2013, Jennifer resumed her studies at AU. However, due to her mental deficiencies and injuries, she could only take two classes a semester.

132. Jennifer continues to undergo treatment for her post concussion syndrome and residual post concussion deficits and depression and will continue to incur such economic damages for the foreseeable future, including but not limited pharmacological management, life care planning, future medical treatment, and other forms of economic damages.

133. Jennifer has incurred and will continue to incur damages to her health and well being including but not limited to nutritional damages as, upon information and belief, the injuries alleged have caused her to unintentionally lose significant weight.

134. Jennifer has incurred and will continue to incur for the foreseeable future damages to her earning capacity.

135. Jennifer has also incurred and continues to incur damages to her educational development.

136. Jennifer also suffered and will continue for the foreseeable future to suffer non-economic damages including but not limited to deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

## COUNT I
### (Negligence)
### Bradley vs. NCAA

137. Plaintiff incorporates by referenced hereinafter all preceding paragraphs.

138. Defendant NCAA undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley.

139. Defendant NCAA further undertook and assumed a duty to protect student-athletes

25

from brain injuries. This duty has been repeated by the NCAA on numerous occasions, including to Plaintiff Jennifer Bradley, Congress and the members of the public. Defendant NCAA reaffirmed its duty to protect Plaintiff Jennifer Bradley and student-athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

140. Defendant NCAA either did not have the requisite knowledge and/or ability to undertake such a duty or failed through its actions and omissions in its undertaking of its duty.

141. Defendant NCAA acted negligently in its position as the regulatory body for college teams, including Defendant AU's field hockey team, and Plaintiff Jennifer Bradley. Defendant NCAA knew or should have known that its actions and/or inactions, in light of concussive and sub-concussive injuries made known to it, would cause harm to Plaintiff Jennifer Bradley.

142. Defendant NCAA was careless and negligent by breaching the duties of care it assumed for the benefit of Plaintiff Jennifer Bradley. Specifically, Defendant NCAA failed in its duties in the following ways:

     a. Failing to enforce the NCAA Constitution, By-laws and the Handbook;
     b. Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions, second-impact syndrome, and post-concussive syndrome;
     c. Failing to enforce the Plan;
     d. Failing to provide Plaintiff and her teammates with a safe environment;
     e. Failing to protect and enhance the physical and educational well-being of Plaintiff and other student-athletes;
     f. Failing to maintain institutional control over Defendant AU, the coaches, athletic trainers, and the athletic director;
     g. Failing to implement appropriate safety procedures and policies regarding concussion prevention;
     h. Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms;
     i. Failing to implement appropriate oversight over its member institutions in their implementation of Concussion Management Plans;
     j. Failing to implement appropriate requirements over its member institutions in their

26

hiring and training of appropriate medical personnel;

k. Failing to provide appropriate guidance to its member institutions on concussion management;

l. Failing to provide its student-athletes with reasonable protection to their physical and mental well-being;

m. Failing to safeguarding its student-athletes from preventable concussion and post-concussion injuries; and

n. Being otherwise negligent.

143. Plaintiff also asserts the doctrines of *respondeat superior*, *res ipsa loquitur*, and informed consent.

144. Plaintiff Jennifer Bradley relied upon Defendant NCAA to uphold its duties to her as a student-athlete. Plaintiff Jennifer Bradley relied on Defendant NCAA's superior knowledge and expertise, as well as its representations that it was looking out for her health and safety.

145. As a direct and proximate result of Defendant NCAA's negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

146. As a direct and proximate result of Defendant NCAA's negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

### COUNT II

27

**(Gross Negligence)**
**Bradley vs. NCAA**

147.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

148.    Defendant NCAA recklessly endangered Plaintiff Jennifer Bradley.

149.    Defendant NCAA undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley.

150.    Defendant NCAA further undertook and assumed a duty to protect student-athletes from brain injuries. This duty has been repeated by the NCAA on numerous occasions, including to Plaintiff Jennifer Bradley, Congress and the members of the public. Defendant NCAA reaffirmed its duty to protect Plaintiff Jennifer Bradley and student-athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

151.    Defendant NCAA knowingly, recklessly, and wantonly failed to undertake its duties through its actions and omissions. Specifically, Defendant NCAA failed in its duties in the following ways:

   a. Failing to enforce the NCAA Constitution, By-laws and the Handbook;
   b. Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions, second-impact syndrome, and post-concussive syndrome;
   c. Failing to enforce the Plan;
   d. Failing to provide Plaintiff and her teammates with a safe environment;
   e. Failing to protect and enhance the physical and educational well-being of Plaintiff and other student-athletes;
   f. Failing to maintain institutional control over Defendant AU, the coaches, athletic trainers, and the athletic director;
   g. Failing to implement appropriate safety procedures and policies regarding concussion prevention;
   h. Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms;
   i. Failing to implement appropriate oversight over its member institutions in their implementation of Concussion Management Plans;
   j. Failing to implement appropriate requirements over its member institutions in their hiring and training of appropriate medical personnel;

28

k. Failing to provide appropriate guidance to its member institutions on concussion management;

l. Failing to provide its student-athletes with reasonable protection to their physical and mental well-being;

m. Failing to safeguarding its student-athletes from preventable concussion and post-concussion injuries; and

n. Being otherwise negligent.

152. Plaintiff also asserts the doctrines of *respondeat superior*, *res ipsa loquitur*, and informed consent.

153. Plaintiff Jennifer Bradley relied upon Defendant NCAA to uphold its duty to her as a student-athlete.

154. As a direct and proximate result of Defendant NCAA's gross negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

155. As a direct and proximate result of Defendant NCAA's gross negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

156. Additionally, Plaintiff Jennifer Bradley seeks punitive damages to be determined by a jury.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

29

## COUNT III
### (Negligence)
### Bradley vs. The Patriot League and American University

157.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

158.    Defendants The Patriot League and American University, including their agents, servants, and employees (collectively hereinafter referred to as "School Defendants") undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating on their field hockey team, including Jennifer Bradley.

159.    School Defendants further undertook and assumed a duty to abide by the NCAA Constitution, Bylaws, Plan, and Handbook.

160.    School Defendants specifically undertook and assumed a duty to "taken reasonable precautions to minimize the risks of injury from athletics participation."

161.    School Defendants specifically undertook and assumed a duty to "protect the health of, and provide a safe environment for, each of its participating student-athletes."

162.    School Defendants further undertook and assumed a duty to protect student-athletes from brain injuries.

163.    School Defendants either did not have the requisite knowledge and/or ability to undertake such a duty or failed through their actions and/or inactions in their undertaking of their duties.

164.    School Defendants were careless and negligent by breaching the duties of care they assumed for the benefit of Plaintiff Jennifer Bradley.   Specifically, School Defendants failed in their duties in the following ways:

   a. Failing to abide by the NCAA Constitution, By-laws and the Handbook;
   b. Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions, second-impact syndrome, and post-concussive syndrome;

30

c. Failing to have a Concussion Management Plan;

d. Failing to have an appropriate Concussion Management Plan;

e. Failing to enforce the Plan;

f. Failing to provide Plaintiff and her teammates with a safe environment;

g. Failing to protect and enhance the physical and educational well-being of Plaintiff and other student-athletes;

h. Failing to maintain institutional control over its coaches, athletic trainers, and athletic director;

i. Failing to implement appropriate safety procedures and policies regarding concussion prevention;

j. Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms;

k. Failing to hire and train appropriate medical personnel;

l. Failing to provide appropriate guidance to its coaches, athletic trainers, athletic director, and student-athletes on concussion recognition, prevention, and management;

m. Failing to provide its student-athletes with reasonable protection to their physical and mental well-being;

n. Failing to safeguarding its student-athletes from preventable concussion and post-concussion injuries;

o. Failing to appreciate and recognize the complaints voiced by Plaintiff Jennifer Bradley; and

p. Being otherwise negligent.

165. Plaintiff also asserts the doctrines of *respondeat superior*, *res ipsa loquitur*, and

informed consent.

166. Plaintiff Jennifer Bradley relied upon School Defendants to uphold their duties to her as a student-athlete. Plaintiff Jennifer Bradley relied on School Defendants' superior knowledge and expertise, as well as their representations that they were looking out for her health and safety.

167. As a direct and proximate result of School Defendants' negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

31

168.    As a direct and proximate result of School Defendants' negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

## COUNT IV
### (Negligent Infliction of Emotional Distress)
### Bradley vs. All Defendants

169.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

170.    All Defendants undertook a duty to protect the physical and mental well being of Plaintiff Jennifer Bradley.

171.    As a result of the Defendants negligence and/or gross negligence stated *supra.*, Plaintiff Jennifer Bradley has and continues to suffer from severe emotional distress.

172.    As a direct and proximate result of the Defendants' negligence and/or gross negligence as stated *supra.*, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

173.    As a direct and proximate result of Defendants' negligence and/or gross negligence as stated *supra.*, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles,

32

pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

**COUNT V**
**(Fraudulent Misrepresentation)**
**Bradley vs. NCAA**

174.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

175.    Defendant NCAA represented to Plaintiff Jennifer Bradley and the public at large that it undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley; and that it undertook and assumed a duty to protect student-athletes from brain injuries.

176.    These representations were false.

177.    These representations were material to Plaintiff Jennifer Bradley and the public at large, in so far as she reasonable believed that those with superior knowledge were regulating, monitoring, and ensuring that she and all other collegiate athletes were participating in an institution of heightened skill and talent, of which the safety of the participates was an impotence to the governing body.

178.    Defendant NCAA, by and through its agents, servants, and employees' actions and/or inactions demonstrated that these representations were not being upheld and were no more than falsities utilized to placate to the public at large in order to increase public perception and monetary success.

33

179. Defendant NCAA by and through its agents, servants, and employees' actions and/or inactions made these false misrepresentations with the intent to deceive the public at large, including Plaintiff Jennifer Bradley.

180. Plaintiff Jennifer Bradley relied upon these misrepresentations and undertook continued participation in the NCAA's intercollegiate athletic program at Defendant AU.

181. As a direct and proximate result of Defendant NCAA's fraudulent misrepresentations, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

182. As a direct and proximate result of Defendant NCAA's fraudulent misrepresentations, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

## COUNT VI
### (Breach of Contract)
### Bradley vs. NCAA

183. Plaintiff incorporates by reference hereinafter all preceding paragraphs.

184. Plaintiff and Defendant NCAA entered into a contract whereby the NCAA agreed

34

to undertake and assume a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley; and agreed to undertake and assume a duty to protect student-athletes from brain injuries. In return, Plaintiff Jennifer Bradley agreed to abide by all rules and regulations promulgated by Defendant NCAA through its Constitution, Bylaws, and numerous authorizations required to participate in field hockey.

185. Plaintiff Jennifer Bradley adhered to and abided by all provisions of the contract.

186. Defendant NCAA breached the contract in failing to protect the physical and mental well-being of Plaintiff and in failing to protect Plaintiff from brain injuries.

187. Defendant NCAA profited from Plaintiff's unwavering commitment to this contract.

188. Plaintiff Jennifer Bradley, however, was severely and permanently injured from Defendant NCAA's breaches of the contract.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

## COUNT VII
### (Breach of Contract)
### Bradley vs. The Patriot League and American University

189. Plaintiff incorporates by reference hereinafter all preceding paragraphs.

190. Plaintiff and School Defendants entered into a contract whereby the School Defendants agreed to abide by all rules and regulations promulgated by Defendant NCAA through its Constitution, Bylaws, Concussion Management Plans, and numerous authorizations required to participate in field hockey including the appropriation of Plaintiff's likeness and achievements.

35

Plaintiff agreed in exchange for such promises by the Defendants to be granted financial aid, a scholarship, and to participate in intercollegiate sports.

191. Plaintiff Jennifer Bradley adhered to and abided by all provisions of the contract.

192. School Defendants breached the contract in failing to abide by all rules and regulations promulgated by Defendant NCAA through its Constitution, Bylaws, Concussion Management Plans, and numerous authorizations required to participate in field hockey including the appropriation of Plaintiff's likeness and achievements.

193. School Defendants profited from Plaintiff's unwavering commitment to this contract.

194. Plaintiff Jennifer Bradley, however, was severely and permanently injured from Defendant NCAA's breaches of the contract.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

### COUNT VII
#### (Medical Malpractice)
#### Bradley vs. All Defendants

195. Defendants The NCAA, The Patriot League, AU, Maryland Sports Medicine Center, David L. Higgins, M.D., P.C., David L. Higgins, and Aaron Williams, as well as through their agents, servants and employees, real or ostensible, (collectively referred to as "Defendants") owed a duty of care to the Plaintiff to act in the same or similar circumstances as a reasonably competent healthcare provider in the same or similar circumstances.

36

196.    Defendants, their agents, servants, and employees, associated with Plaintiff's care and treatment failed to meet the standard of care imposed upon them in the treatment of her beginning on or about September 23, 2011 and continuing thereafter.

197.    Each of the Defendants, their agents, servants and employees owed a duty Plaintiff to provide care and treatment consistent with the appropriate standard of care.

198.    Additionally, Defendant AU assumed a duty to provide the appropriate standard of care to its student-athletes, including Plaintiff, by acting as a participating member of the NCAA and Patriot League and by providing healthcare and healthcare providers to its student-athletes.

199.    Additionally, Defendant NCAA assumed a duty to provide the appropriate standard of care to its student-athletes, including Plaintiff, and to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Plaintiff.

200.    Additionally, Defendant NCAA further undertook and assumed a duty to protect student-athletes from brain injuries. This duty has been repeated by the NCAA on numerous occasions, including to Plaintiff Jennifer Bradley, Congress and the members of the public. Defendant NCAA reaffirmed its duty to protect Plaintiff Jennifer Bradley and student-athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

201.    Additionally, Defendant The Patriot League undertook and assumed a duty to provide the appropriate standard of care to its student-athletes, including Plaintiff, and to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Plaintiff in stating, among other things, that "Patriot League institutions are expected to abide by all rules and procedures set forth in both the NCAA and Patriot League Manuals."

202.    Defendants Williams, Higgins, Higgins, P.C. and Maryland Sports Medicine

Center were required to adhere to the standard of care as healthcare professionals caring for

Plaintiff.

203.    Defendants, their agents, servants, and employees each had a duty to provide and

uphold the standard of care in treating Plaintiff.

204.    Defendants, their agents, servants, and employees, did not employ the requisite

degree of skill and care required of them, as was their duty, while Plaintiff was in their care.

Defendants thereby breached their duties of care owed to Plaintiff including, but not limited to,

the following:

- a. Failure to appreciate the injuries complained of by Plaintiff after suffering the initial blow to her head on or about September 23, 2010;
- b. Failure to timely and appropriately diagnose Plaintiff with a concussion;
- c. Failure to timely and appropriately treat and manage Plaintiff's concussion;
- d. Failing to implement appropriate safety procedures and policies regarding concussion prevention, including implementing such procedures and policies for Plaintiff;
- e. Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms including Plaintiff;
- f. Failing to hire and train appropriate medical personnel;
- g. The Defendants were otherwise negligent;
- h. Plaintiff also relies on *res ipsa loquitur, respondeat superior,* and lack of informed consent.

205.    As a direct and proximate result of the aforesaid negligence of the Defendants,

Plaintiff sustained serious and disabling damage to her body and nervous and cognitive system,

including but not limited to post-concussive syndrome, prolonged residual post-concussion

syndrome deficits and depression, and related injuries and damages; she has in the past and will in

the future incur medical, healthcare, and other expenses; she has in the past suffered and will in

the future continue to suffer loss of earnings and impairment of earning capacity; she has suffered

38

and will continue to suffer pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement, all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

Dated: October 17, 2014

Respectfully submitted,

PAULSON & NACE, PLLC

Matthew A. Nace, Bar No. 1011968
1615 New Hampshire Ave., NW
Washington, DC 20009
202-463-1999 – Telephone
202-223-6824 – Facsimile
man@paulsonandnace.com
*Counsel for Plaintiff*

## Jury Demand

Plaintiff, by and through the undersigned counsel and pursuant to Rule 38 of the District of Columbia Rules of Civil Procedure, hereby demands trial by jury of all issues in this matter.

Matthew A. Nace

39

# EXHIBIT 27

1             IN THE CIRCUIT COURT OF THE STATE OF OREGON

2                  IN THE COUNTY OF MULTNOMAH

3

4                                           **14CV12218**

5 ZACHARY H. WALEN,

                                   CASE NO.

