# EXHIBIT 31

| KRISTEN L. SHEELY, et al., | * | IN THE |
| Plaintiffs, | * | CIRCUIT COURT |
| v. | * | FOR |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., | * | MONTGOMERY COUNTY |
| | * | |
| Defendants. | * | Case No. 380569-V (Specially Assigned: Boynton, J.) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## THIRD AMENDED COMPLAINT

The Plaintiffs, Kristen L. Sheely, in her individual capacity and in her capacity as Personal Representative of the Estate of her son, Derek Thomson Sheely, and Kenneth B. Sheely, by and through counsel, sue the Defendants on the following survival and wrongful death causes of actions. Pursuant to Md. Code Ann., Cts. & Jud. Proc. §§3-901 *et seq.* and Maryland Rule 15-1001, the Individual Plaintiffs are entitled to maintain the wrongful death claims set forth in Counts XI through XX below. The amendments contained in this Third Amended Complaint delete Paragraphs 21 and 147 of the Second Amended Complaint and incorporate amendments made by interlineations to Paragraphs 187, 196, 256, and 265, in order to conform this pleading to the ruling made by this Court on April 15, 2014.

## PARTIES

1.     Plaintiff Kristen L. Sheely brings this action in her individual capacity and in her capacity as Personal Representative of the Estate of her son, Derek Thomson Sheely (sometimes the "Decedent" or "Derek"). At all times relevant hereto, Kristen was the mother of Derek, who died on August 28, 2011. She resides at 14001 Falconcrest Road, Germantown, Maryland 20874.

1

2.     Plaintiff Kenneth B. Sheely was, and at all times relevant hereto has been, the father of Decedent. He resides at 14001 Falconcrest Road, Germantown, Maryland 20874.

3.     Pursuant to Maryland Rule 15-1001(c), Plaintiffs have conducted a good faith and reasonably diligent effort to identify, locate and name as use Plaintiffs all individuals who might qualify as use Plaintiffs.

4.     Defendant Jamie Schumacher is employed as an Assistant Football Coach by Frostburg State University. At all relevant times referenced herein, Defendant Schumacher was a graduate student and not a state personnel of Frostburg State University. He is a resident of the City of Imperial, County of Allegheny, State of Pennsylvania.

5.     Defendant Thomas Rogish is, and at all relevant times referenced herein was, employed as the Head Football Coach by Frostburg State University. He is a resident of the City of Bedford, County of Bedford, State of Pennsylvania.

6.     Defendant Michael Sweitzer, Jr., is, and at all relevant times referenced herein was, employed as an Assistant Athletic Trainer by Frostburg State University. He is a resident of the City of Frostburg, County of Allegany, State of Maryland.

7.     Defendant The National Collegiate Athletic Association (hereinafter "NCAA") is an unincorporated association of private and public colleges and universities which governs intercollegiate athletics. Its principal place of business is located in Indianapolis, Indiana. As an unincorporated association it is a citizen of each state its member is a citizen, including the State of Maryland.

8.     Defendant Kranos Corporation, doing business as Schutt Sports (hereinafter, "Schutt Sports"), is a Delaware corporation, with its principal place of business in Easton, Pennsylvania, which manufacturers, sells and distributes its products all over the United States.

2

By placing its products in the stream of commerce and having multiple sales throughout Maryland, Schutt Sports carries on regular business in Montgomery County.

9.      Defendant George L. Heider, Inc., doing business as Sportsman's (hereinafter, "Sportsman's") is a Pennsylvania company with its principal place of business in Johnstown, Pennsylvania. At all relevant times herein, Sportsman's was registered and qualified to do business in Maryland. At all relevant times herein, Sportsman's was and still is an authorized seller, refurbisher and distributor of Schutt Sports' helmets. By placing its products in the stream of commerce and having multiple sales throughout Maryland, Sportsman's carries on regular business in Montgomery County, Maryland

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court as the amount in controversy exceeds the jurisdictional limit.

11.     Venue is proper in this district pursuant to 6-201(b) because there is more than one defendant, and there is no single venue applicable to all defendants. Therefore, pursuant to Cts. & Jud. Proc. §6-201(a) all may be sued in Montgomery County in which any one of them could be sued. Additionally, pursuant to §6-202(3), venue is proper because the Plaintiffs reside in Montgomery County and Schutt Sports has no principal place of business in Maryland.

## FACTUAL ALLEGATIONS

### A Preventable Tragedy

12.     Utter incompetence, egregious misconduct, false hope and a reckless disregard for player health and safety led to the tragic death of Derek Sheely.

13.     Derek was a 22-year old, two-time Academic, All-Conference Senior at Frostburg State University (hereinafter "Frostburg") in Maryland. He was a talented athlete with a kindred spirit, jovial attitude and had aspirations to work for the Central Intelligence Agency.

14.     In August 2011, he began his final year of collegiate football as the starting fullback for Frostburg's Division III football team.

15.     Concussion has been defined as "a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces."[1] Although concussion most commonly occurs after a direct blow to the head, it can occur after a blow elsewhere that is transmitted to the head. *Id.* Concussion occurs when the brain slams back and forth against the skull, called a coup and countrecoup. Rotational forces cause the brain to twist, which leads to the sheering of long, slender axons of brain cells.

16.     The classic symptoms of concussion, as identified by Defendant NCAA, include:

- Amnesia
- Confusion
- Nausea
- Loss of consciousness
- Balance problem or dizziness
- Double or fuzzy vision
- Sensitivity to light or noise
- Headache
- Feeling sluggish, foggy or groggy
- Concentration or memory problems
- Slowed reaction time
- Headache or "pressure" in head
- Nausea or vomiting
- Does not "feel right"
- Pleas for Help

---

[1] Expert report of Dr. Robert Cantu (July 19, 2013), *Adrian Arrington, et al. v. NCAA*, Case No. 11-cv-06356 (N.D. Ill) opining that Defendant NCAA failed to, *inter alia*, protect the student athletes and thereby violated its duty of care.

4

17.     The appropriate standard of care in which coaches are required to abide is also identified by Defendant NCAA:

[Intentionally Left Blank]

## PREVENTION AND PREPARATION

As a coach, you play a key role in preventing concussions and responding to them properly when they occur. Here are some steps you can take to ensure the best outcome for your student-athletes:

- Educate student-athletes and coaching staff about concussion. Explain your concerns about concussion and your expectations of safe play to student-athletes, athletics staff and assistant coaches. Create an environment that supports reporting, access to proper evaluation and conservative return-to-play.
  - Review and practice your emergency action plan for your facility.
  - Know when you will have sideline medical care and when you will not, both at home and away.
  - Emphasize that protective equipment should fit properly, be well maintained, and be worn consistently and correctly.
  - Review the Concussion Fact Sheet for Student-Athletes with your team to help them recognize the signs of a concussion.
  - Review with your athletics staff the NCAA Sports Medicine Handbook guideline: Concussion or Mild Traumatic Brain Injury (mTBI) in the Athlete.
- Insist that safety comes first.
  - Teach student-athletes safe-play techniques and encourage them to follow the rules of play.
  - Encourage student-athletes to practice good sportsmanship at all times.
  - Encourage student-athletes to immediately report symptoms of concussion.
- Prevent long-term problems. A repeat concussion that occurs before the brain recovers from the previous one (hours, days or weeks) can slow recovery or increase the likelihood of having long-term problems. In rare cases, repeat concussions can result in brain swelling, permanent brain damage and even death.

### IF YOU THINK YOUR STUDENT-ATHLETE HAS SUSTAINED A CONCUSSION:

Take him/her out of play immediately and allow adequate time for evaluation by a health care professional experienced in evaluating for concussion.

An athlete who exhibits signs, symptoms or behaviors consistent with a concussion, either at rest or during exertion, should be removed immediately from practice or competition and should not return to play until cleared by an appropriate health care professional. Sports have injury timeouts and player substitutions so that student-athletes can get checked out.



### IF A CONCUSSION IS SUSPECTED:

1. Remove the student-athlete from play. Look for the signs and symptoms of concussion if your student-athlete has experienced a blow to the head. Do not allow the student-athlete to just "shake it off." Each individual athlete will respond to concussions differently.

2. Ensure that the student-athlete is evaluated right away by an appropriate health care professional. Do not try to judge the severity of the injury yourself. Immediately refer the student-athlete to the appropriate athletics medical staff, such as a certified athletic trainer, team physician or health care professional experienced in concussion evaluation and management.

3. Allow the student-athlete to return to play only with permission from a health care professional with experience in evaluating for concussion. Allow athletics medical staff to rely on their clinical skills and protocols in evaluating the athlete to establish the appropriate time to return to play. A return-to-play progression should occur in an individualized, step-wise fashion with gradual increments in physical exertion and risk of contact.

4. Develop a game plan. Student-athletes should not return to play until all symptoms have resolved, both at rest and during exertion. Many times, that means they will be out for the remainder of that day. In fact, as concussion management continues to evolve with new science, the care is becoming more conservative and return-to-play time frames are getting longer. Coaches should have a game plan that accounts for this change.

## IT'S BETTER THEY MISS ONE GAME THAN THE WHOLE SEASON. WHEN IN DOUBT, SIT THEM OUT.

For more information and resources, visit www.NCAA.org/health-safety and www.CDC.gov/Concussion.

 

*Reference to any commercial entity or product or service on this page should not be construed as an endorsement by the Government of the company or its products or services.*

18.     If a concussion is not treated properly—or recklessly ignored, as the Defendants did here—it can have deadly consequences.

19.     Second-impact syndrome is a rare, but often-times fatal consequence that occurs when an individual sustains an initial concussion and then suffers a second head injury before the symptoms associated with the first impact have cleared.

20.     For years, coaches and athletic trainers have been taught to be vigilant about the signs and symptoms of concussion. Obvious signs such as pleas for help from a player that his head hurts or continuous bleeding from the forehead should *immediately* raise a red flag that a concussion might be suspected.

21.     [Intentionally Omitted].

22.     The Defendants, unfortunately, played by their own rules and disregarded laws and the fundamental tenets of coaching. Instead of placing the athletes' health and well being above all else, they created an environment where players would be punished if they disclosed their injuries. Indeed, players that were injured, including those that were diagnosed with a concussion, were required to clean the field after practice and ridiculed by Defendant Rogish for being "gripers."[2]

23.     In fact, Defendants Rogish and Schumacher marginalized injuries, punished players for disclosing them and challenged players to play through pain. Frostburg's Team Policies, which were, on information and belief, drafted by Defendant Rogish, stated as much:[3]

> We must distinguish between pain and injury…In the **rare event** you are injured, remember the following:…
> 5. If one cannot practice on Wednesday, he **CANNOT START ON SATURDAY**.
> 6. If one cannot practice on a Thursday, he probably **will not dress.**.....

---

[2] 2011 Frostburg's Team Policies.
[3] *Id.*

8. Great champions can distinguish between pain and injury. (emphasis in
the original).

24.    Defendant Rogish also enforced these no-tell, play-through-pain policies during
practice. On multiple occasions, Defendant Rogish would tell the players "you can't make the
club in the tub." In other words, if you disclose your injuries, you will lose playing time and risk
being cut.

25.    What is more, the word "concussion" is not stated a single time in Frostburg's
Team Policies. Thus, Defendants Rogish and Schumacher treated all injuries—brain injuries and
ankle sprains—the same: you were expected to play through them.

**A Sense of False Hope**

26.    Because the brain is freely flowing within the cerebrospinal fluid, no helmet can
prevent, definitively protect and/or reduce, concussions; especially the lower forces that include
a component of rotational acceleration, which are believed to cause most concussions.

27.    Despite scientific evidence to the contrary, Virginia Tech, led by Stefan Duma,
performed a study that purported to rank various helmets based on their ability to reduce
concussions (hereinafter the "STAR System"). The study was flawed from the beginning.

28.    In May 2011, Virginia Tech published its findings and ranked the Schutt Sports
DNA Pro Plus helmet (hereinafter "subject helmet") as a leading helmet in its ability to
"protect[] against concussions."

29.    Relying upon this methodologically flawed study, Frostburg purchased the new
helmets fromSchutt Sports through Defendant Sportsman's. A Frostburg official spokeswoman,

8

Elizabeth Douglas, told ESPN that Frostburg selected the DNA Pro Plus helmet "based on the results of a Virginia Tech Study of the *concussion protection*...."[4]

30.     In 2012, Dr. Albert King aptly attacked Virginia Tech's study stating, "[t]he STAR system is scientifically unsound and is not predictive of a helmet's ability to reduce concussion. It can mislead consumers in the market for a new helmet by giving them a false sense of security or safety." The National Operating Committee on Standards in Athletic Equipment (NOCSAE) also shared these concerns and suggested caution when relying on the STAR System, "the potential exists for players, parents, coaches and administrators to overemphasize the role of the helmet in protecting against concussions."[5]

31.     In the 1970s, the National Institutes of Health also warned that "'existing helmets are not protecting the brain adequately' because their *design* was based on a paradigm that *ignored data* on rotational forces. Revising the existing standards was deemed an 'urgent task.'"[6] Similarly, a 2012 report from the International Olympic Committee World Conference on Prevention of Injury and Illness in Sport shared the same sentiment regarding helmet manufacturers' stagnant movement in research and development: "Little has changed in helmet-safety design during the past 30 years."[7]

32.     In January 2011, United States Senator Tom Udall, D-NM, sent a letter to the Federal Trade Commission requesting an investigation of companies making misleading safety claims. In his letter, Senator Udall specifically cited Schutt Sports as a company that was engaging in false and deceptive practices.

---

[4] http://espn.go.com/college-football/story/_/id/6965977/helmet-helmet-hit-caused-frostburg-state-player-derek-sheely-death
[5] July 3, 2013, NOSCAE press release. "Statement from the National Operating Committee on Standards for Athletic Equipment Regarding 2013 Virginia Tech STAR Rating System.
[6] Bruce Barcott, *Senseless*, Bicycling, Vol. 54 No. 5, June 2013.
[7] *Id.*

33.     Although Schutt Sports *currently* professes that no helmet can reduce or prevent the risks of concussions, it nevertheless knowingly made false marketing claims at various times throughout 2011 by touting that its helmets were, in fact, designed to reduce concussions:

> Each Schutt Adult football helmet and Schutt Youth Football Helmet models exceeds the NOCSAE standard for football and *is designed with the intent to reduce the risk of concussion*. The Schutt IOD 4D, AiR XP, DNA Pro+ Adult football helmets *all featuring **breakthrough technology providing maximum protection to athletes***. (emphases added).

34.     Indeed, Schutt Sports acknowledges that it was "not telling the truth to consumers."

> We *do not make the claim* that our helmets are better at preventing concussions or the *risk of concussions* because we know there are too many unknown variables to be able to *truthfully* make that claim. That has *always* been our position, which is alone in the football helmet market place. - Glenn Beckmann, Schutt Sports Communication Manager
>
> *     *     *     *     *     *     *     *     *     *
>
> Our position based upon the current known science, data and materials has been that football helmets can do very little to directly reduce the risk of concussions and that any organization, academic study or company *saying otherwise is not telling the truth to consumers.... That's why our product claims have never related to concussions*; - Robert Erb, Schutt Sports CEO

35.     Similarly, Schutt Sports claims to utilize the strongest warning label in the helmet industry. In particular, the label warns, "[d]o not butt, ram, spear or strike an opponent with any part of this helmet or faceguard."

36.     Consistent with its false-marketing campaign and deception in the marketplace, Schutt Sports issued a press release that, at best, acknowledges that it anticipates consumers will lead with their head, and, at worst, instructs its consumers to violate its own warning label:

> NFL and college-level football players will soon have the opportunity to *face their foes head-on* with Vengeance...." (emphasis added).

10

37.     Shortly following the distribution of the press release, the medical community expressed its disdain with Schutt Sports' dangerous marketing efforts:

> If you're thinking 'vengeance,' you're thinking of using it as more of an offensive type thing as opposed to protecting somebody. – Dr. Michael Neely

> \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

> I would say it probably doesn't quite portray the right mentality. It gives the message that you're impervious and can exact vengeance on other players without hurting yourself. – Dr. Alok Chaudhari

38.     While Defendant Schutt Sports designed, manufactured and marketed the subject helmet, Defendant Sportsman's, acting as an agent for Defendant Schutt Sports, advertised and sold the subject helmet to Frostburg State University.

39.     Like Defendant Schutt Sports, Defendant Sportsman's website also falsely markets certain products as being able to prevent or reduce concussions. For example, its SportCo MouthGuard claims to be **"Anti-concussion,"** which is utterly false.

### A Complete Loss of Institutional Control: Gross Incompetence and a Reckless Disregard for Safety

40.     Preseason football practice started on August 13, 2011. The first day of practice consisted of helmet fitting. On information and belief, a representative and agent for Schutt Sports and/or Sportsman's improperly fitted Derek with the subject helmet. Derek chose the subject helmet after the representative told the team, "Schutt's new technology can prevent head injuries." This representation is factually false.

41.     Like many of his other teammates that day, Derek relied upon, and was deceived by Schutt Sports. Strapped with a new sense of false security, Derek reasonably believed that his new armor could prevent head injuries.

11

42.     On August 19, 2011, Derek and his teammates started two-a-day practices. Preseason practices at Frostburg served more as a gladiatorial thrill for the coaches than learning sessions for the players.

43.     As the head coach, Defendant Rogish had a duty to, *inter alia*,[8] supervise his assistant coaches, provide competent and responsible personnel, provide prompt and proper medical care, prevent injured players from competing, take measures to properly supervise and care for the players, and ensure that the drills had a competitive purpose which did not place the players at an unnecessary risk of injury. Commensurate with this supervision, Defendant Rogish knew and condoned of the various drills and coaching techniques his assistant coaches, including Defendant Schumacher, were utilizing.

44.     Practice, under Defendant Rogish's control, involved virtually unlimited, full-contact, helmet-to-helmet collisions. One of Derek's teammates described the demeanor of the practices leading up to Derek's fatal injury as completely "out of control." Within a three-and-a-half-day period, Derek and his teammates were exposed to more than 13 hours of full-contact drills – significantly increasing the risk of concussions and repetitive head trauma.

45.     On the morning of August 19, 2011, Defendant Schumacher instructed, with Defendant Rogish's authorization, the fullbacks and tailbacks to engage in a drill that has been criticized by certain National Football League teams and other leagues as extremely dangerous, intolerable and meaningless.

46.     The drill is similar to the so-called "Oklahoma Drill" – but even more dangerous. The fullback and tailback line up behind the quarterback. A linebacker stands approximately six-ten yards away from the fullback. The linebacker is not allowed to defend himself; instead he is

---

[8] See also, Paragraph 17.

12

required to stand upright and "act like a dummy." The quarterback hands the ball off to the tailback, and the fullback and the linebacker are required to smash into each other at full speed (the "Drill"). If the linebacker attempts to defend himself, or the fullback does not run full speed into the linebacker, Defendant Schumacher would require the players to repeat the drill. On information and belief, Defendant Rogish observed Defendant Schumacher performing the Drill. The Drill continues for approximately fifteen minutes with very little, and at times, no rest. During the course of the Drill, each player takes approximately 30-40 sub-concussive, or concussive, blows to the head.

47.     The Drill had a reputation among the players as being "ridiculously dangerous." Players warned each other about the Drill, and, in fact, players quit the team due to its propensity to cause injuries.

48.     Prior to the 2011 season, Defendants Rogish and Schumacher knew[9] that the Drill increased the risks of concussions. At least one player during the 2010 season suffered a concussion while performing the Drill.

49.     What is more, a few days before Derek's fatal blow, two of Derek's teammates suffered concussions during the Drill. Despite the significant damage and excessive amount of blows the players were taking, the Defendants, including the NCAA, Rogish, Schumacher and athletic trainers allowed, condoned and/or demanded that the Drill continue without modification. To this day, one of the Derek's teammates still has significant cognitive impairment as a result of the Drill.

_____

[9] See "Policy Manual for the Athletic Training Program at Frostburg State University." "The head coach [Rogish], or the coach [Schumacher] in charge of specific group, will be given the player's state within minutes on whether he/she can or cannot continue." DEF 158; See also, DEF 150, "When an athlete is injured....The coach will be informed as quickly as possible regarding the athletes' availability in that particular practice or contest."

50.     Dr. Kevin Guskiewicz, a leading scientist on sports concussion, has analogized the violent forces at play during football practice to a car crash. "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100 Gs: in effect, the player had two car accidents that morning." In effect, Derek and his teammates were forced to endure multiple car-like collisions, until one ultimately led to an avoidable death.

51.     Significantly increasing the risks of football, Defendant Schumacher demanded that the players "lead with your head" and use your "hat first." If a player did not perform the Drill as Defendant Schumacher ordered, the players, including Derek, would be berated and cursed at by Defendant Schumacher. Likewise, Defendant Rogish institutionalized a similarly illegal hit. According to the Frostburg Special Teams Playbook, a player is instructed to "earhole this guy." Performing an "earhole" is illegal, according to NCAA Rules, and tantamount to instructing a player to lead with their head in order to blindside an opposing player in the side of the head – often inducing violent rotational forces and a concussion.

