IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | ) ) ) ) ) ) ) ) ) ) | MDL No. 2492 <br><br> Master Docket No. 13 C 9116 <br><br> Judge John Z. Lee |
| This Document Relates to All Cases | ) | |

## MEMORANDUM OPINION AND ORDER

In its January 26, 2016, Memorandum Opinion and Order, the Court granted the Settling Plaintiffs' Joint Motion for the Preliminary Approval of the Amended Class Settlement and Certification of Settlement Class, subject to a number of modifications. *See In re Nat'l Collegiate Athl. Ass'n Student-Athlete Concussion Injury Litig.*, __ F.R.D. __, MDL No. 2492, 2016 WL 305380 (N.D. Ill. Jan. 26, 2016). The Court then provided the parties with an opportunity to determine whether they would be amenable to the modifications or, to the extent they were not, to provide additional evidence to address the concerns set out in the order.

As instructed, counsel for the Settling Plaintiffs and the NCAA, as well as counsel for Lead Objector Anthony Nichols, met on numerous occasions to discuss the modifications proposed by the Court with the assistance of retired United States District Judge Wayne R. Anderson. Based upon these discussions, the parties have agreed to all of the modifications with one exception, and, as to that exception, they have presented additional evidence and arguments to demonstrate why the Court should grant preliminary approval of the settlement agreement as it is now proposed. Finding that the proposed settlement, as it is currently constituted, addresses

the concerns raised in the January 26 order, the Court grants preliminary approval of the Second Amended Class Settlement and conditionally certifies the Settlement Class and Settlement Subclasses.

## Background

The Court assumes familiarity with the facts and history of this multi-district litigation as outlined in the Court's prior orders. Accordingly, only a brief synopsis is provided here.

The Settling Plaintiffs are a putative class of current and former collegiate student-athletes, who have sued the National Collegiate Athletic Association ("NCAA"), asserting contractual and common law claims relating to the way in which the NCAA has addressed concussions and concussion-related risks. Among other things, the Settling Plaintiffs seek medical monitoring for the class, because they contend the class is at risk for developing future symptoms related to concussions and/or the accumulation of sub-concussive hits.

After conducting extensive class and merits discovery, the Settling Plaintiffs and the NCAA have engaged in protracted negotiations to achieve a settlement. The parties have presented a proposed settlement agreement to the Court for preliminary approval on two previous occasions.

On December 17, 2014, the Court declined to approve the first proposed settlement agreement due to a number of significant concerns. *See In re NCAA*, MDL No 2492, 2014 WL 7237208 (N.D. Ill. Dec. 2014). The parties requested an opportunity to re-engage in settlement negotiations in an effort to address the Court's questions. After additional negotiations, they submitted an amended settlement agreement for approval.

On January 26, 2016, the Court preliminarily approved the amended proposed settlement and conditionally certified the settlement class. But the Court did so on the condition that the

parties either agree to certain modifications or provide additional evidence to allay the Court's concerns. Those modifications included: (1) creating subclasses for student-athletes in Contact and Non-Contact sports; (2) requiring notification to class members via the NCAA's website as well as social media in order to supplement the class notice plan; (3) deleting provisions that require a class member to submit a claim to his or her health insurance company or permit the Medical Monitoring Program to seek subrogation or reimbursement from a class member and his or her health insurance company; (4) extending the Medical Monitoring Period if sufficient funds are available at the end of the monitoring period; (5) requiring that the $5 million contribution from the NCAA for concussion research go to research that would otherwise not have occurred absent the settlement; (6) implementing publicity campaigns during the Medical Monitoring Program on the ten-year, twenty-year, thirty-year, and forty-year anniversaries of the commencement of the Medical Monitoring Program to ensure that class members remain aware of the program's availability; (7) enabling the Court to require reports from those in charge of the Medical Monitoring Program as needed; and (8) excluding Class Counsel from the waiver of future claims.[1] The Settling Plaintiffs and the NCAA have since agreed to these modifications.

