1

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3      IN RE:  NATIONAL COLLEGIATE          )  MDL No. 2492
                                             )
 4      ATHLETIC ASSOCIATION STUDENT-ATHLETE )  No. 13 C 9116
                                             )
 5      CONCUSSION INJURY LITIGATION.        )  Chicago, Illinois
                                             )  July 14, 2016
 6                                           )  2:00 o'clock p.m.

 7                        TRANSCRIPT OF PROCEEDINGS
 8                  BEFORE THE HONORABLE JOHN Z. LEE

 9
        APPEARANCES:
10
        For the Plaintiffs       HAGENS BERMAN SOBOL SHAPIRO, L.L.P.
11      and Proposed Class:      BY:  MR. STEVE W. BERMAN
                                 1918 8th Avenue
12                               Suite 3300
                                 Seattle, Washington  98101
13                               (206) 623-7292

14                               HAGENS BERMAN SOBOL SHAPIRO, L.L.P.
                                 BY:  MS. ELIZABETH A. FEGAN
15                               455 North Cityfront Plaza Drive
                                 Suite 2410
16                               Chicago, Illinois  60611
                                 (708) 628-4960
17
                                 SIPRUT P.C.
18                               BY:  MR. TODD L. McLAWHORN
                                 17 North State Street
19                               Suite 1600
                                 Chicago, Illinois  60602
20                               (312) 236-0000

21      For Plaintiff Whittier:  COATS ROSE YALE RYMAN & LEE, P.C.
        (on phone)               BY:  MR. DWIGHT E. JEFFERSON
22                               9 Greenway Plaza
                                 Suite 1100
23                               Houston, Texas  77046
                                 (713) 651-0111

24

25
```

**2**

1    APPEARANCES (Continued):

2

3    For Lead Objector          EDELSON P.C.
     Nichols and                BY:  MR. JAY EDELSON
     Intervenor Plaintiffs:          MR. BENJAMIN S. THOMASSEN
4                                     MR. BENJAMIN H. RICHMAN
                                 350 North LaSalle Street
5                                Suite 1300
                                 Chicago, Illinois  60654
6                                (312) 589-6370

7    (on phone)                  RAIZNER SLANIA, L.L.P.
                                 BY:  MR. JEFFREY L. RAIZNER
8                                2402 Dunlavy Street
                                 Houston, Texas  77006
9                                (713) 554-9099

10

     For Defendant NCAA:         LATHAM & WATKINS, L.L.P.
11                               BY:  MR. MARK S. MESTER
                                      MS. JOHANNA M. SPELLMAN
12                               330 North Wabash Avenue
                                 Suite 2800
13                               Chicago, Illinois  60611
                                 (312) 876-7700

14

15

16

17

18

19

20

21

22
                         COLLEEN M. CONWAY, CSR, RMR, CRR
23                           Official Court Reporter
                      219 South Dearborn Street, Room 1714
24                          Chicago, Illinois  60604
                                (312) 435-5594
25                      colleen_conway@ilnd.uscourts.gov

1        (Proceedings heard in open court:)

2            THE CLERK:  13 C 9116, NCAA Student-Athlete

3    Concussion Injury Litigation.

4            MR. BERMAN:  Good afternoon, Your Honor.  Steve

5    Berman and Elizabeth Fegan on behalf of plaintiffs and proposed

6    class.

7            MR. MESTER:  Good afternoon, Your Honor.  Mark Mester

8    and Johanna Spellman on behalf of the NCAA.

9            MR. EDELSON:  Good afternoon, Your Honor.  Jay

10   Edelson with Ben Richman and Ben Thomassen.  We're back with

11   you again representing a personal injury class.

12           MR. McLAWHORN:  Todd McLawhorn also on behalf of

13   plaintiffs and the proposed class.

14           THE COURT:  Who do we have on the phone?

15           MR. JEFFERSON:  Dwight Jefferson on behalf of

16   Plaintiff Mildred Whittier for Julius Whittier.

17           THE COURT REPORTER:  I'm sorry.  I can't understand

18   him.

19           THE COURT:  Mr. Jefferson, could you speak more

20   clearly and slow down, please.

21           MR. JEFFERSON:  Yeah.  Dwight Jefferson for Plaintiff

22   Mildred Whittier as next friend for Julius Whittier.

23           THE COURT:  Who else do we have on the phone?

24           MR. RAIZNER:  And, Your Honor, Jeff Raizner.  I'm

25   co-counsel with the Edelson firm on some of the newly filed

1  class action litigation.

