**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETE ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492<br>Case No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Brown |

**SETTLEMENT CLASS COUNSEL'S PETITION FOR FEES AND EXPENSES, AND**
**INCENTIVE AWARDS FOR SETTLEMENT CLASS REPRESENTATIVES**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.   BACKGROUND FACTS .....................................................................................3

      A.   The Litigation and Settlement of *Arrington v. NCAA* ..............................3

      B.   An MDL Is Created After the *Arrington* Settlement Negotiations Become Public .........................................................................................5

      C.   Settlement Class Counsel Addresses the Court's Concerns ....................5

      D.   Settlement Class Counsel Successfully Responds to Numerous Attacks by the Objectors .......................................................................6

      E.   Summary of Settlement Class Counsel's Reported Lodestar and Expenses ...................................................................................................7

III.  ARGUMENT .......................................................................................................9

      A.   A $15 Million Fee Award, Which is 21% of Settlement Fund and Reflects a 1.5 Multiplier on Lodestar, is Reasonable ..............................9

      B.   Class Counsel Is Entitled to an Award of Expenses of $750,000, Which Is Less Than the Out-of-Pocket Costs Actually Incurred ......................12

      C.   The Incentive Awards Sought for the Settlement Class Representatives Are Modest...............................................................................................13

IV.  CONCLUSION..................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   No. 07 Civ. 2898, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012)..........................................13, 14

*Arenson v. Bd. of Trade*,
   372 F. Supp. 1349 (N.D. Ill. 1974) ...............................................................................12

*Brown v. Esmor Corr. Servs.*,
   Civ. No. 98-1282(DRD), 2005 U.S. Dist. LEXIS 17042 (D.N.J. Aug. 10, 2005) ...................3

*Castillo v. Noodles & Co.*,
   No. 16-cv-03036, 2016 U.S. Dist. LEXIS 178977 (N.D. Ill. Dec. 23, 2016).........................13

*In re Cenco, Inc. Secs. Litig.*,
   519 F. Supp. 322 (N.D. Ill. 1981) .................................................................................12

*In re Charter Comm's., Inc. Sec. Litig.*,
   No. MDL 1506, 2005 WL 4045741 (ED. Mo. June 30, 2005)................................................12

*Cook v. Niedert*,
   142 F.3d 1004 (7th Cir. 1998) ......................................................................................13

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
   80 F. Supp. 3d 838 (N.D. Ill. 2015) .................................................................................9

*DiGiacomo v. Plains All Am. Pipeline*,
   No. H-99-4137, 2001 WL 34633373 (S.D. Tex. Dec. 19, 2001) ...........................................12

*Florin v. Nationsbank of Georgia, N.A.*,
   34 F.3d 560 (7th Cir. 1994) ..........................................................................................9

*In re Folding Carton Antitrust Litig.*,
   84 F.R.D. 245 (N.D. Ill. 1979).....................................................................................12

*Gaskill v. Gordon*,
   942 F. Supp. 382 (N. D. Ill. 1996) ...............................................................................11

*Gastineau v. Wright*,
   592 F.3d 747 (7th Cir. 2010) ........................................................................................12

*George v. Kraft Foods Global, Inc.*,
   No. 1:08-cv-3799, 1:07-cv-1713, 2012 U.S. Dist. LEXIS 166816 (N.D. Ill.
   June 26, 2012)............................................................................................................11

*Harman v. Lyphomed*,
  945 F.2d 969 (7th Cir. 1991) ..................................................................................9

*Heekin v. Anthem, Inc.*,
  No. 1:05-cv-01908-TWP- TAB, 2012 U.S. Dist. LEXIS 165464 (S.D. Ind.
  November 20, 2012) ............................................................................................11

*Kifafi v. Hilton Hotels Ret. Plan*,
  999 F. Supp. 2d 88 (D.D.C. 2013) ......................................................................15

*Kitson v. Bank of Edwardsville*,
  No. 08-507-GPM, 2010 WL 331730 (S.D. Ill. Jan. 25, 2010) .............................11

*Mathur v. Bd. of Trs. of S. Ill. Univ.*,
  317 F.3d 738 (7th Cir. 2003) ................................................................................8

*McCue v. MB Fin., Inc.*,
  No. 15-cv-988, 2015 U.S.Dist.LEXIS 96653 (N.D. Ill. July 23, 2015) ...............11

*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970) ..............................................................................................9

*Missouri v. Jenkins*,
  491 U.S. 274 (1989) ..............................................................................................8

*Skelton v. General Motors Corp.*,
  860 F.2d 250 (7th Cir. 1988) ..............................................................................12

