**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION** | **MDL No. 2492**<br><br>**Master Docket No. 1:13-cv-09116**<br><br>**This Documents Relates To:**<br>**All Cases**<br><br>**Judge John Z. Lee**<br><br>**Magistrate Judge Geraldine Soat Brown** |

**OBJECTOR ANTHONY NICHOLS'S PETITION FOR AND MEMORANDUM IN
SUPPORT OF AN AWARD OF ATTORNEYS' FEES AND SERVICE AWARD**

## TABLE OF CONTENTS

I.      Nichols's Objections Caused Valuable Changes to Be Made to the
        Settlement. ...........................................................................................................2

II.     The Applicable Law Provides for Attorneys' Fees to Objectors Who Add
        Value to a Settlement. ..........................................................................................6

III.    Nichols's Objections Added at least $50 million in Value to the Settlement. ..............8

IV.     Nichols is Entitled to a Fee Award in the Amount of $6 million. ............................. 13

V.      A Lodestar Cross-check Confirms the Reasonableness of Nichols's
        Requested Attorneys' Fees. ..................................................................................16

VI.     Objectors Nichols and Arrington are Entitled to Service Awards ...........................19

        CONCLUSION ...................................................................................................20

ii

## TABLE OF AUTHORITIES

## UNITED STATES CIRCUIT COURTS OF APPEALS

*Creative Montessori Learning Centers v. Ashford Gear LLC*,
    662 F.3d 913 (7th Cir. 2011) ............................................................... 9

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ............................................................... 1

*Florin v. Nationsbank of Ga., N.A.*,
    34 F.3d 560 (7th Cir. 1994) ............................................................. 16, 18

*Gaskill v. Gordon*,
    160 F.3d 361 (7th Cir. 1998) ............................................................. 6, 7

*Gastineau v. Wright*,
    592 F.3d 747 (7th Cir. 2010) ............................................................... 16

*Goesel v. Boley Int'l (H.K.) Ltd.*,
    86 F.3d 414 (7th Cir. 2015) ............................................................... 15

*Harman v. Lyphomed, Inc.*,
    945 F.2d 969 (7th Cir. 1991) ............................................................... 18

*Hughes v. Kore of Ind. Enters., Inc.*,
    731 F.3d 672 (7th Cir. 2013) ............................................................... 12

*In re Continental Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ............................................................... 18

*In re Synthroid Marketing Litig.*,
    264 F.3d 712 (7th Cir. 2001) ............................................................. 18, 19

*In re Trans Union Corp. Privacy Litig.*,
    629 F.3d 741 (7th Cir. 2011) ......................................................... 2, 6, 7, 16

*Jeffboat LLC v. Dir., Office of Workers' Comp. Programs*,
    553 F.3d 487 (7th Cir. 2009) ............................................................... 17

*Mathur v. Bd. of Trustees of S. Ill. Univ.*,
    317 F.3d 738 (7th Cir. 2003) ............................................................... 17

*Montanez v. Simon*,
    755 F.3d 547 (7th Cir. 2014) ............................................................... 17

*R.D. Legal Funding Partners v. Robinson*,
    476 F. App'x 354 (11th Cir. 2012) ....................................................... 14

*Radcliffe v. Experian Info. Sols., Inc.*,
    715 F.3d 1157 (9th Cir. 2013) ..................................................................... 20

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ........................................................................ 6

*Silverman v. Motorola Sols., Inc.*,
    739 F.3d 956 (7th Cir. 2013) ...................................................................... 15

*Taubenfeld v. AON Corp.*,
    415 F.3d 597 (7th Cir. 2005) ...................................................................... 14

*Wink v. Miller Compressing Co.*,
    Nos. 16-2336 & 16-2339, __ F.3d __, 2017 WL 74711 (7th Cir. Jan. 9, 2017) .......................... 18

**UNITED STATES DISTRICT COURTS**

*Gehrich v. Chase Bank USA, N.A.*,
    2016 WL 3027831 (N.D. Ill. May 27, 2016) .................................................. 19

*Gehrich v. Chase Bank USA, N.A.*,
    316 F.R.D. 215 (N.D. Ill. 2016) ................................................................. 19

*Goodman v. Hangtime, Inc.*,
    No. 14-cv-1022-JRB, dkt. 124 (N.D. Ill. Sept. 29, 2015) ............................... 17

*Great Neck Capital Appreciation Inv. P'Ship, L.P. v. PricewaterhouseCoopers, LLP*,
    212 F.R.D. 400 (E.D. Wis. 2002). ............................................................ 6, 7

*Henry v. Sears, Roebuck & Co.*,
    1999 WL 33526864 (N.D. Ill. July 23, 1999) ............................................... 6

*In re Capital One Tel. Consumer Prot. Act Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ........................................................... 15

*In re Dairy Farmers of Am., Inc.*,
    80 F. Supp. 3d 838 (N.D. Ill. 2015) ........................................................... 16

*In re National Football League Concussion Litigation*,
    307 F.R.D. 351 (E.D. Pa. 2015) ................................................................ 10

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
    273 F. Supp. 2d 563 (D.N.J. 2003) ............................................................. 7

*In re Puerto Rican Cabotage Antitrust Litig.*,
    815 F. Supp. 2d 448 (D.P.R. 2011) ............................................................. 6

