IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | MDL No. 2492 <br><br> Master Docket No. 1:13-cv-09116 <br><br> Judge John Z. Lee <br><br> Magistrate Judge M. David Weisman |

**REPLY IN FURTHER SUPPORT OF THE NCAA'S**
**MOTION FOR THE PAYMENT OF SETTLEMENT EXPENSES**

Date: April 10, 2017

Mark S. Mester
   mark.mester@lw.com
Johanna Spellman
   johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois, 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Defendant National Collegiate Athletic Association ("NCAA"), through its counsel, submits the following reply to the opposing memorandum of Plaintiffs Derek Owens, et al. ("Plaintiffs") and in further support of the NCAA's motion for the payment of settlement expenses:[1]

## I. INTRODUCTION

In reliance on the express terms of the Settlement Agreement as well as the directive of the Court following a discussion of the issue at the November 30, 2016 hearing, the NCAA and its counsel (in coordination with the Notice Administrator) worked very hard last December and January to ensure that subpoenas were served as expeditiously as possible on the remaining colleges and universities that had not voluntarily provided last-known names and addresses in response to three (3) separate requests made by the NCAA over the course of the prior five (5) months. The NCAA and its counsel undertook this effort in the spirit of cooperation and in a sincere effort to effectuate the Notice Plan and provide direct notice to as many members of the Settlement Class as possible, while also doing everything that could be done to maintain the schedule set by the Court in its July 15, 2016 Preliminary Approval Order.

As would be expected, the fees and costs incurred by the NCAA in obtaining the contact information of members of the Settlement Class and later in the preparation and issuance of the subpoenas now at issue were themselves substantial, and the NCAA has already absorbed those fees and costs, with the sole exception of the fees charged by the independent process server retained to serve subpoenas on the remaining colleges and universities. The process server utilized to serve those subpoenas, however, has not been paid, and accordingly, the NCAA filed this motion.

---

[1] Unless otherwise defined, capitalized terms have the meaning ascribed to them in the Second Amended Settlement Agreement, which is Exhibit 1 to the joint motion for preliminary approval filed with the Court on May 20, 2016. See Second Am. Settlement Agt. (Dkt. #266-1).

Giving credence to the old adage that no good deed goes unpunished, Plaintiffs and their counsel now claim that in addition to absorbing the fees and costs incurred in obtaining contact information and in the preparation of the subpoenas, the NCAA itself should be required to pay the process server instead of using proceeds from the fund that was expressly set aside for the very purpose of providing notice to the Settlement Class. Plaintiffs and their counsel make this claim, however, without any real effort to reconcile it with the explicit provision of the Settlement Agreement, which makes clear the NCAA cannot be required to pay any more toward the Settlement or the implementation of the Notice Plan than what the NCAA has <u>already</u> paid and committed to pay, and Plaintiffs and their counsel likewise do not address the fact that the Settlement Agreement fully contemplated the possible need to serve subpoenas such as these <u>and</u> that one of the articulated purposes of the Medical Monitoring Fund is to pay the cost of implementing the Notice Plan and Settlement, of which the service of these subpoenas is plainly an important element, ensuring that members of the Settlement Class who attended colleges and universities that had not voluntarily provided contact information would nevertheless receive direct notice of the Settlement.

Rather than addressing these issues, Plaintiffs and their counsel instead make dubious claims about the viability of serving subpoenas by certified mail, relying almost entirely on <u>dicta</u> in one Seventh Circuit decision, where the Seventh Circuit ultimately concluded that it did not have jurisdiction but nevertheless noted that "many courts" have found Fed. R. Civ. P. 45 requires "nothing short of personal service." Moreover, Plaintiffs and their counsel also ignore the fact that even if certified mail were a permissible option in all applicable jurisdictions under Fed. R. Civ. P. 45 for a nationwide class of this size and breadth (which it plainly is not), service by certified mail would have almost certainly jeopardized the schedule set by the Court for implementing the Notice Plan. Accordingly, the NCAA's motion should be granted, and the

process server, which itself went to considerable lengths to coordinate the service of the subpoenas under a tight timetable right before and after the holidays, should be paid.

