UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION STUDENT-
ATHLETE CONCUSSION LITIGATION

MDL No. 2492

Master Docket No. 13-cv-09116

Judge John Z. Lee

**STATEMENT OF OBJECTION OF SAMANTHA GREIBER,
ON BEHALF OF A PUTATIVE SUBCLASS OF WOMEN LACROSSE PLAYERS,
TO AMENDED SETTLEMENT AGREEMENT**

## **TABLE OF CONTENTS**

I.     Ms. Grieber Represents a Putative Subclass of Women Lacrosse Players Whose Unique Circumstances the Amended Settlement Agreement Fails to Address ............................................................................................................... 1

II.    Objectors Have an Important Role in the Settlement Process ........................... 2

III.   Summary of The Objection ................................................................................ 3

IV.   The NCAA Has Had Extensive Knowledge of the Unique Vulnerability of Women Lacrosse Players and the Means to Minimize Injury to Them ............ 6

     A.    The NCAA Had Extensive Superior Knowledge of the Heightened Risk for Student-Athletes to Suffer Concussions While Playing Women's Lacrosse ............................................................................. 7

     B.    The NCAA Had Extensive Superior Knowledge that Female Athletes in General are at Enhanced Risk of Sustaining Concussions While Playing Collegiate Sports ................................................................. 9

     C.    The NCAA Had Extensive Superior Knowledge that Protective Helmets Reduce the Risk of Concussions ............................................ 10

V.    The NCAA Controls the Rules of the Game and, Thus, Has the Exclusive Ability and Obligation to Protect Women Lacrosse Players ............................ 15

VI.   Ms. Grieber, Like Other Women Lacrosse Players in the Putative Subclass, Sustained Serious Injuries that Could Have Been Avoided or Minimized Had the NCAA Permitted the Use of Protective Helmets ............................... 16

VII.  Any Settlement Should Require the NCAA to Perform Its Contractual Undertaking and Protect Women's Lacrosse Players ..................................... 18

VIII. The Proceedings Before this Court Have Made It Apparent That Class Representatives from Other Sports Cannot Adequately Represent the Interests of Women Lacrosse Players ................................................................ 22

IX.   The Amended Settlement Agreement Cannot Satisfy the Requirements of Rule 23 in the Absence of a Subclass of Women Lacrosse Players ............... 25

     A.    Rule 23(a)(3): The Representative Parties' Claims are Not Typical of the Claims of Women Lacrosse Players ............................................ 26

i

B.    Rule 23(a)(4): The Class Representatives Did Not Fairly and Adequately Protect the Interests of Women Lacrosse Players ............................ 27

C.    Rule 23(b)(2): The NCAA's Actions Relating to Women Lacrosse Players Do Not Apply Generally to the Class ....................................................... 28

X.    The Amended Settlement Agreement Is Not Fair, Reasonable or Adequate For Women Lacrosse Players .................................................................................... 29

XI.   Conclusion............................ .................................................................................. 30

## TABLE OF AUTHORITIES

### CASES

*Alliance .to End Repression v. City of Chicago,*
91 F.R.D. 182 (N.D. Ill. 1981)..................................................................................29

*Amchem Prod., Inc. v. Windsor,*
521 U.S. 591, 117 S. Ct. 2231 (1997).....................................................................27

*Armstrong v. Bd. of Sch. Directors of City of Milwaukee,*
616 F.2d 305 (7th Cir. 1980), *overruled on other grounds by,*
*Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998) ..............................................2

*CE Design Ltd. v. King Architectural Metals, Inc.,*
637 F.3d 721, 724 (7th Cir. 2011) ...........................................................................26

*Balderrama-Baca v. Clarence Davids & Co.,*
318 F.R.D. 603 (N.D. Ill. 2017)........................................................................25, 28

*De La Fuente v. Stokely-Van Camp, Inc.,*
713 F.2d 225 (7th Cir. 1983) ....................................................................................26

*Handschu v. Special Servs. Div.,*
605 F. Supp. 1384 (S.D.N.Y. 1985),
*aff'd,* 787 F.2d 828 (2nd Cir. 1986)........................................................................29

*In re AT & T Mobility Wireless Data Servs. Sales Litig.,*
270 F.R.D. 330 (N.D. Ill. 2010)..........................................................................2, 27

*In re Gen. Motors Corp. Engine Interchange Litig.,*
594 F.2d 1106 (7th Cir. 1979) ..................................................................................26

*In re Mex. Money Transfer Litig.,*
164 F. Supp.2d 1002 (N.D. Ill. 2000) ........................................................................2

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.,*
314 F.R.D. 580 (N.D. Ill. 2016)...........................................................22, 25-26, 28

*In re: Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.,*
2016 WL 3854603 (N.D. Ill. July 15, 2016) ...........................................................5

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.,*
2014 WL 7237208 (N.D. Ill. Dec. 17, 2014)............................................5-6, 21-22, 24-25

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
    148 F.3d 283 (3rd Cir. 1998) .................................................................. 26-27

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1996) ........................................................................29

*Johnson v. Meriter Health Servs. Employee Ret. Plan,*
    702 F.3d 364 (7th Cir. 2012) ........................................................................28

*McDaniel v. Bd. of Educ. of City of Chicago,*
    2013 WL 4047989 (N.D. Ill. Aug. 9, 2013) ...........................................27, 28

*Gates v. Rohm & Haas Co.,*
    248 F.R.D. 434 (E.D. Pa. 2008)....................................................................26

*Reynolds v. Beneficial Nat. Bank,*
    288 F.3d 277 (7th Cir. 2002) .........................................................................2

*Rosario v. Livaditis,*
    963 F.2d 1013 (7th Cir. 1992) ......................................................................26

*Ruiz v. Stewart Assocs., Inc.,*
    167 F.R.D. 402 (N.D. Ill. 1996).....................................................................26

*Sec'y of Labor v. Fitzsimmons,*
    805 F.2d 682 (7th Cir. 1986) ........................................................................27

*Smith v. Family Video Movie Club, Inc.,*
    311 F.R.D. 469 (N.D. Ill. 2015)....................................................................25

*Swan ex rel. I.O. v. Bd. of Educ. of City of Chicago,*
    2013 WL 4047734 (N.D. Ill. Aug. 9, 2013) .................................................25

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) .....................................................................2, 29

<u>STATUTES AND RULES</u>

Fed. R. Civ. P. 23.................................................................................... 1, 22, 25-28

## LIST OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | NCAA Health and Safety Page, http://www.ncaa.org/health-and-safety |
| 2 | United States. Cong. Senate. Committee on Commerce, Science and Transportation. Promoting the Well-Being and Academic Success of College Athletes July. 9, 2014. Washington: GPO, 2014 (statement of Mark Emmert, President, National Collegiate Athletic Association) |
| 3 | Affidavit of Samantha Greiber |
| 4 | Excerpts from NCAA Women's Lacrosse Rules, 2016-2017 |
| 5 | Excerpts from NCAA Men's Lacrosse Rules, 2017-2018 |
| 6 | Clark, Michio J., and T. B. Hoshizaki. "The Ability of Men's Lacrosse Helmets to Reduce the Dynamic Impact Response for Different Striking Techniques in Women's Field Lacrosse." *The American Journal of Sports Medicine*, vol. 44, no. 4, 2016, pp. 1047 |
| 7 | Hootman, Jennifer M., Randall Dick, and Julie Agel. "Epidemiology of Collegiate Injuries for 15 Sports: Summary and Recommendations for Injury Prevention Initiatives." *Journal of Athletic Training*, vol. 42, no. 2, 2007, pp. 311 |
| 8 | Dick, "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Surveillance System," Head and Neck Injuries in Sports, ASTM STP 1229 Earl F Hoerner, Ed , American Society for Testing and Materials, Philadelphia, 1994 |
| 9 | Diamond, Paul T., and S. D. Gale. "Head Injuries in Men's and Women's Lacrosse: A 10 Year Analysis of the NEISS Database. National Electronic Injury Surveillance System." *Brain Injury*, vol. 15, no. 6, 2001, pp. 537 |
| 10 | Covassin, Swanik, and Sachs. "Epidemiological Considerations of Concussions among Intercollegiate Athletes." *Applied Neuropsychology*, vol. 10, no. 1, 2003, pp. 12-22 |
| 11 | Lincoln, Hinton, Almquist, Lager and Dick. "Head, Face, and Eye Injuries in Scholastic and Collegiate Lacrosse." *The American Journal of Sports Medicine*, vol. 35, no. 2, 2007, pp. 207-215 |
| 12 | Marshall, Stephen W., et al. "Epidemiology of Sports-Related Concussion in Seven US High School and Collegiate Sports." *Injury Epidemiology*, vol. 2, no. 1, 2015, pp. 1-10 |

