**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**SETTLEMENT CLASS COUNSEL'S COMBINED RESPONSE TO FEE PETITIONS OF
CERTAIN PLAINTIFFS' AND OBJECTORS' COUNSEL**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    SUMMARY OF FEE PETITIONS TO WHICH SETTLEMENT CLASS
COUNSEL OBJECTS ........................................................................................4

    A.     Submissions by objectors...............................................................4

        1.    The lodestar and expenses of each of objector Anthony Nichols'
law firms .................................................................4

            a.    Edelson P.C. ..........................................................4

            b.    Gordon Law Offices Ltd. .......................................4

            c.    Clifford Law Offices, P.C. ....................................5

        2.    Objector Whittier's fee request for counsel Dwight E. Jefferson ...............5

    B.     Submissions by plaintiffs' counsel ................................................5

        1.    Executive committee member The Dugan Law Firm, APLC's fee
request (Dkt. 339-1) .............................................5

        2.    Plaintiffs' counsel McIlwain LLC's fee request (Dkt. 358) ..................6

III.   ARGUMENT ......................................................................................................7

    A.     Objectors are entitled to a fee award only if they materially enhanced the
benefits to the Class in excess of their fee request...................................7

    B.     Edelson's fee request should be specifically tied to the narrow benefit
conferred. ......................................................................................8

        1.    The Court rejected or ignored the majority of issues raised by
Nichols in his objections...............................................9

            a.    The Court rejected Edelson's assertion that the Settlement
waived a valuable right to Rule 23(b)(3) certification of a
nationwide personal injury class......................................9

            b.    The Court rejected Edelson's position that conflicts of
interest existed. ............................................10

            c.    The Court rejected Edelson's argument that that the
Settlement's concussion management guidelines provided
no benefit. ....................................................10

d.    The Court rejected Edelson's argument that the claims process was designed to discourage claims. ................................11

e.    The Court rejected Edelson's argument that the value of the settlement was limited to a co-pay.................................................11

f.    The Court rejected Edelson's assertion that funds remaining at expiration of the MMP should go to class members and not concussion research...........................................11

g.    The Court rejected Edelson's assertion that the MMP provides benefits to less than one percent of the Settlement Class. ..................................................................................................12

2.    Edelson's windfall request is tied to a single footnote. .............................12

3.    Edelson did not achieve a benefit for the Class worth more than his lodestar, much less worth a 4 multiplier on his lodestar...........................13

C.    Gordon and Jefferson did not materially benefit the Settlement Class.................16

D.    Plaintiffs' counsel should not be compensated for time and expenses incurred for other lawsuits. ..............................................................18

1.    Dugan should be awarded his lodestar, but not reimbursed for expert expenses incurred in connection with a separate lawsuit...............18

2.    McIlwain's time was spent investigating and retaining a client for the single school/single sport MDL. ..........................................................19

E.    Service awards should be based on service, not appearance. ................................19

IV.    CONCLUSION................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Chou-Chen Chems., Inc.*,
    31 B.R. 842 (Bankr. W.D. Ky. 1983) ...................................................................19

*Dewey v. Volkswagen of Am.*,
    909 F. Supp. 2d 373 (D.N.J. 2012) .......................................................................13

*Dryer v. NFL*,
    2013 U.S. Dist. LEXIS 49993 (D. Minn. Apr. 5, 2013) ........................................17

*DuRocher et al. v. NCAA et al.*,
    No. 1:13-cv-01570 (S.D. Ind.) ............................................................................6, 19

*Eubank v Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) .............................................................................15, 16

*In re First Fidelity Bancorp. Sec. Litig.*,
    750 F. Supp. 160 (D.N.J. 1990) ............................................................................13

*Florin v. Nationsbank, N.A.*,
    34 F.3d 560 (7th Cir. 1994) .....................................................................................1

*Gaskill v. Gordon*,
    160 F.3d 361 (7th Cir. 1998) ...................................................................................7

*Gehrich v. Chase Bank USA, N.A.*,
    2016 WL 3027831 (N.D. Ill. May 27, 2016) ......................................................3, 16

*Harman v. Lyphomed, Inc.*,
    945 F.2d 969 (7th Cir. 1991) .................................................................................18

*In re Ikon Office Solutions, Inc.*,
    194 F.R.D. 166 (E.D. Pa. 2000) .............................................................................13

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015), *appeal dismissed* (7th Cir. Jan. 27, 2016),
    *appeal dismissed* (7th Cir. Feb. 1, 2016), *appeal dismissed* (7th Cir. Feb. 3.
    2016) ........................................................................................................................7

*Lobur v. Parker*,
    378 F. App'x. 63 (2d Cir. 2010) .............................................................................15

*McDonough v. Toys "R" Us, Inc.*,
    80 F. Supp. 3d 626 (E.D. Pa. 2015) .......................................................................14

*Mirfasihi v. Fleet Mortg. Corp.*,
    551 F.3d 682 (7th Cir. 2008) ................................................7

*In re Paine*,
    14 B.R. 272 (W.D. Mich. 1981) ................................................19

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ................................................7

*In re Puerto Rican Cabotage Antitrust Litig.*,
    815 F. Supp. 2d 448 (D.P.R. 2011)................................................14

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ................................................7, 17

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005)................................................15

*Skelton v. Gen. Motors Corp.*,
    1988 U.S. Dist. LEXIS 6365 (N.D. Ill. June 27, 1988) ................................................17

*Spark v. MBNA Corp.*,
    289 F. Supp. 2d 510 (D. Del. 2003)................................................7, 8, 17

