UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**REPLY IN SUPPORT OF SETTLEMENT CLASS COUNSEL'S FEE PETITION**

**TABLE OF CONTENTS**

<u>Page</u>

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT.........................................................................................................................2

    A. The record and precedent cited by the Lead Objector supports Class Counsel's fee request based on a percentage request of the Medical Monitoring Fund. ........................................................................................................2

        1. Nichols' contention that the $70 million Fund was a fiction is nonsense. ..............................................................................................2

        2. Whether 21% or 25%, Class Counsel is seeking a reasonable percentage of the Fund................................................................................4

        3. Each firm comprising Class Counsel certified their lodestar.......................6

        4. Siprut PC's hours are appropriate and substantiated. ................................7

        5. Nichols' remaining accusations of "misconduct" are libelous. ...................9

    B. The general objections to the amount of attorneys' fees where compensatory damages are not awarded lack merit......................................................................11

        1. Fee requests in class actions do not require Class Counsel to have achieved the impossible. ..........................................................................11

        2. The miscellaneous objections to fees are without merit. ..........................12

III. CONCLUSION..................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Browning v. Yahoo! Inc.*,
  2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ..........................................................................11

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .................................................................................................11

*Kazman v. Frontier Oil Corp.*,
  398 S.W.3d 377 (Tex. App. 2013) ........................................................................................... 13

*In re NCAA Student-Athlete Concussion Injury Litig.*,
  2016 WL 305380 (N.D. Ill. Jan. 26, 2016) ..............................................................................11

*In re Oil Spill by Oil Rig Deepwater Horizon*,
  910 F. Supp. 2d 891 (E.D. La. 2012) .......................................................................................12

*Pearson v. NBTY, Inc.*,
  772 F.3d 778 (7th Cir. 2014) ...............................................................................................5, 14

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) .....................................................................................................5

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ..............................................................................................1, 12

### STATUTES

28 U.S.C. § 1715 ............................................................................................................................10

I.  INTRODUCTION

Lead Class Counsel negotiated a settlement comprised of a $70 million Medical Monitoring Fund, $5 million for concussion research, and significant changes to the NCAA's concussion-management and return-to-play guidelines.  Nonetheless, the Lead Objector argues Class Counsel should be compensated as if they achieved just $140,000 to $40 million for the Class.[1]  Not only are his arguments factually incorrect, the Lead Objector completely ignores the factors considered by the Seventh Circuit,[2] each of which supports Settlement Class Counsel's petition for $15 million.  Similarly, other objectors complain that attorneys' fees are not justified due to the lack of compensatory damages, but fail to recognize that a nationwide personal injury class could not be certified.

The factors in *Synthroid* support Class Counsel's fee request. First, Class Counsel faced a significant risk of nonpayment when they filed the *Arrington* litigation in 2011.  Second, the quality of Class Counsel's performance is demonstrated by the 10,000+ hours invested on the merits, the NCAA's desire to enter settlement negotiations after Lead Class Counsel filed Plaintiffs' Motion For Class Certification, the subsequent joinder of the Hausfeld Group with Lead Class Counsel to pursue additional protections for early-onset dementia and other symptoms related to Chronic Traumatic Encephalopathy, the support of Robert Cantu, M.D. (one of the leading experts on concussion in sport in the world), and the tenacious work involved in demonstrating that Nichols' claim that a Rule 23(b)(3) nationwide class for personal injury could be certified was not supported by fact or law.

Third, the amount of work necessary to resolve the litigation is self-evident. Settlement negotiations commenced in 2014, and have required significant time and expense to marshal the

---

[1] Dkt. No. 457 at 4-5.
[2] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001).

support of Plaintiffs, the NCAA, the NCAA's insurers, the NCAA's member institutions, and the Lead Objector. Finally, the stakes of the case have always been high. The short and long-term effects of concussions and the accumulation of subconcussive hits are real and can be devastating. The sooner NCAA student-athletes have access to first-class neurological and neuropsychological assessments to determine the cause of any symptoms, the sooner they can seek appropriate treatment. Likewise, the implementation of changes to the NCAA's concussion-management and return-to-play guidelines is critical to reduce the incidence and exacerbation of head trauma.

