**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION** | MDL NO. 2492<br><br>Master Docket No. 13-cv-09116<br><br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
<u>MOTION FOR FINAL APPROVAL OF SECOND AMENDED CLASS SETTLEMENT</u>**

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II. SUMMARY OF SETTLEMENT TERMS.........................................................2

    A.  The Settlement Class includes current and former NCAA student-athletes
        in contact and non-contact sports.............................................................3

    B.  The Settlement provides significant benefits to the Settlement Class. ...................3

        1.  The Medical Monitoring Fund....................................................................3

        2.  The Medical Monitoring Program ..............................................................4

        3.  NCAA changes to concussion-management and return-to-play
            policies ........................................................................................6

    C.  The release is limited in scope. ...............................................................6

III. ARGUMENT .......................................................................................................7

    A.  The strength of Plaintiffs' case compared to the amount of Defendant's
        settlement offer favors approval of the Settlement. ..................................8

    B.  An assessment of the likely complexity, length, and expense of continued
        litigation favors the Settlement. ............................................................12

    C.  The lack of opposition to the Settlement favors final approval...........................12

        1.  Several Settlement Class Members submitted unsolicited
            statements of support. ............................................................13

        2.  Less than one percent of the Class submitted objections, none of
            which preclude final approval...................................................14

            a.  Three objectors lack standing. ......................................................14

            b.  The objection to the lack of compensation for personal
                injury should be overruled where class members retain the
                right to pursue individual and single-school/single-sport
                class claims for negligence. ........................................................15

            c.  The objections to the scope of the release are simply wrong
                or have already been addressed by the Court................................16

|  |  |  |  |
|---|---|---|---|
| | d. | There are no intra-class conflicts. | 18 |
| | e. | The font size in the postcard notice did not create confusion. | 18 |
| | f. | Settlement Class Members will only receive a diagnosis if they purposefully avail themselves of the Medical Monitoring Program. | 19 |
| | g. | The Court has already conditionally certified the Settlement Class, and the Medical Science Committee has provided details regarding the Medical Monitoring Program. | 19 |
| | D. | The stage of the proceedings and the amount of discovery completed at the time of settlement, as well as the opinion of competent counsel, favors final approval. | 19 |
| IV. | CONCLUSION | | 20 |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aarons v. BMW of N. Am., LLC,*
2014 WL 4090564 (C.D. Cal. Apr. 29, 2014) ....................................................................16

*Armstrong v. Bd. of Sch. Dir.,*
616 F.2d 305 (7th Cir. 1980) ...............................................................................................8

*In re AT&T Mobility Wireless Data Servs. Sales Litig.,*
270 F.R.D. 330 (N.D. Ill. 2010) ...........................................................................................9

*Browning v. Yahoo! Inc.,*
2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ....................................................................15

*EEOC v. Hiram Walker & Sons, Inc.,*
768 F.2d 884 (7th Cir. 1985) ...............................................................................................8

*Eisen v. Porsche Cars N. Am., Inc.,*
2014 WL 439006 (C.D. Cal. Jan. 30, 2014) .......................................................................16

*In re FedEx Ground Package Sys., Empl. Practices Litig.,*
273 F.R.D. 424 (N.D. Ind. 2008) ........................................................................................18

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) ............................................................................................15

*Isby v. Bayh,*
75 F.3d 1191 (7th Cir. 1996) ...............................................................................................8

*Carter ex rel. M.C. v. Doyle,*
95 F. Supp. 2d 851 (N.D. Ill. 2000) ....................................................................................18

*Melito v. Am. Eagle Outfitters, Inc.,*
2017 U.S. Dist. LEXIS 147645 (S.D.N.Y. Sept. 8, 2017)...................................................14

*Morgan v. Pub. Storage,*
2016 U.S. Dist. LEXIS 54937 (S.D. Fla. Mar. 9, 2016).......................................................17

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.,*
2015 WL 7960673 (N.D. Cal. Dec. 4, 2015) ......................................................................18

*In re NCAA Student-Athlete Concussion Injury Litig.,*
2014 WL 7237208 (N.D. Ill. Dec. 17, 2014).........................................................................9

- iv -

*In re NCAA Student-Athlete Concussion Injury Litig.*,
  2016 WL 305380 (N.D. Ill. Jan. 26, 2016) ...................................................................9, 10, 19

*In re Oil Spill by Oil Rig Deepwater Horizon*,
  910 F. Supp. 2d 891 (E.D. La. 2012) ....................................................................................14

*Perez v. Asurion Corp.*,
  501 F. Supp. 2d 1360 (S.D. Fla. 2007) ..................................................................................17

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
  463 F.3d 646 (7th Cir. 2006) ......................................................................................1, 7, 8

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
  309 F.3d 978 (7th Cir. 2002) ...................................................................................................8

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  2016 U.S. Dist. LEXIS 130467 (N.D. Ohio Sept. 23, 2016)..................................................17

## STATUTES

28 U.S.C. § 1711.............................................................................................................................18

