IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | MDL No. 2492<br><br>Master Docket No. 1:13-cv-09116<br><br>Judge John Z. Lee<br><br>Magistrate Judge Geraldine Soat Brown |

### DECLARATION OF MATTHEW L. GARRETSON ON BEHALF OF PROGRAM ADMINISTRATOR THE GARRETSON RESOLUTION GROUP, INC.

I, Matthew L. Garretson, hereby declare as follows:

1.      I am the Chief Executive Officer of Garretson Resolution Group ("GRG"). On July 15, 2016, the Court appointed GRG as the Program Administrator to "administer the Second Amended Settlement in accordance with the terms and conditions of this Order and the Second Amended Settlement Agreement." (Doc. No. 278 ¶13.) I make this declaration based upon my personal knowledge, and I am competent to testify as to its contents.

### THE PROGRAM ADMINISTRATOR'S DUTIES

2.      Section VI of the Second Amended Settlement Agreement (the "Settlement Agreement") and the Court's July 15, 2016, Order set forth GRG's duties as the Program Administrator of the Medical Monitoring Program (the "Program"). These duties include:

      a. establishment of a fund to receive the settlement amount and paying all costs of the Program;

      b. building the network of program locations;

1

    c.  implementing and overseeing the online Screening Questionnaire;

    d.  working with Qualifying Class Members to ensure they receive Medical Evaluations;

    e.  paying eligible expenses for Qualifying Class Members who travel more than 100 miles for a Medical Evaluation;

    f.  contracting with local providers for Qualifying Class Members who do not live near a Program Location; and

    g.  processing and aggregating results of the Medical Evaluations, and compensating Program Locations for their services. (Doc. No. 266-1 § VI.A.)

GRG's progress in discharging each of these duties is set forth in the sections that follow.

## ESTABLISHMENT OF THE FUND AND PAYMENT OF EXPENSES

3.      The Settlement Agreement and the Court's July 15, 2016, Order call for the establishment of a Medical Monitoring Fund (the "Fund") for the purpose of paying all costs of the Program in accordance with the Settlement Agreement within ten days after the Preliminary Approval Date. The Settlement Agreement and the Court's July 15, 2016, Order also call for the NCAA to deposit or cause to be deposited $5,000,000.00 into the Fund within fourteen days after the Preliminary Approval Date. (Doc. No. 266-1 § IV.A; Doc. No. 278 ¶ 35.)

4.      Class Counsel and the NCAA selected Huntington National Bank to house the Fund. Thereafter, GRG established the Fund with Huntington National Bank on July 21, 2016, and the NCAA deposited $5,000,000.00 into the Fund on July 28, 2016. Class Counsel, the NCAA, and GRG entered into a Qualified Settlement Fund Agreement dated September 9, 2016, to set forth the terms and conditions for the operation and administration of the Fund, in accordance with the terms outlined in the Settlement Agreement.

2

5.     Upon its appointment as the Program Administrator, GRG established payment processes to receive, process, and approve (as appropriate) invoices submitted for payment. These processes include segregation of duties and other controls to ensure program integrity.

6.     As of September 28, 2017, GRG has issued payments totaling $1,554,600.04 for Settlement-related expenses, primarily related to the administration of class notice, Medical Science Committee (the "Committee") fees, and service of subpoenas. The details of these payments are set forth as an exhibit to this declaration.

7.     The balance in the Settlement Account on September 28, 2017 was $3,467,944.00; this balance reflects the $5,000,000.00 deposit less the payments listed above, plus earned interest.

## IDENTIFICATION OF PROGRAM LOCATIONS AND CANDIDATE PROVIDERS

8.     On August 29, 2016, GRG issued a request for proposals ("RFP") seeking qualified medical providers to participate in the Program. In doing so, GRG, in consultation with the Committee, established a webpage and online form to receive submissions and conducted outreach seeking provider candidates in all 33 markets. In response to the RFP, GRG received 97 submissions and a significant number of questions and inquiries about the program itself. GRG also made an effort to directly contact potential Program Locations that had not responded to the RFP but were identified as important locations.

