**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | **MDL No. 2492** |
| **IN RE: NATIONAL COLLEGIATE** | ) | |
| **ATHLETIC ASSOCIATION STUDENT-** | ) | **Master Docket No. 1:13-cv-09116** |
| **ATHLETE CONCUSSION LITIGATION** | ) | |
| | ) | **Judge John Z. Lee** |
| | ) | |
| | ) | **Magistrate Judge M. David Weisman** |

**UPDATED DECLARATION OF RACHEL CHRISTMAN
REGARDING THE DISSEMINATION OF DIRECT NOTICE AND AUDIT OF DIRECT
NOTICE PROGRAM**

## TABLE OF CONTENTS

A.     Overview.................................................................................................3

B.     Defined Terms .......................................................................................3

C.     Initial Data Collection and Normalization Process................................6

D.     Frostburg State University Direct Notice Distribution and Response ....................7

E.     Additional Records Located for Notice, Prompting Preliminary Audit ...............10

F.     Comprehensive Audit of the Data..........................................................11

G.     Correction to Previously Reported Exclusions ....................................16

H.     Updated Settlement Class Member Correspondence Statistics ...........................17

I, Rachel Christman, hereby declare and state as follows:

1.      I am employed as Senior Project Manager by Gilardi & Co. LLC ("Gilardi"), a KCC Class Action Services company. Gilardi has been retained to administer the Notice Program in this matter. I have personal knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.      I submit this declaration in accordance with the Court's Orders filed November 13, 2017 (Dkt #481) (the "November 2017 Order") and February 6, 2018 (Dkt #494) (the "February 2018 Order") to supplement and correct the information provided in the Declaration of Rachel Christman Regarding Dissemination of Direct Notice, executed September 29, 2017 (Dkt #470) ("Christman Notice Declaration") and to provide detail on the audit of data collection that Gilardi performed in accordance with the February 2018 Order.

### A.    Overview

3.      As explained more fully below, Gilardi has completed the Data Audit of each data file submitted by an NCAA Member Institution ("File"), which resulted in the discovery of 74,706  (approximately 1.8% of the valid Settlement Class Member Information provided to Gilardi) records which were either incorrectly Normalized or which were incorrectly classified as having been included in a Direct Notice Distribution. These records span 28 Files submitted by 27 NCAA Member Institutions. At the direction of the Court, Gilardi is prepared to mail notice and email notice to these additional records within 10 business days.

### B.    Defined Terms

4.      The following defined terms are relevant to understanding how Gilardi processed data that it received from NCAA Member Institutions and how Gilardi performed the audit of data collection described in this declaration:

a. **"*NCAA Member Institution*"** refers to NCAA member schools from which the NCAA requested contact information for known current or former student athletes who played any NCAA-sanctioned sport at any time prior to July 15, 2016 ("Settlement Class Member Information"), such request initially being made in the Summer of 2016.

b. **"*NCAA Upload Website*"** refers to the secure website, https://gilardigateway.com/CollegeAthleteConcussionSettlement/uploadmanager, established by Gilardi on or before August 2, 2016 for NCAA Member Institutions to submit Settlement Class Member Information. The NCAA Upload Website provided data submission instructions for NCAA Member Institutions as well as the downloadable Census Template (defined below).

c. **"*Census Template*"** refers to a non-editable Microsoft Excel spreadsheet which accepts pasted data in a specified format. The purpose of the Census Template is to normalize the data submissions, allowing data submitted on the Census Template to be programmatically combined into a master mailing list by Gilardi once the Census Template is uploaded by the NCAA Member Institution.

d. **"*Normalization*"** refers to the manual process of re-formatting Files (which were not submitted using the Census Template) to remove extraneous data, flag addresses outside the United States as foreign (and re-format as foreign addresses as necessitated for mailing), split out records with multiple mailing and/or email addresses, consolidate records from individual tabs in Microsoft Excel, sort the final resulting data to match the headers used in the Census Template, and paste

4

the normalized data into a Census Template to be programmatically combined as discussed in paragraph 12 below.

e. **_"Master Mailing & Email List"_** refers to the final consolidated list of Settlement Class Member Information submitted by NCAA Member Institutions including both records submitted using the Census Template and records submitted in any other format (referred to as "Non-Standard") after Normalization. Gilardi removed duplicate and incomplete records from this list and processed remaining records through the National Change of Address database to update any changes on file with the United States Postal Service.

f. **_"Master Triage"_** refers to the master index of all Files. The index contains statistical information about each File including record count, count of student athlete emails, classification as either Census, Non-Standard or "Other,"[1] and the final destination of each File (whether mailed, and if so, in which mailing, or not mailed, and if so why not).

