# EXHIBIT 1



1530 Wilson Boulevard • Ste 560 • Arlington, VA • 22209

# NCAA Student-Athlete Concussion Litigation (MDL No. 2492) Independent Audit of Direct Notice Portion of the Notice Program Summary Report
## August 30, 2018

**Assignment**

On July 25, 2018 Monument Economics Group ("MEG") was engaged to perform an independent audit of the direct notice portion of the Notice Program implemented by Gilardi/KCC ("the Administrator") in the above-captioned litigation. The objective of the audit was to determine whether the Administrator effectively provided notice, either by postcard or electronic mail ("email")[1], to potential student-athlete claimants, based on the data that were submitted by the NCAA member institutions.

**Summary Conclusions**

MEG has determined that 90 percent of the student-athletes for whom the Administrator received contact information, or 3,951,552 student-athletes out of a total of 4,379,275 original records provided by the NCAA member institutions, were sent direct mail or email notice. Given the complexity of the data that were provided, this is a reasonable result. To reach this conclusion, we performed a review of the procedures utilized by the Administrator to process the student-athlete contact data provided by NCAA member institutions, and the results achieved. Our review included the following:

1. Determine the total number of files submitted by NCAA member institutions relative to those that were dropped.

---

[1] While there was no suggestion prior to the audit of any deficiency in the Administrator's provision of email notice (and no such issue was discovered as part of this audit), MEG reviewed the Administrator's provision of email notice because the data used to send emails came from the same source files as the addresses used to send direct mail. Moreover, this audit reconfirmed the efficacy of the email component of the Notice Program.



2. Of the files that were dropped, determine the criteria that was applied and the accuracy of the result.

3. Approximately 41 percent of the files submitted by NCAA member institutions did not conform to the "Census" template ("Standard Format") provided by the Administrator. These files required manual processing to "normalize" the data in accordance with the Standard Format. Determine whether the process employed by the Administrator in normalizing certain submissions was sound and resulted in the maximum number of "clean" records.

4. Review the process undertaken by the Administrator to handle returned undeliverable mail ("RUM"), including whether RUM records were sent out for search and a second attempt for direct contact was made. Also investigate the number of RUM records that were contacted by email.

Throughout this summary report, the term "file" is generally used to represent the student-athlete contact information for a single NCAA member institution. Some NCAA member institutions uploaded multiple files (e.g. a file for each sport). Similarly, the term "record" represents a single student-athlete.

MEG has determined that 90 percent of the student-athletes for whom it received contact information, or 3,951,552 student-athletes out of a total of 4,379,275 original records provided to the Administrator by the NCAA member institutions, were contacted pursuant to the direct mail or email notice.[2]

**Table 1**
**Summary of Records Received and Records Included in the Direct Mail and Email Notice Distribution**

| Original Records | Unique Class Members Included in the Direct Notice Distribution | Difference | % of Original Records Included in Direct Notice Distribution |
|---|---|---|---|
| 4,379,275 | 3,951,552 | 427,723 | 90% |

Note: The Original Records' count excludes the files that were fully duplicative of other files uploaded by NCAA Institutions. The Original Records' count includes duplicative records contained within and among files associated with athletes participating in multiple sports, attending multiple schools, etc.

---

[2] Potential Class Members who may not have received direct mail or email notice may still have received notice through alternative means, such as by viewing print publications containing notice, the settlement website, internet



Direct notice was accomplished through a total of seven distributions of postcards. Notice was also sent by email where usable email addresses were provided. Approximately one-half of the student-athletes were contacted through both email and direct mail. The precise numbers appear in the table below.

**Table 2**
**Summary of NCAA Direct Mail and Email Notice Distribution**

| Distribution | Email Count | Postcard Count | Received both Email and Postcard | Unique Class Members |
|---|---|---|---|---|
| 1 | 997,906 | 2,177,545 | | |
| 2 | 2,489 | 3,920 | | |
| 3 | 208,521 | 379,369 | | |
| 4&5 | 690,399 | 1,247,727 | | |
| 6 | 3,605 | 9,239 | | |
| 7 | 45,083 | 62,136 | | |
| *Total* | 1,948,003 | 3,879,936 | 1,876,387 | 3,951,552 |

Note: Student-athletes who received postcard notice through mailing 4 and 5 were sent postcards on different dates, but were sent email notice on the same date, in a single email blast.

In general, given the complexity of the data that were provided, the Administrator successfully contacted the vast majority of the student-athletes identified by the NCAA member institutions. Even still, we have a few recommendations to improve the direct mail and email notice. One area that can be improved involves the way in which files provided in Non-Standard Format were manually processed. The other is related to RUM record processing. We will discuss in greater detail below.

---

publications containing notice, and a press release containing notice, as provided for in the Administrator's Notice Plan. This audit, however, focuses only on the Administrator's provision of direct mail and email notice.



