```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    IN RE:  NATIONAL COLLEGIATE      ) Docket No. 13 C 9116
      ATHLETIC ASSOCIATION STUDENT-    )
 4    ATHLETE CONCUSSION INJURY        )
      LITIGATION                       ) Chicago, Illinois
 5                                     ) February 25, 2019
                                       ) 11:00 o'clock a.m.
 6
              TRANSCRIPT OF PROCEEDINGS - FAIRNESS HEARING
 7               BEFORE THE HONORABLE JOHN Z. LEE

 8    APPEARANCES:

 9    For the Settlement       HAGENS BERMAN SOBOL SHAPIRO, LLP
      Class:                   BY:  MR. STEVE W. BERMAN
10                             1301 2nd Avenue, Suite 2000
                               Seattle, Washington  98101
11
                               HAGENS BERMAN SOBOL SHAPIRO, LLP
12                             BY:  MS. ELIZABETH A. FAGAN
                               1144 West Lake Street, Suite 400
13                             Oak Park, Illinois  60301

14                             SIPRUT, PC
                               BY:  MR. JOSEPH SIPRUT
15                                  MR. TODD L. McLAWHORN
                               17 North State Street, Suite 1600
16                             Chicago, Illinois  60602

17    For the NCAA:            LATHAM & WATKINS, LLP
                               BY:  MR. MARK S. MESTER
18                                  MS. JOHANNA M. SPELLMAN
                                    MR. MARC KLEIN
19                             330 North Wabash Avenue, Suite 2800
                               Chicago, Illinois  60611
20
      For the Objectors:       RIFKIN WEINER LIVINGSTON, LLC
21                             BY:  MR. ARON RASKAS
                               7979 Old Georgetown Road
22                             Suite 400
                               Bethesda, Maryland  20814
23
                               EDELSON, P.C.
24                             BY:  MR. JAY EDELSON
                               350 North LaSalle Street
25                             14th Floor
                               Chicago, Illinois  60654
```

```
 1   APPEARANCES (Cont'd):

 2   For the Objectors          GORDON LAW OFFICES, LTD.
     (Cont'd):                  BY:  MR. RICHARD R. GORDON
 3                              111 West Washington Street
                                Suite 1240
 4                              Chicago, Illinois  60602

 5                              COATS, ROSE, YALE, RYMAN & LEE
                                BY:  MR. DWIGHT E. JEFFERSON
 6                              9 Greenway Plaza, Suite 1000
                                Houston, Texas  77046

 7
     Also Present:              JAMES C. SELMER & ASSOCIATES, PA
 8                              MR. MARC M. BERG,
                                  via teleconference
 9                              500 Washington Avenue South
                                Suite 2010
10                              Minneapolis, Minnesota  55415

11   Court Reporter:            MR. JOSEPH RICKHOFF
                                Official Court Reporter
12                              219 S. Dearborn St., Suite 1232
                                Chicago, Illinois  60604
13                              (312) 435-5562

14              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15                        PROCEEDINGS RECORDED BY
16                        MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER
17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Case 13 CV 9116, NCAA Student-Athlete
2   Concussion Injury Litigation.
3          THE COURT:  All right.  Good morning, everyone.
4          MR. JEFFERSON:  Good morning, your Honor.
5          THE COURT:  We had a bit of a delayed start today
6   because of the Level 2 HAZMAT incident in the courthouse,
7   which now has been cleared up.  So, we're just going to
8   proceed with the agenda that I issued on February 20th, 2019.
9          First, I'll address arguments with regard to the
10  motion for final approval of the second amended class
11  settlement; then I'll hear arguments with regard to settlement
12  counsel's petition for fees, expenses and incentive awards for
13  settlement class representatives; and, finally, I'll address
14  -- or hear arguments -- with regard to the remaining petitions
15  for attorneys' fees and service awards.
16         So, basically, how I'd like to proceed is, if you are
17  addressing the Court, if you could just stand up and just tell
18  me your name and the party that you're representing as the
19  proceedings continue.
20         So, I guess first up is the settlement class
21  counsel's arguments with regard to the motion for final
22  approval.
23         MR. BERMAN:  Good morning, your Honor, Steve Berman
24  on behalf of the class -- settlement class.
25         Because there are people watching, I prepared a

1    PowerPoint so people can follow along my comments.  I have a

2    hard copy.  I don't know if you want a hard copy, your Honor.

3              THE COURT:  I can see it from here.  Thank you.

4              MR. BERMAN:  That's good, because there's a typo in

5    the hard copy.

6              Your Honor, we're pleased to be before you moving for

7    final approval.  And I'd like to place this in context,

8    because this is not a typical final approval hearing in some

9    senses.  You had the foresight to say, this is one of the

10   cases in which I'm going to do a piercing analysis at the

11   preliminary approval stage, and you did so.  So, I think we're

12   at a much more advanced stage than normal.  The Court is more

13   informed than normal.  We worked through many things at great

14   length.  So, I'm going to be, actually, fairly brief today,

15   unless the Court has questions.

16             So, I don't think there's any dispute that these are

17   the five standards that the Seventh Circuit looks to in

18   evaluating settlement.  And I'm just going to march through

19   those in order.

20             The first factor is the strength of the plaintiffs'

21   case versus what we actually achieved in the settlement.  And

22   this is a very unusual case because, as I mentioned to the

23   Court before, I think we obtained more in the settlement than

24   we could if we just continued with the litigation; and, I'll

25   go through the reasons why that's the case.

1   Basically, the settlement achieves everything we

2 would have asked for in terms of medical monitoring, plus

3 more; and, it achieves everything we would have asked for in

4 the return-to-play protocols that we've set up.

5   So, first, in terms of the breadth, the settlement

6 does something that we couldn't have done if we continued to

7 litigate; in that, it covers all genders, all sports, all

8 ages, all states, all time periods, which we could not have

9 accomplished if we continued to litigate.

10   And as the Court is well aware, that medical

11 monitoring includes the medical monitoring fund, which goes

12 for 50 years.  It includes medical evaluations.  And when I

13 mention that we achieved everything we could achieve, at one

14 point Mr. Edelson argued before the Court that, actually, you

15 can get more than the cost of medical monitoring if we

16 litigated.  And the Court did its own research and disagreed

17 with Mr. Edelson.

18   So, we actually achieved in medical monitoring what

19 we could have gotten, and more, if we went to court -- went to

20 trial.

21   The other thing that augers in favor of final

22 approval is some of the opinions, I think, of the experts.

23   Now, Dr. Cantu is without question one of the leading

24 concussion doctors in the country.  He's the go-to guy.  And

25 he has opined that the medical monitoring is valuable because

1   student athletes may be experiencing conditions and symptoms

2   they don't really understand.  They're going to go in, they're

3   going to get a test, and that test can say, you're suffering

4   this from a concussion you had; here's what we can do to help

5   your life.  We can give you more tests, or we can design a

6   therapy program to help offset the effects of this concussion

7   that you have.

8           So, it's a very valuable tool to help these student

9   athletes.  And we designed the tool to go for 50 years.

10          Every single student athlete who's a member of the

11  class can avail themselves of the medical monitoring.  They

12  can complete the questionnaire five times, and they can

13  qualify to receive a medical exam twice.  And there's a

14  special clause that we instituted at your request:  For good

15  cause, people can petition the Science Committee if they want

16  to have an additional examination.

17          The other benefit that class members will receive

18  that, I think, augers in favor of the settlement is that we

19  have the world's best experts on this Medical Science

20  Committee.  You know, we picked two of the best in the

21  country.  The NCAA picked top doctors.  I have not always

22  agreed with what they say, but they clearly are day-to-day

23  dealing with concussions and the growing science that's going

24  to surround concussion treatment as we go forward through this

25  program.

1           So, the Court should be assured that there are some

2    really smart people that are going to be working on this

3    problem for the next 50 years.

4           So, if I look at -- again, looking at what we could

5    have gotten if we kept going and what we did get -- because

6    that's one of the first factors -- the settlement is for all

7    states.  And we know -- and your Honor's already mentioned in

8    one of your prior orders -- that medical monitoring relief is

9    not available in all states.  So, again, if we had gone to

10   trial, we would not have gotten the sweeping, all-state

11   coverage that we did.

12          Also, as I mentioned earlier -- and we've had this

13   discussion before -- there's an unlimited time period in the

14   settlement.  So, everyone that was ever an NCAA athlete gets

15   the benefit of medical monitoring.  If we had gone to trial,

16   we would have had a vigorous debate about when there was a

17   consensus of best practices for treating concussions.  It may

18   have been 2002.  In our complaint we said it was 2004.  Maybe

19   the NCAA would have got a jury or your Honor to say it was

20   2007 or 2010.  But in this settlement, we took away that time-

21   period issue, which is a benefit to the class.

22          And we achieved in the medical monitoring everything

23   that Dr. Cantu set forth in the complaint and the class

24   motion.  So, we got a hundred percent, which is very unusual

25   in presenting a settlement to the Court.  Usually you come

1    in -- class counsel -- and say, damages were X, we got 10

2    percent, 20 percent, 30 percent.  But that's not what we're

3    seeing here today.

4         Then with respect to return to play, I'm not going to

5    go through each one of these, because I think your Honor's

6    written about them and is familiar with them.  But we set out

7    to change the way the NCAA treats concussions, and we achieved

8    everything that we think is part of the best practices for

