**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: NATIONAL COLLEGIATE** | ) | |
| **ATHLETIC ASSOCIATION** | ) | **MDL No. 2492** |
| **STUDENT-ATHLETE CONCUSSION** | ) | |
| **INJURY LITIGATION** | ) | **Master Docket No. 13 C 9116** |
| | ) | |
| | ) | **Judge John Z. Lee** |
| | ) | |
| | ) | **Magistrate Judge David Weisman** |
| | ) | |
| **This Document Relates to All Cases** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, who are former collegiate athletes and members of a provisionally certified settlement class, seek final approval of the Second Amended Class Action Settlement Agreement against Defendant National Collegiate Athletic Association ("NCAA"). In addition, Co-Lead Counsel for the Settlement Class and Subclasses and counsel for the objectors have petitioned for fees and service awards. The Court issued an order approving the settlement on a preliminary basis on July 15, 2016, and, after an extensive program to provide notice to putative class members, held a final fairness hearing on February 25, 2019. For the reasons provided below, the Court certifies the Settlement Class and Subclasses and grants the motion for final approval of the Second Amended Class Action Settlement Agreement ("Settlement Agreement"). The various petitions for fees and service awards are granted in part and denied in part.

## I.     Background and Procedural History[1]

Adrian Arrington, who played football for Eastern Illinois University, brought a putative class action against the NCAA for breach of contract, negligence, fraudulent concealment, unjust enrichment, and medical monitoring based on the way the NCAA handled student-athlete concussions and concussion-related risks.  *See* Corrected Am. Compl., *Arrington v. NCAA*, No. 1:11-cv-06356 (N.D. Ill. 2011), ECF No. 25.  After substantial discovery, the parties in *Arrington* began settlement discussions with the assistance of retired United States District Judge Layn Phillips.  At the same time, dozens of similar putative nationwide class actions were filed throughout the country.[2]  The Multidistrict Litigation Panel consolidated the nationwide class actions for pretrial proceedings in this Court.  MDL Panel Transfer Order of 12/18/13, ECF No. 1.[3]  The Court then appointed Co-Lead Counsel, Special Class Counsel for Medical Monitoring

---

[1]     The procedural history of this multi-district litigation, the terms of prior settlement agreements, and the Court's prior rulings are detailed in the orders issued on December 17, 2014, January 26, 2016, and July 15, 2016.  The Court assumes familiarity with them.  *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, No. 13 C 9116, 2014 WL 7237208 (N.D. Ill. Dec. 17, 2014)*; In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580 (N.D. Ill. 2016); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, No. 13 C 9116, 2016 WL 3854603 (N.D. Ill. July 15, 2016).  Furthermore, the capitalized terms that appear here are defined in those orders and the Settlement Agreement.

[2]     Those actions are: (i) *Walker, et al. v. NCAA*, No. 1:13-cv-00293 (E.D. Tenn., filed Sept. 3, 2013); (ii) *Durocher, et al. v. NCAA*, No. 1:13-cv-01570 (S.D. Ind., filed Oct. 1, 2013); (iii) *Caldwell, et al. v. NCAA*, No. 1:13-cv-03820 (N.D. Ga., filed Oct. 18, 2013); (iv) *Doughty v. NCAA*, No. 3:13-cv-02894 (D.S.C., filed Oct. 22, 2013); (v) *Powell, et al. v. NCAA*, No. 4:13-cv-01106 (W.D. Mo., filed Nov. 11, 2013); (vi) *Morgan, et al. v. NCAA*, No. 0:13-cv-03174 (D. Minn., filed Nov. 19, 2013); (vii) *Walton, et al. v. NCAA*, No. 2:13-cv-02904 (W.D. Tenn., filed Nov. 20, 2013); (viii) *Washington, et al. v. NCAA*, No. 4:13-cv-02434 (E.D. Mo., filed Dec. 3, 2013); (ix) *Hudson v. NCAA*, No. 5:13-cv-00398 (N.D. Fla., filed Dec. 3, 2013); (x) *Wolf v. NCAA*, No. 1:14-cv-01268 (N.D. Ill., filed Feb. 10, 2014); (xi) *Nichols v. NCAA*, No. 1:14-cv-00962 (N.D. Ill., filed Feb. 11, 2014); (xii) *Jackson v. NCAA*, No. 1:14-cv-02103 (E.D.N.Y., filed Apr. 2, 2014); and (xiii) *Whittier v. NCAA*, No. No. 1:14-cv-0978 (W.D. Tex., filed Oct. 27, 2014) (collectively, "Related Actions").

[3]     Unless otherwise noted, "ECF No. __" refers to documents filed in the master docket of the multidistrict litigation, Case No. 1:13-cv-09116.

Relief, an Executive Committee, and Liaison Counsel for Plaintiffs, as well as Lead and Liaison Counsel for the NCAA. Case Management Order ("CMO") No. 3, ECF No. 76.

After extensive, arms-length negotiations, the parties reached a settlement agreement, and a number of the Plaintiffs submitted the settlement agreement to the Court for approval under Fed. R. Civ. P. 23(e). Anthony Nichols, a former San Diego State University football player and the named Plaintiff in *Nichols v. NCAA*, 1:14-cv-00962 (N.D. Ill. 2014), opposed the settlement on various grounds. *See* Nichols's Resp. Pls.' Mot. Preliminary Approval of Class Settlement, ECF No. 83.

The Court declined to approve the settlement agreement on December 17, 2014, raising a number of concerns. *See* Mem. Op. & Order, Dec. 17, 2014, ECF No. 115. To address those concerns, Plaintiffs continued to negotiate with the NCAA directly and in numerous mediation sessions and telephone conferences facilitated by retired United States District Judge Wayne Andersen. As part of this process, Plaintiffs also expanded the group of class representatives to include student-athletes, who played non-contact sports at NCAA-affiliated schools, to obtain their participation in the settlement process. Plaintiffs and the NCAA eventually agreed on an amended settlement agreement in February 2014, and Plaintiffs filed a Fourth Amended Class Action Complaint and a motion for preliminary approval of the amended class settlement agreement. *See* Joint Mot. Prelim. Approval Class Settlement, ECF No. 154 ("Mot. Prelim. Approval"); 4th Am. Compl., ECF No. 171.

Certain of the Plaintiffs were unhappy with the amended settlement. And the Court appointed Nichols as Lead Objector and permitted him to file objections to the amended settlement agreement. The Court also allowed Arrington, then represented by different counsel, to submit his objections. Minute Entry of 8/18/15, ECF No. 206.

Nichols's primary objection was to a provision in the amended settlement agreement requiring settling class members to release their right to pursue any personal-injury claims on a class-wide basis.  *See* Nichols 1st Objections, ECF No. 183; Nichols 2nd Objections, ECF No. 201.  According to Nichols, this procedural right was extremely valuable and outweighed any benefits that the settlement provided to class members.  Nichols 2nd Objections at 2.  Arrington echoed Nichols's concerns, emphasizing that the settlement did not provide monetary compensation for injuries.  Arrington Resp. ¶¶ 11–13, ECF No. 236.  To evaluate these contentions, the Court permitted the parties to submit supplemental briefs using the extensive factual record that had been developed in the *Arrington* case.

After considering the materials submitted by the parties, the Court preliminarily certified the settlement class under Fed. R. Civ. P. 23(b)(2) and found that the amended settlement was within the range of possible approval.  *See In re Nat'l Collegiate Athl. Ass'n Student-Athlete Concussion Injury Litig*., 314 F.R.D. at 608.  However, the Court conditioned this preliminary approval on several conditions.  Among them, the Court required that Plaintiffs and the NCAA provide the class members with notice (including direct notice) and an opportunity to opt out of the settlement.  The Court also limited the release of class-wide personal-injury claims to those instances where a plaintiff or claimant sought a nationwide class or where the proposed class consisted of student-athletes from more than one NCAA-affiliated school or more than one NCAA-sanctioned sport.[4]  Another modification amended the way in which certain settlement funds were to be utilized.  The parties agreed to the Court's suggested modifications.

---

[4]     In evaluating the proposed settlement, the Court determined that it was highly unlikely that a nationwide personal-injury class or a class consisting of student-athletes from more than one NCAA-affiliated school or more than one NCAA-sanctioned sport could be certified under Rule 23(b)(3).  *See In re Nat'l Collegiate Athl. Ass'n Student-Athlete Concussion Injury Litig*., 314 F.R.D. at 596.

Notice was provided via direct mail, email, internet and print advertising campaigns, and a website created for the settlement, http://www.collegeathleteconcussionsettlement.com. *See* Christman Decl. ¶ 3, ECF No. 530. As part of the Notice Program, the Notice Program Administrator mailed 3,886,369 postcards and sent 1,948,656 emails to settlement class members. *Id.* 326,291 postcards were returned as undeliverable, and the Notice Program Administrator searched various databases for updated addresses and re-mailed 202,637 of them. *Id.* In this way, direct notice was sent to 3,958,305 unique settlement class members.

Other methods were employed to reach settlement class members who may not have received a postcard or email. *Id.* n.4. For example, inserts were included in *USA Today* and *Sports Illustrated*. Vasquez Decl. ¶¶ 13–21, ECF No. 530-3. In addition, banner advertising, text link advertising, and tweets were targeted to likely settlement class members via Facebook.com, Google Display Network, Twitter, and other internet media outlets. *Id.* A national press release also was distributed. *Id.* And class members were directed to a toll-free number and website dedicated to the settlement of the class action. *Id.* The robustness of the notice program is evidenced by the fact that approximately 1,884 individual class members have exercised their right to opt out of the settlement class. Christman Decl. ¶ 6.

