IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION LITIGATION | ) MDL No. 2492 ) ) Master Docket No. 1:13-cv-09116 ) ) Judge John Z. Lee ) ) Magistrate Judge M. David Weisman |

**DECLARATION OF WILLIAM C. MULVEY
OF EPIQ MASS TORT**

I, William C. Mulvey, declare as follows:

1. I am a Vice President of Epiq Mass Tort (fka Garretson Resolution Group). On July 15, 2016, the Court appointed Epiq Mass Tort ("Epiq") as the Program Administrator to "administer the Second Amended Settlement in accordance with the terms and conditions of this Order and the Second Amended Settlement Agreement." (Dkt. 278, ¶ 13.) I make this declaration based upon my personal knowledge and I am competent to testify as to its contents.

2. Section VI of the Second Amended Class Action Settlement Agreement (Dkt. 558-1) (the "Settlement Agreement") and the Court's July 15, 2016 Order set forth Epiq's duties as the Program Administrator of the Medical Monitoring Program (the "Program"). Those duties include receiving, processing, and paying expenses (as provided for in the Settlement Agreement and any applicable orders of the Court), implementing and overseeing the online Screening Questionnaire, working with Qualifying Class Members to ensure they receive medical evaluations, processing and allocating results of the Medical Evaluations, and providing periodic reporting to the Parties and the Court.[1] (Dkt. 266-1, § VI.)

---

[1] Unless otherwise defined, capitalized terms have the meaning ascribed to them in the Settlement Agreement.

1

3.Section IV of the Settlement Agreement outlines the benefits to Settlement Class Members and describes the process for the creation of the Program, as led by the Medical Science Committee ("MSC") or "the Program Administrator as its designee." (Dkt. 558-1, § IV.) The Settlement Agreement requires, among other things, establishment of a network of medical institutions or providers ("Program Locations"). (Dkt. 558-1, § IV.B.1.) The Program includes an online Screening Questionnaire designed by the MSC, allows Qualifying Class Members to receive two Medical Evaluations, requires the Program Administrator to pay providers promptly following receipt of invoices and other required program documentation, and calls for the MSC to evaluate the Program periodically throughout its life. (Dkt. 558-1, § IV.)

4.The Settlement Agreement and the Court's July 15, 2016 Order also call for the establishment of a Medical Monitoring Fund (the "Fund") for the purpose of paying all costs of the Program in accordance with the Settlement Agreement. (Dkt. 558-1, § IV.A; Dkt. 278, ¶ 35.) Class Counsel and the NCAA selected Huntington National Bank to hold the Fund, and the NCAA deposited $5,000,000 into the Fund on July 28, 2016. Class Counsel, the NCAA, and Epiq entered into a Qualified Settlement Fund Agreement dated September 9, 2016, to set forth the terms and conditions for the operation and administration of the Fund, in accordance with the terms outlined in the Settlement Agreement.

5.The Settlement Agreement further requires the NCAA to deposit $25,000,000 into the Settlement Account within 30 days of the Effective Date (established by the Court as November 18, 2019). Accordingly, the NCAA deposited that amount into the Settlement Fund on December 18, 2019.

6.The Settlement Agreement requires Epiq as the Program Administrator to administer the Fund and to make certain payments from the Fund, subject to necessary

authorizations. In particular, the Program Administrator is required to make "[a]ll payments for the costs of administration of the Medical Monitoring Program, in amounts to be approved by the Court." (Dkt. 558-1, § IV.A.2.c.) Through December 31, 2019, the Fund has earned $148,588.83 in investment income and incurred total expenses of $15,473,628.37 (comprised of $15,441,202.08 in expenses and $32,426.29 in taxes), leaving a balance of $14,674,960.46.

7. On August 9, 2018, Epiq submitted a declaration to the Court (the "August 2018 Declaration") in support of invoices for payment totaling $395,442.03 for Epiq's administration services performed from January 1, 2016 through March 31, 2018. (Doc. No. 516-1) Payment of the costs set forth in that declaration was approved by the Court on September 12, 2018. In the period between March 31, 2018, and December 31, 2019, Epiq has incurred an additional $198,686 in expenses related to Program planning and set-up, which are described in detail below. Epiq requests Court approval for these expenses.