6                    Plaintiff,

                                   COMPLAINT

7                     v.

8

9 PORTLAND STATE UNIVERSITY,

OREGON HEALTH AND SCIENCE            **DEMAND FOR JURY TRIAL**

10 UNIVERSITY AND THE NATIONAL

COLLEGIATE ATHLETIC                   **NOT SUBJECT TO MANDATORY**

11 ASSOCIATION, NIGEL BURTON,           **ARBITRATION**

DUANE DUEY AND DR. CHARLES

12 WEBB,                               **AMOUNT OF PRAYER: $5,000,000**

                                      **ORS 21.160(1)(D)**

13                    Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.     PARTIES, JURISDICTION, AND VENUE .............................................. 2

III.    BACKGROUND AND SERIOUS NATURE OF CONCUSSIONS .................. 4

    A.      What Is A Concussion? ................................................................. 4

        1.      Medical description. ............................................................. 4

        2.      How concussions occur in sports. ....................................... 7

        3.      Metabolic changes. ............................................................. 7

        4.      Rest is the hallmark of concussion therapy ....................... 9

    B.      Post-Concussion Syndrome ......................................................... 9

IV.     THE CONSENSUS STANDARD FOR PROPER CONCUSSION MANAGEMENT ..... 9

V.      THE PROPER TESTING FOR CONCUSSION IN SPORT ........................... 12

    A.      Neuropsychological Testing ....................................................... 12

    B.      Baseline Testing .......................................................................... 13

VI.     PSU'S ROLE AS AN NCAA DIVISION-I SCHOOL .............................. 13

VII.    THE NCAA MANDATES SCHOOLS TO HAVE A CONCUSSION MANAGEMENT PLAN IN PLACE .......................................................... 14

VIII.   PSU'S REFUSAL TO FOLLOW A CONCUSSION MANAGEMENT PLAN THAT WAS CONSISTENT WITH THE NCAA CONSTITUTION AND GUIDELINES WAS A FORESEEABLE AND SIGNIFICANT BREACH IN THE INSTITUTION'S DUTY TO PROVIDE A SAFE ENVIRONMENT FOR ITS STUDENT-ATHLETES .................... 17

    A.      PSU's Concussion Management Plan should follow the NCAA Constitution and Guidelines ....................................................... 17

    B.      PSU failed to follow a Concussion Management Plan that was consistent with the NCAA Constitution and Guidelines ............ 18

IX.     OHSU FAILED IN ITS DUTY TO PROVIDE APPROPRIATE MEDICAL CARE BY NOT PROPERLY MONITORING ZACH'S POST-CONCUSSION REHABILITATION AND BY NOT KEEPING ACCURATE RECORDS OF THIS SERIOUS INJURY ..................... 19

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

X.    THE NCAA HAS ASSUMED A DUTY TO ENSURE A SAFE PLAYING ENVIRONMENT FOR STUDENT-ATHLETES, YET IT HAS FAILED TO TAKE REASONABLE PRECAUTIONS TO ENFORCE ITS HEALTH AND SAFETY REGULATIONS AGAINST MEMBER INSTITUTIONS ...................................................................................19

XI.   ZACH WALEN'S CONCUSSION AND POST-CONCUSSION TREATMENT..........21

    A.    Zach Walen's Concussion...............................................................22

    B.    Zach's Post Concussion Experience ...............................................27

    C.    PSU Revocation of Zach's Scholarship.........................................27

    D.    Effect of Multiple Concussions on Zach .......................................28

XII.   CLAIMS FOR RELIEF ...........................................................................27

NEGLIGENCE ON BEHALF OF PSU, MR. BURTON AND MR. DUEY .............................28

NEGLIGENCE ON BEHALF OF OHSU AND MEDICAL MALPRACTICE ON BEHALF OF DR. WEBB ..........................................................................................................31

NEGLIGENCE ON BEHALF OF THE NCAA.....................................................................32

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ON BEHALF OF ALL DEFENDANTS ........................................................................................................32

XIII.  DAMAGES..........................................................................................33

XIV.  PRAYER..............................................................................................34

Page ii – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

# I.    INTRODUCTION

1.

A concussion is a serious, traumatic, brain injury that if mistreated can have life-long consequences.  Those who manage and regulate the play of college football therefore have a duty to ensure that the football players are not exposed to unnecessary harm.  Since 2004, if not before, significant progress has been made by the medical community and some football authorities regarding the understanding, identification and treatment of concussions.  This progress has resulted in the recognition and adoption by many institutions of post-concussion best practices protocols whose overarching objective is to preserve the safety of the athlete.  However, these best practices protocols are only useful when adhered to and enforced.

2.

Plaintiff Zach Walen, as a freshman in college, was quickly becoming one of the stars on the Portland State University Vikings football team.  Zach suffered a concussion early on in his first season and did not receive the post-concussion testing and care mandated by international best practices, the National Collegiate Athletic Association ("NCAA"), the NCAA Constitution and Portland State University's own policies and procedures.  Zach was cleared to return to play football before his concussion had resolved.  A violation of return-to-play rules is a serious and hazardous breach of concussion management protocol.  As a foreseeable result of this breach, Zach suffered additional concussive and subconcussive hits while his brain was still healing.  Zach now has a serious and permanent brain injury.

3.

There are three main reasons why Zach was allowed to return to play football when not medically cleared to do so.  First, Portland State University ("PSU") and its football coaching staff blatantly failed to follow PSU's own policies and procedures regarding the identification of concussions and post-concussion management.  Second, Dr. Charles Webb and the Oregon Health and Science University ("OHSU") clearly failed to provide the required post-concussion medical care, including vital

Page 1 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon  97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

1  follow-up visits and basic records management. Third, the NCAA failed in its duty to monitor, let alone

2  enforce, its recent legislation regarding concussions, thereby creating an environment where PSU could

3  and did become lax in following proper procedures for post-concussion care. As a result of the

4  negligence of PSU, OHSU and the NCAA, Zach has suffered serious and permanent neurological, brain,

5  mental and emotional damage. The economic and non-economic losses he has and will sustain will last

6  throughout his lifetime.

7                                    4.

8        Zach now brings these claims against PSU, OHSU and the NCAA and their agents ("the

9  Defendants") for negligence which caused, created or assisted in the occurrence of his concussion, and

10  the permanent harm he has suffered due to the mistreatment he received after the concussion was

11  sustained. He also brings claims against these Defendants for emotional distress.

12              **II.      PARTIES, JURISDICTION, AND VENUE**

13                                    5.

14        Plaintiff Zachary H. Walen, a former Portland State University football player, was born

15  January 2, 1994, and is currently 20 years old. Zach resides in the State of Oregon.

16                                    6.

17        Defendant Portland State University is a public co-educational research university. PSU is a

18  public institution and part of the Department of Higher Education, a division of the State of Oregon.

19  PSU is located in the City of Portland, Multnomah County, Oregon.

20                                    7.

21        Defendant Oregon Health and Science University is a public corporation created by the State of

22  Oregon to carry out public missions and services pertaining to healthcare and research. OSHU is

23  located in the City of Portland, Multnomah County, Oregon.

24  / / / / /

25  / / / / /

26  / / / / /

Page 2 – COMPLAINT AND DEMAND FOR JURY TRIAL

8.

Defendant National Collegiate Athletic Association is a non-profit association that regulates college-level athletes and organizes the athletic programs of many colleges and universities in the United States and Canada. It is headquartered in Indianapolis, Indiana.

9.

At all times relevant to this action, Nigel Burton served as the Head Coach for the football team.

10.

At all times relevant to this action, Duane Duey was the Head Athletic Trainer for the PSU football team.

11.

At all times relevant to this action, Dr. Charles Webb was a physician of orthopedic medicine and Director of Sports Medicine at OHSU.

12.

At all times relevant to this action, Defendant PSU acted by and through authorized or ostensible agents, servants, and/or employees, including, but not limited to Nigel Burton and Duane Duey, all of whom were acting within the scope of their employment.

13.

At all times relevant to this action, Defendant OHSU acted by and through authorized or ostensible agents, servants, and/or employees, including, but not limited to Dr. Charles Webb, all of whom were acting within the scope of their employment.

14.

The names of these authorized or ostensible agents, servants, and/or employees are known to Defendant PSU and unknown to Plaintiff and include all personnel who provided athletic training, athletic and medical evaluation and monitoring, health care, and/or medical services to Zach Walen between the dates of March 2012 and today, relating to the brain injuries he sustained while a member of PSU's football team.

Page 3 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

15.

The names of these authorized or ostensible agents, servants, and/or employees are known to Defendant OHSU and unknown to Plaintiff and include all personnel who provided medical evaluation and monitoring, health care, and/or medical services to Zach Walen between the dates of March 2012 and today, relating to the brain injuries he sustained while a member of PSU's football team.

16.

Plaintiff has complied with all statutory notice requirements by providing written notice of this action to both Defendant OHSU and Defendant PSU.

17.

Because Defendant PSU and Defendant OHSU are considered public bodies and therefore subject to the Oregon Tort Claims Act, and because the individuals identified above were acting as agents, servants, or employees of PSU and OSHU, this Court has jurisdiction over this matter.

18.

Venue is proper with this Court as all allegations against Defendants occurred in the State of Oregon.

## III. BACKGROUND AND SERIOUS NATURE OF CONCUSSIONS

### A. What Is A Concussion?

#### 1. Medical description.

19.

Concussion or mild traumatic brain injury ("mTBI") is a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces. Although a concussion most commonly occurs after a direct blow to the head, it can occur after a blow elsewhere that is transmitted to the head. Concussions can be defined by the clinical features, pathophysiological changes and/or biomechanical forces that occur.

/ / / / /

/ / / / /

Page 4 – COMPLAINT AND DEMAND FOR JURY TRIAL

20.

Most commonly, a concussion is characterized by the rapid onset of cognitive impairment that is self-limited and spontaneously resolves. The acute symptoms of concussion, listed below, are felt in most instances to reflect a functional disturbance in cognitive function instead of structural abnormalities, which is why diagnostic tests such as magnetic resonance imaging ("MRI") and computerized tomography ("CT") scans are most often normal. These studies may have their role in assessing and evaluating the head-injured athlete whenever there is concern for the associated injuries of skull fracture, intracranial bleeding and seizures, when there is concern for structural abnormalities, or when the symptoms of an athlete persist or deteriorate.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Page 5 – COMPLAINT AND DEMAND FOR JURY TRIAL

21.

The Center for Disease Control ("CDC") and NCAA identify the following symptoms as being associated with concussions:



/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Page 6 – COMPLAINT AND DEMAND FOR JURY TRIAL

22.

The CDC and NCAA fact sheet states as follows with respect to symptoms:



## 2. How concussions occur in sports.

23.

Concussions occur when linear and rotational accelerations are impacted to the brain from either direct impacts to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown athletes can receive more than 1,000 impacts greater than 10 G force. This is slightly more force than a fighter pilot receives doing maximal maneuvers. The majority of football-related hits to the head exceed 20 G force.

## 3. Metabolic changes.

24.

After concussion, there is a significant K+ efflux from cells, owing to mechanical membrane disruption, axonal stretch, and opening of voltage-dependent K+ channels. Nonspecific depolarization of

Page 7 – COMPLAINT AND DEMAND FOR JURY TRIAL

neurons leads to release of the excitatory neurotransmitter glutamate, which compounds the K+ flux by activating N-methyl-D-aspartate ("NMDA") and D-amino-3-hydroxy-5-methyl-4-isoxazole-propionic acid ("AMPA") receptors. In an attempt to restore the membrane potential, the NA+, K+-ATPase works overtime, consuming increasing amounts of ATP. To meet these elevated ATP requirements, there is a marked up regulation of cellular glycolysis, which occurs within minutes after a concussion. During this period of hyperglycolysis, there is a commensurate increase in lactate production.

25.

In addition to K+ efflux, NMDA receptor activation permits a rapid and sustained influx of Ca2+. Elevated intracellular Ca2+ can be sequestered in mitochondria, eventually leading to dysfunction of oxidative metabolism and further increasing the cell's dependence on glycolysis-generated ATP. Calcium accumulation may also activate proteases that eventually lead to cell damage or death, and, in axons, excess Ca2+ can lead to dysfunction and breakdown of neurofilaments and microtubules.

26.

These ionic shifts and acute alterations in cellular energy metabolism occur in a posttraumatic setting where cerebral blood flow ("CBF") is diminished, although not to ischemic levels. Rather, it is the mismatch between glucose delivery and glucose consumption that may predispose an athlete to secondary injury. CBF may remain depressed for several days after TBI, possibly limiting the ability of the brain to respond adequately to subsequent perturbations in energy demand.

27.

After the initial period of profound post-injury ionic disturbance and resultant increase in glucose metabolism, the local cerebral metabolic rate for glucose decreases significantly below baseline, as does oxidative metabolism. Then gradually, in most instances of concussion, these metabolic changes revert to baseline over a 10 day period.

/ / / / /

Page 8 – COMPLAINT AND DEMAND FOR JURY TRIAL

### 4. Rest is the hallmark of concussion therapy.

28.

Physical and cognitive rest is the hallmark of initial concussion management. Either physical or cognitive exertion may greatly exacerbate concussion symptoms and retard recovery. This is a major problem for student-athletes who need to perform in the classroom yet may be prevented from doing so by their concussion.

### B. Post-Concussion Syndrome

29.

Post-concussion Syndrome ("PCS") is a serious condition. It is a diagnosis used to describe the range of residual symptoms that persist 12 months and beyond, sometimes years, after the injury. Sufferers often report memory and socialization problems, sleep disturbances, reduced intellectual capacity, lack of concentration, fatigue, frequent headaches and personality changes. Often, despite several of these chronic symptoms, there is no evidence of brain abnormality from conventional structural neuroimaging tests, such as CT scans and MRIs. Consequently, the person can be erroneously labeled as having a short fuse. PCS can be thought of as a very severe concussion and its presence should be recorded in the medical record. Persistent PCS beyond a year is felt by some to be a contraindication to ever return to a collision sport. While most cases of PCS eventually recover, not every case does. The connection between persistent cases of PCS and chronic traumatic encephalopathy at this time is not clear.

### IV. THE CONSENSUS STANDARD FOR PROPER CONCUSSION MANAGEMENT

30.

There is a significant amount of consensus on how best to manage the risk of concussions in athletes, as well as how to provide the best post-concussion care. The Zurich Protocol[1] and the 2004

---

[1] The most widely recognized set of concussion management standards is the Consensus Statement on Concussion in Sport: The 3rd International Conference on Concussion in Sport Held in Zurich, November 2008 ("Zurich Protocol"). The guidelines were developed for use by physician's therapists, athletics trainers health professionals, coaches and others involved in the care of injured athletes. P. McCrory, et al. "Consensus Statement on Concussion in Sport – the 3rd International Conference on

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

NATA Position Statement[2] are two of the leading examples of wide-based, international, consensus on concussion management ("International Consensus Statements"). Each example states that athletes suffering concussion symptoms should never be returned to play in the same game, and that coaches, players, trainers and physicians should follow a return-to-play policy that includes: a systematic and graded return to exertion following injury; systematic reevaluation of symptoms following each exertional state; a collective understanding that the patient is completely asymptomatic at rest, asymptomatic with exertion; and the student-athlete has intact neurocognitive performance prior to final clearance.

31.

Athletic trainers and/or team physicians are also required to monitor an athlete with a concussion at 5-minute intervals from the time of the injury until the athlete's condition completely clears or the athlete is referred for further care. If any of the following symptoms is experienced by a student-athlete on the day of injury, then the best practice is to refer the athlete to a physician.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Concussion In Sport, Held in Zurich, November 2008," (2009) 16 *Journal of Clinical Neuroscience* 755, *available* at http://bjsm.bmj.com/content/47/5/250.full.

[2] The NATA position statement includes information and recommendations for certified athletic trainers, physicians and other medical professionals caring for athletes. Its recommendations are derived from the most recent scientific and clinic-based literature on sport-related concussion. K. Guzkiewicz, et. al., "National Athletic Trainers Association Position Statement: Management of Sport-Related Concussion," (2004) 39(3) *Journal of Athletic Training* 280-97, *available* at http://www.nata.org/sites/default/files/MgmtOfSportRelatedConcussion.pdf.