52.     For more than 40 years, coaches around the country have known that a player should not lead with their head. In fact, in 1967 the American Medical Association Committee on Medical Aspects of Sports declared that coaches should not teach players to lead with their head. By 1976, the NCAA and the National Federation of State High School Associations (NFHS) passed a rule prohibiting initial contact with the head.

53.     Despite this elementary rule, Defendant Schumacher ordered the players to tackle and/or lead with their head. One of Derek's teammates said he was "shocked" when he heard Defendant Schumacher's order, but he said you were required to obey his orders otherwise he would lash out and call players a "b****."

14

54.     The first full day of practice involved more than four hours of full-contact, which significantly increased the risk of concussions and repetitive head trauma.

55.     On the following day, August 20, 2011, Defendant Schumacher ordered the tailbacks and fullbacks, including Derek, to engage in the aforesaid dangerous Drill.

56.     During the course of the Drill, Derek's forehead began bleeding profusely. Pursuant to NCAA Rule 3, "Whenever a participant...is bleeding...the player...shall...be given appropriate medical treatment. *He may not return to the game [or practice] without approval of medical personnel.*"[10]   Despite seeing the blood running from Derek's forehead, Defendants Rogish, Schumacher and Sweitzer violated and failed to enforce this rule on multiple occasions.

57.     On information and belief, Derek was examined by Defendant Michael Sweitzer, Jr., a Certified Athletic Trainer. Defendant Sweitzer was the team's primary athletic trainer and was responsible for overseeing the care provided to Derek. On information and belief, Defendant Sweitzer supervised three to four graduate assistant athletic trainers (hereinafter the "staff").

58.     Instead of investigating whether Derek was suffering from a concussion, Defendant Sweitzer and his staff merely bandaged Derek's forehead and allowed him to return to play. On information and belief, Defendant Sweitzer and his staff did not perform a concussion evaluation or identify whether Derek's helmet was fitted improperly.

59.     Athletic trainers are required to be knowledgeable in proper helmet fitting. According to a textbook used in introductory athletic training courses, "[t]he ability to properly fit a football helmet is an essential skill for the certified athletic trainer."[11]

---

[10] 2011 and 2012 NCAA Rules and Interpretations, § 3, Art. 5(a)(4)

[11] *Athletic Training Student Primer: A Foundation for Success*

15

60.     Defendant Sweitzer and his staff also knew that Derek was susceptible to concussions. Athletic trainers are expected to know a player's history of prior concussions and associated recovery patterns. During the prior season, on information and belief, Derek suffered a concussion during practice, which was diagnosed by Defendant Sweitzer and his staff. It is commonly known that individuals who suffer their first concussion are increasingly susceptible to suffer additional concussions.

61.     After the morning practice concluded, the players broke for lunch and then had several hours of team meetings. Despite exhibiting a significant bruise on his forehead, at no time did Defendants Rogish, Schumacher and/or athletic trainers inquire about Derek's bruise. Though Derek would get a red spot on his forehead during prior preseasons, his teammates said they had never seen his forehead bleed profusely or exhibit such a large, protruding and discolored bruise as they observed in the days leading up to his fatal injury.

62.     On Sunday, August 21, 2011, the team had another set of full contact, two-a-day practices. Defendant Schumacher ordered the tailbacks and fullbacks to engage in the Drill. At this point, the Drill had become so excessive, one of Derek's teammates said he "felt bad for the fullbacks" because they were repeatedly exposed to head trauma.

63.     During the Drill, Derek's head began bleeding, again. For the second time, on information and belief, Derek was examined by Defendant Sweitzer and his staff. Defendant Sweitzer and his staff did not perform a concussion evaluation, examine the fitting of Derek's helmet or investigate why his forehead continued to bleed. On information and belief, Defendant Sweitzer bandaged Derek's forehead and, again, allowed him to return to full-contact practice.

64.     At lunch, Derek's teammates observed a noticeable difference in his behavior. Instead of being social and jovial, Derek appeared to "not be himself."

16

65.     Shortly following lunch, Defendant Schumacher ordered the players to perform the Drill. Derek's forehead began bleeding, again. Derek sought help from Defendant Sweitzer and his staff.

66.     On information and belief, Defendant Sweitzer and his staff, once again, did not perform a concussion evaluation, investigate the cause of Derek's persistent bleeding, or determine if his helmet was fitted properly.

67.     Willfully ignoring an obvious problem with the helmet and a suspected concussion, Defendant Sweitzer and his staff attempted to cure Derek's head injury with a band-aid. Defendant Sweitzer and his staff bandaged Derek's head and allowed him to return to play.

68.     Derek and his teammates continued full-contact practice for an additional two hours. After practice and dinner, Derek and his teammates had team meetings.

69.     Defendants Rogish and Schumacher knew that Derek's forehead was bleeding. Despite manifesting obvious concussion symptoms, neither the coaches nor the athletic trainers followed up with Derek, investigated his bruise or performed a concussion evaluation.

### The Last Clear Chance to Avert the Consequences of Defendants' Gross Negligence

70.     On the morning of August 22, 2011, Derek had breakfast at or around 7 a.m. with his teammates. His teammates remember observing the obvious bruise on his forehead; at that time, Derek did not have a band-aid on his head.

71.     Despite knowing that the Drill was extremely dangerous and seeing two other players suffer concussions during that week, Defendant Rogish and athletic trainers willfully allowed and condoned Defendant Schumacher to continue the Drill.

72.     Defendant Schumacher ordered the players to perform the Drill. Derek's forehead began bleeding, again. For the fourth time, on information and belief, Derek was examined by

17

Defendant Sweitzer. Defendant Sweitzer and his staff did not perform a concussion evaluation, examine the fitting of Derek's helmet or investigate why his forehead continued to bleed.

73.    Having the last clear chance to remove Derek from play, Defendant Sweitzer and his staff willfully disregarded the obvious head injury, placed a bandage on Derek's forehead and allowed him to resume the Drill.

74.    During the offensive and defensive "inside-run drill," in which Defendants Rogish and Schumacher were present and full-speed contact was required, Derek was involved in a significant amount of contact. Shortly after one play, Derek walked back to the huddle and explicitly informed Defendant Schumacher that he "didn't feel right" and that he had a "headache." Upon information and belief, Defendant Rogish heard Derek report his injury. Defendant Rogish should have immediately removed Derek from play, but instead he willfully disregarded Derek's plea for help.

75.    With Defendant Rogish, and on information and belief other members of the coaching staff, standing right next to Defendant Schumacher and thus clearly hearing Derek's disclosure, Defendant Schumacher yelled, "Stop your bitching and moaning and quit acting like a pussy and get back out there Sheely!" Equally vile, Defendant Rogish acceded to Defendant Schumacher's deadly demand and allowed Derek to return to play.

76.    Having the last clear chance to remove Derek from play, Defendants Rogish and Schumacher willfully ignored and recklessly disregarded Derek's plea for help and forced him to return to play.

77.    Derek resumed contact and the players began the 7-on-7 drill. Upon information and belief, Defendant Rogish was in charge of this drill. This is basically a game-like situation where players engage in all-out, full contact. Knowing that Derek was injured, Defendant Rogish

18

continued to disregard Derek's health and safety by forcing him to continue the drill. After completing a series of plays, Derek was involved in a collision with a defensive back. Though the collision was relatively unremarkable, it was of sufficient force to trigger second-impact syndrome.

78.     Derek walked back to the sidelines in a lucid state, and within a few minutes following the collision, Derek collapsed and never regained consciousness. Derek's teammates yelled for the coaches, "Coach, look at Sheely." Outrageously, Defendants Rogish and Schumacher both scoffed and yelled at Derek, ordering him to get up. But, sadly, he could not.

79.     Derek's final collision caused brain herniation, an acute subdural hematoma, and massive vascular engorgement.

80.     Derek was airlifted to the hospital where the doctors performed an emergency craniectomy. Though Derek remained comatose for six days, he continued to suffer from conscious pain. Despite all medical efforts, Derek died on August 28, 2011, due to complications from massive brain swelling caused by second-impact syndrome.

81.     Acknowledging their keen awareness, yet reckless disregard, of the significant dangers imposed by the Drill and that their conduct was a gross deviation from the standard of care, Defendants Rogish and Schumacher, immediately following Derek's fatal injury, armed the linebacker with a blocking shield for protection during the Drill.

82.     Further confirming their gross incompetence about concussions, on information and belief, after Derek's death, the Frostburg Athletic Training Program, Defendants Sweitzer, Rogish and Schumacher ordered "special mouth guards," called Brain Pads. Once again, research by Frostburg Athletic Training Program and the aforesaid Defendants would have revealed that there is no scientific evidence to support a mouth guard's ability to do anything

19

related to concussions. A mouth guard's sole purpose is to prevent dental fractures, not protect against concussions.

## Factual Allegations Against the NCAA[12]

### The NCAA Had A Duty to Protect and Safeguard Derek

83.    Since its inception, the NCAA shouldered a legal duty to protect student-athletes, including Derek. According to its website, the NCAA was founded "*to protect* young people from the dangerous and exploitive athletic practices of the time."

84.    The NCAA holds itself out as the supervisory force over conduct at intercollegiate events and practices throughout the country.

85.    At the turn of the 20th Century an alarming rate of deaths due to head injuries were occurring in college football. President Theodore Roosevelt convened a group of Ivy League Presidents and coaches to discuss how the game could be made safer. As a result of several subsequent meetings of colleges, the Intercollegiate Athletic Association of the United States was formed (IAAUS). In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

86.    The NCAA's founding purpose to protect student-athletes has been repeated often, and as far back as 1909 at the annual convention of member institutions. There, Chancellor James Roscoe Day of Syracuse University stated:

> The lives of the students must not be sacrificed to a sport. Athletic sports must be selected with strict regard to the safety of those practicing them. It must be remembered that the sport is not the end. It is incidental to another

---

[12] Pending in the Northern District of Illinois is a putative class action, *Adrian Arrington et al., v. NCAA*, Case No. 11-cv-06356. The parties in that case have engaged in more than a year-and-a-half of discovery. Many of the facts alleged below arise from the pleadings and documents that have been filed during the course of that case. At times, Plaintiffs will cite to documents which have been produced and Bates Numbered (e.g. NCAA00003843).

end far more important. We lose sight of both the purpose and the proportion when we sacrifice the student to the sport.

87.     Today, those words ring hollow. In fact, the opposite is now true: The NCAA and its member institutions have lost sight of its founding principles, and Derek's life *was sacrificed* to a sport. Instead of making player safety a priority above all else, the NCAA has attempted to shirk its legal duty.

88.     Try as it might to disclaim, the NCAA owed a legal duty—through its historical actions and repeated representations and affirmations—to Derek.

89.     The NCAA purports to be a nonprofit association that is committed to providing opportunities for college athletes. The NCAA has neglected the central purpose for which it was established—to protect student-athletes—and now its primary purpose is to generate revenue for its conferences and members.

90.     In 2012, the NCAA's total revenues eclipsed $838,000,000. In 2010, the NCAA entered into an exclusive television and media rights contract with CBS and Turner Broadcasting. Over the 14-year term contract, the NCAA is to receive $10.8 billion. Similarly, in 2011, the NCAA entered into a multi-media agreement with ESPN, which is to provide for payments totaling $500,000,000 over the life of the 14-year contract.

91.     College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws and Administrative Bylaws, which compromise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

92.     The NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for

member schools. The NCAA promulgates sport-specific standards through its Playing-Rules Committees.

93.     The NCAA also publishes a Sports Medicine Handbook (the "Handbook"), which includes policies and guidelines for the treatment and prevention of injury, as well as return-to-play instruction. The Handbook is also produced annually and sent directly to head athletic trainers, as well as various individuals at NCAA member institutions. The Handbook expressly recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

94.     The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes….;
> (b) To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this associations;….

NCAA Const., Art. 1, § 1.2(a)(b). The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

95.     Despite the multiple rule violations that caused Derek's death, as set forth above, the NCAA never investigated and/or enforced it "procedures" against Frostburg and its coaches when it failed to fulfill its obligations owed to Derek.

96.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides in pertinent part:

> **2.2. The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> **2.2.3 Health and Safety**. It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

97.     In fact, the NCAA Constitution mandates that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience." NCAA Const., Art. 2, § 2.2.1 (Adopted: 1/10/95).

98.     To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations...."

99.     Not only has the NCAA promised to protect student-athletes through its governing documents, but it also has publicly acknowledged its duty to protect the health and safety of student-athletes, including Derek.

100.    The NCAA has consistently recognized its duty to provide a safe environment for student-athletes. For example, the NCAA's website states: "Part of the NCAA's core mission is to provide student-athletes with a competitive environment that is *safe* and ensures fair play. While each school is responsible for the welfare of its student-athletes, the NCAA provides leadership by establishing safety guidelines, playing rules, equipments standards, drug testing procedures and research in the cause of injuries to assist decision making. By taking proactive

23

steps to student-athletes' health and safety, we can help them enjoy a vibrant and fulfilling career." To the contrary, the NCAA has wholly failed in its "leadership."

101.    The NCAA also maintains The Committee on Safeguards and Medical Aspects of Sports, which is publicly touted by the NCAA as "serv[ing] to provide expertise and leadership to the NCAA in order to provide a healthy and safe environment for student-athletes through research, education, collaboration and policy development."

102.    The NCAA has further promised its athletes a safe environment, which is proudly proclaimed on its website:

> The NCAA takes appropriate steps to modify safety guidelines, playing rules and standards to minimize those risks and provide student athletes with the best opportunity to enjoy a healthy career. The injury surveillance program collects, analyzes, interprets and disseminates data in injuries in each sport, providing a wealth of information through which we can provide athletes with a safe competitive environment.

103.    One of the NCAA's "core concepts and priorities" was to use its knowledge to promote health and safety:

> The NCAA has been conducting injury surveillance for more than 20 years. Over time, the underlying principle of the program has remained unchanged – to promote and support student-athlete health and safety.

104.    In fact, the NCAA explains on its website how it promises to use the injury surveillance data it collects:

> How does [the injury surveillance data] help prevent sports injuries?
>
> Once we know how they occur we can take the necessary steps to reduce student-athlete's exposure to situations that cause injuries. For instance, we can make adjustments to rules – such as *eliminating tackling techniques in football* or high-sticking in ice hockey – to reduce situation that expose student-athletes to high risks of injury. Or we can adjust equipment requirements and standards to increase safety.

105.    Moreover, in January 2010, David Klossner, the Director of Health and Safety for the NCAA, testified to Congress that the "core purpose[] of the Association is a commitment to govern athletics in a manner designed to protect the health and safety of all student-athletes." Mr. Klossner also admitted that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

106.    Mr. Klossner represented to Congress that the Committee on Competitive Safeguards and Medical Aspect of Sports "determined that a common player rule is necessary to provide an emphasis on the significance of head injuries...." Mr. Klossner went on to say that the "proposed playing rule...would mandate removing from competition and practice a student-athlete 'who exhibits signs, symptoms or behaviors consistent with a concussion.'" Finally, Mr. Klossner said the NCAA would "explore emerging trends in medical management of concussions" such as "possible limitations on head contact during practice...."

107.    In reinforcing its legal duty owed to Derek and all student-athletes, the NCAA affirmatively acted, in part, by passing a rule that has, according to the NCAA's Director of Health and Safety, *never been enforced* despite systematic and blatant violations. The NCAA also delivered an empty promise and failed to mandate a limit on "head contact during practice."

108.    In the months leading up to the implementation of the NCAA Concussion Management Plan (the "Plan"), NCAA executives debated its merits and some even mocked the idea. Ty Halpin, the Director of the Playing Rules Administration, and Nicole Bracken, Associate Director of Research, expressed their incredulous attitude toward protecting student-athletes:

> **Halpin:** "Dave [Klossner] is hot/heavy on the concussion stuff. He's been trying to force our rules committees to put in rules that are not good - - I think I've finally convinced him to calm down."[13]
>
> **Bracken:** "He [Klossner] reminds me of a cartoon character." [14]
>
> **Halpin:** "HA! I think you're right about that!"[15]

109.    Long overdue, in August 2010, the Plan went into effect; merely mandating toothless guidelines that member institutions have a piece of paper on file. Rule 3.2.4.17.

110.    The Plan has four basic requirements:

1.    An educational component;
2.    Evaluation of students-athletes who show signs of a concussion;
3.    A policy preventing student-athletes diagnosed with concussions from return to play the same day; and
4.    A policy preventing student-athletes diagnosed with concussion from returning until they have been cleared by a physician or a designee.

111.    Just two months after the Plan took effect, the NCAA made a coldly-calculated decision to rip the enforcement measure out of the Plan. In response to a foreseeable scenario posed by Mr. Klossner regarding what the penalty would be if a school—just like Frostburg did here—failed to follow the Plan, the Director of Enforcement, Chris Strobel, replied:[16]

> Isolated incidents of the concussion policy will be dealt with as secondary violations. The enforcement staff will treat violations as secondary unless the institution has a pattern of not following the policy and/or *blatant disregard for the policy.*
>
> Penalties will depend on the circumstances of the violation. *For example, if a coach requires a student-athlete to compete after being informed the student-athlete has been diagnosed with a concussion, we would require a significant penalty (e.g., that the coach be suspended from coaching activities for one or two contests)....* (emphasis added).

---

[13] NCAA10029172-75, at NCAA10029172.
[14] Id.
[15] Id.
[16] NCAA10015557

112.    Just two hours later, the NCAA fatally backtracked and ripped the teeth from its enforcement. The Director of Enforcement changed his position and said that the NCAA would only require schools to have the Plan in place, but would "not suspend or otherwise penalize a coach pursuant to the current legislation even if the student-athlete was required to participate after having been diagnosed with a concussion."[17]

> I have been corrected. I apologize, but my previous e-mail to you was premature in how enforcement would handle 3.2.4.16 issues. Enforcement will only process violations involving (1) an institution not having the concussion management plan in place (secondary violation), and (2) systematic or blatant disregard for the plan that would indicate a lack of institutional control (most likely major)...

113.    Despite a systematic and blatant disregard for the Plan that indicated a clear lack of institutional control, as set forth in Paragraph 1 through 82 above, the NCAA, on information and belief, never investigated or sought to enforce the Plan.

114.    Even worse than the NCAA's ineffective and affirmative actions, or a lack thereof, in carrying out the Plan, the Plan puts the onus of concussion management on the student-athlete by requiring that they "sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions."

115.    Yet, it is universally accepted that player's cannot make that decision for themselves because "a concussion may cloud [a student-athlete's] judgment on whether or not [they] are functioning normally."[18]

116.    Distilled to its essence, the Plan rejects any measure of responsibility for the NCAA, its member schools, and the coaching staff. Instead, the burden falls squarely on the head

---

[17] NCAA10015556
[18] NCAA10054372

of student-athletes – the same student-athletes who have just sustained significant cognitive impairment – to seek out medical attention.

117.    While Derek's and other student-athletes' brains were being damaged due to repeated violations of the Plan, the NCAA decided to spend its time generating revenue and investigating and enforcing the legal fiction of amateurism.[19]

### The NCAA's Systematic Failure to Address Concussions Caused Derek's Death

118.    Despite being in a superior position to address the foreseeable dangers of concussion, the NCAA repeatedly failed to act in, but not limited to, the following ways: by thwarting its charge of leadership, by failing to mandate a continuing education program, by failing to mandate a certification program for coaches, and by failing to adopt and implement rule changes.

119.    Concussion education is a cornerstone for protecting student-athletes, yet when it came to delivering this necessary resource the NCAA punted.

120.    In 2005, Preston Plevretes' was rendered permanently disabled after he suffered second-impact syndrome while playing for La Salle University. His experts concluded that the defendants' conduct was a "reckless and gross deviation from the standard of care." Dr. Michael W. Collins, Ph.D., Assistant Professor in the Department of Orthopedic Surgery and Neurological Surgery at the University of Pittsburgh, opined:[20]

> The lack of institutional involvement in assuring appropriate care of their student athletes and also not having any written protocols for appropriate management of injury is a reckless and gross deviation from the standard

---

[19] The examples are legion, but one should suffice. In 2000, the NCAA investigated and enforced a purported violation by the University of Nebraska. The violation? Eric Crouch ate a $4 ham sandwich.
http://sportsillustrated.cnn.com/football/college/news/2000/06/07/crouch_sandwich_ap/
[20] NCAAPLS000606

28

of care. As such, *the lack of institutional support* was also responsible for Preston's mismanagement and catastrophic outcome.