The remaining modification proposed by the Court addressed the scope of the release contained in the amended settlement agreement. As part of the settlement, the class members would have to release any and all claims "brought or pursued on a class-wide basis and relating to concussions or sub-concussive hits or contact." *In re NCAA*, 2016 WL 305380, at *5. However, they still would retain the right to bring "individual personal or bodily injury claims" and "class claims that do not relate in any way to medical monitoring or medical treatment of

---

[1] The capitalized terms are as defined in the Second Amended Settlement Agreement. ECF 266, Joint Mot. Preliminary Approval 2d Am. Class Settlement & Certification Settlement Class & Settlement Subclasses, Ex. 1.

concussions or sub-concussive hits or contact." *Id.* Effectively, this would mean that, while a class member would retain the right to sue the NCAA individually to recover damages for bodily injury claims, he or she would no longer be able to participate in a class action of any scope against the NCAA in order to assert those claims on a class-wide basis.

In reviewing the overall fairness of the amended settlement, the Court assessed the strength and value of the released procedural claims of the putative class against the value of the settlement to the class. In so doing, the Court found that, based on the record presented by the parties, it was highly unlikely that a nationwide class of current or former NCAA student-athletes or a class consisting of current or former NCAA student-athletes from multiple schools could be certified under Rule 23(b)(3) or 23(c)(4) for the purpose of asserting bodily injury claims for damages. However, the Court also held that the parties had not provided sufficient evidence for the Court to ascertain the likelihood of class certification for a class action brought by current or former NCAA student-athletes from a single NCAA-affiliated school. *Id.* at *23. Accordingly, the Court approved the proposed release of class-wide claims, but only to the extent that it precluded actions brought by a nationwide class or a class that consists of current or former student-athletes from more than one NCAA-affiliated school. *Id.*

After engaging in multiple additional rounds of negotiations, the Settling Plaintiffs and the NCAA now agree that the release of class-wide bodily injury damages claims will not extend to those cases where the class is composed of current or former student-athletes of a single sport at a single NCAA-affiliated school. But they request that the Court permit the release to preclude cases where the class consists of current or former student-athletes from more than one sport at a single school. Put another way, under the new proposal, members of a football team from a single NCAA school would be able to sue the NCAA (as well as its affiliates) on a class-

4

wide basis to recover damages based on bodily injury claims; however, a class consisting of members from both the football team and hockey team from that same school would not. Joint Mot. Preliminary Approval 2d Am. Class Settlement & Certification Settlement Class & Settlement Subclasses, Ex. 1, 2d Am. Class Action Settlement Agreement & Release, XV.A.12. In support of this position, the Settling Plaintiffs and the NCAA argue that it is highly unlikely that such a multiple-sport, single-school class could be certified under Rule 23 and, thus, the procedural right to assert such a claim would have minimal, if any, value to the putative class. As a result, the parties contend, even if such claims were included within the scope of the release, the proposed settlement would remain within the "range of possible approval." *See In re NCAA*, 2016 WL 305380, at *5-6 (citing to authorities).

To buttress their argument, the Settling Plaintiffs and the NCAA have supplemented the record with additional evidence obtained during discovery. And counsel for Lead Objector Anthony Nichols has withdrawn his objection to the settlement based upon the new revisions. Finally, the other attorneys in the related actions (which are listed at *id.* at 1 n.1) also have been provided an opportunity to file objections to this most recent proposal, and none have been filed to date.

## Legal Standard

Any settlement that results in the dismissal of a class action requires court approval. *See* Fed. R. Civ. P. 23(e); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). When parties seek preliminary approval of a class action settlement agreement and certification of a settlement class, the district court conducts an independent class certification analysis and determines whether the proposed settlement is within the range of possible approval. *Gautreaux*

5

*v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, at *3 (N.D. Ill. July 26, 2011).

Because the Court has already conducted an analysis with regard to certification of the settlement class and settlement subclasses under Rule 23(b)(2), it will not repeat that here. *See In re NCAA*, 2016 WL 305380, at *8–22. The Court instead focuses on the new evidence cited by the parties and whether the proposed settlement that releases multiple-sport, single-school bodily injury class claims is within the range of possible approval.

In assessing a settlement's fairness, "relevant factors include: (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014). "The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 n.44 (7th Cir. 1979).

If the district court finds that the certification of the settlement class is appropriate and the proposed settlement is within the range of possible approval, the court will then order the plaintiffs to provide notice of the settlement to the class "in a reasonable manner" so that the class members can raise any objections to the settlement. Fed. R. Civ. P. 23(e)(1). Once the class is provided with notice of the settlement and an opportunity to object, the court will conduct a final approval hearing to determine whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). If the district court is satisfied that the settlement meets

these criteria, it will grant final approval of the settlement, which binds the defendant and all class members to the terms of the settlement.