2  THE COURT:  Anyone else on the phone?  Okay.

3  On January 26th, 2016, the Court preliminarily
4  approved the amended proposed settlement agreement and
5  conditionally certified the settlement class, but the Court did
6  so on the condition that the parties either agree to certain
7  modifications or provide additional evidence to allay the
8  Court's concerns that were identified in that order.

9  Those modifications proposed by the Court include:
10  (1) creating subclasses for student-athletes in contact and
11  non-contact sports; (2) requiring notification of class members
12  via the NCAA's website as well as other social media in order
13  to supplement the notice plan; (3) omitting provisions
14  requiring a class member to submit a claim to his or her health
15  insurance company, or permitting subrogation or reimbursement
16  from a class member or the insurance company; (4) extending the
17  medical monitoring period if sufficient funds are available at
18  the end of the monitoring period; (5) requiring that the $5
19  million contribution from the NCAA for concussion-related
20  research go to research that would otherwise not have occurred
21  absent the settlement; (6) implementing publicity campaigns
22  during the medical monitoring program on the 10-year, 20-year,
23  30-year, and 40-year anniversaries of the commencement of the
24  program to ensure that class members remain aware of the
25  program's availability; (7) enabling the Court to request and

1　require reports from those in charge of the program as needed;

2　and (8) excluding class counsel from the waiver of future

3　claims.　The settling plaintiffs and the NCAA have now agreed

4　to those modifications.

5　　　　　　The remaining modification proposed by the Court

6　addressed the scope of the release contained in the amended

7　settlement agreement.　As part of the settlement, the class

8　members would have to release any and all claims "brought or

9　pursued on a class-wide basis and relating to concussions or

10　sub-concussive hits or contact."　However, they still would

11　retain the right to bring individual personal or bodily injury

12　claims and class claims that do not relate in any way to

13　medical monitoring or medical treatment of concussions or

14　sub-concussive hits or contact.　Effectively, this would mean

15　that, while a class member would retain the right to sue the

16　NCAA individually to recover damages for bodily injury claims,

17　he or she would no longer be able to participate in a class

18　action of any scope against the NCAA in order to assert those

19　claims on a class-wide basis.

20　　　　　　In reviewing the overall fairness of the amended

21　complaint, the Court in January assessed the strength and value

22　of the released procedural claims of the putative class against

23　the value of the settlement to the class.　In so doing, the

24　Court found that, based on the record presented by the parties,

25　it was highly unlikely that a nationwide class of current or

1 former NCAA student-athletes or a class consisting of current

2 or former NCAA student-athletes from multiple schools could be

3 certified under Rule 23(b)(3) or Rule 23(c)(4) for the purpose

4 of asserting bodily injury claims for damages.  However, at

5 that time, the Court also held that the parties had not

6 provided sufficient evidence to ascertain the likelihood of

7 class certification for a class action brought by current or

8 former NCAA student-athletes from a single NCAA-affiliated

9 school.  Accordingly, the Court approved the proposed release

10 of class-wide claims, but only to the extent that it precluded

11 actions brought by a nationwide class or a class that consists

12 of current or former student-athletes from more than one

13 NCAA-affiliated school.

14    After engaging in multiple additional rounds of

15 negotiations, the settling plaintiffs and the NCAA now agree

16 that the release of class-wide bodily injury damages claims

17 will not extend to those cases where the class consists of

18 current or former student-athletes of a single sport at a

19 single NCAA-affiliated school.  However, they request that the

20 Court permit the release to preclude cases where the class

21 consists of current or former student-athletes from more than

22 one sport even if they're from the same school.  Put another

23 way, under the new proposal, members of a football team from a

24 single NCAA school would be able to sue the NCAA, as well as

25 its affiliates, on a class-wide basis to recover damages based

1    on bodily injury claims; however, a class consisting of members

2    from both the football team and the hockey team from that same

3    school would not.

4         To buttress their argument, the settling plaintiffs

5    and NCAA have supplemented the record with additional evidence

6    obtained during discovery.  And counsel for Lead Objector

7    Anthony Nichols has withdrawn his objection to the settlement

8    based upon the new revisions and has submitted a response

9    setting forth some of his positions with regard to some of the

10   arguments made by the NCAA in its submissions.

11        Finally, the other attorneys in the related actions

12   also have been provided an opportunity to file objections to

13   this most recent proposal, and none have been filed to date.

14        So after reviewing the additional materials submitted

15   by the parties, the Court agrees and finds it is highly

16   unlikely that a multiple-sport, single-school, bodily injury

17   class would be sufficiently cohesive to warrant certification

18   under Rule 23(b)(3) and, therefore, the Court finds the value

19   of such a procedural claim, that is, the ability to file a

20   bodily injury class action for damages on behalf of

21   student-athletes for multiple sports even at a single school,

22   is minimal, at best.

23        Accordingly, for these reasons, which will be set

24   forth in a more complete fashion in a written opinion that will

25   be issued shortly, as well as the reasons set forth in my

1    January order, the Court finds on balance that the

2    second-amended settlement agreement and release is within the

3    range of possible approval.  Therefore, the Court grants the

4    joint motion for preliminary approval of a second-amended class

5    action settlement agreement and certification of settlement

6    class and subclasses.