*Spicer v. Chi. Bd. Options Exch., Inc.*,
  844 F. Supp. 1226 (N.D. Ill. 1993) ................................................................12, 15

*Sukhnandan v. Royal Health Care of Long Island LLC*,
  No. 12 Civ. 4216, 2014 WL 3778173 (S.D.N.Y. July 31, 2014) .........................15

*Sutton v. Bernard*,
  504 F.3d 688 (7th Cir. 2007) ..............................................................................12

*In re Sw. Airlines Voucher Litig.*,
  No. 11 Civ. 8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) (Jan. 3, 2014).....15

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ..............................................................................10

*US Airways, Inc. v. McCutchen*,
  133 S. Ct. 1537, 185 L. Ed. 2d 654 (2013) ...........................................................9

- iii -

**Other Authorities**

Fed. R. Civ. P. 23(h) ...................................................................................................................12

Fed. R. Civ. P. 23 ..........................................................................................................................6

Fed. R. Civ. P. 23(b)(3)..................................................................................................................7

## I.    INTRODUCTION

Six years ago, as Lead Class Counsel, Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut P.C. initiated an unprecedented attempt to protect the health and safety of current and former NCAA student-athletes – at a time when the major sports leagues were still denying the connection between concussions in sport and persistent short- and long-term cognitive dysfunction.  Without any guarantee of payment or success, and pursuing areas of the law not well tread such as the NCAA's duty and the right of the class to medical monitoring, Lead Class Counsel prosecuted this litigation through the close of merits discovery and the filing of a motion for class certification.  Lead Class Counsel supported the class motion with a well-developed record of internal NCAA documents reflecting both knowledge and a desire to ignore the deficiencies in concussion management and return-to play protocols at the collegiate level, as well as an opinion from the one of the leading experts on concussion in sport, Dr. Robert Cantu.  Only then, after the expenditure of nearly 10,000 hours of attorney time, did the NCAA suggest that a settlement might be possible.

On February 7, 2014, an initial term sheet was agreed to by the NCAA and Lead Class Counsel that contained the backbones of a historic settlement which remain unchanged today: a $70 million Medical Monitoring Fund plus $5 million to fund concussion research, and sweeping changes to the NCAA's concussion management and return-to-play protocols.

In 2013, Lead Class Counsel also joined forces with a number of other attorneys who filed additional complaints on behalf of current and former football players.  This Court then appointed the Executive Committee of Richard Lewis of Hausfeld LLP, James Dugan of Dugan Law Firm, and Charles Zimmerman of Zimmerman Reed.[1]

---

[1] Mr. Dugan is filing a separate fee petition from this joint application. Accordingly, references to Settlement Class Counsel or Plaintiffs' Counsel do not include Mr. Dugan.

Even at that time however, there was never a guarantee that settlement would receive this Court's approval. Over the last three years, Settlement Class Counsel has invested another 8,000 hours of attorney time to negotiate and respond to this Court's multiple concerns, including but not limited to working with the Medical Science Committee on the scope and tests within the Program, working with actuaries to analyze the sufficiency of the Fund, and proffering facts and law to address the value of a release of class-wide personal injury claims (while preserving individual personal injury claims). Moreover, Settlement Class Counsel has responded to numerous rounds of objections by Nichols, the majority of which were rejected by the Court. Ultimately, the Court granted preliminary approval of the Amended Settlement on July 15, 2016.

Since that time, Lead Class Counsel has spent significant time working with the NCAA, NCAA schools and the Notice Administrator to reach 4.2 million current and former NCAA student-athletes. Lead Class Counsel is also continuing to work with the NCAA, Medical Science Committee and Program Administrator to launch the Medical Monitoring Program, including soliciting interest from and vetting qualifying physicians and hospitals to serve as Program Locations, once the Settlement becomes effective.

Through December 31, 2016, Plaintiffs' Counsel reports expending 18,635.66 hours prosecuting this matter, incurring lodestar of $9,886,565.10, and out of pocket expenses of $760,131.93.[2] Plaintiffs' Counsel seeks an award of $15 million in fees, which is just 21% of the Medical Monitoring Fund – well within the range of reasonableness. Moreover, a lodestar cross-check reflects that a $15 million award is just a 1.5 multiplier on reported time, which is within the

---

[2] Section XVII(B) of the Second Amended Settlement Agreement provides that the NCAA agrees not to oppose an application for fees and expenses not to exceed $15 million in fees and $750,000 in out-of-pocket expenses.

accepted range of 1.3-4 in this District.[3]  And, an expense award of $750,000 will reflect a slight

haircut on our actual out-of-pocket expenses.