*McDonough v. Toys R Us, Inc.*,
    80 F. Supp. 3d 626 (E.D. Pa. 2015) ........................................................... 6

*Pray v. Lockheed Aircraft Corp.*,
    644 F. Supp. 1289 (D.D.C. 1986) ................................................................. 14

*Robles v. Lucky Brand Dungarees, Inc.*,
    No. 10-cv-4846-MMC, dkt. 105 (N.D. Cal. May, 10, 2013) ...................... 17

*Theis v. AVG Techs. USA, Inc.*,
    No. 12-cv-10920-RGS, dkt. 116 (D. Mass. May 5, 2014) ........................... 17

*Yslava v. Hughes Aircraft Corp.*,
    845 F. Supp. 705 (D. Ariz. 1993) ............................................................... 14

**STATE COURTS**

*Ayers v. Jackson Twp.*,
    525 A.2d 287 (N.J. 1987) ............................................................................ 14

*In re Alcolac, Inc.*,
    945 S.W.2d 459 (Mo. Ct. App. 1997) ........................................................ 14

*Leach v. E.I. Dupont de Nemours & Co.*,
    No. 01-C-608 (Cir. Ct. Wood Cnty., W. Va.) ............................................. 14

*Perrine v. E.I. Dupont de Nemours & Co.*,
    No. 04-C-296-2 (Cir. Ct. Harrison Cnty., W. Va. Feb. 25, 2008) ............... 14

**MISCELLANEOUS**

Newberg on Class Actions, § 15:83 ...................................................................... 15

It took the NCAA and Class Counsel two years and three bites at the apple to finally put together a class action settlement that earned approval from this Court. Indeed, the final product is a much-improved first step in providing some relief for former NCAA student-athletes who have suffered or are at risk of suffering serious brain injuries as a result of their participation in collegiate athletics. But the settlement this Court approved and what was originally proffered by the settling parties differ radically and those differences are directly attributable to Lead Objector Nichols's continued participation in this matter.

The settling parties' first bite at the apple provided settlement relief that was largely illusory. Despite the critical importance of the types of injuries involved and the ease of identifying class members, the settling parties planned to rely on publication notice to apprise the class members of the settlement. And in the rare instance a class member learned of the settlement, it only offered a medical test that even Class Counsel's own expert testified was covered by most private insurance, allowed the NCAA to subrogate the costs of providing that test, allowed an estimated $50 million in unused funds to revert to the NCAA, provided sham injunctive relief that NCAA member-schools didn't have to follow, and included a class-action waiver that made it impossible for injured class members to attempt to obtain compensation for personal injuries.

Class Member Anthony Nichols "smell[ed] a rat." *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). Nichols, through attorneys lead by Edelson PC, objected to both the settling-parties first and second attempts to draft an agreement that would pass even the minimal preliminary approval standard. Nichols objected that the original settlement gave virtually nothing to the class, which was of particular concern given that the settlement essentially let the NCAA off the hook, despite profiting for decades off the labor of the athletes who make up the

classes. The Court sustained Nichols's primary objections and identified other concerns of its own, leading to substantial and valuable changes in the settlement. The final settlement cures the deficiencies identified by Nichols in significant respects, and the value of the settlement to class members is thus significantly increased. In the Seventh Circuit, objecting class members who provide a benefit to the class through their objections are entitled to an award of fees that is proportional to the value they have created to the class. *See In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011). Here, Nichols's objections have materially benefitted the class, and he is entitled to a corresponding fee award.

In light of the contributions Nichols has made to the settlement, he respectfully requests an award of attorney's fees. As explained below, while the value of the changes made to the settlement in light of Nichols's objections easily justifies an award of fees in excess of $10 million, he limits his request to $6 million.

## I. Nichols's Objections Caused Valuable Changes to Be Made to the Settlement.

Between 2011 and 2014 a number of lawsuits were filed on behalf of former NCAA student-athletes related to head injuries they suffered while playing collegiate athletics. Plaintiff Adrian Arrington, a former football player at Eastern Illinois University, sued the NCAA in federal court in Chicago in 2011. Two years later, the JPML consolidated for pretrial proceedings the many similar actions in the court hearing the *Arrington* action. (Dkt. 1.)[1]

Roughly six months later a group of plaintiffs led by Arrington moved the district court to preliminarily approve a hastily reached and ill-considered class-action settlement. (Dkt. 64.) Nichols objected to the settlement on various grounds, including that:

---

[1]     References to a docket entry refer to entries on the MDL docket, No. 13 C 9116.

- The process of obtaining a medical-monitoring exam was cumbersome and designed to deter participation in the settlement. Class members had to complete an extensive questionnaire that was then scored against an algorithm to determine test eligibility. When the settlement initially was presented to the court, neither the questionnaire nor the algorithm had been developed. What's more, testing was to be done only at 10 locations nationwide, and any athlete who lived within 200 miles of the to-be-designated facilities would have to pay for any costs associated with taking the test. (Dkt. 83, p. 7 & n.14.)