## II. FACTUAL BACKGROUND

Various of the statements in Plaintiffs' opposing memorandum are incorrect and at odds with the facts of record. See Pls.' Opp. (Dkt. #390) at passim. What actually transpired in connection with the issuance of subpoenas is addressed below. See disc. infra at 3-6.

### A. The NCAA And Its Counsel Expend A Good Deal Of Time, Money And Effort Collecting Contact Information For The Members Of The Settlement Class

By any standard, the task of providing direct notice to members of the Settlement Class has been expansive, laborious and time-consuming. See Spellman Decl., Ex. A hereto, at passim. To date, direct notice has been sent to approximately 2,177,545 physical addresses and to approximately 997,906 email addresses.[2] See id. at ¶ 17. Those notices are being sent to the names and last-known addresses the Notice Administrator obtained from NCAA member institutions. See id.

The names and addresses used by the Notice Administrator were obtained through the extensive efforts of the NCAA, which began last July. See Spellman Decl., Ex. A, at ¶ 3. All told, the NCAA directed three (3) separate written communications to colleges and universities,

---

[2] This figure represents upwards of 52% of the Settlement Class. See Spellman Decl., Ex. A, at ¶ 17. The Notice Administrator, however, has not yet sent the second round of direct notice but will do so once the Court approves the costs associated with those efforts. The Notice Administrator estimates that in the second round of direct notice, notice will be sent by U.S. Mail to an additional 1,501,459 addresses and via email to an additional 688,075 email addresses, for a total of 3,679,004 direct notices and 1,685,981 email notices being sent to individuals who participated in one of 24 or more different NCAA-sanctioned sports at many different member institutions. See Christman Decl. (Dkt. #365-1) at 2-3, 13-15; Spellman Decl., Ex. A, at ¶ 18. That represents direct notice being sent by U.S. Mail to a total of approximately 88% of the Settlement Class. See Spellman Decl., Ex. A, at ¶ 18. Although some mail may be returned undeliverable and not all direct notice will reach the intended member of the Settlement Class, when direct notice is combined with the other forms of notice provided under the Notice Plan, the actual "reach" realized under the Settlement will ultimately be 85% or more, which is exemplary. See Vasquez Decl. (Dkt. #329-1) at 9-10; see also Kaufman v. Am. Express Travel Related Servs., 2016 WL 806546, at *8-9 (N.D. Ill. 2016) (approving class action settlement agreement that "reached" 70% of the settlement class).

explaining the Settlement, the importance of providing notice and requesting cooperation from those institutions. See id. at ¶¶ 3-7. The NCAA's counsel then fielded approximately 448 separate inquiries from approximately 337 different member institutions, addressing a variety of different issues (including whether the request sought information regarding athletes in particular sports, privacy issues, the time period for which the information was requested and questions about the Settlement itself) over the course of the last eight (8) months. See id. at ¶ 14. The staff of the NCAA likewise spent a great deal of time following up with member institutions and answering the many questions that were raised. See id. at ¶ 15.

### B. Steps Taken By The NCAA To Address The Colleges And Universities That Did Not Voluntarily Provide Last-Known Names And Addresses

A substantial majority of NCAA member institutions voluntarily provided last-known names and addresses to the Notice Administrator. See Spellman Decl., Ex. A, at ¶ 6. A portion of colleges and universities, however, did not do so, and those institutions became the focus of the NCAA and its counsel last fall. See id.

In November and December of 2016, counsel for the NCAA sent subpoenas to 62 member institutions that had affirmatively requested subpoenas due to concerns about compliance with the Family Educational Rights and Privacy Act ("FERPA"). See Spellman Decl., Ex. A, at ¶ 5. Those subpoenas, however, were not served using a process server, contrary to the suggestion of Plaintiffs and their counsel in their opposing memorandum.[3] See id. But see