13    Covassin, Swanik, and Sachs. "Sex Differences and the Incidence of Concussions among Collegiate Athletes." *Journal of Athletic Training*, vol. 38, no. 3, 2003, pp. 238

14    Dick,, et al. "Concussion Rates and Gender in NCAA Competitions: 1513." *Medicine & Science in Sports & Exercise*, vol. 40, no. Supplement, 2008, pp. S231

15    Dick, "Is there a Gender Difference in Concussion Incidence and Outcomes?" *British Journal of Sports Medicine*, vol. 43 Suppl 1, 2009, pp. i46-i50

16    Broshek, et al. "Sex Differences in Outcome Following Sports-Related Concussion." *Journal of Neurosurgery*, vol. 102, no. 5, 2005, pp. 856-863

17    Covassin, and. Elbin. "The Female Athlete: The Role of Gender in the Assessment and Management of Sport-Related Concussion." *Clinics in Sports Medicine*, vol. 30, no. 1, 2011, pp. 125-131

18    Covassin, et al. "The Role of Age and Sex in Symptoms, Neurocognitive Performance, and Postural Stability in Athletes After Concussion." *The American Journal of Sports Medicine*, vol. 40, no. 6, 2012, pp. 1303-1312

19    Covassin, et al. "The Management of Sport-Related Concussion: Considerations for Male and Female Athletes." *Translational Stroke Research*, vol. 4, no. 4, 2013, pp. 420

20    Kostyun, and Hafeez. "Protracted Recovery from a Concussion: A Focus on Gender and Treatment Interventions in an Adolescent Population." *Sports Health: A Multidisciplinary Approach*, vol. 7, no. 1, 2014, pp. 52-57

21    King, "A Systematic Review of Age and Gender Factors in Prolonged Post-Concussion Symptoms After Mild Head Injury." *Brain Injury*, vol. 28, no. 13-14, 2014, pp. 1639-1645

22    Sandel, et al. "Sex-Based Differences in Cognitive Deficits and Symptom Reporting Among Acutely Concussed Adolescent Lacrosse and Soccer Players." *The American Journal of Sports Medicine*, vol. 45, no. 4, 2016, pp. 937-944

23    Dick, Randall W. et al. "Descriptive Epidemiology of Collegiate Women's Lacrosse Injuries: National Collegiate Athletic Association Injury Surveillance System, 1988–1989 Through 2003–2004." *Journal of Athletic Training*, vol. 42, no. 2, 2007, pp. 262–269

24    Rodowicz, Olberding and Rau. "Head Injury Potential and the Effectiveness of Headgear in Women's Lacrosse." *Annals of Biomedical Engineering*, vol. 43, no. 4, 2014, pp. 949

| 25 | Crisco, et al. "Surrogate Headform Accelerations Associated with Stick Checks in Girls' Lacrosse." *Journal of Applied Biomechanics*, vol. 31, no. 2, 2015, pp. 122-127 |
| 26 | Excerpts from June 2015 AMA resolutions and June 2015 AMA Reference Committee Reports |
| 27 | Report of the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports, December 13 – 15, 2015 |
| 28 | US Lacrosse 2017 Headgear Clarification |
| 29 | Cascade Releases Its First Women's Headgear, the LX." *Inside Lacrosse*, October 28, 2016 |
| 30 | Hummingbird Flies into Lacrosse Industry with Headgear, USLacrosse Magazine, December 7, 2016 |
| 31 | Excerpts from NCAA Constitution |
| 32 | Benefits to College Student-Athletes." *The Official Site of the NCAA*, www.ncaa.org/student-athletes/benefits-college-student-athletes. |
| 33 | Dick, Agel and Marshall, "National Collegiate Athletic Association Injury Surveillance System Commentaries: Introduction and Methods," *Journal of Athletic Training,* Vol. 42, No. 2, 2007, pp. 173-182 |

Samantha Greiber ("Ms. Greiber"), by her undersigned counsel, pursuant to Fed. R. Civ. P. 23(e) and the Court's Preliminary Approval Order (ECF No. 278), as amended by the Court's August 1, 2017 Minute Entry (ECF No. 432), objects on behalf of a putative subclass of Women Lacrosse Players (defined below) to the Second Amended Class Action Settlement Agreement and Release dated May 20, 2016 ("Amended Settlement"), as not fair, reasonable or adequate as applied to Women Lacrosse Players. The Amended Settlement would release their claims for injunctive relief ordering Defendant National Collegiate Athletic Association ("the NCAA") to implement a necessary, rational, academically-supported and easily accomplished amendment of the NCAA Women's Lacrosse Rules to require Women Lacrosse Players, like men, to wear protective helmets to minimize head injuries and concussions or, alternatively, to promote and educate Women Lacrosse Players about the important benefits of such helmets. Injunctive relief encompassing these objectives was sought in the Fourth Amended Class Action Complaint ("Complaint" or "Compl."), but approval of the Amended Settlement would release such claims and leave young women vulnerable to precisely the type of concussions and head injuries that are the subject of the Complaint. The grounds for the Objection are set forth more fully below.

## I. Ms. Grieber Represents a Putative Subclass of Women Lacrosse Players Whose Unique Circumstances the Amended Settlement Agreement Fails to Address

Ms. Greiber is a former NCAA student athlete who was recruited by Hofstra University ("Hofstra") and provided an athletic scholarship to play NCAA Division I lacrosse for Hofstra. Ms. Greiber played NCAA Division I lacrosse for Hofstra from 2010-2014. As such, Ms. Greiber is a member of the Settlement Class and the Contact Sports Subclass.[1]

---

[1] Ms. Greiber first received notice of this action when she received the Notice of Proposed Settlement in January 2017. Ms. Greiber will appear at the Fairness Hearing through the undersigned counsel, and also expects to appear at the Fairness Hearing in person.

Ms. Greiber is also a member of a putative subclass of women who played NCAA women's lacrosse during the period covered by the Complaint, referred to herein as "Women Lacrosse Players." Ms. Greiber recognizes the extensive and deliberate, phased process that the Court and counsel have undertaken in an effort to satisfy class action standards and construct a settlement that is fair, reasonable and adequate for all class members. While that process addressed numerous concerns, Ms. Greiber respectfully submits that, as demonstrated more fully below, the proposed Amended Settlement falls short with respect to Women Lacrosse Players.

## II.    <u>Objectors Have an Important Role in the Settlement Process</u>

The role of objectors in class action litigation is important because "[i]t is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 288 (7th Cir. 2002). Accordingly, class members must be given an opportunity to object and be heard. *In re AT & T Mobility Wireless Data Servs. Sales Litig.,* 270 F.R.D. 330, 351 (N.D. Ill. 2010); *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1032-33 (N.D. Ill. 2000).

A court may approve a class action settlement only if the "class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds,* 288 F.3d at 279; *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 652 (7th Cir. 2006). The Seventh Circuit has "gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Reynolds,* 288 F.3d at 280. A court must give particular scrutiny where "those whose rights are affected by a class action settlement" were "not involved in its negotiation nor are they present to voice their views in court." *Armstrong v. Bd. of Sch. Directors of City of Milwaukee,* 616 F.2d 305, 313 (7th Cir. 1980), *overruled on other grounds, Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

2

### III.    Summary of the Objection

Women Lacrosse Players represent a unique and atypical subclass. Data from NCAA studies and its Injury Surveillance System, as well as from other academic sources well known to the NCAA, establish that the incidence of concussion for Women Lacrosse Players is consistently among the highest of any NCAA sport. Additional studies demonstrate an enhanced risk of concussion posed to female athletes in general. As such, concussions and head injuries represent a particularly predictable and foreseeable risk of harm for Women Lacrosse Players.

The NCAA has undertaken a duty and contractually obligated itself to protect the health and safety of its student-athletes. "In 1906, the NCAA was founded to keep college athletes safe."[2] The NCAA still projects itself as the protector of student-athletes. In testimony before a United States Senate Committee on July 9, 2014, NCAA Executive Director Mark Emmert assured Congress: "I will unequivocally state we have a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[3] It was, and is, reasonable for student-athletes such as Ms. Greiber to believe that the NCAA meant what it represented to the United States Senate and to rely upon the NCAA to follow through upon such promises. Yet, the NCAA has strikingly failed to protect Women Lacrosse Players and has discriminated against them.

Ms. Greiber sustained concussions twice while participating in lacrosse practices at Hofstra, causing permanent injuries. Ms. Greiber desired to wear a protective helmet that would have protected her from, or minimized, the injuries she sustained.[4] However, the NCAA Women's Lacrosse Rules made it "ILLEGAL" for her to do so.