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ................................................7

*In re Trans Union Corp. Privacy Litig.*,
    2009 WL 4799954 (N.D. Ill. Dec. 9. 2009) ................................................15

*In re Trans Union Corp. Privacy Litig.*,
    629 F.3d 741 (7th Cir. 2011) ................................................13, 15

*In re Visa Check/MasterMoney Antitrust Litig.*,
    2004 U.S. Dist. LEXIS 8737 (E.D.N.Y. Apr. 2, 2004) ................................................16

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ................................................15

## OTHER AUTHORITIES

Richard Posner, *Economic Analysis of Law* § 21.9 (2d ed. 1984) ................................................3, 16

Stuart T. Rossman & Charles Delbaum, *Consumer Class Actions* § 15.2.1 (6th ed. 2006) ................................................3

# I.   INTRODUCTION

Only after Class Counsel litigated the merits of this lawsuit over 10,000+ hours and the initial settlement was reached in 2014 did Edelson P.C. ("Edelson") appear on behalf of Nichols to attack the terms of the settlement. His goal has always been clear: to force an NFL-type personal injury or mass tort resolution with the NCAA. His broad-sweeping attacks failed in nearly every respect. Despite numerous briefs objecting to the settlement, Edelson's arguments had no basis in fact and were unsupported by medical or scientific experts. Edelson primarily argued that (i) the settlement contained immutable conflicts of interest, and (ii) the vast majority of the Class "gets nothing." The Court rejected or ignored Edelson's arguments on both.

As set forth below, any fee to Edelson should be closely tied to Edelson's actual lodestar and then awarded respective of the one issue on which he was partially successful. While Edelson launched a broad attack on the release of the procedural right to pursue class actions on behalf of a nationwide personal injury class, the Court did not adopt Edelson's position. Rather, after thoughtful analysis, the Court held that it could not "conclude from the present record that a very narrowly defined, single-school personal injury class could never be certified against the NCAA."[1] And, for that carve-out, the Court has appointed Edelson lead counsel to pursue the personal injury claims in a separate MDL *where he will be compensated for his work if successful*.[2] Any award to Edelson should thus be a *pro rata* portion of his lodestar tied to this very narrow issue.

---

[1] Mem. Op. & Order, Jan. 26, 2016 (Dkt. 246) ("Order") at 29.

[2] And yet in this case, Edelson attempts to bill approximately 40 hours of work related to the personal injury cases (e.g., building a case website and creating complaint templates) (Dkt. 354-1 at 36-37). Doing so belies the basic principles underlying fee-shifting in class actions: that courts in their equitable discretion may award fees to lawyers who succeed in creating a common fund for the benefit of a class of plaintiffs. *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 563 (7th Cir. 1994). Of course, attorneys are not awarded *ex ante* for simply carving a path to litigation that may in the future create such a fund, as Edelson did when it helped open the door to personal injury claims.

Notwithstanding, Edelson seeks a 4.09 multiplier on his lodestar, claiming he is responsible for adding $50 million in value to the Settlement[3] based on one footnote mentioning the potential for reversion in an early brief.[4] This footnote, however, was not the driver Edelson now claims. While Settlement Class Counsel demonstrated that the Settlement Fund was likely to be nearly exhausted at the end of the Medical Monitoring Period,[5] the Court reasoned that reverter was disfavored due to policy concerns without reference to Edelson's buried footnote on the matter.[6] In fact, the Court only mentioned Nichols' objections twice throughout its original 21-page Opinion and Order; both were in regards to the right of class members to seek personal injury damages against the NCAA on a class-wide basis.[7]

Edelson's footnote is not worth $6 million. Yet, Edelson's request for a $6 million attorney fee is, in large part, based upon its belief that the Court simply adopted its "insistence" that the settlement fund be non-reversionary.[8] He further believes that he was entirely responsible for the direct notice campaign—which has no basis in the record.[9] His grandiose beliefs should be rejected.

Furthermore, Edelson bore little to no risk in advancing legal claims already investigated and briefed by Plaintiffs in their Motion For Class Certification. He conducted no discovery, did not hire any experts, and did not advance any expenses at the risk of non-payment. Multipliers are tied not only to compensation for time, but also to compensation for "the risk of not

---

[3] Dkt. 330 at 8.

[4] *See* Dkt. 83 at 7, n.13.

[5] *See* Corrected Expert Report of Bruce Deal (Dkt. 170) ("Deal Rep.").

[6] Mem. Op. & Order, Dec. 17, 2014 (Dkt. 115), at 19.

[7] *Id*. at 2, 4.

[8] Dkt. 330 at 4.

[9] *See* Settlement Class Reps.' Mot. for Approval of Notice Plan (Dkt. 84).

prevailing" and "the investment (money as well as time) that must be made in a case."[10] Judge Posner likens the increase in fee a contingency lawyer may recover to compensation "not only for the legal services he renders but for the loan of those services."[11] He explains that "[t]he interest rate on such a loan is high because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is so much higher than that of conventional loans."[12] Here, on the other hand, Edelson had little risk that the settlement would not ultimately be approved. Moreover, he protected his investment by limiting it to attorney time, not advancing the hundreds of thousands of dollars Class Counsel did to hire the top concussion experts in sports in the world. Under these circumstances, he is not entitled to the windfall he seeks.