Class Counsel does acknowledge, however, that their request for out-of-pocket expenses should be reduced to $727,189.88.[3] Accordingly, for these and the reasons set forth below, Class Counsel's fee petition should be granted, as amended.

## II. ARGUMENT

**A. The record and precedent cited by the Lead Objector supports Class Counsel's fee request based on a percentage request of the Medical Monitoring Fund.**

**1. Nichols' contention that the $70 million Fund was a fiction is nonsense.**

Class Counsel seeks a percentage of the $70 million Fund in fees and costs. The Lead Objector argues that the Fund is actually less than $70 million, and thus the percentage fee request should come from a gross number of $140,000 to $40 million.[4] His claims include: (i) Edelson was responsible for adding $50 million in value to the Settlement[5] based on one footnote mentioning the potential for reversion in an early brief;[6] (ii) Plaintiffs' expert opined that the

---

[3] As noted by Objector Young, Dkt. No. 425 at 9, Hagens Berman concedes that it should not have billed for marketing fees of $28,526.11. As set forth in their fee petition, the actual expenses incurred by Class Counsel are $755,715.99. Dkt. No. 327 at 13. Less the marketing fees, Class Counsel seeks reimbursement of expenses of $727,189.88.

[4] Dkt. No. 457 at 4-5.

[5] Dkt. No. 330 at 8.

[6] *See* Dkt. No. 83 at 7 n.13.

Fund was worth just $20-40 million;[7] and (iii) the Fund may pay out just $140,000.[8] Each of these arguments is contrived.

First, Edelson's footnote was not the driver he now claims. While Settlement Class Counsel demonstrated that the Settlement Fund was likely to be nearly exhausted at the end of the Medical Monitoring Period,[9] the Court reasoned that reverter was disfavored due to policy concerns without reference to Edelson's buried footnote on the matter.[10] In fact, the Court only mentioned Nichols' objections twice throughout its original 21-page Opinion and Order; both were in regards to the right of Class Members to seek personal injury damages against the NCAA on a class-wide basis.[11]

Second, Bruce Deal was hired to address the Court's express concerns regarding the sufficiency of the Medical Monitoring Fund to last 50 years. The tables Nichols cites in Mr. Deal's reports merely demonstrate how the Fund would react to different inputs based on take rate and varying levels of test costs.[12] In fact, Mr. Deal projected in the fourth scenario that the Fund would have just $2 million left at its conclusion.[13] And, this scenario assumed *more than* $70 million in nominal expenditures, making use of the interest earned on the Fund balance over its life to ensure overall Fund adequacy.[14] Accordingly, Nichols' attempt to use these demonstrations to show the $70 million was a "fiction" should be rejected.

---

[7] Dkt. No. 457 at 5.
[8] *Id*.
[9] *See* Corrected Expert Report of Bruce Deal (Dkt. No. 170) ("Deal Rep.").
[10] Mem. Op. & Order, Dec. 17, 2014 (Dkt. No. 115) at 19.
[11] *Id*. at 2, 4.
[12] Dkt. No. 70 at 26; Dkt. No. 170 at 43.
[13] Dkt. No. 170 at 43.
[14] *Id*.

Next, Nichols' claim that the Fund will pay out as little as $140,000 is not based on fact or science. He claims that insurance will be used by Class Members, who will only need to pay an average $40 co-pay.[15] This Court already found that this argument was not accurate.[16]

Nichols further claims that the Class's benefit is reduced because the MMP makes Class Members "jump through hoops" to get a diagnosis of CTE.[17] In fact, CTE cannot be diagnosed in living persons; it can only be diagnosed post-mortem.[18] Thus, the MMP provides no hoops at all; rather, it provides state of the art neurological and neuropsychological examinations to qualifying Class Members to determine whether cognitive deficits are linked to concussions.

Nichols' recycling of rejected and unsupported arguments is a waste of this Court's time and the parties' resources. The NCAA and its insurers agreed to pay $70 million in hard money prior to Edelson's or Nichols' involvement in the litigation. This Court should reject the attempt to diminish Class Counsel's fee award based on this accomplishment.