## OTHER AUTHORITIES

Fed. R. Civ. P. 23.............................................................................................................................7

010270-12 988153 V1

## I.      INTRODUCTION

The Second Amended Settlement is the culmination of a three-year process, which included an adversarial preliminary review process scrutinizing the terms of the Settlement, the contours of the Medical Monitoring Program, and the sufficiency of the $70 million Medical Monitoring Fund. As a result, the historic 50-year Medical Monitoring Program is ready to be launched for the benefit of the estimated 4.4 million current and former NCAA student-athletes alive today.[1] At a time when we frequently hear of the deaths of young NFL players diagnosed with Chronic Traumatic Encephalopathy post-mortem, the benefits of the Medical Monitoring Program cannot be implemented soon enough. Plaintiffs have achieved the right for all qualifying Settlement Class Members to have neurological, neuropsychological, and mood and behavior evaluations to determine whether their symptoms or conditions are related to the concussions or accumulation of subconcussive hits they sustained while playing NCAA sports. And, the Settlement will require changes to NCAA rules designed to identify concussions early and reduce the harm of secondary injury from returning to play before fully healed.

The factors considered in the Seventh Circuit to determine whether a settlement is fair, adequate, and reasonable support final approval here.[2] First, this Court has invested significant time evaluating the strength of a nationwide class negligence claim as compared to the amount and benefits of a 50-year Medical Monitoring Program, $5 million for concussion research, changes to the NCAA's guidelines, and a limited release. That evaluation supports a finding that the Settlement is fair, adequate, and reasonable whereas the likelihood that a nationwide

---

[1] Dkt. No. 170 at 12 (Plaintiffs' expert, Bruce Deal, estimated that: "Based on NCAA data and US mortality data, the class population comprises 4.4 million current and former male and female student-athletes in all NCAA-sanctioned sports.") (citations omitted).

[2] *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

- 1 -

negligence claim could be certified is virtually nil. Second, settlement is preferable to a likely

complex, lengthy, and expensive litigation through trial and appeal.

Third, despite the fact that 4,068,742 class members received email or postcard notice,

just 22 persons have filed objections.[3] Other than as to Class Counsel's fee petition,[4] the most

common objection complains that the Settlement does not provide for compensatory damages or

medical expenses for treatment. However, given that certification of a nationwide negligence

claim would likely be denied, a 50-state medical monitoring settlement for all current and former

NCAA student-athletes is a victory and the right result for those who are suffering or will suffer

from cognitive or emotional deficits resulting from head trauma. Finally, the Settlement is

supported by highly qualified counsel who litigated the merits of this matter before reaching a

settlement, as well as two respected former federal judges and the Lead Objector, who withdrew

his objection (except as to fees).

Accordingly, Plaintiffs' Motion for Final Approval should be granted.

## II.      SUMMARY OF SETTLEMENT TERMS

Below is a summary of the benefits and release in the Second Amended Settlement.

---

[3] Seven of these objections were sent to Class Counsel or the Administrator but do not appear to be filed with the Court. Class Counsel thus attaches to the Declaration of Elizabeth A. Fegan ("Fegan Decl.") filed herewith, the objections of Malcolm Campbell, Maria Fagan, Paul Krepinski, Gerry Paul Little, Carrie Murphy, Reuben David Patino, Anthony Plastino, Hans Standgaard, and Anita Jeffrey, M.D. as Exs. 1–9, respectively. The remaining 13 objections filed with the Court include Alicia Ahern (Dkt. No. 272 filed 5/25/2016); Adela Aprodu (Dkt. No. 373 filed 3/10/2017); John W. Devereux, Jr. (Dkt. No. 456 filed 9/1/2017); Lacy Donlon (Dkt. No. 459 filed 9/15/2017); Samantha Greiber (Dkt. No. 450 filed 8/30/2017); Anthony Nichols (Dkt. No. 457 filed 9/14/2017); Roliff Purrington (Dkt. No. 377 filed 3/13/2017); Paul J. Schafer (Dkt. No. 438 filed 8/22/2017); Marissa Spinazola (Dkt. No. 458 filed 9/15/2017); Elizabeth Terry (Dkt. No. 427 filed 7/5/2017); Kyle Edward Wilson (Dkt. No. 428 filed 7/20/2017); Steve Wineberg (Dkt. No. 378 filed 3/13/2017); and Mark Young (Dkt. No. 425 filed 7/5/2017).

[4] The objections as to attorneys' fees and costs are addressed in Class Counsel's Reply in Support of Their Fee Petition.

- 2 -

## A. The Settlement Class includes current and former NCAA student-athletes in contact and non-contact sports.

The Settlement Class is defined as:

> All persons who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the date of final approval.[5]

The Settlement Class Representatives include current or former NCAA student-athletes who played contact sports, including football, soccer, hockey, basketball, and wrestling; and non-contact sports, including golf, cross country, track and field, volleyball, softball, and baseball.