9.     On December 6, 2016, GRG, the Committee, Class Counsel, and Counsel for the NCAA convened an all-day meeting in Chicago. During this meeting, GRG reviewed the RFP responses with the other attendees in order to finalize the list of providers who should be targeted for recruitment as Program Locations.

10.     Since that meeting, GRG has begun its initial outreach to thirty-three Program Locations approved by the Committee. Specifically, GRG has made an initial contact to identify the key decision makers and has provided basic program information to the prospective Program

Locations. Following the initial contact, GRG has pre-filled the Program Application for each prospective Program Location (based on information gathered from the RFP responses and other sources) and forwarded the Application to those organizations for completion. Finally, GRG's provider enrollment team has engaged in dialogue with the provider organizations' clinical and administrative staffs to answer their questions about the Program's required operational, testing, and reporting activities.

11.     GRG is currently working to finalize its draft Provider Location Agreement for review by the Parties. This document will establish the terms and conditions of the Program Locations' participation in the Program, including fees for medical services covered by the Program. GRG expects to complete this draft in the near future and will then circulate it to the Parties for review and approval. Once GRG has finalized the provider contract with the Parties, it will begin contract negotiations with prospective Program Locations.

## IMPLEMENTATION AND OVERSIGHT OF THE ADMINISTRATION OF THE SCREENING QUESTIONNAIRES

12.     After the Court appointed GRG as the Program Administrator in July 2016, GRG began working with Class Counsel, Counsel for the NCAA, and the Committee to implement the Program in accordance with Sections IV and VI of the Settlement Agreement, including creating a workable online version of the Screening Questionnaire in accordance with the Committee's April, 2015 Report. During its consultations with the Committee, including the in-person meeting in December, 2016 and several conference calls and email exchanges, GRG has thoroughly reviewed all sections of the Committee's April, 2015 Report to define terms used within the report, to identify implied tasks in need of greater detail for implementation, and to ensure the thorough understanding needed to administer the complex requirements of the Screening Questionnaire. Through these consultations, the Committee has also found opportunities to streamline the

4

information collected through the Screening Questionnaire without compromising the quality of the data collected.

13.    The Committee's April, 2015 Report identified seven neuropsychological tests to be administered as part of the Screening Questionnaire. Of the seven tests, four are proprietary, and three are in the public domain. GRG is working with the two companies (Pearson and PAR) who own the four proprietary tests to license the use of those tests as part of the Screening Questionnaire. Both companies have established licensing processes for situations that require administration of their tests in a method or manner different than their normal method of administration (in this case, via the online Screening Questionnaire), and GRG is working to secure licensure accordingly for the four proprietary tests. GRG has had several discussions with both companies, submitted licensure applications, and is in active talks to secure permission to utilize these tests.

14.    GRG has explored the suitability of numerous online platforms for hosting the online Screening Questionnaire, including the development of a stand-alone platform, securing third-party hosting via established online questionnaire companies, and utilizing other software suitable for such an application. GRG's information technology developers are currently working to configure and deploy this functionality in time to give the Committee the opportunity to explore the site and offer any feedback on the congruence between the online Screening Questionnaire functionality and the Committee's original intent.

## NOTIFYING QUALIFYING SETTLEMENT CLASS MEMBERS OF ELIBILITY FOR MEDICAL EVALUATIONS

15.    After processing the test results from completed Screening Questionnaires, GRG will contact Settlement Class Members via their preferred method of communication (either via the United States Postal Service or the online Settlement Class Member Portal) to inform them

whether they have qualified for a Medical Evaluation. For the Qualifying Class Members, GRG will provide instructions for scheduling the Medical Evaluation via GRG's online Settlement Class Member Portal or GRG's Call Center. Either method of scheduling will utilize GRG's proprietary mapping technology to allow Qualifying Class Members to identify the Program Locations nearest their homes (or the closest alternate locations, if desired), to select their preferred Program Location(s), to submit date preferences, and to provide any other information relevant to the Qualifying Class Member's request for scheduling the Medical Evaluation. Upon receipt of the Qualifying Class Member's preferences, GRG will coordinate the scheduling of the Medical Evaluations with the Program Locations and then will contact the Qualifying Class Members to confirm the date, time, and location of the Medical Evaluation. As the date of the Medical Evaluation approaches, GRG will provide the Qualifying Class Members with reminder correspondence, including any special instructions for the Program Locations (e.g., parking instructions). GRG developed the technology to provide these services in previous medical consultation programs and is on track to reconfigure the technology for use in the Program well in advance of the earliest possible Program start date.