g. **_"Direct Notice Distribution"_** refers to any one of the six postcard mailings (sent on January 9, May 30, June 26, July 28, August 2, and November 14, 2017) or

---

[1] "Other" Files include duplicate Files, blank Files (empty Census Templates), Files deleted or disregarded at the request of the NCAA Member Institution (these were Files which the institutions uploaded by mistake, either including an incomplete list of student athletes, or containing data irrelevant to the Settlement which the institution wished to be withdrawn), cover letters, explanatory Files, and Census Templates submitted by Settlement Class Members. (Certain NCAA Member Institutions mailed copies of the subpoena referenced in paragraph 3 of the Christman Notice Declaration to student athletes prior to uploading Settlement Class Member Information. This caused confusion with some Settlement Class Members who thought they were being served with the subpoena. These Settlement Class Members visited the NCAA Upload Website and uploaded an individual Census Template containing their personal information. Gilardi mailed the Long Form Notice in response to these submissions and added the Settlement Class Members to the Master Mailing & Email List.)

email blasts (sent on January 9, June 30, July 31, August 9, and November 14, 2017) to identified Settlement Class Members.

**C.    Initial Data Collection and Normalization Process**

5.      As discussed in paragraph 4 of the Christman Notice Declaration, Gilardi received 1,442 individual Files in various formats from 1,117 NCAA Member Institutions. These Files were evaluated, Normalized and consolidated into the Master Mailing & Email List. As detailed below, Gilardi implemented checks and balances to ensure all data was properly captured.

6.      Each NCAA Member Institution was provided a unique ID (the "Claim ID") in Gilardi's proprietary claims database (the "Database").

7.      As the NCAA Member Institution submitted Files on the NCAA Upload Website, each upload was assigned a secondary ID titled the "Submission ID" (if multiple Files were uploaded in a single visit to the website, each File was assigned the same Submission ID).

8.      At the point of upload, NCAA Member Institutions were asked to provide a description of the File(s) being uploaded, including a record count. The field set up to collect this information was a free-form text field, and not all NCAA Member Institutions provided a record count along with the file description.

9.      Uploaded Files were linked to the Database, under the Claim ID for the NCAA Member Institution that provided the data.

10.     Files submitted by the NCAA Member Institutions were individually opened and triaged by Gilardi to determine statistical information about each File, including record count, count of student athlete emails, and classification as either Census or Non-Standard.

11.     Separately, a team reviewed each Non-Standard File and Normalized the data to match the Census Template. Normalized data from each Non-Standard File was manually pasted

into a new Census Template and the resulting file was saved in a central location using the appropriate Submission ID in the file name.

12. Prior to each Direct Notice Distribution, Gilardi combined completed Normalized Census Templates with Files submitted by NCAA Member Institutions which had used the Census Template to create a single mail table for the given Direct Notice Distribution. This was done using a programmed script which identified markers in the Census Templates to pull all data into a single file. This data was then processed through the National Change of Address database to capture any updated addresses. Duplicate records were removed, addresses were standardized, invalid addresses were removed, and records with email addresses were isolated for the email blast. Once mailed/emailed, these lists were added to the Master Mailing & Email List.

13. After each Direct Notice Distribution, the Master Triage was updated to indicate what records had been included in the mailing. Where a File was classified as included in a Direct Notice Distribution, the Master Triage also identified the date on which notice was sent.

14. Prior to the Christman Notice Declaration, a final audit was performed on the Master Triage to ensure notice had been sent to all Settlement Class Members for whom last-known contact information was provided. This was done by: (1) using both the Claim ID and Submission ID, comparing an export of all Files linked to the Database to ensure each File had an entry and classification on the Master Triage; and (2) using the Submission ID, comparing an export of all Files uploaded to the NCAA Upload Website to ensure each File had both an entry in the Database and an entry and classification on the Master Triage.

**D. Frostburg State University Direct Notice Distribution and Response**

15. On October 26, 2017, as Gilardi was preparing to transfer all Files to the Program Administrator, a File was discovered which had not been included in any previous Direct Notice

7

Distribution (the "Frostburg File"). Settlement Class Counsel and the National Collegiate Athletic Association ("NCAA," and together with Settlement Class Counsel, the "Parties") were promptly informed of this error on October 27, 2017, and the Parties notified the Court on November 2, 2017.  See Joint Motion For Entry Of Revised Schedule (Dkt #476).