**Support for Summary Conclusions**

**Description of Data Provided to MEG by Administrator**

MEG began receiving data from the Administrator on July 26, 2018. Nearly 3,000 files were successfully downloaded, accessed, and reviewed. MEG has determined that 1,289 NCAA member institutions uploaded student-athlete data to the Administrator and two directly emailed data to the Administrator for a total number of 1,291 participating NCAA member institutions. These 1,291 NCAA member institutions submitted a total of 1,473 files. These files have been categorized as "1 – Original Files." Of the 1,473 files, 75 files either contained no data or contained data that were wholly duplicative of another file and were therefore dropped by the Administrator. Therefore, there are 1,398 files containing records for 4,379,275 potential Class Members. These 1,398 files represent either the files as they were uploaded in the Standard Format or the "normalized" files created by the Administrator to follow the Standard Format. These files have been categorized by mailing, and whether the file was uploaded in the Standard Format or if it required normalization. These files have also been categorized as "2 – Normalized Files."

The Administrator provided MEG with seven files that include the final email tables for each of the Direct Email notifications. These files have been categorized as "3 – Original Email Tables." The Administrator also provided nine files that include the final mail tables for each of the Direct Postcard notifications. These files have been categorized as "4 – Original Mail Tables." The Administrator provided MEG with 93 RUM files that have been categorized as "5 – RUM." We were also provided with the Master Triage file[3] and a file containing the passwords for the password protected files contained in the "1 – Original Files" folder.

---

[3] The Master Triage file contains the master index of all files. The index contains statistical information about each file including record count, count of student-athlete emails, classification as either Census, Non-Standard or "Other" and the final destination of each file (whether mailed, and if so, in which mailing, or not mailed, and if so why not).

4



## Description of Audit Process and Results

### Dropped Files

The first thing that MEG wanted to confirm was that none of the 75 files (i.e. submissions by NCAA member institutions) that were dropped from the population by the Administrator contained any useful student-athlete records. According to the Master Triage file, two of the 75 files that were dropped did not contain any records. MEG examined the two files and we confirm that they do not contain any data.

The remaining 73 files were described as containing data that were entirely duplicative of the data contained in other files. These files contained just over 300,000 records in total. MEG examined a sample of the 73 dropped files[4] and performed a comparison of the records to data in the remaining 1,398 files to determine if those records were already included in the data population (i.e. they were duplicative). MEG determined that none of the dropped files in our sample contained any records that were not already accounted for in the remaining 1,398 files (i.e. were duplicative). These results indicate that a comprehensive review of the remaining 80 percent of the dropped files is unnecessary.

### Normalization of Non-Standard Files

The next thing that MEG wanted to verify was the integrity of the normalization process for certain files. As previously mentioned, approximately 41 percent (571) of the 1,398 files submitted by NCAA member institutions were not uploaded in the Standard Format and therefore required some level of manual processing. MEG reviewed the normalization process to determine the reasons for normalization and whether normalization into the Standard Format was done properly. We sampled 20 percent, or 114 files, that required manual processing. We examined the original content and format that was uploaded to the Administrator and compared that to the post-normalization data file. The majority of these files (80 percent) contained the same number and set of records as the original files, meaning they contained all of the relevant fields that were set forth in the Standard Format template. For these 91 files in our sample, the

---

[4] MEG sampled 20 percent of the remaining dropped files, or 15 files.

5



Administrator simply copied and pasted the relevant fields into the Standard Format. These required no additional manual processing.

For the remaining 23 files in our sample, where the record counts differed between the original and normalized file, the Administrator made three adjustments. First, it copied and pasted the relevant information into the Standard Format. Second, if one record contained multiple addresses, email addresses, or more than three sports in the original file, it added those data to the file as a separate record. Third, it removed records that were duplicative, or for which no address or email address was found.

MEG identified a single file within the sample of 23 files where the student-athlete records were incorrectly dropped when the Administrator was adjusting the data for the number of "sport" fields. The Administrator dropped student-athlete records in which the "sport" fields were left blank in the originally uploaded data from the NCAA member institution. MEG confirmed with the Administrator that these records should not have been dropped. Within that file, there were 883 student-athlete records that were dropped in error.

Given this finding, MEG examined the remaining 457 files that were uploaded in Non-Standard Format to determine the percentage where the original and normalized file had the same number and set of records, requiring only formatting of the data, versus the percentage that required manual processing and therefore might be prone to the same error. We determined that 76 files in the remaining population were manually processed, giving rise to the possibility that records were eliminated due to issues such as omitted "sport" information. The results appear in a table below.

**Table 3**
**Summary of Number of Records Contained in the Originally Uploaded Files and the Normalized Files**

|  | Total Files | Files with the Same Number of Records | | Files with Different Number of Records | | Files Where Records Deleted No "Sport" Indicated | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  |  | # of Files | % of Files | # of Files | % of Files | # of Files | % of Files |
| Sampled Files | 114 | 91 | 80% | 23 | 20% | 1 | 0.9% |
| Unsampled Files | 457 | 381 | 83% | 76 | 17% | UNK | UNK |
| *Total Files* | 571 | 472 | 83% | 99 | 17% | 1 | 0.2% |

As shown in Table 3, MEG has determined that 99 normalized files contained a different number of records than the originally uploaded files. These files required substantive manual



processing and are therefore more prone to having valid records inadvertently dropped. Our recommendation would be that the Administrator re-examines each of these 99 files to determine whether any records were dropped in error and if so, include those records in a supplemental mailing.