9    concussion management.  And, again, that is going to be very

10   valuable to the class.

11        So, that gets us up to what the class is giving up.

12   And I don't think I need to repeat this, because this has been

13   the focal point of a lot of argument and opinions by your

14   Court -- by the Court.  But we're preserving -- and your Honor

15   now has all these cases in front of him -- the right to bring

16   personal injury claims and the statute of limitations is

17   tolled.  So, I do not believe that the class is really losing

18   much, and I think that the Court has already ruled the same.

19        They're waiving a right to bring a nationwide (b)(3)

20   class.  And the Court found that that was of minimal value at

21   best.  So, it's not something that they're giving up so much

22   that the rest of the benefits don't weigh in favor of a

23   settlement.

24        On the 23(c)(4), the issue class, we actually brought

25   this as a (c)(4).  We wanted a (c)(4) issue class for the

1    Court to decide duty.  This was one of the goals of

2    litigation.  The Court ruled, in connection with Mr. Edelson's

3    motion, that there was no 23(c)(4) certification strategy

4    presently before the Court, that the Court agreed with.

5          So, the fact that we were able, again, to get this

6    nationwide class and return-to-play protocols in place exceeds

7    where we would have gotten in all likelihood.

8          The second factor, the complexity of the case.

9    You've already written on that, so I'm not going to dwell on

10   that.  Obviously, if we kept going, this was going to be a

11   lengthy and drawn-out affair.  So, that augers in favor.

12         The third factor, lack of opposition.  There were

13   3.958 million notices sent to people.  We had 21 objections,

14   for an extraordinarily low objection rate.  So, that, again,

15   augers in favor of the class.

16         And this is a class that had more notice than most.

17   It had mailed notice.  It had media notice.  These are all

18   college graduates.  It's a matter that's important to many of

19   them.  So, the lack of objection, I think, favors approval.

20         The next factor, your Honor, is the opinion of

21   counsel.  Well, you have more than the opinion of counsel.

22   You have the opinion of the medical experts, which had filed

23   affidavits in favor of the settlement.

24         And to the extent that your Honor listens to the

25   opinion of counsel, with respect to the return-to-play aspect

1    of the settlement, we believe it is an important settlement.

2    I have handled six to eight NCAA-related concussion cases.

3    So, I've dealt with these student athletes, all of whom, in my

4    view, were hurt because they were returned to play too early.

5    And it is a sad thing to have to deal with a student athlete

6    who is 21, 22 years old, drops out of school, and then they

7    seem to go on this path of depression, isolation, drug use,

8    and their lives really unravel.

9            So, if the return-to-practice protocols can stop that

10   from happening, that's a thing that we all should be proud of,

11   the Court and all the lawyers.

12           The last factor is that based on a full record, the

13   Court is, I think, well aware that there was an extensive

14   record on class certification and getting to class

15   certification and offering opinions in support of class

16   certification.  In fact, Mr. Edelson said the record was

17   complete enough for him to bring his (b)(3) motion.  He didn't

18   need any more discovery.  So, that also augers in favor of the

19   settlement.

20           Obviously, we didn't leave any stone unturned.  We

21   knew the facts at the time that we settled.

22           And the last thing I'd like to say in support of the

23   settlement is -- I don't know if the Court read through all

24   the letters that came in.  There were quite a few.

25           THE COURT:  I did read through all of them.

1       MR. BERMAN:  But this one really struck me.  And this

2   is from this University of Arizona student athlete, where she

3   talks about how grateful she is for the settlement and the

4   work that was done here and the work that may help her in the

5   future.  We don't always get those kind of comments when we're

6   presenting a settlement to the Court.

7       So, unless the Court has any questions, we strongly

8   submit that the five factors all weigh in favor of approval of

9   the settlement.

10      THE COURT:  Thank you, Mr. Berman.

11      MR. BERMAN:  Thank you.

12      THE COURT:  I do not have any questions at this time.

13  I'm fully aware of the record and have reviewed all the

14  materials that everyone has submitted with regard to the

15  fairness hearing and the proposed class settlement.

16      So, at this point, then, I will recognize counsel for

17  Ms. Samantha Grieber, as well as Ms. Donlon and Ms.

18  Spinazzola.

19      MR. RASKAS:  Good morning, your Honor.

20      THE COURT:  Good morning.

21      MR. RASKAS:  Thank you very much.

22      Your Honor, if I may hand up -- I had previously

23  transmitted some exhibits, but this is another copy.

24      THE COURT:  Can you please state your name.

25      MR. RASKAS:  Yes, your Honor.  Aron Raskas.  I

1    represent Samantha Grieber, Lacey Donlon and Marisa

2    Spinazzola, three women who play NCAA -- or have played

3    NCAA -- lacrosse.

4         Your Honor, with me in the courtroom today is

5    Ms. Grieber.  She's one of the student athletes that

6    Mr. Berman described who suffered terrible effects from

7    concussions.

8         Your Honor, Mr. Berman talked about the piercing

9    analysis that the Court conducted.  And I understand that.

10   I've read it.  And I appreciate everything that your Honor has

11   done, the conscientious manner in which the Court has

12   approached this and, certainly, the conscientious manner in

13   which counsel have approached this, as well.  And I wish I

14   could have been part of that debate back in 2015, early 2016,

15   about classes and the like.  But, unfortunately, we weren't

16   aware of it.  And I guess that's the purpose of notice and

17   objection.  That's why we're here.

18        And the reason we're here, your Honor, is because

19   across the continuum of NCAA sports, there's one sport and one

20   group, and one sport and one group only, where the NCAA

21   maintains rules to protect male lacrosse -- male players from

22   concussions and serious head injuries in the sport, yet

23   simultaneously continues to promulgate rules that discriminate

24   against the women playing that sport by making it illegal for

25   them to protect themselves the same way that the men protect

1     themselves.

2          And that sport obviously is lacrosse, and that group

3     is women's lacrosse players.

4          And their unique, serious and substantial claims were

5     simply not addressed in this litigation.

6          I know that your Honor has read our papers, so I'm

7     not going to re-plow that ground.  But I do want to amplify

8     some developments since then and respond to any questions that

9     the Court may have.

10          Your Honor, our argument is several-fold.  The

11    proposed settlement, we believe, is not fair, reasonable or

12    adequate, as it does nothing to address the unique

13    vulnerabilities of this putative subclass of women, the women

14    lacrosse players.

15          Right now, in this litigation, women lacrosse players

16    have the right to proceed in this action as a nationwide class

17    with a very strong case to obtain an order against the NCAA

18    that would require the NCAA to allow them to protect

19    themselves by wearing helmets, just like men do.  But this

20    settlement, if approved, would wrongfully strip from them that

21    right and ability to seek the protection that they need as a

22    nationwide class.  And that's a valuable procedural right that

23    your Honor previously recognized.  And I'll come back to that

24    in a few moments.

25          Furthermore, we believe that before you even get to

1   whether this settlement is fair, reasonable or adequate, under

2   the guidance of Amchem and Ortiz you have to determine whether

3   or not the class can be properly certified.  And we believe

4   that the class cannot be certified under Rules 23(a)(3) and

5   (a)(4), typicality and adequacy of representation, because,

6   despite their conscientious efforts in this case, the class

7   counsel and the named class representatives did not adequately

8   protect the interests of this putative subclass of women

9   lacrosse players.

10          Your Honor, we filed our objection back in August of

11  2017, and since then there's been developments in the case

12  that your Honor's aware of that we've been prosecuting in New

13  York on behalf of Ms. Grieber.  And there's a confidentiality

14  order, protective order in that case, which the NCAA has

15  fought strongly to defend.  So, what I can say about that case

16  and the documents in that case is limited.

17          But I am authorized to say that there are documents

18  and depositions in that case brought by Ms. Grieber in New

19  York against the NCAA that are very relevant to this class

20  action.  The NCAA produced 80,000 pages of documents.  I've

21  identified over 125 as very relevant exhibits.  Those

22  materials could have been obtained in this litigation had the

23  interests of women lacrosse players been adequately

24  represented.  Counsel could have considered those before

25  making determinations.  Counsel could have used them in

1    negotiations with the NCAA in settlement.  And that's what's

2    available in this case.

3           In addition, your Honor -- and I've given to counsel

4    here, and I've submitted to the Court, five documents that I'd

5    ask the Court to enter into the record as exhibits on behalf

6    of these three objectors in this case.  Four I previously

7    transmitted to the Court and to counsel.  There's a fifth here

8    that I've just included here.

9           And let me just review them very briefly, because

10   I'll come back to them and explain why they're relevant.

11          The first is an order entered by the court in New

12   York.  And that's Exhibit 1.  And on Page 8 of that opinion,

13   that judge, Judge Brown, in the Supreme Court for Nassau

14   County, concluded, in denying NCAA's motion to dismiss, that

15   the NCAA's argument that it cannot be liable because the

16   plaintiff assumed the risks inherent in the sport of lacrosse

17   is unavailing because, he held, through its control over the

18   rules of play and equipment, NCAA effectively prohibited the

19   plaintiff from utilizing protective headgear.  As the party

20   with authority to make rules concerning the safety equipment

21   utilized by athletes on the field of play and who undertook to

22   exercise that authority, NCAA had a duty to avoid exposing the

23   plaintiff to risks that were unreasonably increased.

24          That's directly relevant to the issues here, your

25   Honor.