The Settling Plaintiffs now move for final certification of the Settlement Class and Subclasses and approval of the Settlement Agreement. *See* Joint Mot. Preliminary Approval 2d Am. Class Settlement and Certification Settlement Class and Settlement Subclasses, ECF No. 467; *see* 2d Am. Class Action Settlement Agreement & Release ("2d Am. SA"), ECF No. 266-1.

5

## II.    The Settlement

### A.  Settlement Class and Subclasses

The Settlement Class is defined as: "All Persons who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date." 2d Am. SA ¶ III.A.

The Settlement Class Representatives are:

| Representative | Sport | Institution | Participation Dates |
|---|---|---|---|
| Derek Owens | Football | University of Central Arkansas | 2008–11 |
| Angelica Palacios | Soccer | Ouachita Baptist University | 2010–11 |
| Kyle Solomon | Hockey | University of Maine | 2008–10 |
| Abram Robert Wolf | Football | Simpson College | 2012–16 |
| Sean Sweeney | Wrestling | Buena Vista College | 1991–93 |
| Jim O'Connor | Football | Drake University | 1971–74 |
| Dan Ahern | Football | North Carolina State University | 1972–76 |
| Paul Morgan | Football | Vanderbilt University | 1994–97 |
| Jeffery Caldwell | Football | Georgia Tech University | 1995–98 |
| John DuRocher | Football | University of Oregon; University of Washington | 2003–06 |
| Sharron Washington | Football | University of Missouri | 1987–91 |
| Shelby Williams | Golf | Northwest Missouri State University | 2015 |
| Brice Sheeder | Track & Field | Simpson College | 2015 |
| Shavaughne Desecki | Softball | DePaul University | 2003 |
| Spencer Trautmann | Baseball | Western Oregon University | 2015 |
| Ryan Parks | Baseball | University of Illinois | 2002 |
| Ursula Kunhardt | Volleyball | Montana State University | 2011–12 |
| Jessica Miller | Volleyball | Seattle-Pacific University | 2015 |
| Anna Bartz | Track & Field | University of Wisconsin | 2007 |
| Peter Dykstra | Track & Field | University of Wisconsin | 2006 |
| DaChe Williams | Basketball | Northeastern University | 2015 |
| Rachel Harada | Soccer | Rockhurst University | 2015 |
| Natalie Harada | Soccer | Maryville University | 2015 |
| Adam Walker | Golf | Simpson College | 2009–10 |

*Id.* ¶ II.F.

The Contact Sport Settlement Subclass is defined as "All Persons who played an NCAA-sanctioned Contact Sport at an NCAA member institution on or prior to the Preliminary Approval Date." *Id.* ¶ III.A. "Contact sports" include football, lacrosse, wrestling, ice hockey, field hockey, soccer, and basketball. *Id.* ¶ II.I. Class representatives for the Contact Sports Subclass are: Derek Owens (football), Angelica Palacios (soccer), Kyle Solomon (hockey), Rachel Harada (soccer), Natalie Harada (soccer), and DaChe Williams (basketball). *Id.* ¶ II.G.

The Non-Contact Sport Settlement Subclass is defined as "All Persons who played an NCAA-sanctioned non-Contact Sport at an NCAA member institution on or prior to the Preliminary Approval Date." *Id.* ¶ III.A. "Non-Contact sports" include all NCAA-sanctioned sports that are not included in the definition of "Contact Sports." Class representatives for the Non-Contact Sports Subclass are: Shelby Williams (golf), Brice Sheeder (track & field), Shavaughne Desecki (softball), Spencer Trautmann (baseball), Ryan Parks (baseball), Ursula Kunhardt (volleyball), Jessica Miller (volleyball), Adam Walker (golf), Anna Bartz (track & field), and Peter Dykstra (track & field). *Id.* ¶ II.H.

Each of the Settlement Class Representatives has played an NCAA sport during a time when the NCAA's concussion management and return-to-play guidelines purportedly failed to meet consensus best practice standards. And each is at risk for developing future symptoms related to concussions and/or the accumulation of subconcussive hits. *See, e.g.*, 4th Am. Compl. ¶¶ 29, 46, 60, 67, 76, 83, 91, 99, 106, 114, 118, 122, 126, 132, 138, 146, 151.

## B.     The Second Amended Class Action Settlement[5]

### 1.     Medical Monitoring Program

The NCAA will pay $70 million to create a Medical Monitoring Fund (the "Fund") in an interest-bearing account.  2d Am. SA ¶ IV(A)(1)(a).  The Fund will be used to pay the expenses associated with the Medical Monitoring Program ("Monitoring Program" or "Program"), including: Screening Questionnaire Costs; Medical Evaluations; Notice and Administrative Costs; Medical Science Committee Costs; approved Attorneys' Fees and Costs; and Class Representatives' Service Awards. *Id.* ¶ IV(A)(1)(b).  The Fund will be administered by a Program Administrator, an independent professional service company approved by the Court. *Id.* ¶ IV.A.2; *id.* ¶ II.NN; *id.* ¶ VI.A.

The Monitoring Program will last for a period of fifty years. *Id.* ¶ II.X.  If the funding for the Program is depleted before the expiration of the fifty-year period, the Settlement Class Members may pursue individual and class claims seeking medical monitoring, and the statute of limitations will be tolled during the fifty-year Medical Monitoring Period. *Id.* ¶ IV(A)(5).  In addition, during the first ten years, the NCAA will provide $5 million in additional funds for concussion-related research that it otherwise would not have funded absent the settlement. *Id.* ¶ X.A.

The Monitoring Program itself contemplates two different assessment phases: screening and evaluation.  In the screening phase, class members (or someone acting on their behalf) may seek an analysis of their symptoms by completing a Screening Questionnaire, in hard copy form or online, once every five years until age fifty and then not more than once every two years after the age of fifty. *Id.* ¶ IV.B.4; *id.* ¶ IV.B.4.g; Committee Report at 1–35, ECF No. 159.  Their

---

[5]     For the convenience of the reader, the Second Amended Class Action Settlement Agreement and Release, ECF No. 266-1, is included as an exhibit to this Memorandum Opinion and Order.

scores on the Screening Questionnaire will determine whether they qualify for a Medical Evaluation. 2d Am. SA ¶ IV.B.4.e.; Committee Report at 1–35.

The standard for determining whether a Class Member qualifies for a Medical Evaluation is established by the Medical Science Committee ("Medical Committee" or "Committee"). 2d Am. SA ¶ IV.B.4.a–d; Committee Report at 1–35. The Committee consists of four medical experts, who have expertise in the diagnosis, care, and management of sports-related concussions and mid- to late-life neurodegenerative disease: Dr. Brian Hainline, Dr. Robert Cantu, Dr. Ruben Echemendia, and Dr. Robert Stern. 2d Am. SA ¶ V.A.1. The Committee will be chaired by Special Master and retired United States District Judge Wayne Andersen. *Id.* Any future member of the Committee will be appointed jointly by the parties subject to Court approval. *Id.*

Once the Committee receives a class member's response to the Screening Questionnaire, the class member will be notified within thirty days whether he or she qualifies for a Medical Evaluation and will be instructed on where and how to obtain one. *Id.* ¶ IV.B.4.i. A Medical Evaluation will be performed at one of thirty-three program sites located throughout the country.[6] *Id.* ¶ IV.B.1.a.

The Medical Committee will determine the precise scope of the Medical Evaluations, which will be designed to assess symptoms related to persistent post-concussion syndrome, as well as cognitive, mood, behavioral, and motor problems associated with mid- to late-life onset diseases, such as Chronic Traumatic Encephalopathy ("CTE") and other disorders. *Id.* ¶ IV.B.5.c; Committee Report at 36–38. The Committee also will review annually, and amend as needed, the

---

[6] If a class member lives more than one hundred miles from the nearest Program Location, he or she has two options. The class member may request to receive mileage reimbursement for travel to a Program Location, or the class member may have a Medical Evaluation performed by a local physician, if the physician is approved by the Program Administrator and Special Master as a Medical Evaluation service provider and travel to a Program Location would be unduly burdensome. 2d Am. SA ¶ IV.B.5.a.

Screening Questionnaire and the Medical Evaluations to reflect the then-current standard of care; oversee the performance of the Program Locations; and recommend how research funds should be expended.[7] 2d Am. SA ¶ IV.B.5.c. Furthermore, the Committee will provide annual reports to the Court, allowing the Court to retain oversight of the Program. *Id.*

Class Members may qualify for up to two Medical Evaluations during the Medical Monitoring Period and may seek a third by submitting a request to the Committee. *Id.* ¶ IV.B.4.h. The Medical Evaluations will be submitted to a physician, who will provide a diagnosis as well as the results of the Evaluation to the class member or his or her personal physician, within sixty days of the Medical Evaluation. *Id.* ¶ IV.B.5.d.

Neither the Program Administrator nor the Program Locations will seek subrogation or reimbursement from the class member, his or her private health insurance, Medicare, Medicaid, or any other payor or administrator. *Id.* ¶ IV.B.5.g. Moreover, a class member who qualifies for a Medical Evaluation will never be required to make a claim on his or her health insurance policy to receive or qualify for the benefits of the Settlement. *Id.*

So that class members are aware of the Program throughout the fifty-year period, a reminder notice will be sent to them ten years after the effective date of this settlement.[8] *Id.* ¶ XI.3. And public relations campaigns publicizing the Monitoring Program will be performed every ten years during the fifty-year period. *Id.*

---

[7] The Committee will be compensated at a reasonable hourly rate from the Fund by the Program Administrator. 2d Am. SA ¶ V.F.

[8] As a practical matter, the effective date is when the time to appeal expires after the Court's final order and judgment is entered, or when the appellate process has concluded. *See* 2d Am SA ¶ XIV.