8. I offer the following description of the activities performed by Epiq since the August 2018 Declaration, as well as the necessary activities for the implementation of the Program.

**Background**

9. In anticipation of the initial motion for preliminary approval of the proposed settlement, Epiq began working with Class Counsel and Counsel for the NCAA in late 2014 concerning the design and implementation of the Program. Following consultation with the MSC, Class Counsel, and Counsel for the NCAA, Epiq submitted to the Court a report dated April 14, 2015 (the "2015 Epiq Report"), which described a plan to administer the Program. (Dkt. 161.) The plan included estimates for three types of administrative costs associated with administering the Program: (1) foundational costs, (2) program fixed costs, and (3) program variable costs. Epiq's estimate of total costs "to initiate and administer the Medical Monitoring

3

Program" (id. ¶ 41)—based on the requirements of the then-current draft settlement agreement, consultation with the Parties and MSC, and Class Member participation forecasts provided by Bruce Deal of the Analysis Group (Dkt. 170, ¶ 78)—was $8,029,459. (Dkt. 161, ¶ 41.) The 2015 Epiq Report also noted:

> All of [Epiq's] cost estimates include a 3.5% annual increase beginning in the second year of the program, and are presented on an unadjusted basis (i.e., no discount rate has been applied to costs estimates for activity in future years). It should be noted that [Epiq] cost estimates do not include the actual costs of Medical Evaluations, travel reimbursements to qualifying Class Members, or Medical Science Committee fees.

Id. (emphasis in original).

10. The amounts set forth in the 2015 Epiq Report were included in the Corrected Expert Report of Bruce Deal, dated April 20, 2015 (Dkt. 170). In his report, Mr. Deal anticipated that Epiq would provide administrative support for the MSC and outlined other administrative costs that would need to be paid by the Fund, including estimated costs of $8,029,459 for Epiq's work as the Program Administrator:

Table 7. Administrative Costs Proposed by Garretson, by Administrative Category (Baseline scenario).[57,58]

| Projected Cost Category | Source | Estimate |
|---|---|---|
| Program Initiation, Class Member Registration, and Opt Out | Garretson | $576,536 |
| Provider Network Setup and Maintenance | Garretson | $2,367,479 |
| IT Setup and Maintenance | Garretson | $1,917,834 |
| Screening and Evaluations | Garretson | $3,167,610 |

(Id. ¶ 87, b, d.) While the estimate developed by Epiq was included in Mr. Deal's report, Epiq categorizes its fees in a different manner in accordance with the three categories described above (foundational, program fixed costs, and program variable costs). These three categories, however, cover the same costs that comprise Mr. Deal's estimates.

4

**Work on the Medical Monitoring Program**

11. Following this Court's January 26, 2016 Order, which stated that the Court would grant preliminary approval if the Parties made several modifications to the Settlement Agreement, Epiq began planning activities in preparation for tasks that would be required of the Program Administrator immediately following preliminary approval, including reviewing settlement documents and preparing for post-preliminary approval activities (such as establishing the Fund within ten days of preliminary approval and issuing a Settlement-mandated request for proposal [RFP] to potential Program Locations within 45 days of preliminary approval). After the Court appointed Epiq as the Program Administrator in July 2016, Epiq began working with the MSC to begin creating the Program, consistent with Sections IV and VI of the Settlement Agreement, including issuing the RFP seeking providers to participate in the Program; reviewing RFP responses and Program requirements with the MSC, Class Counsel, and Counsel for the NCAA, and planning for required information technology applications. These activities were covered in Epiq's 2018 Declaration to the Court. (Dkt. 516-1 at 11–22.)