Page 10 – COMPLAINT AND DEMAND FOR JURY TRIAL

| Day-of-injury referral | Delayed referral (after the day of injury) |
|---|---|
| 1. Loss of consciousness on the field | 14. Motor deficits subsequent to initial on-field assessment |
| 2. Amnesia lasting longer than 15 min | 15. Sensory deficits subsequent to initial on-field assessment |
| 3. Deterioration of neurologic function* | 16. Balance deficits subsequent to initial on-field assessment |
| 4. Decreasing level of consciousness* | 17. Cranial nerve deficits subsequent to initial on-field assessment |
| 5. Decrease or irregularity in respirations* | 18. Postconcussion symptoms that worsen |
| 6. Decrease or irregularity in pulse* | 19. Additional postconcussion symptoms as compared with those on the field |
| 7. Increase in blood pressure | 20. Athlete is still symptomatic at the end of the game (especially at high school level) |
| 8. Unequal, dilated, or unreactive pupils* | |
| 9. Cranial nerve deficits | |
| 10. Any signs or symptoms of associated injuries, spine or skull fracture, or bleeding* | |

*Requires that the athlete be transported immediately to the nearest emergency department.

(Delayed referral, after the day of injury)
1. Any of the findings in the day-of-injury referral category
2. Postconcussion symptoms worsen or do not improve over time
3. Increase in the number of postconcussion symptoms reported
4. Postconcussion symptoms begin to interfere with the athlete's daily activities (ie, sleep disturbances or cognitive difficulties)

11. Mental status changes: lethargy, difficulty maintaining arousal, confusion, or agitation*
12. Seizure activity*
13. Vomiting

32.

Once the symptoms have been eliminated or have subsided, the student-athlete may still be in a concussed state. In these scenarios, neuropsychological testing is key in demonstrating whether their cognitive abilities have returned to pre-injury levels.

33.

Without subsequent neuropsychological tests post-concussion, it is very difficult for a physician or anyone else to determine when a patient has recovered or reached baseline. And returning a student-athlete to play before they are fully recovered negligently puts them at risk for permanent brain injury. PSU's failure to require a second neuropsychological test for Zach before he was allowed to return to play was against the International Consensus Statements and its own internal instructions.

/ / / / /
/ / / / /
/ / / / /
/ / / / /

Page 11 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

## V.     THE PROPER TESTING FOR CONCUSSION IN SPORT

**A.     Neuropsychological Testing**

34.

The application of neuropsychological ("NP") testing in concussion management has been shown to be of clinical value and contributes significant information in concussion evaluation. Both the National Athletic Trainers' Association ("NATA") Position Statement and the Zurich Protocol provide that neuropsychological testing is one of the cornerstones of appropriate concussion management.

35.

Although in most cases cognitive recovery largely overlaps with symptom recovery, it has been demonstrated that cognitive recovery may occasionally precede or, more commonly, follow clinical symptom resolution. In other words, the student exhibits little to no symptoms but may still be concussed. This suggests that the assessment of cognitive function should be an important component in the overall assessment of concussion and in particular, any return-to-play protocol.

36.

Neuropsychological testing is especially critical in athletes who might have a proclivity to minimize symptoms–whether because of pressure from a coach, to save their spot on the roster, or to protect their scholarship. Neurocognitive testing, with or without a baseline available, can uncover deficits that would alert a trained clinician that recovery had not occurred and would then lead to prudent management of the concussion.

37.

PSU requires that its football student-athletes undergo a clinical neurological assessment (including assessment of their cognitive function) as part of their overall health and safety management. This will normally be done by the treating physician often in conjunction with computerized neuropsychological screening tools.

/ / / / /

/ / / / /

**Law Office of Robert Beatty-Walters**
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

**B.    Baseline Testing**

38.

International standards for treating concussions recognize baseline testing as an essential tool. While normative data is available it is recognized that it is best to compare one's performance to one's own baseline. This is true for neuropsychological testing, balance testing, or other aspects of the neurological examination. For instance, if one's balance or intellect is extremely superior, this athlete could be impaired and yet score in the average range. Only by having a baseline in the superior range would one see this deterioration. PSU provided Zach with a baseline testing in the summer of 2012.

## VI.    PSU'S ROLE AS AN NCAA DIVISION-I SCHOOL

39.

As a member of the NCAA, PSU was obligated to help protect the health and safety of its student-athletes.

40.

As a member of the NCAA, PSU also agreed to abide by the NCAA Constitution.

41.

Article 2.2 of the NCAA Constitution provides information regarding PSU's duty to student-athletes like Zach and its "Principle of Student-Athlete Well-Being" provides in pertinent part:

**2.2 The Principle of Student-Athlete Well-Being**

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. *(Revised: 11/21/05.)*

* * *

**2.2.3 Health and Safety.** It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. *(Adopted: 1/10/95.)*

/ / / / /

/ / / / /

/ / / / /

Page 13 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

42.

The NCAA Constitution also mandates that each member institution establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

## VII. THE NCAA MANDATES SCHOOLS TO HAVE A CONCUSSION MANAGEMENT PLAN IN PLACE

43.

On April 29, 2010, the NCAA Executive Committee adopted a Concussion Management Policy. The Concussion Management Policy was adopted as section 3.2.4.16 of the NCAA Constitution.[3] The Concussion Management Policy required member schools, including PSU, to have a Concussion Management Plan in place for all sports. Each plan must have the following elements:

### NCAA Adopted Concussion Management Plan Legislation

**Concussion Management Plan.** An active member institution shall have a concussion management plan for its student-athletes. The plan shall include, but is not limited to, the following:

(a) An annual process that ensures student-athletes are educated about the signs and symptoms of concussions. Student-athletes must acknowledge that they have received information about the signs and symptoms of concussions and that they have a responsibility to report concussion-related injuries and illnesses to a medical staff member;

(b) A process that ensures a student-athlete who exhibits signs, symptoms or behaviors consistent with a concussion shall be removed from athletics activities (e.g., competition, practice, conditioning sessions) and evaluated by a medical staff member (e.g., sports medicine staff, team physician) with experience in the evaluation and management of concussions;

(c) A policy that precludes a student-athlete diagnosed with a concussion from returning to athletic activity (e.g., competition, practice, conditioning sessions) for at least the remainder of that calendar day; and

(d) A policy that requires medical clearance for a student-athlete diagnosed with a concussion to return to athletics activity (for example, competition, practice, conditioning sessions) as determined by a physician (e.g., team physician) or the physician's designee.

**3.2.4.16.1 Effect of Violation.** A violation of Constitution 3.2.4.16 shall be considered an institutional violation per Constitution 2.8.1; however, the violation shall not affect the student-athlete's eligibility.

/ / / / /

---

[3] In subsequent years the NCAA published the Concussion Management Policy under section 3.2.4.17.

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

44.

The NCAA chair advised athletic trainers that the NCAA's Executive Committee had adopted the Concussion Management Policy as part of NCAA Legislation on April 30 2010. Trainers were also provided a copy of the Recommended Best Practices for a Concussion Management Plan for all NCAA Institutions.

45.

The Sports Medicine Handbook is published on an annual basis by the NCAA to provide guidelines for sports medicine care for student-athletes. In the 2012-2013 Sports Medicine Handbook, the NCAA published the following best practices:

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Page 15 – COMPLAINT AND DEMAND FOR JURY TRIAL

Concussion or Mild Traumatic Brain Injury

**In Addition to the Executive Committee Policy Requirements, Additional Best Practices for a Concussion Management Plan Include, but are not Limited to:**

1. Although sports currently have rules in place, athletics staff, student-athletes and officials should continue to emphasize that purposeful or flagrant head or neck contact in any sport should not be permitted and current rules of play should be strictly enforced.

2. Institutions should have on file and annually update an emergency action plan for each athletics venue to respond to student-athlete catastrophic injuries and illnesses, including but not limited to, concussions, heat illness, spine injury, cardiac arrest, respiratory distress (e.g., asthma), and sickle cell trait collapses. All athletics healthcare providers and coaches (including strength and conditioning staff) should review and practice the plan at least annually.

3. Institutions should have on file an appropriate healthcare plan that includes equitable access to athletics healthcare providers for each NCAA sport.

4. Athletics healthcare providers should be empowered to have the unchallengeable authority to determine management and return-to-play of any ill or injured student-athlete, as the provider deems appropriate. For example, a countable coach should not serve as the primary supervisor for an athletics healthcare provider, nor should the coach have sole hiring or firing authority over a provider.

5. The concussion management plan should outline the roles of athletics healthcare staff (e.g., physician, certified athletic trainer, nurse practitioner, physician assistant, neurologist, neuropsychologist). In addition, the following components have been specifically identified for the collegiate environment:

   a. Institutions should ensure that coaches have acknowledged that they understand the concussion management plan, their role within the plan and that they received education about concussions.

   b. Athletics healthcare providers should practice within the standards as established for their professional practice (e.g., physician, certified athletic trainer, nurse practitioner, physician assistant, neurologist, neuropsychologist).

   c. Institutions should record a baseline assessment

for each student-athlete before the first practice in the sports of baseball, basketball, diving, equestrian, field hockey, football, gymnastics, ice hockey, lacrosse, pole vaulting, rugby, soccer, softball, water polo and wrestling, at a minimum. The same baseline assessment tools should be used post-injury at appropriate time intervals. The baseline assessment should consist of one or more of the following areas of assessment.

   1) At a minimum, the baseline assessment should consist of the use of a symptoms checklist and standardized cognitive and balance assessments [e.g., SAC; SCAT; SCAT II; Balance Error Scoring System (BESS)].

   2) Additionally, neuropsychological testing (e.g., computerized, standard paper and pencil) has been shown to be effective in the evaluation and management of concussions. The development and implementation of a neuropsychological testing program should be performed in consultation with a neuropsychologist who is in the best position to interpret NP tests by virtue of background and training. However, there may be situations in which neuropsychologists are not available and a physician experienced in the use and interpretation of such testing in an athletic population may perform or interpret NP screening tests.

   d. The student-athlete should receive serial monitoring for deterioration. Athletes should be provided with written instructions upon discharge, preferably with a roommate, guardian or someone who can follow the instructions.

   e. The student-athlete should be evaluated by a team physician as outlined within the concussion management plan. Once asymptomatic and post-exertion assessments are within normal baseline limits, return-to-play should follow a medically supervised stepwise process.

6. Institutions should document the incident, evaluation, continued management and clearance of the student-athlete with a concussion.

*For references, visit www.NCAA.org/health safety.*

46.

On information and belief, the April 30, 2010 notification, as well as the 2012-2013 Sports Medicine Handbook, was received by PSU and/or Nigel Burton and/or Duane Duey.

/ / / / /

Page 16 – COMPLAINT AND DEMAND FOR JURY TRIAL

47.

As a result, PSU, its agents and employees knew of the serious nature of concussions and the need to recognize, document, and treat student-athletes suffering from concussions. PSU, its agents and employees also knew that a Concussion Management Plan was required and that a failure to adopt a Plan consistent with the elements outlined in the legislation was a violation of the NCAA Constitution.

## VIII. PSU'S REFUSAL TO FOLLOW A CONCUSSION MANAGEMENT PLAN THAT WAS CONSISTENT WITH THE NCAA CONSTITUTION AND GUIDELINES WAS A FORESEEABLE AND SIGNIFICANT BREACH IN THE INSTITUTION'S DUTY TO PROVIDE A SAFE ENVIRONMENT FOR ITS STUDENT-ATHLETES

### A. PSU's Concussion Management Plan should follow the NCAA Constitution and Guidelines

48.

In addition to section 3.2.4.16 of the NCAA Constitution, the NCAA provided member institutions with a set of Concussion Guidelines. The NCAA Concussion Guidelines state that institutions should make their concussion management plans publicly available, either through printed material or through the institution's website.

49.

As of the date of this filing, PSU has not posted its Concussion Management Plan on its website. PSU has also not made the Plan publicly available through printed material.

50.

It is clear however that PSU was required to have a Concussion Management Plan in place as of 2010. Upon information and belief, PSU's Concussion Management Plan followed NCAA Concussion Guidelines.

51.

NCAA Concussion Guidelines include the following elements:

(a) Education: institutions must provide applicable educational material on concussions on an annual basis;

(b) Pre-Participation Assessment: institutions should conduct a pre-participation assessment on student-athletes that includes a concussion history, symptom evaluation, cognitive assessment and balance evaluation;

Page 17 – COMPLAINT AND DEMAND FOR JURY TRIAL

(c) <u>Recognition and Diagnosis of Concussion</u>: all student-athletes who experience signs, symptoms or behaviors consistent with a sport-related concussion must be removed from practice or competition and referred to an athletic trainer or team physician with experience in concussion management;

(d) <u>Post-Concussion Management</u>: when the rapid assessment of concussion is necessary, (e.g. during competition), symptom assessment, physical and neurological exam and balance exam should be performed. Brief concussion-evaluation tools such as the Standardized Concussion Assessment Tool 3 ("SCAT3") provide standardized methods that can be compared to a baseline evaluation; and

(e) <u>Return to Play</u>: once a student-athlete has returned to his/her baseline, the return-to-play decision is based on a protocol of a stepwise increase in physical activity that includes both an incremental increase in physical demands and contact risk supervised by a physician or a physician-designee. Most return-to -play protocols are similar to those in the Consensus Statement on Concussion in Sport guidelines [i.e., the Zurich Protocol], which outline a progressive increase in physical activity if the individual is at baseline before starting the protocol and remains at baseline throughout each step of the protocol.

**B.  PSU failed to follow a Concussion Management Plan that was consistent with the NCAA Constitution and Guidelines**

52.

As articulated below, PSU's failure to execute a second post-injury ImPACT (Immediate Post Concussion Assessment and Cognitive Testing) test to assess whether Zach had returned to baseline was against International Consensus Statements, NCAA Guidelines requiring an athlete to return to baseline, and PSU's very own Injury Evaluation. Without a second post-injury test, it is very difficult for a physician or a physician's designee to determine when a patient has recovered from his/her concussion. And returning a student-athlete to play before they are fully recovered negligently puts them at risk for permanent brain injury. This is why a second *passing* ImPACT test was required under Zach's Injury Evaluation. There is not one reason why a second ImPACT test was never performed.

53.

PSU's decision to return Zach to play before attaining the required medical clearance was also against International Consensus Statements, PSU's very own Injury Evaluation and a clear violation of

Page 18 – COMPLAINT AND DEMAND FOR JURY TRIAL

the NCAA Constitution. A distinct medical clearance requirement provides the needed check to ensure the health and safety of student-athletes and is required under section 3.2.4.16(d) of the NCAA Constitution. There is not one reason why Zach was allowed to play football without a medical clearance.

**IX.   OHSU FAILED IN ITS DUTY TO PROVIDE APPROPRIATE MEDICAL CARE BY NOT PROPERLY MONITORING ZACH'S POST-CONCUSSION REHABILITATION AND BY NOT KEEPING ACCURATE RECORDS OF THIS SERIOUS INJURY**

54.

All doctors must swear an oath to first, do no harm. This oath applies both at the diagnosis stage and regarding ongoing treatment. As a sports medicine doctor, Dr. Webb had a duty to keep track of a student-athlete's treatment needs. As stated in the NCAA Guidelines, and as set forth in the International Consensus Statements, Dr. Webb should have only cleared Zach if he was completely sure that the student is asymptomatic, at rest and at exertion for at least 24 hours.

55.

Further, Dr. Webb should have clearly communicated to Zach when he was medically cleared to return to play or identified which medical designee was eligible to make that decision. Dr. Webb failed to do either. Dr. Webb should have also ensured that if a medical release was created, that an accurate record of this release be maintained in Zach's medical file.

**X.   THE NCAA HAS ASSUMED A DUTY TO ENSURE A SAFE PLAYING ENVIRONMENT FOR STUDENT-ATHLETES, YET IT HAS FAILED TO TAKE REASONABLE PRECAUTIONS TO ENFORCE ITS HEALTH AND SAFETY REGULATIONS AGAINST MEMBER INSTITUTIONS**

56.

Those who organize and sponsor intercollegiate athletics have a duty to take reasonable precautions to minimize the risks of injury for athletes. The NCAA assumed a duty to protect and safeguard athletes when they agreed to tightly regulate all aspects of an intercollegiate sports league, including the creation of mandatory health and safety regulations. The enforcement of NCAA regulations is a reasonable precaution the organization can take to ensure the health and safety of

Page 19 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

1   student-athletes. The NCAA failed to enforce the Concussion Management Plan at PSU and therefore

2   contributed to Zach's permanent brain injury.

3                                              57.