121.    Similarly, Scott L. Bruce, MS, ATC, a certified athletic trainer and lecturer and approved clinical instructor in the Graduate Athletic training Program at the University of Tennessee at Chattanooga opined that the school, and more directly the NCAA, failed "to educate team members, including Preston Plevretes, on the signs and symptoms of concussion and the risks of catastrophic injury associated with playing while symptomatic."[21]

122.    The NCAA did not meet its obligation to educate student-athletes regarding the risks of catastrophic injury in football. The NCAA did not take any steps to ensure student-athletes, including Derek, understood and appreciated the risks. Cognizant of these facts, Mr. Klossner identified several "NCAA Issues;"[22] chief among them was, "College age athletes often minimize symptoms and/or under-report their injuries; they often feel immortal, and may not understand the consequences of playing with injury."[23] In addition, Mr. Klossner acknowledged that student-athletes, including Derek, were also being pressured by their coaches' "win at all-cost" mentality.[24]

123.    Having actual knowledge of the multiple failures and simple remedial measures at its disposal to ensure a tragedy like Preston's never occurred again, the NCAA turned a blind eye and delivered a stiff arm to its membership.

124.    When a school inquired whether the NCAA was "going to sell or offer the concussion flyers for both the student-athlete and coach…[to be used in an] enhanced concussion

---

[21] NCAAPLS000611
[22] NCAA10140278
[23] *Id.*
[24] NCAA10056397

education program,"[25] or how a school could "go about obtaining 900 Concussion Fact Sheets for Student-Athletes,"[26] the NCAA responded that "[w]e will not be sending out any more flyer [sic] or printing them."[27]

125.    More warning signs were brought to the NCAA's attention. On April 6, 2008, Dr. Frederick Mueller sent Mr. Klossner the "Catastrophic Head Injuries in High School and College Football Players (1977-2008)" and noted that "[n]umbers are going up" and that "[a]lmost all are NCAA players."[28] The study found that "[t]hese numbers are not acceptable and an all-out effort must be made to reduce them."[29] The study recommended that the football rules prohibiting spearing (helmet-to-helmet contact) should be enforced and that the head should not be used as a weapon and states that "[i]f more of these penalties are called there is no doubt that both players and coaches will get the message and discontinue this type of play."[30] The study reiterated that a student-athlete should not be returned to play if they show signs of head trauma and that "[d]uring the 2008 football season there was the possibility of eight second impact syndrome injuries."[31]

126.    Confirming these daunting numbers, in April 2008, Rickey Hamilton Jr., a Division III football player, sent an email to Mr. Klossner, eerily foreshadowing Derek's plea for help:[32]

>    There are multiple players on my team who have suffered injuries and have not had the correct treatment for them. We are trying to see what we

---

[25] NCAA10015560-61, at NCAA10015560
[26] NCAA10012557-58, at NCAA10012557
[27] NCAA10015560
[28] NCAA00003842-73, at NCAA00003843
[29] *Id.*
[30] *Id.* at NCAA00003852
[31] *Id.*
[32] NCAA10023686

can do about this because this is not fair to the student athletes who put their all into something and can't even get the proper treatment needed.

127.     Then, again in 2009, Dean Crowell, an assistant football athletic trainer at the University of Georgia, was also witnessing this potential death sentence first hand, "I personally have seen an athlete knocked unconscious and return in the same quarter in recent years."[33]

128.     Warning signs and calls for leadership were also coming from member institutions and conferences. In 2010, during the NCAA Concussion Working Group, Joni Comstock, the NCAA's Senior Vice President of Championships, recorded in the minutes that "[t]here was continued agreement that the membership was looking to the national office for guidance...."[34] In 2011, Chuck Mitrano, President of the DIII Commissioner's Association, reached out to Mr. Klossner, requesting a seat at the table and the "critical" need of education and leadership from the NCAA, which Mr. Mitrano acknowledged was wholly lacking:[35]

> By having a direct link to this initiative it allows DIII to be part of the process and to keenly raise awareness within our membership. *To be frank, this emphasis is largely absent.*

129.     SEC Commissioner Mike Slive recently confirmed the NCAA's ongoing failures:

> There is much work to be done, and while the Conference has a role to play, prevention and treatment of concussion injuries is a national concern that needs and deserves a coordinated national effort. For this reason, the Presidents and Chancellors will make a *formal request that the NCAA take the lead in organizing and spearheading a national research effort and examining possible revisions to playing rules in football* and other sports....*I hope and expect that the NCAA will take the lead in further development of standards and practices to protect the health and safety of our student athletes.*

130.     The NCAA decided to ignore not only the student-athletes' pleas for help, but also its charge of leadership. Fed up with the NCAA's repeated failures to protect student-

---

[33] NCAA10011982
[34] NCAA10028800
[35] NCAA10035002

31

athletes, members of Congress recently proposed a bill entitled, the "National Collegiate Athletics Accountability Act," which would, *inter alia*, mandate baseline concussion testing.

## Empty Promises and Misfeasance Led to Derek's Death

131.    In the midst of a "concussion crisis," leagues -- including the NFL, Arizona Interscholastic Association,[36] the Ivy League, the Pac-12 and Pop Warner -- have made policy changes aimed at reducing head trauma in football.

132.    It is estimated that college football players are exposed to 1,000 to 2,500 hits to the head each season. Scientific evidence, common sense and simple logic suggest that mandating a limit on contact practices, banning two-a-days and dangerous drills, like the one that led to Derek's death, would significantly decrease the risk of brain damage.

133.    Despite clear and convincing evidence, the NCAA has sat idly by— manufacturing doubt—about the efficacy of limiting contact practices. While reporting on the Ivy League's decision to implement the policy, the NCAA stated on its website, "The exact benefit of the practice modifications is not yet known."

134.    The Ivy League, on the other hand, chose not to wait. In 2010, the Ivy League implemented a conference-wide practice regiment that limited full-contact practices to a maximum of two per week. In addition, for preseason, they limited to one the number of days that pads can be worn during the preseason and also called for "greater time and attention devoted to the teaching of and emphasis on proper techniques for avoiding helmet hits."[37]

135.    If the NCAA would have mandated a similar policy, actually enforced the Plan and carried out its promises, Derek would still be alive today. Likewise, countless other student-

---

[36] Even the powerhouse of high school football, Texas, is on the verge of implementing contact limits to 90 minutes per week.
[37] NCAA00013981, See also, Dr. Cantu's report at 62

athletes would not have been exposed to the excessive amount of head trauma the Defendants caused Derek and his teammates to suffer.

136. Despite the action by multiple other leagues, the NCAA continues to ignore the repeated warnings and long-term effects of concussions. This systematic failure proximately caused Derek's death.

137. Defendants' acts and/or omissions were the direct and proximate cause of Decedent's injuries.

138. Following the fatal blow that triggered second-impact syndrome on August 22, 2011, Decedent lived for an additional six days. Throughout this time, Decedent suffered from conscious pain.

139. Pursuant to Md. Code, Cts. & Jud. Proc., §6-401, the Decedent's rights of action for gross negligence, negligence, negligent misrepresentation, negligent hiring, violations of the Maryland Consumer Protection Act, failure to warn, strict liability, and fraudulent misrepresentation, against Defendants survive in favor of Kristen Sheely, the Personal Representative of Derek's Estate, and she brings the survival claims detailed in Counts I through XI below on behalf of her son's Estate.

140. Defendants are liable to the Plaintiff Personal Representative for such damages as might have been recovered by Decedent himself had he survived the injury and brought this action for the physical and emotional pain and suffering, mental anguish, economic loss and fear caused by Defendants' unlawful actions under the common law of Maryland as described herein.

### Count I – Gross Negligence
### (Survival Action v. Defendants Schumacher, Rogish and Sweitzer)

141. Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140.

142.    Defendants, and each of them, owed duties of care to Decedent, based on their relationship to him as a student, athlete, patient, and general member of the public.

143.    Defendants, and each of them, owed duties of care to Decedent to refrain from creating new risks that are not inherent in football.

144.    Defendants, and each of them, owed duties of care to Decedent to refrain from increasing certain risks that may be inherent in football.

145.    The acts and omissions of Defendants constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences affecting the life of Decedent. Said acts and omissions by Defendants were so utterly indifferent to the rights of Decedent that they amounted to wanton recklessness and gross negligence, which each is individually liable for the injuries that Decedent suffered, and Defendants are not entitled to immunity under State law.

146.    Defendants, and each of them, breached said duties of care by their conduct (whether act or omission) as alleged in paragraphs 1 - 82 of this Complaint.

147.    [Intentionally omitted]

148.    As a direct and proximate result of the wantonly recklessness and grossly negligent acts and omission of Defendants, Decedent was killed and Plaintiffs suffered losses as set forth in Maryland's Wrongful Death and Survival Statute.

149.    The wanton recklessness and gross negligence of Defendants was a direct and proximate cause of Decedent's painful injuries, death and the injuries and damages sustained by the Plaintiffs. As a direct and proximate result of the wanton recklessness and gross negligence of Defendants, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses

described above were caused by the Defendants, without any contributory negligence on Derek's part.

**WHEREFORE**, Plaintiff Personal Representative demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

### Count II – Professional Gross Negligence in the Practice of Athletic Training
### (Survival Action v. Defendant Sweitzer)

150. Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

151. Upon information and belief, Defendant Sweitzer is a "licensed athletic trainer" within the meaning of the Maryland Athletic Trainers Act (MATA). Md. Code Ann., Health Occ. § 14-5D-01.

152. The MATA requires licensed athletic trainers to be professionally competent, lest they will have their license revoked.

153. Defendant Sweitzer undertook a duty to provide athletic training and professional services to Decedent. Defendant Sweitzer was also responsible for supervising the care that was provided to Decedent.

154. In performing such professional services, Defendant Sweitzer owed a duty to use such professional skill, prudence and diligence as other members of the Athletic Training profession commonly possess and exercise.

155. Defendant Sweitzer failed to exercise reasonable care in evaluating, monitoring, detecting and treating Decedent's injuries.

156. Defendant Sweitzer failed to exercise reasonable care in making return-to-play determinations for Decedent.

157.   The failure of the Defendant Sweitzer to exercise such care increased the risk of harm suffered by Decedent, including the unknown risk of death triggered by second-impact syndrome.

158.   As a student-athlete, Decedent relied upon the undertaking of the Defendant Sweitzer to provide athletic-training services, including testing, evaluating, and monitoring of concussive and sub-concussive injuries, as well as return-to-play decisions, testing and determinations.

159.   The conduct of Defendant Sweitzer was in violation of the MATA.

160.   Decedent's reliance on the Defendant Sweitzer, and his intentional failure to perform a manifest duty in reckless disregard of the consequences was a direct and proximate cause of Decedent's death and the injuries and damages suffered by him.  As a direct and proximate result of the conduct of Defendant Sweitzer, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate.  All of the injuries, damages and losses described above were caused by the Defendant, without any contributory negligence on Derek's part.

**WHEREFORE** Plaintiff Personal Representative demands judgment against Defendant Sweitzer for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

### ACTIONS AGAINST SCHUTT SPORTS & SPORTSMAN'S

#### Count III – Negligence
#### (Survival Action v. Schutt Sports & Sportsman's)

161.   Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

36

162.    At all material times, Defendants and/or their agents had a duty to use reasonable care in the manner in which it designed, manufactured, assembled, distributed, marketed, represented and sold the subject helmet.

163.    Defendants breached the duty of care they owed to Decedent, both generally and in the following particular respects:

     i.        Failing to truthfully market their products;

     ii.       Failing to educate their agents about the limitations of the subject helmet;

     iii.      Failing to ensure their agents were competent to sell and fit the subject helmet;

     iv.      Failing to warn about the risks of second-impact syndrome;

     v.       Failing to warn that no helmet can reduce or prevent the risk of concussions;

     vi.      Failing to properly fit Decedent with the subject helmet;

     vii.     Other acts and failures that may be discovered during the course of this case.

164.    Defendants knowingly and falsely marketed the subject helmet as being able to reduce a risk that they knew was not scientifically validated. Defendants knew that their claims were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew that falsely marketing their helmets would deceive the recipient of their consumer goods. Despite this knowledge, Defendants showed a gross indifference, malice, and a reckless disregard towards others by falsely marketing the subject helmet.

165.    As a direct and proximate result of the foregoing, the Decedent suffered severe and painful injuries and death. As a direct and proximate result of the negligent acts and failures

of Defendants, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

WHEREFORE, Plaintiff Personal Representative demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

### Count IV – Negligent Misrepresentation
#### (Survival Action v. Schutt Sports & Sportsman's)

166. Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

167. At all material times, Defendants and their agents had a duty to use reasonable care in the manner in which it designed, manufactured, assembled, distributed, marketed, represented and sold the subject helmet.

168. Defendants and their agents, owing the Decedent said duty of care, negligently misrepresented a material fact, as described in Paragraph 40 above. Defendants' agents, while acting in the course and scope of employment, proclaimed that Defendants' "new technology can prevent head injuries."

169. The Defendants and their agents intended that Decedent would act in reliance upon said misrepresentation.

170. The Defendants and their agents knew the Decedent probably would rely on the misrepresentation, which were material and factually false and caused damages to Decedent and Plaintiffs.

171. The Decedent justifiably acted in reliance on the misrepresentation.

38

172.    Defendants knowingly and falsely marketed and represented the subject helmet as being able to reduce and/or prevent a risk that they knew was not scientifically validated. Defendants knew that their claims and representations were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew that falsely marketing and representing their helmets would deceive the recipient of their consumer goods. Despite this knowledge, Defendants showed a gross indifference, malice, and a reckless disregard towards others by falsely marketing and representing the subject helmet.

173.    The Decedent suffered painful, fatal injuries as a direct and proximate result of his reliance on the misrepresentation of Defendants.   As a direct and proximate result of the misrepresentation and wrongful conduct of Defendants, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate.  All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

**WHEREFORE**, Plaintiff Personal Representative demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

### Count V – Violation of the Maryland Consumer Protection Act
### (Survival Action v. Schutt Sports & Sportsman's)

174.    Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

175.    The Maryland Consumer Protection Act (MCPA) protects the "actual or prospective purchaser, lessee or *recipient of consumer goods*…." Decedent was a "recipient of consumer goods."

39

176.    Defendants, by and through their agents, violated the MCPA in the following ways:

     i.     By making false or misleading oral representations which had the capacity, tendency, or effect of deceiving or misleading Decedent;

     ii.     By representing that the consumer good (i.e. subject helmet) had a characteristic, use and benefit which it did not have;

     iii.     By representing that the consumer good (i.e. subject helmet) had a particular standard, quality, grade, style, which it did not have; and

     iv.     By failing to state a material fact (i.e. that the subject helmet CANNOT prevent head injuries, including concussion and second-impact syndrome) which said failure deceived Decedent.

177.    The aforesaid unfair and deceptive trade practices by Defendants, by and through their agents, induced Decedent's reliance to use the subject helmet, and convinced Decedent that the subject helmet could in fact prevent head injuries.

178.    Defendants knowingly and falsely marketed and represented the subject helmet as being able to reduce and/or prevent a risk that they knew was not scientifically validated. Defendants knew that their claims and representations were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew that falsely marketing and representing their helmets would deceive the recipient of their consumer goods. Despite this knowledge, Defendants showed a gross indifference, malice, and a reckless disregard towards others by falsely marketing and representing the subject helmet.

179.    Decedent's reliance upon Defendants' unfair and deceptive trade practices directly and proximately caused Decedent's painful and severe injuries and death. As a direct

and proximate result of the negligence of Defendants, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

**WHEREFORE,** Plaintiff Personal Representative demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

**Count VI – Strict Liability for Design Defect**
**(Survival Action v. Schutt Sports & Sportsman's)**

180.    Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

181.    At the time the subject helmet was designed, manufactured, sold and distributed by Defendants, the subject helmet was defective in design, unreasonably dangerous, and unsafe for its intended purpose because it did not provide adequate protection against the foreseeable risk of brain injury. The design defect includes, but is not limited to the following:

  i.    Failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to Decedent's head;

  ii.    Failing to design the subject helmet with a shock attenuation system which was not safely configured;

  iii.    Failing to properly and adequately test the helmet model;

  iv.    Failing to warn Decedent that the subject helmet would not protect against second-impact syndrome, and any such warning that may have been made was

41

rendered ineffective by the representations made by and through Defendants' agents; and

v.      Other acts that may be discovered during the course of this case.

182.    The defective design and unreasonably dangerous condition were a proximate and contributing cause of the injuries suffered by Decedent.

183.    At all material times, the subject helmet was being used for the purpose for which it was intended.

184.    Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were the proximate and contributing causes of the painful and fatal injuries suffered by Decedent. A safer alternative design was economically and technologically feasible at the time the product left control of Defendants. As a direct and proximate result of the actions and failures of Defendants, Derek's Estate is entitled to recover for his injuries, pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

**WHEREFORE**, Plaintiff Personal Representative demands judgment against Defendants, jointly and severally, for compensatory damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

<u>**Count VII – Strict Liability for Manufacturing Defect**</u>
**(Survival Action v. Schutt Sports & Sportsman's)**
**(Pled in the Alternative to Count VI Pursuant to Maryland Rule 2-303(c))**

185.    Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

42

186.    At the time the subject helmet was designed, manufactured, sold and distributed by Defendants, the subject helmet was defective in its manufacturing, unreasonably dangerous, and unsafe for its intended purpose because it did not provide adequate protection against the foreseeable risk of brain injury.

187.    Defendants' failure to manufacture the subject helmet to design and manufacturing specifications result in, among other things, the following:

i.     Failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to Decedent's head;

ii.    Failing to manufacture the subject helmet with a shock attenuation system which was not safely configured;

iii.   Failing to properly and adequately test the helmet model;

iv.    Failing to warn Decedent that the subject helmet would not protect against second-impact syndrome, and any such warning that may have been made was rendered ineffective by the representations made by and through Defendants' agents; and

v.     Other acts and failures that may be discovered during the course of this case.

188.    The manufacturing defect was a proximate and contributing cause of the injuries suffered by Decedent.

189.    Defendants are strictly liable for manufacturing and placing in the stream of commerce a defective and unreasonably dangerous product which was a proximate and contributing cause of Decedent's injuries. A safe alternative design was economically and technologically feasible at the time the product left the control of Defendants. As a direct and

43

proximate result of the actions and failures of Defendant Schutt Sports, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

**WHEREFORE**, Plaintiff Personal Representative demands judgment against Defendants, jointly and severally, for compensatory damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

### Count VIII -- Strict Liability – Failure to Warn
**(Survival Action v. Schutt Sports & Sportsman's)**

190. Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

191. At all material times, Defendants had a duty to use reasonable care in the manner in which it designed, manufactured, assembled, distributed, marketed, represented and sold the subject helmet so as to avoid misleading and/or creating a false sense of security for its users.

192. At all materials times, Defendants knew that no helmet could prevent head injuries, including second-impact syndrome, nor could it reduce the rotational forces that primarily cause concussions.

193. Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the subject helmets.

194. Defendants failed to provide necessary and adequate safety and instructional materials and warnings of the risk of second-impact syndrome.

195. Any such warning and/or safety instructional material that may have been provided and/or attached to the subject helmet was nullified and rendered ineffective by contrary representations made by Defendants by and through their agents.

196.     Defendants knew that the substantial dangers were not readily recognizable to an ordinary consumer or user and that such person would use these products without inspection for defects. Despite this knowledge, Defendants showed a gross indifference, malice and a reckless disregard for the health and safety of others by failing to warn of the dangerous condition of its helmets.

197.     Decedent neither knew, nor had reason to know the existence of the aforementioned defects, or increased risks of harm.

198.     Decedent used the subject helmet in a reasonably foreseeable manner at all times.

199.     Decedent's injuries were the legal and proximate result of the actions of Defendants who owed a duty to warn Decedent of the risks of substantial harm associated with the foreseeable use of Defendants' product.

200.     Defendants' failure to warn caused Decedent's painful and severe injuries and death. As a direct and proximate result of Defendants' failure to warn, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate.   All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

**WHEREFORE**, Plaintiff Personal Representative demands judgment against Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

### Count IX – Fraudulent Misrepresentation
### (Survival Action v. Schutt Sports & Sportsman's)

201.     Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

202.    Defendants, by and through their agents, made a false representation of a material fact when it expressed to Decedent and others that the subject helmet's "new technology can prevent head injuries."

203.    Defendants, by and through their agents, knew of the falsity and/or made it with such reckless indifference to the truth that it would be reasonable to charge Defendants with knowledge of its falsity.

204.    Defendants, by and through their agents, intended that Decedent would act in reliance on such statements.

205.    Decedent, and others, did justifiably rely on the representations of Defendants, which were made by and through their agents.

206.    Defendants knowingly and falsely marketed and represented the subject helmet as being able to reduce and/or prevent a risk that they knew was not scientifically validated. Defendants knew that their claims and representations were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew that falsely marketing and representing their helmets would deceive the recipient of their consumer goods. Despite this knowledge, Defendants showed a gross indifference, malice, and a reckless disregard towards others by falsely marketing and representing the subject helmet.