## Analysis

The issue before the Court is decidedly limited. As described above, the parties and intervenors have agreed to all of the Court's modifications save one: the exclusion of multiple-sport, single-school damages class from the proposed release. The parties now present evidence to demonstrate that a multiple-sport, single-school damages class is unlikely to satisfy Rule 23(b)(3)'s predominance requirement. Thus, the parties argue, the procedural right to a file a class action based upon bodily injury damages claims on behalf of a class, consisting of student-athletes from more than one sport at a single school, has minimal value, and the proposed settlement is within the range of possible approval, even when such a right is subject to the release.[2] Accordingly, in evaluating the fairness of the latest proposed settlement, the Court must evaluate the strength of this procedural right—that is, whether a multiple-sport, single-school class asserting bodily injury claims against the NCAA is capable of being certified under Rule 23(b)(3). *See Wong*, 773 F.3d at 863.

Once the requirements of Rule 23(a) are satisfied, certification of a class under Rule 23(b)(3) is proper if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and [when] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Predominance of issues common to all class members, like the other requirements for certification of a suit as a class action, goes to the efficiency of a class action as an alternative to individual suits." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Thus, the

---

[2] Although the NCAA also contends that a multiple-sport, single-school damages class would fail Rule 23(a)'s numerosity requirement, the Court need not address this argument because, even if such a class could satisfy numerosity, it would likely not satisfy Rule 23(b)'s predominance requirement.

"predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "If resolving a common issue will not greatly simplify the litigation . . . the complications, the unwieldiness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring." *Parko*, 739 F.3d at 1085.

The predominance inquiry "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Any lawsuit brought by a multiple-sport, single-school class seeking damages for bodily injury claims would require the class to prove, among other things, that the NCAA's failure to adequately prevent and treat concussions caused a class member to suffer bodily injury. To this end, the parties argue that a multiple-sport class—even from a single school—would not satisfy the predominance requirement, because concussion prevention and treatment practices even at a single school would have varied not only from sport to sport, but from coach to coach.

First, the parties point to evidence that the NCAA typically has promulgated safety rules to prevent and mitigate concussions on a sport-by-sport basis. Along these lines, the NCAA Constitution and Bylaws establish association-wide committees to address issues that affect NCAA members and perform duties necessary for the on-going operation of the association. ECF No. 268, Ex. A, Spellman Decl. ("Spellman Decl."), Ex. 1, NCAA Constitution §§ 21.02 *et seq.* One such committee, the Play Rules Oversight Panel ("PROP"), oversees other NCAA committees that establish rules for individual sports, such as football, wrestling, soccer, just to name a few (the "individual sports rule committees"). *Id.* § 21.1.4. And, as part of its duties, the PROP considers and approves recommendations made by the individual sports rule committees that bear on the safety of players in a particular sport, including, but not limited to, equipment

8

requirements, rules changes, and other issues that address injury risks. *See, e.g.,* Spellman Decl., Ex. 5, 4/14/10 Play Rules Oversight Panel Minutes (discussing proposals by the Soccer Rules Committee and Football Rules Committee); *id.*, Ex. 7, Agenda for February 21, 2013, Meeting, ¶ 7(e) (reviewing information regarding hockey helmet requirements).

Similarly, the NCAA's Committee on Competitive Safeguards and The Medial Aspect of Sports and the Sports Science and Safety Subcommittee are tasked with sponsoring research regarding health and safety issues, promoting education to enhance student-athlete health and safety, and monitoring injury trends to enhance safety in intercollegiate athletics. Spellman Decl., Ex. 1, NCAA Constitution § 21.2.2.2. Like the PROP, these committees generally address health and safety issues on a sport-by-sport basis. *See, e.g.,* Spellman Decl., Ex. 4, June 10, 2007 Minutes of the Committee on Competitive Safeguards and Medical Aspects of Sports ¶¶ 11.b, 11.d (noting recommendation and report submitted by the Field Hockey Rules Committee and Wrestling Rules Committee); *id.*, Ex. 9, Basketball Rules Committee Addresses Safety of Court Surfaces; NCAA 2008 Rule Changes (stating striking an opponent with one's football helmet results in a 15-yard penalty); *id.*, Ex. 2, Feb. 6, 1996 Minutes of the Sports Sciences Safety Subcommittee ¶ 8 (discussing football equipment and rules to prevent concussions proposed by the Football Rules Committee).