7            In accordance with Rule 23(b)(2), the Court

8    conditionally certifies a settlement class of "all persons who

9    played an NCAA-sanctioned sport at an NCAA member institution

10   on or prior to the preliminary approval date," and

11   conditionally certifies the following subclasses, "all persons

12   who played an NCAA-sanctioned contact sport at an NCAA member

13   institution on or before" -- "on or prior to the preliminary

14   approval date," as well as, "all persons who played an

15   NCAA-sanctioned non-contact sport at an NCAA member institution

16   on or prior to the preliminary approval date."

17           Furthermore, the Court preliminarily approves the

18   second-amended class action settlement agreement and release

19   and finds that the second-amended settlement agreement is

20   within the range of possible approval.

21           So, as I noted, a more complete written opinion will

22   be issued shortly.

23           So let's talk about deadlines.  The plaintiffs in

24   their submissions had a chart that talked about some of the

25   deadlines that would be coming up in this case once preliminary

1    approval is granted.  Now that it is today, I wanted to work

2    through some of these dates with you.

3                MR. BERMAN:  I have a chart that --

4                THE COURT REPORTER:  Counsel, your name again?

5                MR. BERMAN:  I'm sorry.  Steve Berman on behalf of

6    the class, Your Honor.

7                I have a chart that assumes, and not lightly, that

8    you sign the agreement today, and it has updated dates if that

9    would be helpful to you.  May I hand that up?

10               THE COURT:  Yes, please.

11          (Document tendered to Court.)

12               MR. BERMAN:  I don't have a chart.  I actually have a

13   preliminary approval order that has the dates.

14               I actually have an easier version, Your Honor, if I

15   may approach?  One I have been working on that's easier.

16          (Document tendered to Court.)

17               THE COURT:  All right.  Let's do this.  Do you have

18   this chart that was in -- that was submitted in your

19   memorandum?

20               MR. BERMAN:  Yes.  I can pull that out.  It was in

21   our brief.

22               THE COURT:  It's on page 12.  Because that's what I

23   was using.

24               MR. MESTER:  Okay.

25               THE COURT:  Well, actually, I think it's in the --

1    perhaps it's in the proposed order that was submitted at the

2    time.

3            MR. MESTER:  Judge, so -- sorry.  Mark Mester on

4    behalf of NCAA.

5            We have a chart, Your Honor, as part of the

6    memorandum in support of the joint motion for preliminary

7    approval.

8            MR. BERMAN:  Is this it?

9            MR. MESTER:  Page 13.

10           THE COURT:  What page is that?

11           MR. BERMAN:  Page --

12           MR. MESTER:  Page 13.

13           MR. BERMAN:  -- 13.

14           MR. JEFFERSON:  Well, Judge, is that the order that

15   is referenced in the --

16           THE COURT:  Mr. Jefferson, hold on for a second.

17           Could I see a copy of that chart, please?

18       (Document tendered to Court.)

19           THE COURT:  Yes, that's exactly what I'm referring

20   to.

21           All right.  So let's work from this chart.  So within

22   five days of preliminary approval, the settlement website

23   established and basic settlement documents posted, that would

24   be 7/21.

25           Is that date still agreeable?

1             MR. BERMAN:  Yes, Your Honor.  We've actually been

2   working on the website materials.

3             MR. MESTER:  Yes, Your Honor.

4             THE COURT:  Okay.  Then within 15 days of today --

5   that's July 29th -- that letter should be sent to NCAA member

6   institutions requesting settlement class member contact

7   information, publication, notice should be published, call

8   center established, notice via social media is to commence.

9             Is that still agreeable?

10            MR. MESTER:  Yes, Your Honor.  We've been working on

11  that draft as well.

12           THE COURT:  Now, in that paragraph, it states, "XXX

13  day claim period begins."  What is that in reference to?

14           MR. BERMAN:  The date notice is sent out.

15           MR. MESTER:  No.

16           MR. BERMAN:  No, that's not right.

17           MR. MESTER:  I think -- with due respect, Your Honor,

18  I think it refers to the total -- the totality of the duration

19  of the claims period.

20           THE COURT:  Okay.  So basically -- and I guess I'm

21  trying to understand why the claims period -- what you're

22  referring to when you say "claims period."

23           All right.  So --

24           MR. MESTER:  Mr. Berman's draft.

25           THE COURT:  All right.  This is --

1          MS. FEGAN:  Typically, Your Honor, we put that there.

2    It's the period during which either there'd be claims which

3    doesn't apply here or they can have time to exclude themselves

4    or to object.

5          THE COURT:  Okay.  So let's get rid of that because

6    that's not necessary here.