Plaintiffs also seek incentive awards of $5,000 for three of the *Arrington* Plaintiffs, Derek

Owens, Kyle Solomon, and Angela Palacios, and $2,500 for the additional Settlement Class

Representatives, Abram Robert Wolf, Sean Sweeney, Jim O'Connor, Dan Ahern, Paul Morgan,

Jeffrey Caldwell, John DuRocher, Sharon Washington, Shelby Williams, Brice Sheeder, Shavaughne

Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, Jessica Miller, Anna Bartz, Peter

Dykstra, DaChe Williams, Rachel Harada, Natalie Harada, and Adam Walker.  These amounts are

well within the range of reasonableness to compensate the class representatives for their time and risk

in this litigation.  Accordingly, as further set forth below, Plaintiffs' motion should be granted.

## II.    BACKGROUND FACTS

### A.    The Litigation and Settlement of *Arrington v. NCAA*

The first class action was filed against the NCAA on September 12, 2011.  Subsequently,

several former NCAA football, ice hockey, and soccer players filed or joined the suit on behalf of

NCAA student-athletes.  On October 19, 2011, the Court appointed Steve W. Berman of Hagens

Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC as Interim Co-Lead Counsel on behalf of

the putative class.[4]  On November 18, 2011, the Lead Plaintiffs filed a Consolidated Class Action

Complaint.[5]

Between October 2011 and June 2013, Lead Plaintiffs and the NCAA conducted full merits

discovery, including the production of 29,502 documents (176,849 pages) by the NCAA, 8,124

---

[3] Lead Class Counsel will allocate the fees among the reporting firms according to each firm's contribution to and risk undertaken in the litigation.  *Brown v. Esmor Corr. Servs.*, Civ. No. 98-1282(DRD), 2005 U.S. Dist. LEXIS 17042 (D.N.J. Aug. 10, 2005) ("Normally lead counsel decides how the awarded counsel fees should be distributed in accordance with each class action's counsel's contribution to the efforts to secure the class action award.").

[4] Order dated October 19, 2011 (*Arrington* Dkt. No. 22).

[5] Consolidated Class Action Complaint (*Arrington* Dkt. No. 24).

documents by 42 third parties (28,485 pages), and 3,842 documents (10,144 pages) by Lead

Plaintiffs.  Lead Plaintiffs took 10 depositions of the NCAA's fact witnesses, and the NCAA deposed

the four Lead Plaintiffs and one absent class member.[6]

On March 11, 2013, Lead Plaintiffs filed their Second Amended Class Action Complaint.[7]

Moreover, on July 19, 2013, Lead Plaintiffs filed their Motion for Class Certification and

Memorandum in Support,[8] together with a detailed Proffer of Facts In Support of Class Certification

("Fact Proffer")[9] and an expert analysis of the NCAA's concussion policies from one of the nation's

leading sport concussion experts, Dr. Robert Cantu.[10]  After the filing of Lead Plaintiffs' class

motion, on August 15, 2013, the Court agreed to the parties' request for a stay pending settlement

negotiations.[11]

Subsequently, Lead Plaintiffs and the NCAA retained the Hon. Layn Phillips (ret.) and

attended mediation sessions on November 1, 2013 (New York), December 13, 2013 (Houston), and

February 6-7, 2014 (New York).  On February 7, 2014, the NCAA and Plaintiffs' Lead Counsel

signed a Term Sheet.

From the filing of *Arrington* in 2011 through the initial settlement (as of January 31, 2014),

Lead Class Counsel invested more than 8,000 hours and invested more than $400,000 in out-of-

pocket costs on a wholly contingent basis.  The Term Sheet included the fundamental agreement still

in place today:  a $75-million Medical Monitoring Fund to create a 50-year Medical Monitoring

Program, as well as the NCAA's agreement to implement significant changes to its concussion

---

[6] Berman Declaration, Ex. A.

[7] Second Amended Class Action Complaint (*Arrington* Dkt. No. 135).

[8] Plaintiffs' Motion for Class Certification (*Arrington* Dkt. No. 174); Plaintiffs' Memorandum in Support of Motion for Class Certification (*Arrington* Dkt. No. 175).

[9] Proffer of Common Facts in Support of Motion for Class Certification ("Fact Proffer") (*Arrington* Dkt. No. 176).

[10] Report of Robert C. Cantu, M.A., M.D., F.A.C.S., F.A.C.S.M. (*Arrington* Dkt. No. 180).

[11] Order (*Arrington* Dkt. No. 186).

management and return-to-play protocols. As reflected below, these core terms remain in place today.