- The principal benefits provided by the Settlement were, according to Plaintiffs' own experts, likely only to be realized by a few thousand class members. (Dkt. 83, p. 3.) From the point of view of the class, this meant the Settlement might end up creating a benefit of less than $200,000, depending on whether these tests were covered by class members' own insurance. (Dkt. 83, p. 6.) From the NCAA's perspective, the costs associated with providing the screening tests for 50 years, were likely to result in more than *$50 million* going back to the NCAA. (Dkt. 83, p. 7 n.13; Dkt. 70, p. 21.)

- The injunctive relief provided for by the settlement was purely precatory: a promise by the NCAA to urge its member institutions to establish "return to play" guidelines for "Contact Sports." (Dkt. 83, p. 5.)

- Despite the fact that NCAA member institutions undoubtedly know the names and contact information of almost all class members, the notice plan relied heavily on publication notice. (Dkt. 83, pp. 25-26.)

- The settlement released class members' ability to bring personal injury claims on a class-wide basis without providing any corresponding benefit, especially for those who already had developed diseases related to repeated brain trauma and who therefore would receive nothing from the settlement. (Dkt. 83, pp. 10-11 & nn. 20, 24.)

- The settlement tolled medical monitoring claims, but not any related personal-injury claims, during the period between preliminary and final approval. (Dkt. 83, p. 24.)

This Court denied preliminarily approval of the initial settlement, highlighting a number of the issues identified by Nichols's counsel, including that: (1) the record contained no evidence of the NCAA's ability to force its member institutions to adopt acceptable return-to-play guidelines (dkt. 115, p. 16); (2) the medical screening review criteria were opaque (dkt. 115, p. 17); (3) the settlement provided too few testing locations (dkt. 115, p. 18); (4) the medical-monitoring fund was reversionary (dkt. 115, p. 20); and (5) the parties had not adequately

3

explored the feasibility of direct notice (dkt. 115, p. 14). On its own, the Court further highlighted that the class representatives were not adequate to represent the interests of athletes who played defined Non-Contact Sports (dkt. 115, p. 11), and suggested that schools who failed to adopt appropriate concussion-preventing measures not be permitted to take advantage of the settlement's release (dkt. 115, p. 16).

Only three months later, Class Counsel and the NCAA came back to the Court with an "amended" settlement and again sought preliminary approval. (Dkts. 154, 166.) This new settlement made a few notable changes in response to Nichols and the Court. In contrast to the original settlement, no portion of the $70 million fund in the amended settlement would revert to the NCAA, the settlement required the NCAA to establish 33 testing facilities and reimbursed expenses for travel of 100 miles or more, it set forth the assessment questionnaire and grading algorithm, it extended the tolling period for personal-injury claims through the date of final approval, broadened the required return-to-play guidelines to include all sports, and, following up on the Court's suggestion, withheld the release of claims from institutions that failed to implement such guidelines, and it made more efforts to give class members direct notice. Although Nichols recognized that "the parties have taken a big step forward in making the $70 million settlement fund non-reversionary" (dkt. 178-1, p. 2), he raised further objections to the amended settlement, including that:

- The settlement again extracted a waiver from class members with live personal-injury claims in exchange for nothing. (Dkt. 183, pp. 3, 8.) Although Class Counsel and the NCAA attempted to justify the waiver on the ground that personal-injuries could not be pursued on a class basis (and therefore the waived rights lacked value), Nichols contended that such claims could be pursued on a classwide basis, as they had been in the NFL's concussion litigation, and the ability to do so was exceptionally valuable. (Dkt. 201.)

4

- The settlement continued to allow subrogation by the administrator overseeing the medical-monitoring program, which essentially required participating class members to pay for their own settlement benefits. (Dkt. 183, pp. 9, 12 n.16.)

- The settlement contained a useless cy pres provision: any monies left in the medical-monitoring fund at the end of the fund's 50-year life would be donated to concussion research rather than used for the benefit of the class members. (Dkt. 183, pp. 11-13.)

During this same time, the Court appointed Nichols Lead Objector. (Dkt. 197.)

The Court again required modifications to the Settlement before it would find the low hurdle of preliminary approval cleared. First, the Court required the settling parties to narrow the scope of the release contained in the settlement so that it would not release class members' rights to pursue personal-injury claims on a single-sport, single-school class basis. (Dkt. 246, p. 45.) Second, the Court disallowed the Program Administrator from seeking subrogation of program costs from private insurers. (Dkt. 246, pp. 47-48.) Third, the Court required the settling parties to revisit the fund at the end of the 50-year period to determine whether sufficient monies remained in the fund to extend the life of the fund, rather than permitting an automatic cy pres donation of unused funds in 50 years. (Dkt. 246, p. 51.) The Court also required the parties to augment their new direct notice program with advertising through social media. (Dkt. 246, p. 41.)

As the named plaintiffs and the NCAA worked to incorporate the Court's required changes, Nichols and his counsel assumed a more active role in the process, participating formally in a follow up mediation as well as informally via phone call and email correspondence, appearing at an in-chambers hearing, and reviewing drafts of the final settlement to ensure that the changes ordered by the Court were included. Eventually, due in part to the participation of Nichols's counsel, the settling parties acquiesced to the Court's proposed changes. (Dkt. 266-1.)