---

[3] In their opposing memorandum, Plaintiffs and their counsel suggest that it was unnecessary to use a process server for colleges and universities that had affirmatively asked for a subpoena to be served due to FERPA and other concerns. See Pls.' Opp. (Dkt. #390) at 2-3. That, however, is not what occurred except in a small number of cases. See Spellman Decl., Ex. A, at ¶¶ 5-11. As noted above, 62 institutions that requested a subpoena were served by means other than a process server, the assumption being that the risk of a motion to quash from an institution that had requested a subpoena was much lower. See id. at ¶ 5; see also infra at 4-6. After the issuance of those 62 subpoenas, five (5) institutions that requested a subpoena were served by process server. See Spellman Decl., Ex. A, at ¶ 11. By the time those five (5) institutions requested a subpoena, the NCAA had received objections from one institution that requested a subpoena on the grounds that its subpoena was served in a manner other than that contemplated by Fed. R. Civ. P. 45. See id. at ¶ 11. That subpoena was re-issued and served via

(continued…)

4

Pls.' Opp. (Dkt. #390) at 2. At the November 30, 2016 status hearing, counsel for the NCAA informed the Court that although a majority of the member institutions had voluntarily provided contact information to the Notice Administrator, a number of member institutions had not done so. See Nov. 30, 2016 Hr'g Tr. (Dkt. #318) at 10:18-11:1. Accordingly, counsel for the NCAA proposed that the NCAA send a final communication to those institutions, stating that subpoenas would be issued to any institution that had not provided the requested data to the Notice Administrator. See id. at 11:13-23. The NCAA did not want to commence the issuance and service of hundreds of subpoenas, however, without the Court's approval, so the NCAA raised the issue at the November 30, 2016 hearing. See id. at 11:24-12:1. At that hearing, the Court was advised of the situation and indicated approval of the NCAA's proposal. See id. at 12:8-9.

On December 15, 2016, the NCAA sent its third and final communication, informing member institutions that had not yet provided Settlement Class Member contact information that if they did not do so soon, subpoenas would be issued. See Spellman Decl., Ex. A, at ¶ 7. In December 2016 and January 2017, counsel for the NCAA then prepared 385 subpoenas. See id. at ¶ 9.[4] Those subpoenas were served by a private process server. See id. at ¶ 10. Class Counsel were, in turn, fully aware that counsel for the NCAA were preparing subpoenas as approved by the Court at the November 30, 2016 status hearing. See id. at ¶ 13. Indeed, by the agreement of the parties, the subpoenas identified Class Counsel as the issuing attorneys. See id. At no time,

---

(…continued)
process server. See id. at ¶ 5. Indeed, since that time, Class Counsel and the NCAA have received more objections to subpoenas on the grounds that they were not served in the manner contemplated by Fed. R. Civ. P. 45 (i.e., by a process server). See disc. infra at 15.

[4] The NCAA's motion mistakenly referred to 446 subpoenas served using a process server. See NCAA Motion (Dkt. #385) at 3. In fact, of the total number of subpoenas sent to NCAA member institutions, 385 of those were served using a process server. See Spellman Decl., Ex. A, at ¶ 9. This is reflected on the invoices attached as Exhibit A to the NCAA's motion (Dkt. #385-1), and we apologize for this inadvertent error.

5

however, did Class Counsel inquire as to how the subpoenas would be served or suggest that anything other than personal service should be utilized.  See id. at ¶ 13.

### III. ARGUMENT

The effort of Plaintiffs and their counsel to alter the terms of the Settlement Agreement and now impose notice-related costs directly on the NCAA should be rejected for at least four (4) separate reasons.  See disc. infra at 6-15.

#### A. The Settlement Agreement Expressly Limits the Contribution Of The NCAA

The Settlement Agreement was, of course, the result of extensive negotiations between the parties and their counsel, including five (5) mediation sessions involving two (2) different mediators.  See Spellman Decl., Ex. A, at ¶ 2.  The Settlement Agreement delineates in considerable detail the financial contributions the NCAA is required to make toward the Settlement, implementation of the Notice Plan and other aspects of the Settlement.  See Second Am. Settlement Agt. (Dkt. #266-1) at §§ II.W. (p.11), IV.A (pp.19-23).