---

[2] http://www.ncaa.org/health-and-safety, attached hereto as Exhibit 1.
[3] United States. Cong. Senate. Committee on Commerce, Science and Transportation. Promoting the Well-Being and Academic Success of College Athletes July. 9, 2014. Washington: GPO, 2014 (statement of Mark Emmert, President, National Collegiate Athletic Association), attached hereto as Exhibit 2.
[4] Affidavit of Samantha Greiber, attached hereto as Exhibit 3.

3

When this action was filed and while settlement discussions were pursued, the NCAA continued to make it "ILLEGAL" for Women Lacrosse Players to wear protective helmets during NCAA lacrosse games and practices. A Rule change and comment finally implemented effective January 1, 2017, is ambiguous and still reflects a bias against helmets, suggesting in the first instance that it is "ILLEGAL" for Women Lacrosse Players to wear a protective helmet in games or in practice.[5] More recently, despite the advent of helmets that offer protection to Women Lacrosse Players, the NCAA has taken no action, and the Amended Settlement Agreement does not require the NCAA, to amend the Women's Lacrosse Rules to mandate the use of such helmets.

The NCAA knows – and has available to it multiple studies and academic articles, some of which it sponsored, demonstrating – that the best available means to prevent student-athlete lacrosse players from suffering concussions is to require them to wear protective helmets, as it does for its male lacrosse players.[6] The NCAA has an obligation to protect Women Lacrosse Players in a similar fashion. Minimally, it must educate NCAA institutions, coaches and Women Lacrosse Players about the available helmets and promote them, including by eliminating any ambiguity or bias against them in the Women's Lacrosse Rules. As academic studies have noted, concussions and other head injuries in women's lacrosse could be reduced, as one study put it, "by having governing bodies improving rules, implementing the use of helmets, or both."[7]

The Complaint properly alleged, based upon overwhelming evidence, that the NCAA acted in breach of its contractual obligations and negligently by "failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries

---

[5] Excerpts from NCAA Women's Lacrosse Rules, 2016-2017, attached hereto as Exhibit 4.

[6] A male lacrosse player "*shall* wear a protective helmet." Excerpts from NCAA Men's Lacrosse Rules, 2017-2018, attached hereto as Exhibit 5.

[7] Clark, Michio J., and T. B. Hoshizaki. "The Ability of Men's Lacrosse Helmets to Reduce the Dynamic Impact Response for Different Striking Techniques in Women's Field Lacrosse." *The American Journal of Sports Medicine*, vol. 44, no. 4, 2016, pp. 1047, attached hereto as Exhibit 6.

or concussions." Compl., ¶¶ 320, 325, 332, 343 and 355. Accordingly, the Complaint properly requested injunctive relief that included "the implementation and/or enforcement of game rules of play and practice designed to minimize, or that would have the effect of minimizing, head injuries or concussions." Compl., pp. 103-04, Request for Relief, ¶ C.7

The Amended Settlement Agreement and Preliminary Approval Order, however, do not provide for the certification of a subclass for Women Lacrosse Players. *See* Amended Settlement Agreement, Section III; Preliminary Approval Order, Section A. Because the specific interests of this vulnerable putative subclass went unaddressed, the Amended Settlement Agreement did not require the NCAA to amend the NCAA Women's Lacrosse Rules to require Women Lacrosse Players to wear protective helmets that would minimize head injuries and concussions or to undertake efforts to promote such helmets to student-athletes or to NCAA institutions and coaches.

Notably, in analyzing other aspects of the proposed settlement, the parties and the Court recognized that "the NCAA typically has promulgated safety rules to prevent and mitigate concussions on a sport-by-sport basis" and its committees "generally address health and safety issues on a sport-by-sport basis." *In re: Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.,* 2016 WL 3854603, at *4 (N.D. Ill. July 15, 2016). Those same factors, as we demonstrate more fully below, require that a subclass of Women Lacrosse Players be certified to acknowledge and address the particular and unique circumstances that they face and provide the predicate remedy that they require. Not only is there no indication that settlement discussions addressed the issue of a Rule change to require helmets in women's lacrosse, but – even after the Court indicated a concern that class representatives as a group must adequately represent the "continuum" of the risk of suffering a concussion across different NCAA-sanctioned sports, *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 2014 WL 7237208, at *6

5

(N.D. Ill. Dec. 17, 2014) – no class representative was established for Women Lacrosse Players.

Final approval of the Amended Settlement would release the NCAA from any claims that the putative subclass of Women Lacrosse Players has to require the NCAA to amend the Women's Lacrosse Rules to require Women Lacrosse Players to wear protective helmets and thereby minimize head injuries and concussions or otherwise remove from the Rules any ambiguity or bias against protective helmets.. Amended Settlement Agreement (ECF No. 266-1), §§ II.QQ and RR; XII.F.a-c; XV.A.7, 8, 10 and 12; and XV.B. If the Amended Settlement is approved without affording Women Lacrosse Players the ability to pursue such a remedy against the NCAA, this group will remain vulnerable to precisely those harms that the Complaint purports to address.

Accordingly, Ms. Greiber makes this Objection to the Amended Settlement on behalf of a putative subclass of Women Lacrosse Players. To provide an adequate remedy for those vulnerable women, the Court should reject any settlement that does not certify a subclass of Women Lacrosse Players and provide an additional period of time for the negotiation of an undertaking by the NCAA, by a date certain, either to amend the NCAA Women's Lacrosse Rules to require Women Lacrosse Players to wear protective helmets; remove from the Rules any ambiguity or bias against protective helmets; or, minimally, to educate Women Lacrosse Players and NCAA institutions and women's lacrosse coaches about the availability and benefits of protective helmets for Women Lacrosse Players so that they may make informed choices.

### IV. The NCAA Has Had Extensive Knowledge of the Unique Vulnerability of Women Lacrosse Players and the Means to Minimize Injury to Them

While comprehensive in many respects, the Complaint falls short in addressing the extensive superior knowledge that the NCAA had about the particular vulnerability of Women

Lacrosse Players to head injuries and concussions. That is set forth below.[8]

### A. The NCAA Had Extensive Superior Knowledge of the Heightened Risk for Student-Athletes to Suffer Concussions While Playing Women's Lacrosse

In 1994, Randall W. Dick, who has served as Assistant Director of Sports Science and/or Associate Director of Research /Injury Surveillance System at the NCAA, authored an article reporting that women sustained concussions in women's lacrosse at a higher percentage (as a percentage of all reported injuries) than players in any other sport with no head protection.[9] The article noted that "most would agree that protective helmets reduce head injuries in the sports in which they are worn," and that "the effectiveness of a mandatory helmet rule in women's lacrosse could be monitored by comparing injury data collected following the rule implementation with the data reported here." *Id.*

In 2000, an article analyzing 10 years of National Electronic Injury Surveillance System data of lacrosse-related injuries observed: "Although protective headgear is required in men's lacrosse, women's lacrosse is viewed as non-contact, and use of helmets and faceguards is prohibited. Yet, women remain at risk for injury to the head and face region from contact with the ball and stick."[10] The authors noted that data from the NCAA Injury Surveillance System "has demonstrated higher rates of injury to the head and face in collegiate women lacrosse players when

---

[8] Much of the data discussed below is from the NCAA's own Injury Surveillance System that is maintained so as to "identify potential modifiable risk factors to target for injury prevention initiatives." Hootman, Jennifer M., Randall Dick, and Julie Agel. "Epidemiology of Collegiate Injuries for 15 Sports: Summary and Recommendations for Injury Prevention Initiatives." *Journal of Athletic Training*, vol. 42, no. 2, 2007, pp. 311, attached hereto as Exhibit 7. *See also* Exhibits 11, 23 and 33, all addressed below.

[9] Dick, "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Surveillance System," Head and Neck Injuries in Sports, ASTM STP 1229 Earl F Hoerner, Ed, American Society for Testing and Materials, Philadelphia, 1994, attached hereto as Exhibit 8.

[10] Diamond, Paul T., and S. D. Gale. "Head Injuries in Men's and Women's Lacrosse: A 10 Year Analysis of the NEISS Database. National Electronic Injury Surveillance System." *Brain Injury*, vol. 15, no. 6, 2001, pp. 537, attached hereto as Exhibit 9.

compared to men." *Id.* The authors noted that "[t]he results of this study support the use of protective headgear in both women's and youth lacrosse, despite the rules limiting player-player contact." *Id.* Their final conclusion: ***"Women and children lacrosse players are at risk for serious injury to the head and face region. The use of protective head/face gear should be encouraged."*** *Id.* (emphasis added).