As to the remaining fee petitions, The Dugan Law Firm, APLC, and McIlwain LLC should not be paid for work performed or experts they retained for other litigation. Similarly, neither Dwight E. Jefferson nor Gordon Law Offices Ltd. enhanced any benefit to the Settlement Class and thus should not be compensated merely for appearing. Attorneys' fee awards "are not participation trophies; rather, only 'lawyers who contribute materially to the proceedings . . . obtain a fee.'"[13]

Finally, Nichols' request for a $5,000 service award, like original class representatives Derek Owens, Kyle Solomon, and Angelica Palacios, should be rejected. Because Nichols did not invest substantial hours participating in discovery like Plaintiffs, his service award should be commensurate with those class representatives seeking $2,500 who appeared during the settlement process to opine in support of or opposed to the Settlement.

---

[10] Stuart T. Rossman & Charles Delbaum, *Consumer Class Actions* § 15.2.1 (6th ed. 2006).

[11] Richard Posner, *Economic Analysis of Law* § 21.9 (2d ed. 1984).

[12] *Id.*

[13] *Gehrich v. Chase Bank USA, N.A.*, 2016 WL 3027831, at *3 (N.D. Ill. May 27, 2016) (internal citation omitted).

## II. SUMMARY OF FEE PETITIONS TO WHICH SETTLEMENT CLASS COUNSEL OBJECTS

### A. Submissions by objectors

#### 1. The lodestar and expenses of each of objector Anthony Nichols' law firms

##### a. Edelson P.C.

Edelson P.C. reports spending 2,627.23 hours for a total lodestar of $1,272,624.25.[14] Yet he requests a fee award of $6 million. After combining his lodestar with his co-counsels' for an aggregate lodestar of $1,463,536.75, Edelson's fee request amounts to a 4.09 multiplier.

##### b. Gordon Law Offices Ltd.

Gordon Law Offices joins in Nichols' request for an award of $6 million. Gordon reports spending 349.5 hours for a lodestar of $175,612.5.[15] Gordon's detailed billing records, however, reflect very little, if any, time spent drafting any of the objections provided to this Court, but rather time spent reviewing pleadings after they were filed,[16] marketing to and retaining clients for future cases,[17] marketing to other lawyers to obtain clients for future cases against NCAA schools,[18] attending hearings in which its lawyers never spoke or appeared,[19] speaking with neurologists or neuropsychologists[20] (none of which ever appeared as experts for the Objectors), listening to an audio book about the NFL, and watching PBS.[21]

---

[14] Dkt. 330-1 ¶ 4.

[15] Dkt. 333 ¶ 4.

[16] *See, e.g.*, Dkt. 357-1 at 3 (entries for 10/29/13 reflect review of both Nichols' motion to intervene and Lead Counsel's opposition on same day).

[17] *See, e.g.*, *id.* at 8 (entry for 9/28/16 reflects meeting with NFL players).

[18] *See, e.g.*, *id.* at 7 (entries for 11/21-22/15 reflect meeting with sports lawyers from across the country), 8 (entry for 5/5-6/16 reflect meetings with lawyers from across the country at NFL Players Association meeting; entry for 5/2/16 reflects preparing for meeting with NFL Players' association; entry for 9/14/16 reflect meeting with sports lawyers from across country).

[19] *See, e.g.*, *id.* at 5 (attended 12/9/14 status, 2/3/15 motion hearing), 8 (attended 5/25/16 hearing).

[20] *See, e.g.*, *id.* at 3 (3/18/14), 4 (7/3/14, 7/19/14), 7 (10/29/15, 10/30/15, 11/23/15, 11/24/15, 1/26/16, 2/2/16, 2/4/16, 2/16/16), 9956 (6/7/16, 7/28/16).

[21] *See, e.g.*, *id.* at 3 (five entries between 11/3–9/13).

### c. Clifford Law Offices, P.C.

Clifford Law Offices P.C. joins in Nichols' request for an award of $6 million, yet reports spending just 25.5 hours of time for a lodestar of $15,300.00.[22] Lead Class Counsel does not object to the validity of the time reported by Clifford,[23] but does object to a 4.09 multiplier.

### 2. Objector Whittier's fee request for counsel Dwight E. Jefferson

Counsel for Plaintiff Whittier, Dwight E. Jefferson, reports that he expended approximately 205 hours of time for a lodestar of $82,000 and expenses of $9,052.67.[24] Whittier initially sought a fee award of $150,000,[25] which equates to a 1.85 multiplier on his counsel's time. Apparently after seeing the exorbitant request made by the Lead Objector, Whittier filed an amended petition, seeking a multiplier near 3 on his time for a total fee award of $231,798.[26] Whittier's counsel generally concurred in Edelson's positions[27] and spent 61.1 hours after Edelson was appointed as Lead Objector on reviewing various pleadings from the docket and "preparing" for hearings that were unnecessary and apparently not at Edelson's direction.[28]

### B. Submissions by plaintiffs' counsel

### 1. Executive committee member The Dugan Law Firm, APLC's fee request (Dkt. 339-1)

The Dugan Law Firm, APLC ("Dugan") seeks a fee award of $96,588.00 for 156.4 hours of time and expenses of $43,227.94.[29] James Dugan was appointed to the Executive Committee; Lead Counsel does not object to his fee request.

---

[22] Dkt. 334 ¶ 3.

[23] Dkt. 355, Ex. A.

[24] Dkt. 328-2 at 11, 25.

[25] Dkt. 328 at 1.

[26] Dkt. 419-1 at 1.

[27] Dkt. 94 at 2 (incorporating by reference "all of the arguments proffered by Nichols" into the Whittier objection).

[28] *See generally* Dkt. 340-3.

[29] Dkt. 339-1 ¶¶ 5-6.