### 2. Whether 21% or 25%, Class Counsel is seeking a reasonable percentage of the Fund.

Nichols asserts that (i) notice and administrative costs should be subtracted from the $70 million before calculating the percentage of fees to be awarded; and (ii) any fee award reduced

---

[15] Dkt. No. 457 at 5.

[16] Dkt. No. 246 at 46 (granting Joint Motion for Preliminary Approval of Amended Class Settlement and Certification of Settlement Class, subject to modifications, and stating: "Second, Nichols contends that, because many class members have private health insurance, the ultimate benefit to the class member is the amount of his or her co-pay for the services provided. That argument assumes that a class member could go to a single doctor on a single visit to determine whether they have PCS or CTE. That also assumes that the Medical Monitoring Program requires class members to assert a claim of benefits against their private health insurance company to obtain the benefits of the settlement. Neither is accurate.").

[17] Dkt. No. 457 at 5 n.1

[18] *See* Mayo Clinic, Chronic traumatic encephalopathy, Tests and diagnosis ("There is currently no reliable way to diagnose CTE. A diagnosis requires evidence of degeneration of brain tissue and deposits of tau and other proteins in the brain that can be seen only upon inspection after death (autopsy)."), *available at* http://www.mayoclinic.org/diseases-conditions/chronic-traumatic-encephalopathy/basics/tests-diagnosis/con-20113581 (last visited Sept. 26, 2017).

010270-12 988211 V1

because the initial Settlement was not approved. First, Class Counsel does not contest that notice and administrative costs are not considered a benefit to the Class for purposes of awarding fees.[19]

However, even if the fee award is determined based on $65 million,[20] the percentage fee request is reasonable. Class Counsel's request for $15 million in fees plus $727,189.88 in expenses is 24% of $65 million. According to the Seventh Circuit, "…the presumption should we suggest be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel."[21] Class Counsel's request falls well below the ceiling of 33%-50%.

Second, Nichols claims that the fee request should be reduced because the Settlement was not approved on the first go-round. However, the cases he cites for this proposition reduced fee awards to class counsel from 1/3 of the fund to 20-25% of the fund[22/23]—exactly what Class Counsel seeks here. Moreover, he fails to take into account that the key terms of the Settlement—$70 million fund, $5 million (additional) for concussion research, and changes to the NCAA's return-to-play and concussion-management guidelines—remain unchanged.

---

[19] *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) (holding notice costs, administration costs, and attorneys' fees are not part of the value received from the settlement by class members).

[20] Nichols attempts to inflate notice costs based on reminder notices to be sent in the future. However, those costs are likely to be far reduced from the initial round because (i) no additional work needs to be done to obtain or clean up contact information from 1,100 schools; (ii) Class Members are providing and will provide email addresses as part of the collection of data; notice via email is much less expensive than mail via the postal service; and (iii) as technology changes, the avenues for notice are becoming far more accessible and less expensive than traditional forms of publication notice.

[21] *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014).

[22] Dkt. No. 457 at 7 (citing *Zink v. First Niagara*, 2016 WL 7473278 (W.D.N.Y. Dec. 29, 2016) and *Valdez v. Neil Jones Food Co.*, 2016 WL 4247911 (E.D. Cal. Aug. 10, 2016)).

[23] Accordingly, even if Objector Wineberg's contention that the percentage is actually 29% is correct, Class Counsel's request is still below the ceiling. *See* Dkt. No. 378, at 2. Similarly, Objector Wilson does not account for the contingency fee permitted nor multiplier allowed under *Synthroid* and its progeny. Dkt. No. 428 at 1.

Finally, Nichols completely ignores that his counsel's fee request (an exorbitant $6 million) will reduce Class Counsel's fee award. Any further reduction ignores the *Synthroid* factors.