## B. The Settlement provides significant benefits to the Settlement Class.

In consideration for the Settlement Class's release of claims against the NCAA for medical monitoring arising from participation in NCAA-sanctioned sports, the NCAA has agreed to provide the following settlement benefits:

### 1. The Medical Monitoring Fund

Unchanged from the original settlement, the NCAA and its insurers have agreed to pay $70 million to create the Medical Monitoring Fund, which will be used to pay the costs of the Medical Monitoring Program, notice and administrative costs, attorneys' fees and costs, and the class representatives' service awards.[6] The NCAA has also agreed to separately dedicate $5 million to concussion-related research.[7]

---

[5] Dkt. No. 266, Ex. 1 (2d Am. Class Action Settlement Agreement & Release ("Am. SA"), ¶ XI(S).

[6] Am. SA, ¶¶ II(W), IV(A)(1).

[7] Am. SA, ¶ X(A).

- 3 -

If the Medical Monitoring Fund is unexpectedly depleted before the expiration of the 50-year Medical Monitoring Period, Settlement Class Members may pursue individual *or class* claims for medical monitoring.[8][9]

### 2. The Medical Monitoring Program

The Medical Monitoring Program is designed to screen those members of the Settlement Class who choose to participate in the program at any time during the 50-year Medical Monitoring Period.[10] The Medical Monitoring Program consists of two phases: the first phase is designed to assess self-reported symptoms and cognitive, mood, behavioral, and motor problems that may be associated with persistent post-concussion syndrome and/or mid- to late-life-onset problems, such as Chronic Traumatic Encephalopathy (CTE) and related disorders; and the second phase provides in-person medical evaluations for those who are eligible as a result of the self-reported responses.[11]

The Medical Science Committee submitted a detailed report regarding the substance and scoring of the Screening Questionnaire,[12] which will determine whether Settlement Class

---

[8] The statute of limitations for medical monitoring will be tolled during the Medical Monitoring Period. Am. SA, ¶ IV(A)(5).

[9] In addition, if it appears that the Medical Monitoring Fund is going to be depleted before the expiration of the Medical Monitoring Period, Class Counsel may serve written notice on the NCAA requiring that the NCAA meet and confer within 30 days regarding additional funding. In that event, the NCAA and/or its insurers may elect to deposit or cause to be deposited additional funds into the settlement account for the Medical Monitoring Fund but are not required to do so. Am. SA, ¶ IV(A)(7). If they choose not to deposit additional funds, notice will be provided to the class that the statute of limitations will begin to run on tolled claims. Am. SA, ¶ IV(A)(8).

[10] Am. SA, ¶ IV(B)(3).

[11] Am. SA, ¶ IV(B)(4).

[12] *See* Dkt. No. 159. Class members may complete the Screening Questionnaire not more than once every five years until the age of fifty and then not more than once every two years after the age of fifty until the end of the Medical Monitoring Period. A class member may complete no more than five Screening Questionnaires during the Medical Monitoring Period. After a class member has submitted three Screening Questionnaires without qualifying for an examination, any further questionnaires completed by that class member will be sent to the

- 4 -

Members qualify for a medical evaluation.[13] According to the Committee, completed Screening Questionnaires will be scored electronically based on existing published normative data using standardized scores (*e.g.*, T-Scores or cut scores) or published "impairment" levels.[14] A class member who meets the criteria (*i.e.*, scores above the cut score) on any one or more of the five standardized symptom scales and does not score above the cut score on the symptom validity measure will screen in for a medical evaluation,[15] except for persons who only meet the criteria for behavioral or mood disorders.[16] Persons in the latter group will be screened by a behavioral health specialist and referred to their local mental health provider.[17]

Medical evaluations will take place at program locations, of which there will be at least 33 nationwide.[18] The initial program locations address both population centers as well as locations that will best support enrollment of quality providers (both neurologists and neuropsychologists) with the requisite education, skill, and experience to perform medical evaluations properly.

The Medical Science Committee has also provided details concerning the scope of the medical evaluations, which will include the following types of testing: (i) a neurological examination; (ii) a neuropsychological examination; (iii) mood, behavioral, and movement

---

Medical Science Committee for review and decision as to the appropriateness of further medical evaluation. Am. SA, ¶ IV(B)(4)(g).

[13] Dkt. No. 159, ¶¶ 8-12.

[14] Dkt. No. 159, ¶ 8.

[15] Class members may qualify for at least two medical evaluations during the Medical Monitoring Period. Am. SA, ¶ IV(B)(4)(h).

[16] Dkt. No. 159, ¶¶ 8, 12.

[17] Dkt. No. 159, ¶ 12.

[18] Am. SA, ¶ IV(B)(5)(a). *See* Dkt. No. 161 at 13.