16.     For Settlement Class Members who qualify as "impaired" on mood and behavioral measures but not on cognitive measures, GRG will provide a telephone screening in accordance with the language in the Committee's April, 2015 Report and the additional guidance of the Committee. During the December, 2016 all-day meeting, GRG moderated a discussion with the Committee to discuss various aspects of the mood and behavioral screening. Since that meeting, GRG has continued to work closely with the Committee to clarify the members' overall intent for these telephone screenings, specify which scores qualify Settlement Class Members for the telephone screenings, define the content of the screenings (i.e., what questions and subject matter those conducting the screenings will cover), and identify the possible outcomes of these screenings

for Settlement Class Members. The Committee is in the process of providing such content and direction.

17.     The Committee's April, 2015 Report recommended the inclusion of ancillary testing as part of the Medical Evaluation. To facilitate adequate guidance to the Program Locations about the types of ancillary testing the Program will fund, GRG has worked with the Committee to identify which ancillary tests would be most beneficial and appropriate for Qualifying Class Members receiving a Medical Evaluation. The Committee is currently circulating a proposed list of covered ancillary tests for inclusion in the Program, which GRG will add to its previously developed provider fee schedule upon finalization.

## REIMBURSING TRAVEL AND CONTRACTING WITH LOCAL PROVIDERS

18.     In its implementation of past programs, GRG has developed technology to automatically calculate the distance from a Settlement Class Member's primary residence to the nearest Program Location. GRG will reconfigure this technology to meet the requirements set forth in IV.B.5.a of the Settlement Agreement. This will enable GRG to calculate mileage reimbursement for Qualifying Class Members who reside more than 100 miles from the nearest Program Location and to identify Qualifying Class Members eligible to request alternate providers for enrollment as Program Locations.

19.     Pursuant to the provisions in Paragraph IV.B.5.a of the Settlement Agreement, GRG will accept proposed alternate locations submitted by Qualifying Class Members for whom travel to the nearest Program Location would be unduly burdensome. In a past medical consultation program, GRG utilized a modified provider contracting process to approach and enroll providers in areas of low concentrations of Settlement Class Members where it was impractical to enroll a provider through the normal contracting process. GRG will use a similar

approach for contracting with providers in situations where Qualifying Class Members put forward alternate providers.

## PROCESSING AND AGGREGATING DATA FROM MEDICAL EVALUATIONS

20.     GRG has been in close consultation with the Committee to identify the data points required for future analysis of the correlation between the Screening Questionnaire cut scores and the Medical Evaluation results.  These consultations, including discussions during the December, 2016 in-person meeting, also covered steps GRG will take to ensure compliance with the Health Insurance Portability and Accountability Act and to allow Settlement Class Members who object to their data being used for analysis to opt out of data collection.  The Committee is currently circulating a proposed list of data points for collection from providers upon the conclusion of each Medical Evaluation.

21.     As part of its implementation of past programs, GRG developed online portal functionality to collect reports and data from providers at the conclusion of evaluations.  GRG will reconfigure this functionality to allow for the collection of data points in a structured format, which will allow for more efficient analysis by the Committee.

## COMPENSATING PROGRAM LOCATIONS FOR SERVICES

22.     Upon retention of the Program Locations, GRG will perform a thorough orientation with each of them to educate the Program Locations and their key employees about GRG's operational processes, including procedures for scheduling Medical Evaluations and submitting invoices for reimbursement following completion of the Medical Evaluations.  After completion of a Program Location's orientation, GRG will begin scheduling appointments with the Program Location.