16.     The error causing the Frostburg File to be missed took place during the manual Normalization process wherein a separate File (the "North Carolina File") was normalized and the Submission ID used in that file name was mis-typed, transposing the last two digits. This created an invalid Submission ID for the North Carolina File, the first eight digits of which matched the first eight digits of the Submission ID for the Frostburg File.  Gilardi subsequently included the North Carolina File in the January 9, 2017 Direct Notice Distribution.  When Gilardi updated the Master Triage, however, Gilardi incorrectly flagged the Frostburg File as having been included that mailing instead of the North Carolina File.  As stated above, the error stemmed from the error in the normalization process, where the North Carolina Submission ID had two digits that were transposed.  Since the North Carolina File did not show up in the Master Triage as having been sent, Gilardi prepared the North Carolina File to be included in the July 28, 2017 Direct Notice Distribution.  The records contained in the North Carolina File, however, were subsequently removed during the deduplication process, so they were only mailed and/or emailed once.  Given the large volume of records being mailed and deduped, Gilardi did not discover that the North Carolina File had been deduped in its entirety.

17.     Prior to notifying the Parties of the omission of the Frostburg File, Gilardi manually and visually reviewed the list of Files included in each Direct Notice Distribution to confirm that each File name referenced the correct Submission ID and therefore had been correctly classified as being included in a Direct Notice Distribution. It was believed that this

additional audit confirmed the inclusion of all valid and unique Files in a Direct Notice Distribution. This audit did not review the contents of these Files (i.e., the audit was performed at the file name level rather than at the record or Settlement Class Member level).

18.     On November 14, 2017, Gilardi caused the Postcard Notice to be mailed to the 9,239 Frostburg State University Settlement Class Members identified in the November 2017 Order. The Postcard Notice was printed on blue paper. That same day, Gilardi caused the Email Notice to be emailed to 3,605 of the 9,239 Frostburg State University Settlement Class Members who also had email addresses. The background of these email notices was light blue. True and correct copies of the Postcard Notice and Email Notice used in the November 14, 2017 Direct Notice Distribution are attached hereto as Exhibits A and B.

19.     With the inclusion of the Frostburg File, Gilardi has sent Direct Notice to approximately 4,077,981 Settlement Class Members.

20.     Since mailing notice to the Frostburg State University Settlement Class Members, 985 unique Frostburg State University Settlement Class Member notices have been returned as undeliverable by the US Postal Service (referred to herein as "Frostburg RUM"). Gilardi has searched all of the Frostburg RUM received as of January 8, 2018, has located updated addresses for and re-mailed 834 Frostburg RUM pieces.

21.     The deadline for Frostburg State University Settlement Class Members to request exclusion from or object to the Settlement was January 16, 2018. To date, Gilardi has received and processed three (3) timely requests for exclusion and has received zero (0) objections to the Settlement from Frostburg State University Settlement Class Members.

22.     On or before November 14, 2017, Gilardi updated the Settlement Website, located at www.collegeathleteconcussionsettlement.com, to clearly identify that:

a. Settlement Class Members who attended any NCAA Member Institution other than Frostburg State University are subject to the deadlines set forth in the Court's August 1, 2017 Minute Order (Dkt #432) with the new Fairness Hearing Date of March 1, 2018;[2]

b. Frostburg State University Settlement Class Members, who will be able to identify themselves through receipt of blue postcard or email notices, are subject to the deadlines set forth in the Court's November 2017 Order.

23. Gilardi also caused the recording on the case-dedicated toll-free telephone number (877-209-9898) to be updated with this information.[3]

### E. Additional Records Located for Notice, Prompting Preliminary Audit

24. As outlined in the Parties' Joint Motion for an Extension of Time to address the Notice Program, filed January 30, 2018 (Dkt# 491), Gilardi determined on January 28, 2018 that information from additional Files had been inadvertently omitted from the Direct Notice Distributions.

25. Gilardi first became aware of this issue on January 28, 2018 after receiving a request for exclusion from a Settlement Class Member whose name and email address did not appear on the Master Mailing & Email List. After pulling the original File from the NCAA Member Institution that this Settlement Class Member had attended, it was discovered that the File had been submitted as a Non-Standard File with Settlement Class Member Information split onto multiple tabs. In the process of Normalizing the File, Gilardi captured Settlement Class

---

[2] The Settlement Website was subsequently updated on February 8, 2018 to reflect the amended timeline laid out in the February 2018 Order (Dkt# 494), and again on February 14, 2018 to provide the updated date and time for the March 8, 2018 Status Hearing.