### Direct Mail and Email Notice Distribution Summary

As set forth in Table 1, there are 427,723 records that were not used for to send direct mail or email notice, representing approximately 10 percent of the original records provided to the Administrator. These records were dropped from the original files uploaded by the Administrator for a number of reasons, including:

    a. They were duplicative in exact name and address of another record.
    b. There were multiple submissions for the same student-athlete by their NCAA member institution because they played multiple sports.
    c. There were multiple submissions for the same student-athlete by different NCAA member institutions because they played at more than one school.
    d. The record had incomplete name and address information.

This number of dropped records (427,000 out of 4.38 million) is not surprising in light of the fact that:

    a. The number of records contained in the files that were provided to the Administrator in non-Standard Format (571) was greater than 2.25 million.
    b. More than 300,000 records were contained in the 73 files that were initially dropped because they were fully duplicative of other files that were uploaded. These records are not included in the 4.38 million count.

MEG suspects that some of the 427,723 records that did not receive notification may have been inadvertently dropped in the normalization process. However, outside of the 883 records (0.2 percent of the 427,723 records not used to send direct mail or email notice) discussed above that were dropped in error, MEG suspects that the majority of those records were excluded for valid reasons. We reiterate our recommendation that the Administrator re-examine the original files in need of manual processing to identify those that may have been dropped in error. Given our



review of the data, through a sampling of the original and normalized files, and aside from this recommendation, we believe that the 90 percent notification rate achieved by the Administrator is a reasonable result.

### Processing of RUM Items

MEG is aware that several passes were made in an effort to locate change of address ("COA") records for RUM items. Our objective in examining the RUM process is to determine whether the handling of RUM items overall was effective. In our experience, the "success" rate in processing RUM items varies significantly depending upon a host of factors including the type of litigation (e.g., securities, consumer, etc.); the length of the claim window; the time elapsed since injury occurred; etc. For example, in securities cases, the claimant data are required by law to be maintained and submitted by the brokerage firms that transacted on behalf of their clients. It is not uncommon for a single investor to hold investments at more than one brokerage firm, creating more than one "touchpoint" of data for that client. The RUM success rate tends to be higher when "institutional" data sets are provided to the Administrator. In consumer cases the length of the claim period is typically larger and there is more variation in the claims data that are submitted, resulting in less favorable RUM success rates. That said, there is no "general" rule of thumb regarding the success rate on RUM items.

The Administrator initially sent 3,879,936 postcards and 320,401 were returned as undeliverable. The U.S. Postal Service was able to directly forward 28,346 of the RUM. The remaining 292,055 of returned items were reviewed by the Administrator to determine if they should be sent to an independent vendor to search for addresses using databases containing public records including name and address information.[5]

---

[5] For example, one of the claimant locator services used by the Administrator is LexisNexis® Accurint®.



**Table 4**
**Summary of Direct Notice Postcard RUM Records**

| Postcard Distribution | RUM | Forwarded RUM | Remaining RUM Records |
|---|---|---|---|
| 3,879,936 | 320,401 | 28,346 | 292,055 |

We were advised by the Administrator that certain RUM records are not indicated for further search, including: i) records with a foreign address and no Social Security Number; ii) addresses with incomplete name and/or address information (the vendors need both pieces of information in order to conduct the search); and iii) records that are associated with student-athletes that already contacted the Administrator to notify of a change of address.

As shown in Figure 1 below, the Administrator sent a total of 263,888 of the RUM records to an independent vendor who was able to find an address for 175,165 of those. Of the 88,723 records for which the vendor could not find an address, 36,753 of those, or 41 percent, had already been sent email notice. The remaining 51,970 records that were sent for search did not receive either an email or postcard.

There were 28,167 RUM items that were not sent for search. The large majority of these (83 percent) had contacted the Administrator previously with a change of address. Any direct change of address records were automatically sent a postcard. There were 626 unsearched RUM records that the Administrator determined did not contain sufficient name and address information to send for search.

MEG is unable to determine the reason why the remaining 4,032 RUM records (shown in Figure 1) were not sent for search. We recommend that those RUM records be reviewed by the Administrator to determine if there are sufficient data to send those items for search. Of the total 4,658 RUM records that were not sent for search, MEG determined that 2,014 of these student-athletes, or 43 percent, had already been sent an email notice.

Figure 1 below shows the results of the RUM process for the 320,401 items returned as undeliverable. Ultimately there were 93,381 records (shown in red in Figure 1) that were either sent for search, but no address information was found, or were not sent for search at all. Of these



records, approximately 42 percent (38,767) were contacted via email. Therefore, of the 3,951,552 unique Class Members who were originally sent direct mail or email notice, 54,614 (1 percent) did not receive an email or postcard.

**Figure 1**
**Results of RUM Processing**