```
 1              THE COURT:  Could I ask you a question.

 2              MR. RASKAS:  Yes, your Honor.

 3              THE COURT:  What is the relief that you are seeking

 4   before the New York Supreme Court?

 5              MR. RASKAS:  We are seeking damages.  We have not

 6   sought injunctive relief in that case, your Honor.  It's a

 7   state court action.

 8              We believe that the place to seek the injunctive

 9   relief that's necessary to protect women across the country

10   who play NCAA lacrosse is first and foremost in this action.

11   And that's why the release that would release their right to

12   proceed in this action on a class-wide basis is of such

13   significance to them.

14              We believe that --

15              THE COURT:  But there wasn't anything procedurally

16   that would have prohibited you from seeking that injunctive

17   relief -- at least nothing out of this Court that would have

18   prohibited from you doing that -- in the New York court; isn't

19   that correct?

20              MR. RASKAS:  That's correct, your Honor.  Yes, it is.

21              THE COURT:  And, presumably, if -- and I know that

22   the NCAA and other people have raised concerns about standing

23   because Ms. Grieber is no longer a lacrosse player, and

24   various other issues.

25              But focusing on the release that is the basis for the
```

1  objection that you raise, if a current lacrosse player -- say,

2  to deal with the standing objections -- would file an

3  individual suit, whether it's New York or Illinois or where

4  have you, asking for injunctive relief to require the NCAA to

5  require helmets for women lacrosse players and the court

6  orders such injunctive relief, as a practical matter wouldn't

7  that mean that all women lacrosse players would benefit from

8  that order requiring the NCAA to mandate helmets for women

9  lacrosse players?

10         MR. RASKAS:  That's not clear, your Honor.  And

11  that's the hub of the issue.

12         The NCAA says, in its response to our objection on

13  Page 5, that if we did that, if we were successful in

14  obtaining such specified relief for a single school, the

15  result would likely be a rule change.  There's no commitment

16  to that.  It's far from certain.

17         The NCAA could theoretically -- your Honor said

18  practically speaking.  The NCAA, practically speaking, could

19  decide not to sponsor lacrosse at that particular member

20  institution after that case and cut it out.  We'd have to

21  start all over with another school, go school by school by

22  school.

23         So, the NCAA could agree here today to be bound by it

24  if that would be the case, but they haven't said that here.

25  They said it would likely.  And, you know, if there was a

1    commitment that -- as your Honor just said, if we got an

2    injunction on a single-school lawsuit ordering that relief,

3    that the NCAA would agree that it's binding upon them to make

4    the rule change nationally, that would be a development to

5    this case and that would expand the release here -- or limited

6    release.

7            THE COURT:  Has there ever been a prior instance

8    where the NCAA has taken such action; that is, in response to

9    complaints from student athletes at a particular school,

10   basically disenfranchised that school or disaffiliated that

11   school from the NCAA as a result of those complaints?

12           MR. RASKAS:  I can't stand here and represent to your

13   Honor that I'm aware of that, but I don't see why it's not a

14   possibility.  Certainly, it seems to me a very realistic

15   possibility.

16           And, again, the NCAA has the power to commit here.  I

17   mean, they're parties to this with Mr. Berman.  And they could

18   commit that the release does not have the effect -- does not

19   limit us from obtaining an injunctive relief that would apply

20   nationwide to the NCAA women lacrosse rules.  You know, if

21   that modification was put on the record, that would be a

22   substantial step forward toward what we would consider the

23   fairness and reasonableness and adequacy of the settlement.

24           THE COURT:  So, I mean, putting aside the issue

25   that's percolating up to the Supreme Court about the authority

1    of one district court to enter nationwide injunctions, if

2    Ms. Grieber -- if she were to file it in the Southern District

3    of New York, say, or in the Southern District of Indiana, or

4    here; and filed a suit on her own behalf or on behalf of

5    lacrosse players, her teammates who played during the four

6    years at her particular school; and, as part of that lawsuit,

7    she asked this Court to issue an injunction requiring the NCAA

8    to promulgate rules requiring female -- women lacrosse players

9    to wear helmets, one would think that, at least under the

10   current state of the law, that the NCAA, if I were to issue

11   such an order, would abide by that order.

12            And there's nothing in the settlement that would

13   prevent Ms. Grieber, or really anyone else, from filing such a

14   suit, so long as it is limited to a single school or -- and a

15   particularly definable class that satisfies Rule 23; isn't

16   that correct?

17            MR. RASKAS:  That's sort of putting the -- a

18   secondary issue before the primary issue.  That being the fact

19   that this action was brought on behalf of all women lacrosse

20   players who are part of the class.

21            And, you know, if you look at the claims for

22   relief -- at the complaint -- I mean, every single cause of

23   action focuses as one of its targets the failure to promulgate

24   rules and regulations to adequately address the dangers of

25   repeated concussions, failure to implement and enforce game

1   rules of play.  The request for relief specifically seeks, in

2   Paragraph 104 --

3          THE COURT:  Oh, no.  Believe me, I'm intimately aware

4   of all the filings in this case.

5          MR. RASKAS:  So, this is the place where it should

6   have been done.

7          THE COURT:  But why?  I mean, why is this the place

8   that should have been done?

9          Why, for example, if a women's lacrosse player --

10  let's say a current women's lacrosse player -- playing at

11  USC -- let's just throw out a name out there.  I don't know if

12  USC has a women's lacrosse team, but presumably they do.  It's

13  a big school.

14         And say that she wants to bring a class action for

15  those women that are playing lacrosse at USC in the academic

16  year 2018-2019.  And she's going to graduate in 2021.  Okay?

17         So, as part of that, she files not only a suit for

18  damages, but a suit for injunctive relief -- which according

19  to the NCAA and plaintiffs' counsel, they're both on record

20  before this Court saying that that is absolutely permissible

21  notwithstanding the release in this case -- and she

22  adjudicates that claim, and whether or not she obtains class

23  certification, and gets a -- she's certainly able to litigate

24  that claim.  And if she proves her claims, then the court in

25  that case has the authority to award injunctive relief and

1    require the NCAA to mandate that particular rule change across

2    the NCAA.

3         So, I guess my question is:  I understand what this

4    case started out with, but really the focus of the fairness

5    hearing is trying to figure out what are the putative class

6    members getting -- what are they getting -- in exchange, or

7    what are they giving up?

8         And as I've written before, the right to bring a

9    nationwide class with all of the various burdens that might

10   impose, I wonder -- and I would like you to address -- how you

11   would value that right versus the consideration that the

12   settlement would provide them.

13        MR. RASKAS:  Several things, your Honor, and that

14   goes back to the original point.  In that USC action, in that

15   case where we would prevail and get an injunction, I don't

16   know that the court could order -- because it's a

17   single-school, single-sport case -- that the court could order

18   it to be binding upon the NCAA nationwide.  I think the NCAA

19   would have the ability, under the release in this case, to

20   argue that it was released from an injunction that would apply

21   nationwide because this was only a single-school action.

22        Again -- again -- you know, the NCAA won't come up to

23   the line, past the line and say that.  They say it would

24   likely be a rule change.  Again, if it would be on the record

25   here today that -- as your Honor said, that that's the case,

1    that would change the dynamic of the settlement and is

2    something that we believe would be much better for the women

3    lacrosse players and their ability to pursue that.

4           With respect to your Honor's opinion in January of

5    2016, your Honor denoted it was a valuable right but found

6    that under a 23(b)(3) class, the class could never be

7    certified; so, therefore, when you did the balancing and what

8    value you were giving up, there was no reason to value it

9    significantly.

10          But here, this would be a class that's uniquely

11   situated for a 23(b)(2) action.  You could easily certify a

12   class of women lacrosse players who are pursuing injunctive

13   relief for a rule change.

14          THE COURT:  And do any of your clients -- are any of

15   your clients currently women lacrosse players?

16          MR. RASKAS:  Yes, your Honor.  Marisa Spinazzola is a

17   women lacrosse player who started her season now at Mercy

18   College in New York.  And she seeks that right.  And if this

19   settlement is approved, she'd be giving up that right to

20   pursue it on behalf of the class on a class-wide basis.

21          But, your Honor --

22          THE COURT:  But -- again, I just want to be clear.

23   But she can bring that suit on her own basis or on behalf of a

24   class of women lacrosse players from her school, assuming she

25   can define an adequate class?

1      MR. RASKAS:  Yes, your Honor.  But the concern that I

2   keep coming back to is what impact that has and what the

3   release will ultimately give the --

4      THE COURT:  Well, with regard to Ms. Spinazzola, even

5   under your scenario, she would obtain the relief, right?

6      I mean, if she were to bring her own individual case

7   and the court would require the NCAA to make a rule change,

8   even under the scenario where the NCAA would make a rule only

9   for one school versus the other schools, I can't imagine the

10  other people in the conference would like that, such a rule.

11  But let's say the NCAA did.  Ms. Spinazzola would get that

12  relief, right.

13     MR. RASKAS:  She would, and then the question becomes

14  what impact it has on the NCAA nationwide or not.  And, again,