2.    **Changes to NCAA Policies**

In addition to the Monitoring Program, the NCAA has agreed to continue implementing changes to its concussion management and return-to-play policies to be consistent with consensus best practices. Cantu Report ¶¶ 47–48, 53, 57, 60, 65, 70, 74, ECF No. 69. First, as part of the settlement, the NCAA has already instituted a policy requiring all student-athletes to undergo pre-season baseline testing prior to the first practice or competition. 2d Am. SA ¶ IX.A.1. Second, the NCAA has revised its return-to-play guidelines to provide that an NCAA student-athlete who has been "diagnosed with a concussion will be prohibited from returning to play or participation in any practice or game on the same [d]ay on which he or she sustained such concussion" and "must be cleared by a physician before being permitted to return to play in practice or competition." *Id.* ¶¶ IX.A.2–3. Third, medical personnel, who are trained in the diagnosis, treatment, and management of concussions, will be present at all Contact Sports games and made available during all Contact Sports practices for Division I, II, and III schools. *Id.* ¶¶ IX.A.4–5. Fourth, before every athletic season, NCAA member institutions will provide NCAA-approved concussion education and training to all student-athletes, coaches, and athletic trainers. *Id.* ¶ IX.F. Fifth, at the beginning of each academic year, member institutions will provide NCAA-supplied educational material to all academic faculty regarding available academic accommodations for NCAA student-athletes who have sustained concussions. *Id.* ¶ IX.E.

To ensure that NCAA member institutions comply with these policies, each member institution must certify in writing, within six months after the effective date of the settlement, that it has implemented a concussion management plan that meets the above requirements. *Id.* ¶ IX.B. The certification must be provided to the Special Master, Class Counsel, and the Notice Administrator, and it will be posted on the settlement website created and maintained by the Notice

Administrator. *Id.* If an NCAA member institution does not submit the written certification, it will not be able to enforce the release of claims contained in the Settlement Agreement. *Id.*

To track the adherence of member institutions to these policies, the NCAA will create a uniform process by which member institutions will be required to report student-athlete concussions and their resolutions. *Id.* ¶ IX.C. In addition, the NCAA will create a reporting mechanism through which third parties, such as NCAA student-athletes or their parents, will be able to report concerns about concussion management issues directly to the NCAA. *Id.* ¶ IX.D.

### 3. Release of Certain Claims

As consideration for the terms outlined above, class members agree as part of the settlement to release any and all past, present, and future claims "seeking damages for medical monitoring, or other legal or equitable relief for medical monitoring, related to concussions or sub-concussive hits or contact . . . with respect to any conduct, acts, omissions, facts, matters, transactions or oral or written statements or occurrences on or prior to the Preliminary Approval Date arising from or relating to concussions or sub-concussive hits or contact sustained during participation in NCAA-sanctioned sports as an NCAA student-athlete." *Id.* ¶ II.RR; *see id.* ¶ XV.A.7. In addition, class members agree to release any and all claims "brought or pursued on a class-wide basis (other than claims pursued on behalf of a class of persons who allege personal injuries or bodily injuries resulting from their participation in a single NCAA-sanctioned sport at a single-NCAA member school, and relating to concussions or sub-concussive hits or contact), including but not limited to tort claims, claims for breach of contract, breach of statutory duties, actual or constructive fraud, negligence, conspiracy, misrepresentation, fraudulent inducement, fraudulent concealment, breach of fiduciary duty, compensatory and punitive damages, injunctive or declaratory relief." *Id.* ¶ II.RR. Significantly, class members retain the right to bring (1) "individual personal or bodily

12

injury claims"; (2) "personal or bodily injury class claims brought on behalf of a class of persons who allege injury resulting from their participation in a single NCAA-sanctioned sport at a single-NCAA member school"; as well as (3) "class claims that do not relate in any way to medical monitoring or medical treatment of concussions or sub-concussive hits or contact." *Id.*

The release of claims benefits "the NCAA, its member institutions (past and present), its current and former officers, directors, employees, insurers, attorneys and agents." *Id.* ¶ II.SS. *But see id.* ¶ IX.B (discussed above). Additionally, the NCAA has agreed to toll the statute of limitations for all personal-injury claims from September 12, 2011, the date the *Arrington* action was filed, through the date of the Court's final approval of the settlement. *Id.* ¶ XXI.S.

### 4. Fees and Awards

The Settling Plaintiffs and the NCAA state that the issue of attorneys' fees was deferred until after an agreement on all other material terms had been reached. Since that time, the NCAA has agreed not to oppose a request for an award of attorneys' fees up to $15 million and out-of-pocket expenses up to $750,000. *Id.* ¶ XVII.B. In addition, because counsel will have a continuing obligation to implement the terms of the settlement throughout the Monitoring Period, the NCAA has agreed not to object to applications from Co-Lead Counsel and one member of the Plaintiffs' Executive Committee for additional attorneys' fees, at a rate not to exceed $400.00 per hour, to a maximum of $500,000, for work performed after the first year from the effective date of Settlement. *Id.* ¶ XVII.C. These requests are subject to the Court's approval.

The Settling Plaintiffs have applied to the Court for reasonable service awards for the Class Representatives, which will be paid from the Fund. The NCAA has agreed not to object to Service Awards in the amount of $5,000 for Class Representatives Owens, Palacios, and Solomon,

who all were deposed in the *Arrington* case, and $2,500 for each Settlement Class Representative who was not deposed. *Id.* ¶ XVII.A.

## Legal Standard

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). Approval requires final certification of the class for settlement and a finding that the settlement is "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e); *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 862 (7th Cir. 2014).

## Analysis

### I.       Settlement Class Certification

The Settlement Class and Subclasses seek certification under Rule 23(b)(2). The Subclasses consist of the Contact Sport Settlement Subclass and the Non-Contact Sport Settlement Subclass. Excluded from the Settlement Class and Subclasses are: (a) the NCAA and its officers and directors; (b) Class Counsel; (c) the Special Master; and (d) the judges who have presided over this litigation. 2d Am. SA ¶ III.A.

"A district court may certify a case for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions of Rule 23(b)."[9] *Id.* at 493. Under Rule 23(b)(2), a class may be certified for injunctive relief if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

---

[9]       The Settlement Class and Settlement Subclasses are sufficiently definite and readily ascertainable, and there has been no objection in this regard. *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 496 (7th Cir. 2012).

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

### A.    Rule 23(a)

#### 1.    Numerosity

Numerosity is satisfied where "it's reasonable to believe [the class is] large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagner Equities, Inc*., 747 F.3d 489, 492 (7th Cir. 2014). Generally speaking, classes of forty or more members are sufficiently numerous to warrant certification. *See, e.g.*, *Pruitt v. City of Chi*., 472 F.3d 925, 926–27 (7th Cir. 2007).

The Court finds the Settlement Class and Subclasses satisfy the numerosity requirement under Rule 23(a). The approximately four million members of the Settlement Class and Subclasses are sufficiently numerous such that joinder would be impracticable.

#### 2.    Commonality

Commonality requires "questions of law or fact common to the class." Fed R. Civ. P. 23(a)(2). A question is common to the class if it generates a common answer, such that determination of the question will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The common questions "need not address every aspect of the plaintiffs' claims," but they "must 'drive the resolution of the litigation.'" *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 553 (7th Cir. 2016) (quoting *Dukes*, 564 U.S. at 350). For purposes of Rule 23(a)(2), "[e]ven a single [common] question" will suffice. *Dukes*, 564 U.S. at 359.

The Settlement Class and Subclasses meet the commonality requirement. Whether the NCAA had a duty to protect student-athletes from concussion-related risks, breached that duty,

and fraudulently concealed the risks are issues central to the litigation and raise questions of law and fact common to members within the Settlement Class and the Settlement Subclasses.

### 3. Typicality

Typicality under Rule 23(a) requires that the named plaintiffs' claims "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members" and "are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). The typicality requirement is thus satisfied when "the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993).

Lacrosse players Samantha Greiber, Lacey Donlon, and Marissa Spinazzola (the "Lacrosse Objectors")[10] contest typicality, arguing that the claims of the Contact Sports Settlement Subclass Representatives are not typical of those of female lacrosse players. *See* Greiber Objection at 26, ECF No. 450; Donlon Objection at 1 (adopting Greiber's Objection), ECF No. 459; Spinazzola Objection at 1 (same), ECF No. 458. In support, the Lacrosse Objectors cite *McDaniel v. Board of Education of the City of Chicago*, No. 13 C 3624, 2013 WL 4047989, at *17 (N.D. Ill. Aug. 9, 2013).

In *McDaniel*, the plaintiffs brought suit on behalf of a putative class of African-American students, alleging that the closures of certain public schools would disproportionately harm them by decreasing educational benefits and increasing risks to their safety. *Id.* at *1. Because the child of one class representative did not attend a school affected by the closures, the Court held that she failed the typicality requirement. *Id.* at *17. Similarly, the Court concluded that another class

---

[10] As a threshold matter, the NCAA contends that Greiber and Donlon lack standing to challenge the settlement's prospective injunctive relief because they no longer play lacrosse for an NCAA member institution. Because it is uncontested that Spinazzola has standing, and because Spinazzola raises the same arguments as Greiber and Donlon, the Court will proceed to address their objections.

representative failed the typicality requirement because the child's mother admitted that the student would not be harmed by the closures. *Id.*

By contrast, the Contact Sports Settlement Subclass Representatives and the Lacrosse Objectors face substantially similar risks of developing symptoms related to concussions and/or successive subconcussive hits. This is enough to establish typicality. Furthermore, the settlement affords all student-athletes, regardless of sport or gender, the same core benefit of access to the Monitoring Program.[11] Thus, the Court finds the claims of the Settlement Class and Settlement Subclass Representatives are typical of the claims of female lacrosse players as they pertain to the settlement.