12. Epiq's activities since March 31, 2018 include ongoing planning and communication with the Parties ($12,860); issuance of attorney fees to 13 of the 16 firms awarded fees by the Court ($6,499)[2]; extensive recruitment of potential network providers in all 34 target cities ($70,137); and planning, design, development, and coordination for information technology applications, including transferring the Settlement Website and call center, creation

---

[2] The remaining three firms were paid in 2020, along with 23 of the 24 Class Representatives awarded service awards. Epiq awaits receipt of a signed IRS Form W-9 from the remaining Class Representative, as well as from the two Objectors awarded Service Awards, and will pay those individuals upon receipt of those forms.

5

of Settlement Class Member registration functionality, development of the online Screening Questionnaire, and development of other Program administration functionality ($103,124).

### Anticipated Costs to Complete Program Set-Up

13. Epiq projects total remaining costs to complete Program set up at $939,000. All projected fees and expenses are foundational costs for the Program, as described in the 2015 Epiq Report. (Dkt. 161, ¶ 38.) I describe below the details of these foundational costs and variances from the estimates set forth in the 2015 Epiq Report.

14. Foundational costs include three basic categories: (i) overall program planning and initiation, (ii) identifying and enrolling the network providers, and (iii) IT system customization and development, including development of the online Screening Questionnaire. (Dkt. 161, ¶ 38). In arriving at the total Program cost estimate of $8,029,459 presented in the 2015 Epiq Report, Epiq's analysis anticipated total foundational costs of $1,271,683 across those three basic categories. The foundational cost estimate for each category, expenses reimbursed for work performed through March 31, 2018, expenses incurred for work performed since March 31, 2018, projected additional Program set-up costs, overage from the original estimate,[3] and overage percentage are set forth below:

---

[3] Overages for all three categories of foundational costs reflect 3.5% inflation adjustments beginning in 2017, in accordance with Epiq's retention agreement. Note that Epiq's 2015 estimate did not account for inflation, under the assumption that most, if not all, foundational work would be completed prior to any inflation adjustments.

| Foundational Costs | 2015 estimate (not adjusted for inflation) | Work Completed/ Previously Approved | Remaining Estimate Following August 2018 Declaration[4] | Work Completed Subject to Court Approval | Current Estimate for Remaining Work[5] |
|---|---|---|---|---|---|
| Program initiation and planning | $152,900 | $192,635 | $35,025[6] | $12,860 | $24,000 |
| Program Location network development | $455,483 | $158,306 | $320,266 | $70,137 | $270,000 |
| IT configuration and development | $663,300 | $7,886 | $702,439 | $103,124 | $645,000 |
| Total | $1,271,683 | $358,827 | $1,057,731 | $186,121 | $939,000 |
| **Fixed and Variable Costs** | | | | | |
| Payment | | | $11,010 | $6,499 | |
| **Other Costs** | | | | | |
| Expenses | | | $25,605 | $6,066[7] | |
| **Totals:** | | | $395,442 | $198,686 | |

---

[4] Adjusted for inflation as of the August, 2018 Declaration. *See* Dkt. 516-1 at 11 to 22.

[5] Adjusted for inflation as of January 1, 2020.

[6] In addition to inflation adjustments, the estimate remaining for program planning and initiation following the August 2018 Declaration reflects an estimated increase in expenses in this category of $60,000 to $75,000, as described in the August 2018 Declaration. *See* Dkt. 516-1 at 6–8.

[7] Expenses incurred are non-recurring and relate to research fees, postage, and a consulting fee paid to a third-party expert to advise on communication with respect to major medical institutions.

15. Program initiation and planning includes time billed for overall planning and oversight and communication with and coordination of the MSC, Class Counsel, Counsel for the NCAA, and other third-parties with respect to construction of the network of Program Locations, Screening Questionnaire design, implementation of Medical Evaluations, and other foundational issues. Epiq has continued to engage in planning and preparation activities in the period between the initially scheduled Fairness Hearing date in May 2017 and the current date, including $12,828 in planning and preparation expenses since the August 2018 Declaration. Epiq projects that additional foundational work in the amount of approximately $24,000 will be performed through the Medical Monitoring Program launch. This falls within the range of projections for this category of tasks included in the August 2018 Declaration, after adjusting for inflation. (Dkt. 516-1 at 6–8.)