4          While the NCAA has mandated Concussion Management Plans at all member institutions, the

5   NCAA has failed to provide any follow-up, monitoring or enforcement of these Plans. It is reasonable

6   for an organization who has assumed a duty to safeguard student-athletes to provide adequate

7   enforcement mechanisms to ensure compliance. The NCAA has already proven such a capacity to

8   investigate and penalize member institutions, as evidenced by the countless disciplinary hearings led by

9   the NCAA and the collection of millions of dollars in fines.

10                                             58.

11         However it is blatantly obvious that, here, the NCAA *has chosen* not to enforce its own rules

12  regarding concussion management. For instance, the NCAA has already admitted that member

13  institutions are not required to submit their Concussion Management Plans to the NCAA for review.

14  The NCAA has also acknowledged that it does not review or audit Concussion Management Plans to

15  ensure they were actually adopted or enforced. Further, there is no reporting mechanism in place to

16  monitor, let alone investigate, enforcement complaints. In fact, as of November 2013, no university has

17  ever been investigated, disciplined or penalized for violating any aspect of the Concussion Management

18  legislation. This type of lax enforcement sends a strong message to schools—the Concussion

19  Management Policy has no teeth.

20                                             59.

21         In spite of the seriousness of what is at issue—the safeguarding of the brains of young student-

22  athletes—NCAA officials have failed to address concerns about concussion management protocols at its

23  member institutions. Most surprisingly, the NCAA consciously decided to give coaches a free ride

24  when it concluded that it would not be appropriate for enforcement to suspend or otherwise penalize a

25  coach for concussion management violations, even if the student-athlete was required to participate after

26  having been diagnosed with a concussion.

Page 20 – COMPLAINT AND DEMAND FOR JURY TRIAL

60.

In contrast, coaches are routinely penalized for other minor, isolated, violations such as providing unauthorized meals to recruits and family members and sending impermissible text messages. Coaches also have the ability to self-report to the NCAA and have done so for even the most minor of violations, such as presenting impermissible iced decorations on a cookie cake given to prospects.

61.

The NCAA's refusal to adequately enforce its Concussion Management Policy sends the signal to coaches that these guidelines are not essential to the health and welfare of student-athletes. As such, the NCAA materially contributed to PSU's failure to create and execute a Concussion Management Plan that was consistent with the NCAA Constitution, which eventually resulted in Zach's permanent brain injury.

## XI.     ZACH WALEN'S CONCUSSION AND POST-CONCUSSION TREATMENT

62.

Prior to his injury Zach Walen had an excellent academic record. Not only did Zach succeed in Advanced Placement classes, but his GPA was over 3.75 for the majority of his junior and senior years of high school. Zach eventually decided to pursue a university degree in business. Zach was also a highly-talented athlete. He received a full athletic scholarship offer to play football at PSU.

63.

On February 1, 2012, Zach signed his letter of intent to play on PSU's football team, the Portland State Vikings.

64.

Zach attended PSU's Bridge Program during the summer of 2012. The Bridge Program required athletes to participate in two university-level summer school classes while maintaining an intensive football training schedule. Zach attended both classes regularly and completed all required assignments. Zach received a "B" grade in the introductory writing class, in spite of an extremely rigorous training schedule. Zach's first day of pre-season football boot camp was on or around August 8, 2012.

Page 21 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

65.

As noted above, PSU is required as a member of the NCAA to provide education to student-athletes on concussion symptoms and management. PSU provided this education in the form of a workshop on or around August 10, 2012.

66.

PSU also required that Zach sign a Portland State University Department of Athletics Concussion Waiver (the "Waiver"). The Waiver is consistent with NCAA Concussion Management Plan Legislation requirements (a)-(d) outlined above. The Waiver also references the Zurich Protocol, which as articulated above, serves as an International Consensus Statement on concussion in sport.

67.

ImPACT is a neuropsychological form of computerized exam used to successfully diagnose and manage concussions. If an athlete is believed to have suffered a head injury during competition, ImPACT is used to help determine the severity of head injury *and* when the injury has fully healed. The computerized program is given to athletes before the season has begun and the athlete is given a baseline score. Later on if a concussion is suspected, the athlete will be required to re-take the test. Physicians then evaluate both the pre-season and the post-injury test data to help determine the extent of the injury. Post-injury tests should occur between 48 and 72 hours after the suspected concussion. Zach completed an ImPACT test on August 6, 2012, and received a baseline score.

68.

At no time, did PSU provide Zach with a copy of PSU's Concussion Management Plan.

A.    **Zach Walen's Concussion**

69.

Zach Walen played his first game as a Viking on opening day, September 1, 2012. Unfortunately, Zach suffered a concussion after receiving a direct blow to the head during the fourth quarter of the game. He also suffered a hit to his leg, which later resulted in significant swelling.

/ / / / /

Page 22 – COMPLAINT AND DEMAND FOR JURY TRIAL

70.

The athletic staff at PSU failed to identify the concussion during or after the game. Zach only received medical attention when his parents, noticing that Zach was exhibiting symptoms consistent with a concussion, brought him to the hospital shortly after the game.

71.

At the hospital, Zach was diagnosed with a concussion. Duane Duey and other PSU football officials visited Zach while he was in the hospital.

72.

Later, PSU athletic staff member, Krista Francisco, prepared an Injury Evaluation based on the incident. The Injury Evaluation notes that Zach was experiencing memory loss, in the form of anterograde amnesia. The Injury Evaluation clearly stipulated that Zach could begin gradual progression back into football participation *only after he passed* an ImPACT test and was symptom free.

73.

On September 4, 2012, Zach took a post-injury ImPACT test. Zach failed the ImPACT test. He scored significantly below his baseline assessment in almost every single category, including the Cognitive Efficiency Index. In addition, Zach's total symptom score on September 4, 2012, was 29, which is more than triple his baseline symptom score of 9.

74.

On or around September 7, 2012, Zach was examined by Dr. Charles Webb, Director of Sport Medicine at OHSU. Mark Walen, Zach's father, was present during this examination. During the examination, Dr. Webb instructed Zach to perform various medical tests, which confirmed that he was still impaired by his concussion and therefore not ready to return to play.

75.

During the evaluation, Dr. Webb informed Mark and Zach that Zach's ability to return to play would be based on when Zach had met or surpassed his baseline ImPACT score. Dr. Webb also informed Zach that he was prohibited from returning to play without a proper medical clearance.

Page 23 – COMPLAINT AND DEMAND FOR JURY TRIAL

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

76.

Despite suffering a brain injury, Zach did not receive any further medical attention from Dr. Webb or any other physician for his concussion. Dr. Webb did, however, provide medical supervision relating to the treatment of Zach's leg injury.

77.

According to Dr. Webb and PSU's own Injury Evaluation, a passing ImPACT test was required for Zach to return to play. However, Zach was never asked to perform a second post-injury ImPACT test.

78.

According to the NCAA Constitution and Dr. Webb, a medical release is required for Zach to return to play. Zach was not provided with, nor is he aware of any written authorization from Dr. Webb or any other physician or physician designee that medically released him to play football.

79.

In spite of the absence of a medical release or a healthy ImPACT test, Nigel Burton, Duane Duey and other PSU officials found it appropriate to unilaterally clear Zach for football participation. Zach attended his first full practice on or around September 15, 2012. Zach returned to football competition on September 22, 2012, during a game against Southern Utah University. Over the rest of the 2012-2013 school year, Zach played approximately eight other games as a linebacker.

80.

During this time, Zach began to experience unexplained anger, along with overwhelming feelings of depression and anxiety. Zach also lost the ability to focus at school, displayed significantly impaired memory skills, and complained of crippling headaches. He also suffered balance trouble, increased numbness in his body and a chronic inability to sleep. He withdrew from the PSU Vikings football team in October 2013.

/ / / / /

/ / / / /

Page 24 – COMPLAINT AND DEMAND FOR JURY TRIAL

81.

Unfortunately, even after withdrawing from PSU's football team, Zach's symptoms did not improve.

82.

On November 4, 2013, Zach and Mark once again met with Dr. Webb. This was the first time Dr. Webb had seen Zach since September 2012, approximately 14 months earlier.

83.

At the end of the appointment, Dr. Webb suggested that it was possible that Zach was suffering from Post-Concussion Syndrome. He then went on to schedule vision, speech and memory tests in order to confirm his impression. He also referred Zach to Dr. Jonathan Crist, a sports medicine doctor at The Portland Clinic.

84.

Zach met with Dr. Crist on November 19, 2013, for further evaluation. Dr. Crist performed several tests, including an additional ImPACT test. Dr. Crist noted that due to the results of these tests, as well as the duration of Zach's symptoms, further evaluation was warranted before he could confirm Post-Concussion Syndrome as a diagnosis. Dr. Crist then proceeded to order an MRI, a Neuro-optometry Evaluation and a Neuropsychological Evaluation. He also referred Zach to Dr. Danielle Erb, a Physiatrist with the Brain Injury Rehabilitation Center at Progressive Rehabilitation Associates. Dr. Erb specializes in Post-Concussion Syndrome management.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Page 25 – COMPLAINT AND DEMAND FOR JURY TRIAL

85.

The Neuropsychological Evaluation took place on December 16, 2013, and was performed by Min D. Nguyen, a licensed psychologist. After the Evaluation, Dr. Nguyen diagnosed Zach with Major Neurocognitive Disorder with behavioral disturbance and Post-Concussion Syndrome. The Walen family was provided with the results of the Neuropsychological Evaluation and its diagnosis on or around December 26, 2013.

86.

On or around January 3, 2014, the Walen family received the results of Zach's Neuro-optometry Evaluation, which was performed by Dr. Bruce Wojciechowski. Dr. Wojciechowski diagnosed Zach with traumatic brain injury with secondary results of a convergence excess and spasm, diplopia, esophoria, deficiencies of smooth pursuit movements, saccadic eye movements and dizziness. Dr. Wojciechowski also noted that the symptoms Zach was experiencing were directly related to the traumatic brain injury that he sustained and these inefficiencies prevented him from performing at an academic level that he is capable of. Dr. Wojciechowski went on to conclude that the visual issues, along with the subsequent cognitive issues, as a result of his concussion make it extremely difficult for Zach to perform in school.

87.

On January 9, 2014, Mr. Walen met with Dr. Danielle Erb. During this meeting they discussed Zach's symptoms and Post-Concussion Syndrome. Dr. Erb declined to provide a diagnosis at that time, as she had not read the Neuropsychological Evaluation. Due to a very long waitlist to see Dr. Erb, Zach's next appointment occurred on March 3, 2014. He underwent a battery of tests that day, including occupational, physical, speech and mental health testing. It was during the performance of these tests that Zach realized that he had Post-Concussion Syndrome and that the symptoms he was experiencing stemmed from the brain injury he sustained while playing football.

/ / / / /

/ / / / /

Page 26 – COMPLAINT AND DEMAND FOR JURY TRIAL

88.

On May 28, 2014, Zach attended another appointment with Dr. Erb. It was then that Zach realized that his brain injury was permanent. During this appointment Dr. Erb disclosed that healing for a brain injury occurs during the first year post-concussion and therefore Zach couldn't expect his brain to heal 18 months after his original concussion.

**B.     Zach's Post Concussion Experience**

89.

Zach has continued to experience intense symptoms related to his brain injury. He experiences chronic headaches, memory loss, balance issues and blurred vision. His ability to concentrate has deteriorated and he suffers from bouts of anger, depression and anxiety. These symptoms came to a head in November 2013. Zach decided to embark on a battery of different therapies on a full-time basis and that these circumstances would require him to seek a medical withdrawal from PSU.

90.

Around the middle of November 2013, Zach petitioned the Deadline Appeals Board at PSU to request a medical withdrawal from the university.

91.

Indeed from September 2012 to this day, Zach has experienced and continued to experience concussion related symptoms, including but not limited to depression, multiple migraine headaches per week, fatigue, irritability, anxiety, balance trouble, suicidal thoughts, memory trouble and difficulty sleeping. It is unlikely that Zach will be able to return to his university studies on a full-time basis, if at all.

**C.     PSU Revocation of Zach's Scholarship**

92.

On June 26, 2014, Zach was informed by written letter that his athletic scholarship in the sport of football would not be renewed for the 2014-15 academic year.

/ / / / /

Page 27 – COMPLAINT AND DEMAND FOR JURY TRIAL

#### D.    Effect of Multiple Concussions on Zach

93.

Due to the fact that Zach returned to play before being medically cleared, Zach was at a greater risk of concussions and other brain injuries, and in fact has suffered long-term injury and illness as a direct result of playing when not medically cleared.

94.

Zach suffers from continuing headaches, lack of focus, short-term memory loss, balance issues, increased irritability, and loss of initiative.  He will continue to suffer from these and other effects of multiple concussions throughout his life.  He may also be at increased risk of suffering from early dementia, potential Parkinson's disease, suicidal ideation, loss of cognitive function, depression, and related mental health issues.

95.

Zach's long-term physical and mental effects resulting from the Defendants' negligence will require specialized testing that is not generally given or available to the public at large.

96.

Zach will also be at risk of further long-term physical and economic damages due to the Defendants' negligence.  He will also require future medical care, treatment, rehabilitation services, products, and accommodations according to contemporary scientific principles within the medical community that specialize in concussion injuries and their connection to memory loss, early-onset dementia, and other physical and mental effects.

### XII.    CLAIMS FOR RELIEF
### NEGLIGENCE ON BEHALF OF PSU, MR. BURTON AND MR. DUEY

97.

The preceding paragraphs are incorporated by reference as if fully set forth herein.

/ / / / /

Page 28 – COMPLAINT AND DEMAND FOR JURY TRIAL

98.

The negligence of Defendant PSU, as well as its agents Mr. Burton and Mr. Duey, including as being directly and vicariously liable upon the principles of agency, *respondeat superior*, corporate, and other liability, consists of one or more of the following:

      a.     The failure to recognize the signs and symptoms of concussions;

      b.     The failure to train staff to recognize the signs and symptoms of concussions;

      c.     The failure to ensure that PSU, NCAA Guidelines and International Consensus Guidelines and protocols for head trauma and concussions were implemented, followed and applied with respect to the PSU football program;

      d.     The failure to evaluate Zach Walen for concussions and head trauma;

      e.     The failure to treat Zach Walen after he suffered his concussion on September 1, 2012;

      f.     The failure to administer a concussion injury assessment to Zach Walen on multiple occasions;

      g.     The failure to employ and/or retain trained personnel able to provide care, treatment, training, management, and/or oversight to Zach Walen;

      h.     The failure to ensure personnel maintained the required knowledge, skills, and competence levels to provide proper, medical care, treatment, training, management, and/or oversight to Zach Walen;

      i.     The failure to oversee personnel in the execution of their duties to assure that Zach Walen received proper care, treatment, training, management, and/or oversight;

/ / / / /

/ / / / /

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

j.      The failure to have in place and/or to enforce policies and procedures regarding care, treatment, training, management, and/or oversight of student-athlete's status post-concussion, including Zach Walen;

k.      The failure to perform medical testing, evaluation, management, and/or oversight of Zach Walen;

l.      The failure to warn Zach Walen about the serious risks of playing football while still symptomatic after suffering a previous concussion;

m.      The failure to document all pertinent information surrounding Zach Walen's concussion, including, but not limited to:

     i.      The cause of injury;

     ii.      The initial signs and symptoms;

     iii.      The state of consciousness;

     iv.      The findings on testing of symptoms and neuropsychological function, noting any deficits compared with Zach Walen's baseline;

     v.      Instructions given to the coaches, athletic trainers, athlete, and/or parents;

     vi.      Recommendations provided by a physician, including when Zach Walen should return to participating in football;

     vii.      The date and time of the athlete's return to participation; and

     viii.      Relevant information on Zach Walen's history of prior concussions and associated recovery patterns.

n.      The failure to have in place and/or to enforce policies and procedures regarding the management of all sport-related concussions before the start of the athletic season;

o.      The failure to administer post-concussion testing on Zach Walen;

/ / / / /

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon 97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

p.     The failure to have in place policies and procedures for testing, evaluation, and clearance of student-athletes post-injury before returning to play, including Zach Walen;

q.     The failure to have in place and/or to enforce policies and procedures regarding all return-to-play decisions;

r.     The failure to make proper return-to-play decisions for Zach Walen;

s.     The failure to determine the severity and classification of concussions of injured athletes, including Zach Walen;

t.     The failure to perform a thorough clinical evaluation of Zach Walen before making a return-to-play decision;

u.     The failure to perform the clinical and cognitive testing required to objectively determine the injury severity of Zach Walen and his readiness to return to play;

v.     The failure to conduct a second post-injury ImPACT test before determining Zach Walen's recovery or his readiness to return to play;

w.     The failure to prevent Zach Walen from returning to play without allowing time to recover from his concussions; and

x.     The failure to recognize the risks of premature return-to-play status following a concussion, including but not limited to Second Impact Syndrome and Post-Concussion syndrome;

## NEGLIGENCE ON BEHALF OF OHSU AND MEDICAL MALPRACTICE ON BEHALF OF DR. WEBB

99.