207.    As a result of that reliance, Decedent suffered severe and painful injuries and death. As a direct and proximate result of the fraudulent misrepresentation of Defendants, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

46

**WHEREFORE**, Plaintiff Personal Representative demands judgment against Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

## ACTIONS AGAINST THE NCAA

### Count X - Negligence
### (Survival Action v. the NCAA)

208.    Plaintiff Personal Representative incorporates as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further alleges as follows:

209.    Since its inception and at all relevant times herein, the NCAA assumed a duty to protect student athletes and Decedent from brain injuries. This duty has been repeated by the NCAA on numerous occasions, including to Decedent, Congress and the members of the public. The NCAA reaffirmed its duty to protect Decedent and student athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

210.    Decedent relied on the NCAA's superior knowledge and expertise, as well as the NCAA's representations that it was looking out for his health and safety.

211.    The NCAA acted carelessly and negligently in its positions as the regulatory body for college teams, including Frostburg State University, and Decedent. The NCAA knew or should have known that its actions and/or inactions in light of the rate of concussive and sub-concussive injuries made known to the NCAA would cause harm to Decedent.

212.    The NCAA was careless and negligent by breaching the duty of care it assumed for the benefit of Decedent, both generally and in the following particular respects:

      i.    Failing to implement hit limits during practices;

      ii.    Failing to limit full-contact practices;

      iii.    Failing to ban two-a-day practices;

47

    iv.    Failing to ban certain drills, including the Drill, the Machine-Gun Drill, the Oklahoma Drill, and other similarly dangerous drills;

    v.    Failing to enforce the NCAA Constitution, By-laws and the Handbook;

    vi.    Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions and second-impact syndrome;

    vii.    Failing to educate student-athletes about the fatal risks of second-impact syndrome;

    viii.    Failing to enforce the Plan;

    ix.    Failing to investigate the events surrounding Decedent's death;

    x.    Failing to provide Decedent and his teammates with a safe environment;

    xi.    Failing to protect and enhance the physical and educational well-being of Decedent and other student athletes;

    xii.    Failing to maintain institutional control over Frostburg, the coaches, athletic trainers, and the athletic director;

    xiii.    Failing to levy violations against Frostburg, the coaches, athletic trainers and the athletic director;

    xiv.    Other acts of negligence or carelessness that may materialize during the pendency of this action

213.    As a direct and proximate result of the foregoing, the Decedent suffered severe and painful injuries and death. As a direct and proximate result of the negligent acts and failures of Defendant NCAA, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses

48

described above were caused by the Defendant, without any contributory negligence on Derek's part.

**WHEREFORE**, Plaintiff Personal Representative demands judgment against Defendant NCAA, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), plus interest and costs.

<u>COUNT XI- Gross Negligence</u>
**(Wrongful Death Action v. Defendants Schumacher, Rogish and Sweitzer)**

214.    Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

215.    Plaintiffs, as primary beneficiaries of the Decedent, sue the Defendants under Md. Code Ann., Cts. And Jud. Proc. Art. 3-901 et seq.

216.    This Complaint is timely filed within three years of Decedent's death pursuant to 3-904(g) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.

217.    Decedent died as a direct and proximate result of the acts and omissions of each Defendant as set forth herein and as may subsequently be discovered.

218.    As a direct and proximate result of the acts or omissions as set forth in paragraphs 1 through 82 above, by intent, malice, recklessness, gross negligence and/or negligence of each Defendant in causing Derek's death, Plaintiffs have sustained and will continue to suffer separate and distinct pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, loss of education, loss of services and support which Derek could have and would have afforded and rendered had he continued to live, all without any negligence on the part of Decedent thereunto contributing.  The Plaintiffs have

49

endured and they will continue to endure an unbearable amount of emotional pain each time they walk past Derek's empty bedroom, touch his clothing or a photograph or paper which relates to Derek, watch a football game, see a commercial produced by the NCAA, see the NCAA's insignia, see the number "40", among multiple other pain-staking moments.

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interests and costs.

### Count XII – Professional Gross Negligence in the Practice of Athletic Training
### (Wrongful Death Action v. Defendant Sweitzer)

219.    Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

220.    Upon information and belief, Defendant Sweitzer is a "licensed athletic trainer" within the meaning of the Maryland Athletic Trainers Act (MATA). Md. Code Ann., Health Occ. § 14-5D-01.

221.    The MATA requires licensed athletic trainers to be professionally competent, lest they will have their license revoked.

222.    Defendant Sweitzer undertook a duty to provide athletic training and professional services to Decedent. Defendant Sweitzer was also responsible for supervising the care that was provided to Decedent.

223.    In performing such professional services, Defendant Sweitzer owed a duty to use such professional skill, prudence and diligence as other members of the Athletic Training profession commonly possess and exercise.

224.    Defendant Sweitzer failed to exercise reasonable care in evaluating, monitoring, detecting and treating Decedent's injuries.

225.    Defendant Sweitzer failed to exercise reasonable care in making return-to-play determinations for Decedent.

226.    The failure of the Defendant Sweitzer to exercise such care increased the risk of harm suffered by Decedent, including the unknown risk of death triggered by second-impact syndrome.

227.    As a student-athlete, Decedent relied upon the undertaking of the Defendant Sweitzer to provide athletic-training services, including testing, evaluating, and monitoring of concussive and sub-concussive injuries, as well as return-to-play decisions, testing and determinations.

228.    The conduct of Defendant Sweitzer was in violation of the MATA.

229.    Decedent's reliance on the Defendant Sweitzer, and his intentional failure to perform a manifest duty in reckless disregard of the consequences was a direct and proximate cause of Decedent's death and the injuries and damages suffered by Plaintiffs, including but not limited to the pain, losses and damages described in paragraph 218 above.

**WHEREFORE** Plaintiffs demand judgment against Defendant Sweitzer for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

51

## ACTIONS AGAINST SCHUTT SPORTS & SPORTSMAN'S

### Count XIII – Negligence
### (Wrongful Death Action v. Schutt Sports & Sportsman's)

230.     Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

231.     At all material times, Defendants and/or their agents had a duty to use reasonable care in the manner in which it designed, manufactured, assembled, distributed, marketed, represented and sold the subject helmet.

232.     Defendants breached the duty of care they owed to Decedent, both generally and in the following particular respects:

i.          Failing to truthfully market their products;

ii.         Failing to educate their agents about the limitations of the subject helmet;

iii.        Failing ensure their agents were competent to sell and fit the subject helmet;

iv.        Failing to warn about the risks of second-impact syndrome;

v.         Failing to warn that no helmet can reduce or prevent the risk of concussions;

vi.        Failing to properly fit Decedent with the subject helmet;

vii.       Other acts and failures that may be discovered during the course of this case.

233.     Defendants knowingly and falsely marketed the subject helmet as being able to reduce a risk that they knew was not scientifically validated. Defendants knew that their claims were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew

that falsely marketing their helmets would deceive the recipient of their consumer goods. Despite this knowledge, Defendants showed a gross indifference and a reckless disregard towards others by falsely marketing the subject helmet.

234.   As a direct and proximate result of the foregoing, the Decedent suffered severe and painful injuries and death. As a direct and proximate result of the negligent acts and failures of Defendants, Derek's Estate is entitled to recover for his injuries and pain and suffering, as well as for the funeral expenses incurred by his Estate. All of the injuries, damages and losses described above were caused by the Defendants, without any contributory negligence on Derek's part.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00),   to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

## Count XIV – Negligent Misrepresentation
### (Wrongful Death Action v. Schutt Sports & Sportsman's)

235.   Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

236.   At all material times, Defendants and their agents had a duty to use reasonable care in the manner in which it designed, manufactured, assembled, distributed, marketed, represented and sold the subject helmet.

237.   Defendants and their agents, owing the Decedent said duty of care, negligently misrepresented a material fact, as described in Paragraph 40 above. Defendants' agents, while

acting in the course and scope of employment, proclaimed that Defendants' "new technology can prevent head injuries."

238.    The Defendants and their agents intended that Decedent would act in reliance upon said misrepresentation.

239.    The Defendants and their agents knew the Decedent probably would rely on the misrepresentation, which were material and factually false and caused damages to Decedent and Plaintiffs.

240.    The Decedent justifiably acted in reliance on the misrepresentation.

241.    Defendants knowingly and falsely marketed and represented the subject helmet as being able to reduce and/or prevent a risk that they knew was not scientifically validated. Defendants knew that their claims and representations were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew that falsely marketing and representing their helmets would deceive the recipient of their consumer goods. Despite this knowledge, Defendants showed a gross indifference, malice, and a reckless disregard towards others by falsely marketing and representing the subject helmet.

242.    The Decedent and Plaintiffs suffered damages as a direct and proximate result of the reliance on the Defendants' misrepresentation, including but not limited to the pain, losses and damages described in paragraph 218 above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

## Count XV – Violation of the Maryland Consumer Protection Act
### (Wrongful Death Action v. Schutt Sports & Sportsman's)

243.    Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

244.    The Maryland Consumer Protection Act (MCPA) protects the "actual or prospective purchaser, lessee or *recipient of consumer goods*...." Decedent was a "recipient of consumer goods."

245.    Defendants, by and through their agents, violated the MCPA in the following ways:

i.      By making false or misleading oral representations which had the capacity, tendency, or effect of deceiving or misleading Decedent;

ii.     By representing that the consumer good (i.e. subject helmet) had a characteristic, use and benefit which it did not have;

iii.    By representing that the consumer good (i.e. subject helmet) had a particular standard, quality, grade, style, which it did not have; and

iv.     By failing to state a material fact (i.e. that the subject helmet CANNOT prevent head injuries, including concussion and second-impact syndrome) which said failure deceived Decedent.

246.    The aforesaid unfair and deceptive trade practices by Defendants, by and through their agents, induced Decedent's reliance to use the subject helmet, and convinced Decedent that the subject helmet could in fact prevent head injuries.

247.    Defendants knowingly and falsely marketed and represented the subject helmet as being able to reduce and/or prevent a risk that they knew was not scientifically validated.

55

Defendants knew that their claims and representations were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew that falsely marketing and representing their helmets would deceive the recipient of their consumer goods. Despite this knowledge, Defendants showed a gross indifference, malice, and a reckless disregard towards others by falsely marketing and representing the subject helmet.

248.    Decedent's reliance upon Defendants' unfair and deceptive trade practices directly and proximately caused Decedent's death and Plaintiffs' damages, including but not limited to the pain, losses and damages described in paragraph 218 above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus reasonable attorneys' fees, interest and costs.

<u>**Count XVI – Strict Liability for Design Defect**</u>
**(Wrongful Death Action v. Schutt Sports & Sportsman's)**

249.    Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

250.    At the time the subject helmet was designed, manufactured, sold and distributed by Defendants, the subject helmet was defective in design, unreasonably dangerous, and unsafe for its intended purpose because it did not provide adequate protection against the foreseeable risk of brain injury. The design defect includes, but is not limited to the following:

    i.    Failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to Decedent's head;

    ii.    Failing to design the subject helmet with a shock attenuation system which was not safely configured;

    iii.    Failing to properly and adequately test the helmet model;

    iv.    Failing to warn Decedent that the subject helmet would not protect against second-impact syndrome, and any such warning that may have been made was rendered ineffective by the representations made by and through Defendants' agents; and

    v.    Other acts that may be discovered during the course of this case.

251.    The defective design and unreasonably dangerous condition were a proximate and contributing cause of the injuries suffered by Decedent.

252.    At all material times, the subject helmet was being used for the purpose for which it was intended.

253.    Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were the proximate and contributing causes of the injuries suffered by Decedent. A safer alternative design was economically and technologically feasible at the time the product left control of Defendant. As a result of its acts and failures, Defendants directly and proximately caused Decedent's death and Plaintiffs' damages, including but not limited to the pain, losses and damages described in paragraph 218 above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

## Count XVII – Strict Liability for Manufacturing Defect
### (Wrongful Death Action v. Schutt Sports & Sportsman's)
### (Pled in the Alternative to Count XVI Pursuant to Maryland Rule 2-303(c))

254.    Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

255.    At the time the subject helmet was designed, manufactured, sold and distributed by Defendants, the subject helmet was defective in its manufacturing, unreasonably dangerous, and unsafe for its intended purpose because it did not provide adequate protection against the foreseeable risk of brain injury.

256.    Defendants' failure to manufacture the subject helmet to design and manufacturing specifications result in, among other things, the following:

    i.    Failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to Decedent's head;

    ii.    Failing to manufacture the subject helmet with a shock attenuation system which was not safely configured;

    iii.    Failing to properly and adequately test the helmet model;

    iv.    Failing to warn Decedent that the subject helmet would not protect against second-impact syndrome, and any such warning that may have been made was

rendered ineffective by the representations made by and through Defendants' agents; and

v.   Other acts and failures that may be discovered during the course of this case.

257.   The manufacturing defect was a proximate and contributing cause of the injuries suffered by Decedent.

258.   Defendants are strictly liable for manufacturing and placing in the stream of commerce a defective and unreasonably dangerous product which was a proximate and contributing cause of Decedent's injuries. A safe alternative design was economically and technologically feasible at the time the product left the control of Defendants. As a result of its acts and failures, Defendants directly and proximately caused Decedent's death and Plaintiffs' damages, including but not limited to the pain, losses and damages described in paragraph 218 above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

## Count XVIII-- Strict Liability – Failure to Warn
### (Wrongful Death Action v. Schutt Sports & Sportsman's)

259.   Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

260.   At all material times, Defendants had a duty to use reasonable care in the manner in which they designed, manufactured, assembled, distributed, marketed, represented and sold the subject helmet so as to avoid misleading and/or creating a false sense of security for its users.

261. At all materials times, Defendants knew that no helmet could prevent head injuries, including second-impact syndrome, nor could it reduce the rotational forces that primarily cause concussions.

262. Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the subject helmets.

263. Defendants failed to provide necessary and adequate safety and instructional materials and warnings of the risk of second-impact syndrome.

264. Any such warning and/or safety instructional material that may have been provided and/or attached to the subject helmet was nullified and rendered ineffective by contrary representations made by Defendants by and through their agents.

265. Defendants knew that the substantial dangers were not readily recognizable to an ordinary consumer or user and that such person would use these products without inspection for defects. Despite this knowledge, Defendants showed a gross indifference, malice and reckless disregard for the health and safety of others by failing to warn of the dangers of its helmets.

266. Decedent neither knew, nor had reason to know the existence of the aforementioned defects, or increased risks of harm.

267. Decedent used the subject helmet in a reasonably foreseeable manner at all times.

268. Decedent's injuries were the legal and proximate result of the actions of Defendants who owed a duty to warn Decedent of the risks of substantial harm associated with the foreseeable use of Defendants' product.

269. Defendants' failure to warn caused Decedent's injuries and death. Furthermore, Defendants directly and proximately caused Plaintiffs' damages, including but not limited to the pain, losses and damages described in paragraph 218 above.

60

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

### Count XIX – Fraudulent Misrepresentation
### (Wrongful Death Action v. Schutt Sports & Sportsman's)

270.    Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140, and further allege as follows:

271.    Defendants, by and through their agents, made a false representation of a material fact when it expressed to Decedent and others that the subject helmet's "new technology can prevent head injuries."

272.    Defendants, by and through their agents, knew of the falsity and/or made it with such reckless indifference to the truth that it would be reasonable to charge Defendants with knowledge of its falsity.

273.    Defendants, by and through their agents, intended that Decedent would act in reliance on such statements.

274.    Decedent, and others, did justifiably rely on the representations of Defendants, which were made by and through their agents.

275.    Defendants knowingly and falsely marketed and represented the subject helmet as being able to reduce and/or prevent a risk that they knew was not scientifically validated. Defendants knew that their claims and representations were false and misleading, making the subject helmet unreasonably dangerous. Defendants knew that falsely marketing and representing their helmets would deceive the recipient of their consumer goods. Despite this

knowledge, Defendants showed a gross indifference, malice, and a reckless disregard towards others by falsely marketing and representing the subject helmet.

276. Decedent suffered fatal injuries and was killed as a result of that reliance. Defendants directly and proximately caused Decedent's death and Plaintiffs' damages, including but not limited to the pain, losses and damages described in paragraph 218 above.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

### ACTIONS AGAINST THE NCAA

#### Count XX - Negligence
#### (Wrongful Death Action v. the NCAA)

277. Plaintiffs Kristen L. Sheely and Kenneth B. Sheely, as Derek's surviving parents, incorporate as if fully stated herein the allegations set forth in Paragraphs 1 through 140 and further allege as follows:

278. Since its inception and at all relevant times herein, the NCAA assumed a duty to protect student athletes and Decedent from brain injuries. This duty has been repeated by the NCAA on numerous occasions, including to Decedent, Congress and the members of the public. The NCAA reaffirmed its duty to protect Decedent and student athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

279. Decedent relied on the NCAA's superior knowledge and expertise, as well as the NCAA's representations that it was looking out for his health and safety.

62

280.     The NCAA acted carelessly and negligently in its positions as the regulatory body for college teams, including Frostburg State University, and Decedent. The NCAA knew or should have known that its actions and/or inactions in light of the rate of concussive and sub-concussive injuries made known to the NCAA would cause harm to Decedent.

281.     The NCAA was careless and negligent by breaching the duty of care it assumed for the benefit of Decedent, both generally and in the following particular respects:

xv.     Failing to implement hit limits during practices;

xvi.     Failing to limit full-contact practices;

xvii.     Failing to ban two-a-day practices;

xviii.     Failing to ban certain drills, including the Drill, the Machine-Gun Drill, the Oklahoma Drill, and other similarly dangerous drills;

xix.     Failing to enforce the NCAA Constitution, by-laws and the Handbook;

xx.     Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions and second-impact syndrome;

xxi.     Failing to educate student-athletes about the fatal risks of second-impact syndrome;

xxii.     Failing to enforce the Plan;

xxiii.     Failing to investigate the events surrounding Decedent's death;

xxiv.     Failing to provide Decedent and his teammates with a safe environment;

xxv.     Failing to protect and enhance the physical and educational well-being of Decedent and other student athletes;

    xxvi.    Failing to maintain institutional control over Frostburg, the coaches, athletic trainers, and the athletic director;

    xxvii.    Failing to levy violations against Frostburg, the coaches, athletic trainers and the athletic director;

    xxviii.    Other acts of negligence or carelessness that may materialize during the pendency of this action

282.    As a direct and proximate result of the foregoing, the Decedent died and Defendant NCAA caused the Plaintiffs to suffer the pain, losses and damages described in paragraph 218 above.

**WHEREFORE**, Plaintiffs demand judgment against Defendant NCAA and its agents, jointly and severally, for compensatory and punitive damages in amounts in excess of Seventy-five Thousand Dollars ($75,000.00), to be apportioned pursuant to Maryland Rule 15-1001 and § 3-904(c) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, plus interest and costs.

Stephen J. Nolan
Stephen J. Nolan, Chartered
Courthouse Commons, Suite A-1
222 Bosley Avenue
Baltimore, Maryland 21204
Telephone: (410) 821-8600
Facsimile: (410) 821-8613
steve@sjnolan.com

Kenneth B. McClain
Humphrey, Farrington & Mcclain, P.C.
221 West Lexington, Suite 400
Independence, MO 64051
Telephone: (816) 836-5050
Fax: (816) 836-8966
kbm@hfmlegal.com

John M. Klamann, KS # 10190
Paul D. Anderson, MO #65354
The Klamann Law Firm, P.A.
929 Walnut Street, Suite 800
Kansas City, MO 64106
Telephone: (816) 421-2626
Facsimile: (816) 421-8686
jklamann@klamannlaw.com
panderson@klamannlaw.com

Wm. Dirk Vandever, MO #24463
The Popham Law Firm, P.C.
712 Broadway, Suite 100
Kansas City, MO 64105
Telephone: (816) 221-2288
Facsimile: (816) 221-3999
dvandever@pophamlaw.com

*Counsel for Plaintiffs*

## ELECTION OF JURY TRIAL

The Plaintiffs elect to have their case tried before a jury.

Stephen J. Nolan

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of December, 2014, copies of the Third

Amended Complaint and copies of the blacklined comparison copies of the Third Amended

Complaint were mailed, via first class mail to:

65

John J. Kuchno, Esquire
Bradley Neitzel, Esquire
Assistant Attorneys General.
200 St. Paul Place
Baltimore, Maryland 21202

C. Scott Toomey, Esquire
Daniel Kain, Esquire
Littleton Joyce Ughetta Park & Kelly, LLP
201 King of Prussia Road, Suite 220
Randor, Pennsylvania 19087

Robert D. Klein, Esquire
Michael S. Rubin, Esquire
Wharton Levin Ehrmantraut & Klein, P.A.
P.O. Box 551
Annapolis, MD 21404-0551

Everett C. Johnson, Esquire
J. Christian Word, Esquire
Sarah M. Gragert, Esquire
Sarah Greenfield, Esquire
Latham & Watkins, LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304

Ralph L. Arnsdorf, Esquire
David M. Story, Esquire
Franklin & Prokopik
Two North Charles Street
Suite 600
Baltimore, Maryland 21201

Stephen J. Nolan

66

# EXHIBIT 32

Filing # 32578618 E-Filed 09/28/2015 04:39:33 PM

IN THE CIRCUIT COURT OF THE
SEVENTH JUDICIAL CIRCUIT IN AND
FOR VOLUSIA COUNTY, FLORIDA

CASE NUMBER:

CHELSEA WHALLEY,

      Plaintiff,

vs.