Additionally, as mentioned above, the NCAA has established individual rules committees for the vast majority of NCAA-sanctioned sports, including football, field hockey, soccer, volleyball, water polo, basketball, bowling, fencing, gymnastics, ice hockey, rifling, skiing, swimming and diving, track and field, wrestling, baseball, beach volleyball, golf, lacrosse, and tennis. *See* http://www.ncaa.org/governance/committees/ncaa-sports-playing-rules-committee-rosters (last visited July 8, 2016). These committees address sport-specific issues that bear on

9

the safety of the student-athletes, including equipment requirements and modifications to playing rules to address the risk of head injuries. *See, e.g.,* Spellman Decl., Exs. 5, 6, 17, 18 (discussing football rules intended to prevent or reduce head injury); *id.*, Ex. 17 (rule changed to reduce hitting from behind and contact to head in hockey); *see also* ECF No. 268, NCAA Mem. at 6 n.12 (examples of rules changes in individual sports to minimize risk of head injuries).

The parties also point to evidence that the actions and practices of individual coaches and athletic trainers typically play a key role in mitigating or aggravating concussion-related risks and injuries. For example, at the University of Maine, even after hockey player Kyle Solomon hit his head on the boards, lost consciousness, and received stitches in the locker room, the head coach and the athletic trainer nevertheless allowed him to play in the third period of the game. *Id.* ¶ 70; *see* NCAA Ex. 20, Solomon Dep. at 84:8–86:9. At the University of Central Arkansas, although Derek Owens complained of recurring migraines to his football head coach after being concussed on several occasions, the head coach did not refer Owens to a physician for neurological testing. ECF No. 218, Pls.' Resp. Nichols' 2d Objections Pls.' Mot Prelim. Approval Class Settlement, Ex. A, Exemplar Proffer of Facts Concerning Arrington Plaintiffs ¶¶ 10, 22. At Ouachita Baptist University, the athletic trainer for the soccer team recommended that Angela Palacios skip practice after suffering from a concussion, but the head coach overruled that determination. *Id.* ¶ 53. In fact, the coach made her run with the team even though she was still vomiting, felt nauseated, and had a severe headache. *Id.* These examples illustrate that the actions of a particular head coach, team medical doctor, or team trainer would likely impact whether and to what degree a particular student-athlete suffers bodily injury as a result of concussions or sub-concussive impacts.[3]

---

[3] The allegations made in the individual lawsuits brought by student-athletes against the NCAA also bear this out. *See* ECF No. 268, NCAA Mem. at 9 n.14; 10 n.15; 12 n.18 (citing cases).

To bolster this argument, the NCAA has presented an expert, Ross Mishkin, who has performed a statistical analysis regarding the number of NCAA head coaches that coach more than one NCAA sport. NCAA Ex. B, Mishkin Report at 4. According to Mishkin, in 2016, NCAA-affiliated schools employed 14,361 head coaches. *Id.* at 5. Nearly 81% (11,619) of them coached a single sport. *Id.* Approximately 18% (2,585) coached more than one sport, and all of these instances involved two or more non-contact sports. *Id.* Indeed, almost half of those who coached more than one sport coached a combination of track and field and cross-country programs. *Id.* Notably, less than 0.5% (57) of head coaches coached two contact sports, and when they did, it was some combination of field hockey, lacrosse, and soccer programs, across men's and women's programs. *Id.* Accordingly, it is highly unlikely that a multiple-sport, single-school class would involve only one head coach, particularly when it comes to contact sports, such as football or ice hockey. And the predominance analysis is further complicated by the involvement of athletic trainers, many of whom are assigned to particular sports. *See, e.g.*, NCAA Ex. 20, Solomon Dep. at 82:2–83:10 (testifying that athletic trainer attended hockey practices and traveled with the hockey team); http://www.usctrojans.com/ot/ usc-ath-medicine-staff.html (last visited July 12, 2016) (listing different athletic trainers for different sports at the University of Southern California); http://www.stanfordsports medicine.com/athletic-training/ (last visited July 12, 2016) (Stanford University); http://www.ramblinwreck.com/ sportsmedicine/staff.html (last visited July 12, 2016) (Georgia Institute of Technology); http://www.guhoyas.com/ot/sportsmed-staff.html (last visited July 12, 2016) (Georgetown University).