7          MR. JEFFERSON:  I didn't --

8          THE COURT:  So then --

9          MR. JEFFERSON:  -- hear that, Judge.  That's a period

10   to file an objection?

11         THE COURT:  No.  We'll get to that, Mr. Jefferson.

12         Okay.  So then we have this -- basically the parties

13   have estimated that notice will be provided -- that you will be

14   able to provide notice individually by mail within six months

15   of today.  Is that correct?

16         MR. MESTER:  Yes, Your Honor.

17         THE COURT:  Okay.  So by January 13th, I would like

18   plaintiffs' class counsel to submit a declaration of proof of

19   mailing and publishing notice as well as their petition for

20   attorneys' fees and expenses.

21         At that date, Mr. Edelson, the lead objector should

22   also file a petition for attorneys' fees and expenses to the

23   extent you are going to file one.

24         MR. EDELSON:  Thank you, Your Honor.

25         THE COURT:  Okay?

1     MR. JEFFERSON:  Is that for all objectors, Judge?

2     THE COURT:  Yes, all objectors may, along with a

3 petition.

4     So then the question becomes how much longer after

5 January 13th should the class be given an opportunity to either

6 exclude themselves or to object.

7     And while this proposal I think gives 28 days, I

8 think given the case and the amount of information that is

9 involved here, I think it's appropriate to have that period be

10 doubled to eight weeks.  Okay?  So the deadline for class

11 members to exclude themselves or to file objections would be

12 March 10th.

13     Then by March 31st, 21 days later, I would like

14 plaintiffs' class lead counsel to file a motion for final

15 approval of a settlement and -- well, you've already filed a

16 petition for an award of attorneys' fees and expenses.

17     In the original chart, Mr. Berman, you had proposed

18 that the motion for final approval be filed basically right

19 after the six months' notice period.  At that point in time, I

20 find it hard to believe that you would have any additional

21 information than you do now that would support a final motion

22 for approval.  At least if you wait till after the objection

23 period, you'd have some additional bases, perhaps, given the

24 percentage of objectors, number of people that have excluded

25 themselves, et cetera, et cetera, that would provide you with

1    more information on which to move for final approval.

2          MR. BERMAN:  That's fine with me, Your Honor.

3          THE COURT:  Okay.  So the motion for final approval

4    should be filed by March 31st.

5          With regard to the declarations of class action

6    settlement administrator and settlement notice administrator, I

7    want those to be filed by April 21st.  And I am going to set

8    the final approval hearing to be May 5th of next year.  It will

9    be May 5th, and we will start at 10:00 a.m.

10          Any comments, concerns, questions regarding that

11    timetable?

12          MR. BERMAN:  Not from me, Your Honor.

13          THE COURT:  Okay.

14          MR. MESTER:  No, Your Honor.

15          THE COURT:  One thing I would like to add, though, is

16    as soon as the last mailings go out and you can confidently

17    state that you have completed the task of sending out

18    individual notice, which would be, I presume, somewhere around

19    the 180-day period, I would like either counsels for the

20    plaintiffs or the NCAA to submit a status report with regard to

21    status of notice.

22          MR. MESTER:  Yes, Your Honor.

23          THE COURT:  If it's done before then, you can file it

24    early and then perhaps we can move some of the dates up.

25          MS. FEGAN:  Okay.

| | |
|---|---|
| 1 | MR. MESTER:  Your Honor, likewise, these were |
| 2 | obviously our best good-faith estimates.  If in -- I assume you |
| 3 | would prefer that if we encounter issues that we weren't |
| 4 | anticipating that we let you know as soon as possible? |
| 5 | THE COURT:  Yes.  The sooner, the better. |
| 6 | MR. MESTER:  Understood. |
| 7 | THE COURT:  Okay.  So I do want to talk briefly about |
| 8 | the tagalong cases for a second, but before we get there, are |
| 9 | there any other issues that at this point we need to address |
| 10 | with regard to the settlement? |
| 11 | MR. BERMAN:  Yes.  There's one other issue, Your |
| 12 | Honor.  In order for us to effectuate the process of going |
| 13 | forward, we would ask the Court to enter the stipulated |
| 14 | qualified HIPAA protective order.  That's -- I have a copy |
| 15 | here.  I don't -- you may have it. |
| 16 | (Document tendered to Court.) |
| 17 | THE COURT:  That's fine.  I'll enter the order. |
| 18 | MR. BERMAN:  Okay. |
| 19 | THE COURT:  Anything else with regard to the |
| 20 | settlement? |
| 21 | MR. MESTER:  No, Your Honor. |
| 22 | MR. BERMAN:  No, Your Honor. |
| 23 | THE COURT:  Okay. |
| 24 | MR. JEFFERSON:  Your Honor, I have one question about |
| 25 | the settlement. |

1    THE COURT:  Yes.  And, Mr. Jefferson, I think -- can

2    you put your mouth closer to the receiver?  We're just having a

3    really difficult time --

4         MR. JEFFERSON:  Yeah, Judge.

5         THE COURT:  -- hearing you.

6         MR. JEFFERSON:  I'm kissing it right now.  Can you

7    all hear me?  Can you hear me now?  I got it up as --

8         THE COURT:  Yes.

9         MR. JEFFERSON:  -- loud as I can get it.

10        THE COURT:  That is better.  And if you could speak

11   slowly, sir.