**B.    An MDL Is Created After the *Arrington* Settlement Negotiations Become Public**

After the Court entered the stay for settlement negotiations on August 15, 2013, *Walker v. NCAA* was filed by Hausfeld LLP on September 3, 2013, followed by an additional eight cases on behalf of NCAA football players.  Led by Hausfeld, these additional Plaintiffs sought to ensure that any medical monitoring relief would include diagnostic measures for late life neurocognitive disease, particularly for former players who played before 2004 and who are most at risk to late life latent neurocognitive disease.[12]

These cases were consolidated by the Judicial Panel on Multidistrict Litigation before this Court. After the MDL was created, Lead Counsel and the Hausfeld Group conferred, forming an Executive Committee (comprised of Hausfeld, Zimmerman Reed, and the Dugan Law Firm) and agreeing to additional tests and protections within the Medical Monitoring Program for early-onset neurocognitive degenerative disease, such as CTE.

On February 7, 2014, Lead Counsel (together with the newly-formed Executive Committee) and the NCAA reached agreement on a settlement which remains true to its core today.

**C.    Settlement Class Counsel Addresses the Court's Concerns**

On several occasions, the Court raised concerns regarding the terms of the Settlement and asked the parties to address those concerns.  Accordingly, Lead Class Counsel continued to negotiate with the NCAA directly and in several additional mediation sessions overseen by Judge Andersen, including on May 12, 2014, March 17, 2015, and April 29, 2016, as well as dozens of telephone calls facilitated by Judge Andersen.

---

[12] *See generally* Lewis Declaration, Ex. D.

Through these additional sessions, Lead Class Counsel was able to address the Court's concerns regarding the creation of subclasses; changes to the Notice Program and publicity campaign; deletion of subrogation rights; the payment of certain class members' costs for evaluations; ongoing notice regarding the sufficiency of the fund; requiring that the $5 million in research money be in addition to current funding; permitting the Court to request reports; and excluding Class Counsel from waiver of future claims (which Class Counsel conceded was correct at the outset).

### D.     Settlement Class Counsel Successfully Responds to Numerous Attacks by the Objectors

Only after the settlement was reached in February 2014 did Plaintiff Nichols appear in the case.  On or about February 11, 2014, Nichols sought to intervene in the litigation to attack the terms of the settlement in an attempt to force an NFL-type personal injury or mass tort resolution with the NCAA.  His broad-sweeping attacks failed in nearly every respect.[13]  Later named the "Lead Objector," Nichols engaged in extensive motion practice on the terms of the Settlement. Despite numerous briefs attacking the settlement, Nichols' arguments were unsupported by medical or scientific experts.

Ultimately, Nichols' work is loosely connected to just two changes.  First, as Class Counsel conceded was correct at the outset, Class Counsel was excluded from the scope of the release.

---

[13] The Court rejected or ignored Nichols' arguments that: a massive personal injury class of more than four million persons can be certified; individual concussion cases are worth just $8,000-$12,000, such that no lawyer would ever take an individual case; few class members will have persistent post-concussion syndrome or early-onset neurological diseases, such as CTE; Class Counsel left "billions on the table" for the class; Nichols can represent personal injury claimants despite the fact that Nichols does not allege that he has PCS or CTE, but instead that he is currently asymptomatic; Class Counsel "repudiated" class members' rights to obtain personal injury damages, exposing putative class members to statute of limitations, statute of repose, and improper claim splitting defenses; Class Counsel and the Settlement Class Representatives are not adequate under Rule 23 and an *Amchem* conflict of interest exists; the vast majority of the Class "gets nothing"; the $5 million research fund is an improper *cy pres remedy*; the Notice was not sufficient because it failed to disclose his objections; the Settlement class is overbroad because it includes those with valid medical monitoring claims as well as those who may not have such claims (or whose states do not recognize such claims); the claims process improperly discourages claims; the prospective injunctive relief is illusory; and Class Member claims are improperly tolled between Final Approval and the Effective Date.

- 6 -

Second, the Court found – at this stage – that it could not "conclude from the present record that a very narrowly defined, single-school personal injury class could never be certified against the NCAA."