## II. The Applicable Law Provides for Attorneys' Fees to Objectors Who Add Value to a Settlement.

"Broad participation in a class action is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee." *Great Neck Capital Appreciation Inv. P'Ship, L.P. v. PricewaterhouseCoopers, LLP*, 212 F.R.D. 400, 413 (E.D. Wis. 2002). Lawyers who represent successful objectors to a class action settlement are entitled to a fee that reflects the value they added to the settlement or the benefit they produce for the class. *See In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 743-48 (7th Cir. 2011); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002). Much like the process for awarding fees to class counsel, the greater the value of an objector's contribution, the greater the fee award they are entitled to. *See Trans Union*, 629 F.3d at 743-48; *Henry v. Sears, Roebuck & Co.*, 1999 WL 33526864, at *1-*2 (N.D. Ill. July 23, 1999) (calculating objector's fee award by reference to the $36 million in value added to settlement following objection). Courts evaluate the reasonableness of an objector's fee request by reference to traditional common-fund principles. *See Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set."), *cited in Reynolds*, 288 F.3d at 288.

Although the market rate for attorneys' fees in class actions that establish a medical monitoring fund is, as in many class actions, typically between 20% and 33% of the value of the fund, *see infra* at 14, courts frequently award objectors fees amounting to around 10% of the value of an objector's contribution. *See, e.g.*, *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 662 (E.D. Pa. 2015) (awarding attorney's fees to objector in the amount of 9.9% of the benefit conferred upon the class attributed to objector's efforts); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 468 (D.P.R. 2011) (awarding attorney's fees to objector equal to 10% of increased benefit to the class). This is likely because, as the Court in *Trans Union*

6

reasoned, the objector is not usually the sole reason for the enhanced settlement value. *See Trans Union*, 629 F.3d at 747 (noting the problem of "joint causation" in this context and concluding that objector counsel should receive $4.1 million because $37.5 million in enhanced settlement value was attributed to successful objection, *i.e.*, 10% of increased benefit to the class). In *TransUnion*, for instance, class counsel "created an asset ... the value of which they did not realize" while the arguments of an objector "enabled the full value to be obtained." *Id.* But here the issue of "joint causation," at least as between the lawyers, is essentially not present. In light of Nichols's objections and the Court's related concerns, specific changes to the settlement were made. No significant expenditure of time and effort by the settling parties was necessary to plug these new terms into the settlement. (Even so, and despite the Court having denied preliminary approval, Class Counsel resisted any revisions to the settlement, and steadfastly refused to sit down with Nichols. Instead of heeding the suggestions of Nichols or the Court, Class Counsel's actions delayed improved relief to the class and caused unnecessary expense for all parties.) As such, the fee awarded to Nichols should approximate the market value of the services provided by his attorneys, without any reduction to account for the role played by Class Counsel. *See Gaskill*, 150 F.3d at 363.

*TransUnion* also suggests that an objector's fee award may be calculated as a percentage of the fee awarded to class counsel. *See* 629 F.3d at 747. Under this analysis, fees are calculated by examining the objector's contribution to the settlement as compared to class counsel's. *See also Great Neck*, 212 F.R.D. at 416 (concluding that, given the lack of available marketplace data for calculating an objector's attorney's fees, "I will compare the relative value of the objector's counsel's contribution to that of class counsel"); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 273 F. Supp. 2d 563, 572 (D.N.J. 2003) (awarding objector 1.4% of class

counsel's fee because objector's efforts enhanced the value of the common fund by 1.4%). Under this approach, if an objection leads to a change in a settlement that doubles the value, the objector's counsel is entitled to half of class counsel's fee.

As explained below, each approach justifies an attorneys' fee award to Nichols in excess of $10 million, well in excess of the $6 million requested.

### III. Nichols's Objections Added at least $50 million in Value to the Settlement.

The first step in determining an appropriate award of attorney's fees for an objector is to determine the value added to the settlement by the objector's participation in the litigation. Here, the enhanced value to the settlement provided by Nichols's objections can be measured in two different ways: from the perspective of the class members or from the perspective of how much the defendant is actually paying out. From either perspective, however, the total value added by Nichols's objections exceeds $50 million.

First, Nichols's objections increased the value of the Settlement to the class members in several ways. For instance, the shift to a deal where none of the allocated funds revert to the NCAA (let alone the $50 million projected by Class Counsel's own expert) significantly changed the incentives of counsel for both parties, and provided an immediate and tangible benefit to the class. As an example, in the initial settlement, Class Counsel and the NCAA agreed to create a paltry 10 Program Locations where class members could be tested for CTE, PCS, and other head-trauma-related diseases. (Dkt. 64, Exh. 1.) What's more, class members were eligible to have their travel costs reimbursed only if they lived more than 200 miles from a testing facility. (Dkt. 64, Exh. 1, p. 24.) As Nichols pointed out in his objection, this number was highly problematic. Huge swaths of the class (the settling parties provided no information on this point) likely would not live anywhere near a testing location, so just traveling to get a test was likely to

be an all-day or multi-day affair. (Dkt. 83, pp. 1 n.3, 7 & n.14.) Of course, the more likely

outcome was that no one would bother to make the trip and the NCAA would get its money

back.

Yet after Nichols's objection caused the parties to alter the Settlement so it would be non-

reversionary, the parties also changed the number of Program Locations to thirty-three. (Dkt.