Most pertinently, the Settlement Agreement calls for the NCAA to pay (under a specified schedule) the total sum of $70 million into the Medical Monitoring Fund, and the proceeds of the Medical Monitoring Fund are to then be used to "pay the costs of the Medical Monitoring Program, Notice and Administrative Costs, the costs of the Medical Science Committee, Class Counsel's Attorneys' Fees and Expenses, and the Class Representatives' Service Awards."  See Second Am. Settlement Agt. (Dkt. #266-1) at § II.W. (p.11).[5]

The Settlement Agreement, however, is crystal clear that above and beyond the payment of the sum of $70 million, the NCAA shall have no further obligation whatsoever to make any additional payments for Notice and Administration Costs, Attorneys' Fees or any other aspects

---

[5]  Unless stated otherwise, all emphasis is supplied, and all internal citations and quotations are omitted from all quoted material herein.

6

of the Settlement, and the Settlement Agreement is likewise very clear that the NCAA shall <u>not</u> be obligated to contribute any sums above and beyond the $70 million itself:

> The NCAA's payment of the Settlement Amount shall be "ALL-IN" and in <u>full</u> satisfaction of all Settlement costs, including costs to fund the Medical Monitoring Program, <u>Notice</u> <u>and</u> <u>Administrative</u> <u>Costs</u>, the costs of the Medical Science Committee, Attorneys' Fees and Expenses, and Service Awards. <u>In no event shall the NCAA be obligated to contribute in excess of $70 million in costs towards this Settlement Agreement, except as set forth in Section IV(A)(7)</u>.[6]

Second Am. Settlement Agt. (Dkt. #266-1) at § IV.A.1.b. (p.19); <u>see also id.</u> at § II.W. (p.11).[7]

As such, there is simply no basis for Plaintiffs and their counsel to now suggest that the NCAA should somehow be obligated to pay <u>additional</u> sums in excess of $70 million for implementation of the Notice Plan, nor has a credible basis been provided by either Plaintiffs or their counsel.[8] <u>See</u> Pls.' Opp. (Dkt. #390) at. <u>passim</u>.

### B. The Settlement Agreement Also Makes Clear That <u>All</u> Notice And Administrative Costs Shall Be Paid From The Medical Monitoring Fund

Apart from making clear that the NCAA may not be required to contribute any more to the Medical Monitoring Fund than the foregoing amount, the Settlement Agreement is equally clear that all costs of notice and Settlement administration are to be paid from the Medical Monitoring Fund:

> All Notice and Administrative Costs shall be paid from the Medical Monitoring Fund.

Second Am. Settlement Agt. (Dkt. #266-1) at § XI.A.7. (p.40); <u>see also id.</u> at § II.W (p.11). The costs associated with the service of subpoenas, however, are plainly a cost of Notice, and

---

[6] Section IV.A.7. is not germane to the issues raised in this motion. <u>See</u> Second Am. Settlement Agt. (Dkt. #266-1) at § IV.A.7. (p.23).

[7] As provided for in the Settlement Agreement, the NCAA already paid $5,000,000 into the Medical Monitoring Fund on July 26, 2016 to pay, <u>inter alia</u>, for the cost of implementing the Notice Plan. <u>See</u> Second Am. Settlement Agt. (Dkt. #266-1) at § IV(A)(1)(d) (pp.19-20).

[8] There is likewise no basis for suggesting that the payment of these costs out of the Medical Monitoring Fund will in any way, shape or form result in the Medical Monitoring Fund being insufficient to meet the needs of the members of the Settlement Class. <u>See</u> Deal Expert Rpt. (Dkt. #170); Mishkin Expert Rpt. (Dkt. #168-1).

7

accordingly, there is no justification for not using the Medical Monitoring Fund to pay them, as Plaintiffs and their counsel would otherwise now suggest.[9] See Pls.' Opp. (Dkt. #390) at 2-3.