A 2003 study determined that, during the examined period of time, ***"women lacrosse players (13.9%) reported the highest percentage of suffering a concussion during a game."***[11] (Emphasis added). The authors observed that determining concussion risk was "important for future advances by the National Collegiate Athletic Association (NCAA) Committee on Competitive Safeguards and Medical Aspects of Sports so they can make changes as needed." *Id.*

In 2007, Mr. Dick and other researchers published an epidemiological study of over 1 million athletic exposures in high school and college men's and women's lacrosse over four seasons.[12] The NCAA had a prominent role in this study. The authors noted that head, face and eye (HFE) injuries "constitute a substantially larger percentage of injuries in women's games than in men's games." In their "Conclusion," the authors observed: ***The women's game, although not allowing physical contact, has higher rates of HFE injuries, most likely because of the lack of any required head/face protection other than a mouth guard."*** *Id.* (emphasis added).

In 2015, a Centers for Disease Control and Prevention-funded study found that the incidence of concussions in women's lacrosse was second only to football.[13]

---

[11] Covassin, Swanik, and Sachs. "Epidemiological Considerations of Concussions among Intercollegiate Athletes." *Applied Neuropsychology*, vol. 10, no. 1, 2003, pp. 12-22, attached hereto as Exhibit 10.
[12] Lincoln, Hinton, Almquist, Lager and Dick. "Head, Face, and Eye Injuries in Scholastic and Collegiate Lacrosse." *The American Journal of Sports Medicine*, vol. 35, no. 2, 2007, pp. 207-215, attached hereto as Exhibit 11.
[13] Marshall, Stephen W., et al. "Epidemiology of Sports-Related Concussion in Seven US High School and Collegiate Sports." *Injury Epidemiology*, vol. 2, no. 1, 2015, pp. 1-10, attached hereto as Exhibit 12.

8

**B.** **The NCAA Had Extensive Superior Knowledge that Female Athletes in General are at Enhanced Risk of Sustaining Concussions While Playing Collegiate Sports**

Beginning as early as 2003, studies appeared in the medical literature suggesting that female college athletes are at greater risk for concussion than male athletes. For example, a 2003 article entitled "Sex Differences and the Incidence of Concussions Among Collegiate Athletes" observed that ***"women's lacrosse had the highest inherent risk of sustaining a concussion during a game situation."*** [14] In its "Conclusions," the authors observed: "female athletes were found to be at greater risk for suffering a concussion during games than male athletes." *Id.*

A parade of articles over the ensuing years reached similar conclusions. Two of those articles were by Mr. Dick. [15, 16] The "Conclusions" of the latter article were: "after evaluating multiple years of concussion data in comparable sports, the evidence indicates that female athletes may be at greater risk for concussion than their male counterparts. There also is some evidence that gender differences exist in outcomes of traumatic brain injury and concussions." *Id.* [17]

---

[14] Covassin, Swanik, and Sachs. "Sex Differences and the Incidence of Concussions among Collegiate Athletes." *Journal of Athletic Training*, vol. 38, no. 3, 2003, pp. 238, attached hereto as Exhibit 13.

[15] Dick,, et al. "Concussion Rates and Gender in NCAA Competitions: 1513." *Medicine & Science in Sports & Exercise*, vol. 40, no. Supplement, 2008, pp. S231, attached hereto as Exhibit 14.

[16] Dick, "Is there a Gender Difference in Concussion Incidence and Outcomes?" *British Journal of Sports Medicine*, vol. 43 Suppl 1, 2009, pp. i46-i50, attached hereto as Exhibit 15.

[17] *See also* Broshek, et al. "Sex Differences in Outcome Following Sports-Related Concussion." *Journal of Neurosurgery*, vol. 102, no. 5, 2005, pp. 856-863, attached hereto as Exhibit 16; Covassin, and. Elbin. "The Female Athlete: The Role of Gender in the Assessment and Management of Sport-Related Concussion." *Clinics in Sports Medicine*, vol. 30, no. 1, 2011, pp. 125-131, attached hereto as Exhibit 17; Covassin, et al. "The Role of Age and Sex in Symptoms, Neurocognitive Performance, and Postural Stability in Athletes After Concussion." *The American Journal of Sports Medicine*, vol. 40, no. 6, 2012, pp. 1303-1312, attached hereto as Exhibit 18; Covassin, et al. "The Management of Sport-Related Concussion: Considerations for Male and Female Athletes." *Translational Stroke Research*, vol. 4, no. 4, 2013, pp. 420, attached hereto as Exhibit 19; Kostyun, and Hafeez. "Protracted Recovery from a Concussion: A Focus on Gender and Treatment Interventions in an Adolescent Population." *Sports Health: A Multidisciplinary Approach*, vol. 7, no. 1, 2014, pp. 52-57, attached hereto as Exhibit 20; King, "A Systematic Review of Age and Gender Factors in Prolonged Post-Concussion Symptoms After Mild Head Injury." *Brain Injury*, vol. 28, no. 13-14, 2014, pp. 1639-1645, attached hereto as Exhibit 21; and Sandel, et al. "Sex-Based Differences in Cognitive Deficits and Symptom Reporting Among Acutely Concussed Adolescent Lacrosse and Soccer Players." *The American Journal of Sports Medicine*, vol. 45, no. 4, 2016, pp. 937-944, attached hereto as

## C. The NCAA Had Extensive Superior Knowledge that Protective Helmets Reduce the Risk of Concussion

A purpose of the 2003 article in the *Journal of Athletic Training* was to identify information that would be "critical to helping the National Collegiate Athletic Association (NCAA) Committee on Competitive Safeguards and Medical Aspects of Sports recognize if there is a need to modify rules or equipment to help reduce the number of concussions sustained by collegiate athletes."[18] The study noted that "women's lacrosse had the highest inherent risk of sustaining concussion during a game situation." *Id.* The researchers observed that ***"[f]emale collegiate lacrosse players are not required to wear a helmet because the sport is classified as noncontact. However, unintentional collisions with opponents' heads or sticks may contribute to the high incidence of concussions."*** *Id.* (emphasis added).

Indeed, the NCAA itself commissioned and conducted studies demonstrating that the Women's Lacrosse Rules provided insufficient protection for Women Lacrosse Players and that protective helmets would provide enhanced protection from serious head injuries and concussions. For example, Mr. Dick undertook a 2007 study entitled "Descriptive Epidemiology of Collegiate Women's Lacrosse Injuries: National Collegiate Athletic Association Injury Surveillance System, 1988–1989," to "review 16 years of National Collegiate Athletic Association injury surveillance data for women's lacrosse and identify potential areas for injury prevention initiatives."[19] The article noted that there was an "increase in game injury rates seen in this study," which the researchers attributed to factors such as "increased participation levels, greater athleticism among

---

Exhibit 22 (all finding essentially that female college athletes are at greater risk for concussion than male athletes and/or have more significant post-concussive impairment or recovery time).

[18] Exhibit 13.

[19] Dick, Randall W. et al. "Descriptive Epidemiology of Collegiate Women's Lacrosse Injuries: National Collegiate Athletic Association Injury Surveillance System, 1988–1989 Through 2003–2004." *Journal of Athletic Training*, vol. 42, no. 2, 2007, pp. 262–269, attached hereto as Exhibit 23.

10

players, the use of more sophisticated equipment (*e.g.*, sticks made of strong, lightweight composite materials rather than wood), and changes in tactics." *Id.* According to the researchers, *writing more than a decade ago,* "[t]hese results support the anecdotal impression that with increased athleticism and a more physically developing women's game, injuries of a contact nature (from a stick, ball, or another player) are becoming a greater concern." *Id.*

Perhaps most significantly, this 2007 study provided more than sufficient empirical evidence to refute any suggestion that the rules distinguishing women's lacrosse from the men's game were sufficient to limit head injuries. As the study reported:

> We found that the game injury mechanisms of player contact and contact from a stick accounted for more than one third of all game injuries. *For a sport in which contact is considered only an incidental event, these mechanisms indicate that the term "incidental" may be a misnomer*, giving players a false sense of the common mechanisms of injury. . . .
>
> Most game head and facial injuries associated with stick contact indicate the limitation of the "bubble rule" in protecting players from head and facial injuries. (The "bubble rule" prohibits a player from placing her stick within 7 in [17.78 cm] of the opponent's head.) *Even if the vast majority of injuries are unintentional, the frequency of above-the-neck injuries indicates that relying on players to self-monitor the location (and use) of their sticks relative to the other players' heads and faces to prevent injury is insufficient.* In addition, the path of the ball, either directly or when deflected, does not recognize an imaginary bubble. *Our findings indicate that relying on players' behavior, rather than protective equipment, is not effective in safeguarding players from potentially serious or disfiguring head and facial injuries.*

*Id.* (emphasis added). "In conclusion," the authors suggested an assessment of "whether protective equipment would reduce head, facial, and eye injuries and, ultimately, improve safety without altering the nature and aggression of the game." *Id.*[20]

---

[20] It the context of this Objection, it is significant to note that the following was inserted at the conclusion of this article, presumably at the request of the NCAA: "DISCLAIMER. The conclusions in the Commentary section of this article are those of the Commentary authors and do not necessarily represent the views of the National Collegiate Athletic Association." However, disclaiming scientific data and conclusions arising empirically from that data, does not render those data and conclusions any less accurate.