However, Dugan claims to have retained an expert for which he expended $38,812.50,[30] to which Lead Counsel objects. Lead Counsel did not authorize Dugan to retain an expert, was not aware Dugan had retained an expert, and never received input from this purported expert. In fact, this expense exceeds the expenses authorized in the Settlement Agreement.

Prior to the filing of their Fee Petition, Lead Counsel reviewed Dugan's time report and identified that the expert was related to helmet safety and not to the Settlement or case against the NCAA. Accordingly, Lead Counsel requested that Dugan remove the request to be reimbursed for an expert that he had hired in connection with the severed case entitled *DuRocher et al. v. NCAA et al.*, No. 1:13-cv-01570 (S.D. Ind.). Because he refused, Lead Counsel declined to file his fee and expense request. Settlement Class Counsel thus request that the Court decline to award Dugan $38,812.50 in expenses.

### 2. Plaintiffs' counsel McIlwain LLC's fee request (Dkt. 358)

McIlwain LLC ("McIlwain") seeks a fee of $43,539.25 and expenses of $306.45 for work performed investigating the claims of a client on whose behalf he filed a lawsuit in the single school/single sport MDL on March 6, 2017.[31] McIlwain's work consisted of "reviewing" every pleading that has been filed since the *Walker* complaint was filed[32] and finding a football player on whose behalf he did not file a complaint or add to this MDL "because of the potential conflict of interests."[33] McIlwain also hired an expert who spent 193 hours[34] "review[ing] all of the

---

[30] *Id.* ¶ 6.
[31] Dkt. 383-2 ¶¶ 22-23.
[32] Dkt. 358-3 ¶ 11.
[33] *Id.* ¶ 13.
[34] *Id.* ¶¶ 19, 22 (reducing expert's hours for fee petition to 96).

medical literature referenced in every original complaint and tag along complaint" in this MDL.[35] McIlwain filed his fee application late due the fact that he was at a winery.[36]

## III.    ARGUMENT

### A.    Objectors are entitled to a fee award only if they materially enhanced the benefits to the Class in excess of their fee request.

Class Counsel acknowledges that "objectors play an essential role in judicial review of proposed settlements of class actions," as they assist the court in preventing a "deal that promotes the self-interest of both class counsel and the defendant" at the expense of the class.[37] In the Seventh Circuit, for an objector to merit an award of attorney fees, "the principles of restitution that authorize such a result also require . . . that the objectors produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class."[38]

Courts commonly deny fee requests from objectors when they are unconvinced that their objections have provided a tangible benefit to the class.[39] Courts have explained that "cases in which objectors are awarded attorneys' fees are few and far between."[40] Those cases should be limited to where "the objectors expended large amounts of time, money and resources, aided the

---

[35] *Id.* ¶¶ 15, 19.

[36] *Id.* ¶ 4.

[37] *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (internal quotation marks and citation omitted).

[38] *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687-88 (7th Cir. 2008) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002)).

[39] *See Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 504 (N.D. Ill. 2015), *appeal dismissed* (7th Cir. Jan. 27, 2016), *appeal dismissed* (7th Cir. Feb. 1, 2016), *appeal dismissed* (7th Cir. Feb. 3. 2016); *Reynolds*, 288 F.3d at 289; *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722-23 (7th Cir. 2001); *Gaskill v. Gordon*, 160 F.3d 361, 363-64 (7th Cir. 1998).

[40] *Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 513-14 (D. Del. 2003) (citing *In re Harnischfeger Indust., Inc. Sec. Litig.*, 212 F.R.D. 400, 413-15 (E.D. Wis. 2002)).

court considerably in its consideration of proposed settlements and fee awards, and the class members were ultimately benefitted as a result of the objectors' efforts."[41]

**B.     Edelson's fee request should be specifically tied to the narrow benefit conferred.**

The Court's primary purpose in appointing Nichols as lead objector was to ensure the adversarial nature of the settlement process and to "evaluat[e] the strength of these procedural claims . . . whether the personal injury claims of the proposed class against the NCAA are capable of being certified under Rule 23(b)(3) and 23(c)(4)."[42] Because Nichols' objections have been fundamentally based upon this sentiment, Edelson was given access to extensive discovery and fact-finding conducted by Class Counsel. Despite this record, the Court concluded that the majority of his objections regarding the value of a nationwide personal injury class were unsubstantiated.[43]

Ultimately, the scope of the release of class-wide personal injury claims was amended, at Class Counsel's suggestion, to allow for single sport, single school class cases to be filed[44]— much narrower than the massive class action capabilities envisioned by Edelson. Accordingly, the primary benefit conferred upon the class as a result of Nichols' objections is the speculative value of the single sport, single school MDL. Settlement Class Counsel does not contest that Edelson is entitled to a fee award relating to this very narrow issue. However, he seeks an unheralded 4 multiplier on his lodestar for a $6 million windfall based on a different issue—and one he only raised in a footnote. As set forth below, his request should be denied.

---

[41] *Id.*

[42] Dkt. 246 at 13-14 (internal quotation marks omitted).

[43] *Id.* at 14.

[44] Sec. Am. SA ¶ II(RR)(ii).