### 3. Each firm comprising Class Counsel certified their lodestar.

On the one hand, Edelson repeatedly asserts that lodestar is irrelevant to the award of fees.[24] He must do this, of course, to justify his own request for $6 million given that it is a 4.09 multiplier on his actual time.[25] Nonetheless, he unjustifiably seeks to reduce Class Counsel's lodestar while maintaining our request for a 1.5 multiplier static. *While so arguing, he nowhere asserts that this reduction will inure to the benefit of the Settlement Class in any way.* In fact, his machinations magically reduce Class Counsel's fee request to $9 million—a perfect set-up to his request for the remaining $6 million of the $15 million agreed to by the NCAA for an award of attorneys' fees in the Settlement. His personal attacks on Class Counsel's integrity should be viewed from the standpoint that the attacks are a personal vendetta of Edelson incentivized by his desire for $6 million, and not the objections of a Class Member seeking to increase the benefit to the Settlement Class.

Each firm that submitted their fee declarations, and subsequent detailed time reports, certified their accuracy and welcome inquiries from the Court as to any concerns it may have. Class Counsel worked diligently to ensure that work performed was not duplicative. Hagens Berman's lodestar is nearly double that of Siprut's for that very reason. Moreover, after Lead Class Counsel and the NCAA advised the Court of settlement negotiations in 2014, Edelson was not the only lawyer to appear. The Hausfeld Group joined the fray to ensure that late-life cognitive impairment was covered.[26] After two of their members were appointed to the

---

[24] Dkt. No. 457 at 3-4, 8.

[25] Dkt. No. 330.

[26] *See, e.g.,* Dkt. No. 5 (after MDL created, filing motion to enjoin settlement negotiations), 40 (withdrawal of motion after counsel conferred multiple times), 49 (joint agreed motion for

Executive Committee, the Hausfeld Group worked behind the scenes to improve the Settlement. Merely because the Hausfeld Group worked cooperatively to effect change, rather than adversarially like Edelson, does not render their work duplicative.

### 4. Siprut PC's hours are appropriate and substantiated.

In his effort to justify his own fees, Nichols' counsel (Jay Edelson) unfortunately denigrates those of Class Counsel, who more than coincidentally are his competitors for fees in this (and other) cases. With respect to the Siprut firm, Edelson's sole basis for attack is based on recasting work performed by Siprut in another, unrelated case. Suffice it to say Siprut disagrees with Edelson's characterization of what transpired in the *Western Union* matter, and the billings in that case have nothing to do with anything.

Edelson provides zero evidence that even a single hour submitted by Siprut was not appropriately billed in either matter, other than speculation concerning his own "analysis" of what he thinks Joe Siprut has submitted in the last five years based on Edelson's computations of hours from fee petitions and docket searches in other matters. In doing so, Edelson ignores that he himself has personally submitted fee petitions in at least 51 federal cases (more than Siprut) during the same time period, and that those petitions list thousands of hours recorded by Edelson and seek tens of millions of dollars. As tempting as it is to respond tit for tat and malign the Edelson firm in the same way the Siprut firm has been impugned by Edelson's baseless conjecturing, we won't. It is not relevant to the issues before this Court, and, in our view, is inappropriate.[27]

---

appointment of Lead Counsel, Special Class Counsel for Monitoring Relief, and Executive Committee).

[27] Incidentally, on its face, Edelson's "analysis" is flawed. For example, Edelson assumes that Siprut would spread his time evenly across all matters, although most contingency fee lawyers (at least the successful ones) spend more time on their better matters that progress to settlement or trial and less time on those matters that do not. Edelson also mischaracterizes the relevant time

- 7 -

More important than what Edelson has to say about *Western Union*, however, is what Edelson fails to say about *this* case. On March 25, 2017, after failing to reach a mediated agreement with Class Counsel (via retired Judge Andersen) concerning his $6 million fee petition on behalf of Nichols, Edelson suddenly decided that he "needed" to take the deposition of the Siprut firm to learn more about Siprut's timekeeping practices.[28] This decision was curious given that Class Counsel's fee petition was filed nearly three months earlier on January 13, 2017, but that it was only *after* Edelson could not get Class Counsel to accede to his $6 million fee request that he suddenly decided discovery from Siprut PC was necessary.