- 5 -

evaluation; and (iv) ancillary testing necessary to complete the evaluation of the class member as determined by the neurologist.[19]

### 3. NCAA changes to concussion-management and return-to-play policies

Under the Settlement, the NCAA will implement the following policies:

- **Baseline testing**: "Every student-athlete will undergo pre-season baseline testing, for each sport in which they participate, prior to participating in practice or competition."[20]

- **No same day return to play**: "Students with a diagnosed concussion will be prohibited from returning to play or participation in any practice or game on that same day and must be cleared by a physician before being permitted to return to play in practice or competition."[21]

- **Medical personnel for contact sports**: All schools will be required to have medical personnel with training in the diagnosis, treatment, and management of concussions present at games and available during practices.[22]

- **Concussion tracking**: The NCAA will put a reporting process in place for schools to report diagnosed concussions and their resolution, as well as a reporting mechanism for concerned persons to the NCAA.[23]

- **Concussion education**: The NCAA will require that its schools provide NCAA-approved concussion education and training to student-athletes, coaches, and athletic trainers before each season.[24]

- **Academic accommodation**: The NCAA will provide member institutions with educational materials for faculty regarding academic accommodations for students with concussions.[25]

## C. The release is limited in scope.

Plaintiffs and the Settlement Class have agreed to release: (i) any and all claims seeking damages or other legal or equitable relief for medical monitoring related to concussions or

---

[19] Dkt. No. 159, ¶¶ 21-26.

[20] Am. SA, ¶ IX.A.1.

[21] Am. SA, ¶ IX.A.2, 3.

[22] Am. SA, ¶ IX.A.4, 5.

[23] Am. SA, ¶ IX.C, D.

[24] Am. SA, ¶ IX.E, F.

[25] Am. SA, ¶ IX.E.

- 6 -

subconcussive hits sustained during participation in collegiate sports as an NCAA student-athlete; and (ii) any and all claims seeking relief for personal injury on a class-wide basis, other than on behalf of a single-school/single-sport class related to concussions or subconcussive hits sustained during participation in collegiate sports as an NCAA student-athlete. Plaintiffs are not releasing, and have expressly reserved, individual personal injury claims, single-school/single-sport negligence claims, and any other claims unrelated to medical monitoring relief for concussions or subconcussive hits.[26] Further, the NCAA has agreed that the statute of limitations will be tolled for all personal injury claims from September 12, 2011 (the date that *Arrington* was filed), through the date of final approval.[27]

## III.     ARGUMENT

"Federal courts naturally favor the settlement of class action litigation."[28] Nevertheless, district courts must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions."[29]

A court may approve a class settlement if, after proper notice and a hearing, the court determines that the proposed settlement is "fair, reasonable, and adequate."[30] Evaluating the fairness of a class settlement in the Seventh Circuit, a district court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition

---

[26] Am. SA, ¶ II.QQ, RR.

[27] Am. SA, ¶ XI.S.

[28] *Isby*, 75 F.3d at 1196.

[29] *Synfuel*, 463 F.3d at 652.

[30] Fed. R. Civ. P. 23(e)(3).

- 7 -

to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement."[31]

Courts "do not focus on individual components of the settlement[ ], but rather view them in their entirety in evaluating their fairness."[32] When analyzing whether a proposed settlement is fair, reasonable, and adequate, courts "should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights."[33] Additionally, a court "must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case,"[34] keeping in mind that the presence of different or more creative alternatives does not preclude settlement approval.[35]

## A. The strength of Plaintiffs' case compared to the amount of Defendant's settlement offer favors approval of the Settlement.

"The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'"[36] The district court "should begin by 'quantifying the net expected value of continued litigation to the class.' To do so, the court should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.'"[37] In doing so, however,

---

[31] *Synfuel Techs., Inc.*, 463 F.3d at 653 (quoting *Isby*, 75 F.3d at 1199).

[32] *Isby*, 75 F.3d at 1199.

[33] *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

[34] *Armstrong v. Bd. of Sch. Dir.*, 616 F.2d 305, 314-15 (7th Cir. 1980).

[35] *See Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 987 (7th Cir. 2002).

[36] *Synfuel*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)).

[37] *Id.* (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002)).

"[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs."[38]

Here, this Court has already undertaken extensive analysis of Plaintiffs' negligence claims, together with the release which expressly preserves the right to bring individual negligence claims and now claims on behalf of a class comprised of student-athletes at a single NCAA school in a single sport. Given that the release originally precluded class negligence claims, that analysis included an assessment of the likelihood of a nationwide personal injury class for all NCAA student-athletes.[39] The Court had the benefit of an adversarial briefing process in which Nichols largely advocated for rejection of the Settlement, claiming anything less than a Rule 23(b)(3) nationwide negligence class was not fair, adequate, or reasonable.

As a result of that process, on January 26, 2016, this Court preliminarily approved the amended settlement and conditionally certified the Settlement Class after assessing the strength and value of the released procedural claims of the putative class against the value of the settlement to the class.[40] In so doing, the Court found that, based on the record, "it was highly unlikely that a nationwide class of current or former NCAA student-athletes or a class consisting of current or former NCAA student-athletes from multiple schools could be certified under Rule 23(b)(3) or 23(c)(4) for the purpose of asserting bodily injury claims for damages."[41] However, the Court also held that the parties had not provided sufficient evidence for the Court to assess

---

[38] *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (internal quotation marks and citations omitted).