23.     Upon completion of each Medical Evaluation, Program Locations will be allowed to submit an invoice for payment.  Within thirty days of receipt, GRG will review all submitted

invoices for alignment with the date of the appointment, the Qualifying Class Member's name, the services delivered, and the scheduled provider. Upon matching these data points, GRG will approve payment at the Program Location's contracted rate for the invoiced medical services covered by the Program, will disburse the funds to the Program Location, will send an Explanation of Payment to the Program Location, and will send an Explanation of Benefit to the Qualifying Class Member.

24.     In sum, GRG is on track to administer the Program in accordance with all of the requirements of the Settlement Agreement.

THE DECLARANT HAS NOTHING FURTHER TO SAY.

Pursuant to 28 U.S.C. § 1746, I swear that the foregoing is true and correct to the best of my knowledge. Executed on this 29th day of September, 2017.

Matthew L. Garretson

9

## Exhibit – Medical Monitoring Fund Expense Detail

1.    Notice Administrator — a series of three wire transfers was issued on August 28, 2017 to the designated account of Gilardi & Co., LLC as follows, after entry of the Court's Order of August 23, 2017 (Docket Entry No. 439) approving payment of notice expenses totaling $1,382,334.73, as follows:

    a.  The amount of $1,015,303.99, per court records filed August 8, 2017.

    b.  The amount of $75,312.74, per an invoice dated June 16, 2017.

    c.  The amount of $291,718.00, per an invoice dated December 22, 2016.

2.    Medical Science Committee — a total of $40,942.16, as follows:

    a.  Check issued on November 17, 2016, to Robert Cantu, M.D., Neurological Surgery, Inc., in the amount of $2,000.00, for an invoice dated September 1, 2016.

    b.  Check issued on November 17, 2016 to Robert A. Stern, Ph.D., in the amount of $3,000.00, for an invoice dated October 9, 2016.

    c.  Check issued on November 17, 2016, to JAMS, INC., in the amount of $1,925.00 for services rendered by the Hon. Wayne Anderson, for an invoice dated November 2, 2016.

    d.  Check issued on January 10, 2017 in the amount of $8,224.20 to Robert Cantu, M.D., Neurological Surgery, Inc., pursuant to an invoice dated December 13, 2016.

    e.  Check issued on January 10, 2017 in the amount of $7,842.22 to Robert A. Stern, Ph.D., pursuant to an invoice dated December 14, 2016.

     f.  Check issued on January 25, 2017 in the amount of $4,745.00 to JAMS, Inc., for services rendered by the Hon. Wayne Andersen per an invoice dated January 3, 2017.

     g.  Check issued on February 28, 2017 in the amount of $11,945.74 to Psychological and Neurobehavioral Services, Inc., for services rendered by Dr. Echemendia, per an invoice dated January 17, 2017.

     h.  Check issued on August 15, 2017 in the amount of $980.00 to JAMS, Inc., for services rendered by Judge Anderson, per an invoice dated August 14, 2017.

     i.  Check issues on September 18, 2017 in the amount of $280.000 to JAMS, Inc., for services rendered by the Hon. Wayne Andersen per an invoice dated September 6, 2017.

3.     Serving by Irving (service of subpoenas upon NCAA member institutions which did not fulfill record requests from the Notice Administrator) — a total of $131,323.15, as follows:

     a.  Check issued on June 15, 2017 to Latham & Watkins, LLP in the amount of $65,977.14 per the Court's overall approval of payment of expenses for the service and issuance of subpoenas in this matter, which occurred on May 09, 2017, Docket Entry No. 405. This check served as reimbursement for the law firm's prior payment of an invoice from Serving by Irving.

     b.  Check issued on June 5, 2017 to Serving by Irving in the amount of $65,346.01 pursuant to an invoice dated February 10, 2017, and the Court's overall approval of payment of expenses for the service and issuance of subpoenas in this matter, which occurred on May 09, 2017, Docket Entry No. 405.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on September 29, 2017, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: ___*/s/ Steve W. Berman*___
Steve W. Berman