[3] The recording was subsequently updated on February 12, 2018 to reflect the amended timeline laid out in the February 2018 Order (Dkt# 494).

Member Information listed on the first tab, but failed to capture Settlement Class Member Information from any additional tabs.

26.     Upon discovery of this additional omission, Gilardi performed a review of all Files submitted by NCAA Member Institutions to compare the record count provided by each NCAA Member Institution at the point of upload[4] to the record count for the File on the Master Triage. Where this comparison indicated a discrepancy of more than 20 records, the File was manually reviewed to explain the discrepancy. This preliminary audit revealed a total of four Files representing 19,422 unique records, including 19,111 records with mailing addresses and 13,596 with email addresses.

27.     This second discovery of administrative error in Normalization prompted a full audit.

**F.      Comprehensive Audit of the Data**

28.     In collaboration with the Parties, Gilardi constructed the following audit steps (referred to herein as the "Data Audit").

29.     **Data Audit Summary:** The objective of the Data Audit was to confirm each File was properly classified, Normalized, and the data used in the direct notice program. Gilardi employed an audit team of 14 agents to process each File for the purposes of the Data Audit. Each File was reviewed to ensure that 1) the steps taken to create and maintain the Master Triage were correct, resulting in all Files being accounted for on the Master Triage, as well as on the Master Mailing & Email List; 2) the record count for each File as displayed on the Master Triage

---

[4] Where the NCAA Member Institution did not provide record counts at the point of data upload(s), the Preliminary Record Count from Gilardi's Weekly Statistic Report (which reflects the earliest snapshot of each File, as these counts were reported on a weekly basis to the Parties as they were received and processed) to the Parties was compared to the records count for that File on the Master Triage.

was correct; 3) the Normalization of Non-Standard Files was done correctly; and 4) all unique records with either a valid mailing address or a valid email address were included in a Direct Notice Distribution, as evidenced by the inclusion of such records in the Master Mailing & Email List.

30.     In the course of the Data Audit, each File was individually opened and reviewed by an agent to capture and/or confirm the following:

a.  Classification of File as either Census, Non-Standard, or "Other."

b.  Appearance of File on both the Master Triage and in the Master Mailing & Email List.

c.  Count of records (not including header rows): The manual count of records by the agent was compared both to the count of records provided by the NCAA Member Institution at the point of upload (where such a count was provided) and to the count on the Master Triage.

d.  Count of emails (not including header rows): The manual count of emails by the agent was compared to the count in the Master Triage.

e.  Count of tabs (where applicable): The manual count of tabs was compared to the Master Triage to ensure each tab was accounted for.

f.  Count of records and emails in Normalized File (where applicable): For Non-Standard Files, the manual count of records and emails from paragraph 30.c and d above was compared to the count of records and emails from the Normalized File.

g.  Appearance on the Master Mailing & Email List: Three (3) sample records were pulled from each File: the first, last, and a random mid-range record with valid mailing or email addresses. These records were matched to the Master Mailing &

Email List. Where a File contained multiple tabs, these three (3) sample records were pulled from each tab.

31.    Where any of the items discussed in paragraphs 30.a – g above were not able to be confirmed in a given File, the agent noted the File as an exception. Exceptions were escalated and reviewed by a manager to determine whether an error had occurred.  If an error had occurred, the manager correctly Normalized the File in question for inclusion in an upcoming Direct Notice Distribution.

32.    **Data Audit Results:** Gilardi has completed the above outlined Data Audit, which resulted in the discovery of 74,706  (approximately 1.8% of the valid Settlement Class Member Information provided to Gilardi) records which were either incorrectly Normalized or which were incorrectly classified as having been included in a Direct Notice Distribution. These records span 28 Files submitted by 27 NCAA Member Institutions.

33.    All Files have been individually reviewed and confirmed as either properly included or can be classified as omitted under a-d below.  These omissions fall into one of four categories (listed in order of frequency):

    a.  Copy Errors (36,195 records spanning 11 Files – All Non-Standard): This includes: (i) failure to copy records on additional tabs that were in Files provided by NCAA Member Institutions, (ii) failure to copy the final records in a batch due to not scrolling to the bottom of the provided list (this also occurred where a Non-Standard File contained blank rows between groups of Settlement Class Member Information, so lower sections of Settlement Class Member Information were not immediately visible and therefore missed), or (iii) failure to copy foreign

13

addresses which had been isolated during Normalization and were subsequently
not added back to the Normalized File.

b. Paste Errors (16,310 records spanning 8 Files – All Non-Standard): This includes
failure to paste the full name and/or address into the Census Template, pasting
addresses in columns intended for names, pasting email addresses in columns
intended for phone numbers, or failing to include all email addresses into a
Normalized File containing correctly Normalized mailing addresses. Normalized
Files containing the Paste Errors were consolidated according to paragraph 12
above.