15  you know, that is something that the NCAA won't commit to.

16  And if we're on the record here today that it has that impact,

17  that would be a significant difference.

18     Your Honor, we have the benefit now of the 2018

19  amendments to Rule 23.  And, you know, in looking at that, the

20  factors there -- Mr. Berman reviewed the Synfuel factors in

21  the Seventh Circuit.  But looking at some of the additions in

22  the 23(e) amendments, the Court must consider the class

23  representative and cast how -- whether the class

24  representatives and class counsel have adequately represented

25  the interest of the class and whether the proposal -- this is

1    23(e)(2)(D) -- whether the proposal treats class members

2    equitably relative to each other.

3         Your Honor, this is the only group that's denied the

4    right to protect themselves like their male counterparts, and

5    now they're being asked to waive that right; to proceed in

6    this action on a class-wide basis to preserve that right.  And

7    under that, we would argue that this certainly does not treat

8    them equitably to all others.

9         Additionally, there's an important Committee note

10   that was just recently offered in connection with the

11   amendments.  The Committee Notes to Paragraphs (A) and (B)

12   talk about some factors that the Court has to focus on.  And

13   it says, for example, the Court has to focus on the nature and

14   amount of discovery in this or other cases or the actual

15   outcomes of other cases, because they may indicate whether

16   counsel negotiating on behalf of the class had an adequate

17   information base.  The pendency of litigation about the same

18   general subject on behalf of class members may also be

19   pertinent.

20        And, your Honor, again, I'm not here to attribute

21   malfeasance to anyone.  This is just something that was

22   missed, plain and simply.  But that's not excusable.  There

23   was no focus upon this critical, critical issue.  It's the

24   only time -- it's the only group of people who are denied the

25   same rights as the male players.

 1          And if you turn to the adequacy of the 23(a)(4)

 2    factors, the court in Amchem and Ortiz is very clear that you

 3    can't jump over the fairness of -- the fairness of a

 4    settlement isn't sufficient reason to disregard the 23(a)

 5    analysis and first you have to find adequacy of

 6    representation.

 7          And when you come to that, your Honor, it becomes a

 8    burden-of-proof issue here, that the party seeking

 9    certification has the burden of demonstrating that

10    certification's proper by a preponderance of the evidence.

11    Your Honor found that in the McDaniel case.  The Seventh

12    Circuit has held that.  The Seventh Circuit has very clearly

13    said, I quote, that the named plaintiffs must adequately

14    protect, quote, the different, separate and distinct interests

15    of the absentee members.

16          And in a recent case that came out of this Court in

17    2018, Ocampo vs. GC Services Limited Partnership, 2018 WL

18    6198464 at Page 9, the Court found that the class

19    representative has to be sufficiently interested in the

20    outcome to ensure vigorous advocacy.

21          And, your Honor, we've now demonstrated that this

22    issue was simply not explored.  I would like to come back for

23    a moment to these few papers here; specifically, the expert

24    report that Dr. Cantu provided in the New York litigation.

25          And I don't have to tell your Honor who Dr. Cantu is.

1   Mr. Berman referred to him.  And he outlines here in Paragraph

2   7 through 11 a couple of very important points.

3        He talks about NOCSAE -- the National Organization

4   For Certification of Safety and Athletic Equipment; it sets

5   the standards -- had been asked to set a standard -- had been

6   asked by U.S. Lacrosse to set a standard for women's lacrosse

7   helmet.  And it advised U.S. Lacrosse that any helmet for

8   women lacrosse players should be equivalent in protection to

9   helmets worn by men lacrosse players.  And they're capable of

10  providing that.

11       If you look at Exhibit 5, that recommendation that

12  was sent to U.S. Lacrosse made its way to the NCAA, as well.

13  The NCAA was aware of that.

14       And Dr. Cantu concludes that it's his opinion to a

15  reasonable degree of scientific certainty that the NCAA

16  rendered Samantha Grieber uniquely vulnerable to concussions

17  by making it illegal for her to wear a helmet.  And he

18  explained that helmets are uniquely constructed to prevent the

19  types of concussions that come from strikes by a ball and

20  strikes by a stick.  There's other forces that cause

21  concussions, but helmets are constructed to prevent those.

22  And that's in Paragraph 7.

23       And he concludes, in Paragraphs 10 and 11, with two

24  opinions that are critical.  It's his opinion to a reasonable

25  degree of scientific certainty that girls and women playing

1   lacrosse should be required to wear hard helmets, similar to

2   men, in game competition and practice.  And it's his opinion

3   to a reasonable degree of scientific certainty that the

4   implementation of a rule for women's lacrosse mandating the

5   use of a hard helmet by all women lacrosse players would

6   enhance the safety of those players and reduce the risk of

7   concussion and other serious head injuries.

8          And, then, just lastly, this next thing is -- Exhibit

9   3 -- is an expert report from Dawn Comstock, who is one of the

10  foremost sports epidemiologists.  She maintains a database of

11  all high school injuries.

12         And she concludes in Paragraph 37 -- remember

13  Dr. Cantu says that helmets are uniquely constructed to

14  prevent concussions caused by stick or ball strikes.  And in

15  Paragraph 37, she concludes that -- drawing on high school

16  data, which she says she could extrapolate to college, as

17  well -- that overall 71.52 percent of girls' lacrosse

18  concussions were the result of being struck by the ball or

19  stick.  And, therefore, she can estimate that 42 percent -- 42

20  percent -- of girls' lacrosse concussions could be prevented

21  if players were allowed to wear the helmet required of boys'

22  lacrosse.

23         And that's a stunning statistic, your Honor.  And

24  yet, the NCAA has done nothing.  And more important, your

25  Honor, coming back to the issue in this case, nothing was done

1    to explore that in this case.

2         And if you go back to those Committee Notes and to

3    Rule 23(a) -- 23(e), Paragraph (A) -- the available evidence,

4    the available -- the discovery that could have been conducted

5    is all factors that the Court has to look at in determining

6    the adequacy of representation.

7         THE COURT:  So, the amendments to Rule 23 that I'm

8    familiar with, actually Judge Dow of this Court was the head

9    person on the rules -- Advisory Rules Committee that led the

10   revisions to Rule 23.  But the Rule 23 amendments really were

11   an effort to codify what was already in the case law that the

12   Supreme Court and other Circuit Courts laid out.

13        So, I don't think that the new Rule 23 amendments

14   were meant to be a substantive change or a sea change in the

15   way that courts are to evaluate settlement -- proposed class

16   action settlements.  They just wanted to recognize the various

17   case law that you've, Mr. Raskas, adequately cited, correctly

18   cited about the probing analysis the Court should do, not only

19   at the final approval stage, but also at the preliminary

20   approval stage.  So, that gave me a little vindication.

21        But in any event, it seems to me, though, that the

22   very fact that you're pursuing this lawsuit in Nassau County,

23   New York, the very fact that you have the reports of Dr. Cantu

24   and Dr. Comstock, the very fact that you have engaged the NCAA

25   in discovery in your claims, doesn't that just show that there

1   are plenty of other available fora for women lacrosse players

2   to raise their concerns notwithstanding the limited release

3   that is being proposed in this case?

4          MR. RASKAS:  Your Honor, with all due respect, that

5   doesn't -- I've done that on my own.  But that doesn't excuse

6   what was not done here.  And that doesn't vitiate a Rule

7   23(a)(4) analysis in this case about whether the class

8   representatives adequately represented this subclass.

9          Again, I wasn't around in 2015 when your Honor did

10  the analysis and added -- or it orally ordered, you know, new

11  named plaintiffs.  There was no one from women's lacrosse who

12  was named as a class representative.  There were two

13  subclasses made, obviously for contact and non-contact.  Had

14  we been aware of this, we would have argued that a subclass

15  must have been created for women lacrosse players.  And we

16  believe that follows from Amchem.  We believe it's similar to

17  the McDaniel case, your Honor, that your Honor had.  It's

18  similar to the Literary Works case out of the Second Circuit,

19  a couple other cases.

20         And the reason for that is, your Honor, because what

21  you have here is you have one class of -- one unique subclass

22  of -- student athletes who have this great need for protection

23  going off into the future.  And others do, too, in some

24  respects, but they have this need to change the rule to

25  protect them in the future.  And the others aren't going to

1    get any different protection; they're just going to get

2    return-to-play rules and changes like that.  And everyone else

3    is focused on the here and now.

4          And I realize that Amchem and other cases are damages

5    cases and there's a finite pool of money and the conflicts

6    arise out of that.  But there's certainly a conflict in

7    vigorousness of representation, focus on representation, and

8    the need to find a result that protects these people.

9          And, your Honor, I come back to the burden of proof.

10   There's a burden of proof on the plaintiffs' class to

11   demonstrate that they adequately represented them.  And by

12   demonstrating that all of this evidence was available -- it is

13   available.  It's sitting at the NCAA.  Discovery requests

14   could have been served.  Depositions could have been taken.

15   Nobody has stood up here and said, we served discovery

16   requests aimed at women's lacrosse.  Nobody said, we took

17   depositions of the women's lacrosse rules committee.  No one

18   said that, we took depositions about the data, the stunning

19   statistics of injury rates in women's lacrosse.

20         THE COURT:  Right, but I guess my point is --

21         MR. RASKAS:  And, lastly, nobody said that they've --

22         THE COURT:  Hold on.

23         MR. RASKAS:  -- explored --

24         THE COURT:  Please --

25         MR. RASKAS:  -- any settlement.