### 4.    Adequacy of Representation

Rule 23(a) requires that the representative parties fairly and adequately represent the class. Fed. R. Civ. P. 23(a)(4). "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

The Court has previously found as a preliminary matter that the proposed Settlement Class Representative and Subclass Representatives adequately represent the interests of the putative Settlement Class. *See In re Nat'l Collegiate Athl. Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. at 591–92. The Lacrosse Objectors, however, contend that their interests have not been fairly and adequately protected during this litigation. Their objection is based on a mistaken belief that the Settlement Agreement prohibits them from filing a claim against the NCAA to require women lacrosse players to wear hard helmets.

---

[11]    It is worth remembering that student-athletes in Non-Contact Sports also face the risk of suffering concussions. *See, e.g.*, 9/15/18 Letter from A. Jeffery to S. Berman, ECF No. 472-9 (student-athlete concussed during track-and-field event).

To the contrary, under the terms of the Settlement Agreement, any female lacrosse player remains free to bring a personal-injury claim against the NCAA on her own behalf or on behalf of a class of female lacrosse players at her school to change the rule. *See* 2d Am. SA ¶ II.RR; *see also Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889 n.4 (7th Cir. 2011) (stating that an "injunction will usually have the same effect on all members of the class as individual suits would"); *see also* NCAA Resp. at 5 (stating that the NCAA promulgates one set of Women's Lacrosse Rules for all student athletes).[12]    What is more, that the Class and Subclass Representatives have negotiated terms to preserve the right of class members, such as the Lacrosse Objectors, to seek rule changes in their respective sport only bolsters the Court's conclusion that the interests of absent class members have been fairly and adequately represented in these proceedings. *See* Fed. R. Civ. P. 23(e)(2)(A).

Next, Adela Aprodu, who played tennis for Drake University, objects to the settlement, contending that it creates a conflict of interest between former, current, and future NCAA student-athletes.[13]    Specifically, she notes that, while current student-athletes will benefit from the amendments to the concussion-related protocols and the Monitoring Program, former student-athletes will receive only the benefits of the Program.  However, the fact that current student athletes will benefit from rule amendments simply recognizes that the injuries suffered by the class

---

[12]    *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (denying various objections because "it appears that most of the objectors have simply misread and/or misunderstood the Settlement documents and/or desired to 'have a better deal'").

[13]    Future NCAA student-athletes are not included in the Settlement Class, and their rights will not be limited by the proposed settlement.  Furthermore, it should be noted that the Settlement Agreement defines "current" players as those who played a NCAA-sanctioned sport prior to the Preliminary Approval Date, which was July 15, 2016.  As a result, to the extent that Aprodu refers to "current" student-athletes, a sizeable majority of them would likely have graduated by now and/or are no longer playing sports for their respective institutions.

as a whole—caused by the purported failure of the NCAA to implement adequate concussion-related procedures—continues over time.

Aprodu also argues that former student-athletes receive no compensation under the Settlement Agreement, suggesting that current student athletes may. But neither current nor former student-athletes receive monetary compensation under this settlement. And to the extent that they want to seek monetary compensation, any current or former student-athlete may bring individual or single-sport/single-school class claims for personal injury against the NCAA or any member institution.

For these reasons, the Court finds that the above objections to the Settlement Class's and Settlement Subclasses's ability to satisfy Rule 23(a)'s requirements are without merit, and Rule 23(a) is satisfied.

### B.  Rule 23(b)(2)

Turning to Rule 23(b)(2), a court may grant class certification under Rule 23(b)(2) so long as the Rule 23(a) factors have been met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Colloquially, 23(b)(2) is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 441 (7th Cir. 2015).

Plaintiffs assert that the NCAA had a duty to protect the health and safety of student-athletes that played NCAA-sanctioned sports. 4th Am. Compl. ¶¶ 170–84. Plaintiffs further claim that the NCAA was aware of the health risks associated with concussive and subconcussive injuries, but failed to promulgate and implement the rules and regulations necessary to safeguard

student-athletes from sustaining them. *Id.* ¶¶ 209–302. To remedy this failure, Plaintiffs seek injunctive relief requiring the NCAA to adopt corrective measures, including "system-wide stepwise 'return to play' guidelines," protective treatment and eligibility requirements for injured student-athletes, and management and oversight by appropriate medical personnel. *Id.*, Request for Relief ¶ C. Plaintiffs also request "the establishment of a medical monitoring program that enables each class member to monitor . . . any long-term effects or neurodegenerative conditions related to concussions or subconcussive hits." *Id.*, Request for Relief ¶ D.

The Lacrosse Objectors contend that the NCAA's conduct in failing to adopt a helmet rule for women's lacrosse differs from its conduct with regard to any other Contact Sport. Greiber Objection at 28. Similarly, Steve Wineberg, a former wrestler at Oberlin College, argues that student-athletes in each Contact Sport generally face widely varying concussion risks and consequently require different measures to reduce those risks. Wineberg Objection at 1, ECF No. 378.

Notably, the Lacrosse Objectors and Wineberg do not disagree that the NCAA's alleged failures affected the entire class. Nor do they argue that the Monitoring Program fails to benefit all NCAA student-athletes. Rather, the gist of their objections is their belief that the NCAA exhibited a greater degree of negligence when it came to their particular sport. But this argument falls short of showing that the NCAA's conduct, as set forth in the complaint, did not apply generally to the class as a whole. Moreover, as noted, to the extent that any student-athlete wishes to seek additional safety protocols for a particular sport, he or she may bring such a claim against the NCAA on an individual or single-sport/single-school basis.

Because the NCAA is alleged to have failed to act on grounds that apply generally to the class, the Court finds that certification of the Settlement Class and Settlement Subclasses under Rule 23(b)(2) is appropriate.

## II.    Approval of the Settlement

After notice and a public hearing, a court may approve a settlement if it determines the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)–(2). In making this determination, the Court must consider a variety of factors, including: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong*, 773 F.3d at 863; *see* Fed. R. Civ. P. 23(e)(2) (listing factors). Such an analysis does "not focus on individual components of the settlements, but rather view[s] them in their entirety in evaluating their fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (internal quotation marks omitted).

While the Court "consider[s] the facts in the light most favorable to the settlement," *id.* (internal quotation marks omitted), it is mindful that "the law quite rightly requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). In this regard, the Seventh Circuit has characterized "the district judge as a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotation marks omitted).

The Court has taken a number of steps to fulfill its oversight responsibilities here. First, the Court reviewed each version of the proposed settlement agreement, suggesting modifications

that it deemed necessary for approval. It also considered the voluminous materials that were submitted in support of and against the proposed settlement, including reports from various medical and economic experts. Furthermore, in order to ensure that the details of the settlement were available to the entire class, the Court oversaw an extensive notice program, including exhaustive efforts to provide direct notice to class members. In addition, any class member, who disagreed with settlement, was given the opportunity to opt out of the class or file objections. *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. at 601–02 (exercising discretion to require notice and opt-out for Rule 23(b)(2) class). After reviewing the entire record and conducting a public hearing, the Court now makes the following findings.

### A. Strength of the Case Balanced Against Amount Offered in the Settlement

"The most important factor relevant to the fairness of a class action settlement is . . . the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal quotation marks omitted). In considering this factor, a judge should try to "estimate the likely outcome of a trial . . . in order to evaluate the adequacy of the settlement." *Eubank v. Pella Corp.*, 753 F.3d 718, 727 (7th Cir. 2014); *see* Fed. R. Civ. P. 23(c)(2)(C).

The proposed settlement creates a $70 million dollar Monitoring Program that entitles all class members to be screened multiple times for symptoms of neurodegenerative diseases during a fifty-year period.[14] Medical experts with specialized knowledge in the diagnosis, care, and management of sports concussions, as well as mid- to late-life neurodegenerative diseases, have created a Screening Questionnaire that is specifically designed to determine whether a class

---

[14] In addition, the settlement requires the NCAA to contribute $5 million over the course of 10 years to research the prevention, treatment, and effects of concussions. 2d SA ¶ X.A. The $5 million must be used to fund research that would not have occurred absent the Settlement Agreement. *Id.*

member is experiencing neurological symptoms caused by concussions.[15]  Proposed Medical Science Committee Report at 1–6, 23–37, ECF No. 159 ("PMSC Report").  The experts also have developed a standardized scoring protocol to determine whether additional evaluation is necessary in individual cases.  *Id.* at 7–36.

Where additional evaluation is warranted, the class member will undergo a comprehensive suite of neurologic, neurophysiological, mood, and behavioral tests.  *Id.* at 36.  The information gathered from the Medical Evaluation will be analyzed by a physician skilled in the diagnosis, treatment, and management of concussions, and the results will be communicated to the class member.  Cantu Report ¶ 87.

Moreover, the Monitoring Program is required to incorporate ever-improving methods for detecting neurodegenerative diseases made possible by advancements in scientific research and technology over the fifty-year period.  Thus, the Monitoring Program provides each class member with an opportunity to monitor his or her own health at various times during the Medical Monitoring Period in order to assess the effects of the concussive or subconcussive impacts experienced as a student-athlete.  In this way, even class members who already have been diagnosed with concussion-related conditions will benefit from the Program, because they will be able to monitor their health over time.  The Court would retain the ability to ensure that the Monitoring Program is effectively implemented and managed as proposed.  *See* Fed. R. Civ. P. 23(e)(2)(C)(ii).

Furthermore, the NCAA has agreed to amend its return-to-play protocols and effectuate steps to provide additional safeguards for student-athletes.  And NCAA member institutions must

---

[15]     This includes the Beck Depression Inventory-II, Geriatric Depression Scale, Brief Symptom Inventory, Behavior Rating Inventory for Executive Functioning, Everyday Cognition, Functional Activities, and Structured Inventory of Malingered Symptomology.

certify that they have complied with these new requirements in order to receive the benefits of the settlement.