16. Program Location network development work includes the RFP and provider selection process, recruiting and contracting with institutions, establishing fee schedules and payment systems, and establishing Medical Evaluation procedures. Epiq has accrued $70,137 in fees since the August 2018 Declaration and projects an additional $270,000 in expenses over the coming months to set up the network of Provider Locations, for a total of $340,137. This is in line with projections in the August 2018 Declaration, adjusted for inflation. (Id.)

17. IT Configuration and Development work includes: (i) foundational work related to Settlement Class Member registration; (ii) the online Screening Questionnaire tool; (iii) Medical Evaluation scheduling systems; (iv) Settlement Class Member correspondence; (v) a provider web portal for scheduling, communication, and reporting; (vi) a provider invoice adjudication system; and (vii) reporting systems. These systems will be developed in the order

8

listed above to ensure required functionality is available when needed. Epiq has accrued an additional $103,124 in IT systems-related fees since the August 2018 Declaration. Epiq projects an additional $645,000 in expenses to complete this work, for a total of $748,124. This amount is in line with projections in the August 2018 Declaration, after adjusting for inflation. (Id.)

### Certification of Compliance with Return-to-Play Guidelines

18. Section IX.B of the Settlement Agreement states that in order to obtain the benefit of the Release, each NCAA member institution must certify in writing within six months of the Effective Date of the Settlement Agreement that the member institution has implemented the return-to-play guidelines set forth in Section IX.A of the Settlement Agreement. (Dkt. 558-1, § IX.B.) Section IX.B of the Settlement Agreement further requires that the written certifications of the member institutions shall be posted on the Settlement Website. (Dkt. 558-1, § IX.B.) Given that the Settlement Website is being administered by Epiq, Counsel for the NCAA have requested (and Class Counsel do not oppose) that in the interests of efficiency, Epiq oversee the submission and posting of such written certifications by NCAA member institutions. Epiq has worked with Counsel for the NCAA and Class Counsel to develop an efficient process using DocuSign that would enable each of the 1,117 NCAA member institutions to log into a dedicated webpage and electronically sign a certificate of compliance. Such an approach eliminates the need for Epiq's developers to perform such work that would otherwise be needed such as building a portal, assigning and communicating log-in credentials, and more.[8] Fees for the e-signature functionality and Epiq's administrative fees to download, verify, and publish the certifications are estimated at $20,600. These costs were not part of the cost estimate included in

---

[8] If the DocuSign system were not used, Epiq would still need to process the received certifications, report back to the NCAA any member institutions who have not submitted their documents by various milestone dates, and upload the certificates to the Settlement Website.

9

the 2015 Epiq Report (Dkt. 161, ¶ 38) and thus would be in addition to the foundational costs described above.

### Summary

19. In summary, Epiq requests approval for $198,686 in fees and expenses accrued between March 31, 2018, and December 31, 2019, as well as approval of cost projections in the amount of $939,000 to complete set-up and begin implementing the Program, for a total of $1,137,686. Not counting pass-through expenses, fees for all foundational work (past and future) are projected to total $1,483,947. This represents an increase of $212,265, or 17%, over Epiq's 2015 estimate, and is due to inflation adjustments and the one-time increase in program planning and initiation fees outlined in the August 2018 Declaration. Additionally, Epiq requests approval of cost projections in the amount of $20,600 for purposes of the submission and posting of certifications of compliance of NCAA member institutions with the return-to-play guidelines as set forth in Section IX.B of the Settlement Agreement.

20. I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

EXECUTED on this 7th day of April, 2020, at Cincinnati, Ohio.

_____
William C. Mulvey
Vice President
EPIQ MASS TORT
6281 Tri-Ridge Blvd
Cincinnati, OH 45140

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on April 8, 2020 a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: ___*/s/ Daniel J. Kurowski*___