The preceding paragraphs are incorporated by reference as if fully set forth herein.

100.

Defendant OHSU and Dr. Webb undertook a duty to provide a reasonable standard of medical care to Plaintiff Walen. Dr. Webb performed medical malpractice by failing to: follow-up with Zach

Page 31 – COMPLAINT AND DEMAND FOR JURY TRIAL

1  regarding his post-concussion care; ensure that a passing ImPACT test was completed; and provide the

2  necessary medical release so that Zach could return to play football. Defendant OHSU allowed Dr.

3  Webb to commit medical malpractice, thereby breaching its duty to provide a reasonable standard of

4  medical care for its patients. Because of OHSU and Dr. Webb's actions, Zach returned to play football

5  too early, which caused in his traumatic brain injury and Post-Concussion Syndrome. This harm is

6  measurable in damages, as Zach is now unable to finish university and requires a battery of medical

7  therapies and treatments.

8                    **NEGLIGENCE ON BEHALF OF THE NCAA**

9                                            101.

10     The preceding paragraphs are incorporated by reference as if fully set forth herein.

11                                           102.

12     The NCAA was founded on the principle to protect young people from the dangerous and

13  exploitative athletic practices of the time. Throughout the past several decades, the NCAA has

14  consistently and thoroughly regulated the health and safety of student-athletes through legislation that

15  mandates a wide variety of rules and regulations that member associations are required to follow. Thus,

16  the NCAA has assumed a duty to protect the safety, health and welfare of the student-athletes who

17  participate in the league.

18                                           103.

19     The NCAA breached its duty to Zach Walen by:

20          a.      Failing to adopt best concussion management practices in a timely fashion so that

21  proper concussion management was engrained in the practices of institutions like PSU; and

22          b.      Failing to adopt a concussion management plan that had enforcement provisions

23  for failure to follow best practices concussion management practices.

24           **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
                        **ON BEHALF OF ALL DEFENDANTS**
25
                                             104.
26
       The preceding paragraphs are incorporated by reference as if fully set forth herein.

Page 32 – COMPLAINT AND DEMAND FOR JURY TRIAL

105.

Zach Walen was a student-athlete who was physically injured during a PSU football game. The PSU athletic coaches, including Nigel Burton and Duane Duey had a special relationship with Zach Walen. Zach's concussion prompted the athletic coaches to essentially assume a surrogate-parent relationship. Zach relied on PSU, Nigel Burton and Duane Duey to exercise independent judgment and satisfy the requirements under PSU's Concussion Management Plan. By virtue of the circumstances, the relationship gave rise to a heightened duty of care on the part of the athletic coaches to protect Zach from emotional harm beyond the general duty to avoid foreseeable risks of harm.

106.

Zach Walen was a patient of Dr. Charles Webb and therefore had a special relationship. This physician-patient relationship gave rise to a heightened duty of care on the part of doctors to protect their patients from emotional harm beyond the general duty to avoid foreseeable risks of harm.

107.

As a direct and proximate result of Defendants' negligence, Zach Walen has suffered from severe emotional distress, pain and suffering.

### XIII.  DAMAGES

108.

As a direct result of Defendants' negligence, Zach Walen has suffered and continues to suffer permanent psychological and physical injuries, including but not limited to permanent brain damage, disability, pain, distress and impairment in all activities.

109.

As a further direct result of Defendants' negligence, Zach Walen has already incurred reasonable and necessary medical expenses in the amount of $100,000, and he will incur additional such expenses in the future in an amount not to exceed $2,000,000. Plaintiff specifically reserves the right to amend these figures to bring them current at time of trial.

/ / / / /

Law Office of Robert Beatty-Walters
1400 SW Montgomery
Portland, Oregon  97201-2557
rbw@beattywalterslaw.com
PH: 503-473-8088 • FX 503-473-8089

110.

As a further direct result of Defendants' negligence, Zach Walen has also suffered other economic damages totaling $1,250,000. This figure includes the permanent impairment of his past and future earning capacity in an amount of $1,000,000, plus the lost value of his ability to perform personal and household services in the amount of $250,000. Plaintiff specifically reserves the right to amend these figures to bring them current at the time of trial.

111.

As a further direct result of Defendants' negligence, Zach Walen has suffered pain, anxiety, and discomfort from the time of his above-described injuries until the present, and he will suffer additional similar losses in the future because of his injuries. Zach's ability to engage in his normal and usual activities, including recreational and athletic activities, has been interfered with from the date of his injuries until the present, and he will suffer similar interference and damages in the future because of his injuries. Zach Walen has suffered non-economic damages in the amount of $1,750,000. Plaintiff specifically reserves the right to amend this figure to bring it current at the time of trial.

## XIV. PRAYER

WHEREFORE, Plaintiff Zach Walen prays for a judgment against Defendants as follows:

A.    For economic damages in an amount not to exceed $3,250,000;

B.    For noneconomic damages in an amount not to exceed $1,750,000; and

C.    For his costs and disbursements incurred herein.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Page 34 – COMPLAINT AND DEMAND FOR JURY TRIAL

1

2    Respectfully Submitted

3    Dated: _August 28, 2014_    By: _/Robert Beatty-Walters/_

4    Robert Beatty-Walters, OSB #954497
     LAW OFFICE OF ROBERT BEATTY-WALTERS

5    1400 SW Montgomery
     Portland, Oregon 97201

6    Telephone: (503) 473-8088
     Facsimile: (503) 473-8089

7    Email rbw@beattywalterslaw.com

8    Steve W. Berman
     (*Pro Hac Vice Application Forthcoming*)

9    Catherine Y.N. Gannon
     (*Pro Hac Vice Application Forthcoming*)

10   HAGENS BERMAN SOBOL SHAPIRO LLP
     1918 Eighth Avenue, Suite 3300

11   Seattle, Washington 98101
     Telephone: (206) 623-7292

12   Facsimile: (206) 623-0594
     Email: steve@hbsslaw.com

13   *Attorneys for Plaintiff Zachary Walen*

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 35 – COMPLAINT AND DEMAND FOR JURY TRIAL

# EXHIBIT 28

# Supreme Court of Pennsylvania
## Court of Common Pleas
### Civil Cover Sheet
Westmoreland _____ County

| For Prothonotary Use Only: | TIME STAMP |
|---|---|
| Docket No: 5804 of 2015 | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☑ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: Jason E. Luckasevic | Lead Defendant's Name: National Collegiate Athletic Association |
|---|---|

| Are money damages requested? ☑ Yes ☐ No | Dollar Amount Requested: (check one) | ☐ within arbitration limits ☑ outside arbitration limits |
|---|---|---|

| Is this a *Class Action Suit?* ☐ Yes ☑ No | Is this an *MDJ Appeal?* ☐ Yes ☑ No |
|---|---|

Name of Plaintiff/Appellant's Attorney: Jason E. Luckasevic

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☑ Other:
  Personal Injury

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort – DES
- ☐ Toxic Tort – Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*Updated 1/1/2011*

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,

PENNSYLVANIA

| | |
|---|---|
| KAREN KINZLE ZEGEL, EXECUTRIX OF THE ESTATE OF PATRICK RISHA, deceased, )<br><br>       Plaintiff, )<br><br>vs. )<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and DARTMOUTH COLLEGE )<br><br>       Defendant. )<br><br>) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 5804 q 2015<br><br>COMPLAINT IN CIVIL ACTION<br><br>**JURY TRIAL DEMANDED**<br><br>Filed on behalf of Plaintiff<br><br>Counsel of Record for this Party:<br><br>Jason E. Luckasevic, Esquire<br>PA ID No. 85557<br>Diana Nickerson Jacobs, Esquire<br>PA ID No.: 73733<br><br>GOLDBERG, PERSKY & WHITE, P.C.<br>1030 Fifth Avenue<br>Pittsburgh, PA 15219<br>(412) 471-3980<br>Firm # 744 |

2015 NOV 13 PM 3: 34
CHRISTINA O'BRIEN
PROTHONOTARY
PROTHONOTARY'S OFFICE
WESTMORELAND COUNTY
b

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,
PENNSYLVANIA

KAREN KINZLE ZEGEL, EXECUTRIX OF THE
ESTATE OF PATRICK RISHA, deceased,

No. 5804 ∆ 2015

      Plaintiff,

**JURY TRIAL DEMANDED**

vs.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION and DARTMOUTH COLLEGE

      Defendant.

## COMPLAINT

Plaintiff, KAREN KINZLE ZEGEL, Executrix of the Estate of Patrick Risha, deceased,
by her counsel, Jason E. Luckasevic, Esquire, and Diana Nickerson Jacobs, Esquire, of
GOLDBERG, PERSKY & WHITE, P.C., brings this Complaint against Defendants National
Collegiate Athletic Association and Dartmouth College, and alleges the following upon
information, belief and investigation of counsel:

## PARTIES

1.      Plaintiff, Karen Kinzle Zegel (hereinafter "Plaintiff"), Executrix of the Estate
of Patrick Risha, deceased, and his mother, is an individual residing at 31 Doyle Street,
Doylestown, Pennsylvania, 18901.

2.      Patrick Risha, deceased, resided in Westmoreland County at 2055 Lakeview
Drive, Belle Vernon, Pennsylvania 15012 at the time of his death on September 17, 2014.

3.      Defendant, National Collegiate Athletic Association (hereinafter
"NCAA" or "Defendant"), is an unincorporated association that acts as the governing body of
college sports. Its principal office is located in Indianapolis, Indiana.  As an unincorporated

association, it is a citizen of each state of which its members are a citizen, including Pennsylvania.

4.      Defendant, Dartmouth College (hereinafter "Dartmouth" or "Defendant") is a private Ivy League research university in Hanover, New Hampshire and is a member of the National Collegiate Athletic Association. In fact, Dartmouth employs two (2) individuals who recruit student athletes from Pennsylvania to play football, Pennsylvania is one of Dartmouth's top recruited states for football, and student-athletes from Pennsylvania regularly and continuously play football for Dartmouth.

## JURISDICTION AND VENUE

5.      Because the NCAA is an unincorporated association, venue is proper in this Court pursuant to Pa.R.C.P. 2156. The NCAA regularly conducts business and association activity in this county as St. Vincent College, Seton Hill University, and the University of Pittsburgh at Greensburg operate college campuses in Westmoreland County, Pennsylvania, where athletes engage in NCAA-governed sporting activity. As a result, Westmoreland County is "a county where the association regularly conducts business or any association activity. . . ," and venue is proper.

6.      Because association members of the NCAA are citizens of Pennsylvania, this Court may exercise personal jurisdiction over the NCAA.

7.      This Court may also exercise personal jurisdiction over Dartmouth because it maintains continuous and systematic contacts with the State of Pennsylvania. Dartmouth regularly engages in sporting activities in eighteen (18) varsity sports, including football, throughout the State of Pennsylvania, including athletic contests with the University of Pennsylvania and Drexel University in Philadelphia, Pennsylvania, Lafayette College in Easton,

Pennsylvania, Franklin & Marshall College in Lancaster, Pennsylvania, and Pennsylvania State University in State College, Pennsylvania. Further, Dartmouth actively recruits student-athletes within the State of Pennsylvania and sponsors alumni associations in the State of Pennsylvania, including the Dartmouth Alumni Club of Philadelphia and the Dartmouth Club of Western Pennsylvania.

## NATURE OF ACTION

8.     This action seeks to recover damages for injuries sustained by Patrick Risha, deceased, (hereinafter "Mr. Risha") as a direct and proximate result of the tortious conduct of Defendants in connection with their failure to take effective action to protect Mr. Risha from the long-term effects of concussions and sub-concussive blows to the head suffered while he played collegiate football for Dartmouth in the NCAA.

9.     The NCAA had a duty to promote the safety of student-athletes during their participation in collegiate sports at its member institutions because 1) it explicitly and voluntarily assumed responsibility for governing collegiate athletics and promoting safety in its constitution, bylaws, committee reports, and other organizing documents;   2) its rulemaking authority precluded its member institutions from attempting to modify playing rules to promote safety; 3) it actively sought the participation of student-athletes in NCAA governed sporting activity and profited from their involvement; and 4) represented to student-athletes, their parents, its member institutions, and the public that it was protecting the safety of its student-athletes and these representations were relied on by them.

10.     During the years of Mr. Risha's collegiate football career, Mr. Risha sustained multiple concussions, subconcussions and repeated blows to the head during football games. During practice, Mr. Risha was instructed by Dartmouth's football coaches to participate in helmet-to-helmet contact during Oklahoma drills.  Upon information and belief, on multiple

occasions, after hits to the head, Mr. Risha exhibited symptoms of concussions including, vomiting, lack of physical control, dizziness, confusion, blackouts, amnesia, and chronic headaches. The concussion symptoms exhibited by Mr. Risha were or should have been noticed by Dartmouth's football coaching and training staff. After exhibiting symptoms of concussions in practices or games, Dartmouth's coaching staff instructed Mr. Risha to return to play and practice. Dartmouth's football coaching and training staff improperly assessed Mr. Risha's condition while he was exhibiting symptoms of having suffered a concussion and failed to seek medical care for Mr. Risha.

11.     Neither Dartmouth, nor any employee, agent or servant of Dartmouth ever disseminated any information to Mr. Risha about concussions, the symptoms of concussions, and the risks associated with concussions, multiple concussions, subconcussions and repeated blows to the head.

12.     During all times relevant to this complaint, the NCAA and Dartmouth knew, or should have known, of the long-term dangers of concussions and sub-concussive blows to the head regularly suffered by intercollegiate football players.

13.     The NCAA and Dartmouth failed to initiate policies or rules necessary to protect Mr. Risha in the face of long-standing and overwhelming evidence regarding the need to do so. The NCAA and Dartmouth failed to educate their football-playing athletes, like Mr. Risha, on the long-term, life-altering risks and consequences of head trauma in football. They failed to establish known protocols system-wide to prevent, mitigate, monitor, diagnose, and treat neurological disorders.

14.     During the time period of the events in this action, the NCAA failed to address and/or correct the coaching of tackling or playing methodologies that cause head injuries; the

Westmoreland County - NOT AN OFFICIAL COPY

NCAA failed to educate coaches, trainers and member institutions as to the symptoms indicating possible concussions; and the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who experienced sustained concussion symptoms.

15.    During the time period of the events in this action, Dartmouth failed to address and/or correct the coaching of tackling or playing methodologies that cause head injuries; Dartmouth failed to educate coaches and/or trainers as to the symptoms indicating possible concussions; failed to warn of the long-term consequences of repeated concussive and sub-concussive trauma, and Dartmouth failed to implement "return to play" guidelines for student-athletes who have sustained concussions.

16.    The NCAA and Dartmouth's conduct increased the risk to Mr. Risha of suffering the injuries described herein.

17.    The NCAA and Dartmouth engaged in a long-established pattern of negligence and inaction with respect to repeated head trauma, concussions, and concussion-related maladies sustained by student-athletes.

18.    Accordingly, Plaintiff seeks financial recovery for the long-term and chronic injuries, financial losses, expenses, and intangible harms Mr. Risha suffered prior to his death, as a result of the NCAA and Dartmouth's negligence, as well as for his death.

## FACTUAL ALLEGATIONS

19.    Mr. Risha was a student at Dartmouth College and played intercollegiate football there as a tailback during the 2001, 2003, and 2004 seasons. He graduated from Dartmouth College with a B.A. in Government in 2006.

20.    At all times while Mr. Risha played intercollegiate football for Dartmouth College, it was a member institution of the NCAA.

Westmoreland County - NOT AN OFFICIAL COPY

21.   During his three season collegiate football career, Mr. Risha experienced numerous blows to the head.

22.   When Mr. Risha began playing in NCAA intercollegiate football at Dartmouth, he sustained the most frequent and ferocious hits of his football career due to the increased caliber and strength of the players and increased number of practices and games.

23.   During his collegiate football career, Mr. Risha sustained countless blows to the head during practices and games. On several occasions, Mr. Risha would continue to play in games after sustaining a blow to the head and would later not be able to recall portions of the time he was playing.