STETSON UNIVERSITY, INC., a not for profit Florida
Corporation, the NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION, INC., an incorporated
association, and the ATLANTIC SUN
CONFERENCE, INC, an incorporated
association,

      Defendants,

_____/

### COMPLAINT

COMES NOW the Plaintiff, CHELSEA WHALLEY (hereinafter "Plaintiff"), and sues the

Defendants, STETSON UNIVERSITY, INC., a not for profit Florida corporation, the

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, INC., an incorporated association,

and the ATLANTIC SUN CONFERENCE, INC., an incorporated association, (hereinafter

"Defendants"), and alleges:

### GENERAL ALLEGATIONS

1.      This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00)

exclusive of costs and attorney fees.

2.      At all times material hereto, Plaintiff resided in Orlando, Florida.

3.      At all times material hereto, Plaintiff played women's softball for Defendant,

STETSON UNIVERSITY, INC. (hereinafter "STETSON").

2015 11600 CIDL

4.     At all times material hereto, Defendant, STETSON was a not for profit Florida Corporation with its principal place of business located at 421 North Woodland Boulevard, DeLand, Florida 32723.

5.     At all times material hereto, Defendant, the NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, INC., (hereinafter "NCAA"), an unincorporated association, was headquartered in Indianapolis, Indiana authorized to transact business in the State of Florida.

6.     At all times material hereto, Defendant, NCAA, was an unincorporated association that governs, regulates and administers rules of all athletic programs of its member schools, conferences, organizations and individuals.

7.     At all times material hereto, Defendant, the ATLANTIC SUN CONFERENCE, INC., a collegiate athletic conference, created and regulated by Defendant, NCAA, was headquartered in Macon, Georgia, authorized to transact business in the State of Florida.

8.     At all times material hereto, Defendant, the ATLANTIC SUN CONFERENCE, INC., sponsors championship competition for in eight men's and eleven women's NCAA regulated sports in the Southeastern United States, including women's softball at Defendant, STETSON.

9.     At all times material hereto, Defendant, STETSON, situated in Volusia County, Florida, was a member school of Defendant, NCAA and Defendant, ATLANTIC SUN CONFERENCE, INC.

10.     At all times material hereto, Defendant, NCAA and Defendant, ATLANTIC SUN CONFERENCE, INC., governed, regulated and administered rules to Defendant, STETSON.

11.     At all times material hereto, Defendants were responsible for the day-to-day management of the practice, health and safety of its athletes.

12.    All conditions precedent to the filing of this action, have occurred, accrued, or have been waived as a matter of law.

13.    In 2003 and 2005, the NCAA participated in studies revealing that student athletes with concussions are at a greater risk of multiple health issues, including but not limited to, suffering post-traumatic brain injuries, headaches, dizziness, depression, memory loss, and impulse control problems. The NCAA also became aware of a correlation between concussions and depression, dementia and early on-set Alzheimer's Disease. ( *Acute effects and recovery time following concussion in collegiate football players: the NCAA Concussion Study*, Journal of the American Medical Association, Vol. 290, No. 19, November 19, 2003, at 2549).

14.    In 2010, the NCAA enacted rule 3.2.4.17 requiring its schools to implement and self-enforce their own Concussion Management Plan, but placed the responsibility of concussion management on student athletes by requiring them to report their athletic injuries to the collegiate medical staff and decide for themselves whether or not to seek medical attention.

15.    The incident giving rise to this cause of action occurred on or about March 14, 2013, at Defendant, STETSON, located at 421 North Woodland Boulevard, DeLand, Florida 32723.

16.    On or about March 14, 2013, Plaintiff was at softball practice located at Defendant, STETSON in preparation for the Defendant, ATLANTIC SUN CONFERENCE, INC. and Defendant, NCAA athletic conference, when she was hit in the head with a softball resulting in extreme nausea, confusion, , dizziness, blurred vision, headaches, numbness of her face and problems maintaining her balance.

17.    On or about March 15, 2013, Defendant, STETSON physically tested Plaintiff with an "IMPACT" test, and based on the results, cleared Plaintiff to play in all three weekend

games of the Defendant, ATLANTIC SUN CONFERENCE, INC., taking place on March 16, 2013 through March 17, 2013 at Florida Gulf Coast University in Fort Myers, Florida.

18.     The IMPACT Clinical Report specifically states that the results were not developed to make return to play decisions, that the Report should only be used as one source of information regarding a person's level of neurocognitive functioning and further states that this Report does not represent medical advice or a diagnosis.

19.     On or about March 18, 2013, following the Defendant, ATLANTIC SUN CONFERENCE, INC., Plaintiff complained to Defendant, STETSON of an increase in symptoms and as a result, was banned from all athletic activity by Defendant, STETSON.

20.     On or about March 18, 2013, Defendant, STETSON denied Plaintiff's request for medical attention unless and until Plaintiff was still symptomatic after a month had passed since the March 14, 2013 injury.

21.     During the week of March 26, 2013, Plaintiff complained to Defendant, STETSON of experiencing depression since the March 14, 2013 injury and in response, Defendant, STETSON gave Plaintiff a daily checklist of her symptoms, but never conducted any diagnostic tests.

22.     During the week of March 26, 2013, Plaintiff requested to see a neurologist and Defendant, STETSON told the Plaintiff she was a difficult athlete for requesting too much information and treatment, and even mocked the Plaintiff with regards to her depression by asking her if she "wanted to jump through the press box window during a softball game".

23.     On or about April 5, 2013, Plaintiff again approached Defendant, STETSON to inquire about seeing a neurologist and Defendant, STETSON claimed it may be a four week wait until Plaintiff could see a neurologist.

24.      On or about April 8, 2013, Plaintiff called a neurologist's office who told Plaintiff she could be seen within the week and to bring a referral form from Defendant, STETSON.

25.      On or about April 8, 2013, Plaintiff requested a referral form for her neurology appointment from Defendant, STETSON but was denied said referral form.

26.      On or about April 8, 2013, following the denial of a neurology referral, Defendant, STETSON set a neurologist appointment for the Plaintiff for April 10, 2013.

27.      On or about April 25, 2013, Plaintiff was diagnosed with Post-Concussion Syndrome due to the lack of treatment and lack of healing following Plaintiff's initial symptoms.

28.      At said time and place, the Defendants failed to exercise reasonable care and caution while fulfilling their supervisory duties allowing Plaintiff to continue playing softball, and therefore be exposed to foreseeable risk and harm.

29.      Defendants owed a duty of care to not expose the Plaintiff to a foreseeable risk and harm.

30.      Defendants were careless and negligent by breaching their duty in the following acts, omissions or commissions:

      a.      In creating and exposing the Plaintiff to a foreseeable and unreasonable risk of head injuries and concussions;

      b.      Failing to implement guidelines for screening, detecting and treating head injuries and concussions sustained by athletes;

      c.      Failing to implement return-to-play policies following head injuries and concussions;

      d.      Failing to warn of the risks of unreasonable harm resulting from head injuries and concussions;

    e.      Failing to warn of the consequences of head injuries and concussions causing permanent health problems;

    f.      Failing to warn of the risks of long-term complications associated with head injuries and concussions and other relevant facts that athletes need to understand in order to make informed decisions regarding their safety as it relates to returning to athletic participation;

    g.      Failing to provide proper supervision and medical attention during school activities; and

    h.      Other acts of negligence or carelessness related to this action.

31.     As a direct and proximate result of Defendants' negligence, Plaintiff sustained injuries and has been caused to suffer bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of the capacity of the enjoyment of life; expense of hospitalization, and medical, nursing care and treatment. The losses incurred are either permanent or continuing in nature and Plaintiff will suffer these losses in the future.

32.     Plaintiff demands trial by jury on all counts of the Complaint.

## COUNT I- NEGLIGENCE AGAINST DEFENDANT, STETSON UNIVERSITY, INC.

33.     Plaintiff reiterates and adopts the allegations contained in the general allegations, paragraphs 1 through 32 above, and in addition alleges:

34.     Defendant, STETSON owed a duty to Plaintiff to implement, regulate and maintain reasonable rules and guidelines for detecting, screening and diagnosing head injuries and concussions.

35.    Defendant, STETSON owed a duty to Plaintiff to comply with NCAA Rule 3.2.4.17 (entitled "Concussion Management Plan") to implement a concussion management plan and breached that duty by failing to do so. (NCAA Division I Manual, ▬▬▬▬▬.

36.    Defendant, STETSON by and through its agents, employees, coaches and trainers, knew the Plaintiff sustained a head injury in which she suffered symptoms before Defendant, ATLANTIC SUN CONFERENCE, INC.  and cleared the Plaintiff to continue playing in all three conference games while experiencing symptoms.

37.    Defendant, STETSON by and through its agents, employees, coaches and trainers, knew the Plaintiff continued suffering symptoms following the Defendant, ATLANTIC SUN CONFERENCE, INC., (a three game conference) and subsequently banned the Plaintiff from all athletic activity.

38.    Defendant, STETSON breached its duty of care to the Plaintiff by failing to warn her of the risks associated with head injuries and concussions that she needed to understand in order to make an informed decision as to whether it was safe for her to return to playing softball.

39.    Defendant, STETSON breached its duty of care to the Plaintiff by failing to detect, screen or diagnose Plaintiff's head injuries even though Defendant STETSON knew Plaintiff was injured enough to ban Plaintiff from all athletic activity following the Defendant ATLANTIC SUN CONFERENCE, INC.

40.    As a direct and proximate result of Defendant, STETSON'S negligence, Plaintiff sustained injuries and has been caused to suffer bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of the capacity of the enjoyment of life; expense of hospitalization, and medical and nursing care and treatment. The losses incurred are either permanent or continuing in nature and Plaintiff will suffer these losses in the future.

## COUNT II- NEGLIGENCE AGAINST DEFENDANT, the NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, INC. ("NCAA")

41.    Plaintiff reiterates and adopts the allegations contained in the general allegations, paragraphs 1 through 32 above, and in addition alleges:

42.    Defendant, NCAA owed a duty to Plaintiff to implement, regulate and maintain reasonable rules and guidelines for detecting, screening and diagnosing head injuries and concussions.

43.    Defendant, NCAA by and through its agents, employees, coaches and trainers, knew of the harmful effects associated with head injuries and concussions based on the findings of the 2003 and 2005 studies.

44.    Defendant, NCAA breached its duty of care to the Plaintiff by failing to enforce a unified Concussion Management Plan amongst all member schools and athletic programs after becoming aware of the results of the 2003 and 2005 studies.

45.    Defendant, NCAA breached its duty of care to the Plaintiff by failing to warn her of the risks associated with head injuries and concussions that she needed to understand in order to make an informed decision as to whether it was safe for her to return to playing softball.

46.    Defendant, NCAA by and through its agents, employees, coaches and trainers, knew the Plaintiff sustained a head injury in which she suffered symptoms prior to the Defendant, ATLANTIC SUN CONFERENCE, INC. and cleared the Plaintiff to continue playing in all three conference games while experiencing symptoms.

47.    Defendant, NCAA by and through its agents, employees, coaches and trainers, knew the Plaintiff continued suffering symptoms following the Defendant, ATLANTIC SUN CONFERENCE, INC., (a three game conference) and subsequently banned the Plaintiff from all athletic activity.

48.     Defendant, NCAA breached its duty of care to the Plaintiff by failing detect, screen or diagnose Plaintiff's head injuries despite clearing Plaintiff play in all three conference games and subsequently banning Plaintiff from all athletic activity.

49.     As a direct and proximate result of Defendant's, NCAA's, negligence, Plaintiff sustained injuries and has been caused to suffer bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of the capacity of the enjoyment of life; expense of hospitalization, and medical and nursing care and treatment. The losses incurred are either permanent or continuing in nature and Plaintiff will suffer these losses in the future.

## COUNT III- NEGLIGENCE AGAINST DEFENDANT, ATLANTIC SUN CONFERENCE, INC.

50.     Plaintiff reiterates and adopts the allegations contained in the general allegations, paragraphs 1 through 32 above, and in addition alleges:

51.     Defendant, ATLANTIC SUN CONFERENCE, INC., owed a duty to Plaintiff to implement, regulate and maintain reasonable rules and guidelines for detecting, screening and diagnosing head injuries and concussions.

52.     Defendant, ATLANTIC SUN CONFERENCE, INC., by and through its agents, employees, coaches and trainers, knew the Plaintiff sustained a head injury and cleared the Plaintiff to continue playing in all three conference games while experiencing symptoms.

53.     Defendant, ATLANTIC SUN CONFERENCE, INC., breached its duty of care to the Plaintiff by failing to warn her of the risks associated with head injuries and concussions that she needed to understand in order to make an informed decision as to whether it was safe for her to return to playing softball.

54.    Defendant, ATLANTIC SUN CONFERENCE, INC., breached its duty of care to the Plaintiff by failing detect, screen or diagnose Plaintiff's head injuries and clearing Plaintiff play in all three conference games.

55.    As a direct and proximate result of Defendant's, ATLANTIC SUN CONFERENCE, INC.'S, negligence, Plaintiff sustained injuries and has been caused to suffer bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of the capacity of the enjoyment of life; expense of hospitalization, and medical and nursing care and treatment. The losses incurred are either permanent or continuing in nature and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff, CHELSEA WHALLEY, sues the Defendants, STETSON UNIVERSITY, INC., the NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, INC., and the ATLANTIC SUN CONFERENCE, INC., for compensatory damages in an amount within the jurisdictional limits of this Court, to-wit: in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of interest and costs, and demands a trial by jury of all issues triable as a right by a jury.

Respectfully submitted this _____ day of September, 2015.


By: /s/ Joel Piedra_____
**JOEL PIEDRA, ESQ. (FBN: 659908)**
The Pendas Law Firm
625 E. Colonial Drive
Orlando, Florida 32803
██████████
Attorney for the Plaintiff
jpiedra@pendaslaw.com

# EXHIBIT 33



NCAA00010613

Catchers and other uniformed team members who receive warm-up pitches on the field of play must wear catcher's headgear.

**EFFECT—The umpire shall warn the violator(s). If the violator(s) does not immediately comply, she shall not be allowed to receive warm-up pitches or catch for the remainder of the game; however, she shall not be ejected.**

*Note: It is strongly recommended that anyone who receives warm-up pitches off the field of play (bullpen area, dead-ball area) should wear catcher's headgear.*

## 3.7 Gloves/Mitts

3.7.1 All players except the catcher must use a leather fielder's glove/mitt that meets the following maximum specifications:

Palm width: 8 inches; top opening of web: 5 inches; web top to bottom: 7.25 inches; thumb top to bottom edge: 9.25 inches; highest finger top to bottom edge: 14 inches.

The catcher may wear a leather glove or leather mitt of any dimension. Gloves/mitts worn by players may not be the color of the ball but may be any combination of other colors. The pitcher's glove and its lacing shall be tan, brown, gray, white or black, or any combination of those colors. The manufacturer's logos are not considered a glove color.

Adding adhesive or creating a sticky or tacky coating to a legal glove, renders the glove illegal.

3.7.2 The use of any treatment or device that fundamentally changes the specifications of gloves is prohibited and renders the equipment altered and unsuitable for play.

**EFFECT—(3.7.1 to 3.7.2)—If noticed before a play, the umpire shall direct the fielder to remove the glove/mitt. Should the illegal glove/mitt reappear, the offending player shall be ejected.**

**If a play is made with the illegal glove/mitt, the offensive coach has the choice of taking the result of the play or having the play nullified. If nullified, the batter returns to bat, base runners return to the bases occupied at the time of the last pitch and play is resumed.**

## 3.8 Helmets

3.8.1 **Offense.** While batting, running the bases or in the on-deck circle or coaches' boxes, each offensive player is required to wear a double-earflap protective helmet approved by NOCSAE. All helmets must be the same color, and the permanent NOCSAE mark and exterior warning label must be legible.

**EFFECT—If an umpire observes a player wearing a damaged or illegal helmet before coming to bat, while at bat or on base, or while in the coaches' boxes, the umpire shall direct the player to change to a legal helmet without penalty. Failure to wear a legal helmet when directed by the umpire shall result in the player's ejection. Deliberately wearing the helmet improperly or intentionally removing the helmet while the ball is live shall result in the player being declared out but shall not remove a force play.**

3.8.2 **Catcher.** The catcher is required to wear a protective helmet while receiving pitches in a game. The catcher's headgear must bear a permanent mark (molded in, embossed or by indestructible seal) indicating compliance with the NOCSAE combined helmet and mask standard.

**EFFECT—The umpire shall warn the violator(s). If the violator(s) does not immediately comply, she shall not be allowed to receive warm-up pitches or catch for the remainder of the game; however, she shall not be ejected.**

3.8.3 **Defense.** A defensive player may wear a helmet. If more than one player wears a helmet, the helmets must be the same color. If a pitcher wears a helmet, it must have a nonglossy finish.

3.8.4 **Student-Athlete Base Coach.** A student-athlete in the coaches' box is required to wear a NOCSAE approved protective helmet whenever the ball is live from the first pitch of an inning to the last out of the inning.

**EFFECT—If an umpire observes a student-athlete in the coaches' boxes without a NOCSAE approved protective helmet, the umpire shall direct the student-athlete to wear one without penalty. Failure to do so when directed by the umpire shall result in ejection of that student-athlete.**

3.8.5 **Face mask.** An offensive player may wear a helmet with a commercially manufactured protective face mask attached. The face mask should meet the NOCSAE standard for the mask and helmet combination and must be permanently attached by the manufacturer or attached by a procedure approved by the manufacturer. In addition, any defensive player may wear a face mask, whether attached to a helmet or not.

## 3.9 Shoes

Shoes are considered equipment and are therefore not subject to the uniform logo rule. (See Rule 3.10.7.) All players must wear shoes with plastic, nylon, canvas, leather or similar synthetic material uppers. The soles may be smooth, have soft or hard rubber cleats or rectangular metal spikes. Spikes must not extend in excess of 3/4-inch from the sole and may not be round. Shoes with detachable cleats that screw into the sole of the shoe are allowed. Pitching toes are allowed for all players as long as the pitching toes are securely fastened.

## 3.10 Uniforms

All eligible players shall be attired with uniforms (jersey, pants, shorts and socks) of the same style, color and trim. Uniform accessories (namely, foul-weather apparel, head gear, knee/shin pads, undershirts and undershorts) are optional parts of the uniform and may be of mixed styles. Uniforms, all accessories and protective equipment must be worn properly and as designed. *Exception:* A uniform part that must be changed because of saturation of blood shall not cause the player to be penalized.

3.10.1 **Coaches' uniform.** Coaches must be neatly dressed in professional coaching attire. Base coaches do not have to be identically dressed.

3.10.2 **Foul-weather apparel.** Sweat shirts, sweat pants, nylon windbreakers and jackets may be worn. Foul-weather garments worn by multiple players should be of the same style, color and trim but must not be distracting, interfere with the game or pose a safety risk to the player(s) or her opponents.

NCAA00010658

# EXHIBIT 34

MINUTES OF THE

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

COMMITTEE ON COMPETITIVE SAFEGUARDS AND MEDICAL ASPECTS OF SPORTS

Sundial Resort                                           June 8-11, 2006
Sanibel, Florida


Participants:

Jerry Diehl, National Federation of State High School Associations
Kimberly Harmon, University of Washington
Donald Kaverman, Southeast Missouri State University
Jerry Koloskie, University of Nevada, Las Vegas
Michael Krauss, Purdue University, chair
Colleen McCullough, Chapman University
Matthew McDougall, Augustana College (South Dakota)
Megan McGrane, University of Pittsburgh
Robin Meiggs, Humboldt State University
Jennifer Palancia Shipp, University of North Carolina at Greensboro
Marc Paul, University of Nevada, Reno
Margot Putukian, Princeton University
Tracy Ray, Samford University
Debra Runkle, University of Dubuque
Gary Skrinar, Boston University
Michael Storey, Bridgewater State College
Jerry Weber, University of Nebraska, Lincoln
Charlie Wilson, Olivet College
David Klossner, NCAA
Mary Wilfert, NCAA

Committee members Larry Holstad and Scott Lynch were unable to attend.

Guests: Alan Utter and Pat Tocci, wrestling consultants; Bob Colgate, National Federation of State High School Associations; Frank Uryasz and Andrea Wickerham, The National Center for Drug Free Sport; Elsa Cole, Denise DeHass, NCAA, were in attendance for portions of the meeting.

[NOTE: These minutes contain only actions taken (formal votes or stated "sense of the meeting") in accordance with NCAA policy regarding minutes of all Association entities. All votes were unanimous voice votes unless otherwise indicated. While certain items on the committee's agenda were acted on at various times throughout the meeting all final actions within a given topic are combined in these minutes for convenience of reference.]