All of this evidence demonstrates the high degree to which the causation inquiry in any bodily injury class action will likely depend on the particular circumstances surrounding the

11

rules, protocols, and equipment adopted for an individual sport, as well as the specific coach and/or medical professional responsible for that sport. As a result, based on the current record, the Court finds that it is highly unlikely that a multiple-sport, single-school bodily injury class would be sufficiently cohesive to warrant certification under Rule 23(b)(3) and, therefore, the value of such a procedural claim—that is, the ability to file a bodily injury class action for damages on behalf of student-athletes from multiple sports at a single school—is minimal, at best.[4]

Turning to the settlement as a whole, the proposed settlement, among other things, creates and funds a $70 million dollar Medical Monitoring Program that entitles all class members nationwide to be screened for symptoms of neurodegenerative diseases multiple times during a fifty-year period at no cost. Considering that many states disallow medical monitoring as a form of relief in the absence of present physical injury, the ability of the Settling Plaintiffs to negotiate the creation of the Medical Monitoring Program for all class members nationwide is a substantial achievement. Furthermore, absent a settlement, class litigation of this nature is extremely complex, very costly, and sure to be protracted, as indicated by the lengthy mediation process and voluminous discovery and motion practice in this case. It also should be noted that the settlement was negotiated and re-negotiated over the course of many months with the careful guidance of two widely respected retired federal judges. Moreover, Lead Counsel for the

---

[4] Indeed, the Court does not believe that requiring student-athletes from two different sports to file two separate class actions against the same school would impose a significant burden on their ability to pursue their claims, as evidenced by the numerous lawsuits of this type that have already been filed. *See, e.g., Hermann v. NCAA*, 2:16-cv-01042-KJM-AC (E.D. Ca.) (University of Georgia football players); *Cook v. NCAA*, 3:16-cv-02630-EMC (N.D. Ca.) (University of Oregon football players); *Walthour v. NCAA*, 6:16-cv-00834-CEM-TBS (M.D. Fla.) (Vanderbilt University football players); *Miller v. NCAA*, 1:16-cv-01222-TWP-MJD (S.D. Ind.) (Auburn University football players); *Owens v. NCAA*, 1:16-cv-01409-TWP-MJD (S.D. Ind.) (University of Tennessee football players); *Lee v. NCAA*, 1:16-cv-01411-WTL-TAB (S.D. Ind.) (Duke University football players); *Seals v. NCAA*, 2:16-cv-00412-RJS-BCW (D. Utah) (University of Utah football players).

Plaintiffs is of the opinion that the settlement is fair and equitable, the Lead Objector has withdrawn his objection based upon the revisions to the settlement agreement, and no one else has objected to the terms of the settlement or release at this time.

In summary, the Court previously has explained why the prior settlement agreement would pass muster (at least, at the preliminary approval stage), if the parties agreed to a number of modifications. Since that time, the parties have agreed to all but one of the modifications, and the Court finds that the adjustment requested by the parties as to the scope of the release does not materially alter the Court's valuation of the settlement. Accordingly, the Court finds, on balance, that the Second Amended Settlement Agreement and Release is within the range of possible approval.

## Conclusion

For the reasons provided herein, the Court grants the Joint Motion for Preliminary Approval of the Second Amended Class Action Settlement Agreement and Certification of Settlement Class and Subclasses [266].

Pursuant to Fed. R. Civ. P. 23(b)(2), the Court conditionally certifies the settlement class of "All Persons who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date" and conditionally certifies the following subclasses: "All Persons who played an NCAA-sanctioned Contact Sport at an NCAA member institution on or prior to the Preliminary Approval Date," and "All Persons who played an NCAA-sanctioned Non-Contact Sport at an NCAA member institution on or prior to the Preliminary Approval Date."

Furthermore, the Court preliminarily approves the Second Amended Class Action Settlement Agreement and Release and finds that the Second Amended Settlement Agreement is within the range of possible approval.

**SO ORDERED**  **ENTERED  7/15/16**

*/s/ John Z. Lee*

_____

**John Z. Lee**
**United States District Judge**