12        MR. JEFFERSON:  Yes, Judge.  The only question I

13   had -- and I don't know.  I mean, I might have missed the

14   chance to ask this question or not, and that is, you know,

15   relating to the personal injury class action.  And I was just

16   noting from review of the plaintiffs' memorandums in support

17   where they reference the order on page 29 as it relates to the

18   narrow time period during which substantially similar

19   concussion-related practices and policies was essentially

20   applied.  That's not placing any specific time period or date

21   in there, is it?

22        THE COURT:  I certainly didn't take it that way,

23   Mr. Jefferson.  I don't know if that answers the question or

24   not.

25        Mr. Edelson, do you have a sense of what

1  Mr. Jefferson is speaking about?

2  MR. EDELSON:  It was hard for me to understand what

3  he was saying, so I apologize, I have nothing to add.

4  THE COURT:  Mr. Jefferson, we're just having a very

5  difficult time hearing you, and I --

6  MR. JEFFERSON:  You guys can't hear me at all?

7  THE COURT:  That's -- why don't you -- if you could

8  just speak slowly, slower, I think that would be helpful.

9  MR. JEFFERSON:  Yes, Judge.  I was referencing page 8

10  of plaintiffs' memorandum in support of the second or, rather,

11  the amended --

12  THE COURT:  Okay.

13  MR. JEFFERSON:  -- settlement and the reference

14  therein to footnote No. 25 which follows the statement that a

15  single-sport, single-school class limited to a particular sport

16  and a narrow time period "during which substantially similar

17  concussion-related practices and policies were consistently

18  applied."  My query was whether or not the final settlement

19  will contain specific dates that would represent this narrow

20  time period that's referenced.

21  THE COURT:  No, it won't, because I think what they

22  were doing there was they were quoting from my order of

23  January, and that certainly wasn't intended to require them to

24  set forth specific time frames.  It was by -- it was merely by

25  explanation of the grounds for my order.

1  MR. JEFFERSON:  Thank you, Your Honor.

2  THE COURT:  Okay.  Thank you, Mr. Jefferson.

3  Anything else that we need to address today with

4  regard to the settlement and implementation of the settlement?

5  MR. BERMAN:  Nothing that I know of, Your Honor.

6  MR. MESTER:  No, Your Honor.

7  MR. JEFFERSON:  All right.

8  THE COURT:  So --

9  MR. JEFFERSON:  So you will be issuing an order with

10  all of those deadlines and dates in it, that's correct?

11  THE COURT:  Yes, I will be.  And, actually, what I'd

12  prefer to have is I'd prefer to have -- Mr. Berman, if you can,

13  or, Ms. Fegan, if you could submit to my *proposed_order* inbox a

14  proposed order just with the timetable, that would be helpful.

15  MR. BERMAN:  We will.  I think we'll meet and make

16  sure we're in agreement --

17  MR. MESTER:  Sure.

18  MR. BERMAN:  -- right after this and then we'll

19  submit a draft.

20  THE COURT:  Okay.  So given those deadlines, let's go

21  ahead and set a status date in this case just so that I can

22  monitor how things are going with regard to particularly the

23  issues of notice and getting addresses.

24  Carmen, give me a date of the week of December 5th.

25  THE CLERK:  We're on trial.

```
 1              (Court conferring with his clerk.)
 2                   THE CLERK:  December 8th --
 3                   MR. JEFFERSON:  Judge?
 4                   THE COURT:  Okay.
 5                   MR. BERMAN:  What day of the week is that?
 6                   THE CLERK:  It's a Thursday.
 7                   December 8th at 2:00 p.m. or --
 8                   THE COURT:  9:00 a.m.
 9                   THE CLERK:  9:00?  December 8th at 9:00 a.m.
10                   THE COURT:  And we will establish a conference
11   call-in number.  It's merely going to be really to -- for me to
12   get a handle on where we are with regard to notice.  Okay?
13                   MR. MESTER:  Sure.
14                   THE COURT:  All right.  So I have received -- moving
15   on to the tagalong cases.  So I have seen the orders come in
16   with regard to these various cases that were filed in various
17   forums everywhere against single schools, and I haven't talked
18   to anyone at the MDL panel yet.  The -- and I don't know
19   whether -- I guess my question is, has anyone in the MDL panel
20   reached out to any of the parties here with regard to whether
21   or not those cases should be tagalong cases to this MDL or
22   whether they raise issues that are sufficiently different from
23   this MDL -- from this particular MDL that they're appropriate
24   for additional analysis by the MDL panel or -- and/or whether
25   they should come in under a different MDL number?