While Nichols had launched a broad attack on the release of the procedural right to pursue class actions on behalf of a nationwide personal injury class, Judge Lee did not adopt Nichols' position. Rather, after thoughtful analysis, the Court held that it could not "conclude from the present record that a very narrowly defined, single-school personal injury class could never be certified against the NCAA."[14]

The NCAA and Class Counsel thus engaged in additional negotiations, as did the NCAA with its insurers. To respond to Judge Lee's concern, the Second Amended Settlement releases all class-wide personal injury claims except for single-sport, single-school class-wide personal injury claims – a carve-out we proposed. The scope of the proposed release thus satisfied the Court's statement that "[p]erhaps there is a putative personal injury class that a potential plaintiff could allege— limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied—that might be appropriate for certification under Rule 23(b)(3)."[15/16]

## E. Summary of Settlement Class Counsel's Reported Lodestar and Expenses

Set forth below is a chart of the reported time from all Plaintiffs' counsel who supports the current settlement and responded to Lead Counsel's request for time. In sum, through November 30,

---

[14] Court's Memorandum Opinion and Order ("Order"), dated January 26, 2016, at 29 (Dkt. No. 246).

[15] Order at 29.

[16] The other changes to the Second Amended Settlement resulted from the Court's own review of the Settlement's terms and did not reflect issues raised by Nichols.

2016, Plaintiffs' counsel report spending 18,481.86 hours litigating this matter for a total lodestar of

$9,791,844.10 (at current hourly rates[17]) and with expenses of $755,715.99.[18]

| Lead Counsel | Lodestar | Fees | Effective Blended Rate | Expenses | Total Fees and Expenses |
|---|---|---|---|---|---|
| Hagens Berman | 11030 | $ 5,518,447.35 | $ 500.31 | $ 658,794.50 | $ 6,177,241.85 |
| Siprut | 4714.5 | $ 2,666,713.00 | $ 565.64 | $ 26,476.76 | $ 2,693,189.76 |
| Tier 1 Totals | 15744.5 | $ 8,185,160.35 | | $ 685,271.26 | $ 8,870,431.61 |
| | | | | | |
| **Executive Committee** | | | | | |
| Zimmerman | 490.61 | $ 352,339.50 | $ 718.17 | $ 7,571.45 | $ 359,910.95 |
| Hausfeld | 1065.6 | $ 650,064.00 | $ 610.05 | $ 50,100.01 | $ 700,164.01 |
| Tier 2 Totals | 1556.21 | $ 1,002,403.50 | | $ 57,671.46 | $ 1,060,074.96 |
| | | | | | |
| **Tier 3 - Hausfeld Group** | | | | | |
| Lite DePalma | 197.4 | $ 145,832.50 | $ 738.77 | $ 2,902.65 | $ 148,735.15 |
| Provosty | 115.9 | $ 54,085.00 | $ 466.65 | $ 1,048.69 | $ 55,133.69 |
| DeFeo | 246.25 | $ 100,788.75 | $ 409.29 | $ 5,113.00 | $ 105,901.75 |
| Zelle | 134.3 | $ 80,874.00 | $ 602.19 | $ 1,076.26 | $ 81,950.26 |
| J. Selmer Law P.A. | 171.3 | $ 68,972.00 | $ 402.64 | $ 623.30 | $ 69,595.30 |
| Thayer Weaver | 188 | $ 94,075.00 | $ 500.40 | $ 970.00 | $ 95,045.00 |
| Tier 3 -Hausfeld Totals | 1053.15 | $ 544,627.25 | | $ 11,733.90 | $ 230,685.41 |
| | | | | | |
| **Tier 3 - HB Group** | | | | | |
| Goplerud | 115.7 | $ 53,800.50 | $ 465.00 | 808.12 | $ 53,800.50 |
| Stranch | 12.3 | $ 5,852.50 | $ 475.81 | $ 231.25 | $ 6,083.75 |
| Tier 3 - HB Group Total | 128 | $ 59,653.00 | | $ 1,039.37 | $ 59,884.25 |
| | | | | | |
| **AGGREGATE TOTALS** | 18481.86 | $ 9,791,844.10 | | $ 755,715.99 | $ 10,221,076.23 |

---

[17] The Supreme Court has approved the use of current hourly rates to compensate for inflation and loss of use of funds, *Missouri v. Jenkins,* 491 U.S. 274, 284 (1989), as has the Seventh Circuit, *Mathur v. Bd. of Trs. of S. Ill. Univ.,* 317 F.3d 738, 744-745 (7th Cir. 2003) ("We have allowed district courts to use either current rates or past rates with interest when calculating the lodestar amount, see *Smith v. Village of Maywood,* 17 F.3d 219, 221 (7th Cir. 1994), because either method provides "an adjustment for delay in payment [which] is . . . an appropriate factor in [**14] the determination of what constitutes a reasonable attorney's fee. . . ." *Missouri v. Jenkins,* 491 U.S. 274, 284 (1989); *see also Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 483 U.S. 711, 716 (1987); *Soto v. Adams Elevator Equip. Co.,* 941 F.2d 543, 553 (7th Cir. 1991)).