154, Exh. 1, p. 12; Dkt. 266, Exh. 1, p. 13.) This more than three-fold increase in Program

Locations is hardly surprising. When the deal was reversionary, the incentives of Class Counsel

and the NCAA were not necessarily aligned with the class—the NCAA in particular had every

incentive to structure a deal that would allow for the biggest reversion of funds. *See Creative

Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011)

(discussing problem of misaligned incentives in class action settlements). What's more, based on

Nichols's objections, the parties agreed that class members should be entitled to reimbursement

if they live more than 100 miles from a testing facility rather than 200, and those who live further

away were given the option of having the screen tests performed by a local doctor. (Dkt. 154,

Exh. 1, p. 26; Dkt 266, Exh. 1, p. 28; *see also* Dkt. 83, p. 7 & n.14.) Again, these additions also

required a greater payout from the settlement fund—an expense that the settling parties were

only willing to make after agreeing that the entirety of the fund should be spent on the class

(rather than reverting to the defendant).

Nichols's forcing the settling parties to spend every last penny of the fund on the class

has led to more robust notice now, as well. The initial notice plan was light on the details (and

wasn't even complete when the parties sought preliminary approval), but was overtly designed to

rely *entirely* on publication notice even though direct notice plainly was feasible. This was

problematic given the scope of the release extracted by the NCAA in exchange for participation

9

in the settlement. (*See* Dkt. 83, pp. 25-26.) In the final settlement, the parties pledge to provide direct notice, a plan the Court approved on the understanding that it would reach 80% of the class *and* that direct notice would be supplemented (on the Court's order) by wide-ranging publication notice. (Dkt. 246, p. 41.) (In other words, even after having been ordered by the Court to beef up their notice plan, the parties still were unable to create an acceptable notice plan.)

These two changes in particular enhanced the value of the settlement to class members. Once the settling parties were forced by Nichols and the Court to spend the whole settlement fund for the benefit of class members, all of the class members will now know about and understand their rights under the settlement, and it will be easier for class members to take advantage of the benefits provided.

Next, Nichols's objections guaranteed the final Settlement preserves the ability of class members to pursue personal-injury claims on a classwide basis. As *In re National Football League Concussion Litigation*, 307 F.R.D. 351, *aff'd sub nom. Armstrong v. Nat'l Football League*, 821 F.3d 410 (3d Cir. 2016), shows, this is a valuable right. The parties in *NFL* recognized that even a robust program of medical monitoring should only be a small piece of the overall scheme of compensating athletes for brain injuries sustained during athletic competition. *See id.* at 366 n.11 (noting that over 90% of the settlement's benefits—at least $600 million— would be compensation for personal injuries). The original settlement in this case, however, effectively made medical monitoring the centerpiece by preventing class members from bringing related personal-injury claims in a class action. Class Counsel justified this lopsided tradeoff (class members surrendering their right to proceed with these claims on a class basis in exchange for nothing) by asserting that the right to assert personal-injury claims in a class action was

valueless—even though Class Counsel themselves had previously sought certification for injured class members on this basis.[2] (Dkt. 103, pp. 46-47.) *NFL* shows otherwise. In *NFL*, for instance, the personal-injury claims accounted for more than 90% of the value provided to class members. To be sure, the ability of class members to proceed in a class is not itself worth eight times the medical monitoring provided by the settlement—some of that value could be recouped in individual settlements and the NCAA litigation presents issues not present in the NFL litigation—but *NFL* persuasively shows that the ability to proceed as a class is at least as valuable as the medical monitoring relief.

Moreover, as this Court pointed out in agreement with Nichols's objection, disallowing subrogation also benefits the class. (Dkt. 246, pp. 47-48.) Were the Program Administrator permitted to subrogate the costs of the medical-monitoring program, it may well have driven the costs of private insurance up or disqualified class members from other benefits. (*Id.*)

Finally, in the initial settlement, the requirement that NCAA schools establish return-to-play guidelines for Contact Sports was nonbinding. (Dkt. 64, Exh. 1, p. 33.) Under the final settlement, "each NCAA member institution shall certify in writing that [it] has put in place a concussion management plan" for each sport, not just Contact Sports. (Dkt. 266, Exh. 1, p. 37.) The final settlement also prevents institutions that fail to implement satisfactory return-to-play guidelines from taking advantage of the release included in the settlement. (Dkt. 266, Exh. 1, p. 37.) This injunctive relief now benefits the entire class, rather than, potentially, none of the class.

While many of these benefits are not readily converted to a dollar figure, even Class Counsel's own expert has conceded that the value provided by the changes Nichols extracted will cost the NCAA at least an additional $50 million. This is doubly appropriate because a class

---

[2]    *See, e.g., Arrington v. NCAA*, No. 11-cv-6356, Dkt. No. 1 at ¶¶ 39, 41-47 (N.D. Ill. Sept. 12, 2011).

action serves more than a compensatory function. *See Hughes v. Kore of Ind. Enters., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013) ("A class action, like litigation in general, has a deterrent as well as a compensatory objective."). Many of the changes made to the Settlement in light of Nichols's objections significantly enhance the deterrent and punitive aspects of the Settlement by forcing the NCAA to pay out $50 million more over the life of the medical monitoring fund than Class Counsel's own expert anticipated they previously would have.