### C. As An Accommodation, The NCAA Took Primary Responsibility For Preparing the Subpoenas That Were Issued

In negotiating the Settlement Agreement, the parties fully contemplated the possible need for the issuance of subpoenas to institutions that did not voluntarily provide contact information for members of the Settlement Class, and the Settlement Agreement makes clear that the responsibility for the issuance of the subpoenas would fall on the parties and not on only one party or its counsel: "If necessary, the Parties will issue subpoenas to obtain such names and addresses." Second Am. Settlement Agt. (Dkt. #266-1) at § XI.A.1. (p.39). Nevertheless, the NCAA and its counsel took the lead on this issue, and Plaintiffs and their counsel made no effort to assist nor did they offer any input or guidance as to how they believed the subpoenas should be served until long after the fact.[10] See Spellman Decl., Ex. A, at ¶ 12. Quite to the contrary,

---

[9] Class Counsel attempt to justify their insistence that the Medical Monitoring Fund not be used to pay these costs by arguing that the costs were not raised during the briefing on the Notice Administrator's additional administrative expenses and revisions of its April 2015 notice cost estimates. See Pls.' Opp. (Dkt. #390) at 1-2. On January 19, 2017, in response to a December 23, 2016 submission from the Notice Administrator on its incurred and projected expenses, the Court directed the parties to provide supplemental information on additional administrative expenses discussed in the Notice Administrator's submission. See Order (Dkt. #337). On March 3, 2017, the parties submitted a response that set forth detailed information on the Notice Administrator's additional expenses and explained revisions to the Notice Administrator's April 2015 notice cost estimates. See Pls.' Resp. to Order Requesting Suppl. Status Rpt. (Dkt. #365). The expenses discussed in that submission, however, were expressly limited to those incurred and projected by the Notice Administrator. See Christman Decl. (Dkt. #365-1). The Notice Administrator did not take responsibility for serving subpoenas on colleges and universities, and thus, those costs were not included in the Notice Administrator's declaration, as Class Counsel should have been aware. See id.

[10] Notably, the NCAA absorbed the fees and costs associated with the preparation and issuance of the subpoenas, but since the responsibility for the issuance of the subpoenas was to fall under the Settlement Agreement on "the Parties" and not only on one party, the NCAA could, of course, seek reimbursement for a portion of the fees and costs the NCAA incurred. The NCAA, however, is not seeking reimbursement for those fees and costs. It is nevertheless troubling that Plaintiffs and their counsel would try to turn the cooperation of the NCAA into a reason, excuse or opportunity to impose on the NCAA costs that the Settlement Agreement expressly provides should be paid out of the Medical Monitoring Fund. See Second Am. Settlement Agt. (Dkt. #266-1) at § XI.A.7. (p.40).

8

Plaintiffs and their counsel were quite content letting the NCAA bear the entire burden of preparing the subpoenas and seeing to it that they were promptly served.[11] See id. at ¶¶ 12-13.

### D. The Use Of Certified Mail In Lieu Of Personal Service Would Have Neither Been Appropriate Nor Feasible Under The Circumstances

Although they made no mention whatsoever of using certified mail while the NCAA and its counsel were preparing the subpoenas for issuance, Plaintiffs and their counsel now suggest that certified mail perhaps could have been used for some unspecified portion of the subpoenas issued in lieu of personal service. See Pls.' Opp. (Dkt. #390) at 2-3. That suggestion, however, while obviously belated, is also misguided for several different reasons. See disc. infra at 9-15.

#### 1. The Weight Of Relevant Authority Makes Clear That Personal Service Is Required Under Fed. R. Civ. P. 45

Both the language of Fed. R. Civ. P. 45 as well as the relevant case law make clear that the use of certified mail is by no means well-established. See disc. infra at 9-12.

##### a. The Language Of Fed. R. Civ. P. 45

In contrast to how the issue is portrayed in Plaintiffs' opposing memorandum, the question of whether it is ever proper to serve a subpoena by any means other than personal service is anything but clear. See generally Emesowum v. Zeldes, 2016 WL 3579232, at *10 (W.D. Tex. 2016) (finding that subpoenas served on nonparties were defective because "[s]ervice of a subpoena by certified mail is improper" and in violation of "Rule 45(b)'s personal service requirement"); Kenyon v. Simon & Schuster, 2016 WL 5930265, at *4 (S.D.N.Y. 2016) (holding that service by certified mail was defective based on "the weight of authority" in the Second Circuit); In re Miscellaneous Subpoenas, 2016 WL 4154889, at *3 (D.S.D. 2016)

---

[11] Needless to say, if Plaintiffs' counsel felt strongly about how the subpoenas were to be served, they could have and should have been more involved in the process, especially since the Settlement Agreement makes clear that all "Parties" are responsible for the service of the subpoenas. See Second Am. Settlement Agt. (Dkt. #266-1) at IX.A.1 (p.39).