In another article published that year, Mr. Dick concluded: **"Although permitting only incidental contact, women's lacrosse had higher rates of head, face, and eye injuries at both the high school and collegiate levels. Concussion was the most common injury."**[21]  And, in another 2007 article, Mr. Dick observed that *"[p]rotective equipment, such as face guards in men's ice hockey and protective devices for injured body parts, also can be as effective in minimizing player and apparatus contact injuries."*[22]  It noted that *sports which "limit or restrict player contact ... still have a majority of their game injuries associated with player contact." Id.*

In 2014, a study tested high velocity impacts on soft headgear (not helmets), which the NCAA had permitted for use in women's lacrosse, on hard men's lacrosse helmets, and on no head gear.  The study concluded that, while the soft headgear "would ***not*** reduce the likelihood of a player sustaining a head injury or concussion during a high velocity ball impact," a *"men's helmet would reduce the risk of head injury during similar impact conditions."*[23] (emphasis added).

A 2015 study published in the *Journal of Applied Biomechanics* measured the accelerations delivered by lacrosse stick strikes to the head, which were covered by either nothing, a hard men's lacrosse helmet, and soft headgear (not a helmet) designed for girls' and women's field hockey and lacrosse. [24]  The average peak accelerations measured on bare headgear were 81.6g for blows to the side and 150.7g for blows to the back of the head.  The men's lacrosse helmet brought the average peak acceleration all the way down to 28.2g on the side and 23.1g on the back of the head.

---

[21] Exhibit 11 (emphasis added).
[22] Exhibit 7 (emphasis added).
[23] Rodowicz, Olberding and Rau. "Head Injury Potential and the Effectiveness of Headgear in Women's Lacrosse." *Annals of Biomedical Engineering*, vol. 43, no. 4, 2014, pp. 949, attached hereto as Exhibit 24.
[24] Crisco, et al. "Surrogate Headform Accelerations Associated with Stick Checks in Girls' Lacrosse." *Journal of Applied Biomechanics*, vol. 31, no. 2, 2015, pp. 122-127, attached hereto as Exhibit 25. The study focused upon youth and high school, but observed that stick velocities were significantly higher at the collegiate level.

The girls' headgear did not reduce the force nearly as much as the men's helmet. The *"largest decrease in acceleration was seen in the men's lacrosse helmet."* *Id.* (emphasis added).

The 2015 study, entitled "Epidemiology of Sports-Related Concussion in Seven US High School and Collegiate Sports," found that the incidence of concussions in women's lacrosse was second only to football.[25] The study warned that *"[a]ddressing stick-to-head contacts needs to be a priority for women's lacrosse."* *Id.* (emphasis added).

In 2016, a study published in *The American Journal of Sports Medicine* observed:

> *Despite women's field lacrosse being noncontact, however, concussions continue to be an issue. The concussion rate in women's lacrosse has been reported to be the second highest in women's sports. ...* Injuries in women's lacrosse occur as a result of player-equipment contact, player-player contact, and player-playing surface contact. *Because of limitations in the current rules and the protective ability of equipment, the use of headgear may be beneficial.*[26]

The results of the study "demonstrated that men's lacrosse *helmets are effective in reducing linear and angular acceleration in women's field lacrosse"* and *"support previous research suggesting if helmets were worn in women's lacrosse, it could decrease the rate of concussion."* *Id.* The study concluded that *"women's field lacrosse may be able to reduce the occurrence of high linear and angular acceleration impacts by having governing bodies improving rules, implementing the use of helmets, or both … ."* *Id.* (emphasis added).

In June 2015, the House of Delegates of the American Medical Association adopted a Resolution that "RESOLVED, That our American Medical Association support requiring approved protective headgear for all athletes participating in the sport of girls'/women's lacrosse."[27] The Reference Committee proposing the Resolution noted that it had "received

---

[25] Exhibit 12.
[26] Exhibit 6.
[27] *See* Excerpts from June 2015 AMA resolutions at 406 and June 2015 AMA Reference Committee Reports at 537, attached hereto as Exhibit 26.

13

significant favorable testimony on the need for players, regardless of gender, to wear approved, protective headgear to prevent concussions." *Id.*

In 2015, at the direction of US Lacrosse, the national governing body for youth lacrosse, but with no known direction or support from the NCAA, ASTM International (formerly known as the American Society for Testing and Materials) created the first performance standard for substantial protective headgear in women's lacrosse. The ASTM standard provides guidelines and test procedures which headgear manufactures can adopt to test products. The NCAA's Committee on Competitive Safeguards and Medical Aspects of Sports declined at its December 2015 meeting to take a "position on the adoption of a new ASTM standard for women's lacrosse headgear."[28]

In 2016, two manufacturers, Hummingbird Sports and Cascade Lacrosse, unveiled the first women's lacrosse helmet to meet ASTM standards.[29] Despite the availably of these carefully developed helmets, and the years of studies warning of the clear and present danger of concussion to Women Lacrosse Players, and the means to reduce it with protective helmets, the NCAA continues to discriminate when it comes to protecting Women Lacrosse Players. It has declined to require the use of protective helmets for Women Lacrosse Players. It continues to maintain ambiguity about, and bias against, protective helmets in the Women's Lacrosse Rules and otherwise. And it has done little, if anything, to educate NCAA institutions, women lacrosse coaches and Women Lacrosse Players about the availability and benefits of protective helmets.

---

[28] http://www.ncaa.org/sites/default/files/Dec2015CSMAS_Report_20160314.pdf (last visited, August 28, 2017), copy attached hereto as Exhibit 27.

[29] US Lacrosse 2017 Headgear Clarification, attached hereto as Exhibit 28 (notably, the Headgear Clarification was published only at https://www.uslacrosse.org/sites/default/files/public/documents/rules/2017-headgear-clarification.pdf; the NCAA seems to have issued no such clarification); see also "Cascade Releases Its First Women's Headgear, the LX." *Inside Lacrosse*, October 28, 2016, attached hereto as Exhibit 29; and Hummingbird Flies into Lacrosse Industry with Headgear, USLacrosse Magazine, December 7, 2016, attached hereto as Exhibit 30.

## V.    The NCAA Controls the Rules of the Game and, Thus, Has the Exclusive Ability and Obligation to Protect Women Lacrosse Players

The NCAA has exclusive control over the safety of its student-athletes. "College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which comprise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships." Compl., ¶ 170. A purpose of the NCAA, according to its Constitution, is "[t]o formulate, copyright and publish rules of play governing intercollegiate athletics." The NCAA Constitution, Article 1.2(d).[30] The NCAA promulgates sports-specific standards through its Playing-Rules Committees.

Among the rules that the NCAA has implemented for men's lacrosse is a strict mandate requiring the use of protective helmets. *See* Rule 1 of the Men's Lacrosse 2013-2014 Rules, titled "The Game, Field, and Equipment."[31] Section 20 is titled "Helmet, Face Mask and Mouthpiece," and states: "All players ***shall*** wear a protective helmet." *Id.* (emphasis added).

When it comes to the Women's Lacrosse Rules, however, the NCAA has failed to act in a similar fashion. Despite the substantial knowledge that the NCAA has about the risk of harm to Women Lacrosse Players and the availability of helmets to protect them from that harm, the NCAA has not required that Women Lacrosse Players wear protective helmets nor has it even encouraged the use of such helmets. It has implemented no Rule specific to helmets. Instead, in a Rule titled "Other Personal Equipment," the Rules state that "soft headgear" – notably, not a helmet – "may be worn." Rule 2 of the Women's Lacrosse 2016-2017 Rules, Section 10.[32] The Approved Ruling

---

[30] Excerpts from NCAA Constitution, attached hereto as Exhibit 31.
[31] Exhibit 5.
[32] Exhibit 4.

published under that Rule is at best ambiguous, and at worst states a bias against the use of protective helmets:

> **A.R. 2-8.** A field player asks to wear a hard helmet to protect an injury.
>
> **RULING:** ILLEGAL. A player cannot wear a hard helmet that would be dangerous to other players. She could wear a soft helmet made of foam type material. Soft headgear is defined as any head covering without hard or unyielding parts that have the potential to injure another player. Soft headgear must allow for the integration of required legal eye protection and is to be worn as directed.