1. **The Court rejected or ignored the majority of issues raised by Nichols in his objections.**

   a. **The Court rejected Edelson's assertion that the Settlement waived a valuable right to Rule 23(b)(3) certification of a nationwide personal injury class.**

Edelson argued that the settlement impermissibly requires class members to waive their ability to pursue personal injury claims on a class-wide basis, strenuously asserting—in multiple rounds of briefing—that a Rule 23(b)(3) personal injury class could be certified.[45] The Court disagreed, however, stating that the likelihood that Plaintiffs would be able to obtain certification of their personal injury claims against the NCAA in this action pursuant to Rule 23(b)(3) and 23(c)(4) based upon the alleged claims of negligence and fraudulent concealment was minimal at best.[46] The Court also concluded that there is very little likelihood that a Rule 23(b)(3) or 23(c)(4) class for personal injury claims against the NCAA could be certified on a nationwide or multi-school basis.[47]

The Court did find, however, that it could not "conclude from the present record that a very narrowly defined, single-school personal injury class could never be certified against the NCAA."[48] Accordingly, *pursuant to a negotiated agreement between the NCAA and Class Counsel based upon Class Counsel's proposal*, the Second Amended Settlement releases all class-wide personal injury claims except for class-wide claims "pursued on behalf of a class of persons who allege personal injuries or bodily injuries resulting from their participation in a single NCAA-sanctioned sport at a single-NCAA member school, and relating to concussions or

---

[45] Dkt. 83, Aug. 22, 2014, at 8-21; Dkt. 178-1 § II.A; Dkt. 233 § II.A.

[46] Order at 14.

[47] *Id.* at 44.

[48] *Id.* at 29.

sub-concussive hits or contact."[49] Edelson never argued for this carve-out, nor proposed it during negotiations. Rather, after agreement between Class Counsel and the NCAA, the agreement was brought to Edelson, who agreed to the proposal without modification.

### b. The Court rejected Edelson's position that conflicts of interest existed.

Edelson argued that there is a conflict of interest between class members who have not been diagnosed with neurodegenerative conditions and those who have.[50] The Court disagreed, finding that "even class members with already diagnosed conditions will likely benefit from the Medical Monitoring Program by enabling them to determine whether their condition is progressively declining and/or whether they are experiencing symptoms related to a different, yet-undiagnosed condition."[51]

Edelson additionally argued that there is a conflict of interest between those class members who reside in states that recognize medical monitoring and those that do not.[52] The Court disagreed, stating: "[T]he Court rejects Nichol's argument that a conflict of interest exists between those class members that reside in states that recognize medical monitoring claims and those that do not."[53]

### c. The Court rejected Edelson's argument that that the Settlement's concussion management guidelines provided no benefit.

Edelson argued that the Settlement's concussion management guidelines to be implemented by the NCAA fail to provide any value because they merely recite guidelines

---

[49] Sec. Am. SA ¶ II(RR). The scope of the proposed release thus satisfied the Court's statement that "[p]erhaps there is a putative personal injury class that a potential plaintiff could allege—limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied—that might be appropriate for certification under Rule 23(b)(3)." Order at 29.

[50] Dkt. 183 at 6.

[51] Order at 17.

[52] Dkt. 183 at 6.

[53] Order at 18.

already in effect.[54] The Court disagreed, finding that the Settlement requires a number of new concussion management guidelines that will benefit the Settlement Class.[55]

> **d.     The Court rejected Edelson's argument that the claims process was designed to discourage claims.**

Edelson argued that the claims process—i.e., completing the questionnaire—will discourage class members from participating.[56] The Court disagreed, finding that answering the questions would not be unduly onerous or invasive.[57]

> **e.     The Court rejected Edelson's argument that the value of the settlement was limited to a co-pay.**

Edelson argued that the ultimate benefit to the Settlement Class Member is his or her co-pay for the services provided.[58] The Court found that Edelson's claim was not accurate.[59]

> **f.     The Court rejected Edelson's assertion that funds remaining at expiration of the MMP should go to class members and not concussion research.**

Edelson argued that the funds remaining at the expiration of the Medical Monitoring Period should benefit the class members and not be used for concussion-related research.[60] The Court disagreed, finding that the Medical Monitoring Period should be extended if sufficient funds exist but otherwise the remaining funds should be allocated to concussion research.[61]

---

[54] Dkt. 178-1 at 19; Dkt. 183 at 8, 10.

[55] Order at 44 n.30.

[56] Dkt. 178-1 at 17.

[57] Order at 46.

[58] Dkt. 178-1 at 16; Dkt. 183 at 8-9.

[59] Order at 47. The Court did, however, reject the right of the Settlement Administrator to seek subrogation, *id.*, which was consistent with Settlement Class Counsel's prior representations that the Program Administrator would not seek subrogation and thus Bruce Deal's report did not assume subrogation would occur. Deal Rep. ¶ 16.

[60] Dkt. 178-1 at 20-21.

[61] Order at 51.

### g. The Court rejected Edelson's assertion that the MMP provides benefits to less than one percent of the Settlement Class.

The Court rejected Edelson's claim that only 0.11% of the Class Members will benefit from the Settlement. The Court found it significant that 100% of the Settlement Class can complete the Screening Questionnaire up to five times over the 50-year Medical Monitoring Period, as symptoms may not arise until mid- to late-life.

### 2. Edelson's windfall request is tied to a single footnote.

One change to the original agreement leads Edelson to claim responsibility for more than two-thirds of the entire Settlement Fund—the provision precluding unused Settlement Funds at the end of the 50-year period from reverting to the NCAA.[62]

While Edelson's objection to the initial settlement agreement merely complained about the fund's reversionary potential in a footnote,[63] the Court addressed the provision in detail and added suggestions for its improvement without any reference to Nichols or Edelson.[64] While Settlement Class Counsel demonstrated that the Settlement Fund was likely to be nearly exhausted at the end of the Medical Monitoring Period and thus the reverter was illusory,[65] the Court reasoned that such a provision is disfavored due to policy concerns without reference to Edelson's buried footnote on the matter.[66] In fact, the Court only mentioned Nichols' objections twice throughout its original 21-page Opinion and Order; both were in regards to the right of class members to seek personal injury damages against the NCAA on a class-wide basis.[67]

---

[62] Dkt. 330 at 8.