And perhaps Edelson also forgot that, rather than fight about the request for discovery into Siprut PC's billing practices, Joe Siprut offered to provide—and did in fact provide—a declaration to Edelson (in draft form for his review) with more detail concerning the Siprut firm's billing practice to allay any "concerns" Edelson professed to have, and to answer the types of questions that would be posed in any deposition of Siprut. After providing the draft declaration to Edelson, that was the last Siprut heard from Edelson on that topic.[29]

Given that history, it seems clear that Edelson's renewed interest in Siprut's timekeeping is simply an effort to take money that would otherwise be paid to the Siprut firm for its work, and to have it paid to Edelson's firm. The Court should properly view anything by Edelson in that context. Also, Edelson's arguments are particularly interesting in light of his own fee petition in this case. Edelson complains that the Siprut firm lodestar of 4,715.4 hours—which is less than half that of co-Class Counsel's Hagen Berman's time as a result of those firms'

---

period (2011-2016) as five years, when it is actually six years. The result is that even accepting Edelson's math, Siprut has submitted fee petitions seeking reimbursement for less than 1,500 hours per year.

[28] Declaration of Joseph J. Siprut, ¶ 2.

[29] *Id.*

coordination of efforts—is too high. But Edelson forgets that in this same case—in which he represents an objector who is seeking an incentive award of $5,000—Edelson's firm billed 2,627.2 hours, which is nearly 56% of that of the Siprut firm, and Edelson himself billed over 500 hours. All in a case where Edelson did not make his first appearance until Class Counsel had already litigated the case for years, and already had extensive settlement discussions with the NCAA (which of course resulted in a formal settlement shortly thereafter). It is hard to imagine how the Siprut firm's hours "lack any credibility" when compared to the volume of hours submitted by one of the attorneys for one objector.

### 5. Nichols' remaining accusations of "misconduct" are libelous.

First, Nichols claims that Class Counsel has violated Rule 23(h) because they "buried" the fact that the Settlement provides the right to seek up to $500,000 in fees for work performed after the first year from the Effective Date to be approved by the Chair of the MSC (in this case, the Special Master is Judge Wayne Andersen (Ret.)).[30] Class Counsel apparently "hid" this provision so well that the Court considered it in its December 17, 2014 Order,[31] and in fact suggested that continuing oversight of the Settlement be done by a Special Master.[32] Nichols' accusation is thus unfounded.

Second, Nichols' argument that Class Counsel engaged in gamesmanship to allow the NCAA to scuttle the deal by postponing CAFA notice of the original settlement until after

---

[30] Dkt. No. 457 at 13.

[31] Dkt. No. 115 at 9 ("As Class Counsel will have a continuing obligation to implement the terms of the Settlement throughout the Medical Monitoring Period, the NCAA also has agreed not to object to applications from Lead Counsel and one member of the Plaintiffs' counsel Executive Committee for additional attorneys' fees, at a rate not to exceed $400.00 per hour to a maximum of $500,000.00 for work performed after the first year from the Effective Date of Settlement.").

[32] *Id*. at 21.

preliminary approval is nonsensical.[33] Class Counsel had no incentive to set up a deal that could be terminated. Moreover, CAFA notice is a defendant's responsibility, and non-compliance with CAFA would not have permitted the NCAA to terminate the deal as Nichols contends.[34] Nonetheless, there was no error. The original settlement agreement was filed on July 29, 2014, and the NCAA sent CAFA notice to the respective attorneys general on August 8, 2014.[35] None have appeared to complain about procedure or substance.

Finally, Nichols' contention that Class Counsel conditioned Arrington's receipt of a service award on his support of the Settlement is just wrong.[36] In fact, Arrington accused Siprut of wrongly stating that he agreed to the Settlement. Thereafter, Siprut withdrew from his representation, and Arrington retained new counsel, namely Clifford Law Offices. Under those circumstances, it would be improper for Class Counsel to continue to advocate on Arrington's behalf. And, in fact, Class Counsel expressly took no position on whether Arrington should receive an incentive award.[37] Litigation misconduct hardly: if Class Counsel had requested relief for Arrington, they would be accused of trying to manipulate a person they know to be represented by other counsel. Nichols' objections should be overruled.

---

[33] Dkt. No. 457 at 17-18.