[39] *See In re NCAA Student-Athlete Concussion Injury Litig.*, 2014 WL 7237208 (N.D. Ill. Dec. 17, 2014) (declining to approve the first proposed settlement agreement).

[40] *In re NCAA Student-Athlete Concussion Injury Litig.*, 2016 WL 305380 (N.D. Ill. Jan. 26, 2016).

[41] *In re NCAA*, 2016 WL 305380, at *23.

- 9 -

the likelihood of class certification for a single-school class.[42] Accordingly, the Court approved

the proposed release of class-wide claims, but only to the extent that it precluded actions brought

by a nationwide class or a multi-school class.[43]

Subsequently, the parties presented an amendment that permitted class members to seek

certification of negligence claims on behalf of single-school/single-sport classes,[44] but not multi-

school or multi-sport classes. Thereafter, in evaluating the fairness of the amended settlement,

the Court "evaluate[d] the strength of this procedural right—that is, whether a multiple-sport,

single-school class asserting bodily injury claims against the NCAA is capable of being certified

under Rule 23(b)(3)."[45] After reviewing additional submissions by the parties, the Court found:

> All of this evidence demonstrates the high degree to which the
> causation inquiry in any bodily injury class action will likely
> depend on the particular circumstances surrounding the rules,
> protocols, and equipment adopted for an individual sport, as well
> as the specific coach and/or medical professional responsible for
> that sport. As a result, based on the current record, the Court finds
> that it is highly unlikely that a multiple-sport, single-school bodily
> injury class would be sufficiently cohesive to warrant certification
> under Rule 23(b)(3) and, therefore, the value of such a procedural
> claim—that is, the ability to file a bodily injury class action for
> damages on behalf of student-athletes from multiple sports at a
> single school—is minimal, at best.[46]

Thus, after balancing the strength of a nationwide negligence claim against the $70

million Medical Monitoring Program, the first factor favors a finding that the Settlement is fair,

adequate, and reasonable. Moreover, "[c]onsidering that many states disallow medical

monitoring as a form of relief in the absence of present physical injury, the ability of the settling

---

[42] *Id.*

[43] *Id.*

[44] Dkt. No. 266; Am. SA, ¶ XV.A.12.

[45] Dkt. No. 276 at 7.

[46] Dkt. No. 276 at 11-12.

- 10 -

plaintiffs to negotiate the creation of the Medical Monitoring Program for all class members nationwide is a substantial achievement."[47] Finally, whereas the *Arrington* plaintiffs sought certification of a liability class comprised of student-athletes in contact sports since 2004, the Settlement provides medical monitoring benefits to all current and former NCAA student-athletes, regardless of age and sport.

By providing all current and former NCAA student-athletes access to the Screening Questionnaire and, if they qualify, to the medical evaluations, the Settlement is unprecedented. Plaintiffs have achieved the right for all qualifying Settlement Class Members to have neurological, neuropsychological, and mood and behavior evaluations to determine whether their symptoms or conditions are related to the concussions or accumulation of subconcussive hits they sustained while playing NCAA sports. And Plaintiffs have ensured that the rights of Settlement Class Members to pursue individual and single-school/single-sport class personal injury claims are protected, through tolling during the pendency of these proceedings.

In sum, Plaintiffs could not have achieved this same victory—a comprehensive Medical Monitoring Program for all living NCAA athletes under 50 states' laws and significant changes to the NCAA's concussion-management and return-to-play guidelines—on a contested basis. Accordingly, this Court should find that the benefits of the Settlement are substantial and encompass or exceed the relief that could be obtained through a jury verdict in favor of a class on a contested basis. This factor favors a finding that the Settlement is fair, adequate, and reasonable.

---

[47] Dkt. No. 276 at 12.

**B.      An assessment of the likely complexity, length, and expense of continued litigation favors the Settlement.**

This Court has already found that "absent a settlement, class litigation of this nature is extremely complex, very costly, and sure to be protracted, as indicated by the lengthy mediation process and voluminous discovery and motion practice in this case."[48] Moreover, the adversarial nature of the settlement process—protracting proceedings three years since the parties first advised the Court that they were involved in settlement negotiations in *Arrington*—demonstrates the significant time and expense of continued litigation.

The risk, expense, complexity, and likely duration of further litigation can only be characterized as monumental. This factor weighs heavily in favor of final approval of the Settlement.

**C.      The lack of opposition to the Settlement favors final approval.**

Plaintiffs' expert has estimated that there are 4.4 million living current and former NCAA student-athletes.[49] In all, 1,117 NCAA member institutions provided the available last known addresses of their current and former student-athletes.[50] As a result, in addition to publication notice, 4,068,742 class members received direct mail or email notice.[51]

---

[48] Dkt. No. 276 at 12. From 2011 through January 31, 2014, Lead Class Counsel reported investing more than 11,000 hours and more than $500,000 in out-of-pocket costs on a wholly contingent basis. Moreover, if this matter went to verdict, a lengthy appeal period would certainly result.