    *i.* As a result of the Paste Errors, approximately 200 records spanning 3 of
the 8 Files were removed as having invalid addresses during this
consolidation and were not included in the Direct Notice Distribution.

    *ii.* The remaining records (approximately 16,100 records spanning 5 of the 8
Files) remained in the Direct Notice Distributions in whole or in part.
However, due to the Paste Errors, the majority of these records were likely
not able to be delivered (or in the case of emails being pasted into a non-
email field, were not sent). While some of these records may have
ultimately been successfully delivered, Gilardi is including these Files out
of an abundance of caution.

c. Flagging Errors (13,937 records spanning 7 Files – Both Census and Non-
Standard): This includes (i) one File where the Normalized File was saved under
the incorrect Submission ID (similar to the Frostburg File), (ii) three Files which
were incorrectly added to the list of completed Files in the January 9, 2017 Direct

14

Notice Distribution, (iii) one File which was flagged for inclusion in the July 28, 2017 Direct Notice Distribution and was not ultimately included, and (iv) two Files which were not included on the Master Triage and therefore were not processed prior to the Data Audit. These were not previously captured as the two Files were uploaded in a single visit to the NCAA Upload Website (along with a third File, which was properly Normalized), and were therefore assigned a single Submission ID for all three Files.

d. Census Errors (8,264 records spanning 2 Files – Both Census and Non-Standard): This includes a Census File which included the entire Settlement Class Member mailing address in a single, wrapped cell in contradiction to the Data Submission Guidelines provided to NCAA Member Institutions. This is not an acceptable data format for Gilardi's system, so the addresses were rejected as being invalid. This category also includes a File which had been submitted as Non-Standard, was correctly Normalized, and flagged to be consolidated as described in paragraph 12 above. At some point during this consolidation process, Gilardi's system failed to fully capture the File, resulting in approximately half of the File being missed.

34. Human error is inevitable in any project, more so with a project as highly manual as the Normalization required to consolidate the Files submitted by the majority of the NCAA Member Institutions. However, these errors would have been minimized had Gilardi introduced the Data Audit at the time of Normalization for each File. Now that each File has been opened and reviewed a second (or in some cases third and fourth) time and the above errors have been addressed, Gilardi believes that all records submitted by NCAA Member Institutions have been

properly handled. At the direction of the Court, Gilardi is prepared to mail notice and email notice to these additional records within 10 business days.

35.     Gilardi bears the full responsibility for the necessity of the above-outlined Data Audit and will not include the cost for work associated with the Data Audit in any invoice. Likewise, should the additional Direct Notice Distribution cause costs to exceed the budget approved by the Court in response to the Second Declaration of Rachel Christman Regarding Notice Program Expenses, filed March 3, 2017, Gilardi is prepared to absorb such excess.

### G.     Correction to Previously Reported Exclusions

36.     The Christman Notice Declaration indicated that Gilardi had received 1,747 timely and 14 late requests for exclusion from the Settlement. As additional late requests for exclusion were entered, it became apparent that certain timely requests for exclusion had been received by Gilardi, identified as requests for exclusion and scanned for processing, but had never ultimately been processed.

37.     Commencing December 20, 2017, Gilardi individually reviewed all images identified as requests for exclusion against the list of 1,747 timely requests for exclusion reported in the Christman Notice Declaration to ensure all such requests were properly processed and accounted for. In addition to the aforementioned three (3) requests for exclusion received by Frostburg State University Settlement Class Members, Gilardi can now conclusively report that 1,839 timely requests for exclusion from the Settlement and 16 late requests for exclusion have been received. In total, Gilardi has received 1,858 requests for exclusion from the Settlement. A corrected list of all requests for exclusion from Settlement Class Members is attached hereto as Exhibit C.

16

**H.** **Updated Settlement Class Member Correspondence Statistics**

38.    The Stay Informed portal on the Settlement Website remains active. To date, Gilardi has received 16,400 entries on the Stay Informed portal.

39.    The case-specific email address, info@collegeathleteconcussionsettlement.com, remains active. To date, Gilardi has received 2,710 emails to this email address.

40.    The toll free telephone number, 877-209-9898 remains active. To date, Gilardi has received 8,963 calls to this number and has received and honored 313 requests for Long Form Notice Packets.

41.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 26th day of February, 2018.

*Rachel Christman*

Rachel Christman