```
 1              THE COURT:  The number one rule is:  Don't talk over
 2    the Judge.  Okay?
 3              But isn't the point that -- the very fact,
 4    Mr. Raskas, that you've done the discovery; and, nothing in
 5    the settlement would preclude you from doing that discovery in
 6    this case or any case in the future.
 7              So, it's not like if the settlement is approved, that
 8    the NCAA will then be able to bury whatever documents it has
 9    or -- with regard to any sports.  But even under the terms of
10    the settlement, women lacrosse players -- or, for that matter,
11    any other athlete -- can file their lawsuits, obtain that
12    discovery and bring those issues to light.
13              MR. RASKAS:  That's true, your Honor.
14              And, first of all, my apologies.  I should not have
15    done that.  I apologize for talking over your Honor.
16              But that doesn't eliminate the 23(a)(4) analysis
17    about whether the class could be properly served by.  There
18    should have been a subclass here.  There needs to be a finding
19    that there was adequate protection of this subgroup.  There
20    simply isn't, your Honor.
21              I see I'm approaching 29 minutes here, and I don't
22    want to belabor my time here.
23              THE COURT:  You can go ahead and finish.
24              MR. RASKAS:  I would just -- I appreciate that, your
25    Honor.  Thank you.  Thank you.
```

1          I just mean to say that there's been no demonstration

2     that this was explored in settlement either.  And I believe

3     that class counsel has an obligation, if they could, to make

4     the case, to make a record that they did explore all these

5     issues to adequately protect the subclass.

6          I'll turn lastly to the Synfuel factors, the Seventh

7     Circuit factors.  In terms of the strength of the plaintiffs'

8     case compared to the amount of defendant's settlement offer,

9     again, you know, we have -- and I realize, yes, I have a

10    strong case in New York.  I'm happy about that.  But that

11    doesn't take the focus or the analysis over what's going on

12    here.

13         And there was a strong case for these women lacrosse

14    players.  The fact that a judge concluded that they could be

15    held liable for breach of duty is significant.  The fact that

16    there's discovery.  The fact that there's opinions from no

17    less than Dr. Cantu.  He was on record before I got his

18    opinion in his book -- that's Exhibit 4 over here -- that

19    women lacrosse players should have helmets.  All this was

20    information that was available to the class representatives

21    and counsel and wasn't explored.

22         In terms of the complexity, length and expense of the

23    litigation, it would be more than proportionate to the

24    substantial risks of severe and even permanent injury that

25    women lacrosse players face.

1        Evaluation of the amount of opposition.  I

2  acknowledge that we have three objectors here on behalf of

3  women lacrosse players.  But that's a result of the fact that

4  this was never on the radar screen, we would argue.

5        In terms of the opinion of competent counsel,

6  precisely because this issue was never apparently addressed,

7  there never was an opinion on it about whether waiving this

8  right for women lacrosse players or failing to pursue relief

9  for women lacrosse players was done or not.

10        And, you know, Mr. Berman referred to the opinions of

11  the Medical Science Committee.  Well, you have Dr. Cantu

12  saying they need a rule to prevent these women from getting

13  concussions and you can just put the helmets on them like they

14  do for the men.  So, that certainly weighs in factor of it.

15        And in terms of the stage of proceedings and amount

16  of discovery completed at the time of settlement, well, no

17  discovery.  Again, I haven't heard that any discovery was

18  aimed or focused at all on this issue of women lacrosse

19  players.

20        So, your Honor, just to summarize -- and, again, I

21  thank you for the time.  And, again, I apologize for

22  interrupting your Honor.

23        Just to summarize, before you even get to the fair,

24  reasonable and adequate, you have to conduct the 23(a)(4)

25  analysis.  We don't believe that the named plaintiffs and

1  class counsel -- again, not through any malfeasance, just for

2  oversight, failed to adequately represent this subclass.  We

3  believe a subclass should have and needs to be appointed, so

4  that women lacrosse players can pursue in this action on a

5  nationwide class basis their claims to seek the relief that

6  they need and to protect themselves.

7          If your Honor does get past that, then we believe the

8  settlement is not fair, reasonable and adequate, because

9  unless the NCAA -- and, again, the NCAA and class counsel

10  should acknowledge -- if your Honor is correct that the

11  release would not preclude us in a single school from

12  enjoining the NCAA nationwide, then the NCAA counsel will

13  stand up here and, you know, I hope they will say that and

14  acknowledge that.

15          And, lastly, your Honor, you know, I was accused of

16  being a professional objector.  I'm probably the only guy in

17  this courtroom that's never been in a class action case.  This

18  is my first time.  It wasn't our purpose here.

19          But we believe that the settlement should be -- that

20  this relief should be given.  And if that is the case, under

21  the provisions that your Honor did ask to be included in the

22  settlement, we'd ask that we'd have the opportunity to apply

23  for reasonable attorney fee for making the settlement

24  materially better.

25          Thank you very much, your Honor.  I appreciate it.

1          THE COURT:  Thank you.

2          Mr. Berman.

3          MR. BERMAN:  Your Honor, Steve Berman on behalf of

4     the class.

5          With respect to -- the first thing I'd like to talk

6     about centers around your Honor's questions; and, that is,

7     counsel in the New York case could get an injunction requiring

8     a rule change.  It's interesting to note that he gave you a

9     copy of his complaint.  He doesn't seek an injunction; so,

10    apparently, isn't that important to his client to make this

11    rule change.  They have litigation.  They could seek the

12    injunction.

13         You know, when you're class counsel and you're

14    seeking injunctive relief, there's a debate about whether you

15    even need to bother with a class.  Because if you get your

16    injunction that's binding on the defendant, why do you need a

17    class?

18         If they got an injunction against the NCAA -- federal

19    court says you will make a rule change, and the federal court

20    has jurisdiction over the NCAA -- it's done.  You don't need a

21    class.  In fact, it's probably more effective.  You don't have

22    to go through all the arguments against class certification

23    that you saw with respect to this case.  So --

24         THE COURT:  Mr. Berman, can you address the issue of

25    adequacy.

1          MR. BERMAN:  Yes.

2          First, your Honor, you ruled and broke the case into

3   contact and non-contact sports.  It's interesting to note that

4   the NCAA labels women's lacrosse as a non-contact sport.  And

5   that's one of the reasons why helmets have not been required.

6   Because, actually -- and we were aware of this literature; we

7   saw it in Dr. Cantu's book, that counsel submitted as an

8   exhibit -- helmets are really thought as protection against

9   skull fractures and face fractures, not against concussions.

10          Counsel said that we were unaware of what was going

11   on in the helmet issue.  That's not the case.

12          During the pendency of this case, there was a

13   helmet -- football helmet cases that were brought, that were

14   severed from this case by the MDL panel.  So, we read the

15   literature about football helmets.  We read the literature in

16   Dr. Cantu's book about lacrosse helmets.  And this case was

17   never about preventing the first injury.

18          So, what counsel is talking about is having a helmet,

19   whether it's a football helmet or a lacrosse helmet, that may

20   prevent the very first concussion.  This case was always

21   focused on the issue of what do you do when people have had

22   lingering post-concussion syndromes?  That's medical

23   monitoring.

24          And, two, what do you do when someone has been

25   returned to play improperly?  We need to prevent that.  You've

1    already got the concussion and you're getting in too early.

2           So, the clients we had were adequate to analyze those

3    issues.  And we had, as you recall, your Honor, 8 current

4    class reps, 17 former class reps, 11 non-contact and 14

5    contact athletes.  And I believe that they were adequate to

6    look at those issues.

7           And, in fact, your Honor is aware that I think the

8    case law says settlements have to be fair and not perfect.

9    We're never going to get perfection over 4 million people.

10   But with respect to the lacrosse players' lawsuit, we actually

11   achieved almost everything that she wanted.

12          So, I pulled up her complaint here.  And one of the

13   things that she asked for was that -- or she alleged is that

14   -- the NCAA failed to implement systemwide guidelines for

15   screening.  We've taken care of that in our settlement.

16          Failed to implement legislation addressing treatment

17   and eligibility of student athletes.  That's also something

18   that we've taken care of in our return-to-play protocols and

19   educational guidelines.

20          Failed to implement systemwide return-to-play

21   guidelines who have sustained concussions.  We've taken care

22   of that.

23          Failed to warn.  Done in our settlement.

24          And I could go on to each one of these allegations

25   she's made.  And our return-to-practice protocols, educational

1    piece accomplishes everything that she sought in her own

2    litigation.  That makes what we did and our class

3    representatives, they looked out for her interest and did an

4    adequate job.  So, I would submit to the Court that we have

5    satisfied the typicality and adequacy prong.

6            This case was never about the initial injuries.  And

7    look at it this way:  Under Mr. Raskas' theory, you shouldn't

8    approve the settlement because there's a lingering issue of

9    whether heading in soccer causes injuries.  And maybe some

10   day -- actually, I sued U.S. Soccer over this and there's been

11   some changes.  But some day maybe some soccer player will come

12   and say we shouldn't be heading and we should have different

13   rules.  That person is free to bring a lawsuit to force a rule

14   change, just like Mr. Raskas is free to bring a lawsuit to

15   force a rule change.  He can do that.

16           So, we've achieved a lot for his client.  And giving

17   up the right to bring the class case where he can accomplish

18   the exact same thing in a non-class case does not make the

19   settlement unfair, we submit to the Court.

20           Again, I'm under my 30 minutes, but unless you have

21   other questions, your Honor, that's all I have.

22           THE COURT:  All right.  Thank you.

23           We'll now hear from the NCAA.

24           MR. MESTER:  Thank you, your Honor.

25           Good morning.

1          First of all, your Honor, I'd like to personally

2     thank you for your patience through this process.  There's

3     obviously been many fits and stops along the way, but you've

4     consistently been patient.  It's very much appreciated.  The

5     net result of that patience and the efforts is a settlement

6     that I'm very confident is going to benefit a large number of

7     people.  While it's probably no surprise that I oftentimes

8     don't agree with Mr. Berman, I do agree that providing a

9     medical monitoring program on the scale and proportion of this

10    one is no small feat.

11         In terms of the settlement itself, I won't go over

12    the statistics that Mr. Berman highlighted, but I think it is

13    worth noting again that for a settlement that received more

14    notice than any case I've ever been involved in in 30 years of

15    practice, there's been an astonishing small number of

16    objections and exclusions.  So, it's been exceedingly well-