The Court finds that the Monitoring Program and additional commitments made by the NCAA provide substantial benefits to the class in an effective and equitable manner. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii), (D).

On the other side of the ledger, the strength of the Settlement Class's claims for medical monitoring depends upon myriad factors, including: whether the state in which the class member resides recognizes medical monitoring claims as an independent cause of action; whether the state recognizes medical monitoring as a form of injunctive relief at all; and whether the state allows medical monitoring as a form of relief in the absence of actual, present physical injury. *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. at 604. Plaintiffs also must overcome a number of affirmative defenses, including statute-of-limitations and assumption-of-risk arguments. Given this, it is highly unlikely that every student-athlete within the Settlement Class would be able to obtain medical monitoring relief, even after years of litigation.

Furthermore, the Court finds that the value of the claims that class members have released as part of the settlement is significantly outweighed by the benefits of the settlement to the class. The Court previously has found that the claims that the class will release as part of the settlement have little value because the likelihood of certification of a nationwide personal-injury class against the NCAA was "minimal, at best." *See id.* at 592–99.

Finally, it should be noted that the parties engaged in a series of lengthy arms-length mediation sessions with retired United States District Judge Wayne Andersen to negotiate the final

24

terms of the settlement. This too supports the fairness of the settlement terms and genuineness of the benefits to the class. *See* Fed. R. Civ. P. 23(e)(2)(B).

For these reasons, the Court finds that the benefits of the settlement to the class substantially outweigh the value of the released claims.

### B.      Stage of the Proceedings and Amount of Discovery Completed, as well as Complexity, Length, and Expense of Further Litigation

The parties have conducted extensive discovery, including taking depositions, reviewing hundreds of thousands of documents, and consulting with leading medical experts in sports-related concussions. *See* Pls.' Mem. Supp. Prelim. Approval at 27–28, ECF No. 156 (noting that, from the filing of the *Arrington* litigation in September 2011 to January 2014, Co-Lead Counsel had spent more than 11,000 hours in attorneys' time and $500,000.00 in out-of-pocket costs). If this case were to continue, litigation likely would take several more years to complete.

During that time, Plaintiffs would be required to contest a number of complex legal and factual issues. In addition to the numerous hurdles noted above, Plaintiffs would have to establish that they lack an adequate remedy at law and that the applicable statutes of limitations do not bar their claims. Plaintiffs also would need to prove, among other things, that they did not assume the risk of injury by playing a particular sport; the information that the NCAA allegedly concealed was not publicly available; they were misled or deceived by any statements or omissions on the part of the NCAA; and their reliance on the alleged statements or omissions caused their injury. Due to these contested issues, Plaintiffs would likely spend millions in additional attorneys' fees and costs over the course of many months to pursue this litigation through trial and possible appeal. By agreeing to the settlement, the settlement class eliminates the risks and expense associated with years of contentious litigation. *See* Fed. R. Civ. P. 23(e)(2)(C)(i).

### C. Opposition to the Settlement

Of the over four million class members who received direct and/or indirect notice, only twenty-two individuals have filed objections. Having already addressed a number of the objections above, the Court now will turn to the remainder.

As an initial matter, the Court notes that Alicia Ahern is not a member of the class, and Reuben David Patino and Mark Young have opted out of the class. All three, therefore, lack standing to object. *See Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992) ("[A] non-settling party does not have standing to object to a settlement between other parties."); Ahern Objection at 1, ECF No. 272 (stating she is the spouse of a class member); Patino Objection and Opt Out at 2, ECF No. 472-6; Young Objection and Opt Out at 1, ECF No. 425.

Sixteen other objectors oppose the settlement, arguing that it provides insufficient relief. Eleven of them complain that the Settlement Agreement does not compensate class members for injuries, medical costs, and other damages.[16] Others propose that the Settlement Agreement include additional forms of injunctive relief, such as protocols requiring helmets for female lacrosse players and athletic scholarships that are guaranteed regardless of injury.[17] As discussed above, however, the Settlement Agreement allows class members to bring personal-injury lawsuits on an individual or single-sport, single-school class basis to seek compensatory or additional types

---

[16]     *See* Aprodu Objection, ECF No. 373; Campbell Objection, ECF No. 472-1; Fagan Objection, ECF No. 472-2; Jeffery Objection, ECF No. 472-9; Krepinski Objection, ECF No. 472-3; Little Objection, ECF No. 472-4; Murphy Objection, ECF No. 472-5; Plastino II Objection, ECF No. 472-7; Purrington Objection, ECF No. 377; Schafer Objection, ECF No. 438.

Another objector seeks compensation for pre-existing injuries she incurred prior to her NCAA athletic career and for being an emancipated minor while she was an NCAA student-athlete. Terry Objection, ECF No. 427. Because such injuries are not the subject of this litigation, Terry's objection lacks merit.

[17]     *See, e.g.*, Donlon Objection; Greiber Objection; Spinazzola Objection; Suddath Objection, ECF No. 493-1; Wilson Objection, ECF No. 428.

of injunctive relief. *See* 2d Am. SA ¶ II.RR. Furthermore, the Settlement Agreement provides for the tolling of the statutes of limitations from September 12, 2011, to the date of its final approval. *See id.* ¶ XXI.S. Accordingly, the Court finds that these objections do not warrant rejection of the Settlement Agreement.

In addition, Aprodu draws attention to the fact that the Settlement Agreement also releases medical monitoring claims against NCAA member institutions. *See* Aprodu Objection; *see* 2d Am. SA ¶ II.SS ("'Released Persons' means the NCAA, its member institutions (past and present), its current and former officers, directors, employees, insurers, attorneys and agents, except as otherwise set forth in Section IX.B."). Aprodu is correct. Because the settlement provides medical monitoring relief to a nationwide class of student-athletes, all of whom played an NCAA-sanctioned sport at an NCAA member institution, allowing future lawsuits by class members against NCAA member institutions for the same relief would be prohibited. *See* 2d Am. SA ¶ III.A. But the release does not preclude class members from seeking damages, including damages based on past medical care, from an NCAA member institution by way of an individual or single-school/single-sport class claim, so long as the claim is unrelated to medical monitoring. Accordingly, this objection does not provide a persuasive reason for rejecting the settlement.

Steve Wineberg objects that the Committee has not revealed details of the Screening Questionnaire and Medical Evaluation and that, as a result, it is impossible to determine whether the settlement is fair and reasonable. Wineberg Objection at 2. To the contrary, the Committee has submitted a detailed protocol for the Screening Questionnaire and the Medical Evaluation, which the Court has reviewed and approved. *See* Committee Report at 1–35. Moreover, the protocol is required to be amended throughout the Medical Monitoring Period to reflect the then-current standard of care and is subject to annual review by the Court. 2d Am. SA ¶ IV.B.5.c.

27

A number of objectors also take exception to the various requests for attorneys' fees on the ground that they are unreasonable and excessive.[18]  The Court will address these objections in conjunction with its analysis of the fee petitions below.

### D. Reaction to the Settlement by Class Members and Competent Counsel

Four class members— Margaret Carper, Kelly Roderick, Marc Elliott, and Letice Jolley— have submitted letters in support of the Settlement Agreement.

Margaret Carper, a former student-athlete at University of Arizona, graduated in 1981 and suffers symptoms caused by concussions she experienced there.  Carper Letter, ECF No. 472-10. She states that this litigation has given her a voice and that she is thankful for Co-Lead Counsel's dedication to securing for her the opportunity to participate in the post-concussion screening process.  *Id.*

Kelly Roderick, who played field hockey at Michigan State University, was concussed while playing in 2008 and still experiences symptoms of post-concussion syndrome.  Roderick Letter, ECF No. 472-11.  With ongoing treatment, hard work, and a supportive network of family and doctors, she has successfully managed her symptoms.  *Id.* at 2.  She now dedicates her life to the field of sports training, working with collegiate and professional teams.  *Id.*  Roderick believes this litigation is "incredibly important for college athletes."  *Id.* at 1.

Marc Elliott also supports the settlement.  Elliott Letter, ECF No. 472-12.  In particular, he supports the amendment of the NCAA's concussion-related rules and procedures.  *Id.* at 1.  Elliott believes that if the NCAA had had proper protocols when he was playing lacrosse at Coker College, his concussion would have been properly diagnosed.  *Id.* at 2.

---

[18]  *See* Aprodu Objection; Schafer Objection; Wilson Objection; Wineberg Objection; *see also* Nichols Objection, ECF No. 457; Devereux Objection, ECF No. 456; Strandgaard Objection, ECF No. 472-8.

Finally, Letice Jolley states that a concussion ended her softball career at the University of Utah in 2000. Jolley Letter, ECF No. 472-13. She lost her memory for a period of time and never received proper treatment for a full recovery. *Id.* Jolley supports the settlement because she does not want anyone else to face the challenges she experienced after her concussion. *Id.*

The Court also notes that Settlement Class Counsel are experienced class action litigators and support the settlement. Pls.' Mem. Supp. Mot. Final Approval at 19–20. Furthermore, as discussed, the class representatives and Settlement Class Counsel have adequately represented the class, and the settlement was the product of extensive arms-length negotiations. It is also worth mentioning that, after three years of vigorously opposing the settlement and after several amendments to the Settlement Agreement, Lead Objector Nichols now supports the settlement.

### E. Petitions for Attorneys' Fees and Costs

Under Rule 23(h), a court may award reasonable attorneys' fees "that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In all class action settlements, there exists a potential conflict of interest between class counsel and the class. *Redman*, 768 F.3d at 629. In purely economic terms, class counsel would prefer to maximize their fees, even if it comes at the class's expense. *Id.*

As a result, "[t]he district court must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988) (citation omitted). "Critically the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel." *Redman*, 768 F.3d at 629. Put another way, "a district court should compare attorney fees to what is actually recovered by the class . . . ." *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d

29

791, 793 (7th Cir. 2017); *see* Fed. R. Civ. P. 23(e)(2)(C)(iii). "The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman*, 768 F.3d at 630.