24.   During his time at Dartmouth, teammates noticed changes in Mr. Risha's behavior and personality. Specifically, Mr. Risha went from being a very outgoing person to a recluse who stayed in his room all the time and participated in no social activities.

25.   Beginning while he attended Dartmouth, and continuing after his football career ended, Mr. Risha gradually became quick to anger, increasingly impulsive, and reclusive. He developed memory problems, difficulty concentrating, and depression. He made increasingly poor decisions, demonstrated addictive behaviors, and suffered from low self-esteem, anxiety, and disturbed sleep.

26.   On September 17, 2014, Mr. Risha committed suicide, at the age of thirty-two.

27.   At the time of his death, Mr. Risha was survived by his three year-old son, Peyton Jordan Risha.

28.   Following his death, Julia K. Kofler, M.D. performed an autopsy of Mr. Risha's brain and spinal cord on September 19, 2014.

29.    Dr. Kofler's "[n]europathologic examination revealed overall mild but widespread tau pathology affecting most cortical and some subcortical brain regions." "The distribution of the abnormal tau aggregates was not in a pattern typical for any of the tau-associated frontotemporal demential disorders or for early Alzheimer's disease."

30.    Dr. Kofler concluded that these findings were most consistent with Chronic Traumatic Encephalopathy (hereinafter "CTE").

31.    CTE is a progressive tauopathy caused from repeated head trauma. Clinically, CTE is associated with symptoms of irritability, impulsivity, aggression, depression, and short term memory loss. With advancing disease, dementia, speech, and gait abnormalities and Parkinsonism may develop.

32.    Mr. Risha developed CTE as a consequence of the repeated head trauma he sustained during his college football career at Dartmouth in the NCAA.

33.    Currently, the accepted means to diagnose CTE is by conducting a post-mortem autopsy of the brain. As a result, it was impossible for Mr. Risha to discover the nature or cause of his injuries until his death.

34.    There are currently more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities that are member schools within the NCAA. Dartmouth competes in thirty-seven (37) varsity sports within the NCAA, including football. Through various licensing programs, the NCAA takes in, on average, nearly $1 billion in revenues each year. The NCAA has remained the most significant college sports governing body since its inception early in the 20th Century.

35.    The NCAA assumed a duty to protect intercollegiate athletes at member institutions from being unnecessarily exposed to sport-related dangers.

Westmoreland County - NO FAN OFFICIAL COPY

36.     Among the original reasons prompting the founding of the NCAA was the desire to reduce the number of student-athlete injuries sustained in playing football, and since its inception, it has assumed a duty to protect student-athletes at its member institutions.

37.     College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which comprise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility and scholarships.

38.     Upon information and belief, the NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for member schools. The NCAA promulgates sport-specific standards through its Playing-Rules Committees.

39.     Article I, Section 1.2 of the NCAA constitution for 2001-2002 includes the following purposes of the Association:

    (a)     To initiate, stimulate and improve intercollegiate athletics programs for student athletes....;
    (b)     To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association;
    (d)     To formulate, copyright and publish rules of play governing intercollegiate athletics;
    (f)     To supervise the conduct of, and to establish eligibility standards, for, regional and national athletics events under the auspeices of this Association;
    (h)     To legislate, through bylaws or resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics; and
    (i)     To study in general all phases of competitive intercollegiate athletics and establish standards whereby the colleges and universities of the United States can maintain their athletic programs on a high level.

40.     The NCAA Constitution also defines one of its "Fundamental Policies" as the

Westmoreland County - NOT AN OFFICIAL COPY

requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when its fails to fulfill this obligations." NCAA Const. 2001-2002, Article I, Section 1.3.2.

41.     To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations...." NCAA Const., Art.2, sec. 2.8.2.

42.     The NCAA Bylaws for 2001-2002, Article 21.2 lists its sports rules committees, which includes the Football Rules Committee. Section 21.2.1.3 states "[[s]ubject to the final authority of the Executive Committee, each rules committee shall establish and maintain rules of play in its sport consistent with the sound traditions of the sport and of such character as to ensure . . . safe participation by the competitors." The playing rules are to be the same for all of the NCAA's divisions.

43.     Upon information and belief, the NCAA maintains the Committee on Safeguards and Medical Aspects of Sports (Medical Committee), which is publicly touted by the NCAA as "serv[ing] to provide expertise and leadership to the NCAA in order to provide a healthy and safe environment to student-athletes through research, education, collaboration and policy development.""

44.     The duties of the Committee on Safeguards and Medical Aspects of Sports include to "[c]ollect and develop pertinent information regarding desirable training methods, prevention and treatment of sports injuries, utilization of sound safety measures at the college level. . ." and "[d]inseminate such information as might be brought appropriately to the attention of the Association's membership and adopt recommended

Westmoreland County - NOT AN OFFICIAL COPY

policies and standards to further the above objectives." (NCAA Bylaws 2001-2002, Article 21.1.2.2).

45.     Upon information and belief, on an annual basis, the Medical Committee publishes the NCAA Sports Medicine Handbook ("Handbook") "to formulate guidelines for sports medicine care and protection of student-athlete's health and safety" and "to assist member schools in developing a safe intercollegiate athletic program."

46.     The Medical Committee and the NCAA recognize that the Handbook "may constitute some evidence of the legal standard of care." The Handbook expressly recognizes that "student-athlete rightly assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

47.     Upon information and belief, one of the NCAA's "core concepts and priorities" was to use its knowledge to promote health and safety:

> The NCAA has been conducting injury surveillance for more than 20 years. Over time, the underlying principle of the program has remained unchanged — to promote and support student athlete health and safety.

48.     Thus, the NCAA has described, time and again, its responsibility for the health and well-being of student-athletes.

49.     Dartmouth College is an Ivy League institution with one of the nation's leading medical schools, the Geisel School of Medicine.

50.     Dartmouth informs each incoming student, including their parents that the safety of its students is its "greatest concern."

51.     Dartmouth, through its Geisel School of Medicine and Department of Psychological and Brain Sciences, has access to each and every medical article published

concerning concussions, brain injuries, mild trauma brain injuries, traumatic brain injuries, and their relationship to sports, including specifically football. Dartmouth also has access to MRIs and other brain imaging software to monitor the brain structure of its student-athletes involved in contact sports.

52.     Dartmouth, through its Geisel School of Medicine and Department of Psychological and Brain Sciences, has studied concussions brain injuries, mild trauma brain injuries, traumatic brain injuries, including their relationship to sports, for decades preceding Mr. Risha's collegiate football career.

53.     Dartmouth knew or should have known of numerous studies on concussions that pointed to a link between repetitive brain trauma and long-term damage to a player's health. Nevertheless, Dartmouth failed to act on this information and continued to let its student athletes, including Mr. Risha, suffer repeated head traumas, including concussions.

54.     Dartmouth Medical School recognized concussions were a major area of concern in football, including the need to understand how concussions were caused so as to provide better medical care for those with brain injuries. Dartmouth Medical School researchers indicated such information was necessary to provide better safety equipment, better preventive measures, and safer techniques taught in sports.

55.     Prior to Mr. Risha's collegiate football career, Dartmouth was aware of ways to monitor concussions and blows to the head. Since the early 1990s, Dartmouth was aware of Head Impact Telemetry (HIT) helmets, which were conceived by Richard Greenwald, Ph.D., an adjunct faculty member of Dartmouth's engineering school. The HIT helmets could keep track of hits that players sustain, tracking data such as head acceleration, impact magnitude, number, location, and direction of hits.

Westmoreland County - NOT AN OFFICIAL COPY

56.   It was not until 2005, after Mr. Risha's collegiate football career ended, that Dartmouth Medical School outfitted Dartmouth's football team with HIT-equipped helmets to determine whether multiple sub-concussive impacts affect cognitive function.

57.   Beginning in 2007 and continuing through 2011, Dartmouth used accelerometers in helmets to measure the force of blows to the head during all practices and games. All participants were given MRI brain scans and wide-ranging mental performance tests before and after their seasons. After a single season, the MRI scans of football players showed changes in the brain's white matter, and players with the biggest changes in white matter had the worst performance on postseason tests of verbal learning and memory. Researchers determined that sub-concussive blows to the head change the brain's structure and how it works. Unfortunately, this was too late for Mr. Risha.

58.   As early as the 1970s, medical researchers advocate keeping the head up and initiating contact with the shoulder as head-first contact increases the risk of concussion and closed head injury.

59.   In 1976, the NCAA changed their football rules to broaden the concept of spearing to include any deliberate use of the helmet as the initial point of contact against an opponent. These rules, however, were rarely enforced by the NCAA because it only penalized players who intentionally led with their helmets.

60.   Beginning in the 1980s, leading coaches in the NFL and collegiate level advocated minimizing contact in practices to protect their players from injuries and keep them safe. Dartmouth knew or should have known that the majority of head traumas occurred in full-contact practice.

61.   During Mr. Risha's collegiate football career, Dartmouth encouraged helmet-to-

Westmoreland County - NOT AN OFFICIAL COPY

helmet contact during practice, especially during Oklahoma drills. Despite knowing this practice was dangerous for nearly thirty (30) years, the NCAA only strengthened its spearing penalty in 2005, after Mr. Risha stopped playing football.

62.     During Mr. Risha's collegiate football career, Dartmouth failed to implement return to play guidelines and/or policies or procedures concerning concussions even though these policies and procedures were known by Dartmouth to be necessary to properly deal with brain injuries.

63.     By 2001, the NCAA and Dartmouth were aware that baseline and neuropsychological testing were essential tools for minimizing the risk of concussions and knew baseline testing was a cornerstone of concussion evaluation and contributed significantly to both the understanding of the injury and management of the player.

64.     Despite this recognition of a duty of care to protect the well-being of the student-athlete, the NCAA and Dartmouth failed to protect Mr. Risha from the long term, life-altering risks and consequences of head trauma he sustained while participating in collegiate football.

65.     The NCAA and Dartmouth failed to educate Mr. Risha about the long-term, life-altering risks and consequences of head injuries that can result from participation in the game of football.

66.     In the face of its overwhelming and superior knowledge of these risks, as compared to that of the student-athletes, the NCAA and Dartmouth's conduct constitutes negligence.

67.     Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause Mild Trauma Brain Injury ("MTBI") with a

Westmoreland County - NOT AN OFFICIAL COPY

heightened risk of long term, chronic neuro-cognitive maladies.

68.    The NCAA and Dartmouth have known or should have known for many years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly.

69.    The NCAA and Dartmouth have known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

70.    The NCAA and Dartmouth have known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one.  Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover.

71.    The NCAA and Dartmouth have has known or should have known for many years that collegiate football players and their families, including Mr. Risha, were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football.

72.    The NCAA and Dartmouth have known or should have known for many years clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a football player's career can cause severe cognitive problems such as depression and early-onset dementia.

73.    The NCAA and Dartmouth have known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury. For decades, these injuries have been documented and associated with sports-related head

impacts in both football and boxing.

74.     The NCAA and Dartmouth have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early —onset Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").

75.     Since the early 1970's the high incidence of concussions among student-athletes in many different sports, including football, hockey, and soccer, has been well known to the NCAA. Further, based on studies that the NCAA *itself* paid for the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and CTE.

76.     From its inception, the NCAA had a duty to protect football players like Mr. Risha from health and safety risks. Similarly, Dartmouth had a duty to protect its students, including Mr. Risha, from health and safety risks. The NCAA and Dartmouth held themselves out as acting in Mr. Risha's best interest. Mr. Risha relied on the NCAA and Dartmouth to disclose relevant risk information and protect his health and safety.

77.     The NCAA and Dartmouth's accumulated knowledge about head injuries to football players, and the associated health risks, was at all times superior to that available to student-athletes like Plaintiff and Mr. Risha.

Westmoreland County - NOT AN OFFICIAL COPY

78.     Prior to 2001, the NCAA and Dartmouth specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease. Despite this knowledge, the NCAA and Dartmouth failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA and Dartmouth's inaction prior to 2001 increased the risk of long-term injury and illness in student-athletes, including Mr. Risha.

79.     For years prior to 2001, the NCAA and Dartmouth has been aware that multiple blows to the head can lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

80.     In 1928, an article by Harrison Martland, M.D., Punch Drunk, identified a condition commonly present in professional boxers called "Punch Drunk" which has associated symptoms including unsteady gait, foot dragging, periods of confusion, tremors, vertigo, and sometimes insanity. Dr. Martland opined that a definite brain injury due to "a single or repeated blows on the head or jaw which cause multiple concussion hemorrhages in the deeper portion of the cerebrum" was the condition's cause. Dr. Martland cited past autopsies that demonstrated a cranial injury death, following injuries where the skull is not fractured and there may be no scalp laceration, may occur in which there are no other lesions but multiple punctate hemorrhages in the deeper structures of the brain. Although admitting the limited evidence available, Dr. Martland concluded that "the fact that nearly one half of fighters who have stayed in the game long enough develop [Punch Drunk]," means that the "condition can no longer be ignored by the medical profession or the public." (JAMA 1928; Vol. 91, No. 15, Pg. 1103).

81.     In 1933, the NCAA's Medical Handbook for Schools and Colleges

Westmoreland County - NOT AN OFFICIAL COPY -

recommended that players with concussions should receive rest and constant supervision and not be permitted to play or practice until symptom-free for 48 hours. For symptoms lasting longer than 48 hours, it recommended players "not be permitted to compete for 21 days or longer, if at all." Additionally, it stated "[t]here is definitely a condition described as "punch drunk" and often recurrent concussion cases in football and boxing demonstrate this. Any individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport."

82.     In 1937, the Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association included the "Seventh Annual Report on Football Injuries and Fatalities: High School and College," states in relevant part [pg. 21-22]:

> 6. During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true. This can be checked at the time of the pre-season medical examination by case history questions. A case in point is where no knowledge was had before the player's death of a boy who suffered a previous concussion from a bicycle accident. Sports demanding personal contact should be eliminated after an individual has suffered one concussion.

83.     In 1952, an article by Augustus Thorndike, M.D., Serious Recurrent Injuries of Athletes – Contraindications to Further Competitive Participation, recommended a three-strike rule for concussions in football (i.e., recommending that players cease to play football after receiving their third concussion). The article states "[p]atients with cerebral concussion that has recurred more than three times or with more than momentary loss of consciousness at any one time should not be exposed to further body-contact trauma." "The college health authorities are conscious of the pathology of the "punch-drunk" boxer." The article goes on to state that in "all serious cases [of cerebral concussion] one should insist upon complete examination, including . . . consultation with a qualified neurologist or neurosurgeon." (N. Engl. J. Med. 1952; 247:554-556).

Westmoreland County - NOT AN OFFICIAL COPY

84.     In the September 1968 issue of NCAA News [Volume 5, No. 8, Page 3], the

NCAA ran an article titled "Dangers of Grid Head Injuries Cited by Safeguards Committee."

In the article, the NCAA's Committee on Competitive Safeguards and Medical Aspects of

Sports issued a statement on the dangers of repeated head injuries in football. The article stated

in relevant part:

> [T]hose individuals who have been rendered unconscious, even momentarily, in a given
> game should never be allowed to play again in the same game and not allowed to return
> to contact until all symptoms have cleared up entirely and he has been checked by a
> competent medical authority. In the area of the head and neck, being super cautious is
> the only route to follow.
>
> It would be hoped that this type of situation would never occur, but often, due to
> pressure from enthusiastic players, parents, coaches, alumni and even enthusiastic and
> well-meaning physicians, boys who should not be playing are allowed to play. Needless
> to say, we all want the athlete to compete as safely as possible and it is this interest
> which prompted the Committee to call attention to this very important aspect of health
> care.

85.     In the 1960's and 70's, the development of the protective face mask in

football allowed the helmeted head to be used as a battering ram. By 1975 the number of head

and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and

New Jersey lead to the creation of the National Football Head and Neck Registry, which

was sponsored by the National Athletic Trainers Association and the Sports Medicine

Center at the University of Pennsylvania.

86.     In the early 1980's, the Department of Neurosurgery at the University of

Virginia published studies on patients who sustained MTBI and observed long-term

damage in the form of unexpected cognitive impairment. The studies were published in

neurological journals and treatises within the United States.