The National Collegiate Athletic Association
July 5, 2006                           MEW/DK

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

<u>Thrusday June 8</u>

<u>Drug Testing Work Group</u>.  This work group completed its review of drug-testing policies related to marijuana and street drugs, and made the following recommendation, supported by the full committee: to redefine the drug class "street drugs" to include marijuana, tetrahydrocannabinol (THC), heroin, opiates, cocaine and methamphetamine, and to provide a distinct sanctioning tract for this drug class that is appropriately responsive to the issues presented when street-drug use is identified; and to test for all banned substances in the year-round program, including street drugs.  Effective August 2008.  Staff will develop a full rationale to defend the committee's position to make a distinction between the appropriate NCAA response to a positive drug test for street drugs, to include an appropriate sanction and a process to assure assessment and intervention, and a positive drug test for performance-enhancing drugs, which will continue to assess a strong withholding penalty and loss of eligibility.

<u>Friday June 9</u>

The meeting was called to order at  8:00 a.m.. by the chair, Dr. Krauss.  All members were present as noted above.

1.  <u>Opening Remarks</u>.  Dr. Krauss welcomed the returning committee members, new committee members and guests.

2.  <u>Committee Staffing Needs</u>.  Committee openings are posted in the NCAA News.  Staff will provide committee members with a reminder of upcoming openings each fall in order to facilitate nominations for those positions.

3.  <u>Approval of Previous Minutes</u>.

    It was VOTED

    "To approve the minutes of the January, 2006 committee meeting as distributed."

4.  <u>CSMAS Mission and duties</u>.  The committee members reviewed the legislated duties of this committee, noting that CSMAS is legislatively charged with operating a national injury surveillance program to monitor injury trend and enhance safety in intercollegiate athletics.

5.  <u>NCAA Governance Actions and Issues</u>.  The committee reviewed relevant actions from the

NCAA Executive Committee, the NCAA Division I Championships/Competition Cabinet, and the NCAA Divisions II and III Management Councils. The committee reaffirmed its intent to have all coaches certified in cardiopulmonary resuscitation (CPR).

6. <u>NCAA Student-Athlete Advisory Committee (SAAC) Report.</u>

    a. <u>Division I</u>. Megan McGrane identified a discussion at the Division I Leadership Conference regarding medical coverage of all practices, and providing medical coverage for travel teams. Ms. McGrane raised concerns about the consistency of certified athletic trainer coverage of sports practice including access to pre and post practice treatment, especially among non-revenue sports. The committee identified concerns that increasing staffing workloads and expansive demands for practice sessions has placed considerable stress on staff and new coverage models may need to be examined. The committee also identified suggestions to accommodate medical coverage for travel teams for non-revenue sports. The committee noted that many institutions email ahead to the host institution to request medical attention and assure that the traveling team carries appropriate medical supplies; however may not be a standard practice.

    b. <u>Division II</u>. Matt McDougall noted a mixed response from Division II SAAC regarding male practice players.

    c. <u>Division III</u>. Colleen McCullough noted SAAC support for the year-round drug-testing pilot in Division III.

8. <u>Outreach</u>. The committee accepted the information from members who represent the following societies: American Medical Society of Sports Medicine (AMSSM); American Orthopedic Society for Sports Medicine (AOSSM); the Football Issues Committee; the National Association of Collegiate Directors of Athletics (NACDA); the National Athletic Trainers' Association (NATA); American College Health Association (ACHA); National Federation of State High School Associations (NFHS); the Joint Commission on Sports Medicine and Science; and the Female Athlete Triad Coalition. Support was voiced from the representatives of these bodies for NCAA efforts in collaborating and addressing psychological issues related to sport, and the CSMAS position on tinted eye shields and spearing in football.

9. <u>Energy Drinks.</u> The committee was provided information from the Coca-Cola Company requesting that CSMAS review its position on energy drinks as they relate to NCAA Bylaw

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16.5.2.g, which restricts the provision of nutritional supplements by NCAA institutions. The committee will take these arguments under review, along with outside consultants review and comments, and provide its recommendation at a later date.

10. Research. The committee received an update on several research projects underway: the homophobia survey has been fully funded, and will be embedded in a broader survey of tolerance within athletics programs; Denise DeHass presented the final report of the 2005 Drug Education and Testing Survey; NCAA research staff is working with Division III governance to collect additional data in review of a recommendation to conduct year-round testing in Division III; the nutrition survey project is now attached to a Division I survey on meal provision during travel; and the "Life-Work Balance" survey, which is being administered to various membership groups to gather further data on this initiative..

[Note: The meeting recessed at 5:30 p.m.]

Sunday June 11, 2006

The meeting was called to order at 8:00 a.m. All members were present as noted above.

11. DEDT Subcommittee Report.

a. Year-round testing. The subcommittee identified the need to develop a testing plan that would provide broader and deeper testing coverage of all sports in the year-round program.

b. Championship testing. Testing in NCAA championships has increased from approximately 1500 to over 2000 annually, with the majority of the increase going towards testing in DIII championship events.

c. EPO testing. The subcommittee agreed to shift testing for EPO, a peptide hormone used in endurance sports training, from championship events to year-round testing during periods preceding championship events.

d. CIR testing. The subcommittee agreed to continue monitoring T/E test results through CIR testing, and to review any data from WADA, to determine a change to the lab level used to identify a T/E positive. The subcommittee recommends maintaining the current level for a positive test, greater than 6:1.

e. Baseball testing. The subcommittee reviewed data demonstrating an increase in testing of baseball players in both the championship testing program and in year-round testing. The subcommittee considered data of steroid use by pitchers. The data does not strongly indicate the need to shift baseball student-athlete drug-testing selection to include more pitchers. The subcommittee recommends maintaining random selections of baseball

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

student-athletes.

f.  Inhalers. The subcommittee considered a request to review the use of inhalers during competitive play. The committee considered whether there was the potential for a performance advantage for use of these inhalers during competition by either asthmatic or non-asthmatic student-athletes. The committee suggests that any determination on this question should be left to the student-athlete's treating physician, but will solicit additional comment.

g.  Supplement product testing. The subcommittee considered the appropriateness of the UCLA lab to conduct testing of supplement products for contaminants in the case of student-athletes involved in an NCAA positive drug test. The subcommittee directed Drug Free Sport to advise the UCLA lab to avoid such product testing in NCAA drug test cases.

h.  DIII year-round drug testing. The subcommittee directed staff to identify any recommendations for year-round drug testing in DIII to be dependent on Association-wide funding. Staff was also advised of the potential for presidential influence through President Myles Brand's newsletter to NCAA presidents, and to maintain an emphasis on the health and safety mission of drug testing.

i.  Synephrine. The subcommittee recommended maintaining synephrine on the list of NCAA banned substances, and monitoring positive tests with no sanctions until additional research is available. The subcommittee agreed to entertain a proposal to fund this research.

j.  Summer drug testing. The NCAA is on target to begin summer drug testing in 2005-06, and will be testing initially only in Division I. The subcommittee will revisit this plan at its next meeting.

k.  "Choices in Sports". The subcommittee recommends that Drug Free Sport assume responsibility for this Web-based encyclopedic resource. The NCAA will provide a link to the resource when it has been updated.

l.  BDWC. The subcommittee recommended dropping the publication of the banned drug wallet card. In order to meet the drug-testing education needs of student athletes, the subcommittee recommends maintaining publication of the "NCAA Drug Policies" brochure, and providing a larger supply of the banned drug poster and supplements poster to the membership to display in training and locker rooms.

m.  Nutritional supplements. The subcommittee recommends the adoption of a standard statement regarding the risk of a positive test by using nutritional supplements: "All nutritional/dietary supplements carry some risk of containing an NCAA banned substance because they are unregulated and may be contaminated. Failure to check out any supplement with your sports medicine staff prior to use may result in a failed appeal for a positive drug test. Student-athletes are ultimately responsible for anything they ingest."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

n.  Banned drug list.  The subcommittee recommends adding a new class of substances, aromatase inhibitors, to the NCAA list of banned drug classes, effective August 2007. This class includes products that may be used to mask steroid use. The committee also recommends adding the new supplement warning language to the list.

o.  Medical exceptions.  The subcommittee recommends that medical exception documentation be requested by Drug Free Sport when they notify the institution of the A+ result.  When B confirmation is made, if documentation has been received and reviewed, a medical exception may be granted.  If not, the student-athlete will be declared ineligible until such time documentation is received, reviewed and the exception granted.  If the exception is not granted, the student-athlete may then request an appeal.  In addition, the subcommittee notes the addition of anabolic agents to the class of drugs for which a medical exception may be granted.  The subcommittee recommends that staff conduct education of athletics staff regarding the medical exception process.

p.  Appeals.  The subcommittee recommends that institutions confirm their desire to appeal an NCAA positive drug test within 48 hours of notification of the confirmed positive test, and to provide all appeal documents within 45 days of the request. The institution will be provided a check list to identify required materials and signatures in order to proceed with the appeal.

q.  Drug-testing Consent form. The subcommittee directed staff to request a review and update the language of the drug-testing consent form.

r.  Student-Athlete Statement.  The subcommittee notes the need for the Student-Athlete Statement to accommodate for the gap at the start of the school year for coverage of year-round testing for some NCAA institutions.  The committee recommends amending the language to "this form shall be in effect from the date this document is signed and shall remain in effect through SEPTEMBER 30 of the following year or until a subsequent consent form is executed whichever occurs earlier."

s.  Evaluation of drug-testing crews and appeals process.  The subcommittee notes the very positive feedback received from the membership regarding the drug-testing crews and the service received through the appeals process.

t.  Lab training.  Staff will contact committee members later in the fall regarding a spring 2007 lab training.

u.  UCLA lab.  Drug Free Sport provided an update on the Utah lab, and will provide further updates as received.

v.  Street-drug testing proposal.  The subcommittee provided further comment on the proposal to include street drug testing in the year-round testing program.  The subcommittee directed staff to begin to move this proposal through the NCAA governance process, moving towards the 2008-10 budget approval process.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12. Sport-Specific Issues.

    a. Field Hockey. The committee reviewed a case study of severe eye injury in the sport of Field Hockey and NCAA ISS data the noted 19% of all injuries in FH occur to the head with 65% of those injuries occurring from elevated balls. In an effort to ensure student-athletes seeking to wear protective eye wear in competition are not denied the use of protective eye at the site of matches, the committee will work with the field hockey community to better communicate the position of the NCAA that protective eye wear meeting the ASTM-F803 standard for field hockey is permissible to wear during competition.

    b. Wrestling. The committee received a report on the latest research in wrestling weight management from Alan Utter, Appalachian State University. Pat Tocci, National Wrestling Coaches Association (NWCA) presented their new on-line weight management program tracking system which will be open to all sports at NCAA member institutions that are already a member of the NWCA. The committee reviewed the 2005-06 weight management program and a report from the NCAA Wrestling Rules Committee requesting action on changes to the program. The committee also emphasized the importance of **witnessing** the urine collection process and noted that institutions should follow the same procedures as NCAA witnessed drug testing to prevent tampering, manipulation, contamination, and exogenous urine samples.

    c. Credentialing at NCAA Championship. The committee suggests a review of the credentialing policy and travel opportunities for participating teams at championships events. The committee believed that these policies should be communicated to the medical community in order to limit confusion about the process and maximize the health and safety of traveling student-athletes. In addition, a process for credentials medical staff will be explored.

    d. Championship Host Medical Evaluations. The committee recommended surveying NCAA championships host's medical staff post event to assess areas of possible improvement.

    e. Full-90 Headgear. The committee reviewed materials submitted by Mr. Jeff Skeen, manufacturer of the Full-90 headband for athletes participating in soccer. The committee noted that only one peer-reviewed research study has shown to decrease direct impact forces to the head with the use of such headbands and in certain laboratory situations. Even though the ASTM has developed a manufacturer-approved standard for Mr. Skeen's product, there is a lack of valid scientific evidence that the use of such products decrease the incidence of concussions or that reduced impact forces correlate to decreased incidence of concussions. The committee appreciates Mr. Skeen's effort to educate parents, coaches and athletes about the risk of concussion in the sport of soccer. The committee also noted that headbands are already permissive in the sport of soccer however the NCAA has not approved nor endorses the use of specific headbands in the sport of soccer. The committee will continue to educate the NCAA membership on this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

issue through articles in the NCAA News.

f. Research Grants. The committee reviewed the Sports Science Research Grant program and recent submitted proposals.

13. Health and Safety Issues and Updates.

a. Contagious disease outbreaks. The committee heard a report from a Ms. Runkle whose campus was hit by a mumps outbreak, describing the impact on team travel and competition.

b. Unethical Conduct. The committee noted that with the interpretation of NCAA Bylaw 10.1 Unethical Conduct, coaches should continue to be educated regarding the over-consumption of caffeinated beverages.

c. Hazing. The committee received an update on the NCAA's involvement in hazing education, through the National Hazing Prevention Week Resource kit, the National Hazing Study from the University of Maine, and the Coaches and Captains Handbook, under development.

d. Sickle cell. The committee received an update on research from Ed Clarke at the University of Arizona that looked at the prevalence of sickle cell trait testing policies in Division I athletics programs. The committee also received information that the NATA will be taking the lead on this topic area in 2007.

e. Male practice players. The committee continues its' original 2004 recommendation that all student-athletes involved with practice squads show proof of medical insurance, sign a drug testing consent form and pass a pre-participation examination. The committee also stated that institutions should provide medical care and coverage for these students that incur athletic-related injuries sustained during a countable practice.

f. Drug-Education and Testing video. The committee reviewed the completed 2006 Drug-Education and Testing video, and supported focused promotion to use this resource to various athletics administrators.

g. Transgendered student-athletes. The committee noted the current NCAA policy is to identify gender participation according to official state documents to determine the sex of the student-athlete. The committee will continue to monitor sports governing bodies' policies on this issue.

h. Injury Surveillance System. The committee reviewed the Injury Surveillance System (ISS) initiatives and extended its continued support for the program. The committee encourages all member institutions to examine their barriers to participating in sports injury reporting and facilitate a solution to improve reporting. The committee emphasized

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NCAA10138901

the impact of the ISS crosses all sports and divisions providing committees invaluable data for decision making on policy and legislative initiatives.

i. Sports Medicine Handbook. The committee approved the following edits to the 2006-07 Sports Medicine Handbook: elimination of the non-transparent eye shields waiver guideline in football, edits to the Lightning Safety Guideline, edits to the Helmet Fitting and Removal Guideline, and the addition of a new guideline, "Depression: Interventions in Intercollegiate Athletics."

14. Topics Identified For Upcoming NCAA News Coverage.

a. Street Drug Testing – Mike Krauss

b. Heading and protective equipment – Margot Putukian

c. Sickle Cell and Rhabdomyolysis – Priscilla Clarkson

d. Sun Safety – staff

15. Future Meetings. The committee approved the following dates and sites for its upcoming meetings:

a. December 14-16, Indianapolis.

b. June 2007, Indianapolis, date to be determined.

16. Adjournment. The meeting was adjourned at 11:00 a.m.

# # # # #

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 35



**P.O. Box 6222**
**Indianapolis, Indiana 46206**
**Telephone: 317/917-6222**

**Shipping/Overnight Address:**
**1802 Alonzo Watford Sr. Drive**
**Indianapolis, Indiana 46202**

**www.ncaa.org**

MEMORANDUM

October 7, 2008

TO:  Head Football Coaches.

FROM:  Debra Runkle, chair
          Committee on Competitive Safeguards and Medical Aspects of Sports.

SUBJECT:   Use of the helmet as a weapon & targeting of defenseless players.

Enclosed you will find a set of four posters designed to educate the membership about the 2008 football rule prohibiting initiating contact with and targeting a defenseless opponent. It is a foul when a player targets an opponent and initiates contact with the crown (top) of the helmet. This rule is intended primarily for the safety of the player who initiates the contact. It is also a foul if a player targets a defenseless opponent and initiates contact above the shoulders. Intentional helmet-to-helmet contact is never legal, nor is any other blow directed toward an opponent's head. Flagrant offenders shall be disqualified.

In 2005, due to concerns over continued head and neck injuries related to head-down contact and spearing in football, the National Athletic Trainers' Association (NATA) and the American Football Coaches Association (AFCA) co-sponsored a task force, looking at ways to prevent head and neck injuries. The **Heads Up!** video focusing on the education of student-athletes, coaches, officials and administrators regarding prevention of head and neck injuries can be found at: www.NATA.org.

Institutions are encouraged to show student-athletes and coaches the 14 minute video and place the enclosed posters in visible areas of the football facility. In addition, placing one poster in the game official's locker room is highly recommended.

Institutions may view video examples and print more copies from our website at: www.NCAA.org/health-safety. We hope these materials will be beneficial to you, your football personnel and student-athletes. Thanks for everything you do.

JK/DK:rhb

cc:  Conference Commissioners
     Directors of Athletics
     Head Athletic Trainers

Enclosures

National Collegiate Athletic Association

An association of more than 1,200 members serving the student-athlete
Equal Opportunity/Affirmative Action Employer



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 36

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3   ADRIAN ARRINGTON, DEREK        )
     OWENS, ANGELA PALACIOS,        )
 4   KYLE SOLOMON, individually,    )
     and on behalf of all other     )
 5   similarly situated,           )
                                    )
 6            Plaintiffs,           )
                                    ) No. 11 CV 06356
 7            vs.                   )
                                    )
 8   NATIONAL COLLEGIATE           )
     ATHLETIC ASSOCIATION,          )
 9                                  )
              Defendant.            )
10
11
12        The deposition of ADRIAN ARRINGTON, called
13   for examination, taken pursuant to the Federal Rules
14   of Civil Procedure of the United States District
15   Courts pertaining to the taking of depositions, taken
16   before Megan M. Cahill, CSR No. 84-004754, a
17   Certified Shorthand Reporter of the State of
18   Illinois, at 17 North State Street, Chicago,
19   Illinois, on March 14, 2013, at 10:00 a.m.
20
21
22
23
24
```

Page 45

1        Q.   Did I read that correctly?

2        A.   Uh-huh.

3        MR. WORD:   Counsel, did I read that

4   correctly?

5        MS. VOLD:   Yes.

6   BY MR. WORD:

7        Q.   Are you then, in this paragraph 28, only

8   describing concussions you suffered during games?

9        A.   Yes, sir.

10       Q.   Okay.  And after each of those

11  concussions you suffered during a game, an EIU doctor

12  told you you can return to play?

13       A.   Yes, sir.

14       Q.   Do you recall suffering a concussion in

15  October of 2007 against Eastern Kentucky?

16       A.   No, I don't recall when it happened.

17                        (Whereupon, Arrington

18                         Deposition Exhibit Nos 7

19                         and 8 were marked for

20                         identification.)

21  BY MR. WORD:

22       Q.   This is another one of those medical

23  reports that we received from EIU.

24       A.   You said this was when I played against

Page 46

1     who?

2          Q.    In the notes section, under 10/6 at the

3     very bottom, last line.

4          A.    Uh-huh.

5          Q.    It says, "Adrian suffered concussion in

6     game versus Eastern Kentucky."

7          A.    Uh-huh.

8          Q.    Do you recall suffering a concussion

9     around October 6th of 2007?

10         A.    This is the game when my teammates had to

11    get me -- tell my coaches when I had to get off the

12    field though, right?

13         Q.    I don't know.

14         A.    Yeah.  This is the one when my teammate

15    had to tell me -- remember when I told you earlier

16    about when I tell you about having better guidelines

17    about making aware of a concussion when your

18    teammates have to -- like, I continued to play a

19    while before my teammates made aware like, I didn't

20    know what the coverage was.  Like, we had a coverage

21    call "black."  "Black" was the man coverage, and my

22    teammates called out the coverage "black," and I come

23    up to my teammate and I said, "What's black?", and

24    they called the coach to the sideline and they called

Page 47

1    a time out and said, "Coach, we got to get him off

2    the field."  You know what I'm saying?  Like, I

3    didn't know what "black" was.  That's how they found

4    out I had a concussion, because I hit somebody on

5    that play and they continued to let me play, and

6    that's how I got off the field because my teammates

7    made it aware because the coach didn't take the hit

8    seriously.  So I get what you're saying about the

9    return to play.  I appreciate them making sure I

10   don't return to play on time, but what about if I

11   would have got injured on that field because they

12   didn't take the hit and take the play as severe as

13   it's supposed to have been?

14        Q.   Right.  So if I understand correctly, you

15   tackled somebody in that game?

16        A.   Yeah.  It was a big hit on the play and

17   they continued to let me play.  Like I said, I don't

18   remember the play.  My teammates -- two of my -- it

19   was a safety in the corner, you know what I'm saying.

20   They called out the coverage, we got the line up and

21   they was like, "black," the coverages is "black."

22   They told me that and I came up to them and was like,

23   "What's black?", and they looked at me and they was

24   like, "Time out.  Time out," and they got the coach

# EXHIBIT 37

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION
 3      ADRIAN ARRINGTON, DEREK OWENS, ANGELA PALACIOS, and
        KYLE SOLOMAN, individually and on behalf of all
 4      others similarly situated,
 5              Plaintiffs,
 6      vs.                                    No. 11-cv-06356
 7      NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
 8              Defendant.
 9      _____
10              DEPOSITION OF DEREK OWENS
             TAKEN ON BEHALF OF THE DEFENDANT
11        ON APRIL 23, 2013, BEGINNING AT 9:00 A.M.
                   IN LITTLE ROCK, ARKANSAS
12
13              APPEARANCES:
14      On behalf of the PLAINTIFF
15              Daniel J. Kurowski
                HAGENS, BERMAN, SOBOL & SHAPIRO, LLP
16              1144 Lake Street, Suite 400
                Oak Park, Illinois 60301
17              (708) 628-4963
                dank@hbsslaw.com
18
19      On behalf of the DEFENDANT
20              Mark S. Mester
                LATHAM & WATKINS, LLP
21              Sears Tower, Suite 5800
                233 South Wacker Drive
22              Chicago, Illinois 60606
                (312) 876-7700
23              webmaster@lw.com
24
25      REPORTED BY:  MICHAEL A. WASHKOWIAK, CCR
```

                                        Page 21

1    don't know that occurred.  I just want to know the

2    ones that you recall.