```

1      MR. MESTER:  Your Honor, we filed the notice

2   initially with the panel and certainly suggested that they

3   should be part of this MDL, and our --

4      THE COURT:  That they should or should not?

5      MR. MESTER:  They should be.  And our understanding

6   is that the clerk agreed, as this is the process, and issued

7   the conditional orders, which I think became final today.

8      But, as I understand it, certainly it was -- our

9   notice said that, and it was -- no one suggested otherwise, it

10  was to be part of this MDL.

11     THE COURT:  Now, Mr. Edelson, what are your thoughts?

12     MR. EDELSON:  We did not object to that.  For us,

13  we're comfortable wherever.  And we definitely agree that there

14  should be an MDL.  In terms of whether it's this MDL or there

15  should be a new number, that's not relevant to -- or it's not

16  really within our system-making authority.

17     What we would ask is if it does remain in this MDL is

18  that we have two separate tracks that are clearer.  I don't

19  think Mr. Berman needs us to show up, you know, at status

20  hearings, and he's welcome to come, you know, whatever happens

21  in ours, but I don't think he ought to be required to.  Just so

22  there's a little bit more clarity there.

23     THE COURT:  And I guess that's what raises the

24  questions for me, is kind of looking for -- looking ahead --

25  can't really say I'm looking forward.  But looking ahead --

1      (Laughter.)

2           THE COURT:  -- to the -- dealing with all of the

3      various individual cases on some sort of consolidated basis --

4      consolidated, that term used very loosely -- I think that those

5      cases would raise issues that are very different in kind than

6      the ones that we've been dealing with in this particular case.

7           So, as I told -- informed the parties, I'm happy to

8      oversee an MDL with all of the individual -- the class action

9      bodily damages claims against the individual schools and the

10     NCAA.  I am just wondering whether as an administrative matter

11     it makes sense to have those cases in this MDL versus another

12     MDL by number because of the two tracks that you referenced.

13          And, frankly, I don't know if the MDL panel really

14     cares how I proceed with regard to the cases as long as I'm

15     dealing with the cases.  But it just kind of raises some

16     questions in my mind about how best to proceed dealing --

17     starting to deal with those other cases, which I think we need

18     to start kind of dealing with soon.

19          MR. EDELSON:  Your Honor, I personally would prefer

20     if there's a different number and a different name just to

21     avoid confusion.  You know, it would be an odd situation where

22     there'll be a settlement going forward as litigation is

23     happening, too.  It's not, you know, unheard of, but a little

24     unusual.  I assume, I assume that the defendants don't have a

25     different view.  And --

1        MR. MESTER:  (Nodding.)

2        MR. EDELSON:  -- we could probably call the panel and

3    ask for their guidance.  We assume you have a bat phone or

4    something which gets to the MDL directly.  But we're happy to

5    do it on our own.

6        MR. MESTER:  At least at this point.

7        THE COURT:  Why don't we do this.  Why don't I make

8    some inquiries and then if it's just procedurally more

9    efficient to have the -- or procedurally necessary to have the

10   parties present their request to the MDL, I'll reach out to you

11   and let you know.  Okay?  But I do know that those cases are

12   all lining up and we're going to have to deal with them sooner

13   rather than later.  All right?

14       MR. EDELSON:  Okay.

15       THE COURT:  Along those lines, Mr. Edelson, is there

16   something that you want to report that we need to address with

17   regard to those other cases?

18       MR. EDELSON:  Yes.  Those -- I think that you're

19   aware of at least seven.  There are 15 filed and there are more

20   to come.

21       THE COURT:  How many more?  To your knowledge.

22       MR. EDELSON:  The -- there will be dozens of cases

23   filed.  We're trying to get them filed over the next six to

24   eight weeks.

25       We do have some thoughts about how to handle this

1    efficiently.  First of all, we've been talking to defense

2    counsel, and everybody so far -- I don't mean -- I have not

3    spoken to everybody, but everyone we've spoken to has agreed

4    that we should stay discovery and stay everything until there's

5    an orderly process.

6          What we don't want is the cases to be going at

7    different stages.  It may be that there are groups.  My

8    personal view, just to flag it, is that there should be

9    bellwether cases so Your Honor isn't dealing with 50 different

10   motions to dismiss dealing with different states and all of

11   that.

12         It -- ideally what I'd like to come out of here with

13   is kind of a general order staying everything for some time,

14   appointing us interim lead for a limited purpose of just

15   scheduling, just trying to organize everything with the

16   defendants so we can come back with a proposal for how to

17   handle these in an efficient way.  During that time, we would

18   move for more formal interim lead and would propose a slate of

19   other attorneys who would be part of the lead structure.