[18] Declarations from each of the firms are attached as Exs. A-L.

## III.    ARGUMENT

**A.    A $15 Million Fee Award, Which is 21% of Settlement Fund and Reflects a 1.5 Multiplier on Lodestar, is Reasonable**

In the Seventh Circuit, a district court awarding attorneys' fees may use the lodestar method or the percentage of recovery method, or some combination of the two.[19]  The percentage of recovery method has emerged as the favored method for calculating fees in common fund cases in the Northern District of Illinois.[20]

Settlement Class Counsel respectfully petitions the Court for a fee award of $15 million plus $750,000 in expenses from the $70 million Medical Monitoring Fund.  The Seventh Circuit has held that the range of appropriate percentage fee awards is from 30% to 50%.[21]  Here, Plaintiffs' request constitutes 21% of the Medical Monitoring Fund.  Given the great risk taken and the substantial result obtained, under either the percentage of recovery method or the lodestar method, Class Counsels' fee application is eminently reasonable.

According to the common fund rule, "'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'"[22]  In economic terms, "[t]he attorney fee award is the compensation for the *effort* expended to benefit the class.  Counsel will not undertake actions of this nature unless they can

---

[19] *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994); *Harman v. Lyphomed*, 945 F.2d 969 (7th Cir. 1991).

[20] *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015).

[21] *See, e.g.*, *Pearson,* 772 F.3d at 782 ("…the presumption should we suggest be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel.").

[22] *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1545, 185 L. Ed. 2d 654 (2013) (*citing Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)); *see also Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970) (recognizing counsel's right to compensation for obtaining a common benefit on behalf of the class).

receive adequate compensation for (i) their time, (ii) the risk of not prevailing, (iii) the delay in receipt of fees, [and] (iv) the investment (money as well as time) that must be made in a case."[23]

Indeed, the contingency fee awarded to class counsel must be greater than the fees that the same attorneys would charge their clients in non-contingency cases. As Judge Posner has explained:

> A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The interest rate on such a loan is high because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is so much higher than that of conventional loans.

Richard Posner, Economic Analysis of Law § 21.9 (2d ed. 1984).

In *In re Synthroid*, the Seventh Circuit held that the market rate for legal fees depends in part on the following: (1) the risk of nonpayment a firm agrees to bear, in part, (2) the quality of its performance, in part on (3) the amount of work necessary to resolve the litigation, and in part on (4) the stakes of the case.[24] Consideration of these factors confirms that an attorneys' fee award of 21% of the Medical Monitoring Fund is appropriate.

First, Class Counsel incurred a significant risk of nonpayment by prosecuting this case. Nationwide medical monitoring was by no means a sure thing. In fact, many prominent persons in the sports field, most notably within the NFL and NCAA, were still publicly denying the links between concussion and long-term cognitive effects. Class Counsel also faced significant risk given the decentralized nature of the NCAA governance system, which the NCAA claimed absolved it from decisions made by each school. At the inception of the lawsuits, there was no certainty that Plaintiffs would succeed, or that the cases would settle.

---

[23] Stuart T. Rossman & Charles Delbaum, *Consumer Class Actions* § 15.2.1 (6th ed. 2006).

[24] *Id.* at 721.

Second, Class Counsel have performed excellently. As reflected above, Class Counsel invested significant time prosecuting the liability stage of the litigation. Only after the significant labor of prosecution was completed did the NCAA seek to enter settlement negotiations. The settlement that Class Counsel has achieved is significant in terms of the scope and term of the Medical Monitoring Program made available to the Class; and, while Class Counsel seeks no compensation for this, the Settlement also provides for injunctive relief that will achieve significant changes going forward to the concussion management and return-to-play protocols implemented among the thousands of NCAA schools.

Third, Class Counsel expended a tremendous amount of work to prepare the cases and achieve a resolution. Plaintiffs and their attorneys invested considerable time and expense investigating the claims, initiating the lawsuits, responding to motions, conducting discovery, prosecuting class certification in *Arrington*, proffering very qualified experts to support the claims, restructuring the settlement to fully address Judge Lee's concerns, and otherwise vigorously prosecuting the cases on behalf of a Class of approximately four million current and former student-athletes.