Under the initial settlement structure, whatever was left in the Settlement Fund, including any interest that had accrued on the fund during the medical monitoring period, was to revert to the NCAA. (Dkt. 54, Exh. 1, p. 19.) Class Counsel's expert reasoned that, given a range of possible response rates to the Settlement, it was likely that more than $30 million would revert to the NCAA, an estimate he later revised upwards to $50 after projected test costs were revised downwards "to more accurately reflect the current expected range of costs." (Dkt. 170, pp. 33, 39; *see also* Dkt. 70, p. 25 (estimating that more than $30 million would revert under three of five proposed scenarios).) And this figure did not account for the NCAA's ability to seek subrogation of the cost of the tests provided for by the medical monitoring fund. Though Class Counsel disputed whether any of the costs could be subrogated, their expert suggests that up to 70% of the program costs might ultimately be reimbursed by private insurance. (Dkt. 70, pp. 3-4.)[3] Neither did the figure account for the Program Administrator's likely ability to negotiate lower costs. (Dkt. 170, p. 33.)

The expert's calculations are easily confirmed. The Fund is to be used to pay administrative costs and fees in addition to the costs of testing. As the Court noted,

---

[3]     Class Counsel suggested that their expert did not consider subrogation because it was unlikely that any costs could be subrogated. (Dkt. 88, p. 3 n.6.) The expert, by contrast, reported that he did not consider subrogation simply in order to ensure that the fund was sufficient under what he called "clearly conservative" estimate. (Dkt. 70, p. 22 n.30; *see id.* at 3-4 (asserting that subrogation wasn't considered "to ensure that all estimates are conservative").)

administrative costs were originally projected to approximately $7.5 million. (Dkt 115, p. 14 n.10.) And Class Counsel's expert projected that between $12 and $54 million of the Fund would be spent on testing under the original settlement, though those figures were re-calculated as between roughly $6.5 and $27 million after using the "more accurate" figures and holding all other variables held constant. (Dkt. 70, p. 21; *see* Dkt. 170, pp. 33-34 (revised cost projections).) The expected value of the NCAA's testing expenditures is therefore approximately $33 or (with more accurate numbers) $17 million, taking the midpoint of the projected ranges. Adding projected attorneys' fees ($15 million) to the administrative costs and the $17 million in expected value, and taking into account that the $70 million Fund will bear interest at 3.4% *per annum*, at least $40 million would have reverted to the NCAA. Moreover, 70% of the $17 million—the amount the expert reported could be subrogated—is $11.9 million, which would also revert to the NCAA.

In sum, the added cost of the settlement to the NCAA thus strongly suggests that the value of the changes to the settlement meets or exceeds $50 million. To account for many of the uncertainties inherent in this forward-looking program, the bottom of this estimate—$50 million—provides a solid benchmark of the value created by Nichols's objections.

**IV.    Nichols is Entitled to a Fee Award in the Amount of $6 million.**

The next step is to determine what portion of this $50 million figure should be awarded to objector's counsel. Under *Gaskill* and cases following its reasoning, the Court must determine what an *ex ante* contingent fee arrangement would look like in a case like this. Data on this question is sparse, in large part because medical-monitoring claims are not recognized in every state. What little information is available, however, suggests that fees in medical-monitoring cases should be treated like fees in traditional tort litigation.

For instance, in *Pray v. Lockheed Aircraft Corp.*, 644 F. Supp. 1289 (D.D.C. 1986) (also known as *Friends for All Children v. Lockheed Aircraft Corp.*), the plaintiffs raised both personal-injury and medical-monitoring claims stemming from an airplane crash. *Id.* at 1290 (the medical-monitoring claims arose out of the sudden loss of cabin pressure experienced during descent which plaintiffs alleged placed them at increased risk of brain damage). In awarding fees, the district court did not differentiate between the personal-injury and medical-monitoring claims, and ultimately awarded plaintiffs' counsel 20% of the fund generated by the litigation. *Id.* at 1311. In two settlements in West Virginia, which raised claims solely for medical monitoring, counsel received fee awards amounting to 25.5% and 33% of the common funds generated. *Perrine v. E.I. Dupont de Nemours & Co.*, No. 04-C-296-2 (Cir. Ct. Harrison Cnty., W. Va. Feb. 25, 2008) (33%); *Leach v. E.I. Dupont de Nemours & Co.*, No. 01-C-608 (Cir. Ct. Wood Cnty., W. Va.) (25.5%).

These figures are comparable to the figures awarded as attorney's fees in toxic tort litigation. *See, e.g.*, *R.D. Legal Funding Partners v. Robinson*, 476 F. App'x 354, 357-58 (11th Cir. 2012) (discussing contingent fee arrangement in toxic-tort case for 33% of recovery); *In re Alcolac, Inc.*, 945 S.W.2d 459, 460, 462 (Mo. Ct. App. 1997) (approving 20% fee award in toxic tort class action). The analogy makes good sense, as most medical-monitoring claims derive from toxic-tort scenarios, or other torts. *See, e.g.*, *Yslava v. Hughes Aircraft Corp.*, 845 F. Supp. 705 (D. Ariz. 1993); *Ayers v. Jackson Twp.*, 525 A.2d 287 (N.J. 1987).