9

(quashing subpoenas for defective service but describing an "emerging minority position" that permits service by means other than personal service, such as Federal Express).

The plain text of Fed. R. Civ. P. 45 would suggest the need to use a process server for personal service, since the subpoena must be served on "the named person" as opposed to leaving it at an address or placing it in a mailbox. See Fed. R. Civ. P. 45(b)(1) ("Serving a subpoena requires <u>delivering a copy to the named person</u> . . ."); see also 9A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2454 (3d ed. Jan. 2017 Supp.) ("The longstanding interpretation of Rule 45 has been that personal service of subpoenas is required. The use of the word 'delivering' in subdivision (b)(1) of the rule with reference to the person to be served has been construed literally. Under this construction, contrary to the practice with regard to the service of a summons and complaint, it is not sufficient to leave a copy of the subpoena at the dwelling place of the witness.").

The proof of service required by the plain language of Fed. R. Civ. P. 45 likewise suggests the need for personal service, since it must be "certified by the server," whereas a postcard signed by a person who received a letter by certified mail is plainly not such a statement. See Fed. R. Civ. P. 45(b)(4); see also, e.g. Special Mkts. Ins. Consultants v. Lynch, 2012 WL 1565348, at *1 n.1 (N.D. Ill. 2012) ("[T]he subpoenas were not properly served. The subpoenas were apparently only dropped in the mail with certified mail return receipt requested. . . . [FRCP] 45(b)(1) requires <u>delivering</u> a copy to the named person. Certified mail is not sufficient. Rule 45(b)(4) reinforces that conclusion. . . . The Proof of Service attached to the subpoenas in this case shows only that the attorney dropped the subpoenas in the mail. It does not show that he delivered them or when they were received.") (emphasis in original).

### b. Relevant Case Law

Pertinent case law fully reflects the foregoing. Numerous courts across the United States have concluded that personal service is required by Fed. R. Civ. P. 45, as the Seventh Circuit

10

itself noted in Ott. See Ott v. City of Milwaukee, 682 F.3d 552, 557 (7th Cir. 2012) ("Many courts have interpreted this language (and its predecessors before the 2007 restyling of the rules) literally to require nothing short of personal service."); see also, e.g., Bonnecaze v. Ezra & Sons, 2016 WL 1268339, at *4 (E.D. La. 2016) ("[T]he Fifth Circuit has interpreted Rule 45's requirement of service to be personal, therefore service by email or certified mail is invalid. As such, the Court finds that Defendants failed to satisfy Rule 45(b)'s personal service requirement."); Prescott v. Cty. of Stanislaus, 2012 WL 10617, at *3-4 (E.D. Cal. 2012) (holding based on Ninth Circuit precedent that a subpoena served by certified mail had not been properly served); Parker v. John Doe #1, 2002 WL 32107937, at *2 (E.D. Pa. 2002) ("Rule 45 requires personal service of subpoenas and, for that reason, Plaintiff's motion for leave to serve subpoenas by certified mail is denied."); McClendon v. TelOhio Credit Union, 2006 WL 2380601, at *2 (S.D. Ohio 2006) ("Rule 45(b)(1) requires personal service of subpoenas and does not permit service by certified mail."); In re Miscellaneous Subpoenas, 2016 WL 4154889, at *3 (holding that service of subpoena by Federal Express was defective); F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson, 636 F.2d 1300, 1312–13 (D.C. Cir. 1980) ("Federal Rule 45(c), governing subpoena service, does not permit any form of mail service, nor does it allow service of the subpoena merely by delivery to a witness' dwelling place."). Likewise, the fees charged by private process servers are properly taxable as costs under 28 U.S.C. § 1920, and the costs associated with the personal service of subpoenas are routinely awarded by courts around the country. See, e.g., Collins v. Gorman, 96 F.3d 1057, 1058-60 (7th Cir. 1996) ("These days solvent litigants use private process servers" and "we think it best to . . . permit[] the prevailing party to recover service costs that do not exceed the marshal's fees, no matter who actually effected service."); Lopez v. Cook, 2016 WL 7384021, at *6 (E.D. Cal. 2016) ("The Ninth Circuit Court of Appeals has held private process servers' fees can be taxed as costs under