*Id.*

The NCAA prescribes specific rules to require Women Lacrosse Players to wear "Mouthpieces" and "Eye Protection," thus recognizing a duty to protect those athletes in games and practices from foreseeable head injuries. Rule 2 of the Women's Lacrosse 2016-2017 Rules, Sections 8 and 9. Yet, it has failed to require the use of helmets to protect women against other, more severe yet similarly foreseeable, head injuries, including concussions. There is no rational basis for such a distinction. It runs contrary to all of the foregoing knowledge possessed by the NCAA and the NCAA's mission and assumed duty to protect player safety. As a result, Women Lacrosse Players are left exposed to the risk of head injuries and concussions.

## VI.   Ms. Greiber, Like Other Women Lacrosse Players in the Putative Subclass, Sustained Serious Injuries That Could Have Been Avoided or Minimized Had the NCAA Permitted the Use of Protective Helmets

Tragically, thousands of young women have suffered head injuries, concussions and even permanent brain injuries as a result of the NCAA's refusal to protect the health of Women Lacrosse Players to the same degree as it does for male athletes. Ms. Greiber, like other Women Lacrosse Players, relied on the superior knowledge of the NCAA to disclose relevant risk information and protect her health and safety. Yet, the NCAA did not do so, and Women Lacrosse Players such as Ms. Greiber have suffered dramatically as a result.

In the middle of her third lacrosse season, during a March 18, 2013 practice, another player

threw a lacrosse ball that ricocheted off of the bleachers and struck Ms. Greiber in the back of the head. Lacrosse balls, thrown by Women Lacrosse Players at speeds of up to 60 MPH, are hard, solid rubber balls with known capacity to ricochet with great force, especially off of hard surfaces. After she was struck, Ms. Greiber experienced painful symptoms. The next day, Deena Casiero, M.D., a designated "team doctor," diagnosed Ms. Greiber with a concussion. On April 30, 2013, Dr. Casiero found the concussion was still resolving. Had Ms. Greiber been permitted by the NCAA to wear a helmet, as she desired, she would not have suffered a concussion, or her injury would have been minimized.

On January 21, 2014, Ms. Greiber participated in a mandatory practice in the rain. Players were instructed to line up on opposite sides of the field and run toward one another, with one player assuming the role of an attacker, and the other that of a defensive player. When Ms. Greiber and another player approached one another, they slipped on the turf, resulting in a head-to-head collision to the right frontal area of Ms. Greiber's head. Ms. Greiber was nearly knocked unconscious. Dr. Casiero saw Ms. Greiber and diagnosed a concussion. Ms. Greiber continued to be followed by Dr. Casiero, as well as by a local neurologist, over the ensuing months. On May 13, 2014, Ms. Greiber received an "exit" physical from Dr. Casiero, who noted a history of concussions and indicated that Ms. Greiber was still symptomatic. Had the NCAA permitted Ms. Greiber to wear a helmet, as she desired, she would not have suffered a concussion, or the severity of her injury would have been significantly reduced.

On June 19, 2014, after she had graduated from Hofstra, Ms. Greiber was referred to the University of Pittsburgh Medical Center Concussion Clinic. She continued to be followed there for over a year. An overall evaluation suggested that Ms. Greiber had ongoing deconditioning and "becomes symptomatic with plyometric-based activities." Ms. Greiber now suffers from a

permanent and debilitating injury. In addition to the debilitating headaches, she has significant sound, sensitivity and balance issues. She experiences dizziness routinely with accompanying nausea. She also regularly feels the emotional aftermath of her concussive injury, suffering from depression, anxiety, short temperament, and irritability.[33]

## VII. Any Settlement Should Require the NCAA to Perform Its Contractual Undertaking and Protect Women Lacrosse Players

The NCAA continues to project itself as the supreme regulatory body in college athletics. Article 2.2 of the NCAA Constitution is entitled "Principles of Student-Athlete Well-Being." It states: "Intercollegiate athletics programs ***shall*** be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes (Revised: 11/21/05)." *Id.* (emphasis added).[34]

As the Complaint well-establishes, "NCAA has consistently recognized its duty to provide a safe environment for student-athletes." *See* Compl., ¶ 177. As the Complaint notes, the NCAA promises its athletes a safe environment and, as recently as August 27, 2012, stated on its website: "The NCAA takes appropriate steps to modify safety guidelines, playing rules and standards to minimize those risks and provide student athletes with the best opportunity to enjoy a healthy career. The injury surveillance program collects, analyzes, interprets and disseminates data on injuries in each sport, providing a wealth of information through which we can provide athletes with a safe competitive environment." Compl., ¶ 179. To this day, the NCAA suggests to prospective and current NCAA student-athletes that one of the "Benefits to [NCAA] College Student-Athletes" is that "The NCAA takes appropriate steps to modify safety guidelines, playing rules and standards."[35]

---

[33] Ms. Greiber has asserted claims for personal injury against the NCAA and others in a separate lawsuit.
[34] Exhibit 31.
[35] "Benefits to College Student-Athletes." *The Official Site of the NCAA*, www.ncaa.org/student-

The NCAA asserts that it uses its knowledge and "injury surveillance data" to promote and support student athlete health and safety. It contends that the "injury surveillance data" that the NCAA collects allows it to *"make adjustments to rules … to reduce situations that expose student-athletes to high risks of injury."* Specifically, it boasts that it *"can adjust equipment requirements and standards to increase safety."* Compl., ¶¶ 180-81 (emphasis added; footnotes omitted).

"On an annual basis, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports publishes ('Medical Committee') the NCAA Sports Medicine Handbook ('Handbook') 'to formulate guidelines for sports medicine care and protection of student-athletes' health and safety' and 'to assist member schools in developing a safe intercollegiate athletic program.' The Medical Committee recognizes that the Handbook 'may constitute some evidence of the legal standard of care.' The Handbook expressly recognizes that 'student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation.'" *Id.,* ¶ 182 (footnotes omitted). In the Handbook, the NCAA also assumes "Shared Responsibility for Intercollegiate Sports Safety." *Id.,* ¶ 183. It notes that, when appropriate, "the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports makes recommendations to modify safety guidelines, equipment standards, or a sport's rule of play." *Id.* (footnote omitted).

Thus, the NCAA has repeatedly described its responsibility for the health and well-being of student-athletes. *Id.,* ¶ 184. Those undertakings formed both express and implied contracts and gave rise to contractual obligations on the part of the NCAA to the Class, and to Women Lacrosse Players in particular. *Id.,* Counts I, II and III. Likewise, those undertakings gave rise to duties that

---

athletes/benefits-college-student-athletes. (last visited August 28, 2017), attached hereto as Exhibit 32.

the NCAA owed to the Class, and to Women Lacrosse Players in particular. *Id.,* Count V.

As far back as 2007, the NCAA was surveying the available data and drawing conclusions from them, leading Mr. Dick, the NCAA Assistant Director of Sports Science and/or Associate Director of Research / Injury Surveillance System, and his coauthors to observe that "[t]he primary goal of the ISS [Injury Surveillance System] is to collect injury and exposure data from a representative sample of NCAA institutions in a variety of sports. Relevant data are then shared with appropriate NCAA sport and policy committees to provide a foundation for evidence-based decision making with regard to health and safety issues."[36] For example, ISS data was utilized by the NCAA in 2003 to require protective eyewear in women's lacrosse "to reduce the small but real risk of significant eye injury." *Id.* at 174.

Tragically, the same ISS data was never utilized to require helmets in women's lacrosse to reduce the far more severe risk of brain injury. The NCAA's cavalier disregard for the evidence it collected regarding the danger of concussions in women's lacrosse reflects a manifest gender bias against female lacrosse players that has resulted in hundreds of concussions to young women across the United States and that continues to put female players in harm's way.

The NCAA owes, and has undertaken, a duty and contractual obligation to student-athletes such as Women Lacrosse Players to supervise, regulate, monitor and provide reasonable and appropriate rules, guidelines and information to prevent or minimize the risk of injury, including specifically the risk of brain injury from concussions, to the student-athletes and to provide for their care and health. Compl., Counts I through V. By virtue of the NCAA's governing authority, the NCAA controls the rules under which NCAA Women's lacrosse is played. Member schools

---

[36] Dick, Agel and Marshall, "National Collegiate Athletic Association Injury Surveillance System Commentaries: Introduction and Methods," *Journal of Athletic Training,* Vol. 42, No. 2, 2007, pp. 173-182, attached hereto as Exhibit 33.

and student-athletes, including specifically Women Lacrosse Players, have no discretion or control over the Rules of the game, which reflect a bias against protective helmets for Womens Lacrosse Players.

The Complaint gave one example of a women lacrosse player who suffered a concussion, and noted that, "[u]nlike in men's lacrosse, women's lacrosse players wear goggles, which protect against eye injury, but they do not wear helmets." Compl., ¶¶ 164-66 and n. 10. Nonetheless, the Amended Settlement Agreement did not designate such a person as a named plaintiff, did not propose a subclass of Women Lacrosse Players and did not provide for an amendment of the Women's Lacrosse Rules that would require Women Lacrosse Players to wear the type of helmet that the Complaint notes they do not wear.