[63] Dkt. 83 at 7 n.13.

[64] Dkt. 115 at 19-20.

[65] *See* Deal Rep.

[66] Dkt. 115 at 19.

[67] *Id*. at 2, 4.

It is clear from the record that the Court did not request changes to the settlement fund's reversionary provision as a result of Nichols' objections. And certainly Edelson's footnote is not worth $6 million. Yet, Edelson's request for a $6 million attorney fee is, in large part, based upon its belief that the Court simply adopted its "insistence" that the settlement fund be non-reversionary.[68] His grandiose beliefs should be rejected.

### 3. Edelson did not achieve a benefit for the Class worth more than his lodestar, much less worth a 4 multiplier on his lodestar.

Edelson is objector's counsel, not class counsel.[69] While class counsel is commonly awarded fees pursuant to a percentage of the settlement fund, objectors have been awarded fees that rarely exceed one percent of a common fund, and generally fall well below one percent.[70] Yet, here he seeks nearly nine percent of the fund.

To justify its request for nearly ten percent of the settlement fund, Edelson relies heavily on *Trans Union*, a case in which objectors were handsomely rewarded not simply for changing the terms or distribution method of the original settlement, but for securing an *additional* $70 million in funds, which unequivocally nearly tripled the size of the original settlement award.[71]

---

[68] Dkt. 330 at 4.

[69] Thus, unlike Class Counsel, Edelson took no depositions, hired no experts, deposed no experts, served no discovery, defended no class depositions, did not consult with doctors to develop the medical science protocols that are foundational to the case and settlement, and did not continuously meet with the science committee.

[70] *See, e.g.*, *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 169, 197 (E.D. Pa. 2000) (awarding objector fees in the amount of $10,000, which is approximately less than 0.0001% of the overall value of the approximately $111 million settlement fund); *In re First Fidelity Bancorp. Sec. Litig.*, 750 F. Supp. 160, 161, 165 (D.N.J. 1990) (awarding objector fees in the amount of $5,000, which is approximately 0.016% of the overall value of the approximately $30.9 million settlement fund); *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 396 (D.N.J. 2012) (awarding one objector $25,000—less than its full lodestar—and a second objector $82,000, which was approximately 0.003% and 0.01%, respectively, of the $8 million fund, where the latter objector's "advocacy provided certainty concerning the ability for owners or lessees of one category of vehicles to obtain cash reimbursement for specific damages")

[71] *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 747 (7th Cir. 2011) ("So far as we can judge, had it not been for the efforts of [the objectors] the class would indeed be poorer by $70 million.").

In addition, Edelson cites *McDonough v. Toys "R" Us, Inc.*,[72] where objectors successfully appealed the settlement, materially changing its terms. No such appeal was taken in this case. Moreover, as discussed above, the Court ignored or rejected the majority of Edelson's objections. And in *In re Puerto Rican Cabotage Antitrust Litig.*,[73] objectors helped the court to realize that class counsel was vastly overestimating the value of a base rate freeze provision (by more than double) and using that figure to inflate its free request at the expense of the class.

By contrast, Edelson's analysis of the supposed benefit conferred is a red herring. While terms have been modified, the Settlement Class has always had the opportunity to avail itself of the full benefits of the Settlement Amount. Edelson can claim a benefit to the Class but not an increase in the monetary benefit conferred. Accordingly, this Court should award Edelson a reasonable fee based on a reasonable lodestar,[74] but certainly not a multiplier.

Even assuming arguendo that Edelson alone achieved the changes he claims, the size of the Medical Monitoring Fund, $70 million, plus $5 million for concussion-related research, did not change from the initial Settlement to the Amended Settlements. Moreover, the definitions of the Settlement Class (and thus the number of beneficiaries) did not change from the initial Settlement to the amended Settlements.

---

[72] 80 F. Supp. 3d 626, 660 (E.D. Pa. 2015).

[73] 815 F. Supp. 2d 448, 467 (D.P.R. 2011).

[74] Class counsel begs the question as to whether timesheets Edelson submitted are reasonable: in addition to billing for time spent researching unsuccessful sanctions motions and potential malpractice cases against class counsel, and work related to its separate personal injury cases, Edelson on at least five occasions billed for unnecessarily large teams of three to five attorneys to attend hearings and mediations. Moreover, Edelson included in its timesheets at least forty hours on a PowerPoint presentation about personal injury claims (Dkt. 354-1 at 21-22, 40); nine hours on a "path to citizenship" proposal, which has nothing to do with this case (*id.* at 40); a seven-hour internal meeting (*id.* at 49); and numerous instances where attorneys billed an unreasonable amount of time (often a full hour) to send a courtesy copy, call the judge's clerks with routine questions, and draft boilerplate procedural motions (*id.* at 23, 34-35).