[34] 28 U.S.C. § 1715(b) ("Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement…."); *Id.* § 1715(e) (absent CAFA notice, a class member may refuse to comply or be bound by the settlement).

[35] The NCAA provided subsequent additional CAFA notices on September 16, 2014, November 4, 2014, April 24, 2015, and May 27, 2016.

[36] Dkt. No. 457 at 18.

[37] Dkt. No. 460 at 25 n.96.

**B. The general objections to the amount of attorneys' fees where compensatory damages are not awarded lack merit.**

**1. Fee requests in class actions do not require Class Counsel to have achieved the impossible.**

All of the remaining objections complain that the Settlement does not provide compensation for personal injury or medical care, and thus the attorneys' fees are not warranted or commensurate with the benefit provided.[38] However, as reflected in Plaintiffs' Motion for Final Approval, complaining that the Settlement should be "better" is not a valid objection.[39]

First, the fact that Plaintiffs did not achieve a nationwide personal injury settlement is hardly questionable given the merits. This Court has already undertaken extensive analysis of the Plaintiffs' negligence claims, together with the release which expressly preserves the right to bring individual negligence claims and class claims for student-athletes at a single NCAA school in a single sport. As the result of an adversarial briefing process, on January 26, 2016, this Court preliminarily approved the amended settlement and conditionally certified the settlement class, finding that "it was highly unlikely that a nationwide class of current or former NCAA student-athletes or a class consisting of current or former NCAA student-athletes from multiple schools could be certified under Rule 23(b)(3) or 23(c)(4) for the purpose of asserting bodily injury claims for damages."[40] Thereafter, the Court further found "that it is highly unlikely that a multiple-sport, single-school bodily injury class would be sufficiently cohesive to warrant

---

[38] *See* Objections of Paul J. Schafer (Dkt. No. 438); John W. Devereaux Jr. (Dkt. No. 456); Gerry P. Little (Ex. 4 to the Declaration of Elizabeth A. Fegan ISO Plaintiffs' Motion For Final Approval of Second Amended Class Settlement ("Fegan Decl.")); Adela Aprodu (Dkt. No. 373); Hans Strandgaard (Ex 8 to Fegan Decl.).

[39] *Browning v. Yahoo! Inc.*, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2007); *see Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean the settlement presented was not fair, reasonable or adequate.").

[40] *In re NCAA Student-Athlete Concussion Injury Litig.*, 2016 WL 305380, at *23 (N.D. Ill. Jan. 26, 2016).

certification under Rule 23(b)(3) and, therefore, the value of such a procedural claim—that is, the ability to file a bodily injury class action for damages on behalf of student-athletes from multiple sports at a single school—is minimal, at best."[41] It is hardly surprising, then, that Plaintiffs could not achieve in settlement what was clearly not achievable on the merits.[42]

Finally, none of these objections apply the *Synthroid* factors to Plaintiffs' fee request.[43] None contest: (i) that Class Counsel faced a significant risk of nonpayment when they filed the *Arrington* litigation in 2011; (ii) the quality of Class Counsel's performance, other than the lack of compensatory payments for ongoing medical care; (iii) the amount of work necessary to resolve the litigation; or (iv) the stakes of the case have always been high. Accordingly, the objections should be overruled.

### 2. The miscellaneous objections to fees are without merit.

Mark Young both objects and requests to be excluded from the Settlement.[44] To the extent he is excluded from the Class, he lacks standing to also object.[45] Nonetheless, his miscellaneous objections should be rejected.

Young suggests that, pursuant to Texas Rule of Civil Procedure 42(i)(2), Class Counsel need be compensated in "medical mental health evaluations, rather than cash."[46] However, Fed.

---

[41] Dkt. No. 276 at 11-12.

[42] Notably, however, for medical monitoring, Class Counsel did achieve relief beyond what the law provides. "Considering that many states disallow medical monitoring as a form of relief in the absence of present physical injury, the ability of the Settling Plaintiffs to negotiate the creation of the Medical Monitoring Program for all class members nationwide is a substantial achievement." Dkt. No. 276 at 12. And, whereas the *Arrington* Plaintiffs sought certification of a liability Class comprised of student-athletes in Contact Sports since 2004, the Settlement provides medical monitoring benefits to all current and former NCAA student-athletes, regardless of age and sport. Am. SA, ¶ II(D).