[49] Dkt. No. 170 at 12.

[50] Declaration of Rachel Christman Regarding Dissemination of Direct Notice ("Christman Decl."), ¶ 4, filed contemporaneously with this Motion.

[51] Christman Decl., ¶ 17.

- 12 -

### 1. Several Settlement Class Members submitted unsolicited statements of support.

In addition to the support of the Settlement Class Representatives,[52] several Settlement

Class Members submitted statements in support of the Settlement.

These include Maggie Carper, from the University of Arizona Class of 1981. She

sustained concussions as a varsity athlete, which have negatively affected her life "intellectually,

emotionally, professionally and socially."[53] She explained:

> [I]t is not possible to exaggerate how much my life changed in
> many absolutely awful ways, as a consequence of "having my bell
> rung" as it was called back in the '70s. . . . Still, it means so much
> to me that you folks took up this cause. I am truly thankful that
> your firm was willing to dedicate you[r] attorneys and the firm's
> resources to concussion litigation. You folks gave me a voice!
> Reading the Court's Legal Notice and reviewing your firm's
> "NCAA Concussions" link has moved me to tears. . . . I hope that
> some day I can shake your hands and thank you so much for
> speaking for me and securing the possibility that I can participate
> in concussion screening and hopefully undergo medical
> evaluation(s) under the settlement you folks are securing for those
> of us who have carried thi[s] very, very heavy load.[54]

Kelly Roderick, a former field hockey player at Michigan State University who has been

under treatment for post-concussion syndrome for more than nine years as a result of being hit in

the head by a ball, wrote that "this litigation is incredibly important for college athletes."[55] Marc

Steven Elliott, a former men's lacrosse player at Coker College whose scholarship was revoked

after suffering from concussion symptoms, felt it important to tell his story and state that he

supported the settlement given that he was "a victim of the negligence and breach[] of duty of

the NCAA to protect all current and former student athletes by failing to adopt appropriate rules

---

[52] *See, e.g.*, Dkt. No. 105-1.

[53] Fegan Decl., Ex. 10.

[54] *Id.*

[55] Fegan Decl., Ex. 11.

- 13 -

and procedures regarding concussions."[56] Similarly, Letice (Jones) Jolley, a former softball

player at the University of Utah whose career was ended by a concussion in 2000, wrote that she

"support[s] this cause because I don't want anyone else to go through some of the challenges I

went through back then."[57] These statements reflect consensus.

### 2. Less than one percent of the Class submitted objections, none of which preclude final approval.

Of the 4.4 million class members, just 21 class members plus one class member's wife —

or 0.04 percent—filed an objection to the Settlement or fees. After the extraordinary amount of

direct notice to the Class, the relative lack of objections demonstrates that the Settlement is fair,

adequate, and reasonable. None of the objections should preclude final approval.

#### a. Three objectors lack standing.

Objectors Reuben David Patino and Mark Young both object and request to be

excluded.[58] To the extent they are excluded from the Class, they lack standing to also object.[59]

Also, as the wife of a former NCAA football player, Alicia Ahern submitted an objection

asking who represents the family of an injured athlete.[60] Because this case is about the effects of

concussions on the athletes themselves, the Settlement does not directly benefit, nor hinder, the

rights of class members' spouses or children. Thus, Ms. Ahern does not have standing.[61]

---

[56] Fegan Decl., Ex. 12.

[57] Fegan Decl., Ex. 13.

[58] Fegan Decl., Ex. 6; Young Objection (Dkt. No. 425).

[59] *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 963 (E.D. La. 2012) ("opt-outs lack standing to contest the Settlement"). Nonetheless, Class Counsel responds to the points each makes below.

[60] Dkt. No. 272.

[61] *Melito v. Am. Eagle Outfitters, Inc.*, 2017 U.S. Dist. LEXIS 147645, at *6-7 (S.D.N.Y. Sept. 8, 2017) (non-class members lack standing to object to and are not bound by a settlement).

- 14 -

### b. The objection to the lack of compensation for personal injury should be overruled where class members retain the right to pursue individual and single-school/single-sport class claims for negligence.

Eleven objections complain that the Settlement does not provide compensation for personal injury or medical care.[62] Complaining that the Settlement should be "better" is not a valid objection.[63] The question "is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."[64]

Here, the Settlement is fair, reasonable, and adequate, providing for a 50-year Medical Monitoring Program with qualifying access to top neurologists and neuropsychologists for the purposes of diagnoses related to head trauma. The Settlement does not provide for compensatory damages related to those diagnoses, but does preserve individual negligence claims, as well as the right to pursue them on behalf of a single-school/single-sport class.[65]

As reflected above, the likelihood of achieving certification of a nationwide class for personal injury was virtually nil. Accordingly, objections that the Settlement does not provide for

---

[62] *See* objections from Anita Jeffrey, M.D. (Fegan Decl., Ex. 9); Paul Krepinski (Fegan Decl., Ex. 3); Anthony J. Plastino, II, Esq. (Fegan Decl., Ex. 7) (Joint Letter Objection on behalf of himself and Anthony J. Plastino, III); Malcolm Campbell (Fegan Decl., Ex. 1) (seeks compensation for arthritis in his knees and concussions): Alicia Ahern (Dkt. No. 272, filed on behalf of Dan Ahern); Paul J. Schafer (Dkt. No. 438); Adela Aprodu (Dkt. No. 373); Roliff Purrington (Dkt. No. 377); Maria Fagan (Fegan Decl., Ex. 2); and Carrie Murphy (Fegan Decl., Ex. 5).