17    received by the class, I think, by any reasonable standard.

18         I did, however, want to, your Honor, address briefly

19    the Grieber objection.  I'll be very brief.

20         I think you asked the question a couple of different

21    times.  I'm not sure you ever got quite as clear an answer as

22    maybe you should have.  But I'd like to bring your Honor back

23    to what was said in the paper filed by -- on behalf of

24    Ms. Grieber.

25         At Page 29, the objection states as follows:  The

1     amended settlement agreement is not fair, reasonable or

2     adequate because it would require women's lacrosse players to

3     release their claims for injunctive relief ordering the NCAA

4     to amend women's lacrosse rules to require women's lacrosse

5     players to wear protective helmets.

6           That's a verbatim quote from the objection.

7           And with due respect to Mr. Raskas, that's simply not

8     correct.  As I understand the settlement, as we negotiated the

9     settlement, the release that's being provided here would not

10     prevent anyone -- Ms. Grieber or anyone else -- from seeking

11     injunctive relief in any other lawsuit.  And, so, the

12     fundamental premise, I believe, of the objection is flawed,

13     because it's not the case that the release extends to the

14     extent that Mr. Raskas suggests it does.

15           That also, I think, informs the adequacy question.

16     There were many claims made in this lawsuit at the outset and

17     gradually those claims narrowed, as is often the case in class

18     litigation, and we got to where we are today.  The claim that

19     we're settling is the medical monitoring claim.  I've not

20     heard anything, from Mr. Raskas or from anyone else,

21     suggesting that women's lacrosse players are differently

22     situated or have unique or special circumstances that would

23     require them to get more or less or different medical

24     monitoring than what the entire class is getting.  And that's

25     what the settlement does.

1          And that's the claim that the class is giving up.

2    The claim they're giving up is an injunctive claim for medical

3    monitoring.  That's the one claim they can't bring.  But any

4    other injunctive claim, they can bring; and, there's no

5    indication in the settlement and no intention on the part of

6    the parties to the settlement to eliminate that claim.

7          So, in that sense, I think this is somewhat a red

8    herring.  We're not preventing Ms. Grieber or anyone else from

9    doing what it is that she says we are preventing her from

10   doing.

11         But, your Honor, I'd be happy to answer any questions

12   you have.

13         THE COURT:  I don't have any questions.  Thank you.

14         MR. MESTER:  Thank you, your Honor.

15         THE COURT:  All right.  Let's now proceed to the

16   second portion of this hearing, which is the settlement class

17   counsel's petition for fees, expenses and incentive awards for

18   settlement class representatives.

19         MR. BERMAN:  Steve Berman, again, your Honor.

20         This is my least favorite part of any case; and, that

21   is, arguing about attorneys' fees.  Again, I'll be brief and

22   answer any questions the Court has.

23         But to be clear, we're seeking $15 million in fees

24   for the settlement class counsel, based on a lodestar at the

25   time that we filed our petition of 9,791,844.  That's based on

1    18,481 hours.  That's for 12 firms that worked under the

2    direction of lead counsel:  Mr. Siprut and myself.

3         And we have costs of 727,189.  And we're seeking

4    service awards of $5,000 for the original plaintiffs and 2500

5    for the additional plaintiffs.

6         THE COURT:  So, the 9.8 million lodestar comparative

7    number, that's based upon the hours of attorneys and staff at

8    your firm, as well as Mr. Siprut's firm, but does that include

9    other firms, as well?

10        MR. BERMAN:  It includes the Executive Committee and

11   all the firms that we tasked to do work.  So, all in.  And I

12   think there's a table in our brief that lists all the firms

13   and summarizes their time for your Honor's ease of

14   understanding where it's coming from.

15        So, in the Seventh Circuit, there are four factors:

16   The risk of non-payment, quality of performance, the work

17   necessary.  And I'll just jump into the very first factor.

18        Mr. Siprut filed the very first case.  Shortly

19   thereafter, we filed.  And we decided to work together.

20        And in terms of risk, there was a lot of press

21   coverage about the initial filing of the case.  No one joined

22   us.  So, when you're a plaintiff's lawyer and you bring a case

23   and there's a lot of press coverage and no one joins you, you

24   kind of go, uh-oh, what did I do wrong here?  No one joined

25   us.

1           So, we worked alone for two years, undeterred by the

2    fact that no one thought we were doing the right thing,

3    apparently.  We moved for class certification.  We submitted a

4    proffer of facts.  We did all the discovery that was

5    necessary.

6           And the risks we faced were substantial.  We've

7    already been over that medical monitoring is a risky cause of

8    action.  The 23(c)(4) certification that we were seeking, I

9    didn't think it was that risky, but your Honor apparently

10   thinks it is riskier than I thought.  But, clearly, 23(c)(4)

11   certification of issues, is not a widely litigated tool and

12   there's not a lot of case law.  So, we had risk there.

13          And even the issue at that time of whether the NCAA

14   had this duty was an untested legal claim.  There were no

15   decisions.

16          It's only after the settlement -- the fact we were

17   discussing settlement -- came out did others seek to join the

18   litigation.  I think that shows you the kind of risk we had.

19          The second factor is the quality of performance.  I'm

20   not going to talk about that.  You witnessed our performance.

21   You can decide whether we performed well or not.  But it's a

22   factor for the Court to consider.  And I think we turned in a

23   quality performance.

24          How much work was necessary.  The Court is already

25   familiar with that and made a finding that this was a complex

1    case.  And, obviously, you've seen there's been extensive

2    record.  So, there was a lot of work that was necessary.

3         And the stakes of the case, the fourth factor, it was

4    obviously a high-stakes case from everyone's perspective.

5    From NCAA, it was high stakes at many levels.  From our

6    perspective, it was high stakes on protecting the rights of

7    the plaintiffs on a very important issue.

8         So, those factors, I think, all favor our fee

9    application.

10        Now, our fee application is asking for a multiple on

11   that lodestar of 1.5.  I did a little math, and if you took

12   the time that we put into this matter since we filed that fee

13   application, I think our actual ask is going to be about 1.2.

14   And if the Court wants me to file updated time records to

15   prove that point, I'd be glad to do so.

16        But the point I'm making is when we ask for 15

17   million out of the 70, we can only get 70.  That's the most we

18   can get when we negotiated after a lot of negotiating.  And we

19   wanted to get as much as we could to the class.  And, so, we

20   took -- I anticipated what our lodestar might be, and I wanted

21   to come out at about a 1.5, which I think is a very kind of

22   small multiple, given the risk that we undertook in this case.

23        We've given you cases that suggest multiples up to 4

24   or 5 are permissible.  But, again, we didn't want to make this

25   a lodestar type of case -- I mean, a big high multiple type of

1  case.

2         So, we think that that request is a reasonable

3  request for the risk and the outcome that we've obtained for

4  this class.

5         Unless you have a lot of questions, that's all I have

6  to say, your Honor.

7         THE COURT:  No.

8         I would like to hear from someone from the Siprut

9  firm.

10        MR. SIPRUT:  Thank you, your Honor.

11        THE COURT:  Can you state your name for the record,

12 please.

13        MR. SIPRUT:  Joe Siprut, settlement class counsel on

14 behalf of the settlement class.

15        I won't repeat everything my colleague, Mr. Berman,

16 set forth for the Court; but, certainly, on all those same

17 bases, we would urge that the Court approve the fees and view

18 it not only as worthy of approval, but safely within the

19 benchmarks of the Seventh Circuit.

20        The standard percentage of the fund in the current

21 Seventh Circuit case law ranges anywhere from 35 to 50

22 percent, which isn't to say it couldn't ever be lower.  But

23 the most recent cases -- which I think we cite in our

24 papers -- talk about how the presumptive range is between 35

25 and 50 percent.

1       So, our number here, even after not including -- or

2    excluding -- the $5 million in research and excluding the $5

3    million that we've characterized notice costs as being --

4    probably be less than that, but conservatively, assuming it's

5    5 million -- that leaves you with 65 million.  The request

6    against that number is a very modest 24 percent.

7       So, we could have asked for more, but we didn't.  And

8    I think that to the extent the aspiration originally, as

9    Mr. Berman said, was to end up with something like a 1.5

10   multiplier, we've done that.  And, again, there we have a very

11   conservative allocation.  As you often see approval given to

12   lodestars of 2 or 3X, we seek only or need only receive

13   approval for 1.5X.

14       THE COURT:  So, Mr. Siprut, there's some mention in

15   the fee petition with regard to a change in the way your firm

16   handled timekeeping during the case -- during the life of this

17   case.  Could you explain that in a bit more detail for me,

18   please.

19       MR. SIPRUT:  Yes.

20       At all relevant times, including now, including the

21   day we filed, we had in place firm-wide systems that were

22   fully compliant with the relevant standards in the law.  From

23   almost all of the life of the case up until probably the last

24   two years ago, but up until the time that we settled the case

25   certainly, there was in place a system that differs from the

1  present one.

2      The prior one basically required that all time of the

3  attorneys working on the case be allocated to one of seven or

4  eight enumerated task billing categories.  Those were

5  generally standard for every case but could be customized,

6  depending on the nature of the case.  But for class actions,

7  it was generally pre-filing investigation; client, you know,

8  searches; screening, and so forth, for class reps; pleadings

9  drafting, and so forth; motion practice; fact discovery; oral

10  discovery.

11      So, the point was every individual attorney was

12  tasked with keeping track of their time to match the

13  categories that the firm itself reported and tracked.

14      And, so, because of the fact that we didn't have a

15  monthly invoicing system where clients would get bills every

16  month, the requirement was that when the firm was in a

17  position to have to submit that time -- whether it be because

18  we were filing something that required it or because, for

19  example, we were exchanging time with co-counsel or whatever

20  internal issue there may have been -- we would then say, okay,

21  everyone make sure that your time is in our database, so that

22  we can report the most recent updated figures.

23      So, that's what we did for several years.  And at the

24  time that we did, it was compliant with all relevant legal

25  standards.

1          Recently, however, as the Court, I'm sure, is aware,

2     there has been increasing interest in looking at sort of

3     narrative, detailed descriptions submitted by class counsel.

4     And there have been one or two instances -- or there were one

5     or two instances -- I was personally involved with where we

6     submitted our records as I've described and the reaction of

7     the court was, how come it's not in detailed narrative format?

8          The short answer at that time was, you know, I

9     thought one of the benefits of being a plaintiff's lawyer and