In awarding fees, a court has the discretion to calculate a reasonable fee by using either the percentage-of-recovery method, which awards fees as a percentage of a common fund, or the lodestar method, which accounts for fees based on the number of hours worked at a reasonable rate and a multiplier based on the risk of initiating the lawsuit. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 973 (7th Cir. 1991); *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566–66 (7th Cir. 1994). Though not required, a district court may calculate a reasonable fee under one method and then cross-check its calculation under the other. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011).

In assessing the reasonableness of an attorney fee award for a class action settlement, district courts should "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832–33 (7th Cir. 2018) (internal quotation marks omitted). "Factors that bear on the market price for legal fees include the risk of nonpayment, the quality of the attorney's performance, the amount of work necessary to resolve the litigation, and the stakes of the case." *Id.*

### 1.     Settlement Class Counsel's Fee Petition

Settlement Class Counsel—which is comprised of Co-Lead Counsel, the Executive Committee, and law firms representing Settlement Class Representatives—propose that the Court apply the lodestar method in evaluating their petition for fees and expenses. The lodestar method is "frequently employed in common fund cases." *Harman*, 945 F.2d at 973. To calculate the

lodestar, the court "[m]ultipl[ies] the hours reasonably expended by the reasonable hourly rates." *Id*. at 974. "A reasonable hourly rate is based on the local market rate for the attorney's services." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). "The best evidence of the market rate is the amount the attorney actually bills for similar work . . . ." *Id.* In total, Settlement Class Counsel report spending 18,481.86 hours litigating this case, resulting in a total lodestar amount of $9,791.844,[19] as well as $750,000 in out-of-pocket expenses. The following paragraphs constitute the Court's findings as to the quality and quantity of the work performed. *See* Fed. R. Civ. P. 23(h).

Beginning in 2011, Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Siprut PC ("Siprut") conducted extensive discovery in the *Arrington* case, reviewing hundreds of thousands of pages of documents and conducting fourteen depositions. They then moved for class certification and participated in three mediation sessions with retired United States District Judge Layn R. Phillips. In February 2014, the parties reached a proposed settlement containing many of the elements in the current Settlement Agreement: the creation of a $70 million fund for a fifty-year Medical Monitoring Program; the implementation of significant changes to the NCAA's concussion management and return-to-play protocols; and the commitment of $5 million to concussion research. From the filing of *Arrington* through the initial settlement agreement, Hagens Berman and Siprut state that they invested more than 8,000 hours of attorney time and $400,000 in out-of-pocket costs on a contingent basis.

After this Court stayed discovery in *Arrington* to provide time for further settlement discussions, Hausfeld LLP ("Hausfeld") filed additional lawsuits seeking medical monitoring

---

[19] Settlement Class Counsel has submitted declarations attesting to their current billing rates, and Co-Lead Counsel has provided the effective blended rates for each firm. *See* Pet. Fees, Expenses, & Incentive Awards at 8–9, ECF No. 327. The Court finds that these rates are consistent with current market rates for similar legal services.

relief for late-life, latent, neurocognitive diseases, such as dementia and CTE. The Judicial Panel on Multidistrict Litigation consolidated all of the concussion-related class actions filed against the NCAA before this Court in MDL 2492.

In July 2014, the Court appointed Hagens Berman and Siprut as Co-Lead Counsel of the multidistrict litigation; Hausfeld as Special Class Counsel for monitoring relief; and Zimmerman Reed PLLP ("Zimmerman Reed"), the Orlando Firm PC, and the Dugan Law Firm APLC, to serve on the Executive Committee. Counsel at these and other law firms representing various class representatives worked together to reach an agreement with the NCAA that added increased testing and protection for late-life, latent, neurocognitive disease.

Co-Lead Counsel then moved for preliminary approval of the settlement and class certification and responded to arguments in opposition to the motion for preliminary approval of the settlement agreement that were raised by Anthony Nichols and echoed by Julius Whittier.[20] *See* Nichols's Resp.; Whittier's Objections, ECF No. 94.

On December 17, 2014, the Court raised several significant concerns regarding the proposed settlement and denied the motion for preliminary approval. But the Court recognized that the proposed settlement agreement constituted a significant step in resolving the complex litigation and encouraged the parties to continue their discussions.

Settlement Class Counsel pursued further negotiations with the NCAA in three separate mediation sessions and numerous telephonic meetings facilitated by Judge Andersen. During this period, Co-Lead Counsel and the Executive Committee worked with the Medical Science Committee to better define the scope of the Monitoring Program and directed the class settlement administrator to analyze the cost and feasibility of direct and indirect notice to the estimated 4.2

---

[20] Nichols and Whittier no longer oppose the settlement as it currently stands, but Nichols has lodged objections to Settlement Class Counsel's fee petition.

million class members.  They also undertook additional economic analyses to assess the sufficiency of the Fund.  Co-Lead Counsel then moved for preliminary approval of an amended settlement agreement and conditional certification of a settlement class on April 14, 2015.

Nichols and Arrington objected to the revised settlement agreement, and Co-Lead Counsel responded.  The Court found Nichols's input helpful as to two issues: (1) whether the settlement agreement should require class members to waive their right to file class actions of all kinds; and (2) whether the $5 million promised by the NCAA for concussion research should be in addition to what the NCAA is currently funding.

In the end, the Court concluded that the amended settlement agreement fell within the range of possible approval, with certain modifications.  First, the Court proposed that the scope of the release barring class actions be limited to personal-injury claims where the proposed class is a nationwide class or consists of student-athletes in more than one sport or at more than one NCAA member institution.  The Court also barred any requirement that a class member pay a deductible or co-payment for a Medical Evaluation and prohibited any subrogation or reimbursement from a class member's health insurance.  After additional discussions, the parties informed the Court that they were amenable to the Court's suggestions, and the Court granted preliminary approval and class certification of the newly revised settlement on July 15, 2016.  *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 2016 WL 3854603, at *6.

Since then Co-Lead Counsel have spent a substantial amount of time coordinating with the NCAA, NCAA member institutions, and the Notice Administrator to reach the approximately 4.2 million current and former NCAA student-athletes with notice of the settlement.  Co-Lead Counsel have kept the Court apprised of the various steps the Notice Administrator has taken to accomplish this task.  In addition, Co-Lead Counsel have continued to work with the NCAA, the Committee,

33

and the Program Administrator to launch the Monitoring Program. This process has involved seeking and vetting qualifying physicians and hospitals to serve as Program Locations so that Medical Evaluations can be performed once the Settlement Agreement has been finally approved. Overall, the Court has appreciated the quality of Co-Lead Counsel's work and their responsiveness to the Court's numerous inquiries.

The procedural history of this case demonstrates the tremendous effort, skill, and coordination that Co-Lead Counsel has dedicated to this litigation. Those who object generally to Co-Lead Counsel's hours simply fail to appreciate the amount of labor performed since the inception of the *Arrington* litigation in 2011.[21]

In support of their respective fee petitions, most of the law firms have provided detailed contemporaneous billing records to account for how the attorneys spent their time and contributed to this litigation. By contrast, Siprut has submitted invoices that contain entries that attempt to group several different activities into broad categories, thereby making it extremely difficult to determine the reasonable value of its services. At a recent hearing, Siprut did indicate that the firm had switched to a more detailed system two years ago. But the requirement that attorneys must provide a detailed description of activity to support the reasonableness of a fee petition has been around for over thirty years. *See, e.g.*, *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 658 (7th Cir. 1985) (affirming the district court's reduction of hours based on vagueness of descriptions and failure to provide detailed analysis). And it was specifically ordered by the Court when it appointed Co-Lead Counsel in July 2014. *See* Case Management Order No. 3 (requiring all Plaintiffs' counsel to keep "contemporaneous time and expense records"). To the extent that

---

[21] *See, e.g.*, Aprodu Objection; Schafer Objection; Strandgaard Objection; Wilson Objection; Wineberg Objection.

Siprut did not alter its billing system to satisfy this requirement until recently, it did so at its own peril. Because the Court finds that Siprut's billing statements do not allow the Court to make a principled determination as to the reasonableness of its fee request, the Court will reduce its fees by half in recognition of the value and services that the firm did provide to the Settlement Class.[22]

Nichols also argues that Co-Lead Counsel's fees should be reduced because the first settlement proposed by the attorneys was rejected by the Court.[23] But the original settlement agreement contained many of the essential terms in the agreement that is before the Court today. It too required the creation of a $70 million Fund to create a fifty-year Monitoring Program, the amendment of concussion management and return-to-play protocols, and the commitment of $5 million to concussion research.

In addition, Nichols objects to the provision in the Settlement Agreement that allows Co-Lead Counsel to receive fees for tasks associated with administering the Medical Monitoring Program, describing the future fee provision as "hidden." Nichols Objection at 12. But the Court has expressly discussed the provision in two prior opinions accessible via the Court's MDL website. *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. at 587; *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 2014

---

[22] Nichols also argues that Co-Lead Counsel's fees should be reduced because, after their client, Arrington, objected to the settlement and retained new representation, Co-Lead Counsel has taken no position as to whether Arrington should receive a service award. But once Co-Lead Counsel's representation of Arrington had concluded, it was reasonable for Co-Lead Counsel to rely on Arrington's new counsel to advocate on his behalf.