87.     In 1982, the University of Virginia and other institutions conducted studies

on college football teams that showed that football players who suffered MTBI suffered

pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

88. The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

89. The NCAA implemented an injury surveillance system in 1982.

90. By 1991, three distinct medical professionals/entities Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

91. In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled "A Summary of Head and Neck Injuries in Collegiate Athletics' Using the NCAA Injury Surveillance System" published by the American Society for Testing and Materials. The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries. The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced." In spite of this admonition, the NCAA did not proceed to educate its active football players on the long term risks of concussions.

92. In 1996, the NCAA Sports Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports discussed the concussion data in football and

Westmoreland County - NOT AN OFFICIAL COPY

other sports and recognized the football helmet would not prevent concussions.

93.    In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

94.    A 2001 report by Dr. Frederick Mueller that was published in the Journal of Athletic Training reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spine injuries for 16.3%, and other injuries for 14.7%. From 1984 to 1999, sixty-nine football head-related injuries resulted in permanent disability.

95.    In 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented there were enduring effects in youth who have experienced a history of two or more concussions. These include decreased overall neuropsychological functioning, as well as decreased mental speed.

96.    In 2003, two articles were published in the *Journal of the American Medical Association*, and both were subtitled "The NCAA Concussion Study." Both studies defined "concussion" as "an injury resulting from a blow to the head causing an alteration in mental status and 1 or more of the following symptoms . . . headache, nausea, vomiting, dizziness/balance problems, fatigue, difficulty sleeping, drowsiness, sensitivity to light or noise, blurred vision, memory difficulty, and difficulty concentrating." Both studies acknowledged that traditional symptoms associated with concussion such as loss of consciousness and memory loss were not required and were relatively uncommon. In

Westmoreland County - NOT AN OFFICIAL COPY

Cumulative Effects Associated with Recurrent Concussion in Collegiate Football, the study concluded that a history of previous concussions was associated with an increased risk of future concussions, and that there may be a 7 to 10 day window of increased susceptibility for recurrent concussive injury. (JAMA, Vol. 290, No. 19, pg. 2549 (November 19, 2003). In Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, the study found that 91% of players with a concussion returned to their personal baseline symptom levels within 7 days after concussion, but cautioned that the rate of recovery following concussion varied from player to player which suggested clinicians cannot expect all collegiate football players will reach complete recovery in 7 days. The study recognized that obtaining a pre-injury neurologic baseline for all players provides the most sensitive means to detect reliable change in performance attributable to concussion and track post-injury recovery. (JAMA, Vol. 290, No. 19, pg. 2556 (November 19, 2003)).

97.     In sum, the NCAA and Dartmouth have known for years prior to, and during, Mr. Risha's NCAA football career that MTBI experienced in football can and does lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

98.     Years later, in 2010, the NCAA finally adopted a system-wide concussion management policy that delegated the concussion problem to its member schools. This public relations maneuver, in the face of decades of knowledge coupled with inaction, was too little and too late for Plaintiff and Mr. Risha.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**
**(AGAINST THE NCAA)**

99.     Plaintiff incorporates the aforementioned paragraphs by reference as though fully set

forth herein.

100.    At all relevant times, the NCAA had a duty toward Mr. Risha to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to him while playing collegiate football. The NCAA voluntarily assumed this duty in its Constitution, Bylaws, and organizational documents.

101.    Mr. Risha did reasonably and justifiably rely upon the NCAA to protect his health and safety.

102.    The NCAA actively sought Mr. Risha's participation in inter-collegiate sports and it gained revenues and fees as a result of his participation.

103.    The NCAA prevented its member institutions from formulating their own safer rules of play for intercollegiate football.

104.    The NCAA acted carelessly and negligently in its position as the regulatory body for collegiate football teams and its student-athletes, including Mr. Risha. The NCAA knew or should have known that its actions or inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to the Mr. Risha in both the short and long term.

105.    The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of Mr. Risha, both generally and in the following particular respects:

   a.    Failing to educate Mr. Risha concerning symptoms that may indicate a concussion has occurred;
   b.    Failing to warn Mr. Risha of the risk of unreasonable harm resulting from repeated concussions and sub-concussions;
   c.    Failing to disclose to Mr. Risha the special risks of long-term complications from repeated concussions and sub-concussions and returning to play;
   d.    Failing to disclose to Mr. Risha the role of repeated concussions and sub-concussions in causing chronic life-long cognitive and neurological decline;
   e.    Failing to promulgate rules and regulations to adequately address the dangers to

Westmoreland County - NOT AN OFFICIAL COPY

Mr. Risha of repeated concussions and sub-concussions and failing to implement a return-to-play policy to minimize long-term chronic cognitive and neurological problems for which he was at an increased risk;

f.    Misrepresenting pertinent facts that Mr. Risha needed to be aware of to make determinations of the safety of returning to play;

g.    Concealing pertinent facts necessary for Mr. Risha to make an informed decision about participating in football;

h.    Failing to require pre-season base-line neurological testing as part of a required medical exam for football players so that health professionals could determine when an athlete actually recovered from a head injury;

i.    Failing to adopt rules and reasonably enforce those rules to minimize the risk of Mr. Risha suffering debilitating concussions and sub-concussions; and

j.    Increasing the risk of harm to Mr. Risha.

106.    Mr. Risha sustained past medical expenses and had difficulty maintaining employment as a result of the harm he suffered and the injuries and disabilities he sustained referenced above.

107.    Mr. Risha has in the past experienced an assortment of problems associated with the harm and injuries described including, but not limited to, headaches, depression, memory impairment, and other neurodegenerative symptoms, as well as embarrassment, and loss of the pleasures of life. These unrelenting problems ultimately led to and caused his death.

108.    As a result of the foregoing, Mr. Risha suffered damages caused by the misconduct of the NCAA.

109.    Plaintiff is entitled to damages in an amount to be determined at trial.

WHEREFORE, Plaintiff requests judgment against Defendant in an amount in excess of the compulsory arbitration limits of this Court, together with the costs of this action and such other relief as may be just.

### COUNT II
### NEGLIGENCE
### (AGAINST DARTMOUTH)

110.    Plaintiff incorporates the aforementioned paragraphs by reference as though fully set

Westmoreland County - NOT AN OFFICIAL COPY

forth herein.

111. At all times material to this action, Dartmouth, by and through its employees, agents or servants had a duty to student-athletes, including Mr. Risha. This duty arises from this relationship between Dartmouth and its student athletes, including Mr. Risha, in that Dartmouth exercises a great degree of control over student-athletes' lives and schedules as detailed in the Dartmouth College Athletics Student-Athlete Handbook and Planner. This includes, but is not limited to, scheduling courses, practices, travel, games, pre-season workout programs, requirements to maintain health insurance, strict drug and alcohol programs beyond those in place for regular students, academic resources including faculty advisors and tutors only available to student-athletes, and regulations involving a student-athletes in season, competition, and out of season conduct.

112. At all times material to this action, Dartmouth, by and through its employees, agents or servants had a duty to Mr. Risha to exercise reasonable care in guarding against risks of harm beyond what is inherent in football. The duty to not increase the risk of harm beyond what is inherent in football includes the duty to:

a. Provide adequate supervision;
b. Provide adequate instruction and training to players regarding the fundamental methods and skills of football to reduce risk of injury;
c. Instruct athletes as to the rules of the particular sport or activity;
d. Supply proper equipment and ensure the proper use of safe equipment;
e. Provide prompt and proper medical care;
f. Provide pre-season and regular season baseline testing to detect and manage concussions;
g. Take proper post-injury measures to avoid aggravation of existing injuries;
h. Prevent injured athletes from competing;
i. Warn players of the risks of concussions, sub-concussions and other latent dangers; and
j. Continue self-education to be knowledgeable in contemporary trends in football coaching, training and safety.

113. Dartmouth, by and through its employees, agents or servants, breached its duty to

Westmoreland County - NOT AN OFFICIAL COPY

Mr. Risha by failing to exercise reasonable care in taking all necessary steps to reduce the risk of injury. Specifically, Dartmouth, by and through its employees, agents or servants, failed to exercise reasonable care to reduce the risk of injury by:

a.   Training and instructing Mr. Risha in improper and unsafe blocking techniques;

b.   Instructing Mr. Risha to engage in helmet-to-helmet contact during practice and Oklahoma drills;

c.   Failing to have a policy that ensures proper football techniques are taught to players;

d.   Failing to provide prompt and proper medical care following Mr. Risha's concussive events;

e.   Failing to implement baseline testing for detecting and managing concussions and sub-concussions;

f.   Failing to have or enforce an appropriate return-to-play policy that would have prevented exacerbating concussive events;

g.   Permitting Mr. Risha to compete despite Mr. Risha's obvious display of concussion symptoms;

h.   Failing to instruct and train players in concussions, the symptoms of concussions, and the latent risks involved in sustaining a concussion, multiple concussions and sub-concussions; and

i.   Increasing the risk of harm to Mr. Risha.

114.   Mr. Risha sustained past medical expenses and had difficulty maintaining employment as a result of the harm he suffered and the injuries and disabilities he sustained referenced above.

115.   Mr. Risha has in the past experienced an assortment of problems associated with the harm and injuries described including, but not limited to, headaches, depression, memory impairment, and other neurodegenerative symptoms, as well as embarrassment, and loss of the pleasures of life. These unrelenting problems ultimately led to and caused his death.

116.   As a result of the foregoing, Plaintiff and Mr. Risha suffered damages caused by the misconduct of Dartmouth.

117.   Plaintiff is entitled to damages in an amount to be determined at trial.

WHEREFORE, Plaintiff requests judgment against Defendant in an amount in excess of

the compulsory arbitration limits of this Court, together with the costs of this action and such other relief as may be just.

## COUNT III
## WRONGFUL DEATH
## (AGAINST THE NCAA)

118.  Plaintiff incorporates the aforementioned paragraphs by reference as though fully set forth herein.

119.  The Restatement (Second) of Torts § 455 states:

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

120.  The NCAA's negligence caused Mr. Risha to suffer brain damage, develop CTE, and develop an uncontrollable impulse to commit suicide.

121.  As a result of the development of CTE in Mr. Risha's brain, he developed an uncontrollable impulse, caused by his brain damage, to commit suicide. This uncontrollable impulse deprived Mr. Risha of his capacity to govern his conduct in accordance with reason.

122.  Plaintiff claims all damages permitted to be recovered by the Pennsylvania Death Act, 42 Pa. C.S.A. § 8301, and pursuant to Pa. C.R.P. 2202(a).

123.  The persons entitled to recover wrongful death damages as a result of the death of Mr. Risha are:

a.    Karen Kinzle Zegel (Mr. Risha's Mother)
b.    Peyton Jordan Risha (Mr. Risha's Minor Son)

124.  Plaintiff claims as damages from Defendant those items of damages permitted to

be recovered pursuant to the Pennsylvania Wrongful Death and Survival Acts, including, but not limited to, that amount of money the Decedent would have earned over the course of his lifetime and the pecuniary value of future services, support, comfort, contribution of the Decedent that would have been rendered to the wrongful death beneficiaries for the expected remainder of his life, and for the pain, suffering, inconvenience, mental anguish, humiliation, loss of life's pleasures, and loss of earning suffered by the Decedent.

125.    Plaintiff further demands damages in the nature of Mr. Risha's medical expenses and payment of funeral and burial expenses.

126.    In addition, Plaintiff demands all other economic losses suffered by the Decedent's survivors including, but not limited to, the cost of administration and other expenses reasonably associated with decedent's death.

WHEREFORE, Plaintiff seeks compensatory damages against Defendant in an amount in excess of the compulsory arbitration limits of this Court, together with the costs of this action and such other relief as may be just.

## COUNT IV
## WRONGFUL DEATH
## (AGAINST DARTMOUTH)

127.    Plaintiff incorporates the aforementioned paragraphs by reference as though fully set forth herein.

128.    The Restatement (Second) of Torts § 455 states:

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or
(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

Westmoreland County - NOT AN OFFICIAL COPY

129.    Dartmouth's negligence caused Mr. Risha to suffer brain damage, develop CTE, and develop an uncontrollable impulse to commit suicide.

130.    As a result of the development of CTE in Mr. Risha's brain, he developed an uncontrollable impulse, caused by his brain damage, to commit suicide. This uncontrollable impulse deprived Mr. Risha of his capacity to govern his conduct in accordance with reason.

131.    Plaintiff claims all damages permitted to be recovered by the Pennsylvania Death Act, 42 Pa. C.S.A. § 8301, and pursuant to Pa. C.R.P. 2202(a).

132.    The persons entitled to recover wrongful death damages as a result of the death of Mr. Risha are:

        a.      Karen Kinzle Zegel (Mr. Risha's Mother)
        b.      Peyton Jordan Risha (Mr. Risha's Minor Son)

133.    Plaintiff claims as damages from Defendant those items of damages permitted to be recovered pursuant to the Pennsylvania Wrongful Death and Survival Acts, including, but not limited to, that amount of money the Decedent would have earned over the course of his lifetime and the pecuniary value of future services, support, comfort, contribution of the Decedent that would have been rendered to the wrongful death beneficiaries for the expected remainder of his life, and for the pain, suffering, inconvenience, mental anguish, humiliation, loss of life's pleasures, and loss of earning suffered by the Decedent.

134.    Plaintiff further demands damages in the nature of Mr. Risha's medical expenses and payment of funeral and burial expenses.

135.    In addition, Plaintiff demands all other economic losses suffered by the Decedent's survivors including, but not limited to, the cost of administration and other expenses reasonably associated with decedent's death.

WHEREFORE, Plaintiff seeks compensatory damages against Defendant in an amount in excess of the compulsory arbitration limits of this Court, together with the costs of this action and such other relief as may be just.

Date: 11/13/15

Respectfully Submitted,

Jason E. Luckasevic, Esquire
PA ID No: 85557
GOLDBERG, PERSKY & WHITE PC
Firm #744
1030 Fifth Avenue, Third Floor
Pittsburgh, PA 15219-6295
Phone: 412.471.3980
Facsimile: 412.471.8308

*Attorney for Plaintiff*

Westmoreland County - Not An Official Copy

## VERIFICATION

I, **KAREN KINZLE ZEGEL, Executrix of the Estate of Patrick Risha, Deceased,**
hereby certify that the statements set forth in the foregoing *COMPLAINT IN CIVIL
ACTION* are true and correct to the best of my knowledge, information and belief. The
factual matters set forth therein are based upon information which has been furnished
to counsel or which has been gathered by counsel as it pertains to this lawsuit; that the
language contained in the foregoing is that of counsel and not the undersigned; and,
that to the extent that the contents of same is that of counsel the undersigned has relied
upon counsel in making this verification.

I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A.
§4904 relating to unsworn fabrication to authorities, which provides that if I knowingly
make false averments, I may be subject to criminal penalties.


Date: __11/10/15__

Karen Kinzle Zegel, Executrix of the
Estate of Patrick Risha, Deceased

# EXHIBIT 29

**University of Central Arkansas**
**Concussion Protocol and Management Plan**

It is often reported that there is no universal agreement on the standard definition or nature of concussion; however, agreement does exist on several features that incorporate clinical, pathologic, and biomechanical injury constructs associated with head injury:

1. Concussion may be caused by a direct blow to the head or elsewhere on the body from an "impulsive" force transmitted to the head.
2. Concussion may cause an immediate and short-lived impairment of neurologic function.
3. Concussion may cause neuropathologic changes; however, the acute clinical symptoms largely reflect a functional disturbance rather than a structural injury.
4. Concussion may cause a gradient of clinical syndromes that may or may not involve LOC. Resolution of the clinical and cognitive symptoms typically follows a sequential course; however in a small percentage of cases, post-concussion symptoms may be prolonged.
5. Concussion is most often associated with normal results on conventional neuroimaging studies, (Guskiewicz,KM.,2004)

## A. Concussion Diagnosis

A student-athlete who exhibits any one of the following signs or symptoms after contact with the head, or other parts of the body which transmits an impulsive force to the head during activity, will be considered as having a concussion and will be diagnosed and treated as having a concussion.

---

**Concussion Signs and Symptoms**

1. Loss of consciousness or fluctuations in consciousness
2. Balance and coordination problems
3. Mental confusion
4. Memory and concentration difficulties
5. Self reported symptoms (SRS)
   a. Headache
   b. Dizziness
   c. Ringing in the ears (tinnitus)
   d. Nausea
   e. Sensitivity to light and sound
   f. Fatigue or drowsiness
   g. Visual disturbances
   h. Emotional state (sadness, irritable or anxious)

---



DEFENDANT'S
EXHIBIT
5 Owens

OWENS_UCA200000038

B.    **Concussion Grading**

The following grading scale will be used to grade concussions:

| Signs/Symptoms | Grade 1 | Grade 2 | Grade 3 |
|---|---|---|---|
| Loss of Consciousness | No LOC | < 1min | ≥ 1min |
| Post Traumatic Amnesia | < 30min | > 30 min < 24hrs Or | > 24hrs Or |
| Post Concussion Signs and Symptoms | < 24hrs | > 24hrs < 7days | > 7days |

(Cantu, R.C., 2001)

C.    **Concussion Management**

The following procedures shall be used as guidelines for management of the student-athlete following a concussion.