3         A    In college?

4         Q    Well, I want to start at the beginning.

5    Do you recall suffering a concussion in junior high

6    school?

7         A    No.

8         Q    Do you recall suffering two concussions in

9    high school?

10        A    One for sure, two possibly, never

11   documented.

12        Q    The one that you recall for sure, is that

13   the one that occurred in 2006?

14        A    Yes, sir.

15        Q    And then I understand you claim there was

16   another concussion that occurred in the spring of

17   2008; is that correct, at the voluntary practice?

18        A    The summer, yes.

19        Q    There was another concussion in September

20   of 2008; is that correct?

21        A    Yes.

22        Q    Then the next one I'm aware of is the

23   concussion in the Tulsa game, which was the fall of

24   2010, correct?

25        A    Yes.

Page 62

1    question.

2         A     Would you like to restate that in pieces,

3    please?

4         Q     (BY MR. MESTER)  Sure.  Prior to or during

5    your time at UCA, did anyone from the NCAA ever

6    make any representations to you either in writing

7    or orally?

8              MR. KUROWSKI:  Same objections.

9         A     Based on what, what type of writing or

10   communication?  Not directly, no.

11        Q     (BY MR. MESTER)  Indirectly?

12        A     I'm still not exactly sure.

13        Q     All I'm trying to get at is whether or not

14   the NCAA ever made any representations to you?

15        A     Representations of what?

16        Q     About anything.  And if so what, when, and

17   where?

18              MR. KUROWSKI:  Objection, calls for

19   speculation, vague.

20        A     To the best of my knowledge I do not

21   recall.

22        Q     (BY MR. MESTER)  How were you made aware

23   of the voluntary practices that you participated in

24   in the summer of 2008?

25        A     Coach Conque.

Page 63

1      Q     Was that a letter? a phone call? an e-
2    mail?
3      A     A visit in his office.
4      Q     What did he tell you during that visit?
5      A     Specifically, I cannot recall for sure.
6    Vaguely, that we would not be having summer
7    workouts and that the offense skill guys,
8    quarterbacks as well as defensive skill guys,
9    defensive backs, will be in attendance, and it is
10   to kind of hone in the offensive schemes as well as
11   the defensive schemes.
12     Q     Did he tell you that attendance was
13   mandatory at those practices?
14     A     It was highly encouraged, not specifically
15   mandatory.  Legally I don't believe it could be
16   made mandatory as well as coaches being present.
17     Q     There were, in fact, no coaches present at
18   those practices, correct?
19     A     Not that I recall.
20     Q     Sitting here today do you have any reason
21   to believe that all NCAA member institutions treat
22   concussions and the prevention of concussions in
23   exactly the same way?
24           MR. KUROWSKI:  Objection, calls for
25   speculation.

1    recall being examined by a physician at UCA?

2            (Whereupon Exhibit 16 was marked for

3    identification)

4        A      That would be the day we reported, so yes

5    I believe all freshman are given physicals the day

6    they report.

7        Q      Did you give that physician any indication

8    with regard to the one or more concussions that you

9    had suffered in high school?

10       A      I do not remember.

11       Q      There's no indication here on the form

12   that you did, but do you have any recollection of

13   doing so?

14       A      I cannot say one way or another.  There's

15   also no indications spot on the form for that.

16       Q      I'm not sure I agree with you there.  Let

17   me ask you this.

18             Did you give any indication to the

19   physician at the time of the concussion you believe

20   you suffered in a voluntary practice in the spring

21   or summer of 2008?

22       A      I do not know.

23       Q      Do you have a recollection of doing so?

24       A      I cannot recall positively one way or the

25   other.

# EXHIBIT 38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-----------------------------------------------------------x
CRAIG CALDERONE

                    Plaintiff/Petitioner,

      - against -                    Index No. 706987/2014

  SEE ANNEXED RIDER

                    Defendant/Respondent.
-----------------------------------------------------------x

## NOTICE OF COMMENCEMENT OF ACTION
## SUBJECT TO MANDATORY ELECTRONIC FILING

      PLEASE TAKE NOTICE that the matter captioned above, which has been commenced by filing of the accompanying documents with the County Clerk, is subject to mandatory electronic filing pursuant to Section 202.5-bb of the Uniform Rules for the Trial Courts. This notice is being served as required by Subdivision (b) (3) of that Section.

      The New York State Courts Electronic Filing System ("NYSCEF") is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and self-represented parties. Counsel and/or parties who do not notify the court of a claimed exemption (see below) as required by Section 202.5-bb(e) must immediately record their representation within the e-filed matter on the Consent/Represent page in NYSCEF. Failure to do so may result in an inability to receive electronic notice of document filings.

      Exemptions from mandatory e-filing are limited to: 1) attorneys who certify in good faith that they lack the computer equipment or (along with all employees) the requisite knowledge to comply; and 2) self-represented parties who choose not to participate in e-filing. For additional information about electronic filing, including access to Section 202.5-bb, consult the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov; mailing address: 60 Centre Street, New York, New York 10007).

Dated: 10-1-2014

_____ (Signature)     49 West 37th Street, 7th Floor (Address)

Scott W. Epstein     (Name)     New York, New York 10018

Antin, Ehrlich & Epstein, LLP (Firm Name)     212-221-5999   (Phone)

                                   sepstein@aeelaw.com   (E-Mail)

To:  see annexed rider

         _____

         _____

6 4/13

RIDER TO NOTICE OF COMMENCEMENT OF ACTION
SUBJECT TO MANDATORY ELECTRONIC FILING

Craig Calderon v Molloy College et al          INDEX NO.: 706987/2014

MOLLOY COLLEGE

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

EAST COAST CONFERENCE
NYIT SAC210

DANIEL LONGO
Molloy College Department of Athletics

SUSAN CASSIDY-LYKE
Molloy College Department of Athletics

JAMES ZEGERS
Molloy College Department of Athletics

INDEPENDENT SOCCER OFFICIALS ASSIGNING BUREAU, INC.

NATIONAL INTERCOLLEGIATE SOCCER OFFICIALS ASSOCIATION

JOHN DOE
Address Unknown

JOHN ROE
Address Unknown

FILED: QUEENS COUNTY CLERK 09/26/2014 07:01 PM

NYSCEF DOC. NO. 1

INDEX NO. 706987/2014

RECEIVED NYSCEF: 09/26/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
------------------------------------------------------------X
CRAIG CALDERONE,

                         Plaintiff,

        ,

        -against-

MOLLOY COLLEGE, NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION , EAST COAST
CONFERENCE, DANIEL LONGO,
SUSAN CASSIDY-LYKE, JAMES ZEGERS,
INDEPENDENT SOCCER OFFICIALS
ASSIGNING BUREAU, INC., NATIONAL
INTERCOLLEGIATE SOCCER OFFICIALS
ASSOCIATION, "JOHN DOE" (as further described
in the annexed complaint), and "JOHN ROE" (as
further described in the annexed complaint),

                       Defendants.
------------------------------------------------------------X

**SUMMONS**
Index No.:
Date Purchased:

Plaintiffs Designate
Queens County as the
Place of Trial

Basis of Venue:
Plaintiff's Residence
32-15 34th Street, Apt. 5B
Astoria, NY 11106

TO THE ABOVE NAMED DEFENDANTS:

      You are hereby summoned to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' attorneys within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint

Dated: New York, New York
      September 26, 2014

                    ANTIN, EHRLICH, & EPSTEIN, LLP

                    BY: Michael Peters
                    Attorneys for Plaintiff
                    49 West 37th Street, 7th Floor
                    New York, NY 10018
                    Phone: 212-221-5999
                    Fax: 212-221-6867

MOLLOY COLLEGE
1000 Hempstead Avenue
Rockville Centre, NY 11571

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
700 W. Washington Street
Indianapolis, IN 46206

EAST COAST CONFERENCE
300 Carleton Avenue
NYIT SAC210
Central Islip, NY 11722

DANIEL LONGO
Molloy College Department of Athletics
1000 Hempstead Avenue
Rockville Centre, NY 11571

SUSAN CASSIDY-LYKE
Molloy College Department of Athletics
1000 Hempstead Avenue
Rockville Centre, NY 11571

JAMES ZEGERS
Molloy College Department of Athletics
1000 Hempstead Avenue
Rockville Centre, NY 11571

INDEPENDENT SOCCER OFFICIALS ASSIGNING BUREAU, INC.
13440 Sunset Lakes Circle
Winter Garden, FL 34787

NATIONAL INTERCOLLEGIATE SOCCER OFFICIALS ASSOCIATION
1030 Ohio Avenue
Cape May, NJ 08204

JOHN DOE
Address Unknown

JOHN ROE
Address Unknown

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-----------------------------------------------------------------X
CRAIG CALDERONE,                                    Index No.:

                Plaintiff,

      -against-                                    COMPLAINT

MOLLOY COLLEGE, NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION , EAST COAST
CONFERENCE, DANIEL LONGO,
SUSAN CASSIDY-LYKE, JAMES ZEGERS,
INDEPENDENT SOCCER OFFICIALS
ASSIGNING BUREAU, INC., NATIONAL
INTERCOLLEGIATE SOCCER OFFICIALS
ASSOCIATION, "JOHN DOE" (as further described
in the annexed complaint), and "JOHN ROE" (as
further described in the annexed complaint),

                Defendants.
-----------------------------------------------------------------X

        Plaintiff, CRAIG CALDERONE, by his attorneys, ANTIN, EHRLICH, & EPSTEIN,

LLP, as and for his Complaint against the Defendants, MOLLOY COLLEGE, NATIONAL

COLLEGIATE ATHLETIC ASSOCIATION, EAST COAST CONFERENCE, DANIEL

LONGO, SUSAN CASSIDY-LYKE, JAMES ZEGERS, INDEPENDENT SOCCER

OFFICIALS ASSIGNING BUREAU, INC., NATIONAL INTERCOLLEGIATE SOCCER

OFFICIALS ASSOCIATION, "JOHN DOE", and "JOHN ROE", states that, upon information

and belief and allege as follows:

## THE PARTIES

      1.  -  On or about September 26, 2012, Plaintiff, CRAIG CALDERONE was, and still

is, a resident County of Queens, State of New York.

1

2.    On or about September 26, 2012, Defendant, MOLLOY COLLEGE, was, and still is, a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

3.    On or about September 26, 2012, Defendant, MOLLOY COLLEGE, was, and still is, a foreign corporation duly licensed to do business in the State of New York.

4.    On or about September 26, 2012, Defendant, MOLLOY COLLEGE, was, and still is, a non-profit corporation organized and existing under and by virtue of the laws of the State of New York.

5.    On or about September 26, 2012, Defendant, MOLLOY COLLEGE, was, and still is, a limited liability corporation organized and existing under and by virtue of the laws of the State of New York.

6.    On or about September 26, 2012, Defendant, MOLLOY COLLEGE, was, and still is, doing business in the State of New York.

7.    On or about September 26, 2012, Defendant, MOLLOY COLLEGE, maintained offices in the State of New York.

8.    On or about September 26, 2012, Defendant, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (hereinafter "NCAA"), was, and still is, a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

9.    On or about September 26, 2012, Defendant, NCAA, was, and still is, a foreign corporation duly licensed to do business in the State of New York.

10.   On or about September 26, 2012, Defendant, NCAA, was, and still is, a non-profit corporation organized and existing under and by virtue of the laws of the State of New York.

11.     On or about September 26, 2012, Defendant, NCAA, was, and still is, a non-profit association organized and existing under and by virtue of the laws of the State of New York.

12.     On or about September 26, 2012, Defendant, NCAA, was, and still is, a limited liability corporation organized and existing under and by virtue of the laws of the State of New York.

13.     On or about September 26, 2012, Defendant, NCAA, was, and still is, a voluntary association.

14.     On or about September 26, 2012, Defendant, NCAA, was, and still is, doing business in the State of New York.

15.     On or about September 26, 2012, Defendant, NCAA, maintained offices in the State of New York.

16.     On or about September 26, 2012, Defendant, EAST COAST CONFERENCE (hereinafter "ECC"), was, and still is, a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

17.     On or about September 26, 2012, Defendant, ECC, was, and still is, a foreign corporation duly licensed to do business in the State of New York.

18.     On or about September 26, 2012, Defendant, ECC, was, and still is, a non-profit corporation organized and existing under and by virtue of the laws of the State of New York.

19.     On or about September 26, 2012, Defendant, ECC, was, and still is, a non-profit association organized and existing under and by virtue of the laws of the State of New York.

20.     On or about September 26, 2012, Defendant, ECC, was, and still is, a limited liability corporation organized and existing under and by virtue of the laws of the State of New York.

3

21. On or about September 26, 2012, Defendant, ECC, was, and still is, a voluntary association.

22. On or about September 26, 2012, Defendant, ECC, was, and still is, doing business in the State of New York.

23. On or about September 26, 2012, Defendant, ECC, maintained offices in the State of New York.

24. On or about September 26, 2012, Defendant, DANIEL LONGO was, and still is, a resident County of Nassau, State of New York.

25. On or about September 26, 2012, Defendant, DANIEL LONGO was, and still is, employed by Defendant MOLLOY COLLEGE.

26. On or about September 26, 2012, Defendant, DANIEL LONGO was, and still is, employed by Defendant MOLLOY COLLEGE as the Head Men's Soccer Coach.

27. On or about September 26, 2012, Defendant, DANIEL LONGO was, and still is, an agent of Defendant MOLLOY COLLEGE.

28. On or about September 26, 2012, Defendant, DANIEL LONGO was acting within the scope of his employment on behalf of Defendant MOLLOY COLLEGE.

29. On or about September 26, 2012, Defendant, DANIEL LONGO had authority to act on behalf of Defendant MOLLOY COLLEGE.

30. On or about September 26, 2012, Defendant, DANIEL LONGO had authority to speak on behalf of Defendant MOLLOY COLLEGE.

31. On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE was, and still is, a resident County of Nassau, State of New York.

4

32.     On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE was, and still is, employed by Defendant MOLLOY COLLEGE.

33.     On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE was, and still is, employed by Defendant MOLLOY COLLEGE as the Director of Athletics.

34.     On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE was, and still is, an agent of Defendant MOLLOY COLLEGE.

35.     On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE was, and still is, an administrator of Defendant MOLLOY COLLEGE.

36.     On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE was acting within the scope of her employment on behalf of Defendant MOLLOY COLLEGE.

37.     On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE had authority to act on behalf of Defendant MOLLOY COLLEGE.

38.     On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE had authority to speak on behalf of Defendant MOLLOY COLLEGE.

39.     On or about September 26, 2012, Defendant, JAMES ZEGERS was, and still is, a resident County of Nassau, State of New York.

40.     On or about September 26, 2012, Defendant, JAMES ZEGERS was, and still is, employed by Defendant MOLLOY COLLEGE.

41.     On or about September 26, 2012, Defendant, JAMES ZEGERS was, and still is, employed by Defendant MOLLOY COLLEGE as the Assistant Director of Athletics For Sports Medicine.

42.     On or about September 26, 2012, Defendant, JAMES ZEGERS was, and still is, an agent of Defendant MOLLOY COLLEGE.

43.     On or about September 26, 2012, Defendant, JAMES ZEGERS was, and still is, an administrator of Defendant MOLLOY COLLEGE.

44.     On or about September 26, 2012, Defendant, JAMES ZEGERS was, and still is, a licensed New York State Athletic Trainer.

45.     On or about September 26, 2012, Defendant, JAMES ZEGERS was acting within the scope of his employment on behalf of Defendant MOLLOY COLLEGE.

46.     On or about September 26, 2012, Defendant, JAMES ZEGERS had authority to act on behalf of Defendant MOLLOY COLLEGE.

47.     On or about September 26, 2012, Defendant, JAMES ZEGERS had authority to speak on behalf of Defendant MOLLOY COLLEGE.

48.     On or about September 26, 2012, Defendant, INDEPENDENT SOCCER OFFICIALS ASSIGNING BUREAU, INC. (hereinafter "ISOAB"), was, and still is, a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

49.     On or about September 26, 2012, Defendant ISOAB, was, and still is, a foreign corporation duly licensed to do business in the State of New York.

50.     On or about September 26, 2012, Defendant ISOAB, was, and still is, a non-profit corporation organized and existing under and by virtue of the laws of the State of New York.

51.     On or about September 26, 2012, Defendant ISOAB, was, and still is, a limited liability corporation organized and existing under and by virtue of the laws of the State of New York.

52.     On or about September 26, 2012, Defendant, ISOAB, was, and still is, a voluntary association.

53. On or about September 26, 2012, Defendant ISOAB, was, and still is, doing business in the State of New York.

54. On or about September 26, 2012, Defendant ISOAB, maintained offices in the State of New York.

55. On or about September 26, 2012, Defendant, NATIONAL INTERCOLLEGIATE SOCCER OFFICIALS ASSOCIATION (hereinafter "NISOA"), was, and still is, a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

56. On or about September 26, 2012, Defendant NISOA, was, and still is, a foreign corporation duly licensed to do business in the State of New York.

57. On or about September 26, 2012, Defendant NISOA, was, and still is, a non-profit corporation organized and existing under and by virtue of the laws of the State of New York.

58. On or about September 26, 2012, Defendant NISOA, was, and still is, a limited liability corporation organized and existing under and by virtue of the laws of the State of New York.

59. On or about September 26, 2012, Defendant, NISOA, was, and still is, a voluntary association.

60. On or about September 26, 2012, Defendant NISOA, was, and still is, doing business in the State of New York.

61. On or about September 26, 2012, Defendant NISOA, maintained offices in the State of New York.

62. That Defendant "JOHN DOE" is and described as follows: a male individual, who, on or about September 26, 2012, was a soccer official and/or referee that was officiating

and/or refereeing the men's soccer game between MOLLOY COLLEGE and Holy Family University, who whistled for the game to continue, with the Plaintiff playing in it, shortly after he regained consciousness, without assessing/evaluating him, or giving others the opportunity to do so.

63.    On or about September 26, 2012, Defendant "JOHN DOE" was employed by Defendant ISOAB as a soccer official or referee.

64.    On or about September 26, 2012, Defendant "JOHN DOE" was an agent of Defendant ISOAB.

65.    On or about September 26, 2012, Defendant "JOHN DOE" was employed by Defendant NISOA as a soccer official or referee.

66.    On or about September 26, 2012, Defendant "JOHN DOE" was an agent of Defendant NISOA.

67.    On or about September 26, 2012, Defendant "JOHN DOE" was employed by Defendant MOLLOY COLLEGE as a soccer official or referee.

68.    On or about September 26, 2012, Defendant "JOHN DOE" was an agent of Defendant MOLLOY COLLEGE.

69.    On or about September 26, 2012, Defendant "JOHN DOE" was employed by Holy Family University as a soccer official or referee.

70.    On or about September 26, 2012, Defendant "JOHN DOE" was an agent of Holy Family University.

71.    On or about September 26, 2012, Defendant "JOHN DOE" was an independent contractor retained to officiate and/or referee the men's soccer game between MOLLOY COLLEGE and Holy Family University on September 26, 2012.

72.     That Defendant "JOHN ROE" is and described as follows: an individual, corporation, partnership, limited liability company, contractor, subcontractor, or other business entity, which, on or about September 26, 2012, was responsible for medically assessing or evaluating the student-athletes participating in the men's soccer game between MOLLOY COLLEGE and Holy Family University, who sustained personal injuries during the game, including but not limited to, blows to the head/concussions, before allowing them to continue playing.