20         THE COURT:  Anything to add, Mr. Mester?

21         MR. MESTER:  Your Honor, I only speak for the NCAA,

22   obviously, at this point.  There are a number of other

23   defendants.  But I certainly have no problem with that.

24         THE COURT:  All right.  And so that all raises --

25   that goes to the point of perhaps having it under a different

1    number.  Its own kind of standalone number might make a lot of

2    sense given the fact that we have the cases that are currently

3    under this or the -- previously before today was under this

4    number, all a part and parcel of the settlement that was

5    preliminarily approved today.  And I think there could be

6    danger of confusion as to, well, what is part of the

7    settlement, what isn't part of the settlement, and I think that

8    could be avoided.  But, again, I will make an inquiry.  And if

9    I need you all to do anything, I'll let you know.  Okay?

10            MR. EDELSON:  Thank you, Your Honor.

11            MR. JEFFERSON:  Now, Judge, can I ask you one other

12   question regarding the current case?

13            THE COURT:  The current case?  Yes.

14            MR. JEFFERSON:  Is it my understanding, then, that

15   the final hearing that the Court has referenced will be the

16   fairness hearing where if anybody has any final objections or

17   anything to make to the settlement, they could be made at that

18   time?

19            THE COURT:  Yes.  The objections will be due -- as I

20   stated, any objections must be filed by March 10th.

21            MR. JEFFERSON:  And then -- and I don't mean to

22   ignore the Court, but let me ask you one other question, too.

23            One of the concerns that I had had from reviewing all

24   of the evidence in the case regarding the settlement and what

25   is commonly known before was the take rate on -- I mean, how

1    many people are really going to take advantage of this.

2                    THE COURT:  I'm sorry.  The what?

3                    MR. JEFFERSON:  The take rate.

4                    THE COURT:  Okay.

5                    MR. JEFFERSON:  The number of people who -- in the

6    class who will actually take advantage of it.

7                    Is there any in there a threshold number where if the

8    rate does not exceed the certain percentage or something by a

9    certain date and then something else happens, does it just roll

10   off in the next 50 years if people aren't taking advantage of

11   it?

12                   THE COURT:  Okay.  I think there are kind of -- I

13   guess, Mr. Jefferson, I thought you were asking one question,

14   but, in fact, you were asking another, but I think both are

15   worth addressing.

16                   First of all, the settlement does not contain a

17   minimum number.  That was part and parcel of the analysis done

18   by Bruce Deal as part of his analysis of how many people he

19   estimates will not only take part -- qualify, but also take

20   part in the monitoring program as part of his analysis, as you

21   may recall, to demonstrate the sufficiency of the funds that

22   the NCAA is putting into the monitoring program.

23                   The other question I think -- I thought you were

24   asking, but it did raise a question in my mind, is kind of

25   the -- is there a threshold number, percentage of opt-outs that

1  would nullify the settlement, and I don't believe there is.

2     Is that correct?

3     MR. BERMAN:  There is no "blow provision," Your

4  Honor.

5     THE COURT:  Right.

6     MR. MESTER:  I'm not sure that's right, Your Honor.

7     MR. JEFFERSON:  Don't exist?  What's it been called?

8  Judge, I didn't hear what he said.

9     THE COURT:  The -- there's -- typically in settlement

10 agreements like this, there's a provision that says that if

11 beyond a certain percentage of class members opt out, then the

12 NCAA or defendants have the option of voiding the settlement.

13    What is that percent?

14    MR. MESTER:  Well, Your Honor, there is one we

15 believe we submitted, as is fairly typical, under seal.  So you

16 have it, but --

17    THE COURT:  Okay.  No, I seem to recall, yes.

18    So the -- there is a number, the -- was the number

19 served?  Was that just to me --

20    MR. MESTER:  It's --

21    THE COURT:  -- in chambers?

22    MR. MESTER:  -- under seal, Your Honor.

23    MR. JEFFERSON:  There is a -- there is an opt-out in

24 the settlement number, Judge?

25    THE COURT:  No, no.  Mr. Jefferson, what we're

1    talking about is there is a threshold number.  Basically if a
2    certain number of -- percentage of the class members -- and I
3    don't know how exactly to determine how many class members
4    there are since there's approximately 4.2 million.  But if a
5    certain percentage of them opt out, that that would allow the
6    NCAA --
7            MR. MESTER:  It was actually, Your Honor -- I
8    apologize.  It was -- it's an absolute number to address that
9    very concern.
10            MR. JEFFERSON:  I understand that, Judge, on the
11    opt-out provision.