Under the percentage of recovery theory, the requested fee of 21% of the Settlement Fund is well within the accepted range of percentages that are routinely approved for attorneys' fees. Such an award comports with "the presumption … that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel."[25]

---

[25] *Pearson*, 772 F.3d at 782. *See also Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N. D. Ill. 1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998) (awarding a 38% fee); *George v. Kraft Foods Global, Inc.*, No. 1:08-cv-3799, 1:07-cv-1713, 2012 U.S. Dist. LEXIS 166816 (N.D. Ill. June 26, 2012) (awarding fee of $3,166,166, which was 33.33% of $9.5 million settlement fund); *Kitson v. Bank of Edwardsville*, No. 08-507-GPM, 2010 WL 331730 (S.D. Ill. Jan. 25, 2010) (33% fee award); *McCue v. MB Fin., Inc.*, No. 15-cv-988, 2015 U.S.Dist.LEXIS 96653 (N.D. Ill. July 23, 2015) (33% of settlement fund after claims administrator's fees were subtracted); and *Heekin v. Anthem, Inc.*, No. 1:05-cv-01908-TWP- TAB, 2012 U.S. Dist. LEXIS 165464 (S.D. Ind. November 20, 2012) ("Sixth, the

A lodestar cross-check also shows that the requested fees are reasonable. A lodestar analysis provides for the base lodestar to be adjusted upward via a multiplier to reflect the benefit of the settlement to the Class as well as the contingent nature of the attorneys' undertaking based on a likelihood of success in obtaining a judgment or settlement measured at the time the attorney began work on the case.[26] The court's task is to do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market" at the outset of the litigation when the risk of loss still existed.[27]

Here, Plaintiffs' fee request of $15 million reflects a 1.5 multiplier on their lodestar. Courts have approved multipliers of up to and beyond four (4).[28] Accordingly, Plaintiffs' fee request is well within the range of reasonableness.

**B.** **Class Counsel Is Entitled to an Award of Expenses of $750,000, Which Is Less Than the Out-of-Pocket Costs Actually Incurred**

Additionally, Class Counsel are entitled to an award of costs of $750,000 pursuant to Fed. R. Civ. P. 23(h), which provides that the court may award "reasonable attorney's fees and non-taxable costs that are authorized by law or by the parties' agreement." Courts regularly award reimbursement for expenses that are reasonable and necessarily incurred.[29] Class Counsel advanced

---

Court finds that there is support from other cases in this Circuit and nationally to support a market rate of 33.3%." (citing 12 cases within the Seventh Circuit where fees were awarded of at least 33%) (footnote 3)).

[26] *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010) (citations and quotations omitted); *Skelton v. General Motors Corp.*, 860 F.2d 250, 255 (7th Cir. 1988) (citations and quotations omitted).

[27] *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007), *citing In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

[28] *See, e.g.*, *In re Cenco, Inc. Secs. Litig.*, 519 F. Supp. 322 (N.D. Ill. 1981) (multiplier of 4*); In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245 (N.D. Ill. 1979) (multipliers ranging from 1.3 to 3); *Arenson v. Bd. of Trade*, 372 F. Supp. 1349 (N.D. Ill. 1974) (multipliers of 3 and 4); *DiGiacomo v. Plains All Am. Pipeline*, No. H-99-4137, 2001 WL 34633373, at *10-11 (S.D. Tex. Dec. 19, 2001) (awarding percentage fee that resulted in multiplier of 5.3); *In re Charter Comm's., Inc. Sec. Litig.*, No. MDL 1506, 2005 WL 4045741, at *18 (ED. Mo. June 30, 2005) (approving 20% fee yielding 5.61 lodestar multiplier as "within the range of multipliers found reasonable for cross-check purposes") (citations omitted); 1 Alba Conte, Attorney Fee Awards § 2.06, at 39 (2d ed.1993) ("When a large common fund has been recovered and the hours are relatively small, some courts reach a reasonable fee determination based on large multiples of 5 or 10 times the lodestar.").

[29] *Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1256 (N.D. Ill. 1993).

significant costs litigating these cases, including costs associated with discovery, travel, court fees, and, perhaps most significantly, to retain expert witnesses that were instrumental in providing critical evidence addressing the medical expertise and science regarding concussion management in sport, as well as to formulate a Medical Monitoring Program to serve the Settlement Class going forward. The expenses incurred by each firm are reflected in the Declarations.

**C.**     **The Incentive Awards Sought for the Settlement Class Representatives Are Modest**

"Plaintiffs in class and collective actions play a crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny."[30]  "Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit."[31]  "Incentive awards serve the important purpose of compensating plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs."[32]

Here, three of the original Plaintiffs from *Arrington*, Derek Owens, Kyle Solomon, and Angela Palacios, seek $5,000 incentive awards.  The remaining Settlement Class Representatives seek $2,500 incentive awards.