While the figures cited above come from common-fund fee awards, rather that *ex ante* negotiated fee arrangements, that is of little consequence. The Seventh Circuit has explicitly instructed that district courts should consider fee awards in similar class actions. *See, e.g.*, *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005). As one district judge has

recognized, these awards are still relevant to approximating the market because "the awards likely affect the price at which national class action lawyers are willing to provide their services going forward." *In re Capital One Tel. Consumer Prot. Act Litig*., 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015). Moreover, the figures provided above are generally in line with fee awards in other class actions. *See* Newberg on Class Actions, § 15:83 (5th ed. Westlaw database updated 2016) (noting that "recent empirical data on fee awards demonstrate that percentage awards in class actions are generally between 20–30%" and that the average fee award in the Seventh Circuit is 31.6%); *see also Silverman v. Motorola Sols., Inc*., 739 F.3d 956, 958 (7th Cir. 2013) (relying on similar empirical data). These figures also are on the low end of fees negotiated in personal-injury cases, the type of scenario from which this particular medical-monitoring claim derives. *See, e.g.*, *Goesel v. Boley Int'l (H.K.) Ltd.*, 86 F.3d 414 (7th Cir. 2015) (reversing as abuse of discretion the district court's decision deeming unconscionable a contingent fee award of 33.3% in a personal-injury case). Applied to Nichols's fee request, these authorities recommend an award between $10 million (20%) on the low end and $16.5 million (33%) on the high end.

A similar result occurs if the fee award is calculated by reference to Class Counsel's fee. Here, Nichols expects that Class Counsel will request an award of $15 million in fees. This award is purportedly based upon the approximately $70 million in value created by the settlement. As discussed, however, at least $50 million, or more than two-thirds, of the settlement's value can be traced to changes forced by Nichols's objections. Moreover, no discount is necessary to account for Class Counsel's role in helping realize the value attributable to Nichols's participation as an objector. The changes made to the settlement did little more than memorialize the Nichols' objections sustained by the Court; no further substantive changes developed by Class Counsel were made to the settlement. In these circumstances, therefore, the

problem of "joint causation" identified by the Seventh Circuit in *TransUnion*, 629 F.3d at 747,
simply does not exist. Whereas the magistrate judge in that case gave equal credit to the objector
and class counsel for the value realized following the relevant objections, no similar
apportionment is necessary here. Nichols should receive credit for the full amount of the value
realized by the Settlement Class as a result of his objections. Therefore, on the assumption that
$15 million in fees are available to be apportioned among the various participating lawyers,
counsel for Nichols is entitled to an award of at least $10 million.

Although the law justifies an 8-figure award in Nichols's case, he and his attorneys limit
their request to $6 million, to ensure that more money flows to class members.[4]

## V.   A Lodestar Cross-check Confirms the Reasonableness of Nichols's Requested Attorneys' Fees.

The Court also has the discretion to award attorneys' fees on the basis of the lodestar
method. *See Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994). The lodestar
method considers both the hours expended by counsel in litigating a particular matter, and the
riskiness of the litigation. *See Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). Often, this
method of calculation is used merely to confirm the reasonableness of an award reached using
the percentage-of-recovery method. *See, e.g.*, *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d
838, 849-51 (N.D. Ill. 2015).[5]

Under the lodestar method, the Court first ascertains counsel's lodestar "by multiplying a
reasonable hourly rate by the number of hours reasonably expended." *Gastineau*, 592 F.3d at

---

[4]    Nichols's request of $6 million does not concede that Class Counsel are entitled to $9
million, or to any specific amount. Nichols' intends to object to Class Counsel's fee petition in
the ordinary course.

[5]    Although Nichols believes that the market would not set compensation based on the
lawyers' lodestar figures, should the Court elect to conduct a lodestar analysis, either as the
principal method for calculating fees or as a cross-check, Nichols proposes that more detailed
time records be exchanged between all firms seeking compensation from the Court. To the extent
it is necessary, Nichols moves the Court to order limited discovery on this issue.

748. A reasonable hourly rate is based on the local market rate for the attorney's services, which is best evidenced by "the amount the attorney actually bills for similar work" or "rates set for the attorney in similar cases." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Jeffboat LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009).

As set forth more fully in the chart contained in the attached declaration, the lodestar figure for Nichols's counsel in this matter is $1,463,536.75. (*See* Declaration of Jay Edelson, attached as Exhibit 1.) (The chart uses counsel's current rates, consistent with Seventh Circuit case law. *See Mathur v. Bd. of Trustees of S. Ill. Univ.*, 317 F.3d 738, 744-45 (7th Cir. 2003).) The hourly rates charged by counsel are reasonable: They are the same rates counsel charges paying clients, and they are consistent with or even below the market rates for legal services in Chicago. (Edelson Decl., ¶ 7.) (Notably, they are also generally lower than the rates submitted by Hagens Berman). Counsel's rates have been approved in settlements both in this district, *see, e.g.*, *Goodman v. Hangtime, Inc.*, No. 14-cv-1022-JRB, dkt. 124 (N.D. Ill. Sept. 29, 2015), and nationwide, *see, e.g.*, *Theis v. AVG Techs. USA, Inc.*, No. 12-cv-10920-RGS, dkt. 116 (D. Mass. May 5, 2014); *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-4846-MMC, dkt. 105 (N.D. Cal. May, 10, 2013). The number of hours expended also is reasonable, given the work Nichols's counsel has done. Some of this work is typical of the work done by objectors, *i.e.*, researching and preparing multiple filings and appearing in court, though the volume and quality of the work of Nichols's counsel in this regard far outstrips that of a run-of-the-mill objector. But Nichols's and his counsel's participation in the litigation also has gone far beyond the work of a typical

objector. After the Court appointed Nichols Lead Objector, his counsel also participated in settlement negotiations, something practically unheard of for an objector.[6]