11

section 1920(1) . . . That private parties incurred fees instead of federal marshals does not preclude reimbursement because, as the court noted, private parties have largely taken on the responsibility of serving summons and subpoenas.").

Significantly, even in jurisdictions that permit service by certified mail, courts often require beforehand "a diligent attempt to personally serve the commanded person." Kenyon v. Simon & Schuster, 2016 WL 5930265, at *4 (S.D.N.Y. 2016) (holding that movant's "failure to first attempt personal service and her failure to seek leave to serve by alternative means before mailing the subpoena [using certified mail] renders her service defective"). Accord Toni Brattin & Co. v. Mosaic Int'l, 2015 WL 1844056, at *4 (N.D. Cal. 2015) (granting party leave to serve subpoenas using first-class mail or overnight service only after multiple failed attempts to serve using process server); Cartier v. Geneve Collections, 2008 WL 552855, at *1 (E.D.N.Y. 2008) (rejecting Plaintiff's request to serve subpoenas using certified mail because Plaintiff had not "diligently to attempted to [sic] effectuate personal service and presented proof that [service by certified mail would provide] sufficient notice [to the nonparty]").[12] Accordingly, personal service is required in many jurisdictions throughout the United States. See disc. supra at 9-12.

### 2. Plaintiffs And Their Counsel Ignore The Relevant Choice Of Law Considerations

Moreover, Plaintiffs and their counsel ignore applicable choice of law principles in relying in their opposing memorandum entirely on one Seventh Circuit decision and one decision from Judge Der-Yeghiayan in arguing that certified mail would have sufficed for the subpoenas that were served in 48 different states, the District of Columbia and Puerto Rico. See Pls.' Opp. (Dkt. #390) at 2-3; see also Spellman Decl., Ex. A, at 14. The member institutions of the NCAA are, of course, scattered throughout the United States, and the applicable law with respect to the

---

[12] In those few jurisdictions that allow the use of certified mail after unsuccessful attempts at personal service, however, the NCAA would have had to attempt personal service before attempting to serve by certified mail, which would have only added to the cost and delay.

12

quashing of a subpoena is the law of the jurisdiction where the target of the subpoena resides or is domiciled and not the law of the jurisdiction where the issuing court is located. See Fed. R. Civ. P. 45(c); Kenyon, 2016 WL 5930265, at *3-4 (citing Southern District of New York law and holding that service of subpoena by certified mail on a nonparty in New York was defective where underlying lawsuit was pending in federal court in Tennessee); In re Miscellaneous Subpoenas, 2016 WL 4154889, at *1-3 (citing Eighth Circuit law and holding that service of subpoena by Federal Express on a nonparty in South Dakota was defective where underlying lawsuit was pending in in federal court in Virginia); Friedberg v. Madison Realty Invs., 2016 WL 1562948, *1-2 (S.D. Ohio 2016) (citing Southern District of Ohio law in discussing whether a subpoena issued to a nonparty in Ohio was properly served where underlying lawsuit was pending in New Jersey federal bankruptcy court); see also Tresona Multimedia v. Legg, 2015 WL 4911093, at *2-3 (N.D. Ill. 2015) (citing Seventh Circuit law in discussing whether a subpoena issued to a nonparty in Illinois placed an undue burden on nonparty where underlying lawsuit was pending in Arizona); Petka v. Mylan Pharm., 2016 WL 6947589, *2-3 (N.D. Cal. 2016) (citing Ninth Circuit law in discussing whether a subpoena issued to a nonparty in California sought relevant discovery where underlying lawsuit was pending in New Jersey).