The NCAA - and the NCAA alone - has the authority to amend the Women's Lacrosse Rules to require the use of protective helmets by Women Lacrosse Players, just as the Men's Lacrosse Rules require the same for men lacrosse players. The NCAA - and the NCAA alone - holds in its hands the power to protect Women Lacrosse Players by amending this Rule. And the NCAA is contractually obligated to do so. Compl., Counts I, II and III.

The settlement process failed to address these unique circumstances. Indeed, in expressing its "concern that the [then] current Class Representatives will not 'fairly and adequately protect the interests of the class,'" the Court observed:

> This is not to say that every single NCAA-sanctioned sport must be represented in this action. But, as NCAA's counsel acknowledged, the risks of suffering a concussion while playing NCAA-sanctioned sports are scattered along a continuum with football on the highest end and sports such as riflery on the lower end. The class representatives as a group must adequately represent this continuum as a whole so that the various interests along the continuum can be voiced as part of the settlement process.

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 2014 WL 7237208,

at *6 (N.D. Ill. Dec. 17, 2014). The studies detailed above consistently placed Women Lacrosse Players near the highest end of this continuum. Yet, despite the Court's articulation of this concern, no class representative was recruited to represent this particularly vulnerable subclass of Women Lacrosse Players. *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.,* 314 F.R.D. 580, 584-85 (N.D. Ill. 2016).

The compelling and unique circumstances that leave Women Lacrosse Players vulnerable to preventable debilitating and permanent head injuries, including concussions, make it imperative that any settlement of this matter include the certification of a subclass of Women Lacrosse Players and an undertaking by the NCAA, by a date certain, either to amend the Women's Lacrosse Rules to require Women Lacrosse Players to wear protective helmets; remove from the Rules any bias against protective helmets; or, minimally, to educate Women Lacrosse Players and NCAA institutions and women's lacrosse coaches about the availability and benefits of protective helmets for Women Lacrosse Players so that they may make informed choices.

## VIII. The Proceedings before This Court Have Demonstrated That Class Representatives from Other Sports Cannot Adequately Represent the Interests of Women Lacrosse Players

In connection with an earlier objection, the parties addressed the issue of whether a class action for personal injuries could be sustained by a single class consisting of multiple sports. While that issue was admittedly different from the issue presented here, many of the facts and arguments presented by the parties, and conclusions reached by the Court, are illustrative in this context.

For example, Plaintiffs argued:

> A class action for multiple sports at a single school could not satisfy Rule 23 requirements, because proof of liability on a class-wide basis would depend on extensive proof unique to each sport, so that a plaintiff who played one sport could not adequately represent the personal-injury interests of athletes who played other sports, even at the same school. . . . . Proof of liability, therefore, depends on a careful examination of practices *for each sport.*

22

Plaintiffs' Memorandum in Support of Joint Motion for Preliminary Approval of Second Amended

Class Settlement and Certification of Settlement Class and Settlement Subclasses (ECF No. 267)

at 8-9 (emphasis in original); *see also id.* at 10 ("a multi-sport class could not be certified, because

the personal-injury claim of an athlete in one sport would not be typical of such claims by athletes

in other sports"); *id.* at 11 ("an athlete from one sport could not establish that the claims relating

to that sport are sufficiently aligned with the interests of athletes in other sports, given the different

evidence that would potentially establish liability for each sport").

The NCAA pointedly made these arguments as well. For example: "The Committee On

Competitive Safeguards And The Medical Aspects Of Sports ("CSMAS") and its Sports Science

and Safety Subcommittee ... largely address health and safety issues on a sport-by-sport basis."

Memorandum of The NCAA in Further Support of the Joint Motion for Preliminary Approval of

Second Amended Class Settlement and Certification of Settlement Class and Settlement

Subclasses (ECF No. 268) at 4. Further:

> Play Rules Oversight Panel ("PROP") is another NCAA committee that
> provides guidance to member institutions on health and safety issues. ... Its
> duties include overseeing the NCAA committees for individual sports,
> monitoring playing rules maintained outside the NCAA and reviewing playing
> rules changes. ... At times, PROP considers rules that bear on student-athlete
> health and safety.... When it does, however, it does so on a sport-by-sport basis,
> further reflecting the heterogenity of the various sports as well as the rules that
> govern them.
>
> * * * * *
>
> In addition to CSMAS and PROP, each NCAA sport has its own committee.
> The individual sport committees address issues that bear on student-athlete
> safety. For example, sport committees consider whether changes regarding
> equipment required for a particular sport may reduce the risk of certain injuries
> posed by participation in that sport. They also consider whether changes to rules
> may reduce the risk of injury. As one might expect, however, the playing rules
> adopted by each committee reflect the different types of risks inherent in
> different sports. Over the past several decades, various sport committees of the
> NCAA have considered the particular risks of head injury and concussion in

their particular sports and have implemented rule changes designed to reduce
the risk of head injury in those sports.

*Id.* at 5-6.

Because "the NCAA acts through its various committees," when NCAA committees "have considered issues related to the risk of head injury and concussion, they have largely done so in the context of particular sports." *Id.* at 18. Therefore, on the basis of these facts, the NCAA has argued that "[a]ny analysis of whether the NCAA breached an alleged duty to student-athletes would require examining the NCAA's acts and/or alleged omissions with respect to participants in particular sports. Among other things, one would need to assess what the NCAA knew or should have known regarding the risks of concussion for the particular sport in question." *Id.* at 16-17. "A court would also need to evaluate the actions the NCAA took or allegedly failed to take in response to the concussion risk posed by each particular sport. *Id.* (emphasis in original)

The NCAA then offered a particularly telling illustration:

> For example, the NCAA's decision to require softball catchers to wear helmets arguably has bearing on its conduct vis-à-vis concussion risks to softball players, but it has no relevance whatsoever to whether or not the NCAA breached an alleged duty owed to football players or participants in any other sport.

*Id.* at 18. Simply substitute in that example "the NCAA's decision not to require women lacrosse players to wear protective helmets," and it becomes plain, by the NCAA's own logic, that a subclass of Women Lacrosse Players is necessary to address the NCAA's breaches of duty and contractual undertakings, and to address the precise injunctive relief that they specifically require.

In reviewing early iterations of a proposed settlement agreement, the Court, too, recognized that, "as NCAA's counsel acknowledged, the risks of suffering a concussion while playing NCAA-sanctioned sports are scattered along a continuum with football on the highest end and sports such as riflery on the lower end." *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion*

*Injury Litig.*, 2014 WL 7237208, at *6. Therefore, the Court urged that "class representatives as a group must adequately represent this continuum as a whole so that the various interests along the continuum can be voiced as part of the settlement process." *Id.* In a subsequent Memorandum and Opinion, the Court further observed that "the facts produced in discovery present a multitude of potential permutations regarding whether the NCAA breached a duty to protect its athletes and caused any particular plaintiff injury."[37] *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. at 595.

### IX. The Amended Settlement Agreement Cannot Satisfy the Requirements of Rule 23 in the Absence of a Subclass of Women Lacrosse Players

This Court has observed that, because "[p]laintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements," the Court "must receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate." *Balderrama-Baca v. Clarence Davids & Co.,* 318 F.R.D. 603, 608 (N.D. Ill. 2017) (Lee, J.) (citations omitted). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* (citation omitted); *see also Smith v. Family Video Movie Club, Inc.,* 311 F.R.D. 469, 473 (N.D. Ill. 2015) (Lee, J.); *Swan ex rel. I.O. v. Bd. of Educ. of City of Chicago*, 2013 WL 4047734, at *4 (N.D. Ill. Aug. 9, 2013) (Lee, J.).

A court must therefore "make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Balderrama-Baca,* 318 F.R.D. at 608 (quotation omitted). "The district court has a 'broad range of discretion in determining whether to create subclasses." *In re Nat'l Collegiate Athletic Ass'n Student–Athlete*

---

[37] The Court made this observation while addressing the issue of whether classes could properly be certified for personal injury actions under Rule 23(b)(3). However, the same underlying factual predicate supports the need for a subclass to protect the unique interests of Women Lacrosse Players.

*Concussion Injury Litig.*, 314 F.R.D at 591 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1129 n. 38 (7th Cir. 1979)).

A. **Rule 23(a)(3): The Representative Parties' Claims are**
   **Not Typical of the Claims of Women Lacrosse Players**

Rule 23(a)(3) requires that the "claims … of the representative parties [be] typical of the claims … of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). "In many cases … the requirement of typicality merges with the further requirement that the class representative 'will fairly and adequately protect the interests of the class.'" *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (quoting Fed. R. Civ. P. 23(a)(4)). To find typicality, a court must find that "[a]ll members of the class were subject to the same allegedly unlawful practices." *De La Fuente*, 713 F.2d at 232. A court will "look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3)." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "[I]f proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims.'" *Ruiz v. Stewart Assocs., Inc.*, 167 F.R.D. 402, 405 (N.D. Ill. 1996) (quotation omitted).