Under similar circumstances, the Second Circuit affirmed a district court's decision to award fees to an objector but deny a multiplier on the objector's lodestar, stating: "the district court [] already accounted for counsel's efforts and contributions to the class settlement in arriving at a reasonable number of hours exerted on the objections."[75] Moreover, in affirming the denial of a multiplier, the Second Circuit found it significant that the "objections arguably resulted in no increase in the class settlement's value," but instead "an improvement to the distributional fairness of the class settlement."[76] And although the Seventh Circuit has instructed courts to award objectors fees that relate to the benefit conferred on the class, fee awards in common fund cases should also be viewed in light of attorneys' investment in the case.[77] For instance, the *Trans Union* special master recommended that the district court award objectors a percentage because he predicted, based on their attorneys' timesheets, that a percentage figure would be a *more modest* fee award than one based on their purported lodestar.[78] But far from modest, here Edelson requests four times its lodestar.

Edelson also attempts to justify its inflated fee request with some disingenuous references to case law. For instance, it likens its contribution to that of objectors in *Eubank v Pella Corp.*, in which attorneys represented ousted class representatives to win a reversal of class counsel's

---

[75] *Lobur v. Parker*, 378 F. App'x. 63, 65 (2d Cir. 2010).

[76] *Id.*

[77] *In re Trans Union Corp. Privacy Litig.*, 629 F.3d at 747-48 ("The special master may have had an inkling that his percentage allocations were arbitrary, because he also looked at the relative time productively invested by the different lawyers . . . ."); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) ("In addition to the percentage-of-recovery approach, we have suggested it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method.") (internal citation omitted); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award.").

[78] *In re Trans Union Corp. Privacy Litig.*, 2009 WL 4799954, at *18-20 (N.D. Ill. Dec. 9, 2009).

collusive and "inequitable—even scandalous" settlement deal.[79] As the record demonstrates, any such analogy to the relative roles of counsel in this case would rely on a false premise that Class Counsel demonstrated anything less than good faith throughout this litigation. And though Edelson bills upward of twenty hours researching possible malpractice and sanctions actions against class counsel,[80] he either has not pursued them or his attempts at such claims have been rightly denied by the district court.

Finally, Edelson bore little to no risk in advancing legal claims already investigated and briefed by Plaintiffs in their Motion For Class Certification. In fact, his final position regarding whether a nationwide Rule 23(b)(3) class could be certified for negligence was taken directly from Plaintiffs' class certification motion, in which they petitioned for an issues class on duty and breach.[81] While given access to all of the discovery conducted by Class Counsel, Edelson did not conduct any independent discovery, nor proffered any expert opinions. Certainly, Edelson did not advance any expenses at the risk of non-payment. Given the low risk of non-payment for time and his failure to advance little to any out-of-pocket costs, he is not entitled to a multiplier or windfall for bearing risk.[82]

## C. Gordon and Jefferson did not materially benefit the Settlement Class.

Objectors' counsel are not entitled to a fee award just for appearing. "This is a litigation, not a winning lottery ticket," nor a place for "participation trophies" for objectors' counsel.[83]

---

[79] 753 F.3d 718, 721 (7th Cir. 2014).

[80] Dkt. 354-1 at 11-12.

[81] *Compare* Dkt. 233 § II.B (Edelson argument that a Rule 23(c)(4) class is viable) *with Arrington* Dkt. 175 (Pls.' Mem. in Support of Mot. for Class Cert. originally advancing same argument).

[82] Posner, *supra*, § 21.9.

[83] *In re Visa Check/MasterMoney Antitrust Litig.*, 2004 U.S. Dist. LEXIS 8737, at *36 (E.D.N.Y. Apr. 2, 2004); *Gehrich v. Chase Bank USA, N.A.*, 2016 WL 3027831, at *3.

First, Gordon's time had little to do with the Settlement Class and is not compensable. Gordon's lawyers should not be compensated for (i) reviewing pleadings after they were filed;[84] (ii) attending hearings in which its lawyers never spoke or appeared;[85] or (ii) marketing to prospective clients and other lawyers to obtain clients for future cases against NCAA schools.[86] In essence, Gordon seeks a windfall for putting his name on Edelson's papers. Gordon did not "expend[] large amounts of time, money and resources" or "aid[] the [Court] considerably in its consideration of proposed settlements."[87] Certainly its work did not "produce an improvement in the settlement worth more than the fee" being sought.[88] Accordingly, Gordon's fee and expense requests should be denied.

Second, Jefferson's request for a three multiplier on his lodestar of $81,066, plus expenses of $9,062.67, is not tied to any material benefit he supposedly achieved for the Class. In fact, Jefferson's client, Whittier, was not appointed Lead Objector. Nichols was appointed Lead Objector on May 14, 2015. Accordingly, the hours spent by Jefferson after that date should

---

[84] *See, e.g.*, Dkt. 357-1 at 3 (entries for 10/29/13 reflect review of both Nichols' motion to intervene and Lead Counsel's opposition on same day). *See also Dryer v. NFL*, 2013 U.S. Dist. LEXIS 49993, at *20 (D. Minn. Apr. 5, 2013) ("The following categories are examples of time that will not be compensated absent extraordinary circumstances: i. Read and review time for persons not overseeing or directly participating in a project."). *Cf. Skelton v. Gen. Motors Corp.*, 1988 U.S. Dist. LEXIS 6365, at *6-7 (N.D. Ill. June 27, 1988) (compensating for limited "read and review" time for work necessary to performing a task).

[85] *See, e.g.*, Dkt. 357-1 at 5 (attended 12/9/14 status, 2/3/15 motion hearing), 8 (attended 5/25/16 hearing). *See also Dryer*, 2013 U.S. Dist. LEXIS 49993, at *20.