[43] *In re Synthroid Mktg. Litig.*, 264 F.3d at 721.

[44] Dkt. No. 425 at 1.

[45] *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 963 (E.D. La. 2012) ("opt-outs lack standing to contest the Settlement"). Nonetheless, Class Counsel responds to the points each makes below.

010270-12 988211 V1

R. Civ. P. 23 applies to this certified class, not the Texas Rules of Civil Procedure. Even if the Texas rules applied however, the provision is intended to preclude fees where "the class recovers only injunctive or other equitable relief…."[47] Here, the NCAA and its insurers are funding $70 million to provide medical monitoring, which is real money—and not the coupons or disclosures that the Texas legislature intended to combat.[48]

Young suggests that Class Counsel need produce their fee agreements with their clients to comply with Rule 1.5(c) of the Illinois Rules of Professional Conduct.[49] However, Rule 1.5(c) does not require Class Counsel to include an hourly rate in its fee agreements nor share their fee agreements with Settlement Class Members.[50/51]

Young contends that Class Counsel's hourly rates are excessive.[52] First, as reflected in counsel's blended rates, the rates are eminently reasonable. Even if this Court were concerned however, this Circuit takes the percentage of recovery approach—and as set forth above, 24% of

---

[46] Dkt. No. 425 at 6.

[47] *Kazman v. Frontier Oil Corp.*, 398 S.W.3d 377, 387 (Tex. App. 2013) (in securities class action, reversing decision to award fees where the settlement involved only additional disclosures to the class).

[48] *Id.*

[49] Dkt. No. 425 at 7-8.

[50] Rule 1.5(c) provides: "A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination."

[51] Of course, to the extent the Court has concerns, Settlement Class Counsel can produce those agreements *in camera*.

[52] Dkt. No. 425 at 8.

- 13 -

the Medical Monitoring Fund is nearly 10% less than the lower end of the ceiling set by the Seventh Circuit.[53]

Young suggests that Hagens Berman's Westlaw and Lexis charges are nothing more than an ATM.[54] In fact, however, the charges grouped under Westlaw and Lexis are Hagens Berman's actual out-of-pocket (paid) expenses for all data and research invoices, including for the following services: data hosting and online usage of the data hosts (by EasyESI n/k/a Everlaw), Lexis, Westlaw, and PACER. The highest of these charges is approximately $69,000 for the cumulative costs of data storage and online usage (*i.e.* the ESI produced by the NCAA, Plaintiffs, and third parties). The combined cumulative research costs for Westlaw and Lexis are approximately $27,000. While Hagens Berman does have flat rate agreements with these services, they are nowhere as low as the Objector contends and Hagens Berman allocates those costs on a *pro rata* basis among its cases based on the actual research conducted in each case each month. Hagens Berman makes no profit on these services and does not seek to recover more than the costs attributable to a particular case.[55]

### III. CONCLUSION

WHEREFORE, Class Counsel respectfully requests that their fee petition be granted, as amended, with an award of $15 million in attorneys' fees plus $727,189.88 in out-of-pocket expenses.

---

[53] *Pearson*, 772 F.3d at 782 (ceiling set at one-third to one-half of recovery).

[54] Dkt. No. 425 at 8.

[55] If this Court requests, Hagens Berman will submit its agreements with the providers *in camera*, as well as the monthly breakdown of charges and payments.

Case: 1:13-cv-09116 Document #: 466 Filed: 09/29/17 Page 18 of 19 PageID #:11201

Dated: September 29, 2017    Respectfully submitted,

By:   */s/ Steve W. Berman*
      Steve W. Berman
*steve@hbsslaw.com*
Christopher P. O'Hara
*chriso@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950


By:   */s/ Joseph J. Siprut*
      Joseph J. Siprut
Todd L. McLawhorn
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342
www.siprut.com

*Settlement Class Counsel*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on September 29, 2017, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By:   */s/ Steve W. Berman*
       Steve W. Berman