[63] *Browning v. Yahoo! Inc.*, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2007); *see Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean the settlement presented was not fair, reasonable or adequate.").

[64] *Hanlon*, 150 F.3d at 1027.

[65] Objector Elizabeth Terry also complains that the Settlement does not compensate class members for pre-existing injuries (in her case, scoliosis), nor provide extra compensation for difficulties faced by emancipated minors, such as sexual assault. Dkt. No. 427 at 1-2. Plaintiffs did not sue for recovery on these bases, and thus her rights in these areas are not affected.

Objector Reuben David Patino seeks a community-needs assessment to evaluate the costs of concussions before a settlement is entered. Fegan Decl., Ex. 6. Here, experts have opined on the costs of the Medical Monitoring Program, Dkt. No. 170, and concussion-related studies will be done through the funding of $5 million. Am. SA, ¶ X.

- 15 -

class-wide compensatory damages are not well-founded. To the extent class members object that the benefits are insufficient or inadequate, they could have opted out.[66]

### c. The objections to the scope of the release are simply wrong or have already been addressed by the Court.

Four objectors—Young, Greiber, Donlon, and Spinazzola—object to the release, despite the fact that the claims they seek to preserve are **not** released under the Settlement.[67]

First, Young objects to the lack of long-term treatment under the Settlement where a person is barred from recovery for personal injury.[68] However, no such bar exists.[69]

Next, Samantha Greiber, joined by Lacey Donlon and Marissa Spinazzola (collectively, "Greiber"), contend that the Settlement is not fair as to female lacrosse players because it releases their right to seek injunctive relief for a rule change requiring helmets to minimize head injuries or to promote the benefits of helmets to female lacrosse players.[70] In fact, the release does neither. And Class Counsel informed Greiber's counsel of that *before* her objection was filed.[71] In fact, the release does not prevent any female lacrosse player from seeking injunctive relief requiring a rule change mandating helmets for female lacrosse players nor education

---

[66] *See Eisen v. Porsche Cars N. Am., Inc.*, 2014 WL 439006, at *7 (C.D. Cal. Jan. 30, 2014) ("Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms."); *Aarons v. BMW of N. Am., LLC*, 2014 WL 4090564, at *13 (C.D. Cal. Apr. 29, 2014) ("To the extent [objectors] believe the settlement is unfair, they could have opted out of the Class.").

[67] *See also* Purrington (Dkt. No. 377 at 2) (requesting, if not already carved out, for the Court to preserve claims for personal injury and long-term care).

[68] Dkt. No. 425.

[69] Am. SA, ¶ II.RR.

[70] Dkt. No. 450 at 9.

[71] Fegan Decl., Ex. 14.

- 16 -

regarding the benefits thereof.[72] Thus, the request to withhold final approval absent certification

of a subclass of female lacrosse players is unnecessary—their right is protected and they can file

individual cases or join the single-school/single-sport MDL and seek the rule change at any

time.[73] Continued pursuit of this objection is frivolous,[74] and Class Counsel intends to seek

sanctions and/or an appeal bond if Greiber pursues these objections on appeal.

      Finally, Aprodu complains that the release includes NCAA schools;[75] however, it is not

as comprehensive as Aprodu complains. The Medical Monitoring Program was funded to be a

comprehensive program for class members who attended any NCAA school. Suing the schools

for the exact same benefit would be duplicative. Nonetheless, class members do retain the right

to sue their respective schools for negligence individually or on behalf of a single-sport class.

Thus, the objection should be rejected.

---

[72] *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (denying various objections because "it appears that most of the objectors have simply misread and/or misunderstood the Settlement documents and/or desired to 'have a better deal'").

[73] The fact that Greiber has not yet filed a separate lawsuit, even after being advised that their position was plainly incorrect, shows that their true motive is to extract a fee in exchange for dropping their objection. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS 130467, at *63 (N.D. Ohio Sept. 23, 2016) ("In nearly every class action settlement today, professional objectors file objections (often frivolous ones) simply in order to obtain standing to appeal the district court's final approval order. . . . The professional objector hopes that class counsel, in order to settle the appeal and gain access to the fee award, will pay the objector to go away.") (citations omitted).