10    leaving the corporate litigation life behind was that I no

11    longer had to describe my life in tenths of an hour with, you

12    know, some sort of justification for what I did.  It turns out

13    I was wrong about that.  And many courts have said, why don't

14    you have that?

15         Well, once it became clear that this sort of trend

16    was changing and I was reading, as we all have, you know,

17    other cases throughout the country where the same issue came

18    up, we said, all right, we need to get our system basically as

19    comprehensive as any corporate litigation firm has.  Even

20    though we're not actually billing anyone, we have to keep

21    track of our time in narrative format just like the old days

22    of corporate litigation.

23         So, we did switch.  About two years ago, we switched.

24    We have a system called Time59.  And the requirement of all

25    lawyers at the firm right now, including me and including the

1   most junior associate, is the same, which is:  Detailed

2   narrative descriptions in tenths of an hour contemporaneously

3   inputted into the system.  In other words, exactly what, you

4   know, Latham or Winston, or whoever, does and exactly like I

5   used to do for the first ten years of my career.

6          So, we now have that system in place, and going

7   forward it will remain in place.

8          But that's what we were referring to in our filings

9   in terms of the prior system versus the new system.

10         THE COURT:  Okay.  Thank you.

11         MR. SIPRUT:  Thank you, your Honor.

12         MR. EDELSON:  Good afternoon, your Honor, Jay Edelson

13  for the lead objector.

14         I wanted to start, unusually, by arguing against my

15  own interests, only because I think that the facts are the

16  facts and people should get credit when they deserve credit.

17         I was not aware of what Mr. Berman was going to start

18  with with his fee presentation, but I agree that that is the

19  right way to look at it.

20         To me, there are two types of cases that are brought.

21  People call them different things.  I call them either

22  proprietors' cases or chase-the-news cases.  A chase-the-news

23  case would be the Equifax data breach where it's in the New

24  York Times and everybody filed.  And I don't think plaintiff's

25  attorneys deserve the same amount of credit for bringing that

 1  type of case.

 2          This case was brought not by me, but by Mr. Siprut

 3  first and then Mr. Berman, I believe, in 2011.  And as class

 4  counsel noted, there was not a huge amount of plaintiff's

 5  attorneys, myself included, who said, no, we want to compete

 6  and take this case.  And the reason was because it was a very

 7  risky case.  I think they still are very risky cases, but

 8  especially at that time.  They were not deemed to be terribly

 9  viable cases.  They deserve a lot of credit for that.

10          They also knew they were going up against NCAA.

11  Mr. Mester is, as you know, a very skilled attorney.  NCAA has

12  unlimited resources, virtually, you know, for purposes of this

13  litigation.  And these cases matter a lot to them.

14          So, I want to start, again, arguing against my own

15  interest, but by noting that they deserve a ton of credit for

16  bringing this case and litigating it for years, which they did

17  do, and putting a lot of their own money in.

18          Okay.  With that being said --

19          Can we go to the first and only slide?

20          This is the extent of our PowerPoint presentation,

21  except we'll have two other columns.

22          I think it's really important that the Court looks at

23  what the original deal is in trying to figure out how class

24  counsel should get paid.  I notice that Mr. Berman focused

25  mostly on lodestar.  But when you're talking about this type

1    of tort settlement and where there is a common fund, the most

2    important thing is what is the class actually getting.  And

3    when you read cases like Pella in the Seventh Circuit, that

4    really is the focus, which is not what is the price tag of the

5    settlement.  Anyone can say a settlement is worth $70 million

6    or $200 million, but what's the actual amount that's being

7    paid out and can benefit the class?

8              So, what was the original deal?

9              And I'm going to be quick because I know your Honor

10   knows this well better than I or any of the other counsel

11   here.

12             The original deal was a claims-made deal.  It was a

13   claims-made deal without any real notice going out.

14   Publication notice alone.  When you have publication notice in

15   a claims-made deal, you're going to get very few claims.

16             Their own expert said that there were going to be

17   maybe 5,000 medical tests given.  He anticipated that there

18   was going to be a $50 million reverter.  $50 million.  And of

19   that, the NCAA at the time was still allowed to take over the

20   subrogation claims and get a bunch of that back.

21             So, of the fund, even after you take away the $50

22   million, half of that would go to the class counsel and the

23   other half -- most of the bulk of the rights would be assigned

24   back to NCAA, where they can pursue the subrogation claims,

25   which is really scary.

1          And the reason why we got involved in the objection

2    is this settlement actually originally -- and I think it's a

3    good settlement now, but originally -- I think, actually hurt

4    the class.  And the reason -- to understand, I think, why they

5    came up with this framework, the big concern for the NCAA was

6    the personal injury cases.  And they, kind of cynically and in

7    a very clever way, figured out they could settle this case and

8    cut off a lot of personal injury cases.

9          How did they do that?  First of all, they said -- and

10   this is from -- I've never seen this in a another settlement.

11   They said the statute of limitations will start tolling at

12   preliminary approval.  So, before any notice goes out or

13   anything else, the statute of limitations for all individual

14   cases starts tolling.  That -- if that objection -- if --

15   sorry.  If that had been the deal, then all these people who

16   now are coming -- I think the Court approved this case

17   preliminarily two years ago.  Their statutes would have been

18   running.

19         We also have the issue of the class personal injury

20   claims.  Mr. Berman spent a lot of time arguing that nobody

21   cared about it; but, as your Honor knows, that's not true.

22   There are over 300 personal injury class actions going right

23   now.

24         Based on the original settlement, then, I think the

25   Court should look at what the actual payout is to the class,

1   which is something under $10 million.

2          Then the next question is, well, how much credit do

3   they get for the new settlement?  And with respect to class

4   counsel, they were not our friends in pushing for changes.

5   There are times when class counsel says, we are now in a

6   better position and we can argue for more.  And they didn't.

7          Mr. Berman was in the press every day saying -- I

8   shouldn't say every day.  That's an overstatement.  He was in

9   the press saying, you can't get these classes certified.  He

10  was arguing that a reversionary fund was appropriate.  He was

11  arguing against notice.  Not once did he join us and say, we

12  can make this settlement better.

13         So, I don't think that the Court should give them

14  much credit for the settlement now.  I think the Court really

15  should just focus on their first settlement that was rejected.

16         Thank you, your Honor.

17         THE COURT:  Thank you.

18         Mr. Berman.

19         MR. BERMAN:  Unless you have questions, your Honor, I

20  don't think I need to respond.  I will say one thing,

21  actually.

22         One way to look at this is Mr. Edelson focuses on

23  you're trying to value what we did originally, what we did

24  later, what he did to make it better.  And that's a cat fight,

25  that I stayed away from in my opening remarks and we're going

1   to stay away from today.

2          But if you look at it on a lodestar basis, you can

3   avoid that cat fight.  Because all the time we put in was time

4   that was necessary to get where we are today.  And we're

5   asking for a modest multiplier.  He doesn't dispute that.

6          And one thing -- another reason to get away from

7   Mr. Edelson's valuation argument is he doesn't value the

8   return-to-play protocol at all.  How would you put money on

9   saving a kid from a debilitating injury?

10         So, that's all I have to say, your Honor.

11         THE COURT:  Thank you.

12         Now we'll proceed to the last portion of this

13  hearing, which is petition for attorneys' fees, service

14  awards, filed by other counsel.

15         Mr. Edelson, I take it we're going to see the rest of

16  that PowerPoint slide.

17         MR. EDELSON:  We are.  Thank you, your Honor.

18         So, your Honor is very familiar with our objections.

19  I'll go through them very quickly.  Our first brief, Mr.

20  Berman, in his papers, made a strange comment that our whole

21  argument is based on a footnote, that we barely mention the

22  reversionary issue.  That's not true.  Our first brief where

23  we objected, we talked about how the settlement is a mess and

24  explained that very few people were going to get any relief at

25  all.  And we put the actual relief at about $150,000.

1        Now, your Honor didn't accept that in total.  But we

2   were very focused on the fact that there were going to be very

3   few claims, and that was the bulk of our argument.  So, we

4   argued that the reversion was inappropriate.

5        Go to the other column.

6        The Court ended up -- your Honor -- only your Honor

7   knows what influenced you.  So, I kind of concede that.  But

8   in the end, your Honor seemed to agree with that and now there

9   is a non-reversionary fund and the actual money is going out.

10        We made a big issue about notice and said you can't

11   just do publication notice.  Your Honor agreed with that, as

12   well.  Because of that, as Mr. Mester says, we have incredibly

13   robust notice, which really is the key to any class

14   settlement.  If you don't give notice, there's not a lot of

15   value beyond the injunctive relief, which the Court can

16   evaluate.

17        We talked in our objections about the medical tests

18   were going to benefit very few people.  We talked about how

19   the testing locations, there are only a few of them.  People

20   drive hundreds of miles to get to them.  There were

21   significant increases in that.

22        The Court knows that our primary focus of our brief

23   -- of our briefing -- was about the class personal injury

24   claims, and those were preserved.  It's true that they were

25   not preserved on a nationwide class basis, but that's really

1    of little moment because people --

2         THE COURT:  It didn't seem to create any sort of

3    impediment for people to file class actions on a more limited

4    basis asserting personal class -- personal injury claims.

5         MR. EDELSON:  That's correct, your Honor.  So -- and,

6    you know, I think that your Honor's ruling made sense, of

7    course.

8         And, then, of course the tolling issue, which I've

9    read before, I think, is a really big one.  The fact that

10   personal injury statute of limitations were going to be

11   untolled at preliminary approval was really cynical and was

12   going to hurt a lot of people.  And we made those arguments,

13   and those were accepted, as well.

14        We -- I agree with Mr. Berman.  I'm not really

15   interested in having a huge cat fight.  Your Honor knows our

16   work.  You can evaluate if we were helpful or not.  You know,

17   we certainly put in a lot of effort and took a lot of risk.

18        The only other point I would make, unless your Honor

19   has questions, is we also asked for incentive awards for

20   Mr. Nichols and Mr. Arrington.

21        If I understand correctly, class counsel thinks

22   Mr. Nichols should get $2500 instead of 5,000 because he

23   wasn't a very active participant.  That's just not true.

24   Mr. Nichols was a very active participant and fought very hard

25   for this and fought publicly.  His name was out there.  And