[23] The original settlement agreement was filed on July 29, 2014, and the NCAA sent notice of the settlement to the respective attorneys general ten days later, on August 8, 2014, in order to comply with the notices requirement of The Class Action Fairness Act. *See* 28 U.S.C. § 1715(b) ("Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement . . . ."). In addition to his other objections, Nichols argues that Co-Lead Counsel's fees should be reduced because the NCAA sent the original settlement on the tenth day. But Nichols concedes that the class was not prejudiced by the delay.

WL 7237208, at *5. Because counsel has a continuing obligation to implement the terms of the settlement throughout the Medical Monitoring Period, it is reasonable that Co-Lead Counsel and one member of the Executive Committee be allowed to apply for additional attorneys' fees, at a rate not to exceed $400.00 per hour, up to a maximum of $500,000, for work performed after the first year from the settlement's effective date. *See* 2d Am. SA ¶ XVII.C. Furthermore, any application for fees and expenses will be reviewed and approved by the Chair of the Medical Science Committee, Judge Andersen, who is well-versed in reviewing attorneys' fees for reasonableness. *Id.* The Court thus overrules this objection by Nichols.

Furthermore, Nichols contends that the fees submitted by the following law firms should be reduced for various reasons: (1) Lite DePalma Greenberg LLC ("Lite DePalma"); (2) Provosty and Gankendorff LLC ("Provosty and Gankendorff"); (3) J. Selmer Law P.A. ("J. Selmer"); (4) Zelle Hofmann Voelbel & Mason LLP ("Zelle Hofmann"); (5) DeFeo & Kolker LLC ("DeFeo & Kolker"); (6) TLW & Assocs. LLC ("TLW"); and (7) Branstetter Stranch & Jennings PLLC ("Branstetter Stranch"). *See* Class Counsel's Pet., Exs. E to J, ECF No. 350. The first four firms, along with Hausfeld and Zimmerman Reed, filed a motion to temporarily enjoin ongoing settlement negotiations between the plaintiffs in *Arrington* and the NCAA in order to represent the interests of former players who played before 2004. While the motion was being briefed, counsel for the movants conferred with Co-Lead Counsel on multiple occasions to ensure that the interests of their clients were being represented and eventually withdrew the motion. *See* Mot. Temporarily Enjoin Ongoing Settlement Negotiations, ECF No. 6-1; Notice of Withdrawal, ECF No. 40. Co-Lead Counsel met with counsel from all six firms and agreed to incorporate additional tests and protections within the Monitoring Program to address late-life neurocognitive degenerative diseases like CTE.

The Court finds that Hausfeld, who was appointed as Special Class Counsel for Medical Monitoring Relief, has borne the brunt of responsibility in pressing for improved testing of latent cognitive injury. This has required coordinating with Co-Lead Counsel, identifying and conferring with medical experts, and preparing experts' affidavits. That said, a comparison of the detailed billing records of Hausfeld and the seven above-mentioned firms reveals a substantial overlap in efforts. The Court therefore reduces the fees sought by the seven firms identified above by fifty percent.

In summary, the Court reduces the fees requested by Siprut; Lite DePalma; Provosty and Gankendorff; J. Selmer; Zelle Hofmann; DeFeo & Kolker; TLW; and Branstetter Stranch by fifty percent. Having reviewed the fees requested by Hagens Berman; Hausfeld; Zimmerman Reed; and Shindler Anderson Goplerud Weese PC ("Shindler Anderson"), the Court finds their fees to be reasonable and appropriate in light of the work they performed on behalf of the Settlement Class and Subclasses.[24] Therefore, the total lodestar for all Settlement Class Counsel is $8,134,711.

In addition to the lodestar amount, "district courts may add a bonus to the lodestar to compensate for the contingent nature of success." *Ohio-Sealy*, 776 F.2d at 660. This bonus is a "multiplier . . . designed to reflect the fact that, no matter how many hours were invested, there was, at the outset, the possibility of no recovery." *Harman*, 945 F.2d at 976. It "includes compensation for the risks assumed in developing the case and for the time-value of money." *Ohio-Sealy*, 776 F.2d at 660. A multiplier also "provides adequate incentive for the attorney to bring th[e] type of case," *Harman*, 945 F.2d at 974. "[T]he judge should view the multiplier from an *ex ante* perspective; that is, what size risk the attorney assumed at the outset by taking th[e]

---

[24]     The Court notes that Nichols has not raised any specific objections to the fee petitions of Zimmerman Reed (one of the law firms appointed to the Executive Committee) or Shindler Anderson, the law firm representing the Non-Contact Sports Settlement Subclass.

case." *Id.*; *Skelton*, 860 F.2d at 258. "This requires comparing the attorney's prospect for success with other cases of similar dimensions." *Harman*, 945 F.2d at 974. "Multipliers anywhere between one and four . . . have been approved. *Id.* at 976; *see* William B. Rubenstein, Newberg on Class Actions § 15:78 (5th ed.) ("Empirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1-2 range.").

Settlement Class Counsel propose a 1.5 multiplier. The Court finds the proposed multiplier warranted. From the outset, the risk inherent in bringing a nationwide class action for medical monitoring was high. Co-Lead Counsel commenced the *Arrington* litigation in 2011, and other Settlement Class Counsel began litigating claims on behalf of additional class representatives in 2013 and 2014, all on a contingent basis. Given the number of affirmative defenses available to the NCAA, including statutes of limitations, assumption of risk, and comparative and contributory negligence, it was far from certain that a nationwide class would prevail. From an *ex ante* perspective, the complexity of the claims and litigation required Settlement Class Counsel to bear a considerable risk to recover anything for the nationwide class. Given the substantial risk, the substantial benefits that the settlement provides to the class, as well as the time value of money, the proposed multiplier of 1.5 is reasonable and warranted.

Accordingly, the Court multiplies the lodestar of $8,134,711 by 1.5 and adds $500,000 in potential future fees,[25] resulting in a total of $12,702,066 in fees for Settlement Class Counsel. What the class members receive is a $70,000,000 Fund, less notice costs, publicity costs, total awarded attorneys' fees and expenses, and incentive awards, resulting in a net benefit of

---

[25] Any application for future attorneys' fees and expenses will be reviewed and approved by the Chair of the Medical Science Committee. *See* 2d Am. SA ¶ XVII.C.

$51,013,208.[26]   A comparison of Settlement Class Counsel's fees to the benefits to the class members results in a ratio of 20%, which is reasonable and reflective of the market. *See, e.g.*, *Ashack v. Caliber Home Loans, Inc.*, No. 1:15-cv-01069-JMS-DML, 2017 WL 2618885, at *2 (S.D. Ind. June 16, 2017) (finding 30.39% ratio reasonable); *Kaufman v. Am. Express Travel Related Servs., Co.*, No. 07-cv-1707, 2016 WL 806546, at *12 (N.D. Ill. Mar. 2, 2016), *aff'd*, 877 F.3d 276, (7th Cir. 2017) (stating that "[t]ypically, attorneys' fees of 25–33 1/3% of a settlement value are reasonable and typical."); *Pearson*, 772 F.3d at 782 ("[A]ttorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel.").[27]

The Court also finds Settlement Class Counsel's expenses of $750,000 reasonable, given the scope and duration of this litigation.[28]   Accordingly, the Court approves the Settlement Class Counsel's petition for attorneys' fees and expenses in the amount of $13,452,066.

### 2.    Objectors' Fee Petitions

Lead Objector Nichols, as well as objectors Arrington and Whittier, also have filed fee petitions.  Courts recognize that "objectors play an essential role in judicial review of proposed

---

[26]    Nichols contends that the benefit to the class is not $70,000,000 because Plaintiffs' expert indicated the possibility that, accounting for accrued interest and differences in testing cost estimates, $50,000,000 may remain in the Fund in the last year of the fifty-year Medical Monitoring Period.  Nichols Objection at 5 (citing Deal Report at 38).  The Settlement Agreement, however, provides that "[i]f the Medical Monitoring Fund contains funds sufficient to extend to the Medical Monitoring Program six months or more beyond the expiration of the Medical Monitoring Period, the Medical Monitoring Period shall be so extended."  2d Am. SA ¶ IV.A.4.  Because an extended Medical Monitoring Period will continue to benefit the Settlement Class and Subclasses by providing class members an opportunity to obtain additional screening and evaluation, *see id.* ¶ IV.B.4.g–h, the Court rejects Nichols's objection.

[27]    As a result, Aprodu's, Devereux's, Schafer's, Strandgaard's, Wilson's, and Wineberg's general objections to the proportion of the Settlement Class Counsel's fee award compared to the benefit to the class are also overruled.

[28]    This amount is less than the out-of-pocket expenses actually incurred, and there has been no objection regarding expenses.

settlements of class actions." *Pearson*, 772 F.3d at 787. "It is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally." *Reynolds*, 288 F.3d at 288. Such "participation is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee." *Id.* Nonetheless, objectors may be "motivated to exaggerate the value of the claim . . . so that they c[an] get a generous award of attorneys' fees." *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687 (7th Cir. 2008). "The principles of restitution . . . require . . . that the objectors produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class." *Id.* at 688.

Edelson PC ("Edelson"), the principal law firm representing Lead Objector Nichols, reports spending 3,002.23 hours representing Nichols, resulting in a lodestar amount of $1,272,624. While Edelson's involvement in this litigation did benefit the class, its claimed contributions to the settlement process are overstated. For example, Edelson takes credit for "forcing the settling parties" to eliminate a reversion clause, claiming that this increased the value of the settlement by $50 million. Nichols's Fee Pet. at 9, ECF No. 330. But, such provisions generally are disfavored, and the Court rejects such reversion clauses as a matter of course. Edelson also claims that it increased the value of the settlement by $5 million by successfully arguing that the concussion research already being performed by the NCAA should not be credited toward the Research Fund. But the parties and the Court have not included the value of the Research Fund as a benefit to the class in assessing fees. Edelson also takes credit for prohibiting the NCAA from obtaining subrogation from private health insurers. But the Settlement Class Counsel had already represented that the Program Administrator would not seek subrogation, and the expert report submitted in support of the settlement assumed that subrogation would not occur.