- Once the student-athlete has been diagnosed with a concussion he/she will be removed from participation and disallowed to return that day.
- An athletic trainer will examine the student-athlete immediately and at 5 min. intervals for the development of amnesia, post-concussion signs and symptoms (PCSS) (i.e. mental status abnormalities, balance difficulties) and self reported symptoms (SRS) (i.e. head-ache, visual disturbances, dizziness, tinnitus, etc.)
- Sport Concussion Assessment Tool 2 (SCAT2) administered as soon as possible.
- The student-athlete will be instructed on complete physical and cognitive rest.
- The student-athlete will be accompanied by a parent/guardian or adult when sent home for serial monitoring of signs of evolving intracranial pathology. Home care instructions for the attending parent or adult are found in section D.
- Re-evaluate using SCAT2 for development of, or worsening of amnesia, PCSS and SRS.
- Referral to a physician or hospital will be based on the following guidelines and signs and symptoms. Note: student-athletes will be evaluated on specific modifiers in section E that may alter management.

  o  Day of Injury Referral
  - Loss of consciousness ≥1min. or fluctuations in consciousness
  - Deterioration in cranial nerve assessment
  - Deterioration in PCSS (SCAT2)
  - Deterioration in amnesia (SCAT2)
  - Deterioration in balance and coordination (SCAT2)
  - Mental status and behavior worsens
  - Unequal, dilated or unreactive pupils
  - Decrease or irregularity in respiration
  - Decrease or irregularity in pulse
  - Seizure activity
  - Vomiting

  o  Delayed Referral
  - Any signs and symptoms from day of injury develop.
  - PTA >24hrs (SCAT2)
  - PCSS do not improve or worsen within 24hrs or PCSS >7days (SCAT2)

2

OWENS_UCA200000039

### D. Home Care Protocol

Once a student-athlete has been diagnosed with a concussion and same day referral to a physician/hospital has not been warranted at the time of the evaluation, the home care protocol will be initiated.

- A parent/guardian or adult will be identified as the caregiver to monitor the student-athlete with the concussion for 24hrs or until re-evaluation by the certified athletic trainer.
- The athletic trainer will review the concussion checklist with the caregiver and student-athlete to identify signs and symptoms and complications of a concussion and to help identify if signs and symptoms are getting worse.
- The caregiver will be instructed to call 911 or transport the student-athlete to the nearest hospital immediately if any of the signs and symptoms on the concussion checklist appear or worsen.
- The caregiver and student-athlete will be instructed on the importance of complete physical and cognitive rest until asymptomatic.
- The caregiver and student-athlete will be instructed to report to the certified athletic trainer the following day for re-evaluation.

### E. Concussion Modifiers

The following modifying factors for concussions may influence the diagnosis and management of concussions and may also predict the potential for prolonged symptoms. (McCrory, et al., 2008)

| Concussion Modifiers | |
|---|---|
| Factors | Modifier |
| Symptoms | Number, Duration (> 10d), Severity |
| Signs | Prolonged LOC (> 1min), Amnesia |
| Sequelae | Concussive convulsions |
| Temporal | Frequency: repeated concussion over time. Timing: concussion close together in time. Recency: recent concussions or TBI |
| Threshold | Repeated concussions occurring with progressively less impact force or slower recovery after each successive concussion |
| Age | Child or adolescent (<18y old) |
| Comorbidities and Premorbidities | Migraines, depression, or other mental health disorders, ADHD, learning disabilities, Sleep disorders |
| Medication | Psychoactive drugs, anticoagulants |
| Behaviour | Dangerous style of play |
| Sport | High-risk activity, contact and collision sport, high sporting level |

3

OWENS_UCA200000040

**F. Return to Play**

- Once the SCAT2 score represents data from baseline SCAT2 and the student-athlete has been asymptomatic of amnesia (PTA), PCSS, and SRS for 24hrs, a graduated return to play protocol will be initiated.
- It should be understood that concussion modifiers in section E may alter the return to play protocol.
- Return to play decision will be made by the UCA team physician and/or the UCA certified athletic trainer who is under the direction of the team physician.

| Graduated Return To Play Protocol | | |
|---|---|---|
| Rehabilitation State | Activity | Objective |
| 1. No Activity | Complete physical and cognitive rest | Recovery |
| 2. Light Aerobic | Walking, stationary bike, no resistance | ↑ HR |
| 3. Sport Specific | Light Sport Drills, no impact | ↑ Movement |
| 4. Complex Drills | Progress to more difficult drills | ↑ Coordination |
| 5. Full Contact Practice | Participate in normal practice | ↑ Confidence |
| 6. Return to Play | Normal game play | n/a |

(McCrory, et al. 2008)

**G. Concussion Disqualification**

1. The decision to disqualify a student-athlete for the season or career will be made by the UCA team physician and athletic training staff. The decision will be based on several factors including but not limited to, number of concussions, duration of signs and symptoms (PCSS), several episodes of loss of consciousness and/or severity of one LOC episode with prolonged PCSS and PTA, increased sensitivity to concussions, as well as all modifiers noted in section E.

2. Guidelines used to decide on disqualification after repeated concussions include but are not limited to the following:
   a. A student-athlete who receives a single grade III concussion in a season with prolonged PCSS and PTA.
   b. A student-athlete who receives three (3) grade II concussions in the same season.
   c. A student-athlete who receives several grade I concussions with prolonged recovery of PTA and PCSS.
   d. A student-athlete who has exhibited more than two LOC episodes during each concussion.
   e. Abnormal neuroimaging results.
   f. Any involvement of, change or abnormal respiration or cardiac function.

3. The UCA Team Physician will have full discretion on disqualifying a student-athlete for the season or career.

4

## H. Concussion Follow-Up and Support System

1. Any student-athlete diagnosed with a concussion will be followed up on their concussion after they have returned to full activity. The concussion follow-up will assist the athletic trainer in determining if the student-athlete is having any residual post-concussion symptoms from their concussion. The student-athlete will be educated on post-concussion syndrome. The concussion follow-up will be administered throughout the athletic season and/or academic year.

2. If the student-athlete has been found to be experiencing any post-concussion symptoms, they will be referred to the UCA Team Physician and/or Team Neurologist for further evaluation. The follow-up evaluation may include but not limited to (Concussion re-evaluation, neuropsychological testing, counseling, psychological evaluation, diagnostic testing, etc.)

## I. Concussion Education

The UCA athletic training staff will be charged with educating the coaching staff and student-athletes on concussion.

1. Coaches
   a. The athletic trainer for each sport will educate the coaches on concussion and the importance of identifying student-athletes early with a concussion so that appropriate management can be initiated.
   b. Coaches will be educated in the protocol for concussion management and return to play guidelines.

2. Student-Athletes
   a. The student-athlete will be given concussion educational material during their initial physical and educated on the importance of notifying the athletic training staff if they experience any signs and symptoms of a concussion.
   b. The student-athlete will sign a Concussion Notification and Agreement Policy form during their initial physical examination.
   c. The student-athlete will be educated on post-concussion syndrome during their follow-up evaluation.

## J. References:

The following references were used in the development of the UCA Concussion Protocol and Management Plan:

1. Covassin,T., Stearne,D., Elbin,R., *Concussion History and Postconcussion Neurocognitive performance and symptoms in Collegiate Athletes.* Journal of Athletic Training. 2008; 43(2) 119-124.
2. Cantu RC., *Posttraumatic retrograde and anterograde amnesia: pathophysiology and implications in grading and safe return to play.* Journal of Athletic Training. 2001; 36: 228-235.
3. Guskiewicz,KM., Bruce, SL., Cantu,RC., Ferrara,MS., Kelly,JP., McCrea,M., Putukian,M., Valovich McLeod, TC., *National Athletic Trainers' Association Position Statement: Management of Sport Related Concussion.* Journal of Athletic Training. 2004; 39(3): 280-297.

5

OWENS_UCA200000042

4. McCrory, P., Meeuwisse,W., Johnston,K., Dvorak,J., Aubry,M., Molloy,M., Cantu,R., *Consensus Statement on Concussion in Sport: The 3rd International Conference on Concussion in Sport, Zurich 2008*. Journal of Athletic Training. 2009; 44(4): 434–448.

5. Onate,JA., Beck,BC., Van Lunen,BL., *On-Field Testing Environment and Balance Error Scoring System Performance During Preseason Screening of Healthy Collegiate Baseball Players*. Journal of Athletic Training. 2007; 42(4): 446–451.

6. Valovich McLeod, TC., *The Value of Various Assessment Techniques in Detecting the Effects of Concussion on Cognition, Symptoms, and Postural Control*. Journal of Athletic Training. 2009; 44(6); 663–665.

6

OWENS_UCA200000043

# EXHIBIT 30

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3   ADRIAN ARRINGTON, DEREK OWENS, ANGELA PALACIOS, and
     KYLE SOLOMAN, individually and on behalf of all
 4   others similarly situated,
 5            Plaintiffs,
 6   vs.                                    No. 11-cv-06356
 7   NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
 8            Defendant.
 9   _____
10           DEPOSITION OF ANGELA PALACIOS
             TAKEN ON BEHALF OF THE DEFENDANT
11       ON APRIL 9, 2013, BEGINNING AT 9:00 A.M.
                IN FAYETTEVILLE, ARKANSAS
12
13
             APPEARANCES:
14
15   On behalf of the PLAINTIFF
16           Aleksandra M.S. Vold
             SIPRUT PC
17           17 North State Street, Suite 1600
             Chicago, Illinois 60602
18           (312) 236-0000
             avold@siprut.com
19
             Daniel J. Kurowski
20           HAGENS, BERMAN, SOBOL & SHAPIRO, LLP
             1144 W. Lake Street, Suite 400
21           Oak Park, Illinois 60301
             (708) 628-4949
22           dank@hbsslaw.com
23
24   REPORTED BY:  MICHAEL A. WASHKOWIAK, CCR
25
```

Page 13

1          MR. WORD:  You want to take a short break?

2          THE WITNESS:  (Witness nods head).

3          MR. WORD:  Let's do that.

4     (BREAK FROM 9:20 TO 9:24)

5     Q     (BY MR. WORD)  How did your coach

6     embarrass you?

7     A     He -- we were -- I was with a group of

8     girls as they were stretching, and he told me that

9     it was time that I go put my running shoes on to go

10    run.  And I thought he was joking, so I played it

11    as a joke and said, like I can't go run.

12          He was like, no, I'm serious; you need to

13    go run.  And then I guess my -- like his tone

14    changed with me and I was like, I really can't go

15    run.  And he pulled me to the side and told me to

16    stop embarrassing him because there was a recruit

17    there and it was in front of the recruit's parents.

18    And I was like, I'm sorry I didn't mean to

19    embarrass you, but I was just letting you know that

20    this is something I can't do.

21          And he told me to go ask the trainers if I

22    could go run, so the trainers -- the trainer that I

23    had I think was a student trainer, so she called

24    the head trainer or the trainer back at school and

25    asked, and that's who said that I could run unless

Page 14

1  my head started hurting.

2      Q    Do you recall the name of the student

3  trainer you spoke to?

4      A    No.

5      Q    Was she at the field?

6      A    Yes.

7      Q    So you spoke to her directly?

8      A    Yes.

9      Q    Was the head trainer at the field?

10     A    No.

11     Q    Do you recall her name?

12     A    No.

13     Q    How did the student trainer contact the

14 head trainer?

15     A    Cell phone.

16     Q    Did you speak to the head trainer on that

17 call?

18     A    No.

19     Q    So the student trainer told you what the

20 head trainer had said?

21     A    Yes.

22     Q    And after the head trainer said that you

23 could run and only stop if it caused problems, you

24 went and got your shoes then?

25     A    Yes.

Page 71

1     Q     Did your coach admonish you in any way for

2  not participating in those practices?

3     A     No.

4     Q     Did he speak to you at all about whether

5  you should or should not be practicing?

6     A     No.

7     Q     Did he say anything on Saturday about why

8  it was okay for you not to practice on Wednesday,

9  Thursday or Friday but you must run a lap on

10  Saturday?

11     A     No.

12     Q     Is there anything else about the Saturday

13  practice that happened with your coach in regards

14  to you practicing or not practicing that you

15  haven't already described?

16     A     I'm not sure.

17     Q     You don't recall anything else?

18     A     No.

19     Q     What happened after your coach told you to

20  sit on the sidelines?

21     A     I --

22     Q     On Saturday, excuse me.

23     A     I went to the sidelines and called my mom.

24     Q     What did you tell your mom?

25     A     I asked her why she had called him, and

Page 72

1    she told me that she was looking at my best

2    interests and -- I mean, I told her what he told

3    me, and she was pretty mad.

4          Q    How do you know she was mad?

5          A    By the tone in her voice.

6          Q    How would you describe the tone in her

7    voice?

8          A    Angry.

9          Q    What did she say?

10         A    I don't know.

11         Q    Who was she angry with?

12         A    My coach.

13         Q    Why was she angry at your coach?

14              MS. VOLD:  Objection, speculation.

15         A    I'm not sure.

16         Q    (BY MR. WORD)  She didn't tell you why she

17   was mad at your coach?

18         A    No.

19         Q    Did she say "I'm mad at Coach Denning"?

20         A    No.

21         Q    Why do you surmise that she was mad at

22   your coach?

23         A    Because after I told her I couldn't run

24   and she told him I couldn't run, their conversation

25   was what she was mad about.

Page 73

1       Q       Did she tell you what she spoke about with

2   Coach Denning?

3       A       Yes.

4       Q       What did she say?

5       A       She called him and told him that I was not

6   to be running, and he told her that I was medically

7   cleared and that he was not discussing this with a

8   parent.

9       Q       So you decided at that point in time to

10  follow your mother's advice or your trainer's

11  advice?

12      A       At that point in time I knew that I wasn't

13  supposed to be running.

14      Q       What led you to that realization that you

15  shouldn't be running?

16      A       That it was only five days later and I was

17  still experiencing symptoms.

18      Q       You were experiencing those symptoms

19  before you ran on Saturday, right?

20      A       Yes.

21      Q       So what happened between the time before

22  you ran and the time after you ran?

23      A       I'm not sure what you mean.

24      Q       I'm just trying to understand.  It seems

25  to me that your state of being is the same both

Page 139

1        A        No.

2        Q        Back to page 931 of Exhibit 16, you see

3   that description of what must take place before a

4   student athlete is allowed to return to the field?

5        A        This?

6        Q        That section, yes.

7        A        Yes.

8        Q        Do you believe your coach complied with

9   those rules?

10              MS. VOLD:  Objection, calls for a legal

11   conclusion.

12        A        I don't know.

13        Q        (BY MR. WORD)  Why don't you know?

14        A        I'm not sure.

15        Q        Can you look at the fourth bullet point

16   that says stepwise, return to play.  That first

17   bullet reads "no activity, rest until

18   asymptomatic."  What does that mean to you?

19        A        Rest until I no longer have symptoms.

20        Q        Does that mean you can play in a game or

21   practice while you still have symptoms?

22        A        No.

23        Q        I don't think you need to be a lawyer to

24   understand to make the determination of whether or

25   not your coach adhered to that policy.  Do you

Page 140

1    think he adhered to it or not?

2        A    No.

3        Q    So he, in fact, instructed you to play, to

4    run, while you were still symptomatic from a

5    concussion, correct?

6        A    Correct.

7        Q    And you informed him that you were

8    symptomatic?

9        A    Yes.

10       Q    You informed the trainers that you were

11   symptomatic?

12       A    Yes.

13       Q    So your coach broke the rule?

14       A    Correct.

15       Q    If you'll look at the next bullet point,

16   it discusses there a team physician or a designee.

17   Who was the team physician?

18       A    I have no idea.

19       Q    Would that be Dr. Kluck?

20       A    Dr. Kluck or the -- I would assume Dr.

21   Kluck.

22       Q    And his designee, could that be a trainer?

23       A    Could be.

24       Q    And to your knowledge did Dr. Kluck or a

25   trainer conduct a medical reevaluation of you after