73.     On or about September 26, 2012, Defendant "JOHN ROE" was employed by MOLLOY COLLEGE.

74.     On or about September 26, 2012, Defendant "JOHN ROE" was an agent of MOLLOY COLLEGE.

75.     On or about September 26, 2012, Defendant "JOHN ROE" was employed by NCAA.

76.     On or about September 26, 2012, Defendant "JOHN ROE" was an agent of NCAA.

77.     On or about September 26, 2012, MOLLOY COLLEGE was, and still is, a private college located in Nassau County, New York. (hereinafter "the college").

78.     On or about September 26, 2012, MOLLOY COLLEGE was, and still is, a member of the NCAA.

79.     On or about September 26, 2012, MOLLOY COLLEGE was, and still is, a member of the ECC.

80.     On or about September 26, 2012, MOLLOY COLLEGE's athletic teams competed, and still compete, in the NCAA's Division II and the ECC.

81. On or about September 26, 2012, MOLLOY COLLEGE's athletic teams participated in intercollegiate athletic events organized, operated, managed, controlled and supervised by Defendant NCAA.

82. On or about September 26, 2012, MOLLOY COLLEGE's athletic teams participated in intercollegiate athletic events organized, operated, managed, controlled and supervised by Defendant ECC.

83. On or about September 26, 2012, Plaintiff, CRAIG CALDERONE, was a student enrolled at MOLLOY COLLEGE.

84. On or about September 26, 2012, Plaintiff, CRAIG CALDERONE, was a student-athlete at MOLLOY COLLEGE.

85. On or about September 26, 2012, Plaintiff, CRAIG CALDERONE, was a member of the MOLLOY COLLEGE Varsity Men's Soccer Team.

86. On or about September 26, 2012, Defendant MOLLOY COLLEGE by its agents, servants, licensees, affiliates, lessees and/or employees, owned the college.

87. On or about September 26, 2012, Defendant MOLLOY COLLEGE by its agents, servants, licensees, affiliates, lessees and/or employees, operated the college.

88. On or about September 26, 2012, Defendant MOLLOY COLLEGE, by its agents, servants, licensees, affiliates, lessees and/or employees, controlled the college.

89. On or about September 26, 2012, Defendant MOLLOY COLLEGE, by its agents, servants, licensees, affiliates, lessees and/or employees, managed the college.

90. On or about September 26, 2012, Defendant MOLLOY COLLEGE, by its agents, servants, licensees, affiliates, lessees and/or employees, supervised the college.

91.     On or about September 26, 2012, Defendant MOLLOY COLLEGE, by its agents, servants, licensees, affiliates, lessees and/or employees, employed personnel at the college.

92.     On or about September 26, 2012, Defendant MOLLOY COLLEGE, by its agents, servants, licensees, affiliates, lessees and/or employees, supervised personnel the college.

93.     On or about September 26, 2012, Defendant MOLLOY COLLEGE by its agents, servants, licensees, affiliates, lessees and/or employees, provided various services to students and student athletes at the college, including but not limited to education, athletic teams, athletic coaches, athletic officials and referees, and an athletic training staff.

94.     On or about September 26, 2012, Defendant MOLLOY COLLEGE, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to Plaintiff, its students, its student-athletes, and the general public, to safely operate, control, supervise, manage, maintain the college and its athletic programs at all times.

95.     On or about September 26, 2012, Defendant MOLLOY COLLEGE, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to exercise reasonable care for the health and safety of its student athletes, including the Plaintiff.

96.     On or about September 26, 2012, Defendant NCAA, by its agents, servants, licensees, affiliates, lessees and/or employees organized intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

97.     On or about September 26, 2012, Defendant NCAA, by its agents, servants, licensees, affiliates, lessees and/or employees operated intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

11

98. On or about September 26, 2012, Defendant NCAA, by its agents, servants, licensees, affiliates, lessees and/or employees managed intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

99. On or about September 26, 2012, Defendant NCAA, by its agents, servants, licensees, affiliates, lessees and/or employees controlled intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

100. On or about September 26, 2012, Defendant NCAA, by its agents, servants, licensees, affiliates, lessees and/or employees supervised intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

101. On or about September 26, 2012, Defendant NCAA, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to Plaintiff, participating student-athletes, and the general public, to safely operate, control, supervise, manage, maintain the athletic events at all times.

102. On or about September 26, 2012, Defendant NCAA, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to exercise reasonable care for the health and safety of participating student athletes, including the Plaintiff.

103. On or about September 26, 2012, Defendant ECC, by its agents, servants, licensees, affiliates, lessees and/or employees organized intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

104. On or about September 26, 2012, Defendant ECC, by its agents, servants, licensees, affiliates, lessees and/or employees operated intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

12

105. On or about September 26, 2012, Defendant ECC, by its agents, servants, licensees, affiliates, lessees and/or employees managed intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

106. On or about September 26, 2012, Defendant ECC, by its agents, servants, licensees, affiliates, lessees and/or employees controlled intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

107. On or about September 26, 2012, Defendant ECC, by its agents, servants, licensees, affiliates, lessees and/or employees supervised intercollegiate athletic events, including Men's Soccer games, participated in by MOLLOY COLLEGE.

108. On or about September 26, 2012, Defendant ECC, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to Plaintiff, participating student-athletes, and the general public, to safely operate, control, supervise, manage, maintain the athletic events at all times.

109. On or about September 26, 2012, Defendant ECC, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to exercise reasonable care for the health and safety of participating student athletes, including the Plaintiff.

110. On or about September 26, 2012, Defendant DANIEL LONGO was, and still is, the Head Men's Soccer Coach at MOLLOY COLLEGE.

111. On or about September 26, 2012, Defendant, DANIEL LONGO, organized the MOLLOY COLLEGE Men's Soccer Team.

112. On or about September 26, 2012, Defendant, DANIEL LONGO, operated the MOLLOY COLLEGE Men's Soccer Team.

13

113.    On or about September 26, 2012, Defendant, DANIEL LONGO, managed the MOLLOY COLLEGE Men's Soccer Team.

114.    On or about September 26, 2012, Defendant, DANIEL LONGO, controlled the MOLLOY COLLEGE Men's Soccer Team.

115.    On or about September 26, 2012, Defendant, DANIEL LONGO, supervised the MOLLOY COLLEGE Men's Soccer Team.

116.    On or about September 26, 2012, Defendant, DANIEL LONGO, had a duty to exercise reasonable care for the health and safety of the members of the MOLLOY COLLEGE Men's Soccer Team, including the Plaintiff.

117.    On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE, was, and still is, the Director of Athletics at MOLLOY COLLEGE.

118.    On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE, organized the MOLLOY COLLEGE Men's Soccer Team.

119.    On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE, operated the MOLLOY COLLEGE Men's Soccer Team.

120.    On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE, managed the MOLLOY COLLEGE Men's Soccer Team.

121.    On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE, controlled the MOLLOY COLLEGE Men's Soccer Team.

122.    On or about September 26, 2012, Defendant SUSAN CASSIDY-LYKE supervised the MOLLOY COLLEGE Men's Soccer Team.

123. On or about September 26, 2012, Defendant, SUSAN CASSIDY-LYKE, had a duty to exercise reasonable care for the health and safety of the members of the MOLLOY COLLEGE Men's Soccer Team, including the Plaintiff.

124. On or about September 26, 2012, Defendant, JAMES ZEGERS, was, and still is, the Assistant Director of Athletics For Sports Medicine at MOLLOY COLLEGE.

125. On or about September 26, 2012, Defendant, JAMES ZEGERS, organized the MOLLOY COLLEGE Athletic Training Staff.

126. On or about September 26, 2012, Defendant, JAMES ZEGERS, operated the MOLLOY COLLEGE Athletic Training Staff.

127. On or about September 26, 2012, Defendant, JAMES ZEGERS, managed the MOLLOY COLLEGE Athletic Training Staff.

128. On or about September 26, 2012, Defendant, JAMES ZEGERS, controlled the MOLLOY COLLEGE Athletic Training Staff.

129. On or about September 26, 2012, Defendant, JAMES ZEGERS, supervised the MOLLOY COLLEGE Athletic Training Staff.

130. On or about September 26, 2012, Defendant, JAMES ZEGERS, had a duty to exercise reasonable care for the health and safety of the members of the MOLLOY COLLEGE Men's Soccer Team, including the Plaintiff.

131. On or about September 26, 2012, Defendant, ISOAB, employed and/or assigned soccer officials or referees to intercollegiate soccer games.

132. On or about September 26, 2012, Defendant, ISOAB, employed and/or assigned "JOHN DOE" to officiate and/or referee the men's soccer game between MOLLOY COLLEGE and Holy Family University on September 26, 2012.

133. On or about September 26, 2012, Defendant, ISOAB, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to exercise reasonable care for the health and safety of the members of the MOLLOY COLLEGE Men's Soccer Team, including the Plaintiff.

134. On or about September 26, 2012, Defendant, NISOA, employed and/or assigned soccer officials or referees to intercollegiate soccer games.

135. On or about September 26, 2012, Defendant, NISOA, employed and/or assigned "JOHN DOE" to officiate and/or referee the men's soccer game between MOLLOY COLLEGE and Holy Family University on September 26, 2012

136. On or about September 26, 2012, Defendant, NISOA, by its agents, servants, licensees, affiliates, lessees and/or employees, had a duty to exercise reasonable care for the health and safety of the members of the MOLLOY COLLEGE Men's Soccer Team, including the Plaintiff.

137. On or about September 26, 2012, Defendant, "JOHN DOE" was a soccer official and/or referee for the men's soccer game between MOLLOY COLLEGE and Holy Family University.

138. On or about September 26, 2012, Defendant, "JOHN DOE" was a soccer official and/or referee for the men's soccer game between MOLLOY COLLEGE and Holy Family University.

139. On or about September 26, 2012, Defendant, "JOHN DOE" controlled the men's soccer game between MOLLOY COLLEGE and Holy Family University.

140. On or about September 26, 2012, Defendant, "JOHN DOE" supervised the men's soccer game between MOLLOY COLLEGE and Holy Family University.

16

141.    On or about September 26, 2012, Defendant, "JOHN DOE", had a duty to exercise reasonable care for the health and safety of the members of the MOLLOY COLLEGE Men's Soccer Team, including the Plaintiff.

142.    On or about September 26, 2012, Defendant, "JOHN ROE" controlled the men's soccer game between MOLLOY COLLEGE and Holy Family University.

143.    On or about September 26, 2012, Defendant, "JOHN ROE" supervised the men's soccer game between MOLLOY COLLEGE and Holy Family University.

144.    On or about September 26, 2012, Defendant, "JOHN ROE", had a duty to exercise reasonable care for the health and safety of the members of the MOLLOY COLLEGE Men's Soccer Team, including the Plaintiff.

## THE GAME

145.    On or about September 26, 2012, the MOLLOY COLLEGE Men's Soccer Team participated in a soccer game against Holy Family University Men's Soccer Team in Philadelphia, Pennsylvania. (Hereinafter "the game").

146.    The game was organized, operated, managed, controlled, and supervised by all of the aforementioned Defendants.

147.    Defendants ISOAB and/or NISOA employed and/or assigned the soccer officials or referees to the game, including "JOHN DOE".

148.    During the game, Plaintiff, CRAIG CALDERONE, was struck in the head by a soccer ball travelling at a high rate of speed.

149.    As a result of the ball striking the Plaintiff in the head, the Plaintiff was rendered unconscious and immediately fell to the ground.

17

150.    The Plaintiff sustained a concussion as a result of the ball striking the Plaintiff's head.

151.    After regaining consciousness, the Plaintiff attempted to stand up

152.    Despite Plaintiff's dazed, confused, and unsteady state and unsteadiness on his feet, none of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, came to Plaintiff's assistance.

153.    "JOHN DOE", an official(s) and/or referee(s) for the game, blew his whistle and directed and permitted the game to resume with Plaintiff still on the field as a player.

154.    At no point did any of the Defendants, their agents, servants, licensees, affiliates, and/or employees, attempt to stop the game.

155.    At no point did any of the Defendants, their agents, servants, licensees, affiliates, and/or employees, attempt to assist the Plaintiff off of the field.

156.    At no point did any of the Defendants, their agents, servants, licensees, affiliates, and/or employees, attempt to remove the Plaintiff from the game.

157.    At no point did any of the Defendants, their agents, servants, licensees, affiliates, and/or employees, attempt to render medical treatment to Plaintiff.

158.    At no point did any of the Defendants, their agents, servants, licensees, affiliates, and/or employees, attempt to evaluate the Plaintiff.

159.    At no point did any of the Defendants, their agents, servants, licensees, affiliates, and/or employees, attempt to conduct concussion tests on the Plaintiff.

160.    At no point did any of the Defendants, their agents, servants, licensees, affiliates, and/or employees, follow the proper concussion protocols.

18

161. The Defendants, their agents, servants, licensees, affiliates, and/or employees, instructed and permitted the Plaintiff to continue playing in the game.

162. Throughout the remainder of the game, the ball came into contact with the Plaintiff's head on several more occasions.

163. Prior to the conclusion of the game the Plaintiff was struck in the head by another player's elbow causing him to fall to the ground again.

164. Despite falling to the ground as a result of the additional blow to the head following a concussion, none of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, came to Plaintiff's assistance.

165. At no point after any of the further blows to the head did any of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, attempt to stop the game.

166. At no point after any of the further blows to the head did any of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, attempt to assist the Plaintiff off of the field.

167. At no point after any of the further blows to the head did any of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, attempt to remove the Plaintiff from the game.

168. At no point after any of the further blows to the head did any of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, attempt to render medical treatment to Plaintiff.

169. At no point after any of the further blows to the head did any of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, attempt to evaluate the Plaintiff.

170. At no point after any of the further blows to the head did any of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, attempt to conduct concussion tests on the Plaintiff.

171. At no point after any of the further blows to the head did any of the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, follow the proper concussion protocols.

172. After the additional blows to the head, the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, instructed and permitted the Plaintiff to continue playing in the game.

173. As a result of multiple blows to the head sustained by the Plaintiff during the game, Plaintiff was (a) rendered sick, sore, lame and disabled and was caused to sustain permanent injuries, (b) was unable to attend to his usual duties for considerable time, (c) required medical aid and attention, (d) sustained a loss of wages and or income, (e) sustained other special damages, (f) suffered grievous physical pain and anguish and will continue to suffer pain, anguish and discomfort, (g) will be required to expend additional sums for medical care, and (h) was otherwise damaged.

## NEGLIGENCE

174. Plaintiff was a student-athlete who was physically injured during a Division II NCAA soccer game. The athletic coaches, trainers, and staff, including, but not limited to DANIEL LONGO, SUSAN CASSIDY-LYKE, JAMES ZEGERS, and their subordinates, had a special relationship with Plaintiff.

20

175.    Following Plaintiff's initial concussion, Defendants voluntarily undertook and assumed a special duty/special relationship by instructing him and permitting him to remain in the game.

176.    Plaintiff justifiably relied upon Defendants, their agents, servants, licensees, affiliates, lessees and/or employees to exercise their independent judgment and expertise in evaluating his health and safety and implementing the applicable MOLLOY COLLEGE, ECC, and NCAA concussion protocols. Plaintiff relied upon the Defendants to his detriment.

177.    By virtue of the circumstances, the relationship gave rise to a heightened duty of care on the part of Defendants to protect the Plaintiff from further injury and harm.

178.    Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, breached the standard of care for ensuring the health and safety of the Plaintiff, while he was engaged in a Division II NCAA soccer game.

179.    That the aforesaid occurrence(s) were caused by the Defendants, their agents, servants, licensees, affiliates, lessees and/or employees, inter alia, in the negligent, careless, and reckless organization, operation, management, control and supervision of the game, without any negligence on the part of the Plaintiff; in that the Defendants failed to recognize the signs and symptoms of concussions; failed to train staff to recognize the signs and symptoms of concussions; failed to ensure that the MOLLOY COLLEGE guidelines, NCAA Guidelines, ECC guidelines, and International Consensus Guidelines and protocols for head trauma and concussions were implemented, followed, and applied with respect to the MOLLOY COLLEGE Men's Soccer program; failed to follow its own concussion protocols; failed to timely, adequately, and/or properly having Plaintiff assessed/evaluated by an appropriate person/medical professional head trauma/concussions before allowing Plaintiff to return to play; failed to

21

administer a concussion injury assessment to Plaintiff on multiple occasions; failed to ensure Plaintiff was examined by a team physician prior to his return to the game; failed to treat Plaintiff after he suffered his concussion; negligently hired, trained, and/or supervised their employees; failed to employ and/or retain trained personnel able to provide medical care, treatment, training, management, and/or oversight to Plaintiff; failed to ensure personnel maintained the required knowledge, skills, and competence levels to provide proper medical care, treatment, training, management, and/or oversight to Plaintiff; failed to oversee personnel in the execution of their duties to assure that Plaintiff received proper medical care, treatment, training, management, and/or oversight; failed to have in place and/or to enforce policies and procedures regarding care, treatment, training, management, and/or oversight of Plaintiff's status post-concussion; failed to perform medical testing, evaluation, management, and/or oversight of Plaintiff; failed to warn Plaintiff about the serious risks of playing soccer while still symptomatic after suffering a previous concussion; failed to document all pertinent information surrounding Plaintiff's concussion; failed to require Plaintiff to undergo and pass concussion testing prior to his return to the game; failed to exercise reasonable care by permitting Plaintiff to continue participating in the game after suffering a concussion; failed to administer post-concussion testing on Plaintiff; failed to have in place and/or enforce policies and procedures regarding the management of all sports related concussions before the start of the athletic season; failed to have in place and/or enforce policies and procedures regarding all return-to-play decisions; failed to make proper return-to-play decisions for Plaintiff; failed to determine the severity and classification of the concussion sustained by Plaintiff; failed to perform the clinical and cognitive testing required to objectively determine the injury severity of Plaintiff and his readiness to return-to-play; failed to prevent Plaintiff from returning-to-play without allowing time to recover

from his concussions; failed to recognize the risks of premature return-to-play status following a concussion, including but not limited to, Second Impact Syndrome, and Post-Concussion Syndrome; failed to adopt best concussion management practices in a timely fashion so that proper concussion management was engrained in the practices of institutions like MOLLOY COLLEGE; failed to follow a concussion management plan that had enforcement provisions for failure to follow best practices for concussion management; in allowing the Plaintiff to return-to-play after each of the several blows to the head he sustained during the game, including but not limited to, the initial one rendering him unconscious; in failing to remove the Plaintiff from the game after each of the several blows to the head he sustained during the game, including but not limited to, the initial one rendering him unconscious; in failing to adopt an/or enforce appropriate head trauma/concussion protocols; in failing to have appropriate personnel at the subject game to enforce head trauma/concussion protocols; and Defendants were otherwise careless, reckless, and negligent.

## DAMAGES

180.    That solely by reason of the foregoing, Plaintiff, CRAIG CALDERONE, became and was rendered sick, sore, lame and disabled; received severe, serious and permanent injuries in and about diverse parts of his person; suffered, and continues to suffer, permanent psychological, mental, and emotional injuries; suffered permanent brain damage, disability, pain, distress and impairment; experienced great pain and suffering and Plaintiff suffered and still suffers from said injuries; and Plaintiff has been informed and verily believes said injuries to be of a permanent nature; and Plaintiff was incapacitated and will continue to be incapacitated from attending to his usual duties for a long period of time; and Plaintiff was and still is and will

continue to be prevented from attending to his usual duties, hobbies, activities and avocation; and Plaintiff was compelled to and did seek hospitalization, medical aid, attention and treatment and will require further medical care and treatment in the future; and Plaintiff was caused to and did expend diverse sums of money in an effort to cure and heal himself and will in the future be required to incur additional expenses for such medical and other aid; and Plaintiff in other ways sustained the loss of diverse sums of money, wages, and earnings, all of which will continue into the future.

181.    Plaintiffs' damages total a sum which exceeds the jurisdiction of all lower Courts of the State of New York.

182.    This action falls within one or more of the exceptions enumerated by Section 1602 of the CPLR.

WHEREFORE, the Plaintiff, CRAIG CALDERONE, demands judgment against the Defendants, MOLLOY COLLEGE, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, EAST COAST CONFERENCE, DANIEL LONGO,  SUSAN CASSIDY-LYKE, JAMES ZEGERS, INDEPENDENT SOCCER OFFICIALS ASSIGNING BUREAU, INC., NATIONAL INTERCOLLEGIATE SOCCER OFFICIALS ASSOCIATION, "JOHN DOE" and "JOHN ROE", jointly and severally, in a sum greater than the jurisdictional limits of all lower Courts that would otherwise have jurisdiction over this action, together with costs and disbursements in this action, along with such other and further relief as this Court deems just and proper.

Dated: New York, New York
        September 26, 2014

ANTIN, EHRLICH, & EPSTEIN, LLP

BY: Michael Peters
Attorneys for Plaintiffs
49 West 37th Street, 7th Floor
New York, NY 10018
Phone: 212-221-5999
Fax: 212-221-6867