12            THE COURT:  Yes.
13            MR. JEFFERSON:  My question was more in line with
14    what you were saying, and that is provided the settlement is
15    approved and that initial opt-out number does not stop the
16    settlement or allow the NCAA to withdraw but, rather, the
17    settlement proceeds forward, do we have any -- anything in the
18    settlement that sets, as you mentioned earlier, a minimum to
19    where if by this time X percentage or whatever of the class
20    members had not taken advantage, then what happens to the
21    money?
22            THE COURT:  There is not.
23            All right.  Anything else.  Yes?
24            MR. BERMAN:  Yes, Your Honor.  I just didn't want to
25    lose sight of one aspect of the class case that actually is a

1    personal injury case, and that is Owens and Solomon, two of the

2    named plaintiffs who we say have very serious injuries, have

3    put those injuries aside to help the class, but we're also

4    going to be now needing a schedule and to litigate the injury

5    part of their case, which somewhat is going to be overlapping

6    with some of the issues you're going to be dealing with.

7              THE COURT:  Yes.  No, I understand.  And I think same

8    with -- Mr. Arrington also has a personal injury class -- or a

9    personal injury claim for himself --

10             MR. BERMAN:  That's correct.

11             THE COURT:  -- that was asserted as part of the

12   original complaint --

13             MR. BERMAN:  Correct.

14             THE COURT:  -- that we still have to address, which

15   is all the more reason why it would be nice to separate the

16   two --

17             MR. EDELSON:  Well --

18             THE COURT:  -- MDLs.

19             MR. BERMAN:  I don't take a position.  Whatever is

20   easier for you.  I just -- at some point, I want to get a

21   schedule for my clients who have been waiting for a long time

22   now.

23             MR. EDELSON:  Well, Your Honor, I'm sorry, just to

24   add a little bit because there may be some confusion.

25             In the MDL, there will be class actions filed, but

1    also more individual cases.  So we think that there should be

2    an orderly process for all of those.  And I don't think that --

3    I mean, Mr. Berman can certainly make whatever arguments he

4    wants about whether his cases should go first or whether he

5    should be involved in the broader MDL, but I don't think that

6    that should be presumed.

7            THE COURT:  As I said, it's -- it just provides more

8    support in my mind of why it would be helpful to have the

9    personal injury claims, whether class or individual, in one MDL

10   separate and apart from the medical monitoring issues and all

11   the things that we're dealing with here.

12           So yes, Mr. Berman, I am well aware of the remaining

13   claims with regard to the individual --

14           MR. BERMAN:  Thank you, Your Honor.

15           THE COURT:  -- personal injury claims.  All right.

16           MR. JEFFERSON:  Judge, can I ask you one other

17   question in that regard?

18           THE COURT:  One more, Mr. Jefferson.

19           MR. JEFFERSON:  Thank you, Judge.  I appreciate it.

20           My client, as you know, Judge, is -- his condition

21   has worsened.  He's been moved out of his home into an assisted

22   care facility.

23           And so is it my understanding, then, of the

24   settlement that as someone who is currently diagnosed with a

25   related injury, personal injury, that he would not be included

1    in the class as it stands now?  Is that right?

2              THE COURT:  No.  He would be included in the class,

3    but he would have the right to pursue his personal injury

4    damages claim regardless of this particular settlement.

5              All right.  So, Mr. Jefferson, if you have any

6    further questions about the structure of the settlement, what I

7    would suggest to you is why don't you give Mr. Berman a call or

8    Ms. Fegan a call, and if they haven't addressed those

9    questions, then you could raise it with me by motion.  Okay?

10             MR. JEFFERSON:  Yes, Your Honor.

11             THE COURT:  Okay.  Is there anything else we need to

12   discuss?

13             MR. MESTER:  No, Your Honor.

14             THE COURT:  So you will be hearing from me with

15   regard to all of those other cases and claims that are still

16   out there.  And with regard to the settlement, I will see you

17   at the next status hearing.

18             MR. MESTER:  Okay.

19             THE COURT:  If there's anything that comes up between

20   now and then, just let me know.

21             MR. EDELSON:  Thank you, Your Honor.

22             MR. MESTER:  Thank you, Your Honor.

23             MR. BERMAN:  Thank you.

24             THE COURT:  Okay.  Thank you.

25         (Proceedings concluded.)

```
 1                    C E R T I F I C A T E
 2
 3
 4
 5              I, Colleen M. Conway, do hereby certify that the
 6    foregoing is a complete, true, and accurate transcript of the
 7    proceedings had in the above-entitled case before the
 8    HONORABLE JOHN Z. LEE, one of the Judges of said Court, at
 9    Chicago, Illinois, on July 14, 2016.
10
11
12         /s/ Colleen M. Conway, CSR,RMR,CRR        07/27/16
13              Official Court Reporter                Date
                United States District Court
14             Northern District of Illinois
                     Eastern Division
15
16
17
18
19
20
21
22
23
24
25
```