Courts consider three factors in their examination of the reasonableness of a requested service award:  (1) the actions the plaintiffs have taken to protect the interests of the class, (2) the degree to which the class has benefited from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing the litigation.[33]  As reflected below, the Settlement Class

---

[30] *Castillo v. Noodles & Co.*, No. 16-cv-03036, 2016 U.S. Dist. LEXIS 178977, at *5 (N.D. Ill. Dec. 23, 2016).

[31] *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

[32] *Castillo*, 2016 U.S. Dist. LEXIS 178977, at *5.

[33] *Castillo*, 2016 U.S. Dist. LEXIS 178977, at *5-6, *citing Cook*, 142 F.3d at 1016; *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 Civ. 2898, 2012 WL 651727, at *16 (N.D. Ill. Feb. 28, 2012).

- 13 -

Representatives took substantial actions to protect the interests of class members, and those actions resulted in a substantial benefit to the Settlement Class.

The *Arrington* Plaintiffs undertook substantial direct and indirect risk. Owens, Solomon, and Palacios agreed to bring the action in their names, opened their medical and personal histories up to scrutiny, were deposed, and were ready to testify if there was a trial. They did so because each of them felt strongly about protecting other student-athletes from facing the same injury and shame they suffered. In so doing, the *Arrington* Plaintiffs assumed significant risk that "should the suit fail, [they] could] find [themselves] liable for the defendant's costs or even, if the suit [was] held to have been frivolous, for the defendant's attorneys' fees."[34] "The incentive reward is designed to compensate [them] for bearing these risks."[35] The *Arrington* Plaintiffs also expended considerable time producing documents, disclosing their medical histories, releasing medical records from numerous doctors, and being deposed by the NCAA. And the *Arrington* Plaintiffs deferred prosecution of their individual personal injury claims in order to put the interests of the Class first. Finally, the *Arrington* Plaintiffs have actively participated in and monitored the Settlement to ensure that the rights of the Class are protected.

The non-*Arrington* Settlement Class Representatives joined the lawsuit after settlement negotiations began. However, their contribution was important. In various roles of current or former players in Contact or Non-Contact Sports, these additional Settlement Class Representatives brought their own sport-centric views to the Settlement to ensure that the interests of all class members were protected. Each of these Plaintiffs reviewed the Settlement, asked questions, engaged in an interview with Judge Andersen to ensure their voices were heard and represented, and submitted declarations to

---

[34] *Espenscheid*, 688 F.3d at 876-77 (internal citations omitted).

[35] *Id.*

- 14 -

the Court regarding their views of the settlement. Courts in this circuit and others have approved incentive awards for similar activities.[36]

Accordingly, Plaintiffs respectfully request that the Court grant their request for incentive awards.

## IV.    CONCLUSION

WHEREFORE, Plaintiffs respectfully request that their motion be granted.

Dated: January 13, 2017

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ Steve W. Berman
Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel.: 206.623.7292
Fax: 206.623.0594
Email: steve@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Tel.: 708.628.4949
Fax: 708.628.4950
Email: beth@hbsslaw.com

---

[36] *See, e.g., Chesemore,* 2014 WL 4415919, at *5, *12 ($10,000 and $25,000 awards for, inter alia, submitting to discovery and participating in settlement discussions); *Sukhnandan v. Royal Health Care of Long Island LLC*, No. 12 Civ. 4216, 2014 WL 3778173, at *16 (S.D.N.Y. July 31, 2014) ($10,000 awards where, inter alia, "[p]laintiffs provided counsel with relevant documents and assisted counsel in preparing for mediation and settlement discussions"); *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) ($10,000 awards where class representatives, inter alia, participated in discovery); *Kifafi v. Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88, 105 (D.D.C. 2013) (class members benefited from named plaintiff's "sustained contributions" to the litigation, which resulted in a sizable ERISA [*8] common fund); *In re Sw. Airlines Voucher Litig.*, No. 11 Civ. 8176, 2013 WL 4510197, at *11 (N.D. Ill. Aug. 26, 2013), appeal dismissed (Jan. 3, 2014) (approving service award in part because "there is a solid basis to believe that discovery," in which named plaintiffs actively participated, "improved the prospects for a favorable settlement").

- 15 -

Joseph J. Siprut
*jsiprut@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL  60602
312.236.0000
Fax: 312.878.1342

*Settlement Class Counsel*

Richard Lewis
HAUSFELD LLP
1700 K Street, NW Suite 650
Washington, DC 20006

Charles Zimmerman
ZIMMERMAN REED
1100 IDS Center
80 South 8th St.
Minneapolis, MN 55402
*Executive Committee for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on January 13, 2017, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By:    */s/ Steve W. Berman*
         Steve W. Berman

- 17 -

010270-12  928140 V1