A reasonable fee, however, is not limited merely to hours worked. Under the lodestar analysis, a risk multiplier is mandated when, as here, "the lawyers had no sure source of compensation of their services." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992); *see Florin*, 34 F.3d at 565 (same). The multiplier attempts to replicate market forces by accounting for the risk associated with the litigation. The multiplier accounts for the risk of nonpayment. *See In re Synthroid Marketing Litig.*, 264 F.3d 712, 719 (7th Cir. 2001). For class counsel, a court will "assess the riskiness of the litigation"—and thus the likelihood of nonpayment—"by measuring the probability of success of this type of case at the outset of the litigation." *Florin*, 34 F.3d at 565. Courts in the Seventh Circuit, applying this approach, have approved risk multipliers of up to 4 for class counsel. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991) (collecting cases).

It stands to reason that an objector would be entitled to a multiplier at or above the high end of this range. Representing an objector is an especially risky undertaking: very few objections are upheld, much less found meritorious enough to justify a fee award. Viewed from an *ex ante* perspective, counsel for an objector faces a much higher risk of nonpayment than class counsel. A higher multiplier is therefore appropriate. *See Synthroid*, 264 F.3d at 719. A $6 million fee award fits this bill, as, given counsel's work, the request fee correlates to a multiplier

---

[6]     Nichols anticipates that Class Counsel will argue that certain of counsel's hours should be pared in order to account for hours spent on efforts unrelated to successful objections. The Court should reject that argument. As the Seventh Circuit recently made clear, when hours spent on "unsuccessful" work represent only a marginal cost over "successful" work done on behalf of a client, a lodestar reduction is inappropriate. *See Wink v. Miller Compressing Co.*, Nos. 16-2336 & 16-2339, __ F.3d __, 2017 WL 74711, at *3 (7th Cir. Jan. 9, 2017). For the same reason, no reduction is necessary here.

of 4.1. Thus, whether independently or as a check on the percentage-of-the-benefit-conferred calculation, Nichols's fee request is reasonable.

## VI.     Objectors Nichols and Arrington are Entitled to Service Awards.

One issue remains: the class members who retained counsel, and who put their names on the many filings that aided the Court in helping the parties to reach the final resolution, deserve some modest compensation as well. The Seventh Circuit follows a market-based approach to determine when objectors should be compensated for their efforts. *See Synthroid*, 264 F.3d at 722-23. Courts will deny service awards when absent class members have come forward and made similar objections without seeking compensation because that indicates that the market for objectors is $0. *See, e.g.*, *Gehrich v. Chase Bank USA, N.A.*, 2016 WL 3027831, at *6 (N.D. Ill. May 27, 2016). That isn't the case here: *multiple* class members objected to the settlement, but none raised the depth and breadth of the issues raised by Nichols. Nichols is entitled to a service award as compensation for his participation above and beyond that of other objectors. Because of the extent of that participation and the value created by Nichols's objections, he is entitled to the same $5,000 award as the named plaintiffs.

Objecting plaintiff Arrington also is entitled to a service award. Arrington originally was a named plaintiff (indeed the litigation still carries his name) and it cannot reasonably be disputed that he put in as much or more time and effort on behalf of the class as any other plaintiff. *See Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 239 (N.D. Ill. 2016) (observing that similar efforts justify incentive awards). But although class counsel promises to seek an award for the "time and service" of the named plaintiffs (dkt. 266-1, p. 57), the settlement leaves Arrington out in the cold, presumably because he withheld approval of the settlement negotiated on his behalf. But conditioning service awards on the plaintiff's approval of class counsel's work

19

is improper, and can be grounds to invalidate the settlement as a whole. *See Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1163-65 (9th Cir. 2013). Arrington's $5,000 award should be restored and he is in fact most deserving.

## CONCLUSION

The Court should award objector Anthony Nichols $6 million in attorney's fees and $5,000 service awards for both Nichols and Arrington.

Date:   January 13, 2017                           Respectfully submitted,

                                                   **ANTHONY NICHOLS**

                                                   By: /s/ Jay Edelson
                                                           One of his Attorneys

                                                   Jay Edelson
                                                   jedelson@edelson.com
                                                   Rafey S. Balabanian
                                                   rbalabanian@edelson.com
                                                   Ari J. Scharg
                                                   ascharg@edelson.com
                                                   Benjamin S. Thomassen
                                                   bthomassen@edelson.com
                                                   EDELSON PC
                                                   350 N. LaSalle, Suite 1300
                                                   Chicago, Illinois 60654
                                                   Tel: 312.589.6370
                                                   Fax: 312.589.6378

20

## CERTIFICATE OF SERVICE

      I, Jay Edelson, an attorney, hereby certify that on January 13, 2017, I served the above and Foregoing ***Objector Anthony Nichols's Petition for and Memorandum in Support of an Award of Attorneys' Fees and Service Award***, by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

                         /s/ Jay Edelson