Accordingly, even if the law in the Northern District of Illinois and the Seventh Circuit were as clear as Plaintiffs and their counsel suggest (and it is not), that would only address a small fraction of the subpoenas that were actually served, since the vast majority were served outside this district and circuit.[13] See Spellman Decl., Ex. A, at ¶ 10. It was precisely because of

---

[13] In fact, in a case decided approximately one year after Ott and cited in a letter containing subpoena objections sent to Class Counsel, another court in the Northern District of Illinois stated that "[s]ervice via certified mail is not sufficient under Rule 45." Parker v. Four Seasons Hotels, 291 F.R.D. 181, 188 (N.D. Ill. 2013); see also Spellman Decl., Ex. A, at ¶ 14.

13

these variations in applicable law, however, that personal service was all the more appropriate in this circumstance. See disc. supra at 11-12.

It was simply not practical to research whether service by certified mail was permissible in every jurisdiction in which the 385 subpoenas were to be served, particularly given the interest of the parties and the Court in serving subpoenas and obtaining contact information as soon as possible. See Nov. 30, 2016 Hr'g Tr. (Dkt. #318) at 11:13-23 (NCAA counsel proposing that the NCAA would send a final communication to member institutions "advising those remaining institutions that they either need to get their data to the notice administrator, or we're going to have to issue a subpoena. And then put a very short fuse on that with the issuance of those subpoenas in early December to the remaining institutions for which we don't have data."); see also id. at 12:8-9 ("The Court: Okay. Alright. That approach seems fine to me."). Indeed, district courts may take different views as to the permissibility of service by certified mail even within particular districts and circuits. See, e.g., Friedberg, 2016 WL 1562948, at *2 (noting split among district courts within the Sixth Circuit regarding whether service by certified mail constitutes proper service). In sum, the NCAA's use of a process server -- a universally accepted method of effecting service -- was reasonable and designed to minimize the risk of objections based on improper service, which would have only further delayed the acquisition of contact information and thus risked delaying the schedule set forth in the Court's July 15, 2016 Preliminary Approval Order.[14]

---

[14] Furthermore, if no one was available to sign the return receipt card when the United States Postal Service attempted delivery, the mail carrier would have left a notice of delivery attempt, informing the institution that a certified mail letter was being held at the local post office. If no one came to the post office to claim the subpoena within 15 business days, however, the subpoena would have been returned. As subpoenas were being issued over the holidays, this was a real risk.

### 3. The Potential For Motions To Quash Was By No Means An Academic Concern

As noted, the NCAA served the vast majority of institutions that had affirmatively requested subpoenas by other means on the assumption that they would be willing to accept the service of a subpoena without insisting on personal service.  See Spellman Decl., Ex. A, at ¶¶ 5-11.  No sooner did the NCAA do that, however, than it received objections and demands that personal service be made.  See id. at ¶ 5.  Accordingly, the experience of the NCAA in attempting to use means other than personal service was a further reason why personal service was necessary for those institutions that had not indicated they would accept service.  See id. at ¶¶ 5-11.

### IV. CONCLUSION

WHEREFORE, the NCAA respectfully requests that the Court approve payment of settlement expenses from the Medical Monitoring Fund totaling $131,323.15 for the service of the subpoenas addressed in the initial motion.  The NCAA further requests whatever other relief the Court deems appropriate.

Dated: April 10, 2017

Respectfully submitted,

*/s/ Johanna M. Spellman*
Liaison Counsel for Defendant
National Collegiate Athletic Association

Mark S. Mester
   mark.mester@lw.com
Johanna Spellman
   johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois, 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

15

## CERTIFICATE OF SERVICE

I, Johanna M. Spellman, certify that on April 10, 2017, a true and correct copy of the forgoing REPLY IN FURTHER SUPPORT OF THE NCAA'S MOTION FOR THE PAYMENT OF SETTLEMENT EXPENSES was filed through the CM/ECF system, which caused notice to be sent to all counsel of record.

*/s/ Johanna M. Spellman*
Johanna M. Spellman
  johanna.spellman@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois, 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767