Here, the claims of the representative parties do not arise from the same practice or course of conduct that gives rise to the claims of Women Lacrosse Players. The NCAA has "singled out" Women Lacrosse Players by not mandating a protective helmet like the NCAA mandates for the male counterparts in their sport. *See Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 441 (E.D. Pa. 2008) (finding typicality because "class representatives here do not allege that they were singled out"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 312 (3rd Cir.

1998) (typicality found where "named plaintiffs here have not relied on allegations that they were singled out and defrauded"). The NCAA's conduct as it pertains to Women Lacrosse Players is so different that it renders their claims atypical. *See McDaniel v. Bd. of Educ. of City of Chicago*, 2013 WL 4047989, at *17 (N.D. Ill. Aug. 9, 2013) (Lee, J.) (finding typicality (and adequacy) lacking where the named plaintiffs were not harmed and did not have the same "safety concerns" as other members of the class). And proof of the representative plaintiffs' claims would not necessarily prove the claims of Women Lacrosse Players. Therefore, the Court should find that the presently proposed Class and Subclasses do not satisfy the requirement of typicality.

### B. Rule 23(a)(4): Class Representatives Did Not Fairly and <u>Adequately Protect the Interests of Women Lacrosse Players</u>

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In making this determination, a court must assess, among other things, whether the named plaintiffs adequately protect "the different, separate, and distinct interest of the absentee members." *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986); *In re AT & T Mobility Wireless Data Servs. Sales Litig.,* 270 F.R.D. 330, 343 (N.D. Ill. 2010). "A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625–26, 117 S. Ct. 2231, 2250-51 (1997) (quotation omitted).

In *Amchem*, "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses." *Id.* at 626, 117 S. Ct. at 2251. The Supreme Court affirmed the Third Circuit's determination that the interests of certain subclasses were not adequately represented. "Most saliently," the Court observed, one class had a "critical goal [of] generous immediate payments, which "tug[ged] against the interest of [other] plaintiffs in ensuring an ample, inflation-protected fund for the future." *Id.*

27

Here, the class representatives do not adequately represent the interests of Women Lacrosse Players. The aim of the class representatives was apparently only to provide for medical monitoring and certain other relief to address post-concussion situations. Nothing appears to have been done to protect Women Lacrosse Players from sustaining head injuries in the first place. *See McDaniel,* 2013 WL 4047989, at *17. The certification of a subclass of Women Lacrosse Players is appropriate and necessary to allow such a remedy be pursued. *See Johnson v. Meriter Health Servs. Employee Ret. Plan,* 702 F.3d 364, 368 (7th Cir. 2012); *In re Nat'l Collegiate Athletic Ass'n Student–Athlete Concussion Injury Litig.*, 314 F.R.D. at 591; *Balderrama-Baca,* 318 F.R.D. at 608-09.

### C. Rule 23(b)(2): The NCAA's Actions Relating to Women Lacrosse Players Do Not Apply Generally to the Class

Rule 23(b)(2) permits certification of a class only where, among other things, the defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The named plaintiffs argue that their "claims for medical monitoring relief and changes to the way the NCAA handles concussion management are based on NCAA conduct that is 'generally applicable to the class.'" Plaintiffs' Memorandum in Support of Joint Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class (ECF No. 156) at 17. The Court seems to have preliminarily agreed. *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.,* 314 F.R.D. at 599.

Ms. Greiber respectfully submits that, when the interests of Women Lacrosse Players are considered, this factor also suggests that certification of the Class and Subclasses as proposed would not be adequate. The NCAA has acted in connection with Women Lacrosse Players on grounds that do ***not*** apply generally to the class. The injunctive relief that they require is not

28

relevant to, nor has it been sought by, any other member of the Class or Subclasses. For this reason, as well, it is appropriate that a subclass of Women Lacrosse Players be proposed and certified.

**X.     The Amended Settlement Is Not Fair, Reasonable or Adequate for Women Lacrosse Players**

"In order to evaluate the fairness of a settlement, a district court must consider 'the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.'" *Synfuel Techs.*, 463 F.3d at 653 (quoting *Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996)). "The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Id.* (quotation omitted). "Where, as here, the suit sounds only in equity, the relief achieved by the proposed settlement is measured against the Court's likely decree after trial. That exercise has two components: (1) plaintiffs' prospects of proving their claims, and (2) assuming plaintiffs' success on the merits, the likelihood of the Court giving the requested declaratory and injunctive relief." *Handschu v. Special Servs. Div.,* 605 F. Supp. 1384, 1394 (S.D.N.Y. 1985), *aff'd*, 787 F.2d 828 (2nd Cir. 1986) (citing *Alliance .to End Repression v. City of Chicago,* 91 F.R.D. 182, 197-98 (N.D. Ill. 1981)).

The Amended Settlement Agreement is not fair, reasonable or adequate because it would require Women Lacrosse Players to release their claims for injunctive relief ordering the NCAA to amend the Women's Lacrosse Rules to require Women Lacrosse Players to wear protective helmets and thereby minimize head injuries and concussions or otherwise remove from the Rules any ambiguity or bias against protective helmets. Although such injunctive relief was sought in

the Complaint, approval of the Amended Settlement Agreement would release any such claims and leave these young women vulnerable to precisely the type of concussions and head injuries that are the subject of the Complaint. Amended Settlement Agreement (ECF No. 266-1), §§ II.QQ and RR; XII.F.a-c; XV.A.7, 8, 10 and 12; and XV.B

The claims set forth in the Complaint are strong and, with evidence adduced to date in this action, and the additional material presented herein, would be sufficient for Plaintiffs to prevail on their claims for breach of express and implied contracts and negligence. If the Court were to find the NCAA in breach of its duties and contractual obligations, particularly as it pertains to Women Lacrosse Players, an appropriate remedy – as requested in the Complaint – would be to enter an injunction either requiring the NCAA to amend the Women's Lacrosse Rules to require protective helmets or, otherwise, remove from the Rules any ambiguity or bias against protective helmets.

The complexity, length and expense of the litigation would be more than proportionate to the substantial risks of severe and even permanent injury that Women Lacrosse Players face and which this action must address. Although Ms. Greiber recognizes that she is presently the first to voice this objection, that derives from the NCAA's failure to discuss the issue of helmets for Women Lacrosse Players. And, precisely because this issue was apparently never previously addressed, there does not appear to have been any opinion of competent counsel on the issue. With respect to the present stage of the proceedings, and the amount of discovery previously conducted, Ms. Greiber notes that she first received notice of this proposed settlement in January 2017.

## XI.    **CONCLUSION**

For all of the foregoing reasons, Ms. Greiber objects to the Amended Settlement Agreement. The Court should find that the Amended Settlement Agreement is not fair, reasonable or adequate as it pertains to Women Lacrosse Players.

Respectfully submitted,

Dated:  August 30, 2017

*/s/ Aron U. Raskas*

Arnold M. Weiner
Aron U. Raskas
Barry L. Gogel
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, Maryland 21211
410-769-8080 Telephone
410-769-8811 Facsimile
aweiner@rwllaw.com
araskas@rwllaw.com
bgogel@rwllaw.com


Alan M. Rifkin
RIFKIN WEINER LIVINGSTON LLC
225 Duke of Gloucester Street
Annapolis, MD 21401
 (410) 269-5066 Telephone
(410) 269-1235 Facsimile
arifkin@rwllaw.com

Charles S. Fax
RIFKIN WEINER LIVINGSTON LLC
7979 Old Georgetown Road, Suite 400
Bethesda, MD 20814
301-951-0150 Telephone
301-951-0172 Facsimile
cfax@rwllaw.com

Roy L. Mason
SMOUSE & MASON, LLC
502 Washington Avenue, Suite 710
Towson, Maryland  21204
410-269-6620 Telephone
443-991-4573 Facsimile
rlm@smouseandmason.com


*Counsel for Objector Samantha Greiber*

31

## CERTIFICATION AND SIGNATURE OF OBJECTOR

I, Samantha Greiber, hereby adopt and submit the forgoing Statement of Objection as my

Objection pursuant to the Preliminary Approval Order.

August 29, 2017

Samantha Greiber
11Hull Avenue
Annapolis, Maryland 21403
(410) 991-1234

32

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 30th day of August, 2017, a true and correct copy of the foregoing document was filed electronically on the Court's CM/ECF system, which caused notice to be sent to all counsel of record.

_/s/ Aron U. Raskas_