[86] *See, e.g.*, Dkt. 357-1 at 8 (entry for 9/28/16 reflects meeting with NFL players), 7 (entries for 11/21-22/15 reflect meeting with sports lawyers from across the country), 8 (entry for 5/5-6/16 reflect meetings with lawyers from across the country at NFL Players Association meeting; entry for 5/2/16 reflects preparing for meeting with NFL Players' association; entry for 9/14/16 reflects meeting with sports lawyers from across country).

[87] *Spark*, 289 F. Supp. 2d at 513.

[88] *Reynolds*, 288 F.3d at 288.

be rejected. Of the 205.8 hours spent, 70.4 hours ($27,666) were spent after May 14, 2015,[89]

merely mimicking the stances taken by the Lead Objector.

Even if the 135.4 hours ($53,400) spent by Jefferson prior to May 14, 2015 are

compensable (which is highly questionable), he is not entitled to a multiplier of 3. According to

the Seventh Circuit, the court should "view the multiplier [request] from an ex ante perspective;

that is, what size risk the attorney assumed at the outset by taking this type of case."[90] Here,

Whittier's counsel had little to no risk in filing an objection in this matter; he expended little

time, did not retain an expert, and followed Nichols' lead. Accordingly, Jefferson's fee and

expense request should be denied.

**D.      Plaintiffs' counsel should not be compensated for time and expenses incurred for other lawsuits.**

**1.      Dugan should be awarded his lodestar, but not reimbursed for expert expenses incurred in connection with a separate lawsuit.**

As a member of the Executive Committee appointed after the original settlement

agreement was submitted to the Court, Dugan contributed to the discourse concerning the

contours of the Medical Monitoring Program for which lodestar is appropriate. His expenses,

however, are overstated.

Dugan claims to have retained an expert for which he seeks expenses from the Settlement

Fund of $38,812.50.[91] However, Lead Counsel did not authorize Dugan to retain an expert, was

not aware Dugan had retained an expert, and never received any input from this purported

---

[89] See Dkt. 340-3.

[90] *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991).

[91] Dkt. 339-1 ¶ 6.

expert.[92] Accordingly, because the expenses incurred for this expert did not materially benefit the Class, the Court should deny Dugan's request for reimbursement of $38,812.50 in expenses.

### 2. McIlwain's time was spent investigating and retaining a client for the single school/single sport MDL.

McIlwain seeks a fee of $43,539.25 and expenses of $306.45 for work performed investigating the claims of a client, Bennie Charles Witukiewicz, on whose behalf he filed a lawsuit in the single school/single sport MDL on March 6, 2017.[93] In fact, McIlwain asserts he did not file an objection on Mr. Witukiewicz's behalf in this MDL due to conflicts of interest.[94] Thus, McIlwain has never submitted any substantive information—pro or con—to this Court regarding the Settlement. His request for fees and expenses should be denied.

### E. Service awards should be based on service, not appearance.

Nichols seeks $5,000 as a service award akin to the class representatives who answered discovery, sat for multi-day depositions, and have been actively litigating this case for six years. Yet, Nichols has not answered discovery, sat for deposition, been examined by an NCAA expert, or appeared in Court. Rather, his attorneys have made legal arguments. His request for a service award of $5,000 should be reduced to $2,500, which is the amount Class Counsel requested for new Class Members who appeared during the settlement process to provide their views.[95]

---

[92] Prior to the filing of their Fee Petition, Lead Counsel reviewed Dugan's time report and identified that the expert was related to helmet safety, and not to the Settlement or case against the NCAA. Accordingly, Lead Counsel requested that Dugan remove the request to be reimbursed for an expert that he had hired in connection with the severed case entitled *DuRocher et al. v. NCAA et al.*, No. 1:13-cv-01570 (S.D. Ind.). Because he refused, Lead Counsel declined to file his fee and expense request.

[93] Dkt. 383 at 4-5.

[94] *Id*. While Settlement Class Counsel is not aware of the specific conflict of interest that prevented Witukiewicz from participating in this MDL, courts have denied compensation to attorneys disqualified by a conflict of interest. *In re Chou-Chen Chems., Inc.*, 31 B.R. 842 (Bankr. W.D. Ky. 1983); *In re Paine*, 14 B.R. 272 (W.D. Mich. 1981).

[95] Dkt. 327 at 13.

## IV.    CONCLUSION

WHEREFORE, Class Counsel respectfully requests that the Court:

1.    Deny Edelson P.C.'s request for $6 million (which is a 4.09 multiplier on its lodestar of $1,272,624.25 combined with Gordon and Clifford), and award Edelson P.C. a pro rata share of its actual lodestar based on the narrow benefit conferred;

2.    Deny the fee petition of Gordon Law Offices Ltd.;

3.    Grant Clifford Law Offices P.C.'s request for a lodestar of $15,300.00, but deny its request for a multiplier;

4.    Deny the fee petition of counsel Dwight E. Jefferson and his firm, Coates Rose, P.C.;

5.    Grant the fee petition of The Dugan Law Firm APLC but limit its reimbursement of expenses to $4,415.44;

6.    Deny the fee petition of McIlwain LLC; and

7.    Award Objector Nichols a service award of $2,500.[96]

Dated: September 15, 2017                    Respectfully submitted,

By:    /s/ Steve W. Berman
         Steve W. Berman
*steve@hbsslaw.com*
Christopher P. O'Hara
*chriso@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

---

[96] Class Counsel takes no position on Adrian Arrington's request for a $5,000 service award.

Elizabeth A. Fegan
*beth@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950

*Settlement Class Counsel*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on September 15, 2017, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: <u>*/s/ Steve W. Berman*</u>
       Steve W. Berman