[74] *Morgan v. Pub. Storage*, 2016 U.S. Dist. LEXIS 54937, at *49 (S.D. Fla. Mar. 9, 2016) (finding an objection "has no basis in fact or law. Frivolous objections like these hurt class actions. They slow down the approval process and delay the class members from receiving the relief to which they are otherwise entitled. Furthermore, they require attorneys that have spent thousands of hours and taken on the considerable financial risk of bringing a class action to pay attorneys that have neither shouldered any of the work or the financial risk. Such a result is patently unfair and discourages excellent attorneys from bringing class actions.").

[75] Dkt. No. 373.

#### d.    There are no intra-class conflicts.

Aprodu complains that there are intra-class conflicts because former NCAA student-athletes "only" receive the benefit of the Medical Monitoring Program whereas current NCAA student-athletes receive the benefit of both the Medical Monitoring Program and rule changes.[76] The law cannot and should not require continuous waves of freshmen to challenge the system when they are most vulnerable or forever lose that right to seek change. Recognizing the inefficiencies with such a rule, the law confirms that plaintiffs maintain standing to assert injunctive relief where the claims involve transitory harms or where "identical injuries suffered by the class continue."[77] Applying this rule here is appropriate as "[a] student-athlete is eligible to participate in NCAA athletics . . . for a limited period of time."[78] Thus, the transitory nature of student-athletes' claims confirms the need to reject Aprodu's objection.

#### e.    The font size in the postcard notice did not create confusion.

Young contends that the font size on the postcard notice was too small, violating CAFA, 28 U.S.C. § 1711, Note (a)(3), which states that class members can be harmed by "confusing notices." Here, 3,808,577 class members received postcard notice.[79] Other than Young, none claim confusion due to the font size in the notice. Moreover, the long-form notice is available on the settlement website and is printed in 12-point font. Accordingly, the objection should be rejected.

---

[76] Dkt. No. 373 at 5.

[77] *See, e.g.*, *Carter ex rel. M.C. v. Doyle*, 95 F. Supp. 2d 851, 857 (N.D. Ill. 2000) (citing *Sosna v. Iowa*, 419 U.S. 393 (1975)).

[78] *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 2015 WL 7960673, at *3 (N.D. Cal. Dec. 4, 2015). *See also In re FedEx Ground Package Sys., Empl. Practices Litig.*, 273 F.R.D. 424, 438 (N.D. Ind. 2008).

[79] Christman Decl., ¶ 17.

f.  **Settlement Class Members will only receive a diagnosis if they purposefully avail themselves of the Medical Monitoring Program.**

Young expresses concern that the Settlement could label class members as having brain injuries, which could cause health insurance to deny coverage as a preexisting condition. No person will receive a diagnosis just by being a member of the Settlement Class. Class members must purposefully avail themselves of the questionnaire and choose to be examined by physicians to receive a diagnosis. Thus, Young's objections should be rejected.

g.  **The Court has already conditionally certified the Settlement Class, and the Medical Science Committee has provided details regarding the Medical Monitoring Program.**

Objector Wineberg complains that the parties have not argued for certification of a Settlement Class.[80] In fact, they have. And the Court conditionally certified the Settlement Class.[81] Similarly, he asserts that the Medical Science Committee has not yet provided details regarding the Medical Monitoring Program. However, the Medical Science Committee has,[82] as requested and acknowledged by the Court.

**D.  The stage of the proceedings and the amount of discovery completed at the time of settlement, as well as the opinion of competent counsel, favors final approval.**

Class Counsel reached the terms of the amended settlement after full merits discovery and an adversarial settlement approval process. The six years of litigating liability, as well as presenting to the Court the nature and likelihood of Rule 23(b)(3) certification of nationwide negligence claims, has provided Class Counsel with a clear view of the strengths and weaknesses of the Class's claims. Based upon this extensive work and their experience in other cases, Class

---

[80] Dkt. No. 378 at 1-2.

[81] *See In re NCAA Student-Athlete Concussion Injury Litig.*, 2016 WL 305380 (N.D. Ill. Jan. 26, 2016), *also available at* http://www.collegeathleteconcussionsettlement.com/media/611223/01-26-16_memorandum_and_opinion.pdfpdf (last accessed Sept. 28, 2017).

[82] Dkt. No. 159.

- 19 -

Counsel supports the Settlement. Moreover, after three years, the Lead Objector has withdrawn any further objection to the merits of the Settlement. Finally, two former federal court judges support the Settlement. These factors favor final approval.

## IV. CONCLUSION

WHEREFORE, Settlement Class Representatives respectfully request that the Court find that the Second Amended Settlement is fair, adequate, and reasonable and grant Plaintiffs' Motion for Final Approval.

Dated: September 29, 2017

Respectfully submitted,

By: ___ */s/ Steve W. Berman* _____
     Steve W. Berman
*steve@hbsslaw.com*
Christopher P. O'Hara
*chriso@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950

By: ___ */s/ Joseph J. Siprut* ___
     Joseph J. Siprut
Todd L. McLawhorn
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342
www.siprut.com

*Settlement Class Counsel*

- 20 -

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on September 29, 2017, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: ___*/s/ Steve W. Berman*___
Steve W. Berman

- 21 -