```
 1    it's hard doing that against the NCAA.  We deal with clients
 2    all the time that are scared to go up against them.
 3             Mr. Arrington, my understanding is that nobody's
 4    objecting to his incentive award.  I think that they're not
 5    taking a position on that.
 6             MS. FAGAN:  Correct.
 7             MR. EDELSON:  Okay.  Thank you.
 8             And we think he also deserves the same $5,000
 9    incentive award.
10             I'm happy to answer questions or go back to my table.
11             THE COURT:  No.  Thank you, Mr. Edelson.
12             MR. EDELSON:  Thank you.
13             THE COURT:  Mr. Gordon.
14             MR. GORDON:  Good morning, Judge, Richard Gordon.
15             Mr. Berman's firm says that I'm claiming to have won
16    the lottery and seeking a participation trophy.  And that
17    couldn't be farther from the truth.  I have a unique practice.
18    I represent professional athletes in Illinois in workers'
19    compensation.  And in 2013, dozens of my clients began calling
20    me about this case and about the NFL concussion case and
21    asking what their rights were, because I was their lawyer or
22    my father, who was -- I was partners with, was their lawyer.
23    That's how I got involved in this case.
24             I know Mr. Nichols.  I communicated with him about
25    this case.  And I brought in the Edelson firm because I knew I
```

1    needed to have that kind of muscle behind me to participate in

2    what, at the time, I saw as a bad settlement for these

3    players.

4           And, so, during the entirety of this lawsuit, I have

5    essentially been the liaison between Mr. Nichols and other

6    class members we had.  You know, Mr. Nichols was the sole

7    class representative, but we had retained dozens of players as

8    class representatives whose interests were being furthered

9    through Mr. Nichols; and, I was also keeping about a hundred

10   other players abreast of what was going on here.

11          The time that I put in was real time.  Most of that

12   time was my own time put into this case.  I was responsible

13   for understanding these players' claims and for helping to

14   communicate what these players were looking for.  I think that

15   the amount of time put in was commensurate with the efforts

16   involved.  And the effort and risk was certainly there, as

17   well.

18          For that reason, I would say that my time should be

19   compensated as put forth in the pleadings.

20          THE COURT:  Thank you, Mr. Gordon.

21          MR. GORDON:  Thank you.

22          THE COURT:  Ms. McNulty.

23       (No response.)

24          THE COURT:  Mr. Jefferson.

25          MR. JEFFERSON:  Thank you, your Honor.

 1          Dwight Jefferson representing objector Julius

 2  Whittier.

 3          Judge, first of all, let me express my thanks to the

 4  Court and the Court's staff.  Over the past couple years in my

 5  involvement in this case, your staff has been very courteous

 6  and cooperative.

 7          Judge, I know that, from observation of you in the

 8  past couple years, that you have read thoroughly every motion

 9  and exhibit that has been submitted to the Court and are very

10  familiar with both the facts and the law regarding these

11  requests.

12          Contrary to what Mr. Berman said from the standpoint

13  of the publicity associated with the original filing of this

14  case, my knowledge of the case really did not accrue until

15  sometime shortly before I became involved in the case on

16  behalf of Mr. Whittier.

17          My purpose in undertaking the case and appearing for

18  the first time in the case, I believe, at the first

19  preliminary settlement hearing was that after becoming aware

20  of Mr. Whittier's condition and talking with him and taking on

21  this case, my purpose, quite frankly, was to come and to

22  object on his behalf to the settlement as it was originally

23  presented, as has been pointed out today, with the non-tolling

24  of the statute of limitations, along with the prohibition

25  against any type of personal injury class.

1           Mr. Whittier over the course of this case, as the

2    Court is aware, has finally succumbed to the Alzheimer's,

3    which ended his life.  He had been an attorney; the first

4    African American to letter in football at the University of

5    Texas; to go on from there to the University of Texas Law

6    School, to a distinguished career in the practice of law in

7    Dallas County, both as a prosecutor and in private practice.

8           And, so, my involvement was personal to that extent,

9    which is one of the reasons I have asked for an award for

10   Mr. Whittier, along with a request for the fees associated

11   with my representation of his interests in this case.

12          He, as an Alzheimer's victim, suffered from one of

13   the most severe diseases associated with the issue involved in

14   this case of repetitive head injury; was the only putative --

15   was the only class member -- named class member -- I think, in

16   the case that was really suffering from that type of

17   condition.  And, so, he represented all those persons still

18   suffering from that same disease.

19          I tried to be conservative in my fees in the sense

20   that the hourly fee charged on this case was really below my

21   standard fee.  In addition, I tried to be conscious of the

22   time involvement in the case related to my involvement.  I

23   tried to be, as I came into this case, an active participant

24   in trying to make the settlement better and preserving those

25   potential rights for those persons who are actually suffering

1    from diseases today.

2            It is within the sound discretion of the Court with

3    regard to these awards and to the attorneys' fees.  And, so,

4    with that, on Mr. Whittier's behalf and my firm's behalf, we

5    will submit our written documentation to you and request the

6    fee that has been requested at your sound discretion.

7            THE COURT:  Thank you, Mr. Jefferson.

8            MR. JEFFERSON:  Thank you, your Honor.

9            THE COURT:  So, Mr. Berman -- Ms. Fagan.

10           MS. FAGAN:  Good afternoon, your Honor, Elizabeth

11   Fagan for the plaintiffs.

12           Your Honor, we acknowledge that objectors can play an

13   important role in reviewing class action settlements and being

14   an adversary.  And we recognize that this Court found that

15   important during the preliminary approval process.  But not

16   all objections are created equally.  The Seventh Circuit has

17   set a standard for when to award fees to objectors.  The

18   Seventh Circuit has said that objectors must produce an

19   improvement in the settlement worth more than the fee they are

20   seeking, otherwise they have rendered no benefit to the class.

21           And, so, as this Court looks at each fee petition, it

22   is important for the Court to look at the particular tangible

23   benefit that the objector brought to the class.

24           If we start with the first premise of why Mr. Edelson

25   was appointed, this Court appointed Mr. Edelson to evaluate

1   the strength of the procedural claims and, quote, whether the

2   personal injury claims of the proposed class against the NCAA

3   are capable of being certified under Rule 23(b)(3) and

4   23(c)(4).

5          Ultimately, the scope of the release as part of that

6   adversarial process was amended.  But the Court, during that

7   process, found that the release of a nationwide class under

8   (b)(3) was of minimal value.  And, in fact, the primary

9   benefit conferred upon the class is the value of the

10   single-sport/single-school MDL, in which Mr. Edelson is

11   currently a participant.  That is where the risk of those

12   classes will ultimately be paid.  This class here should not

13   bear the fees that will otherwise be gotten in the separate

14   MDL.

15          In fact, Mr. Edelson seeks an unheralded 4 multiplier

16   on his time.  That's compared to class counsel, who is seeking

17   at most a 1.4 multiplier.  And if you take our current time

18   into place, it's 1.2.

19          But here, in the Seventh Circuit, multipliers are

20   awarded based on risk.  And if we look at the risk that

21   Mr. Edelson faced at the time that he filed his objection, he

22   took the discovery we did.  He did no additional discovery.

23   He relied on the experts that we had.  He hired no additional

24   experts and didn't submit any experts to this Court.  He bore

25   very little risk, particularly once this Court defined him as

1   the lead objector and defined his task.  It was attorney time

2   purely.

3          Recently there was a case in the Southern District of

4   New York, In Re: Petrobras in 2018.  There the objector sought

5   a lodestar with a multiplier of 1.7.  And the court said:  A

6   substantial reduction is appropriate, as the vast majority of

7   objectors' briefing concerned unsuccessful arguments.

8          And the court also rejected the multiplier saying the

9   objector faced no risks in his involvement.

10         And, so, if we look here at the issues on which

11  Mr. Edelson was successful, first he did bring up excluding

12  class counsel from the release at the very outset.  And we

13  immediately conceded that.  That was not briefed, and there

14  was no substantial time put into that issue.

15         Similarly, he brought up the issue of cy pres and

16  whether the schools should have to do additional, separate

17  testing or research other than what was already under way.

18  Again, that was resolved up front.

19         He also raised the issue of tolling.  We immediately,

20  again, conceded on that issue.  That was not an issue that was

21  fought over the last three years.

22         And, finally, he claims responsibility for notice.

23  However, the original notice plan before this Court always

24  contemplated direct notice.  What we didn't know at the outset

25  was how many schools would produce their address lists.  So,

1   we weren't sure of the extent of the notice plan.  So, what we

2   did was we presented several scenarios to the Court that

3   envisioned more or less publication notice, depending on the

4   responses from the schools.

5        And, obviously, luckily here, after a hard-fought

6   process, we were finally able to get all those addresses from

7   the schools and get direct notice out to every single class

8   member for whom there was contact information.

9        So, ultimately, here if we look at -- going through,

10  there were lots of other issues that Mr. Edelson raised that

11  were not successful and were not successful after extensive

12  briefing before this Court.  And, so, while the adversarial

13  process here did result in the separate MDL, it did not result

14  in a change in the monetary amount of the settlement -- the 70

15  million that the class has always been able to get -- or the

16  fact that there's a 50-year medical monitoring program in

17  place.

18        Your Honor, if we move to Mr. Gordon's petition, I

19  think we just have to start with the threshold question of

20  whether he conferred a benefit on the class.  Everything that

21  he stood here and described was him advising his individual

22  clients as to their rights.  None of his work was presented to

23  this Court.  Looking at his detailed time, a lot of his time

24  is reviewing pleadings after they were filed, marketing to

25  clients, marketing to referral lawyers, and attending

1   hearings.  But he never -- this is the first day that I'm

2   aware of that he stood before the Court.

3        Ultimately, your Honor, fees are not awarded to

4   objectors just for appearing, nor are they awarded to probably

5   the several hundred lawyers that may have opined to their

6   individual counsel -- or counseled their individual clients on

7   the scope of this settlement.

8        Your Honor, Ms. McNulty was not here.  We don't

9   object to Clifford's lodestar.  We just object to the extent

10  that they join in Mr. Edelson's request for a 4 multiplier.

11       Finally, your Honor, with respect to Mr. Jefferson,

12  Mr. Jefferson has been here from the outset.  We appreciate

13  that.  We understand his part of the adversarial process.  I

14  think the main part of our objection as to his time would be

15  the time spent after Mr. Edelson was appointed lead objector,

16  to the extent he was just joining in Mr. Edelson's positions.

17       If your Honor has any questions?

18       THE COURT:  No.  Thank you very much.

19       MS. FAGAN:  Thank you.

20       THE COURT:  All right.  So, Mr. Edelson.

21       And, then, afterwards, I'll provide Mr. Gordon and

22  Mr. Jefferson with a brief time for response, if they would

23  like.

24       MR. EDELSON:  Thank you.

25       Your Honor, it's interesting to hear that I took very

1    little risk in this case.  That's not been my experience over

2    the last few years.  They actually spent a lot of time talking

3    about how hard it is for objectors to get paid, which is true.

4    And we're not a firm that actually objects to cases in order

5    to get money.  We did this because we thought it was a bad

6    deal.  And we took an enormous amount of risk.

7         They make a few other arguments which just seem very

8    inconsistent.  They say that once we were appointed lead

9    objector, we had very little risk at that point and should

10   consider the time differently.  Well, if that's true, then you

11   should consider their time differently, as well.  They spent,

12   apparently, millions of dollars renegotiating the deal.  At

13   that point, it was pretty clear that a deal was going to

14   happen and they were going to get paid.  Why should they get

15   any multiplier on that at all?

16        The reason is that courts generally look at the total

17   time and don't parse it out and say for this part of the case,

18   there was actual risk; for this part of the case, there was

19   this much risk.  We think that you should do that.

20        Similarly, in regard to our lodestar, their

21   comparison to their $9 million lodestar -- which you can

22   evaluate for yourself -- that is an enormous number to put up

23   in any sort of case, especially one like this which didn't get

24   anywhere close to trial.  I don't believe that it is easy for

25   them to stand here and say that their -- that a 1.5 multiplier

1  is really what they're getting.  Even their reasoning makes no

2  sense.  Somehow Mr. Berman always knew that there was going to

3  be a 1.5 multiplier, so that's what he negotiated back years

4  ago knowing then he was going to have to spend millions of

5  dollars more negotiating the deal.

6          I think the reason courts don't look so much at

7  lodestar is because they tend to be a little bit of a fiction.

8  As Mr. Siprut strangely said, he doesn't even think class

9  counsel -- he thought the trend wasn't that class counsel

10 should have to account for its time like corporate attorneys.

11 That's, of course, not true.  I've been practicing with my own

12 firm for 17 years, and you have more of a duty to keep track

13 of your time.

14         But, of course, since you don't have a client who is

15 looking every month and looking at the bill and scrutinizing

16 it, there is -- there are incentives to put the thumb on the

17 scale a little bit.  That's why I think that you should look

18 at what the actual benefit is to the class.  Ms. Fagan ignored

19 the fact that it was over attorney settlement before.

20         The idea that notice was actually going out wasn't

21 true.  I think your Honor made this point, not me -- but I

22 swear I was about to make it right before you did -- where it

23 was an easy fix.  All they had to do was say if the member

24 institutions wanted to get the benefit of the release, they

25 had to send notice out.  And, then, of course, that forces the

1    member institutions to send notice out.  That's why notice

2    went out.  Otherwise, if you just left it to their discretion,

3    it would have been purely publication notice.

4           I don't know why Arrington's counsel wasn't here

5    today.  I just want to speak on her behalf that the Clifford

6    firm did great work and also they're like us.  They're not a

7    firm that objects.  And there is reputational harm in stepping

8    up and objecting to class settlements.  At the end of the day,

9    class action attorneys like to work and play well together.

10   And if you object to settlements, we get invited to fewer

11   parties, which hurts our feelings.

12           That's all I have.  Thank you, your Honor.

13           THE COURT:  Thank you.

14           Mr. Gordon.

15           MR. GORDON:  Thank you, your Honor.

16           Just very briefly, the suggestion that my efforts

17   here were marketing is, frankly, not true and not accurate and

18   really just kind of shows kind of the different way that some

19   attorneys look at this type of a case.

20           Counsel -- Mr. Berman represented one player.  We

21   objected with one player's name, but we used the data and the

22   comments and the criticisms of dozens of players to come up

23   with what made a better deal for everybody, I think.  And

24   that's essentially -- that was the role that I played in this,

25   as well.  Communicating with and conferring with class members

1   and their attorneys is not marketing.  It's what made this

2   settlement better.

3           Just real quickly in terms of risk, like I said

4   earlier, I represent professional athletes.  There was great

5   risk in me getting involved in this case.  And, so, the

6   suggestion to the contrary, I think, is not supported by the

7   reality of things.

8           THE COURT:  Thank you.

9           Mr. Jefferson.

10          MR. JEFFERSON:  Judge, just briefly, three things

11  that I believe brought value to the settlement for the class,

12  that I participated in and was involved in from the first

13  preliminary hearing.

14          First of all, the reverter.  In my opinion, and as I

15  argued to the Court, that -- and as the Court saw, as well --

16  that was really kind of unconscionable to think that you would

17  have a settlement where the money would revert back to the

18  settling party.  That was -- that had a value of $50 million

19  that's going to inure to the benefit of the class.

20          The limitations on -- the tolling of the statute of

21  limitations, that can impact the class, as well, because from

22  the time that the monitoring starts, we don't know what it's

23  going to show.  There may be very well people within the class

24  who would then qualify to be part of the subsequent class of

25  single-sport/single-school.  That's a benefit to the class.

1          And, finally, a benefit to the class -- or the

2  putative class -- members was the action that the Court has

3  taken on the argument of the objectors to take a look at a --

4  single-sport/single-school class actions for the personal

5  injury.

6          And I know that counsel pointed out in his remarks, I

7  guess, in quotations from you, that the chances were minimal,

8  or whatever.  And all I could think of when I heard that, to

9  be quite honest with you, Judge, was dumb and dumber and the

10  thought that we actually have a chance from the standpoint of

11  those putative plaintiffs.

12          Thank you, your Honor.

13          THE COURT:  Thank you, Mr. Jefferson.

14          Mr. Mester, does the NCAA take any position with

15  regard to the fee petitions at all?

16          MR. MESTER:  No, your Honor.  We have an agreement

17  that we would not do so.

18          THE COURT:  Okay.  Very good.

19          Thank you, ladies and gentlemen.  This concludes the

20  fairness hearing.  I will take the motion under advisement,

21  and I will be issuing a written order shortly.

22          Thank you.

23                  *    *    *    *    *

24

25

1    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
2

3
     /s/ Joseph Rickhoff                        March 4, 2019
4    Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25