*See* Deal Report ¶ 16, ECF No. 170. As the Court explained in a prior order, the disallowance of subrogation merely clarified conflicting language in the Settlement Agreement. *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. at 606 (discussing Am. SA ¶ IV(B)(5)(g)). Nor can Edelson take credit for increasing the number of program locations from 10 to 33, requiring reimbursement of travel costs, or enabling a class member to request a qualified medical provider within 100 miles of his or her residence; these were suggestions made by the Court.

Edelson's primary aim in this litigation has always been to preserve the right of class members to pursue separate class actions for personal-injury damages claims against the NCAA. This prompted the Court to assess the value, if any, of such a procedural right when evaluating the fairness of the proposed settlement. The Court ultimately decided that the value of a nationwide class action for personal-injury was minimal, at best. But because the Court could not determine the value of the procedural right to bring a single-sport, single-school class action for personal injury based on the limited record before it, the Court excluded such class actions from the settlement's release. Edelson's input materially assisted the Court in this analysis.[29] That said, the Court notes that 40 hours of Edelson's time were spent on matters relating to the single-sport, single-school litigation. Because these hours did not add value to this settlement, the Court deducts $10,800 from Edelson's request, resulting in a lodestar amount of $1,261,824 in fees.

In its petition, Edelson requests $6 million in fees, almost five times its lodestar amount. But Edelson bore substantially less risk than Settlement Counsel in pursuing this action. Indeed, Nichols's objections relied primarily on the discovery that other counsel conducted in the

---

[29]    This carve-out has resulted in the creation of a second tranche of single-sport, single-school class actions within MDL 2492. *See In re NCAA Student-Athlete Concussion Injury Litigation – Single Sport/ Single School (Football)*, Master Docket Case No. 16-cv-08727. Edelson has been appointed Lead Counsel in that litigation, and Edelson, if successful, likely will seek compensation for its work in that matter.

*Arrington* case. Moreover, as noted, Edelson's objection allowed it to be appointed as Lead Counsel in the second phase of this MDL. Accordingly, the Court awards Edelson $1,261,824 in fees, but declines to award Edelson a multiplier in this case.

Gordon Law Offices Ltd. ("Gordon") also represented Lead Objector Nichols and reports spending 349.5 hours on Nichols's behalf. The Court finds that, while Gordon contributed to the settlement by researching and analyzing some issues raised in Nichols's objections, much of Gordon's efforts overlapped those of Edelson. In addition, a review of Gordon's billing records reveals a substantial amount of time spent on issues that were never raised by Nichols in his objections. For example, Gordon consulted with various doctors regarding the Monitoring Program, but they do not appear in Nichol's objections. Accordingly, based upon a review of Gordon's billing records, the Court finds it appropriate to reduce Gordon's fee request by fifty percent and awards Gordon $87,806 in attorneys' fees.

Dwight E. Jefferson of Coats Rose PC ("Coats Rose") also submitted a petition for fees and expenses. Coats Rose represented Mildred Whittier, as next friend to Julius Whittier. Jefferson states that he has spent 205 hours at his usual billing rate of $400 and incurred $9,063 in costs. The Court recognizes that Jefferson participated in the case by submitting his client's positions for the record. But beyond that, Coats Rose's efforts were largely duplicative of those of Nichols's counsel. *See, e.g.,* Whittier's Mem. Supp. Nichols's Renewed Mot. Appoint Jay Edelson as Lead Class Counsel, ECF No. 146 (duplicating arguments made in Nichols' Renewed Mot. Appoint Edelson as Lead Counsel of Personal Injury Class, ECF No. 128). In addition, after reviewing Coats Rose's billing records, the Court finds that many of the reported hours were spent on issues unrelated to the proposed settlement or were unreasonably high. For example, according to Coats Rose, Jefferson spent over eighteen hours drafting a three-page objection. For these

reasons, based on a review of the billing records, the Court finds that it necessary to reduce Coats Rose's request for attorneys' fees by seventy-five percent and awards Coats Rose $57,950 in attorneys' fees. As for expenses, the Court finds the request for $9,063 in costs to be reasonable in light of the record.

The fee petition of Clifford Law Offices PC ("Clifford") reports 25.5 hours spent advancing objections on behalf of Nichols and Arrington at counsel's usual billing rate of $600.00, for a total of $15,300. The Court finds these hours and fees reasonable, and there has been no objection to them. The Court holds that a multiplier is inappropriate for the reasons discussed above.

In total, Edelson, Gordon, Coats Rose, and Clifford are awarded $1,422,880 in fees. The ratio of their fees to the total attorneys' fees awarded is approximately 11%. Given the benefit the objectors provided to the settlement process, the Court finds this ratio reasonable.

Altogether, the attorneys' fees for Settlement Class Counsel and the objectors total $14,124,947, and for the reasons provided above, the Court finds these fees reasonable and in line with the market price for similar legal services. A comparison of total attorneys' fees to what class members actually receive results in a ratio of 22%, which is well below the ratios deemed reasonable by courts employing the percentage-of-recovery method. *See, e.g.*, *Leung v. XPO Logistics, Inc*., 326 F.R.D. 185, 202 (N.D. Ill. 2018) (finding fee award of 33.3% of the net fund reasonable under the percentage-of-recovery method); *Kolinek v. Walgreen Co*., 311 F.R.D. 483, 503 (N.D. Ill. 2015) (finding 36% of the settlement fund less administrative costs and incentive award reasonable utilizing the percentage-of-recovery method).

### F.     Incentive Awards

A "named plaintiff is an essential ingredient of any class action." *Camp Drug Store*, 897 F.3d at 834 (internal quotation marks omitted).  Accordingly, "an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).  To determine if an incentive award is warranted, a district court evaluates "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Camp Drug Store*, 897 F.3d at 834 (internal quotation marks omitted).

Three Settlement Class Representatives—Derek Owens, Angelica Palacios, and Kyle Solomon—were each deposed over multiple days in the *Arrington* case.  Each agreed to disclose their medical and personal histories to further the interests of the Settlement Class.  Each spent time producing documents and releasing medical records from numerous health providers.  The Court relied on the discovery in *Arrington* to evaluate and ultimately approve the Settlement Agreement.  Furthermore, each deferred litigating his or her individual personal-injury claims to put the class's interests first.  Because these Settlement Class Representatives spent considerable time and effort to protect the interests of the class, the Court finds an incentive award of $5,000 appropriate for Owens, Palacios, and Solomon.

The Court also finds an incentive award of $5,000 appropriate for class-representative-turned-objector Adrian Arrington.  Before his interests diverged from those of the Settlement Class, he too produced documents, disclosed his medical and personal history, released medical records from health providers, and was deposed by the NCAA.  Like Owens, Palacios, and Solomon, Arrington also deferred prosecution of his individual personal-injury claims.  Based on

his time and effort as the named Plaintiff in the case that started it all, the Court provides an incentive award of $5,000 to Arrington.

The other Settlement Class Representatives also spent time and effort to protect the interests of the class, though not to the extent of the individuals mentioned above. In their roles as current and former student-athletes in Contact or Non-Contact Sports, they examined the terms of the Settlement Agreement with the aim of protecting the interests of the class members. They reviewed the Settlement Agreement, asked questions, and were interviewed by mediator Judge Andersen. In addition, they submitted declarations regarding their opinions about the settlement. For their efforts, the Court finds an incentive award in the amount of $2,500 is appropriate for each of the following: Abram Robert Wolf, Sean Sweeney, Jim O'Connor, Dan Ahern, Paul Morgan, Jeffrey Caldwell, John DuRocher, Sharron Washington, Shelby Williams, Brice Sheeder, Shavaughne Desecki, Spencer Trautmann, Ryan Parks, Ursula Kunhardt, Jessica Miller, Anna Bartz, Peter Dykstra, DaChe Williams, Rachel Harada, Natalie Harada, and Adam Walker.

Lead Objector Nichols also seeks an incentive award. Unlike the Settlement Class Representatives who participated in discovery in *Arrington*, however, Nichols did not expend the time and effort that justifies a $5,000 incentive award. Nonetheless, as Lead Objector, Nichols offered critiques of the Settlement Agreement that meaningfully assisted the Court in its analysis. For his contributions, the Court finds an incentive award of $2,500 is appropriate, and the Court awards him accordingly.

In total, the Court awards $75,000 in incentive awards.[30] This includes $5,000 each to Owens, Palacios, Solomon, and Arrington; and $2,500 each to Wolf, Sweeney, O'Connor, Ahern,

---

[30] John Devereux, Jr. objects to the incentive awards, arguing that the Settlement Class Representatives should be paid more than what is provided in the Settlement Agreement. Devereux Objections, ECF No. 468. Because incentive awards must be tied to the time and effort expended to protect the interests of the Settlement Class, and because Devereux does not have personal knowledge of the

Morgan, Caldwell, DuRocher, Washington, Williams, Sheeder, Desecki, Trautmann, Parks, Kunhardt, Miller, Bartz, Dykstra, Williams, R. Harada, N. Harada, Walker, and Nichols.

<u>**Conclusion**</u>

For the reasons provided, the Court certifies the Settlement Class and Subclasses, grants the motion for final approval of the Second Amended Class Action Settlement Agreement [467], and grants in part and denies in part the petitions for fees and service awards [327] [328] [330] [333] [334].

**IT IS SO ORDERED.**                    **ENTERED:**

**John Z. Lee**
**United States District Judge**

**Dated:  August 12, 2019**

---

relevant facts necessary to determine the time and effort spent by the Settlement Class and Subclass Representatives, his objection is without basis.